IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**CIV - FERGUSON**

## 00-6061

DAVID A. NAPOLI,    D.C.
d/b/a NAPOLI CHIROPRACTIC CENTER, and
all others similarly situated,

     Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY, and
MEDVIEW SERVICES, INC.,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: **MAGISTRATE JUDGE**
JUDGE:
MAGISTRATE   **SNOW**

### CLASS ACTION COMPLAINT

NOW COMES Plaintiff, DAVID NAPOLI D.C. d/b/a NAPOLI CHIROPRACTIC CENTER ("DR.

NAPOLI") and all others similarly situated, by and through his attorneys, GOLD, ROSENFELD &

COULSON, a partnership of professional and limited liability corporations, GOGEL, PHILLIPS &

GARCIA, LLP, and KOPELMAN & BLANKMAN, a professional association, and complaining of

Defendants Allstate Insurance Company ("ALLSTATE") and MedView Services, Inc. ("MEDVIEW"),

states as follows:

### THE PARTIES

1.     DR. NAPOLI is a licensed chiropractor who resides in the Southern District of the State of

Florida and has his principal place of business at 5700 Stirling Road, Suite 9, Hollywood, Florida.

2.     ALLSTATE is an insurance company incorporated under the laws of the State of Illinois

with a principal place of business located at 2775 Sanders Road, Northbrook, Illinois. ALLSTATE transacts

business in the Southern District of Florida.

1



3.     MEDVIEW is a business entity incorporated under the laws of the State of Michigan with a principal place of business in Michigan. Companies such as MEDVIEW are sometimes referred to as Brokers or Managed Care Companies in the healthcare industry. They are hereinafter referred to as "middlemen." Middleman MEDVIEW contracts with healthcare providers, such as DR. NAPOLI, for the purpose of uniting healthcare providers with insurance companies. Middleman MEDVIEW may also administer healthcare claims submitted by healthcare providers to insurance companies. The contracts entered into with healthcare providers by middleman MEDVIEW require the healthcare providers to accept fees for services at discounted rates from insurance companies. Healthcare providers, by definition, include, but are not limited to, physicians, chiropractors, hospitals, pharmacies, and other healthcare facilities. After contracting with healthcare providers, middleman MEDVIEW, in turn, develops contractual arrangements with insurance companies for the purpose of coordinating and arranging for the delivery of healthcare services to insureds. Insurance companies benefit by paying healthcare providers at discounted rates. Healthcare providers benefit by becoming a part of the network of healthcare providers that is supposed to be marketed to insurance companies and their insureds through the use of directories and marketing tools, thus increasing the healthcare providers' volume of business referrals. Such healthcare providers are recognized as "preferred providers." The insurance policies sold by the insurance companies to their insureds are recognized as "preferred provider policies." The combination of all parties to this endeavor is recognized as a Preferred Provider Organization ("PPO").

4.     DR. NAPOLI entered into a contract with middleman MEDVIEW under which he agreed to provide his services to individuals insured by certain insurance companies for a discount from his normal fees. That contract is attached as Exhibit 1. Thereafter, ALLSTATE began applying DR. NAPOLI's MEDVIEW contractual discount to DR. NAPOLI's medical bills applicable to his patients who were injured in automobile accidents and covered by a Florida ALLSTATE personal injury protection automobile insurance policy.

2

5.    There would be nothing improper with ALLSTATE gaining access to middleman MEDVIEW's data base of preferred providers containing DR. NAPOLI's name and his discounts and applying these discounts *if* ALLSTATE became a legitimate participant in the PPO to which DR. NAPOLI and other healthcare providers similarly situated belonged. In fact, Florida Personal Injury Protection Statute, §627.736(10)(1992), provides a means for ALLSTATE to participate in such a PPO and offer a preferred provider policy of personal injury protection automobile insurance to its insureds after it enters into contracts with healthcare providers. However, ALLSTATE never became a legitimate participant in DR. NAPOLI's PPO and never complied with the requirements of the Florida statute as set forth in paragraph 13, *infra*. Nevertheless, ALLSTATE has taken discounts on healthcare providers' bills as if it were a legitimate participant in DR. NAPOLI's PPO and had complied with the aforesaid Florida statute by offering a preferred provider policy of personal injury protection automobile insurance to its insureds: none of which was done by ALLSTATE.

6.    This unlawful practice (called a "silent PPO") causes ALLSTATE to enjoy substantial savings and profits by paying out less in benefits which in turn causes DR. NAPOLI and those similarly situated to suffer financial loss, without any consideration from ALLSTATE for these discounts.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1), because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

8.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it arises under the laws of the United States, specifically 18 U.S.C. § 1961 et seq. ("RICO"); 18 U.S.C. §§1341, 1343,1346, 1951, 1952 and 1953, and 15 U.S.C. §§ 1,2, and 13 (the Sherman Anti Trust Act).

9.      Venue is proper in this District pursuant to 28 U.S.C. §1391 (b) and (c) because a

substantial part of the events or omissions giving rise to the claims occurred in this District; and because

Defendants are subject to personal jurisdiction in this District.

## BACKGROUND

10.      With respect to payment of accident related medical expenses, ALLSTATE's standard

Florida Automobile Policy of insurance states in pertinent part that:

**Part III - Personal Injury Protection Coverage VA**

Allstate will pay to or on behalf of the injured person the following benefits. Payments will
be made only when bodily injury, sickness, disease or death is caused by an accident arising
from the use of a motor vehicle as a motor vehicle.(1) Medical expenses: 80% of all
reasonable and necessary treatment expenses incurred...

11.      ALLSTATE's Policy is a typical Florida indemnity insurance policy under which

ALLSTATE is required to indemnify insureds for eighty (80%) percent of the full cost of their reasonable

and necessary medical bills up to a defined limit.  Under the Policy, an insured has the absolute right and

freedom to choose his or her medical providers.  Within Policy limits, medical providers have the unrestricted

right to be reimbursed 80% of their reasonable and necessary accident related medical expenses.

12.      The State of Florida's PIP statute directly addresses a health care provider's right to be paid

for reasonable charges.  Florida Statutes § 627.736 (5) states:

Any physician, hospital, clinic, or other person or institution lawfully rendering treatment to an
injured person for bodily injury covered by personal injury protection insurance may charge only a
reasonable amount for the products, services, and accommodations rendered,...

Fla. Stat. § 627.736 (5)(1992.)

13.      As set forth in paragraph 5 above,  Florida statutes permit an automobile insurance

company to designate certain medical providers (preferred providers) *if* the automobile insurer establishes a

legitimate preferred provider organization ("PPO") network by satisfying the strict requirements of Florida

Statutes § 627.736 (10)(1992) which states as follows:

> (10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as "preferred providers," which shall include health care providers licensed under chapters 458, 459, 460, 461, and 463. *The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a non-preferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policy-holder or applicant, it must also offer a non-preferred provider policy. The insurer shall provide each policy-holder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.* (emphasis added)

14.    ALLSTATE has not offered its insureds preferred policies of personal injury protection automobile insurance. As such, any medical provider who treated or treats an ALLSTATE insured under an ALLSTATE personal injury protection automobile insurance policy is not a "preferred provider". Therefore in accordance with the above quoted statute, "the medical benefits provided by the insurer shall be as *required* by this section." (emphasis added) The medical benefits "required" are 80% of all reasonable and necessary treatment, expenses..." etc. The statute mandates that this 80% be paid: not 80% of an illegitimately taken ALLSTATE discounted amount.

15.    In the present action, ALLSTATE and middleman MEDVIEW have collectively engaged in the previously described "Silent PPO" scheme to reduce benefits paid on auto injury claims. The "Silent PPO" scheme has emerged primarily in the context of indemnity plans. Indemnity insurers, such as ALLSTATE, obtain access to PPO networks of preferred providers and their discounts. ALLSTATE takes advantage of these discounts. ALLSTATE is not, however, entitled to take advantage of these legitimate PPO discounts under the terms and conditions of its Florida automobile insurance policies and Florida statutes. It has not established the statutory mechanism to be entitled to these PPO discounts. This Silent

5

PPO scheme contains none of the legitimate steerage mechanisms required by legitimate PPOs. Legitimate steerage mechanisms include financial incentives for steering insureds to preferred providers, lower premiums, educating and marketing information for insureds about preferred providers in the network, and printing and distributing preferred provider identification cards. By using the Silent PPO scheme, ALLSTATE enjoys substantial savings by paying out less in personal injury protection benefits without the attendant expense of establishing a legitimate PPO network.

16.    Legitimate managed care companies and insurers have knowledge of the illegality of such schemes. The American Association of Preferred Providers has denounced such practices and the American Medical Association has issued an "Action Alert Kit" to its members educating them about Silent PPO schemes. Without complying with the statutory requirements for the establishment of an automobile insurance PPO network, ALLSTATE has systematically discounted medical providers' PIP medical expenses by utilizing PPO discounts. ALLSTATE has illegitimately discounted hundreds of thousands of PIP medical expense claims in this manner without providing any "steerage" or other meaningful consideration for such discounts. As stated, ALLSTATE has not complied with Florida statutes so as to be in a position to take these discounts.

## FACTS AS TO PLAINTIFF

17.    On March 25, 1993, DR. NAPOLI entered into a contract with middleman MEDVIEW to be a participating health care preferred medical provider (hereinafter referred to as a "MEDVIEW Preferred Provider") and middleman MEDVIEW agreed to market DR. NAPOLI's services to existing and potential insurance companies and their insureds and DR. NAPOLI agreed to reduce his bills. (Exhibit 1 attached.)

18.    DR. NAPOLI authorized MEDVIEW to "identify and publish [his] name, address and available services" in MEDVIEW's information materials for distribution to insurance companies' insureds. In exchange for this anticipated marketing to increase his patient volume, DR. NAPOLI agreed with

6

~~MEDVIEW to provide health care services to insureds of such insurance companies at a rate lower than DR.~~ NAPOLI would normally accept for the same healthcare services provided to patients who were not insured by insurance companies who had legitimately qualified to be a part of this PPO.

19.     ALLSTATE has obtained middleman MEDVIEW's database that contained the identities of all of MEDVIEW's Preferred Providers, as well as the discounted fees that these medical providers were willing to accept for medical services. At no time did ALLSTATE have a written contract with DR. NAPOLI or other medical providers in the State of Florida wherein medical providers agreed with ALLSTATE to discount charges for their medical services to patients injured in automobile accidents who were insured for personal injury protection coverage by ALLSTATE.

20.     By virtue of ALLSTATE's access to discounts in agreements between middleman MEDVIEW and DR. NAPOLI, and those similarly situated, as well as ALLSTATE's access to the discounts negotiated between middleman MEDVIEW and other healthcare providers, ALLSTATE began to systematically apply PPO discounts. MEDVIEW and/or ALLSTATE have mailed explanation of benefit forms ("EOBs") that indicated the application of a discount based upon the MEDVIEW Preferred Provider Agreements. These EOBs state that ALLSTATE is entitled to such discounts. Under this scheme, ALLSTATE has been reaping huge savings while violating Florida law and providing no consideration whatsoever to healthcare providers, including DR. NAPOLI, for the right to apply such discounts.

21.     At all times material herein, in the course of his medical practice, DR. NAPOLI provided medical care to patients who had been injured in automobile accidents and who were entitled to personal injury protection benefits from ALLSTATE.

22.     At no time prior to their treatment with DR. NAPOLI did this class of patients receive any marketing materials, including, but not limited to, publications identifying DR. NAPOLI's name, address and available services, from ALLSTATE. At no time did ALLSTATE comply with the requirements of Fla. Stat. § 627.736 (10).

23.    At no time prior to their treatment with DR. NAPOLI did ALLSTATE encourage these patients to use DR. NAPOLI's medical services.

24.    After providing medical treatment to these patients, DR NAPOLI submitted medical bills for reasonable and necessary accident related medical expenses to ALLSTATE for payment.

25.    Upon receipt of the medical bills submitted by DR. NAPOLI for payment under the personal injury protection portion of the Allstate Automobile Policy, ALLSTATE and/or MEDVIEW discounted DR. NAPOLI's and other class members' bills with the MEDVIEW PPO discount claiming that ALLSTATE was entitled to said discount; which it was not.

26.    As stated, DR. NAPOLI and other class members have received no consideration from ALLSTATE for the discounts taken. ALLSTATE could not provide such consideration because ALLSTATE failed to offer its insureds a PPO network in compliance with the Florida personal injury protection statute.

27.    ALLSTATE's illegal activity is demonstrated by Exhibits 2 and 3 attached. Exhibit 2 represents sample EOBs received by DR. NAPOLI illustrating the illegal discount. Exhibit 2 attached illustrates ALLSTATE's version of the "billed amount." This "billed amount" is 80% of what DR. NAPOLI actually billed ALLSTATE. ALLSTATE depicts the "billed amount" as the full amount charged by the medical provider thus overtly concealing the illegal discount. It then pays 80% of the illegally discounted charge as its full obligation under the insured's automobile insurance policy.

28.    ALLSTATE has been applying MEDVIEW PPO discounts to personal injury protection medical expense claims for at least two years. At no time relevant hereto has ALLSTATE established or in any way offered a PPO network to its automobile insureds or otherwise attempted to comply with Florida Stat. §627.736(10).

29.    At the time ALLSTATE implemented its PPO discounting scheme, it knew it was violating Florida law.

8

30.    As stated, ALLSTATE's discounting scheme contains none of the steerage mechanisms associated with legitimate PPOs. The scheme lacks marketing, as well as financial incentives for selecting preferred providers.

31.    After taking the illegal discounts on DR. NAPOLI's bills as described in the preceding paragraphs, as well as those of other healthcare providers, ALLSTATE routinely printed out EOBs showing the discounts. It then forwarded the EOBs and reduced payment checks to the preferred providers in purported full satisfaction of the preferred providers' medical charges.

32.    It was and is the custom and practice of ALLSTATE to discount thousands of preferred provider automobile medical expense claims in this manner in violation of its policies with its insureds and in violation of the Florida personal injury protection statute.

33.    DR. NAPOLI and those similarly situated have been economically damaged and have suffered monetary losses as a result of the conduct of ALLSTATE.

## CLASS ACTION ALLEGATIONS

34.    DR. NAPOLI brings this action on behalf of a class of all other persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The purported class is defined to include:

all Florida healthcare providers whose bills for medical services rendered to patients covered by ALLSTATE's personal injury protection automobile insurance policies were discounted by ALLSTATE based upon a purported MedView Preferred Provider Organization reduction.

35.    There are questions of law and fact that are common to all members of the purported class, which questions predominate over any question affecting only individual class members. [Fed. R. Civ. P. 23 (a)(2)].

36.    The principal common issues include the following:

9

a.    ~~whether ALLSTATE violated Fla Stat. § 627.736, et seq. by paying personal injury~~

protection medical expense claims at Preferred Provider rates;

b.    whether ALLSTATE's processing of the PPO discounts is permissible under state

law or federal law;

c.    whether DR. NAPOLI and those similarly situated are entitled to compensatory,

statutory, or punitive damages against ALLSTATE because of its illegal conduct.

d.    whether DR. NAPOLI and the purported class are entitled to an injunction

preventing the continued disclosure of their discounts to ALLSTATE and the application of these discounts

to automobile personal injury protection medical expense claims.

37.    In this case there is no question as to the identification of class members because the class is

comprised of all healthcare providers whose medical bills were discounted by ALLSTATE based on

MEDVIEW Preferred Provider discounts.  There is also no issue as to the amount of the class members'

damages because the amounts of the discounts are contained in ALLSTATE's computer systems, and on the

EOBs and checks mailed by ALLSTATE to DR. NAPOLI and the members of the purported class. [Fed. R.

Civ. P. 23 (a)(3)].

38.    DR. NAPOLI's claims are typical of the claims of all the members of the purported class

because all claims are based on the same legal and remedial theories.

39.    DR. NAPOLI will fairly and adequately protect the interests of all purported class members

in the prosecution of this action and in the administration of all matters relating to the claims stated herein.

DR. NAPOLI is similarly situated with, and has suffered similar injuries as, the members of the purported

class that he seeks to represent. DR. NAPOLI feels that he has been wronged, wishes to obtain redress of

the wrong and wants ALLSTATE stopped from perpetrating its scheme and continuing to profit from the

misapplication of the PPO volume discounts.  To that end, DR. NAPOLI has retained counsel experienced in

class action cases and health care litigation.  Neither DR. NAPOLI, nor counsel, have any interest that may

cause them to not vigorously pursue this action. [Fed. R. Civ. P. 23 (a) (4)].

40.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because:

  a.     the individual class members are not all aware that they have been wronged and are thus unable to prosecute individual actions;

  b.     concentration of the litigation concerning this matter in this Court is desirable;

  c.     the claims of the representative Plaintiff, DR. NAPOLI, are typical of the claims of the members of the purported class;

  d.     a failure of justice will result from the absence of a class action; and

  e.     the purported class and the difficulties likely to be encountered in the management of this class action are not great.

41.     The purported class is so numerous as to make it impracticable to join all members of the class as plaintiffs. ALLSTATE has discounted thousands of medical bills based on Preferred Provider Volume discounts. Many medical providers may not even be aware of ALLSTATE's sophisticated scheme, and if they were, for many providers, the amount in controversy would be too small to justify the expense of individual litigation. In contrast, on a class-wide basis, ALLSTATE has saved millions of dollars by accessing the discounts of Preferred Providers. [Fed. R. Civ. P. 23 (a)(1)].

## CAUSES OF ACTION

## COUNT I - BREACH OF CONTRACT AS TO MEDVIEW

DR. NAPOLI incorporates paragraphs 1- 41 as if fully set forth herein and further states as follows:

42.     DR. NAPOLI, and the purported class that he seeks to represent, entered into Preferred Provider Agreements with middleman MEDVIEW to become MEDVIEW Preferred Providers. Pursuant to

11

~~the Preferred Provider Agreements, MEDVIEW agreed to market its Preferred Providers to legitimate "Third~~

Party Payors" to increase Preferred Provider patient volume in exchange for volume discounts of *twenty*

*percent (20%)* on subscriber (insured's) medical bills. The MEDVIEW Preferred Provider Agreement

defines Third Party Payors as including business entities such as insurers, employers and third party

administrators who pay for healthcare services rendered to *insured employees*. (Exhibit 1)

43.    The MEDVIEW Preferred Provider Agreement forbids the disclosure of the compensation

of DR. NAPOLI and the purported class members except under limited circumstances.

44.    MEDVIEW has breached its Preferred Provider Agreements in the following manners:

a.    by selling the volume discounts of DR. NAPOLI and the purported class to ALLSTATE,

which is not a legitimate Third Party Payor, for a fee and with knowledge that the discounts would be

applied to automobile personal injury protection medical expense claims and not claims of subscribers as

stated in the contract;

b.    by selling the volume discounts of DR. NAPOLI and the purported class to ALLSTATE

which applied the discounts retrospectively and could not provide an increase in patient volume for DR.

NAPOLI and the purported class;

c.    by failing to offer adequate and meaningful consideration for discounts of Florida

automobile personal injury protection medical expense claims;

d.    by disclosing confidential compensation and discount information to ALLSTATE; and,

e.    by violating the duty of good faith and fair dealing inherent in its Preferred Provider

Agreements through the following acts or failures to act:

(1)    by disclosing the volume discounts of DR. NAPOLI and the purported class to

ALLSTATE;

(2)    by allowing ALLSTATE to use the volume discounts without providing

consideration therefor; and

12

(3)  by allowing the volume discounts to be applied to Florida automobile insurance personal injury protection claims in violation of Florida law and the ALLSTATE automobile insurance policy.

45.  As a direct and proximate result of this breach of contract as alleged, DR. NAPOLI and the members of the purported class have suffered damages.

WHEREFOR, DR. NAPOLI and the purported class demand the following relief:

a) that this Court enjoin MEDVIEW and all persons or entities acting in concert or participation therewith, including, but not necessarily limited to, ALLSTATE, from any further disclosure of DR. NAPOLI'S and the purported class members' proprietary and confidential discount information;

b) that judgment be entered against Defendant MEDVIEW in the amount of damages incurred with interest, reasonable attorneys' fees, and costs; and

c) that this Court order such other relief as it deems just and proper.

## COUNT II

### UNJUST ENRICHMENT-ALLSTATE

DR. NAPOLI, and those similarly situated, reallege paragraphs 1-45 as if fully set forth herein and further state:

46.  No consideration has flowed from ALLSTATE to DR. NAPOLI and the putative class for the discounted payments made by ALLSTATE to DR. NAPOLI and the putative class.

47.  ALLSTATE has benefitted by receiving substantial savings at the expense of DR. NAPOLI and the putative class.

48.  Such savings constitute unjust enrichment for ALLSTATE.

WHEREFORE, DR. NAPOLI and the putative class ask that:

a) judgment be entered against ALLSTATE for the amount of savings realized by

13

ALLSTATE through this unjustment enrichment;

      b) reasonable attorneys fees and costs;

      c) such other and further relief as this Court deems appropriate.

## COUNT III - THIRD PARTY BENEFICIARY BREACH OF CONTRACT-ALLSTATE

DR. NAPOLI incorporates paragraphs 1 - 48 as if fully set forth herein and further states:

49.    ALLSTATE and its insureds who purchased its Florida personal injury protection automobile insurance policy entered into a contract of insurance. That contract provided that in the event the insured was involved in an automobile accident, ALLSTATE would pay on the insured's behalf to medical providers eighty (80%) percent of all reasonable and necessary medical expenses.

50.    DR. NAPOLI and the other members of the purported class are intended third party beneficiaries of these ALLSTATE insurance agreements. DR. NAPOLI and the members of the putative class were to receive 80% of these reasonable and necessary medical expenses under these policies and under the Florida personal injury protection statute: not 80% of a MEDVIEW Preferred Provider discounted rate.

51.    As a result, DR. NAPOLI and the putative class members have suffered damages directly and proximately caused by ALLSTATE's breach of its insurance agreements with its insureds: DR. NAPOLI and the putative class being third party beneficiaries of those insurance agreements.

WHEREFORE, DR. NAPOLI and the members of the class that he seeks to represent demand the following relief:

      a) that this Court enjoin ALLSTATE and all persons or entities acting in concert or participation therewith from any further reductions of DR. NAPOLI's and the purported class members' personal injury protection medical expense claims based on MEDVIEW PPO discounts;

      b) that judgment be entered against ALLSTATE in the amount of DR. NAPOLI's and the purported class members' damages incurred, with interest, reasonable attorneys' fees, and costs; and,

c) that the Court order such other relief as it deems just and proper.

## COUNT IV - RICO

DR. NAPOLI realleges paragraphs 1 through 51 as if fully set forth herein and further states as follows:

52.     ALLSTATE, acting with middleman MEDVIEW, formed an enterprise consisting of an association-in-fact. The "association in fact" is known as a "silent PPO."

53.     ALLSTATE, with the knowing or grossly negligent cooperation of middleman MEDVIEW, participated, directly and indirectly, in the activities of this enterprise through a pattern of racketeering activity, as more fully set forth below.

54.     The activities of this enterprise affected commerce.

55.     The pattern of racketeering activity consisted of multiple acts of mail and wire fraud, punishable under 18 U.S.C. § 1341 and § 1343, respectively.

56.     The pattern of racketeering activity has been continuous for at least two years, and, on information and belief, will continue into the future.

57.     In furtherance of the pattern of racketeering activity, ALLSTATE has engaged in a continuous scheme and artifice to defraud DR. NAPOLI, and those similarly situated, of money as follows:

a.      ALLSTATE obtained proprietary discount information belonging to DR. NAPOLI, and others similarly situated from middleman MEDVIEW;

b.      this discount information was then used by ALLSTATE to take illegitimate discounts on medical bills of persons insured by ALLSTATE, for medical services performed by DR. NAPOLI and those similarly situated;

c.      ALLSTATE, on information and belief, compensated middleman MEDVIEW for this proprietary information;

d.    ~~ALLSTATE transmitted or caused to be transmitted EOBs to persons insured by~~

ALLSTATE. Samples of such EOBs are attached to this Complaint under Exhibits 2 and

3;

e.    these EOBs falsely represented that ALLSTATE was entitled to a PPO discount and

ALLSTATE actually took these discounts;

f.    ALLSTATE caused these EOBs to be deposited in the mail to be delivered by the United

States Postal Service;

g.    ALLSTATE engaged in interstate telephone calls and/or computer communications with

middleman MEDVIEW to transmit information that was false, in that the discount was

taken and the discriminatorily reduced amount was sent to medical providers.

58.    Specifically, for the purpose of executing this scheme and artifice to defraud, ALLSTATE

caused to be deposited to be delivered by the United States Postal Service, according to the directions

thereon, EOBs similar to those attached as Exhibit 2.

59.    Also, for the purpose of executing this scheme and artifice to defraud, ALLSTATE caused

to be transmitted by wire communication in interstate commerce, information reflected in sample Exhibits 2

and 3 attached, as well as other similar documents.

60.    ALLSTATE's conduct gives rise to claims under 18 U.S.C. §1964(a) of RICO and permits

the recovery of treble damages against ALLSTATE for violations of 18 U.S.C. § 1962 (c), for a conspiracy

to violate 18 U.S.C. §1962(a) in violation of 18 U.S.C. §1962(d) and for seeking to aid and abet and aiding

and abetting violations of 18 U.S.C. §1962(a) within the meaning of 18 U.S.C. §2.

61.    DR. NAPOLI and the purported class members are "persons" within the meaning of 18

U.S.C. §1964(c).

62.    At all times relevant hereto, DR. NAPOLI and class members were and are "persons"

within the meaning of 18 U.S.C. §1961(3).

16

63.     With respect to the activities alleged herein, ALLSTATE acted at all times with malice toward the class, intent to engage in the conduct complained of for the benefit of itself and with knowledge that such conduct constituted unlawfulness. Such conduct was done with reckless disregard for the rights of the class as well as the laws, to which ALLSTATE is subject, the same amounting to actionable wantonness.

64.     With respect to the activities alleged herein, ALLSTATE, with the cooperation of middleman MEDVIEW, aided and abetted each other, and others not named in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. §§1962(a) and (c). ALLSTATE operated the scheme or artifice to defraud and to obtain money by false pretenses and to deprive class members of the intangible right of honest payment. In furtherance of this scheme, ALLSTATE interfered with, obstructed, delayed or affected commerce by attempting to obtain and/or actually obtaining property interests to which ALLSTATE was and is not entitled through the exploitation of discount rates to which it is not entitled.

65.     With respect to the overt acts and activities alleged herein, ALLSTATE communicated and conspired with middleman MEDVIEW to violate 18 U.S.C. §§1962(a) and (c), all in violation of 18 U.S.C. §1962(d). ALLSTATE communicated with middleman MEDVIEW so it could participate directly in the fraudulent scheme or artifice alleged herein, to obtain money by false pretenses, and to deprive class members of the intangible right of honest payment. ALLSTATE communicated with middleman MEDVIEW so it could participate directly in the interference with, obstructing of, delaying of, or effect upon commerce by actually obtaining property interests to which ALLSTATE is not or was not entitled through the exploitation of a proprietary discount rate.

66.     The numerous predicate acts of mail and wire fraud, and interference with the operation of legitimate preferred provider discounts herein are part of a common fraudulent and extortionate scheme by ALLSTATE to defraud DR. NAPOLI, and the purported class, of money and property interests under false pretenses; to deprive DR. NAPOLI, and the purported class, of receipt of reasonable and necessary

17

~~compensation for medical services; to interfere with the patient-doctor fiduciary relationship; and, to place~~ ALLSTATE's financial interests over the confidential records of DR. NAPOLI and the purported class so that ALLSTATE could make greater profits.  DR. NAPOLI, and the purported class, as victims of this unlawful pattern of illegal activity, have and continue to suffer losses.

## A. RACKETEERING ACTIVITIES

67.       In carrying out the overt acts and fraudulent scheme described above, ALLSTATE engaged in inter alia, conduct in violation of federal laws, including 18 U.S.C. §§1341 and 1343, 18 U.S.C. §§1341 and 1346, 18 U.S.C. §§1343 and 1346, 18 U.S.C. §1951(b)(2), 18 U.S.C. §1952(a), 18 U.S.C. § 1954, and 18 U.S.C. §1961 et seq., as stated below.

68.       Section 1961(l) of RICO provides that "'racketeering activity' means. . . any act which is indictable under any of the following provisions of Title 18, United States Code ... Section 1341 (relating to mail fraud), Section 1343 (relating to wire fraud)."

69.       The United States Congress amended the mail and wire fraud statutes in 1988 by codifying a partial definition of the central term "scheme or artifice to defraud." The newly created definition of a "scheme or artifice" for purposes of specifically recognizing by statute certain unlawful acts also constituting mail and wire fraud violations under 18 U.S.C. §§1341 and 1343, respectively, now reads in its entirety as follows: "For purposes of this chapter, the term 'scheme or artifice' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §1346.

## 1. 18 U.S.C. §§1341 and 1346, and 18 U.S.C. §§1343 and 1346

70.       For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, ALLSTATE, in violation of 18 U.S.C. §1341 and §1346, placed in United States Post Offices and/or in authorized repositories for mail,

matter, matters and things to be sent or delivered by the United States Postal Service, and received matters and things therefrom and knowingly caused to be delivered by mail those matters and things according to the directions thereon or at the place at which they were directed to be delivered by the persons to whom they were addressed.

71.    For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, ALLSTATE, in violation of 18 U.S.C. §§1343 and 1346, transmitted in interstate commerce by wire, telephone, or computer transmissions. information regarding illegal discounts. In this manner, ALLSTATE, knowingly, was violating obligations of middleman MEDVIEW to DR. NAPOLI and others similarly situated to provide "honest services." ALLSTATE knowingly induced middleman MEDVIEW to deprive DR. NAPOLI and others similarly situated of "honest services."

72.    In those matters and things sent or delivered by the United States Postal Service referred to above, ALLSTATE falsely and fraudulently represented to DR. NAPOLI and the purported class that; (i) ALLSTATE's payments to DR. NAPOLI were for the amount "billed" for the reasonable value of his service and, (ii) that ALLSTATE was entitled to a PPO discount for DR. NAPOLI and the putative class under a system that legitimately provides education, marketing and economic incentives intended to "steer" more patients  and to provide other benefits to healthcare providers. ALLSTATE failed, however, to disclose to DR. NAPOLI and the purported class that its EOBs were based upon illegal discounts designed to maximize profits on discounts illegally obtained  through DR. NAPOLI's proprietary information. ALLSTATE thus failed to disclose material facts regarding ALLSTATE's internal policies and practices specifically designed to reduce or limit the level of payment discussed in detail above.

73.    With respect to its unlawful activities described above, ALLSTATE also transmitted funds, contracts, and other forms of business communications and transactions in a continuous and uninterrupted

19

flow across state lines and employed the United States mails and interstate wires in violations of 18 U.S.C.
§§1341, 1343, and 1346.

74.    ALLSTATE intentionally and knowingly deceived DR. NAPOLI and the purported class
referred to above for the purpose of financial gain. ALLSTATE either knew or recklessly disregarded that
the illegal discounts described above were material.

75.    DR. NAPOLI and the purported class have, therefor, been injured in their business or
property by ALLSTATE's overt acts and racketeering activities in amounts to be determined at trial.

### 2. 18 U.S.C. §1951(b)(2)

76.    During the relevant times, and in furtherance of and for the purpose of executing and/or
attempting to execute the above discussed scheme and artifice to defraud or deprive, ALLSTATE, and
middlemen MEDVIEW, on numerous occasions aided and abetted and conspired to and attempted to and did
interfere with, obstruct, delay or affect "commerce" as that term is defined in 18 U.S.C. §1951. ALLSTATE
unlawfully attempted to and/or did induce middleman MEDVIEW to cause DR. NAPOLI and numerous
other healthcare providers to part with various property interests to which ALLSTATE was and is not
entitled, including the intangible property right of healthcare providers to conduct their business free of fraud
and their fiduciary obligation to provide their patients with privacy. ALLSTATE's conduct induced
middleman MEDVIEW to provide it with the names of healthcare providers and their discounts, and
exploited a fear of economic loss and/or loss of business by DR. NAPOLI and others similarly situated in
violation of 18 U.S.C. §1951(b)(2). In furtherance of the scheme or artifice to defraud and obtain money by
false pretenses from DR. NAPOLI, and the purported class, ALLSTATE communicated with middleman
MEDVIEW to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting
commerce by attempting to obtain and/or actually obtaining property interests to which ALLSTATE was not
entitled through the exploitation of healthcare providers' fear of economic loss and/or loss of business by
refusing to contest the aforesaid illegal discounts. ALLSTATE either knew, or recklessly disregarded, that

the natural consequences of its acts would exploit and continue to exploit fear of economic loss or loss of business by DR. NAPOLI and the purported class and yet secure it tangible property rights to which it is not entitled.

77.    ALLSTATE's overt acts and fraudulent and extortionate racketeering activity has and continues to defraud DR. NAPOLI, and the members of the purported class, of money, has and continues to unlawfully influence and interfere with the relationship of middleman MEDVIEW and DR. NAPOLI and the purported class, as well as interfering with the fiduciary relationship between DR. NAPOLI, and members of the purported class and their patients.

78.    DR. NAPOLI and the purported class have, therefor, been injured in their business or property by ALLSTATE's overt acts and racketeering activities in amounts to be determined at trial.

### 3. 18 U.S.C. §1952(a).

79.    During the relevant times, and in furtherance of and for the purpose of executing the above-described scheme and artifice to defraud DR. NAPOLI and the purported class, ALLSTATE, its employees, agents and others, on numerous occasions did travel and caused others not named in this Complaint to travel in interstate commerce in order to attempt to and to commit mail fraud and wire fraud in violation of the Travel Act, 18 U.S.C. §1952(a).

80.    ALLSTATE's overt acts and fraudulent racketeering activity has and continues to defraud DR. NAPOLI and the purported class of money.

### B. PATTERN OF RACKETEERING ACTIVITY

81.    ALLSTATE has engaged in a "pattern of racketeering activity" as defined in Section 1961(5) of RICO by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years. Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of

commission, and had similar results impacting upon similar victims, including DR. NAPOLI and the purported class.

82.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by ALLSTATE, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefor, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).

### C. RICO VIOLATIONS OF 18 U.S.C. §§1962 (d).

83.    DR. NAPOLI's claim for relief also arises under 18 U.S.C. §1964 (c) of RICO and seeks to recover actual and treble damages for ALLSTATE's violations of 18 U.S.C. §§1962(c) and for its violations of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(a) and (c).

### 1. Section 1962(c) claim.

DR. NAPOLI reasserts and realleges paragraphs 1 through 83 of this Complaint as though fully set forth herein and further states as follows:

84.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1961(3) of RICO states that "person" includes any individual or entity capable of holding a legal or beneficial interest in property. Section 1961(4) of RICO defines enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18U.S.C. §1961(4).

85.    For purposes of this Section 1962(c) claim, the persons consist of ALLSTATE and middleman MEDVIEW.   The enterprise is an association in fact consisting of ALLSTATE and middleman

~~MEDVIEW in terms of control by middleman MEDVIEW over physicians, medical specialists, medical~~

laboratories, hospitals, healthcare clinics, pharmacies, home healthcare agencies, and other miscellaneous

healthcare providers; all of which have the purpose of providing healthcare services to an ALLSTATE

insured under ALLSTATE's personal injury protection policies. This Section 1962(c) enterprise is distinct

from ALLSTATE and includes many persons who are not employees of ALLSTATE and many entities that

are not owned by ALLSTATE. The Section 1962(c) enterprise is engaged in, and its activities substantially

affect, interstate commerce.

86.    ALLSTATE is associated with middleman MEDVIEW in the Section 1962(c) enterprise as

described above and conducts and participates in the affairs of that enterprise through the pattern of

racketeering activity described herein. DR. NAPOLI and the purported class members are directly and

proximately injured both by this pattern of activity and by ALLSTATE's conduct and participation, for

which they are entitled to actual and treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

### 2.    Section 1962(d) Claim.

DR. NAPOLI reasserts and realleges paragraphs 1 through 86 of this Complaint as though fully set

forth herein and further states:

87.    This claim for relief also arises under 18 U.S.C. § 1964(c) of RICO and seeks to recover

actual and treble damages for ALLSTATE's violation of 18 U.S.C. § 1962(d) by conspiring to violate 18

U.S.C. § 1962(a) and (c). Section 1962(d) of RICO provides that it "shall be unlawful for any person to

conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

88.    Section 1961(4) of RICO defines "enterprise" to include "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity." 18 U.S.C. § 1961(4).

89.    Section 1962 (a) of RICO provides that it "shall be unlawful for any person who has

received any income derived, directly or indirectly, from a pattern of racketeering activity... to use or invest

23

directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

90.     For purposes of the claim of a conspiracy in violation of Section 1962(d) to violate Section 1962(a), the persons under the latter subsection consist of ALLSTATE and middleman MEDVIEW and the enterprise consists of ALLSTATE and its investment division, wherein, according to ALLSTATE's website, it has created "a high-quality investment portfolio that consistently achieves excellent returns." In 1998, according to ALLSTATE's website, operating income was $2.6 billion while total net income including *capital gains* was a "record" $3.3 billion.

91.     At all times relevant herein, middleman MEDVIEW and ALLSTATE's investment division together constitute an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(a). The ALLSTATE investment division was and continues to be the investment beneficiary of additional monies realized from the above overt acts and fraudulent and extortionate scheme or activities to defraud DR. NAPOLI and the purported class of money and to deprive them of their intangible right of honest services from middleman MEDVIEW.

92.     ALLSTATE sells insurance nationwide. Assets generated from ALLSTATE's unlawful practices described herein are in the millions of dollars and the proceeds of such income amount to millions of dollars.

93.     ALLSTATE derived substantial income and proceeds through the above described pattern of racketeering activity, and conspired to use or invest, and did use or invest, directly or indirectly, a significant part of such income or proceeds in the operation of the enterprise described above, in violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(a). This use or investment injures DR. NAPOLI and the purported class members because it permits that enterprise to continue, expand, and increase its revenue and to affect healthcare providers that are attacked by the enterprise. This use and

investment directly and proximately injures purported class members in a manner that is distinct from the injury caused by the pattern of racketeering activity described herein.

94.    As demonstrated in detail above, ALLSTATE has engaged in numerous overt and predicate fraudulent and extortionate racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to fraudulently require DR. NAPOLI and the purported class to accept discounted payments, yet failing to disclose numerous internal systemic fraudulent and extortionate policies and practices designed to defraud DR. NAPOLI and the class of money, and to unlawfully interfere with their physician-patient relationship.

95.    ALLSTATE's pattern of fraudulent and extortionate racketeering acts include, but are not limited to, acts in furtherance of its efforts to not disclose conflicts of interest brought about by ALLSTATE's inducement to middleman MEDVIEW to allow ALLSTATE to defraud DR. NAPOLI and the purported class.

96.    The nature of the above described acts of ALLSTATE constitutes material misrepresentations that give rise to an inference that ALLSTATE knew it was violating the objective of 18 U.S.C. §1962(d) by violating 18 U.S.C. §§1962(a) and (c), through its ongoing fraudulent and extortionate acts that have been and are part of an overall pattern of racketeering activity.

97.    As a direct and proximate result of ALLSTATE's overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate IS U.S.C. §§1962(a) and (c), DR. NAPOLI and the class have been and are continuing to be injured in their business or property. Pursuant to 18 U.S.C. §1964(c), DR. NAPOLI is entitled, therefore, to bring this action on behalf of the purported class and to recover actual and treble damages, as well as the costs of bringing this suit and attorneys' fees.

98.    ALLSTATE has sought to and has engaged in the commission of and continues to commit overt acts and the aforesaid described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by ALLSTATE from such pattern of racketeering activity, to-wit:

a.    ~~multiple instances of mail and wire fraud violations of 18 U.S.C. §§1341 and 1343;~~

b.    multiple instances of mail fraud violations of 18 U.S.C. §§1341 and 1346;

c.    multiple instances of wire fraud violations of IS U.S.C. §§1343 and 1346;

d.    multiple instances of extortion violations of 18 U.S.C. §1951(b)(2);

e.    multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud, wire fraud, and extortion, in violation of 18 U.S.C. §1952(a); and

f.    multiple instances of violations of 18 U.S.C. §1954.

99.    ALLSTATE's violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting ALLSTATE's illegal acts constituting a pattern of racketeering activity is fashioned and imposed by this Court.

WHEREFORE, DR. NAPOLI and the members of the class that he seeks to represent demand the following relief:

a) that this Court enjoin ALLSTATE and the aforesaid entities acting in concert or participation therewith from any further reductions of DR. NAPOLI's and the purported class members' PIP medical expense claims based on MEDVIEW PPO discounts;

b) that judgment be entered against ALLSTATE in the amount of DR. NAPOLI's and the purported class members' damages incurred, with interest, reasonable attorneys' fees, and costs; and,

c) that the Court grant such other relief as it deems just and proper.

## COUNT V - VIOLATION OF THE
## SHERMAN ANTI-TRUST ACT 15 U.S.C. §1, §2, AND § 13

DR. NAPOLI incorporates paragraphs 1 through 99 of this Complaint as if fully set forth herein and further states:

100.    ALLSTATE has discriminated in its payments to DR. NAPOLI, and members of the

purported class by taking the illegal discounts as described in the preceding paragraphs while at the same time paying the *full* amount of personal injury protection bills submitted by other medical providers not belonging to the MEDVIEW PPO whose discounts ALLSTATE was not able to obtain.

101.    ALLSTATE's acts as described in the preceding paragraphs of this Complaint violate 15 U.S.C. §1, §2, and §13 in that said price discrimination practices constitute a restraint upon commerce and trade.

102.    As a result of ALLSTATE's violations of the Sherman Anti-Trust Act, DR. NAPOLI and those similarly situated are entitled to actual and treble damages.

WHEREFOR, DR. NAPOLI and the members of the class that he seeks to represent demand the following relief:

a) that this Court enjoin ALLSTATE and the aforesaid entities acting in concert or participation therewith from any further reductions of DR. NAPOLI's and the purported class members' personal injury protection medical expense claims based on MEDVIEW PPO discounts;

b) that judgment be entered against ALLSTATE for treble the amount of DR. NAPOLI's and the purported class members' actual damages incurred, with interest, reasonable attorneys' fees, and costs; and,

c) that the Court grant such other relief as it deems just and proper.

## COUNT VI - DECLARATORY JUDGMENT

DR. NAPOLI incorporates paragraphs 1 through 102 of this complaint as if fully set forth herein and further states as follows:

103.    As previously alleged, ALLSTATE has improperly taken advantage of discounts to which it is not entitled for all the reasons that have been set forth in the previous paragraphs of this complaint.

104.    ALLSTATE's conduct is similar to other types of conduct by insurance companies and/or

third party payors in the healthcare industry who engage in a silent PPO without benefit to the healthcare providers.

105.    This illegal conduct demands a declaration that ALLSTATE's purchasing discounts of healthcare providers without consideration flowing to the healthcare providers should not be countenanced.

WHEREFORE, Plaintiff, DR. NAPOLI on behalf of himself, and others similarly situated, pursuant to 28 U.S.C. §2201 and Federal Rule of Civil Procedure 57, ask this Court to declare that the conduct of ALLSTATE as outlined in the preceding paragraphs of this complaint constitutes a basis to recover monies from discounts improperly taken by ALLSTATE.

## COUNT VII - VIOLATION OF FLORIDA STATUTE 627.736(10)

DR. NAPOLI incorporates paragraphs 1-105 of this Complaint as if fully set forth herein and further states as follows:

106.    At all times material herein, DR. NAPOLI and the members of the class that he seeks to represent presented or had presented on their behalf reasonable and necessary medical charges to ALLSTATE for treatment of patients entitled to PIP medical expense benefits pursuant to Florida automobile insurance policies issued by ALLSTATE.

107.    ALLSTATE has wrongfully claimed MEDVIEW PPO discounts on the medical expenses referred to in the preceding paragraph.

108.    ALLSTATE is not entitled to said MEDVIEW PPO discounts. ALLSTATE has failed to comply with the personal injury protection statute's requirements for establishing an automobile insurance PPO network. Despite this failure, ALLSTATE has reduced and continues to reduce the personal injury protection medical expense claims of DR. NAPOLI and the purported class members by accessing the aforesaid entities' databases of MEDVIEW Preferred Provider volume discounts.

109.    Accordingly, an outstanding balance remains on all PIP medical expenses that ALLSTATE

has reduced based on MEDVIEW Preferred Provider volume discounts. By reducing DR. NAPOLI's and the purported class members' legitimate PIP medical expenses by application of MEDVIEW PPO discounts, ALLSTATE has violated Fla. Stat. § 627.736(10).

110.    As a result of ALLSTATE's failure to comply with Fla. Stat. § 627.736(10), DR. NAPOLI and the members of the purported class have suffered damages and irreparable harm.

WHEREFOR, DR. NAPOLI and the members of the class that he seeks to represent demand the following relief:

a) that this Court enjoin ALLSTATE and all persons or entities acting in concert or participation therewith from any further reductions of DR. NAPOLI's and the purported class members' PIP medical expense claims based on MEDVIEW PPO discounts;

b) that judgment against ALLSTATE be entered in the amount of DR. NAPOLI and the purported class members' damages incurred, including an award of punitive damages, with interest, reasonable attorneys' fees per § 627.428 and costs; and

c) that the Court order such other relief as it deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS CONTAINED HEREIN.


DATED: January 12, 2000

Respectfully submitted

By:

ARTHUR GOLD, ESQ.
GOLD, ROSENFELD & COULSON
A Partnership of Professional and
Limited Liability Corporations
11 S. LaSalle Street, Ste 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778
Facsimile (312)372-5231

By: _____
DOUGLAS A. BLANKMAN, ESQ.
KOPELMAN & BLANKMAN, P.A.
Nationsbank Tower, Suite 1611
One Financial Plaza
Fort Lauderdale, FL 33394
(954) 462-6855
Facsimile (954) 462-6899


CARLIN PHILLIPS, ESQ.
GOGEL, PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
Facsimile (508) 998-0919


C:\WP51\ASG\NAPOLI\COMPLAINT

SEP-24-99 12:00 PM   3732843627654                9549872229                      P.02

cv-06061-WJZ    Document 1     Entered on FLSD Docket 01/13/2000    Pa
                        MEDVIEW SERVICES, INC.

                                                                     # 3276 1

## Participating Health Care Professional Agreement

This Agreement is made and entered into this _25th_ day of _Mar_, 19_93_ by and between MedView Services, Inc., a Corporation doing business as MedView, and Compensation Professionals ("MedView") having its principal place of business at 33991 Hamilton Court, Farmington Hills, Michigan 48334, and _David A. Napch, DC_ (hereinafter, the "Health Care Professional" ["HCP"])

### RECITALS

A. MedView develops contractual arrangements with Payors, which include employers, insurance carriers, third party administrators and other similar entities for the purpose of coordinating and arranging for the delivery of health care services to Subscribers. Certain of those arrangements relate solely to Workers' Compensation Programs, while other arrangements relate generally to programs for the provision of health care services.

B. HCP wishes to provide health care services to Subscribers in accordance with the terms of this Agreement and MedView wishes HCP to provide those services to Subscribers

### AGREEMENT

NOW, THEREFORE, in consideration of the following mutual promises and covenants and other good and valuable consideration, the sufficiency of which is acknowledged by the parties, it is agreed as follows:

### ARTICLE 1. DEFINITIONS

A. "Health Care Services" means those health care services that the HCP is licensed, equipped and staffed to provide, and which HCP customarily provides to its patients, and which are, for each respective Subscriber, services for which certain benefits are available under a Group Contract or Workers' Compensation contract or any other program with provisions for health care services.

B. "Medical Necessity Recommendations" means those recommendations made on a case by case basis pursuant to Utilization Review with respect to services rendered or to be rendered to Subscribers, using criteria such as the intensity of service, severity of illness and discharge screens (ISD) review systems, medical standards of practice. Such determinations shall be made by MedView or a party designated by MedView or a...

C. "Other Subscriber Charges" means copayments coinsurance, deductibles, encounter fees and similar charges, if any, applicable to health care services which are to be paid by the Subscriber pursuant to the terms of Payor's obligation to provide or arrange for health care services or benefits for the Subscriber.

D. "Participating Provider" means a health care professional and/or corporation licensed under the laws of the State of Florida which has been extended the privilege to enter into a valid contract with MedView to provide Health Care Service to Subscribers.

E. "Third Party Payor" means an insurance company employer, third party administrator, or other business entity which has contracted with MedView to pay for Health Care Services rendered by the HCP to MedView insured employees

F. "Quality Assurance" means the process by which MedView, or a party designated by MedView determines that Health Care Services are provided to Subscribers consistent with the standard of quality of care generally accepted in their respective medical communities and generally accepted by governmental and professional review entities

G. "Subscriber" means a person who is entitled to receive certain benefits with respect to Health Care Services.

H. "Utilization Review" means the process by which MedView or a party designated by MedView determines whether or not Health Care Services rendered or to be rendered to a Subscriber meet applicable requirements regarding medical necessity and standards of care.

I. "Clinic Services" means any and all services which a clinic licensed under the laws of the State of Florida is permitted to provide to patients

### ARTICLE 2. REPRESENTATIONS AND WARRANTIES

A. MedView represents that, to the best of its knowledge, as of the effective date of this Agreement, none of the activities to be performed hereunder by MedView have been interpreted by a properly empowered body to be in violation of any applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local

EXHIBIT   1

law, regulation, order or rule of any government al agency or court decision, whether federal, state or local. In the event of such a finding of a violation by MedView, the HCP waives all right to sue MedView for any damages arising out of such violation, unless MedView is found to have knowingly, willfully, and wantonly violated an applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local.

C. HCP represents that neither the making of this Agreement nor the activities to be performed by the HCP pursuant to this Agreement will result in a breach of or default under any Agreement to which the HCP is a party. The HCP also warrants that as of the effective date of this Agreement, none of the activities to be performed hereunder by the HCP have been interpreted by a properly empowered body to be in violation of any applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local.

D. HCP does not represent or warrant that in the future, no properly empowered body will ever find the duties undertaken by the HCP to be in violation of or contrary to any applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local. In the event of such a finding of a violation by the HCP, MedView waives all right to sue the HCP for any damages arising out of such violation, unless the HCP is found to have deliberately, intentionally and knowingly violated an applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local.

## ARTICLE 3. DUTIES OF HCP

A. HCP shall render health care services to Subscribers which HCP is qualified by law to provide, which are medically necessary and consistent with the standard of quality of care generally accepted in their respective medical communities.

B. HCP shall comply with the requirements of all laws and regulations applicable to HCP's business and operations, and shall maintain in effect all licenses, permits and all governmental and board authorizations and approvals required thereby for that business and operations and to provide health care services.

C. HCP shall exercise best efforts to admit and/or refer to MedView's participating hospitals and HCP network. HCP shall utilize a participating hospital in the case of emergency whenever possible, guided by the Subscribers best medical interest.

D. HCP agrees to participate in the Utilization Review program and to abide by decisions resulting from that review subject to rights of reconsideration, review and arbitration as provided in Exhibit C.

E. HCP may be required by MedView to obtain and maintain throughout the term of this Agreement, medical staff membership and privileges deemed reasonably necessary by MedView for the performance of HCP's duties hereunder at participating hospitals.

F. HCP shall maintain in effect appropriate policies of insurance, including policies of comprehensive general liability, workers' compensation, professional liability and other insurance, with appropriate amounts of coverage as necessary to protect HCP and its officers, agents and employees against any claims, liabilities, damages or judgments arising out of any act or omission relating to the services provided or to be provided under this agreement or a minimum of $500,000.00 per occurrence. HCP shall provide certificates of such insurance to MedView upon request. HCP shall give MedView not less than thirty (30) days prior written notice of any cancellation, nonrenewal or material alteration of any such policies of insurance.

G. HCP shall upon request provide to Payor or MedView appropriate and complete information, records and other written documentation regarding health care services provided to Subscribers hereunder. HCP shall also provide such information and documentation to any properly identified representatives of governmental agencies entitled to access thereto by applicable law or regulations.

H. Without limiting the generality of paragraph G, HCP shall upon request provide to Payor, to Payor's authorized representatives (which may include MedView) and to the Subscriber complete and appropriate records and information regarding any health care services that are subject to the Florida Workers' Compensation Law.

I. Notify MedView of any sanction proceeding against the HCP and/or physician under contract with the HCP regarding reimbursement for services provided under a governmental or non-governmental program, and notify MedView of any modification of clinical practice privileges as an active physician on the staff of a preferred hospital.

J. Inform MedView of any pending malpractice litigation against the HCP and/or physician under contract with the HCP initiated as a result of service rendered to any MedView Subscriber, within seven (7) working days of notification to the HCP and/or physician of the pending litigation, and inform MedView of any settlements or judgement involving malpractice litigation arising out of Health Care Services rendered to any patient, whether or not the patient is a MedView Subscriber.

## ARTICLE 4. DUTIES OF MEDVIEW

MedView, by entering into this Agreement, hereby agrees to:

A. Process the HCP's claims for Health Care Services rendered to MedView Subscribers as provided in Exhibit A hereof.

B. Perform or a range for the performance of Utilization and Quality Assurance review of all inpatient Hospital and Health Care Services provided to MedView Subscribers;

C. Adjust fees for Health Care Services to the amounts referred to in Exhibit A which is inclusive and attached to and made part hereof.

D. Maintain adequate professional liability...rance.

E. Perform each additional obligation imposed upon it by this Agreement.

## ARTICLE 5. COMPENSATION OF HCP

A. Subject to the other provisions of this Article 5, Payor shall pay or arrange for payment to HCP for health care services provided to Subscribers, and HCP shall accept as compensation in full for those services, the amounts described in Exhibit A. Such compensation shall be reduced, however, by the amount of applicable Other Subscriber Charges, if any. Other Subscriber Charges, if any, shall be described in Exhibit B.

B. HCP shall look solely to Payor for compensation payable to HCP pursuant to paragraph A, and shall not bill for or otherwise collect or attempt to collect from Subscribers any charges for Health Care Services except applicable Other Subscriber Charges. HCP shall look solely to the Subscriber for payment of applicable Other Subscriber Charges described in Exhibit D and for any of HCP's charges for services that are not health care services.

C. With regard to Workers' Compensation Programs,

(a) HCP shall not bill either Subscribers or the employers (other than self insured employers/Payors) of Subscribers for Health Care Services; and

(b) Payor shall only be obligated to pay HCP for Health Care Services rendered in connection with a claim which Payor has determined is compensable under the terms of the applicable Workers' Compensation Program.

D. Notwithstanding any other provision of this Agreement to the contrary, MedView shall have no responsibility to pay any compensation to HCP or any other person for health care services or other services provided to Subscribers. However, MedView shall urge Payor to exercise its best efforts to pay claims for Health Care Services promptly.

## ARTICLE 6. BILLING PROCEDURES

Upon receipt by MedView of HCP charges for Health Care Services rendered to a MedView Subscriber, MedView shall perform the following:

A. MedView shall make all reasonable efforts to process HCP claims for Health Care Services provided under this Agreement within a reasonable time.

B. MedView shall, in any event, submit to the appropriate Third Party Payor a properly completed claim for Health Care Services provided under this Agreement within three (3) business days of the receipt of the submitted claim from the HCP. Parties hereto acknowledge that claims submission and payment may be delayed due to verification of eligibility for workers' compensation

benefits, coordination... benefits or subrogation of claims for personal liability claims or the like.

C. An HCP shall submit acceptable claims in the manner set forth, and under the conditions contained in the MedView provider manual, which is hereby made a part of and incorporated herein by reference.

## ARTICLE 7. USE OF HCP'S NAME

A. MedView agrees to make good faith efforts, within reasonable budgetary constraints, to market the HCP's services to existing and potential Third Party Payors, including but not limited to, business entities such as insurance companies, employers and union trust funds provided, however, MedView does not guarantee to the HCP any minimum number of MedView Subscriber patients

B. HCP authorizes MedView to identify and publish HCP's name, address and available services in MedView's information materials for distribution to Subscribers and in marketing materials for distribution to contractors and potential contractors of MedView.

## ARTICLE 8. UTILIZATION REVIEW AND QUALITY CONTROL

A. The HCP agrees to cooperate fully with MedView in all Utilization Review procedures established by MedView (Exhibit "C" hereof).

B. MedView shall identify any deviation from medical necessity recommendations in accordance with pre-established criteria as described in his Agreement. MedView will specify the reason for the determination of the issue specified and the specific dates of the service in question.

C. In the event of a dispute concerning the appropriateness of a determination by MedView that the Health Care Services do not meet Medical Necessity recommendations, the HCP may partake in the following appeal process as to the Utilization Review decision:

1. The HCP may appeal to the Utilization Review Committee selected by the management team of MedView.

2. In the event that this Utilization Review Committee affirms the recommendation to the appropriate Third Party Payor disapproval of some or all of the fees claimed, the HCP may then appeal to the management team of MedView.

3. At such level of appeal, a majority vote of the members of the empowered board shall determine whether medical necessity recommendations have not been met, and thus whether MedView should recommend to the Third Party Payor its disapproval of some or all of the fees claimed by the HCP.

4.  At each level of appeal, there shall be de nove review.

5.  MedView will make all reasonable efforts to include on the Utilization Review Committee an ad hoc member representing the Third Party Payor concerned with the claim under review.

D. In the event that a Third Party Payor limits or refuses to pay HCP charges for services provided to a MedView Subscriber as a result of a Utilization Review determination, the HCP cannot pursue payment of such covered services privately from the MedView Subscriber and/or the employer, and/or insurer, unless the MedView Subscriber has been personally responsible for the rejection or limitation of payment by the appropriate Third Party Payor. The HCP shall have the opportunity to prove such a contention by partaking in the appeal process set forth in Article 8 C hereof.

Notwithstanding the language contained in this section, in the case of services provided to a MedView Subscriber to which the MedView Subscriber is not entitled by virtue of a contract between a Third Party Payor and MedView, the HCP may freely pursue payment for such services privately from the MedView Subscriber

E. All communications made during the decisions regarding Utilization Review procedures may be disclosed by either MedView or the HCP only to the extent the MedView Subscriber has consented to such disclosure.

MedView shall independently review the quality of care of the Health Care Services rendered MedView Subscribers. The HCP agrees to be subject to such evaluation, and to supply all information necessary for such evaluation. MedView agrees to give the HCP five (5) working days notice prior to reviewing quality of care of Health Care Services. MedView will make every reasonable attempt to avoid quality of care monitoring during the HCP's normal office hours. The HCP agrees to perform Health Care Services rendered to MedView Subscribers at the level and standard commonly required among the practitioners of the HCP's physicians' specialties.

## ARTICLE 9. CONFIDENTIALITY

A. MedView and the HCP understand and agree that all information, records and inquiries obtained during the course of treatment of Subscribers are privileged and confidential. To the extent provided by law, HCP shall keep confidential and not disclose any patient-identifiable information furnished by the Subscriber, MedView or any other health care provider to any third party, except with the prior written consent of the Subscriber, that would not be provided under the normal billing process.

B. MedView and the HCP understand and agree that the right to information and records of Subscribers is governed by state and federal law regarding the confidentiality of patient medical records. Each party shall comply with all such laws and

regulations in the performance of their respective obligations under this Agreement.

C. MedView and HCP agree that they will not disclose the compensation payable to HCP pursuant to the terms of this Agreement, except to the extent required by applicable laws or as may be required in order to carry out the terms of this Agreement.

D. HCP agrees that it will not participate in or encourage the participation in any combined effort among Participating Providers to threaten not to provide services to any existing or potential MedView Subscribers

## ARTICLE 10  TERM AND TERMINATION

A. The initial term of this Agreement shall be one (1) year from and after the applicable effective date unless sooner terminated by the parties as provided herein. After the initial term, this Agreement shall continue in full force and effect for successive periods of one (1) year each, unless terminated by sixty (60) days' written notice prior to the expiration of any one (1) year term by the parties as provided herein.

B. This Agreement may be terminated at any time by any of the parties hereto by giving written notice to the others upon the occurrence of an event of default as described in paragraph C below

C. An event of default under this Agreement shall be deemed to have occurred in the event that either party shall fail to comply with or perform when due any term or covenant of this Agreement, and such failure is not cured within thirty (30) days after written notice from another party identifying the default and requesting that it be cured.

D. This Agreement may be terminated immediately if it is determined that any party needs and has not secured a license, governmental approval or exemption in accordance with applicable laws and regulations in order to enter into or perform under this Agreement.

E. This Agreement shall terminate automatically and immediately in its entirety (i) in the event HCP commits any act or engages in any conduct for which its license may be revoked or suspended by the licensing authorities of the State of Florida (whether or not such licensing authorities revoke or suspend such license) or is otherwise disciplined by such licensing authority, or (ii) in the event HCP is no longer duly licensed to provide the Health Care Services contemplated by this Agreement.

## ARTICLE 11. INDEMNIFICATION

Each party shall indemnify and hold harmless each other party and any officer, director, shareholder, employee, attorney, or agent of each other party or demand, for any and all claims, actions, demands, obligations, liabilities, suits, damages, losses, costs or expenses of any kind or description whatsoever, including, without limitation, reasonable attorneys' fees and amounts paid in settlement of any and all claims, incurred by any of the

4

indemnified parties by reason of the acts or omissions of the indemnifying party and/or any officer, director, shareholder, employee, attorney or agent of the indemnifying party.

### ARTICLE 12. ASSIGNMENT

HCP may not assign or otherwise transfer any right or delegate any duty of performance hereunder, in whole or in part, without the prior written consent of MedView. MedView retains the right to assign this agreement, in whole or in part, to any entity with which MedView or its parent company or any of its subsidiaries is affiliated.

### ARTICLE 13. PROPRIETARY RIGHTS

Each party has developed certain symbols, trademarks, service marks and other proprietary information, including in the case of MedView, its provider network and agreements related thereto ("Proprietary Information"). Each party will not use the Proprietary Information of the other party without the prior written consent of that party and will cease the use of any such Proprietary Information immediately upon the termination of this Agreement.

### ARTICLE 14. COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

### ARTICLE 15. ENTIRE AGREEMENT/AMENDMENTS

This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, and there are no oral or written collateral representations, agreements or understandings, except as provided herein. All amendments hereto shall be in writing and executed by the parties.

### ARTICLE 16. SEVERABILITY

In case any one or more of the provisions of this Agreement shall be invalid, illegal or unenforceable in any respect, the remaining provisions shall be construed liberally in order to effectuate the purposes hereof, and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

### ARTICLE 17. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

### ARTICLE 18. NOTICES

All notices, demands or communications required or permitted hereunder shall be in writing and shall be deemed effectively given on the date of receipt if personally delivered, ........... or .... .. .. the party it being the same is directed or on the third day after mailing if mailed to such party, by

registered or certified mail, postage prepaid to the following addresses, or to such other addresses as the parties may hereafter designate by written notice:

(a) If to HCP, to the address set forth below: and

(b) If to MedView to the following address:

_____ _____

_____ _____

_____

### ARTICLE 19. SEPARATE AND INDEPENDENT CONTRACTORS

A. For purposes of this Agreement, MedView and HCP are and will act at all times as independent contractors of the others. Nothing contained in this Agreement establishes or constitutes or will be construed as establishing or constituting a partnership, joint venture or employment agreement or employment relationship between MedView and HCP. As independent contractors, MedView and HCP each shall continue to exercise full and unrestricted authority and responsibility regarding their own respective management, organizational structure and activities.

B. Nothing in this Agreement shall be construed as limiting the HCP ability to treat patients who are not MedView Subscribers, or to participate in other health care delivery systems.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the applicable Effective Date.

HCP

By: _David L. Thygee NC._

_DAVID A. NAPIL DC._
(print or type name)

Title: _OWNER_

Address: _5703 STIR LING Road Suite_

_Hollywood, FLA. 33021_

_(305)-987-2229_

MEDVIEW SERVICES, INC, or its own behalf and on behalf of

Payor: _Lisa Cirie-Ruediali._

By: _____

Title: _JUVP & COO_

### Group Health Benefits Reimbursement
### Workers' Compensation Reimbursement

Health Care Professional claims are to be submitted on HCFA-1500 forms using CPT-4 codes.

<u>Group Health Benefits Plans and/or any Program Providing Health Care Services:</u>

Health Care Professional agrees to accept 80% of usual and customary fees

#### Workers' Compensation Programs:

For Health Care Services rendered to MedView subscribers Health Care Professional agrees to accept the lesser of 80% of usual and customary fees or 80% of the charges set by the Florida Department of Labor and Employment Security as maximum fees.

For those services which are "By Report" (BR), "Relativity Not Established" (RNE) or not listed in the state fee guideline, reimbursement shall be made at 80% of the 80th percentile.

All bills submitted to MedView Payors are to reflect usual and customary charges. Provider hereby asserts that those discounts offered to MedView are equivalent to those offered by the Provider to employers.

MedView Services, Inc.

By: _____
Title: _____ Sr VP & COO _____
Date: ___ May 27, 1993 ___

Health Care Professional

By: _____
Title: _____ OWNER _____
Date: _____ 3/25/93. _____

EXHIBIT D

Other Subscriber Charges

Regarding Group Health Plans

Copayments, coinsurance, deductibles, encounter fees and similar charges, if any, applicable to health care services which are to be paid by the Subscriber pursuant to the terms of the Payor's obligation to provide or arrange for health care services or benefits for the Subscriber.

Regarding Worker's Compensation

Convenience items and services requested by the Subscriber that are not compensable under the terms of the applicable Workers' Compensation program.

1-800-877-3200

## UTILIZATION REVIEW

### 1. PRE-ADMISSION REVIEW.

The intent is to provide quality care for MedView Subscribers in the most cost-effective and appropriate setting. For an elective admission, the HCP is required to provide necessary information, reason for admission, procedure planned (if any), and completed pre-admission testing, at least seventy-two (72) hours before the contemplated admission. MedView will review the proposed admission within twenty-four (24) hours and certify, or not certify the admission. In the event of non-certification of admission, MedView will encourage and assist the HCP in seeking alternative forms of care. MedView shall have and exercise the power to terminate membership for those HCP who fail to follow these pre-admission certification procedures as stated in the HCP Agreement and outlined in the MedView Utilization Review Plan.

### 2. SECOND OPINION PROGRAM.

The purpose is to ensure appropriate use of services. When an elective inpatient test or procedure is under consideration and before such a procedure can be certified through the pre-admission certification process, a second opinion may be required. MedView has defined procedures in the Utilization Review plan to assist the MedView HCP in this obligation.

### 3. CONCURRENT REVIEW OF HOSPITAL STAYS

The MedView Utilization Review staff, Medical Director and Physician Advisors will perform non-delegated cyclical concurrent review of all emergent and elective admissions. Documented practice activity will be measured against pre-established criteria systems such as severity of illness/intensity of service review system. Procedures are outlined in the MedView Utilization Review plan.

### 4. RETROSPECTIVE REVIEW.

Retrospective profiling of hospital specific, physician specific and diagnosis specific practice activity will be performed and used by both the MedView Utilization Review and the Quality Assurance Committee.

RD10893

**EXHIBIT C**

**Payors**

Claims office jurisdiction may cover a broader geographic area than the states indicated.

## Group Health

*American International Healthcare-"Options for Healthcare"*(AR, CO, CT, FL, HI, IL, IN, MA, ME, MI, NH, PA, VT, WV)

American International Adjustment Company
American International Group
Comprehensive Addiction Programs
Hechinger Stores (PA, CT, NY)
*Home Quarters* (FL, IL, MA, ME, NH)
J. M. Tull
National Distributors
National Service Industries
Planning Research Corporation

CorVel/MedCheck (formerly Fortis) (CA, CO, FL, IN, IL, KS, MI, MO, PA, TX, WI)
  A.A.A. (MO)
  AIAC (FL, PA)
  Albertsons (CA)
  Alexsis (CA, CO, FL, IL, IN, KS, MI, MO, PA, TX, WI)
  Allstate (FL)
  American States (IL, IN, MO, WI)
  American International Healthcare (WI)
  American Motorists (CO)
  Amerisure (MO)
  Amica Mutual Insurance Company (FL, PA)
  AMPAC (MO)
  Anheuser Busch(CA)
  Argonaut (CA, TX)
  Atlantic Mutual (IL, IN, MO, PA, WI)
  Auto Owners (FL)
  Bankers Risk (FL)
  Bituminous (KS)
  *Boulder County Risk Management* (CO)
  British American Insurance Co (TX)
  Brotherly Aid Liability (PA)
  Carter Hawley Hale (CA)
  CCIA (CO)
  Central Freight Lines (TX)
  Chubb and Son (FL)
  Chubb Group (CA, KS, MO, PA)
  City of Wilmington (PA)
  CFCI (FL)
  CIRSA (CO)
  CNA (IL, KS, MO, WI)
  Cobb Hospital
  Collins & Aikman Group, Inc. (CA)
  Comco Management (CA)
  Connecticut Specialty (FL)
  Conrail (PA)
  *Continental Insurance* (PA)
  Crum & Forster Commercial Insurance (CO, IL, PA, TX)
  Diversified Risk Management (TX)
  Eagle Insurance (CA)

### EXPLANATION OF MEDICAL BILL PAYMENT

Date: 08/16/1999
Bill Received Date: 06/15/1999
Claim #: 3974669809-01
File Handler: JMT
Invoice #: 1825 D
Eligible Injured Person: GARY M. TYSON
Treatment Rendered By: DAVID A. NAPOLI, D.C.
Provider Specialty: CHIROPRACTICS (DC)
TIN: 59-2255849

Service Provided For:
GARY M. TYSON
2646 POLK ST APT 20
HOLLYWOOD FL  33020

**Diagnosis Codes**

| | | | | |
|---|---|---|---|---|
| 723.4 | BRACHIAL NEURITIS OR RADICULITIS NOS | 346.0 | CLASSICAL MIGRAINE | |
| 729.1 | MYALGIA AND MYOSITIS, UNSPECIFIED | 724.8 | OTHER SYMPTOMS REFERABLE TO BACK | |

| Date Of Service(s) From | Thru | Procedure Code/Modifier | Description | Units | Billed Amount | Covered Amount | Reason Code(s) |
|---|---|---|---|---|---|---|---|
| 06/07/99 | 06/07/99 | 97140 | MANUAL THERAPY | 1.00 $ | 48.00 $ | 48.00 | |
| 06/07/99 | 06/07/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 $ | 14.87 $ | 14.87 | |
| 06/07/99 | 06/07/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 $ | 14.53 $ | 14.53 | |
| 06/07/99 | 06/07/99 | A4556 | ELECTRODES | 1.00 $ | 10.00 $ | 10.00 | |
| 06/09/99 | 06/09/99 | 97140 | MANUAL THERAPY | 1.00 $ | 48.00 $ | 48.00 | |
| 06/09/99 | 06/09/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 $ | 14.87 $ | 14.87 | |
| 06/09/99 | 06/09/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 $ | 14.53 $ | 14.53 | |
| 06/09/99 | 06/09/99 | A4556 | ELECTRODES | 1.00 $ | 10.00 $ | 10.00 | |
| 06/11/99 | 06/11/99 | 97140 | MANUAL THERAPY | 1.00 $ | 48.00 $ | 48.00 | |
| 06/11/99 | 06/11/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 $ | 14.87 $ | 14.87 | |
| 06/11/99 | 06/11/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 $ | 14.53 $ | 14.53 | |
| 06/11/99 | 06/11/99 | A4556 | ELECTRODES | 1.00 $ | 10.00 $ | 10.00 | |
| 06/11/99 | 06/11/99 | MISC -IT | | 1.00 $ | 1.95 $ | 1.95 | |

Total:                                                    $   264.15 $   264.15

Eligible Amount Based on  80% Coverage          $       211.71
(Interest paid at 100% (Deductible does not apply to it)

**Modifier Code(s):**
IT  Interest Payment

**Additional Information:**
'FEE REIMBURSEMENTS ARE BASED ON THIS MEDICAL SERVICE PROVIDER'S
AGREEMENTS WITH CCN.  THE PATIENTS RESPONSIBILITY IS LIMITED TO THE
DIFFERENCE BETWEEN THE AMOUNT PAID BY ALLSTATE (AS SHOWN BELOW)
AND THE CCN CONTRACTED FEE, WHICH APPEARS IN THE BILLED AMOUNT
COLUMN."

If you have any questions about this claim, please contact your file handler,
DEBORAH METCALF at (954) 846-7245

Payment for $    211.71 was made on 08/16/1999 to:
DAVID A. NAPOLI, D.C.

Copy(s) of this Explanation of Benefits has been sent to:
GARY M. TYSON, 2646 POLK ST APT 20, HOLLYWOOD, FL, 33020
DAVID A. NAPOLI, D.C., 5700 STIRLING RD ST 9, HOLLYWOOD, FL, 33021

Rec 8/26/99

EXHIBIT 2

Page  1   of  1
Case: AJI-FFLN-0019978
Review Date: 08-18-1999
Adjustor: BADDERS
File: 0000240/0001086/0000000
Reviewer: ASIAS
PPO Claim: 00000007143801

Provent Name: AIGCS FL(FL)        NF - AIGCSDE19850

Claim: 990290651-1

Provider: NAPOLI D A
            5700 STIRLING RD SUITE 9
            HILLYWOOD, FL 33021

DOB: 07-2...1949
Claimant: SAMA, DANTE
            2145 PIERCE ST #204
            HOLLYWOOD, FL 33020

Tax ID: 592255849    DR
DOS: 08-02-1999 to 08-06-1999

Dx 1: 723.4 BRACHIAL NEURITIS NOS        Dx 2: 722.10 LUMBAR DISC DISPLACEME
Dx 3: 346.0 CLASSICAL MIGRAINE           Dx 4: 724.8 OTHER BACK SYMPTOMS

| Date Of Service | PS | TS | Code | Mod | Service Description | Dx No. | Units | Charges | Bill Review | ***Reductions*** PPO | UM | Allowance | Expl Code(s) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08-02-1999 | 3 | 1 | 97140 | | MANUAL THERAPY | 1 | 1 | 60.00 | 17.72 | 8.46 | | 33.82 | |
| 08-02-1999 | 3 | 1 | 97010 | | HOT OR COLD PACKS THER | 1 | 1 | 15.00 | | 3.00 | | 12.00 | |
| 08-02-1999 | 3 | 1 | 97014 | | ELECTRIC STIMULATION TI | 1 | 1 | 25.00 | | 5.00 | | 20.00 | |
| 08-02-1999 | 3 | 1 | A4555 | | ELECTRODES (E.G. APNEA I | 1 | 1 | 10.00 | 10.00 | | | | 217 |
| 08-02-1999 | 3 | 1 | 99070 | | SPECIAL SUPPLIES | 1 | 1 | 35.00 | 35.00 | | | | 217 |
| 08-04-1999 | 3 | 1 | 97140 | | MANUAL THERAPY | 1 | 1 | 60.00 | 17.72 | 8.46 | | 33.82 | |
| 08-04-1999 | 3 | 1 | 97010 | | HOT OR COLD PACKS THER | 1 | 1 | 15.00 | | 3.00 | | 12.00 | |
| 08-04-1999 | 3 | 1 | 97014 | | ELECTRIC STIMULATION TI | 1 | 1 | 25.00 | | 5.00 | | 20.00 | |
| 08-04-1999 | 3 | 1 | A4555 | | ELECTRODES (E.G. APNEA I | 1 | 1 | 10.00 | 10.00 | | | | 217 |
| 08-04-1999 | 3 | 1 | 99070 | | SPECIAL SUPPLIES | 1 | 1 | 25.00 | 25.00 | | | | 217 |
| 08-06-1999 | 3 | 1 | 97140 | | MANUAL THERAPY | 1 | 1 | 60.00 | 17.72 | 8.46 | | 33.82 | |
| 08-06-1999 | 3 | 1 | 97010 | | HOT OR COLD PACKS THER | 1 | 1 | 15.00 | | 3.00 | | 12.00 | |
| 08-06-1999 | 3 | 1 | 97014 | | ELECTRIC STIMULATION TI | 1 | 1 | 25.00 | | 5.00 | | 20.00 | |
| 08-06-1999 | 3 | 1 | A4556 | | ELECTRODES (E.G. APNEA I | 1 | 1 | 10.00 | 10.00 | | | | 217 |

Total Charges:             390.00
Bill Review Reductions:    143.16
Bill Review Allowances:    246.84
PPO Reductions:                         49.38
Recommended Allowance:                              197.46

*217  THE VALUE OF THIS PROCEDURE IS INCLUDED IN THE VALUE OF ANOTHER PROCEDURE PERFORMED ON THIS DATE.

***************************PAYMENT PENDING ADJUSTOR'S REVIEW***********************
The Explanation of Review is sent solely for your records.
*******THIS IS NOT A BILL*******

Preferred Provider Organization:        MEDVIEW/MEDVIEW / CCN

* UNLESS OTHERWISE NOTED ABOVE, ALL BILL REVIEW REDUCTIONS ARE DUE TO CHARGES EXCEEDING AMOUNTS THAT WOULD APPEAR REASONABLE
FOR THE PROVIDER'S GEOGRAPHICAL REGION.

IF YOU HAVE ANY QUESTIONS REGARDING THIS ANALYSIS PLEASE CALL AIGCS - PBR AT
(800) 562-2208 EXT 8594, EXT. 8794 OR SEND YOUR BILL AND THE ANALYSIS TO:

AIGCS - PBR, P.O. BOX 2006, CHADDSFORD, PA 19317

**EXHIBIT    3**

# CIVIL COVER SHEET

**00-6061**   **CIV - FERGUSON**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

avid A. Napoli, D.C., d/b/a Napoli
hiropractic Center and all others
imilarly situated,

**DEFENDANTS**

Allstate Insurance Company

**MAGISTRATE JUDGE
SNOW**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __Broward__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT __Cook__
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

A-NORTH 6061 WDF/LSS

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

See Attachment

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

| **II. BASIS OF JURISDICTION** (PLACE AN X ONE BOX ONLY) | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Case Only) | (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) |
|---|---|---|
| ☐ 1. U.S. Government Plaintiff | ☐ 3. Federal Question (U.S. Government Not a Party) | | | PTF / DEF | | | PTF / DEF |
| | | Citizen of This State | ☐ 1 / ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 / ☐ 4 |
| ☐ 2. U.S. Government Defendant | ☑ 4. Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 / ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 / ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 / ☐ 3 | Foreign Nation | ☐ 6 / ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 USC 1332(a)(1)   28 USC 1331
15USC 1,2,13   18 USC 1961
18 USC 1341, 1343, 1346, 1957, 1952, 1953

**IVa.** __7__ days estimated (for both sides) to try entire case

**V. NATURE OF SUIT** (PLACE AN X IN ONE BOX ONLY)

| A CONTRACT | A TORTS PERSONAL INJURY | B PERSONAL INJURY | A FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUS |
|---|---|---|---|---|---|
| ☑ 110 Insurance | | | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 States Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury-Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | A PROPERTY RIGHTS | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. B |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | PERSONAL PROPERTY | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs | ☐ 840 Trademark | ☑ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) B | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending B | ☐ 660 Occupational Safety/Health | B SOCIAL SECURITY | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits B | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholder's Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | A LABOR | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12USC3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Management Relations B | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| A REAL PROPERTY | B CIVIL RIGHTS | B PRISONER PETITIONS | ☐ 730 Labor/Management Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 740 Railway Labor Act | A FEDERAL TAX SUITS | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure B | ☐ 442 Employment | ☐ 530 General * | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ 791 Employee Ret. Inc. Security Act B | ☐ 871 IRS-Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other * | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights * A or B | | | ☐ 890 Other Statutory Actions * A or B |
| ☐ 290 All Other Real Property | | | | | |

**VI. ORIGIN** (PLACE AN X IN ONE BOX ONLY)

☑ 1. Original Proceeding   ☐ 2. Removed from State Court   ☐ 3. Remanded from Appellate Court   ☐ 4. Reinstated or Reopened   ☐ 5. Transferred from another district (Specify)   ☐ 6. Multidistrict Litigation   ☐ 7. Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT** CHECK IF THIS IS A CLASS ACTION ☑☑ UNDER F.R.C.P. 23   DEMAND $   ☑ Check YES only if demanded in complaint   JURY DEMAND: ☑ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See Instructions): JUDGE _____ DOCKET NUMBER _____

DATE __1/12/00__

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
S/F I-2
REV. 9/94

FOR OFFICE USE ONLY: Receipt No. __518288__   Amount: __150.00__

Date Paid: __1/12/00__   M/fp: _____

ARTHUR GOLD, ESQ.
GOLD, ROSENFELD & COULSON
11 S. LASALLE STREET, SUITE 2500
CHICAGO, ILLINOIS 60603
312-372-0777
FAX 312-372-5231

CARLIN PHILLIPS, ESQ.
GOGEL, PHILLIPS & GARCIA, LLP
13 VENTURA DRIVE
NORTH DARTMOUTH, MA 02747
508-998-0800
FAX 508-998-0919

DOUGLAS A. BLANKMAN, ESQ.
KOPELMAN & BLANKMAN, P.A.
ONE FINANCIAL PLAZA, SUITE 1611
FT. LAUDERDALE, FL 33394
954-452-6855
FAX 954-462-6899