IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

DAVID A. NAPOLI, D.C.                           )
d/b/a NAPOLI CHIROPRACTIC CENTER, and           )
all others similarly situated,                  )
                                                )
        Plaintiffs,                             )        C.A. No. 00-6061
                                                )        Judge Ferguson
v.                                              )        Magistrate Judge Snow
                                                )
ALLSTATE INSURANCE COMPANY, and                 )
MEDVIEW SERVICES, INC.,                         )
                                                )
        Defendants.                             )
                                                )

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

NOW COMES Plaintiff, David A. Napoli, D.C. d/b/a Napoli Chiropractic Center ("DR.

NAPOLI"), by and through his attorneys, GOLD, ROSENFELD & COULSON, a partnership of

professional and limited liability corporations, GOGEL, PHILLIPS & GARCIA, LLP, and

KOPELMAN & BLANKMAN, a professional association, and hereby submits this Memorandum

of Law in Support of Plaintiff's Motion for Class Certification.

## I.    INTRODUCTION

In his class action complaint, DR. NAPOLI, on behalf of himself and a class of similarly

situated Florida medical providers, alleges seven federal and state causes of action against

Defendants, Allstate Insurance Company ("ALLSTATE") and Medview Services, Inc.

("MEDVIEW") for their systematic practice of discounting automobile Personal Injury Protection

("PIP") medical expense claims based on the operation of a "Silent PPO," or "silent preferred

1

provider organization." (See, Class Action Complaint at ¶¶ 15 -16). "Silent PPOs" have been the

subject of a number of lawsuits across the country and the resulting body of case law establishes

that their existence is actionable under various federal and state laws. In conjunction with

MEDVIEW, ALLSTATE misappropriated DR. NAPOLI'S preferred provider organization

discounts and applied them to Florida automobile insurance PIP claims. Through the systematic

operation of this Silent PPO, ALLSTATE has been paying automobile PIP medical expense

claims at a reduced rate without authority or consideration contrary to DR. NAPOLI's preferred

provider contract, the standard Florida ALLSTATE Automobile Policy, and the Florida statute

pertaining to PIP benefits. DR. NAPOLI has also alleged that by its conduct, Defendants have

violated the federal RICO Act and Sherman Anti-Trust Act.

## II.    FACTUAL BACKGROUND

DR. NAPOLI and the putative class members are all preferred health care providers in the

MEDVIEW preferred provider network. DR. NAPOLI is a licensed Florida chiropractor.

(Complaint ¶1). In 1993 he entered into a written contract with MEDVIEW to join

MEDVIEW's "preferred provider organization" ("MEDVIEW PPO"). (Complaint ¶¶ 3, 4, 17);

see also, Medview Services, Inc. Participating Health Care Professional Agreement (attached

hereto as Exhibit 1). Under the terms of the MEDVIEW Agreement, MEDVIEW acted as a

middleman. (Complaint ¶3). MEDVIEW contracted with health care providers such as DR.

NAPOLI, who in return for marketing services to generate patients, agreed to discount their

normal medical fees by 20%. (Complaint ¶¶ 3, 4, 17); (MEDVIEW Agreement, Exhibit 1). The

marketing services consisted of, inter alia, MEDVIEW's publication of DR. NAPOLI's name,

address, and practice area, to be distributed to MEDVIEW "Subscribers"[1] of existing and potential MEDVIEW "Third Party Payors"[2] which included business entities such as insurance companies, employers and union trust funds. (Complaint ¶¶ 3, 5, 18); (MedView Services Agreement, Exhibit 1 at Art. 7(A) - (B)). For patients who were not part of the MEDVIEW PPO network, DR. NAPOLI charged his normal fee without the 20% discount. (Complaint ¶ 18).

ALLSTATE is an insurance company offering Florida residents an automobile insurance policy providing PIP benefits. Under ALLSTATE's standard Florida automobile PIP policy, 80% of "all reasonable and necessary treatment expenses" are paid up to a defined limit. (Complaint ¶¶10, 11); *see also, Allstate Automobile Policy: Florida*, Part III (1) at p. 9 (attached hereto as Exhibit 2). In exchange, an ALLSTATE insured has the unrestricted right to choose his or her medical providers. (Complaint ¶11).

The State of Florida, however, has enacted a statute setting forth specific requirements for establishing an automobile insurance preferred provider network that financially encourages an insured to use a pre-defined group of preferred medical providers. (Complaint ¶¶ 28, 108); see, FLA. STAT. §627.736(10) (1998). Under Section 627.736(10), if an insurance company offers a preferred provider auto policy, it must provide each policy-holder with a current roster of preferred providers in the county in which the insured resides *at the time of purchase of such policy.* FLA. STAT. §627.736(10) (1998) (emphasis added). ALLSTATE has not offered its

---

[1] A "Subscriber" is defined as a person entitled to receive benefits under the MEDVIEW Agreement. (MEDVIEW Agreement, Exhibit 1 at Art. 1(G)).

[2] "Third Party Payor" is defined as an insurance company, employer, third party administrator, or other business entity that has contracted with MedView to pay for health care services rendered by preferred providers to MedView insured employees. (MEDVIEW Agreement, Exhibit 1 at Art. 1(E)).

insureds a "preferred provider policy" (Complaint ¶14). ALLSTATE has *admitted* this allegation

in its answer to the complaint. (*See*, Allstate's Answer and Defenses to Counts II and III of Class

Action Complaint at ¶ 14). As such, and as *admitted* by ALLSTATE, any medical provider who

treated or treats an ALLSTATE insured under an ALLSTATE PIP automobile insurance policy is

not a "preferred provider." (Complaint ¶14); (Defendant's Answer ¶14).

Despite the fact that ALLSTATE did not offer an automobile preferred provider policy to

its insureds, ALLSTATE obtained MEDVIEW's database that contained the identities of all of

MEDVIEW's preferred providers and the discounted fees that they were willing to accept under

the MEDVIEW contract. (Complaint ¶19). Subsequently, ALLSTATE began to systematically

apply the MEDVIEW PPO discount medical rates to PIP medical expense claims submitted to it

by DR. NAPOLI and the members of the putative class. (Complaint ¶¶15, 20, 25). When

ALLSTATE received a medical bill for payment under the PIP portion of its automobile insurance

policy, ALLSTATE and/or MEDVIEW would discount the bill at the MEDVIEW preferred

provider rate, would print out a form explanation or benefits ("EOB") indicating the application

of the discount, and would then make payment at that rate. (Complaint ¶¶20, 25, 31). At no time

prior to DR. NAPOLI's and the putative class members' treatment of patients entitled to PIP

benefits did ALLSTATE market their medical services to their insureds or even comply with the

requirements of Section 627.736(10) pertaining to an automobile preferred provider policy.

(Complaint ¶22).

ALLSTATE has been applying the MEDVIEW PPO discounts to PIP medical expense

claims for at least two years. (Complaint ¶28). It was and still is the custom of ALLSTATE to

discount thousands of Florida PIP medical expense claims in violation of its automobile insurance

4

policy and the Florida PIP and preferred provider statute. (Complaint ¶32). At no time did DR. NAPOLI or the members of the putative class have contracts with ALLSTATE allowing ALLSTATE to apply MEDVIEW discounts to PIP medical expenses. (Complaint ¶19). DR. NAPOLI now seeks to certify a class of Florida MEDVIEW preferred health care providers whose PIP medical expense claims were discounted by ALLSTATE through the application of MEDVIEW PPO discount rates.

## III.   ARGUMENT

The party seeking class certification bears the burden of proof in satisfying the four requirements of Rule 23(a)[3] and Rule 23(b)(3)[4] of the Federal Rules of Civil Procedure. *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981).[5] Generally, Rule 23 is liberally construed and thus a district court is left with broad discretion in deciding whether to certify a purported class. *See e.g., Montelong v. Meese*, 803 F.2d 1341, 1351 (5th Cir. 1986). In determining whether a plaintiff has met his burden, the court's inquiry is limited only to whether the requirements of Rule 23 have been satisfied, not the underlying merits of a plaintiff's claim[6].

---

[3] Under Rule 23(a) a plaintiff must establish that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

[4] Rule 23(b)(3) requires the court to find that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3).

[5] In *Bonner v. City of Prichard*, 661 F. 2d 1206, 1207 (11th Cir. 1981) the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

[6] This principle, however, is not to be construed so rigidly as to prevent the court from looking beyond the pleadings in order to make a reasoned determination as to whether the prerequisites of Rule 23 have been satisfied. *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984); *Kirkpatrick v. J.C.*

5

*D.W. v. Poundstone*, 165 F.R.D. 661, 669 (M.D. Ala. 1996) (relying on *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) and cases cited). Thus, "in determining the propriety of a class action, the question is not whether the ... plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen, supra.*

In the case at bar, Plaintiff has adequately satisfied the prerequisites of Rule 23(a) and Rule 23(b)(3) thereby justifying certification of the proposed class.

### A.    Plaintiff Has Satisfied The Prerequisites Of Rule 23(a)

#### 1.    Joinder of all Members of the Purported Class Would be Impracticable

Rule 23(a)(1) necessitates that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The term "impracticability" does not mean impossibility, but only difficulty or inconvenience in joining all members of a class. *Walco Investments, Inc. v. Thenen*, 168 F.R.D. 315, 324 (S.D. Fla. 1996). Impracticability of joinder depends on the size of the proposed class, geographic diversity of the class members, the nature of the action, the size of each individual claim, judicial economy and the inconvenience of trying individual lawsuits, and the ability of individual class members to institute individual lawsuits. *Id.*

In the present case, joinder of all members of the proposed class would be impracticable. First, MEDVIEW is a national preferred provider organization with numerous preferred providers in Florida. The exact number of Florida health care providers affected by Defendants' activities, although not presently known, is estimated to be at least in the hundreds. To satisfy numerosity, a plaintiff must proffer some evidence of the number of class members, or at least a reasonable

---

*Bradford & Co.*, 827 F.2d 718, 722 n. 2 (11th Cir. 1987).

estimate of that number. *Israel v. Avis Rent-a-Car Systems, Inc.*, 185 F.R.D. 372, 377 (S.D. Fla. 1999). A precise number of class members is not necessary to demonstrate numerosity. *Id.* DR. NAPOLI's estimate with regard to MEDVIEW's preferred provider list is based on the fact that MEDVIEW is a national preferred provider organization that provides managed health care services through a panel of preferred providers consisting of highly qualified and credentialed health care professionals. *See, MedView Services, Inc. Preferred Provider Organization Provider Manual* at 1 (attached hereto as Exhibit 1). In illustrating the nature and size of its preferred provider organization, MEDVIEW, which maintained a regional administrative office in Tampa, Florida, claimed that it contracts with laboratories, physicians, industrial and workers compensation urgent care centers, hospitals, and home health care centers. *Id.* at 3. In turn, MEDVIEW also contracted with insurance companies, third party administrators and self-insured employers (known as "payors") in order to provide a "significant source of patient volume for providers participating in our network." *Id.* at 1. Though the exact number of MEDVIEW preferred providers is not known at this time, it is reasonable to conclude that the preferred provider membership was large enough to provide a variety of medical specialists in order to entice a sufficient number of payors to be able to provide the "significant source of patient volume" to its providers. In assessing numerosity, a court may make common sense assumptions such as these. *Evans v. United States Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983): Ultimately, the exact number of class members can be determined by an examination of MEDVIEW's preferred provider records.

Coupled with the estimate concerning MEDVIEW's preferred provider membership, ALLSTATE is one of the largest automobile insurance underwriters in Florida and reasonably has

7

issued thousands of policies in Florida providing Personal Injury Protection ("PIP") coverage. Based on its sheer market size in Florida, one can rationally assume that thousands of individuals have been involved in motor vehicle accidents resulting in personal injuries who have received medical care from members of MEDVIEW's preferred providers. Given the fact that ALLSTATE has been systematically applying MEDVIEW discounts to PIP medical expense claims for at least two years, it is reasonable to infer that at least hundreds of MEDVIEW preferred providers geographically dispersed throughout Florida have been affected by ALLSTATE's conduct and thus the numerosity requirement is satisfied.

### 2.    Common Questions Of Law And Fact Exist In The Present Case

Rule 23(a)(2) requires that a plaintiff demonstrate that there are common questions of law or fact among the members of the class. Fed. R. Civ. P. 23(a)(2). The so-called "commonality" prerequisite does not require that all of the questions of law or fact raised in the case be common to all class members. *Haitian Refugee Center, Inc. v. Nelson*, 694 F. Supp. 864, 877 (S.D. Fla. 1988), *aff'd*, 872 F.2d 1555 (11th Cir. 1989). A common question has been defined as "one which arises from a 'nucleus of operative facts' regardless of whether 'the underlying facts fluctuate over a class period and vary as to individual claimants.'" *Hill v. Butterworth*, 170 F.R.D. 509, 514 (N.D. Fla. 1997). Generally, where a common scheme is alleged, common questions of law or fact will exist. *Israel, supra* at p. 7.

In the present action, DR. NAPOLI has satisfied the commonality requirement of Rule 23(a)(2). He has identified a common set of operative facts by complaining about ALLSTATE's uniform and standardized course of conduct of improperly accessing all MEDVIEW Preferred Provider discount rates and applying them to PIP medical bills in violation of Florida statutory law

and in breach of ALLSTATE's standard Florida automobile policy. Claims arising from the interpretation of a standard form contract, such as in the case at hand, present a classic case for class action treatment. *Indianer v. Franklin Life Ins. Co.*, 113 F.R.D. 595, 607 (S.D. Fla. 1986).

There are no differences in the common operative facts between any of the purported class members. All proposed class members are MEDVIEW Preferred Providers, they have all submitted medical bills to ALLSTATE pursuant to Part III of its Florida automobile insurance policy, and they have all had these medical bills improperly paid by ALLSTATE using the MEDVIEW discounted rate. These questions of fact link the purported class members in such manner that they all have the same common interest in the subject matter and an interest to ask for the same relief against Defendants.

Additionally, the principal common issues of law to be decided in this action include whether ALLSTATE violated Florida Statutes §627.736, *et seq.* by paying PIP benefits at the MEDVIEW Preferred Provider discount rates, whether ALLSTATE's processing of PIP medical bills in this fashion are violative of state and federal law, whether DR. NAPOLI and the members of the putative class are entitled to compensatory, statutory and punitive damages, and whether DR. NAPOLI and the putative class are entitled to injunctive relief. The members of the class also share the common issues of whether MEDVIEW breached its preferred provider agreement by selling its preferred provider discount information to ALLSTATE which is not a legitimate payor under the contract and which retrospectively applied the discounts to PI P medical expense claims, by failing to offer adequate and meaningful consideration for the application of the discounts to Florida PIP medical expense claims, by wrongfully disclosing the confidential discount information to ALLSTATE, and by violating the duty of good faith and fair dealing

9

inherent in its preferred provider agreements.

The only factual question that may differ from class member to class member is the total amount of discounts wrongfully taken by ALLSTATE. Individual factual issues concerning the amounts of damage suffered, though, should not affect certification. Factual differences concerning damages will not defeat a finding of commonality. *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 696 (S.D. Fla 1992). The issue concerning the amount of individual damages, however, can be easily rectified because a review of ALLSTATE's PIP files will clearly indicate the number of medical bills wrongfully discounted.

### 3.    Plaintiff's Claims Are Typical Of The Claims Of The Class

A plaintiff seeking class certification must also demonstrate that "the claims or defenses of the parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). In order to be "typical," there must be a nexus between the class representative's claims and the common questions of law or fact that unite the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985). A sufficient nexus is established if a named plaintiff's claims stem from the same event, practice, or course of conduct that forms the basis of the class claims and are based upon the same legal or remedial theory. *Id.;* *Walco Investments, Inc. v. Thenen*, 168 F.R.D. at 326. When considering typicality, a court should "focus on whether the named representative's claims have the same essential characteristics as the claims of the class at large." *Campos v. Immigration and Naturalization Service*, 188 F.R.D. 656, 661 (S.D. Fla. 1999). Indeed, when a plaintiff alleges that the same unlawful conduct was directed at or affected both the class representative and the class members, then the typicality requirement is usually met irrespective of varying fact patterns that underlie the

10

individual claims. *David v. Southern Bell Tel. & Tel. Co.*, 1993 U.S. Dist. LEXIS 20033 at \*12 (S.D. Fla. 1993).

In the present case, DR. NAPOLI's claims arise from the same course of conduct that gave rise to the claims of all other purported class members. For at least two years, ALLSTATE has been applying MEDVIEW PPO discounts to PIP medical expense claims. The process followed by Defendants to apply the MEDVIEW discounts is rather simple and consistent. First, a health care provider that also happens to be a MEDVIEW Preferred Provider provides medical treatment to an automobile accident victim. The medical provider then submits the medical charge to ALLSTATE for payment under the applicable PIP coverage. ALLSTATE then accesses MEDVIEW's database of preferred providers with their repricing system. ALLSTATE is then alerted that the medical provider happens to be a MEDVIEW Preferred Provider and automatically reprices the PIP medical expense by applying the MEDVIEW discount rate. An explanation of benefits ("EOB") form is then generated showing the provider's original charge and the MEDVIEW discounted charge. The EOB is then forwarded to the medical provider and the provider is paid at the improperly discounted rate by ALLSTATE. Accordingly, any medical provider belonging to MEDVIEWs' Preferred Provider network who has presented a bill to ALLSTATE for medical services resulting from an automobile accident has unknowingly been subjected to this standard course of conduct.

4.    **The Proposed Class Representatives Will Fairly And Adequately Represent The Interests Of The Class**

The "adequacy" prerequisite under Rule 23(a)(4) encompasses both the adequacy of the proposed class representative and class counsel. *North American Acceptance Corp. v. Arnall,*

*Golden & Gregory*, 593 F.2d 642, 644 n.4 (5th Cir. 1979). Adequacy of representation depends

on the named plaintiff's ability to prosecute the action vigorously through qualified, experienced

and competent counsel, and the named plaintiff must not have interests antagonistic to those of

the class. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987); An adequate

class representative must be part of the class and possess the same interests and suffer the same

injuries as the class members whom he seeks to represent. *Amchem Products, Inc. v. Windsor*,

521 U.S. 591, 625-26 (1997).

In the instant action, DR. NAPOLI's interests are coincident, rather than antagonistic,

with the general interests of the class. The harm suffered by DR. NAPOLI is the same as the harm

suffered by all members of the class and those harms have arisen from a common course of

conduct by Defendants. Thus, DR. NAPOLI will not have interests that will conflict with and

impair his ability to protect the interests of the proposed class. *See e.g., In re New England*

*Mutual Life Ins. Co. Sales Practice Litig.*, 183 F.R.D. 33, 40 (D. Mass. 1998). Given the

commonality between DR. NAPOLI's claims in the present case and those of the proposed class

members, there is no potential for conflicting interests in this action. Accordingly, there is no

antagonism between the interests of DR. NAPOLI and those of the class.

In order to satisfy the second prong of the adequacy requirement, a plaintiff's attorney

must be "qualified, experienced and generally able to conduct the proposed litigation. . ." *Griffin*

*v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). In the present matter, DR. NAPOLI has

retained counsel experienced in handling class actions and actions involving unlawful business

practices, including insurance cases. Plaintiff's counsel are able and accomplished, and have and

will serve as competent, thorough and rigorous advocates for the interests of the class. The three

12

law firms presented as proposed class counsel are qualified and experienced, and have the

resources and ability to conduct the proposed litigation.

**B.    The Requirements Of Rule 23(b)(3) Are Also Satisfied**

**1.    Common Questions Of Law Or Fact Predominate Over Any Questions Affecting Only Individual Class Members**

Once the Court is satisfied that the prerequisites of Rule 23(a) have been met, it must then

make a determination that "the questions of law or fact common to the members of the class

predominate over any questions affecting only individual members." Fed. R.Civ. P. 23(b)(3).

Generally "when one or more of the central issues in the action are common to the class and can

be said to predominate, the action will be considered proper under Rule 23 (b)(3) even though

other important matters will have to be tried separately." *Israel, supra* at p. 7. Furthermore, the

existence of some individual issues will not destroy predominance. *See, Walco Investments, Inc.*

*v. Thenen*, 168 F.R.D. at 334, determining that the existence of a few questions of individual

reliance in a case alleging a fraudulent investment scheme does not negate predominance of

common issues of fact and law. Contrary to the contention of ALLSTATE that fraud and RICO

claims should not be the subject of class action because of the reliance issue. In this way, the

predominance requirement is similar to the typicality requirement of Rule 23(a)(3) that "claims or

defenses" of the named representatives be "typical of the claims or defenses of the class."

*Amchem Prods. v. Windsor*, 521 U.S. at 623 n.18 (1997).

In the case at hand, ALLSTATE's consistent practice of illegally and improperly accessing

the MEDVIEW PPO database to discount PIP medical expense claims in violation of Florida

Statutes §627.736(10)(1998) clearly predominates because it affects every single member of the

13

putative class. In fact, when confronted with a single, common course of fraudulent conduct, courts certify class actions every day and have found that common questions predominate. *See e.g., Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d at 724-25; *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983); *CV Reit, Inc. v. Levy*, 144 F.R.D. at 696; *Kreuzfeld, A.G. v. Carnehammar*, 138 F.R.D. at 602-03. On January 20, 1999, Justice Ginsberg writing for the United States Supreme Court, affirmed the Ninth Circuit in *Humana v. Forsyth*, 19 S. G. 710, 1999 U.S. Lexis 744; 142 L. Ed. 2d 753 which recognized the validity of a similar RICO claim relating to insurance fraud in the medical benefits context. In that case, Humana Insurance is alleged to have defrauded its insureds by paying providers less than 80% of their billings while the insureds continued to be responsible for a 20% co-pay. The standard application of the MEDVIEW PPO discounted rates by ALLSTATE has produced identical results for all class members — a reduction in their PIP medical bills. The illegality of ALLSTATE's conduct and its violation of Florida statutory law is common to the entire class. Additionally, the question as to whether MEDVIEW's standard practice of allowing ALLSTATE to access the MEDVIEW PPO database constitutes a breach of its Preferred Provider Agreement with the purported class members and predominates any individual factual or legal issues that may exist. As such, DR. NAPOLI's case is well suited for certification.

      a.    **Dr. Napoli's Sherman Antitrust Claim Does Not Destroy Predominance Nor Should It Interfere With Certification**

Defendants may attempt to argue that the inclusion of antitrust claims in the complaint will destroy predominance and make it impossible to certify the present class. In advancing this argument Defendants might reason that because DR. NAPOLI has alleged that ALLSTATE's

14

conduct in conjunction with MEDVIEW resulted in price discrimination practices that ultimately placed a restraint on commerce and trade, any trial will be reduced to countless individual issues concerning to what extent commerce or trade was affected by each individual class member and the extent to which each was damaged. DR. NAPOLI submits, however, that such an argument would be fruitless.

Antitrust cases by their nature are well suited for class treatment. *Cumberland Farms, Inc. v. Browning-Ferris Indus., Inc.*, 120 F.R.D. 642, 646 (E.D. Pa. 1988) ("Antitrust price fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy."). Courts have consistently held that the conspiracy issue central to complex anti-trust cases is the overriding predominant question. *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229, 234 (S.D. Fla. 1993) (quoting *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 734 (N.D. Ill. 1977)); *Schreiber v. NCAA*, 167 F.R.D. 169, 174 (D.C. Kan. 1996) (certifying class of assistant coaches alleging antitrust violations relating to salaries); *In re South Cent. States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407 (M.D. La. 1980) (certifying class against wholesale bakeries for price fixing); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 690-91 (D.C. Minn. 1995) (finding typicality requirement satisfied in suit alleging wholesale price fixing of potash since class claims involved same legal theory and same elements of proof regarding alleged conspiracy) .

The present action is no different than the cases cited and lends itself to certification. At the core of DR. NAPOLI's antitrust allegations is ALLSTATE's systematic, homogenous course of conduct in wrongfully applying MEDVIEW discounts to class members' PIP claims thereby conspiring to engage in price discrimination practices that resulted in a restraint on commerce and

trade. Whether this conduct was a violation of antitrust laws is an issue common to the class as a whole. If DR. NAPOLI satisfies his burden and proves this violation, then all that is left to determine is the extent to which each class member was damaged.[7]

**b.    Dr. Napoli's RICO Act Claims Also Do Not Undermine Certification Of The Proposed Class**

To succeed with a civil RICO claim based upon mail fraud, DR. NAPOLI must demonstrate: (1) an enterprise; (2) engaged in a pattern; (3) of racketeering activity; (4) which constituted a scheme to defraud; (5) involving use of the mails in furtherance of the scheme; and (6) the scheme proximately caused injury to the plaintiff. *See e.g., McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir. 1994); *see also, Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) (requiring proximate cause with respect to injury). In certifying a class action involving RICO claims, the two issues that generally arise are the manner in which the defendants made misrepresentations to the class, i.e., oral versus written, and the extent to which each class member relied on the misrepresentations.

In the present action, DR. NAPOLI's fraud claims are based on identical written misrepresentations contained in the computer generated EOBs indicating the application of the MEDVIEW discount and the right by ALLSTATE to access the discount. Any fraudulent misrepresentations made to DR. NAPOLI were also made to all other members of the purported class on the form EOBs issued by Defendants. Thus, the facts distinguish this case from others that rely heavily on oral misrepresentations. *See e.g., Arenson v. Whitehall Convalescent &*

---

[7] The fact that each individual class member suffered different amounts of damages does not render certification impossible. Calculation of damages is a mechanical process. *Davis v. Southern Bell Tel. & Tel. Co.*, 1993 U.S. Dist. LEXIS 20033 at *21 (S.D. Fla. 1993) (citing *Smith v. MCI Telecommunications, Corp.*, 124 F.R.D. 665, 678 (D. Kan. 1989)).

*Nursing Home, Inc.*, 164 F.R.D. 659, 665 (N.D. Ill. 1996) (finding that common questions predominated in RICO action where written misrepresentations made in standard form contract rather than oral misrepresentations were alleged); *In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.*, 122 F.R.D. 251, 256 (C.D. Cal. 1988) (granting class certification to RICO class where complaint focused solely on disclosures and admissions contained in standardized letters despite existence of some oral misrepresentations); *but compare Coe v. Nat'l Safety Assocs.*, 137 F.R.D. 252, 254-55 (N.D. Ill. 1991) (finding RICO claim that relies heavily on oral misrepresentations inappropriate for class certification).

With respect to the reliance issue, plaintiffs presenting a RICO claim must prove that they relied on the defendants' fraudulent misrepresentations. *See e.g., Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1305 (4th Cir. 1993); *In re EDC, Inc.*, 930 F.2d 1275, 1280 (7th Cir. 1991) (requiring reasonable reliance in a civil RICO case). In the class action context, courts have adopted two different approaches to the reliance requirement. When the allegations consist of fraud that was committed in a standard and uniform manner among the members of the class, as is the case here where the class members received virtually identical computer generated EOBs, courts have typically held that individual reliance questions do not predominate. *See e.g., Heastie v. Community Bank*, 125 F.R.D. 669, 675 (N.D. Ill. 1989); *Smith v. MCI Telecomm. Corp.*, 124 F.R.D. 665, 679 (D. Kan. 1989); *McMahon Books, Inc. v. Willow Grove Assocs.*, 108 F.R.D. 32, 38 (E.D. Pa. 1985). When the fraudulent conduct, however, was not uniform with respect to all class members, such as when plaintiffs allege numerous oral misrepresentations that may likely differ from class member to class member, courts treat individual reliance questions as predominating over the common RICO issues. *See e.g., Martin v. Dahlberg, Inc.*, 156 F.R.D.

17

207, 215-16 (N.D. Cal. 1994); *Elliott v. ITT Corp.*, 150 F.R.D. 569, 584-85 (N.D. Ill. 1992);

*Strain v. Nutri/System, Inc.*, 1990 U.S. Dist. LEXIS 17031 (E.D. Pa. 1990).

In the present case, the members of the purported class received virtually identical written

misrepresentations contained in the computer generated EOBs indicating the application of the

MEDVIEW discount and the right by ALLSTATE to access the discount. Thus, DR. NAPOLI's

complaint here falls squarely into the "standard and uniform" document category of cases in

which reliance questions would not predominate. In such an instance where each class member

receives essentially equivalent EOBs that accompany PIP payments, it is reasonable to conclude

that common questions concerning reliance would predominate with respect to the RICO claim.

> **2.    A Class Action Is Superior To Any Other Available Method For The Fair And Efficient Adjudication Of The Present Controversy**

Finally, in order to certify a class, the Court must find that "a class action is superior to

other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P.

23(b)(3). Factors that are pertinent to the superiority requirement are: "(A) the interest of

members of the class in individually controlling the prosecution or defense of separate actions; (B)

the extent and nature of any litigation concerning the controversy already commenced by or

against members of the class; (C) the desirability or undesirability of concentrating the litigation of

the claims in the particular forum; (D) the difficulties likely to be encountered in the management

of a class action." Fed. R.Civ.P. 23(b)(3)(A)-(D). Superiority is found by comparing the

efficiency and fairness of all available methods of adjudicating the matter. *Coleman v. Cannon*

*Oil Co.,* 141 F.R.D. 516, 529 (M.D. Ala. 1991). When deciding whether a class action is

superior to other available methods to adjudicate a controversy, the court may consider the

"inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture Mart, Inc.,* 503 F.2d 1161, 1165 (7th Cir. 1974).

In the present action, superiority is satisfied because there is no better method available for the adjudication of the claims that might be brought by each individual class member than a class action. First, the interest of members of the class in individually controlling the prosecution of separate actions is limited as evidenced by the fact that only one other action has been filed in state court by a medical association consisting of 12 doctors.[8] *See Walco Investments, Inc. v. Thenen,* 168 F.R. D. at 337 (fact that few punitive class members filed individual lawsuits suggests lack of interest in controlling their own litigation). It would be extremely costly and judicially duplicative for class members to try all of their actions separately. Although some of the larger health care provider class members may have larger claims, each class member is still faced with the obstacle of establishing ALLSTATE's violation of the Florida PIP statute coupled with demonstrating the existence of Defendants' fraudulent scheme in violation of the RICO Act. Second, concentrating this action in one forum would be desirable because it will negate the threat of inconsistent adjudications, and prevent duplication of effort. Finally, the difficulties likely to be encountered in the management of this class action are minimal. Despite what Defendants may argue, there are no individual issues of fact or law that would disrupt the litigation of the matter. In fact, the difficulty, if any, of managing any individual differences in fact

---

[8] The case to which DR. NAPOLI makes reference was originally filed in Florida state court. The plaintiffs, twelve doctors who form a loose association of medical practitioners under the name of Park Place Therapeutic Center and Park Place Orthopaedics & Rehabilitation, are represented by one of the law firms representing DR. NAPOLI in the present action. *See, May, et al. v. Allstate Ins. Co.,* C.A. No.: 00-CIV-6269 (S.D. Fla. 2000) (Dimitrouleas, J.).

or law pale in comparison to the magnitude of problems that would likely arise if this case were to be tried in several hundred separate trials. Moreover, there is a strong presumption against denying class certification for management reasons. *Israel v. Avis Rent-a-Car Systems, Inc.*, 185 F.R.D. at 387 (citing *In re South Central States Bakery Prod. Antitrust Litig.*, 86 F.R.D. 407, 423 (M.D. La. 1980)).

## IV.    CONCLUSION

For the foregoing reasons, DR. NAPOLI has demonstrated that the prerequisites of Rules 23(a) and (b) have been satisfied. Therefor, the Court should allow his Motion for Class Certification.

Respectfully submitted

By: _____

By one of DR. NAPOLI's attorneys

GOLD, ROSENFELD & COULSON
A Partnership of Professional and
Limited Liability Corporations
11 S. LaSalle Street, Ste 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 (facsimile)

#5231


GOGEL, PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 (facsimile)

KOPELMAN & BLANKMAN
A Professional Association
National Towers Suite 1611
1 Financial Plaza
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 (facsimile)



# SERVICES, INCORPORATED

# PREFERRED
# PROVIDER
# ORGANIZATION



# TABLE OF CONTENTS

Introduction ................................................................. 1

Definitions................................................................. 2

Preferred Provider Organization .................................. 3

Patient Identification ............................................... 4-5

Sample Workers' Compensation Card........................... 6

Sample Referral Form ............................................... 7

Sample Group Health Card ........................................ 8

Claim Submission .................................................... 9

HCFA 1500............................................................. 10

UB-92.................................................................... 11

Claims Completion.................................................. 12

Utilization Management .......................................... 13-14

Utilization Management Criteria and Referrals ........... 15

Demographic Changes............................................. 16

# INTRODUCTION

Welcome to MedView Services, Incorporated's Preferred Provider Network. MedView provides managed health care services to Group Health, General Liability, (Auto Medical), and Workers' Compensation Clients.  Our provider panel consists of highly qualified and credentialed health care professionals. All of our providers have demonstrated their ability to render quality care to patients experiencing illness or injury.

In return for providing health care services, MedView offers our health care providers an opportunity to increase their Group health, General Liability, including Auto Medical, and Workers' Compensation revenues through the marketing of their services to a large client base, coupled with prompt payment of their professional fees.

MedView contracts with Insurance Companies, Third Party Administrators and Self-Insured Employers. This provides a significant source of patient volume for providers participating in our network. For information on new additions to MedView's client base, please call (810) 488-5260 extension 655.

In order for the MedView Preferred Provider program to operate efficiently, there are certain requirements which must be met. Instructions for patient iden- tification, claims submission, utilization management and referrals are detailed on the following pages so that you may be prepared to handle the needs of MedView patients.  MedView transactions are quick and simple, facilitating the accessibility to the network and a prompt payment of claims.

# DEFINITIONS

A *PROVIDER* is defined as an individual or facility licensed to provide medical care under the laws of the state, which upon application, entered into a contract with MedView to provide health care services to MedVeiw patients.

A *PATIENT OR EMPLOYEE* is defined as a person who, by virtue of an agreement between MedView and any business entity, may obtain medical and/or surgical services from providers.

*MEDVIEW* is defined as a Managed Health Care company that arranges for effective and efficient delivery of medical care. This is accomplished through offering to client companies a network of exclusive providers who are committed to providing quality health car at a preferred rate. In addition, Bill Review, Retrospective Review, Pre-Admission Review, Concurrent Review and other Managed Care Services are offered to clients.

*CLIENTS* are defined as insurance carriers, self-insured employers and third party administrators which have an agreement with MedView to provide Managed Health Care Services.

*UTILIZATION MANAGEMENT* is defined as the process by which MedView determines whether care rendered to a MedView patient has complied with standards of medical necessity.

*USUAL AND CUSTOMARY* is defined as the dollar amount recognized as "reasonable" reimbursement for a specific procedure code in a geographic area. The usual and customary amount is generally based on a prevailing percentile rankings by CPT-4 codes for each United States zip code. While MedView uses a reputable database, some of out clients may select other similar databases. There may be differences in exact dollar amounts depending on which usual and customary database an individual payor uses.

# PREFERRED PROVIDER ORGANIZATION



# PATIENT IDENTIFICATION

## Workers' Compensation

Many employees of MedView's Workers' Compensation clients will be issued ID cards or referral forms at the time of injury. The ID cards and referral forms have been designed so that the MedView name is easily identified by our providers (sample ID card and referral forms are on pages 6 and 7).

Many clients will prepare and issue cards or forms to employees at the time of injury. At the same time, the injured worker will be reminded of the MedView Preferred Provider locations where treatment is available for his/her injury.

The provider must review the instructions on the ID card or referral form, and call the telephone number indicated for admission and billing information (this only applies to clients who are using ID cards or referral forms).

## Group Health

MedView Group Health patients will carry ID cards provided by their employers. The ID cards have been designed so that the MedView name and the employer are identified. The identification card will also indicate plan design, utilization management requirements, the address and telephone number for billing, eligibility and employee information (a sample card is on page 8). Providers must follow all instructions on ID cards.

4

# PATIENT IDENTIFICATION

**General Liability, Including Auto Medical**

MedView General liability, including Auto Medical, patients may be issued ID cards or referral forms by their carriers. The ID cards or referral forms have been designed so that the MedView name and carrier name are easily identified.

The provider should follow any instructions printed on the card regarding requirements for pre-certification or claims submission. The instructions on any cards used by General Liability Patients, including Auto Medical, will vary based on client need.

# *SAMPLE:*
# *WORKERS' COMPENSATION I.D. CARD*

## FRONT:

**INSUROR/PAYOR**                    PHONE#: _____
MEDVIEW SERVICES, INCORPORATED

### TEMPORARY WORKERS' COMPENSATION I.D. CARD

THIS CARD IS TEMPORARY WORKER'S COMPENSATION PROGRAM I.D. CARD VALID ONLY
UNTIL THE VOID DATE ON THIS CARD. THIS CARD IS NOT A GUARANTEE OF ELIGIBILITY FOR
WORKERS' COMPENSATION BENEFITS.

EMPLOYER NAME: _____
EMPLOYEE NAME: _____
I.D. NUMBER: _____
INJURY DATE: _____
PLACE OF INJURY: _____
STATE BODY PART INJURED: _____
CARD VOID DATE: _____
ISSUED BY: _____

PROVIDERS: YOU MUST CALL 1-800-XXX-XXXX TO OBTAIN A BILLING NUMBER BEFORE ANY NON-EMER-
GENCY TREATMENT IS PROVIDED OR WITHIN 24 HOURS OF ANY EMERGENCY TREATMENT. NOTE: FOR
IMPORTANT TREATMENT AND BILLING INFORMATION, SEE REVERSE SIDE OF CARD.

## BACK:

# HOSPITALS & PHYSICIANS

MEDVIEW HAS BEEN ENGAGED BY ABC COMPANY TO
REVIEW THE REASONABLENESS OF MEDICAL CLAIMS

### FOR HOSPITAL ADMISSION & BILLING INFORMATION
### PLEASE CALL 1-800-XXX-XXXX

PHYSICIANS: CONTACT ABC, CO. FOR ADMISSION AUTHORIZATION AT LEAST 48
HOURS PRIORS TO NON-EMERGENCY ADMISSION. FOR EMERGENCY ADMISSION,
CONTACT ABC, CO. WITHIN 24 HOURS OF ADMISSION.

### FOR BILLING INFORMATION

ABC, CO. WILL ISSUE BILLING NUMBER, WHICH MUST BE ENTERED AS THE SUBSCRIBER
NUMBER ON YOUR BILLS. USE THIS NUMBER ON ALL SUBSEQUENT BILLS. ALSO, PLEASE
NOTE THE DATE OF INJURY ON ALL OF YOUR BILLS. ENTER ALL APPROPRIATE INFORMATION
ON THIS I.D. CARD ONTO THE SUBMITTED BILL. BILL ONLY FOR CHARGES RELATED TO THE
NATURE OF THE INJURY ON THE REVERSE OF THIS CARD.

*SAMPLE:*
*REFERRAL FORM*

ABC
Any place
Anywhere, USA 12345
(XXX) XXX-XXXX

### MEDICAL AUTHORIZATION

Date: _____          Time: _____

For: _____

_____Job Related Injury

_____Pre-Employment Physical Exam

_____Return to Work Physical Exam

_____Non-Job Related


_____Bill Company

_____Bill Patient

_____Bill Other


Company Name: _____

Address: _____

Phone Number: _____

Authorized By: _____

*SAMPLE:*
*GROUP HEALTH CARD*

FRONT:

EMPLOYEE HEALTH BENEFIT CARD

# ABC, CO.

EMPLOYEE SIGNATURE

CONFIRMATION OF CARDHOLDER ELIGIBILITY AND
CONFIRMATION OF BENEFITS MAY BE OBTAINED BY
CALLING ABC, COMPANY AT (XXX) XXX-XXXX

GROUP NUMBER 000

NOTE: MANY CLIENTS ID CARDS WILL MAKE REFERENCE TO MEDVIEW'S PPO ON
EITHER THE FRONT OR BACK OF THE CARD.

BACK:

## HOSPITALS & PHYSICIANS

SEND STATEMENT WITH EMPLOYEE'S NAME; PATIENT'S NAME; DIAGNOSIS; DATE OF
TREATMENT; CHARGES AND NAME OF OTHER INSURANCE COMPANY, IF ANY, TO ABC,
COMPANY, 1234 MAIN STREET, ANYWHERE, USA 12345. PLEASE INDICATE IF PATIENT'S
CONDITION IS DUE TO OCCUPATIONAL INJURY OR ILLNESS. BENEFITS ARE AUTOMATI-
CALLY ASSIGNED TO HOSPITAL OR PHYSICIAN.

FOR AUTO ACCIDENT CLAIMS, THE PLAN WILL BE SECONDARY PAYOR IN
STATE WHERE THIS POSITION IS PERMITTED.

ATTENTION: EMPLOYEES, PHYSICIANS AND HOSPITALS

MAXIMUM ALLOWABLE BENEFITS WILL NOT BE PAID UNLESS PRE-CERTIFICA-
TION IS OBTAINED BEFORE ANY NON-EMERGENCY ADMISSION TO A HOSPITAL
OR WITHIN 48 HOURS OF AN EMERGENCY ADMISSION. EMPLOYERS AND
PORVIDERS MUST CALL (800) XXX-XXXX OR (800) XXX-XXXX

IF PRE-ADMISSION REQUIREMENTS ARE NOT SATISFIED, THERE WILL
BE A $250.00 DEDUCTIBLE PER ADMISSION.

8

# CLAIMS SUBMISSION

Sole practitioner, group practice and clinic claims must be submitted on a HCFA-1500 form. Hospitals must submit claims on UB-92 forms. Samples of these claim forms appear on the following pages.

All claims are to be sent directly to the claims payor, unless noted differently by identification card instructions. Upon receipt of the claim, the bill will be repriced according to the contracted MedView reimbursement amount. The claim will then be forwarded to the claims payor within 36 hours of receipt, if the form is properly completed following the guidelines as established by the A.M.A.

*NOTE:* For workers' compensation, only medical expenses for work related injuries or illnesses are to be billed to the workers' compensation client.

## CPT-4 Codes
CPT-4 codes must be used for all claims submitted on the HCFA-1500. CPT-4 code books are available at the following address:

American Medical Association
PO Box 10946
Chicago,IL 60610-0946

## IDC-9 Codes
Diagnoses should be indicated by IDC-9 codes on the HCFA-1500 and UB-92. ICD-9 code books are available from the following address:

Documents
U.S. Government Printing Office
Washington D.C. 20402

APPROVED OMB 0938-0008

CARRIER

## HEALTH INSURANCE CLAIM FORM

PICA                                                                                                    PICA

| 1. MEDICARE  MEDICAID  CHAMPUS  CHAMPVA  GROUP HEALTH PLAN  FECA BLK LUNG  OTHER | 1a. INSURED'S I.D. NUMBER (FOR PROGRAM IN ITEM 1) |
|---|---|
| (Medicare #)  (Medicaid #)  (Sponsor's SSN)  (VA File #)  (SSN or ID)  (SSN)  (ID) | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE  MM  DD  YY    SEX  M  F | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED  Self  Spouse  Child  Other | 7. INSURED'S ADDRESS (No., Street) |
|---|---|---|

| CITY                          STATE | 8. PATIENT STATUS  Single  Married  Other | CITY                          STATE |
|---|---|---|

| ZIP CODE           TELEPHONE (Include Area Code)  (     ) | Employed  Full Time Student  Part Time Student | ZIP CODE           TELEPHONE (INCLUDE AREA CODE)  (     ) |
|---|---|---|

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
|---|---|---|
| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (CURRENT OR PREVIOUS)  YES  NO | a. INSURED'S DATE OF BIRTH  MM  DD  YY    SEX  M  F |
| b. OTHER INSURED'S DATE OF BIRTH  MM  DD  YY    SEX  M  F | b. AUTO ACCIDENT?     PLACE (State)  YES  NO | b. EMPLOYER'S NAME OR SCHOOL NAME |
| c. EMPLOYER'S NAME OR SCHOOL NAME | c. OTHER ACCIDENT?  YES  NO | c. INSURANCE PLAN NAME OR PROGRAM NAME |
| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. RESERVED FOR LOCAL USE | d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  YES  NO  If yes, return to and complete item 9 a-d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _____ DATE _____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _____

PATIENT AND INSURED INFORMATION

| 14. DATE OF CURRENT  MM  DD  YY  ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP) | 15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE  MM  DD  YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  MM  DD  YY    MM  DD  YY  FROM          TO |
|---|---|---|
| 17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE | 17a. I.D. NUMBER OF REFERRING PHYSICIAN | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  MM  DD  YY    MM  DD  YY  FROM          TO |
| 19. RESERVED FOR LOCAL USE | | 20. OUTSIDE LAB?  YES  NO     $ CHARGES |
| 21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)  1. ___  3. ___  2. ___  4. ___ | | 22. MEDICAID RESUBMISSION CODE        ORIGINAL REF. NO. |
| | | 23. PRIOR AUTHORIZATION NUMBER |

| 24. A  DATE(S) OF SERVICE  From  To  MM DD YY  MM DD YY | B  Place of Service | C  Type of Service | D  PROCEDURES, SERVICES OR SUPPLIES (Explain Unusual Circumstances)  CPT/HCPCS  MODIFIER | E  DIAGNOSIS CODE | F  $ CHARGES | G  DAYS OR UNITS | H  EPSDT Family Plan | I  EMG | J  COB | K  RESERVED FOR LOCAL USE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |

PHYSICIAN OR SUPPLIER INFORMATION

| 25. FEDERAL TAX I.D. NUMBER      SSN  EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  YES  NO | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. BALANCE DUE |
|---|---|---|---|---|---|
| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)  SIGNED _____  DATE _____ | 32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (if other than home or office) | 33. PHYSICIAN'S SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE |

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)     PLEASE PRINT OR TYPE

FORM HCFA-1500 (12-90)
FORM OWCP-1500     FORM RRB-1500

DUE FROM PATIENT ▶

OCR/ORIGINAL

X

# CLAIMS COMPLETION

1. Sole practitioners, group practitioners and clinics must complete fields 1-33 on the HCFA-1500.

2. Hospitals must complete all fields on the UB-92.

3. Enter the appropriate CPT-4 or revenue code in the fields provided on the HCFA-1500 or UB-92. Codes that are unbundled or upcoded will be edited.

4. <u>Do not discount fees prior to claims submission.</u> MedView will later reprice the claim in accordance with your provider agreement.

5. Submit completed claims directly to the claims payor, do not send claims to MedView. The claim will be repriced in accordance with your agreement.

*NOTE:* We ask that all providers check their claims for completeness and accuracy prior to submission. This will expedite the processing of your bill. It is particularly important that the patient's name, social security number, employer name and diagnosis be accurate and complete. All coding of bills will be reviewed and edited. Please code claims correctly.

## BALANCE BILLING

All of the claims repriced by MedView are reimbursed at the negotiated rate. Providers are not to resubmit claims or bill patients or employers for the remaining balance.

To facilitate the identification of MedView repriced claims, on EOB with the MedView name will accompany remittance from MedView clients or a statement will appear on the remittance identifying MedView.

# UTILIZATION MANAGEMENT

MedView provides for the review of the utilization of medical services, for some Group Health, Workers' Compensation and General Liability/Auto Medical PPO Clients. This review program includes Pre-Admission Certification, Concurrent Review and Discharge Planning.

MedView recognizes the sensitivity of health care. As a result, only medical professionals are involved in the review process from admission to discharge.

## Pre-Admission Review

Clients using MedView Utilization Management services require that all non-emergency hospital admissions be pre-certified by MedView prior to admission. Whenever a physician determines a need for elective hospitalization, the physician or his representative must call the toll free number on the patient's ID card or referral form prior to the admission, in order to begin the pre-certification process.

One the Pre-Admission Review information is received at MedView a registered nurse reviews the information to establish the need for hospitalization and the appropriate length of stay.

If a question arises as to the admission or length of stay, the case is referred to a review physician. The case is then resolved, "physician" to "physician".

Emergency admissions do not require Pre-Admission Review. However, they will be reviewed upon notification to MedView, according to our normal Concurrent Review procedures. Notification of emergency admission must be made within 24 hours.

Concurrent Review is a medical process that is performed at intervals, based upon the patients' condition. The goal of Concurrent Review is to assure that the treatment plan is consistent with the compensable diagnosis, and that the continued patient stay is medically necessary.

# UTILIZATION MANAGEMENT

During the review process, the nurse reviewer obtains information about the physicians' treatment plan and the patient's clinical condition. This information is obtained from the physician and/or the hospital's Utilization Review Department. The nurse reviewers utilize multiple criteria in making their decision. Primary consideration is always given to assure that quality care is not sacrificed in the name of cost control.

## Confidentiality

Any information acquired by MedView in the exercise of its duties and functions will be held in confidence, and will not be disclosed, except to the extent that it may be necessary to carry out its functions or until it is determined that the information is not confidential.

# UTILIZATION MANGEMENT CRITERIA & REFERRALS

MedView uses review criteria, which are an amalgamation of criteria from various sources. The following sources have been used in the development of MedView criteria:

## Plan of Treatment Criteria

These criteria evaluate the severity of illness and intensity of service rendered to patients in a hospital or an acute care setting. These criteria have been modified to incorporate indicators for home health care.

## Surgical Appropriateness Criteria

These criteria were developed by physician review boards and adopted by peer review organizations in various locales. MedView has adopted these criteria to evaluate whether a patient should obtain a second opinion to aid in deciding if other options for treatment are indicated.

## Professional Activity Study Length of Stay Norms by Commission on Professional and Hospital Activities

This criteria is used to provide initial certification for length of stay. Admissions are initially certified according to regional norms for the geographic location. Further days are provided during concurrent review if the criteria are met.

## Physician Standard of Practice

MedView Physician Advisors' experience in an active medical or surgical practice is utilized to go beyond the set criteria for evaluating medical treatment.

## Referrals

Any time that is becomes necessary to refer a patient for additional health care services, it is required that the referral be made to a participating network provider.

To assist in referring within the network, please call the MedView provider referral hot line at 800-MEDFACT.

# DEMOGRAPHIC CHANGES

Please provide your Provider Relations Representative with written notice of demographic changes within 10 working days of the change. Demographic changes include:

>Federal tax identification change
>Address Change
>Addition or closing of locations
>Addition or termination of contracted providers
>Billing address change
>Telephone number change

It is very important that this information be forwarded to MedView at you earliest convenience. **Failure to update MedView may result in loss of patient referrals due to inadequate information.**



## SERVICES, INCORPORATED

32991 Hamilton Court   Ste. 300
Farmington Hills, MI  48334
(810) 488-5260
Fax (810) 488-5261

# REGIONAL ADMINISTRATIVE OFFICES:

### CALIFORNIA

*EL SUGUNDO*
840 Apollo Street
Suite 254
El Segundo, CA 90245-4701
(310) 615-0368

*SAN FRANCISCO*
255 California Street
Suite 310
San Franciso, CA 94111-4904
(415) 288-6450

### COLORADO

1850 Woodmoor Drive
Suites 200
Monument, CO 80132-9072
(800) PPO-USA1 or (800) 776-8721

### FLORIDA

3625 Queen Palm Drive
Tampa, FL 33619
Suite 200
(813) 623-5282

### ILLINOIS

555 W. Madison
South Cental Atrium Mall
Chicago, IL 60661
(312) 902-3765

### TEXAS

*IRVING*
600 E. John Carpenter Fwy.
Suite 110
Irving, TX 75039
(214) 717-5780

*HOUSTON*
11200 Westheimer
Suite 509
Houston, TX 77042
(713) 784-8195



# MARKETING OVERVIEW

*MedView offers its Preferred Providers an opportunity to increase their practice revenues through direct marketing of their services to a large client base.*

*MedView contracts with large insurers, Third Party Administrators, and Self-Insured Employers for their Group Health, Worker's Compensation, General Liability, and Personal Injury Protection programs. This provides a significant source of patient volume for participating providers.*

*MedView provides a directory listing of its Preferred Providers to its clients for distribution to their insureds and employees. Our clients also have access to MedView's 1-800 provider locator service.*

*Seminars are available for client company management and employees, claim payors, and brokers/agents. Orientation sessions are also available for all claims examiners.*

*Once a patient is present in the provider's location, it is the quality of care that convinces the patient to maintain a relationship with the provider.*

FL