IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

DAVID A. NAPOLI, D.C.,                          )
and all others similarly situated               )
      Plaintiffs,                            )        C.A. No. 00-6061
v.                                              )        Judge Ferguson
                                         )        Magistrate Judge Snow
ALLSTATE INSURANCE COMPANY, and                 )
MEDVIEW SERVICES, INC.,                          )
      Defendants.                            )

## DR. NAPOLI'S OPPOSITION TO ALLSTATE'S DISMISSAL MOTION

### INTRODUCTION

DR. NAPOLI's class action complaint alleges seven federal and state causes of action against two Defendants: ALLSTATE and Medview Service, Inc., ("MEDVIEW"). DR. NAPOLI's case attacks the stealing of medical providers' fee discounts - a widespread, well-known and virulent abuse in the health care industry called a "silent PPO", or "silent preferred provider organization." (*See* complaint, ¶s 15 and 16). "Silent PPOs" have been the subject of a number of lawsuits across the country (as will be denoted below), and the resulting body of case law establishes that their existence is actionable under federal and state law.

ALLSTATE has moved under Rule 12 to dismiss Counts IV, (RICO); V (anti-trust), VI (declaratory judgment), and VII (Florida PPO statute). ALLSTATE has answered Counts II and III (unjust enrichment and third-party contract beneficiary, respectively) and is not named as a Defendant in Count I (breach of contract v. Medview). Defendant MEDVIEW has not joined in ALLSTATE's motion to dismiss, and has not responded to the complaint.

A motion to dismiss tests the sufficiency of a complaint, not its merits. *Weiler v. Household Finance Corp.*, 101 F3d 519, 524 N.1 (7th Cir. 1996). Dismissal of a complaint for

1

failure to state a claim will be granted only if it appears beyond doubt that the plaintiff can prove

no set of facts in support of her claim which would entitle her to relief. *Brooks v. Blue Cross*, 116

F.3d 1364 (11th Cir. 1997); *Richmond v. Nationwide Cassel L.P.*, 52 F3d 640, 644 (7th Cir.

1995). In order to withstand a motion to dismiss, a complaint must allege facts sufficiently,

setting forth the essential elements of the cause of action. *Gray v. County of Dane*, 854, F.2d 179,

182 (7th cir. 1988). All well-pled allegations are presumed to be true and all reasonable

inferences are drawn in favor of the plaintiff. *Brooks, supra* (11th Cir. 1997) *Lanigan v. Village of*

*East Hazel Crest*, 110 F.2d 467, 468 (7th cir. 1997). Such motions are viewed with *disfavor and*

*are rarely granted. Brooks supra*, at 1369 (11th Cir. 1997). Federal courts are notice-pleading

jurisdictions.

Before the Court on ALLSTATE's Rule 12 motion are the complaint and its attached

exhibits, DR. NAPOLI's Amended Local Rule 12.1 Civil Rico Case Statement and its

attachments, and ALLSTATE's motion to dismiss and memorandum of law.[1]

We will demonstrate, based on these materials and relevant law, that ALLSTATE's

motion to dismiss must be denied in its entirety.

## COUNT IV STATES A RICO CLAIM

ALLSTATE argues on the one hand that Count IV is "prolix", "vague" "internally

contradictory" "abstruse", "incomprehensible", not "short, plain, or simple" (ALLSTATE's

motion ¶s 4, 5, and 6); and on the other hand is "not pleaded with particularity", and "bereft of

---

[1] ALLSTATE's answer to Counts II and III includes answers to ¶s 1 - 41, which paragraphs are incorporated into the challenged counts. While allegations of the complaint are to be taken as true, the Court also has before it ALLSTATE's *admissions* to ¶s 4, 11, 14, 21-23, 24, etc. These admissions will be noted *infra*.

any detail" (ALLSTATE's motion ¶s 7, 9, 10).  ALLSTATE cannot have it both ways.  And it

defies logic that ALLSTATE, one of the country's largest insurance companies, cannot

"comprehend" what it is accused of.  As the complaint alleges (see, ¶16), a "silent PPO" is a well-

known abuse.  The American Association of Preferred Providers has denounced "silent PPOs",

and The American Medical Association has issued an "Action Alert Kit" to its members educating

them about silent PPO schemes.  Complaint ¶16.  And, Florida has enacted a statute regulating

the establishment of legitimate PPOs (preferred provider organizations).   Complaint, ¶s 5, 105-

110.  It could not be more obvious from a reading of the complaint that, as ALLSTATE well-

knows, it is accused of participating in a "silent PPO", which is an unlawful and fraudulent

undertaking.

 Civil RICO claims, to be sure, have sometimes been criticized by courts when litigants try

to convert a simple commercial breach of contract, or a "garden - variety fraud claim" into a

RICO case.  (Defendant's memo. p.7 n3).  But the instant case alleges a massive, organized,

continuing fraudulent scheme.  It is precisely the kind of case for which civil - RICO was

designed.[2]

 "To show a violation of §1962, a RICO plaintiff must allege injury from "(1) conduct (2)

of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex

Co.*, 473 U.S. 479, 496 (1985); *H.J. Inc., v Northwestern Bell Telephone Co.*, (492, US 229

(1989); *Morse v. Bankers Life & Casualty*, (N.D. Ill. Feb 23, 2000), attached hereto as Exhibit 3

as no citation has been established. Contrary to ALLSTATE's arguments, each of these elements

---

 [2]  ALLSTATE's repeated use of pejoratives in its brief, such as "ludicrous"
(ALLSTATE's memo. p.15), and "flimsy" (ALLSTATE's memo, p. 14) are not helpful to this
Court, and such rhetoric will *not* be utilized here by DR. NAPOLI.

is more than adequately pleaded.  We will first summarize from the complaint the underlying

conduct - the "silent PPO".  Then we will identify how each of the other RICO elements is

properly pleaded.

**The "Silent PPO"**

The nuts and bolts of the "silent PPO" are described within ¶s 1 - 51 of the complaint.

ALLSTATE has filed an answer to these paragraphs, thus waiving any objection to their form.[3]

DR. NAPOLI is a Florida chiropractor.  (¶1).  In 1993 he entered into a written contract

with Defendant MEDVIEW to join MEDVIEW's "preferred provider organization" or "PPO" (¶s

3, 4, 17, Exhibit 1 to complaint).  Under its PPO, MEDVIEW acted as a middleman.  (¶3).

MEDVIEW contracted with health care providers, such as DR. NAPOLI, who in return for

marketing services to generate patients, agreed to discount his normal fees by 20%.  (¶s 3, 4, 17,

Exhibit 1).  The marketing services consisted of, inter alia, MEDVIEW's publication of DR.

NAPOLI's name, address, and practice area, to be distributed to insured patients of insurance

companies who provide "preferred provider" policies (¶s 3, 5, 18, Exhibit 1), and which insurance

companies have also joined MEDVIEW's PPO.  (¶s 3, 5, 18, Exhibit 1).  A "preferred provider

policy" is one which contemplates "preferred" medical providers by name, and offers a discount if

the insured patient utilizes one of these medical providers (such as Plaintiff Dr. Napoli).  (¶s 3, 4,

5).  For other patients, DR. NAPOLI charged his normal fee, without the 20% discount (¶ 18).

The State of Florida has enacted a statute setting forth requirements for establishing an

automobile insurance PPO network (¶s 28, 108, see Florida stat. §627.736(10)).  ALLSTATE has

---

[3] Also notable is that ALLSTATE has filed no Rule 12(e) motion for a more definite
statement, and no Rule 12(f) motion to strike immaterial matter.

not offered its insureds a "preferred provider policy" (¶14 - *admitted* by ALLSTATE). To the contrary, under ALLSTATE's standard Florida automobile PIP (personal injury protection) policy, 80% of "all reasonable and necessary treatment expenses" are paid. (¶s10, 11)  So, ALLSTATE was never a member of the MEDVIEW PPO, and indeed could not legally be a member - it did not offer its insureds a "preferred provider" policy.  Thus, under no theory was ALLSTATE entitled to discount DR. NAPOLI's bills.  The facts underlying this conclusion are not only pleaded in the complaint, they are *admitted* by ALLSTATE in its answer.  (See ALLSTATE's answer to ¶ 14 of the complaint wherein it admits that it has not offered its insureds preferred provider policies and admits that DR. NAPOLI and those similarly situated are not "preferred providers").

Despite DR. NAPOLI's contract with MEDVIEW, and despite ALLSTATE's ineligibility to benefit from DR. NAPOLI's contractually - limited discounts, ALLSTATE began, gratuitously and officiously, to steal DR. NAPOLI's discounts.  (¶s 15, 19).  To do this, ALLSTATE first obtained (fraudulently) MEDVIEW's database that contained lists of MEDVIEW's preferred providers as well as the discounted fees. (¶19).

ALLSTATE's Florida automobile personal injury protection insurance policy required it to pay 80% of its insureds' reasonable and necessary medical bills up to a defined limit (¶s10, 11).[4]  From time to time, DR. NAPOLI treated ALLSTATE's insureds (¶ 21), and submitted his normal bills for such services to ALLSTATE (¶ 24).  ALLSTATE then mailed a check and an EOB form (Explanation of Benefits) to DR. NAPOLI for each bill (¶s 20, 27, Exhibits 2, 3).  These EOBs concealed the fact that ALLSTATE was stealing DR. NAPOLI's PPO discount.

---

[4] Obviously, the insured was required to pay the remaining 20% of the bills.

(¶27). Specifically, ALLSTATE's EOBs were false in two respects. First, ALLSTATE lied about the "amount billed". (¶ 72, Exhibits 2 and 3). For example, Exhibit 2 (reproduced here ante as Exhibit 2), ALLSTATE's EOB, states that the "Billed Amount" for the manual therapy is $48.00. In fact, the "Billed Amount" by DR. NAPOLI for that service was $60.00 - his normal rate - and the $48.00 figure represented ALLSTATE's unlawful stealing of the 20% discount which DR. NAPOLI by contract extended only to legitimate PPO members - which ALLSTATE admits it was not. *Id.* ALLSTATE then paid DR. NAPOLI 64% of his billed amount rather than the required 80%. (80% of 80% of his billed amount.)

Second, ALLSTATE lied on its EOB about its entitlement to DR. NAPOLI's PPO discount. (¶72, Exhibit 2). ALLSTATE's EOB stated that "fee reimbursements are based on this medical service provider's agreements with CCN." [Defendant MEDVIEW's alleged successor-in-interest]. (*Id*). As discussed above, ALLSTATE was *not* entitled to the benefit of DR. NAPOLI's agreement with MEDVIEW/CCN (by ALLSTATE's own admission).

The combination of these two ALLSTATE lies on the mailed EOBs effectively concealed the stealing of discounts from DR. NAPOLI (¶s 27, 72, 74). This continuing mail fraud is one of the bases for the RICO claim. ALLSTATE's memorandum argues that DR. NAPOLI never "inquired about or raised any objection or question" with ALLSTATE prior to filing suit and that "by comparing the amounts of the checks he received from ALLSTATE to his own books and records... Plaintiff knew or should have known whether ALLSTATE had paid the amounts reflected on his original invoices or some discounted rate." (ALLSTATE's memo, p. 3.) This argument - essentially that there is no fraud because, after an investigation which included a review of his "books and records", DR. NAPOLI could have detected ALLSTATE's lies, is an

6

astounding argument for a Defendant to make - and we invite ALLSTATE to make that argument in front of a Florida jury. But at this Rule 12 pleading stage, it is an irrelevant factual argument. If it is worth anything at this stage of the case, it is an admission that ALLSTATE's deception succeeded and could only be detected by reference to other "books and records". It is contrary to ALLSTATE's contention on page 8 of its memorandum that "there is simply nothing pleaded, beyond mere conclusory statements upon which science [sic] can be based." Although ALLSTATE probably meant to argue scienter, every successful fraud claim is based on subsequent investigation which unearths the fraud. Defendant ALLSTATE has not, and cannot, argue that its EOBs were truthful in every material aspect.[5]

The above summary from the complaint describes a classic "silent PPO" scheme, engaged in by ALLSTATE and MEDVIEW. It is precisely the kind of illegal scheme described and condemned in *HCA Health Services of Georgia, Inc., v. Employers Health Ins. Co.*, 22 F.Supp. 2d 1390 (ND Ga 1998), *Mitzan v. Medview Services, Inc.*, 1999 Mass super Lexis 279, (6/16/99); *Southeast Physical Therapy Services, Inc., v. Healthcare Value Mortgage, Inc.*, Sup. Ct Mass. 98-3546 (7/21/99); and the American Medical Association's "Action Alert Kit.[6] Contractual PPO's, and their legitimate role in the cost-effective provision of health care services, are the subject of numerous judicial opinions, see; e.g., *HCA Health Services of Virginia v. Metropolitan Life Insurance Co.*, 957 F.2d 120, 122 ( 4th Cir. 1991); *Ball Memorial Hospital, Inc., v. Mutual*

_____

[5] So there is no misunderstanding: the EOB attached as Exhibit 2 to the complaint includes the line "Eligible Amount Based on 80% coverage". This line refers to ALLSTATE's obligation to its insured to pay 80% of reasonable and necessary medical bills - it does not refer to DR. NAPOLI's contracted 20% discount to PPO members.

[6] A copy of this document, identified in ¶ 16 of the complaint, is attached to this Response - as Exhibit 1.

*Hospital, Inc., v. Mutual Hospital Ins. Co.*, 784 F2d 1325, 1329-1330 (7th Cir. 1986); Gavin

*North Sherwood Chiropractic Clinic v. Bower*, 838 F.Supp 274 (M.D. La 1993); *Ryan v. VHA*

*Enterprise, Inc.*; 1990 WL 58969.1 (SDNY 1990).

At page 2 of its memo, ALLSTATE injects, without any discussion, another irrelevancy.

ALLSTATE states that ALLSTATE is listed as "Payor" on Plaintiff's agreement with

MEDVIEW. ALLSTATE makes no effort to develop this statement as bearing on any issue

before this Court, so it could only have been inserted to generate confusion. As discussed above,

ALLSTATE has *admitted* that it has not offered its insureds a "preferred provider policy" (¶14 -

admitted), so ALLSTATE's insureds could not, as a matter of law, be entitled to DR. NAPOLI's

discounts. Surely ALLSTATE did not argue or hint that the inclusion of ALLSTATE's name on

a lengthy list of companies on an Exhibit to the NAPOLI-MEDVIEW contract changes anything.[7]

With the underlying fraud scheme in mind, we next turn to Defendant ALLSTATE's

specific RICO pleading objections, all of which are meritless.

### § 1962(c)    Under this subsection, it is a RICO violation for a Defendant "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

ALLSTATE argues that no"enterprise" is pleaded (ALLSTATE's memo p.5); and that no

"pattern" is pleaded (ALLSTATE's memo p. 6). A brief perusal of the complaint and leading

case law refutes these assertions.

Under 18 U.S.C. §1961, a RICO "enterprise" can be any association in - fact. ¶ 52 of the

---

[7] Exhibit C to the NAPOLI-MEDVIEW contact merely lists ALLSTATE as one of numerous insurance companies with which another middleman- "CarVel/MedCheck (formerly Fortis)" had a relationship.

instant complaint expressly alleges that ALLSTATE and MEDVIEW constituted such an

"association - in- fact". Moreover, this association - in - fact was the "silent PPO". The structure

and unlawful, fraudulent workings of this enterprise - the "silent PPO" - are set out in detail in the

complaint. ¶15 for example alleges that Defendants collectively engaged in the "silent PPO",

under which MEDVIEW provided the data base and ALLSTATE stole DR. NAPOLI's

discounts. Paragraphs 19, 57g, 64 and 65 further describe the roles and the workings of this

illegal "silent PPO". The scheme required acts of both Defendants to effect this "silent PPO".

*Richmond v. Nationwide Cassel*, 52 F.3d 640, 645 (7th Cir. 1995).

Contrary to ALLSTATE's memo, RICO nowhere requires that the "enterprise" for a

1962(c) violation consist of "employees or associates" of an enterprise (ALLSTATE's memo. p.

9). The case cited by ALLSTATE does not so require, see *Bill Buck Chevrolet v. CTE Florida,*

*Inc.*, 54 F.Supp 2d 1127 (M.D. Fla 1999); and such a construction would do violence to the

statute's plain language.

The enterprise element is more than sufficiently pleaded. Under RICO, a "pattern of

racketeering activity" means two or more specified federal offenses. 18 U.S.C. §§ 1961, 1962.

The instant complaint alleges a limitless number of predicate acts of mail and wire fraud,

18 U.S.C. §§ 1341, 1346, 1343; extortion based on economic fear, 18 U.S.C. §1951(b)(2); and

the Travel Act: interstate travel in furtherance of the fraud, 18 U.S.C. § 1952(a). This element is

more than adequately pleaded. See, ¶s 55-59, 67-73, 76-79.

The mail fraud allegations, by themselves, are sufficient to overcome a Rule 12 sufficiency

attack. Mail fraud consists of use of the U.S. mails in furtherance of a scheme to defraud . 18

U.S.C §1341. It includes the deprivation of the intangible right of honest services, 18 U.S.C. §

9

1346. Here it is expressly alleged that ALLSTATE mailed fraudulent EOB ("Explanation of

Benefits") forms to DR. NAPOLI (and the rest of the alleged class) with ALLSTATE's illegally

discounted checks . (¶s 57d, 57f, and 58.) These EOBs, as discussed above, lied about the

"amount billed", and lied about ALLSTATE's entitlement to DR. NAPOLI's discount as a PPO

member. See ¶s 27, 72. These lies were not only in furtherance, but necessary for ALLSTATE

to be able to divert moneys due DR. NAPOLI to itself. This is classic mail fraud, and our federal

prisons are rife with inmates whose conduct was analogous. Moreover, similar illegal, concealed

discounts for medical services were the basis for a proper co-payor's class action RICO claim in

*Forsyth v. Humana Inc.*, 114 F.3d 1467 (9th Cir. 1997), affirmed 1999 U.S. Lexis 744, 142 L.Ed

2d 753 (1999). ALLSTATE's other arguments in its Memorandum go to the weight which the

trier-of-fact may choose to give the actual proof of fraud at trial- they do not bear on Rule a 12

motion, which merely tests the complaint's notice - pleading sufficiency. *See, U.S. v. Allen*, 155

F.3d 35, 42 (2d Cir. 1998).

The other RICO predicates are also pled as the federal offenses which they are: extortion

under fear of economic harm, and the Travel Act.

Lastly, ALLSTATE argues that the "relatedness" and "continuity" elements of the RICO

pattern are not pleaded. (ALLSTATE's memo pp. 8-10.) This argument is specious.

ALLSTATE'S continuous mailings of fraudulent EOB's to DR. NAPOLI (and to the alleged

class), which take PPO discounts to which ALLSTATE is not entitled, are factually related and

part of the same scheme, as is pleaded many times in the complaint. *See*, e.g., ¶s 5, 15, 19, 20,

25, 27: the "silent PPO" is the scheme. Paragraphs 81 and 82 expressly allege this relatedness.

Moreover, the "continuity" of the RICO predicates is expressly pleaded. See ¶ 56:

10

"continuous for two years"... will continue into the future."; ¶ 73: "...transactions in a continuous and uninterrupted flow"; ¶82: "pose a threat of continued racketeering activity; ¶80: "...continues to defraud DR. NAPOLI and the purported class"; ¶ 98: "...continues to commit overt acts and ...predicate acts"; ¶ 99: "are continuing".

So these elements are both expressly pleaded, and are inherent in the "silent PPO" scheme. They are pleaded with great specificity.

### § 1962(d):    RICO conspiracy.

ALLSTATE argues that there can be no RICO conspiracy unless there is a substantive RICO pleaded. ALLSTATE's memo. p. 1. While ALLSTATE's assertion is surely incorrect as a matter of law, it doesn't matter on this Rule 12 motion. For, as discussed above, a substantive RICO claim exists here, and has been more than sufficiently pleaded.

ALLSTATE and MEDVIEW, as discussed above, have acted in concert to perpetrate the "silent PPO" scheme.

### § 1962(a).    Under this subsection, it is a RICO violation to use or invest money in an interest in, establishment of, or operation of any enterprise.

ALLSTATE argues, cryptically and very briefly (ALLSTATE's memo p. 5), that the complaint fails to plead harm to DR. NAPOLI "as a result of investment activity by ALLSTATE," and that DR. NAPOLI's injury must be proximately caused by the "investment", not by the predicate acts. One wonders what complaint ALLSTATE is looking at; surely not the complaint in this case! As the complaint alleges, DR. NAPOLI was harmed, and ALLSTATE benefitted, by the fraudulent, deceitful diversion of moneys due DR. NAPOLI, which moneys the scheme diverted to ALLSTATE. Contrary to ALLSTATE's memorandum, both the RICO statute and

11

the case cited by ALLSTATE condemn both the "use" and "investment" of racketeering

proceeds. *See*, 18 U.S.C. § 1962(a); *Vicom, Inc., v. Harbridge Merchant Servs, Inc*., 20 F.3d

771, 778 (7th Cir. 1994). Here, ALLSTATE's use of the illegal discount is the basis for the

§1962(a) claim.

ALLSTATE's "use" or "investment" of moneys lawfully due DR. NAPOLI obviously

caused DR. NAPOLI injury - his loss of moneys earned. So the RICO count (which incorporates

¶s 1 - 51 describing the "silent PPO"), under federal notice - pleading standards, is more than

sufficient on this point. *See*, e.g., ¶s 5, 20, 25, 66, 97.

**Fraud is adequately pleaded**

ALLSTATE argues that the fraud underlying the RICO claims has not been pleaded "with

particularity" under Rule 9(b). (ALLSTATE's memo pp. 12 -15.) ALLSTATE even suggests

that the complaint fails to plead any false material misstatements or omissions; and fails to plead

times and places, content, and ALLSTATE's gain. (ALLSTATE's memo, pp. 12 and 15.) These

arguments ignore the actual averments in the complaint and attached exhibits.

The false statements on the EOBs which ALLSTATE mailed to DR. NAPOLI (and to the

entire class of Plaintiffs) were discussed supra. ALLSTATE mailed a check and EOB form for

each bill (¶s 20, 27, Exhibits 2, 3). These EOBs concealed the fact that ALLSTATE was stealing

DR. NAPOLI's PPO discount. (¶27). Specifically, ALLSTATE's EOBs were false in two

respects. First, ALLSTATE lied about the "amount billed". (¶ 72, Exhibits 2 and 3). For

example, on Exhibit 2 (reproduced here ante), ALLSTATE's EOB, states that the "Billed

Amount" for the manual therapy is $48.00. In fact, the "Billed Amount" by DR. NAPOLI for

that service was $60.00 - his normal rate - and the $48.00 figure represented ALLSTATE's

unlawful stealing of the 20% discount, which DR. NAPOLI by contract extended only to legitimate PPO members - which ALLSTATE admits it was not. *Id.*

Second, ALLSTATE lied on its EOB about its entitlement to DR. NAPOLI's PPO discount. (¶72, Exhibit 2). ALLSTATE's EOB stated the "fee reimbursements are based on this medical service provider's agreements with CCN. [Defendant MEDVIEW's alleged successor-in-interest]. (*Id*). As discussed above, ALLSTATE was *not* entitled to the benefit of DR. NAPOLI's agreement with MEDVIEW/CNN (by ALLSTATE's own admission).

The combination of these two ALLSTATE lies on the mailed EOBs effectively concealed the stealing of discounts from DR. NAPOLI (¶ 27, 72, 74). This continuing mail fraud is one of the bases for the RICO claim. Thus, the complaint sets out the documents and their false statements explicitly.

Two EOB's are attached to the complaint as Ex. 2 and 3. More EOB's are attached as Exhibits to DR. NAPOLI's RICO statement. These EOB's provide all the evidentiary detail that Rule 9(b) and even ALLSTATE asks for. While DR. NAPOLI should not have to interpret these documents for ALLSTATE, we will use the first EOB, marked Exhibit 2 to the complaint and Exhibit 2 to this pleading, to demonstrate the requested detail.[8] This EOB is dated 8-16-99, and was mailed by "ALLSTATE", to "DR. NAPOLI" in Hollywood, Florida. What ALLSTATE obtained as a result of this false EOB was, as pleaded numerous times, 20% of what ALLSTATE should have paid DR. NAPOLI. On Exhibit 2, as discussed earlier, the "Amount Billed, $48.00" was false, as the actual amount billed by DR. NAPOLI was $60.00 (simple math: $48.00 is 80%

---

[8] The EOBs are attached to and incorporated into the complaint, see ¶s 27, 57d, and 58; and are an integral part of the pleading, *See* FRCP 10(c).

of $60.00).  Note the highlighted portions of this exhibit.  Each EOB contains like details.

This evidentiary detail provides everything ALLSTATE seeks in its motion.  It specifies

"who", "what", "where", "when", and "how".  It more than satisfies Rule 9(b) "particularity"

standard.  *See, Brooks v. Blue Cross*, 116 F.3d 1364 (11th Cir. 1997).

**The RICO count is detailed enough**.

After complaining that the RICO count does not plead enough, ALLSTATE next argues

that the RICO count pleads too much.  ALLSTATE's memo p. 15.  ALLSTATE would have a

RICO Plaintiff navigate between the Scylla of "short and plain" and the Charybdis of

"particularity".  Fortunately, the Federal Rules of Civil Procedure do not require such a hazardous

Ulysses - like passage!  Any reasonable Defendant (especially a large insurance company like

ALLSTATE) would know very well that this RICO count charges a "silent PPO" scheme.  As

noted, such an illegal scheme has been the subject of much recent literature.

ALLSTATE knows what it is charged with.[9]

**RICO as a class action**

ALLSTATE argues that this RICO - fraud cannot be a class action because "reliance"

issues are individual.  ALLSTATE's memo p. 11.  Of course, fraud class actions are certified

every day in this country.  (See pages 13, 14, 16, 17, and 18 of Plaintiff's memorandum in support

of his motion for class certification filed simultaneously with this response which addresses the

---

[9]      One additional observation.  ALLSTATE says that this Court's Rule 12.1 (RICO statement) reads as follows: "If you allege violations of more than one subsection of §1962 [each] should be plead as a separate RICO claim." ALLSTATE's motion p.3.  But that is not what the Rule says.  In fact, the Rule states: "If you allege violations of more than one subsection of §1962 or §772.103 each must be treated *or* should be pled as a separate RICO claim." (Emphasis added) Plaintiff's complaint satisfies this Rule: it is expressly treats each subsection of §1962 separately, *see e.g.* ¶84, p.22 (§1962c); ¶87, p.23 (§1962d); ¶ 60, p. 16 (§1064a).

"reliance" issue.) The alleged "silent PPO" utilized uniformly false EOB's which not only drove, but also concealed ALLSTATE's fraud. To the extent it is an issue, "reliance" on ALLSTATE's false statement can readily be inferred from the Plaintiff class' acceptance of the fraudulently generated checks. It is a perfectly proper vehicle for class treatment, a reality which is more fully discussed in the memorandum supporting Plaintiff's motion for class certification.

**RICO is meant to reach ALLSTATE's conduct**

This alleged "silent PPO" is neither a "garden-variety" fraud case, nor a simple breach of contract case. Rather it is a classic situation for which civil RICO is designed. Two entities - ALLSTATE and MEDVIEW - have formed a "silent PPO" enterprise, and have used and conducted its affairs through a continuous and related, pattern of fraud which violates various federal predicate statutes. The "silent PPO" is an illegal and venal institution, which should be stopped and deterred, using the RICO sanctions provided by federal law.

The instant complaint adequately and properly pleads civil RICO. Issues argued by ALLSTATE must be resolved at trial by the jury, see *U.S. v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998).

## COUNT V ADEQUATELY PLEADS AN ANTI-TRUST COUNT

COUNT V alleges that the combination and conspiracy between MEDVIEW and ALLSTATE constitutes an unlawful restraint on commerce, based on the Defendants' taking illegal discounts from the Plaintiff class, while paying others the full 80% amount due.[10]

ALLSTATE makes two arguments here. First, ALLSTATE claims that no combination

---

[10] Contrary to the suggestion in ALLSTATE's memo at p. 17, Count V does not seek to allege monopolization, and does not do so.

or conspiracy is alleged, and thus no 15 U.S.C. §1 violation is stated. Second, ALLSTATE

argues that no Robinson - Patman Act (15 U.S.C. §13) violation is stated because that act does

not apply to "insurance services," ALLSTATE's memo pp. 16 - 17.

ALLSTATE is plain wrong in contending that no combination or conspiracy is alleged.

¶101 refers to the allegations of the earlier paragraphs of the complaint, which describe the "silent

PPO" scheme. At various places, these paragraphs expressly name MEDVIEW and ALLSTATE

as conspirators and co-venturers. ¶ 15:... "ALLSTATE and middleman MEDVIEW have

collectively engaged in the ... silent PPO"; ¶ 52: "...ALLSTATE acting with middleman

MEDVIEW formed an enterprise consisting of an association - in -fact;" ¶ 90: "...conspiracy ...

consists of ALLSTATE and middleman MEDVIEW ....". Moreover, as discussed at length

above, the methods and manner in which ALLSTATE and MEDVIEW interacted to carry out the

illegal "silent PPO" are set out in great detail.

ALLSTATE's only objection to Count V's stating a § 1 restraint of trade combination is

therefore meritless.

As to the § 13 violation, ALLSTATE's characterization of the case as involving

"insurance services" (exempt from the Robinson - Patman Act) is misplaced. The "silent PPO"

has nothing to do with payment for insurance services. The EOB's include payments for *medical*

*devices*, as well as for medical treatments - not insurance services.[11] Thus ALLSTATE's

---

[11] The EOBs attached to the pleadings before the Court include numerous examples of the sale of medical supplies. Attached to this pleading and marked Exhibit 4 is a sample EOB attached to the RICO statement filed with the Court. The highlighted portion illustrates "special supplies" sold to the patient. ALLSTATE's "billed amount" of $249.00. (80% of what Dr. Napoli *actually* billed ALLSTATE.) ALLSTATE took the illegal discount on these supplies yet paid full price to providers whose discounts were not stolen.

objection to the § 13 Robinson - Patman claim is simply irrelevant. Under even the most narrow reading of § 13, payment for *medical supplies* are clearly within its scope. *See, e.g. Bell Memorial Hospital, Inc. v. Mutual Hospital Assn*, 784 F.2d 1325, 1340 (7th Cir. 1986).

PPOs, often regulated by state laws, clearly involve an aspect of collective price restraints. This PPO method of negotiating fees, in which the payors decide the maximum amount they are willing to reimburse providers for medical devices and treatments, and providers decide whether they are willing to accept that limitation on the reimbursement they receive, is a kind of "price fixing," but it is a kind that the antitrust laws do not prohibit. *See, e.g., Kartell v. Blue Shield*, 749 F.2d 922, 923-26 (1st Cir. 1984) (Breyer, J.), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, (1985); *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n*, 745 F2d 248, 256-57 (3d Cir. 1984), *cert. denied*, 471 U.S. 1016, 105 S.Ct. 2021, (1985); *Medical Arts Pharmacy v. Blue Cross & Blue Shield* 675 F.2d 502, 504-06 (2d Cir. 1982); *see* also 8 Phillip E. Areeda, *Antitrust Law* ¶ 1622b (1989). In Statement 8 of their Statements of Antitrust Enforcement Policy in Health Care (Department of Justice and Federal Trade Commission Statements of Antitrust Enforcement Policy in Health Care, 4 Trade Reg. Rep. (CCH) ¶ 13,153 (Sept. 5, 1996)), the Department of Justice and Federal Trade Commission acknowledged that physician-controlled network joint ventures (such as PPOs and IPAs) are lawful under the antitrust laws because they carry the potential for significant efficiencies that benefit consumers. The above analyses apply to agreed contractual PPO-like arrangements. Conversely, an illegal "silent PPO" is shielded by none of the statutory, case law and policy antitrust protections. This is neither an illogical nor an unreasonable conclusion. An illegal PPO, such as that pleaded, is thus a restraint on commerce. *See, Forsyth v. Humana, Inc.*, at page 1 *supra*: illegal medical discounts are a basis for a federal

17

anti-trust claim.

Thus, both of ALLSTATE's attacks on Count V are meritless, and ALLSTATE's motion to dismiss Count V must be denied.

### COUNT VI PROPERLY STATES A CLAIM FOR DECLARATORY RELIEF.

ALLSTATE claims, without analysis, that Count VI is, "at best, redundant, provides no basis for independent declaratory relief against ALLSTATE, and must be dismissed." *See* ALLSTATE Memo at 18. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court . . . upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Declaratory relief is available only in cases involving an actual case or controversy, where the issue is actual and adversarial (as opposed to hypothetical and contrived). *State Farm Mutual. Auto. Ins. Co. v. Bates*, 542 F.Supp. 807, 817 (N.D. Ga. 1982). "The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.* (citing to *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240-241, 57 S. Ct. 461, 463-64, 81 L. Ed. 617 (1937)). The question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Guaranty Nat'l Ins. Co. v. Beeline Stores*, 945 F.Supp. 1510, 1515 (M.D. Ala. 1996). In the present action, DR. NAPOLI, on the face of his complaint, has satisfied the requirements of the Declaratory Judgment Act. By requesting declaratory relief, DR. NAPOLI is merely seeking that the Court declare the present rights and legal relations between himself and ALLSTATE.

18

## COUNT VII STATES A CLAIM UNDER THE FLORIDA STATUTE

ALLSTATE's argument is disingenuous. ALLSTATE argues that 627.736(10) is only a regulatory provision subject to enforcement by the Commissioner of Insurance, and that it governs the conduct in the sale of insurance policies. Thus, the argument goes, there is no basis upon which to conclude that there exists a private right of action.

ALLSTATE completely ignores 627.736(4). That section makes it abundantly clear that the PIP statute is not just regulatory in nature. Florida Statutes 627.736(4)(b) requires that "insurance benefits paid pursuant to this section shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of same." §627.736(4)(b) Fla. Stats.(1998). This subsection is not a mandate of what may or may not appear in an automobile insurance policy. It is a statute requiring payment within a certain time frame. If an insurance company fails to make payment within 30 days, the insured is not limited to a breach of contract claim but may also turn to 627.736(4)(b) for redress.

In fact, Florida courts have found valid private rights of action under 627.736. In *Colonial Penn Ins. Co. v. Magnetic Imaging Systems I, Ltd.*, 694 So.2d 852 (1997) the Florida Court of Appeal certified a class of Colonial Penn insureds and medical providers who received benefit payments beyond the statutory 30 day period without tender of statutory interest.[12] *Id.* at 853. In its reasoning, the *Colonial Penn* Court held that "[t]he claims of class members present a common right of recovery under section 627.736(4)(c) based on Colonial Penn's conduct that raises common issues to all members; whether the statutory interest was paid when due." *Id.* at

---

[12] §627.736(4)(c) provides that all overdue PIP payments bear simple interest at the rate of 10 percent per year. §627.736(4)(c) Fla. Stats. (1998).

854.

In the present case, DR. NAPOLI asserts a cause of action arising from §627.736(10). Subsection (10) provides in pertinent part that "[a]n insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as 'preferred providers' . . .The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy . . . if the requirements of this subsection are met." If an insurer violates this statutory provision, the only basis for which a cause of action could be maintained is the statute itself.

## CONCLUSION

For all these reasons, the Motion of ALLSTATE should be denied.

Respectfully submitted,

GOLD, ROSENFELD & COULSON
A Partnership of Professional and
Limited Liability Corporations
11 S. LaSalle Street, Ste 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 (facsimile)
#5231


GOGEL, PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 (facsimile)

KOPELMAN & BLANKMAN

20

A Professional Association
National Towers
Suite 1611
1 Financial Plaza
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 (facsimile)

C:\WP51\ASG\NAPOLI\MEMO.opp

# American Medical Association

Physicians dedicated to the health of America



# Silent PPO Alert Action Kit

JUNE 1995

# PROVIDERS BEWARE:

## *GUARDING AGAINST SILENT PPOs*

### RESELLING CONTRACT RATE DISCOUNTS THROUGH "SILENT" OR NON-DIRECTED PPOs AND DISCOUNTED INDEMNITY PLANS

 American Hospital Association

American Medical Association
Physicians dedicated to the health of America 

TABLE OF CONTENTS

Executive Summary                                                                        2

Background                                                                              3

What names are used to describe this practice?                                         3

How does this practice differ from typical PPO arrangements?                           3

Who is harmed?  Providers and patients.                                                4

What is an example of this practice?                                                   4

Basic business considerations before contracting.                                      7

Exhibit A -- how to protect your bargain with a PPO. Sample           8-10
  contract provisions, and Preferred provider organization regulation.

AMA, ADA Joint Statement
Page 2

# EXECUTIVE SUMMARY

Health care providers, including physicians, hospitals and health systems, are being victimized by billing schemes that create payment discounts for payors who aren't entitled to them. These payors obtain preferred-provider discounts without providers' consent under practices known as "silent" or "non-directed" PPOs. Depending on patient volume, providers could be losing tens of thousands of dollars, if not hundreds of thousands of dollars, on inappropriately applied discounts.

In Preferred-provider organization (PPO) arrangements, providers offer discounted fees to payors in exchange for "preferred provider" designations that attract more patients. With "silent" PPOs, PPO discounts are applied to indemnity patients not covered by a PPO.

Here's how it works: Suppose a payor receives a $4,000 medical bill, but doesn't want to pay the full amount. The payor contacts a PPO broker who has access to a list of providers and discount levels for several PPOs. The payor learns that the provider is under contract with a PPO for a 25 percent discount. The payor then recalculates the bill, taking 25 percent off the original $4,000 amount. The new bill refers to the PPO's discount as the reason for the lower payment, even though the patient is not covered by that PPO.

Upon receiving the discounted bill, the provider's accounting or billing department verifies that the hospital or physician group has a contract with the PPO. But, unless the specific patient's treatment or admission records are searched to determine coverage, it is impossible to confirm that the patient is not a PPO member. Thus, many providers are granting discounts they're not obligated to give.

Efforts to Identify and stop these arrangements are essential. At a minimum, providers should:

o   scrutinize their PPO contracts and their dealings with payors

o   protect themselves by refusing to sign PPO contracts permitting the sale of discount information;

o   And, as a further precaution, conduct careful audits to determine whether PPO discounts are being applied inappropriately to indemnity patients.

AMA AHA Joint Statement
Page 3

BACKGROUND

This is the second alert from the AHA and AMA that describes a practice that both associations initially reported on in October 1994. It explains Silent PPOs in more detail and recommends ways for providers to protect themselves from these discounting practices.

The term "Silent PPO" was used in the first alert to describe this practice since that term appeared in marketing materials distributed by at least one entity that promotes these practices. Another, perhaps more accurate, characterization of these practices is "secondary market in contracted rates." The secondary market exists for payors who are able to obtain discounted contract rate information and reprice provider bills that then are submitted to unsuspecting providers.

This secondary market, which operates under an array of names, permits PPOs and network brokers to sell hundreds of millions of dollars in provider discounts to payors, brokers, and other entities. These may well be discounts that the providers never intended to grant and which may not be permitted by the providers' PPO contracts.

Access to contracted rates reportedly is sold to a broad base of payors responsible for: indemnity lives, out-of-network care, workers' compensation, automobile accident medical claims and self-insured employers (either self-administered or contracting for third party administrative services). Many payors routinely use the contracted rate information to calculate discounts reflected on Explanation of Benefits forms sent by payors to providers.

WHAT NAMES ARE USED TO DESCRIBE THIS PRACTICE?

What the AHA and AMA view as a secondary market in contracted rates may be referred to in the field as: silent PPOs, non-directed PPOs, voluntary PPOs, wrap around PPOs, blind PPOs, soft channeling, second tier PPOs, total conversion PPOs, extended managed care network, invisible PPOs, supplemental PPOs, back-end PPOs, discounted indemnity or managed indemnity. Undoubtedly, there are other names to describe this practice.

HOW DOES THIS PRACTICE DIFFER FROM TYPICAL PPO ARRANGEMENTS?

Most providers are familiar with the operation of preferred provider organizations, or PPOs. In fact, the great majority of providers have signed contracts with one or more PPOs. In these contracts, providers agree to a discounted fee schedule in anticipation of receiving additional patient flow as a result of being designated a preferred provider. But providers may not know about this secondary market for discounted contract rates.

Discounted indemnity plans and silent PPOs are not conventional managed care products.

AMA AHA Joint Statement
Page 4

They are merely words used to describe a process through which a payor is able to apply a
discount to a provider's bill. This is possible when the PPO makes its roster of preferred
providers and contracted rates available to other payors and brokers for a fee. The discounts
typically are applied to patients who are covered by an employer or payor that has not
contracted with the PPO (i.e. plan participant), therefore, the patients are not subject to
meaningful financial incentives or other steerage mechanisms which encourage them to select
the preferred providers.

WHO IS HARMED? PROVIDERS AND PATIENTS.

This practice results in providers losing revenue to which they are otherwise entitled. In
addition, patients who may think that their health care bills are covered, may be balance
billed by providers who discover that a bill has been repriced through a "silent PPO."

This fluid market in contract rate information exacerbates the imbalance between provider
charges and DRG payments. If hospitals continue to lower their charges to address the PPO
pricing mechanisms, the hospital's Medicare profiles also drop. Likewise, physician
reimbursement under RBRVS may be negatively affected by this vast secondary market in
contract rates that is readily accessible to payors.

If the business office or patient account manager is trying to keep aged accounts receivable as
low as possible, then these repricing practices will be harder to stop. Cash flow may take
precedence over careful analyses of explanation of benefit forms to identify whether the
appropriate amount was remitted. In short, for many providers the amount of collection may
be less important than its timeliness.

"Silent PPO" discounts are usually applied to patients with indemnity coverage. In these
situations, the patient is liable for the provider's reasonable charge, and has the right to
indemnification for all or a portion of the bill from the insurer. If the insurer fails to pay to the
full extent of its obligation by reducing the provider's charge before paying the 80% (for
example) it is obligated to pay, the patient will not receive the level of indemnification he or she
is entitled to. The patient loses in two ways: the insurer may be charging premiums that the
patient believes are based on the insurer's obligation to pay 80% of the charges, and, the patient
is exposed to a potentially larger balance bill from the provider.

WHAT IS AN EXAMPLE OF THIS PRACTICE?

The attached diagram uses a physician's practice to illustrate how the secondary market for
contracted rates works. A typical PPO relationship involves a simple exchange of bargains:
providers agree to discount their fees in exchange for their designation as "preferred
providers." Through the PPO's use of financial incentives, directories and the like, the
preferred providers expect that patients will be steered to them. A typical financial incentive

AMA-AHA Joint Statement
Page 5

may provide that the PPO plan participant, i.e. employers and payors, will pay 90% of a physician's bill if the enrollee chooses a preferred provider, but only 70% if the enrollee does not. In contrast, a traditional indemnity plan pays 80% of the provider's usual and customary fee. PPO plan participants will save money even by paying the higher percentage of a bill because the preferred provider has agreed to accept a lower than customary fee, often dramatically lower.

Once the network of preferred providers is in place, the PPO markets the network to plan participants. The PPO's contracts with providers contemplate this business activity, and generally require the PPO to notify its preferred providers on a regular basis of the addition of new blocks of business. Moreover, enrollees of the PPO carry identification cards which indicate their enrollment in the PPO. These cards aid providers in verifying coverage at the time service is rendered. However, the variety of identification cards in the market can bewilder both enrollees and providers.

Many individuals are reluctant to choose PPOs, HMOs, and other plans which restrict, even to a limited degree, their choice of providers. Thus, a strong demand exists for "freedom of choice," a hallmark of traditional indemnity plans, particularly in certain geographic areas and among certain employee groups. The payors who offer indemnity plans also seek to offer a competitively priced product and are vitally interested in securing provider discounts for their indemnity business. However, these payors may have difficulty securing discounts for their indemnity products directly from providers because they cannot offer providers steerage mechanisms or other inducements to lower their fees. As a result, these payors seek discounted contract rates from other sources, e.g. (1) PPOs that have negotiated discounted contract rates with providers or (2) contract rate brokers who have purchased "access" to those rates from PPOs.

PPOs meet this demand by selling the information from their roster of preferred providers, including the discounted contract rates for each provider, directly to indemnity payors or to brokers who resell the information to payors. Armed with this information, the payor is able to re-price any claim that it receives from a provider in the PPO's network, simply by referencing the provider's discount level with that PPO and asserting (or implying), as discussed below, that it is entitled to the discount as well. This process enables the payor to avail itself of the PPO's discounted rates even though the beneficiary is not in the PPO.

Suppose that a patient is in a traditional indemnity plan that pays 80% of the usual and customary physician's fee. The patient visits her physician for treatment. At the time service is rendered, the physician telephones the number on the patient's insurance card and verifies her indemnity coverage. The physician provides the needed care and submits a bill to the payor.

At this point, the payor is obligated to pay 80% of the usual and customary physician fee.

with no discount. The payor would rather receive a discount, if possible, so it seeks one from a PPO or broker. If the physician has signed a contract with any PPO, the payor will likely gain access to that information. For a fee, the PPO that has a contract with the physician may sell the payor the information on its preferred provider roster. If it does, the payor will be able to reprice the claim from the physician, taking the discount the physician has agreed to with the PPO, and identify the PPO (which the patient does not belong to) on the payor's Explanation of Benefits (EOB) form that accompanies payment of the discounted rate. (Note: Repricing often is done by third party administrators serving the employer/payor.)

Once the physician receives the EOB from the indemnity payor referencing the PPO discount, one of several things may happen. The physician's office staff may not notice the discrepancy, especially if the physician has a contract with the PPO referenced on the EOB. The staff may not compare the EOB with the original verification of coverage, and may simply assume that the payor is entitled to the discount. (Because most payors offer a variety of plans, and the relationship among plans is not obvious and the wide variety of enrollee identification cards, the office staff may believe that the payor and the PPO are related.)

One the other hand, the staff may note the peculiar circumstance of a PPO discount being applied to a patient with indemnity coverage, and may telephone the payor with an inquiry. (This possibility is more likely in the event that the PPO referenced on the EOB is not one with whom the physician has a contract. More on how that can happen below.) In response to this inquiry, the payor is likely to tell the physician that it is "affiliated" with the PPO in question, and that it receives a discount if one of its indemnity insureds happens to visit a provider under contract with the PPO. Given the trust inherent in the health care system, the constantly changing relationships among payors, and physicians' general lack of detailed knowledge of the terms of their PPO contracts, the physician is likely to accept this explanation, extending to the payor a discount to which it may not be entitled. Likewise, hospitals with numerous managed care contracts may have difficulty coordinating and updating their base of participating PPOs and plan participants, as well as devoting appropriate time to scrutinize each contract.

This secondary market in contracted rates is big business. Several brokers operate nationally, and are quite automated. These brokers establish on-going relationships with payors and provide them with computer software containing the provider rosters of one or more PPOs. This software enables the payor to reprice claims from any provider under contract with any of the PPOs automatically, without having to search for access to a PPO discount for each claim. This practice undercuts the business and rationale for legitimate PPOs, which is to create a network of preferred providers and require that financial incentives and other steerage mechanisms are applied to enrollees.

A payor who deals through a broker in this way may reference the broker when identifying the discount on its EOB forms, rather than the specific PPO whose discount it has used.

AMA/AHA Joint Statement
Page 7

When dealing through a broker, the payor simply may not know which PPO the provider has contracted with, and therefore which PPO's discount it is using. The payor may only be told that the broker is "affiliated" with a PPO or a national discount network. The payor may only receive contract rate information from the broker. By referencing only the broker on its EOB forms, the payor may add to the provider's confusion when the EOB is received, because the provider is unlikely to have a contract with the broker. In effect, the provider will be asked to honor a discount for an indemnity patient on behalf of a PPO with which the provider has not contracted.

There is plenty of money for providers to lose in this scheme. Generally, the broker receives 30% of the amount it "saves" the payor on each claim. Thus, if a payor is able to discount a provider's claim by $1000, then $300 will be sent to the broker or PPO who made the transaction possible. If a broker is involved, it will generally split its fee with the PPO that supplied the contracted rates. If you as a provider are approached by a broker or to a by a payor that they are "affiliated" with a national or regional network, ask to see the "affiliation agreement." Chances are it doesn't exist in writing.

Providers who sign PPO contracts may not have contemplated a secondary market in their PPO discounts, but they may have made one possible by signing contracts with loose language. PPOs may also be violating the letter and spirit of their contracts with providers by selling discount information in this way.

There are common elements to all of these arrangements, including:

* Reliance on numerous and complex Explanation of Benefits forms;

* Reliance on loose contract language that usually favors the silent PPO sponsor and payors;

* Communications and information systems problems between hospital/medicaloffice admitting departments and billing/accounts receivable functions.

## BASIC BUSINESS CONSIDERATIONS BEFORE CONTRACTING

The current realities of the market may dictate what contact terms providers can negotiate with PPOs and other brokers. In some cases, the provider may have to accept the "steered" with the "non-steered" patients if the PPO or broker will not accept firm contract provisions that require financial incentives and other limits on the use of the provider's contract rates. Also, providers need to determine whether it is worthwhile signing a contract that may be difficult for the provider to implement. Other considerations include:

1. Payor's ability to pay claims;

AMA AHA Joint Statement
Page 8

2.   What is the actual number of lives that the PPO might be able to deliver.

3.   The past experience of the PPO in directing lives. It is advisable to check the statistics roughly three months before the end of the contract term and ask the PPO to verify the amount of business "steered" to you.

4.   Whether the proposed agreement will bring in new business or simply permit the PPO and any party it contracts with to expand the payor base by substituting different amounts of payment for the same patients, thus lowering the average payments the provider receives. In other words, if the PPO is able to rapidly expand its list of payors (with no limits) within your service area, you may be treating patients that otherwise would have come to you and are only substituting the amount of payment.

5.   Given your market, is the PPO or plan sponsor likely to bring new business by buying market share (covered lives) from indemnity plans or HMOs. That market strategy is another example of possibly treating the same patients for a different, usually lower, payment.

## EXHIBIT A

## HOW TO PROTECT YOUR BARGAIN WITH A PPO

Provider education and efforts to identify and stop these arrangements are essential. At a minimum, providers should follow the contracting advice presented below. In addition, providers should check all PPO directories in their facility to verify the accuracy of the list of participating providers for each PPO and/or "network affiliate" of a PPO. A phone call to the listed PPO and/or network affiliate to verify your status as a direct contract participant is recommended.

### Careful Contracting

Providers signing PPO contracts should ensure:

~   that discounts will be extended only to enrollees of the PPO who have cards identifying them as such;

~   that all PPO members eligible for discounts will be subject to steerage mechanisms; contract language that promises "best efforts" by the PPO to steer enrollees usually is of minimal value under most state law;

~   that the types of entities that can be added to the network are identified in advance, and that providers receive timely notice when payors or employers are added;

AMA-AHA Joint Statement
Page 9

~  that all members added to the PPO be subject to the same steerage mechanisms; that any
   discounts applicable to a PPO enrollee be disclosed at the time coverage is verified;

~  that the sale or other unauthorized use of contract rate information is specifically prohibited.


SAMPLE CONTRACT PROVISIONS

The AHA and AMA have reviewed numerous PPO contracts in order to understand how this
secondary market has gained such a substantial foothold. These contracts are, of course,
numerous, but they contain some common provisions. Presented below are sample contract
provisions that are especially important to be aware of before executing participating provider
agreements:

1.  Certain agreements specify that patients eligible for discounts will be subject to steerage
    mechanisms:

    PPO will provide each Preferred Provider with a list of all Payors who have
    entered into agreements with PPO to utilize the services of Preferred Providers.
    PPO shall require Payors to develop effective channeling mechanisms,
    including financial incentives, for encouraging Participating Patients to use
    health care providers participating in the PPO.

2.  They may also specifically identify the patients to whom provider discounts will apply:

    This agreement provides for each Preferred Provider to provide its full
    complement of health care services at the rates specified on Schedule 1 to
    eligible beneficiaries of the Participating Groups and to any Payor Groups that
    are later added pursuant to this agreement. Each Participating Group will have
    a contract with the PPO that requires the Group to provide financial incentives
    for its beneficiaries to use Preferred Providers. No additional Payor will be
    added to this agreement until the Preferred Providers have had the opportunity
    to review the proposed PPO - Payor contract.

3.  Some of these terms may be incorporated in the definitions of the contract:

    "covered individual" means any individual, employee, member or group
    member and any dependent insured under a contract issued by the Payor, where
    such contract provides financial incentives to use the PPO network of Preferred
    Providers.

4.  The financial incentives may be explicit:

AMA AHA Joint Statement
Page 10

> Insurers, through their contractual agreements with PPO, agree to promote the utilization of Preferred Providers by offering financial incentives to insureds, with a minimum differential of 10%.

5. In some cases, the sponsor of a health benefit plan agrees to contract exclusively with a PPO:

> Sponsor agrees to exclusively offer to the enrollees the "ABC" PPO within the geographical area set forth in Exhibit A. Sponsor also agrees not to enter into any agreements with other providers, medical networks or other entity, directly or indirectly, to provide medical services to its enrollees.

6. Check to determine whether the Client (i.e. payor) of the PPO has agreed in its contract with the PPO network to impose certain duties on the Client's claim administrator to ensure confidentiality of information.

> Claims Administrator will not disclose information, including but not limited to contract rate information, repriced bills from which contract rate data might be derived, and related data, without the written approval of "ABC" PPO. Such confidential information shall not be used by Claims Administrator in any way not expressly authorized under this Agreement.

7. Some PPO agreements may not specifically define the group of beneficiaries eligible for discounts:

> Participating Physicians shall accept the PPO Charge as full payment for Covered Services for Eligible Persons.

PREFERRED PROVIDER ORGANIZATION REGULATION

The 1994 "State Managed Care Legislative Resource" published by the American Managed Care and Review Association (AMCRA) includes a section entitled: "State-by-State Issue Profiles" that describes the status of PPO regulation on a state specific basis. Some states have laws that require PPOs to use incentives to steer patients. In those states where PPO regulation exists, a citation to the applicable law is provided. In addition, this resource includes the phone number for each state's insurance department.

AMCRA's address, phone and fax numbers are

1200 19th Street, NW     PHONE: (202) 728-0506
Suite 200
Washington, D.C. 20036     FAX: (202) 728-0609

## American Medical Association

Physicians dedicated to the health of America



**Silent PPO Alert**

**Table of Contents**

Enclosed are the following materials from the American Medical Association to assist physicians in understanding silent PPOs.

- Joint Statement by the American Medical Association and the American Hospital Association - This joint statement is an in-depth discussion about how silent PPOs operate and how providers can protect themselves from further financial loss.

- "Where Are Your Discounts?" - Published in AM News, this article tells how a Chicago otolaryngologist discovered that his fees were being unfairly discounted. The article gives a general overview of silent PPOs and how they have infiltrated health care reimbursement.

- Protecting Your Practice From Improper Discounts - This piece provides practical advice on 1) contractual language that will help minimize your exposure to silent PPOs, 2) how to identify improper discounts, and 3) how to recover monies owed to you by insurance companies from improper discounts.

- Managed Care Contract Management Applications - Prepared by an expert in computer software, this article points out what physicians should look for in contract management applications. It lists five software applications that include basic functions that would assist in the prevention of financial loss due to improper discounting in managed care contracts and indemnity plans.

- Sample Recovery Letter - This sample letter can be used by physicians in an effort to receive reimbursement from insurance companies that participate in silent PPOs.

- Sample Letter From Physician to Patient - This sample letter can be used by physicians if efforts to recover inappropriate discounts from the insurer are unsuccessful.

- Potential Legal Strategies for Responding to Silent PPOs - This piece discusses possible legal remedies to prevent the proliferation of silent PPOs, and to recoup monies lost due to improper discounting.

PAGE 03
03/07/2000   18:49   3123728778   GOLD   PAGE 01/02

2/30/1999   16:21   3123728778   GOLD

_____ Insurance Company
FRAUD E. CNTRLZD IV?
250 N.W. 8TH ST SUITE 149
_____ FL 33025

**Allstate**
You're in good hands.

## EXPLANATION OF MEDICAL BILL PAYMENT

Service Provided For:
GARY M. TYSON
2646 POLK ST APT 20
HOLLYWOOD FL 33020

Date: 08/16/1999
Bill Received Date: 06/15/1999
Claim #: 3974669809-01
File Handler: JMT
Invoice #: 1825 D
Eligible Injured Person: GARY M. TYSON
Treatment Rendered By: DAVID A. NAPOLI, D.C.
Provider Specialty: CHIROPRACTICS (DC)
TIN: 59-2255849

Diagnosis Codes
721.1   BRACHIAL NEURITIS OR RADICULITIS NOS   346.0   CLASSICAL MIGRAINE
729.1   MYALGIA AND MYOSITIS, UNSPECIFIED   724.8   OTHER SYMPTOMS REFERABLE TO BACK

| Date Of Service(s) | | Code/Modifier | Procedure Description | Units | Billed Amount | Covered Amount | Reason Code(s) |
|---|---|---|---|---|---|---|---|
| From | Thru | | | | | | |
| 06/07/99 | 06/07/99 | 97140 | MANUAL THERAPY | 1.00 $ | 48.00 $ | 48.00 | |
| 06/07/99 | 06/07/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 $ | 14.87 $ | 14.87 | |
| 06/07/99 | 06/07/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 $ | 14.53 $ | 14.53 | |
| 06/07/99 | 06/07/99 | A4556 | ELECTRODES | 1.00 $ | 10.00 $ | 10.00 | |
| 06/09/99 | 06/09/99 | 97140 | MANUAL THERAPY | 1.00 $ | 48.00 $ | 48.00 | |
| 06/09/99 | 06/09/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 $ | 14.87 $ | 14.87 | |
| 06/09/99 | 06/09/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 $ | 14.53 $ | 14.53 | |
| 06/09/99 | 06/09/99 | A4556 | ELECTRODES | 1.00 $ | 10.00 $ | 10.00 | |
| 06/11/99 | 06/11/99 | 97140 | MANUAL THERAPY | 1.00 $ | 48.00 $ | 48.00 | |
| 06/11/99 | 06/11/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 $ | 14.87 $ | 14.87 | |
| 06/11/99 | 06/11/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 $ | 14.53 $ | 14.53 | |
| 06/11/99 | 06/11/99 | A4556 | ELECTRODES | 1.00 $ | 10.00 $ | 10.00 | |
| 06/11/99 | 06/11/99 | MISC IT | | 1.00 $ | 1.95 $ | 1.95 | |

Total:                                              $   264.15 $   264.15

Eligible Amount Based on 90% Coverage          $    211.71
(Interest paid at 100% (Deductible does not apply to it)

Modifier Code(s):
IT   Interest Payment

Additional Information:
FEE REIMBURSEMENTS ARE BASED ON THIS MEDICAL SERVICE PROVIDER'S
AGREEMENTS WITH CCN.   THE PATIENTS RESPONSIBILITY IS LIMITED TO THE
DIFFERENCE BETWEEN THE AMOUNT PAID BY ALLSTATE (AS SHOWN BELOW)
AND THE CCN CONTRACTED FEE, WHICH APPEARS IN THE BILLED AMOUNT
COLUMN.

If you have any questions about this claim, please contact your file handler,
DEBORAH METCALF at (954) 865-7245

Payment for $    211.71 was made on 08/16/1999 to:
DAVID A. NAPOLI, D.C.

Copy(s) of this Explanation of Benefits has been sent to:
GARY M. TYSON, 2646 POLK ST APT 20, HOLLYWOOD, FL. 33020
DAVID A. NAPOLI, D.C., 5700 STIRLING RD ST 9, HOLLYWOOD, FL. 33021

Rec 8/20/99

EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

EVELYN MORSE, individually and on )
behalf of all others similarly situated, )
                                      )
                Plaintiff, )
                                        )
        v.                         )     No. 99 C 0193
                                        ) .
BANKERS LIFE & CASUALTY COMPANY )
and PCS, INC., )
                Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Evelyn Morse has brought suit against defendants Bankers Life and Casualty Co.

and PCS, Inc., claiming breach of contract, breach of duty of good faith and fair dealing,

violation of the Illinois Uniform Deceptive Trade Practices Act, violation of the Illinois

Consumer Fraud and Deceptive Business Practices Act, civil conspiracy, and violation of the

Racketeer Influenced and Corrupt Organizations (RICO) Act. Morse has also moved for class

certification. Both defendants have moved to dismiss the complaint. For the reasons stated

below, the defendants' motions to dismiss are denied and Morse's motion for class certification

is granted with modification.

### I. Background

Defendant Bankers Life sells a Medigap policy which provides a prescription drug

benefit. The policy promises to pay 100% of the cost of prescription drugs that are generic and

80% of the cost of brand name drugs. Bankers Life entered into a contractual relationship with

defendant PCS Inc., under which PCS processes Bankers Life's policyholders' prescription drug

claims. PCS has established a system whereby the policyholder's pharmacy, before releasing the prescription drug to the policyholder, accesses PCS' system and finds out whether PCS will provide 100% of the cost or whether the policyholder must copay 20% before receiving the prescription. Under this system, the pharmacy releases generic drugs to the patient with no exchange of money, since PCS' approval of the drug as generic means that the pharmacy will be paid 100% by PCS, which is then reimbursed by the insurer. If the drug is a brand name drug, though, the pharmacy will be paid only 80% by PCS and must collect the additional 20% from its customer, the policyholder, before releasing the drug.

According to the complaint, Morse, who suffers from breast cancer, was prescribed tamoxifen by her physician. Morse alleges that tamoxifen is a generic drug. However, since her enrollment in the PCS system by Bankers Life in 1997, Morse has been charged a 20% copay for each prescription. To avoid these copayments, Morse asked her physician to prescribe a generic drug rather than tamoxifen, but her physician informed her that tamoxifen was a generic drug. Morse then contacted Bankers Life, which told her that PCS' system classified tamoxifen as a brand name drug and "[t]hey aren't going to change their system in the near future." Bankers Life told Morse that she should continue to pay the 20% copay and, if she then contacted Bankers Life, "we will see that you get the payment for the 20% that you paid."[1]

Bankers Life seeks dismissal of plaintiff's RICO claim, arguing that at most, Morse was inconvenienced by having to seek reimbursement for the amount she overpaid: "[R]ather than

---

[1]The court, as it must, takes as true the allegations of the complaint. It also infers, based on those allegations and on Bankers Life's letter to plaintiff in response to her complaint about the misclassification, that Bankers Life did not disagree that tamoxifen is generic. Bankers Life's letter also strongly suggests that PCS was aware of a problem with its classification.

2

trying to snooker plaintiff out of 20 percent of the cost of her prescriptions, Bankers Life reimbursed her for past co-payments and offered to pay for future co-payments–hardly the signs of a 'scheme to defraud.'" Memorandum in Support of Motion to Dismiss at 5.

II. Standard of Review

A motion to dismiss tests the sufficiency of a complaint, not its merits. *Weiler v. Household Finance Corp.*, 101 F.3d 519, 524 n.1 (7th cir. 1996). Dismissal of a complaint for failure to state a claim will be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995). In order to withstand a motion to dismiss, a complaint must allege facts sufficiently, setting forth the essential elements of the cause of action. *Gray v. County of Dane*, 854 F.2d 179, 182 (7th Cir. 1938). All well-pleaded allegations are presumed to be true and all reasonable inferences are drawn in favor of the plaintiff. *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 468 (7th Cir. 1997).

III. Motion to Dismiss

"To show a violation of § 1962(c), a RICO plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The plaintiff must allege sufficient facts to support each element. *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721 (7th Cir. 1998). Bankers Life contends that Morse has failed to allege that it engaged in a pattern of racketeering activity as required under RICO, and that she has also failed to allege fraud with the particularity required by Rule 9(b) of the Federal

3

Rules of Civil Procedure.[2] Moreover, Bankers Life argues that Morse has failed to allege that it conducted or participated in the affairs of a RICO "enterprise." PCS has also moved to dismiss the RICO claims against it, claiming that Morse's complaint contains no facts demonstrating predicate acts of fraud by PCS, and that the complaint does not identify the existence of a RICO enterprise.

The correspondence Morse has attached to her complaint strongly suggests, at least, that Bankers Life agrees that PCS is classifying tamoxifen as a brand name drug when it in fact is generic; this is inferable from Bankers Life's willingness to reimburse plaintiff for the amount she copaid. The correspondence also demonstrates that when Morse brought the matter to Bankers Life's attention, it told her that PCS was not going to change its system. For Morse, that means that she will have to advance 20% of the cost of the tamoxifen and file for reimbursement. This is for her little more than an inconvenience and a temporary loss of her funds, assuming that she is—and remains able to—come up with the cash to advance (although the cost of such an inconvenience for the elderly and infirm is not trivial). But presumably, numerous Bankers Life policyholders other than Morse are prescribed tamoxifen. It defies common sense to believe that all of them, having been required to pay 20% which Bankers Life was contractually obligated to provide, realize that they have gotten less than they bargained for and have sought reimbursement. If Bankers Life had to respond to all this correspondence and issue all those monthly checks for $18, it can be presumed that dealing with PCS' system's misclassification would become so expensive that something would be done about it. It is far more likely that

---

[2]Rule 9(b) of the Federal Rules of Civil Procedure requires RICO plaintiffs, like any other plaintiffs pleading fraud in the federal courts, to plead all averments of fraud with particularity. *McDonald v. Schencker*, 18 F.3d 491, 495 (7th Cir. 1994).

4

some very large number of the Bankers Life policyholders needing tamoxifen are paying 20% of its cost out of ignorance that Bankers Life is contractually obligated to pay that 20% for them, and that Bankers Life is realizing considerable savings from PCS' misclassification.

The facts pleaded in Morse's complaint are consistent with a scheme to defraud by Bankers Life and PCS and satisfy the requirement of Rule 9(b).[3] Plaintiffs' allegations are consistent with proof that however the misclassification problem began, Bankers Life and PCS continue to administer their prescription drug program in a manner which deprives policyholders of a benefit to which they are entitled and does so knowingly. The circumstances of the alleged fraud, the letters to Morse from Bankers Life and the wire communications between PCS and the pharmacy, are pleaded in specific detail. The only thing that Morse cannot plead with particularity—and she is not required to do so—are the defendants' knowledge and intent. However, given that when Morse complained to Bankers Life about the misclassification, Bankers Life agreed that tamoxifen was misclassified but told Morse that the misclassification would not be corrected, it is readily inferable that Morse may be able to prove knowledge and intent.

The court further believes that under the circumstances alleged here, the two mailings Morse references are sufficient to satisfy RICO's pattern requirement as to Bankers Life; the

---

[3]"Under RICO, 'racketeering activity,' also referred to as 'predicate acts,' is defined 'as acts indictable under any one of several federal or state offenses, including mail fraud under 18 U.S.C. § 1341, and wire fraud under 18 U.S.C. § 1343.'" *American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir. 1999)(quoting *McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir. 1994). To state a claim for mail fraud under 18 U.S.C. § 1341 or wire fraud under 18 U.S.C. § 1343, the plaintiff must allege that (1) the defendant engaged in a scheme to defraud, (2) with an intent to defraud, and (3) that the defendant used the mails or interstate wires in furtherance of that scheme. *Id.* at 542.

many wire communications between PCS and Walgreens are clearly sufficient to allege a pattern as to PCS.[4] The misclassification of a commonly-prescribed drug, and the decision of Bankers Life to pay the one complaining policyholder rather than take steps to correct the misclassification, strongly suggests that there are a large number of victims and many predicate acts. Morse has also successfully alleged an ongoing RICO enterprise in the form of the Prescription Processing Network, comprised of the defendants and Morse's pharmacy. With respect to the conduct element, Morse will be able to determine, only after discovery, the responsibility, if any, Bankers Life has for the misclassification; however, since Bankers Life chooses to employ PCS to administer its drug benefit program, Bankers Life's response to Morse's complaint--that nothing would be done to correct the situation--suggests at the very least Bankers Life's knowing participation in the operation and management of an enterprise which results in its receipt of large amounts of money to which it is not entitled.

In light of the foregoing, the defendants' motions to dismiss are denied.

IV. Class Certification

Morse seeks to have a class of individuals certified pursuant to Rule 23 of the Federal Rules of Civil Procedure. Morse seeks to have certified the following proposed class:

> All persons who are part of PCS' network, who are using generic prescription drugs, such as tamoxifen, who are being charged for such drugs as though they are brand name drugs.

Defendants oppose certification of the class, arguing that Morse has failed to meet the requirements of numerosity, commonality, and typicality. The court will address each of these in turn.

---

[4]The required "pattern" can be established by proof of at least two acts of racketeering activity within a ten-year period. 18 U.S.C. § 1961(5).

Rule 23 of the Federal Rules of Civil Procedure provides a two-step analysis to determine whether class certification is appropriate. First, the plaintiff must meet the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Failure to meet any one of these elements precludes certification of a class. *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993).

Second, the action must satisfy one of the conditions of Rule 23(b). Morse contends that she has satisfied Rule 23(b)(3), which states that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Factors that are pertinent to the predominance and superiority criteria are: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Rule 23(b)(3). The plaintiff bears the burden of showing that the proposed class meets the requirements for certification. *Retired Chicago Police Ass'n*, 7 F.3d at 596. In evaluating a motion for class certification, the court does not examine the merits of the case. *Id.* at 598.

If the party seeking class certification meets each of the certification requirements, the

7

court must certify the proposed class. *Jefferson v. Windy City Maintenance, Inc.*, 1998 WL 474115, at *2 (N.D.Ill. 1998). The court has broad discretion concerning whether a proposed class satisfies certification requirements, but should err in favor of maintaining class actions. *Id.*

A. Numerosity

The defendants contend that Morse has failed to satisfy the numerosity requirement of Rule 23(a)(1). They argue that the complaint contains only conclusory allegations and speculation about the alleged existence of a class of similarly situated persons. Morse counters that her allegations are sufficient for Rule 23(a)(1) purposes.

The court is entitled to make "common sense assumptions" in order to support a finding of numerosity. *Grossman v. Waste Management, Inc*, 100 F.R.D. 781, 785 (N.D.Ill. 1984)(in securities fraud case, "an assumption that the class members are not so numerous as to make joinder impracticable would be, in light of the number of shares traded during the class period, ridiculous."). Morse is aware of a number of people in her building alone who use tamoxifen, and given the scope of the PCS network, it is reasonable to assume at this stage that there are sufficient insureds of Bankers Life similar to Morse to meet the numerosity requirement. In any event, the court notes "that defendants' contention may be a proper subject for a later motion to alter the class definition if developments so warrant." *Id.* See Fed.R.Civ.P. 23(c)(1). The court finds that Morse has satisfied the numerosity requirement.

B. Commonality

Because Rule 23(a)(2) and Rule 23(b)(3) raise the same issue, they will be addressed at

8

the same time.[5] The defendants contend that Morse has failed to meet the requirement of either part of Rule 23 because she has failed to demonstrate the existence of others subject to the same harm as her, or that questions of law or fact common to the class members predominate over any questions affecting only individual members. Morse claims that she has met the requirements of commonality.

Rule 23(b)(3) requires that questions of law or fact common to the members of the class predominate over any questions affecting only individual members. This standard is met when there exists generalized evidence that proves or disproves an element on a simultaneous basis, since such proof obviates the need to examine each class member's individual claim. *Golon v. Ohio Savings Bank*, 1999 WL 965593, at *4 (N.D.Ill. 1999). In order to satisfy the requirement of predominance, the plaintiff must show that common issues not only exist but outweigh the individual questions. The common questions must be central to all claims. *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 529 (N.D.Ill. 1998). When individual issues that cannot be resolved on a class-wide basis dominate, the litigation should not proceed as a class action. *Id.* at 530.

The court has evaluated Morse's proposed class and finds that it fails to satisfy the commonality requirements of Rule 23(a)(2) and Rule 23(b)(3) for several reasons. First, it is not limited to Bankers Life policy holders. Morse states in her motion that "Although the claim of each class member may involve a different generic drug and the amount of their individual

---

[5]"[T]he commonality requirement of Rule 23(a) is subsumed under the 'more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.'" *Golon v. Ohio Savings Bank*, 1999 WL 965593, at *4 (N.D.Ill. 1999)(citing *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997)).

9

monetary damages may differ, their claims all arise from the same course of conduct by defendants." However, this is not true with regard to potential class members who are not Bankers Life policy holders. Plaintiffs who are not Bankers Life policy holders would have to allege different sets of facts relating to their own insurance carriers to support a RICO violation or a civil conspiracy. Furthermore, Bankers Life's actions are central to Morse's claims relating to the Illinois Deceptive Trade Practices Act and the Illinois Consumer Fraud and Deceptive Business Practices Act. Morse's proposed class certification is even less appropriate for claims II and III, which deal with Bankers Life exclusively. Any non-Bankers Life policy holders would have to allege different facts regarding the courses of conduct of their own insurance companies, so the common claims would not predominate over the individual claims.

Second, the failure to limit the class to tamoxifen users is problematic. PCS disputes the designation of tamoxifen as a generic drug. This is a question of fact that is not central to all claims of the class sought to be certified by plaintiff because a finding that tamoxifen is a generic drug does not obviate the need for users of other drugs to prove that their drug was also misclassified. Accordingly, each non-tamoxifen user would have to demonstrate that his or her drug was also misclassified. Requiring analysis of every potentially misclassified drug would threaten to make the present action unmanageable.

The court has broad discretion in determining whether to certify a class. Therefore, the court limits the proposed class as follows:

> All persons insured by a policy of insurance with Bankers Life & Casualty Company who obtained tamoxifen prescriptions from pharmacies that are part of the PCS network and who were charged for tamoxifen as though it is a brand name drug.

This narrowed class satisfies the commonality requirements of Rule 23(a), as well as the

10

requirements of 23(b)(3).[6]

C. Typicality

Bankers Life argues that the motion fails to satisfy the typicality requirement of Rule 23(a)(3) because defenses unique to Morse make her an atypical and inadequate class representative. In particular, Bankers Life points to her acceptance of a reimbursement check for claimed overpayments, and her receipt and understanding of Bankers Life's offer to reimburse her for any future co-payments she might make for tamoxifen.[7]

A class representative's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members, and if the claims are based on the same legal theory. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). The Seventh Circuit has held that a named plaintiff is not a proper class representative where "it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass. *Koos v. First Nat'l Bank*, 496 F.2d 1162, 1164 (7th Cir. 1974). However, the fact that there are defenses unique to the named plaintiff does not mean that a finding of typicality is automatically precluded, because Rule 23(a)(3) mandates the typicality of the named plaintiff's claims, not defenses. It is only when a unique defense "will consume the merits of a case" that a class should not be certified. *In re Synthroid Marketing Litigation*, 188

---

[6]PCS also raises the issue of applicable statutes of limitations, stating that Morse's failure to include a proper time frame in her proposed class definition is a reason to deny her motion. However, the court declines to address the issue at this time. This contention may be a proper subject for a later motion to alter the class definition if developments so warrant. *See* Fed.R.Civ.P. 23(c)(1).

[7]Morse stated in her deposition that she understood that she could request and receive reimbursement for any copayments. Under the advice of an attorney, she has not requested reimbursement since the first check.

F.R.D. 287, 291 (N.D.Ill. 1999)(citations omitted).

In this case, there is no indication that the defenses raised by Bankers Life in its response will "consume the merits" of the present action. Before evaluating Morse's defenses, the court must evaluate Morse's claims relating to the defendants' course of conduct, and this course of conduct gives rise to the claims of other class members. Furthermore, such claims are based on the same legal theories. The court therefore finds that Morse has satisfied the typicality requirement. The court does not make any finding as to whether Bankers Life's reimbursement offer constitutes a defense to plaintiff's claim. The court is skeptical that it does.

V. Conclusion

Defendant Bankers Life's motion to dismiss [13], and defendant PCS's motion to dismiss [15], are denied. Morse's motion for class certification [22] is granted with modification, and the court certifies the following class:

> All persons insured by a policy of insurance with Bankers Life & Casualty Company who obtained tamoxifen prescriptions from pharmacies that are part of the PCS network and who were charged for tamoxifen as though it is a brand name drug.

ENTER:

JOAN B. GOTTSCHALL.
United States District Judge

DATED: February 23, 2000

12





## EXPLANATION OF MEDICAL BILL PAYMENT

**Date:** 08/16/1999
**Bill Received Date:** 06/23/1999
**Claim #:** 3974669809-01
**File Handler:** 3MT
**Invoice #:** 1825 D
**Eligible Injured Person:** GARY M. TYSON
**Treatment Rendered By:** DAVID NAPOLI DC
**Provider Specialty:** CHIROPRACTICS (DC)
**TIN:** 59-2255849

Ace Provided For:
.RY M. TYSON
.646 POLK ST APT 20
HOLLYWOOD FL 33020

**Diagnosis Codes**

| Code | Description | Code | Description |
|------|-------------|------|-------------|
| 23.4 | BRACHIAL NEURITIS OR RADICULITIS NOS | 346.0 | CLASSICAL MIGRAINE |
| 29.1 | MYALGIA AND MYOSITIS, UNSPECIFIED | 724.8 | OTHER SYMPTOMS REFERABLE TO BACK |

| Date Of Service(s) From | Thru | Code/Modifier | Procedure Description | Units | Billed Amount | Covered Amount | Reason Code(s) |
|---|---|---|---|---|---|---|---|
| 6/14/99 | 06/14/99 | 97140 | MANUAL THERAPY | 1.00 | $ 48.00 | $ 48.00 | |
| 6/14/99 | 06/14/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 | $ 14.87 | $ 14.87 | |
| 6/14/99 | 06/14/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 | $ 14.53 | $ 14.53 | |
| 6/14/99 | 06/14/99 | A4556 | ELECTRODES | 1.00 | $ 8.00 | $ 8.00 | |
| 6/16/99 | 06/16/99 | 97140 | MANUAL THERAPY | 1.00 | $ 48.00 | $ 48.00 | |
| 6/16/99 | 06/16/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 | $ 14.87 | $ 14.87 | |
| 6/16/99 | 06/16/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 | $ 14.53 | $ 14.53 | |
| 6/16/99 | 06/16/99 | A4556 | ELECTRODES | 1.00 | $ 8.00 | $ 8.00 | |
| 6/18/99 | 06/18/99 | A4556 | ELECTRODES | 1.00 | $ 8.00 | $ 8.00 | |
| 5.   99 | 06/18/99 | 97140 | MANUAL THERAPY | 1.00 | $ 48.00 | $ 48.00 | |
| 6/18/99 | 06/18/99 | 97010 | HOT OR COLD PACKS THERAP | 1.00 | $ 14.87 | $ 14.87 | |
| 6/18/99 | 06/18/99 | 97014 | ELECTRIC STIMULATION THE | 1.00 | $ 14.53 | $ 14.53 | |
| 6/18/99 | 06/18/99 | 99070 | SPECIAL SUPPLIES | 1.00 | $ 249.00 | $ 249.00 | |
| 6/18/99 | 06/18/99 | MISC  IT | | 1.00 | $ 2.88 | $ 2.88 | |
| otal: | | | | | $ 508.08 | $ 508.08 | |

ligible Amount Based on 80% Coverage        $    407.04
nterest paid at 100% (Deductible does not apply to it)

**Modifier Code(s):**
I   Interest Payment

**Additional Information:**
EE REIMBURSEMENTS ARE BASED ON THIS MEDICAL SERVICE PROVIDER'S AGREEMENTS
TH CCN.  THE PATIENT'S RESPONSIBILITY IS LIMITED TO THE DIFFERENCE
ETWEEN THE AMOUNT PAID BY ALLSTATE (AS SHOWN BELOW) AND THE CCN CONTRACTED
E, WHICH APPEARS IN THE 'BILLED AMOUNT' COLUMN."

  you have any questions about this claim, please contact your file handler,
EBORAH METCALF at (954) 846-7245

yment for $    407.04 was made on 08/16/1999 to:
VID NAPOLI DC

opy(s) of this Explanation of Benefits has been sent to:
RY M. TYSON, 2646 POLK ST APT 20, HOLLYWOOD, FL, 33020
VID NAPOLI DC, 5700 STIRLING RD STE 9, HOLLYWOOD, FL, 33021

*Rec 8/20/99*

