IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| DAVID A. NAPOLI, D.C.<br>d/b/a NAPOLI CHIROPRACTIC CENTER, and<br>all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 00-6061<br>Judge Ferguson |
| v. | ) ) | Magistrate Judge Snow |
| ALLSTATE INSURANCE COMPANY, and<br>MEDVIEW SERVICES, INC., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MEDVIEW SERVICES, INC.'S MOTION TO DISMISS COUNT I OF THE CLASS ACTION COMPLAINT

NOW COMES Plaintiff, David A. Napoli, D.C. d/b/a Napoli Chiropractic Center ("DR. NAPOLI"), by and through his attorneys, GOLD, ROSENFELD & COULSON, a partnership of professional and limited liability corporations, GOGEL, PHILLIPS & GARCIA, LLP, and KOPELMAN & BLANKMAN, a professional association, and hereby submits this Memorandum of Law in Support of Plaintiff's Opposition to MedView Services, Inc.'s Motion to Dismiss Count I of the Class Action Complaint.

## I.    INTRODUCTION

In his class action complaint, DR. NAPOLI, on behalf of himself and a class of similarly situated Florida medical providers, alleges seven federal and state causes of action against Defendants, Allstate Insurance Company ("ALLSTATE") and Medview Services, Inc.

1

("MEDVIEW") for their systematic practice of discounting automobile Personal Injury Protection ("PIP") medical expense claims based on the operation of a "Silent PPO," or "silent preferred provider organization." (See, Class Action Complaint at ¶¶ 15 -16). "Silent PPOs" have been the subject of a number of lawsuits across the country and the resulting body of case law establishes that their existence is actionable under various federal and state laws. In conjunction with MEDVIEW, ALLSTATE misappropriated DR. NAPOLI'S preferred provider organization discounts and applied them to Florida automobile insurance PIP claims. Through the systematic operation of this Silent PPO, ALLSTATE has been paying automobile PIP medical expense claims at a reduced rate without authority or consideration contrary to DR. NAPOLI's preferred provider contract, the standard Florida ALLSTATE Automobile Policy, and the Florida statute pertaining to PIP benefits. In Count I of the Complaint, DR. NAPOLI alleges that through its conduct, MEDVIEW has breached the terms of its PPO agreement.

## II.    FACTUAL ALLEGATIONS

For the purposes of this opposition to MEDVIEW's motion to dismiss, the following facts as pleaded in DR. NAPOLI's Complaint should be accepted as true and should be construed in a light most favorable to him. Rickman v. Precisionaire, Inc., 902 F.Supp. 232, 233 (M.D. Fla. 1995). DR. NAPOLI and the putative class members are all preferred health care providers in the MEDVIEW preferred provider network. (Complaint ¶ 34). DR. NAPOLI is a licensed Florida chiropractor. (Complaint ¶1). In 1993 he entered into a written contract with MEDVIEW to join MEDVIEW's "preferred provider organization" ("MEDVIEW PPO"). (Complaint ¶¶ 3, 4, 17); see also, Medview Services, Inc. Participating Health Care Professional Agreement (attached hereto as Exhibit 1). Under the terms of the MEDVIEW Agreement, MEDVIEW acted as a

2

middleman. (Complaint ¶3). MEDVIEW contracted with health care providers such as DR.

NAPOLI, who in return for marketing services to generate patients, agreed to discount their

normal medical fees by 20%. (Complaint ¶¶ 3, 4, 17); (MEDVIEW Agreement, Exhibit 1). The

marketing services consisted of, inter alia, MEDVIEW's publication of DR. NAPOLI's name,

address, and practice area, to be distributed to MEDVIEW "Subscribers" of existing and potential

MEDVIEW "Third Party Payors"[1] which included business entities such as insurance companies,

employers and union trust funds. (Complaint ¶¶ 3, 5, 18); (MedView Services Agreement,

Exhibit 1 at Art. 7(A) - (B)). In the agreement between MEDVIEW and DR. NAPOLI, a

"Subscriber" is defined as a person entitled to receive benefits under the MEDVIEW agreement.

(MEDVIEW Agreement, Exhibit 1 at Art. 1(G)). Thus, for patients who were not part of the

MEDVIEW PPO network, DR. NAPOLI charged his normal fee without the 20% discount.

(Complaint ¶ 18).

ALLSTATE is an insurance company offering Florida residents an automobile insurance

policy providing PIP benefits. Under ALLSTATE's standard Florida automobile PIP policy, 80%

of "all reasonable and necessary treatment expenses" are paid up to a defined limit. (Complaint

¶¶10, 11). In exchange, an ALLSTATE insured has the unrestricted right to choose his or her

medical providers. (Complaint ¶11). The State of Florida, however, has enacted a statute setting

forth specific requirements for establishing an automobile insurance preferred provider network

that financially encourages an insured to use a pre-defined group of preferred medical providers.

(Complaint ¶¶ 28, 108); see, FLA. STAT. §627.736(10) (1998). Under Section 627.736(10), if an

---

[1] "Third Party Payor" is defined as an insurance company, employer, third party administrator, or other business entity that has contracted with MedView to pay for health care services rendered by preferred providers to MedView insured employees. (MEDVIEW Agreement, Exhibit 1 at Art. 1(E)).

3

insurance company offers a preferred provider auto policy, it must provide each policy-holder with a current roster of preferred providers in the county in which the insured resides *at the time of purchase of such policy.* FLA. STAT. §627.736(10) (1998) (emphasis added). In violation of this statute, ALLSTATE has not offered its insureds a "preferred provider policy" (Complaint ¶14). In fact, ALLSTATE has admitted this allegation in its answer to the complaint. (See, Allstate's Answer and Defenses to Counts II and III of Class Action Complaint at ¶ 14). As such, and as admitted by ALLSTATE, any medical provider who treated or treats an ALLSTATE insured under an ALLSTATE PIP automobile insurance policy is not a "preferred provider." (Complaint ¶14); (Defendant's Answer ¶14).

Despite the fact that ALLSTATE did not offer an automobile preferred provider policy to its insureds, ALLSTATE obtained MEDVIEW's database that contained the identities of all of MEDVIEW's preferred providers and the discounted fees that they were willing to accept under the MEDVIEW contract. (Complaint ¶19). Subsequently, ALLSTATE began to systematically apply the MEDVIEW PPO discount medical rates to PIP medical expense claims submitted to it by DR. NAPOLI and the members of the putative class. (Complaint ¶¶15, 20, 25). When ALLSTATE received a medical bill for payment under the PIP portion of its automobile insurance policy, ALLSTATE and/or MEDVIEW would discount the bill at the MEDVIEW preferred provider rate, would print out a form explanation or benefits ("EOB") indicating the application of the discount, and would then make payment at that rate. (Complaint ¶¶20, 25, 31). At no time prior to DR. NAPOLI's and the putative class members' treatment of patients entitled to PIP benefits did ALLSTATE market their medical services to their insureds or even comply with the requirements of Section 627.736(10) pertaining to an automobile preferred provider policy.

4

(Complaint ¶22).

ALLSTATE has been applying the MEDVIEW PPO discounts to PIP medical expense claims for at least two years. (Complaint ¶28). It was and still is the custom of ALLSTATE to discount thousands of Florida PIP medical expense claims in violation of its automobile insurance policy and the Florida PIP and preferred provider statute. (Complaint ¶32). At no time did DR. NAPOLI or the members of the putative class have contracts with ALLSTATE allowing ALLSTATE to apply MEDVIEW discounts to PIP medical expenses. (Complaint ¶19).

## III.    ARGUMENT

### A.    Standard to Apply on Rule 12(b)(6) Motion to Dismiss

When faced with a motion to dismiss under Rule 12(b)(6) a court must accept a plaintiff's well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff. Kissimmee River Valley Sportsmans Ass'n v. City of Lakeland, 60 F.Supp.2d 1289, 1291 (M.D. Fla. 1999)(citing Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)). A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that a plaintiff can prove no set of facts that support a claim for relief. Rickman v. Precisionaire, Inc., 902 F.Supp. at 233. In fact, the threshold of sufficiency that a plaintiff must overcome to survive a motion to dismiss is exceedingly low. Ancata v. Prison Health Serv., Inc., 769 F.2d 700, 703 (11th Cir. 1985).

### B.    MedView's Rule 12(b)(6) Motion To Dismiss Should Be Denied Because Dr. Napoli Has Properly Plead A Breach Of Contract Claim In The Complaint

#### 1.    Allstate Is Not A Legitimate Third Party Payor

The basis for DR. NAPOLI's cause of action against MEDVIEW is one for breach of

5

contract. MEDVIEW does not question the existence of a valid agreement with DR. NAPOLI. Rather, the matter at issue is whether DR. NAPOLI has properly pleaded a breach of that agreement. In his Complaint, DR. NAPOLI alleges that MEDVIEW breached the PPO agreement in at least five different ways, all of which center around its disclosure of the MEDVIEW discount rates to ALLSTATE in a manner incongruent with the terms of the agreement. (Complaint, ¶ 44 a-e(3)). MEDVIEW agreed to market DR. NAPOLI's medical services to Third Party Payors, including, but not limited to, business entities such as insurers, employers and union trust funds who contracted with MEDVIEW to pay for health care services rendered by DR. NAPOLI to MEDVIEW *insured employees.* (Complaint, ¶ 42). DR. NAPOLI then alleges that MEDVIEW breached the contract by, "selling [DR. NAPOLI's] volume discounts . . . to ALLSTATE, which is not a legitimate Third Party Payor, for a fee and with knowledge that the discounts would be applied to automobile personal injury protection medical expense claims and not claims of subscribers as stated in the contract," and by, "selling [DR. NAPOLI's] volume discounts . . . to ALLSTATE which applied the discounts retrospectively and could not provide an increase in patient volume for DR. NAPOLI and the purported class." (Complaint ¶ 44 §§ a-b).

MedView urges that DR. NAPOLI's Complaint should be dismissed because the language of the contract authorized it to solicit "Payors" such as ALLSTATE. Referring to Article 7 of the contract, MEDVIEW asserts that in exchange for the discounted rates offered by DR. NAPOLI, MEDVIEW agreed to market his participation in the network to "existing and potential Payors." Id., p. 5. MEDVIEW then accuses DR. NAPOLI of ignoring the clear language of the contract by improperly limiting the term "Third Party Payor" to embrace only those who have relationships

with "insured employees." This is an amazing accusation in light of the fact that the very contract
to which MEDVIEW refers - a contract that MEDVIEW itself drafted - specifically defines the
term "Third Party Payor" as follows:

> E. "Third Party Payor" means an insurance company, employer,
> third party administrator, or other business entity which has
> contracted with MedView to pay for Health Care Services
> rendered by the HCP [Health Care Provider] to MedView insured
> employees. See, MedView Services Incorporated, Participating
> Health Care Professional Agreement, Article I, E.

MEDVIEW then asserts that DR. NAPOLI has narrowly defined and limited the Third
Party Payor term through connections between the terms "subscriber" and "insured employees."
DR. NAPOLI respectfully suggests otherwise. The language of the contract is clear on its face.
A "Third Party Payor" is an entity that has contracted with MEDVIEW for the payment of
services rendered by its health care professionals, including DR. NAPOLI, to "MedView insured
employees." Unless a health care professional renders services to a "MedView insured
employee," then the health care professional is not entitled to payment by a "Third Party Payor."

MEDVIEW then refers to the term "Subscribers" which is defined in the contract as "a
person entitled to receive benefits with respect to Health Care Services." MEDVIEW suggests
that ALLSTATE's insureds can be subscribers by virtue of the fact that they are entitled to PIP
benefits under their ALLSTATE automobile insurance policy. When one considers the definition
of the term "Subscribers," however, the logical query that follows is *who are the 'person[s]
entitled to receive benefits with respect to Health Care Services?'* Reading the definition of
"Third Party Payor" in conjunction with the definition of "Subscriber," the clear language of the
contract demonstrates that the "MedView insured employees" referred to in the "Third Party

7

Payor" definition are the ones entitled to such benefits. Such an interpretation makes sense since a Subscriber must have some logical relationship to the Third Party Payor in order for the Third Party Payor to be responsible for payment. Thus, if DR. NAPOLI treats someone who is not a "MedView insured employee," then that person is not a person entitled to benefits under the contract.

### 2. Construing The Contract As A Whole Supports Dr. Napoli's Allegation That Allstate Is Not A Legitimate Third Party Payor

MEDVIEW argues that the clear language of the contract undercuts DR. NAPOLI's allegation that ALLSTATE is not a legitimate Third Party Payor. MEDVIEW urges that the agreement expressly states in four different places that payors include a broad range of entities including insurance companies. DR. NAPOLI does not dispute that fact. What DR. NAPOLI does dispute is that ALLSTATE was a legitimate payor under the contract. Considering the contract as a whole buttresses DR. NAPOLI's allegations. In his Complaint, DR. NAPOLI alleges that he entered into a PPO contract with the anticipation that MEDVIEW's marketing efforts would increase patient volume[2]. (Complaint, ¶ 18). Based upon the language of the contract, DR. NAPOLI expected that MEDVIEW would market his services to legitimate Third Party Payors that consisted of business entities such as insurers, employers and union trust funds who contracted with MEDVIEW to pay for health care services rendered by DR. NAPOLI to

---

[2] MEDVIEW takes umbrage with DR. NAPOLI's use of the term "volume discounts" in his Complaint. Because the specific term "volume discounts" does not expressly appear in the contract, MEDVIEW reasons that his use of the term is an attempt to create a nonexistent duty on the part of MEDVIEW. DR. NAPOLI suggest otherwise. The use of the term "volume discounts" is intended as a term of convenience in the construction of the complaint to refer to the discounts that he was willing to accept in exchange for the increase in patient volume that he anticipated prior to entering into the agreement.

MEDVIEW *insured employees*. (Complaint, ¶ 18). In exchange for this anticipated marketing,
DR. NAPOLI agreed to provide services to patients entitled to benefits under the MEDVIEW
contract for a fee less than he would normally charge. (Complaint, ¶ 18). DR. NAPOLI's
willingness to accept lower fees is typical in the preferred provider organization arrangement
because membership in a PPO may increase a preferred provider's number of patients. See,
Levine v. Central Florida Medical Affiliates, Inc., 72 F.3d 1538, 1546 (11th Cir. 1996) (noting
that providers in Healthchoice PPO were willing to accept lower fees because Healthchoice
membership might increase number of patients).

In fact, the very nature of the preferred provider organizations supports this very
reasonable expectation. In the present era of managed health care, "PPOs are cost containment
devices which have been adopted by employers throughout the country." Saint Vincent Hospital
and Health Center, Inc. v. Blue Cross and Blue Shield of Montana, 261 Mont. 56, 58, 862 P.2d 6,
8 (1993). They are "creatures of employee benefit plans." Willis-Knighton Medical Center v.
Community Health Network of Louisiana, Inc., 1993 WL 77320 at * 4 (W.D. La. 1993). A
preferred provider organization is a "contractual agreement between a health care provider and an
employer. Pursuant to such an agreement, the health care provider offers services to the
employer's employees at reduced rates. In turn, the employer encourages its employees, as
participants of the plan, to use the preferred providers designated by the PPO." Gavin North
Sherwood Chiropractic Clinic, A.P.C. v. Brower, M.D., 838 F.Supp. 274, 275 (M.D. La. 1993).
Encouragement comes from the creation of incentives for subscribers to use the services of the
health care providers within the PPO network. Ball Memorial Hospital, Inc. v. Mutual Hospital
Insurance, Inc., 603 F.Supp. 1077, 1078 (S.D. Ind. 1985) (reasoning that two characteristics

differentiate PPOs from other forms of health insurance: "(1) subscribers are given incentives to use a limited panel of providers, but retain freedom of choice to use other qualified providers, and (2) preferred providers are defined by specific health care cost containment characteristics, such as competitive charges and participation in utilization programs."); see also, Federal Trade Commission v. Tenet Healthcare Corporation, 1998 WL 433855 at * 2 (E.D. Mo. 1998)(noting that PPOs provide participants with incentives to use in-network health providers by reimbursing a lower percentage of medical fees, such as 60% or 70%, if the individual chooses to use an out-of-network provider).

DR. NAPOLI's reasonable expectation was that MEDVIEW would market their services to the types of Third Party Payors that were defined in the contract; that is, insurance companies, employers, third party administrators or other business entities that had contracted with MEDVIEW to pay for Health Care Services rendered to MEDVIEW Subscribers and who had agreed to provide legitimate steerage methods to create incentives for those Subscribers to use the services of the preferred providers in the network. Such was the legitimate expectation of a contracting preferred provider. Instead MEDVIEW sold DR. NAPOLI's volume discount information to ALLSTATE who is not a legitimate Third Party Payor as defined by the contact because it did not have insured employees and it did not have in place a legitimate program to steer insureds to the preferred providers in the network. At no time did ALLSTATE have any relationship with "MedView insured employees" as contemplated in the contract or as anticipated by DR. NAPOLI. In violation of the Florida state statute governing the establishment of an automobile insurance PPO, at no time prior to DR. NAPOLI's treatment of any of his patients injured in automobile accidents did ALLSTATE market his medical services to these patients by

10

providing insurance premium discounts and notification of the identities of all preferred providers

at the point of purchase or renewal of their automobile insurance policy. (Complaint, ¶¶ 13-14).

All that ALLSTATE did with DR. NAPOLI's PPO discount information is to

*retoractively* apply them to his medical bills submitted pursuant to ALLSTATE's PIP coverage.

Prior to entering into the contract with MEDVIEW, there was no expectation on the part of DR.

NAPOLI that his volume discount information would be accessed by automobile insurers that did

not comply with Florida statutory law concerning the establishment of an automobile insurance

preferred provider organization for the payment of PIP claims. It would make absolutely no

economic sense for DR. NAPLOI to allow his discount information to be accessed by illegitimate

Third Party Payors such as ALLSTATE because they did not create incentives for auto insured

drivers to use the doctors in the network, and did not even notify their insureds of the existence of

a preferred provider network.

In its motion to dismiss, MEDVIEW proposes that DR. NAPOLI's interpretation of the

term Third Party Payor as being limited to payors that only have "insured employees" causes the

definition of payor to conflict with the broad meaning given to payor in the recitals of the

agreement. Admittedly, courts do disfavor contractual interpretation that cause separate

provisions to conflict with each other. <u>Maccaferri Gabions, Inc. v. Dynateria, Inc.</u>, 91 F.3d 1431,

1440 (11th Cir. 1996). Under general principles of contractual interpretation, however, "a

contract should be construed so as to give effect to all the contract's provisions. Similarly, if two

clauses of a contract appear to be in conflict, the preferred interpretation is the *one that gives a*

*'harmonious interpretation' to the clauses*." <u>Guaranty Fin. Servs. v. Ryan</u>, 928 F.2d 994, 999

(11th Cir. 1991) (quoting <u>Johnson Controls, Inc. v. City of Cedar Rapids</u>, 713 F.2d 370, 374 (8th

11

Cir. 1983)) (emphasis added).  In the present case, given the nature of PPOs as being "creatures

of employee benefits plans," DR. NAPOLI's interpretation actually gives a harmonious

interpretation to the contract as a whole.  Indeed, to accept MEDVIEW's argument that

ALLSTATE was a legitimate Third Party Payor when it had no steerage mechanisms in place to

encourage its insureds to use the services of MEDVIEW's preferred providers would conflict

with the agreements other provisions and the very nature of the contract.

> **3.    The MedView Contract Does Not Clearly Identify Allstate As A Third
> Party Payor And Does Not Even Refer To An Automobile Insurance
> Preferred Provider Organization**

Despite MEDVIEW's assertions to the contrary, throughout the MEDVIEW contract

there is ***no mention*** of an automobile insurance benefits reimbursement plan.  Simply stated, in

the body of the contract there is no reference to the use of DR. NAPOLI's discounts as part of an

automobile insurance preferred provider organization.  For example, in the agreement,

MEDVIEW represents that it develops contractual arrangements with traditional types of payors

which include employers, insurance carriers, third party administrators and other similar entities

for the coordination of the delivery of health care services.  See, MedView Services, Inc.,

Agreement, Recitals - § A.  MEDVIEW further represented that some of those arrangements

"relate solely to Workers' Compensation, while other arrangements relate generally to programs

for the provision of health care services," while making no reference to automobile programs.  Id.

Additionally, none of the exhibits to the agreement even make reference to an automobile

program.  For example, Exhibit A to the Agreement, which sets out the compensation that

Plaintiffs are willing to accept for services rendered to Subscribers is entitled **"Group Health

Benefits Reimbursement"** and **"Workers' Compensation Reimbursement."**  See, Agreement,

Exhibit A. (bold in original). It does not include "Automobile Benefits Reimbursement," or any term referring to automobile insurance reimbursement benefits.

Pointing to Exhibit C of the agreement, MEDVIEW argues that the contract expressly identified ALLSTATE as one of the Florida payors under the contract. What MEDVIEW ignores, however, is that ALLSTATE's identity appears under the section entitled "Group Health" with other employers such as Hechinger Stores, Home Quarters, National Services Industries, Planning Research Corporation, Anheuser Busch and Albertsons. DR. NAPOLI submits that given the clear language of the section heading under which ALLSTATE is listed and given the other types of entities identified which include employers, third party administrators and insurance companies, a reasonable reader would be led to believe that ALLSTATE was a payor as it relates to group health insurance provided as employee benefits plans, not automobile insurance. Indeed, the very nature of the PPO as being a "creature of employee benefit plans" supports this supposition.

### 4.    Dr. Napoli Has Properly Alleged A Claim For Violation Of The Duty Of Good Faith

Despite MEDVIEW's assertions to the contrary, DR. NAPOLI has properly alleged a cause of action for violation of the duty of good faith and fair dealing inherent in the agreement. See Green Companies v. Kendall Racquetball, 560 So. 2d 1208, 1210 (Fla. 3d DCA 1990) (recognizing that under Florida law every contract carries with it implied provision that parties will act in accordance with principles of good faith and fair dealing); First Nationwide Bank v. Florida Software Services, Inc., 770 F. Supp. 1537 (M.D. Fla. 1991). The scope of the implied duty of good faith and fair dealing is limited though by the express language of the contract.

13

<u>Burger King Corp. v. Weaver</u>, 798 F.Supp. 684, 688 (S.D. Fla. 1992) (citing <u>Coira v. Florida</u> <u>Medical Association, Inc.</u>, 429 So. 2d 23, 24 (Fla. 3d DCA 1983)). Thus, conduct that is expressly authorized by the terms of an agreement cannot be said to breach the implied covenant. <u>Id.</u>  Although MEDVIEW argues otherwise, in the present action, DR. NAPOLI has alleged that MEDVIEW breached the express terms of the PPO agreement by disclosing DR. NAPOLI's discount information to ALLSTATE which was not a legitimate Third Party Payor.  Since the basis for DR. NAPOLI's claim for breach of the covenant of good faith and fair dealing is on the express terms of the PPO contract, DR. NAPOLI's cause of action should not be dismissed.

### 5.    Dr. Napoli Has Properly Alleged Damages As A Result Of MedView's Breach Of Contract

MEDVIEW's argument that DR. NAPOLI makes no claim for damages as to MEDVIEW because DR. NAPOLI's underlying claim is based on the 20% discount that ALLSTATE applied to his PIP medical expenses is nonsensical.  In his complaint, DR. NAPOLI alleges that by virtue of MEDVIEW's breaches of contract in providing an illegitimate Third Party Payor to wrongfully access his discounts, he has been damaged.  (Complaint, ¶ 45).  MEDVIEW's reliance on <u>Olin's,</u> <u>Inc. v. Avis Rental Car Sys., Inc.</u>, 172 So. 250 (Fla. App. 1965), which stands for the principle that only damages that are reasonably foreseeable or contemplated by the parties as a result of the breach of the contract are recoverable, is somehow misplaced.  <u>Id.</u> at 252.  It is true that ALLSTATE was the party that applied the MEDVIEW discount to DR. NAPOLI's medical charges.  However, ALLSTATE obtained the discount information as a result of MEDVIEW's wrongful breach of its contract with DR. NAPOLI.  To suggest that MEDVIEW did not play a hand in DR. NAPOLI's damages defies common sense.  But for MEDVIEW breaching the

14

contract in the first place, ALLSTATE would not have been able to apply the PPO contract discount rate to DR. NAPOLI's bills. Clearly, DR. NAPOLI's damages are reasonably foreseeable result of MEDVIEW's improper release of his discount information to an illegitimate Third Party Payor.

## IV.    CONCLUSION

For the foregoing reasons, DR. NAPOLI respectfully requests that this Court deny MEDVIEW's motion to dismiss.

Respectfully submitted

By: _____

By one of Dr. Napoli's attorneys

GOLD, ROSENFELD & COULSON
A Partnership of Professional and
Limited Liability Corporations
11 S. LaSalle Street, Ste 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 (facsimile)
#5231

GOGEL, PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 (facsimile)

KOPELMAN & BLANKMAN
A Professional Association
National Towers
Suite 1611
1 Financial Plaza
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 (facsimile)

# ADDITIONAL

# ATTACHMENTS

# NOT

# SCANNED

## PLEASE REFER TO COURT FILE