IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

DAVID A. NAPOLI, D.C., d/b/a
NAPOLI CHIROPRACTIC CENTER, and
all others similarly situated,

    Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY, and
MEDVIEW SERVICES, INC.

    Defendants.

CASE NO.: 00-6061-CIV
JUDGE: FERGUSON
MAGISTRATE: SNOW

## MEDVIEW'S REPLY TO PLAINTIFF'S MEMORANDUM
## IN OPPOSITION TO MEDVIEW'S MOTION TO DISMISS

Defendant, MedView Services, Inc. ("MedView"), pursuant to Local Rule 7.1(c), files this reply to Plaintiff's memorandum opposing MedView's motion to dismiss count one of the complaint.

### I.   INTRODUCTION

Plaintiff's opposing memorandum, like his complaint, is long on inflammatory rhetoric but only perfunctorily discusses what is actually at issue -- whether the terms of this particular contract preclude the conduct which MedView is alleged to have engaged in. This action is not a forum to rail against the supposed evils of "silent PPOs", to use Plaintiff's term. Plaintiff's claim against MedView is for breach of contract. It will rise or fall on a comparison of the contract's terms and the activity engaged in. Whether Plaintiff feels in hindsight that his deal makes good economic sense, whether Plaintiff's counsel feels such a deal is desirable from a societal standpoint, or whether the AMA likes or dislikes such arrangements, are irrelevant factors that can have no bearing on the contract claim at bar.

Nor is this action -- in the context of the claim against MedView -- a forum to complain about alleged misconduct by Allstate after it learned of MedView's relationship with the plaintiff. Count one of Plaintiff's complaint concerns whether MedView was entitled to provide information to Allstate, yet Plaintiff's opposition papers focus in large part on what Allstate allegedly did thereafter. Such discussion is completely superfluous in the present context.

Accordingly, in ruling on the instant motion the Court should not become side-tracked by Plaintiff's societal discourse or his focus on what Allstate did after-the-fact with information allegedly received from MedView. The appropriate focus here is on what <u>MedView</u> is alleged to have done and what the terms of the contract say about that. Viewed in that light, count one falls well short of stating any claim for which relief can be granted and should be dismissed.

## II.   ARGUMENT

Briefly stated, MedView is alleged to have informed Allstate about its discount arrangement with the Plaintiff -- that is all. There is no allegation that MedView created a "silent PPO". There is no allegation that MedView "took" or even allowed Allstate to "take" discounts, retroactive or otherwise, from the Plaintiff. All MedView is alleged to have done is to inform Allstate about Plaintiff's agreement with MedView, and the only issue here is whether that activity -- the provision of information to Allstate -- breached MedView's contract with the Plaintiff.

The answer to that question is clearly not. As discussed below, the parties' contract specifically and unambiguously allows MedView to provide this information to insurance companies, and Allstate is one of the insurance companies specifically listed in the contract. Plaintiff himself acknowledges in his complaint that there is nothing improper about providing this information to Allstate. It is what Allstate allegedly did with the information after-the-fact -- use of the information to create a "silent PPO" and to allegedly "steal" discounts to which it was

2

not entitled -- that forms the gravamen of Plaintiff's claim. None of this is alleged to have anything to do with MedView, and therefore none of this can support a claim for breach against MedView.

### A. Plaintiff's Interpretation Cannot Survive a Reasonable Reading of the Contract.

The base issue here is whether the "Participating Health Care Professional Agreement" attached as exhibit one to the complaint (hereinafter the "Agreement") allowed MedView to treat Allstate as an "existing [or] potential Third Party Payor" under the Agreement's article seven, paragraph A.[1] If so, then the contract allowed MedView to do what it is alleged to have done -- inform Allstate about MedView's relationship with Plaintiff.

In its initial memorandum, MedView demonstrated how the Agreement specifically includes "insurance companies" within the definition of "Third Party Payors", and specifically lists Allstate as one of those Payors. MedView also demonstrated how well-accepted, black-letter principles of contract construction require this interpretation. Plaintiff's opposition papers, however, contend that the Court should ignore this clear language and ignore the established rules of construction. Plaintiff would have this Court employ a strained reading of the contract to create an ambiguity -- one that (unlike MedView's proffered construction) requires portions to be construed inconsistently with other portions -- and then resolve that ambiguity in his favor.[2] This reasoning is flawed for a variety of reasons.

---

[1] Plaintiff's opposition papers (e.g. at p. 2) call this agreement a "preferred provider contract" That term, however is supplied by Plaintiff, not the Agreement. Indeed, Plaintiff's opposition papers are replete with representations about the agreement and its import that find no basis in the terms of the agreement itself.

[2] *See* Plaintiff's Memo at 11. Plaintiff admits that his construction creates incongruity among the various contract provisions, and then argues that the conflict should be "harmoniously" resolved in his favor. MedView's construction, on the other hand, avoids incongruity altogether.

First, it is simply not appropriate to adopt a construction that places contract provisions in conflict with one another, requiring that one or another be read out of the contract, when there is a reasonable construction that gives effect to the entirety. *Guaranty Fin. Serv., Inc. v. Ryan*, 928 F. 2d 994, 999 (11th Cir. 1991) (contract provisions should not be construed to conflict with one another unless no other reasonable interpretation is possible). Under Plaintiff's proffered interpretation, the only services eligible for discount under the Agreement are those rendered to MedView insured employees.[3] Plaintiff thus artificially limits the definition of "Payor" to insurers of employees[4], and the definition of "Subscriber" to MedView-insured employees.[5]

However, not only does this contradict the Agreement's plain language, it requires striking out substantial portions of no less than five separate provisions of the contract.[6] As discussed in the initial brief, this strained interpretation must yield to that espoused by MedView, which affords the language of the Agreement its plain meaning and allows all portions of the Agreement to be given effect.

Moreover, Plaintiff's own factual allegations -- which as Plaintiff points out are to be accepted, at least to the extent they are not contradicted by the Agreement's terms -- belie any claim that the Agreement's definition of Payor is limited to insurers of employees, or that the definition of Subscriber is limited to MedView-insured employees. Paragraph 5 of Plaintiff's Complaint alleges that:

---

[3] *See* Plaintiff's Memo at 7-8 ("unless a health care professional renders services to a 'MedView insured employee,' then the health care professional is not entitled to payment by a 'Third Party Payor'").

[4] *See* Plaintiff's Memo at 7-8 ("the 'MedView insured employees' referred to in the 'Third Party Payor' definition are the ones entitled to such benefits")

[5] *See* Plaintiff's Memo at 7-8 ("if Dr. Napoli treats someone who is not a 'MedView insured employee,' then that person is not a person entitled to benefits under the contract").

[6] These are the Agreement's Recitals ¶ A, Art. 1 ¶¶ A, E, and G, and Art. 7 ¶ A. *See* MedView's initial brief at 11-13.

4

> There would be nothing improper with Allstate gaining access to middleman MedView's data base of preferred providers containing [Plaintiff's] name and applying these discounts if Allstate became a legitimate participant in the PPO to which [Plaintiff] . . . belonged. In fact, Florida Personal Injury Protection Statute, § 627.736(10)(1992), provides a means for Allstate to participate in such a PPO . . . .

[Complaint, ¶ 5] In other words, Plaintiff admits that Allstate <u>could</u> be a legitimate Payor under the contract, and, by necessity, that Allstate PIP insureds could be Subscribers, if Allstate did other things outside the parameters of the Agreement at issue here.[7] This admission cannot coexist with Plaintiff's "interpretation" because a patient seeking treatment under PIP insurance would not be a "MedView-insured employee", nor would the PIP insurer be the insured's employer. This underscores just how strained and unreasonable Plaintiff's interpretation of the Agreement is. Paragraph five of the complaint essentially admits that Plaintiff's "interpretation" is wrong.

**B.  Plaintiff's Subjective Beliefs are not Sufficient to Vary the Clear Terms of the Agreement.**

Plaintiff purports to bolster his proffered construction by advancing his own unilateral, subjective beliefs about the way the contract should work. However, Florida's common law does not allow suit for breach based on a plaintiff's subjective belief about contract terms where that belief finds no support in the actual contract language. *State Farm Fire & Cas. Ins. Co. v. Deni. Assoc. of Fla., Inc.*, 678 So. 2d 397, 400 (Fla. Dist. Ct. App. 1996) ("[i]t is foreign to our law to find the meaning of contractual language from the subjective understanding of one of the parties"). In his memorandum, Plaintiff claims that he reasonably expected MedView to market his services to entities "that had contracted with MedView to pay for healthcare services . . . <u>and</u>

---

[7] This highlights the point made earlier -- that if Plaintiff has a complaint it is with what Allstate did or might have done with the discount information, and not with the provision of the information itself.

who had agreed to provide legitimate steerage methods to create incentives for those subscribers to use the services of the preferred providers in the network."[8]  [Plaintiff's Memo at 10] However, the Agreement contains not one word about any "steerage" requirement. Indeed, the Agreement specifically provides at article seven, paragraph A that Plaintiff is in no way guaranteed any particular level of business as a result of the arrangement. This is simply an attempt by the Plaintiffs to impose that which the Agreement does not -- a duty on MedView's part to insure that each "existing [or] potential Third Party Payor" such as Allstate provides Plaintiff with an increase in patient volume.[9] The Agreement cannot support a reasonable expectation that this duty exists because the Agreement contains no such duty and, in fact, disclaims any such duty. *See State Farm*, 678 So. 2d at 400. ("the meaning of a contract is deduced from the unambiguous language")

Plaintiff also states that he entered into the contract with MedView under the expectation that MedView would market his services to Payors. [Plaintiff's Memo at 8-9] In exchange, Plaintiff would provide his services at a discount, and the whole operation would increase Plaintiff's patient volume. Apparently, this is exactly what Plaintiff received. Plaintiff makes no allegation that MedView failed to market his services to "legitimate" Payors, nor does he make any allegation that his contract with MedView failed to increase his patient volume. Instead, Plaintiff alleges that MedView breached a non-existent duty to tie increased patient volume directly to each Payor to whom it marketed Plaintiff's services.

---

[8]Plaintiff's Memo at 10 (emphasis added).

[9] Plaintiff claims it would make "absolutely no economic sense" for him to allow Payors that did not provide "steerage" to discount his services. [Plaintiff's Memo at 11] First, Plaintiff makes no allegation that his practice made less money operating under the MedView Agreement than it did before. Indeed, one can reasonably assume that his practice made more money because while though the Agreement is terminable he continued to operate under the contract for a number of years. Thus, the Agreement must have made "economic sense." In any event, whether a contract makes "economic sense" provides no basis for determining whether a party breached it, nor is "economic sense" a recognized rule of construction. *See Home Dev. Co. of St. Petersburg v. Bursani*, 178 So. 2d 113, 117 (Fla. 1965); *Jacobs v. Petrino*, 351 So. 2d 1036, 1039 (Fla. Dist. Ct. App. 1976).

The fact that the contract does not contain this "steerage" duty shows that the parties did not intend for it to exist. *Home Dev. Co. of St. Petersburg, Inc. v. Bursani*, 178 So. 2d 113, 117 (Fla. 1965) ("the fact that they did not [include it], indicates an intention to exclude such a provision"). If the parties intended to contractually require every Payor that discounted Plaintiff's services to provide "steerage," the contract would have said this, and whether Plaintiff thought the contract imposed this duty on MedView makes no difference. *See Home Dev.*, 178 So. 2d at 117 ("[t]his may have been the intention of Mr. Bursani in entering into the stock-purchase agreement; but the fact remains that this is not what the agreement and charter provision said"). Plaintiff cannot rewrite his contract after the fact by filing a lawsuit. *Jacobs v. Petrino*, 351 So. 2d 1036, 1039 (Fla. Dist. Ct. App. 1976) ("[c]ourts may not rewrite, alter, or add to the terms of a written agreement between the parties . . . in order to relieve one of the parties from the alleged hardship of an improvident bargain").

### C. Plaintiff espouses result-oriented contract construction.

Plaintiff's opposition papers contend, at pp. 11-12, that Plaintiff simply wants to impose a "harmonious interpretation" of the contract. The problem, of course, is that to get to that point the Plaintiff had to create an ambiguity where none exists, such that the Court has to choose which contract provisions it will enforce and which it will read out of the Agreement altogether.[10] This contravenes the well-accepted axiom that if there is a reasonable construction that will give effect to all provisions, that construction should control.

Plaintiff's shortcoming is that he has the interpretation process backwards. Rather than looking to the terms of the Agreement, employing standard rules of construction, and reaching a

---

[10] *See* MedView's initial brief at 9-13, which demonstrates how its proffered construction gives effect to the contract as a whole, whereas Plaintiff's constructions requires that portions of five separate provisions be read out of the Agreement.

conclusion as to what the Agreement means. Plaintiff <u>starts</u> with his preferred conclusion (i.e., that MedView should not have been allowed to provide discount information to Allstate because Allstate allegedly used it to create a "silent PPO") and then <u>backs into</u> a construction that yields his desired result. In other words, Plaintiff does not seek to "harmonize" provisions of the Agreement with one another; he seeks to harmonize the Agreement as a whole with his own view of what it should require: that Payors can only be "legitimate" if they have "steerage mechanisms in place to encourage their insureds to use [Plaintiff's] services . . . ." [Plaintiff's Memo at 12] These terms appear <u>nowhere</u> in the Agreement itself. It is a result-oriented interpretation that reads unambiguous provisions right out of the Agreement and should not be accepted by this Court. *See Guaranty Fin. Serv.*, 928 F.2d at 999-1000 ("harmonious interpretation" is one that gives reasonable meaning to <u>all</u> parts of the contract; provisions should not be construed to conflict with one another unless no other reasonable interpretation is possible).

D. **Allstate's Actions do not Provide a Basis for a Breach of Contract Claim Against MedView.**

Much of Plaintiff's argument pertains not to what MedView is alleged to have done -- the provision of information about the MedView/Plaintiff relationship to Allstate -- but rather to Allstate's conduct thereafter, and the laws (i.e., RICO Act, Sherman Antitrust Act, Florida Insurance Code) Allstate allegedly violated. However, Allstate's alleged after-the-fact activity does not and cannot support a claim for breach against MedView. The only pertinent issue here is whether the contract allowed MedView to disclose information about Plaintiff's discounts to Allstate. If the contract afforded MedView the right to disclose its relationship with the Plaintiff to Allstate, Plaintiff's case ends on MedView's Motion to Dismiss no matter what Allstate may have done thereafter.

Paragraph 5 of the complaint admits that Allstate could discount Plaintiff's services under his MedView contract if Allstate did this in a certain fashion and complied with other requisites. According to Plaintiff, Allstate could have legitimately applied the discounts if Allstate had followed Fla. Stat. § 627.736(10).[11] By conceding that Allstate could, under certain circumstances, properly discount the Plaintiff's services, Plaintiff admits that, under the Agreement, an "existing or potential Third Party Payor" includes Allstate. [*See* Agreement, Art. 7 ¶ A] The Agreement imposed a duty on MedView to market Plaintiff's services to potential Payors, [*id.*], such as Allstate, and gave MedView the right to disclose Plaintiff's discount information in so doing. [*Id.* at Art. 9 ¶ C] This disposes of the contract claim against MedView. If, as Plaintiff alleges, Allstate acted improperly thereafter, that cannot comprise a breach of contract by MedView.

### III. CONCLUSION

To state a claim for breach against MedView, Plaintiff must rely on an interpretation of the Agreement that finds no support in its language. Accordingly, this Court should grant MedView's Motion to Dismiss.

McGUIRE, WOODS, BATTLE & BOOTHE LLP

BY: *[signature]*
William W. Deem (Fla. Bar 512834)
3300 NationsBank Center
50 North Laura Street
Jacksonville, Florida 32202
(904) 798-3200
(904) 798-3207 (fax)

e-mail: wwdeem@mwbb.com

ATTORNEYS FOR MEDVIEW SERVICES, INC.

---

[11] *See* Complaint ¶ 5.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was mailed by U. S. Mail to the following on this __21__ day of April, 2000:

Arthur Gold, Esq.
Gold, Rosenfeld & Coulson
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603

Douglas A. Blankman, Esq.
Kopelman & Blankman, P.A.
Nationsbank Tower, Suite 1611
One Financial Plaza
Ft. Lauderdale, FL 33394

Carlin Phillips, Esq.
Gogel, Phillips & Garcia, LLP
13 Ventura Drive
North Dartmouth, MA 02747

Peter J. Valeta, Esq.
Ross & Hardies
150 N. Michigan Ave.
Suite 2500
Chicago, IL 60601

David B. Shelton, Esq.
Rumberger Kirk et al.
P. O. Box 1873
Orlando, FL 32802-1873

_____
Attorney

jac/2615/ . . . Reply - Motion to Dismiss.doc