IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Civil Action No. 00-CIV-6061 FERGUSON/SNOW

| | |
|---|---|
| DR. PAUL ZIDEL and All Others | § |
| Similarly Situated, | § |
| | § |
| **Plaintiffs,** | § |
| | § |
| v. | § |
| | § |
| ALLSTATE INSURANCE COMPANY | § |
| and COMMUNITY CARE NETWORK, | § |
| INC. d/b/a CCN, | § |
| | § |
| **Defendants.** | § |

## CCN'S MOTION TO DISMISS AND BRIEF IN SUPPORT

Community Care Network, Inc. d/b/a CCN ("CCN"), pursuant to Rule 12(b) of the

Federal Rules of Civil Procedure, moves the Court for an Order dismissing plaintiff's claims

against CCN for failure to state a claim.[1]  In support of this motion, CCN states:

### I.
### INTRODUCTION

CCN and plaintiff entered a contract whereby plaintiff would become a part of CCN's

healthcare provider network. Under the agreement, plaintiff agreed to discount his medical fees

for services rendered to the individuals insured by CCN's clients. Now, apparently dissatisfied

with the bargain, plaintiff attempts to bring claims that have no basis in the plain language of the

---

[1] Contemporaneously with this motion, CCN has filed its motion to compel arbitration and stay litigation. CCN believes that arbitration is the proper forum for the resolution of this dispute, but brings this motion concurrently so as not to waive its defenses pursuant to Fed. R. Civ. P. 12. No waiver of CCN's right to insist upon arbitration should be implied by the filing of this motion to dismiss.



contract in order to recover the value of the discounts he agreed to provide, even though he expressly waived his right to seek payment from CCN. Further, despite the fact that the relationship between them is governed by a contract -- thereby making contract remedies available to plaintiff in the event of a breach -- plaintiff asserts a claim for unjust enrichment against CCN, a party that received no direct benefit from plaintiff. Because plaintiff's complaint fails to state a claim against CCN for which relief can be granted, it should be dismissed.

## II.
## FACTUAL ALLEGATIONS

According to the complaint, plaintiff is an orthopedic surgeon in Plantation, Florida. *See* Amended Class Action Complaint ("Complaint") at ¶ 1. Plaintiff entered a "Community Care Network, Inc. Professional Care Provider Agreement" with CCN on December 13, 1999 (the "Contract"[2]). *See id.* at ¶ 8. Plaintiff alleges that the Contract did not permit the use of his discount information by insurers or brokers that could not increase his patient volume. *See id.* at ¶ 10. Plaintiff contends that CCN disclosed plaintiff's discount rates to Allstate Insurance Company ("Allstate"). Allstate is alleged to have applied plaintiff's discounts to bills for treatment of insureds covered under Allstate's automobile Personal Injury Protection coverage ("Auto PIP"). *See id.* at ¶¶ 11-12, 17-18. Plaintiff himself did not have a contract with Allstate. *See id.* at ¶ 18.

Plaintiff alleges that CCN received a percentage of Allstate's savings and/or a per transaction fee for processing Allstate's claims. *See* Complaint at ¶ 20. Plaintiff asserts that Allstate did not provide any marketing materials to plaintiff's patients prior to their visit and did

---

[2] A true and correct copy of the Contract, which is attached to plaintiff's Amended Class Action Complaint, is attached hereto as Exhibit A for the Court's convenience.

2

not encourage them to use plaintiff for their medical services. *See id.* at ¶¶ 22-23. Further, plaintiff claims that Allstate's use of the CCN discounts violates Florida law. *See id.* at ¶ 22.

Based on these allegations, plaintiff claims that CCN breached the Contract by providing the discounts to an illegitimate "Payor," by (i) selling plaintiff's discounts to Allstate which applied the discounts retrospectively and could not increase plaintiff's patient volume, (ii) by failing to offer consideration for the discounts of the Auto PIP claims, (iii) by disclosing confidential information, and (iv) by violating the duty of good faith and fair dealing. *See* Complaint at ¶¶ 42. Further, plaintiff asserts that CCN was unjustly enriched by Allstate's payments to CCN in exchange for the discounts. *See* Complaint at ¶ ¶ 44-46.

## III.
## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Fed. R. Civ. P. 12(b)(6) provides for the dismissal of actions where the complaint fails to state a claim for which relief can be granted. Dismissal pursuant to Rule 12(b)(6) is appropriate "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Courts may properly consider the allegations of the pleadings, as well as "matters of public record, orders, items appearing in the record of the case and exhibits attached to the complaint" when passing on a Rule 12(b)(6) motion to dismiss. *Halstead v. Motorcycle Safety Found. Inc.*, 71 F. Supp.2d 464, 467 (E.D. Pa. 1999), *citing Chester Co. Intermediate Unit v. Pennsylvania Blue Shield*, 896 F.2d 808, 812 (3rd Cir. 1990); *see Lamson & Sessions Co. v. Indemnity Ins. Co.*, No. 1:99 CV 1013, 2000 U.S. Dist. LEXIS 10042 at *13 (N.D. Ohio 2000). Because plaintiff cannot show that the factual allegations of the Complaint entitle him to the relief sought under any legal theory, CCN's motion to dismiss must be granted.

3

**A.    Plaintiff Waived His Right to Seek Payment from CCN for Health Care Services.**

Distilled to its essence, plaintiff's Complaint seeks damages from CCN amounting to the difference between the agreed-upon reimbursement amounts (i.e., the amount plaintiff was actually paid by Allstate) and plaintiff's usual and customary charges for medical services. In other words, plaintiff asks this Court to require CCN to pay part of his fees for services rendered to his patients. However plaintiff cannot recover these sums from CCN -- the plain language of the Contract prevents plaintiff from looking to CCN for such payment.

Paragraph 2.02 of the Contract states:

> Provider expressly covenants and agrees that CCN shall not be responsible or liable for, nor does CCN guarantee any payments to Provider for, and services rendered by Provider to Beneficiary or Claimant.

This clause waives plaintiff's right to look to CCN for payments for medical services. "Waiver is the intentional or voluntary relinquishment of a known right, or conduct which infers the relinquishment of a known right." *Taylor v. Kenco Chem. & Mfg. Corp.*, 465 So.2d 581, 587 (Fla. 1st DCA 1985). By voluntarily relinquishing his right to pursue CCN for payment for medical services rendered, plaintiff waived his right to recover the very damages he seeks in this action. Since recoverable damages are an essential element of plaintiff's breach of contract claims, plaintiff's breach of contract claims must be dismissed. *See Olin's Inc. v. Avis Rental Car Sys., Inc.*, 172 So.2d 250 (Fla. 3rd DCA 1965).

**B.    Allstate Is a Legitimate "Payor."**

The gravamen of the claim against CCN is that CCN disclosed the make-up of its provider network to Allstate, thereby "allowing" Allstate to apply the CCN discount rate to invoices received from members of the network. However, the Contract between plaintiff and

4

CCN provides that CCN will market its network to "Payors" such as insurance companies and others. Accordingly, if Allstate can fall within the definition of "Payor" under the Contract, then plaintiff's claim fails.

Plaintiff asserts that Allstate's discounting of Plaintiff's fees pursuant to the CCN/Allstate contract is improper because Allstate does not offer an Auto PPO product as (allegedly) required by the Contract between CCN and plaintiff. Further, Plaintiff alleges that Allstate's taking of the CCN discounts in regards to its Auto PIP policies violates F.S.A. § 627.736(10). Plaintiff argues that, because of these alleged violations of the Contract and Florida law, Allstate is not a "legitimate" Payor entitled to discounts under the Contract, and that CCN's conduct in informing Allstate of plaintiff's status as part of CCN's Network therefore violated the Contract. However, the Contract does not limit the field of potential subscribers to the CCN Network -- i.e., the potential clients to whom CCN markets its network -- according to the types of insurance products they offer, nor is an insurer required meet the requirements of Section 627.736(10) to qualify as a "Payor."

## 1.    The Contract itself does not require a "Payor" to offer preferred or exclusive provider products.

The Contract defines "Payor" as "an employer, insurance carrier, claims administrator, health care service plan, trust, nonprofit facility service plan, any governmental unit or other entity which has an obligation to provide Health Care Services or Benefits to a Beneficiary or Claimant." Contract at ¶ 1.06 (emphasis added). The Contract does not limit the definition of "Payor" to certain types of insurance companies or those insurance companies that offer certain types of insurance products. The definition of "Payor" as set forth in section 1.06 is broad, well known, unambiguous, and should thus be given its plain meaning. *See Rose v. M/V "Gulf Stream*

*Falcon,"* 186 F.3d 1345, 1350 (11th Cir. 1999)("It is well settled that the actual language used in

the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that

language controls."); *Florida Mun. Power Agency v. Florida Power & Light Co.*, 81 F. Supp.2d

1313, 1329 (M.D. Fla. 1999). ("If the terms are clear and unambiguous, the court should interpret

the agreement in accordance with its plain meaning.").

## 2.    Plaintiff's claim is premised on the Contract's recitals, yet those are not operative terms of the Contract.

Plaintiff asks the Court to revise the Contract's definition of "Payor" based solely on

prefatory language in the Contract's recitals. Specifically, plaintiff asserts that "legitimate"

Payors are those "which offer preferred provider policies to their insureds." Complaint at ¶ 40.

Plaintiff asserts that the recitals support his unilateral modification of the Contract's definition of

that term, since the recital states that "CCN intends to execute contracts which [sic] Payor

organizations which offer a preferred provider or exclusive provider health care coverage plan to

Beneficiaries or Claimants...." Contract at 1.

It is well established under Florida law that recitals in a contract are not operative

contract provisions. As recently stated by the Eleventh Circuit Court of Appeals:

> Furthermore, Hanson's reliance on the "whereas" clause is
> misplaced for two reasons: First, under Florida law, such 'whereas'
> or other prefatory clauses are not binding.

*Rose*, 186 F.3d at 1350. *See also Johnson v. Johnson*, 725 So.2d 1209, 1212 (Fla. 3rd DCA

1999)("That said, we do not agree that the prefatory recitations contained in the various 'whereas'

clauses are binding, operative provisions to this otherwise unambiguous contract."). Recitals can

be considered only where the contractual provision at issue is ambiguous. *See Rose*, 186 F.3d at

1350 ("Second, although the 'whereas' clause may be evidence of parties' intent, we need not

6

even look to the 'whereas' clause if the operative portion of the contract is unambiguous."
Emphasis added.); *McMahon v. City of Edgewater*, 60 F. Supp.2d 1281, 1284 (M.D. Fla. 1999)
(refusing to consider prefatory language in unambiguous contract). In the instant case, plaintiff
does not contend that the definition of "Payor" in section 1.06 is ambiguous in any way, nor
could he. Instead, plaintiff uses the prefatory language not to resolve an ambiguity, but rather to
conjure an ambiguity where none exists. In other words, plaintiff reads the above recital as
creating a further component of the definition of "Payor" -- a component that limits the plain
definition is section 1.06 and restricts the type of insurance carriers CCN can do business with.
That is wrong. Under Florida law, the definition of "Payor" is not ambiguous, and no reference
to prefatory language is allowed to create ambiguity where none exists:

> The law appears well settled that where there is a difference in the
> recital and covenant, the covenant will control.

*Northern Trust Co. v. King*, 6 So.2d 539, 540 (Fla. 1942).

Plaintiff's reliance on the Contract's recitals is misplaced. As shown below, Allstate
clearly satisfies the Contract's requirements to be a "Payor."

## 3.    Allstate meets the Contract's definition of "Payor."

Allstate indisputably satisfies the plain meaning of the defined term of "Payor." One of
the first allegations of Plaintiff's Amended Class Action Complaint admits Allstate's status:
"ALLSTATE is an insurance company...." Complaint at ¶ 2 (emphasis added). Three
paragraphs later, plaintiff acknowledges that Allstate meets the remaining elements of the
definition of "Payor": "The ALLSTATE automobile Policy is a typical indemnity insurance
policy under which ALLSTATE is required to indemnify claimants for eighty (80%) percent of
the full cost of their reasonable and necessary medical bills up to a defined limit." Complaint at

7

¶ 5. Thus, plaintiff's own pleadings establish that Allstate is an "insurance carrier ... which has an obligation to provide Health Care Services or Benefits to a Beneficiary or Claimant." Contract at ¶ 1.06. Because plaintiff's own pleading demonstrates that Allstate meets the Contract's definition, there can be no genuine dispute that Allstate qualifies a "Payor" to whom CCN is entitled to market its network.

## 4.   Allstate's use of the CCN network does not violate Florida law.

Plaintiff challenges the "legitimacy" of Allstate's "Payor" status based on F.S.A. § 627.736(10)[3]. Plaintiff asserts that this statute precludes Allstate's use of the CCN discounts because Allstate does not offer the specific services required of a statutory automobile PIP PPO. Because Allstate' automobile PIP coverage does not comply with these requirements, plaintiff argues that Allstate is not a legitimate "Payor" under the Contract.

As an initial matter, it should be noted that nowhere in the Contract is an insurance company's status as a potential "Payor" premised on compliance with section 627.736(10). Plaintiff supplies this condition unilaterally.   While Allstate's compliance with F.S.A. §627.736(10) may have some bearing on plaintiff's claim against Allstate, it is clearly irrelevant to the contract claims against CCN.

Nevertheless, plaintiff's claims regarding section 627.736 are flawed. In *Del Gardo v. Allstate Ins. Co.*, Case No. 95-13760-04 from Broward County Circuit Court -- a case in which the plaintiff was represented by the same counsel appearing here on behalf of the putative plaintiff class -- the court considered the propriety of Allstate's use of negotiated discounts for

---

[3] A true and correct copy of F.S.A. § 627.736(10) is attached hereto as Exhibit B for the Court's convenience.

8

medical provider services in regards to automotive PIP policies and found that Allstate's use of negotiated discounts did not violate Florida law. As that court found:

> ALLSTATE's practice of entering into agreements with healthcare providers to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies does not violate the requirements of Florida Statutes, § 627.736(10), under the conditions set forth in this order.

*See* Order, a true and correct copy of which is attached hereto as Exhibit C.[4] The order enumerates several required disclosures that must be at the time a PIP claim is submitted if negotiated discounts are to be used. *See id.* Accordingly, plaintiff is simply wrong in asserting that the fact that Allstate is not a "legitimate" payor under section 627.776(10) makes Allstate ineligible to provide insureds with the option of using network providers at reduced rates.

Plaintiff's theory of illegitimacy rests entirely on the alleged failure to satisfy section 627.736(10). As the court found in *Del Gardo*, however, Allstate's use of negotiated discounts for medical services is not improper *per se* under that statute. Accordingly, Allstate's compliance with section 627.736(10) -- or the lack thereof -- does not disqualify Allstate as a "Payor" under section 1.06 of the CCN Contract. Plaintiff's challenge to the propriety of Allstate's use of the CCN discounts based on Section 627.736(10) must therefore fail.

In addition, this Court has already considered claims concerning the application of section 627.736(10) in the context of negotiated rate reductions. In *May, et al. v. Allstate Insurance Company*, Civil Action No. 00-6269-CIV-Dimitrouleas in the United States District Court for the Southern District of Florida, the court specifically held that section 627.736(10)

---

[4] As stated above, the Court may consider "matters of public record" in passing on a motion to dismiss brought pursuant to Rule 12(b)(6). *See Halstead v. Motorcycle Safety Found. Inc.*, 71 F. Supp.2d 464, 467 (E.D. Pa. 1999). Exhibit C, which is a matter of public record as an order of the Broward County court, is attached hereto for the Court's convenience.

does not require Allstate to offer a PPO plan in order to participate in networks such as CCN. Rather, the statute simply regulates Allstate when and if it <u>chooses</u> to do so.[5]

**B.    CCN Did Not Breach the Contract.**

Plaintiff alleges that CCN breached the Contract by: 1) allowing Allstate, which does not offer a preferred or exclusive provider automobile PIP product to access the CCN network; 2) by permitting Allstate to retroactively apply the negotiated discounts; 3) by failing to offer meaningful consideration for the discounting of automobile PIP claims; 4) by disclosing plaintiff's compensation and discount information to Allstate, and; 5) by violating the duty of good faith and fair dealing through the disclosure of volume discounting, allowing Allstate to use the discounts without consideration, and permitting the application of the discounts in violation of Florida law. However, because Allstate falls within the group with whom CCN is permitted to contract, CCN acted properly by contracting with Allstate for the application of the network discounts to Allstate's automobile PIP products and in disclosing plaintiff's compensation rates, and CCN's motion to dismiss must be granted.

**1.    CCN's disclosure of plaintiff's compensation and discount information to Allstate is required by the Contract.**

Plaintiff complains that CCN's disclosure of the compensation he agreed to accept in the Contract constitutes a breach of the Contract's confidentiality clause. Plaintiff does not specify the exact contractual basis for this claim.

CCN's disclosure of information to Allstate does not breach the Contract. Rather, the disclosure of this information to Payors is the entire purpose of the agreement. The Contract states that:

---

[5] A true and correct copy of the *May* court's April 14, 2000, order is attached as Exhibit D. The reference above was taken from page 5 of the order.

> Provider hereby agrees to provide Health Care Services or Benefits to Beneficiaries or Claimants as set forth in Insuring Agreements, at the Reimbursement Amounts determined and established by CCN through Payor Agreements with Payors, which Payor Agreements are incorporated herein by reference. Such Reimbursement Amounts are set forth in Exhibit A attached hereto and incorporated herein.

Contract at ¶ 2.01. Stated another way, plaintiff agreed to provide medical services to the insureds or beneficiaries of parties contracting with CCN, and to discount his fees according to the schedule attached to the Contract. *See id.* Further, the Contract specifically authorizes CCN to enter agreements to facilitate this process:

> Provider authorizes CCN to act on its behalf to contract for the provision of Health Care Services or Benefits, at Reimbursement Amounts as set forth in Exhibit A.

*Id.* at ¶ 4.01. The Contract thus authorizes CCN to contract with third parties -- "Payors" such as Allstate -- on plaintiff's behalf.

In order to fulfill the object of the Contract -- bringing Payors, their insureds and providers together -- CCN must enter agreements with Payors at the specific Reimbursement Amounts negotiated between plaintiff and CCN. *See id.* at ¶¶ 2.01 and 4.01. To do that, CCN must disclose the make-up of the network and the agreed upon compensation levels to the Payors. Indeed, both of the clauses quoted above expressly refer to the compensation and discount information plaintiff complains was improperly disclosed. *See* Contract at ¶¶ 2.01 and 4.01.

Plaintiff's position on confidentiality thus requires one to read the Contract in a manner that creates internal inconsistencies and defeats the fundamental purpose of the agreement. The courts disfavor this tortured method of construction:

11

> It is a cardinal principal of contract law that no term of a contract
> should be construed to be in conflict with another unless no other
> reasonable construction is possible.

*U.S. v. Pielago*, 135 F.3d 703, 710 (11th Cir. 1998); *see Sea-Land Service, Inc. v. Sellan*, 64 F.

Supp. 2d 1255,1265 (S.D. Fla. 1999)("In interpreting a contract, the courts must give effect to

the entire agreement and avoid any interpretation that creates an unnecessary conflict between

the contract's terms."); *Premier Ins. Co. v. Adams*, 632 So.2d 1054, 1056 (Fla. 5[th] DCA 1994).

Rather than subscribe to this ill-reasoned approach, the Court should read the Contract in a

manner that will give effect to all provisions and serve the goals of the contracting parties. *See

Critchlow v. Williamson*, 450 So.2d 1153, 1156 (Fla. 4th DCA 1984)("It is the duty of the trial

court to attempt to reconcile inconsistencies in a contract in a manner that renders the contract

meaningful.").

Because the goal of the Contract is to authorize CCN to market its network to potential

Payors and enter Payor Agreements on plaintiff's behalf, the confidentiality provisions must be

construed so as not to conflict with this purpose. This conflict is avoided by construing

paragraphs 2.01 and 4.01 such that the Contract prohibits only disclosure for purposes not

otherwise contemplated. This reasonable interpretation of the Contract furthers the goals of the

Contract, avoids internal conflicts and should be applied here. *See id.* ("It is also an elementary

principle of contract construction that a reasonable interpretation of a contract is preferred to an

unreasonable one.").

Since the contract contemplates disclosure of discount information to potential Payors,

CCN's disclosure of plaintiff's information to Allstate -- a contractually permissible Payor -- does

not breach the Contract and CCN's motion to dismiss should be granted.

**2.    Allstate's use of the CCN discounts does not breach the contract.**

The remaining breaches asserted by plaintiff -- Allstate's access to the network without offering a preferred or exclusive provider automobile PIP product, Allstate's retroactive application of the negotiated discounts, CCN's failure to offer meaningful consideration for the discounting of automobile PIP claims, and CCN's alleged violations of the duty of good faith and fair dealing through the disclosure of volume discounting, allowing Allstate to use the discounts without consideration, and permitting the application of the discounts in violation of Florida law -- require the Court to impose duties on CCN that are not required by the Contract. Because the Court cannot alter the Contract to add terms and obligations that were not agreed upon by the parties, CCN's motion to dismiss should be granted.

**a.    *The Contract does not require Payors to offer preferred or exclusive provider products.***

As demonstrated above, the Contract does not limit the definition of "Payor" to those entities offering a preferred or exclusive provider product. *See* Section II.B.1, *supra*. Pursuant to the grant of authority in paragraph 4.01, CCN is free to contract with any "employer, insurance carrier, claims administrator, health care service plan, trust, nonprofit facility service plan, any governmental unit or other entity which has an obligation to provide Health Care Services or Benefits to a Beneficiary or Claimant." Contract at ¶ 1.06.

Nowhere in the Contract does it state that CCN must require Payors to offer only "PPO" or exclusive provider contracts, and there is no basis for adding such a term now.

> It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and thus, the plain meaning of that language controls.

*Rose*, 186 3d at 1350. The Contract's plain language is broad; to impose a limitation on its scope would impair the intent of the parties. Because the Contract's plain language does not require

Payors to offer preferred or exclusive provider plans, CCN's contract with Allstate does not breach the terms of the Contract.

**b.    *The Contract does not prohibit retroactive discounting.***

Plaintiff also complains of Allstate's retroactive application of the network discounts, and seeks to hold CCN liable for Allstate's acts. However, like plaintiff's other claims, this theory is not grounded in the language of the contract, but rather looks to the Court to impose an additional limit on CCN and the Payors. The Contract simply does not contain any temporal limitations on discounting by Payors. *See* Contract at ¶¶ 1.05, 1.09, 2.01, and 2.02.

This Court should reject plaintiff's attempt to revise the Contract's terms to breathe life into his claims. "A party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract." *Mergens v. Dreyfoos*, 166 F.3d 1114, 1117 (11th Cir. 1999). The plain language of the Contract entitles Payors to apply discounts to plaintiff's outstanding bills for medical services rendered to Allstate's insureds, regardless of when the services were rendered. Because the Contract does not prohibit retroactive discounting, plaintiff's claim should be dismissed.

Further, plaintiff's claim impermissibly attempts to hold CCN liable for the acts of Allstate. Even if it is assumed that the Contract does temporally limit the application of discounts, the Contract explicitly excuses CCN from liability for Allstate's refusal to pay plaintiff's usual and customary charges:

> Provider expressly covenants and agrees that CCN shall not be responsible or liable for, nor does CCN guarantee any payments to Provider for, any services rendered by Provider to Beneficiary or Claimant.

14

Contract at ¶ 2.02. Plaintiff agreed to look only to the Payors for payment of his bills at the time he entered the Contract. The plain language of the Contract thus prohibits plaintiff from recovering his unpaid fees from CCN. Plaintiff's claim should be dismissed.

## c.    *The Contract does not require separate consideration for Allstate's discounts.*

Paragraph 42(c) of plaintiff's Complaint asserts that CCN breached the Contract "by failing to offer adequate and meaningful consideration for discounts of Florida automobile personal injury protection medical expense claims." CCN provided consideration for the Contract by contracting with Payors on plaintiff's behalf for the provision of medical services to the Payor's insureds, beneficiaries or claimants. *See* Contract at ¶ 2.01, 4.01. In turn, plaintiff provided consideration to CCN by agreeing to allow Payors to discount his usual and customary charges. *See* Contract at ¶ 2.01. The Contract does not require separate consideration for each insured, beneficiary or claimant who receives the benefit of plaintiff's agreement to discount. In fact, the Contract does not require separate consideration for each type of insurance product, each benefits plan, or even each Payor. As with most of plaintiff's breach of contract theories, success requires a judicial revision of the Contract to include terms supporting plaintiff's claims. Since the Court cannot rewrite the unambiguous Contract to suit plaintiff's fancy, CCN's motion to dismiss should be granted.

## d.    *Plaintiff cannot state a violation of the duty of good faith and fair dealing without stating an independent claim of breach of contract.*

Plaintiff's final allegation of breach of contract asserts that CCN violated the duty of good faith and fair dealing:

> by violating the duty of good faith and fair dealing inherent in its Preferred Provider Agreements through the following acts or failures to act:

15

(1)    by disclosing the volume discounts of DR. ZIDEL and the purported class to ALLSTATE;

(2)    by allowing ALLSTATE to use the volume discounts without providing consideration therefore; and

(3)    by allowing the volume discounts to be applied to Florida automobile insurance personal injury protection claims in violation of Florida law and the ALLSTATE automobile insurance policy.

Complaint at ¶ 42(e). However, the failure of other plaintiffs breach of contract claims requires dismissal of this claim.

Under Florida law, "a duty of good faith and fair dealing must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." *Hospital Corp. of Am. v. Florida Med. Ctr., Inc.*, 710 So.2d 573, 575 (Fla. 4th DCA 1998). Moreover, this District follows the rule that "the implied covenant of good faith and fair dealing is not actionable absent a breach of the contract's express terms." *Burger King v. Holder*, 844 F. Supp. 1528, 1530 (S.D. Fla. 1993). As shown, none of the breach of contract claims asserted here can stand; the claim based on CCN's disclosure of plaintiffs discount and compensation information must fail because plaintiffs theory would create internal conflicts in the Contract and plaintiffs remaining claims must be dismissed because they are not based on the terms of the Contract. *See* Sections III.B.1, III.B.2, *supra.* Thus, because none of plaintiffs claims for breach of contract can survive CCN's motion, plaintiffs claim for breach of the duty of good faith and fair dealing must be dismissed.

16

## B.    The Amended Class Action Complaint Fails to State a Claim for Unjust Enrichment and Should Be Dismissed.

Plaintiff's second claim alleges that Allstate's use of the network discounts unjustly enriched CCN. Specifically, plaintiff asserts that "CCN has benefited by receiving compensation from ALLSTATE for allowing ALLSTATE to receive data creating these illegal discounts" and that "[n]o consideration has flowed from CCN to DR. ZIDEL and the putative class for the discounted payments made by ALLSTATE to DR. ZIDEL and the putative class." Complaint at ¶¶ 44, 45. To state a claim of unjust enrichment under Florida law, a plaintiff must allege: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of such benefit, and (3) acceptance and retention of such benefit by the defendant under such circumstance that it would be inequitable for him to retain it without paying the value thereof." *Nautica Int'l, Inc. v. Intermarine USA, L.P.*, 5 F. Supp.2d 1333, 1341 (S.D. Fla. 1998)(citations omitted). Because plaintiff does not state a claim for unjust enrichment as a matter of law, the Court must grant CCN's motion to dismiss.

### 1.    Plaintiff fails to allege the absence of an adequate legal remedy.

"[U]njust enrichment is an equitable remedy and is not available where an adequate legal remedy exists." *Martinez v. Weyerhaeuser Mort. Co.*, 959 F. Supp. 1511, 1518 (S.D. Fla. 1996)(Ryskamp, J.)(citations omitted). Therefore, to survive a motion to dismiss, plaintiff's Complaint must allege the absence of an adequate legal remedy:

> To state a claim for unjust enrichment, plaintiffs must make this allegation [the allegation that plaintiff does not have an adequate legal remedy available] clear in the complaint.

17

*Id.* Plaintiff's failure to allege that he does not have an adequate legal remedy available requires

the dismissal of his claim. *See Nautica Int'l, Inc.*, 5 F. Supp. 2d at 1342; *Martinez*, 959 F. Supp.

at 1519.

**2.    Plaintiff has adequate legal remedies available.**

Plaintiff cannot make the required allegation for a simple reason: the Contract provides

him with adequate legal remedies. Plaintiff's claim depends in the first instance on obligations

imposed by the Contract and plaintiff has asserted a claim for breach of that Contract. If

wrongful, CCN's conduct will give rise to contract damages -- a legal remedy. The *Nautica Int'l*

*Inc.* court faced a similar situation, and the Court's opinion bears repeating here:

> As stated above, the basis for plaintiff's unjust enrichment claim is
> the tangible benefit defendant received when IMUSA utilized the
> Parent Craft and Nautica's demonstrated expertise, resources and
> investment, to develop the RIB SOCOM. Assuming without
> deciding that defendant's conduct constitutes a breach of contract,
> Nautica has a contractual remedy.

*Nautica Int'l, Inc.*, 5 F. Supp. 2d at 1342.

It is well established that a plaintiff cannot proceed on both a legal and an equitable

theory: "[a]s a general rule, an action seeking to enforce an express contract and also attempting

to disavow the existence of the express contract and accomplish the same purpose under

*quantum meruit* is not available." *Cherokee Oil Co., Ltd. v. Union Oil Co. of Calif.*, 706 F. Supp.

826, 830 (M.D. Fla. 1989). Here, if plaintiff has any claim at all, it is for breach of contract. The

existence of that potential remedy negates his claim for unjust enrichment.

**3.    Plaintiff fails to allege any benefit rendered to CCN by plaintiff.**

Plaintiff's unjust enrichment claim is also defective because it lacks any allegation that he

conferred a benefit on directly on CCN. Instead, plaintiff asserts that he provided discounts to

18

Allstate and that Allstate compensated CCN based on the savings achieved. *See* Complaint at ¶

44-46. Unless a plaintiff alleges that he directly conferred a benefit on the defendant, the

plaintiff does not state a claim for unjust enrichment. *See Huntsman Packaging Corp. v. Kerry*

*Packaging Corp.*, 992 F. Supp. 1439, 1446 (M.D. Fla. 1998); *Peoples Nat'l Bank of Commerce v.*

*First Union Nat'l Bank of Fla.*, 667 So.2d 876, 879 (Fla. 3rd DCA 1996).

In both *Huntsman Packaging Corp.* and *Peoples Nat'l Bank*, the courts considered

pleadings where the plaintiffs alleged facts indicating that the plaintiff had conferred an indirect

benefit, but both courts found this inadequate:

> While the legal standard the *Peoples National Bank* court cited
> does not require that the benefit conferred upon the defendants be
> done so "directly," the court's analysis indicates that it must be. In
> applying this rule of state law as the Florida court did, the court
> must find that plaintiffs in the instant case have likewise failed to
> allege that the directly conferred any benefit on [the defendants],
> even though they arguably did so indirectly.

*Huntsman Packaging Corp.*, 992 F. Supp. at 1446.

> Here, the plaintiff, Peoples National, could not and did not allege
> that it had directly conferred a benefit on the defendants, the other
> participant lenders. In actuality, if any benefit was conferred upon
> each participant lender in the form of overpayments, it could only
> have been conferred upon them by Southeast, not Peoples
> National. Because Peoples National failed to allege ultimate facts
> that support a prima facie case of unjust enrichment, the trial court
> properly dismissed with prejudice the count against the other
> participant lenders.

*Peoples Nat'l Bank of Commerce*, 667 So.2d at 879. Plaintiff's Complaint suffers the same fatal

deficiency as those in *Huntsman Packaging* and *Peoples Nat'l Bank*. Plaintiff does not allege

that CCN received any benefit directly from him. Instead, plaintiff seeks to recover based on

payments CCN allegedly received from Allstate. Because this allegation is insufficient to

19

support a claim for unjust enrichment as a matter of law, CCN's motion to dismiss must be granted.

## V.
## CONCLUSION

Plaintiff's claims fail to consider the language of the Contract between plaintiff and CCN. Instead, plaintiff seeks to unilaterally revise the Contract, inserting terms, obligations and limitations where none currently exist. In the final analysis, plaintiff simply does not like the deal he struck, and seeks this Court's assistance in revising that deal. That is inappropriate. Because plaintiff's Complaint fails to state a claim for which relief can be granted, CCN's motion to dismiss must be granted.

DATED: November 13, 2000.

Respectfully submitted,

McGuireWoods LLP

By:

William W. Deem
Florida Bar No. 0512834
William E. Adams, Jr.
Texas Bar No. 00796104
50 North Laura Street, Suite 3300
Jacksonville, Florida 32205
(904) 798-3200
(904) 798-3207 Facsimile

COUNSEL FOR COMMUNITY
CARE NETWORK, INC. d/b/a CCN

20

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been furnished by U.S. Mail on November 13,

2000, to the following:

Lawrence Kopelman, Esq.
Kopelman & Blankman
National Towers, Suite 1611
1 Financial Plaza
Fort Lauderdale, FL  33394
**Attorneys for Plaintiff**

Eric Lee, Esq.
Atlas Pearlman, P.A.
Marc J. Browner, D.C.
350 East Las Olas Blvd., Suite 1700
Fort Lauderdale, FL  33301
*Attorneys for Plaintiff*

Gold & Coulson
11 S. LaSalle Street, Suite 2500
Chicago, IL  60603
**Attorneys for Plaintiff**

Phillips & Garcia
13 Ventura Drive
North Dartmout, MA  02747
**Attorneys for Plaintiff**

David B. Shelton, Esq.
Rumberger, Kirk & Caldwell
Signature Plaza, Suite 300
201 South Orange Avenue
Orlando, FL  32801
**Attorneys for Allstate**

Peter J. Valeta, Esq.
Ross & Hardies
150 N. Michigan Avenue., Suite 2500
Chicago, IL  60601
**Attorneys for Allstate**

Attorney

\\COM\36068.2

21

### COMMUNITY CARE NETWORK, INC.  PROFESSIONAL CARE PROVIDER AGREEMENT

This PROFESSIONAL CARE PROVIDER AGREEMENT ("Agreement") is made and entered into by and between Community Care Network, Inc. d.b.a. CCN, and $\underline{Paul\ Zidel,\ M.D.}$ , a $\underline{Hand\ Surgeon}$ (hereinafter referred to as "Provider"):

### RECITALS

WHEREAS, CCN intends to execute contracts which Payor organizations which offer a preferred provider or exclusive provider health care coverage plan to Beneficiaries or Claimants; and

WHEREAS, Provider desires to make their services available to Beneficiaries or Claimants of Payors with whom CCN contracts; and

WHEREAS, CCN and Provider share the common goals of establishing a health care delivery system committed to the advancement of quality patient care, and developing innovative approaches to delivery of quality medical services in an efficient and cost-effective manner;

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, it is agreed by and between the parties hereto as follows:

### 1. DEFINITIONS

1.01    **"Beneficiary"** or **"Claimant"** is a person as defined in the applicable Insuring Agreement and who may be entitled to Health Care Services or Benefits.

1.02    **"CCN-Affiliated Health Plan"** is the health care plan offered, sponsored, administered or insured by Payor to provide coverage for Health Care Services or Benefits pursuant to the terms and conditions of this Agreement.

1.03    **"Claims Administrator"** is the Payor or the organization with the Payor has contracted to administer and process claims for the CCN-Affiliated Health Plan.

1.04    **"Health Care Services or Benefits"** shall be any and all covered medical services or benefits for such services rendered or provided to a Beneficiary or Claimant under an Insuring Agreement.

1.05    **"Insuring Agreement"** is the contract, certificate, policy, plan document, or any other legally enforceable instrument issued or sponsored by a Payor under which a Beneficiary or Claimant may be entitled to or receive Health Care Services or Benefits.

1.06    **"Payor"** is an employer, insurance carrier, claims administrator, health care service plan, trust, nonprofit facility service plan, any governmental unit or any other entity which has an obligation to provide Health Care Services or Benefits to a Beneficiary or Claimant.

1.07    **"Payor Agreement"** is an instrument between a Payor and CCN or its authorized representative which provides for CCN providers, including Provider pursuant to this Agreement, to render Health Care Services or Benefits at Reimbursement Amounts determined and established by CCN and such Payor.

1.08    **"Provider"** means the Provider who is duly licensed by the State of $\underline{Florida}$ to provide Health Care Services or Benefits.

**EXHIBIT A**

1.09 **"Reimbursement Amounts"** are the amounts payable to Provider for Health Care Services or Benefits rendered or provided to a Beneficiary or Claimant pursuant to Payor Agreements between CCN and the respective Payors. Such Reimbursement Amounts shall be established by CCN and Payors as specified in Exhibit A attached hereto and incorporated herein or as established by any state regulatory agency, whichever is less. Providers shall not individually or collectively with other providers determine or establish such Reimbursement Amounts.

1.10 **"Utilization Review"** means the function performed by organization(s) or entity(ies) selected by Payors to review and recommend to Payors whether Health Care Services or Benefits provided, or to be provided, are Medically Necessary.

## 2. HEALTH CARE SERVICES OR BENEFITS

2.01 Provider hereby agrees to provide Health Care Services or Benefits to Beneficiaries or Claimants as set forth in Insuring Agreements, at the Reimbursement Amounts determined and established by CCN through Payor Agreements with Payors, which Payor Agreements are incorporated herein by reference. Such Reimbursement Amounts are set forth in Exhibit A attached hereto and incorporated herein.

2.02 Provider agrees to accept the Reimbursement Amounts in Exhibit A as payment in full for Health Care Services or Benefits provided, to Beneficiaries or Claimants. Provider shall look solely to the Payor for payment of any and all compensation due for Health Care Services or Benefits and shall not bill or otherwise collect or attempt to collect from Beneficiaries or Claimants any charges except and unless required or permitted to do so by the applicable Insuring Agreement. The foregoing restriction shall not apply to deductibles, co-payments or co-insurance which may be collected by Provider in accordance with the provisions of the applicable Insuring Agreement, nor to services or benefits rendered to Beneficiaries or Claimants which are not covered by the applicable Insuring Agreement. Provider expressly covenants and agrees that CCN shall not be responsible or liable for, nor does CCN guarantee any payments to Provider for, any services rendered by Provider to Beneficiary or Claimant. ✳

2.03 Payor Agreements shall require Payors to make payments due from Payor to Provider within thirty (30) days of receipt by Payor of complete billings having sufficient information to reprice and/or adjudicate claim unless, within this thirty (30) day period, Provider is given written notice of Payor's inability to pay the claim because it is not complete, or there are issues related to coordination of benefits, subrogation, medical necessity or similar review. If a Payor fails to make timely payments, CCN shall review the applicable Payor Agreement and take appropriate action as specified in the CCN Administrative Manual for Participating Providers.

## 3. TERM; TERMINATION

3.01 Following the effective date set forth herein, this Agreement shall be continued for consecutive annual terms thereafter, unless otherwise terminated.

3.02 This Agreement may be terminated by either party upon ninety (90) days written notice to the other party.

3.03 Provider agrees that if the Agreement is terminated, Provider shall exercise best efforts to notify all Beneficiaries or Claimants who are under Provider's care or seek services from Provider that Provider is no longer a CCN preferred provider. For those Beneficiaries or Claimants under Provider's care who so desire, Provider shall transfer the Beneficiaries or Claimants to other appropriate CCN Provider(s).

3.04 Following termination of this Agreement, CCN shall notify Beneficiaries or Claimants of such termination through the regular periodic updating of CCN Provider listings for Beneficiaries or Claimants.

3.05 Notwithstanding Section 3.02, CCN may terminate or suspend this Agreement, at CCN's option, immediately upon the occurrence of any of the following events:

A) Provider fails to meet or fulfill CCN credentialing criteria;

B) Provider has made a material misrepresentation to CCN;

C) Provider's DEA certificate is revoked, restricted, or suspended;

D) Provider commits any act or engages in any conduct for which Provider's license may be revoked or suspended by the licensing authorities of the state in which the Provider is located (whether or not such licensing authorities revoke or suspend such license);

E) Whenever Provider is prohibited from participation in any federal or state healthcare entitlement program;

F) Provider's performance in providing Health Care Services or Benefits is unsatisfactory for reasons including but not limited to Provider disability and Provider inability to achieve CCN quality assurance standards. CCN shall make such determinations reasonably and in good faith. In such instances, Provider shall have the right to appeal CCN's determination;

G) Provider fails to maintain insurance coverage as required by CCN hereunder;

H) Provider fraudulently submits a claim for services; or

I) Provider ceases to maintain unrestricted active or courtesy admitting privileges at participating hospitals as may be required by CCN.

3.06    Provider shall notify CCN immediately upon the occurrence of any circumstances, including those set forth above, which would render this Agreement terminable by CCN.

3.07    Termination to this Agreement shall not affect any rights or obligations hereunder which shall have previously accrued, or shall thereafter arise with respect to any occurrence prior to termination, and such rights and obligations shall continue to be governed by the terms of this Agreement.

3.08    Either party to this Agreement has the right to terminate upon at least thirty (30) days prior written notice of such termination to the other party if the party to whom such notice is given materially breaches any provision of this Agreement. The party claiming the right to terminate shall set forth in the notice of termination the facts underlying its claims of breach and cite the relevant sections of this Agreement that are claimed to have been breached. Remedy of such breach to the satisfaction of the other party within thirty (30) days of the receipt of such notice shall revive this Agreement for the remaining portion of its then-current term, subject to any other rights of termination contained in this Agreement.

## 4. AUTHORIZATION TO CONTRACT

4.01    Provider authorizes CCN to act on its behalf to contract for the provision of Health Care Services or Benefits, at Reimbursement Amounts as set forth on Exhibit A.

4.02    Provider further authorizes CCN or other Claims Administrator, to coordinate and transmit billings to Payors for payment, on behalf of Provider.

## 5. COVENANTS OF PROVIDER

Provider covenants and agrees to the following:

5.01    To make available and render as appropriate Health Care Services or Benefits to Beneficiaries or Claimants which Provider is qualified by law to provide, which are medically necessary and consistent with the prevailing standards of quality of care generally accepted in their respective medical communities;

5.02    To comply with the requirements of all laws and regulations applicable to Provider's business and profession and ensure that all licenses, permits, authorizations and approvals required for that business and profession be maintained in effect for Provider as well as personnel employed or supervised by Provider, or acting on Provider's behalf;

5.03    To participate in and remain compliant with but not limited to CCN's and/or Payor's credentialing and recredentialing, medical management, utilization review quality assurance program, and which may be amended from time to time. Provider agrees to provide any and all reasonable requested data and records in support of such programs;

5.04    To obtain and maintain throughout the term of this Agreement medical staff membership and active or courtesy privileges for the performance of Provider's duties hereunder at participating hospitals, if necessary for the rendition of Health Care Services or Benefits to Beneficiaries or Claimants;

5.05    To provide prompt availability and accessibility of Health Care Services or Benefits to Beneficiaries or Claimants in the same manner and quality as to all other patients;

5.06    To maximize the utilization of services that are alternatives to inpatient hospitalization and innovative delivery modes that promote more cost-efficient health care, which are consistent with Provider's professional judgment;

5.07    Except in an emergency and/or when medical necessity dictates, to admit Beneficiaries or Claimants, in each instance in which hospitalization is required, to a hospital contracting with CCN unless a Beneficiary or Claimant specifically requests otherwise after having been notified by Provider that the requested hospital is not a CCN hospital;

5.08    To obtain from each Beneficiary or Claimant a written assignment of benefits, an authorization to provide Health Care Services or Benefits to Beneficiary or Claimant and release of Beneficiary's or Claimant's medical records.  If a Beneficiary or Claimant refuses to provide such evidence of assignment, Provider may seek payment from the Beneficiary or Claimant directly with such payment limited to the Reimbursement Amounts defined in this Agreement;

5.09    To refer Beneficiaries or Claimants, in each instance in which referral is required, to other CCN Providers, unless Provider, in his/her professional judgment, determines that the Beneficiary's or Claimant's needs require otherwise and Beneficiary or Claimant so agrees after having been notified by Provider that the proposed provider is not a CCN Provider;

5.10    To permit CCN's representatives, including but not limited to utilization review committee members, and Payor representatives, upon reasonable advance written notice, to inspect specific aspects of the Health Care Services or Benefits provided to Beneficiaries or Claimants by Provider in response to concerns related to a Beneficiary or Claimant, or Payor;

5.11    To coordinate and transmit billings to Payors for payment, if required, in a format commonly used in the community and approved by CCN;

5.12    To provide Health Care Services or Benefits pursuant to all Payor Agreements executed between CCN and Payors;

5.13    To cooperate with Payors in expediting the return to work of ill or injured employed Beneficiaries or Claimants, consistent with Provider's professional judgment; and

5.14    To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant grievances.

## 6. COVENANTS OF CCN

CCN covenants and agrees to the following:

6.01    To accept sole responsibility for filing reports, obtaining approvals and complying with applicable laws and regulations of state, federal and other regulatory agencies having jurisdiction over CCN, provided however, that Provider agrees to cooperate by providing CCN with any information and assistance reasonably required in connection therewith;

6.02    To abide by a policy of non-interference with the professional relationship between any Beneficiary or Claimant and Provider;

6.03    To provide Provider periodically with an up-to-date list of Payors who have executed Payor Agreements with CCN specifying the respective Insuring Agreements pertaining thereto; and

6.04    To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant or Provider grievances.

## 7. RECORDS

7.01    CCN and Provider shall maintain records and procedures, as shall reasonably be required to accurately account for all Health Care Services and Benefits provided pursuant to this Agreement. Such records shall be kept in accordance with generally accepted accounting principles and recognized standards of professional practice.

7.02    CCN and Provider shall have the mutual right, upon request, to inspect and copy, upon reasonable advance notice and during normal business hours or at such other times as may be agreed upon, relevant accounting and administrative books and records, as they pertain to this Agreement. Such information shall be provided to each party hereto pursuant to procedures designed to protect the confidentiality of patient medical records in accordance with applicable legal requirements and recognized standards of professional practice.

7.03    CCN and Provider shall each maintain records with respect to any matters necessary for the proper administration of this Agreement.

7.04    Upon termination of this Agreement, Provider agrees to cooperate with Beneficiaries or Claimants and subsequent Providers with respect to the orderly and prompt transfer of medical records of Beneficiaries or Claimants. This Agreement does not preclude Provider from assessing reasonable charges for the expense of transferring such records if appropriate.

7.05    CCN shall have access to provider records for four (4) years from the date on which Provider supplied or provided Health Care Services or Benefits documented in such records, regardless of when the Agreement has been terminated.

## 8. INSURANCE REQUIREMENTS

8.01    **Professional Liability Insurance.** Provider shall carry professional liability insurance or an equivalent program of self-insurance in minimum amounts as specified and amended from time to time in the CCN Administrative Manual for Participating Providers. Provider shall notify CCN of cancellation or material modification of the coverage under such professional liability insurance at least thirty (30) days prior to any cancellation or modification. Certificates of insurance evidencing Provider's professional liability insurance coverage shall be provided to CCN no later than thirty (30) days following execution of this Agreement.

8.02    **General Liability Insurance.** Provider shall also maintain a policy or program of comprehensive general liability insurance, covering Provider's acts or failure to act, with minimum coverage as specified and amended from time to time in the CCN Administrative Manual for Participating Providers.

8.03    **Extended Insurance.** In the event Provider terminates this Agreement for any reason whatsoever, or if Provider changes insurance carriers, Provider agrees to maintain malpractice insurance coverage in the amount required under Section 8.01 of this Agreement for all Health Care Services or Benefits provided to Beneficiaries or Claimants until the statutes of limitation expire for the filing of malpractice claims pertaining to those Health Care Services or Benefits. Such insurance coverage may take the form of an "occurrence" policy covering claims made for services rendered no matter when the claims are filed, ongoing "claims made" insurance covering all claims filed during the period when the insurance is in force, or "tail insurance" coverage if the Provider cancels his/her "claims made" coverage.

## 9. ADMINISTRATIVE MANUAL

9.01    Provider agrees to comply with the requirements and procedures set forth in the Administrative Manual for Participating Providers ("Administrative Manual") which CCN shall provide for use by Provider, and the provisions of the Administrative Manual (as it may be amended by CCN in its sole discretion from time to time) are incorporated herein by this reference. CCN will distribute the Administrative Manual or any amendments to the Administrative Manual to Provider at least thirty (30) days prior to implementation or amendment. Notwithstanding Section 10.01 of this Agreement, any such amendment shall be effective thirty (30) days after such amendment has been distributed to Provider. The Administrative Manual shall cover administration of this Agreement, Utilization Review/Quality Assurance Program, minimum professional and general liability insurance requirements for Provider, billing and accounting requirements for services rendered hereunder, and other matters as deemed necessary by CCN.

## 10. AMENDMENT

10.01    This Agreement or any part hereof, may be amended only by CCN at any time during the term of this Agreement with thirty (30) days prior written notice to the provider by CCN. Provider shall have thirty (30) days after Provider receives written notice of such notice to provide CCN with written notice rejecting the amendment. Failure of Provider to provide such written notice to CCN shall constitute Provider's acceptance of said amendment. Except as provided above, any other amendment or modification of this Agreement shall be in writing and executed by each party hereto.

## 11. ASSIGNMENT

11.01    No assignment or delegation of the rights, duties or obligations hereunder shall be made without the mutual written consent of the parties hereto. Notwithstanding the foregoing, CCN retains the right to assign this Agreement or delegate its performance hereunder in whole or in part, without Provider's consent, to any entity with which CCN or its parent company or any of its subsidiaries is affiliated.

## 12. DISPUTE RESOLUTION AND ARBITRATION

12.01    CCN and Provider agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

12.02    The sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits. The parties shall mutually agree to the appointment of an impartial arbitrator within 30 days of the written request for the appointment of an arbitrator by any party. The arbitrator must be familiar with the health care industry. In the event that mutual agreement cannot be obtained, then the American Arbitration Association shall appoint an arbitrator who is familiar with the health care industry if one can be located; and, if one cannot be located, then another arbitrator shall be appointed. All arbitration proceedings shall be conducted in accord with the rules of the American Arbitration Association and the award shall be binding, final and conclusive on the parties. Any party may enforce the award rendered by the arbitrator in any court of competent jurisdiction.

12.03   In the event of any dispute as to the interpretation of any provision in this Agreement, there shall not be any inference made for or against either party by reason of such party proposing or modifying any provision.

## 13. INDEPENDENT CONTRACTOR

13.01   Provider, in furnishing Health Care Services or Benefits pursuant to this Agreement, does so as an independent contractor. Neither Provider nor CCN shall be construed to be the agent, employee, or representative of the other, except as specified in this Agreement.

13.02   Nothing contained herein shall be construed to prevent Provider from independently operating or participating in any other agreement or in providing health care services independent of this Agreement.

## 14. WAIVER

14.01   The waiver by either party of any breach of any provision of this Agreement or warranty or representation herein set forth shall not be construed as a waiver of any subsequent breach of the same or any other provision.

## 15. SEVERABILITY

15.01   If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated as a result of such decision.

## 16. GOVERNING LAW

16.01   This Agreement shall be construed and enforced in accordance with the laws of the State of _Florida_ as amended from time to time subject to any applicable federal law.

## 17. INDEMNIFICATION

17.01   Each party to this Agreement agrees to indemnify and hold harmless the other party and its directors, officers, employees and agents against any and all liability and expense, including defense costs and legal fees as they are incurred in connection with claims or demands for damages of any nature whatsoever including, but not limited to, bodily injury, death, personal injury or property damage arising from or caused by the indemnifying party's acts or failure to act or the acts or failure to act of its directors, officers, employees or agents.

## 18. NOTICES

18.01   Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall either be personally delivered or sent by registered or certified mail with the United States Postal Service, return receipt requested, postage prepaid, addressed to such party at its respective last known address.

## 19. CONFIDENTIALITY

19.01   The parties hereto shall maintain the confidentiality of any and all medical, financial and administrative records which shall be in their possession and control, and such information shall only be released or disseminated pursuant to the valid written authorization of the other party, Beneficiary or Claimant or as and when permitted under applicable law.

19.02   CCN and Provider shall hold any and all proprietary and confidential information in the strictest confidence and shall not voluntarily or involuntarily, sell, transfer, publish, display or otherwise make available to others any portion of the other party's proprietary and confidential information. Provider acknowledges that this Agreement, Amendments, and Exhibits hereto are deemed proprietary and confidential. Provider agrees that the terms of 19.02 shall survive this Agreement for a period of two (2) years.

IN WITNESS THEREOF, the parties hereto have executed this Agreement by their duly authorized officers, and it shall be effective as of the 1st day of **August**, 1998.

**PROVIDER**                                          **CCN**

**FEDERAL TAX IDENTIFICATION #:**

65-0435831

_____                    _____
Signature                                            Signature

Paul Zidel, M.D.                                     Gavin Meshad
Please print name                                    Please print Vice President, Southeast Region

M.D.
_____                    _____
Title                                                Title

12/13/95                                             8-1-98
_____                    _____
Date                                                 Date

PROFESSIONAL01/98

nent of Highway Safety and Motor llation or termination of the required

*July 1, 2000*

)r registration has been suspended statement upon compliance with the Department of Highway Safety and of $150 for the first reinstatement. l reinstatement and $500 for each :he first reinstatement. Any person )n must also secure noncancelable 1e appropriate person proof that the -tment of Highway Safety and Motor the person does not have a second tatement, the reinstatement fee shall eriod. In the event that a person's his section or s. 316.646,only one 1d the registration. All fees shall be .or Vehicles at the time of reinstate- ehicles shall issue proper receipts for ghway Safety Operating Trust Fund. ill be distributed from the Highway tity or state agency which employed seizes a license plate pursuant to s. he local government entity or state

*ly 1, 2000*

- been suspended pursuant to this ompliance with the requirements of \way Safety and Motor Vehicles of a statement. Such reinstatement fee ch subsequent reinstatement during on reinstating her or his insurance erage as described in s. 627.7275(2) : coverage is in force on a form l Motor Vehicles, such proof to be econd reinstatement within 3 years 1t fee shall be $150 for the first )e collected by the Department of instatement. The Department of : receipts for such fees and shall ting Trust Fund. One-third of the 'om the Highway Safety Operating agency which employed the law ense plate pursuant to s. 324.201 or ment entity or state agency for any

-nse plate by a recovery agent shall n in the Highway Safety Operating

7, c 97-102, § 362, July 1, 1997; Laws '. June 29, 1999; Laws 1999, c. 99-248,

## Historical and Statutory Notes

Laws 1997, c. 97-84, § 2, eff. Oct. 1, 1997, in subsec. (1), inserted ", a school bus as defined in 234.051.".

Laws 1997, c. 97-102, eff. July 1, 1997, removed gender-specific references applicable to human beings from volume 4 of the Florida Statutes without substantive changes in legal effect.

Laws 1998, c. 98-223, § 14, in the first sentence of subsec. (6), following "registration" deleted "and driver's license", in subsec. (7)(a), in the first sentence, preceding "registration" deleted "driver's license or"; and deleted a sentence providing that in the event a license and registration was suspended pursuant to § 316.646, only one reinstatement fee would be paid to reinstate the license and registration.

Laws 1999, c. 99-3, § 34, eff. June 29, 1999, amended the section to conform to the redesignation of s. 768.28(14) as s. 768.28(15).

Laws 1999, c. 99-248, § 63, in subsec (7), deleted the paragraph (a) designation and paragraph (b), which formerly read:

"(7)(a) Any operator or owner whose driver's license or registration has been suspended pursuant to this section or s. 316.646 may effect its reinstatement upon compliance with the requirements of this section and upon payment to the Department of Highway Safety and Motor Vehicles of a nonrefundable reinstatement fee of $150 for the first reinstatement. Such reinstatement fee shall be $250 for the second reinstatement and $500 for each subsequent reinstatement during the 3 years following the first reinstatement. Any person reinstating her or his insurance under this

subsection must also secure noncancelable coverage as described in s. 627.7275(2) and present to the appropriate person proof that the coverage is in force on a form promulgated by the Department of Highway Safety and Motor Vehicles, such proof to be maintained for 2 years. If the person does not have a second reinstatement within 3 years after her or his initial reinstatement, the reinstatement fee shall be $150 for the first reinstatement after that 3-year period. In the event that a person's license and registration are suspended pursuant to this section or s. 316.646, only one reinstatement fee shall be paid to reinstate the license and the registration. All fees shall be collected by the Department of Highway Safety and Motor Vehicles at the time of reinstatement. The Department of Highway Safety and Motor Vehicles shall issue proper receipts for such fees and shall promptly deposit those fees in the Highway Safety Operating Trust Fund. One-third of the fee collected under this subsection shall be distributed from the Highway Safety Operating Trust Fund to the local government entity or state agency which employed the law enforcement officer or the recovery agent who seizes a license plate pursuant to s. 324.201 or to s. 324.202. Such funds may be used by the local government entity or state agency for any authorized purpose.

"(b) One-third of the fee collected for the seizure of a license plate by a recovery agent, shall be paid to the recovery agent, and the balance shall remain in the Highway Safety Operating Trust Fund and be distributed pursuant to s. 321.245."

## Library References

**Texts and Treatises**

4 Fla Jur 2d, Automobiles and Other Vehicles § 39; 31 Fla Jur 2d, Insurance §§778, 784, 840.

4A Fla Jur 2d, Automobiles and Other Vehicles § 37, 110, 568; 30A Fla Jur 2d, Insurance § 2055; 31 Fla Jur 2d, Insurance §§2908, 3084.

## Notes of Decisions

**14. Set-offs**

Insured tort-feasor was entitled to set-off for personal injury protection (PIP) benefits that would have been payable to injured driver, who was uninsured in contravention of Florida's no-fault laws, uninsured driver was self-insured to extent of 80% of her own medical expenses, entitling insured tort-feasor to exemption from tort liability to same extent. Holt v. King, App. 4 Dist., 707 So.2d 1141 (1998).

Insured tort-feasor is entitled to personal injury protection (PIP) set-off against claimant who is uninsured in contravention of no-fault laws. Holt v. King, App. 4 Dist., 707 So.2d 1141 (1998).

**16. Self-insurers**

When party chooses to entirely forgo personal injury protection (PIP) insurance coverage, she becomes self-insured as to entirety of the mandatory coverage. Holt v. King, App. 4 Dist., 707 So.2d 1141 (1998).

## 627.736. Required personal injury protection benefits; exclusions; priority

(1) **Required benefits.**—Every insurance policy complying with the security requirements of s. 627.733 shall provide personal injury protection to the named insured, relatives residing in the same household, persons operating the insured motor vehicle, passengers in such motor vehicle, and other persons struck by such motor vehicle and suffering bodily injury while not an occupant of a self-propelled vehicle, subject to the provisions of subsection (2) and paragraph (4)(d), to a limit of $10,000 for loss sustained by any such person as a result of bodily injury, sickness, disease, or death arising out of the ownership, maintenance, or use of a motor vehicle as follows:

91

## EXHIBIT B

(a) *Medical benefits*—Eighty percent of all reasonable expenses for necessary medical, surgical, X-ray, dental, and rehabilitative services, including prosthetic devices, and necessary ambulance, hospital, and nursing services. Such benefits shall also include necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person who relies upon spiritual means through prayer alone for healing, in accordance with his or her religious beliefs.

(b) *Disability benefits*—Sixty percent of any loss of gross income and loss of earning capacity per individual from inability to work proximately caused by the injury sustained by the injured person, plus all expenses reasonably incurred in obtaining from others ordinary and necessary services in lieu of those that, but for the injury, the injured person would have performed without income for the benefit of his or her household. All disability benefits payable under this provision shall be paid not less than every 2 weeks.

(c) *Death benefits.*—Death benefits of $5,000 per individual. The insurer may pay such benefits to the executor or administrator of the deceased, to any of the deceased's relatives by blood or legal adoption or connection by marriage, or to any person appearing to the insurer to be equitably entitled thereto.

Only insurers writing motor vehicle liability insurance in this state may provide the required benefits of this section, and no such insurer shall require the purchase of any other motor vehicle coverage other than the purchase of property damage liability coverage as required by s. 627.7275 as a condition for providing such required benefits. Insurers may not require that property damage liability insurance in an amount greater than $10,000 be purchased in conjunction with personal injury protection. Such insurers shall make benefits and required property damage liability insurance coverage available through normal marketing channels. Any insurer writing motor vehicle liability insurance in this state who fails to comply with such availability requirement as a general business practice shall be deemed to have violated part X of chapter 626, and such violation shall constitute an unfair method of competition or an unfair or deceptive act or practice involving the business of insurance; and any such insurer committing such violation shall be subject to the penalties afforded in such part, as well as those which may be afforded elsewhere in the insurance code.

(2) Authorized exclusions.—Any insurer may exclude benefits:

(a) For injury sustained by the named insured and relatives residing in the same household while occupying another motor vehicle owned by the named insured and not insured under the policy or for injury sustained by any person operating the insured motor vehicle without the express or implied consent of the insured.

(b) To any injured person, if such person's conduct contributed to his or her injury under any of the following circumstances:

1. Causing injury to himself or herself intentionally; or

2. Being injured while committing a felony.

Whenever an insured is charged with conduct as set forth in subparagraph 2., the 30-day payment provision of paragraph (4)(b) shall be held in abeyance, and the insurer shall withhold payment of any personal injury protection benefits pending the outcome of the case at the trial level. If the charge is nolle prossed or dismissed or the insured is acquitted, the 30-day payment provision shall run from the date the insurer is notified of such action.

(3) Insured's rights to recovery of special damages in tort claims.—No insurer shall have a lien on any recovery in tort by judgment, settlement, or otherwise for personal injury protection benefits, whether suit has been filed or settlement has been reached without suit. An injured party who is entitled to bring suit under the provisions of ss. 627.730–627.7405, or his or her legal representative, shall have no right to recover any damages for which personal injury protection benefits are paid or payable. The plaintiff may prove all of his or her special damages notwithstanding this limitation, but if special damages are introduced in evidence, the trier of facts, whether judge or jury, shall not award damages for personal injury protection benefits paid or payable. In all cases in which a jury is required to fix damages, the court shall instruct the jury that the plaintiff shall not recover such special damages for personal injury protection benefits paid or payable.

(4) Benefits; when due.—Benefits due from an insurer under ss. 627.730–627.7405 shall be primary, except that benefits received under any workers' compensation law shall be

92

credited against
accrues, upon re
incurred which
Agency for He
assistance under
out of the ow
627.730–627.7405

(a) An insure
accident involvir
required by ss. 6

(b) Personal i
overdue if not pa
covered loss and
as to the entire
within 30 days a
remainder of the
within 30 days a
shall not be dee
insurer is not r
furnished to the
overdue, paymer
which is equivale
postpaid envelop

(c) All overdue

(d) The insur
benefits for:

1. Accidental
vehicle, or while
contact with a m

2. Accidental
America or its te
motor vehicle.

3. Accidental
household, unde
provided the rel
not himself or he
under ss. 627.730

4. Accidental
owner's motor v
vehicle, if the in
injured person is

a. The owner
627.730–627.7405

b. Entitled to
motor vehicle.

(e) If two or
same injury to a
and any insurer
insurers an equiv
the claim.

(f) Medical pa
the portion of a
covered but is no
whether the full
benefits shall no

|

credited against the benefits provided by subsection (1) and shall be due and payable as loss accrues, upon receipt of reasonable proof of such loss and the amount of expenses and loss incurred which are covered by the policy issued under ss. 627.730–627.7405. When the Agency for Health Care Administration provides, pays, or becomes liable for medical assistance under the Medicaid program related to injury, sickness, disease, or death arising out of the ownership, maintenance, or use of a motor vehicle, benefits under ss. 627.730–627.7405 shall be subject to the provisions of the Medicaid program.

(a) An insurer may require written notice to be given as soon as practicable after an accident involving a motor vehicle with respect to which the policy affords the security required by ss. 627.730–627.7405.

(b) Personal injury protection insurance benefits paid pursuant to this section shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of same. If such written notice is not furnished to the insurer as to the entire claim, any partial amount supported by written notice is overdue if not paid within 30 days after such written notice is furnished to the insurer. Any part or all of the remainder of the claim that is subsequently supported by written notice is overdue if not paid within 30 days after such written notice is furnished to the insurer. However, any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer. For the purpose of calculating the extent to which any benefits are overdue, payment shall be treated as being made on the date a draft or other valid instrument which is equivalent to payment was placed in the United States mail in a properly addressed, postpaid envelope or, if not so posted, on the date of delivery.

(c) All overdue payments shall bear simple interest at the rate of 10 percent per year.

(d) The insurer of the owner of a motor vehicle shall pay personal injury protection benefits for:

1. Accidental bodily injury sustained in this state by the owner while occupying a motor vehicle, or while not an occupant of a self-propelled vehicle if the injury is caused by physical contact with a motor vehicle.

2. Accidental bodily injury sustained outside this state, but within the United States of America or its territories or possessions or Canada, by the owner while occupying the owner's motor vehicle.

3. Accidental bodily injury sustained by a relative of the owner residing in the same household, under the circumstances described in subparagraph 1. or subparagraph 2., provided the relative at the time of the accident is domiciled in the owner's household and is not himself or herself the owner of a motor vehicle with respect to which security is required under ss. 627.730–627.7405.

4. Accidental bodily injury sustained in this state by any other person while occupying the owner's motor vehicle or, if a resident of this state, while not an occupant of a self-propelled vehicle, if the injury is caused by physical contact with such motor vehicle, provided the injured person is not himself or herself:

a. The owner of a motor vehicle with respect to which security is required under ss. 627.730–627.7405; or

b. Entitled to personal injury benefits from the insurer of the owner or owners of such a motor vehicle.

(e) If two or more insurers are liable to pay personal injury protection benefits for the same injury to any one person, the maximum payable shall be as specified in subsection (1), and any insurer paying the benefits shall be entitled to recover from each of the other insurers an equitable pro rata share of the benefits paid and expenses incurred in processing the claim.

(f) Medical payments insurance, if available in a policy of motor vehicle insurance, shall pay the portion of any claim for personal injury protection medical benefits which is otherwise covered but is not payable due to the coinsurance provision of paragraph (1)(a), regardless of whether the full amount of personal injury protection coverage has been exhausted. The benefits shall not be payable for the amount of any deductible which has been selected.

93

(g) It is a violation of the insurance code for an insurer to fail to timely provide benefits as required by this section with such frequency as to constitute a general business practice.

(5) **Charges for treatment of injured persons.—**

(a) Any physician, hospital, clinic, or other person or institution lawfully rendering treatment to an injured person for a bodily injury covered by personal injury protection insurance may charge only a reasonable amount for the products, services, and accommodations rendered, and the insurer providing such coverage may pay for such charges directly to such person or institution lawfully rendering such treatment, if the insured receiving such treatment or his or her guardian has countersigned the invoice, bill, or claim form approved by the Department of Insurance upon which such charges are to be paid for as having actually been rendered, to the best knowledge of the insured or his or her guardian. In no event, however, may such a charge be in excess of the amount the person or institution customarily charges for like products, services, or accommodations in cases involving no insurance, provided that charges for cephalic thermograms and peripheral thermograms shall not exceed the maximum reimbursement allowance for such procedures as set forth in the applicable fee schedule established pursuant to s. 440.13.

(b) With respect to any treatment or service, other than medical services billed by a hospital for services rendered at a hospital-owned facility, the statement of charges must be furnished to the insurer by the provider and may not include, and the insurer is not required to pay, charges for treatment or services rendered more than 30 days before the postmark date of the statement, except for past due amounts previously billed on a timely basis under this paragraph, and except that, if the provider submits to the insurer a notice of initiation of treatment within 21 days after its first examination or treatment of the claimant, the statement may include charges for treatment or services rendered up to, but not more than, 60 days before the postmark date of the statement. The injured party is not liable for, and the provider shall not bill the injured party for, charges that are unpaid because of the provider's failure to comply with this paragraph. Any agreement requiring the injured person or insured to pay for such charges is unenforceable. For emergency services and care as defined in s. 395.002 rendered in a hospital emergency department or for transport and treatment rendered by an ambulance provider licensed pursuant to part III of chapter 401, the provider is not required to furnish the statement of charges within the time periods established by this paragraph; and the insurer shall not be considered to have been furnished with notice of the amount of covered loss for purposes of paragraph (4)(b) until it receives a statement complying with paragraph (5)(d), or copy thereof, which specifically identifies the place of service to be a hospital emergency department or an ambulance in accordance with billing standards recognized by the Health Care Finance Administration. Each notice of insured's rights under s. 627.7401 must include the following statement in type no smaller than 12 points:

> BILLING REQUIREMENTS.—Florida Statutes provide that with respect to any treatment or services, other than certain hospital and emergency services, the statement of charges furnished to the insurer by the provider may not include, and the insurer and the injured party are not required to pay, charges for treatment or services rendered more than 30 days before the postmark date of the statement, except for past due amounts previously billed on a timely basis, and except that, if the provider submits to the insurer a notice of initiation of treatment within 21 days after its first examination or treatment of the claimant, the statement may include charges for treatment or services rendered up to, but not more than, 60 days before the postmark date of the statement.

(c) Every insurer shall include a provision in its policy for personal injury protection benefits for binding arbitration of any claims dispute involving medical benefits arising between the insurer and any person providing medical services or supplies if that person has agreed to accept assignment of personal injury protection benefits. The provision shall specify that the provisions of chapter 682 relating to arbitration shall apply. The prevailing party shall be entitled to attorney's fees and costs. For purposes of the award of attorney's fees and costs, the prevailing party shall be determined as follows:

1. When the amount of personal injury protection benefits determined by arbitration exceeds the sum of the amount offered by the insurer at arbitration plus 50 percent of the

94

difference between the amount of the claim asserted by the claimant at arbitration and the amount offered by the insurer at arbitration, the claimant is the prevailing party.

2. When the amount of personal injury protection benefits determined by arbitration is less than the sum of the amount offered by the insurer at arbitration plus 50 percent of the difference between the amount of the claim asserted by the claimant at arbitration and the amount offered by the insurer at arbitration, the insurer is the prevailing party.

3. When neither subparagraph 1. nor subparagraph 2. applies, there is no prevailing party. For purposes of this paragraph, the amount of the offer or claim at arbitration is the amount of the last written offer or claim made at least 30 days prior to the arbitration.

4. In the demand for arbitration, the party requesting arbitration must include a statement specifically identifying the issues for arbitration for each examination or treatment in dispute. The other party must subsequently issue a statement specifying any other examinations or treatment and any other issues that it intends to raise in the arbitration. The parties may amend their statements up to 30 days prior to arbitration, provided that arbitration shall be limited to those identified issues and neither party may add additional issues during arbitration.

(d) All statements and bills for medical services rendered by any physician, hospital, clinic, or other person or institution shall be submitted to the insurer on a Health Care Finance Administration 1500 form, UB 92 forms. or any other standard form approved by the department for purposes of this paragraph. All billings for such services shall, to the extent applicable, follow the Physicians' Current Procedural Terminology (CPT) in the year in which services are rendered. No statement of medical services may include charges for medical services of a person or entity that performed such services without possessing the valid licenses required to perform such services. For purposes of paragraph (4)(b), an insurer shall not be considered to have been furnished with notice of the amount of covered loss or medical bills due unless the statements or bills comply with this paragraph.

**(6) Discovery of facts about an injured person; disputes.—**

(a) Every employer shall, if a request is made by an insurer providing personal injury protection benefits under ss. 627.730–627.7405 against whom a claim has been made, furnish forthwith, in a form approved by the department, a sworn statement of the earnings, since the time of the bodily injury and for a reasonable period before the injury, of the person upon whose injury the claim is based.

(b) Every physician, hospital, clinic, or other medical institution providing, before or after bodily injury upon which a claim for personal injury protection insurance benefits is based, any products, services, or accommodations in relation to that or any other injury, or in relation to a condition claimed to be connected with that or any other injury, shall, if requested to do so by the insurer against whom the claim has been made, furnish forthwith a written report of the history, condition, treatment, dates, and costs of such treatment of the injured person, together with a sworn statement that the treatment or services rendered were reasonable and necessary with respect to the bodily injury sustained and identifying which portion of the expenses for such treatment or services was incurred as a result of such bodily injury, and produce forthwith, and permit the inspection and copying of, his or her or its records regarding such history, condition, treatment, dates, and costs of treatment. Such sworn statement shall read as follows: "Under penalty of perjury. I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief." No cause of action for violation of the physician-patient privilege or invasion of the right of privacy shall be permitted against any physician, hospital, clinic, or other medical institution complying with the provisions of this section. The person requesting such records and such sworn statement shall pay all reasonable costs connected therewith. If an insurer makes a written request for documentation under this paragraph within 20 days after having received notice of the amount of a covered loss under paragraph (4)(a), the insurer shall pay the amount or partial amount of covered loss to which such documentation relates in accordance with paragraph (4)(b) or within 10 days after the insurer's receipt of the requested documentation, whichever occurs later. For purposes of this paragraph, the term "receipt" includes, but is not limited to, inspection and copying pursuant to this paragraph.

(c) In the event of any dispute regarding an insurer's right to discovery of facts about an injured person's earnings or about his or her history, condition, or treatment, or the dates and

costs of such treatment, the insurer may petition a court of competent jurisdiction to enter an order permitting such discovery. The order may be made only on motion for good cause shown and upon notice to all persons having an interest, and it shall specify the time, place, manner, conditions, and scope of the discovery. Such court may, in order to protect against annoyance, embarrassment, or oppression, as justice requires, enter an order refusing discovery or specifying conditions of discovery and may order payments of costs and expenses of the proceeding, including reasonable fees for the appearance of attorneys at the proceedings, as justice requires.

(d) The injured person shall be furnished, upon request, a copy of all information obtained by the insurer under the provisions of this section, and shall pay a reasonable charge, if required by the insurer.

(e) Notice to an insurer of the existence of a claim shall not be unreasonably withheld by an insured.

**(7) Mental and physical examination of injured person; reports.—**

(a) Whenever the mental or physical condition of an injured person covered by personal injury protection is material to any claim that has been or may be made for past or future personal injury protection insurance benefits, such person shall, upon the request of an insurer, submit to mental or physical examination by a physician or physicians. The costs of any examinations requested by an insurer shall be borne entirely by the insurer. Such examination shall be conducted within the municipality where the insured is receiving treatment, or in a location reasonably accessible to the insured, which, for purposes of this paragraph, means any location within the municipality in which the insured resides, or any location within 10 miles by road of the insured's residence, provided such location is within the county in which the insured resides. If the examination is to be conducted in a location reasonably accessible to the insured, and if there is no qualified physician to conduct the examination in a location reasonably accessible to the insured, then such examination shall be conducted in an area of the closest proximity to the insured's residence. Personal protection insurers are authorized to include reasonable provisions in personal injury protection insurance policies for mental and physical examination of those claiming personal injury protection insurance benefits. An insurer may not withdraw payment of a treating physician without the consent of the injured person covered by the personal injury protection, unless the insurer first obtains a report by a physician licensed under the same chapter as the treating physician whose treatment authorization is sought to be withdrawn, stating that treatment was not reasonable, related, or necessary.

(b) If requested by the person examined, a party causing an examination to be made shall deliver to him or her a copy of every written report concerning the examination rendered by an examining physician, at least one of which reports must set out the examining physician's findings and conclusions in detail. After such request and delivery, the party causing the examination to be made is entitled, upon request, to receive from the person examined every written report available to him or her or his or her representative concerning any examination, previously or thereafter made, of the same mental or physical condition. By requesting and obtaining a report of the examination so ordered, or by taking the deposition of the examiner, the person examined waives any privilege he or she may have, in relation to the claim for benefits, regarding the testimony of every other person who has examined, or may thereafter examine, him or her in respect to the same mental or physical condition. If a person unreasonably refuses to submit to an examination, the personal injury protection carrier is no longer liable for subsequent personal injury protection benefits.

**(8) Applicability of provision regulating attorney's fees.—**With respect to any dispute under the provisions of ss. 627.730–627.7405 between the insured and the insurer, the provisions of s. 627.428 shall apply.

(9)(a) Each insurer which has issued a policy providing personal injury protection benefits shall report the renewal, cancellation, or nonrenewal thereof to the Department of Highway Safety and Motor Vehicles within 45 days from the effective date of the renewal, cancellation, or nonrenewal. Upon the issuance of a policy providing personal injury protection benefits to a named insured not previously insured by the insurer thereof during that calendar year, the insurer shall report the issuance of the new policy to the Department of Highway Safety and Motor Vehicles within 30 days. The report shall be in such form and format and contain such

diction to enter an
on for good cause
fy the time, place,
to protect against
an order refusing
costs and expenses
ys at the proceed-

information obtained
sonable charge, if

bly withheld by an

ered by personal
for past or future
he request of an
ans.  The costs of
e insurer.  Such
ared is receiving
purposes of this
d resides, or any
location is within
cted in a location
n to conduct the
mination shall be
rsonal protection
protection insur-
injury protection
hysician without
tion, unless the
as the treating
that treatment

o be made shall
on rendered by
ning physician's
rty causing the
examined every
z any examina-
By requesting
position of the
relation to the
mined, or may
ondition.  If a
ury protection

o any dispute
insurer, the

ction benefits
t of Highway
, cancellation,
on benefits to
dar year, the
ıy Safety and
contain such

information as may be required by the Department of Highway Safety and Motor Vehicles which shall include a format compatible with the data processing capabilities of said department, and the Department of Highway Safety and Motor Vehicles is authorized to adopt rules necessary with respect thereto. Failure by an insurer to file proper reports with the Department of Highway Safety and Motor Vehicles as required by this subsection or rules adopted with respect to the requirements of this subsection constitutes a violation of the Florida Insurance Code.[1] Reports of cancellations and policy renewals and reports of the issuance of new policies received by the Department of Highway Safety and Motor Vehicles are confidential and exempt from the provisions of s. 119.07(1). These records are to be used for enforcement and regulatory purposes only, including the generation by the department of data regarding compliance by owners of motor vehicles with financial responsibility coverage requirements. In addition, the Department of Highway Safety and Motor Vehicles shall release, upon a written request by a person involved in a motor vehicle accident, by the person's attorney, or by a representative of the person's motor vehicle insurer, the name of the insurance company and the policy number for the policy covering the vehicle named by the requesting party. The written request must include a copy of the appropriate accident form as provided in s. 316.065, s. 316.066, or s. 316.068.

(b) Every insurer with respect to each insurance policy providing personal injury protection benefits shall notify the named insured or in the case of a commercial fleet policy, the first named insured in writing that any cancellation or nonrenewal of the policy will be reported by the insurer to the Department of Highway Safety and Motor Vehicles. The notice shall also inform the named insured that failure to maintain personal injury protection and property damage liability insurance on a motor vehicle when required by law may result in the loss of registration and driving privileges in this state, and the notice shall inform the named insured of the amount of the reinstatement fees required by s. 627.733(7). This notice is for informational purposes only, and no civil liability shall attach to an insurer due to failure to provide this notice.

(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as "preferred providers," which shall include health care providers licensed under chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a nonpreferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy. The insurer shall provide each policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

Amended by Laws 1996, c. 96-406, § 381, eff. July 3, 1996; Laws 1997, c. 97-102, § 1738, eff. July 1, 1997; Laws 1998, c. 98-270, § 2, eff. Oct. 1, 1998; Laws 1999, c. 99-8, § 262, eff. June 29, 1999.

[1] Section 624.01 et seq.

### Historical and Statutory Notes

Laws 1996, c. 96-406 was a reviser's bill which deleted references to § 119.14 throughout Florida Statutes to conform to the repeal of § 119.14, the Open Government Sunset Review Act, by Laws 1995, c. 95-217, § 1.

Laws 1997, c. 97-102, eff. July 1, 1997, removed gender-specific references applicable to human beings from volume 4 of the Florida Statutes without substantive changes in legal effect.

Laws 1998, c. 98-270, § 2, rewrote subsec. (5); in subsec. (6)(b), added the last two sentences; and

rewrote subsec. (7)(a). Subsections (5) and (7)(a) formerly read:

"(5) Charges for treatment of injured persons.— Any physician, hospital, clinic, or other person or institution lawfully rendering treatment to an injured person for a bodily injury covered by personal injury protection insurance may charge only a reasonable amount for the products, services, and accommodations rendered, and the insurer providing such coverage may pay for such charges direct-

ly to such person or institution lawfully rendering such treatment, if the insured receiving such treatment or his or her guardian has countersigned the invoice, bill, or claim form approved by the Department of Insurance upon which such charges are to be paid for as having actually been rendered, to the best knowledge of the insured or his or her guardian. In no event, however, may such a charge be in excess of the amount the person or institution customarily charges for like products, services, or accommodations in cases involving no insurance, provided that charges for cephalic thermograms and peripheral thermograms shall not exceed the maximum reimbursement allowance for such procedures as set forth in the applicable fee schedule established pursuant to s. 440.13. Every insurer shall include a provision in its policy for personal injury protection benefits for binding arbitration of any claims dispute involving medical benefits arising between the insurer and any person providing medical services or supplies if that person has agreed to accept assignment of personal injury protection benefits. The provision shall specify that the provisions of chapter 682 relating to arbitration shall apply. The prevailing party shall be entitled to attorney's fees and costs."

"(7)(a) Whenever the mental or physical condition of an injured person covered by personal injury protection is material to any claim that has been or may be made for past or future personal injury protection insurance benefits, such person shall, upon the request of an insurer, submit to mental or physical examination by a physician or physicians. The costs of any examinations requested by an insurer shall be borne entirely by the insurer. Such examination shall be conducted within the municipality of residence of the insured

or in the municipality where the insured is receiving treatment. If the examination is to be conducted within the municipality of residence of the insured and if there is no qualified physician to conduct the examination within such municipality, then such examination shall be conducted in an area of the closest proximity to the insured's residence. Personal protection insurers are authorized to include reasonable provisions in personal injury protection insurance policies for mental and physical examination of those claiming personal injury protection insurance benefits. An insurer may not withdraw payment of a treating physician without the consent of the injured person covered by the personal injury protection, unless the insurer first obtains a report by a physician licensed under the same chapter as the treating physician whose treatment authorization is sought to be withdrawn, stating that treatment was not reasonable, related, or necessary."

Laws 1998, c. 98-270, § 3, provides:

"(1) Paragraph (5)(c) of s. 627.736, Florida Statutes, as amended by section 2 of this act, shall apply to arbitrations commenced on or after the effective date of this act.

"(2) Paragraph (7)(a) of s. 627.736, Florida Statutes, as amended by section 2 of this act, shall apply to new and renewal policies with an effective date on or after the effective date of this act.

"(3) All other provisions of section 2 of this act shall apply to accidents occurring on or after the effective date of this act."

Laws 1999, c. 99-8, § 262, eff. June 29, 1999, substituted "Agency for Health Care Administration" for "Department of Health and Rehabilitative Services".

## Library References

**Texts and Treatises**

30 Fla Jur 2d, Insurance § 380; 30A Fla Jur 2d, Insurance §§ 2055, 2058, 2059; 31 Fla Jur 2d, Insurance §§ 2998, 3001, 3003, 3005–3009, 3016–3020, 3030, 3039–3041, 3043, 3047, 3069, 3070, 3084, 3085, 3112, 3129, 3131, 3133; 31A Fla Jur 2d, Insurance §§ 3166, 3176, 3249, 3252–3259, 3297, 3383, 3394, 3395, 3399, 3430, 3467, 3759, 3819, 4210.

4 Fla Jur 2d, Automobiles and Other Vehicles § 112; 10 Fla Jur 2d, Conflict of Laws §§ 17, 44; 10 Fla Jur 2d, Constitutional Law § 345; 17 Fla Jur 2d, Damages § 39; 30 Fla Jur 2d, Insurance § 674; 31 Fla Jur 2d, Insurance §§ 777, 779–782, 784–786, 789, 797, 809, 923.

## Notes of Decisions

Arbitration 82
Class actions 63.5
Comparative negligence 13.5
Damages 72–75
   Medical expenses 73.5
Medical expenses, damages 73.5
Reasonableness and necessity 48.5

**2. —— Due process, validity**

Statute obligating a medical provider who takes assignment of a patient's claim for personal injury protection (PIP) benefits to arbitrate any dispute with the patient's PIP insurer over the claim

violates due process, as it singles out medical providers for the denial of access to a court and substitutes a prevailing-party standard for obtaining attorney fees for the statutory standard which insureds enjoy. Delta Cas. Co. v. Pinnacle Medical, Inc., App. 5 Dist., 721 So.2d 321 (1998), rehearing denied, review granted 732 So.2d 328.

**4. Construction and application**

Tort-feasor was entitled to offset in damages for medical bills already paid by automobile insurer under additional personal injury protection (APIP) coverage; tort-feasor was not entitled to offset for bills covered by APIP, but as yet unpaid by insur-

er, F.S.1991, §§
Allan, App. 5 Dist

Under statute p
insurance, if avai
pay portion of cla
medical benefits v
not payable due t
less of whether r
has been exhaust
all situations who
medical payments
extended to perso
pay merely beca
coverage. Allstat
700 So.2d 110 (199

**6. Purpose**

Nothing in the :
protection (PIP) h
all reasonable exp
vices suggests a
normal dynamics
den on the insurer
was unreasonable
necessary. Deru:
Dist., 723 So.2d
So.2d 892.

**11. Self-propelle**

Jitney is "self-p
of statute govern
(PIP) benefits; th
passenger from re
surer of driver of
gressive Cas. Ins.
So.2d 543 (1997).

**13. Causation, i**

Statute entitling
pant to recover p
benefits for injury
a vehicle allows re
the most substant
injury. Milgram v
731 So.2d 134 (199

**13.5. Comparati**

In determining
defendants who h
ment in action ar
the percentage of
gence was properl
nomic damages f
subtraction of pe
benefits; to initial
urged by the mo
portion of the full
defendant because
by the amount of
ligence. Assi v. F
Inc., App. 5 Dist.,

**16. —— Causal**
            **tenance or**

Fortune Ins. C
So.2d 139 (1992),
613 So.2d 3.

98



IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO. 95-13760-04

JOHN DEL GARDO and MICHELLE        CLASS REPRESENTATION
DEL GARDO, on behalf of themselves
and all others similarly situated,

        Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY,
and ALLSTATE INDEMNITY
COMPANY,

        Defendants.
_____/



## ORDER REGARDING PIP CLAIM PROCEDURES

THIS CAUSE is before the Court pursuant to Rule 1.220(e) of the Florida Rules of Civil Procedure, upon a Stipulation and Agreement of Settlement entered into by and between the Class and Defendant ALLSTATE INSURANCE COMPANY and ALLSTATE INDEMNITY COMPANY (collectively "ALLSTATE").

WHEREAS, the Court having heard argument of Counsel, and having reviewed all of the submissions presented with respect to the proposed Settlement between the Class and ALLSTATE, in connection with the entry of the Final Judgment and Order Approving Settlement in this matter, and

WHEREAS, the Court has determined that Final Judgment and Order Approving Settlement in this matter is to be entered, and

WHEREAS, under the terms of the Final Judgment and Order Approving Settlement in this matter, this Court further indicates its intention to enter an Order Regarding PIP Claim Procedures, and

**EXHIBIT C**

1

WHEREAS, this Court has been fully advised by the parties hereto with regard to the applicable law under Florida Statutes, § 627.736 (10), and

WHEREAS, this Court finds that certain PIP claim procedures proposed by ALLSTATE, as reflected below are in compliance with and do not violate the applicable requirements of Florida Statutes, § 627.736 (10), it is hereby

ORDERED, ADJUDGED AND DECREED that:

1. ALLSTATE's practice of entering into agreements with health care providers to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies does not violate the requirements of Florida Statutes, § 627.736 (10), under the conditions set forth in this Order;

2. ALLSTATE is authorized and has agreed to provide information to PIP claimants at the time they submit their PIP claim to ALLSTATE that ALLSTATE has entered into agreements with certain health care providers to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies, which reduced rates shall be applicable with regard to services rendered to such ALLSTATE PIP claimants at least until such time as their applicable ALLSTATE PIP benefits are exhausted;

3. ALLSTATE PIP claimants may also be informed by ALLSTATE at the time they submit their PIP claim to ALLSTATE of the identity of those certain health care providers which have agreed to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies, provided that those claimants are also informed that the decision to obtain treatment from such providers is strictly by voluntary choice, that the claimant may choose to change health care providers at any time without regard to whether or not the substitute provider selected was party to an agreement with ALLSTATE to charge reduced rates for services rendered to PIP claimants under ALLSTATE automobile insurance policies; and

4. ALLSTATE PIP claimants who obtain treatment from health care providers who are parties to agreements to charge reduced rates for services rendered by such providers under

2

ALLSTATE automobile insurance policies must be informed by ALLSTATE that their bills from such providers are subject to agreed, reduced rates and that he or she is only responsible for payment of 20% of the charges for those services based on the such reduced rates with regard to services rendered to such ALLSTATE PIP claimants at least until such time as their applicable ALLSTATE PIP benefits are exhausted.

5.       The notices attached as Exhibits "A," "B" and "C" hereto provide, in form and substance, adequate notice regarding the ALLSTATE business practices which are the subject of this Order.

DONE and ORDERED THIS ____ day of _____, 1999.

HONORABLE  PATRICIA  COCALIS
CIRCUIT COURT JUDGE

Copies furnished:
Larry Kopelman, Esq.
Eric Lee, Esq.
David Shelton, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6269-CIV-DIMITROULEAS

DRS. MARTIN MAY, ALAN LAZAR,
MARTIN HALE, JOEL RUSH, PAUL ZIDEL,
RICHARD LINN, RICHARD BERKOWITZ,
DOUGLAS STRINGHAM, ANDREW
ELLOWITZ, ALAN NOVICK, DEBRA WEISS,
and NEIL SCHECHTER,

   Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY,

   Defendant.

_____/



## ORDER ON MOTION TO REMAND
## AND MOTION TO DISMISS

   THIS CAUSE is before the Court upon Plaintiffs', Drs. Martin May, Alan Lazar, Martin

Hale, Joel Rush, Paul Zidel, Richard Linn, Richard Berkowitz, Douglas Stringham, Andrew

Ellowitz, Alan Novick, Debra Weiss and Neil Schechter Motion for Remand, filed herein on

March 14, 2000 and Defendant, Allstate Insurance Company's Motion to Dismiss, filed herein

on March 1, 2000. The Court has carefully reviewed the motions and is otherwise fully advised

in the premises.

## I. BACKGROUND

   Plaintiffs are doctors, who practice under the names "Park Place Therapeutic Center" and

"Park Place Orthopaedics & Rehabilitation." As this entity, they submit claims to Allstate for

payment on behalf of persons insured by Allstate for personal injury protection benefits, and

receive payments from Allstate.

RECEIVED
APR 17 2000

1

**EXHIBIT D**

Defendant, Allstate, sells automobile insurance policies in Florida which contain personal injury protection, pursuant to Florida law. Under the PIP coverage, Allstate agrees to pay 80% of reasonable charges for necessary medical treatment provided to covered insured who suffer injury in an automobile accident. Plaintiffs claim that the amount that they have received, pursuant to bills they have sent to Defendant, of work they have done on Defendant's insureds, is "substantially less than [Allstate] is statutorily and contractually obligated to pay."

On January 21, 2000, Plaintiffs filed a two Count Complaint in the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida. The action was timely removed. The Complaint is for: 1) Declaratory Relief; and 2) Breach of Contract.

Plaintiffs seek remand to State Court, arguing that the amount of PIP benefits paid to Plaintiffs pursuant to illegally obtained discounts by Defendant, compared to the amounts that should have been paid, can not be determined with certainty. They could potentially exceed or fall below the necessary jurisdictional amount, and therefore Defendants cannot provide, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional requirement. Defendant counters this argument by stating that Plaintiffs are engaged together in the practice of medicine, submit the claims together, and receive payments together. Defendant submits the Explanation of Medical Bill Payments and Health Insurance Claim Forms as evidence that Plaintiffs are engaged in a united practice of medicine.

Defendant next moves to dismiss this action. It argues that Plaintiffs do not allege that Allstate offers "preferred provider" PIP coverage under the policy. The insured are entitled to choose the health care provider they want, on their own. Plaintiffs claim that Defendant pays PIP claims for medical benefits at 80% of "preferred provider" rates. Defendant argues that it is not required to offer a "preferred provider" policy to its insured and therefore, has not failed to pay

2

PIP benefits as required by § 627.736, Florida Statutes. Defendant also argues that the Complaint does not establish that it breached an obligation under the PIP coverage or § 627.736(10), Florida Statutes, by paying medical benefits at a "reasonable" rate, if it is less than what Plaintiffs request. Defendant's last argument is that there is no private cause of action permitted for violations of § 627.736(10). In sum, Defendant claims Plaintiffs do not state a claim.

Plaintiffs, in their two page response, argue that they strongly disagree with Defendant's arguments in the dismissal motion, and aver that they do state a claim.

## II. DISCUSSION

### A. Remand

"Any civil case filed in state court may be removed by the defendant to federal court if the case could have been brought originally in federal court." Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1356 (11th Cir. 1996). Federal Jurisdiction should be found, unless it appears within "a legal certainty that the claim is really for less than the jurisdictional amount." Id. at 1356. However, "[w]here a plaintiff has made an unspecified demand for damages, a lower burden of proof is warranted because there is simply no estimate of damages to which a court may defer. Id. at 1356-57; See Gafford v. General Electric Company, 997 F.2d 150, 160 (6th Cir. 1993).

Plaintiffs claim that the amount of controversy in this action can only be determined by calculating the amount of PIP benefits paid individually, to Plaintiffs. However, Plaintiffs are engaged together in the practice of medicine under two names, "Park Place Therapeutic Center" and "Park Place Orthopaedics & Rehabilitation." Plaintiffs submit forms to receive payment, and receive payment collectively. The Health Insurance Claim Forms, submitted by Defendant,

3

shows that the I.D. Number of Referring Physician contains the same tax number on each sheet.

Additionally, in the space marked "Physician's, Supplier's Billing Name...," Park Place

Therapeutic Center is noted on each form. On the Explanation of Medical Bill Payment,

submitted by Defendant, in the space marked, "Treatment Rendered By," is the name Park Place

Therapeutic Center. "[W]hen several plaintiffs unite to enforce a single title or right, in which

they have a common and undivided interest, it is enough if their interests collectively equal the

jurisdictional amount." Troy Bank of Troy, Indiana v. G.A. Whitehead & Company, 222 U.S.

39, 40-41 (1911). The aggregate amount of the reduction of payments clearly exceeds the

$75,000 threshold necessary to confer jurisdiction on this Court.

## B. Dismiss

It is long settled that a complaint should not be dismissed unless it appears beyond a

doubt that the plaintiff could prove no set of facts in support of his claim which would entitle

him to relief. Conley v. Gibson, 355 U.S. 41 (1957). The allegations of the claim must be taken

as true and must be read to include any theory on which the plaintiff may recover. See Linder v.

Portocarrero, 963 F.2d 332, 334-336 (11th Cir.1992) (citing Robertson v. Johnston, 376 F.2d 43

(5th Cir.1967)). There must be a showing that the plaintiff has no claim before granting a motion

to dismiss. June Vernon and Delroy Vernon v. Medical Management Associates of Margate,

Inc., 912 F.Supp. 1549 (S.D.Fla. 1996).

Defendant's first argument is that the Complaint fails to allege a breach of contract or

violation of § 627.736. Plaintiffs allege in their Complaint, that Allstate pays PIP claims for

medical benefits at 80% of "preferred provider" rates. However, Plaintiffs fail to define

"preferred provider" rates, nor do they allege that such rates were not reasonable. Plaintiffs

claim, then, that because Allstate does not provide an option to insureds to purchase a "preferred

4

provider" policy for PIP benefits, it breached its contracts of insurance with its insureds and violated § 627.736(10) by paying at those rates. Therefore, Plaintiffs' only allegation is that Allstate is paying certain health care providers reduced rates which those providers have agreed to accept for medical services covered under the Allstate PIP contracts.

Plaintiffs, in the Complaint, claim that Defendant's standard policy does not comply with § 627.736(1)(a), which necessitates a party to have personal injury protection of "[e]ighty percent of all reasonable expenses for necessary medical..." Plaintiffs claim that they provided medical treatment, and were paid less than what is statutorily and contractually obligated to pay. However, Plaintiff's claims are not based on this Florida Statute.

Plaintiffs also argue that Defendant refers to Plaintiffs actions as "preferred providers," and such designation is improper. § 627.736(10), Florida Statutes, states in pertinent part, "(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as 'preferred providers,' which shall include health care providers...The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits..." Plaintiffs attached the insurance policy to the Complaint. The Court may consider the policy for purposes of a motion to dismiss. Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1369 (11th Cir. 1997); Smith Barney, Inc. v. Scanlon, 180 F.R.D. 444, 446 (S.D.Fla. 1998). Such consideration of a document attached to Plaintiff's complaint does not convert the motion to dismiss into a motion for summary judgment. Id. The policy does not contain the term "preferred providers," and Plaintiffs are not the parties the statute is meant to protect. Additionally, the statute does not state that Defendant must offer a "preferred providers" plan, but only regulates those parties that choose to do so.

5

Defendant argues that the statute was not enacted to benefit medical providers, and
therefore, does not allow Plaintiffs to rely on it as their basis for damages. In Fischer v. Metcalf,
the Third District Court of Appeals discussed three criteria[1] which are pertinent to whether the
legislature intended a statute to benefit a party. They are, "1) whether the plaintiff is one of the
class for whose especial benefit the statute was enacted; 2) whether there is any indication, either
explicit or implicit, of a legislative intent to create or deny such a remedy; and 3) whether
judicial implication is consistent with the underlying purposes of the legislative scheme."
Fischer v. Metcalf, 543 So.2d 785, 788 (Fla. 3rd DCA 1989); See Cort v. Ash, 422 U.S. 66
(1975).

§ 627.736, Florida Statutes, was not enacted to benefit medical providers. Plaintiffs are
not the class whose especial benefit the statute was enacted. The statute was enacted to protect
insureds from harm as a result of accidents with other drivers, and actions by insurance
companies. The statute was not enacted to ensure that medical providers received what they felt
was a reasonable wage. The legislature did not imply, nor can it be inferred, that the medical
providers were the parties the statute was enacted to protect. The Court cannot infer that the
Legislature intended to protect the medical providers with the enactment of § 627.736.
"Legislative intent, rather than duty to benefit a class of individuals, should be the primary factor
considered by a court in determining whether a cause of action exists when a statute does not
expressly provide for one." Murthy v. N. Sinha Corp., 644 So.2d 983, 985 (Fla. 1994).
Plaintiffs claim for relief based on Defendant's alleged violation of § 627.736, Florida, Statutes,
does not allege a cause of action.

---

[1] Out of a four part test.

6

The remaining issue is whether Plaintiffs may sue Defendant for paying them what they do not deem to be reasonable rates, as preferred providers. However, the term preferred provider is not mentioned in the insurance policy and Defendant's actions do not resemble the statute's definition of the term preferred provider. Therefore, Plaintiffs claim is based on being intended third party beneficiaries to Defendant's insurance policies. Plaintiffs are not in direct contractual privity with Defendant. "[T]he term 'privity' is a word of art derived from the common law of contracts and used to describe the relationship with persons who are parties to a contract." Espinosa v. Sparber, et al., 612 So.2d 1378, 1380 (Fla. 1993). Usually only parties to a contract may collect on the contract. However, "an intended third party beneficiary of a contract may recover damages from the contracting parties if they breach the contract." Jacobson v. Heritage Quality Construction Co., Inc., 604 So.2d 17, 18 (Fla. 4th DCA 1992). "Essential to the right of a third party beneficiary of a contract to maintain an action for its breach is a clear intent and purpose of the contract to directly and substantially benefit the third party." Thompson v. Commerical Union Insurance Company of N.Y., 250 So.2d 259, 262 (Fla. 1971). The insurance policies between Defendant and the insureds are clear in their intent to directly and substantially benefit Plaintiffs[2]. Plaintiffs, in the present action, "must plead the contract which was expressly for (their) benefit and one under which it clearly appears that (they were) a beneficiary." Weimar v. Yacht Club Point Estates, Inc., 223 So.2d 100, 102 (Fla. 4th DCA 1969). Plaintiffs properly pled that they were intended third party beneficiaries to defeat the motion to dismiss.

## III. CONCLUSION

Plaintiffs did not, nor could they, properly plead a cause of action under § 627.736(1)(a)

---

[2] Although this benefit is not the main crux of the insurance policy.

7

and (10) as the basis of Defendant's liability. The statute does not delineate that there exists such a cause of action exists, nor is the statute drafted to benefit medical providers. Plaintiffs do state a cause of action for breach of contract, in that they are the intended third party beneficiaries to the insurance policy, but not on the basis that they were improperly treated as preferred providers.

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Remand is hereby **DENIED**;

2. Defendant's Motion to Dismiss is hereby **GRANTED**; in part. Motion to Dismiss Count I is hereby Granted; Count I is dismissed with prejudice. Motion to Dismiss Count II is hereby **GRANTED**; Count II dismissed without prejudice, with leave to amend in accordance with this Order. An Amended Complaint shall be filed within then days of this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this _14_ day of April, 2000.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Peter Valeta, Esq.
Lawrence Kopelman, Esq.
David B. Shelton, Esq.

8