UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6061-CIV-FERGUSON/SNOW

DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

      Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,

      Defendant.

_____/



FILED by _____ D.C.

DEC 1 5 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff DR. PAUL ZIDEL ("DR. ZIDEL") on behalf of himself and all others similarly situated, by his undersigned counsel, sues Defendant ALLSTATE INSURANCE COMPANY ("ALLSTATE") and alleges as follows:

## THE PARTIES

1.    DR. ZIDEL is a licensed physician with a speciality in orthopedic surgery who resides in the Southern District of Florida and has his principal place of business at 301 N.W. 84th Avenue, Plantation, Florida.

2.    ALLSTATE is an insurance company incorporated under the laws of the State of Illinois with a principal place of business located at 2775 Sanders Road, Northbrook, Illinois. ALLSTATE transacts business in the Southern District of Florida.

3.    Non-Party COMMUNITY CARE NETWORK, INC. ("CCN") is a business entity incorporated under the laws of the State of California with its principal place of business in Nashville, Tennessee. CCN is not registered to do business in Florida.

7091-00100 302334.1



## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs and is between citizens of different states.

5.    This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, specifically 18 U.S.C. § 1961 et seq. (the "RICO Act").

6.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because ALLSTATE is subject to personal jurisdiction in this District.

## BACKGROUND

7.    ALLSTATE's standard Florida Automobile Insurance Policy (hereinafter the "Policy") provides Personal Injury Protection ("PIP") benefits to its insureds.

8.    With respect to payment of accident related medical expenses under PIP, ALLSTATE's policy of insurance states in pertinent part that ALLSTATE must pay eighty (80%) percent of all reasonable and necessary accident related medical expenses.

9.    ALLSTATE's Policy is a typical Florida indemnity insurance policy under which ALLSTATE is required to indemnify claimants for eighty (80%) percent of the full cost of their reasonable and necessary medical bills up to a defined limit.

10.    Under the Policy, an insured has the absolute right and freedom to choose his or her medical providers.

7091-00100 302334.1                                    2

11.     Within Policy limits, medical providers have the unrestricted right to be reimbursed

eighty (80%) percent of their reasonable and necessary accident related medical expenses.

12.     The State of Florida's PIP statute directly addresses a health care provider's right to

be paid for reasonable charges. Section 627.736(5), Florida Statutes ("Section 627.736") states:

> Any physician, hospital, clinic, or other person or institution lawfully rendering
> treatment to an injured person for bodily injury covered by personal injury protection
> insurance may charge only a reasonable amount for the products, services, and
> accommodations rendered ...

13.     Florida statutes permit an automobile insurance company to designate certain medical

providers as preferred providers *if* the automobile insurer establishes a legitimate preferred provider

organization ("PPO") network by satisfying the strict requirements of Section 627.736(10) which

provides as follows:

> (10) An insurer may negotiate and enter into contracts with licensed health care
> providers for the benefits described in this section, referred to in this section as
> "preferred providers," which shall include health care providers licensed under
> chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an
> insured to use a preferred provider at the time of purchase of the policy for personal
> injury protection benefits, if the requirements of this subsection are met. If the
> insured elects to use a provider who is not a preferred provider, whether the insured
> purchased a preferred provider policy or a non-preferred provider policy, the medical
> benefits provided by the insurer shall be as required by this section. If the insured
> elects to use a provider who is a preferred provider, the insurer may pay medical
> benefits in excess of the benefits required by this section and may waive or lower the
> amount of any deductible that applies to such medical benefits. If the insurer offers
> a preferred provider policy to a policy-holder or applicant, it must also offer a non-
> preferred provider policy. The insurer shall provide each policy-holder with a current
> roster of preferred providers in the county in which the insured resides at the time of
> purchase of such policy, and shall make such list available for public inspection
> during regular business hours at the principal office of the insurer within the state.

14.     ALLSTATE has not offered its insureds preferred policies for PIP automobile

insurance. As such, any medical provider who treated or treats an ALLSTATE insured under an

7091-00100 302334.1                            3

ATLAS PEARLMAN
ATTORNEYS AT LAW

ALLSTATE PIP auto insurance policy is not a "preferred provider." Therefore, in accordance with the above quoted statute, "the medical benefits provided by the insurer shall be as required by this section." (emphasis added). The medical benefits "required" are eighty (80%) percent of "all reasonable and necessary treatment, expenses..."

15.    Companies such as CCN are sometimes referred to as "brokers" or "managed care companies" in the health care industry. CCN contracts with health care providers, such as DR. ZIDEL, for the purpose of uniting health care providers with commercial payors to coordinate and arrange for the delivery of health care services to the payors' legitimate subscribers. CCN may also administer health care claims submitted by health care providers to insurance companies.

16.    The contracts entered into with health care providers by CCN require the health care providers to accept fees for services to subscribers at discounted rates from payors.

17.    Health care providers, by definition, include, but are not limited to, physicians, chiropractors, hospitals, pharmacies, and other health care facilities.

18.    Payors benefit by paying health care providers at discounted rates.

19.    Health care providers benefit by becoming part of the network of health care providers that are supposed to be marketed by payors to their subscribers and insureds through the use of directories and marketing tools, thus increasing the health care providers' volume of business referrals. Such health care providers are recognized as "preferred providers."

20.    The insurance policies sold or provided by the payors to their subscribers are recognized as "preferred provider policies."

21.    The combination of all parties to this endeavor is recognized as a Preferred Provider Organization ("PPO").

ATLAS PEARLMAN

22.     At all times material herein, DR. ZIDEL was a party to an agreement pursuant to which he agreed to provide his services to CCN PPO Subscribers. As consideration for this increased volume, DR. ZIDEL agreed to discount his normal fees. Thereafter, ALLSTATE began applying DR. ZIDEL's CCN contractual discount to DR. ZIDEL's medical bills for his patients who were injured in automobile accidents and covered by a Florida ALLSTATE PIP Policy.

23.     Section 627.736(10), provides a means for ALLSTATE to participate in such a PPO and offer a preferred provider policy for personal injury protection automobile insurance to its insureds after it enters into contracts with health care providers.

24.     ALLSTATE never became a legitimate participant in DR. ZIDEL's PPO and never complied with the requirements of the Section 627.736(10).

25.     Nevertheless, ALLSTATE has taken discounts on health care providers' bills as if it were a legitimate participant in DR. ZIDEL's PPO and had complied with Section 627.736 by offering a preferred provider policy of personal injury protection automobile insurance to its insureds, none of which was done by ALLSTATE.

26.     This unlawful practice (called a "Silent PPO") allows ALLSTATE to enjoy substantial savings and profits by paying out less in benefits which in turn causes DR. ZIDEL and those similarly situated to suffer financial loss, without any consideration from ALLSTATE for these discounts.

27.     ALLSTATE and middleman CCN have collectively engaged in the previously described "Silent PPO" scheme to reduce benefits paid on auto injury claims.

5

ATLAS PEARLMAN

28.     The "Silent PPO" scheme has emerged primarily in the context of indemnity plans. Indemnity insurers, such as ALLSTATE, obtain access to PPO networks of preferred providers and their discounts. ALLSTATE takes advantage of these discounts.

29.     ALLSTATE is not, however, entitled to take advantage of these legitimate PPO discounts under the terms and conditions of its Florida automobile insurance policies, the Florida PIP statutes, and the CCN PPO contract with DR. ZIDEL.

30.     ALLSTATE has not established the statutory prerequisites to be entitled to these PPO discounts.

31.     This Silent PPO scheme contains none of the legitimate steerage mechanisms required by legitimate PPOs. Legitimate steerage mechanisms include creating financial incentives for steering insureds to preferred providers such as lower premiums or lower co-payments, providing education and marketing information to insureds about preferred providers in the network, and printing and distributing preferred provider identification cards.

32.     By using the Silent PPO scheme, ALLSTATE enjoys substantial savings by paying PIP benefits without the attendant expense of establishing a legitimate PPO network.

33.     Legitimate managed care companies and insurers have knowledge of the illegality of such schemes. The American Association of Preferred Providers has denounced such practices and the American Medical Association has issued an "Action Alert Kit" to its members educating them about Silent PPO schemes.

34.     Without complying with the statutory prerequisites for the establishment of an automobile insurance PPO network, ALLSTATE has systematically discounted medical providers' PIP medical expenses by utilizing PPO discounts.



35.    ALLSTATE has illegitimately discounted hundreds of thousands of PIP medical expense claims in this manner without providing any steerage or other meaningful consideration for such discounts.

## FACTS AS TO PLAINTIFF

36.    On or about December 13, 1999, DR. ZIDEL entered into an agreement with CCN whereby he became a participating health care preferred medical provider (hereinafter referred to as a "CCN Preferred Provider").

37.    On December 13, 1999, DR. ZIDEL executed a "Community Care Network, Inc., Professional Care Provider Agreement" ("PPA") with CCN to become a CCN preferred provider. The PPA is attached hereto as Exhibit 1. Pursuant to the PPA agreement, DR. ZIDEL agreed to become a provider for CCN "Payor organizations which offer a preferred provider or exclusive provider health care coverage plan to beneficiaries or claimants". DR. ZIDEL's December 13, 1999 agreement does not allow CCN to allow automobile insurers or PPO discount brokers with automobile insurer clients access to DR. ZIDEL's preferred provider rates. DR. ZIDEL signed no agreement with CCN of any kind before December 13, 1999.

### The Illegitimate Discounting of DR. ZIDEL's Accident Related Medical Bills Based on CCN PPO Discounts either *before* or *after* December 13, 1999.

38.    Both before and after December 13, 1999, ALLSTATE had not offered a PPO endorsement to its automobile insureds. Moreover, ALLSTATE never offered its Florida automobile insureds premium reductions as an economic incentive to use preferred providers.

39.    DR. ZIDEL's PPA with CCN did not authorize the application of his discounts by automobile insurers or discount brokers who could not increase DR. ZIDEL's patient volume.

ATLAS PEARLMAN

Importantly, ¶s 19.01 and 19.02 of Exhibit 1 specifically prohibit disclosure of same. Increased patient volume was the consideration for DR. ZIDEL's discounts under Exhibit 1.

40.    Despite these known facts, CCN allowed ALLSTATE access to all of CCN's preferred provider's confidential and proprietary discount rates knowing that ALLSTATE was not a proper payor under Exhibit 1 and could not increase preferred provider patient volume.

41.    With CCN's consent, its database of preferred provider discounts was loaded into ALLSTATE's software and applied to all bills submitted to the ALLSTATE by CCN preferred providers such as DR. ZIDEL.

42.    In exchange for CCN's anticipated effort to increase his patient volume, DR. ZIDEL agreed with CCN to provide health care services to Subscribers of such Payors at a rate lower than DR. ZIDEL would normally accept for the same health care services.

43.    ALLSTATE obtained access to CCN's database that contained the identities of all of CCN's Preferred Providers, as well as the discounted fees that these health care providers were willing to accept for medical services.

44.    At no time did ALLSTATE have a written contract with DR. ZIDEL or other health care providers in Florida wherein health care providers agreed with ALLSTATE to discount charges for their medical services to patients injured in automobile accidents who were insured for PIP coverage by ALLSTATE.

45.    By virtue of ALLSTATE's access to the discounted rates in the agreements between CCN, DR. ZIDEL, and the class, ALLSTATE began to systematically apply PPO discounts.

46.    CCN and/or ALLSTATE have mailed explanation of benefit forms ("EOBs") that indicated the application of a discount based upon the CCN Preferred Provider Agreements.

ATLAS PEARLMAN

47.     These EOBs state that ALLSTATE is entitled to such discounts.

48.     Under this scheme, ALLSTATE has been reaping huge savings while violating Florida law and providing no consideration whatsoever to health care providers, including DR. ZIDEL, for the right to apply such discounts.

49.     At all times material herein, in the course of his medical practice, DR. ZIDEL provided medical care to patients who had been injured in automobile accidents and who were entitled to PIP benefits from ALLSTATE. DR. ZIDEL routinely received an assignment of benefits from his patients.

50.     At no time prior to their treatment with DR. ZIDEL did this class of patients receive any marketing materials, including, but not limited to, publications identifying DR. ZIDEL's name, address and available services, from ALLSTATE.

51.     At no time did ALLSTATE comply with the requirements of Section 627.736(10).

52.     At no time prior to their treatment with DR. ZIDEL did ALLSTATE encourage these patients to use DR. ZIDEL's medical services.

53.     After providing medical treatment to these patients, DR ZIDEL submitted medical bills for reasonable and necessary accident related medical expenses to ALLSTATE for payment.

54.     Upon receipt of the medical bills submitted by DR. ZIDEL for payment under the PIP portion of the ALLSTATE Automobile Policy, ALLSTATE discounted DR. ZIDEL's and other class members' bills by using the CCN PPO discounted rates claiming that ALLSTATE was entitled to said discount.

55.     CCN was paid a percentage of ALLSTATE's discount savings on each PIP medical expense claim.

ATLAS PEARLMAN
ATTORNEYS AT LAW

56. DR. ZIDEL and other class members have received no consideration from ALLSTATE for the discounts taken.

57. ALLSTATE could not provide such consideration because ALLSTATE failed to offer its insureds a PPO automobile insurance policy compliance with the Florida PIP statute.

58. ALLSTATE routinely and systematically applied the CCN PPO discounted rates to PIP medical expense claims.

59. At the time ALLSTATE implemented its PPO discounting scheme, it knew it was violating Florida law.

60. After taking the illegal discounts on DR. ZIDEL's and the class' bills, as described above, ALLSTATE routinely printed out EOBs showing the discounts. It then forwarded the EOBs and reduced payment checks to the health care providers in purported full satisfaction of the health care providers' medical charges.

61. It was and is the custom and practice of ALLSTATE to discount thousands of automobile medical expense claims in this manner in violation of its policies with its insureds and in violation of Florida's PIP statutes.

62. DR. ZIDEL and those similarly situated have been economically damaged and have suffered monetary losses as a result of the conduct of ALLSTATE.

## CLASS ACTION ALLEGATIONS

63. DR. ZIDEL brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class of all other persons and entities similarly situated. The class is defined to include:

all Florida health care providers whose bills for medical services rendered to patients covered by ALLSTATE's personal injury protection automobile insurance policies


ATLAS PEARLMAN

were discounted by ALLSTATE based upon a purported CCN Services, Inc. Preferred Provider Organization reduction.

64.    There are questions of law and fact that are common to all members of the class, which questions predominate over any question affecting only individual class members.

65.    The principal common issues include the following:

(a)    whether ALLSTATE violated Section 627.736, Florida Statutes by paying personal injury protection medical expense claims at discounted Preferred Provider rates;

(b)    whether ALLSTATE's processing of the PPO discounts is permissible under state law or federal law;

(c)    whether DR. ZIDEL and those similarly situated are entitled to compensatory, statutory, or punitive damages against ALLSTATE because of its illegal conduct; and

(d)    whether DR. ZIDEL and the class are entitled to an injunction preventing the continued disclosure and/or use of their discounts by ALLSTATE and the application of these discounts to automobile personal injury protection medical expense claims.

66.    The class is comprised of all health care providers whose medical bills were discounted by ALLSTATE based on CCN Preferred Provider discounts.

67.    The amounts of the discounts are contained in ALLSTATE's computer systems and on the EOBs and checks mailed by ALLSTATE to DR. ZIDEL and the members of the class.

68.    DR. ZIDEL's claims are typical of the claims of all members of the class because the claims are based on the same legal and remedial theories.

69.    DR. ZIDEL will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein.

ATLAS PEARLMAN

70.    DR. ZIDEL is similarly situated with, and has suffered similar injuries as, the members of the class that he seeks to represent.

71.    DR. ZIDEL has retained counsel experienced in class action cases and health care litigation.

72.    Neither DR. ZIDEL, nor counsel, have any interest that may cause them to not vigorously pursue this action.

73.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because:

(a)    the individual class members are not all aware that they have been wronged and are thus unable to prosecute individual actions;

(b)    concentration of the litigation concerning this matter in this Court is desirable;

(c)    the claims of the representative Plaintiff are typical of the claims of the members of the class;

(d)    a failure of justice will result from the absence of a class action; and

(e)    the class and the difficulties likely to be encountered in the management of this class action are not great.

74.    The class is so numerous as to make it impracticable to join all members of the class as plaintiffs.

75.    ALLSTATE has discounted thousands of medical bills based on CCN Preferred Provider discounted rates. Many health care providers may not even be aware of ALLSTATE's sophisticated scheme, and if they were, for many providers, the amount in controversy would be too small to justify the expense of pursuing individual litigation.



76.    In contrast, on a class-wide basis, ALLSTATE has saved millions of dollars by accessing and utilizing the discounted rates of health care Providers.

## AS AND FOR A FIRST
## CAUSE OF ACTION
### (Unjust Enrichment)

77.    DR. ZIDEL repeats and realleges each and every allegation contained in Paragraphs "1" through "76" above as if set forth fully herein.

78.    DR. ZIDEL and the class conferred benefits upon ALLSTATE by providing health care services to individuals insured by ALLSTATE.

79.    DR. ZIDEL and the class billed ALLSTATE the reasonable value for these services.

80.    ALLSTATE improperly paid these bills at reduced rates.

81.    ALLSTATE has provided no consideration to DR. ZIDEL and the class for the retention of the discounts by ALLSTATE.

82.    ALLSTATE has reaped the benefit of substantial monetary savings on PIP claims by wrongfully and illegally applying the CCN PPO discounted rates to Florida PIP medical expense claims.

83.    ALLSTATE had knowledge that it reaped said financial benefits to the detriment of DR. ZIDEL and the members of the class by voluntarily accepting and retaining said benefits.

84.    Such savings constitute unjust enrichment for ALLSTATE and it would be inequitable under the circumstances for ALLSTATE to retain the benefits received from DR. ZIDEL and the members of the class without paying the full value thereof to DR. ZIDEL and the class members.

ATLAS PEARLMAN

## AS AND FOR A SECOND
## CAUSE OF ACTION
### (Third-Party Beneficiary Breach of Contract)

85.    DR. ZIDEL repeats and realleges each and every allegation contained in Paragraphs "1" through "76" above as if set forth fully herein.

86.    ALLSTATE and its insureds who purchased its Florida PIP automobile insurance policy entered into a contract of insurance.

87.    ALLSTATE's contract provided that in the event an insured was involved in an automobile accident, ALLSTATE would pay, on the insured's behalf, eighty (80%) percent of all reasonable and necessary medical expenses incurred.

88.    DR. ZIDEL and the other members of the class provided medical services to ALLSTATE insureds who were injured in automobile accidents.

89.    DR. ZIDEL and the members of the class are intended third-party beneficiaries of ALLSTATE's automobile insurance agreements.

90.    DR. ZIDEL and the members of the class were to be paid 80% of all reasonable and necessary medical expenses incurred and billed.

91.    ALLSTATE breached the agreement by improperly paying medical expenses at reduced rates.

92.    As a result, DR. ZIDEL and the putative class members have suffered damages directly and proximately caused by ALLSTATE's breach of its insurance agreements with its insureds.

ATLAS PEARLMAN

## AS AND FOR A THIRD
## CAUSE OF ACTION
### (RICO Act Violations)

93.    DR. ZIDEL repeats and realleges each and every allegation contained in Paragraphs "1" through "76" above as if set forth fully herein.

94.    ALLSTATE, acting with middleman CCN, formed an association-in-fact enterprise designed to reduce payments made to CCN preferred providers on all Florida PIP medical expense claims submitted to ALLSTATE. The "association- in- fact" is known as a "silent PPO."

95.    ALLSTATE, with the knowing or grossly negligent cooperation of middleman CCN, participated, directly and indirectly, in the activities of this enterprise through a pattern of racketeering activity, as more fully set forth below.

96.    The activities of this enterprise affected commerce.

97.    The pattern of racketeering activity consisted of multiple acts of mail and wire fraud, punishable under 18 U.S.C. § 1341 and § 1343, respectively.

98.    The pattern of racketeering activity has been continuous for at least two years, and, on information and belief, will continue into the future.

99.    In furtherance of the pattern of racketeering activity, ALLSTATE and CCN have engaged in a continuous scheme and artifice to defraud DR. ZIDEL, and those similarly situated, of money as follows:

(a)    CCN solicited DR. ZIDEL and all other members of the class by mail to join its PPO network. CCN mailed its marketing materials and preferred provider agreements to potential preferred providers, including DR. ZIDEL, through the United States mails.



(b)     At all times material herein, CCN entered into a preferred provider agreement with DR. ZIDEL and the members of the class that did not authorize the disclosure, sale, lease or license of the preferred provider discounts contained under the agreement to ALLSTATE which was not, and could not, be without offering a PPO auto insurance policy, a legitimate payor under the agreement.

(c)     CCN entered into an agreement with ALLSTATE under which CCN disclosed, leased, sold and/or licensed the use of the confidential, proprietary CCN preferred provider database that included DR. ZIDEL's and class members' identity and preferred provider discount information.

(d)     In exchange for providing ALLSTATE with access to the identities of its preferred providers and their preferred provider discount rates CCN agreed to receive a fee consisting of a percentage of the savings realized by ALLSTATE for each CCN preferred provider discount applied to Florida PIP medical expense claims including those of DR. ZIDEL and the members of the purported class.

(e)     The identities of the CCN preferred providers and their preferred provider discount information were then used by ALLSTATE in a computerized system to take illegitimate discounts on Florida PIP medical expense claims submitted by DR. ZIDEL and members of the class for medical services performed by DR. ZIDEL and those similarly situated on ALLSTATE insureds who were not, and could not be, legitimate Subscribers under the CCN preferred provider contract:

(f)     After computer application of the CCN preferred provider discounts to Florida PIP medical expense claims, ALLSTATE then printed EOBs that falsely represented that ALLSTATE was entitled to apply the CCN PPO discount to Florida PIP medical expense claims.

Based on the application of the CCN PPO discount, ALLSTATE then reduced Florida PIP medical expense claims by such amounts. Copies of such an EOB is attached as Exhibit 1;

    (g)    By use of the United States mail, ALLSTATE, with the knowledge and consent of CCN, transmitted said EOBs and reduced claims checks to medical providers such as DR. ZIDEL and the members of the class, to ALLSTATE insureds, and/or to ALLSTATE insureds' attorneys;

    (h)    Said EOBs falsely represented that ALLSTATE was entitled to apply the CCN PPO discounts to Florida PIP medical expense claims submitted by DR. ZIDEL and members of the class;

    (i)    ALLSTATE engaged in interstate telephone calls and/or computer communications with middleman CCN to transmit information that was false and to exchange fees and compensation essential to the association-in-fact.

100.    In the above described manner, ALLSTATE was able to gain access to managed care contract rates for application to Florida PIP medical expense claims without providing any consideration to DR. ZIDEL or members of the purported class, and without ever entering into a managed care agreement with any medical providers.

101.    This scheme to sell and grant access to unauthorized proprietary discounts worth millions of dollars has directly caused monetary damages to DR. ZIDEL and members of the class.

102.    ALLSTATE's and CCN's conduct gives rise to claims under 18 U.S.C. § 1964(a) of RICO and permits the recovery of treble damages against the Defendants for violations of 18 U.S.C. § 1962 (c), for a conspiracy to violate 18 U.S.C. § 1962(a) in violation of 18 U.S.C. § 1962(d) and

7091-00100 302334.1        17

ATLAS PEARLMAN

for seeking to aid and abet and aiding and abetting violations of 18 U.S.C. § 1962(a) within the meaning of 18 U.S.C. § 2.

103.    DR. ZIDEL and the class members are "persons" within the meaning of 18 U.S.C. § 1964(c).

104.    At all times relevant hereto, DR. ZIDEL and class members were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

105.    With respect to the activities alleged herein, ALLSTATE and CCN acted at all times with malice toward the class, intent to engage in the conduct complained of for their own benefit and with knowledge that such conduct constituted unlawful activity. Such conduct was done with reckless disregard for the rights of the class as well as the laws, to which ALLSTATE and CCN are subject, the same amounting to actionable wantonness.

106.    With respect to the activities alleged herein, ALLSTATE and CCN aided and abetted each other, and others not named in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. §§ 1962(a) and (c).

107.    ALLSTATE and CCN operated the scheme or artifice to defraud and to obtain money by false pretenses and to deprive class members of the intangible right of honest payment.

108.    In furtherance of this scheme, ALLSTATE and CCN interfered with, obstructed, delayed or affected commerce by attempting to obtain and/or actually obtaining property interests, to which ALLSTATE and CCN are not entitled, through the exploitation of discount rates.

ATLAS PFARIMAN

109.    With respect to the overt acts and activities alleged herein, ALLSTATE communicated and conspired with middleman CCN to violate 18 U.S.C. §§ 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d).

110.    ALLSTATE communicated with middleman CCN so that it could participate directly in the fraudulent scheme or artifice alleged herein, to obtain money by false pretenses and to deprive class members of the intangible right of honest payment.

111.    ALLSTATE communicated with middleman CCN so that it could participate directly in the interference with, obstructing of, delaying of, or effect upon commerce by actually obtaining property interests to which ALLSTATE is not or was not entitled, through the exploitation of a proprietary discount rate.

112.    The numerous predicate acts of mail and wire fraud and interference with the operation of legitimate preferred provider discounts herein are part of a common fraudulent and extortionate scheme by ALLSTATE and CCN to defraud DR. ZIDEL and the purported class of money and property interests under false pretenses; to deprive DR. ZIDEL and the purported class of receipt of reasonable and necessary compensation for medical services; to interfere with the patient-doctor fiduciary relationship; and to place ALLSTATE's and CCN's financial interests over the confidential records of DR. ZIDEL and the class so that ALLSTATE and CCN could make greater profits.

113.    DR. ZIDEL, and the purported class, as victims of this unlawful pattern of illegal activity, have and continue to suffer losses.

ATLAS PEARLMAN

### A.    RACKETEERING ACTIVITIES.

114.    In carrying out the overt acts and fraudulent scheme described above, ALLSTATE and CCN engaged in *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§ 1341 and 1343. 18 U.S.C. §§ 1341 and 1346, 18 U.S.C. §§ 1343 and 1346, 18 U.S.C. § 1951(b)(2), 18 U.S.C. § 1952(a), 18 U.S.C. § 1954, and 18 U.S.C. § 961 et seq., as stated below.

115.    Section 1961(l) of RICO provides that "'racketeering activity' means. . . any act which is indictable under any of the following provisions of Title 18, United States Code ... Section 1341 (relating to mail fraud), Section 1343 (relating to wire fraud)."

116.    The United States Congress amended the mail and wire fraud statutes in 1988 by codifying a partial definition of the central term "scheme or artifice to defraud." The newly created definition of a "scheme or artifice" for purposes of specifically recognizing by statute certain unlawful acts also constituting mail and wire fraud violations under 18 U.S.C. §§ 1341 and 1343. respectively, now reads in its entirety as follows: "For purposes of this chapter, the term 'scheme or artifice' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

#### 1.    18 U.S.C. §§ 1341 and 1346, and 18 U.S.C. §§ 1343 and 1346

117.    For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, ALLSTATE and CCN, in violation of 18 U.S.C. § 1341 and § 1346, placed in United States Post Offices and/or in authorized repositories for mail, matter, matters and things to be sent or delivered by the United States Postal Service, and received matters and things therefrom and knowingly caused

7091-00100 302334.1                20

to be delivered by mail those matters and things according to the directions thereon or at the place
at which they were directed to be delivered by the persons to whom they were addressed.

118.    For the purpose of executing and/or attempting to execute its scheme to defraud and
to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to
execute its scheme or artifice to deprive another of the intangible right of honest services,
ALLSTATE and CCN, in violation of 18 U.S.C. §§ 1343 and 1346, transmitted in interstate
commerce by wire, telephone, or computer transmissions, information regarding illegal discounts.
In this manner, ALLSTATE, was knowingly violating obligations of middleman CCN to DR. ZIDEL
and others similarly situated to provide "honest services."

119.    ALLSTATE knowingly induced middleman CCN to deprive DR. ZIDEL and others
similarly situated of "honest services."

120.    In those matters and things sent or delivered by the United States Postal Service
referred to above, ALLSTATE and CCN falsely and fraudulently represented to DR. ZIDEL and the
class that:

(a)    ALLSTATE's payments were for the amount "billed" for the reasonable value
of the services, and

(b)    that ALLSTATE was entitled to a PPO discount for DR. ZIDEL and the class
under a system that legitimately provides education, marketing and economic incentives intended
to "steer" more patients  and to provide other benefits to health care providers. ALLSTATE failed,
however, to disclose to DR. ZIDEL and the class that its EOBs were based upon illegal discounts
designed to maximize profits on discounts illegally obtained  through DR. ZIDEL's proprietary
information.  ALLSTATE thus failed to disclose material facts regarding ALLSTATE's internal

21

ATLAS PEARLMAN

policies and practices specifically designed to reduce or limit the level of payment discussed in detail above.

121.    With respect to its unlawful activities described above, ALLSTATE and CCN also transmitted funds, contracts, and other forms of business communications and transactions in a continuous and uninterrupted flow across state lines and employed the United States mails and interstate wires in violations of 18 U.S.C. §§ 1341, 1343, and 1346.

122.    ALLSTATE and CCN intentionally and knowingly deceived DR. ZIDEL and the purported class referred to above for the purpose of financial gain. ALLSTATE and CCN either knew, or recklessly disregarded, that the illegal discounts described above were material.

123.    DR. ZIDEL and the class have been injured in their business or property by ALLSTATE's and CCN's overt acts and racketeering activities in amounts to be determined at trial.

## 2.    18 U.S.C. § 1951(b)(2)

124.    During the relevant times and in furtherance of and for the purpose of executing and/or attempting to execute the above discussed scheme and artifice to defraud or deprive, ALLSTATE and middlemen CCN, on numerous occasions aided and abetted and conspired to and attempted to and did interfere with, obstruct, delay or affect "commerce" as that term is defined in 18 U.S.C. § 1951.

125.    ALLSTATE unlawfully attempted to and/or did induce middleman CCN to cause DR. ZIDEL and numerous other health care providers to part with various property interests to which ALLSTATE was and is not entitled, including the intangible property right of health care providers to conduct their business free of fraud and their fiduciary obligation to provide their patients with privacy.

126. ALLSTATE's conduct induced middleman CCN to provide it with the names of health care providers and their discounts and exploited a fear of economic loss and/or loss of business by DR. ZIDEL and others similarly situated in violation of 18 U.S.C. § 1951(b)(2).

127. In furtherance of the scheme or artifice to defraud to obtain money by false pretenses from DR. ZIDEL and the class, ALLSTATE communicated with middleman CCN to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which ALLSTATE was not entitled through the exploitation of health care providers' fear of economic loss and/or loss of business by refusing to contest the aforesaid illegal discounts.

128. ALLSTATE either knew, or recklessly disregarded, that the natural consequences of its acts would exploit and continue to exploit fear of economic loss or loss of business by DR. ZIDEL and the class.

129. ALLSTATE's and CCN's overt acts and fraudulent and extortionate racketeering activities has and continues to defraud DR. ZIDEL and the members of the class, of money, has and continues to unlawfully influence and interfere with the relationship of middleman CCN and DR. ZIDEL and the purported class, as well as interfering with the fiduciary relationship between DR. ZIDEL, and members of the purported class and their patients.

130. DR. ZIDEL and the purported class have, therefor, been injured in their business or property by ALLSTATE's overt acts and racketeering activities in amounts to be determined at trial.

### 3. 18 U.S.C. § 1952(a).

131. During the relevant times, and in furtherance of and for the purpose of executing the above-described scheme and artifice to defraud DR. ZIDEL and the purported class, ALLSTATE

ATLAS PEARLMAN

and CCN, their employees, agents and others, on numerous occasions did travel and caused others not named in this Complaint to travel in interstate commerce in order to attempt to and to commit mail fraud and wire fraud in violation of the Travel Act, 18 U.S.C. § 1952(a).

132.    ALLSTATE's and CCN's overt acts and fraudulent racketeering activity has and continues to defraud DR. ZIDEL and the class of money.

## B.    PATTERN OF RACKETEERING ACTIVITY.

133.    ALLSTATE and CCN have engaged in a "pattern of racketeering activity" as defined in 18 U.S.C. 1961(5) of RICO by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years. Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including DR. ZIDEL and the class.

134.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by ALLSTATE and CCN, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefor, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

## C.    RICO VIOLATIONS OF 18 U.S.C. §§ 1962 (d).

135.    DR. ZIDEL's claim for relief also arises under 18 U.S.C. § 1964 (c) of RICO and seeks to recover actual and treble damages for ALLSTATE's and CCN's violations of 18 U.S.C. §§ 1962(c) and for its violations of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a) and (c).

ATI AC DEADI MAN

#### 1. Section 1962(c) claim.

136.    DR. ZIDEL repeats and realleges each and every allegation contained in Paragraphs "1" through "76" as if fully set forth herein.

137.    18 U.S.C. § 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

138.    18 U.S.C. § 1961(3) of RICO states that a "person" includes any individual or entity capable of holding a legal or beneficial interest in property.

139.    18 U.S.C. § 1961(4) of RICO defines enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

140.    For purposes of this 18 U.S.C. § 1962(c) claim, the persons consist of ALLSTATE and middleman CCN. The enterprise is an association in fact consisting of ALLSTATE and middleman CCN by virtue of its control over physicians, medical specialists, medical laboratories, hospitals, health care clinics, pharmacies, home health care agencies, and other miscellaneous health care providers, all of which have the purpose of providing health care services to ALLSTATE insureds making PIP claims under ALLSTATE's automobile insurance policies.

141.    This 18 U.S.C. § 1962(c) enterprise is distinct from ALLSTATE and includes many persons who are not employees of ALLSTATE and many entities that are not owned by ALLSTATE. The Section 1962(c) enterprise is engaged in, and its activities substantially affect, interstate commerce.

ATLAS PEARLMAN

142.    ALLSTATE is associated with middleman CCN in the 18 U.S.C. § 1962(c) enterprise as described above and conducts and participates in the affairs of that enterprise through the pattern of racketeering activity described herein. DR. ZIDEL and the purported class members are directly and proximately injured both by this pattern of activity and by ALLSTATE's conduct and participation, for which they are entitled to actual and treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

## 2.    Section 1962(d) Claim.

143.    DR. ZIDEL repeats and realleges each and every allegation contained in Paragraphs "1" through "76" as if fully set forth herein.

144.    This claim for relief also arises under 18 U.S.C. § 1964(c) of RICO and seeks to recover actual and treble damages for ALLSTATE's and CCN's violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a) and (c). Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

145.    18 U.S.C. § 1961(4) of RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

146.    18 U.S.C. § 1962 (a) of RICO provides that it "shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity... to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

147.    For purposes of the claim of a conspiracy in violation of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a), the persons under the latter subsection consist of ALLSTATE and middleman CCN and the enterprise consists of ALLSTATE and its investment division, which further profits from the ill-gotten gains.

148.    At all times relevant herein, middleman CCN and ALLSTATE's investment division together constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).

149.    The ALLSTATE investment division was and continues to be the investment beneficiary of additional monies realized from the above overt acts and fraudulent and extortionate scheme or activities to defraud DR. ZIDEL and the purported class of money and to deprive them of their intangible right of honest services from middleman CCN.

150.    ALLSTATE sells insurance nationwide. Assets generated from ALLSTATE's unlawful practices described herein are in the millions of dollars and the proceeds of such income amount to millions of dollars.

151.    ALLSTATE derived substantial income and proceeds through the above described pattern of racketeering activity, and conspired to use or invest, and did use or invest, directly or indirectly, a significant part of such income or proceeds in the operation of the enterprise described above, in violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a).

152.    This use or investment injures DR. ZIDEL and the purported class members because it permits that enterprise to continue, expand, and increase its revenue and to affect health care providers that are attacked by the enterprise. This use and investment directly and proximately injures purported class members in a manner that is distinct from the injury caused by the pattern of racketeering activity described herein.

153.     As demonstrated in detail above, ALLSTATE has engaged in numerous overt and
predicate fraudulent and extortionate racketeering acts in furtherance of the conspiracy, including
material misrepresentations and omissions designed to fraudulently require DR. ZIDEL and the
purported class to accept discounted payments, yet failing to disclose numerous internal systemic
fraudulent and extortionate policies and practices designed to defraud DR. ZIDEL and the class of
money, and to unlawfully interfere with their physician-patient relationship.

154.     ALLSTATE's pattern of fraudulent and extortionate racketeering acts include, but
are not limited to, acts in furtherance of its efforts to not disclose conflicts of interest brought about
by ALLSTATE's inducement to middleman CCN to allow ALLSTATE to defraud DR. ZIDEL and
the purported class.

155.     The nature of the above described acts of ALLSTATE constitutes material
misrepresentations that give rise to an inference that ALLSTATE knew it was violating the objective
of 18 U.S.C. § 1962(d) by violating 18 U.S.C. §§ 1962(a) and (c), through its ongoing fraudulent and
extortionate acts that have been and are part of an overall pattern of racketeering activity.

156.     As a direct and proximate result of ALLSTATE's overt acts and predicate acts in
furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate IS U.S.C. §§ 1962(a) and (c),
DR. ZIDEL and the class have been and are continuing to be injured in their business or property.

157.     Pursuant to 18 U.S.C. § 1964(c), DR. ZIDEL is entitled, therefore, to bring this action
on behalf of the purported class and to recover actual and treble damages, as well as the costs of
bringing this suit and attorneys' fees.

158.     ALLSTATE has sought to and has engaged in the commission of and continues to
commit overt acts and the aforesaid described unlawful racketeering predicate acts that have and

continue to generate income or proceeds received by ALLSTATE from such pattern of racketeering

activity, to-wit:

        (a)     multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and

1343;

        (b)     multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

        (c)     multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346;

        (d)     multiple instances of extortion violations of 18 U.S.C. § 1951(b)(2);

        (e)     multiple instances of travel in interstate commerce to attempt to and to

actually commit mail fraud, wire fraud, and extortion, in violation of 18 U.S.C. § 1952(a); and

        (f)     multiple instances of violations of 18 U.S.C. § 1954.

     159.    ALLSTATE's violations of the above federal laws and the effects thereof detailed

above are continuing and will continue unless injunctive relief prohibiting ALLSTATE's illegal acts

constituting a pattern of racketeering activity is fashioned and imposed by this Court.

## AS AND FOR A FOURTH
## CAUSE OF ACTION
### (Declaratory Judgment)

     160.    DR. ZIDEL repeats and realleges each and every allegation contained in Paragraphs

"1" through "76" above as if set forth fully herein.

     161.    As previously alleged, ALLSTATE has improperly taken advantage of discounts to

which it is not entitled for all the reasons that have been set forth in the previous paragraphs of this

Complaint.

162.    ALLSTATE has taken these discounts in breach of the terms and conditions of their automobile insurance policies. Said policies are indemnity policies that do not provide for preferred provider benefits or the application of preferred provider rates.

163.    By using CCN's preferred provider rates to limit the payment of DR. ZIDEL's and class members' PIP medical bills, ALLSTATE has imposed a limitation on benefits that is not contained in their automobile insurance policies. DR. ZIDEL and the class members are intended third-party beneficiaries of said insurance policies and are entitled to a declaration that ALLSTATE's payments of their PIP medical bills at preferred provider rates is a breach of the applicable insurance contracts.

164.    DR. ZIDEL on behalf of himself, and others similarly situated, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, ask this Court to declare that ALLSTATE has breached its insurance contracts by imposing a limitation on benefits not contained in said policies.

## AS AND FOR A FIFTH
## CAUSE OF ACTION
### (Violation of Section 627.736, Florida Statutes)

165.    DR. ZIDEL repeats and realleges each and every allegation contained in Paragraphs "1" through "76" above as if set forth fully herein.

166.    At all times material herein, DR. ZIDEL and the members of the class that he seeks to represent presented or had presented on their behalf reasonable and necessary medical charges to ALLSTATE for treatment of patients entitled to PIP medical expense benefits pursuant to a Florida automobile insurance policy issued by ALLSTATE.

7091-00100 302334 1                                    30

167.    Pursuant to Section 627.736, Florida Statutes:

(1)    **Required benefits.** Every insurance policy complying with the security requirements of s. 627.733 shall provide personal injury protection to the named insured, relatives residing in the same household, persons operating the insured motor vehicle, passengers in such motor vehicle, and other persons struck by such motor vehicle and suffering bodily injury while not an occupant of a self-propelled vehicle, subject to the provisions of subsection (2) and paragraph (4)(d), to a limit of $10,000 of loss sustained by any such person as a result of bodily injury, sickness, disease, or death arising out of the ownership, maintenance, or use of a motor vehicle as follows:

(a)    Medical benefits. Eighty percent of all reasonable expenses for necessary medical, surgical, X-ray, dental, and rehabilitative services, including prosthetic devices, and necessary ambulance, hospital, and nursing services. Such benefits shall also include necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person who relies upon spiritual means through a prayer alone for healing, in accordance with his religious beliefs.

. . .

(4)    **Benefits; when due.**

. . .

(g)    It is a violation of the insurance code for an insurer to fail to timely provide benefits as required by this section with such frequency as to constitute a general business practice.

168.    Effective October 1, 1991, as amended, effective October 1, 1992, Section

627.736(10), Florida Statutes provides:

An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section referred to in this section as "preferred providers" which shall include health care providers licensed under chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a nonpreferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical

benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy. The insurer shall provide each policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

169.    Pursuant to Section 627.736(10), Florida Statutes: "If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a non-preferred provider policy, the medical benefits provided by the insurer shall be as required by this section." (Emphasis added).

170.    Pursuant to Section 627.736(10), Florida Statutes: "If the insured elects to use a provider who is a preferred provider, the insurance may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits." (Emphasis added).

171.    In violation of the foregoing provisions of Section 627.736, ALLSTATE has implemented a policy and has conducted itself in a manner with such frequency as to constitute a general business practice whereby ALLSTATE has paid and continues to pay medical benefits at a rate less than the reasonable and necessary rate.

172.    ALLSTATE, as part of its general business practice, has been paying medical benefits at 80% of preferred provider rates.

173.    At all times material hereto, ALLSTATE did not offer preferred provider policies.

174.    Since ALLSTATE did not offer a preferred provider policies, ALLSTATE was required to pay 80% of all reasonable and necessary medical expenses.

175.    If ALLSTATE issued and sold preferred provider policies, ALLSTATE would then be entitled to pay medical benefits in excess of the benefits required and may waive or lower the amounts of any deductible that applies to such medical benefits.

176.    By paying PIP benefits at a preferred provider rate, ALLSTATE has significantly reduced its payments and obligations under PIP policies throughout the State of Florida.

177.    ALLSTATE's actions are in direct violation of Section 627.736.

178.    ALLSTATE has wrongfully reduced DR. ZIDEL's and the class members' PIP medical expense claims based on CCN preferred provider discounts.

179.    ALLSTATE is not entitled to said CCN preferred provider discounts. ALLSTATE has failed to offer insureds a PPO endorsement and also failed to otherwise comply with the requirements of Section 627.736(10).

180.    Despite this failure, ALLSTATE has reduced and continues to reduce PIP automobile insurance medical expense claims of DR. ZIDEL and the purported class members by accessing and applying CCN preferred provider discounts.

181.    Accordingly, an outstanding balance remains on all automobile insurance PIP medical expense claims that ALLSTATE has reduced based on CCN preferred provider discounts.

182.    Pursuant to Section 627.736(4)(b): "Personal injury protection insurance benefits paid pursuant to this section shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of same."

183.    Pursuant to Section 627.736(c): "All overdue payments shall bear interest at the rate of 10 percent per year."

184.   ALLSTATE has failed to pay the full amount of the reasonable and necessary medical expense billed by DR. ZIDEL and the class members within 30 days after ALLSTATE was furnished with written notice of the reasonable and necessary amount of the medical expense.

185.   ALLSTATE has failed to pay interest on the remaining balances owed to DR. ZIDEL and the class members.

186.   By reducing DR. ZIDEL's and the purported class members' legitimate medical expenses by the application of CCN preferred provider discount rates, ALLSTATE has violated Section 627.736.

187.   As a result of ALLSTATE's failure to comply with Section 627.736, DR. ZIDEL and the members of the purported class have suffered damages.

WHEREFORE, DR. ZIDEL and the class demand the following relief:

(a)   As to the First Cause of Action against ALLSTATE, compensatory damages;

(b)   As to the Second Cause of Action against ALLSTATE, compensatory damages;

(c)   As to the Third Cause of Action against ALLSTATE and CCN, compensatory damages, punitive damages, and injunctive relief;

(d)   As to the Fourth Cause of Action against ALLSTATE, a declaration that ALLSTATE's insurance practices are improper;

(e)   As to the Fifth Cause of Action against ALLSTATE, compensatory damages;

(f)   Attorneys' fees and costs where applicable;

(g)   A trial by jury on all issues so triable; and

(h)   Such other and further relief as the Court may deem just and proper.

ATLAS PEARLMAN, P.A.
Co-Counsel for Plaintiff
DR. PAUL ZIDEL
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301
(954) 763-1200

By:_____

JAN DOUGLAS ATLAS
Florida Bar No. 226246

By:_____

ERIC LEE
Florida Bar No. 961299

**Co-Counsel for Plaintiff**

GOLD & COULSON
A Partnership of Professional and
Limited Liability Corporation
11 S. LaSalle Street
Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A.
Bank of America Tower
Suite 1611
One Financial Plaza
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

### COMMUNITY CARE NETWORK, INC. PROFESSIONAL CARE PROVIDER AGREEMENT

This PROFESSIONAL CARE PROVIDER AGREEMENT ("Agreement") is made and entered into by and between Community Care Network, Inc. d.b.a. CCN, and  Paul Zickl, M.D. , a  Hand Surgeon  (hereinafter referred to as "Provider"):

### RECITALS

WHEREAS, CCN intends to execute contracts which Payor organizations which offer a preferred provider or exclusive provider health care coverage plan to Beneficiaries or Claimants; and

WHEREAS, Provider desires to make their services available to Beneficiaries or Claimants of Payors with whom CCN contracts; and

WHEREAS, CCN and Provider share the common goals of establishing a health care delivery system committed to the advancement of quality patient care, and developing innovative approaches to delivery of quality medical services in an efficient and cost-effective manner;

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, it is agreed by and between the parties hereto as follows:

### 1. DEFINITIONS

1.01    **"Beneficiary"** or **"Claimant"** is a person as defined in the applicable Insuring Agreement and who may be entitled to Health Care Services or Benefits.

1.02    **"CCN-Affiliated Health Plan"** is the health care plan offered, sponsored, administered or insured by Payor to provide coverage for Health Care Services or Benefits pursuant to the terms and conditions of this Agreement.

1.03    **"Claims Administrator"** is the Payor or the organization with the Payor has contracted to administer and process claims for the CCN-Affiliated Health Plan.

1.04    **"Health Care Services or Benefits"** shall be any and all covered medical services or benefits for such services rendered or provided to a Beneficiary or Claimant under an Insuring Agreement.

1.05    **"Insuring Agreement"** is the contract, certificate, policy, plan document, or any other legally enforceable instrument issued or sponsored by a Payor under which a Beneficiary or Claimant may be entitled to or receive Health Care Services or Benefits.

1.06    **"Payor"** is an employer, insurance carrier, claims administrator, health care service plan, trust, nonprofit facility service plan, any governmental unit or any other entity which has an obligation to provide Health Care Services or Benefits to a Beneficiary or Claimant.

1.07    **"Payor Agreement"** is an instrument between a Payor and CCN or its authorized representative which provides for CCN providers, including Provider pursuant to this Agreement, to render Health Care Services or Benefits at Reimbursement Amounts determined and established by CCN and such Payor.

1.08    **"Provider"** means the Provider who is duly licensed by the State of  Florida  to provide Health Care Services or Benefits.

### EXHIBIT A

1.09    **"Reimbursement Amounts"** are the amounts payable to Provider for  ealth Care Services or Benefits rendered or provided to a Beneficiary or Claimant pursuant to Payor Agreements between CCN and the respective Payors.  Such Reimbursement Amounts shall be established by CCN and Payors as specified in Exhibit A attached hereto and incorporated herein or as established by any state regulatory agency, whichever is less.  Providers shall not individually or collectively with other providers determine or establish such Reimbursement Amounts.

1.10    **"Utilization Review"** means the function performed by organization(s) or entity(ies) selected by Payors to review and recommend to Payors whether Health Care Services or Benefits provided, or to be provided, are Medically Necessary.

## 2. HEALTH CARE SERVICES OR BENEFITS

2.01    Provider hereby agrees to provide Health Care Services or Benefits to Beneficiaries or Claimants as set forth in Insuring Agreements, at the Reimbursement Amounts determined and established by CCN through Payor Agreements with Payors, which Payor Agreements are incorporated herein by reference. Such Reimbursement Amounts are set forth in Exhibit A attached hereto and incorporated herein.

2.02    Provider agrees to accept the Reimbursement Amounts in Exhibit A as payment in full for Health Care Services or Benefits provided, to Beneficiaries or Claimants.  Provider shall look solely to the Payor for payment of any and all compensation due for Health Care Services or Benefits and shall not bill or otherwise collect or attempt to collect from Beneficiaries or Claimants any charges except and unless required or permitted to do so by the applicable Insuring Agreement.  The foregoing restriction shall not apply to deductibles, co-payments or co-insurance which may be collected by Provider in accordance with the provisions of the applicable Insuring Agreement, nor to services or benefits rendered to Beneficiaries or Claimants which are not covered by the applicable Insuring Agreement.  Provider expressly covenants and agrees that CCN shall not be responsible or liable for, nor does CCN guarantee any payments to Provider for, any services rendered by Provider to Beneficiary or Claimant. 

2.03    Payor Agreements shall require Payors to make payments due from Payor to Provider within thirty (30) days of receipt by Payor of complete billings having sufficient information to reprice and/or adjudicate claim unless, within this thirty (30) day period, Provider is given written notice of Payor's inability to pay the claim because it is not complete, or there are issues related to coordination of benefits, subrogation, medical necessity or similar review.  If a Payor fails to make timely payments, CCN shall review the applicable Payor Agreement and take appropriate action as specified in the CCN Administrative Manual for Participating Providers.

## 3. TERM; TERMINATION

3.01    Following the effective date set forth herein, this Agreement shall be continued for consecutive annual terms thereafter, unless otherwise terminated.

3.02    This Agreement may be terminated by either party upon ninety (90) days written notice to the other party.

3.03    Provider agrees that if the Agreement is terminated, Provider shall exercise best efforts to notify all Beneficiaries or Claimants who are under Provider's care or seek services from Provider that Provider is no longer a CCN preferred provider.  For those Beneficiaries or Claimants under Provider's care who so desire, Provider shall transfer the Beneficiaries or Claimants to other appropriate CCN Provider(s).

3.04    Following termination of this Agreement, CCN shall notify Beneficiaries or Claimants of such termination through the regular periodic updating of CCN Provider listings for Beneficiaries or Claimants.

3.05    Notwithstanding Section 3.02, CCN may terminate or suspend this Agreement, at CCN's option, immediately upon the occurrence of any of the following events:

A) Provider fails to meet or fulfill CCN credentialing criteria;

B) Provider has made a material misrepresentation to CCN;

C) Provider's DEA certificate is revoked, restricted, or suspended;

D) Provider commits any act or engages in any conduct for which Provider's license may be revoked or suspended by the licensing authorities of the state in which the Provider is located (whether or not such licensing authorities revoke or suspend such license);

E) Whenever Provider is prohibited from participation in any federal or state healthcare entitlement program;

F) Provider's performance in providing Health Care Services or Benefits is unsatisfactory for reasons including but not limited to Provider disability and Provider inability to achieve CCN quality assurance standards. CCN shall make such determinations reasonably and in good faith. In such instances, Provider shall have the right to appeal CCN's determination;

G) Provider fails to maintain insurance coverage as required by CCN hereunder;

H) Provider fraudulently submits a claim for services; or

I) Provider ceases to maintain unrestricted active or courtesy admitting privileges at participating hospitals as may be required by CCN.

3.06 Provider shall notify CCN immediately upon the occurrence of any circumstances, including those set forth above, which would render this Agreement terminable by CCN.

3.07 Termination to this Agreement shall not affect any rights or obligations hereunder which shall have previously accrued, or shall thereafter arise with respect to any occurrence prior to termination, and such rights and obligations shall continue to be governed by the terms of this Agreement.

3 08 Either party to this Agreement has the right to terminate upon at least thirty (30) days prior written notice of such termination to the other party if the party to whom such notice is given materially breaches any provision of this Agreement. The party claiming the right to terminate shall set forth in the notice of termination the facts underlying its claims of breach and cite the relevant sections of this Agreement that are claimed to have been breached. Remedy of such breach to the satisfaction of the other party within thirty (30) days of the receipt of such notice shall revive this Agreement for the remaining portion of its then-current term, subject to any other rights of termination contained in this Agreement.

## 4. AUTHORIZATION TO CONTRACT

4.01 Provider authorizes CCN to act on its behalf to contract for the provision of Health Care Services or Benefits, at Reimbursement Amounts as set forth on Exhibit A.

4.02 Provider further authorizes CCN or other Claims Administrator, to coordinate and transmit billings to Payors for payment, on behalf of Provider.

## 5. COVENANTS OF PROVIDER

Provider covenants and agrees to the following:

5.01 To make available and render as appropriate Health Care Services or Benefits to Beneficiaries or Claimants which Provider is qualified by law to provide, which are medically necessary and consistent with the prevailing standards of quality of care generally accepted in their respective medical communities;



5.02    To comply with the requirements of all laws and regulations applicable to Provider's business and profession and ensure that all licenses, permits, authorizations and approvals required for that business and profession be maintained in effect for Provider as well as personnel employed or supervised by Provider, or acting on Provider's behalf;

5.03    To participate in and remain compliant with but not limited to CCN's and/or Payor's credentialing and recredentialing, medical management, utilization review quality assurance program, and which may be amended from time to time.  Provider agrees to provide any and all reasonable requested data and records in support of such programs;

5.04    To obtain and maintain throughout the term of this Agreement medical staff membership and active or courtesy privileges for the performance of Provider's duties hereunder at participating hospitals, if necessary for the rendition of Health Care Services or Benefits to Beneficiaries or Claimants;

5.05    To provide prompt availability and accessibility of Health Care Services or Benefits to Beneficiaries or Claimants in the same manner and quality as to all other patients;

5.06    To maximize the utilization of services that are alternatives to inpatient hospitalization and innovative delivery modes that promote more cost-efficient health care, which are consistent with Provider's professional judgment;

5.07    Except in an emergency and/or when medical necessity dictates, to admit Beneficiaries or Claimants, in each instance in which hospitalization is required, to a hospital contracting with CCN unless a Beneficiary or Claimant specifically requests otherwise after having been notified by Provider that the requested hospital is not a CCN hospital;

5.08    To obtain from each Beneficiary or Claimant a written assignment of benefits, an authorization to provide Health Care Services or Benefits to Beneficiary or Claimant and release of Beneficiary's or Claimant's medical records.  If a Beneficiary or Claimant refuses to provide such evidence of assignment, Provider may seek payment from the Beneficiary or Claimant directly with such payment limited to the Reimbursement Amounts defined in this Agreement;

5.09    To refer Beneficiaries or Claimants, in each instance in which referral is required, to other CCN Providers, unless Provider, in his/her professional judgment, determines that the Beneficiary's or Claimant's needs require otherwise and Beneficiary or Claimant so agrees after having been notified by Provider that the proposed provider is not a CCN Provider;

5.10    To permit CCN's representatives, including but not limited to utilization review committee members, and Payor representatives, upon reasonable advance written notice, to inspect specific aspects of the Health Care Services or Benefits provided to Beneficiaries or Claimants by Provider in response to concerns related to a Beneficiary or Claimant, or Payor;

5.11    To coordinate and transmit billings to Payors for payment, if required, in a format commonly used in the community and approved by CCN;

5.12    To provide Health Care Services or Benefits pursuant to all Payor Agreements executed between CCN and Payors;

5.13    To cooperate with Payors in expediting the return to work of ill or injured employed Beneficiaries or Claimants, consistent with Provider's professional judgment; and

5.14    To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant grievances.

## 6. COVENANTS OF CCN

CCN covenants and agrees to the following:

6.01    To accept sole responsibility for filing reports, obtaining approvals and complying with applicable laws and regulations of state, federal and other regulatory agencies having jurisdiction over CCN, provided however, that Provider agrees to cooperate by providing CCN with any information and assistance reasonably required in connection therewith;

6.02    To abide by a policy of non-interference with the professional relationship between any Beneficiary or Claimant and Provider;

6.03    To provide Provider periodically with an up-to-date list of Payors who have executed Payor Agreements with CCN specifying the respective Insuring Agreements pertaining thereto; and

6.04    To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant or Provider grievances.

## 7. RECORDS

7.01    CCN and Provider shall maintain records and procedures, as shall reasonably be required to accurately account for all Health Care Services and Benefits provided pursuant to this Agreement. Such records shall be kept in accordance with generally accepted accounting principles and recognized standards of professional practice.

7.02    CCN and Provider shall have the mutual right, upon request, to inspect and copy, upon reasonable advance notice and during normal business hours or at such other times as may be agreed upon, relevant accounting and administrative books and records, as they pertain to this Agreement. Such information shall be provided to each party hereto pursuant to procedures designed to protect the confidentiality of patient medical records in accordance with applicable legal requirements and recognized standards of professional practice.

7.03    CCN and Provider shall each maintain records with respect to any matters necessary for the proper administration of this Agreement.

7.04    Upon termination of this Agreement, Provider agrees to cooperate with Beneficiaries or Claimants and subsequent Providers with respect to the orderly and prompt transfer of medical records of Beneficiaries or Claimants. This Agreement does not preclude Provider from assessing reasonable charges for the expense of transferring such records if appropriate.

7.05    CCN shall have access to provider records for four (4) years from the date on which Provider supplied or provided Health Care Services or Benefits documented in such records, regardless of when the Agreement has been terminated.

## 8. INSURANCE REQUIREMENTS

8.01    **Professional Liability Insurance.** Provider shall carry professional liability insurance or an equivalent program of self-insurance in minimum amounts as specified and amended from time to time in the CCN Administrative Manual for Participating Providers. Provider shall notify CCN of cancellation or material modification of the coverage under such professional liability insurance at least thirty (30) days prior to any cancellation or modification. Certificates of insurance evidencing Provider's professional liability insurance coverage shall be provided to CCN no later than thirty (30) days following execution of this Agreement.

8.02    **General Liability Insurance.** Provider shall also maintain a policy or program of comprehensive general liability insurance, covering Provider's acts or failure to act, with minimum coverage as specified and amended from time to time in the CCN Administrative Manual for Participating Providers.

5                                                          PROFESSIONAL01/98

8 03   **Extended Insurance.** In the event Provider terminates this Agreement for any reason whatsoever, or if Provider changes insurance carriers, Provider agrees to maintain malpractice insurance coverage in the amount required under Section 8.01 of this Agreement for all Health Care Services or Benefits provided to Beneficiaries or Claimants until the statutes of limitation expire for the filing of malpractice claims pertaining to those Health Care Services or Benefits. Such insurance coverage may take the form of an "occurrence" policy covering claims made for services rendered no matter when the claims are filed, ongoing "claims made" insurance covering all claims filed during the period when the insurance is in force, or "tail insurance" coverage if the Provider cancels his/her "claims made" coverage.

## 9. ADMINISTRATIVE MANUAL

9.01   Provider agrees to comply with the requirements and procedures set forth in the Administrative Manual for Participating Providers ("Administrative Manual") which CCN shall provide for use by Provider, and the provisions of the Administrative Manual (as it may be amended by CCN in its sole discretion from time to time) are incorporated herein by this reference. CCN will distribute the Administrative Manual or any amendments to the Administrative Manual to Provider at least thirty (30) days prior to implementation or amendment. Notwithstanding Section 10.01 of this Agreement, any such amendment shall be effective thirty (30) days after such amendment has been distributed to Provider.  The Administrative Manual shall cover administration of this Agreement, Utilization Review/Quality Assurance Program, minimum professional and general liability insurance requirements for Provider, billing and accounting requirements for services rendered hereunder, and other matters as deemed necessary by CCN.

## 10. AMENDMENT

10.01   This Agreement or any part hereof, may be amended only by CCN at any time during the term of this Agreement with thirty (30) days prior written notice to the provider by CCN.  Provider shall have thirty (30) days after Provider receives written notice of such notice to provide CCN with written notice rejecting the amendment.  Failure of Provider to provide such written notice to CCN shall constitute Provider's acceptance of said amendment.  Except as provided above, any other amendment or modification of this Agreement shall be in writing and executed by each party hereto.

## 11. ASSIGNMENT

11 01   No assignment or delegation of the rights, duties or obligations hereunder shall be made without the mutual written consent of the parties hereto.  Notwithstanding the foregoing, CCN retains the right to assign this Agreement or delegate its performance hereunder in whole or in part, without Provider's consent, to any entity with which CCN or its parent company or any of its subsidiaries is affiliated.

## 12. DISPUTE RESOLUTION AND ARBITRATION

12.01   CCN and Provider agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

12.02   The sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits.  The parties shall mutually agree to the appointment of an impartial arbitrator within 30 days of the written request for the appointment of an arbitrator by any party.  The arbitrator must be familiar with the health care industry. In the event that mutual agreement cannot be obtained, then the American Arbitration Association shall appoint an arbitrator who is familiar with the health care industry if one can be located; and, if one cannot be located, then another arbitrator shall be appointed.  All arbitration proceedings shall be conducted in accord with the rules of the American Arbitration Association and the award shall be binding, final and conclusive on the parties. Any party may enforce the award rendered by the arbitrator in any court of competent jurisdiction.

12.03    In the event of any dispu.. as to the interpretation of any provision in ι    Agreement, there shall not be any inference made for or against either party by reason of such party proposing or modifying any provision.

## 13. INDEPENDENT CONTRACTOR

13.01    Provider, in furnishing Health Care Services or Benefits pursuant to this Agreement, does so as an independent contractor. Neither Provider nor CCN shall be construed to be the agent, employee, or representative of the other, except as specified in this Agreement.

13.02    Nothing contained herein shall be construed to prevent Provider from independently operating or participating in any other agreement or in providing health care services independent of this Agreement.

## 14. WAIVER

14.01    The waiver by either party of any breach of any provision of this Agreement or warranty or representation herein set forth shall not be construed as a waiver of any subsequent breach of the same or any other provision.

## 15. SEVERABILITY

15.01    If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated as a result of such decision.

## 16. GOVERNING LAW

16.01    This Agreement shall be construed and enforced in accordance with the laws of the State of _Florida_ as amended from time to time subject to any applicable federal law.

## 17. INDEMNIFICATION

17.01    Each party to this Agreement agrees to indemnify and hold harmless the other party and its directors, officers, employees and agents against any and all liability and expense, including defense costs and legal fees as they are incurred in connection with claims or demands for damages of any nature whatsoever including, but not limited to, bodily injury, death, personal injury or property damage arising from or caused by the indemnifying party's acts or failure to act or the acts or failure to act of its directors, officers, employees or agents.

## 18. NOTICES

18.01    Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall either be personally delivered or sent by registered or certified mail with the United States Postal Service, return receipt requested, postage prepaid, addressed to such party at its respective last known address.

## 19. CONFIDENTIALITY

19.01    The parties hereto shall maintain the confidentiality of any and all medical, financial and administrative records which shall be in their possession and control, and such information shall only be released or disseminated pursuant to the valid written authorization of the other party, Beneficiary or Claimant or as and when permitted under applicable law.

19.02  CCN and Provider shall hold any and all proprietary and confidei .1 information in the strictest confidence and shall not voluntarily or involuntarily, sell, transfer, publish, display or otherwise make available to others any portion of the other party's proprietary and confidential information.  Provider acknowledges that this Agreement, Amendments, and Exhibits hereto are deemed proprietary and confidential.  Provider agrees that the terms of 19.02 shall survive this Agreement for a period of two (2) years.

IN WITNESS THEREOF, the parties hereto have executed this Agreement by their duly authorized officers, and it shall be effective as of the 1st day of _**Augu͟s͟t**_ , 1998.

**PROVIDER**                                                        **CCN**

**FEDERAL TAX IDENTIFICATION #:**

65-0435831

_____
Signature

Paul Zidel, M.D.
_____
Please print name

M.D.
_____
Title

12/13/98
_____
Date

_____
Signature

Gavin Meshad
_____
Please print name Vice President, Southeast Region

_____
Title

8-1-98
_____
Date

PROFESSIONAL01/98

INSURANCE | RATES AND CONTRACTS | § 627.736

ent of Highway Safety and Motor
ation or termination of the required

*July 1, 2000*

registration has been suspended
tatement upon compliance with the
epartment of Highway Safety and
f $150 for the first reinstatement.
reinstatement and $500 for each
e first reinstatement. Any person
1 must also secure noncancelable
appropriate person proof that the
ment of Highway Safety and Motor
he person does not have a second
tement, the reinstatement fee shall
iod. In the event that a person's
is section or s. 316.646,only one
l the registration. All fees shall be
r Vehicles at the time of reinstate-
icles shall issue proper receipts for
way Safety Operating Trust Fund.
l be distributed from the Highway
ty or state agency which employed
izes a license plate pursuant to s.
e local government entity or state

*r 1, 2000*

been suspended pursuant to this
mpliance with the requirements of
vay Safety and Motor Vehicles of a
tatement. Such reinstatement fee
h subsequent reinstatement during
n reinstating her or his insurance
*rage as described in s. 627.7275(2)*
coverage is in force on a form
*Motor Vehicles, such proof to be*
cond reinstatement within 3 years
. fee shall be $150 for the first
collected by the Department of
nstatement. The Department of
receipts for such fees and shall
ing Trust Fund. One-third of the
m the Highway Safety Operating
igency which employed the law
ise plate pursuant to s. 324.201 or
nent entity or state agency for any

ise plate by a recovery agent shall
in the Highway Safety Operating

, c. 97-102, § 362, July 1, 1997; Laws
June 29, 1999; Laws 1999, c. 99-248,

## Historical and Statutory Notes

Laws 1997, c. 97-84, § 2, eff. Oct. 1, 1997, in subsec. (1), inserted ", a school bus as defined in 234.051,".

Laws 1997, c. 97-102, eff. July 1, 1997, removed gender-specific references applicable to human beings from volume 4 of the Florida Statutes without substantive changes in legal effect.

Laws 1998, c. 98-223, § 14, in the first sentence of subsec. (6), following "registration" deleted "and driver's license"; in subsec. (7)(a), in the first sentence, preceding "registration" deleted "driver's license of"; and deleted a sentence providing that in the event a license and registration was suspended pursuant to § 316.646, only one reinstatement fee would be paid to reinstate the license and registration.

Laws 1999, c. 99-3, § 34, eff. June 29, 1999, amended the section to conform to the redesignation of s. 768.28(14) as s. 768.28(15).

Laws 1999, c. 99-248, § 63, in subsec. (7), deleted the paragraph (a) designation and paragraph (b), which formerly read:

"(7)(a) Any operator or owner whose driver's license or registration has been suspended pursuant to this section or s. 316.646 may effect its reinstatement upon compliance with the requirements of this section and upon payment to the Department of Highway Safety and Motor Vehicles of a nonrefundable reinstatement fee of $150 for the first reinstatement. Such reinstatement fee shall be $230 for the second reinstatement and $500 for each subsequent reinstatement during the 3 years following the first reinstatement. Any person reinstating her or his insurance under this

subsection must also secure noncancelable coverage as described in s. 627.7275(2) and present to the appropriate person proof that the coverage is in force on a form promulgated by the Department of Highway Safety and Motor Vehicles, such proof to be maintained for 2 years. If the person does not have a second reinstatement within 3 years after her or his initial reinstatement, the reinstatement fee shall be $150 for the first reinstatement after that 3-year period. In the event that a person's license and registration are suspended pursuant to this section or s. 316.646, only one reinstatement fee shall be paid to reinstate the license and the registration. All fees shall be collected by the Department of Highway Safety and Motor Vehicles at the time of reinstatement. The Department of Highway Safety and Motor Vehicles shall issue proper receipts for such fees and shall promptly deposit those fees in the Highway Safety Operating Trust Fund. One-third of the fee collected under this subsection shall be distributed from the Highway Safety Operating Trust Fund to the local government entity or state agency which employed the law enforcement officer or the recovery agent who seizes a license plate pursuant to s. 324.201 or to s. 324.202. Such funds may be used by the local government entity or state agency for any authorized purpose.

"(b) One-third of the fee collected for the seizure of a license plate by a recovery agent, shall be paid to the recovery agent, and the balance shall remain in the Highway Safety Operating Trust Fund and be distributed pursuant to s. 321.245."

## Library References

Texts and Treatises
4 Fla Jur 2d, Automobiles and Other Vehicles § 39; 31 Fla Jur 2d, Insurance §§778, 784, 840.

4A Fla Jur 2d, Automobiles and Other Vehicles § 37, 410, 568, 305A Fla Jur 2d, Insurance § 2055; 31 Fla Jur 2d, Insurance §§2998, 3084.

## Notes of Decisions

**14. Set-offs**

Insured tort-feasor was entitled to set-off for personal injury protection (PIP) benefits that would have been payable to injured driver, who was uninsured in contravention of Florida's no-fault laws; uninsured driver was self-insured to extent of 80% of her own medical expenses, entitling insured tort-feasor to exemption from tort liability to same extent. Holt v. King, App. 4 Dist., 707 So.2d 1141 (1998).

Insured tort-feasor is entitled to personal injury protection (PIP) set-off against claimant who is uninsured in contravention of no-fault laws. Holt v. King, App. 4 Dist., 707 So.2d 1141 (1998).

**16. Self-insurers**

When party chooses to entirely forgo personal injury protection (PIP) insurance coverage, she becomes self-insured as to entirety of the mandatory coverage. Holt v. King, App. 4 Dist., 707 So.2d 1141 (1998).

## 627.736. Required personal injury protection benefits; exclusions; priority

(1) **Required benefits.**—Every insurance policy complying with the security requirements of s. 627.733 shall provide personal injury protection to the named insured, relatives residing in the same household, persons operating the insured motor vehicle, passengers in such motor vehicle, and other persons struck by such motor vehicle and suffering bodily injury while not an occupant of a self-propelled vehicle, subject to the provisions of subsection (2) and paragraph (4)(d), to a limit of $10,000 for loss sustained by any such person as a result of bodily injury, sickness, disease, or death arising out of the ownership, maintenance, or use of a motor vehicle as follows:

91

**§ 627.73´**                                              INSURANCE                                              RATES AND

(a) *Medical benefits*—Eighty percent of all reasonable expenses for necessary medical, surgical, X-ray, dental, and rehabilitative services, including prosthetic devices, and necessary ambulance, hospital, and nursing services. Such benefits shall also include necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person who relies upon spiritual means through prayer alone for healing, in accordance with his or her religious beliefs.

(b) *Disability benefits*—Sixty percent of any loss of gross income and loss of earning capacity per individual from inability to work proximately caused by the injury sustained by the injured person, plus all expenses reasonably incurred in obtaining from others ordinary and necessary services in lieu of those that, but for the injury, the injured person would have performed without income for the benefit of his or her household. All disability benefits payable under this provision shall be paid not less than every 2 weeks.

(c) *Death benefits*—Death benefits of $5,000 per individual. The insurer may pay such benefits to the executor or administrator of the deceased, to any of the deceased's relatives by blood or legal adoption or connection by marriage, or to any person appearing to the insurer to be equitably entitled thereto.

Only insurers writing motor vehicle liability insurance in this state may provide the required benefits of this section, and no such insurer shall require the purchase of any other motor vehicle coverage other than the purchase of property damage liability coverage as required by s. 627.7275 as a condition for providing such required benefits. Insurers may not require that property damage liability insurance in an amount greater than $10,000 be purchased in conjunction with personal injury protection. Such insurers shall make benefits and required property damage liability insurance coverage available through normal marketing channels. Any insurer writing motor vehicle liability insurance in this state who fails to comply with such availability requirement as a general business practice shall be deemed to have violated part X of chapter 626, and such violation shall constitute an unfair method of competition or an unfair or deceptive act or practice involving the business of insurance; and any such insurer committing such violation shall be subject to the penalties afforded in such part, as well as those which may be afforded elsewhere in the insurance code.

(2) **Authorized exclusions.**—Any insurer may exclude benefits:

(a) For injury sustained by the named insured and relatives residing in the same household while occupying another motor vehicle owned by the named insured and not insured under the policy or for injury sustained by any person operating the insured motor vehicle without the express or implied consent of the insured.

(b) To any injured person, if such person's conduct contributed to his or her injury under any of the following circumstances:

1. Causing injury to himself or herself intentionally; or

2. Being injured while committing a felony.

Whenever an insured is charged with conduct as set forth in subparagraph 2., the 30-day payment provision of paragraph (4)(b) shall be held in abeyance, and the insurer shall withhold payment of any personal injury protection benefits pending the outcome of the case at the trial level. If the charge is nolle prossed or dismissed or the insured is acquitted, the 30-day payment provision shall run from the date the insurer is notified of such action.

(3) **Insured's rights to recovery of special damages in tort claims.**—No insurer shall have a lien on any recovery in tort by judgment, settlement, or otherwise for personal injury protection benefits, whether suit has been filed or settlement has been reached without suit. An injured party who is entitled to bring suit under the provisions of ss. 627.730–627.7405, or his or her legal representative, shall have no right to recover any damages for which personal injury protection benefits are paid or payable. The plaintiff may prove all of his or her special damages notwithstanding this limitation, but if special damages are introduced in evidence, the trier of facts, whether judge or jury, shall not award damages for personal injury protection benefits paid or payable. In all cases in which a jury is required to fix damages, the court shall instruct the jury that the plaintiff shall not recover such special damages for personal injury protection benefits paid or payable.

(4) **Benefits; when due.**—Benefits due from an insurer under ss. 627.730–627.7405 shall be primary, except that benefits received under any workers' compensation law shall be

92

RATES AND

credited agains
accrues, upon r
incurred which
Agency for H
assistance unde
out of the ov
627.730–627.740

(a) An insur
accident involv
required by ss.

(b) Personal
overdue if not p
covered loss an
as to the entire
within 30 days
remainder of th
within 30 days
shall not be de
insurer is
furnished to th
overdue, payme
which is equiva
postpaid envelo

(c) All overd

(d) The insu
benefits for:

1. Accident
vehicle, or whil
contact with a r

2. Accident
America or its
motor vehicle.

3. Accident
household, und
provided the re
not himself or
under ss. 627.7

4. Accident
owner's motor
vehicle, if the
injured person

a. The own
627.730–627.740

b. Entitled
motor vehicle.

(e) If two or
same injury to
and any insur
insurers an eq
the claim.

(f) Medical j
the portion of
covered but is
whether the fu
benefits shall

*ecessary medical,
:es, and necessary
nclude necessary
of the state for an
: for healing, in*

l loss of earning
jury sustained by
1 others ordinary
erson would have
lisability benefits

er may pay such
sed's relatives by
ng to the insurer

vide the required
any other motor
ge as required by
y not require that
be purchased in
fits and required
rketing channels.
s to comply with
1 to have violated
of competition or
:; and any such
in such part. as

' same household
ot insured under
r vehicle without

her injury under

h 2., the 30-day
he insurer shall
:ome of the case
is acquitted, the
of such action.
No insurer shall
' personal injury
.ed without suit.
730—627.7405, or
' which personal
ll of his or her
e introduced in
:es for personal
required to fix
'er such special

)—627.7405 shall
on law shall be

credited against the benefits provided by subsection (1) and shall be due and payable as loss accrues, upon receipt of reasonable proof of such loss and the amount of expenses and loss incurred which are covered by the policy issued under ss. 627.730–627.7405. When the *Agency for Health Care Administration provides, pays, or becomes liable for medical assistance under the Medicaid program related to injury, sickness, disease, or death arising out of the ownership, maintenance, or use of a motor vehicle, benefits under ss. 627.730–627.7405 shall be subject to the provisions of the Medicaid program.*

(a) An insurer may require written notice to be given as soon as practicable after an accident involving a motor vehicle with respect to which the policy affords the security required by ss. 627.730–627.7405.

(b) Personal injury protection insurance benefits paid pursuant to this section shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of same. If written notice is not furnished to the insurer as to the entire claim, any partial amount supported by written notice is overdue if not paid within 30 days after such written notice is furnished to the insurer. Any part or all of the remainder of the claim that is subsequently supported by written notice is overdue if not paid within 30 days after such written notice is furnished to the insurer. However, any payment shall not be deemed overdue when the insurer has reasonable proof to establish that the insurer is not responsible for the payment, notwithstanding that written notice has been furnished to the insurer. For the purpose of calculating the extent to which any benefits are overdue, payment shall be treated as being made on the date a draft or other valid instrument which is equivalent to payment was placed in the United States mail in a properly addressed, postpaid envelope or, if not so posted, on the date of delivery.

(c) All overdue payments shall bear simple interest at the rate of 10 percent per year.

(d) The insurer of the owner of a motor vehicle shall pay personal injury protection benefits for:

1. Accidental bodily injury sustained in this state by the owner while occupying a motor vehicle, or while not an occupant of a self-propelled vehicle if the injury is caused by physical contact with a motor vehicle.

2. Accidental bodily injury sustained outside this state, but within the United States of America or its territories or possessions or Canada, by the owner while occupying the owner's motor vehicle.

3. Accidental bodily injury sustained by a relative of the owner residing in the same household, under the circumstances described in subparagraph 1. or subparagraph 2., provided the relative at the time of the accident is domiciled in the owner's household and is not himself or herself the owner of a motor vehicle with respect to which security is required under ss. 627.730–627.7405.

4. Accidental bodily injury sustained in this state by any other person while occupying the owner's motor vehicle or, if a resident of this state, while not an occupant of a self-propelled vehicle, if the injury is caused by physical contact with such motor vehicle, provided the injured person is not himself or herself:

a. The owner of a motor vehicle with respect to which security is required under ss. 627.730–627.7405; or

b. Entitled to personal injury benefits from the insurer of the owner or owners of such a motor vehicle.

(e) If two or more insurers are liable to pay personal injury protection benefits for the same injury to any one person, the maximum payable shall be as specified in subsection (1), and any insurer paying the benefits shall be entitled to recover from each of the other insurers an equitable pro rata share of the benefits paid and expenses incurred in processing the claim.

(f) Medical payments insurance, if available in a policy of motor vehicle insurance, shall pay the portion of any claim for personal injury protection medical benefits which is otherwise covered but is not payable due to the coinsurance provision of paragraph (1)(a), regardless of whether the full amount of personal injury protection coverage has been exhausted. The benefits shall not be payable for the amount of any deductible which has been selected.

§ 7.736                                    **INSURANCE**

(g) It is a violation of the insurance code for an insurer to fail to timely provide benefits as required by this section with such frequency as to constitute a general business practice.

(5) **Charges for treatment of injured persons.—**

(a) Any physician, hospital, clinic, or other person or institution lawfully rendering treatment to an injured person for a bodily injury covered by personal injury protection insurance may charge only a reasonable amount for the products, services, and accommodations rendered, and the insurer providing such coverage may pay for such charges directly to such person or institution lawfully rendering such treatment, if the insured receiving such treatment or his or her guardian has countersigned the invoice, bill, or claim form approved by the Department of Insurance upon which such charges are to be paid for as having actually been rendered, to the best knowledge of the insured or his or her guardian. In no event, however, may such a charge be in excess of the amount the person or institution customarily charges for like products, services, or accommodations in cases involving *no* insurance, provided that charges for cephalic thermograms and peripheral thermograms shall not exceed the maximum reimbursement allowance for such procedures as set forth in the applicable fee schedule established pursuant to s. 440 13.

(b) With respect to any treatment or service, other than medical services billed by a hospital for services rendered at a hospital-owned facility, the statement of charges must be furnished to the insurer by the provider and may not include, and the insurer is not required to pay, charges for treatment or services rendered more than 30 days before the postmark date of the statement, except for past due amounts previously billed on a timely basis under this paragraph. and except that, if the provider submits to the insurer a notice of initiation of treatment within 21 days after its first examination or treatment of the claimant, the statement may include charges for treatment or services rendered up to, but not more than, 60 days before the postmark date of the statement. The injured party is not liable for, and the provider may not bill the injured party for, charges that are unpaid because of the provider's failure to comply with this paragraph. Any agreement requiring the injured person or insured to pay for such charges is unenforceable. For emergency services and care as defined in s. 395 002 rendered in a hospital emergency department or for transport and treatment rendered by an ambulance provider licensed pursuant to part III of chapter 401, the provider is not required to furnish the statement of charges within the time periods established by this paragraph; and the insurer shall not be considered to have been furnished with notice of the amount of covered loss for purposes of paragraph (4)(b) until it receives a statement complying with paragraph (5)(d), or copy thereof, which specifically identifies the place of service to be a hospital emergency department or an ambulance in accordance with billing standards recognized by the Health Care Finance Administration. Each notice of insured's rights under s. 627.7401 must include the following statement in type no smaller than 12 points:

BILLING REQUIREMENTS.—Florida Statutes provide that with respect to any treatment or services, other than certain hospital and emergency services, the statement of charges furnished to the insurer by the provider may not include, and the insurer and the injured party are not required to pay, charges for treatment or services rendered more than 30 days before the postmark date of the statement, except for past due amounts previously billed on a timely basis, and except that, if the provider submits to the insurer a notice of initiation of treatment within 21 days after its first examination or treatment of the claimant, the statement may include charges for treatment or services rendered up to, but not more than, 60 days before the postmark date of the statement.

(c) Every insurer shall include a provision in its policy for personal injury protection benefits for binding arbitration of any claims dispute involving medical benefits arising between the insurer and any person providing medical services or supplies if that person has agreed to accept assignment of personal injury protection benefits. The provision shall specify that the provisions of chapter 682 relating to arbitration shall apply. The prevailing party shall be entitled to attorney's fees and costs. For purposes of the award of attorney's fees and costs, the prevailing party shall be determined as follows:

1. When the amount of personal injury protection benefits determined by arbitration exceeds the sum of the amount offered by the insurer at arbitration plus 50 percent of the

difference between the amount of the claim asserted by the claimant at arbitration and the amount offered by the insurer at arbitration, the claimant is the prevailing party.

2. When the amount of personal injury protection benefits determined by arbitration is less than the sum of the amount offered by the insurer at arbitration plus 50 percent of the difference between the amount of the claim asserted by the claimant at arbitration and the amount offered by the insurer at arbitration, the insurer is the prevailing party.

3. When neither subparagraph 1. nor subparagraph 2. applies, there is no prevailing party. For purposes of this paragraph, the amount of the offer or claim at arbitration is the amount of the last written offer or claim made at least 30 days prior to the arbitration.

4. In the demand for arbitration, the party requesting arbitration must include a statement specifically identifying the issues for arbitration for each examination or treatment in dispute. The other party must subsequently issue a statement specifying any other examinations or treatment and any other issues that it intends to raise in the arbitration. The parties may amend their statements up to 30 days prior to arbitration, provided that arbitration shall be limited to those identified issues and neither party may add additional issues during arbitration.

(d) All statements and bills for medical services rendered by any physician, hospital, clinic, or other person or institution shall be submitted to the insurer on a Health Care Finance Administration 1500 form, UB 92 forms, or any other standard form approved by the department for purposes of this paragraph. All billings for such services shall, to the extent applicable, follow the Physicians' Current Procedural Terminology (CPT) in the year in which services are rendered. No statement of medical services may include charges for medical services of a person or entity that performed such services without possessing the valid licenses required to perform such services. For purposes of paragraph (4)(b), an insurer shall not be considered to have been furnished with notice of the amount of covered loss or medical bills due unless the statements or bills comply with this paragraph.

(6) **Discovery of facts about an injured person; disputes.**—

(a) Every employer shall, if a request is made by an insurer providing personal injury protection benefits under ss. 627.730–627.7405 against whom a claim has been made, furnish forthwith, in a form approved by the department, a sworn statement of the earnings, since the time of the bodily injury and for a reasonable period before the injury, of the person upon whose injury the claim is based.

(b) Every physician, hospital, clinic, or other medical institution providing, before or after bodily injury upon which a claim for personal injury protection insurance benefits is based, any products, services, or accommodations in relation to that or any other injury, or in relation to a condition claimed to be connected with that or any other injury, shall, if requested to do so by the insurer against whom the claim has been made, furnish forthwith a written report of the history, condition, treatment, dates, and costs of such treatment of the injured person, together with a sworn statement that the treatment or services rendered were reasonable and necessary with respect to the bodily injury sustained and identifying which portion of the expenses for such treatment or services was incurred as a result of such bodily injury, and produce forthwith, and permit the inspection and copying of, his or her or its records regarding such history, condition, treatment, dates, and costs of treatment. Such sworn statement shall read as follows: "Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief." No cause of action for violation of the physician-patient privilege or invasion of the right of privacy shall be permitted against any physician, hospital, clinic, or other medical institution complying with the provisions of this section. The person requesting such records and such sworn statement shall pay all reasonable costs connected therewith. If an insurer makes a written request for documentation under this paragraph within 20 days after having received notice of the amount of a covered loss under paragraph (4)(a), the insurer shall pay the amount or partial amount of covered loss to which such documentation relates in accordance with paragraph (4)(b) or within 10 days after the insurer's receipt of the requested documentation, whichever occurs later. For purposes of this paragraph, the term "receipt" includes, but is not limited to, inspection and copying pursuant to this paragraph.

(c) In the event of any dispute regarding an insurer's right to discovery of facts about an injured person's earnings or about his or her history, condition, or treatment, or the dates and

costs of such treatment, the insurer may petition a court of competent jurisdiction to enter an order permitting such discovery. The order may be made only on motion for good cause shown and upon notice to all persons having an interest, and it shall specify the time, place, manner, conditions, and scope of the discovery. Such court may, in order to protect against *annoyance, embarrassment, or oppression, as justice requires, enter an order refusing* discovery or specifying conditions of discovery and may order payments of costs and expenses of the proceeding, including reasonable fees for the appearance of attorneys at the proceedings, as justice requires.

(d) The injured person shall be furnished, upon request, a copy of all information obtained *by the insurer under the provisions of this section, and shall pay a reasonable charge, if* required by the insurer.

(e) Notice to an insurer of the existence of a claim shall not be unreasonably withheld by an insured.

(7) **Mental and physical examination of injured person; reports.—**

(a) Whenever the mental or physical condition of an injured person covered by personal injury protection is material to any claim that has been or may be made for past or future' personal injury protection insurance benefits, such person shall, upon the request of an insurer, submit to mental or physical examination by a physician or physicians. The costs of any examinations requested by an insurer shall be borne entirely by the insurer. Such examination shall be conducted within the municipality where the insured is receiving treatment, or in a location reasonably accessible to the insured, which, for purposes of this paragraph, means any location within the municipality in which the insured resides, or any location within 10 miles by road of the insured's residence, provided such location is within the county in which the insured resides. If the examination is to be conducted in a location reasonably accessible to the insured, and if there is no qualified physician to conduct the examination in a location reasonably accessible to the insured, then such examination shall be conducted in an area of the closest proximity to the insured's residence. Personal protection insurers are authorized to include reasonable provisions in personal injury protection insurance policies for mental and physical examination of those claiming personal injury protection insurance benefits. An insurer may not withdraw payment of a treating physician without the consent of the injured person covered by the personal injury protection, unless the insurer first obtains a report by a physician licensed under the same chapter as the treating physician whose treatment authorization is sought to be withdrawn, stating that treatment was not reasonable, related, or necessary.

(b) If requested by the person examined, a party causing an examination to be made shall deliver to him or her a copy of every written report concerning the examination rendered by an examining physician, at least one of which reports must set out the examining physician's findings and conclusions in detail. After such request and delivery, the party causing the examination to be made is entitled, upon request, to receive from the person examined every written report available to *him or her or his or her representative concerning any examination*, previously or thereafter made, of the same mental or physical condition. By requesting and obtaining a report of the examination so ordered, or by taking the deposition of the examiner, the person examined waives any privilege he or she may have, in relation to the claim for benefits, regarding the testimony of every other person who has examined, or may thereafter examine, him or her in respect to the same mental or physical condition. If a person unreasonably refuses to submit to an examination, the personal injury protection carrier is no longer liable for subsequent personal injury protection benefits.

(8) **Applicability of provision regulating attorney's fees.—**With respect to any dispute under the provisions of ss. 627.730–627.7405 between the insured and the insurer, the *provisions of s. 627.428 shall apply.*

(9)(a) Each insurer which has issued a policy providing personal injury protection benefits shall report the renewal, cancellation, or nonrenewal thereof to the Department of Highway Safety and Motor Vehicles within 45 days from the effective date of the renewal, cancellation, or nonrenewal. Upon the issuance of a policy providing personal injury protection benefits to *a named insured not previously insured by the insurer thereof during that calendar year*, the insurer shall report the issuance of the new policy to the Department of Highway Safety and Motor Vehicles within 30 days. The report shall be in such form and format and contain such

information :
which  shall
department,
adopt rules r
the Departm
rules adopted
Florida Insu
issuance of r
are confident
for enforcem
data regardii
requirements
release, upoi
person's atto
the insurance
the requestir
form as prov

(b) Every
tion benefits
first named
reported by
notice shall a
and property
in the loss of
named insure
is for informa
to provide th

(10) An in
for the benef
which shall ii
The insurer
purchase of
subsection ar
whether the
the medical
insured elect
benefits in e>
of any dedu(
provider poli
policy.   The
providers in
and shall ma
principal offi(
Amended by 1
1997;  Laws  1

¹ Section 624

Laws 1996,
deleted referei
Statutes to co
Open Governm
1995, c. 95–217

Laws 1997, (
gender-specific
ings from volu
substantive cha

Laws 1998,
in subsec. (6)(b

information as may be required by the Department of Highway Safety and Motor Vehicles which shall include a format compatible with the data processing capabilities of said department, and the Department of Highway Safety and Motor Vehicles is authorized to adopt rules necessary with respect thereto. Failure by an insurer to file proper reports with the Department of Highway Safety and Motor Vehicles as required by this subsection or rules adopted with respect to the requirements of this subsection constitutes a violation of the Florida Insurance Code.[1]  Reports of cancellations and policy renewals and reports of the issuance of new policies received by the Department of Highway Safety and Motor Vehicles are confidential and exempt from the provisions of s. 119.07(1). These records are to be used for enforcement and regulatory purposes only, including the generation by the department of data regarding compliance by owners of motor vehicles with financial responsibility coverage requirements.  In addition, the Department of Highway Safety and Motor Vehicles shall release, upon a written request by a person involved in a motor vehicle accident, by the person's attorney, or by a representative of the person's motor vehicle insurer, the name of the insurance company and the policy number for the policy covering the vehicle named by the requesting party.  The written request must include a copy of the appropriate accident form as provided in s. 316.065, s. 316.066, or s. 316.068.

(b) Every insurer with respect to each insurance policy providing personal injury protection benefits shall notify the named insured or in the case of a commercial fleet policy, the first named insured in writing that any cancellation or nonrenewal of the policy will be reported by the insurer to the Department of Highway Safety and Motor Vehicles.  The notice shall also inform the named insured that failure to maintain personal injury protection and property damage liability insurance on a motor vehicle when required by law may result in the loss of registration and driving privileges in this state, and the notice shall inform the named insured of the amount of the reinstatement fees required by s. 627.733(7). This notice is for informational purposes only, and no civil liability shall attach to an insurer due to failure to provide this notice.

(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as "preferred providers," which shall include health care providers licensed under chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met.  If the insured elects to use a provider who is not a preferred provider, the medical benefits provided by the insurer shall be as required by this section.  If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits.  If the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy.  The insurer shall provide each policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

Amended by Laws 1996, c. 96–406, § 381, eff. July 3, 1996; Laws 1997, c. 97–102, § 1738, eff. July 1, 1997; Laws 1998, c. 98–270, § 2, eff. Oct. 1, 1998; Laws 1999, c. 99–8, § 262, eff. June 29, 1999.

[1] Section 624.01 et seq.

## Historical and Statutory Notes

Laws 1996, c. 96–406 was a reviser's bill which deleted references to § 119.14 throughout Florida Statutes to conform to the repeal of § 119.14, the Open Government Sunset Review Act, by Laws 1995, c. 95–217, § 1.

Laws 1997, c. 97–102. eff. July 1, 1997, removed gender-specific references applicable to human beings from volume 4 of the Florida Statutes without substantive changes in legal effect.

Laws 1998, c. 98–270, § 2, rewrote subsec. (5); in subsec. (6)(b), added the last two sentences; and

rewrote subsec. (7)(a)  Subsections (5) and (7)(a) formerly read:

"(5) Charges for treatment of injured persons — Any physician, hospital, clinic, or other person or institution lawfully rendering treatment to an injured person for a bodily injury covered by personal injury protection insurance may charge only a reasonable amount for the products, services, and accommodations rendered, and the insurer providing such coverage may pay for such charges direct-

liction to enter an
on for good cause
y the time, place,
to protect against
n order refusing
osts and expenses
s at the proceed-

rmation obtained
onable charge, if

ly withheld by an

red by personal
r past or future'
e request of an
is.  The costs of
insurer  Such
ed is receiving
ourposes of this
resides, or any
cation is within
ed in a location
to conduct the
ination shall be
ional protection
rotection insur-
jury protection
vsician without
on, unless the
as the treating
hat treatment

be made shall
n rendered by
ng physician's
y causing the
amined every
any examina-
dy requesting
osition of the
lation to the
ained, or may
idition  If a
y protection

any dispute
insurer, the

tion benefits
of Highway
cancellation,
i benefits to
ar year, the
Safety and
ontain such

ly to such person or institution lawfully rendering such treatment, if the insured receiving such treatment or his or her guardian has countersigned the invoice, bill, or claim form approved by the Department of Insurance upon which such charges are to be paid for as having actually been rendered, to the best knowledge of the insured or his or her guardian. In no event, however, may such a charge be in excess of the amount the person or institution customarily charges for like products, services, or accommodations in cases involving no insurance, provided that charges for cephalic thermograms and peripheral thermograms shall not exceed the maximum reimbursement allowance for such procedures as set forth in the applicable fee schedule established pursuant to s. 440.13. Every insurer shall include a provision in its policy for personal injury protection benefits for binding arbitration of any claims dispute involving medical benefits arising between the insurer and any person providing medical services or supplies if that person has agreed to accept assignment of personal injury protection benefits. The provision shall specify that the provisions of chapter 682 relating to arbitration shall apply. The prevailing party shall be entitled to attorney's fees and costs."

"(7)(a) Whenever the mental or physical condition of an injured person covered by personal injury protection is material to any claim that has been or may be made for past or future personal injury protection insurance benefits, such person shall, upon the request of an insurer, submit to mental or physical examination by a physician or physicians. The costs of any examinations requested by an insurer shall be borne entirely by the insurer. Such examination shall be conducted within the municipality of residence of the insured

or in the municipality where the insured is receiving treatment. If the examination is to be conducted within the municipality of residence of the insured and if there is no qualified physician to conduct the examination within such municipality, then such examination shall be conducted in an area of the closest proximity to the insured's residence. Personal protection insurers are authorized to include reasonable provisions in personal injury protection insurance policies for mental and physical examination of those claiming personal injury protection insurance benefits. An insurer may not withdraw payment of a treating physician without the consent of the injured person covered by the personal injury protection, unless the insurer first obtains a report by a physician licensed under the same chapter as the treating physician whose treatment authorization is sought to be withdrawn, stating that treatment was not reasonable, related, or necessary."

Laws 1998; c. 98-270, § 3, provides:

"(1) Paragraph (5)(c) of s. 627.736, Florida Statutes, as amended by section 2 of this act, shall apply to arbitrations commenced on or after the effective date of this act.

"(2) Paragraph (7)(a) of s. 627.736, Florida Statutes, as amended by section 2 of this act, shall apply to new and renewal policies with an effective date on or after the effective date of this act.

"(3) All other provisions of section 2 of this act shall apply to accidents occurring on or after the effective date of this act."

Laws 1999, c. 99-8, § 262, eff. June 29, 1999, substituted "Agency for Health Care Administration" for "Department of Health and Rehabilitative Services".

## Library References

### Texts and Treatises

30 Fla Jur 2d, Insurance § 380; 30A Fla Jur 2d, Insurance §§ 2055, 2058, 2059; 31 Fla Jur 2d, Insurance §§ 2998, 3001, 3003, 3005-3009, 3016-3020, 3030, 3039-3041, 3043, 3047, 3069, 3070, 3084, 3085, 3112, 3129, 3131, 3133; 31A Fla Jur 2d, Insurance §§ 3166, 3176, 3249, 3252-3259, 3297, 3383, 3394, 3395, 3399, 3430, 3467, 3759, 3819, 4210.

4 Fla Jur 2d, Automobiles and Other Vehicles § 112; 10 Fla Jur 2d, Conflict of Laws §§ 17, 44; 10 Fla Jur 2d, Constitutional Law § 345; 17 Fla Jur 2d, Damages § 39; 30 Fla Jur 2d, Insurance § 674; 31 Fla Jur 2d, Insurance §§ 777, 779-782, 784-786, 789, 797, 809, 923.

## Notes of Decisions

Arbitration 82
Class actions 63.5
Comparative negligence 13.5
Damages 72-75
   Medical expenses 73.5
Medical expenses, damages 73.5
Reasonableness and necessity 48.5

**2. —— Due process, validity**

Statute obligating a medical provider who takes assignment of a patient's claim for personal injury protection (PIP) benefits to arbitrate any dispute with the patient's PIP insurer over the claim

violates due process, as it singles out medical providers for the denial of access to a court and substitutes a prevailing-party standard for obtaining attorney fees for the statutory standard which insureds enjoy. Delta Cas. Co. v. Pinnacle Medical, Inc., App. 5 Dist., 721 So.2d 321 (1998), rehearing denied, review granted 732 So.2d 328.

**4. Construction and application**

Tort-feasor was entitled to offset in damages for medical bills already paid by automobile insurer under additional personal injury protection (APIP) coverage; tort-feasor was not entitled to offset for bills covered by APIP, but as yet unpaid by insur-

er, F.S.1991, §
Allan, App. 5 Di

Under statute insurance, if av pay portion of c . medical benefits not payable due less of whether has been exhau all situations w medical paymer extended to per pay merely he coverage. Allst 700 So.2d 110 (1

**6. Purpose**

Nothing in th protection (PIP) all reasonable e vices suggests normal dynamic den on the insur was unreasonab necessary. Der Dist., 723 So.2 So.2d 892.

**11. Self-prope**

Jitney is "sel of statute gove (PIP) benefits, passenger from surer of driver gressive Cas. In So.2d 543 (1997)

**13. Causation**

Statute entit part to recover benefits for inju a vehicle allows the most substa injury. Milgram 731 So.2d 134 (1

**13.5. Compara**

In determini defendants who ment in action the percentage gence was prop nomic damages subtraction of benefits; to init urged by the r portion of the fi defendant beca by the amount ligence. Assi v Inc., App. 5 Dis

**16. —— Caus**
      **tenance**

Fortune Ins. So.2d 139 (199 613 So 2d 3.



IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO. 95-13760-04

**JOHN DEL GARDO and MICHELLE**          CLASS REPRESENTATION
**DEL GARDO, on behalf of themselves**
**and all others similarly situated,**

        Plaintiffs,

vs.

**ALLSTATE INSURANCE COMPANY,**
**and ALLSTATE INDEMNITY**
**COMPANY,**

        Defendants.
_____/

## ORDER REGARDING PIP CLAIM PROCEDURES

THIS CAUSE is before the Court pursuant to Rule 1.220(e) of the Florida Rules of Civil
Procedure, upon a Stipulation and Agreement of Settlement entered into by and between the
Class and Defendant ALLSTATE INSURANCE COMPANY and ALLSTATE INDEMNITY
COMPANY (collectively "ALLSTATE").

WHEREAS, the Court having heard argument of Counsel, and having reviewed all of the
submissions presented with respect to the proposed Settlement between the Class and
ALLSTATE, in connection with the entry of the Final Judgment and Order Approving
Settlement in this matter, and

WHEREAS, the Court has determined that Final Judgment and Order Approving
Settlement in this matter is to be entered, and

WHEREAS, under the terms of the Final Judgment and Order Approving Settlement in
this matter, this Court further indicates its intention to enter an Order Regarding PIP Claim
Procedures, and

**EXHIBIT C**

WHEREAS, this Court has been fully advised by the parties hereto with regard to the applicable law under Florida Statutes, § 627.736 (10), and

WHEREAS, this Court finds that certain PIP claim procedures proposed by ALLSTATE, as reflected below are in compliance with and do not violate the applicable requirements of Florida Statutes, § 627.736 (10), it is hereby

ORDERED, ADJUDGED AND DECREED that:

1.    ALLSTATE's practice of entering into agreements with health care providers to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies does not violate the requirements of Florida Statutes. § 627.736 (10), under the conditions set forth in this Order;

2.    ALLSTATE is authorized and has agreed to provide information to PIP claimants at the time they submit their PIP claim to ALLSTATE that ALLSTATE has entered into agreements with certain health care providers to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies, which reduced rates shall be applicable with regard to services rendered to such ALLSTATE PIP claimants at least until such time as their applicable ALLSTATE PIP benefits are exhausted;

3.    ALLSTATE PIP claimants may also be informed by ALLSTATE at the time they submit their PIP claim to ALLSTATE of the identity of those certain health care providers which have agreed to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies, provided that those claimants are also informed that the decision to obtain treatment from such providers is strictly by voluntary choice, that the claimant may choose to change health care providers at any time without regard to whether or not the substitute provider selected was party to an agreement with ALLSTATE to charge reduced rates for services rendered to PIP claimants under ALLSTATE automobile insurance policies; and

4.    ALLSTATE PIP claimants who obtain treatment from  health care providers who are parties to agreements to charge reduced rates for services rendered by such providers under

ALLSTATE automobile insurance policies must be informed by ALLSTATE that their bills from such providers are subject to agreed, reduced rates and that he or she is only responsible for payment of 20% of the charges for those services based on the such reduced rates with regard to services rendered to such ALLSTATE PIP claimants at least until such time as their applicable ALLSTATE PIP benefits are exhausted.

5.      The notices attached as Exhibits "A," "B" and "C" hereto provide, in form and substance, adequate notice regarding the ALLSTATE business practices which are the subject of this Order.

DONE and ORDERED THIS _____ day of _____, 1999.

HONORABLE  PATRICIA  COCALIS
CIRCUIT COURT JUDGE

Copies furnished:
Larry Kopelman, Esq.
Eric Lee, Esq.
David Shelton, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6269-CIV-DIMITROULEAS

DRS. MARTIN MAY, ALAN LAZAR,
MARTIN HALE, JOEL RUSH, PAUL ZIDEL,
RICHARD LINN, RICHARD BERKOWITZ,
DOUGLAS STRINGHAM, ANDREW
ELLOWITZ, ALAN NOVICK, DEBRA WEISS,
and NEIL SCHECHTER,



Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY,

Defendant.
_____/

## ORDER ON MOTION TO REMAND
## AND MOTION TO DISMISS

THIS CAUSE is before the Court upon Plaintiffs', Drs. Martin May, Alan Lazar, Martin

Hale, Joel Rush, Paul Zidel, Richard Linn, Richard Berkowitz, Douglas Stringham, Andrew

Ellowitz, Alan Novick, Debra Weiss and Neil Schechter Motion for Remand, filed herein on

March 14, 2000 and Defendant, Allstate Insurance Company's Motion to Dismiss, filed herein

on March 1, 2000. The Court has carefully reviewed the motions and is otherwise fully advised

in the premises.

## I. BACKGROUND

Plaintiffs are doctors, who practice under the names "Park Place Therapeutic Center" and

"Park Place Orthopaedics & Rehabilitation." As this entity, they submit claims to Allstate for

payment on behalf of persons insured by Allstate for personal injury protection benefits, and

receive payments from Allstate.

1

RECEIVED
APR 1 7 2000

**EXHIBIT D**

Defendant, Allstate, sells automobile insurance policies in Florida which contain personal injury protection, pursuant to Florida law. Under the PIP coverage, Allstate agrees to pay 80% of reasonable charges for necessary medical treatment provided to covered insured who suffer injury in an automobile accident. Plaintiffs claim that the amount that they have received, pursuant to bills they have sent to Defendant, of work they have done on Defendant's insureds, is "substantially less than [Allstate] is statutorily and contractually obligated to pay."

On January 21, 2000, Plaintiffs filed a two Count Complaint in the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida. The action was timely removed. The Complaint is for: 1) Declaratory Relief; and 2) Breach of Contract.

Plaintiffs seek remand to State Court, arguing that the amount of PIP benefits paid to Plaintiffs pursuant to illegally obtained discounts by Defendant, compared to the amounts that should have been paid, can not be determined with certainty. They could potentially exceed or fall below the necessary jurisdictional amount, and therefore Defendants cannot provide, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional requirement. Defendant counters this argument by stating that Plaintiffs are engaged together in the practice of medicine, submit the claims together, and receive payments together. Defendant submits the Explanation of Medical Bill Payments and Health Insurance Claim Forms as evidence that Plaintiffs are engaged in a united practice of medicine.

Defendant next moves to dismiss this action. It argues that Plaintiffs do not allege that Allstate offers "preferred provider" PIP coverage under the policy. The insured are entitled to choose the health care provider they want, on their own. Plaintiffs claim that Defendant pays PIP claims for medical benefits at 80% of "preferred provider" rates. Defendant argues that it is not required to offer a "preferred provider" policy to its insured and therefore, has not failed to pay

2

PIP benefits as required by § 627.736, Florida Statutes. Defendant also argues that the

Complaint does not establish that it breached an obligation under the PIP coverage or §

627.736(10), Florida Statutes, by paying medical benefits at a "reasonable" rate, if it is less than

what Plaintiffs request. Defendant's last argument is that there is no private cause of action

permitted for violations of § 627.736(10). In sum, Defendant claims Plaintiffs do not state a

claim.

Plaintiffs, in their two page response, argue that they strongly disagree with Defendant's

arguments in the dismissal motion, and aver that they do state a claim.

## II. DISCUSSION

### A. Remand

"Any civil case filed in state court may be removed by the defendant to federal court if

the case could have been brought originally in federal court." Tapscott v. MS Dealer Service

Corp., 77 F.3d 1353, 1356 (11ᵗʰ Cir. 1996). Federal Jurisdiction should be found, unless it

appears within "a legal certainty that the claim is really for less than the jurisdictional amount."

Id. at 1356. However, "[w]here a plaintiff has made an unspecified demand for damages, a lower

burden of proof is warranted because there is simply no estimate of damages to which a court

may defer. Id. at 1356-57; See Gafford v. General Electric Company, 997 F.2d 150, 160 (6ᵗʰ Cir.

1993).

Plaintiffs claim that the amount of controversy in this action can only be determined by

calculating the amount of PIP benefits paid individually, to Plaintiffs. However, Plaintiffs are

engaged together in the practice of medicine under two names, "Park Place Therapeutic Center"

and "Park Place Orthopaedics & Rehabilitation." Plaintiffs submit forms to receive payment,

and receive payment collectively. The Health Insurance Claim Forms, submitted by Defendant,

3

shows that the I.D. Number of Referring Physician contains the same tax number on each sheet.
Additionally, in the space marked "Physician's, Supplier's Billing Name...," Park Place
Therapeutic Center is noted on each form. On the Explanation of Medical Bill Payment,
submitted by Defendant, in the space marked, "Treatment Rendered By," is the name Park Place
Therapeutic Center. "[W]hen several plaintiffs unite to enforce a single title or right, in which
they have a common and undivided interest, it is enough if their interests collectively equal the
jurisdictional amount." Troy Bank of Troy, Indiana v. G.A. Whitehead & Company, 222 U.S.
39, 40-41 (1911). The aggregate amount of the reduction of payments clearly exceeds the
$75,000 threshold necessary to confer jurisdiction on this Court.

## B. Dismiss

It is long settled that a complaint should not be dismissed unless it appears beyond a
doubt that the plaintiff could prove no set of facts in support of his claim which would entitle
him to relief. Conley v. Gibson, 355 U.S. 41 (1957). The allegations of the claim must be taken
as true and must be read to include any theory on which the plaintiff may recover. See Linder v.
Portocarrero, 963 F.2d 332, 334-336 (11th Cir.1992) (citing Robertson v. Johnston, 376 F.2d 43
(5th Cir.1967)). There must be a showing that the plaintiff has no claim before granting a motion
to dismiss. June Vernon and Delroy Vernon v. Medical Management Associates of Margate,
Inc., 912 F.Supp. 1549 (S.D.Fla. 1996).

Defendant's first argument is that the Complaint fails to allege a breach of contract or
violation of § 627.736. Plaintiffs allege in their Complaint, that Allstate pays PIP claims for
medical benefits at 80% of "preferred provider" rates. However, Plaintiffs fail to define
"preferred provider" rates, nor do they allege that such rates were not reasonable. Plaintiffs
claim, then, that because Allstate does not provide an option to insureds to purchase a "preferred

4

provider" policy for PIP benefits, it breached its contracts of insurance with its insureds and violated § 627.736(10) by paying at those rates. Therefore, Plaintiffs' only allegation is that Allstate is paying certain health care providers reduced rates which those providers have agreed to accept for medical services covered under the Allstate PIP contracts.

Plaintiffs, in the Complaint, claim that Defendant's standard policy does not comply with § 627.736(1)(a), which necessitates a party to have personal injury protection of "[e]ighty percent of all reasonable expenses for necessary medical..." Plaintiffs claim that they provided medical treatment, and were paid less than what is statutorily and contractually obligated to pay. However, Plaintiff's claims are not based on this Florida Statute.

Plaintiffs also argue that Defendant refers to Plaintiffs actions as "preferred providers," and such designation is improper. § 627.736(10), Florida Statutes, states in pertinent part, "(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as 'preferred providers,' which shall include health care providers...The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits..." Plaintiffs attached the insurance policy to the Complaint. The Court may consider the policy for purposes of a motion to dismiss. Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1369 (11th Cir. 1997); Smith Barney, Inc. v. Scanlon, 180 F.R.D. 444, 446 (S.D.Fla. 1998). Such consideration of a document attached to Plaintiff's complaint does not convert the motion to dismiss into a motion for summary judgment. Id. The policy does not contain the term "preferred providers," and Plaintiffs are not the parties the statute is meant to protect. Additionally, the statute does not state that Defendant must offer a "preferred providers" plan, but only regulates those parties that choose to do so.

5

Defendant argues that the statute was not enacted to benefit medical providers, and therefore, does not allow Plaintiffs to rely on it as their basis for damages. In Fischer v. Metcalf, the Third District Court of Appeals discussed three criteria[1] which are pertinent to whether the legislature intended a statute to benefit a party. They are, "1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; 2) whether there is any indication, either explicit or implicit, of a legislative intent to create or deny such a remedy; and 3) whether judicial implication is consistent with the underlying purposes of the legislative scheme." Fischer v. Metcalf, 543 So.2d 785, 788 (Fla. 3rd DCA 1989); See Cort v. Ash, 422 U.S. 66 (1975).

§ 627.736, Florida Statutes, was not enacted to benefit medical providers. Plaintiffs are not the class whose especial benefit the statute was enacted. The statute was enacted to protect insureds from harm as a result of accidents with other drivers, and actions by insurance companies. The statute was not enacted to ensure that medical providers received what they felt was a reasonable wage. The legislature did not imply, nor can it be inferred, that the medical providers were the parties the statute was enacted to protect. The Court cannot infer that the Legislature intended to protect the medical providers with the enactment of § 627.736. "Legislative intent, rather than duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists when a statute does not expressly provide for one." Murthy v. N. Sinha Corp., 644 So.2d 983, 985 (Fla. 1994). Plaintiffs claim for relief based on Defendant's alleged violation of § 627.736, Florida, Statutes, does not allege a cause of action.

---

[1] Out of a four part test.

The remaining issue is whether Plaintiffs may sue Defendant for paying them what they do not deem to be reasonable rates, as preferred providers. However, the term preferred provider is not mentioned in the insurance policy and Defendant's actions do not resemble the statute's definition of the term preferred provider. Therefore, Plaintiffs claim is based on being intended third party beneficiaries to Defendant's insurance policies. Plaintiffs are not in direct contractual privity with Defendant. "[T]he term 'privity' is a word of art derived from the common law of contracts and used to describe the relationship with persons who are parties to a contract." Espinosa v. Sparber, et al., 612 So.2d 1378, 1380 (Fla. 1993). Usually only parties to a contract may collect on the contract. However, "an intended third party beneficiary of a contract may recover damages from the contracting parties if they breach the contract." Jacobson v. Heritage Quality Construction Co., Inc., 604 So.2d 17, 18 (Fla. 4th DCA 1992). "Essential to the right of a third party beneficiary of a contract to maintain an action for its breach is a clear intent and purpose of the contract to directly and substantially benefit the third party." Thompson v. Commerical Union Insurance Company of N.Y., 250 So.2d 259, 262 (Fla. 1971). The insurance policies between Defendant and the insureds are clear in their intent to directly and substantially benefit Plaintiffs[2]. Plaintiffs, in the present action, "must plead the contract which was expressly for (their) benefit and one under which it clearly appears that (they were) a beneficiary." Weimar v. Yacht Club Point Estates, Inc., 223 So.2d 100, 102 (Fla. 4th DCA 1969). Plaintiffs properly pled that they were intended third party beneficiaries to defeat the motion to dismiss.

## III. CONCLUSION

Plaintiffs did not, nor could they, properly plead a cause of action under § 627.736(1)(a)

---

[2] Although this benefit is not the main crux of the insurance policy.

7

and (10) as the basis of Defendant's liability. The statute does not delineate that there exists such

a cause of action exists, nor is the statute drafted to benefit medical providers. Plaintiffs do state

a cause of action for breach of contract, in that they are the intended third party beneficiaries to

the insurance policy, but not on the basis that they were improperly treated as preferred

providers.

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Remand is hereby **DENIED**;

2. Defendant's Motion to Dismiss is hereby **GRANTED**; in part. Motion to Dismiss

Count I is hereby Granted; Count I is dismissed with prejudice. Motion to Dismiss Count II is

hereby **GRANTED**; Count II dismissed without prejudice, with leave to amend in accordance

with this Order. An Amended Complaint shall be filed within then days of this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this _14_ day of

April, 2000.

WILLIAM P. DIMITROULEAS

United States District Judge

Copies furnished to:

Peter Valeta, Esq.
Lawrence Kopelman, Esq.
David B. Shelton, Esq.

8