## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

**Civil Action No. 00-CIV-6061 Ferguson/Snow**

| | |
|---|---|
| DR. PAUL ZIDEL and All Others<br>Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY,<br><br>Defendant/Third-Party Plaintiff,<br><br>v.<br><br>COMMUNITY CARE NETWORK, INC.,<br>d/b/a CCN,<br><br>Third-Party Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**NIGHT BOX**
**FILED**

OCT - 3 2001

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

### CCN'S PARTIALLY UNOPPOSED
### MOTION TO COMPEL ARBITRATION

Third-Party Defendant, CCN Managed Care, Inc. ("CCN"), moves for the entry of an order staying or dismissing this litigation and compelling arbitration of the claims asserted herein. Defendant/Third-Party Plaintiff Allstate Insurance Company ("Allstate") does not oppose this motion, but Plaintiff Paul Zidel does. In support of this motion, CCN states:

1.    Plaintiff, Dr. Paul Zidel, alleges that he was a part of CCN's healthcare provider network, and agreed to discount his fees for patients insured by CCN's "payor" clients. Defendant Allstate was one of CCN's payor clients.



2. CCN is based in San Diego, California, and develops and markets health care provider networks in 48 of the 50 states. [Declaration of Dave Cowan attached as Exhibit A][1] There are approximately 368,000 healthcare providers and facilities that are members of CCN's networks. Id. Members of CCN's networks agree to discount their usual and customary charges to patients insured by CCN's "payor" clients -- e.g. insurance companies, employers, third-party administrators, and the like. Id. CCN provides its network members with a variety of services, including marketing and administrative support. Id. CCN's network providers routinely conduct business with CCN's national headquarters in San Diego and CCN's regional offices. Id.

3. Accordingly, CCN operates in interstate commerce, and the Federal Arbitration Act, 9 U.S.C. § 1 et seq., governs this motion.

4. Plaintiff's amended complaint (the first complaint naming CCN as a defendant) asserted a variety of claims against CCN and Allstate. However, each of the claims relied on the same core factual allegation -- that the contract between Plaintiff and CCN (the "Provider Agreement") did not allow CCN to give Payor clients such as Allstate access to CCN's network.

5. The Provider Agreement contains an arbitration clause, and CCN filed a motion to stay the litigation and compel arbitration. The merits of this motion were clear, so rather than respond to the motion, Plaintiff elected to dismiss his claims against CCN.

6. However, Plaintiff's claims have not proceeded to arbitration. Instead, Plaintiff simply continued his case against Allstate, which eventually brought CCN back into the case through the filing of a third-party complaint.

7. Though the alignment of the parties has shifted, the base issue presented by Plaintiff's claims, now embodied in the second amended complaint, remains the same -- whether

---

[1] The attached declaration is a copy of the original, which is already of record as an attachment to CCN's prior motion to compel arbitration, filed in November 2000.

the terms of Plaintiff's Provider Agreement precluded CCN from affording Allstate with access to its network. Plaintiff's claims against Allstate presume (and actually allege) the existence of the Provider Agreement, as well as CCN's alleged obligation under that Agreement to limit network access. Plaintiff's legal theories depend on a showing that the conduct for which recovery is sought was not allowed by the Provider Agreement. Moreover, even though Plaintiff seeks no recovery from CCN, Plaintiff's claims against Allstate involve allegations of interdependent, concerted conduct by CCN and Allstate, which would clearly fall within the arbitration provision if asserted against CCN.

8.     Because the Provider Agreement requires arbitration as the "sole and exclusive remedy for the resolution of any and all demands, disputes, claims or lawsuits", CCN requests that the Court stay this litigation in its entirety, and compel arbitration of the claims asserted herein.

9.     A copy of the Provider Agreement is attached to Plaintiff's second amended complaint. For convenience, an additional copy is attached hereto as Exhibit B.

## Memorandum of Law

CCN develops health care provider networks, and markets those networks to its "payor" clients such as insurance companies. Network members agree to discount their fees for medical treatment provided to patients insured by CCN's clients. CCN maintains and markets provider networks in 48 of the 50 states. There are approximately 368,000 healthcare providers and facilities that are members of CCN's network.

Plaintiff Zidel, a hand surgeon, joined the CCN network by executing the Community Care Network Inc. Professional Care Provider Agreement (the "Provider Agreement"). A copy

3

of the Provider Agreement is attached.    The Provider Agreement contains the following

arbitration clause:

> The sole and exclusive remedy for the resolution of any and all demands, disputes, claims or lawsuits shall be binding arbitration, as the parties do not want the delay or expense of lawsuits.    The parties shall mutually agree to the appointment of an impartial arbitrator within 30 days of the written request for the appointment of any arbitrator by any party.    The arbitrator must be familiar with the health care industry.    In the event that mutual agreement cannot be obtained, then the American Arbitration Association shall appoint an arbitrator who is familiar with the health care industry if one can be located; and if one cannot be located, then another arbitrator shall be appointed.    All arbitration proceedings shall be conducted in accord with the rules of the American Arbitration Association and the award shall be binding, final and conclusive on the parties. Any party may enforce the award rendered by the arbitrator in any court of competent jurisdiction.

Provider Agreement, at ¶ 12.02 (emphasis added).    The instant motion seeks to enforce this

provision.

## A.    The Federal Arbitration Act.

### 1.    The scope of the Federal Arbitration Act.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, is applicable to all "written

provision[s] in . . . a contract evidencing a transaction involving commerce." 9 U.S.C. § 2.    The

phrase "involving commerce" has been interpreted to extend the Act's coverage "expansively as

coinciding with that of the Commerce Clause." See Allied-Bruce Terminix Cos., Inc. v. Casarotto,

513 U.S. 265, 274 (1995), citing Perry v. Thomas, 482 U.S. 483, 490 (1987) (the Act "embodies

Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the

commerce clause").

CCN operates a statewide and nationwide network of physicians and health care providers

and provides access to those networks to insurance companies, employers and other third parties

seeking to provide health care for their employees, insureds or beneficiaries.    CCN's principal place

4

of business is in San Diego, California. CCN transacts business with both its network providers and its payor clients across state lines, as evidenced by the fact that the Contract at issue here is between citizens of different states. Accordingly, by virtue of CCN's interstate activities, the Provider Agreement necessarily "involves commerce" within the meaning of the FAA. 9 U.S.C. § 2. See Allied-Bruce, 513 U.S. at 269, 272-73. See also In re Managed Care Litigation, 132 F. Supp. 2d 989, 993 (S. D. Fla. 2000) (because managed care companies operated in interstate commerce, Federal Arbitration Act governed motions to compel arbitration).

### 2. The Court should compel arbitration and dismiss or stay these proceedings.

Courts are to honor and enforce arbitration provisions agreed to by the parties. 9 U.S.C. §§ 3-4; Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1984) ("By its terms the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). CCN's motion to compel arbitration thus requires but a simple, two-part analysis -- (1) did the parties agree to arbitrate their disputes; and (2) do the claims at issue fall within the scope of the arbitration provision. See AT&T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 649-50 (1986).

#### (a) *The parties agreed in writing to arbitrate disputes.*

As described above, the Contract contains a provision requiring the parties to arbitrate any disputes. "[A]rbitration agreements are no more than contracts to which the usual rules of contract interpretation apply," and "when the parties clearly and unmistakably intended to refer a dispute to arbitration, their will must be respected." Singer v. Smith Barney Shearson, 926 F. Supp. 183, 187 (S.D. Fla. 1996). The pertinent part of paragraph 12.02 states "[t]he *sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration* as the

5

parties do not want the delay or expense of lawsuits." The arbitration clause is in writing, signed by Plaintiff, and demonstrates an intent to arbitrate all disputes within its ambit.

**(b)** *This dispute is subject to the Contract's arbitration clause.*

It is presumed that claims arising out of a contract that includes an arbitration provision should be arbitrated. See AT&T Tech., 475 U.S. at 650. "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985). This presumption of arbitrability stems from a strong federal policy favoring arbitration of disputes. See e.g. Southland Corp. v. Keating, 465 U.S. 1, 9 (1984) (enacting the FAA "Congress declared a national policy favoring arbitration"); Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). All doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration -- "the parties' intentions control, but those intentions are generously construed as to the issues of arbitrability." Mitsubishi Motors Corp., 473 U.S. at 626 (emphasis added). See also AT&T Tech, 475 U.S. at 650; Moses, 460 U.S. at 24-5. [2]

Section 12.02 of the Agreement expressly provides for arbitration of "any demands, disputes, claims or lawsuits," without exception. This is a very broad standard. In this litigation, the second amended complaint alleges that Plaintiff executed the Provider Agreement and became a member of CCN's preferred provider organization, and that CCN's payor client,

---

[2] In analyzing the complaint, the Court should focus on Plaintiff's allegations rather than the labels attached to the causes of action. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 622 n.9 (1985); J. J. Ryan & Sons, Inc. v. Rhone Puelenc Textile, S.A., 863 F.2d 315 (4th Cir. 1988) ("To decide whether an arbitration agreement encompasses a dispute a court must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim.") Thus a claim may assert tort or statutory liability, rather than breach of contract, and still fall within a contract's arbitration clause. **The Courts have specifically held that the federal presumption in favor of arbitrability extends to statutory claims, such as Plaintiff's RICO claims.** See In re Managed Care Litigation, 132 F. Supp. 2d at 993 (presumption applies to statutory claims with equal force; if plaintiff's claims "touch matters" resolved by the agreement, then those claims are to be arbitrated irrespective of how the allegations are labeled).

Allstate, inappropriately accessed that network, i.e. applied the CCN discount to Plaintiff's claims for treatment of Allstate's insureds.[3] It is also alleged that Allstate and CCN conspired to deprive Plaintiff of the alleged benefit of the Provider Agreement, i.e. the benefit of "steerage" in return for the discounted medical fees.[4] Accordingly, the claims require an adjudication of Plaintiff's alleged rights and expectations under the Provider Agreement, and also involve allegations relating to CCN's performance under the Agreement. This would fall within the broad scope of the Agreement's arbitration clause even without the legal presumption in favor of arbitrability.[5]

## B.    The Florida Arbitration Code.

CCN contends that the Federal Arbitration Act governs the instant dispute. However, should the Court decide that CCN is not engaged in interstate commerce, the Florida Arbitration Code (the "FAC") would also require that this dispute be referred to arbitration.

The FAC provides that parties "may include in a written contract a provision for the settlement by arbitration of any controversy thereafter arising between them" and that the agreement to arbitrate shall be "valid, enforceable and irrevocable." § 682.02, Fla. Stat. (2000). When presented with a motion to compel arbitration, a court "is limited to determining (1) whether a valid written arbitration agreement exists containing an arbitration clause, (2) whether an arbitrable issue exists, and (3) whether the right to arbitrate was waived." Seifert v. U.S. Home Corp., 750 So.2d

---

[3] See e.g. Second Amended Complaint at ¶¶ 22-27.

[4] See e.g. Second Amended Complaint at ¶¶ 99-102, 105-112, 133-35, 140-42 and 147-49. The Second Amended Complaint often refers to the loss of its alleged contractual benefit to "steerage" by labeling the alleged conspirators as a "silent PPO" (see e.g. Second Amended Complaint at ¶ 31) or alleging that Allstate could not be a "legitimate" payor under the Provider Agreement because it did not offer what Plaintiff considers to be a legitimate PPO product with suitable steerage (see e.g. Second Amended Complaint at ¶ 99-b).

[5] Plaintiff cannot legitimately dispute that the central focus of his claims fall within the arbitration provision's scope. Indeed, Plaintiff initially demanded that CCN arbitrate this dispute before (apparently) abandoning his request in favor of

633, 636 (Fla. 1999). See also Piercy v. School Board of Wash. Cty., 576 So.2d 806, 807 (Fla. 1ˢᵗ DCA 1991); Gale Group, Inc. v. Westinghouse Elec. Corp., 683 So.2d 661, 662-63 (Fla. 5ᵗʰ DCA 1996). Because the instant dispute satisfies all of these requirements, CCN's motion should be granted.

## 1.    The Contract contains a valid arbitration clause.

The Contract's arbitration clause meets the requirements for validity in Florida. The clause satisfies all requirements to constitute a binding contractual agreement, and demonstrates the parties' "intent to submit a dispute to a third party for resolution." Piercy, 683 So.2d at 663. See also Larry Kent Homes, Inc. v. Empire of Am., FSA, 474 So.2d 868 (Fla. 5ᵗʰ DCA 1985). The Provider Agreement requires that "[t]he sole and exclusive remedy for the resolution of any and all demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits." Because the arbitration clause is mutually binding and shows that the parties intended to arbitrate future disputes between them, the Provider Agreement's clause is valid and enforceable.

## 2.    The claims asserted are subject to arbitration.

Any doubts about the scope of the arbitration clause must be resolved in CCN's favor -- "[a]rbitration is a favored means of dispute resolution and *courts should resolve doubts concerning the scope of such agreements in favor of arbitration*." Stinson-Head, Inc. v. City of Sanibel, 661 So.2d 119, 120 (Fla. 2ⁿᵈ DCA 1995)(emphasis added). See also Regency Group, Inc. v. McDaniels, 647 So.2d 192, 193 (Fla. 1ˢᵗ DCA 1994); Royal Carribean Cruises v. Universal Employment Agency, 664 So.2d 1107, 1108 (Fla. 3ʳᵈ DCA 1995); Federal Vending, Inc. v. Steak & Ale of Fla., 687 So.2d 1366, 1368 (Fla. 4ᵗʰ DCA 1997). The analysis set forth

this litigation. See letter from Lawrence M. Kopelman to Community Care Network/CCN dated May 3, 2000, attached hereto as Exhibit C.

8

above with respect to the FAA applies here as well. Because the scope of the Agreement's arbitration clause is clearly broad enough to encompass Plaintiff's claims, CCN's motion should be granted and arbitration should be compelled.

## C. Arbitration Is Appropriate Even Though Defendant Allstate Is Not A Party To The Arbitration Agreement

Arbitration is a matter of contract, and parties usually cannot be required to arbitrate disputes in the absence of agreement to do so. See AT&T Technologies. Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986). However, the Eleventh Circuit has recognized that the lack of a written arbitration agreement signed by all parties to a dispute does of itself not preclude arbitration. See e.g. Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 756-57 (11th Cir. 1993); McBro Planning and Development Co. v. Triangle Electrical Construction Co., Inc., 741 F.2d 342, 344 (11th Cir. 1984). Federal courts, including this District Court, have compelled arbitration in a variety of circumstances despite the lack of a written arbitration agreement between plaintiff and defendant, including (i) cases in which a party is equitably estopped to assert the lack of a written agreement with the defendant, (ii) cases involving agency or related principles involving signatory and nonsignatory defendants, and (iii) cases involving third party beneficiaries. In re Managed Care Litigation, 132 F. Supp. 2d at 994. Here, having asserted claims against Allstate that depend in the first instance on his alleged rights under the Provider Agreement, and having alleged a concert of action between Allstate and CCN, Plaintiff is estopped to resist arbitration on grounds that Allstate is not signatory to the agreement.

There are at least two different circumstances in which a party will be equitably estopped from resisting arbitration on grounds that one or more litigants is not a signatory to the

9

arbitration agreement. First, where a plaintiff is signatory to an agreement containing an arbitration clause and relies on the terms of the agreement in asserting claims against the defendant, or where those claims presume the existence of the agreement and plaintiff's alleged rights thereunder, the plaintiff may not avoid arbitration on grounds that the defendant is a non-signatory. See MS Dealer Service Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999). Second, where a signatory plaintiff asserts substantially interdependent and concerted misconduct by both a nonsignatory and signatory to the agreement, he may not resist arbitration by asserting the lack of an agreement with the non-signatory defendant. Id. Both of these circumstances are presented by Plaintiff's claims in this case.[6]

## 1.   Plaintiff's claims presume the existence of his Provider Agreement with CCN, and rely on his alleged rights under that Agreement.

"[E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claim against the nonsignatory." MS Dealer, 177 F.3d at 947. Moreover, when the claim "makes reference to or presumes the existing of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate." Id. In this circumstance, the claims are said to be "intimately founded in and intertwined with the underlying contract obligations," and the arbitration clause in the underlying contract will be enforced despite the lack of a signed agreement between plaintiff and defendant. See McBro Planning and Development, 741 F.2d at 343-44. This principle applies here.

Allstate is alleged to have been one of CCN's payor clients, and Plaintiff is alleged to have been a member of CCN's provider network pursuant to the Provider Agreement. Each of

---

[6] This issue presents a question of law for the Court. See Sunkist Soft Drinks, 10 F.3d at 757 (enforcement of arbitration provision with respect to claims against a non-signatory presents a question of law).

10

Plaintiff's claims presumes the existence of the Provider Agreement, and is founded on Plaintiff's alleged expectation under that Agreement, i.e. his expectation that network access would be afforded only to payors who provide the requisite "steerage".[7]  In other words, Plaintiff specifically references his Provider Agreement, and his claims require a showing that the discounting of his fees by Allstate was improper because the Provider Agreement did not allow CCN to afford network access to Allstate.  Absent that showing, there was no wrongful conduct and Plaintiff's claims cannot succeed.  Accordingly, plaintiff's claims are said to "arise out of and relate directly to" the Provider Agreement within the ambit of MS Dealer, and the claims are "intimately founded in and intertwined with" the Provider Agreement within the meaning of McBro Planning and Development.  *It would be grossly inequitable to allow Plaintiff to advance his claims -- all of which rely on rights allegedly flowing from the Provider Agreement -- while avoiding his agreement to arbitrate.*  Cf. Int'l Paper Company v. Schwabedissen Maschinen & Anlagen, 206 F. 3d 411, 417-418 (4th Cir. 2000)(it would be inequitable to allow plaintiff to pursue the benefit of a contract and at the same time assert defenses to enforcement of its arbitration provision).

## 2.    Plaintiff's claims allege interdependent and concerted misconduct between CCN and Allstate.

Equitable estoppel is also warranted when a signatory plaintiff makes allegations of substantially interdependent, concerted misconduct by both a nonsignatory party (here, Allstate) and another signatory party (here, CCN).  Otherwise, the arbitration agreement between the two

---

[7] See e.g. paragraph 37 of the Second Amended Complaint, alleging that the Provider Agreement did not permit CCN to allow automobile insurers access to preferred provider rates, and paragraph 39, which alleges that the Agreement did not authorize the application of discounts by insurers such as Allstate who could not increase Plaintiff's patient volume.

signatories "would be rendered meaningless and the federal policy in favor or arbitration effectively thwarted." MS Dealer, 177 F.3d at 947 (internal citations omitted).

The Second Amended Complaint is replete with allegations that CCN and Allstate acted in concert and in violation of the CCN/Provider Agreement. Plaintiff specifically accuses Allstate and CCN of having "collectively engaged" in the alleged "scheme to reduce benefits paid on auto injury claims".[8] This allegation is incorporated by reference in each count of the second amended complaint.[9] Plaintiff also names CCN as a RICO co-conspirator, alleging that they formed an "association-in-fact", engaging in a conspiracy to commit RICO predicate acts and aiding and abetting the commission of those acts.[10] These allegations bring this case directly within the parameters of MS Dealer, and warrant an order staying the litigation and compelling arbitration.

### 3.    Allstate does not oppose the arbitration of Plaintiff's claims.

In the CCN/Provider Agreement, Plaintiff expressly agreed to arbitrate claims arising thereunder as the "sole and exclusive remedy." Allstate is the only party in this action that is a nonsignatory to the CCN/Provider Agreement, requiring the arbitration of disputes. Therefore, Allstate would be the only party that could arguably oppose arbitration. However, Allstate has indicated that it does not oppose CCN's efforts to stay this litigation and to compel arbitration of Plaintiff's claims.

---

[8] See Second Amended Complaint at ¶ 27.

[9] See Second Amended Complaint at ¶¶ 77, 85, 93, 160 and 165.

[10] See Second Amended Complaint at ¶¶ 94-102, 105-112, 114, 117-122, 124-127, 131, 133-34, 142 and 148.

## Conclusion

Distilled to its essence and regardless of the particular theories advanced, Plaintiff can only succeed on his claims if he can show that his Provider Agreement with CCN limits the kind of payor clients (such as Allstate) with whom CCN can do business. Because the Provider Agreement requires the arbitration of claims as the "sole and exclusive remedy," CCN submits that the Court should dismiss this litigation and compel arbitration of the claims asserted.

For all the foregoing reasons, CCN respectfully requests that the Court enter an order dismissing this litigation and compelling arbitration of the pending claims.

## Certificate of Conference

The undersigned certifies that he spoke with counsel for Plaintiff and counsel for Allstate regarding this Motion. Plaintiff opposes the relief sought herein. Allstate does not oppose the relief sought herein.

Respectfully submitted,

McGuireWoods LLP

By: _____

William W. Deem
Florida Bar No. 0512834
3300 Bank of America Center
50 North Laura Street
Jacksonville, FL 32202
Telephone: (904) 798-3200
Facsimile: (904) 798-3207

wdeem@mcguirewoods.com

ATTORNEYS FOR THIRD-PARTY
DEFENDANT CCN MANAGED CARE, INC.

13

**Certificate of Service**

I certify that a copy of the foregoing has been furnished by facsimile and U.S. Mail on this $3^{a}$ day of October, 2001, to all counsel listed on the attached service list.

_____
Attorney

·COM·68384.1

14

## MASTER SERVICE LIST
### (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)

**Co-Counsel for Plaintiffs**

ATLAS PEARLMAN, P.A.
Jan Douglas Atlas, Esq.
atlas@atlaslaw.com
Eric Lee, Esq.
lee@atlaslaw.com
Robin Corwin Campbell, Esq.
campbell@atlaslaw.com
350 East Las Olas Boulevard,
Suite 1700
Fort Lauderdale, FL 33301
(954) 763-1200
(954) 766-7800 Facsimile

**Co-Counsel for Plaintiffs**

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

**Co-Counsel for Plaintiffs**

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphilips@gpandg.com
Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

**Co-Counsel for Plaintiffs**

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 1611
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
personalinjurylawyer@earthlink.net
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-1000
(813) 254-6327 Facsimile

**Co-Counsel for Plaintiffs**

RICHARD BOKOR, P.A.
Richard Bokor, Esq.
rabokor1@tampabay.rr.com
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-1000
(813) 254-6327 Facsimile

**Co-Counsel for Plaintiffs**

Casey Fundaro, Esq.
fundaro@aol.com
1100 5th Avenue S., Suite 201
Naples, FL 34102-6407
(941) 435-7995
(941) 435-1269 Facsimile

**Counsel for Allstate**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 Facsimile

**Counsel for Beech Street and ADP**

TEW, CARDENAS REBAK KELLOGG
LEHMAN DEMARIA TAGUE
RAYMOND & LEVINE, L.L.P.
Thomas Tew, Esquire
(305) 539-2106
tt@tewlaw.com
Joseph A. DeMaria, Esquire
(305) 539-2440
jad@tewlaw.com
John M. Quaranta, Esquire
(305) 539-2495
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1116 Facsimile

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esquire
fanania@anania-law.com
Donald A. Blackwell, Esquire
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

**Counsel for CCN**

MCGUIRE WOODS LLP
William W. Deem, Esquire
wdeem@mcguirewoods.com
William E. Adams, Esquire
badams@mcguirewoods.com
Curt Caywood, Esquire
ccaywood@mcguirewoods.com
3300 Bank of America Tower
50 N. Laura Street
Jacksonville, Florida 32202
(904)798-3200
(904)798-3207 Facsimile

**Counsel for Nationwide**

FOWLER, WHITE
Katherine C. Lake, Esquire
klake@fowlerwhite.com
Bruce A. Aebel, Esquire
baebel@fowlerwhite.com
Post Office Box 1438
Tampa, FL 33601
(813)228-7411
(813)229-8313 Facsimile

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esquire
haggerty@scdlaw.com
1601 Market Street, 34th Floor
Philadelphia, Pennsylvania 19103-2316
(215)299-4314
(215)299-4301 Facsimile

## Counsel for Florida Farm Bureau

HOLLAND & KNIGHT, LLP
Gregory A. Baldwin, Esquire
gbaldwin@hklaw.com
Robert K. Levenson, Esquire
rlevenson@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305)374-8500
(305)789-7799 Facsimile

## Counsel for Liberty Mutual

AKERMAN, SENTERFITT et al.
Mark Shapiro, Esquire
mshapiro@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, Florida 33131
(305)374-5600
(305)374-5095 Facsimile

## Counsel for Hartford, Metropolitan, Integon

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, Florida 33131
(305)374-5600
(305)374-5095 Facsimile

## Counsel for Prudential

SHEA & GARDNER
John D. Aldock, Esquire
jaldock@sheagardner.com
(202) 828-2140
Richard M. Wyner, Esquire
Rwyner@sheagardner.com
(202) 828-2188
Jeffrey M. Klein, Esquire
jklein@sheagardner.com
(202) 828-4301
M. David Dobbins, Esquire
ddobbins@sheagardner.com
202) 828-2184
1800 Massachusetts Avenue, N.W.
Washington, DC 20036
202-828-2000
202-828-2195 (Facsimile)

BUTLER BURNETTE PAPPAS
Kathy Johnson Maus
Kmaus@bbplaw.com
Eric Zivitz
Ezivitz@bbplaw.com
3520 Thomasville Road
Suite 102
Tallahassee, Florida 32308.3469
850.894.4111
850.894.4999 (Facsimile)

## Counsel for Superior

BUTLER BURNETT PAPPAS
Alan J. Nisberg, Esquire
anisberg@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, Florida 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for American International**
CONROY, SIMBERG, GANON,
KREVANS & ABEL, P.A.
Dale L. Friedman, Esquire
dfriedman@csglaw.com
Brian P. Knight, Esquire
bknight@csglaw.com
3440 Hollywood Blvd., 2nd Floor
Holly wood, Florida 33021
(954) 961-1400
(954) 967-8577 (Facsimile)

COM 74107 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Civil Action No. 00-CIV-6061 FERGUSON/SNOW

| | |
|---|---|
| DR. PAUL ZIDEL and All Others | § |
| Similarly Situated, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | § |
| | § |
| ALLSTATE INSURANCE COMPANY | § |
| and COMMUNITY CARE NETWORK, | § |
| INC. d/b/a CCN, | § |
| | § |
| Defendants. | § |

## DECLARATION OF DAVE COWAN

I, Dave Cowan, hereby declare and state as follows:

1.     My name is Dave Cowan. I am over 18 years of age and am fully competent to make this declaration. I have personal knowledge of all facts stated herein and state that they are true and correct.

2.     I am Sr. Vice President, Eastern Region for CCN Managed Care, Inc. ("CCN") and have been so employed for 11 years. CCN's principal place of business is located in San Diego, California. CCN has 40 offices across the country and employs approximately 1500 people nationwide.

3.     CCN develops and markets health care service provider networks. CCN maintains and markets provider networks in 48 states and the District of Columbia. There are approximately 368,000 health care providers and facilities who are members of CCN's network. CCN forms its networks by recruiting health care service providers to join the networks. Members of CCN's networks agree to discount their usual and customary charges for health care services provided to

---

DECLARATION OF DAVE COWAN                                                    PAGE 1

EXHIBIT A

CCN' clients' insureds or beneficiaries. CCN markets the network to entities that provide health care benefits to large numbers of individuals, such as insurance companies, employers, third-party administrators, in the network's operating area. CCN provides its network members with a variety of services, including marketing and administrative support. CCN's network providers routinely conduct business with CCN's national headquarters in San Diego and CCN's regional offices.

4.    CCN's clients are typically large companies that operate in several states or -- as is the case with Allstate Insurance Company -- have nationwide operations. CCN's clients provide heath care benefits to approximately 32 million individuals across the country. As with its network providers, CCN provides its clients with a variety of administrative, marketing and other services. CCN's clients transact business with both CCN's national headquarters and our regional offices.

5.    A true and correct copy of the Community Care Network, Inc. Provider Agreement between CCN and Paul Zidel, M.D. is attached as Exhibit B to CCN's Motion to Compel Arbitration and Stay Litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 13, 2000.

This PROFESSIONAL CARE PROVIDER AGREEMENT ("Agreement") is made and entered into by and between Community Care Network, Inc. d.b.a. CCN, and $\underline{Hu\ R'7\ icl2l\ Ll.D.}$ , a $\underline{Hand\ Surgeon}$ (hereinafter referred to as "Provider")

## RECITALS

WHEREAS, CCN intends to execute contracts which Payor organizations which offer a preferred provider or exclusive provider health care coverage plan to Beneficiaries or Claimants, and

WHEREAS, Provider desires to make their services available to Beneficiaries or Claimants of Payors with whom CCN contracts, and

WHEREAS, CCN and Provider share the common goals of establishing a health care delivery system committed to the advancement of quality patient care, and developing innovative approaches to delivery of quality medical services in an efficient and cost-effective manner.

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, it is agreed by and between the parties hereto as follows:

## 1. DEFINITIONS

1.01   **"Beneficiary"** or **"Claimant"** is a person as defined in the applicable Insuring Agreement and who may be entitled to Health Care Services or Benefits

1.02   **"CCN-Affiliated Health Plan"** is the health care plan offered, sponsored, administered or insured by Payor to provide coverage for Health Care Services or Benefits pursuant to the terms and conditions of this Agreement

1.03   **"Claims Administrator"** is the Payor or the organization with the Payor has contracted to administer and process claims for the CCN-Affiliated Health Plan

1.04   **"Health Care Services or Benefits"** shall be any and all covered medical services or benefits for such services rendered or provided to a Beneficiary or Claimant under an Insuring Agreement.

1.05   **"Insuring Agreement"** is the contract, certificate, policy, plan document, or any other legally enforceable instrument issued or sponsored by a Payor under which a Beneficiary or Claimant may be entitled to or receive Health Care Services or Benefits

1.06   **"Payor"** is an employer, insurance carrier, claims administrator, health care service plan, trust, nonprofit facility service plan, any governmental unit or any other entity which has an obligation to provide Health Care Services or Benefits to a Beneficiary or Claimant

1.07   **"Payor Agreement"** is an instrument between a Payor and CCN or its authorized representative which provides for CCN providers, including Provider pursuant to this Agreement, to render Health Care Services or Benefits at Reimbursement Amounts determined and established by CCN and such Payor.

1.08   **"Provider"** means the Provider who is duly licensed by the State of $\underline{Florida}$ to provide Health Care Services or Benefits

EXHIBIT B

v-06061-WJZ "Reimbursement Amounts" are the Entered on FLSD Docket 10/04/2001 P

rendered or provided to a Beneficiary or Claimant pursuant to Payor Agreements between CCN and the respective Payors. Such Reimbursement Amounts shall be established by CCN and Payors as specified in Exhibit A attached hereto and incorporated herein or as established by any state regulatory agency, whichever is less. Providers shall not individually or collectively with other providers determine or establish such Reimbursement Amounts.

1.10 "Utilization Review" means the function performed by organization(s) or entity(ies) selected by Payors to review and recommend to Payors whether Health Care Services or Benefits provided, or to be provided, are Medically Necessary.

## 2. HEALTH CARE SERVICES OR BENEFITS

2.01 Provider hereby agrees to provide Health Care Services or Benefits to Beneficiaries or Claimants as set forth in Insuring Agreements, at the Reimbursement Amounts determined and established by CCN through Payor Agreements with Payors, which Payor Agreements are incorporated herein by reference. Such Reimbursement Amounts are set forth in Exhibit A attached hereto and incorporated herein.

2.02 Provider agrees to accept the Reimbursement Amounts in Exhibit A as payment in full for Health Care Services or Benefits provided, to Beneficiaries or Claimants. Provider shall look solely to the Payor for payment of any and all compensation due for Health Care Services or Benefits and shall not bill or otherwise collect or attempt to collect from Beneficiaries or Claimants any charges except and unless required or permitted to do so by the applicable Insuring Agreement. The foregoing restriction shall not apply to deductibles, co-payments or co-insurance which may be collected by Provider in accordance with the provisions of the applicable Insuring Agreement, nor to services or benefits rendered to Beneficiaries or Claimants which are not covered by the applicable Insuring Agreement. Provider expressly covenants and agrees that CCN shall not be responsible or liable for, nor does CCN guarantee any payments to Provider for, any services rendered by Provider to Beneficiary or Claimant.

2.03 Payor Agreements shall require Payors to make payments due from Payor to Provider within thirty (30) days of receipt by Payor of complete billings having sufficient information to reprice and/or adjudicate claim unless, within this thirty (30) day period, Provider is given written notice of Payor's inability to pay the claim because it is not complete, or there are issues related to coordination of benefits, subrogation, medical necessity or similar review. If a Payor fails to make timely payments, CCN shall review the applicable Payor Agreement and take appropriate action as specified in the CCN Administrative Manual for Participating Providers.

## 3. TERM; TERMINATION

3.01 Following the effective date set forth herein, this Agreement shall be continued for consecutive annual terms thereafter, unless otherwise terminated.

3.02 This Agreement may be terminated by either party upon ninety (90) days written notice to the other party.

3.03 Provider agrees that if the Agreement is terminated, Provider shall exercise best efforts to notify all Beneficiaries or Claimants who are under Provider's care or seek services from Provider that Provider is no longer a CCN preferred provider. For those Beneficiaries or Claimants under Provider's care who so desire, Provider shall transfer the Beneficiaries or Claimants to other appropriate CCN Provider(s).

3.04 Following termination of this Agreement, CCN shall notify Beneficiaries or Claimants of such termination through the regular periodic updating of CCN Provider listings for Beneficiaries or Claimants.

3.05 Notwithstanding Section 3.02, CCN may terminate or suspend this Agreement, at CCN's option, immediately upon the occurrence of any of the following events:

   B) Provider has made a material misrepresentation to CCN;

   C) Provider's DEA certificate is revoked, restricted, or suspended;

   D) Provider commits any act or engages in any conduct for which Provider's license may be revoked or suspended by the licensing authorities of the state in which the Provider is located (whether or not such licensing authorities revoke or suspend such license);

   E) Whenever Provider is prohibited from participation in any federal or state healthcare entitlement program;

   F) Provider's performance in providing Health Care Services or Benefits is unsatisfactory for reasons including but not limited to Provider disability and Provider inability to achieve CCN quality assurance standards. CCN shall make such determinations reasonably and in good faith. In such instances, Provider shall have the right to appeal CCN's determination;

   G) Provider fails to maintain insurance coverage as required by CCN hereunder;

   H) Provider fraudulently submits a claim for services; or

   I) Provider ceases to maintain unrestricted active or courtesy admitting privileges at participating hospitals as may be required by CCN

3.06  Provider shall notify CCN immediately upon the occurrence of any circumstances, including those set forth above, which would render this Agreement terminable by CCN

3.07  Termination to this Agreement shall not affect any rights or obligations hereunder which shall have previously accrued, or shall thereafter arise with respect to any occurrence prior to termination, and such rights and obligations shall continue to be governed by the terms of this Agreement

3.08  Either party to this Agreement has the right to terminate upon at least thirty (30) days prior written notice of such termination to the other party if the party to whom such notice is given materially breaches any provision of this Agreement. The party claiming the right to terminate shall set forth in the notice of termination the facts underlying its claims of breach and cite the relevant sections of this Agreement that are claimed to have been breached. Remedy of such breach to the satisfaction of the other party within thirty (30) days of the receipt of such notice shall revive this Agreement for the remaining portion of its then-current term, subject to any other rights of termination contained in this Agreement.

## 4. AUTHORIZATION TO CONTRACT

4.01  Provider authorizes CCN to act on its behalf to contract for the provision of Health Care Services or Benefits, at Reimbursement Amounts as set forth on Exhibit A.

4.02  Provider further authorizes CCN or other Claims Administrator, to coordinate and transmit billings to Payors for payment, on behalf of Provider.

## 5. COVENANTS OF PROVIDER

Provider covenants and agrees to the following:

5.01  To make available and render as appropriate Health Care Services or Benefits to Beneficiaries or Claimants which Provider is qualified by law to provide, which are medically necessary and consistent with the prevailing standards of quality of care generally accepted in their respective medical communities;

5 02    To comply with the requirements of all laws and regulations applicable to Provider's business and profession and ensure that all licenses, permits, authorizations and approvals required for that business and profession be maintained in effect for Provider as well as personnel employed or supervised by Provider, or acting on Provider's behalf;

5 03    To participate in and remain compliant with but not limited to CCN's and/or Payor's credentialing and recredentialing, medical management, utilization review quality assurance program, and which may be amended from time to time. Provider agrees to provide any and all reasonable requested data and records in support of such programs;

5 04    To obtain and maintain throughout the term of this Agreement medical staff membership and active or courtesy privileges for the performance of Provider's duties hereunder at participating hospitals, if necessary for the rendition of Health Care Services or Benefits to Beneficiaries or Claimants;

5 05    To provide prompt availability and accessibility of Health Care Services or Benefits to Beneficiaries or Claimants in the same manner and quality as to all other patients,

5 06    To maximize the utilization of services that are alternatives to inpatient hospitalization and innovative delivery modes that promote more cost-efficient health care, which are consistent with Provider's professional judgment;

5 07    Except in an emergency and/or when medical necessity dictates, to admit Beneficiaries or Claimants, in each instance in which hospitalization is required, to a hospital contracting with CCN unless a Beneficiary or Claimant specifically requests otherwise after having been notified by Provider that the requested hospital is not a CCN hospital;

5 08    To obtain from each Beneficiary or Claimant a written assignment of benefits, an authorization to provide Health Care Services or Benefits to Beneficiary or Claimant and release of Beneficiary's or Claimant's medical records    If a Beneficiary or Claimant refuses to provide such evidence of assignment, Provider may seek payment from the Beneficiary or Claimant directly with such payment limited to the Reimbursement Amounts defined in this Agreement;

5 09    To refer Beneficiaries or Claimants, in each instance in which referral is required, to other CCN Providers, unless Provider, in his/her professional judgment, determines that the Beneficiary's or Claimant's needs require otherwise and Beneficiary or Claimant so agrees after having been notified by Provider that the proposed provider is not a CCN Provider;

5 10    To permit CCN's representatives, including but not limited to utilization review committee members, and Payor representatives, upon reasonable advance written notice, to inspect specific aspects of the Health Care Services or Benefits provided to Beneficiaries or Claimants by Provider in response to concerns related to a Beneficiary or Claimant, or Payor;

5 11    To coordinate and transmit billings to Payors for payment, if required, in a format commonly used in the community and approved by CCN;

5 12    To provide Health Care Services or Benefits pursuant to all Payor Agreements executed between CCN and Payors;

5 13    To cooperate with Payors in expediting the return to work of ill or injured employed Beneficiaries or Claimants, consistent with Provider's professional judgment, and

5 14    To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant grievances.

CCN covenants and agrees to the following

6.01    To accept sole responsibility for filing reports, obtaining approvals and complying with applicable laws and regulations of state, federal and other regulatory agencies having jurisdiction over CCN, provided however, that Provider agrees to cooperate by providing CCN with any information and assistance reasonably required in connection therewith;

6.02    To abide by a policy of non-interference with the professional relationship between any Beneficiary or Claimant and Provider;

6.03    To provide Provider periodically with an up-to-date list of Payors who have executed Payor Agreements with CCN specifying the respective Insuring Agreements pertaining thereto; and

6.04    To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant or Provider grievances.

## 7. RECORDS

7.01    CCN and Provider shall maintain records and procedures, as shall reasonably be required to accurately account for all Health Care Services and Benefits provided pursuant to this Agreement. Such records shall be kept in accordance with generally accepted accounting principles and recognized standards of professional practice.

7.02    CCN and Provider shall have the mutual right, upon request, to inspect and copy, upon reasonable advance notice and during normal business hours or at such other times as may be agreed upon, relevant accounting and administrative books and records, as they pertain to this Agreement. Such information shall be provided to each party hereto pursuant to procedures designed to protect the confidentiality of patient medical records in accordance with applicable legal requirements and recognized standards of professional practice.

7.03    CCN and Provider shall each maintain records with respect to any matters necessary for the proper administration of this Agreement.

7.04    Upon termination of this Agreement, Provider agrees to cooperate with Beneficiaries or Claimants and subsequent Providers with respect to the orderly and prompt transfer of medical records of Beneficiaries or Claimants. This Agreement does not preclude Provider from assessing reasonable charges for the expense of transferring such records if appropriate.

7.05    CCN shall have access to provider records for four (4) years from the date on which Provider supplied or provided Health Care Services or Benefits documented in such records, regardless of when the Agreement has been terminated.

## 8. INSURANCE REQUIREMENTS

8.01    **Professional Liability Insurance.** Provider shall carry professional liability insurance or an equivalent program of self-insurance in minimum amounts as specified and amended from time to time in the CCN Administrative Manual for Participating Providers. Provider shall notify CCN of cancellation or material modification of the coverage under such professional liability insurance at least thirty (30) days prior to any cancellation or modification. Certificates of insurance evidencing Provider's professional liability insurance coverage shall be provided to CCN no later than thirty (30) days following execution of this Agreement.

8.02    **General Liability Insurance.** Provider shall also maintain a policy or program of comprehensive general liability insurance, covering Provider's acts or failure to act, with minimum coverage as specified and amended from time to time in the CCN Administrative Manual for Participating Providers.

8 03    **Extended Insurance.** In the event Provider terminates this Agreement for any reason whatsoever, or if Provider changes insurance carriers, Provider agrees to maintain malpractice insurance coverage in the amount required under Section 8 01 of this Agreement for all Health Care Services or Benefits provided to Beneficiaries or Claimants until the statutes of limitation expire for the filing of malpractice claims pertaining to those Health Care Services or Benefits. Such insurance coverage may take the form of an "occurrence" policy covering claims made for services rendered no matter when the claims are filed, ongoing "claims made" insurance covering all claims filed during the period when the insurance is in force, or "tail insurance" coverage if the Provider cancels his/her "claims made" coverage

## 9. ADMINISTRATIVE MANUAL

9 01    Provider agrees to comply with the requirements and procedures set forth in the Administrative Manual for Participating Providers ("Administrative Manual") which CCN shall provide for use by Provider, and the provisions of the Administrative Manual (as it may be amended by CCN in its sole discretion from time to time) are incorporated herein by this reference   CCN will distribute the Administrative Manual or any amendments to the Administrative Manual to Provider at least thirty (30) days prior to implementation or amendment. Notwithstanding Section 10 01 of this Agreement, any such amendment shall be effective thirty (30) days after such amendment has been distributed to Provider   The Administrative Manual shall cover administration of this Agreement, Utilization Review/Quality Assurance Program, minimum professional and general liability insurance requirements for Provider, billing and accounting requirements for services rendered hereunder, and other matters as deemed necessary by CCN

## 10. AMENDMENT

10 01   This Agreement or any part hereof, may be amended only by CCN at any time during the term of this Agreement with thirty (30) days prior written notice to the provider by CCN   Provider shall have thirty (30) days after Provider receives written notice of such notice to provide CCN with written notice rejecting the amendment   Failure of Provider to provide such written notice to CCN shall constitute Provider's acceptance of said amendment   Except as provided above, any other amendment or modification of this Agreement shall be in writing and executed by each party hereto.

## 11. ASSIGNMENT

11 01   No assignment or delegation of the rights, duties or obligations hereunder shall be made without the mutual written consent of the parties hereto   Notwithstanding the foregoing, CCN retains the right to assign this Agreement or delegate its performance hereunder in whole or in part, without Provider's consent, to any entity with which CCN or its parent company or any of its subsidiaries is affiliated.

## 12. DISPUTE RESOLUTION AND ARBITRATION

12 01   CCN and Provider agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement

12 02   The sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits   The parties shall mutually agree to the appointment of an impartial arbitrator within 30 days of the written request for the appointment of an arbitrator by any party   The arbitrator must be familiar with the health care industry. In the event that mutual agreement cannot be obtained, then the American Arbitration Association shall appoint an arbitrator who is familiar with the health care industry if one can be located; and, if one cannot be located, then another arbitrator shall be appointed.   All arbitration proceedings shall be conducted in accord with the rules of the American Arbitration Association and the award shall be binding, final and conclusive on the parties   Any party may enforce the award rendered by the arbitrator in any court of competent jurisdiction.

PROFESSIONAL01-98

any inference made for or against either party by reason of such party proposing or modifying any provision.

## 13. INDEPENDENT CONTRACTOR

13.01  Provider, in furnishing Health Care Services or Benefits pursuant to this Agreement, does so as an independent contractor. Neither Provider nor CCN shall be construed to be the agent, employee, or representative of the other, except as specified in this Agreement.

13.02  Nothing contained herein shall be construed to prevent Provider from independently operating or participating in any other agreement or in providing health care services independent of this Agreement.

## 14. WAIVER

14.01  The waiver by either party of any breach of any provision of this Agreement or warranty or representation herein set forth shall not be construed as a waiver of any subsequent breach of the same or any other provision.

## 15. SEVERABILITY

15.01  If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated as a result of such decision.

## 16. GOVERNING LAW

16.01  This Agreement shall be construed and enforced in accordance with the laws of the State of Florida as amended from time to time subject to any applicable federal law.

## 17. INDEMNIFICATION

17.01  Each party to this Agreement agrees to indemnify and hold harmless the other party and its directors, officers, employees and agents against any and all liability and expense, including defense costs and legal fees as they are incurred in connection with claims or demands for damages of any nature whatsoever including, but not limited to, bodily injury, death, personal injury or property damage arising from or caused by the indemnifying party's acts or failure to act or the acts or failure to act of its directors, officers, employees or agents.

## 18. NOTICES

18.01  Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall either be personally delivered or sent by registered or certified mail with the United States Postal Service, return receipt requested, postage prepaid, addressed to such party at its respective last known address.

## 19. CONFIDENTIALITY

19.01  The parties hereto shall maintain the confidentiality of any and all medical, financial and administrative records which shall be in their possession and control, and such information shall only be released or disseminated pursuant to the valid written authorization of the other party, Beneficiary or Claimant or as and when permitted under applicable law.

confidence and shall not voluntarily or involuntarily, sell, transfer, publish, display or otherwise make available to others any portion of the other party's proprietary and confidential information. Provider acknowledges that this Agreement, Amendments, and Exhibits hereto are deemed proprietary and confidential. Provider agrees that the terms of 19.02 shall survive this Agreement for a period of two (2) years.

IN WITNESS THEREOF, the parties hereto have executed this Agreement by their duly authorized officers, and it shall be effective as of the 1st day of __August__, 1998.

PROVIDER                                          CCN

FEDERAL TAX IDENTIFICATION #:

_65-0435831_

_____          _____
Signature                                         Signature

Paul Zidel, M.D.                           Gavin Meshad
Please print name                          Please print name President, Southeast Region

M.D.                                              _____
Title                                              Title

12/13/98                                        _8-1-98_
Date                                              Date

LAW OFFICES OF
**KOPELMAN & BLANKMAN**
A PROFESSIONAL ASSOCIATION

NATIONSBANK TOWER, SUITE 1611
ONE FINANCIAL PLAZA
FORT LAUDERDALE, FLORIDA 33394

LAWRENCE M. KOPELMAN
DOUGLAS A. BLANKMAN

TELEPHONE
(954)462-6855
FAX (954)462-6899

May 3, 2000

Community Care Network/CCN
1507 N. Falkenburg Road
Tampa, Florida 33619

RE:    Park Place Therapeutic Center and Drs. Martin May, Alan Lazar, Martin Hale, Joel Rush,
       Paul Zidel, Richard Linn, Richard Berkowitz, Douglas Stringham, Andrew Ellowitz, Alan
       Novick, Debra Weiss and Neil Schechter

To Whom It May Concern:

Pursuant to Section 11.01 of the Community Care Network, Inc., Professional Care Provider
Agreement entered into with Park Place Therapeutic Center on June 5, 1998 and further, pursuant
to Section 12.02 of the Community Care Network, Inc., Professional Care Provider Agreement
entered into with the above named medical providers, this letter shall serve as a written request for
arbitration to resolve the disputes and demands set forth in my letter dated April 5, 2000.

Specifically, it is hereby alleged that Community Care Network has breached the terms and conditions
of its agreements with the above referenced claimants by failing to execute contracts with Payor
Organizations which offer Preferred Provider or Exclusive Provider Healthcare Coverage Plans to
its beneficiaries and/or claimants.

Pursuant to the aforementioned agreements, we have thirty (30) days from the date of this request
to mutually agree to the appointment of an impartial arbitrator. Kindly contact me upon receipt of
this letter so that we may discuss the appointment of said arbitrator.

Very truly yours,

Lawrence M. Kopelman

LMK/cjl
CM-RRR

cc:    Matthew S. Nelles, Esquire
       Via: Fax & U.S. Mail

EXHIBIT C