IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
SOUTHERN DIVISION (FORT LAUDERDALE)

DR. PAUL ZIDEL

     Plaintiff,              CASE NO. 00-6061-CIV-FERGUSON/SNOW

v.

ALLSTATE INSURANCE COMPANY
and COMMUNITY CARE NETWORK,
INC., d/b/a/ CCN,

     Defendant.

_____/

SALVATORE D. LARUSSO, D.C., d/b/a
FAMILY CHIROPRACTIC CENTER,

     Plaintiff,              CASE NO. 01-8111-CIV-FERGUSON/SNOW

v.

HARTFORD INSURANCE COMPANY
OF THE MIDWEST,

     Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS THE
## COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

Defendant, Hartford Insurance Company of the Midwest ("Hartford"), hereby moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Amended Class Action Complaint (the "Complaint"). In support of its Motion, Hartford states as follows:

### MEMORANDUM OF LAW

### Introduction

As this Court is aware, this Action is one of 15 actions filed against different insurers in this Court. The gravamen of all 15 cases is a challenge to the insurers' application of certain negotiated discounts to medical bills arising from personal injury protection ("PIP") automobile insurance claims. Plaintiff Salvatore Larusso ("Larusso") alleges that Hartford was not entitled to apply such discounts to medical bills he submitted on behalf of Hartford insureds.



While Hartford is mindful that this Court has considered motions to dismiss filed by other insurers and parties in related cases, Hartford nonetheless contends that the Complaint filed in this Action is woefully deficient and should be dismissed. Despite its 38 pages and 194 paragraphs, the Complaint fails to set forth a single cognizable claim for relief. Despite Larusso's desire to turn a simple billing dispute into a complex federal class action case, it is clear that the law does not permit such a suit to proceed. As the court held in *Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.* 162 F.3d 1290, 1333 (11th Cir. 1998):

> This case is part of a broader phenomenon that we have previously labeled 'shotgun pleading.' These types of cases invariably begin with a long list of general allegations, most of which are immaterial to most of the claims for relief. The general allegations are incorporated by reference into each count of the complaint. . . . If the trial judge does not quickly demand repleader, all is lost -- extended and largely aimless discovery will commence, and the trial court will soon be drowned in an uncharted sea of depositions, interrogatories, and affidavits. Given the massive record and loose pleadings before it, the trial court, whose time is constrained by the press of other business, is unable to squeeze the case down to its essentials; the case therefore proceeds to trial without proper delineation of the issues . . . . The result is a massive waste of judicial and private resources . . . .

Larusso's Complaint, which is nothing more than a copy of the complaints in the other 14 actions (including the same typographical and other errors) suffers from the problems identified by the *Johnson* court. Hartford respectfully requests that this Court exercise its broad power and dismiss the deficient Complaint in its entirety.

## I.    Factual Background

Larusso, a chiropractor, alleges that he entered into a contract with non-party Community Care Network, Inc. ("CCN")[1] [the "CCN Contract"]. Pursuant to the CCN Contract, CCN agreed to make reasonable efforts to market Larusso's services to an open-ended list of business entities, including "insurance companies" that paid for health care services.[2] Larusso agreed to discount

---

[1]    Larusso also alleges that  alleges that CCN is the successor by merger of Medview Services, Inc. The two entities alleged merged in January of 1998. (Compl. ¶ 3).

[2]    Health care services includes services "for which certain benefits are available under a Group Contract or Workers' Compensation contract or any othe program with provisions for health care services." (Ex. 1, Art. 1(A) and Ex. A).

his normal fees to third party payors who contracted with CCN. (Compl. ¶¶ 22, 45). While Larusso has failed to attach this contract to the Complaint, Hartford has attached a copy as Ex. 1. Notably, nothing in the contract limits CCN's potential clients to those that offered "preferred provider" policies. Indeed, the phrase "preferred provider" does not even occur in the contract.

Larusso further alleges that he provided medical services to certain persons who were insured by Hartford for, among other things, PIP benefits. He alleges that he submitted medical bills to Hartford arising from his provision of medical services to Hartford insureds. (*Id.* at ¶¶ 56-57). He complains that Hartford reduced the amounts payable by applying the discount that he had agreed to accept pursuant to his CCN Contract. (*Id.* at ¶ 62). He alleges that, despite his agreement with CCN to discount his normal fees, Hartford was not entitled to this discount. He concedes, however, that CCN itself provided its discount database to Hartford. (*Id.* at ¶ 46).

While Larusso makes conclusory allegations that the discounts were applied to "all bills submitted to Hartford by CCN preferred providers," he identifies but a single instance of such conduct. (*Id.* at ¶ 62 and Ex. 1). He alleges that Hartford sent him an explanation of benefit ("EOB") form which misrepresented that Hartford is entitled to the CCN PPO discounts. (*Id.* at ¶¶ 68, 107). Only one such EOB is attached to the Complaint and involves a $330.00 charge on behalf of Hartford insured Desmond Mahon. That EOB discloses the application of a discount.

## II.    The Class

Larusso also seeks to represent a class of "similarly situated" persons (Compl. ¶ 71):

> [A]ll Florida healthcare providers whose bills for medical services rendered to patients covered by Hartford's automobile insurance policies were discounted by Hartford based upon a purported CCN Preferred Provider Organization reduction.

## III.    The Claims

Larusso asserts 5 claims on behalf of the putative class: (1) unjust enrichment; (2) breach of third-party beneficiary contract; (3) RICO Act violations; (4) declaratory relief; and (5) violation of Fla. Stat. § 627.736. Notably, and despite the many allegations against CCN, Larusso has failed to join CCN as a party to this Action.[3]

---

[3]    Hartford notes that CCN has been joined as a party in actions against other insurers pending before this Court.

In essence, Larusso asserts that his CCN contract authorized CCN to market his services only to insurers that offered "steerage mechanisms" to increase the volume of patients directed to him. (Compl. ¶ 40). That is a contract claim against CCN. By this Action, however, Larusso has sued not CCN, but Hartford. And instead of invoking his CCN contract, Larusso has relied on insurance policies between Hartford and its insureds, on the PIP Statute, on RICO, and on principles of equity.

Larusso's attempt to dress his contract claim in statutory and equitable garb should inspire skepticism. Indeed, a review of his CCN Contract reveals no breach of any of CCN's obligations by its marketing of Larusso's services to Hartford. As set forth below, this contractual authorization of CCN's actions is fatal to every one of Larusso's claims.

For the reasons set forth below, Hartford maintains that this Action must be dismissed with prejudice. In an effort to explain the ramifications of Larusso's allegations and the numerous problems that those allegations present, it is necessary to file this somewhat exhaustive memorandum. Hartford hopes that this memorandum clarifies and defines the legal and factual issues presented.

## Argument

## I. There Has Been No Breach of the CCN Contract

The central theme of Larusso's Complaint is that insurers who enjoy the benefits of his discounted rates must, in return, attempt to increase his patient volume by employing "steerage mechanisms." (Compl. ¶ 22 (citing "increased volume" as "consideration"), ¶ 31 (discussing "steerage mechanisms"). His theory is: (a) that CCN wronged him by providing his discounts to Hartford, which did not have steerage mechanisms in place; and (b) that Hartford wronged him by availing itself of the discounts.

Tellingly, Larusso is unable to explain the source of CCN's purported obligation to market his services only to entities with steerage mechanisms **or** Hartford's obligation to provide such mechanisms. The obvious place to look is the one Larusso steadfastly avoids --his CCN Contract. That contract begins with the recital:

Medview develops contractual arrangements with Payors, which include

employers, **insurance carriers**, third party administrators and other similar
entities for the purpose of coordinating and arranging for the delivery of health
care services to Subscribers.

(Ex. 1 (emphasis added)). Nothing in this recital indicates that acceptable Payors are limited to

those who provide steerage mechanisms. Indeed, Hartford fits easily within this definition.[4]

Nor does the definition of "Third Party Payor" (Ex. 1, Art. 1.E) mention steerage

mechanisms or PPOs. It defines "Third Party Payor" as "an **insurance company**, employer,

third party administrator, or other business entity which has contracted with MedView to pay for

Health Care Services rendered by [Larusso]." (Ex. 1 (emphasis added)). Again, Hartford fits

easily within this definition. Nothing in the definition limits Payors to entities with steerage

mechanisms.

Other parts of the CCN Contract are inconsistent with Larusso's position:

- **Article 7:** directly addresses CCN's obligation to market Larusso's services. CCN
  agreed "to make good faith efforts, within reasonable budgetary constraints, to market
  [Larusso's] services to existing and potential Third Party Payors, including but not
  limited to, business entities such as **insurance companies**, employers and union trust
  funds." (Ex. 1, Art. 7 (emphasis added)). Again, nothing in this clause mentions steerage
  mechanisms or PPOs. In marketing Larusso's services to Hartford, CCN did exactly
  what the contract contemplated.

- **Article 5:** addresses compensation. In exchange for CCN's marketing of his services,
  Larusso agreed to provide a discount to Payors -- to "accept as compensation in full for
  those services, the amounts described in Exhibit A." (Ex. 1, Art. 5.A). Exhibit A
  provides, as to "any Program Providing Health Care Services," Larusso "agrees to accept
  80% of usual and customary fees." He admits that his CCN Contract "require[d him] to
  accept fees for services to subscribers at discounted rates from payors." (Compl. ¶ 16).

- **Article 4:** addresses the procedures by which payment is to be made. Article 4 states
  that CCN agreed to "[p]rocess [Larusso's] claims for Health Care Services rendered to
  MedView Subscribers as provided in Exhibit A" and to "[a]djust fees for Health Care
  Services to the amounts referred to in Exhibit A." Exhibit A reflects Larusso's agreement
  to accept discounted fees.

In short, what the CCN Contract provided for was exactly what Larusso alleges happened: CCN

marketed his services to Hartford, in exchange for which he agreed to provide services at a

discounted rate. Hartford paid the reduced bills. Nothing in this sequence of events constitutes a

---

[4]      There can be no argument that this does not apply to PIP insurance. *See* note 2, *supra*.

breach of the CCN contract.

While Larusso alleges that CCN was not allowed to market his services to Hartford (Compl. ¶¶ 38, 40), these allegations are but mere legal conclusions which are belied by the provisions of his CCN Contract and need not be taken as true. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). Accordingly, all of Larusso's claims (Counts I-V) are barred because the basis of his claims, that his CCN contract was violated, is without legal or factual foundation.

## II.   There Has Been No Violation of Florida Statute

An alternative basis of Larusso's claims is his allegation that, by paying him according to the discounted rates he negotiated with CCN, Hartford violated the PIP Statute, Fla. Stat. § 627.736(10) (Count V). There are two basic flaws with this theory. First, the PIP Statute regulates the contractual relationship between insurers and their insureds. It does not regulate the contractual relationship, if any, between insurers and medical providers. Second, Larusso does not have a private right of action for violation of Stat. § 627.736(10).

### A.   The PIP Statute Does Not Regulate The Relationship Between Insurers And Providers

The aim of the PIP Statute is twofold: to make certain that insureds receive adequate medical treatment and to lower total medical costs. To promote these aims, the Legislature has partially regulated the contracting process. The PIP Statute sets certain contractual requirements and it provides means by which parties can vary their contracts from those requirements. Subsection (1) describes the protections that a PIP policy must provide, including, as a general matter, that an insurer must pay 80% of reasonable and necessary medical expenses. Subsection (10) describes a situation where an insurer can offer different benefits than those set forth in Subsection (1). It is these subsections on which Larusso focuses, arguing that Hartford has failed to pay the required benefits. (Compl. ¶ 178).

Larusso is wrong. Neither of these subsections has anything to do with whether an insurer can negotiate a reduced rate with a provider on an individual or global basis. These subsections are not concerned with the **size** of the bill; they are concerned with how the cost of that bill is shared between the insurance company and the insured. For example, if a reasonable bill is

CASE NO. 01-8111-CIV-FERGUSON

$400, an insurer must generally pay 80% ( $320). Whether an insurer can negotiate with the provider to reduce the bill from $400 to $300 is an issue entirely outside the scope of the Statute. Indeed, the only part of the PIP Statute addressing the **size** of a provider's bill is subsection (5)(a), which forbids providers from charging more than a "reasonable amount." It certainly does not prevent negotiated discounts.

Once it is understood that the focus is not on the size of the bill but on the way in which the cost is shared between the insurer and the insured, it becomes clear that Hartford did not violate the statute. The only way it could have violated the statute was to leave one of its insureds obligated to pay more than 20% of a provider's bills. But it never did that.

If Hartford and CCN bargained with Larusso for a lower price, as they did, Hartford had to pay only 80% of that lower price. One court has recognized that this practice is consistent with the PIP Statute, finding that the "practice of entering into agreements with health care providers to charge reduced rates for services rendered by such providers to PIP claimants under . . . automobile insurance policies does not violate the requirements of Florida Statutes, § 627.736(1)." *Del Gardo v. Allstate Ins. Co.*, (Case No. 95-13760-04, Order Dated July 9, 1999, attached at Ex. 2).

If Hartford proceeded under subsection (10), the Statute would permit Hartford to vary the insured's benefits from the 80% requirement of subsection (1).[5] Indeed, Hartford would be permitted to "pay benefits in excess of those required by this section." § 627.736(10). That is, on a bill of $400, Hartford could pay 90% instead of 80% -- $360 instead of $320 -- in order to induce its insureds to visit a particular provider, to reduce deductibles and/or to attract new insureds.[6] This makes economic sense. Paying 90% of certain provider's discounted rates might still be cheaper for an insurer than paying 80% of a different provider's undiscounted rate.

---

[5]    Nothing in § 627.736(10) requires Hartford to offer a PPO program.

[6]    Larusso's theory is that Hartford has been doing the opposite, paying **less** than required. (Compl. ¶¶ 178, 183). Section 627.736(10) does not authorize insurers to pay **less** than 80%, so whether Hartford has complied with its requirements or not is irrelevant. And what Hartford has done is not to pay less (or more) than 80% of Larusso's fees. It is simply agreed to a lower fee, something the statute does not address at all.

Again, the Statute makes no mention of a provider's discount. Whether a provider itself negotiates a discount with an insurance company is irrelevant for the purposes of the Statute.

## B.    There Is No Private Right of Action For Violation of § 627.736(10)

Under Florida law, a private right of action exists solely where such right exists on the face of the statute or where legislative history reveals an intent by the legislature to provide for a private right of action. *Murthy v. N. Sinha Corp.,* 644 So. 2d 983, 985-86 (Fla. 1994). Notably, the PIP statute itself does not provide a private right of action for violation of subsection 10.

When the legislature has seen fit to authorize a private right of action, it has done so expressly. *See, e.g.,* Fla. Stat. § 624.155 (providing for private right of action for violation of certain insurance statutes not including § 627.736). In a case with almost identical allegations and claims for relief, this Court held that there is no private right of action under this statute. *See May v. Allstate Ins. Co.,* (Case No. 00-6269-CIV-DIMITROULEAS) (S.D. Fla. April 14, 2000) at 4-8 (attached as Ex. 3).

Even if a private right of action exists, Larusso does not have standing to assert such a claim. Florida law is clear that where a cause of action is to be implied under a statute, only members of the class intended to benefit from the statute are entitled to sue. *See Fischer v. Metcalf,* 543 So. 2d 785, 788 (Fla. 3d DCA 1989). As this Court held in *May,* (Ex. 3 at 6):

> § 627.736, Fla. Stat., was not enacted to benefit medical providers. Plaintiffs are not the class whose especial benefit the statute was enacted. The statute was enacted to protect insureds from harm as a result of accidents with other drivers, and actions by insurance companies. The statute was not enacted to ensure that medical providers received what they felt was a reasonable wage. The legislature did not imply, nor can it be inferred, that the medical providers were the parties the statute was enacted to protect. The Court cannot infer that the Legislature intended to protect the medical providers with the enactment of § 627.736.

Thus, Larusso has no standing to bring his claim for violation of § 627.736(10) (Count V).

## III.    There Has Been No Violation of Hartford's Contracts With Its Insureds

By Count II , Larusso asserts rights as a "third-party beneficiary" of Hartford's contracts with its insureds.[7] Larusso alleges that, because Hartford has paid 80% of Larusso's discounted

---

[7]    Not only has Larusso failed to attach a copy of his CCN contract, he has failed to attach or incorporate the contract which forms the basis for his breach of third party beneficiary

fee, Hartford has breached its contractual obligation to pay 80% of its insureds' reasonable and necessary medical expenses. This Count must be dismissed for two reasons: (1) Larusso is not an intended beneficiary of Hartford's contracts with its insureds; and (2) Hartford's alleged conduct does not constitute a violation of those contracts.

### A.    Larusso Is Not An Intended Beneficiary of Hartford's Policies

A person who is not a party to a contract may sue for breach of that contract **only if that person is an intended third-party beneficiary thereof**. *See, e.g., Caretta Trucking v. Cheoy Lee Shipyards,* 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994). That is, a party must allege: (1) a contract between A and B; (2) an intent, either expressed by the parties or in the contract, that the contract primarily and directly benefit C, the third party; (3) a breach of that contract by either A or B (or both); and (4) damages to C resulting from the breach. *See Caretta Trucking,* 647 So. 2d at 1031. In addition, **both** contracting parties must have intended to benefit the third party. *Id.; see also Clark & Co. v. Department of Ins.,* 436 So. 2d 1013, 1016 (Fla. 1st DCA 1983). Larusso's allegations fail to include these requisite elements.

For example, Larusso's allegations do not establish the second element -- that both Hartford and its insureds specifically intended for Larusso to primarily and directly benefit from the policies. Although an individual automobile insurance policy may contemplate that Hartford would indemnify an insured for certain costs incurred, including charges for medical services, the policy directly and primarily benefits only Hartford (which receives premium payments from its insureds) and its insureds (who receive insurance coverage). Although Larusso and may have received an indirect benefit from the policy -- *i.e.,* by Hartford paying for medical services that Larusso provided to its insureds -- such a benefit is too far removed to establish that the medical providers were meant to benefit directly and primarily from the policy. *See Caretta Trucking,* 647 So. 2d at 1031-32.

More importantly, Larusso's claim of "third party beneficiary" status is suspect and

---

contract claim. *See Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982) (dismissal is appropriate when the complaint fails to mention provisions of the contract that allegedly have been violated).

ignores Florida PIP case law.   In most instances, a provider who seeks to sue insurers for medical billing dispute does so pursuant to an "assignment of benefits" from an insured transferring the insured's right to sue for those benefits.  As one Florida appellate court has observed, "[c]ourts have recognized that medical service providers can assert claims for PIP benefits against insurers **when an insured has assigned them the right to the benefits**." *Hartford Ins. Co. of the Southeast v. St. Mary's Hosp.*, 771 So. 2d 1210 (Fla., 4th DCA 2000) (providers can assert claims for PIP benefits against insurers "when an insured has assigned them the right to benefits."); *see also Parkway Gen. Hosp., Inc. v. Allstate Ins.* Co., 393 So. 2d 1171, 1172 (Fla., 3d DCA 1981); *Medical Rehab and Therapy Ctr. v. State Farm Mutual Auto. Ins. Co.*, 8 Fla. L. Weekly Supp. 605 (Fla., 13th Jud'l Cir. (App.), July 16, 2001) (without an assignment, medical provider lacked standing to sue for PIP benefits); *Sal Martingano, D.C. v. State Farm Mutual Auto. Ins. Co.*, 8 Fla. L. Weekly Supp. 323 (Fla., Brevard County, March 5, 2001) (same).  Notably, Larusso does not allege that he holds such an assignment.   Instead, he attempts to circumvent this requirement by asserting improper "third party beneficiary" status.

## B.    Hartford's Alleged Conduct Does Not Violate Its Contracts With Its Insureds

Larusso's breach of contract argument is essentially identical to Larusso's claim that Hartford violated § 627.736(10) by paying 80% of a negotiated fee, and it fails for the same reasons.  Larusso agreed to "accept as compensation in full . . . the amounts described in Exhibit A," (*i.e.*, "80% of usual and customary fees").  (Ex. 1 at Art. 5.A; Ex. A).  When Larusso entered into his CCN Contract, he negotiated a fee for his services.  That negotiated fee constitutes the total of the insured's medical expenses.  Indeed, Florida case law clarifies that the statutory obligation is only to pay 80% of a provider's reasonable "bill."  *See, e.g., Bolden v. State Farm Mutual Auto. Ins. Co.,* 689 So. 2d 339, 340 (Fla. 4th DCA 1997) (payment of "80% of . . . medical bills" is "required by the PIP statute").

Larusso does not even attempt to explain how paying 80% of a negotiated fee amounts to a breach of contract, nor does he point to any language in Hartford's contracts with its insureds that forbids Hartford from negotiating discounts with health care providers.  His sole allegation of impropriety is that "Hartford breached the agreement by improperly paying medical expenses

at reduced rates." (Compl. ¶ 99). Again, this is a legal conclusion, which need not be considered on a motion to dismiss. *See Papasan*, 478 U.S. at 286. It is unsupported by any specific factual allegation and it is false. As demonstrated above, Larusso's CCN Contract authorized Hartford to pay the discounted fee. Accordingly, Larusso's contract claim (Count II) must be dismissed.

## IV.    Larusso Fails To State A Claim For Unjust Enrichment

### A.    Larusso Has Failed To Allege the Elements of A Claim for Unjust Enrichment (Count I)

To maintain a claim for unjust enrichment, Larusso must allege that: (1) he has conferred a benefit on Hartford, who has knowledge of it; (2) Hartford voluntarily accepted and retained the benefit; and (3) the circumstances are such that it would be inequitable for Hartford to have retained the benefit without paying the value thereof to Larusso.[8] *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank*, 667 So. 2d 876 (Fla. 3d DCA 1996). It is vital that Larusso allege that he has **directly** conferred a benefit upon Hartford. *Huntsman Packaging Corp. v. Kerry Packaging Corp.,* 992 F. Supp. 1439 (M.D. Fla. 1998); *Peoples*, 667 So. 2d at 879.

The only benefit that Larusso **directly** conferred was his medical services -- which were conferred solely upon Hartford insureds. (*Id.* at ¶ 90). Larusso does not and cannot allege that he directly conferred any benefit upon Hartford itself. Indeed, as the courts found in *Huntsman* and *Peoples,* the mere fact that a defendant may have indirectly benefitted from a plaintiff's services is insufficient to support an unjust enrichment claim. *See Huntsman*, 992 F. Supp. at 1446 (where plaintiff provided materials to company which failed to pay, sued prospective purchaser of company and bank which had loaned money thereto, plaintiff failed to state claim for unjust enrichment because defendants were merely third parties who did not receive any direct benefits from plaintiff); *Peoples*, 667 So. 2d at 879. Accordingly, Count I must be dismissed.

---

[8]    Larusso also fails to allege that he is without an adequate remedy at law. This too is fatal to Larusso's equitable claim for unjust enrichment. *See Martinez v. Weyerhaeuser Mortgage Co.,* 959 F. Supp. 1511 (S.D. Fla. 1996).

CASE NO. 01-8111-CIV-FERGUSON

**B.     Larusso's Claim for Unjust Enrichment Is**
**        Inconsistent with His Contractual Claim**

Principles of equity prohibit a party to sue for unjust enrichment when the parties share a contractual relationship. Indeed, an unjust enrichment theory creates a "quasi contract" or a "contract implied in law" only where an actual contract does not exist or cannot be enforced. *Gilman Yacht Sales, Inc. v. First Nat'l Bank*, 600 So. 2d 1131, 1135 (Fla. 4th DCA 1992); *Hoon v. Pate Constr. Co.,* 607 So. 2d 423, 427 (Fla. 4th DCA 1992); *Quayside Assoc., Ltd. v. Triefler*, 506 So. 2d 6, 7 (Fla. 3d DCA 1987).

While Larusso contends that he is an intended third party beneficiary of the contract between Hartford and Hartford insureds (Compl. ¶ 101), he has brought an inconsistent claim for unjust enrichment. Equity is a not a "back door" to new or different contractual terms. The theory of unjust enrichment has no application to actual contractual relationships. *Santovenia v. Confederation Life Ass'n*, 460 F.2d 805, 811 (5th Cir. 1972). The alleged existence of a contract-based relationship between Hartford and Larusso affords Larusso an adequate remedy at law, and estops him from pleading a theory of unjust enrichment. *Bowleg v. Bowe,* 502 So. 2d 71, 72 (Fla. 3d DCA 1987).

**V.     Larusso Fails to State A Claim For Declaratory Relief**

By Count IV, Larusso seeks a declaration that Hartford breached its policies by reducing amounts payable on his bills. His claim must be dismissed because: (1) he is not a third party beneficiary of the policies between Hartford and its insureds and thus has no standing to sue for declaratory relief as to those policies; (2) his claim is not appropriate for declaratory relief as a matter of law; and (3) his claim is merely duplicative of his breach of contract claim.

First, it is clear that Larusso lacks standing to maintain his declaratory relief claim. It is beyond dispute that third parties to a contract do not have rights under that contract unless they are intended third-party beneficiaries. *See, e.g., Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277 (Fla. 1985); *McKinney-Green, Inc. v. Davis*, 606 So. 2d 393 (Fla. 1st DCA 1992). As set forth above, Larusso is not an intended beneficiary of the Hartford policies and has no standing to bring a claim for declaratory relief in connection with those policies.

Second, Larusso's claim is inappropriate for declaratory relief as a matter of law. In reviewing a claim for declaratory judgment challenged by a motion to dismiss, the issue is not whether the plaintiff will prevail but whether the plaintiff is entitled to a declaration of rights.[9] *See, e.g., Dimuccio v. D'Ambra,* 779 F. Supp. 1318, 1322 (M.D. Fla. 1991); *X Corp. v. Y Person*, 622 So. 2d 1098, 1101 (Fla. 2d DCA 1993). Declaratory relief is not available "where the object of the action is to try disputed questions of fact as the determinative issue rather than to seek a construction of definite stated rights, status or other relations." *X Corp.,* 622 So. 2d at 1101; *see also Medical Center Health Plan v. Brick*, 572 So. 2d 548, 551 (Fla. 1st DCA 1990); *Wolf Sanitary Wiping Cloth, Inc. v. Wolf,* 526 So. 2d 702 (Fla. 2d DCA 1988).

Here, the requested declaration is not a simple matter of policy or statutory construction. Rather, it contemplates the resolution of myriad individual **issues of fact** -- *i.e.,* whether Larusso will prevail on his alleged entitlement to payment of certain medical bills. Another Florida federal court dismissed a similar class action against a PIP insurer on the basis of a similarly inappropriate declaratory relief action. In *Reed v. State Farm Mutual Auto. Ins. Co.*, slip op. at 6 (Case No. 98-798-CIV-T-24F) (M.D. Fla. July 30, 1998) (attached as Ex. 4), the court found that the plaintiffs effectively sought a declaration that they would prevail on their claims for PIP benefits, the determinative issue in the case, which was inappropriate in an action for declaratory relief. *See also Cruz v. Union Gen'l Ins.,* 586 So. 2d 91, 91-92 (Fla. 3d DCA 1991) (court dismissed declaratory relief action seeking determination that medical bills were appropriate under the PIP statute; court found that plaintiff's avenue of redress "is an action for breach of contract"); *Donovan v. State Farm Mut. Auto. Ins. Co.,* 560 So. 2d 330, 330 (Fla. 4th DCA 1990) (propriety of PIP medical bills is a factual issue for the jury). Larusso's claim for declaratory relief -- which seeks nothing less than a declaration that Hartford should pay his bills -- should likewise be dismissed with prejudice

Finally, Larusso's declaratory relief claim should be dismissed because it represents nothing more than a repetition of his claim for breach of third-party beneficiary contract (Count

---

[9]     Larusso has also failed sufficiently to allege that he is without an adequate remedy at law, which is a prerequisite to such declaratory relief.

II) and offers no independent basis for relief. Indeed, by seeking a declaration that Hartford breached the policy, Larusso seeks nothing more than a declaration that he "wins" his claim for breach of contract. Such a declaration is meaningless and offers no independent relief.

## VI.    Larusso Fails To State a Claim For RICO Violations

Count III of the Complaint appears to assert an undefined RICO claim. Indeed, it is almost impossible to discern the intended scope of Larusso's RICO claim. Hartford is left to presume that Larusso is asserting violations of §1962(c) and (d) as these are the only sections set forth as "subheadings" in the RICO section of the Complaint. (Compl. at 26-27). To add to the confusion, even these subheadings are lumped together under a larger subheading titled "RICO violations of 18 U.S.C. §§ 1962(d)." (*Id.* at p. 27).

Rather than venture into all the vast complexities of RICO jurisprudence at this juncture, Hartford identifies the following deficiencies with regard to Larusso's RICO claim, all of which provide sufficient basis for dismissal.

### A.    The RICO Claim Does Not Sufficiently Allege Predicate Acts

### 1.    It Does Not Sufficiently Allege Mail Fraud Or Wire Fraud

To state a claim for mail fraud and/or wire fraud,[10] Larusso must allege that Hartford: (1) knowingly devised or participated in a scheme to defraud him; (2) intended to defraud him; and (3) used the U.S. mail or interstate wires for the purpose of executing the scheme. *See Neder v. United States*, 527 U.S. 1, 24-25 (1999); *United States v. O'Malley*, 707 F.2d 1240, 1246-47 (11th Cir.1983). He must precisely allege the content of each fraudulent representation and must specifically identify the acts of each individual who allegedly participated in the scheme. *See Cesnick v. Edgewood Baptist Church*, 88 F.3d 902 (11th Cir. 1996).

Larusso relies on mere conclusory statements. He alleges, in a conclusory manner, that Hartford engaged in multiple acts of mail fraud and wire fraud. The essence of his claim is that Hartford transmitted EOB forms explaining the discounted fees. (Compl. ¶¶ 107(d), 128). Again, this claim rests upon the same central theory as his other counts: that Hartford was not

---

[10]    The elements of mail fraud and wire fraud are identical. *See Pelletier v. Zweifel*, 921 F.2d 1465 (11th Cir. 1991). Therefore, this motion addresses the two claims together.

entitled to the discounts because it had no steerage mechanisms in place. (*Id.* at ¶ 128(b)). As set forth above, the CCN Contract authorized CCN to market Larusso's services to insurers without qualification. Indeed, the word "steerage mechanism" does not appear in that contract.

He does not and cannot allege that Hartford fraudulently induced him to enter into any agreements or that the EOB forms themselves contained false statements. *See U.S. v. Migliaccio,* 34 F.3d 1517 (10th Cir. 1994); *Seaman v. Arvida Realty Sales, Inc.,* 910 F. Supp. 581 (M.D. Fla. 1995). The EOB form he attaches clearly discloses that the amount paid by Hartford **included the application of a discount**. (Compl. at ¶ 50, Ex. 1). Thus, there is no intent to defraud.

Moreover, Larusso does not include any allegations that Hartford intended to defraud him. *See U.S. v. Alkins*, 925 F.2d 541 (2d Cir. 1991) (finding that a defendant is not guilty of mail fraud or wire fraud if defendant believed the information it is transmitting is true). Nor does he allege how he reasonably and justifiably relied to his detriment upon any information in the EOB forms. In fact, the Complaint contains no allegations as to his reliance. Accordingly, Larusso cannot rely upon mail fraud or wire fraud to satisfy the RICO predicate act requirement.

### 2. The RICO Claim Does Not Sufficiently Allege Any Other Predicate Acts

In addition to his claims of mail and wire fraud, which are clearly the focal "predicate acts," Larusso refers to a variety of other purported predicate acts. (Compl. at ¶¶ 104, 121-139, 165). Larusso has failed to state a cause of action under any of these statutes:

- **The Hobbs Act, 18 U.S.C. §1951(b)(2):** makes it unlawful to interfere with commerce by extortion. While Larusso alleges that Hartford exploited his "fear of economic loss and/or loss of business," (*id.* at ¶ 134) there are no factual allegations supporting this statement. *See Rini v. Zwirn*, 886 F. Supp. 270, 291 (E.D.N.Y. 1995) (plaintiffs' allegation as to Hobbs Act extortion was devoid of any pleaded facts indicating when the alleged extortion demands occurred, who made them or to whom they were made. "Pleadings which . . . merely parrot the statutory language are plainly inadequate to support a civil RICO predicate act."). Moreover, this theory is entirely inconsistent with Larusso's premise that Hartford was not employing "steerage mechanisms" to begin with.

- **The Travel Act, 18 U.S.C. §1952(a):** requires that Larusso allege that Hartford engaged in interstate travel with the intent to promote unlawful activity or that Hartford committed an overt act in performing or attempting to perform an unlawful activity. *See U.S. v. Fetlow,* 21 F.3d 243 (8th Cir. 1994). The Travel Act defines "unlawful activity" to include such crimes as extortion, bribery, arson, and money laundering. *See* §1952(b).

No such allegations are contained in the Complaint.

- **Armed Vessels or Foreign Nations, 18 U.S.C. §961:** the inclusion of this section is an error that should be stricken. The inclusion of this error is particularly egregious as this mistake has been pointed out to Larusso's counsel in connection with previous motions filed in these cases. Clearly, this section does not apply to the allegations in this Action.

- **Offer, acceptance, or solicitation to influence operations of employee benefit plan, 18 U.S.C. §1954:** As there are no factual allegations dealing with this purported violation, Hartford presumes that this reference is also an error and should be stricken.

- **Scheme or artifice to defraud, 18 U.S.C. §1346:** Section 1346 is not a separate substantive offense. Rather, it provides a definition for "scheme or artifice to defraud" for the mail fraud and wire fraud statutes. Accordingly, this statute does not provide the basis for a predicate act.

Accordingly, Larusso's RICO claim should be dismissed.

### B.    The RICO Claim Fails To Statute A Claim Under §§ 1962(c) or (d)

Section 1962(c) makes it unlawful for any person "employed by or associated with any enterprise" to conduct the affairs of the enterprise through a pattern of racketeering activity. 18 U.S.C. §1962(c). In this case, Larusso alleges that Hartford and CCN formed an association-in-fact enterprise. (Compl. at ¶102). The Complaint is, however, devoid of allegations as to the structure of the enterprise. *See United States v. Goldin Indus.*, 219 F.3d 1271, 1275 (11th Cir. 2000). Nor does the Complaint allege that Hartford and CCN engaged in an ongoing organization as a continuing unit. Therefore, Larusso's RICO claim fails to state a claim under §1962(c) and should be dismissed.

Alternatively, the Complaint appears to assert a claim under §1962(d) on the basis that Hartford conspired to violate both §1962(a) and §1962(c). A RICO conspiracy requires that Larusso allege and prove an agreement to violate substantive RICO provisions, which can be shown: (1) by an "agreement on an overall objective," *United States v. Valera*, 845 F.2d 923, 929 (11th Cir.1988); or (2) a personal agreement to commit two predicate acts and therefore to participate in a "single objective" conspiracy. *See United States v. To*, 144 F.3d 737 (11th Cir. 1998). The Complaint falls short of pleading either of these types of agreements. Indeed, under the "Section 1962(d) claim" subheading, there are no allegations as to any sort of an agreement,

let alone an agreement between CCN and Hartford to violate RICO.   More importantly, Larusso cannot state a cause of action under §1962(d) **in the absence of a stated violation of any substantive RICO section.**   As he has failed in his attempt to plead a violation of any substantive RICO section, his RICO claim should be dismissed.

### C.    Larusso's Claims For Punitive Damages Under RICO Should Be Stricken

Larusso seeks to recover punitive damages for the alleged RICO violations.  (Compl.  ¶ 194).  But he is not entitled to punitive damages under RICO because RICO already provides for treble damages.  *See Toucheque v. Price Bros. Co.,* 5 F. Supp. 2d 341, 350 (D. Md.1998); *Standard Chlorine of Delaware, Inc. v. Sinibaldi,* 821 F. Supp. 232 (D. Del. 1992); *Bingham v. Zolt,* 823 F. Supp. 1126, 1135 (S.D.N.Y.1993). Accordingly, this Court should strike Larusso's demand for punitive damages.

## VII.    Larusso Has Failed To State Viable Class Action Claims

### A.    Larusso's RICO Allegations Are Not Appropriate For Class Action Treatment

As set forth above, Larusso brings this Action as a putative class action on behalf of all similarly situated providers.  However, Larusso's RICO claim, which is essentially predicated on alleged acts of mail and wire fraud, is inappropriate for class action treatment as a matter of law. It will indisputably  require individualized proof of misrepresentation, reliance, injury and damages. *See Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014, 1025 (11th Cir. 1996) (RICO claim predicated on mail fraud and wire fraud was inappropriate for classwide resolution due to manageability concerns); *Pelletier v. Zweifel,* 921 F.2d 1465, 1499-50 (11th Cir. 1991) (each plaintiff must demonstrate reliance on deceptive conduct in furtherance of the alleged RICO scheme).  The Eleventh Circuit reaffirmed this principle earlier this year in *Patterson v. Mobil Oil Corp.,* 2001 WL 96049 (5th Cir. Feb. 5, 2001).  In *Patterson,* the court reiterated that RICO claims premised on fraud are inappropriate for class action treatment because individual findings of reliance are necessary to establish such RICO claims.

### B.    Larusso's Other Claims Are Equally Unsuited For Class Action Treatment

Larusso's other class claims are equally inappropriate for class action treatment.  Courts

have recognized that similar insurance class actions, involving thousands of claims under individual policies, are unfeasible because individual factual issues predominate over common legal questions in such cases. *See, e.g., Reed*, Ex. 4 at 6, n.3; *Banks v. Travelers Ins. Co.*, 60 F.R.D. 158, 160 (E.D. Pa. 1973) (class action arising from separate insurance contracts was inappropriate for class action treatment); *Humana, Inc. v. Castillo*, 728 So. 2d 261 (Fla. 2d DCA 1999); *Cordell v. World Ins. Co.*, 418 So. 2d 1162 (Fla. 1st DCA 1982). Indeed, courts have dismissed class claims even before class certification has been considered. *See, e.g., Reed*, Ex. 4.

This case is a perfect example of why courts have refused to permit some insurance disputes to proceed as class actions. Here, the Court will need to make a myriad of individual factual determinations with regard to each claim that will far outweigh any similarity that may exist between the claims. The adjudication of this case as a class action would require this Court to consider the individual facts surrounding the PIP medical claims of thousands of Hartford policyholders and their providers and Hartford's many defenses to each one of those claims. For example, the Court would need to consider whether each class member had a proper PIP medical bill which was inappropriately reduced by Hartford. Thus, for each class member's claim, the Court would need to determine, at a minimum:

- Whether each bill was submitted in connection with a PIP claim;

- Whether the medical provider had a valid assignment of benefits or other standing to sue;

- Whether the bill was for a medical benefit covered by the PIP Statute (*i.e.,* whether the bill was for reasonable expenses for necessary medical or other services. § 627.736(1)(a). This determination could require expert testimony as to each individual bill;[11]

- Whether the bill was for services rendered by a hospital-owned facility. § 627.736(5)(b);

- Whether any authorized exclusions under the PIP Statute applied to the bill. § 627.736(2);

- Whether the class member provided "reasonable proof" of his or her loss. § 627.736(4);

- Whether the bill arose out of covered accidental bodily injury defined in § 627.736(4)(d);

---

[11]    As set forth above, the issue of whether particular medical services are "reasonable" or "necessary" is unquestionably an issue that would have to be individually determined with regard to each class member. *See Reed*, Ex. 4 at 6; *Donovan*, 560 So. 2d at 330.

- Whether the bill was properly countersigned on a form approved by the Department of Insurance. § 627.736(5)(a);

- Whether the charges set forth in the bill were in excess of the amount that the provider customarily charges. § 627.736(5)(a);

- Whether the provider had valid licenses to perform the services at issue. § 627.736(5)(d);

- The date that the medical services associated with the bill were rendered;

- The date that the bill for such services was postmarked. § 627.736(5)(b);

- Whether a bill was associated with a course of treatment or single visit. § 627.736(5)(b);

- The date that Hartford received each separate medical bill;

- Whether Hartford paid the medical bill;

- If the bill was not paid, the reason that payment was denied; and

- If the bill was paid, whether it was paid on time.

The recent amendments to the PIP Statute, which substantially change certain provisions, including caps on certain reimbursements to providers, will only complicate this analysis.

In addition to these numerous inquiries regarding the entitlement of each class member to payment on an individual PIP medical bill, each class member may also be subject to different and unique defenses in response to their claim for PIP benefits. For example:

- Whether the provider has standing to sue, including the issue of whether the provider has a legally valid assignment of benefits;

- Whether there had been any prior settlements/litigation between Hartford and the class member;

- Whether Hartford had any counterclaims, set-offs (such as overpayment) or individual defenses; or

- Whether Hartford wanted to request mediation pursuant to Fla. Stat. § 627.745(1)(a).

These issues are but the tip of the iceberg. Clearly, all of these individual factual issues cannot be successfully resolved in a single court proceeding.

When faced with circumstances like the instant case, courts have dismissed class claims

in insurance policy cases.  In *Reed*, Ex. 4 at 6, for example, the court found that a similar PIP

class action was inappropriate for class action treatment because individual factual issues would

predominate over common legal questions. *See also Ross-Randolph v. Allstate Ins.* Co., (Case

No. DKC-99-334) (D. Maryland,  May 11, 2001) (attached as Ex. 5) (same); *Cordell*, 418 So. 2d

at 1164 (class action claims dismissed where class members sought different remedies and

defendant could assert different defenses to each claim).  This case law is clear that, because of

the innumerable factual determinations involved in resolving the multitude of claims asserted in

this proposed class action, the class claims should be dismissed.  Individual factual issues will

quickly overwhelm any questions common to the class as a whole, rendering this action

inappropriate for class action treatment.

     **WHEREFORE,** Hartford respectfully requests that this Court dismiss the Amended

Complaint in its entirety.

Respectfully submitted,

Akerman, Senterfitt & Eidson, P.A.
Counsel for Defendant
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, Florida 33131-1704
Phone: (305) 374-5600
Fax: (305) 374-5095
E-Mail: MAldrich@Akerman.com


Marcy Levine Aldrich
  Fla. Bar No. 0968447
Paul Shelowitz
  Fla. Bar No.777447


and
Howard J. Roin
Co-Counsel for Defendant
Mayer, Brown & Platt
190 South LaSalle Street
Chicago, IL, 60603-3441
Tel: 312-782-0600
Fax: 312-701-7711
E-Mail: hroin@mayerbrown.com

# EXHIBIT "1"

## Participating Health Care Professional Agreement

This Agreement is made and entered into this ___30___ day of _April_, 19 _96_ by and between MedView Services, Incorporated, a Corporation doing business as MedView, and Compensation Professionals ("MedView") having its principal place of business at 32991 Hamilton Court, Farmington Hills, Michigan 48334, and _N. Salah Lahssa_ (hereinafter, the "Health Care Professional" ("HCP")).

### RECITALS

A. MedView develops contractual arrangements with Payors, which include employers, insurance carriers, third party administrators and other similar entities for the purpose of coordinating and arranging for the delivery of health care services to Subscribers. Certain of those arrangements relate solely to Workers' Compensation Programs, while other arrangements relate generally to programs for the provision of health care services.

B. HCP wishes to provide health care services to Subscribers in accordance with the terms of this Agreement and MedView wishes HCP to provide those services to Subscribers.

### AGREEMENT

NOW, THEREFORE, in consideration of the following mutual promises and covenants and other good and valuable consideration, the sufficiency of which is acknowledged by the parties, it is agreed as follows:

### ARTICLE 1.  DEFINITIONS

A. "Health Care Services" means those health care services that the HCP is licensed, equipped and staffed to provide, and which HCP customarily provides to its patients, and which are, for each respective Subscriber, services for which certain benefits are available under a Group Contract or Workers' Compensation contract or any other program with provisions for health care services.

B. "Medical Necessity Recommendations" means those recommendations made on a case by case basis pursuant to Utilization Review with respect to services rendered or to be rendered to Subscribers, using criteria such as the intensity of service, severity of illness and discharge screens (ISD) review systems, medical standards of practice. Such determinations shall be made by MedView or a party designated by MedView to make such a determination.

C. "Other Subscriber Charges" means copayments, coinsurance, deductibles, encounter fees and similar charges, if any, applicable to health care services which are to be paid by the Subscriber pursuant to the terms of Payor's obligation to provide or arrange for health care services or benefits for the Subscriber.

D. "Participating Provider" means a health care professional and/or corporation licensed under the laws of the State of Florida which has been extended the privilege to enter into a valid contract with MedView to provide Health Care Service to Subscribers.

E. "Third Party Payor" means an insurance company, employer, third party administrator, or other business entity which has contracted with MedView to pay for Health Care Services rendered by the HCP to MedView insured employees.

F. "Quality Assurance" means the process by which MedView, or a party designated by MedView determines that Health Care Services are provided to Subscribers consistent with the standard of quality of care generally accepted in their respective medical communities and generally accepted by governmental and professional review entities.

G. "Subscriber" means a person who is entitled to receive certain benefits with respect to Health Care Services.

H. "Utilization Review" means the process by which MedView or a party designated by MedView determines whether or not Health Care Services rendered or to be rendered to a Subscriber meet applicable requirements regarding medical necessity and standards of care.

I. "Clinic Services" means any and all services which a clinic licensed under the laws of the State of Florida is permitted to provide to patients.

### ARTICLE 2.  REPRESENTATIONS AND WARRANTIES

A. MedView represents that, to the best of its knowledge, as of the effective date of this Agreement, none of the activities to be performed hereunder by MedView have been interpreted by a properly empowered body to be in violation of any applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local.

B. MedView does not represent or warrant that in the future, no properly empowered body will ever find the duties undertaken by MedView to be in violation of or contrary to any applicable law, regulation, order or rule of any governmental agency or court



**EXHIBIT**

**A**

1

...cy, whether federal, state or local ...e event of such a finding of a violation by MedView, the HCP ...aives all right to sue MedView for any damages arising o ...: such violation, unless MedView is found to have knowingly, willfully, and wantonly violated an applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local.

C. HCP represents that neither the making of this Agreement nor the activities to be performed by the HCP pursuant to this Agreement will result in a breach of or default under any Agreement to which the HCP is a party. The HCP also warrants that as of the effective date of this Agreement, none of the activities to be performed hereunder by the HCP have been interpreted by a properly empowered body to be in violation of any applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local.

D. HCP does not represent or warrant that in the future, no properly empowered body will ever find the duties undertaken by the HCP to be in violation of or contrary to any applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local. In the event of such a finding of a violation by the HCP, MedView waives all rights to sue the HCP for any damages arising out of such violation, unless the HCP is found to have deliberately, intentionally and knowingly violated an applicable law, regulation, order or rule of any governmental agency or court decision, whether federal, state or local.

## ARTICLE 3. DUTIES OF HCP

A. HCP shall render health care services to Subscribers which HCP is qualified by law to provide, which are medically necessary and consistent with the standard of quality of care generally accepted in their respective medical communities.

B. HCP shall comply with the requirements of all laws and regulations applicable to HCP's business and operations, and shall maintain in effect all licenses, permits and all governmental and board authorizations and approvals required thereby for that business and operations and to provide health care services.

C. HCP shall exercise best efforts to admit and/or refer to MedView's participating hospitals and HCP network. HCP shall utilize a participating hospital in the case of emergency whenever possible, guided by the Subscribers best medical interest.

D. HCP agrees to participate in the Utilization Review program and to abide by decisions resulting from that review subject to rights of reconsideration, review and arbitration as provided in Exhibit C.

E. HCP may be required by MedView to obtain and maintain throughout the term of this Agreement, medical staff membership and privileges deemed reasonably necessary by MedView for the performance of HCP's duties hereunder at participating hospitals.

F. HCP shall maintain in effect appropriate policies of insurance, including policies of comprehensive general liability, workers' comp...tion, professional liability and other insurance, with appropriate amounts of coverage as necessary to protect HCP and its officers, agents and employees against any claims, liabilities, damages or judgments arising out of any act or omission relating to the services provided or to be provided under this agreement or a minimum of $500,000.00 per occurrence. HCP shall provide certificates of such insurance to MedView upon request. HCP shall give MedView not less than thirty (30) days prior written notice of any cancellation, nonrenewal or material alteration of any such policies of insurance.

G. HCP shall upon request provide to Payor or MedView appropriate and complete information, records and other written documentation regarding health care services provided to Subscribers hereunder. HCP shall also provide such information and documentation to any properly identified representatives of governmental agencies entitled to access thereto by applicable law or regulations.

H. Without limiting the generality of paragraph G, HCP shall upon request provide to Payor, to Payor's authorized representatives (which may include MedView) and to the Subscriber complete and appropriate records and information regarding any health care services that are subject to the Florida Workers' Compensation Law.

I. Notify MedView of any sanction proceeding against the HCP and/or physician under contract with the HCP regarding reimbursement for services provided under a governmental or non-governmental program, and notify MedView of any modification of clinical practice privileges as an active physician on the staff of a preferred hospital;

J. Inform MedView of any pending malpractice litigation against the HCP and/or physician under contract with the HCP initiated as a result of service rendered to any MedView Subscriber, within seven (7) working days of notification to the HCP and/or physician of the pending litigation, and inform MedView of any settlement or judgement involving malpractice litigation arising out of Health Care Services rendered to any patient, whether or not the patient is a MedView Subscriber.

## ARTICLE 4. DUTIES OF MEDVIEW

MedView, by entering into this Agreement, hereby agrees to:

A. Process the HCP's claims for Health Care Services rendered to MedView Subscribers as provided in Exhibit A hereof;

B. Perform or arrange for the performance of Utilization and Quality Assurance review of all inpatient Hospital and Health Care Services provided to MedView Subscribers;

C. Adjust fees for Health Care Services to the amounts referred to in Exhibit A which is inclusive and attached to and made part hereof.

2

PLF03772002

PLF03774

D. Maintain adequate professional liability insurance.

E. Perform each additional obligation imposed upon it by this Agreement.

## ARTICLE 5. COMPENSATION OF HCP

A. Subject to the other provisions of this Article 5, Payor shall pay or arrange for payment to HCP for health care services provided to Subscribers, and HCP shall accept as compensation in full for those services, the amounts described in Exhibit A. Such compensation shall be reduced, however, by the amount of applicable Other Subscriber Charges, if any. Other Subscriber Charges, if any, shall be described in Exhibit B.

B. HCP shall look solely to Payor for compensation payable to HCP pursuant to paragraph A, and shall not bill for or otherwise collect or attempt to collect from Subscribers any charges for Health Care Services except applicable Other Subscriber Charges. HCP shall look solely to the Subscriber for payment of applicable Other Subscriber Charges described in Exhibit B and for any of HCP's charges for services that are not health care services.

C. With regard to Workers' Compensation Programs,

(a) HCP shall not bill either Subscribers or the employers (other than self insured employers/Payors) of Subscribers for Health Care Services; and

(b) Payor shall only be obligated to pay HCP for Health Care Services rendered in connection with a claim which Payor has determined is compensable under the terms of the applicable Workers' Compensation Program.

D. Notwithstanding any other provision of this Agreement to the contrary, MedView shall have no responsibility to pay any compensation to HCP or any other person for health care services or other services provided to Subscribers. However, MedView shall urge Payor to exercise its best efforts to pay claims for Health Care Services promptly.

## ARTICLE 6. BILLING PROCEDURES

Upon receipt by MedView of HCP charges for Health Care Services rendered to a MedView Subscriber, MedView shall perform the following:

A. MedView shall make all reasonable efforts to process HCP claims for Health Care Services provided under this Agreement within a reasonable time.

B. MedView shall, in any event, submit to the appropriate Third Party Payor a properly completed claim for Health Care Services provided under this Agreement within three (3) business days of the receipt of the submitted claim from the HCP. Parties hereto acknowledge that claims submission and payment may be delayed due to verification of eligibility for workers' compensation benefits, coordination of benefits or subrogation of claims for personal liability claims or the like.

C. An HCP shall submit acceptable claims in the manner set forth, and under the conditions contained in the MedView provider manual, which is hereby made a part of and incorporated herein by reference.

## ARTICLE 7. USE OF HCP'S NAME

A. MedView agrees to make good faith efforts, within reasonable budgetary constraints, to market the HCP's services to existing and potential Third Party Payors, including but not limited to, business entities such as insurance companies, employers and union trust funds provided, however, MedView does not guarantee to the HCP any minimum number of MedView Subscriber patients.

B. HCP authorizes MedView to identify and publish HCP's name, address and available services in MedView's information materials for distribution to Subscribers and in marketing materials for distribution to contractors and potential contractors of MedView.

## ARTICLE 8. UTILIZATION REVIEW AND QUALITY CONTROL

A. The HCP agrees to cooperate fully with MedView in all Utilization Review procedures established by MedView (Exhibit "C" hereof);

B. MedView shall identify any deviations from medical necessity recommendations in accordance with pre-established criteria as described in this Agreement. MedView will specify the reason for the determination of the issue specified and the specific dates of the service in question.

C. In the event of a dispute concerning the appropriateness of a determination by MedView that the Health Care Services do not meet Medical Necessity Recommendations, the HCP may partake in the following appeal process as to the Utilization Review decision:

1. The HCP may appeal to the Utilization Review Committee selected by the management team of MedView.

2. In the event that this Utilization Review Committee affirms the recommendation to the appropriate Third Party Payor of disapproval of some or all of the fees claimed, the HCP may then appeal to the management team of MedView.

3. At each level of appeal, a majority vote of the members of the empowered body shall determine whether medical necessity recommendations have not been met, and thus whether MedView should recommend to the Third Party Payor the disapproval of some or all of the fees claimed by the HCP.

4. At each level of appeal, there shall be de novo review.

5

PLF03772003

MedView will make all reasonable efforts to include on the Utilization Review Committee an ad hoc member representing the Third Party, or concerned with the claim under review.

D. In the event that a Third Party Payor limits or refuses to pay HCP charges for services provided to a MedView Subscriber as a result of a Utilization Review determination, the HCP cannot pursue payment of such covered services privately from the MedView Subscriber and/or the employer, and/or insurer, unless the MedView Subscriber has been personally responsible for the rejection or limitation of payment by the appropriate Third Party Payor. The HCP shall have the opportunity to prove such a contention by partaking in the appeal process set forth in Article 8 C hereof.

Notwithstanding the language contained in this section, in the case of services provided to a MedView Subscriber to which the MedView Subscriber is not entitled by virtue of a contract between a Third Party Payor and MedView, the HCP may freely pursue payment for such services privately from the MedView Subscriber.

E. All communications made during the decisions regarding Utilization Review procedures may be disclosed by either MedView or the HCP only to the extent the MedView Subscriber has consented to such disclosure.

MedView shall independently review the quality of care of the Health Care Services rendered MedView Subscribers. The HCP agrees to be subject to such evaluation, and to supply all information necessary for such evaluation. MedView agrees to give the HCP five (5) working days notice prior to reviewing quality of care of Health Care Services. MedView will make every reasonable attempt to avoid quality of care monitoring during the HCP's normal office hours. The HCP agrees to perform Health Care Services rendered to MedView Subscribers at the level and standard commonly required among the practitioners of the HCP's physicians' specialties.

## ARTICLE 9. CONFIDENTIALITY

A. MedView and the HCP understand and agree that all information, records and inquiries obtained during the course of treatment of Subscribers are privileged and confidential. To the extent provided by law, HCP shall keep confidential and not disclose any patient-identifiable information furnished by the Subscriber, MedView or any other health care provider to any third party, except with the prior written consent of the Subscriber, that would not be provided under the normal billing process.

B. MedView and the HCP understand and agree that the right to information and records of Subscribers is governed by state and federal law regarding the confidentiality of patient medical records. Each party shall comply with all such laws and regulations in the performance of their respective obligations under this Agreement.

C. MedView and HCP agree that they will not disclose the compensation payable to HCP pursuant to the terms of this Agreement except to include on an agreement, that it may be required in order to carry out the terms of this Agreement.

D. HCP agrees that it will not participate in or encourage the participation in any combined effort among Participating Providers to threaten not to provide services to any existing or potential MedView Subscribers.

## ARTICLE 10. TERM AND TERMINATION

A. The initial term of this Agreement shall be one (1) year from and after the applicable effective date unless sooner terminated by the parties as provided herein. After the initial term, this Agreement shall continue in full force and effect for successive periods of one (1) year each, unless terminated by sixty (60) days' written notice prior to the expiration of any one (1) year term by the parties as provided herein.

B. This Agreement may be terminated at any time by any of the parties hereto by giving written notice to the others upon the occurrence of an event of default as described in paragraph C below.

C. An event of default under this Agreement shall be deemed to have occurred in the event that either party shall fail to comply with or perform when due any term or covenant of this Agreement, and such failure is not cured within thirty (30) days after written notice from another party identifying the default and requesting that it be cured.

D. This Agreement may be terminated immediately if it is determined that any party needs and has not secured a license, governmental approval or exemption in accordance with applicable laws and regulations in order to enter into or perform under this Agreement.

E. This Agreement shall terminate automatically and immediately in its entirety (i) in the event HCP commits any act or engages in any conduct for which its license may be revoked or suspended by the licensing authorities of the State of Florida (whether or not such licensing authorities revoke or suspend such license) or is otherwise disciplined by such licensing authority, or (ii) in the event HCP is no longer duly licensed to provide the Health Care Services contemplated by this Agreement.

## ARTICLE 11 REGULATORY COMPLIANCE.

MedView and HCP agree to comply with any federal or state regulatory changes to Health Care laws or policies in order to maintain the mutual benefits intended by this Agreement. Reimbursement levels negotiated under this Agreement shall be applicable to any regulated maximum allowable reimbursement level included under such Regulatory Changes.

## ARTICLE 12. INDEMNIFICATION

Each party shall indemnify and hold harmless each other party and any officer, director, shareholder, employee, attorney, or agent of each other party, on demand, for any and all claims, actions,

4

PLF03772004

PLF03776

demand, obligations, liabilities, suits, damages, losses, costs or expenses of any kind or description whatsoever, including, without limitation, reasonable attorneys' fees and amounts paid in settlement of any and all claims, incurred by any of the indemnified parties by reason of the acts or omissions of the indemnifying party and/or any officer, director, shareholder, employee, attorney or agent of the indemnifying party.

## ARTICLE 13. ASSIGNMENT

HCP may not assign or otherwise transfer any right or delegate any duty of performance hereunder, in whole or in part, without the prior written consent of MedView. MedView retains the right to assign this agreement, in whole or in part, to any entity with which MedView or its parent company or any of its subsidiaries is affiliated.

## ARTICLE 14. PROPRIETARY RIGHTS

Each party has developed certain symbols, trademarks, service marks and other proprietary information, including in the case of MedView, its provider network and agreements related thereto ("Proprietary Information"). Each party will not use the Proprietary Information of the other party without the prior written consent of that party and will cease the use of any such Proprietary Information immediately upon the termination of this Agreement.

## ARTICLE 15. COUNTERPARTS

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

## ARTICLE 16. ENTIRE AGREEMENT/AMENDMENTS

This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, and there are no oral or written collateral representations, agreements or understandings, except as provided herein. All amendments hereto shall be in writing and executed by the parties.

## ARTICLE 17. SEVERABILITY

In case any one or more of the provisions of this Agreement shall be invalid, illegal or unenforceable in any respect, the remaining provisions shall be construed liberally in order to effectuate the purposes hereof, and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

## ARTICLE 18. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

## ARTICLE 19. NOTICES

All notices, demands or communications required or permitted hereunder shall be in writing and shall be deemed effectively given

on the date of receipt, personally delivered, telecopied or telexed to the party to which the same is directed or on the third day after mailing if mailed to such party, by registered or certified mail, postage prepaid to the following addresses, or to such other addresses as the parties may hereafter designate by written notice:

(a) If to HCP, to the address set forth below: and

_____

_____

_____

(b) If to MedView to the following address:

32991 Hamilton Court
Farmington Hills, MI 48334

## ARTICLE 20. SEPARATE AND INDEPENDENT CONTRACTORS

A. For purposes of this Agreement, MedView and HCP are and will act at all times as independent contractors of the others. Nothing contained in this Agreement establishes or constitutes or will be construed as establishing or constituting a partnership, joint venture or employment agreement or employment relationship between MedView and HCP. As independent contractors, MedView and HCP each shall continue to exercise full and unrestricted authority and responsibility regarding their own respective management, organizational structure and activities.

B. Nothing in this Agreement shall be construed as limiting the HCP ability to treat patients who are not MedView Subscribers, or to participate in other health care delivery systems.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the applicable Effective Date.

(HCP)

By: _____

_____
(print or type name)

Title: Director

Address: 6319 S Dixie Hwy
W. Palm Bch, FL 33405

(2) 13766 Wellington Trace #13
Wellington, FL 33414

MEDVIEW SERVICES, INCORPORATED, on its own behalf and on behalf of Payors

By: _____

Title: VP E CEO

5

PLF03772006

Group Health Benefits Reimburse    nt
Workers' Compensation Reimbursement

Health Care Professional claims are to be submitted on HCFA-1500 forms using CPT-4 codes.

Group Health Benefits Plans and/or any Program Providing Health Care Services:

Health Care Professional agrees to accept 80% of usual and customary fees.

Workers' Compensation Programs:

For Health Care Services rendered to MedView subscribers Health Care Professional agrees to accept the lesser of 80% of usual and customary fees or 80% of the charges set by the Florida Department of Labor and Employment Security as maximum fees.

For those services which are "By Report" (BR), "Relativity Not Established" (RNE) or not listed in the state fee guideline, reimbursement shall be made at 80% of the 80th percentile.

All bills submitted to MedView Payors are to reflect usual and customary charges. Provider hereby asserts that those discounts offered to MedView are equivalent to those offered by the Provider to employers.

All physicians, facilities and/or locations, either locally or in other states who use the Federal Tax Identification number indicated on the attached Application are subject to the terms of this Agreement.

MedView Services, Incorporated          Health Care Professional

By: _____          By: _____

Title: Sr. V.P. & COO                  Title: Director

Date: May 19, 1994                     Date: 4/25/94

PLF03772007

# EXHIBIT "2"



IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

CASE NO. 95-13760-04

JOHN DEL GARDO and MICHELLE          CLASS REPRESENTATION
DEL GARDO, on behalf of themselves
and all others similarly situated,

        Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY,
and ALLSTATE INDEMNITY
COMPANY,

        Defendants.



## ORDER REGARDING PIP CLAIM PROCEDURES

THIS CAUSE is before the Court pursuant to Rule 1.220(e) of the Florida Rules of Civil Procedure, upon a Stipulation and Agreement of Settlement entered into by and between the Class and Defendant ALLSTATE INSURANCE COMPANY and ALLSTATE INDEMNITY COMPANY (collectively "ALLSTATE").

WHEREAS, the Court having heard argument of Counsel, and having reviewed all of the submissions presented with respect to the proposed Settlement between the Class and ALLSTATE, in connection with the entry of the Final Judgment and Order Approving Settlement in this matter, and

WHEREAS, the Court has determined that Final Judgment and Order Approving Settlement in this matter is to be entered, and

WHEREAS, under the terms of the Final Judgment and Order Approving Settlement in this matter, this Court further indicates its intention to enter an Order Regarding PIP Claim Procedures, and

1

WHEREAS, this Court has been fully advised by the parties hereto with regard to the applicable law under Florida Statutes, § 627.736 (10), and

WHEREAS, this Court finds that certain PIP claim procedures proposed by ALLSTATE, as reflected below are in compliance with and do not violate the applicable requirements of Florida Statutes, § 627.736 (10), it is hereby

ORDERED, ADJUDGED AND DECREED that:

1.   ~~ALLSTATE's practice of entering into agreements with health care providers to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies does not violate the requirements of Florida Statutes, § 627.736 (10) under the conditions set forth in this Order;~~

2.   ALLSTATE is authorized and has agreed to provide information to PIP claimants at the time they submit their PIP claim to ALLSTATE that ALLSTATE has entered into agreements with certain health care providers to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies, which reduced rates shall be applicable with regard to services rendered to such ALLSTATE PIP claimants at least until such time as their applicable ALLSTATE PIP benefits are exhausted;

3.   ALLSTATE PIP claimants may also be informed by ALLSTATE at the time they submit their PIP claim to ALLSTATE of the identity of those certain health care providers which have agreed to charge reduced rates for services rendered by such providers to PIP claimants under ALLSTATE automobile insurance policies, provided that those claimants are also informed that the decision to obtain treatment from such providers is ~~solely by voluntary~~ choice, that the claimant may choose to change health care providers at any time without regard to whether or not the substitute provider selected was party to an agreement with ALLSTATE to charge reduced rates for services rendered to PIP claimants under ALLSTATE automobile insurance policies; and

4.   ALLSTATE PIP claimants who obtain treatment from health care providers who are parties to agreements to charge reduced rates for services rendered by such providers under

2

ALLSTATE automobile insurance policies must be informed by ALLSTATE that their bills from such providers are subject to agreed, reduced rates and that he ~~or she is only responsible for payment of 20% of the charges for those services based on the such reduced rates~~ with regard to services rendered to such ALLSTATE PIP claimants at least until such time as their applicable ALLSTATE PIP benefits are exhausted.

5.      The notices attached as Exhibits "A," "B" and "C" hereto provide, in form and substance, adequate notice regarding the ALLSTATE business practices which are the subject of this Order.

DONE and ORDERED THIS _8_ day of _July_, 1999.

HONORABLE PATRICIA COCALIS
CIRCUIT COURT JUDGE

Copies furnished:
Larry Kopelman, Esq.
Eric Lee, Esq.
David Shelton, Esq.

3

Re:    Medical Benefits Application Kit

Dear Insured:

Thank you for providing us an opportunity to serve you during your recovery period. You can expedite your claim by doing the following:

1.    Complete and return the enclosed Application for "No Fault" benefits form. Be sure the two authorization forms attached to the bottom are signed.

2.    Ask your doctor to complete the enclosed Attending Physician's report and mail it directly to our office. Please remind your physician to attach his office notes with his billing.

3.    As you receive medical bills for this injury, identify them with the claim number shown above and send them directly to our office.

4.    If your coverage includes wage benefits and you will be losing wages from work as a direct result of your auto accident, please see the attached wage loss claim instructions.

5.    If you incur any expenses for essential services, please submit your physician's detailed prescription for those services. Individuals or companies providing essential services must include their IRS Tax ID Number on their bill or paid receipt for payment of reasonable services.

For medical bills submitted by you or your physician, please allow up to 30 days for processing. For established wage loss claims, please allow up to two weeks for processing.

In addition, you are entitled to mileage expenses incurred as a result of treatment you received. If you desire to submit such a claim, please submit a statement as to the actual miles driven.

*The Allstate policy pays for medical expenses which are reasonable, necessary, and related to this automobile accident. All medical bills are reviewed to determine if they meet these criteria. To review the treatment tendered, Allstate may seek the opinion of another physician. If charges are received which are not reasonable or necessary, a payment may be made for less than the billed amount. In most cases, these issues are resolved by the Allstate Claim Representative and the Health Care Provider.*

*Additionally, Allstate has agreements with certain health care providers to charge reduced rates for services they render to Allstate Personal Injury Protection customers. If you receive treatment from a provider who has an agreement with Allstate, these reduced rates will apply until your available Personal Injury Protection benefits have exhausted. If you are responsible to make payment for any portion of theses services, payment will be based on the reduced rates, until your available Personal Injury Protection benefits exhaust.*

EXHIBIT "A"

*Allstate is committed to the protection of our customers' interest. We intend to fully defend and, if necessary, indemnify you against any action that the health care provider may take. We will also consider any other appropriate measures to protect you should the health care provider pursue collection efforts for the unpaid reduced portion of the bill.*



Allstate
You're in good hands.

Allstate Insurance Company
FT LAUD S, ENTR-ED PIP
16438 S.W. 8TH ST, SUITE 105
SUNRISE FL  33323

EXPLANATION OF MEDICAL BILL PAYMENT

Service Provided For:                              Date: 01/16/1997
ELENA GARCIA                        Bill Received Date: 01/06/1997
2225 TAFT ST                                Claim #: 007223-2304-01
HOLLYWOOD FL  33021-0403                    File Handler: SVW
                                           Invoice #: 0577 16436
                              Eligible Injured Person: ELENA GARCIA
                              Treatment Rendered By: BROWARD INSTITUTE OF ORTH
                              Provider Specialty: SURGERY, ORTHOPAEDIC MD
                                                  File: AS-046262

Diagnosis Code:
847.0    NECK SPRAIN

| Date Of Service(s) Thru | Procedure Code/Modifier Description | Units | Billed Amount | Covered Amount | Reason Code(s) |
|---|---|---|---|---|---|
| 12/11/96  12/11/96  97010 | HOT OR COLD PACKS THERAP | 1.00 J | 39.00 | 13.00 | 14 |
| 12/11/96  12/11/96  97035 | ULTRASOUND THERAPY | 1.00 U | 64.30 | 44.04 | 14 |

Total:                                      5      170.00        73.00

Eligible Amount Based On ICE Coverage         $      89.30

Reason Code(s):
14  Payment adjusted to the previously negotiated amount.

If you have any questions about this claim, please contact your file handler.
VARIAN RENITTE or (954) 846-7865

Payment for $   64.00 was made on 01/17/1997 to:
BROWARD INSTITUTE OF ORTHOPAEDIC SPECIAL.

EXHIBIT "B"

Page 1

Allstate Insurance Company
Florida West PIP Central
PO Box 31059
St Petersburg FL 33733

**EXPLANATION OF MEDICAL BILL PAYMENT**

Service Provided For:                          Date: 06/18/1999
GREGORY MARION                    Bill Received Date: 05/28/1999
1003 SE 44th ST                            Claim #: 4583/65735-01
Cape Coral FL 33904                     File Handler: JPL
                                               Invoice #: 1588 PL
                            Eligible Injured Person: GREGORY MARION
                            Treatment Rendered By: JAMES L. WALSH, D.C.
                            Provider Specialty: CHIROPRACTICS (DC)
                                    (Tax 43-0988911)

================================================================

Diagnostic Codes
722.0   DISPLACEMENT OF CERVICAL INTERVERTEBRAL   723.4   BRACHIAL NEURITIS OR RADICULITIS NOS
722.11  DISPLACEMENT OF THORACIC INTERVERTEBRAL   839.21  CLOSED DISLOCATION, THORACIC VERTEBRA

| Date Of Service(s) | | Procedure | | | Billed | Covered | Reason |
|---|---|---|---|---|---|---|---|
| From | Thru | Comp/Modifier | Description | Units | Amount | Amount | Code(s) |
| 05/7/99 | 05/17/99 | 98941 | CHIROPRACTIC MANIPULATIO | 1.00 $ | 28.00 | $ 28.00 | |
| 05/19/99 | 05/19/99 | 98941 | CHIROPRACTIC MANIPULATIO | 1.00 $ | 28.00 | $ 28.00 | |
| Totals: | | | | $ | 56.00 | $ 56.00 | |

Eligible Amount Based on 100% Coverage          $      56.00

Additional Information:
*PPL REIMBURSEMENTS ARE BASED ON THIS MEDICAL SERVICE PROVIDER'S
AGREEMENT WITH CCN. (A) PATIENT'S RESPONSIBILITY IS LIMITED TO THE
DIFFERENCE BETWEEN THE AMOUNT PAID BY ALLSTATE (AS SHOWN BELOW)
AND THE CCN CONTRACTED FEE, WHICH APPEARS IN THE BILLED AMOUNT
COLUMN*.

IF you have any questions about this claim, please contact your file handler,
PAMELA EVANNS at (727) 573-9700

Payment for $     56.00 was made on 06/18/1999 to:
JAMES L. WALSH, D.C.

Copy(s) of this Explanation of Benefits has been sent to:
GREGORY MARION, 1003 SE 44TH ST, CAPE CORAL, FL, 33904
JAMES L. WALSH, D.C., 4818 CORONADO PKWY #1, CAPE CORAL, FL, 33904

**Allstate**
You're in good hands.

124

EXHIBIT C

# EXHIBIT "3"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6269-CIV-DIMITROULEAS

DRS. MARTIN MAY, ALAN LAZAR,
MARTIN HALE, JOEL RUSH, PAUL ZIDEL,
RICHARD LINN, RICHARD BERKOWITZ,
DOUGLAS STRINGHAM, ANDREW
ELLOWITZ, ALAN NOVICK, DEBRA WEISS,
and NEIL SCHECHTER,



        Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY,

        Defendant.

_____/

### ORDER ON MOTION TO REMAND
### AND MOTION TO DISMISS

THIS CAUSE is before the Court upon Plaintiffs', Drs. Martin May, Alan Lazar, Martin

Hale, Joel Rush, Paul Zidel, Richard Linn, Richard Berkowitz, Douglas Stringham, Andrew

Ellowitz, Alan Novick, Debra Weiss and Neil Schechter Motion for Remand, filed herein on

March 14, 2000 and Defendant, Allstate Insurance Company's Motion to Dismiss, filed herein

on March 1, 2000. The Court has carefully reviewed the motions and is otherwise fully advised

in the premises.

### I. BACKGROUND

Plaintiffs are doctors, who practice under the names "Park Place Therapeutic Center" and

"Park Place Orthopaedics & Rehabilitation." As this entity, they submit claims to Allstate for

payment on behalf of persons insured by Allstate for personal injury protection benefits, and

receive payments from Allstate.

1

Defendant, Allstate, sells automobile insurance policies in Florida which contain personal injury protection, pursuant to Florida law. Under the PIP coverage, Allstate agrees to pay 80% of reasonable charges for necessary medical treatment provided to covered insured who suffer injury in an automobile accident. Plaintiffs claim that the amount that they have received, pursuant to bills they have sent to Defendant, of work they have done on Defendant's insureds, is "substantially less than [Allstate] is statutorily and contractually obligated to pay."

On January 21, 2000, Plaintiffs filed a two Count Complaint in the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida. The action was timely removed. The Complaint is for: 1) Declaratory Relief; and 2) Breach of Contract.

Plaintiffs seek remand to State Court, arguing that the amount of PIP benefits paid to Plaintiffs pursuant to illegally obtained discounts by Defendant, compared to the amounts that should have been paid, can not be determined with certainty. They could potentially exceed or fall below the necessary jurisdictional amount, and therefore Defendants cannot provide, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional requirement. Defendant counters this argument by stating that Plaintiffs are engaged together in the practice of medicine, submit the claims together, and receive payments together. Defendant submits the Explanation of Medical Bill Payments and Health Insurance Claim Forms as evidence that Plaintiffs are engaged in a united practice of medicine.

Defendant next moves to dismiss this action. It argues that Plaintiffs do not allege that Allstate offers "preferred provider" PIP coverage under the policy. The insured are entitled to choose the health care provider they want, on their own. Plaintiffs claim that Defendant pays PIP claims for medical benefits at 80% of "preferred provider" rates. Defendant argues that it is not required to offer a "preferred provider" policy to its insured and therefore, has not failed to pay

2

PIP benefits as required by § 627.736, Florida Statutes. Defendant also argues that the Complaint does not establish that it breached an obligation under the PIP coverage or § 627.736(10), Florida Statutes, by paying medical benefits at a "reasonable" rate, if it is less than what Plaintiffs request. Defendant's last argument is that there is no private cause of action permitted for violations of § 627.736(10). In sum, Defendant claims Plaintiffs do not state a claim.

Plaintiffs, in their two page response, argue that they strongly disagree with Defendant's arguments in the dismissal motion, and aver that they do state a claim.

## II. DISCUSSION

### A. Remand

"Any civil case filed in state court may be removed by the defendant to federal court if the case could have been brought originally in federal court." Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1356 (11th Cir. 1996). Federal Jurisdiction should be found, unless it appears within "a legal certainty that the claim is really for less than the jurisdictional amount." Id. at 1356. However, "[w]here a plaintiff has made an unspecified demand for damages, a lower burden of proof is warranted because there is simply no estimate of damages to which a court may defer. Id. at 1356-57; See Gafford v. General Electric Company, 997 F.2d 150, 160 (6th Cir. 1993).

Plaintiffs claim that the amount of controversy in this action can only be determined by calculating the amount of PIP benefits paid individually, to Plaintiffs. However, Plaintiffs are engaged together in the practice of medicine under two names, "Park Place Therapeutic Center" and "Park Place Orthopaedics & Rehabilitation." Plaintiffs submit forms to receive payment, and receive payment collectively. The Health Insurance Claim Forms, submitted by Defendant,

shows that the I.D. Number of Referring Physician contains the same tax number on each sheet.

Additionally, in the space marked "Physician's, Supplier's Billing Name...," Park Place

Therapeutic Center is noted on each form. On the Explanation of Medical Bill Payment,

submitted by Defendant, in the space marked, "Treatment Rendered By," is the name Park Place

Therapeutic Center. "[W]hen several plaintiffs unite to enforce a single title or right, in which

they have a common and undivided interest, it is enough if their interests collectively equal the

jurisdictional amount." Troy Bank of Troy, Indiana v. G.A. Whitehead & Company, 222 U.S.

39, 40-41 (1911). The aggregate amount of the reduction of payments clearly exceeds the

$75,000 threshold necessary to confer jurisdiction on this Court.

### B. Dismiss

It is long settled that a complaint should not be dismissed unless it appears beyond a

doubt that the plaintiff could prove no set of facts in support of his claim which would entitle

him to relief. Conley v. Gibson, 355 U.S. 41 (1957). The allegations of the claim must be taken

as true and must be read to include any theory on which the plaintiff may recover. See Linder v.

Portocarrero, 963 F.2d 332, 334-336 (11th Cir.1992) (citing Robertson v. Johnston, 376 F.2d 43

(5th Cir.1967)). There must be a showing that the plaintiff has no claim before granting a motion

to dismiss. June Vernon and Delroy Vernon v. Medical Management Associates of Margate,

Inc., 912 F.Supp. 1549 (S.D.Fla. 1996).

Defendant's first argument is that the Complaint fails to allege a breach of contract or

violation of § 627.736. Plaintiffs allege in their Complaint, that Allstate pays PIP claims for

medical benefits at 80% of "preferred provider" rates. However, Plaintiffs fail to define

"preferred provider" rates, nor do they allege that such rates were not reasonable. Plaintiffs

claim, then, that because Allstate does not provide an option to insureds to purchase a "preferred

4

provider" policy for PIP benefits, it breached its contracts of insurance with its insureds and violated § 627.736(10) by paying at those rates. Therefore, Plaintiffs' only allegation is that Allstate is paying certain health care providers reduced rates which those providers have agreed to accept for medical services covered under the Allstate PIP contracts.

Plaintiffs, in the Complaint, claim that Defendant's standard policy does not comply with § 627.736(1)(a), which necessitates a party to have personal injury protection of "[e]ighty percent of all reasonable expenses for necessary medical..." Plaintiffs claim that they provided medical treatment, and were paid less than what is statutorily and contractually obligated to pay. However, Plaintiff's claims are not based on this Florida Statute.

Plaintiffs also argue that Defendant refers to Plaintiffs actions as "preferred providers," and such designation is improper. § 627.736(10), Florida Statutes, states in pertinent part, "(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as 'preferred providers,' which shall include health care providers...The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits..." Plaintiffs attached the insurance policy to the Complaint. The Court may consider the policy for purposes of a motion to dismiss. Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1369 (11th Cir. 1997); Smith Barney, Inc. v. Scanlon, 180 F.R.D. 444, 446 (S.D.Fla. 1998). Such consideration of a document attached to Plaintiff's complaint does not convert the motion to dismiss into a motion for summary judgment. Id. The policy does not contain the term "preferred providers," and Plaintiffs are not the parties the statute is meant to protect. Additionally, the statute does not state that Defendant must offer a "preferred providers" plan, but only regulates those parties that choose to do so.

Defendant argues that the statute was not enacted to benefit medical providers, and therefore, does not allow Plaintiffs to rely on it as their basis for damages. In Fischer v. Metcalf, the Third District Court of Appeals discussed three criteria[1] which are pertinent to whether the legislature intended a statute to benefit a party. They are, "1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; 2) whether there is any indication, either explicit or implicit, of a legislative intent to create or deny such a remedy; and 3) whether judicial implication is consistent with the underlying purposes of the legislative scheme." Fischer v. Metcalf, 543 So.2d 785, 788 (Fla. 3rd DCA 1989); See Cort v. Ash, 422 U.S. 66 (1975).

§ 627.736, Florida Statutes, was not enacted to benefit medical providers. Plaintiffs are not the class whose especial benefit the statute was enacted. The statute was enacted to protect insureds from harm as a result of accidents with other drivers, and actions by insurance companies. The statute was not enacted to ensure that medical providers received what they felt was a reasonable wage. The legislature did not imply, nor can it be inferred, that the medical providers were the parties the statute was enacted to protect. The Court cannot infer that the Legislature intended to protect the medical providers with the enactment of § 627.736. "Legislative intent, rather than duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists when a statute does not expressly provide for one." Murthy v. N. Sinha Corp., 644 So.2d 983, 985 (Fla. 1994). Plaintiffs claim for relief based on Defendant's alleged violation of § 627.736, Florida, Statutes, does not allege a cause of action.

---

[1] Out of a four part test.

6

The remaining issue is whether Plaintiffs may sue Defendant for paying them what they do not deem to be reasonable rates, as preferred providers. However, the term preferred provider is not mentioned in the insurance policy and Defendant's actions do not resemble the statute's definition of the term preferred provider. Therefore, Plaintiffs claim is based on being intended third party beneficiaries to Defendant's insurance policies. Plaintiffs are not in direct contractual privity with Defendant. "[T]he term 'privity' is a word of art derived from the common law of contracts and used to describe the relationship with persons who are parties to a contract." Espinosa v. Sparber, et al., 612 So.2d 1378, 1380 (Fla. 1993). Usually only parties to a contract may collect on the contract. However, "an intended third party beneficiary of a contract may recover damages from the contracting parties if they breach the contract." Jacobson v. Heritage Quality Construction Co., Inc., 604 So.2d 17, 18 (Fla. 4th DCA 1992). "Essential to the right of a third party beneficiary of a contract to maintain an action for its breach is a clear intent and purpose of the contract to directly and substantially benefit the third party." Thompson v. Commerical Union Insurance Company of N.Y., 250 So.2d 259, 262 (Fla. 1971). The insurance policies between Defendant and the insureds are clear in their intent to directly and substantially benefit Plaintiffs[2]. Plaintiffs, in the present action, "must plead the contract which was expressly for (their) benefit and one under which it clearly appears that (they were) a beneficiary." Weimar v. Yacht Club Point Estates, Inc., 223 So.2d 100, 102 (Fla. 4th DCA 1969). Plaintiffs properly pled that they were intended third party beneficiaries to defeat the motion to dismiss.

## III. CONCLUSION

Plaintiffs did not, nor could they, properly plead a cause of action under § 627.736(1)(a)

---

[2] Although this benefit is not the main crux of the insurance policy.

7

and (10) as the basis of Defendant's liability. The statute does not delineate that there exists such

a cause of action exists, nor is the statute drafted to benefit medical providers. Plaintiffs do state

a cause of action for breach of contract, in that they are the intended third party beneficiaries to

the insurance policy, but not on the basis that they were improperly treated as preferred

providers.

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Remand is hereby **DENIED**;

2. Defendant's Motion to Dismiss is hereby **GRANTED**; in part. Motion to Dismiss

Count I is hereby Granted; Count I is dismissed with prejudice. Motion to Dismiss Count II is

hereby **GRANTED**; Count II dismissed without prejudice, with leave to amend in accordance

with this Order. An Amended Complaint shall be filed within then days of this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this _14_ day of

April, 2000.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Peter Valeta, Esq.
Lawrence Kopelman, Esq.
David B. Shelton, Esq.

# EXHIBIT "4"

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

98 JUL 30 PM 2:56

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA. FLORIDA

LINDA REED &
BRUCE REED,

     Plaintiffs,

vs.                   Case No. 98-798-CIV-T-24F

STATE FARM MUTUAL
AUTOMOBILE INSURANCE CO.,

     Defendants.
_____/

## O R D E R

Before the Court is Defendant's Motion to Dismiss the Class Action Complaint (Doc. No. 11, filed April 27, 1998), Plaintiff's response (Doc. No. 13, filed May 6, 1998), and Defendant's Motion for Leave to File a Reply in Support of its Motion to Dismiss (Doc. No. 14, May 15, 1998).

### I.

### FACTUAL BACKGROUND

On September 24, 1992, the Plaintiffs were involved in a motor vehicle accident in which they sustained bodily injuries. They sought treatment from a chiropractor and neurologist and made claims for benefits under the Personal Injury Protection ("PIP") and medical payment coverage of their insurance policy with Defendant State Farm Mutual Automobile Insurance Company ("State Farm").

On February 8, 1993, Plaintiffs underwent an independent medical examination by Dr. Jeserki, a chiropractor designated by State Farm. Dr. Jeserki determined that the Plaintiffs had reached

maximum medical improvement ("MMI"), and that there would be no further remedial benefit from continued chiropractic treatment. Thus, on March 12, 1993, State Farm sent a letter to the Plaintiffs advising them that it would not consider medical bills submitted after March 9, 1993, based upon Dr. Jeserki's report.  On May 7, 1993, State Farm notified Plaintiffs that their benefits for neurological treatment by Dr. Robert Martinez were suspended as of March 12, 1993, based upon Dr. Martinez's notes from the Plaintiffs' April 1, 1993 visit which indicated that he had determined that they had reached MMI.

Plaintiffs allege that State Farm has a policy of refusing to pay for palliative treatment once an insured has reached MMI, and requests a determination as to whether such treatment is reasonable and necessary under the Florida Motor Vehicle No-Fault Law, Fla. Stat. §§ 627.730-627.7405, and their motor vehicle insurance policy.  Plaintiffs desire benefits for reasonable and necessary palliative chiropractic and neurological care after reaching MMI. They also seek a determination as to whether State Farm may suspend their benefits for neurological care because they reached MMI, and not based upon an independent medical examination ("IME") by a neurologist who determined that their benefits should be suspended.

II.

### STANDARD OF REVIEW

A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts that would entitle him to relief. Conley v. Gibson,

2

355 U.S. 41, 45-46 (1957); <u>Bank v. Pitt</u>, 928 F.2d 1108, 1111-12 (11th Cir. 1991). In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff and accept all allegations as true. <u>Scheuer v. Rhodes</u>, 416 U.S. 232 (1974); <u>Colodny v. Iverson, Yoakum, Papiano & Hatch</u>, 838 F. Supp. 572, 574 (M.D. Fla. 1993). The Federal Rules of Procedure "do not require a claimant to set out in detail the facts upon which he bases his claim." <u>Conley</u>, 355 U.S. at 47. All that is required is "a short and plain statement of the claim." Fed.R.Civ.P. 8(a)(2).

"The test for the sufficiency of a complaint for declaratory judgment is not whether the plaintiff will succeed in obtaining the decree he seeks favoring his position, but whether he is entitled to a declaration of rights at all." <u>X Corp. v. Y Person</u>, 622 So.2d 1098, 1101 (Fla. 2d DCA 1993)(citation omitted). Plaintiffs must show that they are in doubt as to the existence or nonexistence or a right, and that there is an actual, present, and practical need for the declaration. <u>Id</u>.

III.

<u>MOTION TO DISMISS</u>

Defendant moves for dismissal of Plaintiffs' Complaint on the grounds that Plaintiffs' request to have this Court declare that they have a right to receive "palliative treatment" treatment after they have reached MMI, under the Florida No-Fault law and their motor vehicle insurance policy, requires a factual determination. It further contends that Plaintiffs have failed to plead the

3

requisite elements for a class action, identifying class members would be practically impossible, individual questions of fact predominate over common questions of law, and the Complaint violates the rule against splitting a single cause of action.

Plaintiffs argue that determining whether Defendant's interpretation of Florida's No-fault law to mean that only remedial care is reasonable and necessary after MMI is not factual in nature and involves statutory construction, and the interpretation of State Farm's insurance policy. They also claim that they have properly asserted a class action.[1]

## A.   Declaratory Relief

Declaratory proceedings are appropriate when brought to determine contract interpretations, or the construction of rights or other relations, but are not a proper vehicle to try disputed questions of fact as to determinative issues. Dimuccio v. D'Ambra, 779 F. Supp. 1318, 1322 (M.D. Fla. 1991); X Corp., 622 So.2d at 1101; Travelers Ins. Co. v. Emery, 579 So.2d 798, 800-01 (Fla. 1st DCA 1991); Medical Center Health Plan v. Brick, 572 So.2d 548, 551 (Fla. 1st DCA 1990); State Farm Automobile Ins. Co. v. Wallace, 209 So.2d 719, 721 (Fla. 2d DCA 1968).

Here, the named Plaintiffs purport to bring a class action on behalf of themselves and: "all State Farm Mutual Automobile Insurance Company policy holders who were insured with policies issued pursuant to Florida's No-Fault law, who, since March 12,

---

[1]    The Court notes that Plaintiffs cite no supporting law or authority in their responsive pleading.

1993, have been denied No-Fault or medical payment benefits because they have reached maximum medical improvement." [Complt. Class Alleg., ¶(D)(ii)]. Plaintiffs request that this Court "construe the phrase reasonable and necessary as it exists in the No-Fault law and the insurance policy." [Doc. No. 13, p.4]. Florida Statute section 627.736(1)(a) provides:

> *Medical benefits* - Eighty percent of all reasonable expenses for necessary medical, surgical, X-ray, dental, and rehabilitative services, including prosthetic devices, and necessary ambulance, hospital, and nursing services. Such benefits shall also include necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person who relies upon spiritual means through prayer alone for healing, in accordance with his or her religious beliefs."

Fla. Stat. § 627.736(a).[2]

In a case factually similar to the instant case, the court dismissed plaintiff's action for declaratory relief finding that whether medical expenses are "reasonable, related, or necessary" requires a purely factual determination. Cruz v. Union General Ins., 586 So.2d 91 (Fla. 3d DCA 1991). In Cruz, the insured sought declaratory relief regarding the denial of medical benefits. Specifically, the plaintiff sought a declaration regarding whether an IME and ensuing report could form the basis for a denial of accrued and future medical expenses relative to any and all medical specialties under section 627.736(7). The court found that this required a purely factual determination of whether his medical

---

[2]

    The insurance policy at issue contains substantially the same provision. [Doc. No. 11, Exh. A, p.9].

expenses were "reasonable, related, or necessary." Id. Thus, it dismissed the claim for declaratory relief, and held that the correct avenue of redress was the plaintiff's action for breach of contract. Id. See also Donovan v. State Farm Mutual Automobile Ins. Co., 560 So.2d 330, 331 (Fla. 4th DCA 1990)(whether medical bills were reasonable and necessary is question for jury).

As in Cruz, the Plaintiffs here seek resolution of the same factual determination, what type of medical expenses are reasonable and necessary under section 627.736(7). The Court cannot consider this request without evaluating each individual claim dispute. The statute and the contract are clear and unambiguous, State Farm must cover eighty percent of all reasonable charges incurred for necessary medical, and other, services. Thus, there is no need to construe the statute. Instead, whether post MMI palliative medical expenses are reasonable and necessary requires a case by case assessment of each individual claim for relief which would turn on the circumstances, facts, and medical situation of each claim. In addition, a finding in favor of the Plaintiffs would amount to a declaration that they prevail on their claim for benefits, the determinative issue in the case, which is inappropriate in an action for declaratory relief. As a result, Defendant's motion to dismiss the Complaint is granted.[3]    This does not preclude

---

[3]

For the same reasons, this issue is inappropriate for class action treatment.    Individual factual issues predominate over common legal questions.

Plaintiffs from bringing an action on the contract, or other non-declaratory action.

Upon consideration, it is **ORDERED AND ADJUDGED** that:

(1)  Defendant's Motion to Dismiss the Class Action Complaint (Doc. No. 11) is **GRANTED.**

(2)  Defendant's Motion for Leave to File a Reply in Support of its Motion to Dismiss (Doc. No. 14) is **GRANTED.**

DONE AND ORDERED at Tampa, Florida, this 30th day of July, 1998.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
All Parties and
Counsel of Record

# EXHIBIT "5"

For HJR - No Transmission Information Available   in on line [0] for HJR * Pg 2/28
05/15/2001 15:06 FAX 301 907 9591              BUDOW & NOBLE PC                              002

05/15/01  12:11  FAX 410 878 1839            MILLER&TRUHE LLC                                02

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JACQUELINE ROSS-RANDOLPH, et al.    :

                                :

     v.                   : Civil Action No. DKC 99-3344

                                :

ALLSTATE INSURANCE COMPANY     :

                                :

### ORDER

For the reasons stated in the foregoing Memorandum Opinion, IT IS this _11th_ day of May, 2001, by the United States District Court for the District of Maryland, ORDERED that:

1.    The Motion to Dismiss by Defendant ALLSTATE INSURANCE COMPANY BE, and the same hereby IS, GRANTED in part and DENIED in part as follows:

    A.    The Motion to Dismiss is DENIED as to Plaintiffs Jacqueline Ross-Randolph and Patricia Smith's personal and individual claims;

    B.    The Motion to Dismiss is GRANTED with respect to the class action allegations in Plaintiffs' complaint;

2.    Pursuant to Fed. R. Civ. P. 23(d)(4), the court orders that "the pleadings be amended to eliminate therefrom allegations as to representation of absent persons;"

3.    The Motion to Stay Discovery by Defendant ALLSTATE INSURANCE COMPANY BE, and the same hereby IS, DENIED as follows:



For HJR - No Transmission Information Available   in  on line [0] for HJR * Pg 3/28
05/15/2001 15:07 FAX 301 907 9591        BUDOW & NOBLE PC                              ☒003
    05/15/01  12:11  FAX 410 876 1839        MILLER&TRUHE LLC                        ☒03

A. The Motion to Stay Discovery is DENIED with respect to Plaintiffs Jacqueline Ross-Randolph and Patricia Smith;

B. The Motion to Stay Discovery is DENIED as MOOT with respect to the issues regarding class certification; and

4. The clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties.

_Deborah K Chasanow_
DEBORAH K. CHASANOW
United States District Judge

2

For HJR - No Transmission Information Available  in  on line [0] for HJR * Pg 4/28
05/15/2001 15:07 FAX 301 907 9591        BUDOW & NOBLE PC                                    ☒004
05/15/01  12:11  FAX 410 876 1839.        MILLER&TRUHE LLC                                    ☒04

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JACQUELINE ROSS-RANDOLPH, et al.

v.                                  : Civil Action No. DKC 99-3344

ALLSTATE INSURANCE COMPANY

## MEMORANDUM OPINION

Pending before the court and ready for resolution are the motions by Defendant Allstate Insurance Company ("Allstate") to dismiss Plaintiffs' complaint and to stay discovery pending resolution of its motion to dismiss.[1] Jacqueline Ross-Randolph and Patricia Smith ("named Plaintiffs") seek to bring a class action against Allstate, alleging, *inter alia*, that it summarily and wrongfully denied certain benefits under automobile liability insurance contracts provided by Allstate and under which Plaintiffs were covered. In their complaint, Plaintiffs bring the following causes of action: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) fraud; (4) breach of statutory duty; (5) bad faith denial of claims; (6) breach of fiduciary duty; and (7) punitive damages. Defendant moves to dismiss the named Plaintiffs' claims for lack of standing. Defendant further contends that the class action allegations should be stricken

---

[1]By consent of the parties, this action was stayed pending resolution of similar cases in other courts and was reopened, again by consent.

For HJR - No Transmission Information Available    in on line [0] for HJR * Pg 5/28
05/15/2001 15:07 FAX 301 907 9591          BUDOW & NOBLE PC                    Ø005
    05/15/01  12:11  FAX 410 876 1839          MILLER&TRUHE LLC                    Ø05

because Plaintiffs fail to establish several requirements of Fed.
R. Civ. P. 23.  No hearing is deemed necessary, and the court now
rules pursuant to Local Rule 105.6.  For the reasons that follow,
the court will deny Defendant's motions to dismiss and to stay
discovery as to the named Plaintiffs, and grant Defendant's motion
to strike the class allegations.  As explained below, Defendant's
motion to stay discovery as to the class certification issues is
mooted by the court's opinion.

**I. Background**

    Plaintiffs are Maryland residents, who either purchased, or
otherwise were covered under, an Allstate motor vehicle liability
insurance policy that contained personal injury protection ("PIP")
coverage.  Maryland law requires that all motor vehicle liability
insurance policies sold or issued in the state contain PIP
coverage, unless the motorist waives such coverage.[2]  Plaintiffs
allege that Defendant "induced" them not to waive PIP coverage by
representing to them that it would pay their "reasonable and
necessary" medical bills and lost income (up to 85 %) regardless of
fault.  Allstate further allegedly represented that it would: "(a)
evaluate PIP claims fairly, objectively, thoroughly, and promptly,
(b) interpret the contracts of insurance in accordance with
Maryland law, recognizing Plaintiffs' reasonable expectations, (c)
use only proper standards in deciding to pay or deny PIP claims,

_____

    [2]Md. Code Ann., Ins., §§ 19-505, et seq. (1997).

For HJR - No Transmission Information Available   in  on line [0] for HJR ▪ Pg 6/28
05/15/2001 15:07 FAX 301 907 9591  ___ ,  BUDOW & NOBLE PC                    ☒008
    05/15/01  12:11  FAX 410 875 1839        MILLER&TRUHE LLC                 ☒00

[and] (d) avoid improperly denying a portion of the claim . . . ."
Paper no. 2 ("Complaint") ¶ 18.  Plaintiffs allege that after being
involved in automobile accidents and incurring reasonable and
necessary medical expenses and/or lost income, they submitted
timely claims to Allstate.  They allege that the company "denied
their claims or refused to provide, in whole or in part, the PIP
benefits required by . . . [the Maryland Insurance Code] and
contract."  Complaint ¶¶ 14-16.  Plaintiffs further allege that in
denying their claims, Allstate employed a fraudulent scheme,
whereby, among other things, it: (1) used computer programs to
generate reports "predictably" adverse to Plaintiffs that purported
to reflect a reasonable amount for a given medical procedure; and
(2) engaged consultants who issued reports adverse to Plaintiffs,
as a result of, for example, failing to perform a thorough and
objective review of Plaintiffs' medical records when called to do
so.  Complaint ¶ 19.

Plaintiff Ross-Randolph alleges that she entered into an
automobile insurance contract with Allstate and subsequently was
involved in an accident.  She alleges that Allstate refused to pay
approximately $166 of her accident-related medical bills.
Plaintiff Smith, who was covered under her husband's policy, also
alleges that she was injured in an automobile accident and that
Allstate refused to pay approximately $273 of her related medical
bills.

3

For HJR - No Transmission Information Available   in  on line [0] for HJR * Pg 7/28
05/15/2001 15:08 FAX 301 907 9591          BUDOW & NOBLE PC                      007
05/15/01  12:11  FAX 410 876 1839          MILLER&TRUHE LLC                      07

## II. Analysis

Defendant contends that the named Plaintiffs lack standing because they have not suffered an injury in fact. Defendant also asserts that Plaintiffs' class action claims should be dismissed because: (1) there are no questions of law or fact common to the class, for purposes of Rule 23(a)(2) or 23(b)(3); (2) the claims of the representative parties are not typical of those of the class; (3) the class cannot establish the adequacy of representation requirement; and (4) defendant possesses unique defenses. The court addresses arguments regarding the individual and class claims in turn.

### A. Individual Standing

In any litigation, including a purported class action, the named plaintiffs must allege and prove standing in their own right to bring the suit. *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) (explaining that an individual who seeks to bring a class action must allege and show that he personally has been injured, "not that injury has been suffered by other, unidentified members of the class to which . . . [he] belong[s] and which . . . [he] purport[s] to represent.") (citation omitted). The existence of a wrong on a defendant's part without an injury to the plaintiff lacks a basis for redress. *Adams v. Bethlehem Steel Corp.*, 736 F.2d 992, 994 (4th Cir. 1984) (citation omitted).

4

Defendant challenges Plaintiffs' standing to bring this action, but fails to designate whether it moves to dismiss on that ground pursuant to Rule 12(b)(1), lack of subject matter jurisdiction, or Rule 12(b)(6), failure to state a claim.  While a plaintiff's standing to bring suit may be raised and treated on a motion to dismiss for failure to state a claim, *see e.g.*, *Thompson v. County of Franklin*, 15 F.3d 245, 247 (2d Cir. 1994) (citation omitted), courts generally analyze issues of standing pursuant to 12(b)(1), *see* *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 145 F.3d 660, 661-62 (4th Cir. 1998) (affirming district court's dismissal of complaint for lack of standing pursuant to 12(b)(1)); *Thompson*, 15 F.3d at 247-48 (12(b)(1) is more appropriate method by which to analyze standing issue); *Maryland Minority Contractor's Ass'n, Inc. v. Maryland Stadium Auth.*, 70 F. Supp 2d. 580, 586-87 (D. Md. 1998) (analyzing standing issue under 12(b)(1)); *Prince George's County v. Levi*, 79 F.R.D. 1, 5 (D. Md. 1977) (same)). According to the Second Circuit, the standing "'inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise,'" and thus should be analyzed under 12(b)(1).  *Thompson*, 15 F.3d at 247 (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975))). Consequently, the court will analyze Defendant's argument that Plaintiffs lack standing to bring this action under Rule 12(b)(1).

5

05/15/2001 15:08 FAX 301 907 9591    For HJR - No Transmission Information Available    in on line [0] for HJR * Pg 9/28
BUDOW & NOBLE PC    ☑009
05/15/01  12:11  FAX 410 876 1839    MILLER&TRUHE LLC    ☑09

There are two ways to present a 12(b)(1) motion to dismiss. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A defendant may either contend (1) that the complaint fails to allege facts upon which subject matter can be based, or (2) that the jurisdictional facts alleged in the complaint are untrue. *Id.* If, as in the case now before the court, a defendant raises the first argument, then the allegations in the complaint are assumed to be true, and the court will view the motion as it would one brought under 12(b)(6). *Id.*

Defendant contends that the named Plaintiffs lack standing because they have alleged an insufficient injury with respect to their breach of contract claim.[3] Specifically, Allstate argues that medical providers have not compelled Plaintiffs to pay the outstanding balances from their medical bills that Allstate refused to pay. Plaintiffs contend that the issue of the suit is the propriety of Allstate's practices, not simply the denial of benefits.

Defendant's argument was considered and rejected in a similar case. In *Puritt v. Allstate Ins. Co.*, 672 N.E.2d 353, 354 (Ill. App. Ct. 1996), a purported class action suit, one of the individual Plaintiffs alleged that he had been involved in an accident, for which he received medical care. He submitted timely

---

[3] It is apparent from the complaint that all of Plaintiffs' causes of action flow from the alleged breach of contract.

claims that were denied because Allstate determined that the
charges were unreasonable. Although the plaintiff had paid his own
medical bill before filing the action, the court did not rest its
finding that he had standing to bring the suit on that fact. In
denying Allstate's motion to dismiss for failure to assert an
injury, the court stated: "If, as plaintiffs contend, Allstate as
a matter of policy and practice makes arbitrary and unreasonable
determinations concerning the fees medical providers should charge,
enough of an injury is established to defeat the motions to
dismiss." *Id.* at 356. The court went on to state that "[t]he
insureds did not have to wait until lawsuits against them were
filed or collection agents began harassing them or their credit
files were red-flagged. There is standing." *Id.* In *Tilley v.
Allstate Ins. Co.*, 40 F. Supp 2d. 809, 811, 814 (S.D. W.Va. 1999),
the court faced a similar issue when it considered Allstate's
argument that because plaintiffs had not been compelled to pay
their outstanding medical expenses, they suffered no injury. The
court found the argument premature. It stated that factual
disputes existed as plaintiffs had contended they had paid their
own doctors' bills and their reputations and doctor-patient
relationships had suffered because of late payments. *Id.* at 814.
The court stated, "[h]ere, Plaintiffs alleged Allstate failed to
pay their medical expenses in accord with the insurance contract.
The Court cannot hold with certainty [on a motion to dismiss) that

Plaintiffs cannot prove a set of facts entitling them to relief."
*Id.*

In the instant case, Plaintiffs allege that they entered into
insurance contracts with Allstate, and submitted claims for medical
treatment they received as a result of injuries sustained in
automobile accidents.   They allege that Maryland law requires
contracts containing PIP coverage to pay insureds reasonable and
necessary medical expenses, and up to 85 percent of their lost
income incurred as a result of an automobile accident or incident.
They allege that Allstate induced them not to waive PIP coverage
under their contracts by promising to give their claims
independent, objective consideration in determining which claims
are reasonable and necessary.   They allege that Maryland law
requires such consideration. *See Huntt v. State Farm Mut. Auto
Ins. Co.,* 72 Md.App. 189, 193-94, 527 A.2d 1333, 1334-35 (1987),
*cert. denied,* 311 Md. 286, 533 A.2d 1307 (1987) (insurer's
obligation is only to pay reasonable expenses incurred from
necessary medical procedures, thus insurer had a right to require
claimant to visit doctor of its choice to test proof of entitlement
to claim).   They allege that Allstate employed a scheme whereby the
amounts ultimately paid to medical providers were arbitrarily and
fraudulently lowered, resulting in breaches of their contracts, for
which they have incurred losses and damages.   The fact that
creditors or the medical providers have not yet compelled

8

For HJR - No Transmission Information Available  in on line [0] for HJR * Pg 12/28
05/15/2001 15:09 FAX 301 907 9591          BUDOW & NOBLE PC                    ☑012
    05/15/01  12:11  FAX 410 876 1839        MILLER&TRUHE LLC                    ☑12

Plaintiffs to pay their outstanding bills does not necessarily defeat standing. Any alleged injury is of course subject to proof. At this stage, however, enough of an injury has been alleged to proceed.

### B. Class claims

"As soon as practicable after commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Fed. R. Civ. P. 23(c)(1). Rule 23(a) requires four showings for class certification

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class [("commonality")], (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class [("typicality")], and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition to satisfying Rule 23(a), a party seeking certification must satisfy one of three requirements under Rule 23(b). Plaintiffs claim that their complaint alleges facts sufficient to support certification under Rule 23(b)(1)(A) or (b)(3). See Fed. R. Civ. P. 23(b)(1)(A) (court must find that "the prosecution of separate actions by or against individual [class] members . . . would create a risk of . . . inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for" Defendant); (b)(3) (court must find that "questions of law or fact common to

For HJR - No Transmission Information Available  in on line [0] for HJR * Pg 13/28
05/15/2001 15:09 FAX 301 907 9591          BUDOW & NOBLE PC                          ⓐ013
     05/15/01  12:11  FAX 410 876 1839          MILLER&TRUHE LLC                          ⓑ13

the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy").[4]

There is no presumption that class action should be allowed. *Windham v. American Brands, Inc.*, 565 F.2d 59, 64 n.6 (4th Cir. 1977). The party seeking to maintain a class action bears the burden of proving class action status is appropriate by meeting the requirements under Rule 23. *Id.*; *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985) (plaintiff has burden of setting forth prima facie showing that Rule 23 requirements are met or that *discovery is likely to substantiate class allegations*) (emphasis added); *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 496 (D. Md. 1998) (court must find all requirements of Rule 23(a) and at least one requirement from Rule 23(b) before a court may certify a class) (citing *In re A.H. Robbins Co., Inc.*, 880 F.2d 709, 727-28 (4th Cir. 1989), abrogated on other grounds by Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)).

In determining whether a party complies with Rule 23, a court does not have to wait until class certification is sought. *Cook County College Teachers Union v. Byrd*, 456 F.2d 882, 885 (7th Cir.

---

[4] In their complaint, Plaintiffs also cite Rule 23(b)(2) as a basis for class certification. They apparently have abandoned that allegation, as they do not raise it in their memorandum in opposition to Defendant's motion to dismiss.

for HJR - No Transmission Information Available   in on line [0] for HJR * Pg 14/28
05/15/2001 15:10 FAX 301 907 9591        BUDOW & NOBLE PC                    014
    05/15/01  12:11  FAX 410 876 1839        MILLER&TRUHE LLC                    14

1972) (party opposing class certification may move for an order to
determine whether an action may be maintained as a class action);
see also *Strange v. Norfolk and Western Railway Co.*, No. 85-1929,
1987 WL   36160, at *3 (4th Cir. Jan. 12, 1987) (citing this
proposition from *Cook County*). A party challenging the validity of
maintaining an action under Rule 23 may move for a determination
under Rule 23(c)(1) that a class action is unwarranted. 7B Charles
Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice &
Procedure, §1798 (3d ed. 1986); see also *Oxman v. WLS-TV*, 595
F.Supp. 557, 561 (N.D. Ill. 1984) (analyzing plaintiff's motion to
strike class allegations under Rule 23(c)(1)).  If a plaintiff
fails to allege sufficient facts to show the requirements under
Rule 23 have been met, then pursuant to Rule 23(d)(4), the court
can order that "the pleadings be amended to eliminate allegations
regarding the representation of absent persons . . . ." 5 Moore's
Federal Practice, §23.60 [3] (Matthew Bender 3d ed. 1997); see
also *General Telephone Co. of the Southwest v. Falcon*, 457 U.S.
147, 160 (1982) (it at times may be clear from the pleadings alone
"whether the interests of the absent parties are fairly encompassed
within the named plaintiff's claim"); *Lumpkin v. E.I. Du Pont De
Nemours & Co.*, 161 F.R.D. 480, 481 (M.D. Ga. 1995) (granting
defendant's motion to strike class allegations before the defendant
responded to plaintiffs discovery requests, as it was clear that
Rule 23 requirements were not met).

For HJR - No Transmission Information Available  in  on line [0] for HJR * Pg 15/28
05/15/2001 15:10 FAX 301 907 9591          BUDOW & NOBLE PC                    ☒015
   05/15/01  12:11  FAX 410 876 1839          MILLERATRUHE LLC                  ☒15

Defendant first argues that this case lacks a common question
of law or fact to satisfy Rule 23(a)(2) because a fact finder will
have to determine for each claimant whether the medical expenses
submitted were reasonable or necessary.  Even assuming some common
question of fact exists, however, Defendant contends that
Plaintiffs fail to meet the manageability requirement under Fed. R.
Civ. P. 23(b)(3), which require that issues of fact and law that
affect the class predominate over issues affecting only individual
members.  Defendant argues that because no common issues of fact
predominate, the "predominance" and "superiority" elements of the
rule are lacking.

In response, Plaintiffs argue that there only needs to be one
question of law or fact common among Plaintiffs to meet the
requirements of Rule 23(a)(2).  Plaintiffs claim this showing is
met because they "have alleged sufficient common questions" in this
case, such as: "(1) whether a common scheme existed to deceive
persons of ordinary prudence, (2) whether the defendant owed the
plaintiffs a fiduciary duty, (3) whether the defendant acted with
an intent to defraud customers, and (4) whether the defendant
engaged in a pattern and practice of illegal activity."  Plaintiffs
contend that, under Rule 23(b)(3), courts have held that where
there are liability issues common to the class, those issues
predominate over individual issues, such as varying degrees of
damages.  As explained below, the court finds that Plaintiffs have

For HJR - No Transmission Information Available   in on line [0] for HJR * Pg 16/28
05/15/2001 15:10 FAX 301 907 9591          BUDOW & NOBLE PC                          ☒016
   05/15/01 12:11 FAX 410 878 1839          MILLERATRUHE LLC                          ☒16

failed to satisfy Rules 23(a)(2), (b)(1) or (b)(3), which suffices
to defeat class certification.

    1. <u>Rule 23(a)(2) -- Commonality of Claims</u>

    Under Rule 23(a), commonality and typicality are often
analyzed together because they "[b]oth serve as guideposts for
determining whether . . . the named plaintiff's claim and the class
claims are so interrelated that the interests of the class members
will be fairly and adequately protected . . . ." *Stott v. Haworth*,
916 F.2d 134, 143 (4th Cir. 1990) (citing *General Telephone Co.*,
457 U.S. at 157 n.13). The commonality requirement does not
mandate that Plaintiffs share all issues in common, but merely a
single common issue. *Peoples*, 179 F.R.D. at 498 (citing *Central
Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 636 (D.S.C.
1992), *aff'd*, 6 F.3d 177 (4th Cir. 1993); *Holsey v. Armour & Co.*,
743 F.2d 199, 216-17 (4th Cir. 1984)).

    However, class certification is appropriate only "when a
determinative critical issue overshadows all other issues." *Stott*,
916 F.2d at 145 (citation omitted). If a court must make specific,
individual inquiries as to each of the class plaintiffs regarding
the critical issues, then there is no commonality and typicality,
and certification is improper. *Id*. In *Stott*, the district court
had certified a class of plaintiffs who were discharged when a new
administration took office in North Carolina. The plaintiffs
asserted that class action status was appropriate because they all

For HJR - No Transmission Information Available  in on Line [0] for HJR * Pg 17/26
05/15/2001 15:10 FAX 301 907 9591          BUDOW & NOBLE PC                    ☐017
       05/15/01  12:11  FAX 410 876 1839         MILLER&TRUHE LLC               ☐17

held positions that exempted them from being discharged, and they
were discharged for political reasons. *Id.* at 137. The defendants
moved for summary judgment and decertification. The district court
denied both motions. In denying summary judgment, the court "noted
that a decision as to the appropriateness of summary judgment could
not be made without a review of the circumstances surrounding each
class member." *Id.* at 137-38. In denying the motion for
decertification, the district court found there was a central issue
that predominated: "whether the . . . administration engaged in a
policy . . . of firing . . . employees solely because of their
political affiliation or activities." *Id.* at 138. Reversing, the
Fourth Circuit held that the critical, dispositive questions in the
case required individual determinations as to each plaintiff and
thus there were no "substantial facts or questions of law common or
typical to all members of the certified class." *Id.* at 145.
Specifically, the Fourth Circuit noted that to determine whether
commonality existed, the district court would have had to conduct
a position-by-position analysis on behalf of each plaintiff in
order to determine whether a particular position requires, as a
qualification for its performance, political affiliation. *Cf.*
*Zimmerman v. Bell*, 800 F.2d 386, 389-90 (4th Cir. 1986) (in
securities case, district court did not abuse its discretion in
deciding not to certify class, as claims necessarily depended on
the unique, precise dates plaintiffs owned stock and whether each

stockholder possessed knowledge of certain facts); *Peoples*, 179
F.R.D. at 498 (under Rule 23(a)(2) or 23(b), class certification is
inappropriate "where individual factual considerations predominate
over common questions").

Plaintiffs argue that a common question only needs to advance
the litigation as a whole to satisfy Rule 23(a)(2), that
certification will not be defeated solely because of some factual
differences among members of the class, and that in some cases, a
common course of deceptive conduct by a defendant has sufficed to
meet the commonality requirement. However, as explained above, in
this circuit, certification is appropriate only when a
determinative critical issue overshadows all others. Questions
that are not dispositive but that merely propel a suit into a
posture where judicial scrutiny is necessary for just adjudication
fall short of establishing the commonality prong. *Stott*, 916 F.2d
at 145.

Plaintiffs contend that the purported class shares numerous
common issues of fact or law, including whether: (1) all Plaintiffs
purchased or were covered under contracts containing PIP coverage;
(2) all Plaintiffs were involved in automobile accidents; (3) all
Plaintiffs submitted timely claims; (4) Defendant systematically
denied these claims using a computer program without individual,
objective consideration; and (5) defendant made representations to
claimants to induce them not to waive PIP coverage. Further, a

15

05/15/2001 15:11 FAX 301 907 9591    For HJR - No Transmission Information Available   in  on line [0] for HJR * Pg 19/28
                                     BUDOW & NOBLE PC                                          Ø019
05/15/01  12:11  FAX 410 878 1839         MILLER&TRUHE LLC                                     Ø19

question of law the class allegedly shares is the proper procedure Defendant must employ to evaluate claims in compliance with Maryland law. Paper no. 18 at 21-22.

However, in order to determine whether any Plaintiff is entitled to relief in this action, each Plaintiff will have to prove his or her entitlement to benefits. Defendant asserts, and Plaintiffs do not deny, that an insurers' obligation under Maryland's PIP statute necessarily turns on whether a particular medical procedure is necessary and an individual claimant's charges derived therefrom are reasonable. Thus, an insurer must make an individual determination as to each insured's claim to determine whether, if at all, PIP benefits are appropriate.  *Huntt,* 72 Md.App. at 193-94, 527 A.2d at 1334-35 (PIP statute does not provide a claimant a blank check, as insurers are only obligated to pay reasonable expenses incurred from necessary medical services arising from a particular accident).  During litigation of any claims, *the fact finder must determine whether a particular medical provider's procedure was necessary for each claimant,* which in turn will determine the reasonableness of an expense.  *See Sabatier v. State Farm Mutual Automobile Ins. Co.,* 327 Md. 296, 303, 609 A.2d 307, 310-11 (1992) (PIP statute required court to make an individual determination as to whether a particular medical procedure was necessary).

16

For HJR - No Transmission Information Available    in  on line [O] for HJR * Pg 20/28
05/15/2001 15:11 FAX 301 907 9591          BUDOW & NOBLE PC                         ☑020
    05/15/01  12:11  FAX 410 876 1839          MILLER&TRUHE LLC                        ☑20

Other individual factual inquiries involve whether all injuries claimed resulted solely from the alleged accident and whether each claimant actually relied on any alleged representations by Defendant in entering into the contracts. This latter inquiry is especially pertinent as Plaintiffs bring claims for fraud and breach of fiduciary duty. Plaintiffs appear to allege that a fiduciary relationship was developed, at least in part, by an Allstate advertisement that stated "you are in good hands," which they claim, "underscor[ed] the special type of relationship between each of the Plaintiffs and Defendant . . . ." Even assuming all Plaintiffs heard this advertisement, it would be impossible without individual inquiries to determine whether each Plaintiff actually relied on the advertisement or any other alleged representation before entering into a contract with Allstate. The Fourth Circuit has held that claims that require proof of individual reliance, such as fraud, are inappropriate for class action status. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (citing *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 953 (8th Cir. 1994)). Even assuming the truth of Plaintiffs' allegations, Plaintiffs fail to explain how individualized inquiries into each insured's claim can be avoided.

In addition, Plaintiffs cite no authority, and the court has found none, that deals with certification of a class of plaintiffs whose action is based on an insurer's failure to undertake a

17

"reasonable and necessary" analysis as to each class member's individual claims, and in which the court found certification appropriate.   Defendant, however, cites and/or attaches as exhibits, several cases from state and federal courts that have addressed the exact or a similar issue and have uniformly found commonality and/or other Rule 23 requirements lacking.   Although not binding, these opinions are persuasive.   See Paper no. 20, Defendant's exhibit D, *Gloria v. Allstate County Mut. Ins. Co.*, No. SA-99-CA-676-PM, at 22-23 (W.D. Tex. Sept. 29, 2000) (granting defendant's motion to strike class action allegations, incorporated in defendant's motion to dismiss, as "even if . . . the computerized evaluation of the PIP claims was flawed, the parties and the Court still will need to analyze each charge on every claim for reasonableness and necessity."); Paper no. 20, Defendant's exhibit H, *Advocacy Organizations for Patients Providers v. Auto Club Ins. Ass'n*, No. 96-1409-CZ at *3-4 (2000) (Michigan state trial court analyzing class claims under state standard analogous to Rule 23, and holding that whether a provider's charges or services or an insurer's determinations are reasonable and necessary are questions of fact, and such factual inquiries into individual claims would predominate, making class action status unmanageable); *Ammons v. American Family Mut. Ins. Co.*, 897 P.2d 860, 863 (Colo. App. 1995) (typicality prong failed as a determination of what would be a reasonable and necessary medical

18

For HJR - No Transmission Information Available   In  on line [0] for HJR * Pg 22/28
05/15/2001 15:12 FAX 301 907 9591          BUDOW & NOBLE PC                    ☒022
   05/15/01  12:11  FAX 410 876 1639          MILLER&TRUHE LLC                  ☒22

expense for treatment will vary from person to person); *Ralph v. American Family Mut. Ins. Co.*, 835 S.W.2d 522, 524 (Mo. App. 1992) (issues such as "amount of medical treatment, [and] whether that treatment was necessary, . . . charges are reasonable, and . . . treatment was for injuries sustained in the accident" are all specific to individuals, not common to the class). "[A] representative plaintiff cannot establish commonality . . . if the court must investigate each plaintiff's individual claim . . . ." *Peoples*, 179 F.R.D. at 498 (citation omitted). Thus, Plaintiffs fail to meet the commonality prong under Rule 23(a)(2).[5]

If a movant fails to meet any of Rule 23(a)'s requirements, analysis under Rule 23(b) is unnecessary. *See Broussard*, 155 F.3d at 337 n.3 (party must satisfy requirements of 23(a) before 23(b) can be considered) (citing *Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594, 596 (4th Cir. 1976)). However, the court will briefly analyze Plaintiffs' claims under Rule 23(b) as well.

   2. **Rule 23(b)(1) -- Prejudice to Either Plaintiff or Defendant**

Plaintiffs claim that certification is appropriate because they meet the requirements under Rule 23(b)(1). Specifically,

_____

[5]Defendant also moves to strike Plaintiffs' allegations for failing to meet Rule 23(a)(3), because it has a unique defense to the named Plaintiffs' claims, and Rule 23(a)(4), because the named Plaintiffs are not representative members of the class. The sole basis for both of Defendant's arguments is that the named Plaintiffs lack standing to bring this suit. The court has denied Defendant's motion to dismiss on standing grounds, and for that reason cannot now definitively state as a matter of law that Plaintiffs fail to meet Rule 23(a)(3) and (4) for lack of standing.

19

For HJR - No Transmission Information Available  in  on line [0] for HJR * Pg 23/28
05/15/2001 15:12 FAX 301 907 9591        BUDOW & NOBLE PC                    ☑023
    05/15/01  12:11  FAX 410 878 1833        MILLER&TRUBE LLC                ☑23

Plaintiffs contend that under Rule 23(b)(1)(A) certification is proper because separate individual actions would inflict upon Defendant varying standards of conduct. Plaintiffs assert that all claimants have a right to an objective review of their individual claims, and that separate individual actions might produce inconsistent standards in the procedures Defendant must undertake to comply with the legal requirement that all PIP claims are evaluated objectively.

A class action may be brought under Rule 23(b)(1)(A) or (b)(1)(B) if individual adjudications would prejudice either the opposing party, (b)(1)(A), or the class members themselves, (b)(1)(B). *Zimmerman*, 800 F.2d at 389 (finding Rule 23(b)(1)(A) inapplicable because defendants did not argue they would be prejudiced if the class was not certified). Moreover, "the dangers of imposing incompatible standards of conduct" on a Defendant in an action for money damages are generally nonexistent. *Id.* (citing *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1340 n.10 (9th Cir. 1976)). In this case, Defendant does not contend that it would suffer prejudice if the case is not certified, and Plaintiffs exclusively request money damages in their prayer for relief. Thus, Rule 23(b)(1)(A) is not the proper basis for class certification. Likewise, Plaintiffs fail to show that any purported class members would suffer prejudice absent certification. Both parties agree that Maryland law requires

20

For HJR - No Transmission Information Available   in  on line [0] for HJR * Pg 24/28
05/15/2001 15:12 FAX 301 907 9591          BUDOW & NOBLE PC                          ☑024
     05/15/01  12:11  FAX 410 876 1839          MILLER&TRUHE LLC                          ☑24

insurers to conduct independent reviews of an insured's claim.
Plaintiffs fail to explain why in this case, as long as Defendant
complies with the law, the procedure it adopts is relevant.

   3. Rule 23(b)(3) - <u>Whether Common Issues of Law or Fact will
Predominate</u>

   "In order to 'predominate,' common issues must constitute a
significant part of the individual cases." *Mullen v. Treasure
Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir. 1999) (citing *Jenkins
v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986). In
support of certification under Rule 23(b)(3), Plaintiffs argue that
if there are liability issues common to the class, those common
questions of liability will predominate over individual issues
regarding varying degrees of damages.[6] *See Iron Workers Local
Union No. 17 v. Philip Morris Inc.*, 182 F.R.D. 523, 540 (N.D. Ohio
1998) (especially in antitrust and conspiracy claims, courts
frequently consider issues of liability in determining whether
common questions of law or fact predominate). Plaintiffs also
assert that a single common issue may be the overriding one in a
litigation, such as whether there has been a common course of
misrepresentation on the part of the Defendant, despite the fact
that the suit also entails numerous remaining individual questions.

_____

   [6]Rule 23(b)(3) also requires that the movant show that a class
action is superior to other forms of adjudication. In its motion,
however, Defendant focuses on the predominance prong. Thus, the
court does so as well.

For HJR - No Transmission Information Available  in  on line [0] for HJR * Pg 25/28
05/15/2001 15:12 FAX 301 907 9591          BUDOW & NOBLE PC
   05/15/01  12:11  FAX 410 876 1839          MILLER&TRUHE LLC

Plaintiffs contend that this case contains the following overriding issues: (1) the nature and extent of Defendant's duties under Maryland law; (2) Defendant's common course of deceptive conduct in evaluating PIP claims; and (3) Defendant's common course of misrepresentation in inducing Plaintiffs to enter into contracts.

However, the issues that vary in this case do not merely involve degrees of damages. They involve, among other things, whether and to what extent a claimant had a right to PIP benefits at all. As explained above, this inquiry will necessarily require that the fact finder make individual determinations on a number of issues as to each purported class member. Defendant contends that because of these individual inquiries, the case would be unmanageable.

Rule 23(b)(3) sets forth four factors that a court might consider in determining whether the predominance and superiority elements are met. One of the factors is "difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). A court should generally not deny class certification on manageability grounds without allowing a plaintiff an opportunity to conduct some discovery. *Windham*, 565 F.2d at 64 n.5 (explaining that "hard data should be presented to the district court as to the actual difficulty or ease involved in determining class membership and managing this proceeding") (citation omitted). Even if the court were to permit discovery in this case, however,

For HJR - No Transmission Information Available   in  on line [0] for HJR * Pg 26/28
05/15/2001 15:13 FAX 301 907 9591          BUDOW & NOBLE PC                              ☑028
     05/15/01  12:11  FAX 410 876 1839        MILLER&TRUBE LLC                          ☑28

it likely would not aid Plaintiffs in proving that they satisfy
Rule 23(b)(3).   "[W]here  individual  factual  considerations
predominate  over  common  questions,"  class  certification  is
inappropriate under rule 23(b).  *Peoples*, 179 F.R.D. at 498.  As
already  explained,  it  is  apparent  from  the  pleadings  that
individual factual determinations will constitute a significant
part of this action, and Plaintiffs themselves admit that Maryland
law requires that the court conduct individual inquiries into each
insured's claim to resolve the issues this case raises.  *Cf.*
*Zimmerman*, 800 F.2d at 390 (explaining that when possibility of
individualized determinations would impose an undue managerial
burden on district court, circuit court could not say that trial
court was wrong to deny certification under Rule 23(b)(3)).  Thus,
Plaintiffs  fail  to  allege  sufficient  facts  to  satisfy  Rule
23(b)(3)'s requirements as well.

   C.   Defendant's Motion to Stay Discovery

   Defendant moves to stay discovery in this matter because it
contends the court may dispose of the case by granting its motion
to dismiss.[7]  Plaintiffs contend, at least with respect to the
class claims, that discovery should proceed so that they have an
opportunity to obtain information bearing on the propriety of the

-------------------

[7]Defendant also states that its motion to stay discovery
should be granted pending its motion to stay this entire action.
Defendant earlier abandoned that motion and does not seek a ruling
on it.  Paper no. 16.

23

For HJR - No Transmission Information Available   in on line [0] for HJR * Pg 27/28
05/15/2001 15:13 FAX 301 907 9591          BUDOW & NOBLE PC
   05/15/01  12:11  FAX 410 876 1839          MILLERATRUHE LLC

case.   Specifically, Plaintiffs argue that because they have

alleged a common course of conduct on Defendant's part, they should

be allowed to conduct discovery on such issues as whether Defendant

engaged in an objective review of Plaintiff's claims and the extent

to which computer programs were used to evaluate claims.

Defendant's motion is denied as to the named Plaintiffs, as

Defendant only sought a stay of discovery until the court ruled on

its motion to dismiss, which, if granted, would have disposed of

. this action.   The motion will be denied, and Defendant presents no

argument why discovery should not proceed at this time.

Discovery as to the class presents another matter.    It is

Plaintiffs' burden to set forth a prima facie case showing that

Rule 23's requirements are met or that discovery is likely to

substantiate class allegations.   *Mantolete*, 767 F.2d at 1424.    If

it appears from the pleadings that class certification is

unwarranted, the court may strike allegations pertaining to those

claims and refuse to allow further discovery.   *Lumpkin*, 161 F.R.D.

at 481 (striking class allegations before plaintiffs obtained any

discovery).   As explained above, Plaintiffs' claims are riddled

with individual inquiries, which makes this action inappropriate

for class certification.   To grant any relief in this case, the

court will have to inquire into each class member's individual

claim to determine whether any medical procedure was necessary,

expense was reasonable, and benefits were due.    Maryland law

05/15/2001 15:13 FAX 301 907 9591    For HJR - No Transmission Information Available   in  on line [0] for HJR * Pg 28/28
BUDOW & NOBLE PC

05/15/01  12:11  FAX 410 876 1839           MILLER&TRUSH LLC                              @028
@28

requires such inquiries. The court finds that additional discovery
will not aid Plaintiffs in showing that class action status is
appropriate.   Because of the court's resolution on this issue,
Defendant's motion to stay discovery with respect to class
certification is moot.

**III. Conclusion**

    Defendant's motions to dismiss and to stay discovery as to the
named Plaintiffs are denied and Defendant's motion to strike the
class allegations is granted.  Defendant's motion to stay discovery
as to the class certification issues is mooted by the court's
opinion.

    A separate Order will be entered.


                    *Deborah K. Chasanow*
                    DEBORAH K. CHASANOW
                    United States District Judge

                    May 11 , 2001.

CASE NO. 01-8111-CIV-FERGUSON

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing was served, by

U.S. Mail, on all persons on the attached Service List this _22nd_ day of October, 2001.

_____
Marcy Levine Aldrich

## SERVICE LIST
*Salvatore D. Larusso, D.C. v. ITT Hartford Life and Annuity Ins. Co.*
(Case Nos. 00-6061; 01-8111-Civ-Ferguson) (S.D. Fla.)

**Co-Counsel for Plaintiffs**

ATLAS PEARLMAN, P.A.
Jan Douglas Atlas, Esq.
  atlas@atlaslaw.com
Eric Lee, Esq.
  lee@atlaslaw.com
Robin Corwin Campbell, Esq.
  campbell@atlaslaw.com
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301
Tel: (954) 763-1200
Fax: (954) 766-7800

**Co-Counsel for Plaintiffs**

GOLD & COULSON
Arthur S. Gold, Esq.
  asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
Tel: (312) 372-0777
Fax: (312) 372-0778

**Co-Counsel for Plaintiffs**

PHILLIPS & GARCIA
Andrew Garcia, Esq.
  agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
  cphilips@gpandg.com
13 Ventura Drive
North Darthmouth, MA 02747
Tel: (508) 998-0800
Fax: (508) 998-0919

**Co-Counsel for Plaintiffs**

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
  dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 1611
Fort Lauderdale, FL 33394
Tel: (954) 462-6855
Fax: (954) 462-6899

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
  personalinjurylawyer@earthlink.net

230 East Davis Boulevard
Tampa, FL 33606
Tel: (813) 251-1000
Fax: (813) 254-6327

**Co-Counsel for Plaintiffs**

RICHARD BOKOR, P.A.
Richard Bokor, Esq.
  rabokor1@tampabay.rr.com
230 East Davis Boulevard
Tampa, FL 33606
Tel: (813) 251-1000
Fax: (813) 254-6327

**Co-Counsel for Plaintiffs**

Casey Fundaro, Esq.
Florida Bar No. 933650
  fundaro@aol.com
1100 5th Avenue S., Suite 201
Naples, FL 34102-6407
Tel: (941) 435-7995
Fax: (941) 435-1269

**Counsel for Allstate**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.
  dshelton@rumberger.com
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
Tel: (407) 872-7300
Fax: (407) 841-2133

ROSS & HARDIES
Peter J. Valeta, Esq.
  peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
Tel: (312) 750-3619
Fax: (312) 920-7241

**Counsel for Beech Street and ADP**

TEW, CARDENAS, REBAK, KELLOGG, LEHMAN, DEMARIA,
  TAGUE, RAYMOND & LEVINE, L.L.P.
Thomas Tew, Esquire
Direct Tel: (305) 539-2106
  tt@tewlaw.com
Joseph A. DeMaria, Esquire
Direct Tel: (305) 539-2440
  jad@tewlaw.com
John M. Quaranta Esquire
Direct Tel:  (305)536-8432
  jmq@tewlaw.com

MI714681;1                                  - 2 -

Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
Fax: (305) 536-1116

**Counsel for Progressive**

ANANIA, BANDKLAYDER, *et al.*
Francis Anania, Esq.
  fanania@anania-law.com
Donald A. Blackwell, Esq.
  dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
Tel: (305) 373-4900
Fax: (305) 373-6914

**Counsel for CCN**

MCGUIRE, WOODS, et al.
William W. Deem, Esquire
  wdeem@mcguirewoods.com
William E. Adams, Esquire
Florida Bar No. 467080
  badams@mcguirewoods.com
Curt Caywood, Esquire
  ccaywood@McGuireWoods.com
3300 Bank of America Tower
50 N. Laura Street
Jacksonville, Florida  32202
Tel: (904)798-3200
Fax: (904)798-3207

**Counsel for Nationwide**

FOWLER, WHITE, et al.
Katherine C. Lake, Esquire
  klake@fowlerwhite.com
Bruce A. Aebel, Esquire
  baebel@fowlerwhite.com
Post Office Box 1438
Tampa, Florida 33601
Tel: (813)228-7411
Fax: (813)229-8313

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esquire
  haggerty@scdlaw.com
1601 Market Street, 34th Floor
Philadelphia, Pennsylvania 19103-2316
Tel: (215)299-4314
Fax: (215)299-4301

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Gregory A. Baldwin, Esquire

MI714681;1

gbaldwin@hklaw.com
Robert K. Levenson, Esquire
rlevenson@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
Tel: (305) 374-8500
Fax: (305)789-7799

**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT & EIDSON, P.A.
Mark Shapiro, Esquire
mshapiro@akerman.com
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, Florida  33131
Tel: (305)374-5600
Fax: (305)374-5095

**Counsel for Metropolitan**

AKERMAN, SENTERFITT & EIDSON, P.A.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, Florida 33131
Tel: (305)374-5600
Fax: (305)374-5095

SONNENSCHEIN, NATH & ROSENTHAL
Jeffrey P. Lennard, Esq.
jlennard@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
Tel: 312-876-8000
Fax: 312-876-7934

**Counsel for Integon**

AKERMAN, SENTERFITT & EIDSON, P.A.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, Florida 33131
Tel: (305)374-5600
Fax: (305)374-5095

**Counsel for Prudential**

SHEA & GARDNER
John D. Aldock, Esquire
jaldock@sheagardner.com
Direct Tel: (202) 828-2140
Richard M. Wyner, Esquire
Rwyner@sheagardner.com
Direct Tel: (202) 828-2188

MI714681;1                                    - 4 -

Jeffrey M. Klein, Esquire
  jklein@sheagardner.com
Direct Tel: (202) 828-4301
M. David Dobbins, Esquire
  ddobbins@sheagardner.com
Direct Tel: (202) 828-2184
1800 Massachusetts Avenue, N.W.
Washington, District of Columbia 20036
Tel: 202-828-2000
Fax: 202-828-2195

BUTLER BURNETTE PAPPAS
Kathy Johnson Maus
  kmaus@bbplaw.com
Eric Zivitz
  ezivitz@bbplaw.com
3520 Thomasville Road, Suite 102
Tallahassee, Florida  32308-3469
Tel: 850-894-4111
Fax: 850-894-4999

**Counsel for Superior**

BUTLER BURNETT PAPPAS
Alan J. Nisberg, Esquire
  anisberg@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway, Suite 1100
Tampa, Florida 33607
Tel: (813) 281-1900
Fax: (813) 281-0900

**Counsel for American International**
CONROY, SIMBERG, GANON, KREVANS & ABEL, P.A.
Dale L. Friedman, Esquire
  dfriedman@csglaw.com
Brian P. Knight, Esquire
  bknight@csglaw.com
3440 Hollywood Boulevard, 2nd Floor
Holly wood, Florida 33021
Tel: (954) 961-1400
Fax: (954) 967-8577