# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 00-CIV-6061-FERGUSON/SNOW (Consolidated)
### Referred to Magistrate Judge Snow

DR. PAUL ZIDEL, and all others )
similarly situated, )
                 )
       Plaintiffs, )
                 )
v. )
                 )
ALLSTATE INSURANCE COMPANY, )
and COMMUNITY CARE )
NETWORK, INC., d/b/a CCN, )
                 )
       Defendants. )
_____)

ULTRA OPEN MRI CORPORATION, )
on behalf of itself and all others )
similarly situated, )
                 )     **Case No.: 01-6779- CIV-~~LENARD~~**
                 )
vs. )
FIDELITY AND CASUALTY COMPANY )
OF NEW YORK and THE CONTINENTAL )
INSURANCE COMPANY, )
                 )
       Defendants. )
_____)

FILED BY [signature] D.C.
CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.-FTL
2001 OCT 23 PM 1:32

## DEFENDANTS FIDELITY AND CASUALTY COMPANY OF NEW YORK'S and THE CONTINENTAL INSURANCE COMPANY'S ANSWER TO CLASS ACTION COMPLAINT

      Defendants, Fidelity and Casualty Company of New York and The Continental Insurance

Company (hereinafter, collectively referred to as "CNA"), by and through their attorneys, and

for their Answer to Plaintiff, Ultra Open MRI Corporation's ("UOMC") Class Action Complaint

("Complaint") state as follows:

## THE PARTIES

1.      UOMC is a corporation incorporated under the laws of the State of Florida with its principal place of business in Bradenton, Florida.

ANSWER:    CNA lacks sufficient information to admit or deny the allegations made and

contained in Paragraph 1.

2.      CNA are insurance companies incorporated under the laws of the State of Illinois with their principal place of business located it in Chicago, Illinois.  CNA provides automobile insurance throughout the State of Florida, is registered to do business in Florida, and transacts business in the Southern District of Florida.

ANSWER:    CNA admits the allegations made and contained in Paragraph 2.

3.      Non-party Beech Street Corporation ("Beech Street") is a California corporation that established a preferred provider organization. In 1999, Beech Street merged with non-party Capp, Care, Inc.

ANSWER:    CNA lacks sufficient information to admit or deny the allegations made and

contained in Paragraph 3.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1331 because it arises under the laws of the United States, specifically 18 U.S.C. § 1961 et seq. (the "RICO Act").

ANSWER:    CNA admits that the allegations made and contained in Paragraph 4 of the Class

Action Complaint purport to allege that this Court has subject matter jurisdiction over

this action pursuant to 18 U.S.C. § 1331, but denies such allegations.

5.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 (b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District. CNA is subject to personal jurisdiction in this District, CNA insures numerous individuals in this District. and numerous class members are present in this District.

ANSWER:    CNA admits the allegations made and contained in Paragraph 5.

2

## BACKGROUND

6.  CNA's standard Florida Automobile Insurance Policy (hereinafter the "Policy") provides personal injury protection benefits to its insureds.  Certain policies also provide extended personal injury protection benefits and MPC coverage. All such coverage shall referred to as ("PIP") coverage.

ANSWER:    CNA states that the Policy speaks for itself.  CNA denies the allegations made

and contained in Paragraph 6 to the extent that they are inconsistent with the foregoing.

7.  With respect to payment of accident related medical expenses under PIP, CNA's policy of insurance states in pertinent part that CNA must pay eighty (80%) percent of all reasonable and necessary accident related medical expenses.

ANSWER:    CNA states that the Policy speaks for itself.  CNA denies the allegations made

and contained in Paragraph 7 to the extent that they are inconsistent with the foregoing.

8.  CNA's Policy is a typical Florida indemnity insurance policy under which CNA is required to indemnify claimants s for eighty percent (80%) of the full cost of their reasonable and necessary medical bills up to a defined limit.

ANSWER:    CNA states that the Policy speaks for itself. CNA   denies the allegations made

and contained in Paragraph 8 to the extent that they are inconsistent with the foregoing.

9.  Under the Policy, an insured has the absolute right and freedom to choose his or her medical providers.

ANSWER:    CNA admits the allegations made and contained in Paragraph 9.

10.  Within Policy limits. medical providers have the unrestricted right to be reimbursed eighty percent (80%) of their reasonable and necessary accident related medical expenses.

ANSWER:    CNA states that the Policy speaks for itself.  CNA denies the allegations made

and contained in Paragraph 10 to the extent that they are inconsistent with the foregoing.

11.  The State of Florida's PIP statute directly addresses a healthcare provider's right to be paid for reasonable charges. Section 627.736(5(5).  Florida Statutes ("Section 627.736") states:

An physician, hospital, clinic, or other person or institution lawfully rendering treatment to an injured person for bodily injury covered by personal Injury

3

protection insurance may charge only a reasonable amount for the products, services, and accommodations rendered

ANSWER:    CNA states that all applicable statutory provisions speak for themselves.  CNA

denies the allegations made and contained in Paragraph 11 to the extent that they are

inconsistent with the foregoing.

12.    Florida statutes permit an automobile insurance company to designate certain medical providers as preferred providers *if* the automobile insurer establishes a legitimate preferred provider organization ("PPO") network by satisfying the strict requirements of Section 627.736(10) which provides as follows:

> (10) An insurer may negotiate and enter into contracts with licensed healthcareproviders for the benefits described in this section, referred to in this section as"preferred providers," which shall include healthcare providers licensed underchapters 459, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirenments of this subsection are met. If the insured elects to use a provider who is not a a preferred provider, whether the insured purchased a preferred provider policy or a non-preferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferredd provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policy-holder or applicant, it must also offer a non-preferred provider policy. The insurer shall provide each policy-holder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy. and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

ANSWER:    CNA states that all applicable statutory provisions speak for themselves.  CNA

denies the allegations made and contained in Paragraph 12 to the extent that they are

inconsistent with the foregoing.

13.    CNA has not offered its insureds preferred policies for PIP automobile insurance. As such, any medical provider who treated or treats a CNA insured under a CNA PIP auto insurance policy is not a "preferred provider."  Therefore, in accordance with the above quoted statute, "the medical benefits provided by the insurer <u>shall</u> be as <u>required</u> by this section." (emphasis added).  The medical benefits "required" are 80% of "all reasonable and necessary treatment, expenses . . . ."

4

ANSWER:   CNA admits the allegations made and contained in the first sentence of Paragraph

13, states that all applicable statutory provisions speak for themselves, denies such

allegations to the extent that they are inconsistent with such statutory provisions, and

denies the remaining allegations made and contained in Paragraph

14.    Companies such as Beech Street are sometimes referred to as "brokers" or "managed care companies" in the healthcare industry.  Beech Street contracts with healthcare providers, such as UOMC, for the purpose of uniting healthcare providers with commercial payors to coordinate and arrange for the deliver of healthcare services to the payors' legitimate subscribers.  Beech Street may also administer healthcare claims submitted by healthcare providers to insurance companies.  These contracts are typically referred to as Preferred Provider Agreements ("PPAs").

ANSWER:   CNA states that Beech Street's contracts with healthcare providers speak for

themselves, and denies the allegations made and contained in Paragraph 14 to the extent

that they are inconsistent with the foregoing.

15.    The contracts entered into with healthcare providers by Beech Street require the healthcare providers to accept fees for services to subscribers at discounted rates from payors.

ANSWER:   CNA states that Beech Street's contracts with healthcare providers speak for

themselves, and denies the allegations made and contained in Paragraph 15 to the extent

that they are inconsistent with the foregoing.

16.    Healthcare providers, by definition, include, but are not limited to, physicians, chiropractors, hospitals, pharmacies, and other healthcare facilities.

ANSWER:   CNA admits the allegations made and contained in Paragraph 16.

17.    Payors benefit by paying healthcare providers at discounted rates.

ANSWER:   CNA affirmatively states that, inter alia, reduced medial costs benefit insureds by

making their limited amount of personal injury protection benefits cover a larger amount

of medical bills and by reducing their co-payment amount.  CNA denies the allegations

5

made and contained in Paragraph 17 to the extent that they are inconsistent with the foregoing.

18.    Healthcare providers benefit by becoming part of the network of healthcare providers that are supposed to be marketed by payors to their subscribers and insureds through the use of directories and marketing tools, thus increasing the healthcare providers volume of business referrals. Such healthcare providers are recognized as "preferred providers."

ANSWER:    CNA admits that the "benefit" alleged in Paragraph 18 may accrue to health care

providers under certain contractual arrangements, denies that such "benefit" is the sole

benefit which health care providers may receive in connection with any network

arrangement for which they may contract, and denies the allegations made and contained

in Paragraph 18 to the extent that they are inconsistent with the foregoing.

19.    The insurance policies sold or provided by the payors to their subscribers are recognized as "preferred provider policies."

ANSWER:    CNA lacks sufficient information to admit or deny the allegations made and

contained in Paragraph 19.

20.    The combination of all parties to this endeavor is recognized as Preferred Provider Organization.

ANSWER:    CNA lacks sufficient information to admit or deny the allegations made and

contained in Paragraph 20.

21.    At all times material herein, UOMC entered into a contract under which it agreed to provide services to Beech Street's PPO Subscribers. Thereafter, CNA began applying UOMC's Beech Street contractual discount to UOMC's medical bills for its patients who were injured in automobile accidents and covered by a Florida CNA PIP Policy. CNA utilized the services of ADP Integrated Medical Solutions, Inc. ("ADP") to process and discount UOMC's bills.

ANSWER:    With respect to the first sentence of Paragraph 21, CNA states that UOMC's

contract with Beech Street speaks for itself and denies the allegations made and contained

in Paragraph 21 to the extent that they are inconsistent with the foregoing. CNA

6

affirmatively states that, during the relevant time period, pursuant to its agreement with Beech Street, CNA paid medical bills involving personal injury protection benefits claimants who were treated by health care providers who had contracted with Beech Street at the rates established under such contracts. CNA denies the remaining allegations made and contained in the second sentence of Paragraph 21 to the extent that it is inconsistent with the foregoing. CNA admits the allegations made and contained in the last sentence of Paragraph 21.

22.    Section 627.736(10), provides a means for CNA to participate in such a PPO and offer a preferred provider policy for personal injury protection automobile insurance to its insureds after it enters into contracts with healthcare providers.

ANSWER:    CNA states that all applicable statutory provisions speak for themselves. CNA denies the allegations made and contained in Paragraph 22 to the extent that they are inconsistent with the foregoing.

23.    CNA never became a legitimate participant in UOMC's purported PPO and never complied with the requirements of the Section 627.736(10).

ANSWER:    CNA denies the allegations made and contained in Paragraph 23.

24.    Nevertheless, CNA has taken discounts on healthcare providers' bills as if it were a legitimate participant in UOMC's purported PPO and had complied with Section 627.736 by offering a preferred provider policy of personal injury protection automobile insurance to its insureds, none of which was done by CNA.

ANSWER:    CNA affirmatively states that, during the relevant time period, pursuant to its agreement with Beech Street, CNA paid medical bills involving personal injury protection benefits claimants who were treated by health care providers who had contracted with Beech Street at the rates established under such contracts. CNA denies the remaining allegations made and contained in Paragraph 24 to the extent that they are inconsistent with the foregoing.

7

25.    This unlawful practice (called a "Silent PPO") allows CNA to enjoy substantial savings and profits by paying out less in benefits which in turn causes UOMC and those similarly situated to suffer financial loss, without any consideration from CNA for these discounts.

ANSWER:    CNA objects to the characterization of its activities as a "Silent PPO".  CNA

denies the allegations made and contained in Paragraph 25.

26.    CNA, Beech Street and ADP have collectively engaged in the previously described "Silent PPO" scheme to reduce benefits paid on auto injury claims.

ANSWER:    CNA objects to the characterization of its activities as a "Silent PPO".  CNA

denies that allegations made and contained in Paragraph 26.

27.    The "Silent PPO" scheme has emerged primarily in the context of indemnity plans.  Indemnity insurers, such as CNA, obtain access to PPO networks of preferred providers and their discounts.  CNA takes advantage of these discounts.

ANSWER:    CNA denies the allegations made and contained in Paragraph 27.

28.    CNA is not, however, entitled to take advantage of these legitimate PPO discounts under the terms and conditions of its Florida automobile insurance policies, the Florida PIP statutes, and the Beech Street PPA contract with UOMC.

ANSWER:    CNA denies the allegations made and contained in Paragraph 28.

29.    CNA has not established the statutory prerequisites to be entitled to these PPO discounts.

ANSWER:    CNA denies the allegations made and contained in Paragraph 29.

30.    This Silent PPO scheme contains none of the legitimate steerage mechanisms required by legitimate PPOs.  Legitimate steerage mechanisms include creating financial incentives for steering insureds to preferred providers such as lower premiums or lower co-payments, providing education and marketing information to insureds about preferred providers in the network, and printing and distributing preferred provider identification cards.

ANSWER:    CNA objects to the characterization of its activities as a "Silent PPO".  CNA

denies the allegations made and contained in Paragraph 30.

31.    By using the Silent PPO scheme, CNA enjoys substantial savings by paying PIP benefits without the attendant expense of establishing a legitimate PPO network.

ANSWER:    CNA objects to the characterization of its activities as a "Silent PPO".  CNA

denies the allegations made and contained in Paragraph 31.

32.    Legitimate managed care companies and insurers have knowledge of the illegality of such schemes.  The American Association of Preferred Providers has denounced such practices and the American Medical Association has issued an "Action Alert Kit" to its members educating them about Silent PPO schemes.

ANSWER:    CNA denies the allegations made and contained in the first sentence of Paragraph

32.  CNA lacks sufficient information to admit or deny the allegations made and

contained in the second sentence of Paragraph 32.

33.    CNA all had knowledge of the illegal nature of this Silent PPO discounting scheme.  Silent PPO discounting schemes have been the subject of widespread discussion in the insurance and managed care industries with many major medical associations denouncing the practice.

ANSWER:    CNA denies the allegations made and contained in Paragraph 33.

34.    Beech Street had direct knowledge of the illegitimate nature of Silent PPOs. Beech Street purportedly drafted the PPA, executed the PPA with UOMC and had express knowledge of its provisions.

ANSWER:    CNA lacks sufficient information to admit or deny the allegations made and

contained in Paragraph 34.

35.    Under CNA's Silent PPO scheme, Beech Street licensed, leased or otherwise provided its discount database to CNA.

ANSWER:    CNA objects to the characterization of its activities as a "Silent PPO".  CNA

affirmatively states that, during the relevant time period, CNA, pursuant to its agreement

with Beech Street, paid medical bills involving personal injury protection benefits

claimants who were treated by health care providers who had contracted with Beech

Street at the rates established under such contracts.  CNA denies the remaining

allegations made and contained in Paragraph 35 to the extent that they are inconsistent

with the foregoing.

9

36.    Armed with the Beech Street preferred provider database of discounts, CNA systematically processed all Florida medical expense claims through ADP's automated PPO repricing product and applied discounts to bills where the medical provider's tax identification number on the bill matched a tax identification number in Beech Street's database.  At no time did UOMC have a contract with CNA authorizing discounts to be taken on its medical bills.

ANSWER:    CNA admits that it did not enter into any direct contract with UOMC authorizing

discounts to be taken on its bills.  CNS affirmatively states that, during the relevant time

period, CNA, pursuant to its agreement with Beech Street, paid medical bills involving

personal injury protection benefits claimants who were treated by health care providers

who had contracted with Beech Street at the rates established under such contracts.  CNA

denies the remaining allegations made and contained in Paragraph 36 to the extent that

they are inconsistent with the foregoing.

37.    CNA routinely and systematically used Beech Street's preferred provider discounts to reduce millions of dollars of medical bills.  The discounts were routinely and systematically applied despite the fact that a preferred provider policy was not offered by CNA and despite the fact that claimants were not referred, steered or directed to preferred providers.

ANSWER:    CNA affirmatively states that during the relevant time period, pursuant to its

agreement with Beech Street, CNA paid medical bills involving personal injury

protection benefits claimants who were treated by health care providers who had

contracted with Beech Street at the rates established under such contracts, and denies the

remainder of Paragraph 37 to the extent that it is inconsistent with the foregoing.

38.    As part of CNA's Silent PPO scheme, upon information and belief, Beech Street was paid a percentage of CNA's PPO discount savings and/or a per transaction fee for processing claims for CNA.

ANSWER:    CNA objects that the characterization of its activities as a "Silent PPO".  CNA

admits that it paid Beech Street for its services pursuant to its agreement with Beech

Street.  CNA denies the remaining allegations of Paragraph 38.

39.     Without complying with the statutory prerequisites for the establishment of an automobile insurance PPO network, CNA has systematically discounted medical providers' PIP medical expenses by utilizing PPO discounts.

ANSWER:     CNA denies the allegations made and contained in Paragraph 39.

40.     CNA has illegitimately discounted hundreds of thousands of PIP medical expense claims in this manner without providing any steerage or other meaningful consideration for such discounts.

ANSWER:     CNA denies the allegations made and contained in Paragraph 40.

## FACTS AS TO PLAINTIFF

41.     At all times material herein, UOMC was purportedly a party to a PPA with Beech Street to be a participating healthcare preferred medical provider (hereinafter referred to as a "Beech Street Preferred Provider").

ANSWER:     CNA states that UOMC's contract with Beech Street speaks for itself, and denies the allegations made and contained in Paragraph 41 to the extent that they are inconsistent with the foregoing.

42.     Pursuant to the purported PPA Agreement, UOMC agreed to become a member of Beech Street's Network (i.e. employer/employee based group or individual health plan related payors).  UOMC's purported agreement does not allow Beech Street to allow automobile insurers or PPO discount brokers with automobile insurance clients access to UOMC's preferred provider rates.

ANSWER:     CNA states that UOMC's contract with Beech Street speaks for itself, and denies the allegations made and contained in Paragraph 42 to the extent that they are inconsistent with the foregoing.  CNA denies the remaining allegations made and contained in Paragraph 42.

43.     UOMC's purported agreement does not allow Beech Street to allow automobile insurers or PPO discount brokers with automobile insurer clients access to UOMC's rates.

ANSWER:     CNA states that UOMC's contract with Beech Street speaks for itself, and denies the allegations made and contained in Paragraph 43 to the extent that they are inconsistent with the foregoing.

11

44.    CNA has not offered a PPO endorsement to its automobile insureds. Morever, CNA never offered its Florida automobile insureds premium reductions as an economic incentive to use preferred providers.

ANSWER:    CNA states that it has not offered or sold a preferred provider PIP coverage in

Florida pursuant to § 627.736(10) and denies the remaining allegations made and

contained in Paragraph 44.

45.    UOMC's purported PPA with Beech Street did not authorize the application of discounts by automobile insurers or discount brokers who could not increase UOMC's patient volume. Increased patient volume.

ANSWER:    CNA states that UOMC's contract with Beech Street speaks for itself, and denies

the allegations made and contained in Paragraph 45 to the extent that they are

inconsistent with the foregoing.

46.    Despite these known facts, Beech Street allowed CNA access to all of Beech Street's preferred provider's confidential and proprietary discount rates knowing that CNA was not a proper payor under the PPA and could not increase preferred provider patient volume as promised by Beech Street.

ANSWER:    CNA denies the allegations made and contained in Paragraph 46.

47.    With Beech Street's consent, its database of preferred provider discounts was loaded into CNA's software and applied to all bills submitted to the CNA by Beech Street preferred providers such as UOMC.

ANSWER:    CNA denies the allegations made and contained in Paragraph 47.

48.    In exchange for Beech Street's anticipated effort to increase its patient volume, UOMC purportedly agreed with Beech Street to provide healthcare services to Subscribers of such Payors at a rate lower than UOMC would normally accept for the same healthcare services.

ANSWER:    CNA states that UOMC's contract with Beech Street speaks for itself and denies

the allegations made and contained in Paragraph 48 to the extent that they are

inconsistent with the foregoing.

49.    CNA obtained access to Beech Street's database that contained the identities of all Beech Street's purported Preferred Providers, as well as the discounted fees that these healthcare providers are willing to accept for medical services.

ANSWER:    CNA denies the allegations made and contained in Paragraph 49.

50.    At no time did CNA have a written contract with UOMC or other healthcare providers in Florida wherein healthcare providers agreed with CNA to discount charges for their medical services to patients injured in automobile accidents who were insured for PIP coverage by CNA.

ANSWER:    CNA admits that it did not have such a direct written contract with UOMC at any

time and denies the remaining allegations made and contained in Paragraph 50.

51.    By virtue of CNA's access to the discounted rates in the purported agreements between Beech Street, UOMC, and the class, CNA began to systematically apply PPO discounts.

ANSWER:    CNA affirmatively states that during the relevant time period, CNA, pursuant to

its agreement with Beech Street, paid medical bills involving personal injury protection

benefits claimants who were treated by health care providers who had contracted with

Beech Street at the rates established under such contracts.  CNA denies the allegations

made and contained in Paragraph 51 to the extent that it is inconsistent with the

foregoing.

52.    ADP, Beech Street and/or CNA have mailed explanation of medical bill payment forms ("EOBs") that indicated the application of a discount based upon the Beech Street Preferred Provider Agreements.

ANSWER:    CNA affirmatively states that during the relevant time period, CNA, pursuant to

its agreement with Beech Street, paid medical bills involving personal injury protection

benefits claimants who were treated by health care providers who had contracted with

Beech Street at the rates established under such contracts and that is issued EOB forms,

via United States mail.  CNA states that such EOB forms speak for themselves.  CNA

denies the allegations made and contained in Paragraph 52 to the extent that they are

inconsistent with the foregoing.

53.    These EOBs state that CNA is entitled to such discounts.

13

ANSWER:    The EOBs speak for themselves, and CNA denies the allegations made and

contained in Paragraph 53 to the extent that they are inconsistent with the foregoing.

54.    Under this scheme, CNA has been reaping huge savings while violating Florida law and providing no consideration whatsoever to healthcare providers, including UOMC, for the right to apply such discounts.

ANSWER:    CNA denies the allegations made and contained in Paragraph 54.

55.    Under CNA's Silent PPO scheme, it incorporated the purported Beech Street preferred provider discounts into its existing cost containment software product -- a product specifically designed to "re-price" medical bills based on preferred provider rates for non-managed care lines of insurance such as property and casualty insurance.

ANSWER:    CNA objects to the characterization of its activities as a "Silent PPO". CNA

denies the allegations made and contained in Paragraph 55.

56.    At all times material herein, in the course of its medical practice, UOMC provided medical care to patients who had been injured in automobile accidents and who were entitled to PIP benefits from CNA.

ANSWER:    From time to time, CNA received medical bills involving personal injury

protection benefits claimants under CNA policies who were treated by UOMC and lacks

sufficient information to admit or deny the remaining allegations made and contained in

Paragraph 56.

57.    At no time prior to their treatment with UOMC did this class of patients receive any marketing materials, including, but not limited to, publications identifying UOMC's name, address and available services, from CNA.

ANSWER:    CNA states that it did not provide written materials to individual personal injury

protection benefits claimants which identify UOMC's name, address, and available

services, and denies the remaining allegations of Paragraph

58.    At no time did CNA comply with the requirements of Section 627.736(10).

ANSWER:    CNA denies the allegations made and contained in Paragraph 58.

14

59.    At no time prior to their treatment with UOMC did CNA encourage these patients to use UOMC's medical services.

ANSWER:    CNA denies the allegations made and contained in Paragraph 59.

60.    After providing medical treatment to these patients, UOMC submitted medical bills for reasonable and necessary accident related medical expenses to CNA for payment.

ANSWER:    From time to time, CNA received medical bills from UOMC for payment. CNA

lacks sufficient information to admit or deny the remaining allegations made and

contained in Paragraph 60.

61.    Upon receipt of the medical bills submitted by UOMC for payment under the PIP portion of the CNA Automobile Policy, CNA discounted UOMC's and other class members' bills by using the Beech Street PPO discounted rates claiming that CNA was entitled to said discount.

ANSWER:    From time to time, pursuant to its agreement with Beech Street, CNA paid

medical bills involving personal injury protection benefits claimants who were treated by

health care providers who had contracted with Beech Street based on the rates for such

providers which Beech Street informed CNA applied. CNA lacks sufficient information

to admit or deny the remaining allegations made and contained in Paragraph 62.

62.    Upon information and belief, ADP and/or Beech Street were paid a percentage of CNA's discount savings on each PIP medical expense claim.

ANSWER:    From time to time, pursuant to its agreements with Beech Street and ADP, CNA

made payments to Beech Street and ADP based on UOMC's billed rates and Beech Street

rates and denies the remaining allegations made and contained in Paragraph 62.

63.    UOMC and other class members have received no consideration from CNA for the discounts taken.

ANSWER:    CNA denies the allegations made and contained in Paragraph 63.

64.    CNA could not provide such consideration because CNA failed to offer its insureds a PPO automobile insurance policy compliance with the Florida PIP statute.

15

ANSWER:    CNA denies the allegations made and contained in Paragraph 64.

65.    CNA's illegal activity is demonstrated by Exhibit "1" attached hereto. Exhibit "1" represents a sample of an EOB received by UOMC illustrating the illegal discount.

ANSWER:    CNA denies the allegations made and contained in Paragraph 65.

66.    UOMC billed CNA $899.00 for CPT Code 72141.  CNA then paid less than the amount billed by UOMC.

ANSWER:    CNA states that Exhibit 1 speaks for itself, and denies the allegations made and

contained in Paragraph 66 to the extent that they are inconsistent with the foregoing.

67.    CNA was supposed to pay eighty (80%) percent of the billed amount.

ANSWER:    CNA denies the allegations made and contained in Paragraph 67.

68.    CNA paid only 80% of the reduced amount as its full obligation under the insured's automobile insurance policy.

ANSWER:    Pursuant to its agreement with Beech Street, CNA paid this medical bill based on

the rates agree to by UOMC which Beech Street informed CNA applied.  CNA denies the

remaining allegations made and contained in Paragraph 68.

69.    This example resulted in the misappropriation of $287.68 from UOMC.

ANSWER:    CNA denies the allegations made and contained in Paragraph 69.

70.    CNA routinely and systematically applied the Beech Street PPO discounted rates to PIP medical expense claims.

ANSWER:    CNA affirmatively states that during the relevant time period, pursuant to its

agreement with Beech Street, CNA paid medical bills involving personal injury

protection benefits claimants who were treated by health care providers who had

contracted with  Beech Street based on the rates for such providers which Beech Street

informed CNA applied.  CNA denies the allegations made and contained in Paragraph 70

to the extent that they are inconsistent with the foregoing.

16

71.    At the time CNA implemented its PPO discounting scheme, it knew it was violating Florida law.

ANSWER:    CNA denies the allegations made and contained in Paragraph 71.

72.    After taking the illegal discounts from UOMC's and the class' bills, as described above, CNA routinely printed out EOBs showing the discounts. It then forwarded the EOBs and reduced payment checks to the healthcare providers in purported full satisfaction of the healthcare providers' medical charges.

ANSWER:    CNA states that the EOBs speak for themselves and denies the allegations of

Paragraph 72 to the extent that they are inconsistent with the EOBs. CNA denies the

remaining allegations made and contained in Paragraph 72.

73.    It was and is the custom and practice of CNA to discount thousands of automobile medical expense claims in this manner in violation of its policies with its insureds and in violation of Florida's PIP statutes.

ANSWER:    CNA denies the allegations made and contained in Paragraph 73.

74.    UOMC and those similarly situated have been economically damaged and have suffered monetary losses as a result of the conduct of CNA.

ANSWER:    CNA denies the allegations made and contained in Paragraph 74.

## CLASS ACTION ALLEGATIONS

75.    UOMC brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class of all other persons and entities similarly situated. The class is defined to include:

> all Florida healthcare providers whose bills for medical services rendered to patients covered by CNA's automobile insurance policies were discounted by CNA based upon a purported Beech Street Preferred Provider Organization reduction.

ANSWER:    CNA admits that the allegations of Paragraph 75 purport to allege that this action

is brought pursuant to Fed.R.Civ.P. 23 on behalf of a purported class, but denies that this

is a proper class action.

76.    There are questions of law and fact that are common to all members of the class, which questions predominate over any question affecting only individual class members.

ANSWER:     CNA denies the allegations made and contained in Paragraph 76.

77.     The principal common issues include the following:

(a)     whether CNA violated Section 627.736, Florida Statutes, by paying personal injury protection medical expense claims at discounted Preferred Provider rates;

(b)     whether CNA's processing of the PPO discounts is permissible under state law or federal law;

(c)     whether UOMC and those similarly situated are entitled to compensatory, statutory, or punitive damages against CNA because of its illegal conduct; and

(d)     whether UOMC and the class are entitled to an injunction preventing the continued disclosure and/or use of their discounts by CNA and the application of these discounts to automobile personal injury protection medical expense claims.

ANSWER:     CNA denies the allegations made and contained in Paragraph 77.

78.     The class is comprised of all healthcare providers whose medical bills were discounted by CNA based on Beech Street Preferred Provider discounts.

ANSWER:     CNA states that the purported alleged class definition speaks for itself and denies the allegations made and contained in Paragraph 78 to the extent that they are inconsistent with that definition.

79.     The amounts of the discounts are contained in CNA's computer systems and on the EOBs and checks mailed by CNA to UOMC and the members of the class.

ANSWER:     CNA denies the allegations made and contained in Paragraph 79.

80.     UOMC's claims are typical of these claims of all members of the class because the claims are based on the same legal and remedial theories.

ANSWER:     CNA denies the allegations made and contained in Paragraph 80.

81.     UOMC will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein.

ANSWER:     CNA lacks sufficient information to admit or deny the allegations made and contained in Paragraph 81.

18

82.    UOMC is similarly situated with, and has suffered similar injuries as, the members of the class that he seeks to represent.

ANSWER:    CNA denies the allegations made and contained in Paragraph 82.

83.    UOMC has retained counsel experienced in class action cases and healthcare litigation.

ANSWER:    CNA admits that UOMC has retain counsel, but lacks sufficient information to

admit or deny the remaining allegations made and contained in Paragraph 83.

84.    Neither UOMC, nor counsel, have any interest that may cause them to not vigorously pursue this action.

ANSWER:    CNA lacks sufficient information to admit or deny the allegations made and

contained in Paragraph 84.

85.    A class action is CNA to other available methods for the fair and efficient adjudication of the controversy, because:

(a)    the individual class members are not all aware that they have been wronged and are thus unable to prosecute individual actions;

(b)    concentration of the litigation concerning this matter in this Court is desirable;

(c)    the claims of the representative Plaintiff are typical of the claims of the members of the class;

(d)    a failure of justice will result from the absence of a class action; and

(e)    the class and the difficulties likely to be encountered in the management of this class action are not great.

ANSWER:    CNA denies the allegations made and contained in Paragraph 85.

86.    The class is so numerous as to make it impracticable to join all members of the class as plaintiffs.

ANSWER:    CNA denies the allegations made and contained in Paragraph 86.

87.    CNA has discounted thousands of medical bills based on Beech Street Preferred Provider discounted rates.    Many healthcare providers may not even be aware of CNA's

sophisticated scheme, and if they were, for many providers, the amount in controversy would be too small to justify the expense of pursuing individual litigation.

ANSWER:    CNA denies the allegations made and contained in Paragraph 87.

88.    In contrast, on a class-wide bases, CNA has saved millions of dollars by accessing and utilizing the discounted rates of healthcare providers.

ANSWER:    CNA denies the allegations made and contained in Paragraph 88.

**AS AND FOR A FIRST**
**CAUSE OF ACTION**
**(Unjust Enrichment)**

89.    UOMC repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

ANSWER:    CNA restates and incorporates by reference its responses to Paragraphs 1-88 as if

fully set forth herein.

90.    UOMC and the class conferred benefits upon CNA by providing healthcare services to individuals insured by CNA.

ANSWER:    CNA denies the allegations made and contained in Paragraph 90.

91.    UOMC and the class billed CNA the reasonable value for these services.

ANSWER:    From time to time, CNA received medical bills from UOMC for payment. CNA

lacks sufficient information to admit or deny the allegations made and contained in

Paragraph 91.

92.    CNA improperly paid these bills at reduced rates.

ANSWER:    CNA denies the allegations made and contained in Paragraph 92.

93.    CNA has provided no consideration to UOMC and the class for the retention of the discounts by CNA.

ANSWER:    CNA denies the allegations made and contained in Paragraph 93.

94.    CNA has reaped the benefit of substantial monetary savings on PIP claims by wrongfully and illegally applying the Beech Street PPO discounted rates to Florida PIP medical expense claims.

ANSWER:    CNA denies the allegations made and contained in Paragraph 94.

95.    CNA had knowledge that it reaped said financial benefits to the detriment of UOMC and the members of the class by voluntarily accepting and retaining said benefits.

ANSWER:    CNA denies the allegations made and contained in Paragraph 95.

96.    Such savings constitute unjust enrichment for CNA and it would be inequitable under the circumstances for CNA to retain the benefits received from UOMC and the members of the class without paying the full value thereof to UOMC and the class members.

ANSWER:    CNA denies the allegations made and contained in Paragraph 96.

WHEREFORE, Defendants respectfully requests this Court to enter and Order dismissing Count I of the Complaint.

## **Affirmative Defenses to Count I**

### **First Defense**

1.    Count I fails to state a claim for which relief may be granted.

### **Second Defense**

1.    CNA was entitled to, pursuant to its agreement with Beech Street, to pay medical bills involving personal injury benefits claimants who were treated by health care providers who had contracted with Beech Street at the rates established under such contracts.

### **Third Defense**

1.    UOMC knew, or should have known, that with regard to certain covered claimants covered by Florida CNA personal injury protection automobile policy, CNA was informed and reasonably believed, based on its conversations with Beech Street representatives, that it was entitled to apply the Beech Street discount with UOMC.

### **Fourth Defense**

1.    UOMC provided medical treatment to certain patients and submitted medical bills to CNA for payment thereafter.

2.    The medical bills which UOMC submitted to CNA were prepared by UOMC agents and/or employees.

3.    As a result, UOMC knew, or should have known, at all times the amount of payments which it was expecting to receive from CNA with regard to such bills.

On those occasions when UOMC received payments from CNA with regard to such bills, it knew or should have known whether or not CNA had made payment based on the amount which it had billed or hade made payment of a different amount, including payments which factored in an additional discount or reduction.

4.    Instead of making an inquiry of CNA or otherwise alerting CNA to the fact that it was claiming that CNA was not paying such bills at the proper rates, UOMC accepted and acquiesced to such payments without complaint before instituting this lawsuit.

5.    As a result, UOMC's claim for unjust enrichment is barred by the equitable doctrine of laches.

### Fifth Defense

1.    UOMC provided medical treatment to certain patients and submitted medical bills to CNA for payment thereafter.

2.    The medical bills which UOMC submitted to CNA were prepared by UOMC agents and/or employees.

3.    As a result, UOMC knew, or should have known, at all times the amount of payments which it was expecting to receive from CNA with regard to such bills.

4    On those occasions when UOMC received payments from CNA with regard to such bills, it knew or should have known whether or not CNA had made payment based on the amount which it had billed or hade made payment of a different amount, including payments which factored in an additional discount or reduction.

5.    Instead of making an inquiry of CNA or otherwise alerting CNA to the fact that it was claiming that CNA was not paying such bills at the proper rates, UOMC accepted and acquiesced to such payments without complaint before instituting this lawsuit.

6.    As a result, UOMC's claim for unjust enrichment is barred by the equitable doctrines of waiver and estoppel.

WHEREFORE, Defendants respectfully requests this Court to enter an Order dismissing Count I of the Complaint with prejudice.

### AS AND FOR A SECOND
### CAUSE OF ACTION
#### (Third-Party Beneficiary Breach of Contract)

97.    UOMC repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

ANSWER:    CNA restates and incorporates by reference its responses to Paragraphs 1-88 as if

fully set forth herein.

98.    CNA and its insureds who purchased its Florida PIP automobile insurance policy entered into a contract of insurance.

ANSWER:    CNA admits the allegations made and contained in Paragraph 98.

99.    CNA's contract provided that in the event an insured was involved in an automobile accident, CNA would pay, on the insured's behalf, eighty (80%) percent of all reasonable and necessary medical expenses incurred.

ANSWER:    CNA states that the contract speaks for itself.  CNA denies the allegations made

and contained in Paragraph 99 to the extent that they are inconsistent with the foregoing.

100.    UOMC and the other members of the class provided medical services to CNA insureds who were injured in automobile accidents.

ANSWER:    From time to time. CNA received medical bills from UOMC for payment.  CNA

denies the remaining allegations made and contained in Paragraph 100.

101.    UOMC and the members of the class are intended third-party beneficiaries of CNA's automobile insurance agreements.

ANSWER:    Paragraph 101 states a legal conclusion to which no response is required, and

denies the remaining allegations made and contained in Paragraph 101.

102.    UOMC and the members of the class were to be paid eighty (80%) of all reasonable and necessary medical expenses incurred and billed.

ANSWER:    CNA's Policy and the Florida PIP statute set forth CNA's obligations with regard

to PIP claims and CNA denies the allegations in Paragraph 102 to the extent that they are

inconsistent with those obligations.  CNA denies the remaining allegations made and

contained in Paragraph

103.    CNA breached the agreement by improperly paying medical expenses at reduced rates.

ANSWER:    CNA denies the allegations made and contained in Paragraph 103.

23

104.    As a result, UOMC and the putative class members have suffered damages directly and proximately caused by CNA's breach of its insurance agreements with its insureds.

ANSWER:    CNA denies the allegations made and contained in Paragraph 104.

WHEREFORE, Defendants respectfully requests this Court to enter and Order dismissing Count II of the Complaint.

### Affirmative Defenses to Count II

### First Defense

1.    Count II fails to state a claim for which relief may be granted.

### Second Defense

1.    CNA was entitled to, pursuant to its agreement with Beech Street, to pay medical bills involving personal injury benefits claimants who were treated by health care providers who had contracted with Beech Street at the rates established under such contracts.

### Third Defense

1.    UOMC knew, or should have known, that with regard to certain covered claimants covered by Florida CNA personal injury protection automobile policy, CNA was informed and reasonably believed, based on its conversations with Beech Street representatives, that it was entitled to apply the Beech Street discount with UOMC.

### Fourth Defense

1.    UOMC provided medical treatment to certain patients and submitted medical bills to CNA for payment thereafter.

2.    The medical bills which UOMC submitted to CNA were prepared by UOMC agents and/or employees.

3.    As a result, UOMC knew, or should have known, at all times the amount of payments which it was expecting to receive from CNA with regard to such bills.
On those occasions when UOMC received payments from CNA with regard to such bills, it knew or should have known whether or not CNA had made payment based on the amount which it had billed or hade made payment of a different amount, including payments which factored in an additional discount or reduction.

4.    Instead of making an inquiry of CNA or otherwise alerting CNA to the fact that it was claiming that CNA was not paying such bills at the proper rates, UOMC accepted and acquiesced to such payments without complaint before instituting this lawsuit.

5.     As a result, UOMC's claim for third party beneficiary breach of contract is barred by the equitable doctrine of laches.

### Fifth Defense

1.     UOMC provided medical treatment to certain patients and submitted medical bills to CNA for payment thereafter.

2.     The medical bills which UOMC submitted to CNA were prepared by UOMC agents and/or employees.

3.     As a result, UOMC knew, or should have known, at all times the amount of payments which it was expecting to receive from CNA with regard to such bills.

4      On those occasions when UOMC received payments from CNA with regard to such bills, it knew or should have known whether or not CNA had made payment based on the amount which it had billed or hade made payment of a different amount, including payments which factored in an additional discount or reduction.

5.     Instead of making an inquiry of CNA or otherwise alerting CNA to the fact that it was claiming that CNA was not paying such bills at the proper rates, UOMC accepted and acquiesced to such payments without complaint before instituting this lawsuit.

6.     As a result, UOMC's claim for third party beneficiary breach of contract is barred by the equitable doctrines of waiver and estoppel.

WHEREFORE, Defendants respectfully requests this Court to enter an Order dismissing Count II of the Complaint with prejudice.

### AS AND FOR A THIRD
### CAUSE OF ACTION
### (RICO Act Violations)

105.     UOMC repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

ANSWER:     CNA restates and incorporates by reference its responses to Paragraphs 1-88 as if

fully set forth herein.

106.     CNA, acting with Beech Street formed an association-in-fact enterprise designed to reduced payments made to Beech Street preferred providers on all Florida PIP medical expense claims submitted to CNA.  The "association-in-fact" is known as a "Silent PPO."

ANSWER:     CNA denies the allegations made and contained in Paragraph 106.

25

107. CNA, with the knowing or grossly negligent cooperation of Beech Street participated, directly and indirectly, in the activities of this enterprise through a pattern of racketeering activity, as more fully set forth below.

ANSWER: CNA denies the allegations made and contained in Paragraph 107.

108. The activities of this enterprise affected commerce.

ANSWER: CNA denies the allegations made and contained in Paragraph 108.

109. The pattern of racketeering activity consisted of multiple acts of mail and wire fraud, punishable under 18 U.S.C. § 1341 and § 1343, respectively.

ANSWER: CNA denies the allegations made and contained in Paragraph 109.

110. The pattern of racketeering activity has been continuous for at least two years, and, on information and belief, will continue into the future.

ANSWER: CNA denies the allegations made and contained in Paragraph 110.

111. In furtherance of the pattern of racketeering activity, CNA has engaged in a continuous scheme and artifice to defraud UOMC, and those similarly situated, of money as follows:

1. Beech Street solicited UOMC by mail to join its PPO network. Beech Street mailed its marketing and preferred provider agreements to potential preferred providers through use of the United States mails. Beech Street entered into a PPA with UOMC and class members which did not authorize the disclosure, sale, lease or license of preferred provider discounts to CNA;

2. Beech Street entered into a broker agreement (hereinafter referred to as a "Broker Agreement") with CNA which allowed for the disclosure and lease and/or license of the Beech Street preferred provider database to CNA;

3. CNA applied Beech Street's preferred provider discounts to medical expense claims submitted to CNA by Beech Street preferred providers;

4. Beech Street and CNA transferred claim information, medical bills, EOBs, compensation information and documentation and other documentation and information necessary to carry out this scheme via the United States mails and/or by wire;

5. After computer application of the discounts, CNA printed Explanation of Reimbursement forms ("EOBs") on its form EOBs which indicated the PPO discount and the reduced amount owed after application of the discount;

6. By use of the United States mail, Beech Street, ADP and/or CNA thereafter transmitted or caused to be transmitted said EOBs and reduced claim checks to medical providers and persons insured by CNA. A sample of such an EOB is attached hereto as Exhibit "1."

7. Said EOBs falsely represented that CNA was entitled to apply a Beech Street PPO discount to the claim;

8. Said EOBs falsely claimed the "ALLOWED AMOUNT" to be less than the amount actually owed and also falsely decreased a claimant's deductible, thereby exposing claimants to liability for the fraudulently discounted amount;

9. CNA, ADP and/or Beech Street engaged in interstate telephone calls, computer communications, and/or wire communications and transactions to transmit information that was false and to exchange fees and compensation essential to the scheme.

ANSWER:    CNA denies the allegations made and contained in Paragraph 111.

112. In the above described manner, CNA was able to gain access to managed care contract rates for application to Florida PIP medical expense claims without providing any consideration to UOMC or members of the purported class, and without ever entering into a managed care agreement with any medical providers.

ANSWER:    CNA denies the allegations made and contained in Paragraph 112.

113. This scheme to sell and grant access to unauthorized proprietary discounts worth millions of dollars has directly monetary damages to UOMC and members of the class.

ANSWER:    CNA denies the allegations made and contained in Paragraph 113.

114. CNA's, ADP's and/or Beech Street's conduct gives rise to claims under 18 U.S.C. § 1964(a) of RICO and permits the recovery of treble damages against CNA for violations of 18 U.S.C. § 1964(c), for a conspiracy to violate 18 U.S.C. § 1962(a) in violation of 18 U.S.C. § 1962(d) and for seeking to aid and abet and aiding and abetting violations of 18 U.S.C. § 1962(a) within the meaning of 18 U.S.C. § 2.

ANSWER:    CNA denies the allegations made and contained in Paragraph 114.

115. UOMC and the class members are "persons" within the meaning of 18 U.S.C. § 1964(c).

ANSWER:    CNA denies the allegations made and contained in Paragraph 115.

116. At all times relevant hereto, UOMC and class members were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

ANSWER:    CNA denies the allegations made and contained in Paragraph 116.

117.    With respect to the activities alleged herein, CNA, ADP and/or Beech Street acted at all times with malice toward the class, intent to engage in the conduct complained of for their own benefit and with knowledge that such conduct constituted unlawful activity.  Such conduct was done with reckless disregard for the rights of the class as well as the laws, to which CNA, ADP and/or Beech Street are subject, the same amounting to actionable wantonness.

ANSWER:    CNA denies the allegations made and contained in Paragraph 117.

118.    With respect to the activities alleged herein, CNA, ADP and/or Beech Street aided and abetted each other, and others not named in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. § 1962(a) and (c).

ANSWER:    CNA denies the allegations made and contained in Paragraph 118.

119.    CNA operated the scheme or artifice to defraud and to obtain money by false pretenses and to deprive class members of the intangible right of honest payment.

ANSWER:    CNA denies the allegations made and contained in Paragraph 119.

120.    In furtherance of this scheme, CNA, ADP and/or Beech Street interfered with, obstructed, delayed or affected commerce by attempting to obtain and/or actually obtaining property interests, to which CNA and Beech Street are not entitled, through the exploitation of discount rates.

ANSWER:    CNA denies the allegations made and contained in Paragraph 120.

121.    With respect to the overt acts and activities alleged herein, CNA communicated and conspired with ADP and/or Beech Street to violate 18 U.S.C. §§ 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d).

ANSWER:    CNA denies the allegations made and contained in Paragraph 121.

122.    CNA communicated with Beech Street and/or ADP so that it could participate directly in the fraudulent scheme or artifice alleged herein, to obtain money by false pretenses and to deprive class members of the intangible right of honest payment.

ANSWER:    CNA denies the allegations made and contained in Paragraph 122.

123.    CNA communicated with ADP and/or Beech Street so that it could participate directly in the interference with, obstructing of, delaying of, or effect upon commerce by actually obtaining property interests to which CNA was not entitled, through the exploitation of a proprietary discount rate.

ANSWER:    CNA denies the allegations made and contained in Paragraph 123.

124.    The numerous predicate acts of mail and wire fraud and interference with the operation of legitimate preferred provider discounts herein are part of a common fraudulent and extortionate scheme by CNA, ADP and/or Beech Street to defraud UOMC and the purported class of money and property interests under false pretenses; to deprive UOMC and the purported class of receipt of reasonable and necessary compensation for medical services; to interfere with the patient-doctor relationship; and to place CNA's, ADP's and/or Beech Street's financial interests over the confidential records of UOMC and the class so that CNA, ADP and/or Beech Street could make greater profits.

ANSWER:    CNA denies the allegations made and contained in Paragraph 124.

125.    UOMC, and the purported class, as victims of this unlawful pattern of illegal activity, have and continue to suffer losses.

ANSWER:    CNA denies the allegations made and contained in Paragraph 125.

## 1.    RACKETEERING ACTIVITIES.

126.    In carrying out the overt acts and fraudulent scheme described above, CNA, ADP and/or Beech Street engaged in *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. §§ 1341 and 1346, 18 U.S.C. §§ 1343 and 1346, 18 U.S.C. § 1951(b)(2), 18 U.S.C. § 1952(a), 18 U.S.C. § 1954, and 18 U.S.C. § 961 et seq., as stated below.

ANSWER:    CNA denies the allegations made and contained in Paragraph 126.

127.    Section 1961(1) of RICO provides that "'racketeering activity' means . . . any act which is indictable under any of the following provisions of Title 18, United States Code . . . Section 1341 (relating to mail fraud), Section 1343 (relating to wire fraud)."

ANSWER:    CNA denies the allegations made and contained in Paragraph 127.

128.    The United States Congress amended the mail and wire fraud statutes in 1988 by codifying a partial definition of the central term "scheme or artifice to defraud." The newly created definition of a "scheme or artifice" for purposes of specifically recognizing by statute certain unlawful acts also constituting mail and wire fraud violations under 18 U.S.C. §§ 1341 and 1343, respectively, now reads in its entirety as follows: "For purposes of this chapter, the term 'scheme or artifice' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

ANSWER:    CNA denies the allegations made and contained in Paragraph 128.

### 1.    18 U.S.C. §§ 1341 and 1346, and 18 U.S.C. §§ 1341 and 1346

129.    For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, CNA and Beech Street, in violation of 18 U.S.C. § 1341 and § 1346, placed in United States Post Offices and/or in authorized repositories for mail, matter, matters and things to be sent or delivered by the United States Postal Service, and received matters and things therefrom and knowingly caused to be delivered by mail those matters and things according to the directions thereon or at the place at which they were directed to be delivered by the persons to whom they were addressed.

ANSWER:    CNA denies the allegations made and contained in Paragraph 129.

130.    For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, CNA and/or Beech Street, in violation of 18 U.S.C. §§ 1343 and 1346, transmitted in interstate commerce by wire, telephone, or computer transmissions, information regarding illegal discounts. In this manner, CNA, was knowingly violating purported obligations of Beech Street to UOMC and others similarly situated to provide "honest services."

ANSWER:    CNA denies the allegations made and contained in Paragraph 130.

131.    CNA knowingly induced ADP and/or Beech Street to deprive UOMC and others similarly situated of "honest services."

ANSWER:    CNA denies the allegations made and contained in Paragraph 131.

132.    In those matters and things sent or delivered by the United States Postal Service referred to above, CNA, ADP and Beech Street falsely and fraudulently represented to UOMC and the class that:

1.    CNA's payments were for the amount "billed" for the reasonable value of the services, and

2.    that CNA was entitled to a PPO discount for UOMC and the class under a system that legitimately provides education, marketing and economic incentives intended to "steer" more patients and to provide other benefits to healthcare providers. CNA failed, however, to disclose to UOMC and the class that its EOBs were based upon illegal discounts designed to maximize profits on discounts illegally obtained through UOMC's proprietary information. CNA thus failed to disclose material facts regarding CNA's internal policies and practices specifically designed to reduce or limit the level of payment discussed in detail above.

ANSWER:    CNA denies the allegations made and contained in Paragraph 132.

30

133.    With respect to its unlawful activities described above, CNA also transmitted funds, contracts, and other forms of business communications and transaction sin a continuous and uninterrupted flow across state lines and employed the United States mails and interstate wires in violations of 18 U.S.C. §§ 1341, 1343, and 1346.

ANSWER:    CNA denies the allegations made and contained in Paragraph 133.

134.    CNA intentionally and knowingly deceived UOMC and the purported class referred to above for the purpose of financial gain.  CNA either knew, or recklessly disregarded, that the illegal discounts described above were material.

ANSWER:    CNA denies the allegations made and contained in Paragraph 134.

135.    UOMC and the class have been injured in their business or property by CNA's overt acts and racketeering activities in amounts to be determined at trial.

ANSWER:    CNA denies the allegations made and contained in Paragraph 135.

### 2.    18 U.S.C. §§ 1951(b)(2)

136.    During the relevant times and in furtherance of and for the purpose of executing and/or attempting to execute the above discussed scheme and artifice to defraud or deprive, CNA, ADP and/or Beech Street, on numerous occasions aided and abetted and conspired to and attempted to and did interfere with, obstruct, delay or affect "commerce" as that term is defined in 18 U.S.C. § 1951.

ANSWER:    CNA denies the allegations made and contained in Paragraph 136.

137.    CNA unlawfully attempted to and/or did induce ADP and/or Beech Street to cause UOMC and numerous other healthcare providers to part with various property interests to which CNA was and is not entitled, including the intangible property right of healthcare providers to conduct their business free of fraud and their fiduciary obligation to provide their patients with privacy.

ANSWER:    CNA denies the allegations made and contained in Paragraph 137.

138.    CNA's conduct induced ADP and/or Beech Street to provide it with the names of healthcare providers and their discounts and exploited a fear of economic loss and/or loss of business by UOMC and others similarly situated in violation of 18 U.S.C. § 1951(b)(2).

ANSWER:    CNA denies the allegations made and contained in Paragraph 138.

139.    In furtherance of the scheme or artifice to defraud to obtain money by false pretenses from UOMC and the class, CNA communicated with ADP and/or Beech Street to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which CNA was not

entitled through the exploitation of healthcare providers' fear of economic loss and/or loss of business by refusing to contest the aforesaid illegal discounts.

ANSWER:    CNA denies the allegations made and contained in Paragraph 139.

140.    CNA either knew, or recklessly disregarded, that the natural consequences of its acts would exploit and continue to exploit fear of economic loss or loss of business by UOMC and the class.

ANSWER:    CNA denies the allegations made and contained in Paragraph 140.

141.    CNA's, ADP's and/or Beech Street's overt acts and fraudulent and extortionate racketeering activities has and continues to defraud UOMC and the members of the class, of money, has and continues to unlawfully influence and interfere with the purported relationship of Beech Street and UOMC and the purported class, as well as interfering with the fiduciary relationship between UOMC, and members of the purported class and their patients.

ANSWER:    CNA denies the allegations made and contained in Paragraph 141.

142.    UOMC and the purported class have, therefor, been injured in their business or property by CNA's overt acts and racketeering activities in amounts to be determined at trial.

ANSWER:    CNA denies the allegations made and contained in Paragraph 142.

### 3.    18 U.S.C. § 1952(a).

143.    During the relevant times, and in furtherance of and for the purpose of executing the above-described scheme and artifice to defraud UOMC and the purported class, CNA, ADP and/or Beech Street and their respective employees, agents and others, on numerous occasions did travel and caused others not named in this Complaint to travel in interstate commerce in order to attempt to and to commit mail fraud and wire fraud in violation of the Travel Act, 18 U.S.C. § 1952(a).

ANSWER:    CNA denies the allegations made and contained in Paragraph 143.

144.    CNA's, ADP's and Beech Street's overt acts and fraudulent racketeering activity has and continues to defraud UOMC and the classes of money.

ANSWER:    CNA denies the allegations made and contained in Paragraph 144.

### 2.    PATTERN OF RACKETEERING ACTIVITY.

145.    CNA, ADP and/or Beech Street have engaged in a "pattern of racketeering activity" as defined in 18 U.S.C. 1961(5) of RICO by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including UOMC and the class.

ANSWER:    CNA denies the allegations made and contained in Paragraph 145.

146.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by CNA, ADP and/or Beech Street, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefor, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

ANSWER:    CNA denies the allegations made and contained in Paragraph 146.

### 3.    RICO VIOLATIONS OF 18 U.S.C. §§ 1962(d).

147.    UOMC's claim for relief also arises under 18 U.S.C. § 1964(c) of RICO and seeks to recover actual and treble damages for CNA's and Beech Street's violations of 18 U.S.C. §§ 1962(c) and for its violations of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a) and (c).

ANSWER:    CNA denies the allegations made and contained in Paragraph 147.

### 1.    Section 1962(c) claim.

148.    UOMC repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

ANSWER:    CNA restates and incorporates by reference its responses to Paragraph 1-88 as if

fully set forth herein.

149.    18 U.S.C. § 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

ANSWER:    CNA states that all applicable statutory provisions speak for themselves.  CNA

denies the allegations made and contained in Paragraph 149 to the extent that they are

inconsistent with the foregoing.

150.    18 U.S.C. § 1961(3) of RICO states that a "person" includes any individual or entity capable of holding a legal or beneficial interest in property.

ANSWER:    CNA states that all applicable statutory provisions speak for themselves.  CNA

denies the allegations made and contained in Paragraph 150 to the extent that they are

inconsistent with the foregoing.

33

151.    18 U.S.C. § 1961(4) of RICO defines enterprise to include "any individual, partnership, cooperation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

ANSWER:    CNA states that all applicable statutory provisions speak for themselves. CNA

denies the allegations made and contained in Paragraph 151 to the extent that they are

inconsistent with the foregoing.

152.    For purposes of this 18 U.S.C. § 1962(c) claim, the persons consist of CNA, ADP and/or Beech Street. The enterprise is an association-in-fact consisting of CNA, ADP and/or Beech Street by virtue of its control over physicians, medical specialists, medical laboratories, hospitals, healthcare clinics, pharmacies, home healthcare agencies, and other miscellaneous healthcare providers, all of which have the purpose of providing healthcare services to CNA's insureds making PIP claims under CNA's automobile insurance policies.

ANSWER:    CNA denies the allegations made and contained in Paragraph 152.

153.    This 18 U.S.C. § 1962(c) enterprise is distinct from CNA and includes many persons who are not employees of CNA and many entities that are not owned by CNA. The Section 1962(c) enterprise is engaged in, and its activities substantially affect, interstate commerce.

ANSWER:    CNA denies the allegations made and contained in Paragraph 153.

154.    CNA is associated with ADP and Beech Street in the 18 U.S.C. § 1962(c) enterprise as described above and conducts and participates in the affairs of that enterprise through the pattern of racketeering activity described herein. UOMC and the purported class members are directly and proximately injured both by this pattern of activity and by CNA's conduct and participation, for which they are entitled to actual and treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

ANSWER:    CNA denies the allegations made and contained in Paragraph 154.

## 2.    Section 1962(d) Claim.

155.    UOMC repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

ANSWER:    CNA restates and incorporates by reference its responses to Paragraphs 1-88 as if

fully set forth herein.

156.    This claim for relief also arises under 18 U.S.C. § 1964(c) of RICO and seeks to recover actual and treble damages for CNA's and Beech Street's violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a) and (c). Section 1962(d) of RICO provides that it

"shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

ANSWER:    CNA denies the allegations made and contained in Paragraph 156.

157.    18 U.S.C. § 1961(4) of RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

ANSWER:    CNA states that all applicable statutory provisions speak for themselves. CNA

denies the allegations made and contained in Paragraph 157 to the extent that they are

inconsistent with the foregoing.

158.    18 U.S.C. § 1962(a) of RICO provides that it "shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in sacquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities or which affect, interstate or foreign commerce."

ANSWER:    CNA states that all applicable statutory provisions speak for themselves. CNA

denies the allegations made and contained in Paragraph 158 to the extent that they are

inconsistent with the foregoing.

159.    For purposes of the claim of a conspiracy in violation of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a), the persons under the latter subsection consist of CNA and Beech Street and the enterprise consists of CNA and its investment division, which further profits from the ill-gotten gains.

ANSWER:    CNA denies the allegations made and contained in Paragraph 159.

160.    At all times relevant herein, Beech Street's, ADP's  and CNA's investment division together constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).

ANSWER:    CNA denies the allegations made and contained in Paragraph 160.

161.    The CNA investment division was and continues to be the investment beneficiary of additional monies realized from there above overt acts and fraudulent and extortionate scheme or activities to defraud UOMC and the purported class of money and to deprive them of their intangible right of honest services from Beech Street.

ANSWER:    CNA denies the allegations made and contained in Paragraph 161.

162.    CNA sells insurance. Assets generated from CNA's unlawful practices described herein are in the millions of dollars and the proceeds of such income amount to millions of dollars.

ANSWER:    CNA admits the allegations made and contained in the first sentence of Paragraph 162. CNA denies the remaining allegations made and contained in Paragraph 162.

163.    CNA derived substantial income and proceeds through the above described pattern of racketeering activity, and conspired to use or invest, and did use or invest, directly or indirectly, a significant part of such income or proceeds in the operation of the enterprise described above, in violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a).

ANSWER:    CNA denies the allegations made and contained in Paragraph 163.

164.    This use or investment injures UOMC and the purported class members because it permits that enterprise to continue, expand, and increase its revenue and to affect healthcare providers that are attached by the enterprise. This use and investment directly and proximately injures purported class members in a manner that is distinct from the injury caused by the pattern of racketeering activity described herein.

ANSWER:    CNA denies the allegations made and contained in Paragraph 164.

165.    As demonstrated in detail above, CNA has engaged in numerous overt and predicate fraudulent and extortionate racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to fraudulently require UOMC and the purported class to accept discounted payments, yet failing to disclose numerous internal systemic fraudulent and extortionate policies and practices designed to defraud UOMC and the class of money, and to unlawfully interfere with their physician-patient relationship.

ANSWER:    CNA denies the allegations made and contained in Paragraph 165.

166.    CNA's pattern of fraudulent and extortionate racketeering acts include, but are not limited to, acts in furtherance of its efforts to not disclose conflicts of interest brought about by CNA's inducement to ADP and Beech Street to allow CNA to defraud UOMC and the purported class.

ANSWER:    CNA denies the allegations made and contained in Paragraph 166.

167.    The nature of the above described acts of CNA constitutes material misrepresentations that give rise to an inference that CNA knew it was violating the objective of 18 U.S.C. § 1962(d) by violating 18 U.S.C. § 1962(a) and (c), through its ongoing fraudulent and extortionate acts that have been and are part of an overall pattern of racketeering activity.

ANSWER:    CNA denies the allegations made and contained in Paragraph 167.

168. As a direct and proximate result of CNA's overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a) and (c), UOMC and the class have been and are continuing to be injured in their business or property.

ANSWER:    CNA denies the allegations made and contained in Paragraph 168.

169. Pursuant to 18 U.S.C. § 1964(c), UOMC is entitled, therefore, to bring this action on behalf of the purported class and to recover actual and treble damages, as well as the costs of bringing this suit and attorneys' fees.

ANSWER:    CNA denies the allegations made and contained in Paragraph 169.

170. CNA has sought to and has engaged in the commission of and continues to commit overt acts and the aforesaid described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by CNA from such pattern of racketeering activity, to-wit:

    1.    multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;
    2.    multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346;
    3.    multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1343;
    4.    multiple instances of extortion violations of 18 U.S.C. § 1951(b)(2);
    5.    multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud, wire fraud, and extortion, in violation of 18 U.S.C. § 1952(a); and
    6.    multiple instances of violations of 18 U.S.C. § 1954.

ANSWER:    CNA denies the allegations made and contained in Paragraph 170.

171. CNA's violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting CNA's illegal acts constituting a pattern of racketeering activity is fashioned and imposed by this Court.

ANSWER:    CNA denies the allegations made and contained in Paragraph 171.

## Affirmative Defenses to Count III
### First Defense

1. Count III fails to state a claim for which relief may be granted.

WHEREFORE, CNA respectfully requests this Court to enter an Order dismissing Count III of the Complaint with prejudice.

## AS AND FOR A FOURTH
## CAUSE OF ACTION
### (Declaratory Judgment)

37

172.    UOMC repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

ANSWER:    CNA restates and incorporates by reference its responses to Paragraphs 1-88 as if

fully set forth herein.

173.    As previously alleged, CNA has improperly taken advantage of discounts to which it is not entitled for all the reasons that have been set forth in the previous paragraphs of this Complaint.

ANSWER:    CNA denies the allegations made and contained in Paragraph 173.

174.    CNA has taken these discounts in breach of the terms and conditions of their automobile insurance policies.  Said policies are indemnity policies that do not provide for preferred provider benefits or the application of preferred provider rates.

ANSWER:    CNA denies the allegations made and contained in the first sentence of Paragraph

174.  With respect to the second sentence of Paragraph 174, CNA states that the policies

speak for themselves.  CNA denies the allegations made and contained in the second

sentence of Paragraph 174 to the extent that they are inconsistent with such policies.

175.    By using Beech Street's purported provider rates to limit the payment of UOMC's and class members PIP medical bills, CNA has imposed a limitation on benefits that is not contained in their automobile insurance policies.  UOMC and the class members are intended third-party beneficiaries of said insurance policies and are entitled to a declaration that CNA's payments of their PIP medical bills at preferred provider rates is a breach of the applicable insurance contracts.

ANSWER:    CNA denies the allegations made and contained in Paragraph 175.

WHEREFORE, CNA respectfully requests this Court to enter an Order dismissing Count IV of the Complaint.

**AS AND FOR A FIFTH**
**CAUSE OF ACTION**
**(Violation of Section 627.736, Florida Statutes)**

176.    UOMC repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

38

ANSWER:     CNA restates and incorporates by reference its responses to Paragraphs 1-88 as if

fully set forth herein.

177.     At all times material herein, UOMC and the members of the class that he seeks to represent presented or had presented on their behalf reasonable and necessary medical charges to CNA for treatment of patients entitled to PIP medical expense benefits pursuant to a Florida automobile insurance policy issued by CNA.

ANSWER:     From time to time, CNA received medical bills from UOMC for payment.  CNA

denies the remaining allegations made and contained in Paragraph 177.

178.     Pursuant to Section 627.736, Florida Statutes:

**(1)     Required benefits.**  Every insurance policy complying with the security requirements of s. 627.733 shall provide personal injury protection to the named insured, relatives residing in the same household, persons operating the insured motor vehicle, passengers in such motor vehicle, and other persons struck by such motor vehicle and suffering bodily injury while not an occupant of a self-propelled vehicle, subject to the provisions of subsection (2) and paragraph (4)(d), to a limit of $10,000 of loss sustained by any such person as a result of bodily injury, sickness, disease, or death arising out of the ownership, maintenance, or use of a motor vehicle as follows:

    (a)     Medical benefits.  Eighty percent of all reasonable expenses for necessary medical, surgical, X-ray, dental, and rehabilitative services, including prosthetic devises, and necessary ambulance, hospital, and nursing services.  Such benefits shall also include necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person who relies upon spiritual means through a prayer alone for healing, in accordance with his religious beliefs.

. . . .

**(4)     Benefits; when due.**

. . . .

    (g)     It is a violation of the insurance code for an insurer to fail to timely provide benefits as required by this section with such frequency as to constitute a general business practice.

ANSWER:     CNA states that all applicable statutory provisions speak for themselves.  CNA

denies the allegations made and contained in Paragraph 178 to the extent that they are

inconsistent with the foregoing.

179.     Effective   October 1,   1991,   as   amended,   effective   October 1,   1992, Section 627.736(10), Florida Statues provides:

An insurer may negotiate and enter into contracts with licensed healthcare providers for the benefits described in this section referred to in this section as "preferred providers" which shall include healthcare providers licensed under chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a nonpreferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy. The insurer shall provide each policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

ANSWER:    CNA states that all applicable statutory provisions speak for themselves. CNA

denies the allegations made and contained in Paragraph 179 to the extent that they are

inconsistent with the foregoing.

180.    Pursuant to Section 627.736(10), Florida Statutes: "If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a non-preferred provider policy, the medical benefits provided by the insurer shall be as required by this section." (Emphasis added).

ANSWER:    CNA states that all applicable statutory provisions speak for themselves. CNA

denies the allegations made and contained in Paragraph 180 to the extent that they are

inconsistent with the foregoing.

181.    Pursuant to Section 627.736(10), Florida Statutes: "If the insured elects to use a provider who is a preferred provider, the insurance may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits." (Emphasis added).

ANSWER:    CNA states that all applicable statutory provisions speak for themselves. CNA

denies the allegations made and contained in Paragraph 181 to the extent that they are

inconsistent with the foregoing.

182.    In violation of the foregoing provisions of Section 627.736, CNA has implemented a policy and has conducted itself in a manner with such frequency as to constitute a general business practice whereby CNA has paid and continues to pay medical benefits at a rate less than the reasonable and necessary rate.

ANSWER:    CNA denies the allegations made and contained in Paragraph 182.

183.    CNA, as part of its general business practice, has been paying medical benefits at eighty (80%) percent of preferred provider rates.

ANSWER:    CNA denies the allegations made and contained in Paragraph 183.

184.    At all times material hereto, CNA did not offer preferred provider policies.

ANSWER:    CNA admits the allegations made and contained in Paragraph 184.

185.    Since CNA did not offer a preferred provider policies, CNA was required to pay eighty (80%) percent of all reasonable and necessary medical expenses.

ANSWER:    CNA's Policy and the Florida PIP statute set forth CNA's obligations with regard

to PIP claims and CNA denies the allegations made and contained in Paragraph 185 to

the extent that they are inconsistent with those obligations. CNA denies the remaining

allegations made and contained in Paragraph 185.

186.    If CNA issued and sold preferred provider policies, CNA would then be entitled to pay medical benefits in excess of the benefits required and may waive or lower the amounts of any deductible that applies to such medical benefits.

ANSWER:    CNA denies the allegations made and contained in Paragraph 186.

187.    By paying PIP benefits at a preferred provider rate, CNA has significantly reduced its payments and obligations under PIP policies throughout the State of Florida.

ANSWER:    CNA denies the allegations made and contained in Paragraph 187.

188.    CNA's actions are in direct violation of Section 627.736, Florida Statutes.

41

ANSWER:    CNA denies the allegations made and contained in Paragraph 188.

189.    CNA has wrongfully reduced UOMC's and the class members' PIP medical expense claims based on Beech Street preferred provider discounts.

ANSWER:    CNA denies the allegations made and contained in Paragraph 189.

190.    CNA is not entitled to said Beech Street preferred provider discounts. CNA has failed to offer insureds a PPO endorsement and also failed to otherwise comply with the requirements of Section 627.736(10), Florida Statutes.

ANSWER:    CNA denies the allegations made and contained in Paragraph 190.

191.    Despite this failure, CNA has reduced and continues to reduce PIP automobile insurance medical expense claims of UOMC and the purported class members by accessing and applying Beech Street preferred provider discounts.

ANSWER:    CNA affirmatively states that during the relevant time period, pursuant to its agreement with Beech Street, CNA paid medical bills involving personal injury protection benefits claimants who were treated by health care providers who had contracted with Beech Street based on the rates for such providers which Beech Street informed CNA applied. CNA denies the allegations made and contained in Paragraph 191 to the extent that they are inconsistent with the foregoing.

192.    Accordingly, an outstanding balance remains on all automobile insurance PIP medical expense claims that CNA has reduced based on Beech Street preferred provider discounts.

ANSWER:    CNA denies the allegations made and contained in Paragraph 192.

193.    Pursuant to Section 627.736(4)(b): "Personal injury protection insurance benefits paid pursuant to this section shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of same."

ANSWER:    CNA states that all applicable statutory provisions speak for themselves. CNA denies the allegations made and contained in Paragraph 193 to the extent that they are inconsistent with the foregoing.

194.    Pursuant to Section 627.736(c): "All overdue payments shall bear interest at the rate of 10 percent per year."

ANSWER:    CNA states that all applicable statutory provisions speak for themselves.  CNA

denies the allegations made and contained in Paragraph 194 to the extent that they are

inconsistent with the foregoing.

195.    CNA has failed to pay the full amount of the reasonable and necessary medical expense billed by UOMC and the class members within 30 days after CNA was furnished with written notice of the reasonable and necessary amount of the medical expense.

ANSWER:    CNA denies the allegations made and contained in Paragraph 195.

196.    CNA has failed to pay interest on the remaining balances owed to UOMC and the class members.

ANSWER:    CNA denies the allegations made and contained in Paragraph 196.

197.    By reducing UOMC's and the purported class members' legitimate medical expenses by the application of Beech Street preferred provider discount rates, CNA has violated Section 627.736, Florida Statutes.

ANSWER:    CNA denies the allegations made and contained in Paragraph 197.

198.    As a result of CNA's failure to comply with Section 627.736, Florida Statutes, UOMC and the members of the purported class have suffered damages.

ANSWER:    CNA denies the allegations made and contained in Paragraph 198.

### Affirmative Defense to Count V
### First Defense

1.    Count V fails to state a claim upon which relief may be granted.

2.    In May v. Allstate Insurance Company, Case No. 00-6269-Civ-Dimitrouleas (S.D. Fla. April 4, 2000), the court dismissed similar claims alleged against Allstate Insurance Company ("Allstate") under § 627.736(10).  In its Order, a copy of which is attached hereto as Exhibit A, the May court interpreted the statute and determined that it does not allow for a private cause of action to be asserted against Allstate.

3.    First, the court held that § 627.736(10) does not require an insurer to offer a "preferred provider" policy, and it only regulates those insurers which offer such a policy. Opinion at page 5.   Since Allstate does not offer a "preferred provider" policy, the court reasoned, the statute does not apply to Allstate.  Id.

43

4.    In addition, the court held that § 627.736(10) is not intended to benefit medical providers, that medical providers are not within the class of persons the statute was enacted to protect, and that the provider's allegations of a violation of the statute cannot state a cause of action. Opinion at page 6.

WHEREFORE, Defendants respectfully request this Court to enter an Order dismissing Count V of the Complaint with prejudice.

### Affirmative Defenses to All Counts Seeking Punitive Damages

1.    Any award of punitive damages would violate the United States and Florida State Constitution, relevant United Supreme Court and state court precedents, and relevant state statutes.

WHEREFORE, Defendants respectfully request this Court to enter an Order dismissing all punitive damages claims made in the Complaint with prejudice.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by U.S. Mail to counsel on the attached service list this 22nd day of October, 2001.

PETER J. VALETA
Florida Bar No. 327557
ROSS & HARDIES
150 North Michigan Ave., Suite 2500
Chicago, Illinois 60601
Telephone: (312) 750-3619
Telecopier: (312) 750-8600
Attorneys for Fidelity and Casualty Company
of New York and The Continental Insurance
Company

DAVID B. SHELTON
Florida Bar No. 0710539
Rumberger, Kirk & Caldwell
P.O. Box 1873
Orlando, Florida 32802
Telephone: (407) 839-4511
Telecopier: (407) 841-2133
Attorneys for Fidelity and Casualty Company
of New York and The Continental Insurance
Company

## SERVICE LIST

**Co-Lead Counsel for Plaintiffs**

Jan Douglas Atlas, Esq.
Eric Lee, Esq.
Robin Corwin Campbell, Esq.
ATLAS PEARLMAN, P.A.
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301

Arthur S. Gold, Esq.
GOLD & COULSON
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603

Andrew Garcia, Esq.
Carlin Phillips, Esq.
PHILLIPS & GARCIA
13 Ventura Drive
North Darthmouth, MA 02747

Larry Kopelman, Esq.
Douglas Blankman, Esq.
KOPELMAN & BLANKMAN, P.A
Bank of America Tower
One Financial Plaza, Suite 1611
Fort Lauderdale, FL 33394

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
230 East Davis Boulevard
Tampa, FL 33606

Richard Bokor, Esq.
RICHARD BOKOR, P.A.
230 East Davis Boulevard
Tampa, FL 33606

Casey Fundaro, Esq.
1100 5th Avenue S., Suite 201
Naples, FL 34102-6407

**Counsel for Allstate, Fidelity and Casualty, Continental, Deerbrook**

David B. Shelton, Esq.
RUMBERGER, KIRK & CALDWELL
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873

Peter J. Valeta, Esq.
ROSS & HARDIES
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601

**Counsel for Beech Street and ADP**

Thomas Tew, Esq.
Joseph A. DeMaria, Esq.
John M. Quaranta, Esquire
TEW, CARDENAS, et al.
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336

**Counsel for Progressive**

Francis Anania, Esq.
Donald A. Blackwell, Esq.
ANANIA, BANDKLAYDER, et al.
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131

**Counsel for CCN**

William W. Deem, Esq.
William E. Adams, Esq.
MCGUIRE WOODS, LLP
3300 Bank of America Center
50 N. Laura Street
Jacksonville, FL 32202-4099

45

**Counsel for Nationwide**

Katherine C. Lake, Esq.
FOWLER, WHITE, et al.
Post Office Box 1438
Tampa, FL 33601

James C. Haggerty, Esq.
SWARTZ CAMPBELL DETWEILER
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316

**Counsel for Florida Farm Bureau**

Robert K. Levenson, Esquire
HOLLAND & KNIGHT, LLP
701 Brickell Avenue, Suite 3000
Miami, FL 33131

**Counsel for Liberty Mutual**

Mark Shapiro, Esq.
AKERMAN, SENTERFITT et al.
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, FL 33131

**Counsel for Hartford, Metropolitan, Integon**

Marcy Levine Aldrich, Esq.
AKERMAN, SENTERFITT et al.
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, FL 33131

**Counsel for Metropolitan**

Jeffrey P. Lennard, Esquire
SONNENSCHEIN, NATH & ROSENTHAL
8000 Sears Tower
Chicago, IL 60606

633849

**Counsel for Prudential**

John D. Aldock, Esquire
Jeffrey M. Klein, Esquire
Michael Isenman, Esquire
SHEA & GARDNER
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

Kathy Johnson Maus
Lola M. Swaby
BUTLER BURNETTE PAPPAS
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308-3469

**Counsel for Superior**

Alan J. Nisberg, Esquire
BUTLER BURNETT PAPPAS
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607

**Counsel for American International**

Dale L. Friedman, Esquire
Brian P. Knight, Esquire
CONROY, SIMBERG, GANNON,
KREVANS & ABEL, P.A.
3440 Hollywood Blvd., 2nd Floor
Hollywood, FL 33021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6269-CIV-DIMITROULEAS

DRS. MARTIN MAY, ALAN LAZAR,
MARTIN HALE, JOEL RUSH, PAUL ZIDEL,
RICHARD LINN, RICHARD BERKOWITZ,
DOUGLAS STRINGHAM, ANDREW
ELLOWITZ, ALAN NOVICK, DEBRA WEISS,
and NEIL SCHECHTER,

     Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY,

     Defendant.

_____/



## ORDER ON MOTION TO REMAND
## AND MOTION TO DISMISS

THIS CAUSE is before the Court upon Plaintiffs', Drs. Martin May, Alan Lazar, Martin

Hale, Joel Rush, Paul Zidel, Richard Linn, Richard Berkowitz, Douglas Stringham, Andrew

Ellowitz, Alan Novick, Debra Weiss and Neil Schechter Motion for Remand, filed herein on

March 14, 2000 and Defendant, Allstate Insurance Company's Motion to Dismiss, filed herein

on March 1, 2000. The Court has carefully reviewed the motions and is otherwise fully advised

in the premises.

## I. BACKGROUND

Plaintiffs are doctors, who practice under the names "Park Place Therapeutic Center" and

"Park Place Orthopaedics & Rehabilitation." As this entity, they submit claims to Allstate for

payment on behalf of persons insured by Allstate for personal injury protection benefits, and

receive payments from Allstate.

1

Defendant, Allstate, sells automobile insurance policies in Florida which contain personal injury protection, pursuant to Florida law. Under the PIP coverage, Allstate agrees to pay 80% of reasonable charges for necessary medical treatment provided to covered insured who suffer injury in an automobile accident. Plaintiffs claim that the amount that they have received, pursuant to bills they have sent to Defendant, of work they have done on Defendant's insureds, is "substantially less than [Allstate] is statutorily and contractually obligated to pay."

On January 21, 2000, Plaintiffs filed a two Count Complaint in the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida. The action was timely removed. The Complaint is for: 1) Declaratory Relief; and 2) Breach of Contract.

Plaintiffs seek remand to State Court, arguing that the amount of PIP benefits paid to Plaintiffs pursuant to illegally obtained discounts by Defendant, compared to the amounts that should have been paid, can not be determined with certainty. They could potentially exceed or fall below the necessary jurisdictional amount, and therefore Defendants cannot provide, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional requirement. Defendant counters this argument by stating that Plaintiffs are engaged together in the practice of medicine, submit the claims together, and receive payments together. Defendant submits the Explanation of Medical Bill Payments and Health Insurance Claim Forms as evidence that Plaintiffs are engaged in a united practice of medicine.

Defendant next moves to dismiss this action. It argues that Plaintiffs do not allege that Allstate offers "preferred provider" PIP coverage under the policy. The insured are entitled to choose the health care provider they want, on their own. Plaintiffs claim that Defendant pays PIP claims for medical benefits at 80% of "preferred provider" rates. Defendant argues that it is not required to offer a "preferred provider" policy to its insured and therefore, has not failed to pay

2

PIP benefits as required by § 627.736, Florida Statutes. Defendant also argues that the Complaint does not establish that it breached an obligation under the PIP coverage or § 627.736(10), Florida Statutes, by paying medical benefits at a "reasonable" rate, if it is less than what Plaintiffs request. Defendant's last argument is that there is no private cause of action permitted for violations of § 627.736(10). In sum, Defendant claims Plaintiffs do not state a claim.

Plaintiffs, in their two page response, argue that they strongly disagree with Defendant's arguments in the dismissal motion, and aver that they do state a claim.

## II. DISCUSSION

### A. Remand

"Any civil case filed in state court may be removed by the defendant to federal court if the case could have been brought originally in federal court." Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1356 (11th Cir. 1996). Federal Jurisdiction should be found, unless it appears within "a legal certainty that the claim is really for less than the jurisdictional amount." Id. at 1356. However, "[w]here a plaintiff has made an unspecified demand for damages, a lower burden of proof is warranted because there is simply no estimate of damages to which a court may defer. Id. at 1356-57; See Gafford v. General Electric Company, 997 F.2d 150, 160 (6th Cir. 1993).

Plaintiffs claim that the amount of controversy in this action can only be determined by calculating the amount of PIP benefits paid individually, to Plaintiffs. However, Plaintiffs are engaged together in the practice of medicine under two names, "Park Place Therapeutic Center" and "Park Place Orthopaedics & Rehabilitation." Plaintiffs submit forms to receive payment, and receive payment collectively. The Health Insurance Claim Forms, submitted by Defendant,

3

shows that the I.D. Number of Referring Physician contains the same tax number on each sheet.

Additionally, in the space marked "Physician's, Supplier's Billing Name...," Park Place

Therapeutic Center is noted on each form.  On the Explanation of Medical Bill Payment,

submitted by Defendant, in the space marked, "Treatment Rendered By," is the name Park Place

Therapeutic Center.  "[W]hen several plaintiffs unite to enforce a single title or right, in which

they have a common and undivided interest, it is enough if their interests collectively equal the

jurisdictional amount."  Troy Bank of Troy, Indiana v. G.A. Whitehead & Company, 222 U.S.

39, 40-41 (1911).  The aggregate amount of the reduction of payments clearly exceeds the

$75,000 threshold necessary to confer jurisdiction on this Court.

## B.  Dismiss

It is long settled that a complaint should not be dismissed unless it appears beyond a

doubt that the plaintiff could prove no set of facts in support of his claim which would entitle

him to relief.  Conley v. Gibson, 355 U.S. 41 (1957).  The allegations of the claim must be taken

as true and must be read to include any theory on which the plaintiff may recover.  See Linder v.

Portocarrero, 963 F.2d 332, 334-336 (11th Cir.1992) (citing Robertson v. Johnston, 376 F.2d 43

(5th Cir.1967)).  There must be a showing that the plaintiff has no claim before granting a motion

to dismiss.  June Vernon and Delroy Vernon v. Medical Management Associates of Margate,

Inc., 912 F.Supp. 1549 (S.D.Fla. 1996).

Defendant's first argument is that the Complaint fails to allege a breach of contract or

violation of § 627.736.  Plaintiffs allege in their Complaint, that Allstate pays PIP claims for

medical benefits at 80% of "preferred provider" rates.  However, Plaintiffs fail to define

"preferred provider" rates, nor do they allege that such rates were not reasonable.  Plaintiffs

claim, then, that because Allstate does not provide an option to insureds to purchase a "preferred

provider" policy for PIP benefits, it breached its contracts of insurance with its insureds and violated § 627.736(10) by paying at those rates. Therefore, Plaintiffs' only allegation is that Allstate is paying certain health care providers reduced rates which those providers have agreed to accept for medical services covered under the Allstate PIP contracts.

Plaintiffs, in the Complaint, claim that Defendant's standard policy does not comply with § 627.736(1)(a), which necessitates a party to have personal injury protection of "[e]ighty percent of all reasonable expenses for necessary medical..." Plaintiffs claim that they provided medical treatment, and were paid less than what is statutorily and contractually obligated to pay. However, Plaintiff's claims are not based on this Florida Statute.

Plaintiffs also argue that Defendant refers to Plaintiffs actions as "preferred providers," and such designation is improper. § 627.736(10), Florida Statutes, states in pertinent part, "(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as 'preferred providers,' which shall include health care providers...The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits..." Plaintiffs attached the insurance policy to the Complaint. The Court may consider the policy for purposes of a motion to dismiss. Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1369 (11th Cir. 1997); Smith Barney, Inc. v. Scanlon, 180 F.R.D. 444, 446 (S.D.Fla. 1998). Such consideration of a document attached to Plaintiff's complaint does not convert the motion to dismiss into a motion for summary judgment. Id. The policy does not contain the term "preferred providers," and Plaintiffs are not the parties the statute is meant to protect. Additionally, the statute does not state that Defendant must offer a "preferred providers" plan, but only regulates those parties that choose to do so.

5

Defendant argues that the statute was not enacted to benefit medical providers, and therefore, does not allow Plaintiffs to rely on it as their basis for damages. In <u>Fischer v. Metcalf,</u> the Third District Court of Appeals discussed three criteria[1] which are pertinent to whether the legislature intended a statute to benefit a party. They are, "1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; 2) whether there is any indication, either explicit or implicit, of a legislative intent to create or deny such a remedy; and 3) whether judicial implication is consistent with the underlying purposes of the legislative scheme." <u>Fischer v. Metcalf,</u> 543 So.2d 785, 788 (Fla. 3rd DCA 1989); <u>See</u> <u>Cort v. Ash,</u> 422 U.S. 66 (1975).

§ 627.736, Florida Statutes, was not enacted to benefit medical providers. Plaintiffs are not the class whose especial benefit the statute was enacted. The statute was enacted to protect insureds from harm as a result of accidents with other drivers, and actions by insurance companies. The statute was not enacted to ensure that medical providers received what they felt was a reasonable wage. The legislature did not imply, nor can it be inferred, that the medical providers were the parties the statute was enacted to protect. The Court cannot infer that the Legislature intended to protect the medical providers with the enactment of § 627.736. "Legislative intent, rather than duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists when a statute does not expressly provide for one." <u>Murthy v. N. Sinha Corp.,</u> 644 So.2d 983, 985 (Fla. 1994). Plaintiffs claim for relief based on Defendant's alleged violation of § 627.736, Florida, Statutes, does not allege a cause of action.

---

[1] Out of a four part test.

6

The remaining issue is whether Plaintiffs may sue Defendant for paying them what they do not deem to be reasonable rates, as preferred providers. However, the term preferred provider is not mentioned in the insurance policy and Defendant's actions do not resemble the statute's definition of the term preferred provider. Therefore, Plaintiffs claim is based on being intended third party beneficiaries to Defendant's insurance policies. Plaintiffs are not in direct contractual privity with Defendant. "[T]he term 'privity' is a word of art derived from the common law of contracts and used to describe the relationship with persons who are parties to a contract." Espinosa v. Sparber, et al., 612 So.2d 1378, 1380 (Fla. 1993). Usually only parties to a contract may collect on the contract. However, "an intended third party beneficiary of a contract may recover damages from the contracting parties if they breach the contract." Jacobson v. Heritage Quality Construction Co., Inc., 604 So.2d 17, 18 (Fla. 4th DCA 1992). "Essential to the right of a third party beneficiary of a contract to maintain an action for its breach is a clear intent and purpose of the contract to directly and substantially benefit the third party." Thompson v. Commerical Union Insurance Company of N.Y., 250 So.2d 259, 262 (Fla. 1971). The insurance policies between Defendant and the insureds are clear in their intent to directly and substantially benefit Plaintiffs[2]. Plaintiffs, in the present action, "must plead the contract which was expressly for (their) benefit and one under which it clearly appears that (they were) a beneficiary." Weimar v. Yacht Club Point Estates, Inc., 223 So.2d 100, 102 (Fla. 4th DCA 1969). Plaintiffs properly pled that they were intended third party beneficiaries to defeat the motion to dismiss.

## III. CONCLUSION

Plaintiffs did not, nor could they, properly plead a cause of action under § 627.736(1)(a)

---

[2] Although this benefit is not the main crux of the insurance policy.

7

and (10) as the basis of Defendant's liability. The statute does not delineate that there exists such

a cause of action exists, nor is the statute drafted to benefit medical providers. Plaintiffs do state

a cause of action for breach of contract, in that they are the intended third party beneficiaries to

the insurance policy, but not on the basis that they were improperly treated as preferred

providers.

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Remand is hereby **DENIED**;

2. Defendant's Motion to Dismiss is hereby **GRANTED**; in part. Motion to Dismiss

Count I is hereby Granted; Count I is dismissed with prejudice. Motion to Dismiss Count II is

hereby **GRANTED**; Count II dismissed without prejudice, with leave to amend in accordance

with this Order. An Amended Complaint shall be filed within then days of this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 14 day of

April, 2000.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Peter Valeta, Esq.
Lawrence Kopelman, Esq.
David B. Shelton, Esq.