# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### FT. LAUDERDALE DIVISION

Case No. 00-CIV-6061-FERGUSON/SNOW (Consolidated)
Referred to Magistrate Judge Snow

DR. PAUL ZIDEL, and all others similarly
situated,               )
                        )
        Plaintiffs,     )
                        )
v.                      )
                        )
ALLSTATE INSURANCE COMPANY,   )
and COMMUNITY CARE NETWORK, INC.,   )
d/b/a CCN,              )
                        )
        Defendants.     )
                        )
_____)

MARC J. BROWNER, D.C., individually   )
and on behalf of all others similarly situated,   )
                        )
        Plaintiffs,     )
                        )               CASE NO. 00-7163
v.                      )               FERGUSON/SNOW
                        )               (Consolidated)
ALLSTATE INDEMNITY COMPANY,   )
BEECH STREET CORPORATION, and   )
ADP INTEGRATED MEDICAL SOLUTIONS,   )
INC.,                   )
                        )
        Defendants.     )
_____)

## DEFENDANT, ALLSTATE INDEMNITY COMPANY'S ANSWER
## TO CLASS ACTION COMPLAINT

Defendant, Allstate Indemnity Company ("Allstate"), by and through its attorneys, and

for its Answer to Plaintiffs' Class Action Complaint ("Complaint") states as follows:



## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

ANSWER:      Allstate admits the allegations made and contained in Paragraph 1.

2.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S. § 1331 because it arises under the laws of the United States, specifically 15U.S.C. § 1125 et seq. (the Lanham Act);18 U.S.C. § 1961 et seq. ("RICO"); and 18 U.S.C. §§ 1341, 1343, 1346, 1951, 1952 and 1953.

ANSWER:      Allstate admits that the allegations made and contained in paragraph 2 purport to

allege that subject matter jurisdiction over this action exists pursuant to 28 U.S.C.

§ 1331, but denies such allegations.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Defendants are subject to personal jurisdiction in this District.

ANSWER:      Allstate admits the allegations made and contained in Paragraph 3.

## THE PARTIES

4.      Plaintiff, Marc J. Browner, D.C. ("Dr. Browner") is a licensed chiropractor who resides in the Southern District of the State of Florida and has his principal place of business at 8320 W. Sunrise Blvd., Ste. 111, Plantation, Florida 33322.

ANSWER:      Allstate lacks sufficient information to admit or deny the allegations made and

contained in Paragraph 4.

5.      Allstate Indemnity Company ("Allstate") is an insurance company licensed to sell insurance in this District with a principal place of business of 3075 Sanders Road, Northbrook, Illinois.  Defendant is a member of the Allstate group of insurance companies.

ANSWER:      Allstate affirmatively states that it principal place of business is 2775 Sanders

Road, Northbrook, Illinois, and admits the allegations made and contained in

Paragraph 5.

2

6.      Defendant, Beech Street Corporation ("Beech Street") is an entity with a principle place of business of 173 Technology Drive, Irvine, CA 92618.  Beech Street operates a national preferred provider organization.

ANSWER:    The allegations made and contained in Paragraph 6 are not directed to Allstate

and, therefore, Allstate makes no answer thereto.


7.      Defendant, ADP Integrated Medical Solutions, Inc. ("ADP") is an entity with a principle place of business of 10401 Fernwood Road, Suite 250, Bethesda, Maryland 20817. ADP is in the business of developing software driven insurance cost containment products used in the claims review process by property and casualty insurers to reduce payments made on insurance medical expense claims.

ANSWER:    The allegations made and contained in Paragraph 7 are not directed to Allstate

and, therefore, Allstate makes no answer thereto.

## FACTUAL BACKGROUND
### The Payment of Medical Expenses Under Florida Automobile Insurance Policies and Florida Statutes § 627.736(5)

8.      With respect to payment of accident related medical expenses, the standard and uniform language in Allstate's Florida automobile policy (the "Policy") states in pertinent part that Allstate must pay 80% of all reasonable and necessary accident related medical expenses.

ANSWER:    Allstate states that the insurance policy speaks for itself.  Allstate denies the

allegations of Paragraph 8 to the extent that they are inconsistent with the

foregoing.


9.      Allstate's Policy is a typical indemnity insurance policy under which Allstate is required to indemnify claimants for eighty (80%) percent of the full cost of their reasonable and necessary medical bills up to a defined limit.  Under the Policy, a claimant has the absolute right and  freedom to choose his or her medical providers.  Within Policy limits, medical providers have the unrestricted right to be reimbursed 80% of their reasonable and necessary accident related medical expenses.

ANSWER:    Allstate states that the insurance policy speaks for itself.  Allstate admits the

allegations made and contained in the second sentence of Paragraph 9.  Allstate

3

denies the allegations of Paragraph 9 to the extent that they are inconsistent with

the foregoing.

10.    The State of Florida's PIP statute directly addresses a health care provider's right to be paid for reasonable charges.  Florida Statutes § 627.736 (5) states:

> Any physician, hospital, clinic, or other person or institution lawfully rendering treatment to an injured person for bodily injury covered by personal injury protection insurance may charge only a reasonable amount for the products, services, and accommodations rendered,...

Fla. Stat. § 627.736(5)(1992).

ANSWER:    Allstate states that all applicable statutory provisions speak for themselves.

Allstate denies the allegations of Paragraph 10 to the extent that they are

inconsistent with the foregoing.

**The Florida Automobile Managed Care PPO Endorsement and Allstate's
Failure to Offer a PPO Endorsement**

11.    Florida statutes permit an automobile insurance company to designate certain medical providers (preferred providers) *if* the automobile insurer establishes a legitimate preferred provider organization ("PPO") network by satisfying the strict requirements of Florida Statutes § 627.736 (10)(1992) which states as follows:

> (10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as "preferred providers," which shall include health care providers licensed under chapters 458, 459, 460, 461 and 463. *The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a non-preferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policy-holder or applicant, it must also offer a non-preferred provider policy. The insurer shall provide each policy-holder with a current roster of preferred providers in the county in which the insured resides at the*

4

> *time of purchase of such policy, and shall make such list available for*
> *public inspection during regular business hours at the principal office of*
> *the insurer within the state.* (emphasis added).

ANSWER:    Allstate states that all applicable statutory provisions speak for themselves.

Allstate denies the allegations of Paragraph 11 to the extent that they are

inconsistent with the foregoing.

12.    Allstate does not negotiate and enter into contracts with licensed health care providers for the benefits described in this section.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 12.

13.    Allstate does not offer an option to its insureds to use a preferred provider at the time of purchase of a policy for PIP benefits.

ANSWER:    Allstate admits the allegations made and contained in Paragraph 13.

14.    Allstate does not provide each policy holder with a current roster of preferred providers in the county in which the insured resides at the time the policy is purchased.

ANSWER:    Allstate admits that it does not provide written rosters of preferred providers to

policy holders at the time the policy is purchased. Allstate denies remainder of

the allegations made and contained in Paragraph 14 to the extent they are

inconsistent with the foregoing.

15.    Despite its failure to offer a PPO endorsement, Allstate has been applying discounts to its insureds' medical expense claims through a PPO network set-up by Beech Street. At all times relevant hereto, Allstate's insureds, who had already started treating with their medical providers, had no knowledge of such a PPO network or the doctors allegedly in said network and otherwise never elected to participate in such a network or have their bills discounted based on PPO rates.

ANSWER:    Allstate affirmatively states that Allstate Insurance Company, for itself and its

affiliated companies, including Allstate Indemnity Company, entered into an

agreement with Beech Street. Pursuant to the agreement, Allstate, as of March

2000, paid medical bills involving personal injury protection benefits claimants

who were treated by health care providers who had contracted with Beech Street

5

at the rates established under such contracts, and during such time, some of

Allstate's personal injury protection claimants may have previously sought

treatment from such providers.  Allstate denies the allegations made and

contained in Paragraph 15 to the extent that they are inconsistent with the

foregoing.

**Dr. Browner's Preferred Provider Agreement with Beech Street**

16.    At all times material hereto, Dr. Browner had a "Preferred Provider Agreement" ("PPA") with Beech Street to become a Beech Street preferred provider.  Under the PPA, Dr. Browner agreed to discount his charges for Beech Street "Eligible Persons" insured under "Plans," as defined under the PPA, when such potential patients were referred to Dr. Browner through legitimate steerage mechanisms supposedly established by Beech Street and the various insurers who are Beech Street's clients.

ANSWER:    Allstate states that Dr. Browner's PPA with Beech Street speaks for itself, and

lacks sufficient information to admit or deny the allegations made and contained

in Paragraph 16.

17.    Under the PPA, "Plans" is defined as follows:

"Plans" means the individual or group medical benefit programs of Payor, including, without limitation, insurance policies and administrative services only agreements, benefits services only agreements, third party administrator agreements, multiple employer trusts, pre-paid plans, competitive medical plans, governmental programs and self-insured plans and trusts.

ANSWER:    Allstate states that Dr. Browner's PPA with Beech Street speaks for itself.

Allstate denies the allegations of Paragraph 17 to the extent that they are

inconsistent with the foregoing.

18.    Under the PPA, "Eligible Persons" is defined as follows:

"Eligible Persons" means the persons who (i) are entitled to receive Covered Services pursuant to a plan, ***and (ii) have been issued and present to Provider*** either (a) Plan identification cards bearing the name

6

Beech Street or CAPP CARE, the Beech Street or CAPP CARE logo, or (b) other information identifying such persons entitled to access the Beech Street Network. (emphasis added) .

ANSWER:     Allstate states that Dr. Browner's PPA with Beech Street speaks for itself.

Allstate denies the allegations of Paragraph 18 to the extent that they are

inconsistent with the foregoing.

19.     Under the PPA, "Payor" is defined as follows:

"Payor" means the party responsible for providing the reimbursement for Covered Services on behalf of Eligible Persons, including, without limitation, insurance carriers, self-insured employers, pre-paid plans, third party administrators, trust funds, competitive medical plans, governmental programs and administrative services groups. The current list of Payors will be made to Provider upon request .

ANSWER:     Allstate states that Dr. Browner's PPA with Beech Street speaks for itself.

Allstate denies the allegations of Paragraph 19 to the extent that they are

inconsistent with the foregoing.

20.     Dr. Browner's PPA does not provide for discounts where steerage has not taken place or where a discount broker or insurer retroactively applies a discount to bills rendered to patients who began treating with Dr. Browner prior to Allstate gaining access to the Beech Street discounts.

ANSWER:     Allstate states that Dr. Browner's PPA with Beech Street speaks for itself.

Allstate denies the allegations of Paragraph 20 to the extent that they are

inconsistent with the foregoing.

**The Illegitimate Discounting of Dr. Browner's Accident Related Medical Bills Based on Beech Street PPO Discounts**

21.     Allstate has failed to offer its insureds a PPO endorsement.   Instead of establishing a legitimate PPO endorsement as provided by statute, Allstate entered into a cost containment agreement ("Cost Containment Agreement") with Beech Street and/or ADP whereby it was granted "access" to Beech Street's preferred provider discounts for application to medical expense claims submitted to Allstate.

7

ANSWER:    Allstate admits that it does not have a PPO endorsement and that Allstate

Insurance Company entered into an agreement with Beech Street in which Beech

Street permitted Allstate Insurance Company and its affiliated companies,

including, but not limited to, Allstate Indemnity Company to apply Beech

Street's negotiated rates to medical bills for Allstate's personal injury protection

benefits claimants. Allstate denies the remainder of Paragraph 21 to the extent

that it is inconsistent with the foregoing.

22.    After Allstate entered into its Cost Containment Agreement with Beech Street and/or ADP, the Defendants began applying Beech Street discounts to medical bills for existing patients (hereinafter referred to as the "Treating Patients") who had begun treating with the Plaintiff prior to the execution of the Cost Containment Agreement.

ANSWER:    Allstate affirmatively states that Allstate Insurance Company, for itself and its

affiliated companies, including Allstate Indemnity Company, entered into an

agreement with Beech Street. Pursuant to the agreement, Allstate, as of March

2000, paid medical bills involving personal injury protection benefits claimants

who were treated by health care providers who had contracted with Beech Street

at the rates established under such contracts, and during such time, some of the

claimants may have previously sought treatment from such providers. Allstate

denies the remainder of Paragraph 22 to the extent that it is inconsistent with the

foregoing.

23.    Despite these known facts, Beech Street allowed ADP and Allstate access to all of Beech Street's preferred provider's confidential and proprietary discounts rates knowing that Allstate and ADP would be applying PPO discounts to bills where the patient had not been steered to Plaintiff and who had begun treating with Plaintiff before Allstate had entered into its Cost Containment Agreement with Beech Street and/or ADP.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 23.

24.    With Beech Street's consent, its database of preferred provider discounts was loaded into ADP's software and discounts were applied to all bills submitted to Allstate by Beech Street preferred providers such as Dr. Browner.

ANSWER:    Allstate affirmatively states that Allstate Insurance Company, for itself and its

affiliated companies, including Allstate Indemnity Company, entered into an

agreement with Beech Street.  Pursuant to the agreement, Allstate, as of March

2000, paid medical bills involving personal injury protection benefits claimants

who were treated by health care providers who had contracted with Beech Street

at the rates established under such contracts.   Allstate denies the remainder of

Paragraph 24 to the extent that it is inconsistent with the foregoing.

**The Defendants' Operation of a Silent PPO**

25.    In the healthcare industry, the above described scheme designed to wrongfully discount medical provider bills is a called a "Silent PPO."  A Silent PPO is the illegitimate sale of  PPO rates to indemnity insurers, such as Allstate, who do not offer a PPO policy, whose insureds do not even know of the existence of the PPO, whose insureds do not select to treat with a PPO  preferred provider and where no legitimate mechanism (i. e. an in-network and out-of-network plan design)exists to increase preferred provider patient volume.

ANSWER:    Allstate objects to the characterization of its activities as a "Silent PPO." Allstate

admits that it does not offer a PPO policy.  Allstate denies the remainder of the

allegations made and contained in Paragraph 25.

26.    In essence, under the Silent PPO scheme, medical providers receive nothing for steep discounts and the indemnity insurers, the PPO and the discount broker split millions in savings shaved off of insurance medical expense claims.

ANSWER:    Allstate objects to the characterization of its activities as a "Silent PPO".  Allstate

denies the allegations made and contained in Paragraph 26.

27.    The Defendants all had knowledge of the illegal nature of this Silent PPO discounting scheme. Silent PPO discounting schemes have been the subject of widespread discussion in the insurance and managed care industries with many major medical associations denouncing the practice. Allstate knew of the purpose and requirements of Florida Statutes §627.736(l0)(1992) and the terms and conditions of its Policy and that said discounts were in violation of each.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 27.

28.    Defendant, Beech Street had direct knowledge of the illegitimate nature of Silent PPOs. Beech Street drafted the PPA, executed the PPA with Dr. Browner and had express knowledge of its provisions. Moreover, Beech Street has issued letters to providers discussing the Silent PPO issue, and Beech Street is a member of the American Association of Preferred Provider Organizations which prohibits Silent PPO practices.

ANSWER:    Allstate lacks sufficient information to admit or deny the allegations contained in

Paragraph 28.

29.    Under Allstate's Silent PPO scheme, Beech Street licensed, leased or otherwise provided its discount database to ADP. ADP incorporated the Beech Street preferred provider discounts into its existing cost containment software product--a product specifically designed to "re-price" medical bills based on preferred provider rates for non-managed care lines of insurance such as property and casualty insurance.

ANSWER:    The allegations made and contained in Paragraph 29 are not directed to Allstate

and, therefore, Allstate makes no answer thereto.

30.    Armed with the Beech Street preferred provider database of discounts, ADP licensed, leased or otherwise sold its PPO re-pricing software to Allstate. Allstate, or ADP on its behalf, systematically processed all Florida medical expense claims through ADP's automated PPO re-pricing product and applied discounts to medical expense claims. At no time did Dr. Browner have a contract with ADP or Allstate authorizing discounts to be taken on his medical bills.

ANSWER:    Allstate admits that it did not enter into any direct contract with Dr. Browner

authorizing discounts to be taken on his medical bills.    Allstate lacks knowledge

sufficient to admit or deny the existence of a contract between Dr. Browner and

ADP.  Allstate denies the remaining allegations made and contained in Paragraph

30.

31.    Allstate routinely and systematically used ADP's re-pricing product in conjunction with the Beech Street preferred provider discounts to reduce millions of dollars of medical bills. The discounts were routinely and systematically applied to treating patient bills despite the following facts: a) the patients begun treating with their provider before the execution of the Cost Containment Agreement between Allstate and ADP; b) a preferred provider policy was not offered by Allstate; and c) claimants were not referred, steered or directed to Beech Street preferred providers.

ANSWER:     Allstate affirmatively states that Allstate Insurance Company, for itself and its

affiliated companies, including Allstate Indemnity Company, entered into an

agreement with Beech Street.  Pursuant to the agreement, Allstate, as of March

2000, paid medical bills involving personal injury protection benefits claimants

who were treated by health care providers who had contracted with Beech Street

at the rates established under such contracts, and during such time, some of the

claimants may have previously sought treatment from such providers.   Allstate

denies the remainder of Paragraph 31 to the extent that it is inconsistent with the

foregoing.

    32.    As part of the Defendants' Silent PPO scheme, Beech Street and ADP were paid a
percentage of Allstate's PPO discount savings and/or a per transaction fee for processing claims
for Allstate. This Silent PPO discounting scheme has saved Allstate millions of dollars.

ANSWER:     Allstate objects to the characterization of its activities as a "Silent PPO".  Allstate

admits that it paid Beech Street and ADP for their services pursuant to agreements

with Beech Street and ADP.  Allstate denies the remainder of the allegations of

Paragraph 32.

    33.    As part of this scheme, Defendants have routinely and systematically applied
Beech Street preferred provider rates to automobile medical expense claims and accordingly,
Allstate has routinely and systematically issued medical providers, via the United States mail,
Explanation of Benefit (" EOB") forms identifying the Beech Street discount with accompanying
checks for the reduced amounts.

ANSWER:     Allstate affirmatively states that Allstate Insurance Company, for itself and its

affiliated companies, including Allstate Indemnity Company, entered into an

agreement with Beech Street.  Pursuant to the agreement, Allstate, as of March

2000, paid medical bills involving personal injury protection benefits claimants

who were treated by health care providers who had contracted with Beech Street

at the rates established under such contracts, and during such time, some of the claimants may have previously sought treatment from such providers. Allstate denies the remainder of Paragraph 33 to the extent that it is inconsistent with the foregoing.

34.    Dr. Browner brings this action on behalf of a class of all other persons or entities similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

ANSWER:    Allstate admits that Plaintiff purports to bring this action as a class action and denies the remaining allegations of Paragraph 34.

35.    Plaintiff seeks to certify the following class consisting of:

all Florida healthcare providers whose bills for medical services rendered to patients covered by Allstate automobile insurance policies were discounted by Allstate allegedly pursuant to a Beech Street Preferred Provider Agreement dated April 1999 (or that defines "Eligible Persons" and "Payors" as set out above)and whose patients began treatment with said healthcare providers prior to Allstate's agreement with Beech Street and/or ADP for access to the Beech Street preferred provider discounts.

ANSWER:    Allstate admits that Dr. Browner seeks to certify the class as defined in Paragraph 35, denies that any class can be certified, and denies the remainder of the allegations of Paragraph 35.

36.    There are questions of law and fact that are common to all members of the purported class, which questions predominate over any question affecting only individual class members.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 36.

37.    The principal common issues include the following:

a.    whether Allstate violated Fla Stat. §627.736, et seq. by paying personal injury protection medical expense claims at discount rates which rates are less than the amount required by Florida law;

12

     b.     whether Allstate's payment of medical providers at discount rates, which rates are less than the amount required by Florida law, was a breach of its insurance Policy;

     c.     whether Defendants 'use and application of Beech Street's discount rates to Allstate automobile medical expense claims was allowed by the Beech Street PPA;

     d.     whether Defendants could apply Beech Street discounts to patient bills where the patients had chosen and began treating with their healthcare provider prior to Beech Street entering into an agreement with ADP or Allstate for access to the discounts;

     e.     whether Allstate's misappropriation of Beech Street's discounts is a violation of the Lanham and RICO Acts;

     f.     whether Dr. Browner and those similarly situated are entitled to compensatory, statutory, or punitive damages against the Defendants because of their illegal conduct;

     g.     whether Dr. Browner and the purported class are entitled to an injunction preventing the continued disclosure and application of their Beech Street preferred provider discounts by Allstate and ADP.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 37.

     38.     In this case there is no question as to the identification of class members because the class is comprised of all healthcare providers whose medical bills were discounted by Allstate based on Beech Street preferred provider discounts. Beech Street and ADP have a database of Beech Street's preferred providers. There is also no issue as to the amount of the class members' damages because the amounts of the discounts are contained in the Defendants' computer systems, and on the EOBs and checks mailed by Allstate to Dr. Browner and the members of the
purported class.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 38.

     39.     Dr. Browner's claims are typical of the claims of all the members of the purported class because all claims are based on the same legal and remedial theories.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 39.

     40.     Dr. Browner will fairly and adequately protect the interests of all purported class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein. Dr. Browner is similarly situated with, and has suffered similar injuries as, the members of the purported class that he seeks to represent. Dr. Browner feels that he has been

wronged, wishes to obtain redress of the wrong and wants the Defendants stopped from perpetrating their scheme and continuing to profit from the misapplication of PPO volume discounts. To that end, Dr. Browner has retained counsel experienced in class action cases and health care litigation. Neither Dr. Browner, nor counsel, have any interest that may cause them to not vigorously pursue this action.

ANSWER:    Allstate admits that Dr. Browner has retained counsel, denies the second sentence

of Paragraph 40 in its entirety, and lacks sufficient information to admit or deny

the remaining allegations made and contained in Paragraph 40.

41.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because:

a.    the individual class members are not all aware that they have been wronged and are thus unable to prosecute individual actions;

b.    concentration of the litigation concerning this matter in this Court is desirable;

c.    the claims of the representative Plaintiff, Dr. Browner, are typical of the claims of the members of the purported class;

d.    a failure of justice will result from the absence of a class action; and

e.    the purported class and the difficulties likely to be encountered in the management of this class action are not great.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 41.

42.    The purported class is so numerous as to make it impracticable to join all members of the class as plaintiffs. Allstate has discounted thousands of medical bills based on preferred provider volume discounts. Many medical providers may not even be aware of Allstate's sophisticated scheme, and if they were, for many providers, the amounts in controversy would be too small to justify the expense of individual litigation. By contrast, on a class-wide basis, Allstate has saved millions of dollars by accessing preferred provider discounts.

ANSWER:    Allstate denies that allegations made and contained in Paragraph 42.

## CAUSES OF ACTION

### COUNT I
### (Breach of Contract as to Beech Street)

Dr. Browner re-alleges the above paragraphs as if fully set forth herein and further states as follows:

ANSWER:    Count I is not directed to Allstate and, as such, Allstate makes no answer hereto.

43.    Dr. Browner, and the Class that he seeks to represent, entered into PPA's with Beech Street. Beech Street disclosed Dr. Browner's and the Class Members' confidential and proprietary discounts to ADP and Allstate, entities that were not legitimate payors pursuant to the PPA.

ANSWER:    Count I is not directed to Allstate and, as such, Allstate makes no answer hereto.

44.    After disclosing the discounts to ADP and Allstate, Beech Street allowed ADP and Allstate to apply PPO discounts to patients who were treating with their healthcare provider prior to Beech Street's agreement with ADP and Allstate ("Treating Patients"). Said Treating Patients were not and could not have been referred or steered to the healthcare providers, including Dr. Browner, by Beech Street, ADP or Allstate because said Treating Patients had previously selected their medical providers and were already under their care.

ANSWER:    Count I is not directed to Allstate and, as such, Allstate makes no answer hereto.

45.    Prior to March 1, 2000, Allstate paid medical providers the proper, non-discounted rate for claimants covered by Allstate who treated with Dr. Browner and the Class. After March 1, 2000, Allstate suddenly began applying Beech Street discounts to patients of Dr. Browner and the Class who had already begun treating with their providers. For example, one week the providers were being paid properly by Allstate for a Treating Patients, and the next week the provider's bills for the same Treating Patient were being discounted based on the Beech Street discount rates.

ANSWER:    Count I is not directed to Allstate and, as such, Allstate makes no answer hereto.

46.    Beech Street has breached its PPAs in the following manner:

a.    by selling the volume discounts of Dr. Browner and the Class to the illegitimate payors ADP and Allstate for a fee with knowledge that the discounts would be applied to automobile medical expense claims where no steerage or direction of patients/claimants could have or did take place;

b.    by allowing discounts to be taken for patients/claimants who were ineligible persons under the PPA;

c.    by allowing discounts to be applied to medical bills of Allstate claimants who were already treating with their medical providers prior to Beech Street's agreement with ADP and Allstate and who were not and could not be steered or directed to Plaintiff and the Class because they had already chosen and started treating with their providers; and

d.    by failing to offer adequate and meaningful consideration for the discounts taken on Dr. Browner's and the Class Members' Treating Patients.

ANSWER:    Count I is not directed to Allstate and, as such, Allstate makes no answer hereto.

47.    As a direct result of said breaches of contract, Dr. Browner and the Class have suffered damages, including the systematic and routine under-payment of their medical bills by Allstate.

ANSWER:    Count I is not directed to Allstate and, as such, Allstate makes no answer hereto.

**COUNT II**
**(Breach of Duty of Good Faith and Fair Dealing as to Beech Street)**

Dr. Browner re-alleges the above paragraphs as if fully set forth herein and further states

as follows:

48.    Dr. Browner and the Class entered into PPAs with Beech Street.  At all times material herein, pursuant to the PPA and Florida law, Beech Street owed Dr. Browner and the Class a duty of good faith and fair dealing.

ANSWER:    Count II is not directed to Allstate and, as such, Allstate makes no answer hereto.

49.    Beech Street disclosed Dr. Browner's and the Class Members' confidential and proprietary discounts to ADP and Allstate, entities that were not legitimate payors pursuant to the PPA.

ANSWER:    Count II is not directed to Allstate and, as such, Allstate makes no answer hereto.

50.    After disclosing the discounts to ADP and Allstate, Beech Street allowed ADP and Allstate to apply PPO discounts to patients who were treating with their healthcare provider prior to Beech Street's agreement with ADP and Allstate.  Said Treating Patients were not and could not have been referred or steered to the healthcare providers by Beech Street, ADP or Allstate as said Treating Patients had previously selected their medical providers and were already under their care.

ANSWER:    Count II is not directed to Allstate and, as such, Allstate makes no answer hereto.

51.    Prior to March 1, 2000, Allstate paid medical providers the proper, non-discounted rate for claimants covered by Allstate who treated with Dr. Browner and the Class.

After March 1, 2000, Allstate suddenly began applying Beech Street discounts to patients of Dr. Browner and the Class who already begun treating with their providers. For example, one week the providers were being paid properly by Allstate for a Treating Patient, and the next week the provider's bills for the same Treating Patient were being discounted based on the Beech Street discount rates.

ANSWER:   Count II is not directed to Allstate and, as such, Allstate makes no answer hereto.

52.   Beech Street has violated its duty of good faith and fair dealing by engaging in the following acts and omissions:

a.   by selling the volume discounts of Dr. Browner and the Class to the illegitimate payors ADP and Allstate for a fee with knowledge that the discounts would be applied to automobile medical expense claims where no steerage or direction of patients/claimants could have or did take place;

b.   by allowing discounts to be taken for patients/claimants who were ineligible persons under the PPA;

c.   by allowing discounts to be applied to medical bills of Allstate claimants who were already treating with their medical providers prior to Beech Street's agreement with ADP and Allstate and who were not and could not be steered or directed to Plaintiff and the Class because they had already been chosen and started treating with their providers;

d.   by failing to offer adequate and meaningful consideration for the discounts taken on the Plaintiff and the Class' Treating Patients.

ANSWER:   Count II is not directed to Allstate and, as such, Allstate makes no answer hereto.

53.   As a direct result of said violations, Plaintiff and the Class have suffered damages, including the systematic and routine under-payment of their medical bills by Allstate.

ANSWER:   Count II is not directed to Allstate and, as such, Allstate makes no answer hereto.

## COUNT III
### (Unjust Enrichment as to Allstate and ADP)

Dr. Browner re-alleges the above paragraphs as if fully set forth herein and further states as follows:

ANSWER:   Allstate restates and incorporates by reference its responses to the paragraphs

above as is fully set forth herein.

54.   Allstate and ADP have supplied Dr. Browner's and the Class Members' preferred provider discounts to numerous claims where they had no right to do so. Allstate and ADP were

not proper payors under the Beech Street PPA and at all relevant times, Dr. Browner's and the Class Members' Treating Patients were not persons eligible to receive PPO discounts.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 54.

55.    At all times materials hereto, Dr. Browner and the Members of the Class involuntarily conferred a benefit on both Allstate and ADP consisting of the application of their Beech Street PPA discounts.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 55.

56    Both Allstate and ADP had knowledge of the conferring of the benefit alleged in the preceding paragraph, and voluntarily accepted and retained the benefit.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 56.

57.    Moreover, Allstate and ADP provided no consideration to Plaintiff and the Class for the benefit of their preferred provider discounts.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 57.

58.    As a direct result of misappropriating Plaintiff's and the Class' preferred provider discounts, Allstate has gained the benefit of paying Dr. Browner's and the Class Members' medical bills at discount rates. Allstate has realized substantial savings from the application of such discounts to medical expense claims.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 58.

59.    As a direct result of misappropriating Dr. Browner's and the Class Members' preferred provider discounts and serving as the facilitator of this discounting scheme, ADP has gained the benefit of being paid substantial compensation in the form of processing fees and/or a percentage of Allstate's claims savings. ADP had realized substantial compensation from the application of Dr. Browner's and the Class Members' preferred provider rates.

ANSWER:    Paragraph 59 contains allegations directed toward ADP. Allstate lacks sufficient

information to admit or deny such allegations.

60.    Allstate and ADP have received and continue to receive benefits in the form of savings, compensation and/or profits at the expense of Dr. Browner and the Class.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 60.

61.    The circumstances as alleged are such that it would be inequitable for Allstate and ADP to retain the benefits obtained from Dr. Browner and the Class without paying the value thereof.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 61.

62.    Such savings, compensation and/or profits constitute unjust enrichment for Allstate and ADP and must be disgorged.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 62.

**Affirmative Defenses to Count III**

**First Defense**

1.    Count III fails to state a claim for which relief may be granted.

**Second Defense**

1.    Dr. Browner knew, or should have known, that with regard to certain covered claimants covered by Florida Allstate personal injury protection automobile policy, Allstate was informed and reasonably believed, based on its conversations with Beech Street and ADP representatives, that it was entitled to apply the Beech Street discount with Dr. Browner.

**Third Defense**

1.    Dr. Browner provided medical treatment to certain patients and submitted medical bills to Allstate for payment thereafter.

2.    The medical bills which Dr. Browner submitted to Allstate were prepared by Dr. Browner and/or his agents and/or employees.

3.    As a result, Dr. Browner knew, or should have known, at all times the amount of payments which he was expecting to receive from Allstate with regard to such bills. On those occasions when Dr. Browner received payments from Allstate with regard to such bills, he knew or should have known whether or not Allstate had made payment based on the amount which he had billed or hade made payment of a different amount, including payments which factored in an additional discount or reduction.

4.    Instead of making an inquiry of Allstate or otherwise alerting Allstate to the fact that he was claiming that Allstate was not paying such bills at the proper rates, Dr. Browner accepted and acquiesced to such payments without complaint for an unjustified length of time before instituting this lawsuit.

5.    In addition, Beech Street had informed Dr. Browner that Beech Street had contracted with Allstate Insurance Company, and its affiliates including Allstate Indemnity Company, for reimbursement of Allstate for Allstate PIP/MedPay claimants under the Beech Street contract.

6.    Furthermore, Dr. Browner executed a contract with Beech Street in which he expressly agreed to accept payment for services rendered to claimants under Auto Medical insurance policies, like those issued by Allstate, at the Beech Street negotiated rates.  See Beech Street Provider Agreement, Schedule 1A, attached hereto as Exhibit A.

7.    As a result, Dr. Browner's claim for unjust enrichment is barred by the equitable doctrine of laches.

### Fourth Defense

1.    Dr. Browner provided medical treatment to certain patients and submitted medical bills to Allstate for payment thereafter.

2.    The medical bills which Dr. Browner submitted to Allstate were prepared by Dr. Browner and/or his agents and/or employees.

3.    As a result, Dr. Browner knew, or should have known, at all times the amount of payments which he was expecting to receive from Allstate with regard to such bills. On those occasions when Dr. Browner received payments from Allstate with regard to such bills, he knew or should have known whether or not Allstate had made payment based on the amount which he had billed or hade made payment of a different amount, including payments which factored in an additional discount or reduction.  Those payments were accompanied by

Explanation of Benefits forms which stated that reductions were made pursuant to the Beech Street contract.

4.      Instead of making an inquiry of Allstate or otherwise alerting Allstate to the fact that he was claiming that Allstate was not paying such bills at the proper rates, Dr. Browner accepted and acquiesced to such payments without complaint for an unjustified length of time before instituting this lawsuit.

5.      In addition, Beech Street had informed Dr. Browner that Beech Street had contracted with Allstate Insurance Company, and its affiliates including Allstate Indemnity Company, for reimbursement of Allstate for Allstate PIP/MedPay claimants under the Beech Street contract.

6.      Furthermore, Dr. Browner executed a contract with Beech Street in which he expressly agreed to accept payment for services rendered to claimants under Auto Medical insurance policies, like those issued by Allstate, at the Beech Street negotiated rates. <u>See</u> Beech Street Provider Agreement, Schedule 1A, attached hereto as Exhibit A.

7.      As a result, Dr. Browner's claims are barred by the doctrines of waiver and estoppel.

WHEREFORE, Allstate Indemnity Company respectfully requests this Court to enter an Order dismissing Count III of the Complaint with prejudice.

**COUNT IV**
**(Third Party Beneficiary Breach of Contract as to the Allstate)**

Dr. Browner re-alleges the above paragraphs as if fully set forth herein and further states as follows:

<u>ANSWER</u>:    Allstate restates and incorporates by reference its responses to the above paragraphs as if fully set forth herein.

63.    Allstate and its insureds entered into a contract of insurance that provided for the payment of medical expenses up to a defined limit.  That contract provided that in the event the insured was involved in an automobile accident, Allstate would pay to medical providers on the insured's behalf eighty (80%) percent of all reasonable and necessary medical expenses.

ANSWER:    Allstate states that the insurance policy speaks for itself.  Allstate denies the

allegations of Paragraph 63 to the extent that they are inconsistent with the

foregoing.

64.    Dr. Browner and the Class are intended third party beneficiaries of their patients' insurance agreements.  Dr. Browner and the Class were to receive 80% of their reasonable and necessary medical expenses under these policies and under the Florida personal injury protection statute -- not 80% of a discounted bill after application of Beech Street preferred provider discounts.

ANSWER:    Allstate admits that it agreed to pay PIP benefits according to its Policy and

denies any allegations inconsistent with the terms of its Policy.  Allstate denies

the remaining allegations made and contained in Paragraph 64.

65.    Allstate's application of Beech Street preferred provider discounts to medical expense claims submitted by Allstate claimants was a breach of its insurance Policy.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 65.

66.    As a result, Dr. Browner and the Class have suffered damages directly and proximately caused by Allstate's breach of its insurance agreements with its insureds.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 66.

### **Affirmative Defenses to Count IV**

### **First Defense**

1.    Count IV fails to state a claim for which relief may be granted.

### **Second Defense**

1.    Dr. Browner knew, or should have known, that with regard to certain covered claimants

covered by Florida Allstate personal injury protection automobile policy, Allstate was informed

22

and reasonably believed, based on its conversations with Beech Street representatives, that it was entitled to apply the Beech Street discount with Dr. Browner.

## Third Defense

1.      Dr. Browner provided medical treatment to certain patients and submitted medical bills to Allstate for payment thereafter.

2.      The medical bills which Dr. Browner submitted to Allstate were prepared by Dr. Browner and/or his agents and/or employees.

3.      As a result, Dr. Browner knew, or should have known, at all times the amount of payments which he was expecting to receive from Allstate with regard to such bills. On those occasions when Dr. Browner received payments from Allstate with regard to such bills, he knew or should have known whether or not Allstate had made payment based on the amount which he had billed or hade made payment of a different amount, including payments which factored in an additional discount or reduction.

4.      Instead of making an inquiry of Allstate or otherwise alerting Allstate to the fact that he was claiming that Allstate was not paying such bills at the proper rates, Dr. Browner accepted and acquiesced to such payments without complaint for an unjustifiable length of time before instituting this lawsuit.

5.      In addition, Beech Street had informed Dr. Browner that Beech Street had contracted with Allstate Insurance Company, and its affiliates including Allstate Indemnity Company, for reimbursement of Allstate for Allstate PIP/MedPay claimants under the Beech Street contract.

6.      Furthermore, Dr. Browner executed a contract with Beech Street in which he expressly agreed to accept payment for services rendered to claimants under Auto Medical insurance policies, like those issued by Allstate, at the Beech Street negotiated rates. See Beech Street Provider Agreement, Schedule 1A, attached hereto as Exhibit A.

7.    As a result, Dr. Browner's claim for third party beneficiary breach of contract is barred by the equitable doctrine of laches.

### Fourth Defense

1.    Dr. Browner provided medical treatment to certain patients and submitted medical bills to Allstate for payment thereafter.

2.    The medical bills which Dr. Browner submitted to Allstate were prepared by Dr. Browner and/or his agents and/or employees.

3.    As a result, Dr. Browner knew, or should have known, at all times the amount of payments which he was expecting to receive from Allstate with regard to such bills. On those occasions when Dr. Browner received payments from Allstate with regard to such bills, he knew or should have known whether or not Allstate had made payment based on the amount which he had billed or had made payment of a different amount, including payments which factored in an additional discount or reduction. Those payments were accompanied by Explanation of Benefits forms which stated that reductions were made pursuant to the Beech Street contract.

4.    Instead of making an inquiry of Allstate or otherwise alerting Allstate to the fact that he was claiming that Allstate was not paying such bills at the proper rates, Dr. Browner accepted and acquiesced to such payments without complaint for an unjustified length of time before instituting this lawsuit.

5.    In addition, Beech Street had informed Dr. Browner that Beech Street had contracted with Allstate Insurance Company, and its affiliates including Allstate Indemnity Company, for reimbursement of Allstate for Allstate PIP/MedPay claimants under the Beech Street contract.

6.    Furthermore, Dr. Browner executed a contract with Beech Street in which he expressly agreed to accept payment for services rendered to claimants under Auto Medical

24

insurance policies, like those issued by Allstate, at the Beech Street negotiated rates. See Beech Street Provider Agreement, Schedule 1A, attached hereto as Exhibit A.

      7.    As a result, Dr. Browner's claims are barred by the doctrines of waiver and estoppel.

      WHEREFORE, Allstate Indemnity Company respectfully requests this Court to enter an Order dismissing Count IV of the Complaint with prejudice.

**COUNT V**
**(RICO Act Violations as to all Parties)**

      Dr. Browner re-alleges the above paragraphs as if fully set forth herein and further states as follows:

ANSWER:    Allstate restates and incorporates by reference its responses to the above

              paragraphs as if fully set forth herein.

      67.    Allstate, acting with Beech Street and middleman and discount broker ADP, formed an association-in-fact enterprise designed to reduce payments made to preferred providers on medical expense claims. The "association in fact" is known as a "Silent PPO."

ANSWER:    Allstate denies the allegations made and contained in Paragraph 67.

      68.    Allstate, with the knowing or grossly negligent cooperation of Beech Street and middleman ADP, participated, directly and indirectly, in the activities of this enterprise through a pattern of racketeering activity, as more fully set forth below.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 68.

      69.    The activities of this enterprise affected commerce.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 69.

      70.    The pattern of racketeering activity consisted of multiple acts of mail and wire fraud, punishable under 18 U.S.C. §1341 and §1343, respectively.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 70.

      71.    The pattern of racketeering activity is an "open-ended" pattern that has been continuous and, on information and belief, will continue into the future.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 71.

72.     In furtherance of the pattern of racketeering activity, the Defendants have engaged in a continuous scheme of two or more related predicate acts that have the same or similar purpose, result, participants, victims, or methods of commission and are intended to defraud Dr. Browner, and those similarly situated, of money as follows:

a.     Beech Street solicited Dr. Browner by mail to join its PPO network. Beech Street mailed its marketing and preferred provider agreements to potential preferred providers through use of the United States mail. Beech Street then entered into a PPA with Dr. Browner and Class Members that 1) did not authorize the disclosure, sale, lease or license of preferred provider discounts to Allstate or ADP; 2) required direction or steerage of claimants before a discount could be taken and 3) only allowed discounts for eligible persons;

b.     Beech Street entered into an agreement with ADP (hereinafter referred to as a "Lease Agreement") whereby it disclosed, leased and/or licensed the use of the confidential, proprietary Beech Street preferred provider database to ADP in a secondary market transaction;

c.     In exchange for providing ADP access to said discounts, Beech Street agreed to receive a fee from ADP based on a percentage of anticipated insurance company savings and/or based on a flat fee structure each time a discount would be applied;

d.     As a PPO broker in the PPO discount secondary black market, ADP entered into a broker agreement (hereinafter referred to as a "Broker Agreement") with Allstate that allowed for the disclosure and lease and/or license of the Beech Street preferred provider database to Allstate;

e.     ADP incorporated the Beech Street database into its PPO re-pricing insurance cost containment software and thereafter applied, or allowed Allstate to apply, Beech Street preferred provider discounts to medical expense claims submitted to Allstate by Beech Street preferred providers;

f.     ADP, which is based in Maryland, Allstate, and Beech Street transferred claim information, medical bills, EOBs, compensation information and documentation and other documentation and information necessary to carry out this scheme via the United States mails and/or by wire;

g.     After computer application of the discounts, ADP and Allstate printed Explanation of Benefit forms ("EOBs") on Allstate's form EOBs that 1) falsely indicated the PPO discount amount as the "Billed Amount" when the actual amount billed by the provider to Allstate was really higher than the PPO discounted amount and 2) falsely

26

indicated Allstate's obligation as 80% of the "Covered Amount" when said "Covered Amount" represented the actual charge less the illegal PPO discount;

h.       By use of the United States mail, ADP and Allstate, with the consent and knowledge of Beech Street, thereafter transmitted or caused to be transmitted said EOBs *and reduced claim checks* to medical providers and persons insured by Allstate. Samples of such EOBs and claim checks are attached hereto as Exhibits 1 and 2, respectively.

i.       Said EOBs falsely represented that Allstate was entitled to apply a Beech Street PPO discount to the claim and said claim checks falsely stated the amount due and owing the providers as an amount that was less than that actually owed;

j.       Said EOBs further contain a 1-800 number to call for "questions regarding network contract issues" which when dialed puts the caller through to Beech Street rather than Allstate, although the EOB is on Allstate's letterhead;

k.       The Defendants engaged in interstate telephone calls, computer communications, and/or wire communications and transactions to transmit information that was false and to exchange fees and compensation essential to the scheme.

ANSWER:       Allstate denies the allegations made and contained in Paragraph 72.

73.       In the above described manner, the Defendants were able to gain access to managed care contract rates without providing any consideration to medical providers and without ever entering into a managed care contract with any medical providers. This scheme to sell and grant access to unauthorized proprietary discounts worth millions of dollars in the secondary PPO discount black market has caused Dr. Browner and the Class Members to suffer monetary damages.

ANSWER:       Allstate denies the allegations made and contained in Paragraph 73.

74.       The Defendant's conduct gives rise to claims under 18 U .S.C. §1964(a) of the RICO Act and permits the recovery of treble damages against the Defendants for violations of 18 U.S.C. §1962(c), for a conspiracy to violate 18 U.S.C. §1962(a) in violation of 18 U.S.C. §1962(d) and for seeking to aid and abet and aiding and abetting violations of 18 U.S.C. §1962(a) within the meaning of 18 U.S.C. §1962.

ANSWER:       Allstate denies the allegations made and contained in Paragraph 74.

75.       Dr. Browner and the purported Class Members are "persons" within the meaning of 18 U.S.C. §1964(c).

ANSWER:       Allstate denies the allegations made and contained in Paragraph 75.

76.     At all times relevant hereto, Dr. Browner and the Class Members were and are "persons" within the meaning of 18 U.S.C. §1961(3).

ANSWER:     Allstate denies the allegations made and contained in Paragraph 76.

77.     With respect to the activities alleged herein, Defendants acted at all times with malice toward the class, intent to engage in the conduct complained of for their own benefit and with knowledge that such conduct constituted unlawfulness.     Such conduct was done with reckless disregard for the rights of the class as well as the laws, to which Defendants are subject, the same amounting to actionable wantonness.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 77.

78.     With respect to the activities alleged herein, Defendants aided and abetted each other, and others not named in this Complaint, in committing those activities, within the meaning of 18 U.S.C. §2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. §§1962(a) and (c).  Defendants operated the scheme or artifice to defraud and to obtain money by false pretenses and to deprive class members of the intangible right of honest payment.  In furtherance of this scheme, the Defendants interfered with, obstructed, delayed or affected commerce by attempting to obtain and/or actually obtaining property interests to which Defendants were not entitled through the exploitation of discounts rates to which they were not entitled.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 78.

79.     With respect to the overt acts and activities alleged herein, Defendants communicated to violate 18 U.S.C. §§1962(a) and (c), all in violation of 18 U.S.C. §1962(d). Defendants, who individually operate legitimate businesses (an insurer, a PPO and a bill review company), joined forces so they could participate directly in the fraudulent scheme or artifice alleged herein, to obtain money by false pretenses, and to deprive class members of the intangible right of honest payment.  Defendants communicated and conspired with each other and participated directly in the interference with, obstructing of, delaying of, or effect upon commerce by actually obtaining property interests to which they were not entitled through the exploitation of a proprietary discount rate.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 79.

80.     The numerous predicate acts of mail and wire fraud, and interference with the operation of legitimate preferred provider discounts herein are part of a common fraudulent scheme by Defendants to defraud Dr. Browner, and the purported Class, of money and property interests under false pretenses; to deprive Dr. Browner, and the purported Class, of receipt of reasonable and necessary compensation for medical services; to interfere with the patient-doctor fiduciary relationship; and, to place Defendants' financial interests over the confidential rates of

Dr. Browner and the purported class so that Defendants could make greater profits. Dr. Browner, and the purported Class, as victims of this unlawful pattern of illegal activity, have and continue to suffer losses.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 80.

**Racketeering Activities**

81.     In carrying out the overt acts and fraudulent scheme described above, the Defendants engaged in inter alia, conduct in violation of federal laws, including 18 U.S.C. §§1341 and 1343, 18 U.S.C. §§1341 and 1346, 18 U.S.C. §§1343 and 1346, 18 U.S.C. §1951(b)(2), 18 U.S.C. §1952(a), 18 U.S.C. §1954, and 18 U.S.C. §1961 et seq., as stated below.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 81.

82.     Section 1961(1) of the RICO Act provides that "'racketeering activity'" means . . . any act which is indictable under any of the following provisions of Title 18, United States Code . . . Section 1341 (relating to mail fraud), Section 1343 (relating to wire fraud)."

ANSWER:     Allstate states that all applicable statutory provisions speak for themselves.

Allstate denies the allegations of Paragraph 82 to the extent that they are

inconsistent with the foregoing.

83.     The United States Congress amended the mail and wire fraud statutes in 1988 by codifying a partial definition of the central term "scheme or artifice to defraud." The newly created definition of a "scheme or artifice" for purposes of specifically recognizing by statute certain unlawful acts also constituting mail and wire fraud violations under 18 U.S.C. §§1341 and 1343, respectively, now reads in its entirety as follows: "For purposes of this chapter, the term 'scheme or artifice' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. §1346.

ANSWER:     Allstate states that all applicable statutory provisions speak for themselves.

Allstate denies the allegations of Paragraph 83 to the extent that they are

inconsistent with the foregoing.

**18 U.S.C. §§1341 and 1346, and 18 U.S.C. §§1343 and 1346**

84.     For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, the Defendants, in violation of 18 U.S.C. §1341 and §1346, placed in United States Post Offices and/or in authorized repositories for mail, matter, matters and things to be sent or delivered by the United States Postal Services, and received matters and things therefrom and knowingly caused to be delivered by mail those matters and things according to the directions thereon or at the place at which they were directed to be delivered by the persons to whom they were addressed.

ANSWER:     Allstate denies the allegations made and contained in Paragraph 84.

85.     For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, the Defendants, in violation of 18 U.S.C. §§1343 and 1346, transmitted in interstate commerce by wire, telephone, or computer transmissions, information regarding illegal discounts. In this manner, the Defendants were knowingly depriving Dr. Browner and others similarly situated to provide "honest services." The Defendants knowingly worked in concert to deprive Dr. Browner and others similarly situated of "honest services."

ANSWER:     Allstate denies the allegations made and contained in Paragraph 85.

86.     In those matters and things sent or delivered by the United States Postal Service referred to above, Defendants falsely and fraudulently represented to Dr. Browner and the purported class that:

a.     After computer application of the discounts ADP and Allstate printed Explanation of Benefit forms ("EOBs") on Allstate's form EOBs which 1) falsely indicated the PPO discount amount as the "Billed Amount" when the actual amount billed by the provider to Allstate was really higher than the PPO discounted amount and 2) falsely indicated Allstate's obligation as 80% of the "Covered Amount" when said "Covered Amount" represented the actual charge less the illegal PPO discount;

b.     By use of the United States mail, ADP and Allstate, with the consent and knowledge of Beech Street, thereafter transmitted or caused to be transmitted said *EOBs and reduced claim checks* to medical providers and persons insured by Allstate. Samples of such EOBs and claim checks are attached hereto as Exhibits 1 and 2, respectively.

c.      Said EOBs falsely represented that Allstate was entitled to apply a Beech Street PPO discount to the claim and said claim checks falsely stated the amount due and owing the providers as an amount that was less than that actually owed;

d.      Beech Street and Allstate represented to providers that discounts would be taken for insureds who were referred or directed to Plaintiff and the Class and who had otherwise complied with the PPA when in fact said representations were false and misleading;

ANSWER:    Allstate denies the allegations made and contained in Paragraph 86.

87.    With respect to its unlawful activities described above, the Defendants also transmitted funds, contracts, claims checks, and other forms of business communications and transactions in a continuous and uninterrupted flow across state lines and employed the United States mails and interstate wires in violations of 18 U.S.C. §§1341, 1343, and 1346.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 87.

88.    The Defendants intentionally and knowingly deceived Dr. Browner and the purported class referred to above for the purpose of financial gain. Defendants either knew or recklessly disregarded that the illegal discounts described above were material.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 88.

89.    Dr. Browner and the purported class have, therefore, been injured in their business or property by the Defendants' overt acts and racketeering activities in amounts to be determined at trial.

ANSWER:    Allstate denies that allegations made and contained in Paragraph 89.

**18 U.S.C. §1951(b)(2)**

90.    During the relevant times, and in furtherance of and for the purpose of executing and/or attempting to execute the above discussed scheme and artifice to defraud or deprive, the Defendants on numerous occasions aided and abetted and conspired to and attempted to and did interfere with, obstruct, delay or affect "commerce" as that is defined in 18 U.S.C. §1951.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 90.

91.    The Defendants unlawfully caused Dr. Browner and numerous other healthcare providers to part with various property interests to which the Defendants were not entitled, including the intangible property right of healthcare providers to conduct their business free of fraud and their fiduciary obligation to provide their patients with privacy.

31

ANSWER:    Allstate denies the allegations made and contained in Paragraph 91.

92.    The Defendants as part of their scheme exploited a fear of economic loss and/or loss of business by Dr. Browner and others similarly situated in violation of 18 U.S.C. §1951(b)(2).  In furtherance of the scheme or artifice to defraud and obtain money by false pretenses from Dr. Browner and the purported class, the Defendants conspired and communicated amongst each other to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled through the exploitation of healthcare providers' fear of economic loss and/or loss of business by refusing to contest the aforesaid illegal discounts.  The Defendants either knew, or recklessly disregarded, that the natural consequences of their acts would exploit and continue to exploit fear of economic loss or loss of business by Dr. Browner and the purported class and yet secure tangible property rights to which they were not entitled.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 92.

93.    The Defendants' overt acts and fraudulent and extortionate racketeering activity has and continues to defraud Dr. Browner, and the members of the purported class, of money, as well as interfering with the fiduciary relationship between Dr. Browner and members of the purported class, and their patients.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 93.

94.    Dr. Browner and the purported class have, therefore, been injured in their business or property by the Defendant's overt acts and racketeering activities in amounts to be determined at trial.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 94.

**18 U.S.C. §1952(a)**

95.    During the relevant times, and in furtherance of and for the purpose of executing in the above-described scheme and artifice to defraud Dr. Browner and the purported class, the Defendants, their employees, agents and others, on numerous occasions did travel and cause others not named in this Complaint to travel in interstate commerce in order to attempt to and to commit mail fraud and wire fraud in violation of the Travel Act, 18 U.S.C. §1952(a).

ANSWER:    Allstate denies the allegations made and contained in Paragraph 95.

96.    Defendants' overt acts and fraudulent racketeering activity has and continues to defraud Dr. Browner and the purported class of money.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 96.

**Pattern of Racketeering Activity**

97.    The Defendants have engaged in a "pattern of racketeering activity" as defined in Section 1961(5) of the RICO Act by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above within the past ten years.  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Dr. Browner and the purported Class.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 97.

98.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5).

ANSWER:    Allstate denies the allegations made and contained in Paragraph 98.

**Violations of the RICO Act, 18 U.S.C. §§1962(d), as to all Parties**

99.    Dr. Browner's claim for relief also arises under 18 U.S.C. §1964(c) of the RICO Act and seeks to recover actual and treble damages for the Defendants' violations of 18 U.S.C. §§1962(c) and for its violations of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(a) and (c).

ANSWER:    Allstate denies the allegations made and contained in Paragraph 99.

**Section 1962(c) Claim**

100.    Section 1962(c) of the RICO Act provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Section 1962(3) of the RICO Act states that "person" includes any individual or entity capable of holding a legal or beneficial interest in property.  Section 1961(4) of the RICO Act defines enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).

33

ANSWER:    Allstate states that all applicable statutory provisions speak for themselves.

Allstate denies that allegations of Paragraph 100 to the extent that they are

inconsistent with the foregoing.

101.    For purposes of this Section 1962(c) claim, the persons consist of Allstate, Beech Street and ADP. The enterprise is an association in fact consisting of Allstate, Beech Street and ADP. Allstate and ADP by virtue of control by Beech Street over physicians, medical specialists, medical laboratories, hospitals, healthcare clinics, pharmacies, home healthcare agencies, and other miscellaneous healthcare providers; all of which have the purpose of providing healthcare services to Allstate's insureds under Allstate's automobile insurance policies, deprive Dr. Browner and the purported class of rightful compensation. Thus, this illegal conduct provides Defendants increased profits from two sources. The first source of increased profits comes from the savings and fees obtained by Defendants from the Silent PPO when preferred policy discounts are illegally taken. The second source of increased profits realized by Allstate is from its insureds. Allstate's insured's pay *full* premiums for insurance policies that are not preferred provider policies, whereas lower premiums are charged for actual preferred policies of automobile insurance. This Section 1962(c) enterprise is distinct from Allstate and includes many persons who are not employees of Allstate and many entities that are not owned by Allstate. The Section 1962(c) enterprise is engaged in, and its activities substantially affect, interstate commerce.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 101.

102.    Allstate is associated with Beech Street and ADP in Section 1962(c) enterprise as described above and all three Defendants conduct and participate in the affairs of that enterprise through the pattern of racketeering activity described herein. Dr. Browner and the purported class members are directly and proximately injured both by this pattern of activity and by Allstate's conduct and participation, for which they are entitled to actual and treble damages, attorneys' fees, and costs under 18 U.S.C. §1964(c).

ANSWER:    Allstate denies the allegations made and contained in Paragraph 102.

**Section 1962(d) Claim**

Dr. Browner re-alleges the above paragraphs as if fully set forth herein and further states as follows:

ANSWER:    Allstate restates and incorporates by reference its response to the above

paragraphs as if fully set forth herein.

103.    This claim for relief also arises under 18 U.S.C. §1964(c) of the RICO Act and seeks to recover actual and treble damages for Allstate's violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(a) and (c). Section 1962(d) of the RICO Act provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this action."

ANSWER:    Allstate denies the allegations made and contained in Paragraph 103.

104.    Section 1961(4) of the RICO Act defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).

ANSWER:    Allstate states that all applicable statutory provisions speak for themselves.

Allstate denies the allegations of Paragraph 104 to the extent that they are

inconsistent with the foregoing.

105.    Section 1962(a) of the RICO Act provides that it "shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

ANSWER:    Allstate states that all applicable statutory provisions speak for themselves.

Allstate denies the allegations of Paragraph 105 to the extent that they are

inconsistent with the foregoing.

106.    For purposes of the claim of a conspiracy in violation of Section 1962(d) to violate Section 1962(a), the persons under the latter subsection consist of Allstate, Beech Street and ADP and the enterprise consists of the Allstate and their investment division, which further profits from the ill-gotten gains.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 106.

107.    At all times relevant herein, Beech Street, ADP and Allstate's investment division together constitute an "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(a). Allstate's investment division was and continues to be the investment beneficiary of additional monies realized from the above overt acts and fraudulent and extortionate scheme or activities to defraud Dr. Browner and the purported class of money and to deprive them of their intangible right of honest services from Beech Street.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 107.

108.    Allstate sells insurance nationwide.  Assets generated from Allstate's unlawful practices described herein are in the millions of dollars and the proceeds of such income amount to millions of dollars.

ANSWER    Allstate admits the allegations made and contained in the first sentence of

Paragraph 108.  Allstate denies the remaining allegations made and contained in

Paragraph 108.

109.    Allstate derived substantial income and proceeds through the above described pattern of racketeering activity, and conspired to use or invest, and did use or invest, directly or indirectly, a significant part of such income or proceeds in the operation of the enterprise described above, in violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(a). This use or investment injures Dr. Browner and the purported class members because it permits that enterprise to continue, expand, and increase its revenue and to affect healthcare providers that are attacked by the enterprise.  This use and investment directly and proximately injures purported class members in a manner that is distinct from the injury caused by the pattern of racketeering activity described herein.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 109.

110.    As demonstrated in detail above, Allstate has engaged in numerous overt and predicate fraudulent and extortionate racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to fraudulently require Dr. Browner and the purported class to accept discounted payments, yet failing to disclose numerous internal systemic fraudulent and extortionate policies and practices designed to defraud Dr. Browner and the class of money, and to unlawfully interfere with their physician-patient relationship.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 110.

111.    Allstate's pattern of fraudulent and extortionate racketeering acts includes, but is not limited to, acts in furtherance of its efforts to not disclose conflicts of interest brought about

by Allstate's inducement to Beech Street to allow Allstate to defraud Dr. Browner and the purported class.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 111.

112.    The nature of the above described acts of Allstate constitutes material misrepresentations that give rise to an inference that Allstate knew it was violating the objective of 18 U.S.C. §1962(d) by violating 18 U.S.C. §§1962(a) and (c), through ongoing fraudulent and extortionate acts that have been and are part of an overall pattern of racketeering activity.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 112.

113.    As a direct and proximate result of Allstate's overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §§1962(a) and (c), Dr. Browner and the class have been and are continuing to be injured in their business or property. Pursuant to 18 U.S.C. §1964(c), Dr. Browner is entitled, therefore, to bring this action on behalf of the purported class and to recover actual and treble damages, as well as the cots of bringing this suit and attorneys' fees.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 113.

114.    Allstate has sought to and has engaged in the commission of and continue to commit overt fraudulent acts. The aforesaid described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Allstate from such pattern of racketeering activity, are:

a.    multiple instances of mail and wire fraud violations of 18 U.S.C. §§1341 and 1343;
b.    multiple instances of mail fraud violations of 18 U.S.C. §§1341 and 1346;
c.    multiple instances of wire fraud violations of 18 U.S.C. §§1343 and 1346;
d.    multiple instances of extortion violations of 18 U.S.C. §1951(b)(2);
e.    multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud, wire fraud, and extortion, in violation of 18 U.S.C. §1952(a); and
f.    multiple instances of violations of 18 U.S.C. §1954.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 114.

115.    Allstate's violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Allstate's illegal acts constituting a pattern of racketeering activity is fashioned and imposed by this Court.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 115.

**Affirmative Defenses to Count V**

**First Defense**

1.     Count IV fails to state a claim for which relief may be granted.

WHEREFORE, Allstate Indemnity Company respectfully requests this Court to enter an

Order dismissing Count V of the Complaint with prejudice.

**COUNT VI**
**(Violations of the Lanham Act, 15 U.S.C. §1125 et seq., as to All Defendants)**

Dr. Browner re-alleges the above paragraphs as if fully set forth herein and further states
as follows:

ANSWER:     Allstate restates and incorporates by reference its responses to the above

paragraphs as if fully set forth herein.

116.     Chapter 22 title 15 §1125(a) states in pertinent part:

(a) Civil Action.

> Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or
> device, or any combination thereof, or any false designation of origin,
> false or misleading description of fact, or false or misleading
> representation of fact, which (A) is likely to cause confusion or to cause
> mistake, or to deceive as to the affiliation, connection, or association of
> such person with anther person, or as to origin, sponsorship, or approval of
> his or her goods, services, or commercial activities by another person . . .
>
> Shall be liable in a civil action by any person who believes that he or she
> is or is likely to be damaged by such act.

ANSWER:     Count VI was dismissed by Order of this Court.

117.     Dr. Browner and the class members entered into PPA's with Beech Street that
limited the use of their preferred provider discounts to payors as defined by the PPAs and
eligible persons as also defined by the PPA.

ANSWER:     Count VI was dismissed by Order of this Court.

118.    Dr. Browner and the class members never agreed to grant preferred provider discounts to discount brokers such as ADP or to insurers who could not offer direction or steerage such as Allstate.

ANSWER:    Count VI was dismissed by Order of this Court.

119.    Dr. Browner and the class members agreed to be preferred providers for legitimate payors who offered PPO plans that contained steerage mechanisms in the plan design and to allow discounts to insureds who met the eligibility requirements of the PPA.

ANSWER:    Count VI was dismissed by Order of this Court.

120.    The Defendants misappropriated Dr. Browner's and class members' preferred provider discounts and applied said discounts to automobile medical expense claims of Beech Street preferred providers. Defendants falsely represented on EOBs and claim checks that Dr. Browner and class member's had agreed to participate in and/or be associated or affiliated with an automobile insurance PPO discounting program designed to reduce medical expenses paid by Allstate on patients who were not directed or referred to their providers by Allstate and who had already been treating with their provider at the time Allstate gained access to the discounts.

ANSWER:    Count VI was dismissed by Order of this Court.

121.    Moreover said EOBs and claim checks indicated that Dr. Browner and class members agreed to accept as full and final payment the Beech Street discounted amount. Said EOBs and claim checks also falsely represented the actual amount of co-payment owed to Dr. Browner and class members as an amount less than Dr. Browner and the class members were entitled to from their patients.

ANSWER:    Count VI was dismissed by Order of this Court.

122.    Said false and misleading EOBs and claim checks were mailed to Dr. Browner's office, to patients and often times to the patients' attorneys.

ANSWER:    Count VI was dismissed by Order of this Court.

123.    Said false statements were likely to confuse, to cause mistake and to deceive others, including Dr. Browner's and the class members' patients and patients' attorneys, as to the affiliation, connection, or association of Dr. Browner and class members in an attempt to conceal Allstate's Silent PPO scheme of reducing medical expense claims based on Beech Street discounts.

ANSWER:    Count VI was dismissed by Order of this Court.

124.    Dr. Browner and the class members were in no way associated, affiliated or connected with Allstate's purported automobile insurance Silent PPO discounting scheme and never warranted or condoned such a scheme.

ANSWER:    Count VI was dismissed by Order of this Court.

125.    As a direct and proximate result of Defendants' violations of 15 U.S.C. §1125, et seq., Dr. Browner and the class members have suffered damages. Moreover, Defendants have been unjustly enriched by said violations and should be made to disgorge all fees, profits, savings or compensation associated with said violations.

ANSWER:    Count VI was dismissed by Order of this Court.

## COUNT VII
### (Declaratory Judgment as to Allstate)

Dr. Browner incorporates the above paragraphs as if fully set forth herein and further states as follows:

ANSWER:    Allstate restates and incorporates by reference its responses to the above

paragraphs as if fully set forth herein.

126.    As previously alleged, Allstate has improperly taken advantage of discounts to which it is not entitled for all the reasons that have been set forth in the previous paragraphs of this Complaint.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 126.

127.    Allstate has taken these discounts in breach of the terms and conditions of its automobile insurance policies. Said policies are indemnity policies that do not provide for preferred provider benefits or the application of preferred provider rates.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 127.

128.    By using the Beech Street preferred provider rates to limit the payment of Dr. Browner's and class members' bills, Allstate had imposed a limitation on benefits that is not contained in its automobile insurance policies. Dr. Browner and the class members are intended third-party beneficiaries of said insurance policies and are entitled to a declaration that Allstate's payments of their medical bills at preferred provider rates is a breach of the applicable insurance contract.

40

ANSWER:    Allstate denies the allegations made and contained in Paragraph 128.

129.    There exists an actual controversy between Plaintiff and Allstate on this issue and Plaintiff seeks a declaration of his right under Allstate's policy.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 129.

## COUNT VIII
## (Violation of Florida Statute 627.736(10) as to the Allstate)

Dr. Browner incorporates the above paragraphs of this Complaint as if fully set forth herein and further states as follows:

ANSWER:    Allstate restates and incorporates by reference its responses to the above

paragraphs as if fully set forth herein.

130.    At all times material herein, Dr. Browner and the members of the class that he seeks to represent presented or had presented on their behalf reasonable and necessary medical charges to Allstate for treatment of patients entitled to PIP medical expense benefits pursuant to a Florida automobile insurance policy issued by Allstate.

ANSWER:    Allstate affirmatively states that Allstate Insurance Company, for itself and its

affiliated companies, including Allstate Indemnity Company, entered into an

agreement with Beech Street. Pursuant to the agreement, Allstate, as of March

2000, paid medical bills involving personal injury protection benefits claimants

who were treated by health care providers who had contracted with Beech Street

at the rates established under such contracts, and during such time, some of the

claimants may have previously sought treatment from such providers. Allstate

denies the remainder of Paragraph 130 to the extent that it is inconsistent with the

foregoing.

131.    Allstate has wrongfully reduced Dr. Browner's and the class members' medical expense claims based on Beech Street preferred provider discounts.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 131.

41

132.    Allstate is not entitled to said Beech Street preferred provider discounts.  Allstate failed to offer insureds a PPO endorsement and also failed to otherwise comply with the requirements of Florida Statute 627.736(10).

ANSWER:    Allstate denies the allegations made and contained in Paragraph 132.

133.    Despite this failure, Allstate has reduced and continues to reduce the automobile insurance medical expense claims of Dr. Browner and the purported class members by accessing and applying Beech Street preferred provider volume discounts.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 133.

134.    Accordingly, an outstanding balance remains on all automobile insurance medical expense claims that Allstate has reduced based on Beech Street preferred Provider volume discounts as alleged in this Complaint.  By reducing Dr. Browner's and the purported class members' legitimate medical expenses by application of Beech Street preferred provider discounts rates, Allstate has violated Fla. Stat. §627.736(10).

ANSWER:    Allstate denies the allegations made and contained in Paragraph 134.

135.    As a result of Allstate's failure to comply with Fla. Stat. §627.736(10), Dr. Browner and the members of the purported class have suffered damages and irreparable harm.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 135.

## Affirmative Defenses to Count VIII

### First Defense

1.    Count VIII fails to state a cause of action upon which relief may be granted.

2.    In May v. Allstate Insurance Company, Case No. 00-6269-Civ-Dimitrouleas (S.D.Fla. April 4, 2000), the court dismissed similar claims alleged against Allstate under §627.736(10).  In its Order, a copy of which is attached hereto as Exhibit B, the May court interpreted the statute and determined that it does not allow for a private cause of action to be asserted against Allstate.

3.    First, the court held that §627.736(10) does not require an insurer to offer a "preferred provider" policy, and it only regulates those insurers which offer such a policy.

42

Opinion at page 5. Since Allstate does not offer a "preferred provider" policy, the court reasoned, the statute does not apply to Allstate. Id.

      4.      In addition, the court held that §627.736(10) is not intended to benefit medical providers, that medical providers are not within the class of persons the statute was enacted to protect, and that the provider's allegations of a violation of the statute cannot state a cause of action. Opinion at page 6.

      WHEREFORE, Allstate Indemnity Company respectfully requests this Court to enter an Order dismissing Count VIII of the Complaint with prejudice.

**COUNT IX**
**(Breach of Contract as to Allstate)**

      Dr. Browner incorporates the above paragraphs of this Complaint as if fully set forth herein and further states as follows:

ANSWER:      Allstate restates and incorporates by reference its responses to the above

                    paragraphs as if fully set forth herein.

      136.      Dr. Browner and class members treated and billed claimants covered by automobile insurance policies written by Allstate. Said Policies provided for the payment of 80% of reasonable and necessary accident related medical expense claims.

ANSWER:      With respect to the first sentence of Paragraph 136, Allstate affirmatively states

                    that Allstate Insurance Company, for itself and its affiliated companies, including

                    Allstate Indemnity Company, entered into an agreement with Beech Street.

                    Pursuant to the agreement, Allstate, as of March 2000, paid medical bills

                    involving personal injury protection benefits claimants who were treated by health

                    care providers who had contracted with Beech Street at the rates established under

                    such contracts, and during such time, some of the claimants may have previously

                    sought treatment from such providers. With respect to the second sentence of

                    Paragraph 136, Allstate states that the automobile insurance policies speak for

43

themselves. Allstate denies the allegations made and contained in Paragraph 136

to the extent that they are inconsistent with the foregoing.

137.    Dr. Browner and class members executed "Assignment of Benefit" forms (hereinafter "Assignments") with claimants thereby assigning all rights and interests in their insurance benefits to Dr. Browner and the class members.

ANSWER:    Allstate lacks sufficient information to admit or deny the allegations made and

contained in Paragraph 137 because Plaintiff has failed to specifically alleged any

facts regarding a single bill of claimant.

138.    Based on Allstate's representations, Allstate paid Beech Street preferred providers, who had accepted Assignments, at Beech Street preferred provider discount rates.

ANSWER:    Allstate affirmatively states that Allstate Insurance Company, for itself and its

affiliated companies, including Allstate Indemnity Company, entered into an

agreement with Beech Street. Pursuant to the agreement, Allstate, as of March

2000, paid medical bills involving personal injury protection benefits claimants

who were treated by health care providers who had contracted with Beech Street

at the rates established under such contracts, and during such time, some of the

claimants may have previously sought treatment from such providers. Allstate

denies the remainder of the allegations made and contained in Paragraph 138.

139.    Allstate's payment of medical expense claims based on Beech Street preferred provider discount rates is a breach of the terms and conditions of Allstate's insurance contracts.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 139.

140.    Dr. Browner and class members, as assignees of their patients' rights, have suffered damages as a result of Allstate's breach of contract.

ANSWER:    Allstate denies the allegations made and contained in Paragraph 140.

## Affirmative Defenses to Count IX

### First Defense

1.    Count IX fails to state a claim for which relief may be granted.

### Second Defense

1.    Dr. Browner provided medical treatment to certain patients and submitted medical bills to Allstate for payment thereafter.

2.    The medical bills which Dr. Browner submitted to Allstate were prepared by Dr. Browner and/or his agents and/or employees.

3.    As a result, Dr. Browner knew, or should have known, at all times the amount of payments which he was expecting to receive from Allstate with regard to such bills.
On those occasions when Dr. Browner received payments from Allstate with regard to such bills, he knew or should have known whether or not Allstate had made payment based on the amount which he had billed or had made payment of a different amount, including payments which factored in an additional discount or reduction.  Those payments were accompanied by Explanation of Benefits forms which stated that reductions were made pursuant to the Beech Street contract.

4.    Instead of making an inquiry of Allstate or otherwise alerting Allstate to the fact that he was claiming that Allstate was not paying such bills at the proper rates, Dr. Browner accepted and acquiesced to such payments without complaint for an unjustified length of time before instituting this lawsuit.

5.    In addition, Beech Street had informed Dr. Browner that Beech Street had contracted with Allstate Insurance Company, and its affiliates including Allstate Indemnity Company, for reimbursement of Allstate for Allstate PIP/MedPay claimants under the Beech Street contract.

6.    Furthermore, Dr. Browner executed a contract with Beech Street in which he expressly agreed to accept payment for services rendered to claimants under Auto Medical insurance policies, like those issued by Allstate, at the Beech Street negotiated rates. See Beech Street Provider Agreement, Schedule 1A, attached hereto as Exhibit A.

7.    As a result, Dr. Browner's claims are barred by the doctrines of waiver and estoppel.

### Third Defense

1.    Dr. Browner provided medical treatment to certain patients and submitted medical bills to Allstate for payment thereafter.

2.    The medical bills which Dr. Browner submitted to Allstate were prepared by Dr. Browner and/or his agents and/or employees.

3.    As a result, Dr. Browner knew, or should have known, at all times the amount of payments which he was expecting to receive from Allstate with regard to such bills. On those occasions when Dr. Browner received payments from Allstate with regard to such bills, he knew or should have known whether or not Allstate had made payment based on the amount which he had billed or had made payment of a different amount, including payments which factored in an additional discount or reduction. Those payments were accompanied by Explanation of Benefits forms which stated that reductions were made pursuant to the Beech Street contract.

4.      Instead of making an inquiry of Allstate or otherwise alerting Allstate to the fact that he was claiming that Allstate was not paying such bills at the proper rates, Dr. Browner accepted and acquiesced to such payments without complaint for an unjustified length of time before instituting this lawsuit.

5.      In addition, Beech Street had informed Dr. Browner that Beech Street had contracted with Allstate Insurance Company, and its affiliates including Allstate Indemnity Company, for reimbursement of Allstate for Allstate PIP/MedPay claimants under the Beech Street contract.

6.      Furthermore, Dr. Browner executed a contract with Beech Street in which he expressly agreed to accept payment for services rendered to claimants under Auto Medical insurance policies, like those issued by Allstate, at the Beech Street negotiated rates.  See Beech Street Provider Agreement, Schedule 1A, attached hereto as Exhibit A.

7.      As a result, Dr. Browner's claims are barred by the doctrine of laches.

WHEREFORE, Allstate Indemnity Company respectfully requests this Court to enter an Order dismissing Count IX of the Complaint with prejudice.

### Affirmative Defenses As To All Counts Seeking Punitive Damages

1.      Any award of punitive damages would violate the United States and Florida State Constitution, relevant United States Supreme Court and state court precedents, and relevant state statutes.

WHEREFORE, Allstate Indemnity Company respectfully requests this Court to enter an Order dismissing the punitive damages claims made in the Complaint with prejudice.

47

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by U.S. Mail to counsel on the attached service list this 22nd day of October, 2001.

PETER J. VALETA
Florida Bar No. 327557
ROSS & HARDIES
150 North Michigan Ave., Suite 2500
Chicago, Illinois 60601
Telephone: (312) 750-3619
Telecopier: (312) 750-8600
Attorneys for Allstate Indemnity Company

DAVID B. SHELTON
Florida Bar No. 0710539
Rumberger. Kirk & Caldwell
P.O. Box 1873
Orlando, Florida 32802
Telephone: (407) 839-4511
Telecopier: (407) 841-2133
Attorneys for Allstate Indemnity Company

48

## SERVICE LIST

### Co-Lead Counsel for Plaintiffs

Jan Douglas Atlas, Esq.
Eric Lee, Esq.
Robin Corwin Campbell, Esq.
ATLAS PEARLMAN, P.A.
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301

Arthur S. Gold, Esq.
GOLD & COULSON
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603

Andrew Garcia, Esq.
Carlin Phillips, Esq.
PHILLIPS & GARCIA
13 Ventura Drive
North Darthmouth, MA 02747

Larry Kopelman, Esq.
Douglas Blankman, Esq.
KOPELMAN & BLANKMAN, P.A
Bank of America Tower
One Financial Plaza, Suite 1611
Fort Lauderdale, FL 33394

### Co-Counsel for Plaintiffs

Susan L. Lawson, Esq.
230 East Davis Boulevard
Tampa, FL 33606

Richard Bokor, Esq.
RICHARD BOKOR, P.A.
230 East Davis Boulevard
Tampa, FL 33606

Casey Fundaro, Esq.
1100 5th Avenue S., Suite 201
Naples, FL 34102-6407

### Counsel for Nationwide

Katherine C. Lake, Esq.
FOWLER, WHITE, et al.
Post Office Box 1438
Tampa, FL 33601

### Counsel for Allstate, Fidelity and Casualty, Continental, Deerbrook

David B. Shelton, Esq.
RUMBERGER, KIRK & CALDWELL
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873

Peter J. Valeta, Esq.
ROSS & HARDIES
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601

### Counsel for Beech Street and ADP

Thomas Tew, Esq.
Joseph A. DeMaria, Esq.
John M. Quaranta, Esquire
TEW, CARDENAS, et al.
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336

### Counsel for Progressive

Francis Anania, Esq.
Donald A. Blackwell, Esq.
ANANIA, BANDKLAYDER, et al.
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131

### Counsel for CCN

William W. Deem, Esq.
William E. Adams, Esq.
MCGUIRE WOODS, LLP
3300 Bank of America Center
50 N. Laura Street
Jacksonville, FL 32202-4099

### Counsel for Prudential

John D. Aldock, Esquire
Jeffrey M. Klein, Esquire
Michael Isenman, Esquire
SHEA & GARDNER
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

James C. Haggerty, Esq.
SWARTZ CAMPBELL DETWEILER
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316

**Counsel for Florida Farm Bureau**

Robert K. Levenson, Esquire
HOLLAND & KNIGHT, LLP
701 Brickell Avenue, Suite 3000
Miami, FL 33131

**Counsel for Liberty Mutual**

Mark Shapiro, Esq.
AKERMAN, SENTERFITT et al.
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, FL 33131

**Counsel for Hartford, Metropolitan, Integon**

Marcy Levine Aldrich, Esq.
AKERMAN, SENTERFITT et al.
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, FL 33131

**Counsel for Metropolitan**

Jeffrey P. Lennard, Esquire
SONNENSCHEIN, NATH & ROSENTHAL
8000 Sears Tower
Chicago, IL 60606

Kathy Johnson Maus
Lola M. Swaby
BUTLER BURNETTE PAPPAS
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308-3469

**Counsel for Superior**

Alan J. Nisberg, Esquire
BUTLER BURNETT PAPPAS
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607

**Counsel for American International**

Dale L. Friedman, Esquire
Brian P. Knight, Esquire
CONROY, SIMBERG, GANNON,
KREVANS & ABEL, P.A.
3440 Hollywood Blvd., 2nd Floor
Hollywood, FL 33021

# BEECH STREET PROVIDER AGREEMENT

This PROVIDER AGREEMENT ("Agreement") is made and entered into by and between Beech Street Corporation a California Corporation ("Beech Street") and ___MARC BROWNER, D.C._____(PROVIDER).

## RECITALS

A.  **Beech Street.** Beech Street (i) establishes and administers networks of Participating Providers to provide quality cost-efficient health care services and enters into agreements with Participating Providers to provide Covered Services to Eligible Persons for which Payors pay Participating Provider in accordance with the Beech Street Reimbursement Schedule pursuant to agreements between Beech Street and Payors (as the capitalized terms are defined below); and (ii) reviews the performance of and the utilization of health care services provided by the Participating Providers.

B.  **PROVIDER.** Provider desires to enter into this Agreement to provide such services and Beech Street desires that Provider become a Participating Provider in the Beech Street Network on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises, mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I – PREAMBLE AND RECITALS

The preamble and recitals set forth above are hereby incorporated into and made a part of this Agreement.

## ARTICLE II – DEFINITIONS

2.1  **Plans.** "Plans" means the individual or group medical benefit programs of Payor, including, without limitation, insurance policies and administrative services only agreements, benefits services only agreements, third party administrator agreements, multiple employer trusts, pre-paid plans, competitive medical plans, governmental programs and self-insured plans and trusts.

2.2  **Eligible Persons.** "Eligible Persons" means the persons who (i) are entitled to receive Covered Services pursuant to a plan, and (ii) have been issued and present to Provider either (a) Plan identification cards bearing the name Beech Street or CAPP CARE, the Beech Street or CAPP CARE logo, or (b) other information identifying such persons as persons entitled to access the Beech Street Network.

2.3  **Covered Services.** "Covered Services" means the health care services and supplies provided pursuant to a Plan.

2.4  **Facility Provider.** "Facility Provider" means a health care facility that has entered into an agreement with Beech Street to provide the Covered Services to Eligible Persons.

2.5  **Participating Providers.** "Participating Providers" means all of the health care providers, including Facility Providers, who have in force and effect agreements with Beech Street to provide the Covered Services to Eligible Persons.

2.6  **Standard Terms and Conditions.** "Standard Terms and Conditions" means the terms and conditions established by Beech Street and accepted by Payors, attached hereto as EXHIBIT A.

2.7  **UM Program.** "UM" Program" means the utilization management program developed, established and administered by Beech Street, summarized in EXHIBIT B.

2.8  **Payor.** "Payor" means the party responsible for providing the reimbursement for Covered Services on behalf of Eligible Persons, including, without limitation, insurance carriers, self-insured employers, pre-paid plans, third party administrators, trust funds, competitive medical plans, governmental programs and administrative service groups.  The current list of Payors will be made available to Provider upon request.

2.9  **Participating Provider Appeal Procedure.** "Participating Provider Appeal Procedure" means the procedure of Beech Street to receive and process appeals or decisions to terminate Participating Providers, attached hereto as EXHIBIT C.

2.10  **Beech Street Reimbursement Schedule.** "Beech Street Reimbursement Schedule" means the schedule of maximum reimbursement amounts for Covered Services established from time to time by Beech Street and accepted by Payor attached hereto as SCHEDULE 1.

2.11  **Payor or Product Alternative Reimbursement Schedule.** "Payor or Product Alternative Reimbursement Schedule" means the schedule of maximum reimbursement amounts for Covered Services established by a Payor or Beech Street for Plans or Products offered by Beech Street to Provider as an alternative to the Beech Street Schedule 1 Reimbursement Schedule.

EXHIBIT "A"



**2.12 Beech Street Network.** "Beech Street Network" means the arrangement of Participating Providers in Provider's geographic area of which Provider is a member and the collective grouping of all such arrangements regionally or nationally.

**2.13 Medically Necessary.** "Medically Necessary" or "Medical Necessity" means services or supplies which, under the provisions of this Agreement, are determined to be: (i) appropriate for the symptoms, diagnosis or treatment of the injury or disease; (ii) provided for the diagnosis or direct care and treatment of the injury or disease; (iii) within standards of good medical practice within the organized medical community; (iv) not primarily for the convenience of the Eligible Person or of any Participating Provider providing Covered Services to the Eligible Person; and (v) an appropriate supply or level of service needed to provide safe and adequate care.

## ARTICLE III – STANDARD TERMS AND CONDITIONS AND REIMBURSEMENT SCHEDULE

**3.1 Standard Terms and Conditions and Reimbursement Schedule.** (i) Provider accepts the Standard Terms and Conditions and the Beech Street Reimbursement Schedule. (ii) Provider shall provide Covered Services to Eligible Persons of each Payor subject to the terms hereof. If the participation of any Payor with respect to Provider in the Beech Street Network shall be withdrawn, Provider shall provide Covered Services to Eligible Persons of each such Payor through the effective date of withdrawal of such Payor.

**3.2 Payor or Product Alternative Reimbursement Schedule.** If a Payor desiring to access the Beech Street Network does not pay for Covered Services on the basis contemplated by the Beech Street Schedule 1 Reimbursement Schedule, or if Beech Street determines that a Product line will be reimbursed different from Schedule 1, Beech Street may submit to Provider a Payor or Product Alternative Reimbursement Schedule. Provider shall have the option to reject any such Payor Alternative Reimbursement Schedule by giving Beech Street written notice within fifteen (15) days of receipt. If Provider does not give Beech Street notice of rejection within such fifteen (15) day period, the Payor or Product Alternative Reimbursement Schedule shall become the Beech Street Reimbursement Schedule for such Payor or Product line, and Provider shall provide Covered Services to Eligible Persons of such Payor or Product line in accordance with that Reimbursement Schedule.

**3.3 Modification of Reimbursement Schedules.** During the term of this Agreement, Beech Street shall review at least annually the reimbursement schedules established pursuant to ARTICLE III and may modify any such reimbursement schedule by sending written notice to Provider which shall be effective on the date provided in such notice, but in no event earlier than seventy-five (75) days from the receipt thereof.

## ARTICLE IV – OBLIGATIONS OF PROVIDER

**4.1 Provider Services and Obligations.** Provider shall:

**4.1.1** provide to Eligible Persons the Medically Necessary Covered Services that are customarily furnished to the general public, and

**4.1.2** accept assignment of Eligible Persons' claims for reimbursement for Covered Services furnished by Provider by obtaining necessary authorization from Eligible Persons to bill Payors, and bill Payors directly on Universal Insurance Claims forms, or other claim forms acceptable to Payor, within sixty (60) days after providing Covered Services to Eligible Persons; and

**4.1.3** accept as full payment for the Covered Services the lesser of billed charges or the reimbursement amount provided in the Beech Street Reimbursement Schedule; and

**4.1.4** during the term of this Agreement, continue to hold a proper and unrestricted license, certificate, registration or other valid authorization to practice as issued in the state in which Provider is located; and

**4.1.5** notify Beech Street within ten (10) days in the event: (i) of any loss or other change in Provider's license, registration, certificate or other authorization to practice in any state. (ii) Provider receives notice that any professional liability claim is being brought against Provider, or that any action by any duly authorized body or health care facility seeking to impose discipline, restrictions or loss of privileges or license has been commenced against Provider, or (iii) of any judgment or settlement with respect to any professional liability claim involving Provider or if any discipline, restrictions or loss of privileges or license as described in subsection (ii) above is imposed on Provider; and

**4.1.6** within the dictates of good practice, and in the best interests of Eligible Persons under Provider's care attempt to refer such Eligible Persons requiring referral to other Participating Providers; and admit Eligible Persons to Participating Facilities; and

**4.1.7** comply with the UM Program as amended from time to time by Beech Street and participate in and observe the protocols of the UM Program; and

**4.1.8** cooperate in and be bound by the resolution of matters filed pursuant to the Participating Provider Appeal Procedure; and

4.1.9 acknowledge that: (i) neither Beech Street nor Payor practices medicine or any other profession; (ii) Beech Street does not control the provision of Covered Services to Eligible Persons; and (iii) Provider shall be responsible for the care and treatment of Eligible Persons under Provider's care, including, without limitation, any and all clinical decisions regarding the admission, treatment and discharge of such Eligible Persons, notwithstanding the receipt by Provider, whether in writing or otherwise, of any information, recommendation, authorization or failure to grant authorization regarding such admission, treatment or discharge that may be issued by Beech Street or its agent pursuant to the UM Program or otherwise, or by any other person or entity performing utilization management or review or similar services with respect to such Eligible Person; and

4.1.10 subject to Sections 5.2 and 5.3, provide Beech Street and Payors with access, upon reasonable notice during normal business hours, to pertinent records and information regarding Covered Services rendered to Eligible Persons for inspection and copying in such a manner as may be reasonably requested. (i) by Beech Street to permit Beech Street to implement the UM Program and Perform its administrative obligations set forth herein, and (ii) By Payor or by Beech Street on behalf of Payor to permit Payor to verify claims for Covered Services submitted by Provider. All such information shall be in such content and format as is reasonably necessary and appropriate to the purposes referred to above, and all reasonable costs of inspection and copying shall be borne by Beech Street or Payor, as applicable.

4.1.11 Provider shall remain and be in good standing of the practitioner staff of at least one (1) Facility Provider: (I) if eligible for such staff privileges; and (ii) if Provider is a member of the practitioner staff of any hospital.

4.2 **Changes in Tax Identification Number.** Provider shall provide written notice (the "Tax I.D. Notice") to Beech Street of the tax identification numbers ("I.D. Numbers") of Provider and of any application for or receipt of a new I.D. Number by Provider which Tax I.D. Notice shall include the reason for such application.

## ARTICLE V – CONFIDENTIAL INFORMATION

5.1 **Legal Restrictions.** Neither party hereto shall be in default for failure to supply information which cannot be supplied due to prevailing law or for supplying information required to be supplied due to prevailing law.

5.2 **Confidentiality.** Each party may, in the course of the relationship established by this Agreement, disclose to the other party in confidence non-public information concerning patient treatment and/or finances, and such party's earnings, volume of business, methods, systems, practices, plans and other confidential or commercially valuable proprietary information (collectively, "Confidential Information"). Each party acknowledges that the disclosing party shall at all times be and remain the owner of all Confidential Information disclosed by such party, and that the party to whom Confidential Information is disclosed may use such Confidential Information only in furtherance of the purposes and obligations of this Agreement. The party to whom any Confidential Information is disclosed shall use its best efforts, consistent with the manner in which it protects its own Confidential Information to preserve the confidentiality of any such Confidential Information which such party knows or reasonably should know that the other party deems to be Confidential Information. Neither party shall use for its own benefit, or disclose to third parties, any Confidential Information of the other party without such other party's written consent.

5.3 **Medical Records.** The parties shall maintain the confidentiality of the medical records of each Eligible Person, and the release of any information reflected therein shall require the consent of such Eligible Persons unless otherwise permitted or required under applicable law.

5.4 **Trademarks and Copyrights.** Beech Street and Provider each reserve the right to the control and use of its respective names, copyrights, symbols, trademarks and service marks presently existing or later established. Neither party shall use the other party's name, copyrights, symbols, trademarks or service marks in advertising or promotional materials or otherwise without the approval of the other party, of the name, copyrights, symbols, trademarks or service marks of such other party shall cease immediately upon the earlier written notice of such other party or termination of this Agreement. Provider hereby grants Beech Street and each Payor, upon the prior approval of Beech Street, the right to use the name, address, specialty and other pertinent biographical data of Provider in connection with the obligations of Beech Street hereunder, including, without limitation, in Participating Provider directories and referral services.

## ARTICLE VI – INSURANCE

;.1 **Provider.** Provider shall maintain during the term of this Agreement at Provider's expense, in amounts reasonably satisfactory to Beech Street, policies of professional liability insurance with companies reasonably acceptable to Beech Street, or coverage provided under a legally established insurance trust. Upon request, Provider shall provide Beech Street with satisfactory evidence of such insurance or coverage. 'rovider shall provide Beech Street with prior notification of any cancellation, non-renewal or other material change in such insurance or overage.

.2 **Beech Street.** Beech Street shall maintain professional liability insurance or coverage and comprehensive general liability coverage.

## ARTICLE VII – TERM AND TERMINATION

**7.1  Term.** The term of this Agreement shall commence on the date it is executed by Beech Street ("Effective Date") and shall continue indefinitely unless terminated as provided herein.

**7.2  Termination by Provider.** Provider may terminate this Agreement at any time, with or without cause, upon sixty- (60) days prior written notice to Beech Street.

**7.3  Termination Pursuant to the Participating Provider Appeal Procedure.** Beech Street may terminate this Agreement immediately upon notice to Provider and subject to the Participating Provider Appeal Procedure, in the event of: (i) a decision to terminate Provider for Provider's failure to provide health care services in compliance with the UM Program; or (ii) any other termination for cause, except those provided in Section 7.4.

**7.4  Termination by Beech Street**

**7.4.1** Beech Street may terminate this Agreement immediately, upon notice to Provider and without review under the Participating Provider Appeal Procedure, if Provider: (i) commits professional misconduct, violates the principles of professional ethics or, in the determination of Beech Street, has been subject to an excessive number of professional liability claims;     (ii)    acts in a manner which, in the determination of Beech Street , threatens serious injury to the reputation of Beech Street or in a manner which may adversely affect the ability of Beech Street to conduct business; or (iii) is subject to an indictment or information for a felony, or to any disciplinary action referred to in Section 4.1.5.

**7.4.2** Beech Street may terminate this Agreement at any time, without cause or reason and without review under the Participating Provider Appeal Procedure, upon sixty- (60) days prior written notice to Provider.

**7.5  Procedure upon Termination.** In the event of the termination of this Agreement and consistent with applicable law, Provider shall:

**7.5.1** remain liable for the provision of Covered Services subsequent to such termination to Eligible Persons who shall be receiving care from Provider until the conclusion of any course of treatment for a specific condition existing as of such termination: and

**7.5.2** immediately discontinue use of any and all signs, plaques, letterheads, forms or other materials identifying Provider as a Participating Provider, and

**7.5.3** immediately disclose to each Eligible Person in Provider's care and each Eligible Person who subsequently requests treatment, in the form prescribed by Beech Street, the possible adverse economic consequences to such Eligible Persons of such termination; and

**7.5.4** in the absence of the foregoing disclosure, assume and be fully responsible for any difference in benefits payable by such Eligible Person's Payors in consequences of such termination.

## ARTICLE VIII – MISCELLANEOUS PROVISIONS

**8.1     Participating Provider Appeal Procedure.** The appeal of any decision made by Beech Street to terminate Provider as a Participating Provider pursuant to Section 7.3 shall be subject to resolution pursuant to the Participating Provider Appeal Procedure.

**8.2     Non-Exclusivity.** Nothing in this Agreement shall be intended or construed to prevent either party from entering into substantially similar agreements with other entities similar to the other party.

**8.3     Professional Relationship.** This Agreement shall not be intended, nor shall it be construed, to affect any Provider-patient relationship.

**8.4     Independent Contractors.** Each party, its officers, agents and employees are at all times independent contractors to the other party. Nothing in this Agreement shall be construed to make or render either party or any of its officers, agents or employees an agent, servant or employee of, or joint venturer of or with the other.

**8.5     Notices.** All notices shall be in writing, effective on delivery, addressed to Beech Street or Provider at the addresses set forth below, or to any other address specified in writing by such party.

**8.6     Entire Agreement; Agreements Superseded.** This Agreement represents the entire agreement and understanding of the parties and all prior or concurrent agreements, whether written or oral, in regard to the subject matter hereof are and have been merged herein and superseded hereby. Beech Street may amend this Agreement by sending any substantive amendment to Provider, which amendment shall be

4



effective thirty (30) days following receipt by Provider, unless Provider provides written notice of rejection during such period. If Provider rejects such amendment, such amendment shall not be given effect.

**8.7    Compliance with Terms.**  Failure to insist upon strict compliance with any of the terms herein (by way of waiver or breach) by either party hereto shall not be deemed to be a continuous waiver in the event of any future breach or waiver of any condition hereunder.

**8.8    Rights of Parties.**  Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to this Agreement and to their respective successors and assigns.

**8.9    Assignment.**  This Agreement may be assigned upon written notice to the parties hereto.

**8.10   Benefits.**  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, personal representatives, executors, administrators, successors and assigns.

**8.11   Gender and Number.**  The use of the masculine, feminine or neuter gender and the use of the singular and plural shall not be given the effect of any exclusion or limitation herein, and the use of the word "person" or "party" shall mean and include any individual, trust, corporation, partnership or other entity.

**8.12   Severability.**  If any portions of this Agreement shall for any reason, be invalid or unenforceable, such portions shall be ineffective only to the extent of such invalidity or unenforceability, and the remaining portion or portions shall nevertheless be valid, enforceable and of full force effect.

**8.13   Multiple Counterparts.**  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute a single instrument.

**8.14   Conflict of Laws.**  This Agreement shall be governed by the laws of the state in which Provider practices, without giving effect to its conflicts of law provisions.

IN WITNESS WHEREOF, the parties hereto have set their hands on the dates set forth below, as of the Effective Date.

_____
Signature of Provider

MARC BROWNER, D.C.
Print Name of Provider

10/11/99
Date Executed by Provider

8320 W. SUNRISE BLVD STE 111
Address

PLANTATION, FL 33322
City, State, Zip Code

(954) 423-0020
Area Code        Telephone Number

65-0731209
Federal Tax I.D. or Social Security Number (as applicable)

Beech Street Corporation
173 Technology
Irvine, CA 92618

By _____

Joseph P. Radigan
Name

Executive Vice President
Title

11/13/99
Date Executed by Beech Street

EXHIBIT A
BEECH STREET
STANDARD TERMS AND CONDITIONS

The following shall constitute the Standard Terms and Conditions as defined in this Agreement.

1.    **COVERED SERVICES.**  Participating Provider shall furnish to Eligible Persons those Medically Necessary Covered Services customarily furnished to the general public by such Participating Provider in the same physical setting and in the same manner as such services are customarily provided to other similarly situated patients of Participating Provider.

2.    **PAYMENT TO PARTICIPATING PROVIDER.**  Pursuant to the terms of the applicable Plan, Payor or its agent and the Eligible Person shall pay to Participating Provider and Participating Provider shall accept the amounts set forth in the applicable Beech Street Reimbursement Schedule as full payment of any claim submitted by Participating Provider for Covered Services furnished to Eligible Persons pursuant to such Plan.

3.    **PAYMENT BY ELIGIBLE PERSONS.**  Participating Provider shall collect and/or bill Eligible Persons directly for:  (i) any deductible, co-payment or co-insurance for Covered Services specified in the applicable Plan in amounts which, when added to Payor's payments, shall not exceed the applicable Reimbursement Schedule for such Covered Services; (ii) any services that are not Covered Services; and any Covered Services provided to Eligible Persons after the benefits set forth In a Plan to which the Eligible Person is entitled have been exhausted.

4.    **TIME FOR PAYMENT.**  Except where coordination of benefits applies, Payor or its paying agent has agreed to make all payments due to Participating Provider within thirty (30) days following receipt by Payor, or its paying agent, of a complete and proper claim form and other information required to determine that the claim is payable under the Plan.

5.    **VERIFICATION OF ELIGIBLE PERSONS.**  Payor shall provide Eligible Persons with appropriate written documentation identifying the patient as a Beech Street or CAPP CARE Eligible Person.  Provider is responsible for verifying eligibility for Covered Services prior to treatment or within seventy-two (72) hours after admission by contacting the appropriate Payor.

6.    **EXHAUSTON OF BENEFITS.**  If an Eligible Person shall exhaust any benefits under any Plan, Payor shall then notify the applicable Participating Provider and Eligible Person and payment shall be due such Participating Provider pursuant to Section 3 hereof.

7.    **MARKETING PROMOTION.**  Payor and Participating Provider authorize each other to use the other's name, address and telephone number and the Participating Provider's specialty and other biographical data or services available, as applicable, subject to Section 5.4 and the prior approval of Beech Street.

8.    **AGREEMENTS SUPERSEDED.**  Any agreement between Participating Provider and any Payor is hereby superseded by this Agreement.



# EXHIBIT B
# BEECH STREET
## SUMMARY OF UTILIZATION MANAGEMENT PROGRAM

Beech Street shall perform utilization management ("UM") services and shall have overall responsibility for reviewing (1) utilization activities to determine the appropriateness of care of Eligible Persons and (2) physician claims to assess compliance with Beech Street billing guidelines.

This Exhibit summarizes generally the standards and procedures that Beech Street will use in performing UM and the interrelationship between Beech Street, the attending health care provider and the facility utilization review program. All capitalized terms used in this Exhibit B which are not otherwise defined shall have the meanings set forth in the Agreement to which this Exhibit B is attached.

**NOTE:** Nothing in the UM Program is intended or shall be construed to override or affect in any manner the authority and responsibility of each Participating Provider for the care and treatment of each Eligible Person under such Participating Provider's care, including, without limitation, all decisions with respect to the admission, treatment or discharge of such Eligible Person.

**1. GENERAL.**

a. Different Plans have different review requirements. When UM review is required by a Plan, it shall be the responsibility of the attending health care provider and the Eligible Person to provide Beech Street with information in advance to determine the appropriateness of all inpatient admissions and elective procedures (whether or not inpatient admission is required) for which such review is required. The information may be provided by mail (time permitting), by telephone (800-CAPPING) or by facsimile (949/251-2250) during normal business hours.

b. Beech Street UM Program activities are primarily performed in consultation with the attending health care provider. Without violating applicable statutes, Beech Street shall contact the facility or attending health care provider to obtain information necessary to perform UM Program services.

c. Each inpatient admission and each elective procedure shall be deemed Medically Necessary upon demonstration to Beech Street's satisfaction that such admission or procedure is appropriate under the circumstances.

d. Upon determining that the proposed inpatient admission or elective procedure is appropriate, Beech Street shall notify the attending health care provider, Eligible Person and facility outlining pertinent data.

**2. INPATIENT ADMISSION REVIEW.** Eligible Persons requiring Medical care on an emergency basis shall not require pre-admission review. The attending health care provider shall notify Beech Street of the emergency admission by the close of the next business day so that a length of stay ("LOS") can be calculated.

**3. SECOND OPINION PROGRAM.** The second opinion of another Participating Provider is required by certain Plans and Payors in connection with certain procedures and diagnosis. At the time the attending health care provider or Eligible Person contacts Beech Street for a determination with respect to any Covered Services, Beech Street shall notify them whether a second opinion is required and shall furnish or cause to be furnished a list of second opinion Participating Providers where available.

**4. LENGTH OF STAY.** Beech Street shall calculate an appropriate LOS for all admissions based generally on the median LOS for each diagnosis as derived from empirical data from recognized industry databases.

**5. CASE MANAGEMENT AND CONCURRENT REVIEW.** Case management is a program designed to identify specific cases which involve catastrophic injury or chronic illness to Eligible Persons or which otherwise require long-term care for such Eligible Persons and to evaluate, coordinate and monitor appropriate individualized and cost-effective medical treatment for such Eligible Persons. The Case Manager will contact the Participating Provider caring for an Eligible Person requiring Case Management when necessary to obtain information or coordinate care. In the best interests of the Eligible Person, the Participating Provider shall work cooperatively with the Case Manager.

Concurrent review is periodic review during the Eligible Person's inpatient stay to determine whether continued confinement is Medically Necessary. The Beech Street UM Program identifies those cases which warrant concurrent review, and with respect to those cases, Beech Street performs concurrent review to determine whether the Eligible Person is still confined and when discharge is anticipated. It is the responsibility of the attending health care provider and the Eligible Person to provide Beech Street with information to determine whether it is appropriate to continue confinement beyond the LOS previously determined by Beech Street to be Medically Necessary. Beech Street does not perform concurrent review in instances where inpatient facility charges are not determined with reference to length of stay.

**6. RETROSPECTIVE REVIEW.** Beech Street may perform retrospective review to verify that all physician claims submitted are in accordance with the UM Program's billing guidelines as outlined in the Beech Street Participating Provider manual, and Beech Street may, from time to time, otherwise assess whether the care rendered to the Eligible Person was appropriate for the patient's condition and provided in a cost effective manner.

**7. DISCHARGE PLANNING.** The facility shall perform discharge planning as a means of coordinating and monitoring the Eligible Person's post-hospitalization health care needs. Discharge planning shall be performed during the Eligible Person's inpatient stay in coordination with the attending health care provider, Beech Street and the designated provider of home health care services.

# EXHIBIT C
## BEECH STREET
### PROVIDER APPEAL PROCEDURE

Any Provider (the "Terminated Party") terminated by Beech Street pursuant to the provisions of Section 7.3 of the Agreement to which this EXHIBIT C is attached may file a written request for reconsideration of the termination with Beech Street explaining in detail the reasons why such Terminated Party believes Beech Street should reconsider its decision. Beech Street will determine the issues presented by the request (the "Issues") within thirty (30) days after receipt of Terminated Party's request and such additional information as Beech Street may have requested in order to enable it to evaluate the Issues or will provide such Terminated Party with oral or written progress reports every thirty (30) days until the Issues are resolved. Beech Street will notify the Terminated Party in writing of its determination with respect to the Issues.

If the Terminated Party is not satisfied with Beech Street 's determination such party may request a meeting (the "Grievance Meeting") at Beech Street 's executive offices or at such other location as may be designated by Beech Street, including, in certain cases, Beech Street 's legal counsel and no more than two representatives from the Terminated Party together with such Terminated Party's legal counsel, if desired. Grievance Meetings will be scheduled within 45 days of receipt of a written request for such Grievance Meeting by the Terminated Party. Following the Grievance Meeting Beech Street will notify the Terminated Party in writing of its final determination together with an explanation of the reasons for the determination.

## SCHEDULE 1A
## BEECH STREET/CAPP CARE
## PAYOR OR PRODUCT ALTERNATIVE REIMBURSEMENT SCHEDULE

### FLORIDA

*Provider* will be reimbursed for Workers' Compensation at the lesser of the following:

1)   20% off Provider's usual billed charges; or
2)   20% off the applicable State's current Workers' Compensation Fee Schedule; or
3)   Schedule I Reimbursement

*Provider* will be reimbursed for <u>Auto Medical</u> at the following:

    Schedule I Reimbursement

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6269-CIV-DIMITROULEAS

DRS. MARTIN MAY, ALAN LAZAR,
MARTIN HALE, JOEL RUSH, PAUL ZIDEL,
RICHARD LINN, RICHARD BERKOWITZ,
DOUGLAS STRINGHAM, ANDREW
ELLOWITZ, ALAN NOVICK, DEBRA WEISS,
and NEIL SCHECHTER,

      Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY,

      Defendant.

_____/



## ORDER ON MOTION TO REMAND
## AND MOTION TO DISMISS

THIS CAUSE is before the Court upon Plaintiffs', Drs. Martin May, Alan Lazar, Martin

Hale, Joel Rush, Paul Zidel, Richard Linn, Richard Berkowitz, Douglas Stringham, Andrew

Ellowitz, Alan Novick, Debra Weiss and Neil Schechter Motion for Remand, filed herein on

March 14, 2000 and Defendant, Allstate Insurance Company's Motion to Dismiss, filed herein

on March 1, 2000. The Court has carefully reviewed the motions and is otherwise fully advised

in the premises.

## I. BACKGROUND

Plaintiffs are doctors, who practice under the names "Park Place Therapeutic Center" and

"Park Place Orthopaedics & Rehabilitation." As this entity, they submit claims to Allstate for

payment on behalf of persons insured by Allstate for personal injury protection benefits, and

receive payments from Allstate.

1

EXHIBIT "B"

Defendant, Allstate, sells automobile insurance policies in Florida which contain personal injury protection, pursuant to Florida law. Under the PIP coverage, Allstate agrees to pay 80% of reasonable charges for necessary medical treatment provided to covered insured who suffer injury in an automobile accident. Plaintiffs claim that the amount that they have received, pursuant to bills they have sent to Defendant, of work they have done on Defendant's insureds, is "substantially less than [Allstate] is statutorily and contractually obligated to pay."

On January 21, 2000, Plaintiffs filed a two Count Complaint in the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida. The action was timely removed. The Complaint is for: 1) Declaratory Relief; and 2) Breach of Contract.

Plaintiffs seek remand to State Court, arguing that the amount of PIP benefits paid to Plaintiffs pursuant to illegally obtained discounts by Defendant, compared to the amounts that should have been paid, can not be determined with certainty. They could potentially exceed or fall below the necessary jurisdictional amount, and therefore Defendants cannot provide, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional requirement. Defendant counters this argument by stating that Plaintiffs are engaged together in the practice of medicine, submit the claims together, and receive payments together. Defendant submits the Explanation of Medical Bill Payments and Health Insurance Claim Forms as evidence that Plaintiffs are engaged in a united practice of medicine.

Defendant next moves to dismiss this action. It argues that Plaintiffs do not allege that Allstate offers "preferred provider" PIP coverage under the policy. The insured are entitled to choose the health care provider they want, on their own. Plaintiffs claim that Defendant pays PIP claims for medical benefits at 80% of "preferred provider" rates. Defendant argues that it is not required to offer a "preferred provider" policy to its insured and therefore, has not failed to pay

2

PIP benefits as required by § 627.736, Florida Statutes. Defendant also argues that the Complaint does not establish that it breached an obligation under the PIP coverage or § 627.736(10), Florida Statutes, by paying medical benefits at a "reasonable" rate, if it is less than what Plaintiffs request. Defendant's last argument is that there is no private cause of action permitted for violations of § 627.736(10). In sum, Defendant claims Plaintiffs do not state a claim.

Plaintiffs, in their two page response, argue that they strongly disagree with Defendant's arguments in the dismissal motion, and aver that they do state a claim.

## II. DISCUSSION

### A. Remand

"Any civil case filed in state court may be removed by the defendant to federal court if the case could have been brought originally in federal court." Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1356 (11th Cir. 1996). Federal Jurisdiction should be found, unless it appears within "a legal certainty that the claim is really for less than the jurisdictional amount." Id. at 1356. However, "[w]here a plaintiff has made an unspecified demand for damages, a lower burden of proof is warranted because there is simply no estimate of damages to which a court may defer. Id. at 1356-57; See Gafford v. General Electric Company, 997 F.2d 150, 160 (6th Cir. 1993).

Plaintiffs claim that the amount of controversy in this action can only be determined by calculating the amount of PIP benefits paid individually, to Plaintiffs. However, Plaintiffs are engaged together in the practice of medicine under two names, "Park Place Therapeutic Center" and "Park Place Orthopaedics & Rehabilitation." Plaintiffs submit forms to receive payment, and receive payment collectively. The Health Insurance Claim Forms, submitted by Defendant,

3

shows that the I.D. Number of Referring Physician contains the same tax number on each sheet.

Additionally, in the space marked "Physician's, Supplier's Billing Name...," Park Place

Therapeutic Center is noted on each form. On the Explanation of Medical Bill Payment,

submitted by Defendant, in the space marked, "Treatment Rendered By," is the name Park Place

Therapeutic Center. "[W]hen several plaintiffs unite to enforce a single title or right, in which

they have a common and undivided interest, it is enough if their interests collectively equal the

jurisdictional amount." Troy Bank of Troy, Indiana v. G.A. Whitehead & Company, 222 U.S.

39, 40-41 (1911). The aggregate amount of the reduction of payments clearly exceeds the

$75,000 threshold necessary to confer jurisdiction on this Court.

## B. Dismiss

It is long settled that a complaint should not be dismissed unless it appears beyond a

doubt that the plaintiff could prove no set of facts in support of his claim which would entitle

him to relief. Conley v. Gibson, 355 U.S. 41 (1957). The allegations of the claim must be taken

as true and must be read to include any theory on which the plaintiff may recover. See Linder v.

Portocarrero, 963 F.2d 332, 334-336 (11th Cir.1992) (citing Robertson v. Johnston, 376 F.2d 43

(5th Cir.1967)). There must be a showing that the plaintiff has no claim before granting a motion

to dismiss. June Vernon and Delroy Vernon v. Medical Management Associates of Margate,

Inc., 912 F.Supp. 1549 (S.D.Fla. 1996).

Defendant's first argument is that the Complaint fails to allege a breach of contract or

violation of § 627.736. Plaintiffs allege in their Complaint, that Allstate pays PIP claims for

medical benefits at 80% of "preferred provider" rates. However, Plaintiffs fail to define

"preferred provider" rates, nor do they allege that such rates were not reasonable. Plaintiffs

claim, then, that because Allstate does not provide an option to insureds to purchase a "preferred

4

provider" policy for PIP benefits, it breached its contracts of insurance with its insureds and violated § 627.736(10) by paying at those rates. Therefore, Plaintiffs' only allegation is that Allstate is paying certain health care providers reduced rates which those providers have agreed to accept for medical services covered under the Allstate PIP contracts.

Plaintiffs, in the Complaint, claim that Defendant's standard policy does not comply with § 627.736(1)(a), which necessitates a party to have personal injury protection of "[e]ighty percent of all reasonable expenses for necessary medical..." Plaintiffs claim that they provided medical treatment, and were paid less than what is statutorily and contractually obligated to pay. However, Plaintiff's claims are not based on this Florida Statute.

Plaintiffs also argue that Defendant refers to Plaintiffs actions as "preferred providers," and such designation is improper. § 627.736(10), Florida Statutes, states in pertinent part, "(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as 'preferred providers,' which shall include health care providers...The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits..." Plaintiffs attached the insurance policy to the Complaint. The Court may consider the policy for purposes of a motion to dismiss. Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1369 (11th Cir. 1997); Smith Barney, Inc. v. Scanlon, 180 F.R.D. 444, 446 (S.D.Fla. 1998). Such consideration of a document attached to Plaintiff's complaint does not convert the motion to dismiss into a motion for summary judgment. Id. The policy does not contain the term "preferred providers," and Plaintiffs are not the parties the statute is meant to protect. Additionally, the statute does not state that Defendant must offer a "preferred providers" plan, but only regulates those parties that choose to do so.

5

Defendant argues that the statute was not enacted to benefit medical providers, and therefore, does not allow Plaintiffs to rely on it as their basis for damages. In <u>Fischer v. Metcalf</u>, the Third District Court of Appeals discussed three criteria[1] which are pertinent to whether the legislature intended a statute to benefit a party. They are, "1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; 2) whether there is any indication, either explicit or implicit, of a legislative intent to create or deny such a remedy; and 3) whether judicial implication is consistent with the underlying purposes of the legislative scheme." <u>Fischer v. Metcalf</u>, 543 So.2d 785, 788 (Fla. 3rd DCA 1989); See <u>Cort v. Ash</u>, 422 U.S. 66 (1975).

§ 627.736, Florida Statutes, was not enacted to benefit medical providers. Plaintiffs are not the class whose especial benefit the statute was enacted. The statute was enacted to protect insureds from harm as a result of accidents with other drivers, and actions by insurance companies. The statute was not enacted to ensure that medical providers received what they felt was a reasonable wage. The legislature did not imply, nor can it be inferred, that the medical providers were the parties the statute was enacted to protect. The Court cannot infer that the Legislature intended to protect the medical providers with the enactment of § 627.736. "Legislative intent, rather than duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists when a statute does not expressly provide for one." <u>Murthy v. N. Sinha Corp.</u>, 644 So.2d 983, 985 (Fla. 1994). Plaintiffs claim for relief based on Defendant's alleged violation of § 627.736, Florida, Statutes, does not allege a cause of action.

---

[1] Out of a four part test.

6

The remaining issue is whether Plaintiffs may sue Defendant for paying them what they do not deem to be reasonable rates, as preferred providers. However, the term preferred provider is not mentioned in the insurance policy and Defendant's actions do not resemble the statute's definition of the term preferred provider. Therefore, Plaintiffs claim is based on being intended third party beneficiaries to Defendant's insurance policies. Plaintiffs are not in direct contractual privity with Defendant. "[T]he term 'privity' is a word of art derived from the common law of contracts and used to describe the relationship with persons who are parties to a contract." Espinosa v. Sparber, et al., 612 So.2d 1378, 1380 (Fla. 1993). Usually only parties to a contract may collect on the contract. However, "an intended third party beneficiary of a contract may recover damages from the contracting parties if they breach the contract." Jacobson v. Heritage Quality Construction Co., Inc., 604 So.2d 17, 18 (Fla. 4th DCA 1992). "Essential to the right of a third party beneficiary of a contract to maintain an action for its breach is a clear intent and purpose of the contract to directly and substantially benefit the third party." Thompson v. Commerical Union Insurance Company of N.Y., 250 So.2d 259, 262 (Fla. 1971). The insurance policies between Defendant and the insureds are clear in their intent to directly and substantially benefit Plaintiffs[2]. Plaintiffs, in the present action, "must plead the contract which was expressly for (their) benefit and one under which it clearly appears that (they were) a beneficiary." Weimar v. Yacht Club Point Estates, Inc., 223 So.2d 100, 102 (Fla. 4th DCA 1969). Plaintiffs properly pled that they were intended third party beneficiaries to defeat the motion to dismiss.

## III. CONCLUSION

Plaintiffs did not, nor could they, properly plead a cause of action under § 627.736(1)(a)

---

[2] Although this benefit is not the main crux of the insurance policy.

7

and (10) as the basis of Defendant's liability. The statute does not delineate that there exists such

a cause of action exists, nor is the statute drafted to benefit medical providers. Plaintiffs do state

a cause of action for breach of contract, in that they are the intended third party beneficiaries to

the insurance policy, but not on the basis that they were improperly treated as preferred

providers.

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Remand is hereby **DENIED**;

2. Defendant's Motion to Dismiss is hereby **GRANTED**; in part. Motion to Dismiss

Count I is hereby Granted; Count I is dismissed with prejudice. Motion to Dismiss Count II is

hereby **GRANTED**; Count II dismissed without prejudice, with leave to amend in accordance

with this Order. An Amended Complaint shall be filed within then days of this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this _14_ day of

April, 2000.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Peter Valeta, Esq.
Lawrence Kopelman, Esq.
David B. Shelton, Esq.

8