UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6061-CIV-FERGUSON/SNOW
(Consolidated Case)



DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

Defendants.
____________________________________/

SALVATORE D. LARUSSO, D.C.
d/b/a FAMILY CHIROPRACTIC
CENTER, on behalf of himself
and all others similarly situated,

CASE NO. 01-8111-CIV-FERGUSON

Plaintiff,

vs.

FLORIDA FARM BUREAU CASUALTY
INSURANCE COMPANY,

Defendant.
____________________________________/

**MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANT FLORIDA FARM BUREAU'S MOTION TO DISMISS</u>**[1]

Plaintiff SALVATORE D. LARUSSO, D.C., on behalf of himself and all others similarly situated ("LARUSSO"), by his undersigned counsel, hereby submits his Memorandum of Law in Opposition to Defendant FLORIDA FARM BUREAU CASUALTY INSURANCE COMPANY's



[1]FARM BUREAU's Motion to Dismiss was filed in Case No. 01-8111-CIV-FERGUSON before the matter was consolidated pursuant to this Court's May 14, 2001 oral ruling and September 28, 2001 Omnibus Order.

7090-00100 338740.1



("FARM BUREAU") Motion to Dismiss. For all the reasons set forth herein, LARUSSO respectfully submits that FARM BUREAU'S Motion to Dismiss should be denied in all respects.

## INTRODUCTION

In this Court's November 13, 2001 Report and Recommendation, Magistrate Judge Snow notes that LARUSSO did not file a response to FARM BUREAU'S Motion to Dismiss because the Court had orally denied the Motion at the May 14, 2001 status conference. See Report and Recommendation at p.3, n.1 (Nov. 13, 2001). Although this Court orally denied FARM BUREAU'S Motion to Dismiss, since this Court's September 28, 2001 Omnibus Order ("Omnibus Order") did not refer to the denial of FARM BUREAU'S Motion to Dismiss, in an abundance of caution, LARUSSO hereby files his opposition to FARM BUREAU'S Motion to Dismiss.

## ARGUMENT
**(Incorporation of Prior Memoranda)**

FARM BUREAU's Motion to Dismiss is identical to the Motions to Dismiss this Court has already denied. The claims asserted by LARUSSO against FARM BUREAU are identical to the claims asserted by LARUSSO against Defendant LIBERTY MUTUAL INSURANCE COMPANY in Larusso v. Liberty Mutual Ins. Co., Case No. 00-7692-CIV-FERGUSON and are identical to the claims asserted by Plaintiff DR. PAUL ZIDEL in Zidel v. Allstate Ins. Co., Case No. 00-6061-CIV-FERGUSON. The claims asserted by LARUSSO against FARM BUREAU have also been asserted by Plaintiff MARC J. BROWNER, D.C. in Browner v. Allstate Indemnity Co., Case No. 00-7163-CIV-FERGUSON and by Plaintiff KEITH BRICKELL, D.C. in Brickell v. Progressive Express Ins. Co., et al., Case No. 00-6649-CIV-FERGUSON.

This Court's September 28, 2001 Omnibus Order denied the Motions to Dismiss from Case Nos. 00-6061, 00-6649, 00-7163 and 00-7692, except as to the Lanham Act Counts. The claims asserted by LARUSSO against FARM BUREAU are identical to the claims which this Court has already determined to state valid causes of action. These issues were extensively briefed and rather than restate agreements previously asserted, LARUSSO adopts the various Memoranda of Law filed in Opposition to the Motions to Dismiss in Case No. 00-6649 (D.E. #38 and D.E. # 47); Case No. 00-7163 (D.E. #32 and D.E. #47); and (Case No. 00-6061 (D.E. #38). These memoranda, along with the oral arguments heard before this Court on the various Motions to Dismiss, fully addressed the issues once again raised by FARM BUREAU. Based upon the fact that this Court has already denied Motions to Dismiss identical claims in the other actions, FARM BUREAU's Motion to Dismiss should be similarly denied.

LARUSSO also adopts and reasserts the additional arguments set forth in LARUSSO's Memorandum of Law in Opposition to Defendant HARTFORD INSURANCE COMPANY OF THE MIDWEST's ("HARTFORD") Motion to Dismiss. The Memorandum of Law in Opposition to HARTFORD'S Motion to Dismiss incorporates 12 recent decisions decided during the past year which have found that the utilization of PPO reductions by insurance companies without offering a PPO insurance policy and without complying with Section 627.736(10), Florida Statutes, is invalid and illegal.[2] The Memorandum of Law in Opposition to HARTFORD'S Motion to Dismiss also cites HCA Health Services of Georgia v. Employee's Health Ins. Co., 240 F.3d 982 (11th Cir. 2001),

---

[2]In the recent decision, after a trial, in Dennis M. Jewell v. Nationwide Mutual Insurance Company, Consolidated Case No. 2001 SC 009351 SC, Sarasota County Court, the Court found that Section 627.730(10), Florida Statutes, sets forth the sole method by which an insurance carrier may utilize preferred provider rates.

in which the Eleventh Circuit, under the heightened standards of the Employee Retirement Income Security Act, found silent PPOs to be invalid and damaging to health care providers and insureds. FARM BUREAU'S Motion to Dismiss raises no new arguments. The claims asserted by LARUSSO against FARM BUREAU have already been sustained by this Court and FARM BUREAUS' Motion to Dismiss should be denied.

**ARGUMENT**
**(Specific Response to FARM BUREAU)**

Charging LARUSSO with manufacturing "a complex and jumbled set of racketeering allegations" out of a "simple fee dispute," FARM BUREAU claims that LARUSSO's 38 page Complaint simply "boils down to [his] dissatisfaction with the amounts [FARM BUREAU] reimbursed him for providing medical treatment to the Company's policy holders who had been in car accidents." (Def.'s Mot. Dismiss at 1). On the contrary, LARUSSO's Complaint "boils down to" FARM BUREAU's outright theft of his preferred provider organization ("PPO") discounts and its application of these discounts to automobile insurance Personal Injury Protection ("PIP") claims through the systematic operation of a "Silent PPO" in conjunction with a discount broker, Community Care Network, Inc. ("CCN").

**I. FARM BUREAU'S ASSERTION THAT LARUSSO HAS NOT BEEN DAMAGED IS FALSE AND MISLEADING, AND FURTHER UNDERSCORES THE FRAUD BEING PERPETRATED BY FARM BUREAU.**

Further underscoring the fraudulent nature of its Silent PPO scheme, FARM BUREAU would have the Court believe that LARUSSO has not been damaged because it has paid all that it is required to pay under Section 627.736, Florida Statutes (the "PIP Statute") by paying 80% of LARUSSO's medical bills. According to FARM BUREAU, "Larusso was not damaged by the 20%





preferred provider discount [FARM BUREAU] applied to his bills because the result was Larusso being paid exactly what [FARM BUREAU] owed him under the law."

Although appealing on its face, FARM BUREAU's argument is misleading because it suggests that even by applying the PPO discount FARM BUREAU is in all instances paying 80% of LARUSSO's charges leaving him with no damage. FARM BUREAU blatantly ignores the fact, however, that the patient treated by LARUSSO referred to in the Explanation of Benefits ("EOB") attached as Exhibit 1 to his complaint had a "medical expense option" that required FARM BUREAU to pay 100% of the amount billed by LARUSSO for treatment of that patient. (Compl. ¶ 63). As part of its Silent PPO scheme though, FARM BUREAU applied LARUSSO's PPO discount to LARUSSO's charge ***and then paid him 100% of the reduced amount***. If LARUSSO's patient did not have the "medical expense option," then under its Silent PPO scheme, FARM BUREAU would have paid LARUSSO only 80% of the reduced amount after applying the PPO discount.

Using the charges that appear on LARUSSO's sample EOB as an example of how FARM BUREAU's argument is misleading, LARUSSO submitted total charges of $340.00 for treatment of this particular patient for dates of service of April 18, 19 and 23,1997. In adjusting these charges through its computer database, FARM BUREAU then applied LARUSSO's PPO reductions ($68.00) to the charges resulting in a net balance of $272.00. If the patient ***did not*** have the "medical expense option," then FARM BUREAU would only have paid the Florida PIP statutory requirement of 80% of the $272.00, or $217.60. In this instance, however, FARM BUREAU paid 100% of the $272.00 reduction based on its obligation under the insurance policy as opposed to the ***full $340.00 charge***

***that it was legally required to pay*** leaving LARUSSO with $68.00 of damages as to the services appearing on this particular EOB. (Compl. ¶¶ 64-65).

In either example (i.e., FARM BUREAU paying 80% after the 20% reduction, or paying 100% after the 20% reduction), LARUSSO is damaged by FARM BUREAU's Silent PPO Scheme. In blatant disregard of this fact, however, FARM BUREAU clouds the true nature of its outright theft of LARUSSO's PPO discount by arguing that it has already paid 80% of LARUSSO's bill as statutorily required[3].

## II. FARM BUREAU ADMITS TO THE OPERATION OF A SILENT PPO WHICH HAS BEEN CONDEMNED BY THE ELEVENTH CIRCUIT.

FARM BUREAU admits that it is perpetrating the Silent PPO about which LARUSSO complains. On both pages 2 and 12 of its Motion to Dismiss, FARM BUREAU categorically admits that it *does not* offer preferred provider policies for PIP auto insurance to its policy holders. (Def.'s Mot. at 2, 12). Yet amazingly, FARM BUREAU acknowledges paying LARUSSO only 80% of his PIP charges on the basis of the application of LARUSSO's preferred provider discount with CCN. (Def.'s Mot. at 3). If FARM BUREAU admits that it did not offer PPO auto insurance policies to its insureds, yet still applied a reduction based on a preferred provider contract, then it can only be engaging in the very conduct about which LARUSSO is complaining; a Silent PPO.

---

[3]FARM BUREAU notes that LARUSSO did allege that the patient had a "medical expense option" requiring FARM BUREAU to pay 100% of all medical expenses. (Def.'s Mot. at 3 n. 2). Ignoring outright the fact that they did not pay 100% of LARUSSO's medical expenses, FARM BUREAU then continues that the "chief allegation of the Complaint is that [FARM BUREAU] was not paying Larusso 80% of reasonable and necessary medical expenses. Yet. . .the Company did, in fact, pay 80% of [the]. . . medical expenses." Id. Despite FARM BUREAU's assertions to the contrary, the "chief allegation" of LARUSSO's complaint is **not** that FARM BUREAU was not paying 80% of his medical bills, but that FARM BUREAU was operating a Silent PPO scheme to systematically steal LARUSSO's and other medical providers' PPO discounts. LARUSSO respectfully submits that FARM BUREAU's argument that by paying 80% of LARUSSO's bills he is not damaged is an apparent attempt to distort the facts and obfuscate FARM BUREAU's conduct.

The Eleventh Circuit recently condemned the Silent PPO scheme involving the same MedView PPO contract that is at the center of the present case in HCA Health Servs. of Georgia, Inc., 240 F.3d 983. In HCA Health Servs., the Court of Appeals described a series of "shared savings agreements," or broker contracts, aimed at allowing a third-party payor or insurance company to access discount fees from health care providers without do anything in return for the provider. The broker contracts were between "middleman" MedView Services, Inc.[4], Health Strategies, Inc. (a vendor of health care provider discounts that allows insurance companies to access provider discounts such as those in the MedView PPO network), and Employers Health, Inc., the insurance company that ultimately accessed the MedView PPO discount thanks to the processing by Health Strategies, Inc. HCA Health Servs., 240 F.3d at 986-87.

In a scathingly worded decision, the Court of Appeals denounced this arrangement because the health care provider never receives "steerage" as consideration in exchange for the provider's PPO discount. The Court of Appeals recognized the term "steerage" as meaning "actively encouraging plan participants to seek the services of the providers in the PPO by such means as financial incentives. . . . Steerage also occurs through communication efforts such as providing participants with a list of preferred providers, a hotline to inform and refer participants to preferred providers, and issuing identification cards designed to inform providers that a patient is a participant eligible for the PPO discount." HCA Health Servs., 240 F.3d at 1002, n 43. Without the necessary

[4] MedView is described by the Court of Appeals as "an entity that contracts with [medical care] providers . . . to form a preferred network which MedView then markets to third party payors, usually insurance companies." HCA Health Servs., 240 F.3d at 986.

element of steerage, the Court highlighted the financial piracy taking place at the expense of consumers and providers noting its concern that:

> while participants are deterred from exercising their contractual right to obtain out-of-network medical care, brokers such as HSI are profiting. EHI pays HSI a fee equal to twenty percent (20%) of the discount obtained on each provider bill . . . . In essence, participants pay more (in the form of premium payments) and providers receive less than the usual and customary fee for services. Meanwhile, EHI [the insurance company] collects premium payments which reflect its obligation to pay for out-of-network care while simultaneously refusing to pay the full fee for such care when its obligation arises. Then, EHI [the insurance company] pays HSI [the broker] a percentage of its savings and pockets the remainder.

Id. at 1005, n 50.

Ultimately, the Court of Appeals reasoned that the Silent PPO scheme, if allowed to perpetuate, will cause a "downward spiraling" of the level of health care services as a whole:

> Given that economic principles, not subjective motivations, underlie our analysis, we note that when a provider's fees are reduced yet overhead and other costs of doing business remain constant, something has to give. Of course we are not intimating that, regarding quality of outcomes, a provider will purposely provide less or worse medical care. We are saying that the economic realities of this scenario mean that something has to give, i.e., the level of service. The provider will be forced to take on more patients to offset the reduction in its fee; more patients may result in increased waiting time. Another way the provider can compensate for accepting lower fees is to cut the salaries of his staff or hire fewer staff. Lower salaries may mean a less educated or experienced staff, both of which would impact the level of service a patient receives. Likewise, fewer staff necessarily means there will be less personnel available to attend to the patient; this too impacts the level of service a patient receives. . .

Id. at 1007, n 54.

In the instant case, FARM BUREAU took part in the same type of scheme condemned by the HCA Health Servs. Court. FARM BUREAU admittedly did not offer preferred provider auto policies to its insureds, so it could not possibly provide LARUSSO with the necessary "steerage" to

support the application of the PPO reduction. Yet, FARM BUREAU applied LARUSSO's PPO reductions to his PIP auto claims, despite the fact that it was not offering PPO auto policies.

## III. IN COUNT III LARUSSO PROPERLY STATES A CLAIM UNDER THE RICO STATUTE.

Despite FARM BUREAU's assertion that Count III is a "transparent attempt to secure federal jurisdiction," LARUSSO has properly alleged claims under the RICO statute. While it is true that civil RICO claims have sometimes been criticized by courts as being overly-expansive, in the present action LARUSSO alleges a massive, organized, and continuing fraudulent scheme surrounding the improper application of PPO discounts to PIP insurance claims. It is precisely the kind of conduct for which civil RICO was designed.

### A. FARM BUREAU's RICO Enterprise - The Silent PPO.

According to FARM BUREAU, LARUSSO alleges nothing about FARM BUREAU's RICO enterprise that would indicate that it existed, how it operated, the nature of the enterprise, or who operated it.[5] At the heart of the RICO enterprise alleged by LARUSSO in paragraphs 7-70 is FARM BUREAU's operation, in conjunction with CCN, of a Silent PPO.

LARUSSO is a chiropractor licensed in the State of Florida. (Compl. ¶ 1). Like the health care provider in the HCA Health Servs. case, LARUSSO was a party to a contract with CCN (as successor by merger with MedView Services, Inc.) to be a preferred provider in CCN's preferred provider organization. (Compl. ¶ 36). CCN agreed to market LARUSSO's name, address and available services in CCN's information materials for distribution to its Subscribers and to existing

[5] Under the RICO Act it is unlawful "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise [that affects interstate commerce] through a pattern of racketeering activity." 18 U.S.C. §§ 1962(c).

and potential Payors. (Compl. ¶ 37). In exchange for CCN's marketing efforts aimed at increasing patient volume, LARUSSO agreed to provide health care services to CCN Subscribers at a rate lower than he would normally accept for the same health care services[6]. (Compl. ¶ 45).

LARUSSO's PPO contract with CCN did not authorize CCN to allow automobile insurers that could not increase patient volume, such as FARM BUREAU, to access and apply LARUSSO's PPO discount rates. (Compl. ¶¶ 38, 40). FARM BUREAU never offered a PPO automobile insurance policy to its insureds[7]. (Compl. ¶¶ 14, 39). In fact, Florida has enacted a statute setting forth the requirements for establishing an automobile insurance PPO network which requires an insurer, among other things, to publish the identities of all preferred health care providers in its network with its insureds and to offer premium discounts to its insureds to economically encourage use of the network. See Fla. Stat. § 627.736(10). FARM BUREAU, twice by its own admission in its motion, acknowledges that it "does ***not*** offer preferred policies for PIP automobile insurance." (Def.'s Mot. at 12, 2). (emphasis in the original). Despite these facts, FARM BUREAU obtained access to all of CCN's preferred providers' discount rates knowing that it was not a proper Payor because it did not offer PPO auto policies and could therefor not increase patient volume. (Compl. ¶¶ 41, 46, 47). With CCN's consent, its database of preferred provider discounts was loaded into FARM BUREAU's software. (Compl. ¶ 42). By virtue of FARM BUREAU's access to the CCN

[6]The facts alleged in LARUSSO's complaint concerning the overall structure of the PPO and the expectation of "steerage" are virtually identical to the HCA Health Servs. Case.

[7] If FARM BUREAU *by its own admission* does not offer PPO policies to its insureds, then it seems legally impossible for FARM BUREAU to apply LARUSSO's CCN discounts to PIP auto insurance claims. FARM BUREAU's conduct in this regard is exactly the conduct condemned by the Eleventh Circuit in HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co. as discussed, *supra*.





discount rates, FARM BUREAU began to systematically apply PPO discounts to PIP auto insurance claims even though it did not offer PPO policies in violation of the Florida PIP Statute. (Compl. ¶¶ 48, 57, 66, 69).

In the course of his medical practice, LARUSSO provided medical care to patients who were injured in auto accidents and were entitled to the payment of PIP benefits from FARM BUREAU. (Compl. ¶ 52). At no time prior to their treatment with LARUSSO did these patients receive any marketing materials from FARM BUREAU identifying him as a CCN preferred provider. FARM BUREAU also did not encourage these patients to use LARUSSO's services. (Compl. ¶¶ 53, 55). Indeed, at no time did FARM BUREAU comply with Florida Statutes §627.736(10). (Compl. ¶ 54). After treating these patients, LARUSSO submitted reasonable and necessary medical bills for payment to FARM BUREAU. (Compl. ¶ 56). On receipt of the bills, FARM BUREAU discounted LARUSSO's (and all other members of the purported class) medical bills by using the CCN PPO discount rate claiming that FARM BUREAU was entitled to the discount. (Compl. ¶ 57). After taking the discount, FARM BUREAU routinely printed out EOB forms showing the application of the CCN discount to the medical charge and claiming that FARM BUREAU was entitled to apply the PPO discount. (Compl. ¶¶ 68, 107(d)(e)(f)). Through the operation of this scheme, FARM BUREAU gained access to managed care contract rates without providing any consideration to medical providers, without entering into a contract with medical providers, and without offering a preferred provider auto insurance policy at a reduced premium to its insureds. (Compl. ¶¶ 41, 46, 47, 51, 59, 60, 69).





The above summary from the Complaint describes the classic "silent PPO" scheme engaged in by FARM BUREAU and CCN. It is precisely the kind of illegal scheme described and condemned by the Eleventh Circuit in the HCA Health Servs. case and by the Massachusetts Trial Court in Mitzan v. Medview Services, Inc., 1999 Mass. Super. LEXIS 279 (June 16, 1999). Contractual PPO's, and their legitimate role in the cost-effective provisions of health care services are the subject of numerous judicial opinions. See e.g., HCA Health Services of Virginia v. Metropolitan Life Ins. Co., 957 F.2d 120, 122 (4th Cir. 1991); Ball Memorial Hosp., Inc., v. Mutual Hosp., Inc., v. Mutual Hosp. Ins. Co., 784 F.2d 1325, 1329-30 (7th Cir. 1986); Gavin North Sherwood Chiropractic Clinic v. Bower, 838 F. Supp 274 (M.D. La. 1993).

LARUSSO's "RICO allegations" are more than sufficient to put FARM BUREAU on notice as to the nature of the alleged silent PPO conspiracy. LARUSSO clearly identified the alleged conspirators and the overt acts performed by FARM BUREAU in furtherance of the conspiracy including a limitless number of predicate acts of mail and wire fraud, 18 U.S.C. §§ 1341, 1346, 1343; extortion based on economic fear, 18 U.S.C. §1951(b)(2); and the Travel Act, interstate travel in furtherance of the fraud, 18 U.S.C. § 1952(a). LARUSSO alleged that the intent of the conspiracy was to illegally and surreptitiously apply PPO discounts to legitimate Florida PIP medical claims. And, LARUSSO alleged that he, and the purported class, has suffered financial injury as a result of FARM BUREAU's conduct. Since LARUSSO's allegations are sufficiently specific to put FARM BUREAU on notice of the nature of the conspiracy and the conduct constituting the conspiracy, the Complaint should not be dismissed. See e.g., Primerica Fin. Serv. v. Mitchell, 48 F.Supp.2d 1363,





1369-70 (S.D. Fla. 1998) (finding allegations in complaint sufficiently specific enough to put defendants on notice of nature of conspiracy to avoid Rule 12(b)(6) dismissal).

**B. LARUSSO Adequately Establishes FARM BUREAU's Conspiracy to Perpetrate a Fraud on LARUSSO and the Class.**

A plaintiff can establish a RICO conspiracy claim 1) by showing that the defendant agreed to the overall objective of the conspiracy; or 2) by showing that the defendant agreed to commit two predicate acts. Republic of Panama v. BCCI Holdings, S.A., 119 F.3d 935, 950 (11th Cir. 1997) (citing United States v. Church, 955 F.2d 688, 694 (11th Cir.) (internal quotations and citations omitted), cert. denied, 506 U.S. 881, 113 S. Ct. 233, 121 L. Ed. 2d 169 (1992)). As described *supra*, throughout his Complaint, LARUSSO outlined a complex conspiracy between FARM BUREAU and CCN under which FARM BUREAU would access a computer database of preferred providers and apply their PPO discounts to Florida PIP claims. FARM BUREAU admitted that it does not offer its insureds PPO policies, yet it applied PPO discounts that were obtained from CCN[8] to PIP claims for over two years. It is not difficult to see that the overall objective of the conspiracy was to increase profits at the expense of health care providers. It is hard to believe that FARM BUREAU did not knowingly take part in the Silent PPO scheme in place between it and CCN in violation of Section 1962(d). At a minimum, the RICO agreement can be inferred by FARM BUREAU's conduct. See United States v. Church, 955 F.2d at 695 (RICO agreement need not be established by direct evidence, but can be inferred from conduct of participants).

---

[8]Notably, FARM BUREAU paid CCN a percentage of the amount of money saved by FARM BUREAU when it applied each PPO discount. (Compl. ¶¶ 58, 107(b)). Given this fact, to suggest that FARM BUREAU did not knowingly participate with CCN in the Silent PPO scheme is ludicrous.

C. LARUSSO Has Alleged Multiple Instances of FARM BUREAU's Mail Fraud.

Courts have recognized that if the alleged fraud occurred over an extended period of time and the acts were numerous, the specificity requirements are less stringently applied. Bill Buck Chevrolet, Inc. v. GTE Fla., Inc., 54 F.Supp.2d 1127, 1136 (M.D. Fla. 1999). This relaxed requirement is applied where "strict application of Rule 9(b) could result in substantial unfairness to private litigants who could not possibly have detailed knowledge of all the circumstances surrounding the alleged fraud." Id. (quoting NCR Credit Corp. v. Reptron Electronics, Inc., 155 F.R.D. 690, 692 (M.D. Fla. 1994).

In the Complaint, LARUSSO details FARM BUREAU's fraudulent conduct spanning over two years. LARUSSO identifies the precise fraudulent statements contained in the EOBs that were mailed to providers by FARM BUREAU as part of its scheme. On the face of the EOBs (a sample of which was attached as Exhibit 1 to the Complaint), FARM BUREAU states the actual amount billed by the health care provider, the amount of the PPO reduction, and that the reduction is based on the provider's PPO contract with MedView Services. (Compl. ¶¶ 49, 50, 61-65, 68, 69, 107(d)(f)). LARUSSO leaves no question that FARM BUREAU is responsible for the statements and that the EOBs are used in furtherance of its Silent PPO scheme[9]. (Compl. ¶¶ 49, 120, 126, 130). LARUSSO also alleges how the statements in the EOB misleadingly assert that FARM BUREAU

[9]FARM BUREAU disingenuously asserts that the EOB attached as Exhibit 1 to the Complaint "cannot be taken as an instance of mailing, because on its face it does not even come from [FARM BUREAU], but instead appears to be from 'HCO Networks, Inc.'" (Def.'s Mot. at 8 n. 6). FARM BUREAU conveniently ignores the facts that on its face FARM BUREAU is identified as the "Insurer," FARM BUREAU's "Claim Number" is referenced, and FARM BUREAU's policy holder is identified as the "Claimant." Little doubt remains that the EOBs are mailed in furtherance of FARM BUREAU's Silent PPO scheme. By pointing to HCO Networks, Inc. and then trying to disassociate itself from the mailing to avoid culpability, FARM BUREAU just again underscores the fraudulent nature of its entire PPO Scheme.





is entitled to apply the PPO discount when FARM BUREAU does not even offer a PPO auto insurance policy to its insureds. (Compl. ¶¶ 47, 49, 50, 107(d)(f),128(b)). Finally, LARUSSO properly asserts that FARM BUREAU has profited as a result of its misleading EOBs. (Compl. ¶¶ 51, 109, 115, 120, 127, 130). There can be little doubt that LARUSSO has satisfactorily alerted FARM BUREAU to the precise misconduct surrounding the mailing of the EOBs with which it is charged in compliance with Rule 9's heightened pleadings requirements. See Primerica Fin. Serv. v. Mitchell, 48 F.Supp.2d at 1369-70.

FARM BUREAU also urges that LARUSSO's mail fraud predicate acts fail because he has not alleged the element of fraud. It has been established, however, that even entirely truthful and innocent mailings can constitute mail fraud so long as they are in furtherance of a scheme to defraud. Florida Software Sys. v. Columbia/HCA Healthcare Corp., 46 F.Supp.2d 1276, 1282-83 (M.D. Fla. 1999) (citing Schmuck v. United States, 489 U.S. 705, 715, 109 S. Ct. 1443 (1989); Demerath Land Co. v. Sparr, 48 F.3d 353, 355 (8th Cir. 1995)("It is not necessary that the mailings themselves be misleading or constitute the actual fraud, they must merely be in furtherance of the plan or scheme to defraud.")). Thus, in the present case it does not matter whether the statements on the EOBs were fraudulent or not[10]. All that matters is that LARUSSO allege that the EOBs were mailed in

[10]LARUSSO denies that the EOBs sent by FARM BUREAU do not contain fraudulent statements. The EOB clearly states the actual amount charged by LARUSSO for his medical service in the "Billed Amount" column, and the amount of the PPO discount paid by FARM BUREAU in the "PPO Reduction" column. FARM BUREAU also clearly states on the EOB that "these PPO/UCR reductions are according to your contract with MEDVIEW SERVICES, INC." FARM BUREAU stretches the bounds of credulity by suggesting that these statements taken as a whole mean something other than that FARM BUREAU has a right to apply LARUSSO's PPO discounts by virtue of some claimed relationship between FARM BUREAU and LARUSSO's PPO. Indeed, "fraudulent intent may be inferred from 'the relationship among the parties to the transaction and the secrecy of the [transaction], or from inadequacy of consideration and hasty, unusual transactions.'" Florida Software Sys., 46 F.Supp.2d at 1282 (quoting In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1041 (2nd Cir. 1984)(citations omitted)).





furtherance of FARM BUREAU's scheme to defraud. LARUSSO has sufficiently alleged that as part of FARM BUREAU's Silent PPO scheme, FARM BUREAU mailed to LARUSSO, and the members of the purported class, EOBs showing the application of the PPO discount to PIP charges and that the reductions were made according to the PPO contract with MedView. (Compl. ¶¶ 49, 50, 61, 62, 68, 107(d)(e)(f), 128(a)(b)).

**D. LARUSSO Has Properly Alleged FARM BUREAU's Wire Fraud.**

In the context of a civil RICO action, "mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property; and (2) uses the mails or wires in furtherance of that scheme." Ayers v. GMC, 234 F.3d 514, 520 (11th Cir. 2000) (quoting Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir.1991)). LARUSSO alleged that FARM BUREAU, in conjunction with CCN (as successor in interest to MedView Services), transmitted fraudulent information pertaining to the application of his preferred provider discounts to Florida PIP claims in furtherance of its Silent PPO scheme. CCN, as the PPO broker or "middleman," provided FARM BUREAU with computer access to PPO discounts in exchange for a percentage of the savings realized by FARM BUREAU. (Compl. ¶¶ 58, 107(a)-(c)). LARUSSO alleged that in furtherance of the Silent PPO scheme, FARM BUREAU and CCN transmitted information through interstate telephone calls and/or electronic computer communications regarding the illegal PPO





discounts and its Silent PPO scheme, and transmitted funds and contracts across state lines[11]. (Compl. ¶¶ 107(g), 118, 119, 126, 129).

**E. LARUSSO Has Properly Alleged FARM BUREAU'S Hobbs Act Violations.**

LARUSSO also alleges that FARM BUREAU's conduct was in direct violation of the Hobbs Act which prohibits anyone from in any way or degree obstructing, delaying, or affecting commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempting or conspiring to do so, or committing or threatening physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section[12]. 18 U.S.C. § 1951(a). The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. 18 U.S.C. § 1951(b).

Specifically, LARUSSO alleges that through its fraudulent conduct, FARM BUREAU caused him and other healthcare providers to part with property interests, including the intangible property right to conduct their business free from fraud, by exploiting a fear of economic loss or loss of business. (Compl. ¶ 133). Fear of economic loss is a type of fear within the purview of Section 1951. United States v. Haimowitz, 725 F.2d 1561, 1572 (11th Cir. 1984). Furthermore, the fear experienced by the victim does not have to be the consequence of a direct threat. Id. Hobbs Act extortion can be found if the circumstances render the victim's fear reasonable. Id. (citing United

---

[11]FARM BUREAU argues that "if the wire communications were between Larusso and [FARM BUREAU], Larusso's claim must fail because this activity would be, by definition, ***intra***state, not ***inter***state." (Def. Motion at 10). Nowhere in his Complaint does LARUSSO suggest that he had wire communications with FARM BUREAU that constituted a violation of Section 1343. FARM BUREAU then urges that if LARUSSO is alleging that the communications were between FARM BUREAU and CCN, then the claim still must fail because LARUSSO's allegations are not specific enough. (Def. Motion at 11). FARM BUREAU's "Rule 9 specificity argument," however, has been addressed throughout this Opposition, and should fail with respect to the wire fraud claims.

[12]Extortionate conduct in violation of Section 1951 is included in the term "racketeering activity" under Section 1961(1). 18 U.S.C. § 1961(1).

States v. Kopituk, 690 F.2d 1289, 1328 (11th Cir.1982), cert. denied, 463 U.S. 1209 (1983); United States v. Sander, 615 F.2d 215, 218 (5th Cir.1980); United States v. Quinn, 514 F.2d 1250, 1266-67 (5th Cir.1975), cert. denied, 424 U.S. 955 (1976)).

LARUSSO alleges that FARM BUREAU illicitly retained his PPO discounts through the exploitation of a health care provider's fear of economic loss and/or loss of business by refusing to contest the illegal discounts. (Compl. ¶ 135). In today's "managed care marketplace," this fear is both rational and reasonable. LARUSSO was a party to the MedView PPO contract that was later merged with CCN. (Compl. ¶ 22). The MedView PPO contract prohibits LARUSSO from "balance billing" patients. As part of its scheme, FARM BUREAU issues EOBs on which it states that it is applying LARUSSO's MedView PPO discounts. By its statements, FARM BUREAU leads LARUSSO and his patients to believe that FARM BUREAU is entitled to apply the PPO discount to the PIP claims. LARUSSO is now faced with a proverbial "two-edged sword;" if he balance bills the patient, he risks both the PPO claiming that he is violating the PPO contract and the wrath of the patient for attempting to collect a balance to which they have been lead to believe LARUSSO is not entitled. Knowing LARUSSO's predicament, FARM BUREAU is exploiting LARUSSO's fear of "balance billing" his patients for the unpaid balance of his PIP medical expenses.

## CONCLUSION

For all the reasons set forth herein, Plaintiff SALVATORE D. LARUSSO, D.C., on behalf of himself and all others similarly situated, respectfully requests that this Court enter an Order

denying Defendant FLORIDA FARM BUREAU CASUALTY INSURANCE COMPANY's Motion to Dismiss, together with such other and further relief as this Court may deem just and proper.

Respectfully submitted,

ATLAS PEARLMAN, P.A.
Co-Counsel for Class Plaintiffs
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301
(954) 763-1200
(954) 766-7800 Facsimile

By:______________________
JAN DOUGLAS ATLAS
Florida Bar No. 226246

By:______________________
ERIC LEE
Florida Bar No. 961299

By:______________________
ROBIN CORWIN CAMPBELL
Florida Bar No. 327931

**Co-Counsel for Class Plaintiffs**

GOLD & COULSON
A Partnership of Professional and
Limited Liability Corporation
11 S. LaSalle Street
Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile





PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A
Bank of America Tower
One Financial Plaza
Suite 2510
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by mail this 21st day of November, 2001 upon: all individuals on the attached service list.

ERIC LEE





# MASTER SERVICE LIST
## (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)
(Updated 10/26/01)

**Co-Lead Counsel for Plaintiffs**

ATLAS PEARLMAN, P.A.
Eric Lee, Esq.
lee@atlaslaw.com
Jan Douglas Atlas, Esq.
atlas@atlaslaw.com
Robin Corwin Campbell, Esq.
campbell@atlaslaw.com
Suite 1700
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301
(954) 763-1200
(954) 766-7800 Facsimile

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphillips@phillipsgarcia.com
Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 2510
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
personalinjurylawyer@earthlink.net
Suite 200
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-8879
(813) 251-5786 Facsimile

RICHARD BOKOR, P.A.
Richard Bokor, Esq.
rabokor1@tampabay.rr.com
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-1000
(813) 254-6327 Facsimile

Casey Fundaro, Esq.
fundaro@aol.com
1100 5th Avenue S., Suite 201
Naples, FL 34102-6407
(941) 435-7995

**Counsel for:**
**Allstate, Fidelity and Casualty,**
**Continental, Deerbrook**

RUMBERGER, KIRK &
CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 Facsimile

**Counsel for Beech Street and ADP**

TEW, CARDENAS,et al.
John M. Quaranta, Esq.
(305)539-2495
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1116 Facsimile

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

**Counsel for CCN**

MCGUIRE WOODS, LLP
William W. Deem, Esq.
wdeem@mcguirewoods.com
William E. Adams, Esq.
badams@mcguirewoods.com
3300 Bank of America Tower
50 North Laura Street
Jacksonville, FL 32202
(904) 798-3200
(904) 798-3207 Facsimile






**Counsel for Nationwide**

FOWLER, WHITE, et al.
Katherine C. Lake, Esq.
klake@fowlerwhite.com
Post Office Box 1438
Tampa, FL 33601
(813) 228-7411
(813) 229-8313 Facsimile

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esq.
haggerty@scdlaw.com
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316
(215) 299-4314
(215) 299-4301 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Robert K. Levenson, Esq.
rlevenson@hklaw.com
Greg Baldwin, Esq.
gbaldwin@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 Facsimile

**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT et al.
Mark Shapiro, Esq.
mshapiro@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for:**
**Hartford, Metropolitan, Integon**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Metropolitan**

SONNENSCHEIN, NATH & ROSENTHAL
Jeffrey P. Lennard, Esq.
jpl@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000
(312) 876-7934

**Counsel for Hartford**

MAYER, BROWN & PLATT
Howard J. Roin, Esq.
hroin@mayerbrown.com
190 South LaSalle Street
Chicago, IL, 60603-3441
(312) 782-0600
(312) 701-7711 Facsimile

**Counsel for Superior**

BUTLER BURNETT PAPPAS
Alan J. Nisberg, Esq.
anisberg@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for Prudential**

BUTLER BURNETT PAPPAS
Kathy J. Maus, Esq.
kmaus@bbplaw.com
Lauren D. Levy, Esq.
llevy@bbplaw.com
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308
(850) 894-4111
(850) 894-4999 Facsimile

SHEA & GARDNER
John D. Aldock, Esq.
Jaldock@SheaGardner.com
Jeffrey M. Klein, Esq.
Jklein@SheaGardner.com
Michael Isenman, Esq.
misenman@sheagardner.com
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
(202) 828-2000
(202) 828-2195 Facsimile

**Counsel for American International**

CONROY, SIMBERG, GANON, KREVANS & ABEL, P.A.
Dale L. Friedman, Esq.
dfriedman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Boulevard
Second Floor
Hollywood, FL 33021
(954) 961-1400
(954) 967-8577 Facsimile


7090-00100 318823.1

