UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

DR PAUL ZIDEL, on behalf of himself and
others similarly situated,

      Plaintiff,

v.

ALLSTATE INSURANCE COMPANY,

      Defendant/Third Party Plaintiff,

v.

COMMUNITY CARE NETWORK, INC.,
doing business as CCN,

      Third Party Defendant.

_____

ULTRA OPEN MRI CORPORATION, on
behalf of itself and all others similarly situated,

      Plaintiff,

vs.

PROGRESSIVE AMERICAN INSURANCE
COMPANY,

      Defendant.

_____/

Case No. 01-6776

**NIGHT BOX
FILED**

DEC 28 2001

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

**PROGRESSIVE AMERICAN'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S AMENDED
MOTION FOR CLASS CERTIFICATION**

    The Defendant, PROGRESSIVE AMERICAN INSURANCE COMPANY ("PROGRESSIVE"), hereby files its Memorandum of Law in Opposition to the Amended Motion for Class Certification filed herein by the Plaintiff, ULTRA OPEN MRI CORPORATION ("UOMC"), and states as follows:

**BACKGROUND**

    This is an action for damages and equitable relief arising out of a series of contractual relationships, which define the parties' rights and obligations with respect to the provision of and



ANANIA, BANDKLAYDER, BLACKWELL, BAUMGARTEN & TORRICELLA
BANK OF AMERICA TOWER, PENTHOUSE ONE • SECOND STREET, SUITE 4300, MIAMI, FLORIDA 33131 • TELEPHONE (305) 373-4900 • FACSIMILE (305) 373-6914

reimbursement for health care services rendered to non-party insureds, who were involved in motor vehicle accidents.

As alleged in the Complaint, UOMC entered into a Preferred Provider Agreement ("Agreement") with Beech Street Corporation ("Beech Street"). Beech Street, a California corporation, enters into "contracts with healthcare providers, such as UOMC, for the purpose of uniting healthcare providers with commercial payors to coordinate and arrange for the delivery of healthcare services to the payors' legitimate subscribers. . . The contracts entered into with healthcare providers by Beech Street require the healthcare providers to accept fees for services to subscribers at discounted rates. . ." *See* Amended Complaint, Paragraph Nos. 14 and 15.

Under the express terms of that Agreement, UOMC agreed to participate in Beech Street's provider program. *See* Beech Street Ancillary Provider Agreement attached as Exhibit A. UOMC's Agreement further provides that Beech Street "has or will enter into agreements with Payors," that Beech Street "will provide [UOMC] with a current list of Payors who have executed agreements with Beech Street," and that "Beech Street shall notify Payor or Payor's plan administrators that [UOMC] has agreed to participate in the Beech Street Preferred Provider Program and to provide Covered Services for a set fee under the terms of [the] Agreement." Agreement at p. 1 and Sections 3.1 and 3.3, respectively.[1]

Consistent with its Agreement with UOMC, Beech Street subsequently entered into agreements with PROGRESSIVE, whereby, among other things, PROGRESSIVE became authorized to access Beech Street's network of providers and, accordingly, became authorized Payors within the meaning of the UOMC/Beech Street Agreement. PROGRESSIVE, through ADP Integrated Medical Solutions, Inc. ("ADP"), then began adjusting bills that UOMC submitted for services rendered to its insureds in accordance with the Agreement.

---

[1] The Agreement defines "Payor" to include, among others, an "**insurance carrier**...which has an obligation to provide Benefits to a Beneficiary **and which has entered into an agreement with Beech Street to participate in its Preferred Provider Program**." *Id.* at Section 1.5 (emphasis added).

## STATEMENT OF PROCEEDINGS

After transacting business on the foregoing basis, without objection, UOMC filed suit against PROGRESSIVE claiming that the parties' contractual relationships violate the RICO Act. UOMC further alleges that PROGRESSIVE has been unjustly enriched, has breached its insurance contracts, has perpetrated a fraud on UOMC and other similarly situated health care providers, and has violated Florida's PIP statute. UOMC also seeks declaratory and injunctive relief, punitive damages, and attorneys' fees.

In its Amended Motion for Class Certification, UOMC seeks permission to prosecute its claims on behalf of the following proposed class:

> [a]ll Florida healthcare providers whose bills for medical services rendered to patients covered by PROGRESSIVE's automobile insurance policies were discounted by PROGRESSIVE based upon a purported Beech Street Preferred Provider Organization reduction.

UOMC's Class Action Complaint at p. 12. However, a review of the record and the applicable authorities conclusively demonstrates that UOMC's Motion is premature, as a matter of law. Moreover, UOMC has not met and cannot meet its burden with respect to any of Fed. R. Civ. P. 23's mandatory preconditions to class certification. Accordingly, this Court should either defer ruling on or deny UOMC's Amended Motion for Class Certification.

## ARGUMENT

**I.    UOMC'S MOTION FOR CLASS CERTIFICATION IS PREMATURE, AS A MATTER OF LAW, BECAUSE PROGRESSIVE HAS NOT BEEN AFFORDED A REASONABLE OPPORTUNITY TO CONDUCT DISCOVERY RELATING TO THE CLASS CERTIFICATION ISSUE**

UOMC's Motion for Class Certification is premature, in that PROGRESSIVE has not been afforded a reasonable opportunity to conduct discovery, including the deposition of UOMC, to determine, among other things, the impracticability of joinder, the commonality and typicality of its claims, and its commitment and ability to adequately represent the interests of the putative class. *See, e.g., In re American Medical Sys., Inc.*, 75 F.3d 1069, 1086 (6th Cir. 1996) (citing *Chateau de Ville Prods., Inc. v. Tams-Witmark Music Library, Inc.*, 586 F.2d 962, 966 (2d Cir. 1978) for the

well-settled proposition that a district "court should defer decision on [class] certification pending discovery if the record is inadequate for resolving the relevant issue"). *See also Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1313 (4th Cir. 1978) (noting that "discovery is to be encouraged" on the class issue). Accordingly, this Court should defer ruling on Plaintiff's Motion until PROGRESSIVE has had a reasonable opportunity to conduct discovery on the class certification issue.

## II.    UOMC IS NOT ENTITLED TO CLASS CERTIFICATION, AS A MATTER OF LAW, BECAUSE IT HAS NOT ADEQUATELY DEFINED THE PUTATIVE CLASS AND HAS NOT SATISFIED ITS BURDEN UNDER RULES 23(a) AND 23(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Rule 23 of the Federal Rules of Civil Procedure, which governs the pleading and prosecution of class action complaints in federal court, makes it clear that a party seeking class certification bears the initial burden of establishing that: (1) the putative class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact that are common to the class ("commonality"); (3) the party's claims or defenses are typical of the claims or defenses of the class ("typicality"); and (4) the party will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). *See also Sandlin v. Shapiro & Fishman*, 168 F.R.D. 662 (M.D. Fla. 1996)(movant for class certification bears a "strict" burden of persuasion with respect to each of the elements of Rule 23). In addition, the movant must demonstrate that the purported class falls within one of the categories set forth in Rule 23(b)(*e.g.*, that the questions of law or fact common to the members of the putative class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy). Fed. R. Civ. P. 23(b)(3).

As a general rule, a movant's failure to satisfy his burden with respect to any of the Rule 23 elements is fatal to a motion for class certification. *See, e.g., Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 721, n. 2 (11th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988). *See also Amchem Products, Inc. v. Windsor*, 521 U.S. 591(1997)(wherein the Court notes that class certification requires a "searching inquiry" into, and "strict compliance" with, each element of Rule 23(a) and 23(b)). Courts also routinely deny class certification where a movant has not adequately defined

the class and/or it is not clearly ascertainable. *See, e.g., DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)(holding that it is "elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable"). *See also O'Connor v. Boeing North Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)(wherein the court states that the definition of the putative class should be "precise, objective and presently ascertainable"). Significantly, UOMC has not adequately defined the putative class, nor has it satisfied its burden with respect to the numerosity, commonality, typicality, or adequacy requirements of Rule 23. Accordingly, this Court should deny UOMC's Motion, as a matter of law.

A.    UOMC Has Not Met Its Burden of Establishing That Joinder of the Members of the Putative Class Would Be Impracticable

Fed. R. Civ. P. 23(a)(1) provides that a class action is appropriate only "if the class is so numerous that joinder of all members is impracticable." However, the mere size of a putative class, standing alone, is not sufficient to satisfy the impracticability requirement of Rule 23(a)(1). *See, e.g., Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980), *cert. denied*, 449 U.S. 1113 (1981); *Minersville Coal Co. v. Anthracite Export Ass'n*, 55 F.R.D. 426 (M.D. Pa. 1971)(wherein the court refused to grant certification to a class that potentially included more than 300 independent anthracite producers, in part, because the "class [was] not so numerous that joinder of all members was impracticable"). *See also Spectrum Fin. Co. v. Marconsult, Inc.*, 608 F.2d 377 (9th Cir. 1979)(in which the court held that the movant had not met his burden of establishing that joinder of 92 members of the class was impracticable, because each could be identified and reached for litigation communication).

Instead, in determining whether joinder is impracticable, a district court should consider several factors, including, but not limited to, the size of the proposed class, the geographic dispersion of the putative class members, the nature of the action, the ease of identifying the names and addresses of prospective class members, the size of the claims of the class members, whether class certification would further the interests of judicial economy, the inconvenience of trying individual lawsuits, and the ability of individual class members to institute individual lawsuits. *See,*

*e.g., Walco Inv., Inc. v. Thenen*, 168 F.R.D. 315, 324 (S.D. Fla. 1996). *See also Powers v. Government Employees Ins. Co.,* 192 F.R.D. 313, 316-17 (S.D. Fla. 1998). Finally, unfounded speculation regarding the anticipated size of the class and the other factors is not enough to satisfy Rule 23(a)(1). *See Brooks v. Southern Bell Tel. & Tel. Co.*, 133 F.R.D. 54, 56 (S.D. Fla. 1990) ("Court cannot rely on conclusory allegations which parrot the provisions of Rule 23 to support certification").

Here, UOMC attempts to satisfy its burden under Rule 23(a)(1) by "estimating" that the number of Florida health care providers affected by PROGRESSIVE Defendant's activities is "estimated to be in the thousands." Plaintiff's Amended Memo at p. 7. UOMC's estimate is "based on the fact that Beech Street is a national preferred provider organization that provides managed healthcare services through a panel . . . consisting of highly qualified and credentialed healthcare professionals." *Id.* Significantly, however, aside from a conclusory and unsubstantiated assertion on Page 7 of its Memorandum, UOMC makes no effort to quantify the number of those individuals that also are or, during the applicable time period, were insureds under automobile policies issued by PROGRESSIVE. *Id.* at p. 8 (wherein UOMC boldly asserts that "PROGRESSIVE is a significant automobile insurance underwriter in Florida and has issued thousands of policies in Florida providing PIP coverage"). UOMC also proffers no evidence which would enable this Court to quantify what portion of the latter population, if any, were involved in injury producing automobile accidents, let alone sought treatment for their injuries from a Beech Street provider. (wherein UOMC simply states that "one can rationally **assume** that thousands of individuals [insured by PROGRESSIVE] have been involved in motor vehicle accidents resulting in personal injuries who have received medical care [from Beech Street's preferred providers]"). *Id.* Indeed, if UOMC's allegations regarding the absence of a referral mechanism are accurate, such a class is likely to be very small, since the insureds' treatment by a Beech Street provider would occur, if at all, only through happenstance.

In addition, UOMC has not disclosed what steps, if any, it has taken to identify the names and addresses of the prospective class members or, alternatively, demonstrated that it would be

ANANIA, BANDKLAYDER, BLACKWELL, BAUMGARTEN & TORRICELLA

BANK OF AMERICA TOWER, 100 S.E. SECOND STREET, SUITE 4200, MIAMI, FLORIDA 33131-2144 • TELEPHONE (305) 373-4900 • FACSIMILE (305) 373-6914

impracticable to identify, name, and communicate with those entities. Moreover, UOMC has not explained why or how class certification would further the interests of judicial or litigant economy, nor has it explained why a federal class is preferable to having those providers, who share its distorted interpretation of the applicable Florida Statutes and provider agreements, litigate individual lawsuits, many of which could likely be resolved expeditiously in county court. In addition, UOMC has not demonstrated that the class of health care providers allegedly affected by "Defendant's activities" do not have the means and the ability to institute and prosecute their own individual lawsuits if they truly believe that PROGRESSIVE has not properly interpreted and administered the applicable agreements. The absence of such a proffer, together with UOMC's unsubstantiated "estimates" and "assumptions" regarding the prospective class, are wholly insufficient to satisfy its burden with respect to the impracticability requirements of Rule 23(a)(1) and mandate the denial of its Motion for Class Certification.

B.    The Nature of the Substantive Claims and Defenses of the Putative Class and the Variations in the Facts Underlying Those Claims Preclude a Finding of the "Commonality" That Rule 23(a)(2) Requires

In order to satisfy its burden with respect to the second mandatory pre-condition to class certification, UOMC must establish that "there are questions of law or fact common to the class." Rule 23(a)(2). Typically, Rule 23(a)(2) does not require that there be "commonality" as to all questions of law and fact among the claims of the prospective class members. *See, e.g., Haitian Refugee Ctr., Inc. v. Nelson*, 694 F. Supp. 864, 877 (S.D. Fla. 1988), *aff'd*, 872 F.2d 1555 (11th Cir. 1989). However, notwithstanding the presence of some common questions of law and fact, a number of federal courts in the Southern District and elsewhere have denied class certification, based on a movant's failure to satisfy the requirements of Rule 23(a)(2), where the nature of the substantive claims and defenses and variations in the facts underlying those claims preclude a finding of "commonality." *See, e.g., Brooks v. Southern Bell Tel. & Tel. Co.*, 133 F.R.D. 54 (S.D. Fla. 1990). *See also Graham v. Security Sav. & Loan*, 125 F.R.D. 687 (N.D. Ind. 1989); *Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123 (D.N.J. 1989)(refusing to grant class certification to employees of a convenience store, who were seeking to assert RICO and state anti-racketeering

claims against their former employer); *Polich v. Burlington N., Inc.*, 116 F.R.D. 258 (D. Mont. 1987); *Wucsina v. Reliance Elec. Co.*, 129 F.R.D. 164 (N.D. Ind. 1986)(wherein the court denied certification to a class of the defendant's former employees, who were seeking to recover severance pay under a collective bargaining agreement, in part because the resolution of the claims of the class would require 15 distinct interpretations of the collective bargaining agreement, due to the disparate layoff dates of the putative class members).

In *Brooks*, for example, employees of Southern Bell filed suit against their employer and AT&T to enforce their purported contractual right to free local and long distance telephone service, a right which plaintiffs claimed they had earned by working for Southern Bell for thirty (30) years prior to the divestiture of AT&T in 1984. Plaintiffs then sought to certify a class comprised of more than 5,000 other Southern Bell employees, who also had spent more than thirty (30) years working for Southern Bell before the divestiture and allegedly had, but were being denied, similar contractual rights to free local and long distance service. The defendants opposed the motion, claiming that the plaintiffs had not met their burden with respect to any of the requirements of Rule 23. The district court agreed and denied the motion. In reaching its decision, the court emphasized, among other things, that each of the prospective class members allegedly had a contract with the defendants, whose "terms and conditions [would] require specific, individualized proof." *Id.* at 56, 57. Moreover, once each member established those contracts and their terms and conditions, the court would have to determine, again on a contract by contract basis, the applicability of any legal defense which would bar plaintiffs' claims, including certain individualized defenses [such as] statutes of limitation, laches, waiver, and course of dealings between the parties." *Id.* at 57. Consequently, the court concluded that "it was not only conceivable, but probable, that [it] would be required to hear evidence regarding the existence, terms, modifications, and limitations of each alleged contract of the over 5,000 prospective class members." *Id.* Based on these considerations, the court held that there existed little commonality of fact and law, other than the common theories of relief, which, standing alone, was not sufficient to satisfy the requirements of Rule 23(a)(1).

ANANIA, BANDKLAYDER, BLACKWELL, BAUMGARTEN & TORRICELLA

BANK OF AMERICA TOWER, 100 S.E. SECOND STREET, SUITE 4300, MIAMI, FLORIDA 33131 • TELEPHONE (305) 373-4900 • FACSIMILE (305) 373-6914

The court in *Polich* reached a similar result in an action predicated on claims of common law fraud, fraudulent misrepresentation, and promissory estoppel. In *Polich,* a group of former railroad employees, who lost their jobs when the defendant railroad closed the locomotive and rail shops where they had worked, filed suit claiming that the defendants had promised in1970 and, again, in 1981, that they "would never close the shops." Plaintiffs, in turn, sought to certify a class that included "all railroad employees of the defendants adversely affected by defendants' closure of the railroad shops and facilities." 116 F.R.D. at 261. Defendants opposed the motion, claiming, in part, that the individualized nature of proof in common law fraud cases precluded a finding of commonality and mandated the denial of the motion. The district court agreed. In doing so, the court emphasized that each employee affected by the closure brought a "unique set of facts to the case" with respect to when they worked for the shops, the circumstances under which they left or lost their jobs, whether they were even aware of the defendants' purported misrepresentations, the extent to which they relied on those representations, if at all, and the nature and extent of the affected employees' consequent and proximate damage arising from the defendants' allegedly tortious conduct. *Id.* at 261-62. Based on these considerations, the court concluded that "the common questions of fact and law required by Rule 23(a)(1) are absent in this case." *Id.* at 262. Accordingly, it refused to grant class certification.

There is no principled basis for distinguishing this case from *Polich* and *Brooks* on the issue of "commonality." Like *Brooks*, each of the providers UOMC seeks to include in the class had or has a separate contract with Beech Street. Those contracts, in turn, were, in all likelihood, the product of unique negotiations and pre-contractual representations and, consequently, may contain differing terms, conditions, and discounted rate schedules. Moreover, each of those providers treated different patients, who may have been insured by any one of a number of Progressive entities. In addition, they presumably rendered unique health care services to each of the insureds, the reasonable cost of which, in all likelihood, differed considerably by geographic location. Finally, but no less significantly, the defenses to each provider's claim also are likely to be case specific (*e.g.*, laches, waiver, estoppel, course of dealing, and statutes of limitations), as are the

providers' alleged damages, if any. Indeed, aside from the fact that each member of the prospective class may have a common cause of action (*i.e.*, for breach of contract) against PROGRESSIVE, there is almost no legal or factual commonality between their claims.

The lack of commonality is even more pronounced with respect to UOMC's RICO Act claims, since they are predicated almost exclusively on allegations of fraud, which, by definition, are unique to each of the prospective class members. Specifically, to prevail on their claims, each provider will be required to establish that PROGRESSIVE made a misrepresentation of material fact to him or her with the intent to induce the provider to rely on it, that the provider did, in fact, reasonably and justifiably rely on that misrepresentation, and that the provider suffered damages as a direct and proximate result of that reliance. Such claims simply cannot and do not satisfy the commonality requirement of Rule 23(a)(1). *See, e.g., Casper v. Cunard Line, Ltd.*, 560 F. Supp. 240 (E.D. Pa. 1983)(wherein the court refused to certify a class action on behalf of passengers who allegedly were fraudulently induced to book passage on a ship, noting that the alleged oral and written representations varied from passenger to passenger, as did the passengers' reliance and damages, making it impossible for plaintiff to satisfy Rule 23(a)(1)'s "commonality" requirement). *See also Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998)(denying class certification to franchisees in breach of fiduciary duty, fraud and negligent misrepresentation action against franchisor for misuse of common advertising funds, based on its conclusion that where the rights of the putative class members arise out of fraudulent representations that may vary widely between class members and are dependent on the individual class members' reliance on those representations, they are not suitable for class wide relief); *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996)(holding that "a fraud class action cannot be certified when individual reliance will be an issue"). Accordingly, this Court must deny Plaintiff's Amended Motion for Class Certification.

### III. THIS COURT ALSO SHOULD DENY UOMC'S AMENDED MOTION FOR CLASS CERTIFICATION, BECAUSE THE ISSUES AFFECTING INDIVIDUAL MEMBERS OF THE PUTATIVE CLASS PREDOMINATE OVER QUESTIONS OF LAW OR FACT COMMON TO THE CLASS AS A WHOLE AND A CLASS ACTION IS NOT A SUPERIOR METHOD FOR ADJUDICATING THIS CONTROVERSY

Even if UOMC could satisfy the requirements of Rule 23(a), which, for the reasons set forth above, it cannot, this Court would be required to deny its Amended Motion for Class Certification, because it has not met and cannot meet its burden under Rule 23(b)(3). A party seeking class certification under that Rule must demonstrate that "questions of law or fact common to the members of the class predominate over any questions affecting individual members." Fed. R. Civ. P. 23(b)(3). Stated otherwise, "a plaintiff must demonstrate that issues which are subject to generalized proof predominate over issues that require individualized proof." *Powers v. Government Employees Ins. Co.,* 192 F.R.D. 313, 318 (S.D. Fla. 1998) (citing *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir. 1997)). *See also Israel v. Avis Rent-A-Car Systems, Inc.,* 185 F.R.D. 372, 384 (S.D. Fla. 1999), *rev'd on other grounds,* 211 F.3d 1228 (11th Cir. 2000) (noting that "the predominance inquiry [of Rule 23(b)(3)] is far more demanding than Rule 23(a)'s commonality requirement"). Rule 23(b)(3) also requires a movant to demonstrate that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." *Id.* The purpose of the latter requirement is to afford a means of vindication for groups of people who individually would be without effective strength to bring their opponents into court at all. *Amchem Products, Inc.,* 521 U.S. 617. Thus, in determining the issue of "superiority," a district should consider, among other things: (1) the prospective class members' interest in prosecuting and controlling their own actions; (2) the extent and nature of other litigation already filed by prospective class members; (3) the desirability of focusing the litigation in a particular forum; and (4) the difficulties likely to be encountered in managing the prospective class action. Fed. R. Civ. P. 23(b)(3).

The arguments and authorities that mandate the conclusion that UOMC has not satisfied and cannot satisfy the "commonality" requirement of Rule 23(a)(2), apply with equal force to UOMC's efforts to satisfy Rule 23(b)(3)'s "predominance" requirement and require a similar conclusion. UOMC also has not satisfied its burden with regard to the "superiority" element of Rule 23(b)(3), because it cannot fairly represent to the Court that the individual members of the prospective class of Florida **health care professionals** lack the financial means, motivation, or ability to maintain their own actions against PROGRESSIVE, if they truly believe they have been wronged by PROGRESSIVE's alleged acts and omissions. Indeed, prior to the filing of UOMC's Complaint, at least one group of health care providers, who otherwise would have been included in the class, sought identical relief against PROGRESSIVE in Broward County Circuit Court, *see Drs. Martin May, et al. v. Progressive American Ins. Co., et al.,* Case No. 00-001434 CACE 05. Although the *May* plaintiffs later voluntarily dismissed their case, its filing belies UOMC's contention that the proposed class action is a superior or more efficient means of resolving the issues raised in this action and further supports the denial of Plaintiff's Amended Motion for Class Certification.

## CONCLUSION

Based on the foregoing arguments and authorities, the Defendant, PROGRESSIVE AMERICAN INSURANCE COMPANY, respectfully requests that this Court either deny Plaintiff's Amended Motion for Class Certification and that it award PROGRESSIVE any and all such further relief to which it is entitled.

Case No. 00-06061-CIV FERGUSON
Page 13

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served by first

class mail this 28th day of December, 2001, to all counsel listed on the attached service list.

ANANIA, BANDKLAYDER, BLACKWELL,
BAUMGARTEN & TORRICELLA
Attorneys for PROGRESSIVE
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
Telephone:    (305) 373-4900
Facsimile:    (305) 373-6914

By: _____
       Francis A. Anania
       Florida Bar No. 160256
       *fanania@anania-law.com*
       Donald A. Blackwell
       Florida Bar No. 370967
       *dblackwell@anania-law.com*
       Ana Rivero-Alexander
       Florida Bar No. 872490
       *aalexander@anania-law.com*

G:\DATA\JAM2\Progressive\Ultra Open MRI Corporation\Memo-opp to mtn for class cert.wpd

## MASTER SERVICE LIST
### Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW

**Co-Lead Counsel for Plaintiffs**

Jan Douglas Atlas, Esq.
Eric Lee, Esq.
Robin Corwin Campbell, Esq.
ATLAS PEARLMAN, P.A.
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, Florida 33301

Arthur S. Gold, Esq.
GOLD & COULSON
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603

Andrew Garcia, Esq.
Carlin Phillips, Esq.
PHILLIPS & GARCIA
13 Ventura Drive
North Darthmouth, MA 02747

Larry Kopelman, Esq.
Doulgas Blankman, Esq.
KOPELMAN & BLANKMAN, P.A.
Bank of America Tower
One Financial Plaza, Suite 1611
Fort Lauderdale, Florida 33394

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
230 East Davis Boulevard, Suite 200
Tampa, FL 33606

Richard Bokor, Esq.
RICHARD BOKOR, P.A.
230 East Davis Boulevard
Tampa, FL 33606

Casey Fundaro, Esq.
1100 5th Avenue S., Suite 201
Naples, FL 34102-6407

**Counsel for Allstate, Fidelity and Casualty, Continental, Deerbrook**

David B. Shelton, Esq.
RUMBERGER, KIRK & CALDWELL
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, FL 32802-1873

Peter J. Valeta, Esq.
ROSS & HARDIES
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601

**Counsel for Beech Street and ADP**

Thomas Tew, Esq.
Joseph A. DeMaria, Esq.
John M. Quaranta, Esq.
TEW, CARDENAS, et al.
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336

**Counsel for Progressive**

Francis Anania, Esq.
Donald A. Blackwell, Esq.
ANANIA, BANDKLAYDER, et al.
NationsBank Tower, Suite 4300
100 S.E. Second Street
Miami, Florida 33131

**Counsel for CCN**

William W. Deem, Esq.
William E. Adams, Esq.
MCGUIRE WOODS, LLP
3300 Bank of America Center
50 N. Laura Street
Post Office Box 4099 (32201)
Jacksonville, FL 32202

**Counsel for Nationwide**

Katherine C. Lake, Esq.
FOWLER, WHITE, et al.
Post Office Box 1438
Tampa, FL 33601

James C. Haggerty, Esq.
SWARTZ, CAMPBELL & DETWEILER
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316

**Counsel for Florida Farm Bureau**

Gregory A. Baldwin, Esq.
Robert K. Levenson, Esq.
HOLLAND & KNIGHT, LLP
701 Brickell Avenue, Suite 3000
Miami, Florida 33131

**Counsel for Liberty Mutual**

Mark Shapiro, Esq.
AKERMAN, SENTERFITT, et al.
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, Florida 33131

**Counsel for Hartford, Metropolitan, Integon**

Marcy Levine Aldrich, Esq.
AKERMAN, SENTERFITT, et al
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, FL 33131

**Counsel for Metropolitan**

Jeffrey P. Lennard, Esq.
SONNENSCHEIN, NATH &
ROSENTHAL
8000 Sears Tower
Chicago, IL 60606

**Counsel for Hartford**

Howard J. Roin, Esq.
MAYER, BROWN & PLATT
190 South LaSalle Street
Chicago, IL 60603-3441

**Counsel for Prudential**

John D. Aldock, Esq.
Jeffrey M. Klein, Esq.
Michael Isenman, Esq.
SHEA & GARDNER
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

Kathy Johnson Maus, Esq.
Lauren D. Levy, Esq.
BUTLER BURNETT PAPPAS
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308-3469

**Counsel for Superior**

Alan J. Nisberg, Esq.
BUTLER BURNETT PAPPAS
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607

**Counsel for American International**

Dale L. Friedman, Esq.
Brian P. Knight, Esq.
CONROY, SIMBERG, GANNON,
KREVANS & ABEL, P.A.
3440 Hollywood Boulevard, 2nd Floor
Hollywood, FL 33021

## BEECH STREET ANCILLARY PROVIDER AGREEMENT

This ANCILLARY PROVIDER AGREEMENT ("Agreement") is made and entered into by and between Beech Street Corporation, a California Corporation ("Beech Street") and _____ ("Ancillary Provider").

### RECITALS:

A.  Beech Street.  Beech Street, as agent and attorney-in-fact for Payors (as defined herein), arranges, manages and maintains national preferred provider organizations and networks of such organizations; to obtain quality, cost efficient health care services, of selected health care providers; to market and administer the provision of such services; and to negotiate agreements with purchasers and providers of such services.

B.  Ancillary Provider.  Ancillary Provider desires to provide such health care services.

NOW, THEREFORE, in consideration of the premises, mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE I – PREAMBLE AND RECITALS

The preamble and recitals set forth above are hereby incorporated into and made a part of this Agreement.

### ARTICLE II – DEFINITIONS

2.1 Plans.  "Plans" means the individual or group medical benefit programs of Payor, including, without limitation, insurance policies and administrative services only agreements, benefits services only agreements, third party administrator agreements, multiple employer trusts, pre-paid plans, competitive medical plans, governmental programs and self-insured plans and trusts.

2.2 Eligible Persons. "Eligible Persons" means the persons who (i) are entitled to receive Covered Services pursuant to a plan, and (ii) have been issued and present to Provider either (a) Plan identification cards bearing the name Beech Street or CAPP CARE, the Beech Street or CAPP CARE logo, or (b) other information identifying such persons as persons entitled to access the Beech Street Network.

2.3 Covered Services.  "Covered Services" means the health care services and supplies provided pursuant to a Plan.

2.4 Facility Provider.  "Facility Provider" means a health care facility that has entered into an agreement with Beech Street to provide Covered Services to Eligible persons.

2.5 Participating Providers.  "Participating Providers" means all of health care providers who have in force and effect agreements with Beech Street to provide Covered Services to Eligible Persons.

2.6 Standard Terms and Conditions.  "Standard Terms and Conditions" means the terms and conditions established by Beech Street and accepted by Payors, attached hereto as EXHIBIT A.

2.7 UM Program.  "UM Program," means the utilization management program developed established and administered by Beech Street, summarized in EXHIBIT B.

2.8 Payor.  "Payor" means the party responsible for providing the reimbursement for Covered Services on behalf of Eligible Persons, including, without limitation, insurance carriers, self-insured employers, pre-paid plans, third party administrators, trust funds, competitive medical plans, governmental programs and administrative service groups.  The current list of Payors will be made available to Provider upon request.

2.9 Beech Street Reimbursement Schedule.  "Beech Street Reimbursement Schedule" means the schedule of maximum reimbursement amounts for Covered Services established from time to time by Beech Street and accepted by Payor, attached hereto as SCHEDULE 1.

2.10 Payor or Product Alternative Reimbursement Schedule.  "Payor or Product Alternative Reimbursement Schedule" means the schedule of maximum reimbursement amounts for Covered Services established by a Payor or Beech Street for Plans or Products offered by Beech Street to Provider as an alternative to the Beech Street Schedule 1 Reimbursement Schedule.

2.11 Beech Street Network.  "Beech Street Network" means an arrangement of Participating Providers in a geographic area in which Ancillary Provider furnishes Covered Services and the collective grouping of all such arrangements regionally or nationally.

7/99                                                    1

EXHIBIT

A

04/13/01  FRI 14:59  [TX/RX NO 6155]

2.12 Medically Necessary. "Medically Necessary" or Medical Necessity" means services or supplies which, under the provisions of this Agreement, are determined to be: (i) Appropriate for the symptoms, diagnosis or treatment of the injury or disease; (ii) provided for the diagnosis or direct care and treatment of the injury or disease; (iii) within standards of good medical practice within the organized medical community; (iv) not primarily for the convenience of the Eligible Person or of any Participating Provider providing Covered Services to the Eligible Person; and (v) an appropriate supply or level of service needed to provide safe and adequate care.

## ARTICLE III – STANDARD TERMS AND CONDITIONS AND REIMBURSEMENT SCHEDULE

3.1 Standard Terms and Conditions; Reimbursement Schedule. (i) Ancillary Provider accepts the Standard Terms and Conditions and the Beech Street Reimbursement Schedule. (ii) Ancillary Provider shall provide Covered Services to Eligible Persons of each Payor subject to the terms hereof. If the participation of any Payor with respect to Ancillary Provider in the Beech Street Network shall be withdrawn, Ancillary Provider shall provide Covered Services to Eligible Persons of each such Payor through the effective date of withdrawal of such Payor.

3.2 Payor or Product Alternative Reimbursement Schedule. If a Payor desiring to access the Beech Street Network does not pay for Covered Services on the basis contemplated by the Beech Street Schedule 1 Reimbursement Schedule, or if Beech Street determines that a Product line will be reimbursed different from Schedule 1, Beech Street may submit to Ancillary Provider a Payor or Product Alternative Reimbursement Schedule. Ancillary Provider shall have the option to reject any such Payor Alternative Reimbursement Schedule by giving Beech Street written notice within fifteen (15) days of receipt. If Ancillary Provider does not give Beech Street notice of rejection within such fifteen (15) day period, the Payor or Product Alternative Reimbursement Schedule shall become the Beech Street Reimbursement Schedule for such Payor or Product line, and Ancillary Provider shall provide Covered Services to Eligible Persons of such Payor or Product line in accordance with that Reimbursement Schedule.

3.3 Renewal of Reimbursement Schedule. The term of the Beech Street Reimbursement Schedule shall be as set forth therein. During any such term, the parties may agree upon a new reimbursement schedule, which shall be effective upon the expiration of the then current Beech Street Reimbursement Schedule ("Current Schedule") or as otherwise provided in the new reimbursement schedule. If the parties shall not agree upon a new reimbursement schedule, the Current Schedule shall remain in effect for an additional term equal to that of the Current Schedule, unless this Agreement shall be terminated pursuant to Section 7.4.

## ARTICLE IV – OBLIGATIONS OF ANCILLARY PROVIDER

4.1 Ancillary Provider Services and Obligations. Ancillary Provider shall, and Ancillary Provider hereby warrants and Represents that each employee, agent and contractor of Ancillary Provider that furnishes Covered Services as provided hereunder, shall:

4.1.1 accept assignment of Eligible Persons' claims for reimbursement for Covered Services furnished by Ancillary Provider by obtaining necessary authorization from Eligible Persons to bill Payors, and bill Payors directly on Universal Insurance Claim forms, Superbills, UB-92 or other claim Forms acceptable to Payor, within sixty (60) days after providing Covered Services to Eligible Persons. Such bills shall indicate Ancillary Provider's then-current identifying information (name, address and tax identification number, license number and telephone number) as required. Ancillary Provider shall notify Beech Street in writing from time to time of any changes in such identifying information from that previously furnished Beech Street, and all such bills, regardless of the location at which Covered Services were provided, shall be submitted using only the identifying information which Ancillary Provider shall have most recently provided to Beech Street; and

4.1.2 accept as full payment for Covered Services the lesser of billed charges or the reimbursement amount provided in the Beech Street Reimbursement Schedule; and

4.1.3 during the term of the Agreement, continue to hold a proper and unrestricted license, certificate, registration or other valid authorization necessary to perform the services required by this Agreement, be and continue to be accredited by any applicable accrediting body, be and remain Medicare certified, if applicable, and give written notice to Beech Street within ten (10) days in the event such authorization, accreditation or certification shall be restricted in any way or terminated. Ancillary Provider warrants that Ancillary Provider holds such license, certificate, registration or other valid authorization as of the Effective Date of this Agreement; and

4.1.4 notify Beech Street in the event that Ancillary Provider has received notice of any professional liability claim against Ancillary Provider or any disciplinary action by a duly authorized body or health care facility against Ancillary Provider; and

04/13/01  FRI 14:59  [TX/RX NO 6155]

4.1.5 notify Beech Street of any disciplinary action or any judgment or settlement with respect to any professional liability claim involving Ancillary Provider that is reported or required to be reported to any agency or organization which authorizes Ancillary Provider to perform the services required by this Agreement; and

4.1.6 treat Eligible Persons in all respects as Ancillary Provider treats all other patients; and determine whether or not to accept Eligible Persons for treatment only on the basis of the same Criteria employed by Ancillary Provider to make such Determinations in connection with all other patients similarly situated; and

4.1.7 within the dictates of good practice, and in the best interests of Eligible Persons under Ancillary Provider's care, attempt to refer such Eligible Persons requiring referral to other Participating Providers; and

4.1.8 comply with and is hereby bound by the UM Program as presently enacted by Beech Street and participate in and observe the protocols of the UM Program as presently enacted by Beech Street and participate in and observe the protocols of the UM Program. Beech Street may amend the UM Program by sending any substantive amendment to Ancillary Provider, which amendment shall be effective thirty (30) days following receipt by Ancillary Provider, unless Ancillary Provider provides written notice of rejection during such period. If Ancillary Provider rejects such amendment such amendment shall not be given effect; PROVIDED, HOWEVER that Beech Street shall have the option to terminate this Agreement upon notice to Ancillary Provider and subject to section 7.5, and such termination shall be effective sixty (60) days subsequent to such notice to Ancillary Provider; and

4.1.9 acknowledge that; (i) neither Beech Street nor Payor practices medicine or any other profession; (ii) Beech Street does not control the provision of Covered Services to Eligible Persons; and (iii) Ancillary Provider shall be responsible for the care and treatment of Eligible Persons receiving Covered services from Ancillary Provider, notwithstanding the receipt by Ancillary Provider, whether in writing or otherwise, of any information, recommendation, authorization or failure to grant authorization regarding such care or treatment that may be issued by CAPP CARE or its agent pursuant to the UM Program or otherwise, or by any other person or entity performing utilization management or review or other similar services with respect to such Eligible persons; and

4.1.10 subject to Sections 5.2 and 5.3, provide Beech Street and Payors with access, upon reasonable notice during normal business hours, to pertinent records and information regarding covered Services rendered to Eligible Persons for inspection and copying in such a manner as may be reasonably requested. (i) by Beech Street to permit Beech Street to implement the UM Program and perform its administrative obligations set forth herein; and (ii) by Payor or by Beech Street on behalf of Payor to permit Payor to verify claims for Covered Services submitted by Ancillary Provider. All such information shall be in such content and format as is reasonably necessary and appropriate to the purposes referred to above, and all reasonable costs of inspection and copying shall be borne by Beech Street or Payor, as applicable.

4.2 Changes in Tax Identification Number. Ancillary Provider shall provide written ("Notice") to Beech Street of the application for or receipt of a new tax identification number ("ID Number") by Ancillary Provider or by such other entity that desires to be bound by the terms of this Agreement ("Successor"), which Notice shall include the reason for such application. Actual knowledge by Beech Street of any change in Ancillary Provider's ID Number shall also constitute "Notice", as such term is used herein. Beech Street may terminate this Agreement, effective as of the Notice date and subject to Section 7.5, upon written notice to Ancillary Provider no more than (30) days following receipt by Beech Street of the Notice. If Beech Street fails to terminate this Agreement as Provided herein, Ancillary Provider or Successor shall promptly execute and deliver to Beech Street an assumption Agreement, in form acceptable to Beech Street, pursuant to which Ancillary Provider or Successor shall agree to assume and be bound by the duties and obligations of Ancillary Provider under this Agreement. Following the date of the Notice, neither Ancillary Provider nor Successor shall submit any bill or other claim for payment for Covered Services furnished to Eligible Persons until ten (10) days Following the receipt, if any, by Beech Street of the executed assumption agreement.

## ARTICLE V – CONFIDENTIAL INFORMATION

5.1 Legal Restrictions. Neither party hereto shall be in default for failure to supply information which cannot be supplied due to prevailing law or for supplying information required to be supplied due to prevailing law.

5.2 Confidentiality. Each party may, in the course of the relationship established by this Agreement, disclose to the other party in confidence non-public information concerning patient treatment and/or finances, and such party's earnings, volume of business, methods, systems, practices, plans and other confidential or commercially valuable proprietary information (collectively, "Confidential Information"). Each party acknowledges that the disclosing party shall at all times be and remain the owner of all Confidential Information disclosed by such party, and that the party to whom Confidential Information is disclosed may use such Confidential Information only in furtherance of the purposes and Obligations of this Agreement. The party to whom any Confidential Information is disclosed shall use its best efforts, consistent with the manner in which it protects its own Confidential Information which such party knows or reasonably should know that the other party deems to be Confidential Information. Neither party shall use for its own benefit, or disclose to third parties any Confidential Information of the other party without such other party's written concent.

7/99                                                    3

MAR-02-01 06:14AM FROM-BEECH STREET                                   T-922 P.005/011 F-848

5.3 Medical Records. The parties shall maintain the confidentiality of the medical records of each Eligible Person, and the release of any information reflected therein shall require the consent of such Eligible Persons unless otherwise permitted or required under applicable law.

5.4 Trademarks and Copyrights. Beech Street and Ancillary Provider each reserve the right to the control and use of its respective names, copyrights, symbols, trademarks, and service marks presently existing or later established. Neither party shall use the other party's name, copyrights, symbols, trademarks, or service marks in advertising or promotional material or otherwise without the prior written consent of such other party. Any use by a party, without the approval of the other party, of the name, copyrights, symbols, trademarks or service marks of such other party shall cease immediately upon the earlier of written notice of such other party or termination of their Agreement. Ancillary Provider hereby grants Beech Street and each payor, upon the prior approval of Beech Street, the right to use the name, address, nature of services furnished by Ancillary Provider and other pertinent biographical data of Ancillary Provider in connection with the obligations of Beech Street hereunder, including, with limitation, in Participating Provider directories and referral services.

## ARTICLE VI – INSURANCE

6.1 Ancillary Provider. Ancillary Provider shall secure and maintain during the term of this Agreement, at its expense, in amounts reasonably satisfactory to Beech Street, policies of comprehensive general liability and professional liability insurance with companies reasonably acceptable to Beech Street. Upon request, Ancillary Provider shall provide Beech Street with satisfactory evidence of such insurance, indicating applicable scope of coverage and policy limits, deductibles, co-insurance and term, which evidence may, at Beech Street's option, be in the form of a certificate from the carrier. Ancillary Provider shall provide Beech Street with prior notification of any cancellation, non-renewal or other material change in such insurance. Upon Beech Street's request, Ancillary Provider shall arrange for such policies to provide for advance written notice to Beech Street, at the same time Ancillary Provider (i) notified, of any such cancellation, non-renewal or material change.

6.2 Beech Street. Beech Street shall maintain preferred provider organization professional liability insurance or coverage and comprehensive general liability coverage.

## ARTICLE VII – TERM AND TERMINATION

7.1 Term. The term of this Agreement commence on the first day of the month following the month in which this Agreement is accepted by Beech Street ("Effective Date") and shall continue indefinitely unless either party shall give the other party at least ninety (90) days prior to written notice of termination, with or without cause.

7.2 Termination for Breach. Except as otherwise specifically provided in Section 7.3, either party may terminate this Agreement upon breach of this Agreement by the other party not remedied within sixty (60) days after receipt by such other party of written notice thereof from the terminating party.

7.3 Termination by Beech Street. Beech Street may terminate this Agreement immediately, upon notice to Ancillary Provider if Ancillary Provider: (i) fails to comply with Section 4.1.4; (ii) fails to comply with Section 4.1.5; (iii) fails to comply with Section 4.1.6; (iv) fails to comply with Section 4.1.9; (v) rejects an amendment to the UM Program, in which event termination will be in accordance with Section 4.1.9; (vi) gives Beech Street notice of a new ID Number in accordance with Section 4.2; (vii) fails to comply with Section 6.1; (viii) commits professional misconduct or, in the determination of Beech Street, has been subject to an excessive number of professional liability claims; (ix) acts in a manner which in the determination of Beech Street, threatens serious injury to the reputation of Beech Street or in a manner which may adversely affect the ability of Beech Street to conduct business, (x) is subject to an indictment or information for a felony, or to any disciplinary action referred to in Section 4.1.5; or (xi) upon the sale, exchange or other disposition of substantially all of the property and/or assets of Ancillary Provider, the merger or consolidation of Ancillary Provider with any other corporation, the sale of stock or transfer of membership in Ancillary Provider in an amount which constitutes fifty percent (50%) or more of the voting rights of the stockholders or members of Ancillary Provider or the transfer of the management of Ancillary Provider to an unrelated entity.

7.4 Termination for Non – Negotiation of Beech Street Reimbursement Schedule. If the parties shall fail to agree upon a new reimbursement schedule pursuant to section 3.3, either party may terminate this Agreement upon notice to the other party prior to the expiration of the Current Schedule, which termination shall be effective ninety (90) days following such expiration. During such Ninety-(90) day period, the terms of the Current Schedule shall remain in effect.

7.5 Procedure Upon Termination. Upon termination, all rights and obligations hereunder shall cease except those as provided in this Section 7.5 or those, which shall have theretofore accrued as a result of the operation of this Agreement. In the event of the termination of this Agreement and consistent with applicable law, Ancillary Provider shall:

7/99                                                    4

7.5.1 remain liable for the provision of Covered Services subsequent to such termination to Eligible Persons who shall be receiving Covered Services from Ancillary Provider until the conclusion of any course of treatment for a specific condition existing as of such termination or the discharge, transfer or other conclusion of the provision of such Covered Services to such Eligible Persons; and

7.5.2 immediately discontinue use of any and all signs, plaques, letterheads, forms or other materials identifying Ancillary Provider as a Participating Provider; and

7.5.3 immediately disclose to each Eligible Person in Ancillary Provider's care and each Eligible Person who subsequently requests treatment, in the form prescribed by Beech Street, the possible adverse economic consequences to such Eligible Persons of such termination; and

7.5.4 in the absence of the foregoing disclosure, assume and be fully responsible for any difference in benefits payable by such Eligible Persons' Payors in consequence of such termination.

# VIII – MISCELLANEOUS PROVISIONS

8.1 Non Exclusivity. This Agreement shall not be intended or construed to prevent either party from entering into substantially similar Agreements with other entities similar to the other party.

8.2 Ancillary Provider – Patient Relationships. This Agreement shall not be intended nor shall it be construed to affect any Ancillary Provider-patient relationship.

8.3 Independent Contractors. Each party, its officer's agents and employees are at all times independent contractors to the other party. Nothing in this Agreement shall be construed to make or render either party or any of its officers, agents, or employees and agent, servant, or employee of, or joint venturer of or with, the other.

8.4 Notices. All notices shall be in writing, effective on delivery, addressed to Beech Street or Provider at the addresses set forth below, or to any other address specified in writing by such party.

8.5 Entire Agreement; Agreements Superseded. This Agreement represents the entire agreement and understanding of the parties and all prior or concurrent agreements, whether written or oral, in regard to the subject matter hereof are and have been merged herein and superseded hereby, and any such existing agreement between Ancillary Provider and any Payor shall be superseded hereby. This Agreement may be amended by written consent of both parties; effective on the date of the amendment or at such other time as said amendment may provide.

8.6 Compliance with Terms. Failure to insist upon strict compliance with any of the terms herein (by way of waiver or breach) by either party hereto shall not be deemed to be a continuous waiver in the event of any future breach or waiver of any condition hereunder.

8.7 Rights of Parties. Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to this Agreement and to their respective successors and assigns.

8.8 Assignment. This Agreement may be assigned upon written notice to the parties hereto.

8.9 Benefits. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, personal representatives, executors, administrators, successors and assigns.

8.10 Gender and Number. The use of the masculine, feminine or neuter gender and the use of the singular and plural shall not be given the effect of any exclusion or limitation herein; and the use of the work "person" or "party" shall mean and include any individual, trust, corporation, partnership or other entity.

8.11 Severability. If any portions of this Agreement shall for any reason, be invalid or unenforceable, such portions shall be ineffective only to the extent of such invalidity or unenforceability, and the remaining portion or portions shall nevertheless be valid, enforceable and of full force and effect.

8.12 Multiple Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute a single instrument.

8.13 Conflict of Laws. This Agreement shall be governed by the laws of the State of California, without giving effect to its conflicts of law provisions.

7/99                                                    5

8.14 **Medicare Requirements.** If Ancillary Provider seeks reimbursement from the federal government for all or part of the services provided by Beech Street under this Agreement, upon proper demand, Beech Street shall permit the Comptroller General of the United States, the Department of Health and Human Services and their duly authorized representatives access to Beech Street's books, documents and records relating to each service rendered under this Agreement for a period of four (4) years after such service is rendered, if the provisions of Section 952 of the Omnibus Reconciliation Act of 1980 (P.L. 96-449) and 42 C.F.R. part 420 Subpart D are deemed to apply to the services provided under this Agreement. Authority for similar access will be included in any Subcontract for the provision of services under this Agreement between Beech Street and any organization related to it, where the cost or value of such subcontract is TEN THOUSAND DOLLARS ($10,000.00) or more in a twelve (12) month period.

IN WITNESS WHEREOF, the parties hereto have set their hands on the dates set forth below ~~as of the~~ Effective Date. as of 10/1/00.

_____
Signature of Ancillary Provider

_Ultra Open MRI Corporation ( Corporation )_
Name of Ancillary Provider   Type of Corporation (for profit or professional)
Partnership (if applicable)

_Florida_
State of Incorporation (if applicable)

_P99000096303_
State License, Certificate or other Authorization Number

_6449 38th Ave N.  Suite E-3_
Address

_St. Petersburg  FL  33710_
City, State, Zip Code

_Pinellas_          _(727) 343-6376_
County            Telephone Number

_59-3605967_
Federal Tax I.D. or Social Security Number

_C25B3_            _8-31-2000_
Medicare Provider Number   Date Executed by Ancillary Provider

Beech Street Corporation
173 Technology Drive
Irvine, CA 92618

By: _____

Name: _____Charles Busch_____

Title: _____Regional Vice President_____

_9/11/00_
Date Executed by Beech Street

BEECH STREET ANCILLARY SERVICE AGREEMENT SCHEDULE 1 OF REIMBURSEMENTS

Facility: _Ultra Open MRI Corporation_
Federal Tax ID #: __59-3605962__

### ALL SERVICES

This BEECH STREET Reimbursement Schedule represents the payment due to Facility for providing Covered Services to Eligible Persons. The Scope of Services covered by this Schedule 1 includes all inpatient services, outpatient services provided on or off campus, and all services billed under the above listed Federal Tax Identification number. Facility represents a discount from facility's usual and customary charge in effect as of the date of service. Service categories with a Per Diem, Case Rate, or Straight Discount reimbursement methodology include all facility charges, exclusive of professional fees unless footnoted. Service categories with Package Rate reimbursement include both facility and professional fees.

| Service Category | Maximum LOS | Reimbursement Amount | Foot Type | Note |
|---|---|---|---|---|
| All Services | N/A | 40.00% | Straight Discount | |

Legend: CR=Case Rate; PD=Per Diem; PKG=Package Rate; SD=Straight Discount; N/A=No Maximum Los; PM= Per Month
PV=Per Visit; PH=Per Hour; PI=Per Item

☑ 010

## BEECH STREET ANCILLARY SERVICE AGREEMENT
Payor Alternative Reimbursement Schedule

Facility: _____ Ultra Open MRI Corporation _____

Federal Tax ID #: _____ 59-3605967 _____

## ALL SERVICES

This BEECH STREET Reimbursement Schedule represents the payment due to Facility for providing Covered Services to Eligible Persons. The Scope of Services covered includes all inpatient services, outpatient services provided on or off campus, and all services billed under the above listed Federal Tax Identification number. Facility represents a discount from facility's usual and customary charge in effect as of the date of service. Service categories with a Per Diem, Case Rate, or Straight Discount reimbursement methodology include all facility charges, exclusive of professional fees unless footnoted. Service categories with Package Rate reimbursement include both facility and professional fees.

Service Category

All Services:

Facility will be reimbursed for Workers' Compensation at the lesser of the following:

1)   Schedule 1 Reimbursement or

2)   90% of the applicable State's current Workers' Compensation Fee Schedule

Facility will be reimbursed for Auto Medical at:

1)   Schedule 1 Reimbursement

Legend: CR=Case Rate; PD=Per Diem; PKG=Package Rate; SD=Straight Discount; N/A=No Maximum Los; PM=Per Month PV=Per Visit; PH=Per Hour; PI=Per Item

1

# EXHIBIT A
## BEECH STREET
## STANDARD TERMS AND CONDITIONS

The following shall constitute the Standard Terms and Conditions as defined in this Agreement. Beech Street represents that all Payors have authorized Beech Street to bind such Payors to the following Standard Terms and Conditions:

**1. COVERED SERVICES.** Participating Provider shall furnish to Eligible Persons those Medically Necessary Covered Services customarily furnished to the general public by such Participating Provider in the same physical setting and in the same manner as such services are customarily provided to other similarly situated patients of Participating Provider.

**2. PAYMENT TO PATICIPATING PROVIDER.** Pursuant to the terms of the applicable Plan, Payor or its agent and the Eligible Person shall pay to Participating Provider and Participating Provider shall accept the amounts set forth in the applicable Beech Street Reimbursement Schedule as full payment of any claim submitted by Participating Provider for Covered Services furnished to Eligible Persons pursuant to such Plan.

**3. PAYMENT BY ELIGIBLE PERSONS.** Participating Provider shall collect and/or bill Eligible Persons directly for: (i) any deductible, co-payment or co-insurance for Covered Services specified in the applicable Plan in amounts which, when added to Payor's payments, shall not exceed the applicable Reimbursement Schedule for Covered Services; (ii) any services that are not Covered Services; and (iii) any Covered Services provided to Eligible Persons after the benefits set forth in a Plan to which the Eligible Person is entitled have been exhausted.

**4. TIME FOR PAYMENT.** Except where coordination of the benefits applies, Payor or its paying agent has agreed to make all payments due to Participating Provider within thirty (30) days following receipt by Payor, or its paying agent, of a complete and proper claim form and other information required to determine that the claim is payable under the Plan.

**5. VERIFICATION OF ELIGIBLE PERSONS.** Payor shall provide Eligible Persons with appropriate written documentation identifying the patient as a Beech Street or CAPP CARE Eligible Person. Facility is responsible for verifying eligibility for Covered Services prior to treatment or within seventy-two (72) hours after admission by contacting the appropriate Payor.

**6. EXHAUSTION OF BENEFITS.** If an Eligible Person shall exhaust any benefits under any Plan, Payor shall then notify the applicable Participating Provider and the Eligible Person, and payment shall be due such Participating Provider pursuant to Section 3 hereof.

**7. MARKETING AND PROMOTION.** Payor and Participating Provider authorize each other to use the other's name, address and telephone number and the Participating Provider's specialty and other biographical data or services available, as applicable, subject to Section 5.6 and the prior approval of Beech Street.

**8. AGREEMENTS SUPERSEDED.** Any agreement between Participating Provider and any Payor is hereby superseded by this Agreement.

12-20-2001 13:26 FAX
MAR-03-01 05:15AM FROM-BEECH Street

# BEECH STREET
## SUMMARY OF UTILIZATION MANAGEMENT PROGRAM

Beech Street shall perform utilization management ("UM") services and shall have overall responsibility for reviewing (1) utilization activities to determine the appropriateness of care of Eligible Persons and (2) physician claims to assess compliance with Beech Street billing guidelines.

This Exhibit summarizes generally the standards and procedures that Beech Street will use in performing UM and the interrelationship between Beech Street, the attending health care provider and the facility utilization review program. All capitalized terms used in this Exhibit B which are not otherwise defined shall have the meanings set forth in the Agreement to which this Exhibit B is attached.

**NOTE:** Nothing in the UM Program is intended or shall be construed to override or affect in any manner the authority and responsibility of each Participating Provider for the care and treatment of each Eligible Person under such Participating Provider's care, including, without limitation, all decisions with respect to the admission, treatment or discharge of such Eligible Person.

1.   **GENERAL.**

a.   Different Plans have different review requirements. When UM review is required by a Plan, it shall be the responsibility of the attending health care provider and the Eligible Person to provide Beech Street with information in advance to determine the appropriateness of all inpatient admissions and elective procedures (whether or not inpatient admission is required) for which such review is required. The information may be provided by mail (time permitting), by telephone (800-CAPPING) or by facsimile (949/251-2250) during normal business hours.

b.   Beech Street UM Program activities are primarily performed in consultation with the attending health care provider. Without violating applicable statutes, Beech Street shall contact the facility or attending health care provider to obtain information necessary to perform UM Program services.

c.   Each inpatient admission and each elective procedure shall be deemed Medically Necessary upon demonstration to Beech Street's satisfaction that such admission or procedure is appropriate under the circumstances.

d.   Upon determining that the proposed inpatient admission or elective procedure is appropriate, Beech Street shall notify the attending health care provider, Eligible Person and facility outlining pertinent data.

2.   **INPATIENT ADMISSION REVIEW.** Eligible Persons requiring Medical care on an emergency basis shall not require pre-admission review. The attending health care provider shall notify Beech Street of the emergency admission by the close of the next business day so that a length of stay ("LOS") can be calculated.

3.   **SECOND OPINION PROGRAM.** The second opinion of another Participating Provider is required by certain Plans and Payors in connection with certain procedures and diagnosis. At the time the attending health care provider or Eligible Person contacts Beech Street for a determination with respect to any Covered Services, Beech Street shall notify them whether a second opinion is required and shall furnish or cause to be furnished a list of second opinion Participating Providers where available.

4.   **LENGTH OF STAY.** Beech Street shall calculate an appropriate LOS for all admissions based generally on the median LOS for each diagnosis as derived from empirical data from recognized industry databases.

5.   **CASE MANAGEMENT AND CONCURRENT REVIEW.** Case management is a program designed to identify specific cases which involve catastrophic injury or chronic illness to Eligible Persons or which otherwise require long-term care for such Eligible Persons and to evaluate, coordinate and monitor appropriate individualized and cost-effective medical treatment for such Eligible Person. The Case Manager will contact the Participating Provider caring for an Eligible Person requiring Case Management when necessary to obtain information or coordinate care. In the best interests of the Eligible Person, the Participating Provider shall work cooperatively with the Case Manager.

Concurrent review is periodic review during the Eligible Person's inpatient stay to determine whether continual confinement is Medically Necessary. The Beech Street UM Program identifies those cases which warrant concurrent review, and with respect to those cases, Beech Street performs concurrent review to determine whether the Eligible Person is still confined and when discharge is anticipated. It is the responsibility of the attending health care provider and the Eligible Person to provide Beech Street with information to determine whether it is appropriate to continue confinement beyond the LOS previously determined by Beech Street to be Medically Necessary. Beech Street does not perform concurrent review in instances where inpatient facility charges are not determined with reference to length of stay.

6.   **RETROSPECTIVE REVIEW.** Beech Street may perform retrospective review to verify that all physician claims submitted are in accordance with the UM Program's billing guidelines as outlined in the Beech Street Participating Provider manual, and Beech Street may, from time to time, otherwise assess whether the care rendered to the Eligible Person was appropriate for the patient's condition and provided in a cost effective manner

7.   **DISCHARGE PLANNING.** The facility shall perform discharge planning as a means of coordinating and monitoring the Eligible Person's post-hospitalization health care needs. Discharge planning shall be performed during the Eligible Person's inpatient stay in coordination with the attending health care provider, Beech Street and the designated provider of home health care services.

04/13/01   FRI 14:59   [TX/RX NO 6155]