IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No. 00-CIV-6061-FERGUSON/SNOW
(Consolidated)

DR. PAUL ZIDEL, and all others similarly )
  Situated Plaintiffs, )
   )
v. )
   )
ALLSTATE INSURANCE COMPANY, )
Defendant / Third-Party Plaintiff, )
   )
v. )
   )
COMMUNITY CARE NETWORK, INC., )
d/b/a CCN, )
Third-Party Defendant. )
_____ )

**ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY,
DEERBROOK INSURANCE COMPANY, FIDELITY AND CASUALTY COMPANY
OF NEW YORK, AND CONTINENTAL INSURANCE COMPANY'S
MOTION TO DISMISS PLAINTIFFS' RESPECTIVE RICO CLAIMS**

      Defendants, Allstate Insurance Company (Case No. 00-6061-CIV-FERGUSON) and

Allstate Indemnity Company (Case No. 00-7163-CIV-FERGUSON) (collectively "Allstate"),

Deerbrook Insurance Company (Case No. 01-6777-CIV-FERGUSON), Fidelity and Casualty

Company of New York (Case No. 01-6779-CIV-FERGUSON) and Continental Insurance

Company (Case No. 01-6779-CIV-FERGUSON) (collectively "CNA"), by and through their

undersigned counsel, move this Court pursuant to F.R.Civ.P. 12(b)(6) for an Order dismissing

the RICO claims alleged in the Complaints in each of the foregoing cases and respectfully state

as follows:

      1.     In each of their complaints against the aforementioned Defendant insurers, the

Plaintiff providers have asserted a RICO claim (Zidel Second Amended Class Action Complaint,



Count III; Browner Class Action Complaint, Count V; Ultra Open MRI Class Action Complaint (Deerbrook), Count III; and Ultra Open MRI Class Action Complaint (CNA), Count III).

2.    Each of the respective RICO claims is based upon the respective Plaintiff medical provider's allegations that it has not received payments it was owed for medical services performed, because, purportedly in violation of Fla. Stat. §627.736(10), the Defendant insurers' each formed an "association-in-fact," known as a "Silent PPO," designed to reduce payments made to medical providers, including Plaintiffs, on all Florida PIP medical expense claims submitted to the Defendant insurers.  (Zidel Amended Class Action Complaint, ¶¶ 50, 55; Browner Class Action Complaint, ¶ 67; Ultra Open MRI Class Action Complaints, ¶ 106). Plaintiffs allege that through these "Silent PPOs," the Defendant insurers perpetrated the alleged insurance fraud that forms the basis for the Plaintiffs' RICO claims.

3.    Pursuant to the Southern District of Florida's recent decision in In Re Managed Care Litigation, (Order Granting In Part and Denying In Part the Defendants' Motion to Dismiss the Amended Complaints)(slip op.)(MDL No. 1334; Master File No. 00-1334-MD-MORENO)(S.D. Fla., February 20, 2002), attached hereto as Exhibit A, the aforementioned RICO claims must be dismissed with prejudice.[1]

4.    In Managed Care, the Southern District addressed the impact of the McCarran-Ferguson Act on RICO claims in a multi-district case brought by plaintiffs alleging insurance fraud.  In particular, the plaintiffs claimed that the defendants did not properly notify subscribers

---

[1]    The Allstate Defendants did not raise this issue in their prior motions to dismiss because those motions were filed and decided before the Managed Care decision was handed down. Deerbrook and CNA have not filed motions to dismiss previously, following this Court's directive not to file additional motions to dismiss in similar cases until previously filed motions to dismiss had been decided by the Court.

about the defendant managed care organizations' ("MCOs") internal cost reduction practices that did or could affect both professional medical judgment as to appropriate medical treatment and the granting or denial of policy claims. They claimed that the defendant MCOs defined "medical necessity" by relying on guidelines created by third parties who made their decisions based upon "the minimum possible level of care that was adequate in a limited sample of 'best case' situations." Plaintiffs further charged that they were not fully informed about monetary incentives used to influence their doctors and that their doctors were financially pressured to keep patients in the dark about the "medical necessity" review process and monetary incentives.

5.    The defendants sought to dismiss that action based upon McCarran-Ferguson Act (the "Act"), which seeks to alleviate the impact of federal statutes that impinge upon state power and discretion to regulate and tax insurance by mandating that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. §1012(b).

6.    The Southern District held that, of the states involved in Managed Care, Florida, California, New Jersey, and Virginia did not expressly provide for private causes of action to victims of insurance fraud and, therefore, the plaintiffs' RICO claims were reverse preempted by the Act. Accordingly, the RICO claims of the plaintiffs from those states were dismissed. The Southern District based its decision regarding Florida law, at least in part, on Greene v. Well Care HMO, Inc., 778 So. 2d 1037, 1040 (Fla. 4th DCA 2001) (holding that although Florida law specifically prohibits an HMO from engaging in any unfair or deceptive trade practice, no civil action to enforce these provisions is permissible).

7.    The same analysis applies in the present case and results in the reverse preemption of the Plaintiff providers' RICO claims.

8.    The Southern District of Florida has already held that the specific statute upon which the Plaintiff providers rely in bringing such claims, Fla. Stat. §627.736(10), does not provide a private right of action for these Plaintiffs.  In May v. Allstate Insurance Company, Case No. 00-06269-Civ-Dimitrouleas (S.D. Fla. April 4, 2000), this Court dismissed claims alleged against Allstate under Fla. Stat. §627.736(10).  In its Order, a copy of which is attached hereto as Exhibit B, this Court interpreted the statute and determined that it did not allow a private cause of action to be asserted against Allstate.  In fact, the decision in May is conclusively binding on Plaintiff Dr. Zidel, who was a party to that case.  See Citibank, N.A. v. Data Lease Fin. Corp., 904 F.2d 1498, 1501 (11th Cir. 1990)(the doctrine of res judicata precludes a subsequent suit on claims which were raised, or which could have been raised, in a prior suit); Aquatherm Indus., Inc. v. Florida Power & Light Co., 84 F.3d 1388, 1394-95 (11th Cir. 1996)(Florida law requires plaintiffs to "raise all available claims involving the same circumstances in one action"); Tuma v. Dade County Public Schools, 989 F. Supp. 1471, 1473 n.2 (S.D. Fla. 1998)(res judicata means previous parties to an action, including those in privity with them, are barred from relitigating issues that were or could have been raised in the initial action).  Dr. Zidel's attempt to reassert claims under Subsection 10, albeit under the auspices of RICO, is thus barred by res judicata and Count IV of his Amended Class Action Complaint must be dismissed for that reason.[2]

---

[2]    Dr. Zidel is one of several doctors who are engaged together in the practice of medicine as "Park Place Therapeutic Center" and "Park Place Orthopaedics & Rehabilitation" (collectively "Park Place Doctors").  The Park Place Doctors sued Allstate in the May case to recover PIP payments which they alleged were improperly discounted.  The Park Place Doctors alleged that

4

9.    Since the statutory section pursuant to which these Plaintiffs have brought their RICO claims has already been held by the Southern District of Florida not to afford a private cause of action to medical providers, and since the Southern District of Florida has already held that, pursuant to McCarran-Ferguson, if the statute upon which a plaintiff relies for an insurance-based RICO claim does not provide a private right of action such claim is reverse preempted, Plaintiffs' RICO claims cannot survive.  Based on the combination of the McCarran-Ferguson Act and the Southern District's prior decisions in <u>Managed Care</u> and <u>May</u>, Plaintiffs' respective RICO claims must be dismissed with prejudice against the respective Defendant insurers.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been furnished by U.S. Mail to counsel on the attached service list this 2nd day of April, 2002.

_____
DAVID B. SHELTON

| PETER J. VALETA | DAVID B. SHELTON |
|---|---|
| Florida Bar No. 327557 | Florida Bar No. 0710539 |
| ROSS & HARDIES | Rumberger, Kirk & Caldwell |
| 150 North Michigan Ave., Suite 2500 | P.O. Box 1873 |
| Chicago, Illinois 60601 | Orlando, Florida 32802 |
| Telephone: (312) 750-3619 | Telephone: (407) 839-4511 |
| Telecopier: (312) 750-8600 | Telecopier: (407) 841-2133 |
| Attorneys for Allstate, Allstate Indemnity, | Attorneys for Allstate,   Allstate Indemnity, |
| Fidelity and Casualty, Continental, Deerbrook | Fidelity and Casualty, Continental, Deerbrook |

6506373

---

Allstate's payments were made in amounts "substantially less than [Allstate] is statutorily and contractually obligated to pay," and improperly based upon their agreement with CCN. As noted above, the district court granted Allstate's Motion to dismiss, concluding that Florida Statute §627.736(10) does not allow a private cause of action to be asserted against Allstate. Subsequently, the <u>May</u> case was voluntarily dismissed on the express condition that Dr. Zidel remain bound by the Order which dismissed his Section 627.736(10) claim. A copy of the dismissal Order is attached as Exhibit C.

## SERVICE LIST

**Co-Lead Counsel for Plaintiffs**

Jan Douglas Atlas, Esquire
Eric Lee, Esquire
Robin Corwin Campbell, Esquire
ATLAS PEARLMAN, P.A.
350 East Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301

Arthur S. Gold, Esquire
GOLD & COULSON
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603

Andrew Garcia, Esquire
Carlin Phillips, Esquire
PHILLIPS & GARCIA
13 Ventura Drive
North Dartmouth, MA 02747

Larry Kopelman, Esquire
Douglas Blankman, Esquire
KOPELMAN & BLANKMAN, P.A
Bank of America Tower
One Financial Plaza, Suite 1611
Fort Lauderdale, FL 33394

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esquire
230 East Davis Boulevard, Suite 200
Tampa, FL 33606

Richard Bokor, Esquire
RICHARD BOKOR, P.A.
230 East Davis Boulevard
Tampa, FL 33606

Casey Fundaro, Esquire
1100 5th Avenue S., Suite 201
Naples, FL 34102-6407

**Counsel for Beech Street and ADP**

John M. Quaranta, Esquire
TEW, CARDENAS, et al.
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336

**Counsel for Progressive**

Francis Anania, Esquire
Donald A. Blackwell, Esquire
ANANIA, BANDKLAYDER, et al.
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131

**Counsel for CCN**

William W. Deem, Esquire
William E. Adams, Esquire
MCGUIRE WOODS, LLP
3300 Bank of America Center
50 N. Laura Street
Jacksonville, FL 32202-4099

**Counsel for Nationwide**

Katherine C. Lake, Esquire
FOWLER, WHITE, et al.
Post Office Box 1438
Tampa, FL 33601

James C. Haggerty, Esquire
SWARTZ CAMPBELL DETWEILER
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316

**Counsel for Florida Farm Bureau**

Robert K. Levenson, Esquire
Greg Baldwin, Esquire
HOLLAND & KNIGHT, LLP
701 Brickell Avenue, Suite 3000
Miami, FL 33131

**Counsel for Liberty Mutual**

Mark Shapiro, Esquire
AKERMAN, SENTERFITT et al.
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, FL 33131

**Counsel for Hartford, Metropolitan, Integon**

Marcy Levine Aldrich, Esquire
AKERMAN, SENTERFITT et al.
SunTrust International Center, 28th Floor
One Southeast Third Avenue
Miami, FL 33131

**Counsel for Metropolitan**

Jeffrey P. Lennard, Esquire
SONNENSCHEIN, NATH & ROSENTHAL
8000 Sears Tower
Chicago, IL 60606

**Counsel for Hartford**

Howard J. Roin, Esquire
MAYER, BROWN & PLATT
190 South LaSalle Street
Chicago, IL 60603-3441

**Counsel for Superior**

Alan J. Nisberg, Esquire
BUTLER BURNETT PAPPAS
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607

**Counsel for Prudential**

John D. Aldock, Esquire
Jeffrey M. Klein, Esquire
Michael Isenman, Esquire
SHEA & GARDNER
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

Kathy J. Maus, Esquire
Lauren D. Levy, Esquire
BUTLER BURNETTE PAPPAS
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308-3469

**Counsel for American International**

Dale L. Friedman, Esquire
Brian P. Knight, Esquire
CONROY, SIMBERG, GANNON, KREVANS & ABEL, P.A.
3440 Hollywood Blvd., 2nd Floor
Hollywood, FL 33021

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

MDL No. 1334
Master File No. 00-1334-MD-MORENO

IN RE: MANAGED CARE LITIGATION



FILED by ___ D.C.

FEB 2 0 2002

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

THIS DOCUMENT RELATES TO
SUBSCRIBER TRACK CASES

_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## THE DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINTS

Before the Court is a second round of motions to dismiss filed by the managed care

insurance company ("MCO") Defendants[1] seeking to topple the insured subscriber Plaintiffs'

complaints stating claims under the Racketeer Influenced and Corrupt Organizations Act

("RICO") and the Employee Retirement Income Security Act ("ERISA"). Pursuant to 28 U.S.C.

§ 1407, the Judicial Panel on Multidistrict Litigation transferred five of these lawsuits to this

Court, joining the Price v. Humana case filed in the Southern District of Florida. In the June 12,

2001 Subscriber Track Order, which addressed the initial motions to dismiss, this Court

dismissed without prejudice nearly all of the RICO claims because the Plaintiffs had not properly

pled the predicate acts of mail and wire fraud with particularity as required by Rule 9(b) of the

Federal Rules of Civil Procedure. In re Managed Care Litig., 150 F. Supp. 2d 1330, 1347 (S.D.

Fla. 2001) ("Subscriber Track Order"). The Court finds that the new complaints are compliant

with Rule 9(b) and that the Plaintiffs have demonstrated standing to bring the RICO claims.

_____

[1]This Order considers six individual putative class action lawsuits brought against Aetna,
CIGNA, Health Net (previously known as Foundation Health Systems), Humana, Prudential, and
United. Upon mutual agreement of the parties, on July 24, 2001, the Court granted a motion to
dismiss Hitsman v. PacifiCare with prejudice.

EXHIBIT "A"

However, the Court now finds that the McCarran-Ferguson Act, a law that Congress passed to prohibit federal lawsuits that encroach upon the state regulatory decisionmaking process, requires that the RICO claims of ten of the sixteen Plaintiffs be dismissed with prejudice. The laws regulating the insurance industry in the states of Florida, New Jersey, California and Virginia do not provide for civil remedies, thus reverse-preempting the federal RICO claims brought by the Plaintiffs who reside in those states.

The Court dismisses the ERISA misrepresentation of medical necessity definition fiduciary duty claim and both summary plan description claims of the subscribers who continue to be enrolled in the Defendants' health plans because those Plaintiffs have an adequate remedy under other provisions of the statute and, furthermore, they failed to exhaust appropriate administrative procedures before filing the present lawsuit. Those Plaintiffs who are no longer participants of the MCOs' health plans have stated valid misrepresentation claims, but the claims must be tailored to conform with this Court's prior ruling concerning what information ERISA requires a fiduciary to disclose. However, the Court denies the motion to dismiss the remaining ERISA claim alleging a breach of fiduciary duty for improperly interfering with physician-patient communication by imposing "gag orders" on doctors. That claim has been properly pled and will proceed. Finally, all of the common law civil conspiracy and state unjust enrichment claims are dismissed.

## I. Introduction

### A. Issues Relating Specifically to <u>O'Neill v. Aetna</u>

For ease of administration, citations to provisions that are common in the Plaintiffs' complaints will refer to the <u>O'Neill v. Aetna</u> Subscriber Track Second Consolidated Amended

Complaint ("O'Neill Compl."). Defendant Aetna raises two new objections to that particular

Complaint. First, Aetna contends that dismissal is warranted because the Plaintiffs failed to

correctly plead the identity of its corporations. Specifically, the Amended Complaint does not

name the correct states of incorporation because a December 13, 2000 reorganization, which took

place after the Plaintiffs filed their initial complaint, relocated Aetna, Inc. to Pennsylvania. The

Plaintiffs are directed to take timely, appropriate action to correct this administrative oversight.

      Of greater significance is the Defendant's second argument that the Plaintiffs are

purportedly attempting to hold the Aetna parent corporation liable for the conduct of its

subsidiaries. See United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of

corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . .

is not liable for the acts of its subsidiaries."). The Plaintiffs respond that the Amended

Complaint charges Aetna with responsibility only for its own wrongful conduct, and they

disavow any reliance on derivative liability or a corporate-veil-piercing theory. See O'Neill

Compl., ¶ 36 ("Aetna is responsible for the distribution of the advertising, marketing, and

membership materials . . . for all of its Health Plans."); Plaintiffs' Response in Opposition to

Defendants' Motion to Dismiss Each of the Consolidated Amended Complaints Filed in the

Subscriber Track at 68 (clarifying that the Plaintiffs are not proceeding under an alter ego theory

of liability). Although open to different constructions, the text of the Amended Complaint

supports the Plaintiffs' interpretation, thus resolving the issue in their favor. See Bestfoods, 524

U.S. at 65 ("[T]he existence of the parent-subsidiary relationship under state corporate law is

simply irrelevant to the issue of direct liability.").

3

## B. Factual Overview

The Plaintiffs claim that the Defendants did not properly notify subscribers of the MCOs'

internal cost-reduction practices that did or could affect both professional medical judgment as to

appropriate medical treatment and the granting or denial of policy claims. The MCOs allegedly

induced their customers to enroll and re-enroll in the Defendants' health plans by virtue of

standardized misrepresentations and factual omissions contained in various disclosure materials,

such as summary plan descriptions and subscriber agreements. O'Neill Compl., ¶¶ 58-59. Those

materials state that the subscriber's Primary Care Physician will prescribe treatments on the basis

of the physician's independent medical judgment, exercised with reference to each subscriber's

medical needs. Id. at ¶¶ 53, 61, 68.

The Plaintiffs allege that the managed care insurance companies apply the term "medical

necessity" in a manner that conflicts with the definition stated in membership materials and

common usage in the medical profession. Id. at ¶¶ 43, 45, 63. Rather than applying that term in

congruence with the patient's medical needs in the view of the patient's doctor and the American

Medical Association, it is alleged that every Defendant managed care company relies on

undisclosed and unregulated guidelines created by third parties who make their calculated

decisions based upon "the minimum possible level of care that was adequate in a limited sample

of 'best case' situations." Id. at ¶ 80. The insurance industry's collusive practices, together with

protective cover provided by organizations such as the National Committee for Quality

Assurance ("NCQA"), also defraud patients of proper treatment and appropriate insurance

coverage as promised. Id. at ¶¶ 97 (outlining industry-wide approach to managed care, which

includes the adoption of health care review criteria, the joint development of accreditation

4

standards, participation in trade associations, and the use of industry informational sources), 105 ("[T]he NCQA's quality assurance standards are, in large part, a sham.").[2]

The Plaintiffs also charge that they were not fully informed about certain monetary incentives used to influence their doctors. The plan benefits materials state that such incentives are "intended to continually improve medical care" and "enhance patient satisfaction." Id. at ¶ 68. The Plaintiffs argue that those financial incentives instead erode the doctors' independent judgments because they reward doctors who limit medical expenses according to factors that override a patient's best interest in favor of restraining "unnecessary" treatment and maximizing the insurance company's profits. Id. at ¶ 63. The physician financial arrangements also include incentives causing claim reviewers to limit treatment, even where the denied benefits would have satisfied the definition of medical necessity as stated in materials provided to members and potential members. Id.

Furthermore, the MCOs allegedly require "gag clauses" in their contracts with physicians, whereby the doctors suffer penalties if they communicate to the patients information concerning proprietary information such the financial incentives or discuss alternative treatment not covered by the managed care company's plan. Id. at ¶¶ 63, 75, 91. The Plaintiffs allege that each managed care company applies extortionate financial pressure on the physicians in order to keep patients in the dark about the financial incentives and the medical necessity maneuvers, yet tell potential plan members in advertisements and on the Internet that it "encourages participating

---

[2]Some of the complaints discuss other health care organizations, including the American Association of Health Plans and the Coalition for Affordable Quality Healthcare. Williamson v. Prudential Ins. Co. of Am. Class Action Complaint at ¶ 83. Other complaints only briefly mention collusive industry practices or organizations. See, e.g., Price v. Humana, Inc. Subscriber Track Consolidated Amended Complaint at ¶¶ 115-116.

physicians to discuss their financial arrangements with patients." Id. at ¶ 64.

## C. Motion to Dismiss Standard

A court should grant a motion to dismiss only if the plaintiff fails to allege any facts that would entitle the plaintiff to relief. Conley v. Gibson, 355 U.S. 41 (1957). When ruling on such a motion, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. Scheuer v. Rhodes, 416 U.S. 232 (1974); St. Joseph's Hospital, Inc. v. Hospital Corp. of Am., 795 F.2d 948 (11th Cir. 1986). As this Court has indicated previously, a motion to dismiss is merely the first juncture of what could be a long journey. See, e.g., Subscriber Track Order, 150 F. Supp. 2d at 1339 (noting that the issue of "whether the evidence supports the allegations of injury" would be revisited). It is not the role of this Court to applaud or impugn the motivation behind a lawsuit or speculate upon fact-intensive issues beyond the scope of a motion to dismiss. See generally Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60 (1993) (holding in the antitrust context that "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation."). Instead, the proper question at this stage is whether, taking all of the facts pled by the Plaintiffs as true, the complaints under review state a cause of action.

## II. Racketeer Influenced and Corrupt Organizations Act

With the enactment of the RICO statute, Title IX of the Organized Crime Control Act of 1970, Congress "intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots" by offering "enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." United States v. Gilbert, 244 F.3d 888, 909 (11th Cir. 2001) (quoting Russello v. United States, 464 U.S. 16, 26-27 (1983)

6

(citing Pub. L. No. 91-452, 84 Stat. 922, 923 (1970)) (quotations omitted)).  Title 18, § 1962(c)

of the United States Code states that it is "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity or collection of unlawful debt."  "Racketeering activity" consists

of any enumerated federal and state crime listed in § 1961(1) of the statute, the pertinent

predicate acts examined in this Order being the alleged mail fraud and wire fraud.  See 18 U.S.C.

§§ 1341 (mail fraud), 1343 (wire fraud), 1346 (scheme or artifice to defraud).  In order to

promote private enforcement of its criminal provisions, RICO § 1964(c) provides a private cause

of action punctuated by treble damages for "any person injured in his business or property by

reason of a violation of section 1962."  The Court now turns to the issues of standing, proximate

cause, the McCarran-Ferguson Act, Fed. R. Civ. P.  9(b), and the enterprise requirement, insofar

as those matters were not resolved in the June 12, 2001 Order.

**A. Standing and Proximate Cause**

The Defendants ask this Court to reconsider its ruling that the Plaintiffs demonstrated

standing to bring their RICO claims premised upon the allegations that they have been injured by

paying more for insurance coverage than they would have absent the Defendants' alleged

omissions and misrepresentations.  Respectfully declining to follow the position taken in Maio v.

Aetna, Inc., 221 F.3d 472 (3d Cir. 2000) (holding that where plaintiffs claimed that insurance

company's fraudulent misrepresentations led them to purchase overpriced insurance coverage, a

RICO injury did not occur until the company failed to perform its contractual obligations), this

Court observed that "[t]he mail and wire fraud predicate acts which form the basis of the

7

injurious racketeering activity are similar to the tort of fraudulent inducement, a cause of action

which may be brought independent of a contract claim." Subscriber Track Order, 150 F. Supp.

2d at 1338 (citing HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So.2d 1238, 1239

(Fla.1996)); see also Reiter v. Sonotone Corp., 442 U.S. 330, 340 (1979) ("A person whose

property is diminished by a payment of money wrongfully induced is injured in his property.")  It

is unnecessary to revisit the standing issue, except to the extent a discussion will clarify the

matter.

      The Defendants argue that one may not bring a tortious fraud claim if the "material

misrepresentations that form the basis of [a] fraud in the inducement claim are the same

allegations that form the basis of the breach of contract claim." Medalie v. PSC Secs. Corp., 87

F. Supp. 2d 1295, 1305 (S.D. Fla. 2000).  That is, "the fraud must be separate and distinct from

the breaching party's performance of the contract." Id.; but see Formosa Plastics Corp. USA v.

Presidio Eng'rs and Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998) (holding that "tort damages

are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent

representations are later subsumed in a contract or whether the plaintiff only suffers an economic

loss related to the subject matter of the contract.").  Otherwise, the only proper remedy is an

action for breach of contract (a claim that both this Court and the Third Circuit agree would be

dismissed on the facts of this case).  But this rule of law is only applicable to state tort claims and

has no impact on the federal RICO claims, which, "unlike claims for common law fraud, cannot

be said to be redundant with a common law breach of contract claim." See Kingston Square

Tenants Ass'n v. Tuskegee Gardens, Ltd., 792 F. Supp. 1566, 1577 (S.D. Fla. 1992) (quoting

Vista Co. v. Columbia Pictures Indus., Inc., 725 F. Supp. 1286, 1301 (S.D.N.Y. 1989)).  In this

8

instance, the state common law tail does not wag the federal criminal law dog.

The Defendants also resurrect the related argument that the Plaintiffs have not established proximate causation. The Court now finds that the Plaintiffs have pled sufficient facts showing proximate cause, which is a requisite element of a RICO claim. Holmes v. Securities Investor Prot. Corp., 503 U.S. 258, 268-69 (1992). Proximate cause is not the equivalent of sole cause. Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1399 (11th Cir. 1994). A proposed cause "is a proximate cause if it is 'a substantial factor in the sequence of responsible causation.'" Id., (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990)). Furthermore, § 1964(c) of RICO incorporates the same proximate cause requirements that govern civil antitrust claims brought under the Clayton Act. Holmes, 503 U.S. at 1317.

The first matter for consideration is the possible effect of agency principles on the proximate cause calculus. As a general rule, an employer functions as an agent of its employees when it negotiates health insurance for the benefit of those employees. United Omaha Life Ins. Co. v. Sun Life Ins. Co., 894 F.2d 1555, 1558 (11th Cir. 1990) (citing Dawes Mining Co. v. Callahan, 246 Ga. 531, 533-34, 272 S.E.2d 267 (1980)). However, the employer serves as an agent of the insurance company when it enrolls employees in a previously-negotiated plan. Id. The Plaintiffs allege that the cost containment practices and true application of "medical necessity" were not disclosed to them. The Defendants counter that even if this position is correct, at least some proper disclosures were made to the Plaintiffs' employers during the insurance negotiation process.

In accordance with general agency principles, it therefore follows that knowledge of information disclosed by the defendant insurance companies to the employers may be imputed to

9

at least those employees who worked for the employer during the negotiation process. This threatens to cut off the proximate causation essential to a RICO claim because the Plaintiffs cannot claim to have reasonably relied on the misrepresentations if, by operation of law, they had adequate knowledge contradicting the misstatements. Cf. Beck v. Prupis, 162 F.3d 1090, 1097 (11th Cir. 1998) (observing that the RICO plaintiff "failed to demonstrate proximate cause—he has presented no evidence that he actually saw, let alone relied upon, any false financial statements prior to making his financial decisions.").

Nevertheless, "[i]t is universally accepted that '[t]he rule imputing an agent's knowledge to the principal is designed to protect only those who exercise good faith, and is not intended to serve as a shield for unfair dealing by the third person. The rule may not be invoked where third persons use the agent to further their own frauds upon the principal . . . .'" First Ala. Bank v. First State Ins. Co., 899 F.2d 1045, 1060 n. 8 (11th Cir. 1990), (quoting Agency, 3 Am. Jur. 2d § 295). Each Defendant in this case "cannot use agency law's constructive knowledge rule to shield itself from liability for its fraudulent misrepresentation." Id.; but see id. at 1081 n. 15 (Tjoflat, C.J., dissenting) (discussing qualifications to the general rule that a third party may not invoke the constructive knowledge rule to perpetrate a fraud on the principal). The Plaintiffs have pled predicate acts of mail and wire fraud, the facts are to be construed in the light most favorable to the Plaintiffs, and hence the Defendants may not assert constructive knowledge as a defense at this time.

The Defendants next argue that, under the standard set forth in Illinois Brick Co. v. Illinois, 431 U.S. 730 (1977), the Plaintiff subscribers cannot recover because they are indirect purchasers of insurance coverage whose damages resulted from overcharges to the employers,

10

and the charges were passed on to the Plaintiffs. The Supreme Court rejected this argument in Blue Shield of Va. v. McCready, 457 U.S. 465 (1982). In that case, a group health plan subscriber brought an antitrust class action against her health insurer, alleging that Blue Shield's policy of applying a reimbursement standard more favorable to treatment administered by psychiatrists than psychologists was in furtherance of an unlawful conspiracy to restrain competition in the psychotherapy market. Id. at 467.

The McCready Court found the Illinois Brick analysis unpersuasive, arguing that "whatever the adverse effect of Blue Shield's actions on McCready's employer, who purchased the plan, it is not the employer as purchaser, but its employees as subscribers, who are out of pocket as a consequence of the plan's failure to pay benefits." Id. at 475. As with the present case, "[d]enying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends." Id. at 479. Moreover, the key policy concern underlying Illinois Brick is the judicial interest in avoiding duplicative recovery. The absence of any employer plaintiffs in this multidistrict litigation underscores the conclusion that the Plaintiff subscribers are the injured parties "most likely to press their claims with the vigor that the [RICO] treble-damages remedy was intended to promote." McCready, 457 U.S. at 474.

## B. The McCarran-Ferguson Act

The Defendants once again contend that the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), bars the RICO claims of the Plaintiffs residing in California, Florida, New Jersey, and

Virginia.[3] The McCarran-Ferguson Act seeks to alleviate the impact of federal statutes that impinge upon state power and discretion to regulate and tax insurance by mandating that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). This Court previously concluded that "the Defendants have not shown that permitting the Plaintiffs to remedy alleged acts of fraud, extortion and conspiracy in federal court will significantly impair, rather than advance, the interests of state insurance laws or that this action will disrupt a state administrative system." Subscriber Track Order, 150 F. Supp. 2d at 1341. However, after verifying that the state of California does not provide a relevant private cause of action, this Court then held that the RICO claim brought by Plaintiff Williamson, a California resident, should be curtailed. Id. Guided by this ruling, the Defendants in their motions to dismiss present new information concerning the

---

[3]Even though they are already plaintiffs in tag-along cases previously transferred to this Court, Michael V. Amorosi (a resident of New Jersey) and John and Catherine Romero (residents of Virginia) joined the latest primary amended complaints filed against Defendants Aetna and Prudential respectively. The Defendants argue that this action violates the "first filed" rule. See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 675 F.2d 1169, 1174 (11th Cir. 1982) ("In absence of compelling circumstances, the court initially seized of a controversy should be the one to decide the case."). This Court retains jurisdiction over all of these cases and will adjudicate these claims now in the interest of judicial efficiency. In addition, the Defendants' argument that these Plaintiffs are engaging in "a transparent attempt to evade controlling Third Circuit authority that dooms" their claims, see Supplemental Memorandum of Law in Support of Aetna's Motion to Dismiss Plaintiffs' Second Amended Complaint at 16, is not supported by choice of law principles. See, e.g., In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1176 (D.C. Cir. 1987) ("[T]he several cases consolidated for pretrial preparation in the instant proceeding . . . have binding force [in the transferor forum] as 'law of the case,' for if [they] did not, transfers under 28 U.S.C. § 1407 could be counterproductive, i.e., capable of generating rather than reducing the duplication and protraction Congress sought to check."). Finally, the issue is partially moot given this Court's treatment of the RICO claims in light of the McCarran-Ferguson Act.

12

relevant state laws. In light of this additional, nearly uncontroverted information, the McCarran-Ferguson Act requires that some of the Plaintiffs' RICO claims be dismissed.

In Humana, Inc. v. Forsyth, 525 U.S. 299 (1999), the Supreme Court granted certiorari to answer the question of whether "a federal law, which proscribes the same conduct as state law, but provides materially different remedies, 'impair[s]' state law under the McCarran-Ferguson Act?" Id. at 305. In that case, health insurance policyholders brought civil RICO claims alleging that Humana and a hospital engaged in a fraudulent scheme whereby the insurance company secretly obtained discounts from the hospital, but concealed those discounts from the policyholders. Id. at 303-04. The Court found that although RICO did not fall within the business of insurance exception, neither did it "invalidate" or "supercede" state law. Id. at 307. The case therefore turned on the definition of "impair." Justice Ginsburg, writing for an unanimous Court, formulated the following test for determining whether a federal civil action impairs state law: "When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." Id. at 310. Applying this standard to the case before it, the Court found that while federal and state law both regulate the same fraudulent insurance activity, the Nevada Unfair Insurance Practices Act authorizes private actions for victims of insurance fraud and provides remedies exceeding those available under RICO's civil provisions. Id. at 311-14. Therefore, because RICO advanced the state's interest in prohibiting insurance fraud and did not frustrate any articulated state policy, the McCarran-Ferguson Act did not bar the plaintiffs' claims. Id. at 311.

The present case differs from Humana in at least one key respect: unlike Nevada, the

states of California, Florida, New Jersey, and Virginia do not expressly provide for private causes of action to victims of insurance fraud. See, e.g., Samura v. Kaiser Found. Health Plan, Inc., 17 Cal. App.4th 1284, 22 Cal. Rptr. 2d 20 (1993) (holding that no private cause of action could be maintained under the Knox-Keene Act or the Business and Professions Code to remedy fraud alleged by the plaintiff health care plan beneficiary), cert. denied, 511 U.S. 1084 (1994); Greene v. Well Care HMO, Inc., 778 So.2d 1037, 1040 (Fla. Dist. Ct. App. 2001) (holding that although Florida law specifically prohibits an HMO from engaging in any unfair or deceptive trade practice, no civil action to enforce these provisions is permissible); Ambrose v. Blue Cross & Blue Shield of Va., 891 F. Supp. 1153, 1165 (E.D. Va. 1995) (holding that there was no private cause of action under relevant state insurance laws, thus requiring dismissal pursuant to the McCarran-Ferguson Act); American Chiropractic Ass'n, Inc. v. Trigon Healthcare, Inc., 151 F. Supp. 2d 723, 735 (W.D. Va. 2001) (finding, post-Humana, that the plaintiffs failed to meet their burden that a private cause of action existed under Virginia's insurance laws and dismissing the claims pursuant to the McCarran-Ferguson Act).[4] Permitting the Plaintiffs' civil RICO claims to proceed would "frustrate [a] declared state policy" and possibly "interfere with a State's administrative regime." Humana, 525 U.S. at 310; American Chiropractic Ass'n, 151 F. Supp. 2d at 734-35 (permitting private RICO claims addressing matters intended to be handled exclusively by government regulatory bodies "would convert a system of public redress into a

---

[4]Although there is no New Jersey judicial or legislative pronouncement directly on point, the Plaintiffs do not suggest that an express cause of action analogous to their RICO claims exists, nor do they present any basis for implying such a right from New Jersey's insurance laws, which authorize a private cause of action for physical injuries only. See, e.g., Housing Authority v. Williams, 263 N.J. Super. 561, 566, 623 A.2d 318, 320 (1993) ("Under the expressio unius doctrine, it is generally held that where the Legislature makes express mention of one thing, the exclusion of others is implied.")

system of private redress.") (quoting Ambrose, 891 F. Supp. at 1165). Consequently, where state insurance laws closely regulate the very activity forming the basis of a plaintiff's claim, "[t]he absence of a state-level cause of action counsels in favor of barring the federal lawsuit" if the federal law does not specifically relate to the business of insurance. Subscriber Track Order, 150 F. Supp. 2d at 1340 (citing LaBarre v. Credit Acceptance Corp., 175 F.3d 640, 643 (8th Cir. 1999) (holding that the McCarran-Ferguson Act barred a RICO suit where no analogous private cause of action existed under Minnesota law)); Cf. Moore v. Liberty Nat. Life Ins. Co., 267 F.3d 1209, 1222 (11th Cir. 2001) (holding that the McCarran-Ferguson Act does not preclude private actions brought under 42 U.S.C. §§ 1981 and 1982 alleging racial discrimination in the charging of premiums and dissemination of benefits because the suits would not frustrate any declared state policy condoning racial distinctions in life insurance policies).

The Plaintiffs argue that even if the McCarran-Ferguson Act abrogates their claims, these lawsuits should nevertheless continue as claims for injunctive relief alone. But the Plaintiffs do not point to any case that permitted such a compromise. The states could have chosen to offer a civil cause of action limited to injunctive relief, but instead elected to provide no private remedy at all. Therefore, the RICO claims (including the RICO conspiracy claims) of the following Plaintiffs are hereby dismissed in their entirety: Aetna Plaintiff Michael V. Amorosi (New Jersey); both Health Net Plaintiffs, Linda Romero and Rafael O. Valdes (Florida); United Plaintiff Julian Craig Murphy (Florida); Humana Plaintiffs Regina Joi Price, Anthony Sessa, and Arnold Katz (Florida); and all three Prudential Plaintiffs, Raymond Williamson (California) and John and Catherine Romero (Virginia). The RICO claims brought by the other Plaintiffs, who are citizens of other states, remain in this case.

15

**C. Enterprise**

Section 1962(c) of RICO forbids anyone to "conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The term "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." § 1961(4). An association-in-fact enterprise requires that the plaintiff identify a group of persons who are associated together for a "common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583 (1981). This "association of individual entities, however loose or informal, . . . furnishes a vehicle for the commission of two or more predicate crimes" that comprise the racketeering activity. United States v. Goldin Indus., 219 F.3d 1271, 1275 (11th Cir. 2000) ("Goldin II "), cert. denied, 531 U.S. 1015 (2000). A plaintiff must plead facts suggesting that the purported enterprise is "an ongoing organization, formal or informal," and that "the various associates function as a continuing unit." Turkette, 452 U.S. at 583.

The Plaintiffs in their amended complaints allege that each Defendant insurance company associated with an enterprise consisting of the Defendant, the Defendant's health plans, and the primary physicians, medical specialists, medical laboratories, hospitals, outpatient centers, pharmacies, home health agencies who contract with the Defendant. O'Neill Compl., ¶ 122 (referring to this national health care network as the "National Enterprise."). All of these entities are said to be "associated in fact as part of the health care network with common purposes of providing medical services to [the insurance company's] customers and earning profits from the providing of those services." Id.; see also McRaney v. United HealthCare Complaint, ¶¶ 44-45

16

(setting forth an identical enterprise in greater detail). The June 12, 2001 Order addressing the Defendants' initial motions to dismiss the Subscriber Track complaints left open two issues with respect to the Enterprise element: (1) whether the enterprise lacks an adequate structure and (2) whether each Defendant operated or managed each respective enterprise. The Court now addresses each of these arguments in turn.

In the March 2, 2001 Provider Track Order, this Court rejected the physician plaintiffs' theory that "an entire nationwide or regional industry or profession may constitute an enterprise." In re Managed Care Litig., 135 F. Supp. 2d 1253, 1262 (S.D. Fla. 2001) ("Provider Track Order"). The observation that the proposed "enterprises lack a distinct structure; one cannot easily identify who comes within the ambit of these enterprises, or where they begin and end" described the complete absence of any discernible association in fact that RICO would recognize. Id. There is, however, no strict "structure" requirement in the Eleventh Circuit. See, e.g., Goldin II, 219 F.3d at 1274-75 ("[U]nder our case law, a RICO enterprise need not possess an "ascertainable structure" distinct from the associations necessary to conduct the pattern of racketeering activity.") (citing United States v. Weinstein, 762 F.2d 1522, 1537 n. 13. (11th Cir. 1985)); Avirgan v. Hull, 932 F.2d 1572, 1578 (11th Cir. 1991) ("[A] RICO enterprise may be an 'amoeba-like' structure or a loose informal association.") (citing United States v. Cagnina, 697 F.2d 915, 921 (11th Cir. 1983)).

Notwithstanding the breadth of the statutory language, the Defendants turn to legal authority outside the Eleventh Circuit holding that a RICO enterprise requires a structure beyond that commonly found in on-going contractual relationships. See, e.g., Jennings v. Emry, 910 F.2d 1434, 1440 (7th Cir. 1990) (observing that an enterprise must have "an ongoing 'structure'

17

of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchial or consensual decision making."). Even if the Court adopted this heightened standard, each National Enterprise pled by the Plaintiffs would likely prevail. All of the relevant published cases cited by the Defendants describe a putative enterprise consisting of either a random collection of contracting entities, independent actors committing criminal acts within a particular industry, or a manufacturer selling a product through independent distributors.[5] The Plaintiffs in the present case have not alleged a series of random contractual exchanges, but a network of physicians, hospitals, pharmacies and health care professionals through which the Defendants deliver health care to the subscribers. Moreover, the network is not mere conjecture on the part of the Plaintiffs. Each Defendant openly celebrates its respective network, acknowledges their creation of it and uses the network as a public relations vehicle. See, e.g., Price v. Humana Complaint, ¶ 39(a), (quoting Humana website ("Nationally, Humana has

_____

[5]See, e.g., Stachon v. United Consumers Club, Inc., 229 F.3d 673, 676 (7th Cir. 2000) ("[T]he mere fact that UCC, for nearly 21 years, had business dealings with a wide assortment of unnamed manufacturers, wholesalers, and members in no way establishes that they function with UCC as a continuing unit or as an ongoing structured organization."); 800537 Ontario Inc. v. Auto Enters., 113 F. Supp. 2d 1116, 1123 (E.D. Mich.2000) ("The mere fact that [the Defendants] have engaged in a business relationship is insufficient to establish that Defendants 'functioned as a continuous unit' for RICO purposes."); In re MasterCard Int'l Inc. Internet Gambling Litig., 132 F. Supp. 2d 468 (E.D. La. 2001) (concluding that the Plaintiffs had pled a "random intersection" of on-line casinos, credit card companies and issuing banks); VanDenBroeck v. CommonPoint Mortg. Co., 210 F.3d 696, 700 (6th Cir. 2000) (holding that the defendant lender's relationship with the numerous secondary lenders to which it sold customer loans was "too unstable and fluid an entity to constitute a RICO enterprise"); First Nationwide Bank v. Gelt Funding, Corp., 820 F. Supp. 89, 98 (S.D.N.Y. 1993) (conclusory allegations that disparate parties were associated in fact by virtue of their involvement in the real estate market insufficient to maintain a RICO enterprise); Moll v. U.S. Life Title Ins. Co. of N.Y., 654 F. Supp. 1012, 1031 (S.D.N.Y. 1987) (allegation of enterprise consisting of a "group of attorneys . . . abstractors and other individuals and corporations . . . engaged in the real estate settlement industry" insufficient to establish enterprise).

18

assembled one of health care's largest networks.")); ¶ 39(e), (quoting Humana 1999 10-Q (First

Quarter) at 11-12 ("The Company is a health services company that facilitates the delivery of

health care services through networks of providers to its approximately 6.1 million members.")).

      The Plaintiffs also prevail on the second issue, whether the Defendants "operate or

manage" the enterprise. The operation or management test requires that "[i]n order to

'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have

some part in directing those affairs." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993); U.S.

v. Castro, 89 F.3d 1443, 1452 (11th Cir. 1996). Each insurance company is poised at the apex of

the network of its creation and facilitates the interaction between the members of the enterprise

on a daily basis. Moreover, the Plaintiffs allege that each insurance company applies extortionate

financial and contractual pressure on the physicians in order to maintain the silence essential to

the success of the fraud. O'Neill Compl., ¶ 86. As stated in the Provider Plaintiffs'

Consolidated Amended Class Action Complaint, the physician Plaintiffs submit that the

Defendants possess "overwhelming and dominant economic and market power" and use threats

to banish doctors from the National Enterprise network as a means to "coerce Plaintiffs and the

class into accepting contracts and Defendants' policies and practices" according to nonnegotiable

terms. Id. at ¶ 181; see also id. at ¶ 285 ("Aetna demanded that [Dr. Molk] sign the contract, on a

take-it-or-leave-it basis, within forty-eight hours, and threatened that if he did not sign the

contract within 2 days, Aetna would begin immediately informing his patients that he had

'resigned' from the Aetna network."). These factual allegations support the inference that the

Defendants have some part in directing the affairs of each National Enterprise.

19

## D. Pleading Fraud with Particularity

This Court previously dismissed all of the Plaintiffs' complaints, save for the complaint against Humana, for failure to meet the standard of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Ordinarily, a plaintiff must allege "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." Brooks v. Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1380- 81 (11th Cir. 1997). However, Rule 9(b) must be read in conjunction with Rule 8(a) so as to not "abrogate the concept of notice pleading." Durham v. Business Management Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988). This Court upheld the Price v. Humana Complaint on the ground that it survived under the "alternative means" of satisfying the rule. Subscriber Track Order, 150 F. Supp. 2d at 1347; Durham, 847 F.2d at 1512 (citing Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)).

The Plaintiffs have pled their complaints broadly with an eye to class adjudication. As a consequence, the Plaintiffs' pleadings stretch even the "alternative means" of satisfying the particularity requirement. Nevertheless, the Plaintiffs have stated in a straightforward and specific manner the nature of the fraud. The amended complaints assiduously follow the example of the Price v. Humana Complaint and will be upheld.

However, fairness dictates that this Court define narrowly the scope of those materials that are purportedly "Disclosure Documents," as that term is used in the Plaintiffs' complaints.

20

The following items stated in the complaints are amenable to categorization: "summary plan descriptions" (an ERISA term of art), "certificates of coverage," "other plan benefit descriptions mailed to Class Members upon or [within thirty days] after their enrollment," "notification of Health Plan changes or modifications," "penta-annual updated summary plan descriptions," "subscriber agreements," and "provider directories." See O'Neill Compl., ¶ 58. The following items are impermissibly vague or redundant and are hereby stricken from the Plaintiffs' complaints: "evidences of coverage," "plan summaries or descriptions," "summaries of benefits," "notifications of modifications and changes to the plan," "other coverage descriptions," and, not least of all, the global phrase "member information." Id.

### III. Employee Retirement Income Security Act

#### A. Introduction

The Plaintiffs have revised their complaints in light of the June 12, 2001 Subscriber Track Order dismissing some of the ERISA claims for failure to state a claim upon which relief may be granted and the rest for failure to plead exhaustion of administrative procedures.[6] 150 F. Supp. 2d at 1353-57. The Subscriber Track Order, after addressing the failure to plead exhaustion of administrative procedures, tentatively upheld three ERISA claims and gave notice to the Plaintiffs that they ought to clarify their pleading of a fourth.[7] Two of these claims arise

---

[6] The following Plaintiffs are asserting ERISA claims: Julian Craig Murphy, Jo Ann O'Neill, Michael V. Ambrosi, Danny E. Waldrop, Bobby Pickney, Linda Romero, Rafael O. Valdes, Arnold Katz, Dawn Yingling, Raymond D. Williamson, John Romero, and Catherine Romero.

[7] The Plaintiffs seek restitution and injunctive relief for the summary plan description claims. O'Neill Compl., ¶ 156. As for the breach of fiduciary duty claims, the Plaintiffs claim appropriate equitable relief to redress the violations of the Defendants' duty to discharge their duties with care, skill and prudence, recover the amounts by which each MCO has been unjustly

21

under a plan administrator's duty to abide by ERISA's specifications regarding the contents of summary plan descriptions ("SPDs") distributed to plan beneficiaries. See 29 U.S.C. § 1021 et seq (ERISA §§ 101-104). First, the Court observed that "the Defendants do not dispute the Plaintiffs' allegation that they fail to properly disclose the source of financing of the plans and the identity of any organizations through which benefits are provided." 150 F. Supp. 2d at 1355; 29 U.S.C. § 1022(b). Second, the Court acknowledged the possible viability of a "misrepresentation" claim based upon the Defendants' allegedly inaccurate description of the medical necessity definition regularly applied during the claim review process, insofar as this ran counter to the requirement that an SPD "shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 150 F. Supp. 2d at 1355; § 1022(a).

This Court also tentatively upheld two claims that allegedly constitute a breach of ERISA's general fiduciary duties. See 29 U.S.C. § 1104(a) (ERISA § 404(a)(1)). ERISA requires that plan fiduciaries exercise a prudent person standard of care when they "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a) (ERISA § 404(a)). The Court found that the Plaintiffs' allegations that the Defendants misrepresent the medical necessity definition in plan documents stated a claim for which relief may be granted. 150 F. Supp. 2d at 1355. Finally, the Court noted that the Plaintiffs' allegations concerning contractual "gag clauses" mentioned outside the breach of fiduciary duty section of their complaints could constitute improper interference with physician-patient communication in violation of § 1104 and gave the Plaintiffs the option of amending their

enriched, and restore the value of the promised insurance coverage. Id. at ¶ 166.

22

complaints to "clarify whether they are stating a fiduciary claim based upon any purported gag clauses, and, if so, the specific nature of those arrangements." Id. at 1356-57.

ERISA is "an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests– not all in favor of potential plaintiffs." Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993). The Supreme Court has observed that "courts may have to take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place." Varity, 516 U.S. at 497.

Bearing these principles in mind, the Court now finds that the misrepresentation of medical necessity fiduciary duty claims brought by current subscribers must be dismissed because the Plaintiffs have an adequate remedy under the claim for benefits provision, 29 U.S.C. § 1132(a)(1)(B) (ERISA § 502(a)(1)(B)). Those Plaintiffs who are no longer participants of the MCOs' health plans have stated valid misrepresentation claims, but they must be tailored to conform with this Court's prior ruling concerning what information ERISA requires a fiduciary to disclose. All of the SPD claims are dismissed because the Plaintiffs have an adequate remedy under either 29 U.S.C. § 1132(c) (ERISA § 502(c)) or § 1132(a)(1)(B). However, the Court upholds the sole remaining ERISA claim, the interference with patient-physician communication breach of fiduciary duty allegation.

23

**B. Current Subscribers Cannot Assert An Action Under § 1132(a)(3)**

    **1. Breach of Fiduciary Duty for Misrepresentation of Medical Necessity Definition**

    The Plaintiffs assert all of their ERISA claims in this lawsuit under the "catch all"

provision of ERISA, 29 U.S.C. § 1132(a)(3) (§ 502(a)(3)).[8] However, a plaintiff with an

adequate remedy under the statute's claim for benefits provision, § 1132(a)(1)(B), may not also

maintain an action under the catch-all section.[9] See Varity Corp. v. Howe, 516 U.S. 489, 513-15

(1996); Katz v. Comprehensive Plan Of Group Ins., 197 F.3d 1084, 1088 (11th Cir. 1999) ("[A]n

ERISA plaintiff with an adequate remedy under § 1132(a)(1)(B), cannot alternatively plead and

proceed under § 1132(a)(3)."). Those Plaintiffs who have left the plan do not have an adequate

---

[8] 29 U.S.C. § 1132 Civil enforcement
(a) Persons empowered to bring a civil action
A civil action may be brought--
    (1) by a participant or beneficiary--
        (A) for the relief provided for in subsection (c) of this section, or
        (B) to recover benefits due to him under the terms of his plan, to enforce
        his rights under the terms of the plan, or to clarify his rights to future benefits under the
        terms of the plan;
    (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under
    section 1109 of this title;
    (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates
    any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate
    equitable relief (i) to redress such violations or (ii) to enforce any provisions of this
    subchapter or the terms of the plan . . .

[9] The Defendants presented this argument in their motions to dismiss the first round of
complaints. This Court did not reach the issue in the previous Subscriber Track Order because
(1) Rule 8(e)(2) of the Federal Rules of Civil Procedure permit pleading inconsistent claims in
the alternative, (2) the Subscriber Track Order concluded that the Plaintiffs' coverage benefit
theory did not state a cognizable claim for benefits under § 1132(a) (and hence an adequate
remedy under that section was seemed unavailable), and (3) in any event, a factual determination
of adequacy appeared to be premature. The Court now concludes that it need not go beyond the
facts pled by the Plaintiffs to hold that § 1132(a) will provide an adequate remedy to the
Plaintiffs at some point in the future.

remedy under the claim for benefits provision.[10]  Id. at 515 ("The plaintiffs in this case could not

proceed under the first subsection because they were not longer members of the Massey-

Ferguson plan and, therefore, had no 'benefits due [them] under the terms of [the] plan.'")

(emphasis in original).  Similarly, the interference with physician-patient communication claims

do not fall within § 1132(a)(1)(B) and should not be dismissed.  However, this Court holds that,

taking all of the relevant facts pled by the Plaintiffs who continue to participate in their plans as

true, the remaining breach of fiduciary duty claims would eventually be adequately addressed in

an action under § 1132(a)(1)(B), and, consequently, these fraudulent misrepresentation claims

brought under the catch-all section are barred.

      The Plaintiffs' claims in large part appear to be based upon a fraudulent inducement

theory.  The Eleventh Circuit has repeatedly held, in cases considering whether a state common

law cause of action is preempted by ERISA, that an action to remedy fraudulent inducement to

purchase an insurance contract and other fraud relating to the scope of insurance coverage should

be characterized as a claim for benefits under § 1132(a)(1)(B).  Butero v. Royal Maccabees Life

Ins. Co., 174 F.3d 1207, 1213 (11th Cir. 1999) ("[W]e have held that claims against an insurer

for fraud and fraud in the inducement to purchase a policy are in essence claims 'to recover

benefits due to [the beneficiary] under the terms of the plan.'"); Engelhardt v. Paul Revere Life

Ins. Co., 139 F.3d 1346, 1353-54 (11th Cir. 1998).  A fiduciary duty action for fraudulent

misrepresentations connected to the purchase of an insurance policy survives only if the health

_____

[10]Jo Ann O'Neill, Raymond D. Williamson, John Romero, and Catherine Romero are no
longer members of the respective defendant MCO's health care plan and therefore do not have an
adequate remedy under § 1132(a)(1)(B).  For the same reason, this Court's discussion of the
exhaustion requirement in the next subsection does not apply to these Plaintiffs.

care plan subscribers were <u>current</u> employees at the time they were induced to join an ERISA

plan previously established by the employer. <u>Piazza v. Ebsco Industries, Inc.</u>, 273 F.3d 1341,

1350 (11th Cir. 2001) (holding that the definition of "participant" under ERISA does not include

a future employee and fiduciary duties only extend to participants and their beneficiaries);

<u>Engelhardt</u>, 139 F.3d at 1352 & n. 7 (finding that insurance company became an ERISA entity in

relation to the employer and its current employees at the time the employer joined the plan);

ERISA § 102(7) (29 U.S.C. § 1002(7)). Cf. <u>Uselton v. Commercial Lovelace Motor Freight,</u>

<u>Inc.</u>, 940 F.2d 564, 582-83 (10th Cir. 1991) (holding that "the fiduciary relationship necessary to

state [a § 1132(a)(2)) claim addressing] fraud committed in connection with an investor's initial

decision to join an ERISA plan . . . does not come into existence until an individual becomes an

ERISA plan participant, thus denying participants an ERISA remedy for fraud or

misrepresentation that occurred before and in connection with their decision to join the plan.").

But in <u>Franklin v. QHG of Gadsden, Inc.</u>, 127 F.3d 1024 (11th Cir. 1997) and <u>Hall v.</u>

<u>Blue Cross/Blue Shield of Alabama</u>, 134 F.3d 1063 (11th Cir. 1998), where the Eleventh Circuit

held that state law fraudulent inducement claims were preempted, the pertinent

misrepresentations clearly <u>preceded</u> either the acceptance of an employment offer or the

establishment of the plan. <u>See Franklin</u>, 127 F.3d at 1026 (plaintiff's acceptance of employment

offer was conditioned on the promise that her husband would receive the same level of care

under the new employer's plan as he had been receiving under her previous benefit plan); <u>Hall</u>,

134 F.3d at 1064 (misrepresentations concerning coverage for preexisting conditions were made

to current employee negotiating a switch of plans for the entire office staff). Therefore, the

actions that conceive a claim for benefits arising out of a fraudulent misrepresentation will often

precede the existence of a fiduciary duty. However, a § 1132(a) claim is not ripe until a claim for medical benefits is submitted to the plan administrator. Subscriber Track Order, 150 F. Supp. 2d at 1357. Once a claim for benefits is submitted, the plan administrator must acknowledge and abide by the terms of the summary plan description if they conflict with the coverage actually provided under the policy. Buce v. Allianz Life Ins. Co., 247 F.3d 1133, 1155-56 (11th Cir. 2001) (Barkett, C.J., concurring) ("[W]hen a plan and its summary description conflict, and the employee or beneficiary demonstrates the requisite reliance, the terms of that description determine her eligibility for benefits.") (citing McKnight v. Southern Life and Health Ins. Co., 758 F.2d 1566, 1570 (11th Cir. 1985)); Senkier v. Hartford Life & Accident Ins. Co., 948 F.2d 1050, 1051 (7th Cir. 1991) ("[I]n the event of a discrepancy between the coverage promised in the summary plan document and that actually provided in the policy, he is entitled to claim the former.").

The Plaintiffs argue that they are entitled to injunctive relief to curb the ongoing violations of their statutory rights. Assuming for purposes of argument that the MCOs are fiduciaries vis-à-vis an ERISA plan, it is a breach of fiduciary duty to provide current plan participants with misleading information concerning future benefits available under the plan at any time, including the process of re-enrollment in the plan. Varity, 516 U.S. at 502 ("Conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose."); Local Union 2134, United Mine Workers of Am. v. Powhatan Fuel, Inc., 828 F.2d 710, 713 (11th Cir. 1987) (misrepresentations concerning the existence of insurance coverage would constitute a breach of

27

fiduciary duty to the health plan). Yet, in "horizontal preemption" fashion, § 1132(a)(1)(B) necessarily sweeps within its scope fiduciary claims for equitable relief predicated <u>solely</u> on a challenge to claim review policies that have yet to be applied to any specific claim for benefits. See <u>Varity</u>, 516 U.S. at 512 ("ERISA specifically provides a remedy <u>for breaches of fiduciary duty</u> with the respect to the interpretation of plan documents and the payment of claims . . . that runs directly to the injured beneficiary.") (citing § 1132(a)(1)(B)) (emphasis added). If it were not so, any Plaintiff could "complicate ordinary benefit claims by dressing them up in 'fiduciary duty' clothing." <u>Id.</u> at 514-15 (observing that § 1132(a)(3) may only be invoked where there is no adequate relief elsewhere in the statute, and this serves to restrict the practice of cross-dressing legal claims). Although preemption rulings are not always conterminous with an affirmative claim for relief under ERISA, <u>see, e.g.</u>, <u>Mertens</u>, 508 U.S. at 261, in this instance, the preemption cases suggest the correct result. The breach of fiduciary duty claims for the alleged misrepresentations of the medical necessity definition must therefore be dismissed.

Cases cited by the Plaintiffs to suggest that a plaintiff need not suffer an actual injury to bring a breach of fiduciary duty claim are not inconsistent with this result. See <u>Larson v. Northrop Corp.</u>, 21 F.3d 1164 (D.C. Cir. 1994); <u>Gluck v. Unisys Corp.</u>, 960 F.2d 1168 (3d Cir. 1992); <u>Ziegler v. Connecticut General Life Ins. Co.</u>, 916 F.2d 548 (9th Cir. 1990). None of these cases considered a claim brought directly under § 1132(a)(3), and they all preceded <u>Varity</u>, which imposed limitations on such claims. Furthermore, all of these cases address controversies concerning retirement benefits, and the "last action which constituted a part of the breach or violation," 29 U.S.C. § 1113, may differ when the subject matter is medical benefits sought under a present and continuing health insurance plan. <u>Cf.</u> <u>Larson</u>, 21 F.3d at 1170 ("[O]nce the

28

sponsor of a terminated plan, as opposed to an ongoing plan, purchases an annuity to fund a

plan's pension liabilities, the sponsor has no further financial responsibility to [plan]

participants.") (internal quotation marks omitted).

### 2. Alleged Flaws in the Summary Plan Description Documents

The Plaintiffs submit that they are entitled to equitable relief (restitution and remedial

disclosures) under § 1132(a)(3) for (1) the alleged misrepresentation of medical necessity in the

summary plan description and (2) the failure to disclose in the summary plan description the

source of financing of the plans and the identity of any organizations through which benefits are

provided. However, the Plaintiffs cannot bring a § 1132(a)(3) claim because an adequate remedy

is available under two other statutory provisions. First, in cases alleging reporting and disclosure

violations only, a plaintiff must bring an action under § 1132(a)(1)(A) for the relief provided in §

1132(c).[11] See Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1170 (3d Cir. 1990) ("To the

extent plaintiffs seek redress for defendants' reporting and disclosure violations as such, they

should have sought the remedies available to them under section 502(a)(1)(A)."); Lewandowski

v. Occidental Chem. Corp., 986 F.2d 1006, 1009-10 (6th Cir. 1993) (holding that section 502(c)

"acts as an affirmative limit on possible remedies. Because plaintiff seeks recovery expressly

---

[11]29 U.S.C. § 1132(c) reads in relevant part as follows:
Any administrator . . . who fails or refuses to comply with a request for any information
which such administrator is required by this subchapter to furnish to a participant or
beneficiary (unless such failure or refusal results from matters reasonably beyond the
control of the administrator) by mailing the material requested to the last known address
of the requesting participant or beneficiary within 30 days after such request may in the
court's discretion be personally liable to such participant or beneficiary in the amount of
up to $100 a day from the date of such failure or refusal, and the court may in its
discretion order such other relief as it deems proper.

29

based on defendant's failure to follow ERISA procedures, she may not recover."); LaBrache v.
American Maritime Officers Pension Plan, 45 F. Supp. 2d 1335, 1340 (M.D. Fla. 1999) ("In
cases alleging reporting and disclosure violations, a plaintiff must bring action under §
1132(a)(1)(A) for the relief provided in § 1132(c)."); Mohalley v. Kendall Health Care Products
Co., 903 F. Supp. 1530, 1539 (M.D. Ga. 1995) (same); Welsh v. GTE Serv. Corp., 866 F. Supp.
1420, 1425 (N.D. Ga. 1994) (same).

    Second, a plaintiff may be entitled to relief for procedural violations when asserting a
claim under § 1132(a)(1)(B).  See Harris v. Pullman Standard, Inc., 809 F.2d 1495, 1499 (11th
Cir. 1987) (citing Blau v. Del Monte Corp., 748 F.2d 1348, 1353 (9th Cir. 1985), abrogation on
other grounds recognized by Dytrt v. Mountain State Tel. & Tel. Co., 921 F.2d 889, 894 n. 4 (9th
Cir. 1990)).  However, "violations of ERISA's requirements do not entitle plaintiffs to
substantive relief unless 'the quantity of [the] procedural violations . . . work a substantive
harm.'"  Bush v. Humana Health Plan of Ala., Inc., 973 F. Supp. 1376, 1382 (M.D. Ala. 1997)
(quoting Harris, 809 F.2d at 1499); Blau, 748 F.2d at 1353 ("Ordinarily, a claimant who suffers
because of a fiduciary's failure to comply with ERISA's procedural requirements is entitled to no
substantive remedy.").  Moreover, this "substantive harm" basis of recovery has no ready
connection with § 1132(a)(3), but refers instead to the principle that "in reviewing an
administrator's decision, a court must consider continuing procedural violations in determining
whether the decision to deny benefits in a particular case was arbitrary and capricious."  Blau,
748 F.2d at 1354 (emphasis added).

    A pension case cited by the Plaintiffs, Layaou v. Xerox Corp., 238 F.3d 205 (2d Cir.
2001), affirms an individual's right to bring a suit enforcing the terms of an SPD, but it actually

30

undercuts the Plaintiffs' position. In the Second Circuit, "if a summary plan 'is inadequate to inform an employee of his rights under the plan, ERISA empowers plan participants and beneficiaries to bring civil actions against plan fiduciaries for any damages that result from the failure to disclose' under § 1132(a)(1)(B)." Id. at 212 (emphasis added) (quoting Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990)). Whether the Plaintiffs have an adequate remedy somewhere in the statute is precisely the issue here, and the Second Circuit apparently permits a suit for summary plan description violations directly under § 1132(a)(1)(B).

Where a health care subscriber pleads technical violations of the statutory requirements for SPDs, the legislative policy favoring the avoidance of undue complexity and costly litigation will often outweigh the interest of that plaintiff bringing suit under § 1132(a)(3). Varity, 516 U.S. at 497; Hein v. TechAmerica Group, Inc., 17 F.3d 1278, 1280 (10th Cir. 1997) (observing if the mere "failure of the employer to comply with its duties under ERISA [would be sufficient] to establish a right to alleged benefits," then "ERISA would be turned into a strict liability statute."). If the Plaintiffs want to know the source of financing of the plans and the identity of any organizations through which benefits are provided, then they should ask the plan administrator for this information. If the SPD contains an inaccurate or misleading definition of medical necessity, subscribers are entitled to request additional information that would correct this deficiency. If the plan administrator fails to provide sufficient and accurate information, the subscriber may sue under § 1132(a)(1)(A) for the rights established in § 1132(c), and a court may impose the stipulated fines and in its discretion order such other relief as it deems proper. If a claim for medical benefits is submitted and denied by the plan administrator, the subscriber will have an opportunity to assert the terms of the SPD during the administrative plan's review

31

process or bring an appropriate claim pursuant to § 1132(a)(1)(B) to account for the SPD

deficiencies. McKnight, 758 F.2d at 1570; Harris, 809 F.2d at 1499. Because §§ 1132(a)(1)(B)

and 1132(c) offer adequate remedies, relief under § 1132(a)(3) is not available.[12]  Therefore, all

of the summary plan description claims are dismissed.

## C. Whether the Current Subscribers Failed to Exhaust Administrative Procedures

The Defendants renew their contentions that the ERISA claims should be dismissed

because a plaintiff must exhaust administrative remedies before bringing a lawsuit in federal

court. See Mason v. Continental Group, Inc., 763 F.2d 1219 (11th Cir. 1985); Byrd v.

MacPapers, Inc., 961 F.2d 157, 160-61 (11th Cir. 1992). This Court must "apply the exhaustion

requirement strictly" and "recognize narrow exceptions only based on exceptional

circumstances." Perrino v. S. Bell Tel. & Tel. Co., 209 F.3d 1309, 1318 (11th Cir. 2000). This

requirement applies to claims for benefits that have been denied as well as claims grounded in

the statutory provisions of ERISA. Mason, 763 F.2d at 1226-27. Although a court generally

limits its discussion to facts alleged in the complaint when contemplating a motion to dismiss, "a

document central to the complaint that the defense appends to its motion to dismiss is also

properly considered, provided that its contents are not in dispute." Harris v. Ivax Corp., 182 F.3d

799, 802 n.2 (11th Cir. 1999).

---

[12]The Third Circuit has, in the years since it decided Hozier, refined the scope of that
decision. A recent pronouncement on the matter from that circuit implicitly affirms the ability of
a subscriber to bring a § 1132(a)(3) action in cases that present "extraordinary circumstances."
See Jordan v. Federal Express Corp., 116 F.3d 1005, 1011 (3d Cir. 1997). However, the Hozier
court explicitly rejected the Blau theory of recovery that the Eleventh Circuit later adopted, and
the Third Circuit has affirmed this holding. See, e.g., Ackerman v. Warnaco, Inc., 55 F.3d 117,
124 (3d Cir. 1995). Therefore, there are fewer remedies for disclosure violations available under
the Third Circuit's interpretation of § 1132(a) than in other circuits, thus affecting the
determination of whether an "adequate" remedy exists for § 1132(a)(3) purposes.

The Plaintiffs state in their complaints that they "have excusably refrained from attempting to exhaust administrative procedures" prior to filing their claims in federal court. O'Neill Compl., ¶ 114. District courts have the discretion to excuse exhaustion "when resort to the administrative route is futile or the remedy inadequate." Springer v. Wal-Mart Assocs. Group Health Plan, 908 F.2d 897, 899 (11th Cir. 1990) (internal quotation marks and citations omitted). The current subscribers' claims that the Defendants misrepresented the medical necessity definition in violation of their fiduciary obligations under § 1104(a) have already been dismissed, but the Court also finds those claims (and perhaps the summary plan description claims as well) would very likely be dismissed eventually because the Plaintiffs have not pled any facts justifying their failure to abide by ERISA's exhaustion requirement.

The amended complaints allege that the exhaustion requirement may be excused in this case because "no administrative procedure capable of entertaining such claims or affording adequate remedies for such claims has been made available or disclosed to plaintiffs." O'Neill Compl., ¶ 114. However, ERISA mandates that every employee benefit plan "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). The complaints do not suggest that the Plaintiffs conducted a good faith inquiry into the applicability or adequacy of these administrative proceedings. Cf. Response Oncology, Inc. v. MetraHealth Ins. Co., 978 F. Supp. 1052, 1063-64 (S.D. Fla. 1997) (holding allegations that the plaintiff met with the defendants on numerous occasions over several years without success to be insufficient grounds for excusing exhaustion). The Plaintiffs do not plead the nonexistence of administrative review for a denial of benefits (and indeed acknowledge the existence of those

33

procedures in briefs filed with the Court), nor do they allege that they did not receive plan documents outlining the availability of administrative procedures. There being no allegations concerning any claims denied, the Defendants could not be expected to notify Plaintiffs of these review procedures beyond the disclosure in plan documents.

The medical necessity misrepresentation claims are inextricably intertwined with the claim administration process. To excuse a challenge to claim review policies and criteria on the grounds that the administrative procedure is primarily designed to handle actual claims for benefits would permit any plaintiff, prior to undergoing a medical procedure that she knows will not likely be reimbursed, to evade exhaustion by bringing a preemptive suit to prospectively adjudicate a claim that would otherwise be subject to administrative claim-resolution procedures. Permitting such tactics would subvert the strong congressional policy that plans provide review procedures in order to "reduce the number of frivolous lawsuits under ERISA, minimize the cost of dispute resolution, enhance the plan's trustees' ability to carry out their fiduciary duties expertly and efficiently by preventing premature judicial intervention in the decisionmaking process, and allow prior fully considered actions by pension plan trustees to assist courts if the dispute is eventually litigated." Mason, 763 F.2d at 1227. Although this Court has countenanced the Plaintiffs' RICO claims based upon similar facts and allegations, the statutory structures and purposes underlying RICO and ERISA are not identical. Whereas RICO is intended to be read broadly to combat illegal, systematic practices, see Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497 (1985), ERISA strongly favors administrative resolution and the construction of a factual record prior to an action being filed in federal court. See Perrino, 209 F.3d at 1315.

The Plaintiffs also plead that resort to those administrative procedures would be a futile

exercise due to each insurance company's (1) "longstanding misleading and deceptive conduct in connection with its basic coverage promise" and (2) "assertions in the instant litigation and elsewhere that plaintiffs' claims are not legally recognizable (wholly apart from any asserted failure of plaintiffs to exhaust administrative remedies), and that those claims do not justify granting all or any part of the relief plaintiffs have sought." O'Neill Compl., ¶ 114. The first ground, the Defendants' alleged "longstanding misleading and deceptive conduct," would apparently excuse any ERISA plaintiff who alleges malfeasance by a defendant and is too vague and conclusory to constitute a cognizable reason.

The Plaintiffs' second contention, that the Defendants' positions taken in the instant litigation and elsewhere ensure that administrative review would be a meaningless exercise, would effectively deter bona fide usage of the failure-to-exhaust defense. See Ames v. American Nat'l Can Co., 170 F.3d 751, 756 (7th Cir. 1999) ("[I]t would be bizarre indeed to find that ANC's price for prevailing on the exhaustion argument is that it is estopped from urging the interpretation of the plan that it believes is correct."). Given the absence of any allegations concerning claims for specific medical benefits, the Defendants clearly have not taken any position with respect to the merits of reimbursing any individual claim for expenses incurred in connection with medical treatment. In addition, the Plaintiffs have brought civil RICO claims alleging relief from alleged criminal activity based in large part on the same factual allegations that form the basis of these ERISA claims. The Defendants faced a choice between vigorously contesting the ERISA claims or risking exposure to RICO's treble damages and potential criminal liability.

The Plaintiffs' averments are insufficient to excuse the exhaustion requirement as to the

35

misrepresentation of medical necessity claims. However, whether the source of financing and administration SPD requirement and the physician-patient communication interference fiduciary duty claims would be dismissed on grounds of nonexhaustion is uncertain. Those claims are not clear attempts to circumvent the claim review process, and the Defendants' plans do not clearly apply to such claims.

**D. The Misrepresentation Claims Must Conform with This Court's Previous Ruling**

Although the misrepresentation fiduciary duty claims brought by the _former_ subscribers are not dismissed, these Plaintiffs should be aware of the fragility of their claims.[13] The Subscriber Track Order found that absent a specific inquiry by the beneficiary or some other compelling circumstance, neither the summary plan description requirements nor ERISA's general fiduciary duty obligations require that a plan administrator disclose financial incentives paid to physicians or employees in the claims review process. 150 F. Supp. 2d at 1353-56. The Plaintiffs repled their summary plan description claim by stating that the Defendants "inaccurately described the medical necessity definition actually applied during the claims review process." O'Neill Compl., ¶ 154. The Plaintiffs contend that at the root of this inaccurate description is the failure to disclose the cost-based criteria, the subcontracting review of claims to third parties, and the use of physicians and non-physicians who lacked proper training and specialization. Id. at 155.

In order to state a claim for which relief may be granted, the misrepresentation of medical necessity definition claim must be kept analytically distinct from a bare allegation that the

---

[13]The former subscriber Plaintiffs' summary plan description claims per se are dismissed in this Order, but the allegations concerning the summary plan description claim are incorporated by reference into their breach of fiduciary duty misrepresentation claim.

Defendants failed to disclose the nature of their cost-suppression-based criteria. If, in the end, the Plaintiffs' misrepresentation claim boils down to an allegation that the Defendants mislead their subscribers by failing to give enough information about cost-suppression <u>incentives</u> to place the medical necessity terminology in its proper context, it would be precisely the sort of omission-based claim that this Court has already rejected. 150 F. Supp. 2d at 1353-56. Such a claim would be fatally imprecise and subject to dismissal.

To be sure, this is a fine distinction. Permitting the claims to go forward poses the danger of a slippery slope that threatens to relegate the principles elucidated in <u>Ehlmann v. Kaiser Found. Health Plan of Texas</u>, 198 F.3d 552, 556 (5th Cir. 2000) and <u>Weiss v. CIGNA Healthcare, Inc.</u>, 972 F. Supp. 748, 754 (S.D.N.Y.1997) into a historical footnote in that the Plaintiffs in those cases who sought to compel disclosure of financial incentives simply neglected to plead the magic words "medical necessity." However, the slope has not yet been reached. Time will tell whether the misrepresentation claims lack a precision permitting them to be readily distinguished from failure to disclose the financial incentives that the Defendants are not required to disclose.

The Defendants in a supplemental filing bring to this Court's attention <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 122 S.Ct. 708 (2002) and argue that this case compels dismissal of the Plaintiffs' ERISA claims because their "monetary" claims for restitution under § 1132(a)(3) are not "equitable relief" and hence are impermissible. However, the Plaintiffs seek not only restitution, but other injunctive relief. Furthermore, <u>Knudson</u> may not extend to cases concerning a breach of fiduciary duty. <u>See, e.g.</u>, <u>Strom v. Goldman, Sachs & Co.</u>, 202 F.3d 138 (2d Cir. 1999) (noting that "the plaintiff's claim is based on the alleged breach of a fiduciary

37

duty, a claim that always has been within the exclusive jurisdiction of equity," and holding that the relief sought was "equitable" within the meaning of § 1132(a)(3)). The Court declines to further address the matter at this time.

### E. Unlawful Interference with Physician-Patient Communication

The Plaintiffs have pled a breach of fiduciary duty in accordance with the Court's suggestion that the Plaintiffs "clarify whether they are stating a fiduciary claim based upon any purported gag clauses, and, if so, the specific nature of those arrangements." Subscriber Track Order, 150 F. Supp. 2d at 1357. The Plaintiffs submit that the Defendants have breached their fiduciary obligations under § 1104(a)(1)(A) (brought pursuant to § 1132(a)(3)) to discharge their duties "solely in the interest" of the participants and beneficiaries "by taking actions including but not limited to entering contracts with medical service providers and groups of providers, which discourage medical providers from imparting complete and accurate information to participants and beneficiaries in ERISA covered employee benefit plans . . . ." O'Neill Compl., ¶ 163. The allegedly suppressed information includes matters such as the "financial incentives (exempting the methodologies thereof) and other contractual relationships imposed on medical service providers or claims reviewers which encourage them to limit the cost of services or supplies prescribed, recommended, authorized, approved, covered, or made available to employee benefit plan participants and beneficiaries." Id. In addition, the "nature of any disputes or disagreements between a medical service provider" and the MCO, or the "scope and terms" of the subscriber's coverage are also forbidden topics. Id.

The Defendants argue that these contractual gag provisions, and other means that promote a physician "white wall of silence," are not connected to plan administration and therefore do not

38

fall within the scope of ERISA's statutory duties. The term "fiduciary" in § 3(21)(A) of ERISA

is defined "not in terms of formal trusteeship, but in <u>functional</u> terms of control and authority

over the plan." <u>Mertens</u>, 508 U.S. at 262 (emphasis in original). Accordingly, under ERISA, a

person "is a fiduciary with respect to a plan" not for all purposes and at all times, but only "to the

extent" that "he has any discretionary authority or discretionary responsibility in the

administration of such plan." 29 U.S.C. § 1002(21)(A)(iii), § 3(21)(A)(iii).

This Court has held that "absent a specific inquiry by the beneficiary or some other

special circumstance, there is no affirmative fiduciary duty to disclose financial incentives paid to

physicians or employees in the claims review process." 150 F. Supp. 2d at 1356.  However, the

Plaintiffs allege that the Defendants are taking actions with the specific intent to suppress

information that would prompt plan participants to ask questions triggering the MCO's statutory

responsibility to provide answers concerning financial incentives.  If true, this preemptive

strategy designed to minimize the statutory obligations is wholly incompatible with the spirit of

proper plan administration, especially if the MCOs assure their customers that they "encourage[]

participating physicians to discuss their financial arrangements with patients."  O'Neill Compl., ¶

64. All of the Plaintiffs have satisfactorily pled a fiduciary duty claim based upon improper

interference with patient-physician communication.

### IV. Federal Common Law Civil Conspiracy

The Plaintiffs have pled a "common law of civil conspiracy" claim.  Each complaint

alleges that the particular Defendant managed care company named in the complaint agreed with

assorted entities (including other managed care companies not named in the respective

complaint) not to disclose cost containment strategies to each of their participants.  <u>See, e.g.,</u>

39

O'Neill Compl., ¶ 169. The complaints do not expressly state, for purposes of the common law conspiracy claims, what substantive law the Defendants conspired to violate. The parties' pleadings clarify that the claim is intended to be a federal common law claim designed to supplement the remedies of ERISA.[14]

However, § 1132(a) of ERISA offers relief for breaches of fiduciary duty. Whether those breaches are committed in solitude or in conspiratorial fashion, ERISA reaches all such actions. A breach of fiduciary duty by any other name is covered just the same. There is no justification for fashioning an independently-standing ERISA conspiracy claim against the Defendants. See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985) ("The six carefully integrated civil enforcement provisions found in § 1132(a) of [ERISA] as finally enacted, however, provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.") (emphasis in original); Pacificare, Inc. v. Martin, 34 F.3d 834, 836 (9th Cir. 1994) ("[T]he Supreme Court's approval of the development of a federal common law under ERISA does not authorize the creation of federal common law causes of action."); Useden v. Acker, 947 F.2d 1563, 1579 (11th Cir. 1991) ("[T]he Supreme Court has unambiguously intervened to restrain the grafting of novel remedies onto the statute."). Cf. Thorton v. Evans, 692 F.2d 1064, 1078 (7th Cir. 1983) (recognizing a cause of action under the common law of trusts brought against non-fiduciaries who conspire with an ERISA fiduciary). These claims are dismissed.

---

[14] The claims of those Plaintiffs whose plans are not governed by ERISA fail because they have alleged no substantive law which the Defendants conspired to violate. If RICO provides the basis, such conspiracy claims are already covered by explicit provisions in that statute.

## V. Unjust Enrichment Claims

The final claim pled by the Plaintiffs, newly added to the amended complaints, arises under the common law of unjust enrichment. The claim does not recite the particular actions of the Defendants that incur liability, but incorporates the allegations of the preceding paragraphs of each complaint. See, e.g., O'Neill Compl., ¶ 182. As with the RICO claims, it is alleged that the Plaintiffs purchased the Defendants' health coverage, that the companies provided coverage of lesser value than the coverage represented, and each insurance company "has been unjustly enriched by retaining the financial benefits generated by providing coverage of lesser value" to the putative class members. Id. at ¶ 187.

If the Defendants are ERISA fiduciaries, the claims of the Plaintiffs enrolled in ERISA-covered plans are likely preempted. In Pilot Life Ins. Co., v. Dedeaux, 481 U.S. 41, 48 (1987), the Supreme Court held that the plaintiff's common law causes of action, "each based on alleged improper processing of a claim for benefits under an employee benefit plan, undoubtedly meet the criteria for pre-emption under § 514(a)." The gravamen of virtually all of the Plaintiffs' allegations is that the Defendants process claims by using improper criteria and procedures. Furthermore, as noted earlier, the Eleventh Circuit has repeatedly held that "claims against an insurer for fraud and fraud in the inducement to purchase a policy are in essence claims 'to recover benefits due to [the beneficiary] under the terms of the plan.'" Butero, 174 F.3d at 1213. Regardless of whether a plaintiff alleges entitlement to particular benefits, see Franklin, 127 F.3d at 1028, the terms of the ERISA-governed policies are critical to the resolution of fraud claims and such claims thus relate to the plan. Hall, 134 F.3d at 1065.

In any event, all the Plaintiffs' unjust enrichment claims as pled are legally infirm and

must be dismissed.  First, however, the applicable state law governing the claims must be

acknowledged.  Although in multidistrict litigation cases the transferee forum generally controls

with respect to choice of law on federal law issues, see, e.g., In re Korean Air Lines Disaster of

September 1, 1983, 829 F.2d 1171 (D.C.Cir. 1987), the state choice of law rules of the transferor

forum must be consulted when adjudicating questions of state law.  Ferens v. John Deere Co.,

494 U.S. 516 (1990); In re Nucorp Energy Secs. Litig., 772 F.2d 1486, 1492 (9th Cir. 1985)

(applying the choice of law rules of Illinois because the state law claims were originally filed in

district court in Illinois before they were transferred to California by the Judicial Panel on

Multidistrict Litigation).  Thus, one would look to the choice of law rules of the state in which

the federal transfer court sits.

    Nevertheless, the parties have not brought to the Court's attention any conflicts among

the different states involved that would require a choice of law analysis.  See generally Singer v.

AT & T Corp., 185 F.R.D. 681, 692 (S.D. Fla. 1998) (observing that "breach of contract and

unjust enrichment . . . are universally recognized causes of action that are materially the same

throughout the United States."); American Airlines v. Wolens, 513 U.S. 219, 233 (1995) (noting

that "contract law is not at its core diverse, nonuniform and confusing").  The key issues appear

to be answered by universal principles of contract law, and therefore the Court need not conduct

an elaborate choice of law analysis.  See Jean v. Dugan, 20 F.3d 255, 260 (7th Cir. 1994)

(citation omitted) ("This court has held that before 'entangling itself in messy issues of conflict

of laws a court ought to satisfy itself that there actually is a difference between the relevant laws

of the different states.'").

    It is blackletter law that "the theory of unjust enrichment is equitable in nature and is,

42

therefore, not available where there is an adequate legal remedy." Webster v. Royal Caribbean Cruises, Ltd., 124 F. Supp. 2d 1317, 1326 (S.D. Fla. 2000) (quoting Gary v. D. Agustini & Asociados, S.A., 865 F. Supp. 818, 827 (S.D. Fla. 1994) (quotation marks omitted). An unjust enrichment claim can exist only if the subject matter of that claim is not covered by a valid and enforceable contract. See Webster, 124 F. Supp. 2d at 1326 (noting that under Florida law, "quantum meruit damages cannot be awarded when an enforceable contract exists."); California Medical Ass'n, Inc. v. Aetna U.S. Healthcare of Calif., Inc., 94 Cal. App.4th 151, 172, 114 Cal. Rptr. 2d 109, 125 (2001) ("[A]s a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights."); Lane Constr. Co. v. Brown & Root, Inc., 29 F. Supp. 2d 707, 727 (E.D. Va. 1998) ("It is a well-settled principle under Virginia law that unjust enrichment claims arise only where there is no express contract."), rev'd in part on other grounds, 207 F.3d 717 (4th Cir. 2000); Inglish v. Prudential Ins. Co. of Am., 928 S.W.2d 702, 706 (Tex. 1996) ("As with claims of quantum meruit, unjust enrichment claims are predicated on the absence of an express contract controlling the circumstances.").

The Plaintiffs have not explicitly alleged that an adequate remedy at law does not exist, and the failure to do so is fatal. Webster, 124 F. Supp. 2d at 1326-27; Martinez v. Weyerhaeuser Mortg. Co., 959 F. Supp. 1511, 1518 (S.D. Fla. 1996). The Plaintiffs argue that this Court may nevertheless infer that an adequate remedy at law does not exist if such a situation is "clear from the face of the Amended Complaint." Martinez, 959 F. Supp. at 1518; Webster, 124 F. Supp. 2d at 1327. But the lack of an adequate remedy is not self-evident. The RICO claims entitle successful Plaintiffs to treble damages. The Plaintiffs with ERISA plans have brought and may

43

in the future bring claims under that statute, and the non-ERISA Plaintiffs likely have a third

party beneficiary contract claim against the Defendants that would defeat the availability of an

unjust enrichment theory of recovery.  See, e.g., Smith v. Equifax Servs., Inc., 537 So. 2d 463,

464 (Ala. 1988) (noting that employees who pay premiums through salary deductions have third-

party beneficiary rights under the employer's insurance policy).

   Finally, the Plaintiffs counter that these claims are implicitly pled in the alternative.

However, an unjust enrichment claim can only be pled in the alternative if one or more of the

parties contest the existence of an express contract governing the subject of the dispute, and such

is not the case here.[15] Webster, 124 F. Supp. 2d at 1326; Thunderwave, Inc. v. Carnival Corp.,

954 F. Supp. 1562, 1566 (S.D. Fla. 1997) (holding that because the defendant denied the

existence of an express oral contract, the plaintiff could properly plead an alternative claim for

unjust enrichment).  Although this Court previously permitted a re-pleading of claims, at some

point the cycle must end, and the next stage will begin.  These claims are dismissed.

### VI. Conclusion

For the reasons stated above, it is

   ADJUDGED that Defendants' motions to dismiss are GRANTED in part and DENIED in

part.  Plaintiffs Murphy, Price, and Sessa brought only RICO and the other non-ERISA claims,

---

[15]This Court held in the Provider Track litigation that "[t]o the extent that the Plaintiffs' quasi-contract claims are covered by contractual arrangements between the parties, the Court treats the Plaintiffs' contention as a pleading of alternative or inconsistent claims for relief in accordance with Federal Rule of Civil Procedure 8(e)(2)." 135 F. Supp. 2d at 1269.  However, this conclusion hinged upon the premise that "having asserted that the Defendants have engaged in fraud and employed contracts of adhesion, the Plaintiffs could seek a rescission of the contracts." Id.  The Plaintiff subscribers in this case have not argued that they are victims of contracts of adhesion, and, even if rescission is possible as a third party beneficiary, the Plaintiffs have not sought that remedy.

all of which were dismissed.  The other Plaintiffs remain in this lawsuit, the claims that remain

being: (1) the RICO claims of those Plaintiffs who reside in states that recognize a private cause

of action for insurance fraud, (2) all of the ERISA claims alleging interference with physician-

patient communication as a breach of fiduciary duty, and (3) the misrepresentation of "medical

necessity" breach of fiduciary duty claims of those Plaintiffs who no longer subscribe to the

Defendants' health care plans.  The subscriber Plaintiffs may file amended complaints strictly

consistent with this opinion no later than <u>March 20, 2002</u>.  No new Plaintiffs or claims will be

permitted without prior leave of the Court.


      DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of February,

2002.


                                       FEDERICO A. MORENO
                                       UNITED STATES DISTRICT JUDGE


COPIES PROVIDED TO COUNSEL ON
THE February 19, 2002 SERVICE LIST

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-6269-CIV-DIMITROULEAS

DRS. MARTIN MAY, ALAN LAZAR,
MARTIN HALE, JOEL RUSH, PAUL ZIDEL,
RICHARD LINN, RICHARD BERKOWITZ
DOUGLAS STRINGHAM, ANDREW
ELLOWITZ, ALAN NOVICK, DEBRA WEISS,
and NEIL SCHECHTER,



     Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY,

     Defendant.

_____/

## ORDER ON MOTION TO REMAND
## AND MOTION TO DISMISS

THIS CAUSE is before the Court upon Plaintiffs', Drs. Martin May, Alan Lazar, Martin

Hale, Joel Rush, Paul Zidel, Richard Linn, Richard Berkowitz, Douglas Stringham, Andrew

Ellowitz, Alan Novick, Debra Weiss and Neil Schechter Motion for Remand, filed herein on

March 14, 2000 and Defendant, Allstate Insurance Company's Motion to Dismiss, filed herein

on March 1, 2000. The Court has carefully reviewed the motions and is otherwise fully advised

in the premises.

## I. BACKGROUND

Plaintiffs are doctors, who practice under the names "Park Place Therapeutic Center" and

"Park Place Orthopaedics & Rehabilitation." As this entity, they submit claims to Allstate for

payment on behalf of persons insured by Allstate for personal injury protection benefits, and

receive payments from Allstate.

1

Defendant, Allstate, sells automobile insurance policies in Florida which contain personal injury protection, pursuant to Florida law. Under the PIP coverage, Allstate agrees to pay 80% of reasonable charges for necessary medical treatment provided to covered insured who suffer injury in an automobile accident. Plaintiffs claim that the amount that they have received, pursuant to bills they have sent to Defendant, of work they have done on Defendant's insureds, is "substantially less than [Allstate] is statutorily and contractually obligated to pay."

On January 21, 2000, Plaintiffs filed a two Count Complaint in the Circuit Court, Seventeenth Judicial Circuit, in and for Broward County, Florida. The action was timely removed. The Complaint is for: 1) Declaratory Relief; and 2) Breach of Contract.

Plaintiffs seek remand to State Court, arguing that the amount of PIP benefits paid to Plaintiffs pursuant to illegally obtained discounts by Defendant, compared to the amounts that should have been paid, can not be determined with certainty. They could potentially exceed or fall below the necessary jurisdictional amount, and therefore Defendants cannot provide, by the preponderance of the evidence, that the amount in controversy exceeds the jurisdictional requirement. Defendant counters this argument by stating that Plaintiffs are engaged together in the practice of medicine, submit the claims together, and receive payments together. Defendant submits the Explanation of Medical Bill Payments and Health Insurance Claim Forms as evidence that Plaintiffs are engaged in a united practice of medicine.

Defendant next moves to dismiss this action. It argues that Plaintiffs do not allege that Allstate offers "preferred provider" PIP coverage under the policy. The insured are entitled to choose the health care provider they want, on their own. Plaintiffs claim that Defendant pays PIP claims for medical benefits at 80% of "preferred provider" rates. Defendant argues that it is not required to offer a "preferred provider" policy to its insured and therefore, has not failed to pay

2

PIP benefits as required by § 627.736, Florida Statutes. Defendant also argues that the

Complaint does not establish that it breached an obligation under the PIP coverage or §

627.736(10), Florida Statutes, by paying medical benefits at a "reasonable" rate, if it is less than

what Plaintiffs request. Defendant's last argument is that there is no private cause of action

permitted for violations of § 627.736(10). In sum, Defendant claims Plaintiffs do not state a

claim.

Plaintiffs, in their two page response, argue that they strongly disagree with Defendant's

arguments in the dismissal motion, and aver that they do state a claim.

## II. DISCUSSION

### A. Remand

"Any civil case filed in state court may be removed by the defendant to federal court if

the case could have been brought originally in federal court." Tapscott v. MS Dealer Service

Corp., 77 F.3d 1353, 1356 (11th Cir. 1996). Federal Jurisdiction should be found, unless it

appears within "a legal certainty that the claim is really for less than the jurisdictional amount."

Id. at 1356. However, "[w]here a plaintiff has made an unspecified demand for damages, a lower

burden of proof is warranted because there is simply no estimate of damages to which a court

may defer. Id. at 1356-57; See Gafford v. General Electric Company, 997 F.2d 150, 160 (6th Cir.

1993).

Plaintiffs claim that the amount of controversy in this action can only be determined by

calculating the amount of PIP benefits paid individually, to Plaintiffs. However, Plaintiffs are

engaged together in the practice of medicine under two names, "Park Place Therapeutic Center"

and "Park Place Orthopaedics & Rehabilitation." Plaintiffs submit forms to receive payment,

and receive payment collectively. The Health Insurance Claim Forms, submitted by Defendant,

3

shows that the I.D. Number of Referring Physician contains the same tax number on each sheet.

Additionally, in the space marked "Physician's, Supplier's Billing Name...," Park Place

Therapeutic Center is noted on each form. On the Explanation of Medical Bill Payment,

submitted by Defendant, in the space marked, "Treatment Rendered By," is the name Park Place

Therapeutic Center. "[W]hen several plaintiffs unite to enforce a single title or right, in which

they have a common and undivided interest, it is enough if their interests collectively equal the

jurisdictional amount." Troy Bank of Troy, Indiana v. G.A. Whitehead & Company, 222 U.S.

39, 40-41 (1911). The aggregate amount of the reduction of payments clearly exceeds the

$75,000 threshold necessary to confer jurisdiction on this Court.

### B. Dismiss

It is long settled that a complaint should not be dismissed unless it appears beyond a

doubt that the plaintiff could prove no set of facts in support of his claim which would entitle

him to relief. Conley v. Gibson, 355 U.S. 41 (1957). The allegations of the claim must be taken

as true and must be read to include any theory on which the plaintiff may recover. See Linder v.

Portocarrero, 963 F.2d 332, 334-336 (11th Cir.1992) (citing Robertson v. Johnston, 376 F.2d 43

(5th Cir.1967)). There must be a showing that the plaintiff has no claim before granting a motion

to dismiss. June Vernon and Delroy Vernon v. Medical Management Associates of Margate,

Inc., 912 F.Supp. 1549 (S.D.Fla. 1996).

Defendant's first argument is that the Complaint fails to allege a breach of contract or

violation of § 627.736. Plaintiffs allege in their Complaint, that Allstate pays PIP claims for

medical benefits at 80% of "preferred provider" rates. However, Plaintiffs fail to define

"preferred provider" rates, nor do they allege that such rates were not reasonable. Plaintiffs

claim, then, that because Allstate does not provide an option to insureds to purchase a "preferred

provider" policy for PIP benefits, it breached its contracts of insurance with its insureds and violated § 627.736(10) by paying at those rates. Therefore, Plaintiffs' only allegation is that Allstate is paying certain health care providers reduced rates which those providers have agreed to accept for medical services covered under the Allstate PIP contracts.

Plaintiffs, in the Complaint, claim that Defendant's standard policy does not comply with § 627.736(1)(a), which necessitates a party to have personal injury protection of "[e]ighty percent of all reasonable expenses for necessary medical..." Plaintiffs claim that they provided medical treatment, and were paid less than what is statutorily and contractually obligated to pay. However, Plaintiff's claims are not based on this Florida Statute.

Plaintiffs also argue that Defendant refers to Plaintiffs actions as "preferred providers," and such designation is improper. § 627.736(10), Florida Statutes, states in pertinent part, "(10) An insurer may negotiate and enter into contracts with licensed health care providers for the benefits described in this section, referred to in this section as 'preferred providers,' which shall include health care providers...The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits..." Plaintiffs attached the insurance policy to the Complaint. The Court may consider the policy for purposes of a motion to dismiss. Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1369 (11th Cir. 1997); Smith Barney, Inc. v. Scanlon, 180 F.R.D. 444, 446 (S.D.Fla. 1998). Such consideration of a document attached to Plaintiff's complaint does not convert the motion to dismiss into a motion for summary judgment. Id. The policy does not contain the term "preferred providers," and Plaintiffs are not the parties the statute is meant to protect. Additionally, the statute does not state that Defendant must offer a "preferred providers" plan, but only regulates those parties that choose to do so.

Defendant argues that the statute was not enacted to benefit medical providers, and therefore, does not allow Plaintiffs to rely on it as their basis for damages. In <u>Fischer v. Metcalf</u>, the Third District Court of Appeals discussed three criteria[1] which are pertinent to whether the legislature intended a statute to benefit a party. They are, "1) whether the plaintiff is one of the class for whose especial benefit the statute was enacted; 2) whether there is any indication, either explicit or implicit, of a legislative intent to create or deny such a remedy; and 3) whether judicial implication is consistent with the underlying purposes of the legislative scheme." <u>Fischer v. Metcalf</u>, 543 So.2d 785, 788 (Fla. 3rd DCA 1989); <u>See</u> <u>Cort v. Ash</u>, 422 U.S. 66 (1975).

§ 627.736, Florida Statutes, was not enacted to benefit medical providers. Plaintiffs are not the class whose especial benefit the statute was enacted. The statute was enacted to protect insureds from harm as a result of accidents with other drivers, and actions by insurance companies. The statute was not enacted to ensure that medical providers received what they felt was a reasonable wage. The legislature did not imply, nor can it be inferred, that the medical providers were the parties the statute was enacted to protect. The Court cannot infer that the Legislature intended to protect the medical providers with the enactment of § 627.736. "Legislative intent, rather than duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists when a statute does not expressly provide for one." <u>Murthy v. N. Sinha Corp.</u>, 644 So.2d 983, 985 (Fla. 1994). Plaintiffs claim for relief based on Defendant's alleged violation of § 627.736, Florida, Statutes, does not allege a cause of action.

---

[1] Out of a four part test.

The remaining issue is whether Plaintiffs may sue Defendant for paying them what they do not deem to be reasonable rates, as preferred providers. However, the term preferred provider is not mentioned in the insurance policy and Defendant's actions do not resemble the statute's definition of the term preferred provider. Therefore, Plaintiffs claim is based on being intended third party beneficiaries to Defendant's insurance policies. Plaintiffs are not in direct contractual privity with Defendant. "[T]he term 'privity' is a word of art derived from the common law of contracts and used to describe the relationship with persons who are parties to a contract." Espinosa v. Sparber, et al., 612 So.2d 1378, 1380 (Fla. 1993). Usually only parties to a contract may collect on the contract. However, "an intended third party beneficiary of a contract may recover damages from the contracting parties if they breach the contract." Jacobson v. Heritage Quality Construction Co., Inc., 604 So.2d 17, 18 (Fla. 4th DCA 1992). "Essential to the right of a third party beneficiary of a contract to maintain an action for its breach is a clear intent and purpose of the contract to directly and substantially benefit the third party." Thompson v. Commerical Union Insurance Company of N.Y., 250 So.2d 259, 262 (Fla. 1971). The insurance policies between Defendant and the insureds are clear in their intent to directly and substantially benefit Plaintiffs[2]. Plaintiffs, in the present action, "must plead the contract which was expressly for (their) benefit and one under which it clearly appears that (they were) a beneficiary." Weimar v. Yacht Club Point Estates, Inc., 223 So.2d 100, 102 (Fla. 4th DCA 1969). Plaintiffs properly pled that they were intended third party beneficiaries to defeat the motion to dismiss.

### III.  CONCLUSION

Plaintiffs did not, nor could they, properly plead a cause of action under § 627.736(1)(a)

---

[2] Although this benefit is not the main crux of the insurance policy.

7

and (10) as the basis of Defendant's liability. The statute does not delineate that there exists such

a cause of action exists, nor is the statute drafted to benefit medical providers. Plaintiffs do state

a cause of action for breach of contract, in that they are the intended third party beneficiaries to

the insurance policy, but not on the basis that they were improperly treated as preferred

providers.

Accordingly, it is

**ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion to Remand is hereby **DENIED**;

2. Defendant's Motion to Dismiss is hereby **GRANTED**; in part. Motion to Dismiss

Count I is hereby Granted; Count I is dismissed with prejudice. Motion to Dismiss Count II is

hereby **GRANTED**; Count II dismissed without prejudice, with leave to amend in accordance

with this Order. An Amended Complaint shall be filed within then days of this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this _14_ day of

April, 2000.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

Peter Valeta, Esq.
Lawrence Kopelman, Esq.
David B. Shelton, Esq.

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO.: 00-CIV-6269-FERGUSON



FILED by _____ D.C.

NOV 2 2 2000

CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

DRS. MARTIN MAY, ALAN LAZAR, MARTIN
HALE, JOEL RUSH, PAUL ZIDEL,
RICHARD LINN, RICHARD BERKOWITZ,
DOUGLAS STRINGHAM,
ANDREW ELLOWITZ, ALAN NOVICK,
DEBRA WEISS and NEIL SCHECHTER,

       Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,

       Defendant.
_____/

## FINAL ORDER OF DISMISSAL

This matter came on for consideration on Plaintiffs' Motion For Voluntary Dismissal Without Prejudice. Upon consideration of the matter, it is hereby ORDERED AND ADJUDGED that Plaintiffs' action is dismissed without prejudice under Federal Rule of Civil Procedure 41(a)(2) based on the following conditions: Judge Dimitrouleas' dismissal of Plaintiffs' claims that Defendant violated Section 627.736(10), Florida Statutes, as reflected in his order dated April 14, 2000, shall remain in effect as a dismissal with prejudice of such claims. All other claims are dismissed without prejudice. Defendant shall also remain bound by Judge Dimitrouleas' order of April 14, 2000.

DONE and SIGNED in Chambers at Ft. Lauderdale, Florida this 22ND day of November, 2000.

_____
Wilkie D. Ferguson, Jr.
United States District Judge

EXHIBIT "C"