UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

       Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

       Defendants.

_____/



## NOTICE OF SUPPLEMENTAL AUTHORITY IN OPPOSITION
## TO THE PENDING MOTIONS TO COMPEL ARBITRATION

PLEASE TAKE NOTICE that the Class Plaintiffs, on behalf of themselves and all others

similarly situated, by their undersigned counsel, hereby notify this Court of supplemental authority

in opposition to the pending Motions to Compel Arbitration. On March 29, 2002, the Eleventh

Circuit rendered its decision in Ivax Corp. v. B. Braun of America, Inc., 2002 WL 480099 (11th Cir.

2002). A true and correct copy of the decision is attached hereto as Exhibit "1."

                     Respectfully submitted,

                     ATLAS PEARLMAN, P.A.
                     Co-Counsel for Class Plaintiffs
                     350 East Las Olas Boulevard, Suite 1700
                     Fort Lauderdale, FL 33301
                     (954) 763-1200
                     (954) 766-7800 Facsimile

       By: _____
               ERIC LEE
               Florida Bar No. 961299



CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

**Co-Counsel for Class Plaintiffs**

GOLD & COULSON
A Partnership of Professional and
Limited Liability Corporations
11 S. LaSalle Street
Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A.
Bank of America Tower
Suite 2510
One Financial Plaza
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

mail this _8th_ day of April, 2002 upon: all individuals on the attached service list.

ERIC LEE

2



## MASTER SERVICE LIST
### (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)
(Updated 1/22/02)

### Co-Lead Counsel for Plaintiffs

ATLAS PEARLMAN, P.A.
Eric Lee, Esq.
lee@atlaslaw.com
Jan Douglas Atlas, Esq.
atlas@atlaslaw.com
Robin Corwin Campbell, Esq.
campbell@atlaslaw.com
Suite 1700
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301
(954) 763-1200
(954) 766-7800 Facsimile

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphillips@phillipsgarcia.com
Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 2510
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

### Co-Counsel for Plaintiffs

Susan L. Lawson, Esq.
personalinjurylawyer@earthlink.net
Suite 200
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-8879
(813) 251-5786  Facsimile

RICHARD BOKOR, P.A.
Richard Bokor, Esq.
rabokor1@tampabay.rr.com
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-1000
(813) 254-6327 Facsimile

Casey Fundaro, Esq.
fundaro@aol.com
P.O. Box 7420
Fort Lauderdale, FL 33338-7420
(954) 462-2833
(954) 462-2835 Facsimile

### Counsel for:
### Allstate, Fidelity and Casualty,
### Continental, Deerbrook

RUMBERGER, KIRK &
CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 Facsimile

### Counsel for Beech Street and ADP

TEW, CARDENAS,et al.
John M. Quaranta, Esq.
(305)539-2495
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1116 Facsimile

### Counsel for Progressive

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

### Counsel for CCN

MCGUIRE WOODS, LLP
William W. Deem, Esq.
wdeem@mcguirewoods.com
3300 Bank of America Tower
50 North Laura Street
Jacksonville, FL  32202
(904) 798-3200
(904) 798-3207 Facsimile





**Counsel for Nationwide**

FOWLER, WHITE, et al.
Katherine C. Lake, Esq.
klake@fowlerwhite.com
Post Office Box 1438
Tampa, FL 33601
(813) 228-7411
(813) 229-8313 Facsimile

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esq.
haggerty@scdlaw.com
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316
(215) 299-4314
(215) 299-4301 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Robert K. Levenson, Esq.
rlevenson@hklaw.com
Greg Baldwin, Esq.
gbaldwin@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 Facsimile

**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT et al.
Mark Shapiro, Esq.
mshapiro@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for:**
**Hartford, Metropolitan, Integon**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Metropolitan**

SONNENSCHEIN, NATH & ROSENTHAL
Jeffrey P. Lennard, Esq.
jpl@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000
(312) 876-7934

**Counsel for Hartford**

MAYER, BROWN & PLATT
Howard J. Roin, Esq.
hroin@mayerbrown.com
190 South LaSalle Street
Chicago, IL, 60603-3441
(312) 782-0600
(312) 701-7711 Facsimile

**Counsel for Superior**

BUTLER BURNETTE PAPPAS
Alan J. Nisberg, Esq.
anisberg@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for Prudential**

BUTLER BURNETTE PAPPAS
Kathy J. Maus, Esq.
kmaus@bbplaw.com
Lauren D. Levy, Esq.
llevy@bbplaw.com
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308
(850) 894-4111
(850) 894-4999 Facsimile

SHEA & GARDNER
John D. Aldock, Esq.
Jaldock@SheaGardner.com
Michael Isenman, Esq.
misenman@sheagardner.com
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
(202) 828-2000
(202) 828-2195 Facsimile

**Counsel for American International**

CONROY, SIMBERG, GANON,
KREVANS & ABEL, P.A.
Dale L. Friedman, Esq.
dfriedman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Boulevard
Second Floor
Hollywood, FL 33021
(954) 961-1400
(954) 967-8577 Facsimile


ATLAS PEARLMAN

Header:

agreement, did not constitute action inconsistent with an intent to arbitrate, and thus did not result in waiver of purchaser's right to compel arbitration of dispute arising under purchase agreement, where state litigation was based on a separate confidentiality agreement between purchaser and firm, and former parent was not named as a party and did not participate in state litigation, which was not an artful attempt to evade arbitration.

**[8] Arbitration ⬤➔8**
33k8 Most Cited Cases

Parties to an arbitration agreement may not evade arbitration through artful pleading, such as by naming individual agents of the party to the arbitration clause and suing them in their individual capacity.

**[9] Arbitration ⬤➔23.3(1)**
33k23.3(1) Most Cited Cases

Conduct of purchaser of subsidiary corporation in allegedly limiting and eventually refusing to allow accounting firm retained by former parent to have access to its books and records, in connection with former parent's claim that post-sale income of purchaser entitled it to contingency payments under purchase agreement, did not result in waiver by purchaser of right to compel arbitration of dispute under agreement, where purchaser's conduct did not did not disable dispute resolution process, because arbitrator was empowered under agreement to use whatever procedures were reasonably appropriate to resolve dispute.

**[10] Arbitration ⬤➔23.3(1)**
33k23.3(1) Most Cited Cases

Participating in litigation is not the only way to waive the right to arbitration.

**[11] Arbitration ⬤➔23.3(1)**
33k23.3(1) Most Cited Cases

A contractual breach alone cannot rise to the level of a waiver of right to compel arbitration; otherwise, parties would never arbitrate contract disputes.

**[12] Arbitration ⬤➔1.1**
33k1.1 Most Cited Cases

While Federal Arbitration Act (FAA) is designed to place arbitration agreements on the same footing as other contracts, it does not require parties to arbitrate when they have not agreed to do so. 9 U.S.C.A. § 1 et

seq.

**[13] Arbitration ⬤➔6.2**
33k6.2 Most Cited Cases

Parties to an arbitration agreement may exclude certain claims from the scope of the agreement.

**[14] Arbitration ⬤➔23.10**
33k23.10 Most Cited Cases

Federal Arbitration Act (FAA) creates a presumption in favor of arbitrability, so that parties must clearly express their intent to exclude categories of claims from their arbitration agreement. 9 U.S.C.A. § 1 et seq.

**[15] Arbitration ⬤➔7**
33k7 Most Cited Cases

Courts may not twist the language of contract that contains an arbitration clause to achieve a result which is favored by federal policy in favor of arbitration, but contrary to the intent of the parties.

**[16] Arbitration ⬤➔7.7**
33k7.7 Most Cited Cases

Dispute between purchaser of subsidiary corporation, and subsidiary's former parent, in which parent alleged that purchaser had breached provisions of agreement, which called for parent to receive contingency payments if purchaser's income in subsequent years exceeded stated amount, by failing to maintain complete and accurate books and records, and failing to allow parent to examine books, in actuality involved claim that purchaser had improperly calculated its income, and thus came within scope of provision of agreement which called for parties to arbitrate any disputes involving objections by purchaser that it had not been paid amounts due.

Kenneth Winston Starr, Kirkland & Ellis, Washington, DC, for Defendants- Appellants.

Eugene E. Stearns, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson PA, Miami, FL, Alan N. Salpeter, Jeffrey W. Sarles, Stephen Michael Shapiro, Mayer, Brown, Rowe & Maw, Chicago, IL, for Plaintiff-Appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before TJOFLAT, CARNES and REAVLEY, [FN*] Circuit Judges.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

TJOFLAT, Circuit Judge:

*1 B. Braun of America, Inc., ("BOA") and B. Braun Medical Inc., ("BMI") (collectively, "Braun") [FN1] appeal the district court's denial of a petition to compel arbitration and accompanying motion for a stay pending arbitration. We conclude that the district court erred in finding that Braun had waived its right to arbitration, and, because we hold that the dispute between Braun and the appellee, Ivax Corporation ("Ivax"), falls within the scope of the parties' arbitration clause, we reverse.

I.

A.

On May 30, 1997, Braun, a Pennsylvania corporation, agreed to purchase from Ivax, a Florida corporation with its principal place of business in Miami, all of the outstanding common stock of Ivax's subsidiary, a medical device manufacturer called McGaw, Inc. ("McGaw"). The terms of the sale were set forth in a Stock Purchase Agreement ("Agreement"), which required Braun to make an initial payment of approximately $320 million to Ivax. The Agreement also provided for the possibility of "contingency payments" to be made by Braun to Ivax based on the "adjusted combined operating income" ("ACOI") [FN2] of Braun and McGaw in the years following the stock purchase. In particular, section 2.4 of the Agreement stated that if the ACOI for a given fiscal year were $45 million or greater, then Braun must make a further payment, the amount of which depended on the ACOI. The total aggregate of the contingency payments, if any were made, was not to exceed $80 million. The Agreement also required Braun to determine the ACOI for each fiscal year and to provide Ivax with an audited statement setting forth the ACOI and "in reasonable detail the basis for the determination of such amount." [FN3]

Section 2.5 of the Agreement provided a process by which Ivax could verify Braun's ACOI determination and make any objections. [FN4] First, section 2.5 required Braun to "maintain complete and accurate books and records of account [s] relating to [its ACOI determination]." These books and records were then to be made available to Ivax's accountants so that the accountant could "examine the relevant books and records ... to verify that appropriate accounting and payments [had] been made." If Ivax subsequently determined that it should have received a contingency payment, section 2.5(a) stated that Ivax was to give

written notice to Braun, setting forth the basis and determination for its objections. Upon receiving this notice, Braun and its accountants were entitled to examine the relevant working papers and procedures of Ivax's accountants. The parties then had thirty days from the date of Ivax's notice "to negotiate in good faith a resolution of their dispute."

If the parties could not resolve their disagreement within thirty days, however, then section 2.5(a) supplied the solution: Either Braun or Ivax "may cause such dispute to be submitted for determination" to an arbitrator, who was to be chosen from one of the "Bix Six" (now Big Five) public accounting firms. [FN5] The arbitrator had thirty days from the date it was selected to "determine the disputed items using such procedures and factual investigations and determinations as the arbitrator may reasonably deem appropriate; provided, however, that the arbitrator shall be instructed to resolve such disputed items in accordance ... with that described in Section 2.4 [of the Agreement]." The decision by the arbitrator concerning the disputed items was to be " 'final' and binding upon both [parties] and ... nonappealable." [FN6]

B.

*2 Pursuant to the Agreement, Braun calculated the ACOI for fiscal years 1998 and 1999, and, for each year, submitted its statements to Ivax. [FN7] Because Braun's determinations revealed that the ACOI for each year was less than $45 million, it made no contingency payments to Ivax. Not surprisingly, Ivax invoked its right under section 2.5 of the Agreement to have its accounting firm, Arthur Andersen ("AA"), examine Braun's books and records and the work papers of Braun's accountant, PricewaterhouseCoopers, LLP ("PwC"). Ivax therefore notified Braun on June 18, 1999, and then again on December 29, 1999, that it wanted to examine the books and records for fiscal years 1998 and 1999, respectively.

Beginning in July 1999, Braun provided AA access to its books and records as well as to PwC's work papers related to its audits. [FN8] Over the next ten months, AA examined Braun's records and PwC's papers, intermittently requesting additional information and further access, which Braun often denied because it believed the requested information to be irrelevant. Finally, in May 2000, Braun refused to allow AA to continue its examination unless and until AA signed a "Confidentiality Agreement." This agreement required AA to treat as confidential all of Braun's books and records and allowed AA to disclose to Ivax only reports of its examination and any information

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

"necessary to provide Ivax a meaningful statement of account." Notably, Ivax was not a party to the agreement. On June 8, 2000, Braun and AA executed the Confidentiality Agreement, and AA subsequently resumed its examination of Braun's books and records. [FN9]

On November 21, 2000, and November 29, 2000, Ivax sent Braun notices, pursuant to section 2.5(a) of the Agreement, explaining that it believed that Braun owed it contingency payments for fiscal years 1998 and 1999. [FN10] Ivax's notices further stated that Braun had breached section 2.5 of the Agreement by, among other things, "failing to maintain complete and accurate books and records ... relating to the determination of [the ACOI]," by failing to allow Ivax to examine its books, and by "failing to calculate [the ACOI] in accordance with the Agreement." Each notice also included three pages setting forth various "deficiencies in Braun's Statement of [the ACOI]."

Shortly after receiving Ivax's notices, on December 11, 2000, Braun's accountant, PwC, began to review AA's work papers. One week later, pursuant to section 2.5(a), the parties agreed to begin good faith negotiations on December 21, 2000, which was the last day of the thirty-day negotiation period. The meeting on December 21, however, proved fruitless, the parties ending their discussion without a solution. [FN11]

*3 In the meantime, on December 20, 2000, the day before the parties' negotiation attempt, Braun sued AA in the Court of Common Pleas of Lehigh County, Pennsylvania. In a six-count complaint, Braun alleged that AA had breached the Confidentiality Agreement by improperly copying Braun's records and by providing Ivax with confidential information. Braun asserted that it brought the lawsuit in order "to protect its trade secrets and other confidential and proprietary business information" and to enjoin AA from "using or disclosing to any person" any of the information obtained from Braun. Ivax was not named as a defendant.

### C.

On the same day the parties attempted to negotiate a settlement, December 21, 2000, Ivax filed the instant suit in the United States District Court for the Southern District of Florida. Alleging that Braun breached sections 2.4 and 2.5 of the Agreement, Ivax claimed that it was deprived of the contingency payments for fiscal years 1998 and 1999, and prayed for $80 million in damages. Specifically, Ivax alleged that Braun (1) "deliberately fail[ed] to maintain accurate and complete

accounting books and records," (2) "inappropriately included [certain] losses in [the ACOI calculation], thereby artificially reducing the ACOI]," (3) "intentionally implement[ed] inadequate accounting procedures," (4) "den[ied] Ivax the ability to examine all relevant books and records," and (5) "deliberately failed to calculate [the ACOI] in accordance with section 2.4(e) of the Agreement." [FN12]

Less than a month after the lawsuit was filed (and before filing its answer), Braun petitioned the court to compel arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4 (2000), [FN13] and filed an accompanying motion for a stay pending arbitration pursuant to 9 U.S.C. § 3. [FN14] The district court, without conducting an evidentiary hearing, [FN15] denied Braun's motion on February 28, 2001. The court reasoned that Braun had waived arbitration "by filing suit in a Pennsylvania state court seeking to prevent disclosure by AA of the results of [its] audit," which indicates Braun's "intent to prevent Ivax from implementing the steps required under section 2.5(a) of the [Agreement] to obtain arbitration." The court further explained that Braun's "limiting and ... refusing [AA]'s access to their books and records as well as to [PwC]'s books and records is inconsistent with a good faith intent to arbitration [sic]." These acts, the court continued, prejudiced Ivax by preventing it from "present[ing] timely, reasonable, and detailed objections ... to [Braun's] ACOI statements," as well as by increasing the costs by delaying examination.

This interlocutory appeal followed.

### II.

*4 [1][2][3] The ability of parties to agree to arbitrate their disputes is well-recognized. In 1925, Congress enacted the FAA, seeking to "reverse the longstanding judicial hostility to arbitration agreements ... and to place [these] agreements on the same footing as other contracts." Equal Employment Opportunity Comm'n v. Waffle House, Inc., --- U.S. ----, 122 S.Ct. 754, 761, 151 L.Ed.2d 755 (2002) (citations omitted). [FN16] Indeed, the Supreme Court has commanded that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Notwithstanding this strong federal policy, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d

648 (1986) (citation omitted).

[4][5] Furthermore, an agreement to arbitrate, "just like any other contract ..., may be waived." *See e.g., Burton-Dixie Corp. v. Timothy McCarthy Const. Co., 436 F.2d 405, 407 (5th Cir.1971). [FN17]* In determining whether a party has waived its right to arbitrate, we have established a two- part test. First, we decide if, "under the totality of the circumstances," the party "has acted inconsistently with the arbitration right," and, second, we look to see whether, by doing so, that party "has in some way prejudiced the other party." *S & H Contractors, Inc. v. A.J. Taft Coal Co., 906 F.2d 1507, 1514 (11th Cir.1990)* (citations omitted).

[6] The district court denied Braun's petition to compel arbitration on the ground that Braun had waived its right to arbitrate. We review this legal conclusion *de novo.* [FN18] *See Subway Equip. Leasing Corp. v. Forte, 169 F.3d 324, 326 (5th Cir.1999)* ("We review the issue of whether a party's conduct amounts to a waiver of arbitration *de novo.*"); *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 25 (2d Cir.1995)* ("The question of whether a party's pretrial conduct amounts to waiver of arbitration is purely a legal one, and our review of this issue is *de novo.*").

A.

[7] One of the district court's two bases for holding that Braun had waived its right to arbitrate was Braun's state court suit against AA, conduct the court found inconsistent with an intent to arbitrate. Braun argues that participation in litigation against AA, an entity not a party to the arbitration agreement, cannot express an intent to forego the arbitration of a dispute against Ivax. We agree.

It is true that we have held that "[w]aiver occurs when a party seeking arbitration substantially participates in litigation to a point inconsistent with an intent to arbitrate." *Morewitz v. West of Engl. Ship Owners Mut. Prot. & Indem. Ass'n, 62 F.3d 1356, 1366 (11th Cir.1995)*; *see also S & H Contractors, 906 F.2d at 1514* ("[A] party that substantially invokes the litigation machinery prior to demanding arbitration may waive its right to arbitrate.") (citations omitted). In *Morewitz,* we found that an insurer had waived its right to arbitrate a dispute with an injured third party because, in an earlier lawsuit, it had colluded substantially with its insured to the detriment of the third party. *See Morewitz, 62 F.3d at 1365-66.* There, the administrator of the estates of shipwrecked crew

members had sued the ship's owner and manager in federal court in Virginia. *Id. at 1359.* The insurance company with a protection and indemnity policy covering the ship retained counsel to defend the action, never mentioning the arbitration clause in its insurance policy that required any dispute about the insured's obligations to "be referred to ... arbitration." *Id.* After a verdict in its favor, the administrator sued the insurer in federal court in Alabama to enforce the judgment. *Id. at 1360.* When the insurer then sought to compel arbitration, we concluded that it had waived its right by failing to demand arbitration earlier when it had participated in the litigation against the administrator in federal court in Virginia. *Id. at 1366.*

The conduct of the insurer in *Morewitz,* however, is a far cry from Braun's behavior in the instant case. In *Morewitz,* the insurer, though not a named party to the earlier suit, participated in that suit by hiring counsel and defending its interests against one of the named parties, the administrator-- the very party with whom the insurer later attempted to compel arbitration. Our objection was that, by litigating in court against the party with whom it now sought arbitration, the insurer had evinced an intent to waive arbitration. *See Morewitz, 62 F.3d at 1366.* Here, on the other hand, Braun instigated litigation against AA based on a separate confidentiality agreement between Braun and AA. Braun never named Ivax as a party, nor did Ivax in any way participate in that litigation. Because Braun and AA had no agreement to arbitrate, the only way for Braun to recover from AA was to sue.

*5 The only other cases before us that have involved waiver based on litigation activity have dealt entirely with litigation between the parties to the arbitration agreement. In each case, we held that the party engaging in litigation against the other party clearly appeared to forego arbitration, and instead sought to resolve the dispute in court. *See S & H Contractors, 906 F.2d at 1514* (holding that the party demanding arbitration had waived its right to arbitrate by filing, eight months earlier, a complaint against the other party to the arbitration agreement); *E.C. Ernst, Inc. v. Manhattan Constr. Co., 551 F.2d 1026, 1040-41 (5th Cir.1977)* (finding waiver and noting that, for two and a half years, the parties to the arbitration agreement had litigated their dispute before one party requested arbitration); *Burton-Dixie Corp., 436 F.2d at 408-09* (finding waiver and noting that the party seeking arbitration, a contractor, did not attempt to invoke the arbitration provision and instead "proceeded to litigate the dispute," even "implead[ing] as third- party defendants two of its subcontractors"). Because Braun's litigation with AA did not involve Ivax, these cases are

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

inapposite.

Much more analogous to the instant case is *Usher Syndicate, Ltd. v. Figgie Int'l, Inc.,* No. 87-1079, Oct. 22, 1987, 1987 WL 19840 (unpublished opinion) (S.D.Fla.1987), in which the court determined that a party had not waived its right to arbitrate by earlier filing a suit against a third party. In *Usher,* one party to a reinsurance contract that contained an arbitration clause sued the other party to the contract, claiming breach. *Id.* When the defendant thereafter moved the court to stay the action pending arbitration, the plaintiff argued that the defendant had waived its right to arbitrate because the defendant had earlier sued a third party, an underwriter of reinsurance, on a related issue. *Id.* The court disagreed, stating:

"It cannot be said, however, that pursuing rights against persons not party to an arbitration agreement constitutes a waiver of arbitration. The defendants in the [related litigation], not being signatories to the arbitration agreement, cannot be forced into arbitration. The only method by which the defendants could effectively enforce their rights against the [underwriter] was to file the collateral suit. It is in no manner inconsistent with their right to force the Plaintiffs in this litigation into arbitration as provided in the contract. Both rights exist in defendants; they are distinguishable and consistent because they are distinct rights as against separate parties."

**\*6** *Id.* (citations omitted). *See also Maxum Founds., Inc. v. Salus Corp.,* 779 F.2d 974, 982 (4th Cir.1985) ("[T]he mere filing of a third-party complaint by a party that seeks arbitration will not permit a court to find that the right to arbitrate has been waived.").

[8] Ivax, however, argues that Braun's suit against AA was designed to obstruct the possibility of arbitration by preventing AA from providing Ivax with the information to which Ivax was entitled under section 2.5 of the Agreement. This argument has initial appeal; surely parties to an arbitration agreement may not "evade arbitration through artful pleading," such as "'by naming individual agents of the party to the arbitration clause and suing them in their individual capacity.'" *Doctor's Assocs. v. Hollingsworth,* 949 F.Supp. 77, 83 (D.Conn.1996) (quoting *Mosca v. Doctors Assocs.,* 852 F.Supp. 152, 155 (E.D.N.Y.1993)). Nonetheless, we believe that Braun's suit against AA was not a practice in artful pleading, but rather, was more like the suit in *Usher:* litigation against a third party on an issue unrelated to the arbitration agreement. Specifically, Braun sued AA--not because it was Ivax's agent--but because it had breached the Confidentiality Agreement. That the relief

Braun sought indirectly affected Ivax's ability to verify the ACOI calculation is overshadowed by Braun's main objective in suing AA--to protect its trade secrets and private business records from potential competitors. [FN19] Indeed, because AA was not a party to the arbitration agreement, Braun was faced with only two choices: ignore AA's breach and risk losing confidential information, or sue AA in court. That Braun chose to protect its business interests by suing AA does not demonstrate Braun's intent to waive arbitration.

B.

[9] The district court had a second reason for ruling that Braun had waived its right to arbitrate, namely that Braun had limited and eventually refused AA access to its books and records as well as to Braun's accountant's (PwC's) books and records. This conduct, the district court found, "is inconsistent with a good faith intent to [arbitrate]." Braun responds that this alleged behavior is, at most, a breach of the Agreement with Ivax but in no way evinces a desire to forego arbitration. Again, we agree.

[10] The district court is correct in assuming that participating in litigation is not the only way to waive the right to arbitration. *See, e.g., S & H Contractors,* 906 F.2d at 1514 ("A party has waived its right to arbitrate if, under the totality of the circumstances, the party has acted inconsistently with the arbitration right.") (citation omitted). In *E.C. Ernst,* for example, we found waiver from the defendant's conduct, noting that, six months before the suit was filed, the defendant had stated to the plaintiff that it would file suit if the plaintiff initiated arbitration, and further observing that the defendant litigated the case with the plaintiff for two and a half years before finally requesting arbitration. *See E.C. Ernst,* 551 F.2d at 1040-41; *see also Blake Constr. Co. v. United States,* 252 F.2d 658, 662 (5th Cir.1958) (finding waiver because the party demanding arbitration had consistently rejected the other party's earlier requests for arbitration).

**\*7** [11] Even assuming that Braun did indeed unduly limit AA's access to its books and records--a point bitterly disputed by Braun and Ivax [FN20]-- we cannot conclude that this conduct rises to the level of waiver. Ivax argues that the limitation of access by Braun "sabotage[ed] the verification and dispute resolution process" and therefore showed that Braun intended to avoid arbitration. Because we take issue with Ivax's premise, we disagree with its conclusion. Braun's alleged conduct of prohibiting further access to its books and records did not disable the dispute resolution

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

process because the arbitrator, under section 2.5(a) of the Agreement, may use whatever "procedures and factual investigations and determinations" as "reasonably ... appropriate" to determine the correct ACOI. That is to say, no matter how significantly Braun may have limited AA's access, the arbitrator still would have been able to reach a decision because the Agreement provides that the arbitrator has virtually unlimited access. Therefore, Braun's alleged conduct--merely reflecting its belief that the line of access provided by the Agreement should be drawn further back than where Ivax would draw it--is, at most, a breach of the Agreement. A breach alone, however, cannot rise to the level of waiver; otherwise, parties would never arbitrate contract disputes. [FN21]

Ivax proposes two other reasons, neither of which the district court relied upon, to find that Braun intended to waive its right to arbitrate. First, Ivax asserts that Braun denied the adequacy of Ivax's November 21 and November 29, 2000 notices, which were sent pursuant to section 2.5(a) and set forth Ivax's objections to Braun's ACOI determination. Second, Ivax claims that Braun failed to negotiate in good faith on the thirtieth day of the negotiation period, refusing to attend the meeting or engage in "any substantive discussions."

Neither reason persuades us. First of all, Braun's objection to the inadequacy of Ivax's notices in no way shows an intent to avoid arbitration; rather, Braun sought further information, presumably to prepare a response to Ivax's objections. As for Ivax's second reason, Braun participated in the conference on the thirtieth day, albeit by telephone, and claims that Ivax terminated the negotiation, a fact which remains undisputed. These two acts, to which Ivax draws our attention, are better viewed in the totality of the circumstances, namely, Braun's substantial participation in the dispute resolution procedure outlined in section 2.5. For example, after receiving Ivax's notices, Braun requested access to AA's work papers in order to review Ivax's objections. Moreover, Braun agreed with Ivax to negotiate a resolution to their dispute on the last day of the thirty-day negotiation period. When the negotiation failed and Ivax sued Braun in district court, Braun, less than one month after receiving the complaint, filed a petition to compel arbitration. Two months later, when Braun filed its answer, it again asserted its right to arbitration as an affirmative defense.

**8 Faced with these facts, we cannot agree with the district court that Braun's conduct expressed an intent to waive arbitration. We therefore find it unnecessary to discuss the prejudice prong of our two-part waiver test.

### III.

Finding that Braun did not waive its right to arbitration does not end our inquiry, however. Ivax, with one more arrow in its quiver, argues that the instant dispute is beyond the scope of the arbitration clause in section 2.5(a); [FN22] therefore, we should affirm the district court on that basis. Specifically, Ivax asserts that the arbitration clause carves out only a narrow circumstance over which the arbitrator is to preside: a dispute about whether a given item is to be included in the ACOI calculation. Because the thrust of its complaint is Braun's failure to maintain its books and records properly, Ivax argues that the instant dispute is therefore not arbitrable.

[12][13] Ivax's contention requires us to apply basic principles of contract interpretation while mindful of the federal policy in favor of arbitration. See Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054, 1057 (11th Cir.1998). The FAA, while designed to place arbitration agreements "on the same footing as other contracts," Waffle House, Inc., 122 S.Ct. at 761 (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991)), nevertheless, "does not require parties to arbitrate when they have not agreed to do so." Volt Info. Scis., Inc. v. Board of Trustees, 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488 (1989). Parties to an arbitration agreement, moreover, may "exclude[e] certain claims from the scope of their arbitration agreement." Id. (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985)).

[14][15] We have held, however, that the FAA "creates a presumption in favor of arbitrability; so, parties must clearly express their intent to exclude categories of claims from their arbitration agreement." Paladino, 134 F.3d at 1057 (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945, 115 S.Ct. 1920, 1925-25, 131 L.Ed.2d 985 (1995)); see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...."). [FN23] Of course, "courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the intent of the parties." Paladino, 134 F.3d at 1057 (quoting Goldberg v. Bear, Stearns & Co., 912 F.2d 1418, 1419-20 (11th Cir.1990)); see also Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57, 115

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

S.Ct. 1212, 1216, 131 L.Ed.2d 76 (1995) ( "[T]he FLA's proarbitration policy does not operate without regard to the wishes of the contracting parties.").

**\*9** **[16]** With this legal background in mind, we turn to Ivax's argument. First, we believe that Ivax's contention that its lawsuit centers on Braun's failure to maintain its books and records properly is belied by the complaint itself, which is more accurately viewed as a disagreement with Braun's ACOI calculation. Furthermore, our review of the arbitration clause in section 2.5(a) leads us to find that the scope of the clause is broad enough to encompass this type of dispute easily. We therefore conclude that the current dispute should be submitted to arbitration.

Ivax essentially asserts that the subject of its complaint is Braun's deliberate and bad-faith refusal to adhere to its obligation to maintain accurate books and records, an issue separate and apart from the determination of the ACOI. We believe, however, that, viewed in the context of Ivax's other assertions, this claim does not accurately reflect the true nature of the complaint. Rather, the claim on which Ivax proposes we focus is only ancillary to the broader claim that Braun miscalculated the ACOI and improperly refused to make the two contingency payments. Indeed, in its complaint Ivax itself states that, in fiscal years 1998 and 1999, "[Braun] provided Ivax with a statement purporting to show that no [contingency] [p]ayment was due," and "Ivax did not agree with [Braun's] statement." Furthermore, Ivax contends that Braun's statements "were materially deficient" because Braun "failed to calculate [the ACOI] in accordance with section 2.4(e) of the Agreement."

Ivax correctly points out that the complaint does allege that Braun "failed to maintain accurate and complete books," but the enumerated paragraphs that follow this assertion clarify exactly what that means. The paragraphs catalog what Ivax views as Braun's mistakes in calculating the ACOI: (1) "fail[ing] to implement any procedures to ... track items that may be required to be accounted for as adjustments to [the ACOI];" (2) inappropriately includ[ing] losses from damage by Hurricane Georges in its ACOI calculation, "thereby artificially reducing [the ACOI] and denying Ivax the benefit of Payments;" (3) improperly "implement[ing] a new accounting system for 'chargebacks' from [its] customers," a system which did not accurately track those chargebacks; (4) "deliberately 'add[ing]' $32.5 million to [its] receivable reserve;" and, (5) "record[ing] over 8,500 manual journal entries," resulting in "multiple-million dollar changes to [Braun's] financial statements." [FN24] By setting forth

these allegations, Ivax demonstrates that its real contention is with Braun's miscalculation of the ACOI and failure to make the contingency payments.

Perhaps more telling of the true nature of Ivax's complaint is its prayer for damages, $80 million, which is the full amount of the contingency payments Ivax believes it is due for fiscal years 1998 and 1999. Ivax alleges in the complaint that it deserves the entire $80 million "as damages for Braun's misconduct and breach of contract," which "it would have received if Braun had adhered to its contractual obligations." We believe, however, that, for a court to award Ivax $80 million, Ivax would also have to prove that the ACOI for each fiscal year was sufficient to signal a contingency payment, thus highlighting that the ultimate issue at hand is the determination of the ACOI.

**\*10** In the face of these facts, we therefore disagree with Ivax regarding the subject of its complaint. *Cf. Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1113-16 (11th Cir.2001) (construing plaintiff's complaint, which, "[o]n its face ... would appear to arise from the contract," but, on closer inspection, involves claims arising under tort law that "do not involve directly the contract"). We conclude that the true thrust of Ivax's complaint is Braun's failure to calculate the ACOI properly--either because Braun inadequately kept its books or because it used improper accounting procedures--and consequent failure to make the contingency payments.

Such a dispute, we believe, is well within the scope of the parties' arbitration clause. Section 2.5, entitled "Records; Inspection of Records," sets forth an elaborate process for resolving any "dispute" involving "objections" by Ivax that it had "not been paid amounts due it." The first paragraph of section 2.5 made it Braun's responsibility to "maintain complete and accurate books and records" to determine the ACOI and gave Ivax the right to review those records. Subsection (a), immediately following the first paragraph, stated that, if, after reviewing Braun's records, Ivax determined "that it ha[d] not been paid amounts due [that is, a contingency payment]," then Ivax should provide written notice, setting forth its "specific objections" to Braun's ACOI statement. Braun and its accountants were then to examine the figures and procedures of Ivax's accountants. The parties then had thirty days to "negotiate in good faith a resolution of their dispute." The next sentence is key, stating,
 "If such dispute cannot be resolved [in thirty days] ... then either [Braun] or [Ivax] may cause such dispute to be submitted for determination to the Arbitrator, who shall as soon as practicable, but in any event no

later than thirty (30) days thereafter, determine the disputed items using such procedures and factual investigations and determinations as the Arbitrator may reasonably deem appropriate."

Interpreting section 2.5 "with a healthy regard for the federal policy favoring arbitration," *Moses Cone*, 460 U.S. at 24, 103 S.Ct. at 941, we conclude that the phrase "such dispute," as set out in the final portion of section 2.5(a), easily encompasses the instant lawsuit. Read in its context, "such dispute" must refer to the first sentence of section 2.5(a): disagreements that arise when "Ivax determines that it has not been paid amounts due it." Indeed, this is the only "dispute" the section contemplates; it serves as the catalyst for the entire ACOI verification process. Moreover, "such dispute" appears to refer to any assertion by Ivax that Braun should make a contingency payment--regardless of the reasons Ivax may give.

Ivax, however, would have us find that the scope of the clause is much narrower--that it includes only disputes about whether particular accounting entries were correctly included in the ACOI determination. To reach a ruling on the disputed items, the arbitrator, according to Ivax, "would have in hand reports from the two parties' accountants, based on complete and accurate information." Ivax also points out that the arbitrator has only thirty days to "determine the disputed items," meaning that the clause cannot encompass broader disputes regarding the ACOI, such as the sufficiency of Braun's record- keeping.

**11** We believe, however, that this interpretation makes little sense against the backdrop of the rest of section 2.5, which clearly states that, if Ivax "determines that it has not been paid amounts due it," the parties must proceed along the agreed-upon dispute resolution process. Moreover, section 2.5(a) grants the arbitrator the power to use "whatever procedures and factual investigations" it deems necessary to determine the ACOI. Such a grant of access would be unnecessary under Ivax's narrow interpretation, which confines the arbitrator to adjudicating disputes over proper ACOI entries based solely on "reports from the two parties' accountants." Rather, the necessary inference of granting the arbitrator this broad access is that the parties intended the arbitrator to decide *any* dispute related to the ACOI determination. Finally, we note that the thirty-day time limit on the arbitrator is insignificant in light of the fact that, if the arbitrator needs more time to arrive at the proper ACOI, the parties could surely agree to grant an extension. [FN25]

Ivax's interpretation of the scope of the arbitration

clause makes even less sense in light of Ivax's own conduct prior to this litigation. Indeed, Ivax engaged the agreed-upon process up to the step of arbitration, presumably because it believed that the current dispute was arbitrable. Ivax, for example, provided Braun with notices, completing the first step of the process; allowed Braun to examine its books and records, fulfilling the second requirement; sent Braun requests for changes to the arbitration procedure, indicating its belief that the dispute was arbitrable; and, proposed a negotiation on the thirtieth day of the negotiating period, initiating the process' final step. To allow Ivax to withdraw from the dispute resolution process at this point--based on this very narrow construction of section 2.5--would ignore the parties' clear intention to arbitrate this very dispute.

In truth, it seems that the last place where the parties intended this dispute to be adjudicated is in court before a jury. From the very beginning, the parties agreed that calculating the ACOI would be complicated and would involve complex accounting procedures; Ivax, for example, submits that the "[ACOI] is distinct from [normal] operating income" and needs "special systems and procedures" to calculate it properly. Knowing this, the parties required that Braun's ACOI statement be audited by a Big Five accounting firm and agreed that it could be verified by a separate Big Five accounting firm chosen by Ivax. Anticipating that disagreements could arise between these two accounting houses, the parties further agreed to submit disputes to an arbitrator--to be chosen from among the remaining Big Five accounting firms. Thus, in light of the parties' clear preference for expert accountants, it seems implausible that the parties intended that the instant dispute be resolved in court by a jury.

In sum, we find that the thrust of Ivax's complaint is a disagreement over Braun's ACOI calculation and that such a dispute falls easily within the scope of the parties' arbitration agreement.

IV.

**12** Having found that Braun did not waive its right to arbitrate and that the instant dispute falls within the scope of the parties' arbitration clause, we REVERSE the district court's order denying Braun's petition to compel arbitration and accompanying motion for a stay pending arbitration and REMAND the case for further proceedings not inconsistent herewith.

SO ORDERED.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

FN* Honorable Thomas M. Reavley, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

FN1. BOA is the entity that initially entered into the stock-purchase agreement at issue in this case, and BMI is BOA's wholly-owned subsidiary. Because BOA subsequently assigned all of its rights and interests under the stock-purchase agreement to BMI, and BMI assumed all of BOA's duties and obligations under that agreement, we hereinafter refer to the two Braun entities bound by the agreement as "Braun."

FN2. Section 1.3 of the Agreement defined "ACOI" as "the combined operating income of [McGaw] and [Braun] ... determined in accordance with GAAP on both a basis consistent with the accounting principles applied in the preparation of [Braun]'s September 30, 1996 audited financial statements, as adjusted by Section 2.4 and on a basis consistent with Schedule 2.4 hereto."

FN3. Section 2.4(e) of the Agreement set forth guidelines for determining the ACOI, stating that "no income or expenses shall be included or deductions taken for [twelve separate and specified items]." Moreover, section 2.4(f) explained how restructuring charges were to be determined and included in the ACOI.

FN4. The first paragraph of section 2.5 and 2.5(a) of the parties' Agreement states:
*Records; Inspection of Records.* [Braun] shall maintain complete and accurate books and records of account relating to the determination of the [ACOI]. Upon reasonable notice not more frequently than annually, [Ivax] shall have the right to have an Accountant of its choosing and reasonably acceptable to [Braun] examine the relevant books and records of [Braun] during normal business hours to verify that appropriate accounting and payments have been made by [Braun] under this Agreement with respect to the preceding three (3) fiscal years, to the extent not previously examined. [Braun] will cause its Accountants to provide [Ivax]'s

Accountants access to its work papers (excluding the proprietary materials of [Braun]'s Accountants).
(a) In the event that as a result of any examination by [Ivax] pursuant to this Section 2.5 [Ivax] determines that it has not been paid amounts due it under Section 2.5 of this Agreement with respect to any preceding fiscal year, [Ivax] may provide notice to [Braun] in writing of such determination, which notice shall set forth in reasonable detail the basis for such determination and [Ivax]'s specific objection(s) to [Braun]'s Statement with respect to such fiscal years. [Braun] and its Accountants shall thereafter be entitled to examine the relevant working papers of [Ivax]'s Accountants (excluding the proprietary materials of [Ivax]'s Accountants) and the procedures carried out in connection with their examination. [Braun] and [Ivax] and their respective Accountants shall have thirty (30) days from the date [Braun] receives notification of [Ivax]'s determination and objection(s) to negotiate in good faith a resolution of their dispute. If such dispute cannot be resolved within such thirty (30) day period, then either [Braun] or [Ivax] may cause such dispute to be submitted for determination to the Arbitrator, who shall as soon as practicable, but in any event no later than thirty (30) days thereafter, determine the disputed items using such procedures and factual investigations and determinations as the Arbitrator may reasonably deem appropriate; provided, however, that the Arbitrator shall be instructed to resolve such disputed items in accordance and in a manner consistent with that described in Section 2.5 hereof. The Arbitrator's determination of the disputed items shall be " 'final' and binding upon both [Braun] and [Ivax] and shall be nonappealable."

FN5. Section 1.9 of the Agreement defined "Arbitrator" as "any mutually acceptable Accountants." "Accountants" is defined in section 1.1 of the Agreement as "one of the 'Big Six' independent certified public accounting firms."

FN6. Notably, section 15.12 of the Agreement provided that the parties were to litigate in the courts "any claim arising out of this

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Agreement ... not otherwise subject to arbitration pursuant to Article 2 hereof."

FN7. Before Braun submitted its statements to Ivax, PricewaterhouseCoopers LLP ("PwC") audited them, as required by section 2.4(a)(i) of the Agreement. PwC represented in an affidavit that, following its examination of Braun's records, its statements for 1998 and 1999 (and 2000) "present fairly, in all material respects, the [ACOI] ... pursuant to the Agreement...."

FN8. The breadth of access Braun provided to AA is an issue over which the parties bitterly disagree, and, indeed, is part of Ivax's allegations in the instant lawsuit. Braun submitted to the district court the sworn affidavits of two PwC partners, Stephen S. Hamilton and Geoffrey Osborne, both of whom stated that PwC had given "full access" to AA and that AA should have had no difficulty in determining the ACOI from the records it had obtained from Braun. Ivax, on the other hand, submitted the affidavit of AA partner, John P. Garvey, who stated that Braun "did not provide full, independent access to the PwC work papers," as well as the affidavit of Ivax corporate officer, James M. Millsap, who stated that Braun had "withheld any analyses, compilations and other comparisons necessary to make the data useful to Ivax."

FN9. Ivax asserts that, even after the execution of the Confidentiality Agreement, Braun continued to withhold from AA portions of its books and records and denied repeated requests for additional information "needed to determine the accuracy of Braun's ACOI statements for 1998 and 1999."

FN10. The parties initially quibbled over the sufficiency of Ivax's notices, but in its brief to this court, Braun conceded that, "[o]n November 21, 2000, and November 29, 2000, Ivax initiated the contractually provided arbitration process for fiscal years 1998 and 1999 ... pursuant to section 2.5(a) of the Agreement."

FN11. Again, the parties disagree over the details of what occurred at this negotiation. Each side appears to allege that the other failed to negotiate "in good faith," and each asserts different causes for the meeting's termination.

FN12. Soon after the lawsuit was filed, Ivax moved the district court to enjoin Braun from pursuing relief against AA in the Pennsylvania state court proceeding. On January 24, 2001, the district court granted Ivax's motion, reasoning that Braun's lawsuit against AA sought to "enjoin AA from sharing information and work product [with] Ivax," the result of which "has the real potential of undermining this Court['s] determination of discovery matters." The court therefore enjoined Braun from seeking any relief "inconsistent with this order including any relief that could result in the destruction, los[s] or manipulation of [AA]'s reports, information and work product." Braun does not appeal this ruling.

FN13. 9 U.S.C. § 4 states in pertinent part, "A party aggrieved by the alleged ... refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement."

FN14. The relevant portion of 9 U.S.C. § 3 states:
If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had....

FN15. The district court heard oral argument on Braun's petition.

FN16. The provision of the FAA upon which

the Supreme Court relied is 9 U.S.C. § 2, which states, in relevant part:

A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

FN17. The FAA likewise provides that litigation may be stayed pending arbitration only if "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. We have before clarified that the term "default" carries the same meaning as "waiver." See *Morewitz v. West of Engl. Ship Owners Mut. Prot. & Indem. Ass'n*, 62 F.3d 1356, 1365-66 n. 16 (11th Cir.1995).

FN18. Ivax argues that this determination is so "fact intensive" that we should review it "under the 'clearly erroneous' standard." We disagree. To the extent that we have reviewed waiver determinations under a clearly erroneous standard, *see e.g.*, *Howard Hill, Inc. v. George A. Fuller Co.*, 473 F.2d 217, 218 (5th Cir.1973), *Blake Constr. Co. v. United States*, 252 F.2d 658, 662 (5th Cir.1958), we have done so only to review the underlying factual conclusions of the district court--not to review the legal question of whether such conduct results in waiver. This latter question is the one before us, and, because it is a legal one, it requires *de novo* review.

FN19. Moreover, Braun's suit against AA, which sought to enjoin *AA* from using its books and records, in no way affects the *arbitrator* 's ability to make an ACOI determination; according to section 2.5 of the Agreement, the arbitrator may use whatever "procedures and factual investigations and determinations" as "reasonably ... appropriate" to determine the ACOI. *See infra* part II.B.

FN20. *See supra* note 8. We note that the district court never made a factual finding that Braun had *unduly* limited AA's access to its books and records, thereby breaching section 2.5 of the Agreement. The court merely stated what both parties had already conceded, that is, that Braun had "limit[ed] and eventually refus[ed][AA]'s access to [its] books and records as well as [to] [PwC]'s books and records." The district court's conclusion that this conduct by Braun was "inconsistent with a good faith intent to arbitrat[e]" is a legal conclusion we review *de novo. See supra* part II.

FN21. Ivax also contended in the district court and argues again here that Braun failed properly to maintain the books and records in the first instance, thereby thwarting the dispute resolution process and indicating an intent to avoid arbitration. Because we believe that this allegation is no different from the contention that Braun unduly limited AA's access, we come to the same conclusion: that it does not reflect an intent by Braun to forego arbitration. Rather, such conduct would, at most, result in a breach of the Agreement, and, if the breach falls within the scope of the arbitration clause, it should be resolved by the arbitrator.

FN22. Section 2.5 is set out in full at *supra*, note 4.

FN23. Ivax argues that this "presumption of arbitrability" does not apply to the arbitration clause at hand because it is a "narrow" clause, as opposed to a "broad" arbitration clause, such as the one in *Moses Cone,* which required arbitration of "any dispute arising out of or relating to [the contract at issue]." It appears to us, however, that the Court in *Moses Cone* made no such distinction, but rather, grounded its preference for arbitration in the "congressional declaration [in the FAA] of a liberal federal policy favoring arbitration agreements." *Id.* 103 S.Ct. at 941.

FN24. The complaint contains further allegations of Braun's wrongdoings in calculating the ACOI: (1) "apply[ing]

generally accepted accounting principles in an inconsistent fashion to benefit [itself];" and, (2) "attempting to record unpermitted changes in [its] product-cost composition ..., to adjust McGaw intangible assets ..., to record nonrecurring losses with respect to Hurricane Georges ..., [and] to record an excessive reserve for chargebacks." Ivax also complains that Braun "materially changed [its] accounting procedures" and "never provided Ivax with any advance written notice [of the change]."

FN25. Of course, the parties' agreement to arbitrate only obligates them to arbitrate in good faith for a period of thirty days. If the arbitrator is unable to reach a decision at the end of the thirty-day period, and there is no agreed-upon extension, then the parties are free to litigate the matter to a conclusion.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works