UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW**

DR. PAUL ZIDEL, on behalf of    §
himself and other similarly      §
situated,           §
          §
    Plaintiffs,     §
v.           §
          §
ALLSTATE INSURANCE COMPANY,   §
          §
    Defendant/Third-Party Plaintiff,  §
v.           §
          §
COMMUNITY CARE NETWORK, INC.,  §
doing business as CCN,     §
          §
    Third-Party Defendant.   §
          §

SALVATORE D. LARUSSO, D.C.,   §       00-07692
d/b/a Family Chiropractic Center,   §
on behalf of himself and others similarly  §
situated         §
          §
    Plaintiffs,     §
v.           §
          §
LIBERTY MUTUAL INSURANCE    §
COMPANY and COMMUNITY     §
CARE NETWORK, INC.,     §
          §
    Defendants.     §

NIGHT BOX
FILED

MAY 3 1 2002

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

## CCN'S MOTION TO COMPEL ARBITRATION
## AND TO STAY OR DISMISS LITIGATION

Defendant, CCN Managed Care, Inc. ("CCN"), moves for the entry of an order

compelling arbitration of the claims against it, and staying or dismissing this litigation.

In support of this motion, CCN states:



## I.

## **INTRODUCTION**

1.    The Complaint asserts claims based on an alleged contract between CCN and Plaintiff.    However, the Complaint is unacceptably vague in terms of its identification of the contract upon which the claims are premised.

2.    The Complaint does not identify any specific contract or even specifically describe the contract's terms.    Indeed, the Complaint is not even clear as to the identity of the contracting parties.    From the Complaint it might be reasonable to infer that Plaintiff's claims are premised on (i) a contract with CCN, (ii) a contract with Medview Services, Inc., an alleged predecessor of CCN, or (iii) both.

3.    Accordingly, following its receipt of the Complaint, CCN filed a motion for more definite statement in hopes of obtaining record notice of the contract being sued upon. That motion is now fully-briefed, but no substantive ruling has yet issued. [1]

4.    In February 2001, Plaintiff Larusso executed a "Provider Agreement" with CCN (the "CCN Provider Agreement").    A copy of the CCN Provider Agreement is attached as Exhibit A.    It is not clear from the current record whether Plaintiff's claims in this case are premised, in whole or in part, on this particular CCN Provider Agreement -- i.e. whether he intends to assert damages based on conduct governed by this agreement, by some other agreement, or both.

---

[1] CCN's motion for more definite statement (docket entry 28 in case 00-7692) remained pending for over a year. On March 1, 2002, the Court entered an order "dismissing" that motion "as moot." (Docket entry 635) CCN moved for reconsideration of that order on grounds that nothing had occurred in this case to render its motion for more definite statement moot, and also requested an extension of its time to respond to the complaint pending action on the request for reconsideration. (Docket entry 636) Despite Plaintiff's failure to file papers opposing the motion for reconsideration or the extension request, no order has been entered thereon. See Local Rule 7.1(c) (failure to file opposing memorandum can be cause to grant motion by default). For that reason CCN has not yet been able to even file a motion to dismiss, let alone try to answer the complaint.

5. The CCN Provider Agreement contains a very broad arbitration clause, which is not limited to disputes arising under that particular agreement, nor is it limited to disputes solely between CCN and Plaintiff.[2]

6. CCN had hoped to obtain clarification, preferably via ruling on the motion for more definite statement, as to the specific agreement(s) placed at issue in this case. However, it has now been over a year since CCN filed that motion, and it is still not clear from the record what agreement(s) Plaintiff purports to sue under.[3] Therefore, since the arbitration clause in the CCN Provider Agreement is broad enough to encompass any claim brought against CCN by this Plaintiff -- whether arising under that particular agreement, a different agreement, or both -- CCN now moves for the entry of an order enforcing the CCN Provider Agreement's arbitration clause.

7. Even if Plaintiff's claims are based on another agreement that does not contain an arbitration clause, Plaintiff was aware of his alleged claims against CCN at the time he signed the Provider Agreement and agreed to arbitrate all disputes. Accordingly, the plain language of the broad arbitration provision in the CCN Provider Agreement, coupled with the inclusive reading mandated by the Federal Arbitration Act, requires arbitration of Plaintiff's claims, regardless of which particular contract he bases those claims on.

---

[2] See Provider Agreement at § 12.02. CCN will file a separate affidavit authenticating this agreement.

[3] CCN's participation in the litigation during this interim period has been exclusively responsive and defensive. CCN has not actively pursued the case on the merits, but has instead sought to avoid litigating. Moreover, during this interim period CCN repeatedly announced its intention to pursue arbitration.

8.    Counsel for CCN has inquired whether Plaintiff would be willing to submit his dispute to arbitration.  Plaintiff's counsel responded that Plaintiff was not willing to arbitrate this dispute and will oppose this motion.

## II.

## FACTUAL BACKGROUND

9.    CCN develops and markets health care provider networks.  CCN maintains and markets provider networks in 48 of the 50 states.  See Exhibit B (Declaration of Dave Cowan).[4]  There are approximately 368,000 healthcare providers and facilities who are members of CCN's network.  Id.  CCN forms its networks by recruiting health care service providers to join the networks. Id.  Members of CCN's networks agree to discount their usual and customary charges for health care services provided to CCN's clients' insureds or beneficiaries. CCN markets the network to entities that provide health care benefits to large numbers of individuals, such as insurance companies, employers, third-party administrators, in the network's operating area. Id. CCN provides its network members with a variety of services, including marketing and administrative support. Id.  CCN's network providers conduct business with CCN's national headquarters in San Diego and CCN's regional offices. Id.

10.    On February 8, 2001, Plaintiff, Dr. Salvatore D. Larusso, executed the attached CCN Provider Agreement.

---

[4] The attached Declaration is a copy of the original.  The original declaration is already of record as an attachment to CCN's Motion to Compel Arbitration in the *Zidel* action, case no. 00-6061,which has been consolidated with this and other actions at least for pre-trial purposes.

11.    The CCN Provider Agreement requires that Plaintiff must pursue any "demands, disputes, claims or lawsuits" through arbitration rather than the judicial process:

> The sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits . . . .

[CCN Provider Agreement, at § 12.02.]

12.    Although Plaintiff's participation in the CCN network ultimately terminated, the CCN Provider Agreement also provides:

> Termination of this Agreement shall not affect any rights or obligations hereunder which shall have previously accrued, or shall thereafter arise with respect to any occurrence prior to termination, and such rights and obligations shall continue to be governed by the terms of this Agreement.

[CCN Provider Agreement, at § 3.07]  Accordingly, Plaintiff's obligation to arbitrate his claims survives termination of the CCN Provider Agreement.

### III.

### ARGUMENT AND AUTHORITIES

**1.    The Scope of the Federal Arbitration Act.**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, is applicable to all "written provision[s] in . . . a contract evidencing a transaction involving commerce." 9 U.S.C. § 2.  The phrase "involving commerce" has been interpreted broadly to extend "expansively as coinciding with that of the Commerce Clause." See Allied-Bruce Terminix Cos., Inc. v. Casarotto, 513 U.S. 265, 274 (1995), citing Perry v. Thomas, 482 U.S. 483, 490

(1987) (the Act "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the commerce clause").

As shown in the attached declaration, CCN operates a nationwide network of health care providers, and provides access to those networks to national insurance companies, employers and other third parties. CCN's principal place of business is in San Diego, California. CCN transacts business with both its network providers and its clients across state lines. CCN provides assistance, support and materials to each of its physicians throughout the provider network. CCN also provides these same benefits to its clients, which are located in many states across the nation. By virtue of CCN's interstate activities, the CCN Provider Agreement necessarily "involves commerce," and falls within the ambit of the FAA. See Allied-Bruce, 513 U.S. at 269. See also In re Managed Care Litigation, 132 F.Supp. 2d 983, 993 (S.D. Fla. 2000) (because managed care companies operated in interstate commerce, the FAA governed motions to compel).

**2.      The Court Should Compel Arbitration And Stay These Proceedings**.

Courts are to honor and enforce arbitration provisions agreed to by the parties. See 9 U.S.C. §§ 3-4; Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 218 (1984) ("By its terms the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). CCN's motion to compel arbitration thus requires but a simple, two-part analysis -- (1) did the parties agree in writing to arbitrate disputes; and (2) do the claims asserted fall within the scope of the arbitration agreement. See AT&T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 649-50 (1986).

####    a.    *The parties agreed in writing to arbitrate disputes.*

As described above, the CCN Provider Agreement contains a provision requiring the parties to arbitrate <u>any</u> disputes. "[A]rbitration agreements are no more than contracts to which the usual rules of contract interpretation apply," and "when the parties clearly and unmistakably intended to refer a dispute to arbitration, their will must be respected." <u>Singer v. Smith Barney Shearson</u>, 926 F. Supp. 183, 187 (S.D. Fla. 1996). The pertinent part of paragraph 12.02 states "[t]he sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits." [Provider Agreement, at § 12.02.] Accordingly, the arbitration clause is in writing, signed by the parties, and clearly demonstrates their intent to arbitrate any claims.

####    b.    *The claims are subject to the Agreement's arbitration clause.*

It is presumed that claims or disputes between parties to an arbitration agreement should be arbitrated. *See AT&T Tech.*, 475 U.S. at 650. "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 626 (1985). This presumption of arbitrability stems from a strong federal policy favoring arbitration of disputes. <u>See</u> <u>e.g.</u>, <u>Southland Corp. v. Keating</u>, 465 U.S. 1, 9 (1984) (enacting the FAA "Congress declared a national policy favoring arbitration"); <u>Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 24 (1983). Therefore, while "the parties' intentions control . . . those intentions are generously construed as to the issues of arbitrability." <u>Mitsubishi Motors Corp.</u>, 473 U.S. at 626; <u>see</u> <u>AT&T Tech</u>, 475 U.S. at 650; <u>Moses</u>, 460 U.S. at 24-5.

In analyzing the Complaint, the Court should focus on Plaintiff's allegations rather than the labels attached to the causes of action.  See <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.</u>, 473 U.S. 614, 622 n.9 (1985); <u>J. J. Ryan & Sons, Inc. v. Rhone Puelenc Textile, S.A.</u>, 863 F.2d 315 (4th Cir. 1988) ("To decide whether an arbitration agreement encompasses a dispute a court must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless of the legal label assigned to the claim.")  Thus a claim may assert tort or statutory liability, in addition to or rather than breach of contract, and still fall within a contract's arbitration clause.  The Courts have specifically held that the federal presumption in favor of arbitrability extends to statutory claims, such as Plaintiff's RICO claims.   See <u>In re Managed Care Litigation</u>, 132 F. Supp. 2d at 993 (presumption applies to statutory claims with equal force).  Here, of course, the arbitration clause is not even limited to claims arising under the CCN Provider Agreement, so this question is not even a close one.

The plain language of the provision at issue is broad enough to cover all claims asserted by Plaintiff.  To the extent that Plaintiff might argue that some or all of his claims arise from an earlier agreement, or that CCN is (purportedly) liable only as a successor to another company, Plaintiff was aware of those issues at the time he executed the CCN Provider Agreement with its broad arbitration provision -- requiring the arbitration of <u>all</u> disputes, without limitation.  <u>Compare, Boyd v. Homes of Legend, Inc.</u>, 981 F.Supp. 1423, 1429-31 (M.D. Ala. 1997)(construing arbitration clause explicitly limited to disputes among the parties that arose from that particular agreement).  Thus, the claims asserted in the Complaint are subject to the CCN Provider Agreement's arbitration clause, and CCN's motion must be granted.

4.  **The pendency of claims against co-defendant Liberty Mutual do not alter this analysis.**

    a)  *Most or all of the claims against Liberty Mutual are arbitrable.*

The presence in this case of co-defendant Liberty Mutual does not negate Plaintiff's obligation to arbitrate his claims. First, as set forth above, the arbitration clause at issue is not limited to disputes between CCN and the Plaintiff. Moreover, the CCN Provider Agreement explicitly references CCN's payor clients such as Liberty Mutual, and requires Plaintiff to provide services for, and receive payment from, those clients.[5] Indeed, the Agreement specifically authorizes CCN to act on behalf of the Plaintiff in contracting for the provision of healthcare services to the payors, it incorporates by reference the terms of CCN's contracts with the payors and requires Plaintiff to adhere to them, and it requires Plaintiff to cooperate with the payors[6]. Accordingly, and particularly when viewed in light of the presumption of arbitrability, the arbitration clause clearly embodies an intent to include within its ambit claims against CCN's non-signatory payor clients. See Cuningham Hamilton Quiter P.A. v. B. L. of Miami, Inc., 776 So.2d 940, 941 (Fla. 3d DCA 2000)(holding that arbitration clauses can be broad enough to require arbitration of disputes with non-signatories).

Moreover, even if Plaintiff argues that he did not agree to arbitrate claims against Liberty Mutual, the Eleventh Circuit has recognized that the lack of a written arbitration agreement signed by all parties to a dispute does of itself not preclude arbitration. See e.g. Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 756-57 (11th Cir. 1993); McBro Planning and Development Co. v. Triangle Electrical Construction Co., Inc., 741

---

[5] Provider Agreement at ¶¶ 1.06 and 2.01.

[6] Provider Agreement at ¶¶ 2.01, 2.02, 4.01 and 5.11-.13

F.2d 342, 344 (11th Cir. 1984). Federal courts, including this District Court, have compelled arbitration in a variety of circumstances despite the lack of a written arbitration agreement between plaintiff and defendant, including (i) cases in which a party is equitably estopped to assert the lack of a written agreement with the defendant, (ii) cases involving agency or related principles involving signatory and nonsignatory defendants, and (iii) cases involving third party beneficiaries. In re Managed Care Litigation, 132 F. Supp. 2d at 994. Here, having asserted claims against Liberty Mutual that depend in the first instance on his alleged rights under the Provider Agreement -- i.e. Plaintiff's alleged contractual right to limit access to the CCN network to only those insurers that offer Plaintiff's preferred form of insurance product -- and having alleged a concert of action between Liberty Mutual and CCN, Plaintiff is estopped to resist arbitration on grounds that Liberty Mutual is not signatory to the agreement.

There are at least two different circumstances in which a party will be equitably estopped from resisting arbitration on grounds that one or more litigants is not a signatory to the arbitration agreement. First, where a plaintiff is signatory to an agreement containing an arbitration clause and relies on the terms of the agreement in asserting claims against the defendant, or where those claims essentially presume the existence of the agreement and plaintiff's alleged rights thereunder, the plaintiff may not avoid arbitration on grounds that the defendant is a non-signatory. See MS Dealer Service Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999). Second, where a signatory plaintiff asserts substantially interdependent and concerted misconduct by both a nonsignatory and signatory to the agreement, he may not resist arbitration by asserting

the lack of an agreement with the non-signatory defendant.   Id.   Both of these circumstances are presented by Plaintiff's claims in this case.[7]

> i.    Plaintiff's claims presume the existence of his Provider Agreement, and rely on his alleged rights under that Agreement.

"[E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claim against the nonsignatory." MS Dealer, 177 F.3d at 947. Moreover, when the claim "makes reference to or presumes the existing of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate." Id. In this circumstance, the claims are said to be "intimately founded in and intertwined with the underlying contract obligations," and the arbitration clause in the underlying contract will be enforced despite the lack of a signed agreement between plaintiff and defendant. See McBro Planning and Development , 741 F.2d at 343-44. This principle applies here.

Liberty Mutual is alleged to have been one of CCN's payor clients, and Plaintiff is alleged to have been a member of CCN's provider network pursuant to the Provider Agreement.   Each of Plaintiff's claims presumes the existence of the Provider Agreement, and is founded on Plaintiff's alleged expectation under that Agreement, i.e. his expectation that network access would be afforded only to payors who provide the requisite "steerage".[8]   In other words, Plaintiff specifically references his Provider

---

[7] This issue presents a question of law for the Court. See Sunkist Soft Drinks, 10 F.3d at 757 (enforcement of arbitration provision with respect to claims against a non-signatory presents a question of law).

[8] See e.g. complaint at paragraph 30, equating a "legitimate" PPO with "steerage", i.e. the persuasion or channeling of patients to the network providers. See also paragraph 106(b), where Plaintiff alleges that Liberty Mutual was not entitled to apply the standard CCN discount because it was not a "legitimate payor" under the CCN Provider Agreement. This is begs the question of whether Liberty Mutual was in fact a

Agreement, and his claims require a showing that the discounting of his fees by Liberty Mutual was improper because the Provider Agreement did not allow CCN to afford network access to Liberty Mutual. Absent that showing, there was no wrongful conduct and Plaintiff's claims cannot succeed. Accordingly, plaintiff's claims are said to "arise out of and relate directly to" the Provider Agreement within the ambit of <u>MS Dealer</u>, and the claims are "intimately founded in and intertwined with" the Provider Agreement within the meaning of <u>McBro Planning and Development</u>. It would be grossly inequitable to allow Plaintiff to advance his claims -- all of which rely on rights allegedly flowing from the Provider Agreement -- while avoiding his agreement to arbitrate. <u>Cf.</u> <u>Int'l Paper Company v. Schwabedissen Maschinen & Anlagen</u>, 206 F. 3d 411, 417-418 (4th Cir. 2000)(it would be inequitable to allow plaintiff to pursue the benefit of a contract and at the same time assert defenses to enforcement of its arbitration provision).

        ii.    Plaintiff's claims allege interdependent and concerted misconduct between CCN and Liberty Mutual.

Equitable estoppel is also warranted when a signatory plaintiff makes allegations of substantially interdependent, concerted misconduct by both a nonsignatory party (here, Liberty Mutual) and another signatory party (here, CCN). Otherwise, the arbitration agreement between the two signatories "would be rendered meaningless and the federal policy in favor or arbitration effectively thwarted." <u>MS Dealer</u>, 177 F.3d at 947 (internal citations omitted).

The Complaint is replete with allegations that CCN and Liberty Mutual acted in concert and in violation of the CCN Provider Agreement. Plaintiff specifically accuses

---

"proper" payor under the CCN Provider Agreement, and must be answered in Plaintiff's favor if he is to prevail on <u>any</u> count in the complaint with the possible exception of the statutory claim.

Liberty Mutual and CCN of having formed an "association in fact" in an alleged scheme to "reduce payments made to CCN preferred providers on all Florida PIP medical expense claims submitted to Liberty Mutual.[9]  Plaintiff also names CCN as a RICO co-conspirator, alleging that they formed an "association-in-fact", engaging in a conspiracy to commit RICO predicate acts, and aiding and abetting the commission of those acts.[10]  These allegations bring this case directly within the parameters of <u>MS Dealer</u>, and warrant an order staying the litigation and compelling arbitration.

iii.    <u>Liberty Mutual does not oppose arbitration.</u>

In the CCN Provider Agreement, Plaintiff expressly agreed to arbitrate claims arising thereunder as his "sole and exclusive remedy."  Liberty Mutual is the only party in this action that is not a signatory to the CCN Provider Agreement.  Therefore, Liberty Mutual would be the only party that could arguably oppose arbitration.  However, Liberty Mutual has indicated that it does not oppose CCN's efforts to stay this litigation and to compel arbitration of Plaintiff's claims.[11]

*b)    Any claims that are not subject to arbitration must be stayed.*

Finally, even if one or more of Plaintiff's claims against Liberty Mutual -- e.g., the statutory claim under Florida Statutes Chapter 627 -- fall outside the scope of the arbitration clause or are otherwise not arbitrable, the fact that one claim may not be arbitrable does not mean that the rest of the claims are thereby rendered non-arbitrable as well.  In this circumstance, under black-letter principles, the arbitrable claims <u>must</u> be

---

[9] See e.g. Complaint at ¶ 101.

[10] Second Amended Complaint at ¶¶ 94-102, 105-112, 114, 117-122, 124-127, 131, 133-34, 142 and 148.

[11] Even if Liberty Mutual did oppose arbitration, Plaintiff would still be required to arbitrate any claims against CCN.  <u>See</u> Baron v. Best Buy Co. Inc., 79 F. Supp. 2d 1350, 1356-57 (S. D. Fla. 1999arbitration is

referred to arbitration. See Baron v. Best Buy Co. Inc., 79 F. Supp. 2d 1350, 1356-57 (S.

D. Fla. 1999)("The Supreme Court has instructed that district courts must 'compel

arbitration of pendent arbitrable claims when one of the parties files a motion to compel,

even where the results would be the possibly inefficient maintenance of separate

proceedings in different forums'," quoting Dean Witter Reynolds, Inc. v. Byrd, 470 U.S.

212, 217 (1985)).    Therefore, any non-arbitrable claims should be stayed pending

arbitration. See Western International Media Corp. v. A.R. Johnson, 754 F. Supp. 871

(S.D. Fla. 1991) (non-arbitrable claims stayed pending arbitration of remaining claims to,

inter alia, avoid inconsistent results and unnecessary duplication and waste).

**IV.**

**CONCLUSION**

Since this dispute involves interstate commerce and is subject to a written

arbitration agreement between the parties, the Federal Arbitration Act requires that the

Court grant CCN's motion and compel arbitration and stay this litigation.

> MCGUIREWOODS LLP
>
> By: _____
>
> William W. Deem
> Florida Bar No. 0512834
> 50 North Laura Street, Suite 3300
> Jacksonville, FL 32202
> (904) 798-3200
> (904) 798-3207 Facsimile
> wdeem@mcguirewoods.com
>
> COUNSEL FOR DEFENDANT CCN
> MANAGED CARE, INC.

---

mandatory even where that could result in arguably inefficient maintenance of separate proceedings in
different forums).

## CERTIFICATE OF CONSULTATION

Counsel for CCN certifies that he consulted counsel for the Plaintiff with respect to the foregoing. Plaintiff will oppose this motion. Co-defendant Liberty Mutual does not oppose this motion.

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing motion has been furnished by U.S. Mail on this 31st day of May, 2002, to all counsel listed on the attached service list.

_____
Attorney

138480.2

-15-

## MASTER SERVICE LIST
### (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)
(Amended 5/6/02)

**Co-Lead Counsel for Plaintiffs**

LEE & AMTZIS, P.L.
Eric Lee, Esq.
elee@leeamlaw.com
350 N.W. 12th Avenue, Suite 150
Deerfield Beach, FL 33442
(561) 981-9988
(561) 981-9980 (Facsimile)

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 (Facsimile)

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphilips@phillipsgarcia.com
Attorneys at Law
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 (Facsimile)

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 2510
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 (Facsimile)

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
personalinjurylawyer@earthlink.net
230 East Davis Boulevard, Suite 200
Tampa, FL 33606
(813) 251-8879
(813) 251-5786 (Facsimile)

RICHARD BOKOR, P.A.
Richard Bokor, Esq.
rabokor1@tampabay.rr.com
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-1000
(813) 254-6327 (Facsimile)

Casey Fundaro, Esq.
fundaro@aol.com
P.O. Box 7420
Fort Lauderdale, FL 33338-7420
(954) 462-2833
(954) 462-2835 (Facsimile)

**Counsel for:**
**Allstate, Fidelity and Casualty,**
**Continental, Deerbrook**

RUMBERGER, KIRK &
CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, FL 32802-1873
(407) 872-7300
(407) 841-2133 (Facsimile)

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 (Facsimile)

**Counsel for Beech Street and ADP**

TEW, CARDENAS, et al.
John M. Quaranta, Esq.
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, FL 33131-4336
(305) 539-2495
(305) 536-1116 (Facsimile)

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, FL 33131
(305) 373-4900
(305) 373-6914 (Facsimile)

**Counsel for CCN**

MCGUIRE WOODS LLP
William W. Deem, Esq.
wdeem@mcguirewoods.com
3300 Bank of America Tower
50 N. Laura Street
Jacksonville, FL 32202
(904) 798-3200
(904) 798-3207 (Facsimile)

**Counsel for Nationwide**

FOWLER, WHITE
Katherine C. Lake, Esq.
klake@fowlerwhite.com
Post Office Box 1438
Tampa, FL 33601
(813) 228-7411
(813) 229-8313 (Facsimile)

SWARTZ CAMPBELL
DETWEILER
James C. Haggerty, Esq.
haggerty@scdlaw.com
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316
(215) 299-4314
(215) 299-4301 (Facsimile)

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Robert K. Levenson, Esq.
rlevenson@hklaw.com
Greg Baldwin, Esq.
gbaldwin@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 (Facsimile)

**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT et al.
Mark Shapiro, Esq.
mshapiro@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 (Facsimile)

**Counsel for:**
**Hartford, Metropolitan, Integon**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 (Facsimile)

**Counsel for Metropolitan**

SONNENSCHEIN, NATH &
ROSENTHAL
Jeffrey P. Lennard, Esq.
jpl@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000
(312) 876-7934 (Facsimile)

**Counsel for Superior**

BUTLER BURNETTE PAPPAS
Alan J. Nisberg, Esq.
anisberg@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 (Facsimile)

**Counsel for Prudential**

BUTLER BURNETTE PAPPAS
Kathy J. Maus, Esq.
kmaus@bbplaw.com
Lauren D. Levy, Esq.
llevy@bbplaw.com
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308
(850) 894-4111
(850) 894-4999 (Facsimile)

SHEA & GARDNER
John D. Aldock, Esq.
jaldock@sheagardner.com
Michael Isenman, Esq.
misenman@sheagardner.com
1800 Massachusetts Avenue, N.W.
Washington, DC 20036
(202) 828-2000
(202) 828-2195 (Facsimile)

**Counsel for American**
**International**

CONROY, SIMBERG, GANON,
KREVANS & ABEL, P.A.
Dale L. Friedman, Esq.
dfriedman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Blvd., 2nd Floor
Holly wood, FL 33021
(954) 961-1400
(954) 967-8577 (Facsimile)

\\COM\138288.1

## CCN MANAGED CARE, INC. PROFESSIONAL CARE PROVIDER AGREEMENT

This PROFESSIONAL CARE PROVIDER AGREEMENT ("Agreement") is made and entered into by and between CCN Managed Care, Inc. d.b.a. CCN, and _____Salvatore D. LaRusso Jr___ , a _____ (hereinafter referred to as "Provider"):

### RECITALS

WHEREAS, CCN intends to execute contracts with Payor organizations which offer a preferred provider or exclusive provider health care coverage plan to Beneficiaries or Claimants; and

WHEREAS, Provider desires to make their services available to Beneficiaries or Claimants of Payors with whom CCN contracts; and

WHEREAS, CCN and Provider share the common goals of establishing a health care delivery system committed to the advancement of quality patient care, and developing innovative approaches to delivery of quality medical services in an efficient and cost-effective manner;

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, it is agreed by and between the parties hereto as follows:

### 1. DEFINITIONS

1.01    "**Beneficiary**" or "**Claimant**" is a person as defined in the applicable Insuring Agreement and who may be entitled to Health Care Services or Benefits.

1.02    "**CCN-Affiliated Health Plan**" is the health care plan offered, sponsored, administered or insured by Payor to provide coverage for Health Care Services or Benefits pursuant to the terms and conditions of this Agreement.

1.03    "**Claims Administrator**" is the Payor or the organization with the Payor has contracted to administer and process claims for the CCN-Affiliated Health Plan.

1.04    "**Health Care Services or Benefits**" shall be any and all covered medical services or benefits for such services rendered or provided to a Beneficiary or Claimant under an Insuring Agreement.

1.05    "**Insuring Agreement**" is the contract, certificate, policy, plan document, or any other legally enforceable instrument issued or sponsored by a Payor under which a Beneficiary or Claimant may be entitled to or receive Health Care Services or Benefits.

1.06    "**Payor**" is an employer, insurance carrier, claims administrator, health care service plan, trust, nonprofit facility service plan, any governmental unit or any other entity which has an obligation to provide Health Care Services or Benefits to a Beneficiary or Claimant.

1.07    "**Payor Agreement**" is an instrument between a Payor and CCN or its authorized representative which provides for CCN providers, including Provider pursuant to this Agreement, to render Health Care Services or Benefits at Reimbursement Amounts determined and established by CCN and such Payor.

1.08    "**Provider**" means the Provider who is duly licensed by the State of Florida to provide Health Care Services or Benefits.

**EXHIBIT A**

1.09    "Reimbursement Amounts" are the amounts payable to Provider for Health Care Services or Benefits rendered or provided to a Beneficiary or Claimant pursuant to Payor Agreements between CCN and the respective Payors. Such Reimbursement Amounts shall be established by CCN and Payors as specified in Exhibit A attached hereto and incorporated herein or as established by any state regulatory agency, whichever is less. Providers shall not individually or collectively with other providers determine or establish such Reimbursement Amounts.

1.10    "Utilization Review" means the function performed by organization(s) or entity(ies) selected by Payors to review and recommend to Payors whether Health Care Services or Benefits provided, or to be provided, are Medically Necessary.

## 2.  HEALTH CARE SERVICES OR BENEFITS

2.01    Provider hereby agrees to provide Health Care Services or Benefits to Beneficiaries or Claimants as set forth in Insuring Agreements, at the Reimbursement Amounts determined and established by CCN through Payor Agreements with Payors, which Payor Agreements are incorporated herein by reference. Such Reimbursement Amounts are set forth in Exhibit A attached hereto and incorporated herein.

2.02    Provider agrees to accept the Reimbursement Amounts in Exhibit A as payment in full for Health Care Services or Benefits provided, to Beneficiaries or Claimants. Provider shall look solely to the Payor for payment of any and all compensation due for Health Care Services or Benefits and shall not bill or otherwise collect or attempt to collect from Beneficiaries or Claimants any charges except and unless required or permitted to do so by the applicable Insuring Agreement. The foregoing restriction shall not apply to deductibles, co-payments or co-insurance which may be collected by Provider in accordance with the provisions of the applicable Insuring Agreement, nor to services or benefits rendered to Beneficiaries or Claimants which are not covered by the applicable Insuring Agreement. Provider expressly covenants and agrees that CCN shall not be responsible or liable for, nor does CCN guarantee any payments to Provider for, any services rendered by Provider to Beneficiary or Claimant.

2.03    Payor Agreements shall require Payors to make payments due from Payor to Provider within thirty (30) days of receipt by Payor of complete billings having sufficient information to reprice and/or adjudicate claim unless, within this thirty (30) day period, Provider is given written notice of Payor's inability to pay the claim because it is not complete, or there are issues related to coordination of benefits, subrogation, medical necessity or similar review. If a Payor fails to make timely payments, CCN shall review the applicable Payor Agreement and take appropriate action as specified in the CCN Administrative Manual for Participating Providers.

## 3.  TERM; TERMINATION

3.01    Following the effective date set forth herein, this Agreement shall be continued for consecutive annual terms thereafter, unless otherwise terminated.

3.02    This Agreement may be terminated by either party upon ninety (90) days written notice to the other party.

3.03    Provider agrees that if the Agreement is terminated, Provider shall exercise best efforts to notify all Beneficiaries or Claimants who are under Provider's care or seek services from Provider that Provider is no longer a CCN preferred provider. For those Beneficiaries or Claimants under Provider's care who so desire, Provider shall transfer the Beneficiaries or Claimants to other appropriate CCN Provider(s).

3.04    Following termination of this Agreement, CCN shall notify Beneficiaries or Claimants of such termination through the regular periodic updating of CCN Provider listings for Beneficiaries or Claimants.

2

PROFESSIONAL 2000 FL

3.05    Notwithstanding Section 3.02, CCN may terminate or suspend this Agreement, at CCN's option, immediately upon the occurrence of any of the following events:

A)    Provider fails to meet or fulfill CCN credentialing criteria;

B)    Provider has made a material misrepresentation to CCN;

C)    Provider's DEA certificate is revoked, restricted, or suspended;

D)    Provider commits any act or engages in any conduct for which Provider's license may be revoked or suspended by the licensing authorities of the state in which the Provider is located (whether or not such licensing authorities revoke or suspend such license);

E)    Whenever Provider is prohibited from participation in any federal or state healthcare entitlement program;

F)    Provider's performance in providing Health Care Services or Benefits is unsatisfactory for reasons including but not limited to Provider disability and Provider inability to achieve CCN quality assurance standards. CCN shall make such determinations reasonably and in good faith. In such instances, Provider shall have the right to appeal CCN's determination;

G)    Provider fails to maintain insurance coverage as required by CCN hereunder;

H)    Provider fraudulently submits a claim for services; or

I)    Provider ceases to maintain unrestricted active or courtesy admitting privileges at participating hospitals as may be required by CCN.

3.06    Provider shall notify CCN immediately upon the occurrence of any circumstances, including those set forth above, which would render this Agreement terminable by CCN.

3.07    Termination to this Agreement shall not affect any rights or obligations hereunder which shall have previously accrued, or shall thereafter arise with respect to any occurrence prior to termination, and such rights and obligations shall continue to be governed by the terms of this Agreement.

3.08    Either party to this Agreement has the right to terminate upon at least thirty (30) days prior written notice of such termination to the other party if the party to whom such notice is given materially breaches any provision of this Agreement. The party claiming the right to terminate shall set forth in the notice of termination the facts underlying its claims of breach and cite the relevant sections of this Agreement that are claimed to have been breached. Remedy of such breach to the satisfaction of the other party within thirty (30) days of the receipt of such notice shall revive this Agreement for the remaining portion of its then-current term, subject to any other rights of termination contained in this Agreement.

## 4. AUTHORIZATION TO CONTRACT

4.01    Provider authorizes CCN to act on its behalf to contract for the provision of Health Care Services or Benefits, at Reimbursement Amounts as set forth on Exhibit A.

4.02    Provider further authorizes CCN or other Claims Administrator, to coordinate and transmit billings to Payors for payment, on behalf of Provider.

3

PROFESSIONAL 2000 FL

## 6. COVENANTS OF PROVIDER

Provider covenants and agrees to the following:

5.01  To make available and render as appropriate Health Care Services or Benefits to Beneficiaries or Claimants which Provider is qualified by law to provide, which are medically necessary and consistent with the prevailing standards of quality of care generally accepted in their respective medical communities;

5.02  To comply with the requirements of all laws and regulations applicable to Provider's business and profession and ensure that all licenses, permits, authorizations and approvals required for that business and profession be maintained in effect for Provider as well as personnel employed or supervised by Provider, or acting on Provider's behalf;

5.03  To participate in and remain compliant with but not limited to CCN's and/or Payor's credentialing and recredentialing, medical management, utilization review quality assurance program, and which may be amended from time to time. Provider agrees to provide any and all reasonable requested data and records in support of such programs;

5.04  To obtain and maintain throughout the term of this Agreement medical staff membership and active or courtesy privileges for the performance of Provider's duties hereunder at participating hospitals, if necessary for the rendition of Health Care Services or Benefits to Beneficiaries or Claimants;

5.05  To provide prompt availability and accessibility of Health Care Services or Benefits to Beneficiaries or Claimants in the same manner and quality as to all other patients;

5.06  To maximize the utilization of services that are alternatives to inpatient hospitalization and innovative delivery modes that promote more cost-efficient health care, which are consistent with Provider's professional judgment;

5.07  Except in an emergency and/or when medical necessity dictates, to admit Beneficiaries or Claimants, in each instance in which hospitalization is required, to a hospital contracting with CCN unless a Beneficiary or Claimant specifically requests otherwise after having been notified by Provider that the requested hospital is not a CCN hospital;

5.08  To obtain from each Beneficiary or Claimant a written assignment of benefits, an authorization to provide Health Care Services or Benefits to Beneficiary or Claimant and release of Beneficiary's or Claimant's medical records. If a Beneficiary or Claimant refuses to provide such evidence of assignment, Provider may seek payment from the Beneficiary or Claimant directly with such payment limited to the Reimbursement Amounts defined in this Agreement;

5.09  To refer Beneficiaries or Claimants, in each instance in which referral is required, to other CCN Providers, unless Provider, in his/her professional judgment, determines that the Beneficiary's or Claimant's needs require otherwise and Beneficiary or Claimant so agrees after having been notified by Provider that the proposed provider is not a CCN Provider;

5.10  To permit CCN's representatives, including but not limited to utilization review committee members, and Payor representatives, upon reasonable advance written notice, to inspect specific aspects of the Health Care Services or Benefits provided to Beneficiaries or Claimants by Provider in response to concerns related to a Beneficiary or Claimant, or Payor;

5.11  To coordinate and transmit billings to Payors for payment, if required, in a format commonly used in the community and approved by CCN;

4

5.12   To provide Health Care Services or Benefits pursuant to all Payor Agreements executed between CCN and Payors;

5.13   To cooperate with Payors in expediting the return to work of ill or injured employed Beneficiaries or Claimants, consistent with Provider's professional judgment; and

5.14   To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant grievances.

## 6. COVENANTS OF CCN

CCN covenants and agrees to the following:

6.01   To accept sole responsibility for filing reports, obtaining approvals and complying with applicable laws and regulations of state, federal and other regulatory agencies having jurisdiction over CCN, provided however, that Provider agrees to cooperate by providing CCN with any information and assistance reasonably required in connection therewith;

6.02   To abide by a policy of non-interference with the professional relationship between any Beneficiary or Claimant and Provider;

6.03   To provide Provider periodically with an up-to-date list of Payors who have executed Payor Agreements with CCN specifying the respective Insuring Agreements pertaining thereto; and

6.04   To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant or Provider grievances.

## 7. RECORDS

7.01   CCN and Provider shall maintain records and procedures, as shall reasonably be required to accurately account for all Health Care Services and Benefits provided pursuant to this Agreement. Such records shall be kept in accordance with generally accepted accounting principles and recognized standards of professional practice.

7.02   CCN and Provider shall have the mutual right, upon request, to inspect and copy, upon reasonable advance notice and during normal business hours or at such other times as may be agreed upon, relevant accounting and administrative books and records, as they pertain to this Agreement. Such information shall be provided to each party hereto pursuant to procedures designed to protect the confidentiality of patient medical records in accordance with applicable legal requirements and recognized standards of professional practice.

7.03   CCN and Provider shall each maintain records with respect to any matters necessary for the proper administration of this Agreement.

7.04   Upon termination of this Agreement, Provider agrees to cooperate with Beneficiaries or Claimants and subsequent Providers with respect to the orderly and prompt transfer of medical records of Beneficiaries or Claimants. This Agreement does not preclude Provider from assessing reasonable charges for the expense of transferring such records if appropriate.

7.05   CCN shall have access to provider records for four (4) years from the date on which Provider supplied or provided Health Care Services or Benefits documented in such records, regardless of when the Agreement has been terminated.

5



## 8. INSURANCE REQUIREMENTS

8.01    **Professional Liability Insurance.** Provider shall carry professional liability insurance or an equivalent program of self-insurance in minimum amounts as specified and amended from time to time in the CCN Administrative Manual for Participating Providers. Provider shall notify CCN of cancellation or material modification of the coverage under such professional liability insurance at least thirty (30) days prior to any cancellation or modification. Certificates of insurance evidencing Provider's professional liability insurance coverage shall be provided to CCN no later than thirty (30) days following execution of this Agreement.

8.02    **General Liability Insurance.** Provider shall also maintain a policy or program of comprehensive general liability insurance, covering Provider's acts or failure to act, with minimum coverage as specified and amended from time to time in the CCN Administrative Manual for Participating Providers.

8.03    **Extended Insurance.** In the event Provider terminates this Agreement for any reason whatsoever, or if Provider changes insurance carriers, Provider agrees to maintain malpractice insurance coverage in the amount required under Section 8.01 of this Agreement for all Health Care Services or Benefits provided to Beneficiaries or Claimants until the statutes of limitation expire for the filing of malpractice claims pertaining to those Health Care Services or Benefits. Such insurance coverage may take the form of an "occurrence" policy covering claims made for services rendered no matter when the claims are filed, ongoing "claims made" insurance covering all claims filed during the period when the insurance is in force, or "tail insurance" coverage if the Provider cancels his/her "claims made" coverage.

## 9. ADMINISTRATIVE MANUAL

9.01    Provider agrees to comply with the requirements and procedures set forth in the Administrative Manual for Participating Providers ("Administrative Manual") which CCN shall provide for use by Provider, and the provisions of the Administrative Manual (as it may be amended by CCN in its sole discretion from time to time) are incorporated herein by this reference. CCN will distribute the Administrative Manual or any amendments to the Administrative Manual to Provider at least thirty (30) days prior to implementation or amendment. Notwithstanding Section 10.01 of this Agreement, any such amendment shall be effective thirty (30) days after such amendment has been distributed to Provider. The Administrative Manual shall cover administration of this Agreement, Utilization Review/Quality Assurance Program, minimum professional and general liability insurance requirements for Provider, billing and accounting requirements for services rendered hereunder, and other matters as deemed necessary by CCN.

## 10. AMENDMENT

10.01    This Agreement or any part hereof, may be amended only by CCN at any time during the term of this Agreement with thirty (30) days prior written notice to the provider by CCN. Provider shall have thirty (30) days after Provider receives written notice of such notice to provide CCN with written notice rejecting the amendment. Failure of Provider to provide such written notice to CCN shall constitute Provider's acceptance of said amendment. Except as provided above, any other amendment or modification of this Agreement shall be in writing and executed by each party hereto.

## 11. ASSIGNMENT

11.01    No assignment or delegation of the rights, duties or obligations hereunder shall be made without the mutual written consent of the parties hereto. Notwithstanding the foregoing, CCN retains the right to assign this Agreement or delegate its performance hereunder in whole or in part, without Provider's consent, to any entity with which CCN or its parent company or any of its subsidiaries is affiliated.

## 12. DISPUTE RESOLUTION AND ARBITRATION

12.01    CCN and Provider agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

6

12.02   The sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits. The parties shall mutually agree to the appointment of an impartial arbitrator within 30 days of the written request for the appointment of an arbitrator by any party. The arbitrator must be familiar with the health care industry. In the event that mutual agreement cannot be obtained, then the American Arbitration Association shall appoint an arbitrator who is familiar with the health care industry if one can be located; and, if one cannot be located, then another arbitrator shall be appointed. All arbitration proceedings shall be conducted in accord with the rules of the American Arbitration Association and the award shall be binding, final and conclusive on the parties. Any party may enforce the award rendered by the arbitrator in any court of competent jurisdiction.

12.03   In the event of any dispute as to the interpretation of any provision in this Agreement, there shall not be any inference made for or against either party by reason of such party proposing or modifying any provision.

## 13. INDEPENDENT CONTRACTOR

13.01   Provider, in furnishing Health Care Services or Benefits pursuant to this Agreement, does so as an independent contractor. Neither Provider nor CCN shall be construed to be the agent, employee, or representative of the other, except as specified in this Agreement.

13.02   Nothing contained herein shall be construed to prevent Provider from independently operating or participating in any other agreement or in providing health care services independent of this Agreement.

## 14. WAIVER

14.01   The waiver by either party of any breach of any provision of this Agreement or warranty or representation herein set forth shall not be construed as a waiver of any subsequent breach of the same or any other provision.

## 15. SEVERABILITY

15.01   If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated as a result of such decision.

## 16. GOVERNING LAW

16.01   This Agreement shall be construed and enforced in accordance with the laws of the State of Florida as amended from time to time subject to any applicable federal law.

## 17. INDEMNIFICATION

17.01   Each party to this Agreement agrees to indemnify and hold harmless the other party and its directors, officers, employees and agents against any and all liability and expense, including defense costs and legal fees as they are incurred in connection with claims or demands for damages of any nature whatsoever including, but not limited to, bodily injury, death, personal injury or property damage arising from or caused by the indemnifying party's acts or failure to act or the acts or failure to act of its directors, officers, employees or agents.

## 18. NOTICES

18.01   Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall either be personally delivered or sent by registered or certified mail with the United States Postal Service, return receipt requested, postage prepaid, addressed to such party at its respective last known address.

## 19. CONFIDENTIALITY

19.01   The parties hereto shall maintain the confidentiality of any and all medical, financial and administrative records which shall be in their possession and control, and such information shall only be released or disseminated pursuant to the valid written authorization of the other party, Beneficiary or Claimant or as and when permitted under applicable law.

19.02   CCN and Provider shall hold any and all proprietary and confidential information in the strictest confidence and shall not voluntarily or involuntarily, sell, transfer, publish, display or otherwise make available to others any portion of the other party's proprietary and confidential information. Provider acknowledges that this Agreement, Amendments, and Exhibits hereto are deemed proprietary and confidential. Provider agrees that the terms of 19.02 shall survive this Agreement for a period of two (2) years.

IN WITNESS THEREOF, the parties hereto have executed this Agreement by their duly authorized officers, and it shall be effective as of the 1st day of _March, 2001_

PROVIDER                                              CCN

FEDERAL TAX IDENTIFICATION #:
_65-0430505_

Signature                                             Signature

_Dr. Salvatore D. LaRusso_                            M. Cornelia Outten
Please print name                                     Please print name

_Director_                                            Vice President, East Networks
Title                                                 Title

_2/8/01_                                              _3-1-01_
Date                                                  Date

8                                    PROFESSIONAL 2000 FL



AMENDMENT TO THE CCN MANAGED CARE, INC.

PROFESSIONAL CARE PROVIDER AGREEMENT/

PROFESSIONAL CARE PROVIDER AGREEMENT

(Provider Group)/

ANCILLARY PROVIDER AGREEMENT

Pursuant to Section 10 Amendment of the CCN Managed Care, Inc. Professional Care Provider Agreement/ Professional Care Provider Agreement (Provider Group)/Ancillary Provider Agreement, the Agreement is hereby amended as follows:

Amendment to Section 6.03:  Delete in its entirety and replace with the following:

"To provide Provider access to an up-to-date list of Payors who have executed Payor Agreements with CCN."

Amendment to Section 18:  Delete in its entirety and replace with the following:

"Any notice required under Section 3 Term; Termination and Section 8 Insurance Requirements of this Agreement shall be in writing and shall either be personally delivered or sent by registered or certified mail, return receipt requested, postage prepaid, addressed to such party at its respective last known address.  All other notices required or permitted to be given pursuant to this Agreement shall be in writing and shall be either personally delivered or sent postage prepaid addressed to such party at its respective last known address."

The above referenced Agreement is hereby amended effective on date appearing on page 8 of the Agreement. All other terms and conditions of the Agreement and its Appendices shall remain in full force and effect.

**EXHIBIT A: CCN REIMBURSEMENT AMOUNTS**
**GREATER FLORIDA**

1. **Group Health, Auto Medical, and Property & Casualty Payors (other than Workers' Compensation):** Except as otherwise specified below, payment to Provider shall be based on the lesser of Provider's usual billed charge or the CCN Fee Schedule. The ground rules as stated in St. Anthony Publishing, Inc. Relative Values For Physicians (RVP) shall apply *

## SAMPLE CCN FEE SCHEDULE – GREATER FLORIDA

| CPT CODE | DESCRIPTION | | CPT CODE | DESCRIPTION | |
|---|---|---|---|---|---|
| **EVALUATION AND MANAGEMENT:** | | | 31575 | Diagnostic laryngoscopy | 145.15 |
| 99201 | Office visit, new, brief evaluation | 47.00 | 31622 | Bronchoscopy | 323.63 |
| 99202 | Office visit, new, limited initial history | 73.00 | 33200 | Insert permanent pacemaker | 1482.69 |
| 99203 | Office visit, new, intermed history | 104.00 | 33533 | CABG, arterial, single | 3249.23 |
| 99204 | Office visit, new, extended history | 150.00 | 33534 | CABG, arterial, two | 3624.36 |
| 99205 | Office visit, new, comprehensive history | 186.00 | 42821 | Tonsillectomy & adnoidectomy | 756.00 |
| 99211 | Office visit, estab, minimal service | 23.00 | 43239 | Upper GI endoscopy, biopsy | 327.90 |
| 99212 | Office visit, estab, brief exam | 40.00 | 44950 | Appendectomy | 627.54 |
| 99213 | Office visit, estab, intermediate exam | 55.00 | 45300 | Proctosigmoidoscopy | 67.79 |
| 99214 | Office visit, estab, extended exam | 85.00 | 45330 | Sigmoidoscopy, diagnostic | 116.60 |
| 99215 | Office visit, estab, comprehensive exam | 127.00 | 45380 | Colonoscopy and biopsy | 420.80 |
| 99221 | Initial hosp care, brief history & exam | 88.54 | 45385 | Colonoscopy | 619.86 |
| 99222 | Initial hosp care, intermediate hist&exam | 140.22 | 47600 | Cholecystectomy | 1025.40 |
| 99223 | Initial hosp care, comprehensive exam | 181.39 | 49505 | Repair inguinal hernia | 607.36 |
| 99231 | Subsqt hosp care, limited exam | 44.45 | 52000 | Cystoscopy | 182.43 |
| 99232 | Subsqt hosp care, intermediate exam | 66.32 | 52647 | Laser surgery of prostate | 1166.19 |
| 99233 | Subsqt hosp care, extended exam | 92.81 | 55700 | Biopsy of prostate | 183.09 |
| 99238 | Hospital discharge day | 79.09 | 55845 | Extensive prostate surgery | 2832.50 |
| 99241 | Office consult, new, limited exam | 65.00 | 56308 | Laparoscopy w/ hysterectomy | 2705.00 |
| 99242 | Office consult, new, intermediate exam | 107.00 | 56340 | Laparoscopy w/ cholecystectomy | 1060.80 |
| 99244 | Office consult, new, extended exam | 188.00 | 57454 | Colposcopy and biopsy | 224.00 |
| 99245 | Office consult, new, comprehensive exam | 246.00 | 58120 | Dilation and curettage (D&C) | 600.00 |
| 99251 | Initial hsp consult, new, brief exam | 60.89 | 58150 | Total hysterectomy | 1280.46 |
| 99252 | Initial hsp consult, new, limited exam | 94.00 | 59400 | Obstetrical care, routine, vag delivery | 1825.13 |
| 99253 | Initial hsp consult, new, intermed exam | 124.68 | 59409 | Vaginal delivery only | 1117.93 |
| 99255 | Initial hsp consult, new, comprehensive | 231.85 | 59410 | Vaginal delivery w/ PP care | 1192.96 |
| 99295 | Initial NICU care | 1200.00 | 59425 | Antepartum care only 4-6 visits | 394.34 |
| 99431 | Initial care, normal newborn | 114.37 | 59426 | Antepartum care only 7+ visits | 676.08 |
| | | | 59510 | Cesarean delivery | 2042.10 |
| 10060 | I & D abscess, simple/single | 74.39 | 61312 | Craniectomy or craniotomy | 2792.63 |
| 11100 | Biopsy of skin lesion | 68.33 | 63030 | Laminotomy | 1622.26 |
| 11101 | Biopsy, each added lesion | 36.15 | 66984 | Remove cataract, insert lens | 1440.00 |
| 11400 | Removal of skin lesion | 72.58 | 69436 | Tympanostomy | 254.09 |
| 11406 | Removal of skin lesion | 263.28 | 70450 | CAT scan of head or brain | 277.40 |
| 11440 | Removal of skin lesion | 93.11 | 71010 | Chest xray | 34.56 |
| 11602 | Removal of skin lesion | 203.35 | 71020 | Chest xray | 44.25 |
| 17000 | Destroy benign/repinal lesion | 55.01 | 71250 | CAT scan of chest | 353.48 |
| 19100 | Biopsy of breast | 98.94 | 71260 | Contrast CAT scan of chest | 412.46 |
| 20610 | Draw/inject joint/bursa | 55.90 | 72148 | Magnetic image, lumbar spine | 668.81 |
| 28285 | Repair of hammertoe | 477.10 | 74000 | Xray exam of abdomen | 36.78 |
| 28296 | Correction of bunion | 943.04 | 76092 | Mammogram, screening | 60.06 |
| 29819 | Arthroscopy shoulder | 1025.44 | 76805 | Echo exam of pregnant uterus | 168.23 |
| 29881 | Arthroscopy knee | 1054.55 | 76857 | Echo exam of pelvis | 75.73 |
| 30520 | Septoplasty | 849.38 | | | |
| 31231 | Nasal endoscopy, diagnostic | 108.70 | | | |

1

412_00_12

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Civil Action No. 00-CIV-6061 FERGUSON/SNOW

DR. PAUL ZIDEL and All Others §
Similarly Situated, §
§
Plaintiffs, §
§
v. §
§
ALLSTATE INSURANCE COMPANY §
and COMMUNITY CARE NETWORK, §
INC. d/b/a CCN, §
§
Defendants. §

## DECLARATION OF DAVE COWAN

I, Dave Cowan, hereby declare and state as follows:

1.      My name is Dave Cowan. I am over 18 years of age and am fully competent to make this declaration. I have personal knowledge of all facts stated herein and state that they are true and correct.

2.      I am Sr. Vice President, Eastern Region for CCN Managed Care, Inc. ("CCN") and have been so employed for 11 years. CCN's principal place of business is located in San Diego, California. CCN has 40 offices across the country and employs approximately 1500 people nationwide.

3.      CCN develops and markets health care service provider networks. CCN maintains and markets provider networks in 48 states and the District of Columbia. There are approximately 368,000 health care providers and facilities who are members of CCN's network. CCN forms its networks by recruiting health care service providers to join the networks. Members of CCN's networks agree to discount their usual and customary charges for health care services provided to

---

**EXHIBIT B**

CCN' clients' insureds or beneficiaries. CCN markets the network to entities that provide health care benefits to large numbers of individuals, such as insurance companies, employers, third-party administrators, in the network's operating area. CCN provides its network members with a variety of services, including marketing and administrative support. CCN's network providers routinely conduct business with CCN's national headquarters in San Diego and CCN's regional offices.

4.      CCN's clients are typically large companies that operate in several states or -- as is the case with Allstate Insurance Company -- have nationwide operations. CCN's clients provide heath care benefits to approximately 32 million individuals across the country. As with its network providers, CCN provides its clients with a variety of administrative, marketing and other services. CCN's clients transact business with both CCN's national headquarters and our regional offices.

5.      A true and correct copy of the Community Care Network, Inc. Provider Agreement between CCN and Paul Zidel, M.D. is attached as Exhibit B to CCN's Motion to Compel Arbitration and Stay Litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 13, 2000.