018365                UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA


DR. PAUL ZIDEL, on behalf of              CASE NO. 00-6061-CIV-FERGUSON/SNOW
himself and others similarly situated,

        Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
et al.

        Defendants.
_____


MOTE WELLNESS & REHAB, INC. on behalf     CASE NO. 01-8549-CIV-FERGUSON/SNOW
of itself and all others similarly situated,

        Plaintiff,

v.

AMERICAN INTERNATIONAL INSURANCE
COMPANY and AMERICAN INTERNATIONAL
SOUTH INSURANCE COMPANY,

        Defendants.
_____/


## AMERICAN INTERNATIONAL'S EMERGENCY MOTION TO COMPEL ARBITRATION, EMERGENCY MOTION TO STAY PROCEEDINGS, AND EMERGENCY MOTION FOR PROTECTIVE ORDER

Defendant AMERICAN INTERNATIONAL INSURANCE COMPANY ("AMERICAN

INTERNATIONAL"), pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and to the Florida

Arbitration Code, Fla. Stat. §682.01 et seq., moves to compel arbitration in this matter and to dismiss the



CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

action. In addition, AMERICAN INTERNATIONAL moves to stay this suit pending arbitration and for

a protective order to preclude further discovery in this matter pending resolution of the arbitration issues.

## INTRODUCTION

The initial Plaintiff, MOTE WELLNESS & REHAB, INC., filed its Class Action Complaint, on June

14, 2001, Case No.: 01-8549-CIV-Ryskamp. This suit was ultimately consolidated with a number of other

suits under Case No.: 00-6061. It soon became apparent that there was no basis for MOTE's suit since no

PPO reductions were ever taken from any insurance claim submitted by MOTE, which was clearly a

necessary element for MOTE to maintain a cause of action. After MOTE declined to voluntarily dismiss

the suit, the Defendants filed a Motion to Dismiss and Alternative Motion for Summary Judgment with

supporting exhibits and an affidavit establishing that no PPO reductions were taken and that the Defendants

were entitled to dismissal and/or summary judgment. The Defendants also filed a Motion for Rule 11

Sanctions. Both of these motions remain pending.

Rather than respond to the Defendants' motion, Plaintiff's counsel filed an "amended" Class Action

Complaint which purports to substitute MOTE entirely for a new Plaintiff, DR. ANDREW ELLOWTIZ

(hereinafter ELLOWITZ). The Defendants moved to strike the "amended" complaint since such pleading

practice is violative of the Federal Rules of Civil Procedure as well as established precedent in the Eleventh

Circuit. The Magistrate issued a Report and Recommendation dated May 17, 2002, recommending that

the District Court permit the substitution of ELLOWITZ for MOTE.

2

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

The Defendants have filed Objections to the Magistrate's Report and Recommendation. While the District Court has not yet ruled on the Defendants' Objections to Magistrate's Report and Recommendation, the Defendants assume that the recommendations will be adopted based on previous rulings in this matter. Accordingly, without waiving any objections to the Magistrate's Report, the Defendants move herein for an Order compelling ELLOWITZ to arbitrate the matter raised in the Amended Class Action Complaint and, further, to stay this proceeding pending the arbitration. Because ELLOWITZ was substituted as an entirely new plaintiff, there is no issue as to waiver of any rights to arbitration.

There are two separate and independent bases to compel arbitration in this case. First, ELLOWITZ should be required to arbitrate his claim because the PPO agreement which he entered into with CCN, and which incorporates AMERICAN INTERNATIONAL by reference, requires arbitration of any dispute arising under the agreement. The second basis for arbitration is that the AMERICAN INTERNATIONAL insurance contract, pursuant to which ELLOWITZ brings this claim via an assignment from the insured, also contains a provision requiring arbitration of disputes under the PIP portion of the policy, whether such dispute involves an insured or a medical provider as is the case here.

## EMERGENCY NATURE OF MOTION

This motion is made on an emergency basis due to the fact that a number of the other consolidated Defendants has already appealed to the Eleventh Circuit this Court's denial of their motions to stay proceedings pending arbitration. The issue of whether arbitration will be compelled is still pending the District Court's decision on whether to accept the Magistrate's recommendations in the other cases.

3

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

AMERICAN INTERNATIONAL has not yet filed a notice of appeal because it did not have a pending

motion to compel arbitration, or a motion to stay proceedings, since ELLOWITZ was only recently

substituted as the Plaintiff in this matter.  On the assumption that the Magistrate and the Court will rule in

this matter the same as it has in the other cases, a determination of this issue on an emergency basis will

promote judicial economy by permitting the appeals to proceed together.

Furthermore, this Court has ordered that class certification discovery be completed by July 31, 2002.

The Plaintiff has propounded Requests for Production, Interrogatories, answers to which are due June 18,

2002.  The Plaintiff has also propounded Requests for Admission for which responses are due June 19,

2002.  AMERICAN INTERNATIONAL requests an emergency ruling on its request for a stay and for a

protective order on pending discovery until the arbitration issue is determined since participation in

discovery is inconsistent with the intent to arbitrate.

## LEGAL ARGUMENTS

### I.  ARBITRATION IS REQUIRED UNDER ELLOWITZ' PPO CONTRACT WITH COMMUNITY CARE NETWORK

ELLOWITZ' Amended Class Action Complaint alleges that ELLOWTIZ entered into a contract

(the "PPO agreement") with COMMUNITY CARE NETWORK, INC. (hereinafter CCN), a preferred

provider organization.  *See* Amended Complaint, ¶20.  Pursuant to the PPO agreement, CCN agreed to

provide ELLOWITZ access to its members in exchange for applying a discount to ELLOWITZ' medical

4

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

bills. *Id.* ELLOWITZ alleges that CCN, in turn, entered into an agreement with "AIG"[1] through which it paid bills submitted by ELLOWITZ at the discounted rate pursuant to the PPO agreement. *Id.* at ¶43.

CCN develops and markets health care provider networks. CCN maintains and markets provider networks in 48 of the 50 states. *See* CCN's Motion to Compel Arbitration (DE 698)(Declaration of Dave Cowan). There are approximately 368,000 healthcare providers and facilities who are members of CCN's network. *Id.* CCN forms its networks by recruiting health care service providers to join the networks. *Id.* Members of CCN's networks agree to discount their usual and customary charges for health care services provided to CCN's clients' insureds or beneficiaries. CCN markets the network to entities that provide health care benefits to large numbers of individuals, such as insurance companies, employers, third-party administrators, in the network's operating area. *Id.* CCN provides its network members with a variety of services, including marketing and administrative support. *Id.* CCN's network providers conduct business with CCN's national headquarters in San Diego and CCN's regional offices. *Id.*

There is no question that the PPO agreement specifically contemplates CCN entering into the third party arrangements with AMERICAN INTERNATIONAL to have access to physicians in CCN's network. The PPO agreement refers to these third parties as "payors" which are defined as entities, including insurance carriers, that have an obligation to provide health care benefits or services to a beneficiary or

_____

[1]ELLOWITZ has named only AMERICAN INTERNATIONAL as a defendant in this action. Reference to "AIG" in the Amended Complaint is improper as it could appear to refer to an unnamed, unrelated entity. Accordingly, reference to this Defendant will be made only as AMERICAN INTERNATIONAL.

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

claimant. *See* CCN Managed Care, Inc. Professional Provider Agreement, attached hereto as Exhibit A.[2]

ELLOWITZ agreed to abide by the PPO reimbursement rates as follows:

> 2.01 Provider hereby agrees to provide Health Care Services or Benefits to Beneficiaries or Claimants as set forth in Insuring Agreements, at the Reimbursement Amounts determined and established by CCN through Payor Agreements with Payors, **which Payor Agreements are incorporated herein by reference**. Such Reimbursement Amounts are set forth in Exhibit A attached hereto and incorporated herein.

> 2.02 Provider agrees to accept the Reimbursement Amounts in Exhibit A as payment in full for Health Care Services or Benefits provided, to Beneficiaries or Claimants. Provider shall look solely to the Payor for payment of any and all compensation due for Health Care Services or Benefits and shall not bill or otherwise collect or attempt to collect from Beneficiaries or Claimants any charges except and unless required or permitted to do so by the applicable Insuring Agreement.

> . . .

> 4.01 Provider authorizes CCN to act on its behalf to contract for the provision of Health Care Services or Benefits, at Reimbursement Amounts as set forth on Exhibit A.

*See* Exhibit A, pp. 2, 3 (emphasis added).

The CCN Provider Agreement requires that ELLOWITZ must pursue any "demands, disputes, claims or lawsuits" through arbitration rather than the judicial process:

> The sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits . . . .

*See* Exhibit A, p. 7, §12.02. As set forth in more detail below, the instant lawsuit falls within this provision.

---

[2]ELLOWITZ refers to, but fails to attach, the PPO agreement in the Amended Complaint which is a critical element of the alleged RICO scheme. There is no question ELLOWITZ has alleged that he is party to a PPO agreement with CCN. The agreement attached as Exhibit A is an exhibit to a similar motion filed by CCN in <u>Zidel v. Allstate Ins. Co.</u>, Case No.: 00-6061.

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

Magistrate Judge Snow recommended denial of a similar motion filed by CCN and Allstate Insurance Company in Case No.: 00-6061, based on the same CCN PPO agreement and arbitration provision. *See* Report and Recommendation dated January 18, 2002 (DE 550). The Report and Recommendation in that case makes the conclusory statement that "there is no basis for Allstate to seek to compel arbitration under CCN's PPO agreement with the plaintiff. If Allstate cannot compel arbitration, CCN cannot." *Id* It is unclear why the Magistrate came to this conclusion when the PPO agreement unambiguously incorporates the contracts of third party "payors" which would include AMERICAN INTERNATIONAL as well as Allstate. ELLOWITZ agreed in the contract that he would seek payment directly from the "payors" and would not hold CCN responsible for such payments. The issue in this case clearly involves payments made pursuant to the PPO agreement. There is no doubt that ELLOWITZ was aware that third party "payor" contracts would be made part of the PPO agreement, thus, requiring him to submit to arbitration on issues regarding payments made under the PPO agreement. Accordingly, the previous Report and Recommendation should be neither binding or even persuasive on this issue.

## A. THE SCOPE OF THE FEDERAL ARBITRATION ACT.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, is applicable to all "written provision[s] in . . . a contract evidencing a transaction involving commerce." 9 U.S.C. § 2. The phrase "involving commerce" has been interpreted broadly to extend "expansively as coinciding with that of the Commerce Clause." *See Allied-Bruce Terminix Cos., Inc. v. Casarotto*, 513 U.S. 265, 274 (1995), *citing Perry v.*

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

*Thomas*, 482 U.S. 483, 490 (1987) (the Act "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the commerce clause").

As shown in the declaration attached to CCN's motion (DE 698), CCN operates a nationwide network of healthcare providers, and provides access to those networks to national insurance companies, employers and other third parties. CCN's principal place of business is in San Diego, California. CCN transacts business with both its network providers and its clients across state lines. CCN provides assistance, support and materials to each of its physicians throughout the provider network. CCN also provides these same benefits to its clients, which are located in many states across the nation. By virtue of CCN's interstate activities, the CCN Provider Agreement necessarily "involves commerce," and falls within the ambit of the FAA. *See Allied-Bruce*, 513 U.S. at 269. *See also In re Managed Care Litigation*, 132 F.Supp. 2d 983, 993 (S.D. Fla. 2000) (because managed care companies operated in interstate commerce, the FAA governed motions to compel).

## B. THE COURT SHOULD COMPEL ARBITRATION AND STAY THESE PROCEEDINGS.

Courts are to honor and enforce arbitration provisions agreed to by the parties. *See* 9 U.S.C. §§ 3-4; *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1984) ("By its terms the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). AMERICAN INTERNATIONAL's motion to compel arbitration thus requires but a simple, two-part analysis – (1) did the parties agree in writing to arbitrate disputes; and (2) do the claims asserted fall within

the scope of the arbitration agreement. *See AT&T Tech., Inc. v. Communications Workers of Am.*, 475

U.S. 643, 649-50 (1986).

**1. The Parties Agreed in Writing to Arbitrate Disputes**

As described above, the CCN Provider Agreement contains a provision requiring the parties to

arbitrate <u>any</u> disputes. "[A]rbitration agreements are no more than contracts to which the usual rules of

contract interpretation apply," and "when the parties clearly and unmistakably intended to refer a dispute

to arbitration, their will must be respected." *See Singer v. Smith Barney Shearson*, 926 F. Supp. 183, 187

(S.D. Fla. 1996). The pertinent part of paragraph 12.02 states "[t]he sole and exclusive remedy for the

resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not

want the delay or expense of lawsuits." *See* Exhibit A, at §12.02.

As set forth above, the PPO agreement specifically contemplates that CCN will, in turn, contract

with entities such as AMERICAN INTERNATIONAL and incorporates such third party contracts by

reference. *See Cunningham Hamilton Quiter P.A. v. B.L. of Miami, Inc.*, 776 So.2d 940, 941 (Fla. 3d

DCA 2000)(holding that arbitration clauses can be broad enough to require arbitration of disputes with non-

signatories). Accordingly, AMERICAN INTERNATIONAL is entitled to require arbitration pursuant to

the CCN PPO agreement.

**2. The Claims are Subject to the PPO Agreement's Arbitration Clause.**

It is presumed that claims or disputes between parties to an arbitration agreement should be

arbitrated. *See AT&T Tech*, 475 U.S. at 650. "The Arbitration Act establishes that, as a matter of federal

law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). This presumption

of arbitrability stems from a strong federal policy favoring arbitration of disputes. *See e.g., Southland Corp.*

*v. Keathing*, 465 U.S. 1, 9 (1984) (enacting the FAA "Congress declared a national policy favoring

arbitration"); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

Therefore, while "the parties' intentions control . . . those intentions are generously construed as to the

issues of arbitrability." *Mitsubishi Motors Corp.*, 473 U.S. at 626; *AT&T Tech*, 475 U.S. at 650; *Moses*,

460 U.S. at 24-5.

In analyzing the Amended Complaint, the Court should focus on Plaintiff's allegations rather than

the labels attached to the causes of action. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,

473 U.S. 614, 622 n.9 (1985); *J.J. Ryan & Sons, Inc. v. Rhone Puelenc Textile, S.A.*, 863 F. 2d 315 (4th

Cir. 1988) ("To decide whether an arbitration agreement encompasses a dispute a court must determine

whether the factual allegations underlying the claim are within the scope of the arbitration clause, regardless

of the legal label assigned to the claim."). Thus a claim may assert tort or statutory liability, in addition to

or rather than breach of contract, and still fall within a contract's arbitration clause. Courts have specifically

held that the federal presumption in favor of arbitrability extends to statutory claims, such as Plaintiff's

RICO claims. *See In re Managed Care Litigation*, 132 F. Supp. 2d at 993 (presumption applies to

statutory claims with equal force). The plain language of the provision at issue is broad enough to cover

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

all claims asserted by ELLOWITZ. Thus, the claims asserted in the Amended Complaint are subject to the

CCN Provider Agreement's arbitration clause, and this motion must be granted.

It is anticipated ELLOWITZ will argue that arbitration should be denied under the PPO agreement

as he did not agree to arbitrate claims against AMERICAN INTERNATIONAL despite the incorporation

of AMERICAN INTERNATIONAL's "payor" contract into the PPO agreement. Even if there was any

validity to that argument, which there is not, the Eleventh Circuit has recognized that the lack of a written

arbitration agreement signed by all parties to a dispute does of itself not preclude arbitration. *See Sunkist*

*Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10F.3d 753, 756-57 (11th Cir. 1993); *McBro Planning and*

*Development Co. v. Triangle Electrical Construction Co., Inc.*, 741 F.2d 342, 344 (11th Cir. 1984).

Federal courts, including this District Court, have compelled arbitration in a variety of circumstances despite

the lack of a written arbitration agreement between plaintiff and defendant, including (i) cases in which a

party is equitably estopped to assert the lack of a written agreement with the defendant, (ii) cases involving

agency or related principles involving signatory and nonsignatory defendants, and (iii) cases involving third

party beneficiaries. *In re Managed Care Litigation*, 132 F.Supp.2d at 994. Here, having asserted claims

against AMERICAN INTERNATIONAL that depend in the first instance on his alleged rights under the

Provider Agrement – i.e. ELLOWITZ' alleged contractual right to limit access to the CCN network to only

those insurers that offer Plaintiff's preferred form of insurance product – and having alleged a concert of

action between AMERICAN INTERNATIONAL and CCN, Plaintiff is estopped to resist arbitration on

grounds that AMERICAN INTERNATIONAL is not signatory to the agreement.

11

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

There are at least two different circumstances in which a party will be equitably estopped from resisting arbitration on grounds that one or more litigants is not a signatory to the arbitration agreement. First, where a plaintiff is signatory to an agreement containing an arbitration clause and relies on the terms of the agreement in asserting claims against the defendant, or where those claims essentially presume the existence of the agreement and plaintiff's alleged rights thereunder, the plaintiff may not avoid arbitration on grounds that the defendant is a non-signatory. *See MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999). Second, where a signatory plaintiff asserts substantially interdependent and concerted misconduct by both a non-signatory and signatory to the agreement, he may not resist arbitration by asserting the lack of an agreement with the non-signatory defendant. *Id.* Both of these circumstances are presented by ELLOWITZ' claims in this case.[3]

a.    ELLOWITZ' claims presume the existence of his Provider Agreement, and rely on his alleged rights under that Agreement.

"[E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claim against the nonsignatory." *MS Dealer*, 177 F.3d at 947. Moreover, when the claim "makes reference to or presumes the existing of the written agreement, the signatory's claims arise out of an relate directly to the written agreement, and arbitration is appropriate." *Id.* In this circumstance, the claims are said to be "intimately founded in and

_____

[3]This issue presents a question of law for the Court. *See Sunkist Soft Drinks*, 10 F.3d at 757 (enforcement of arbitration provision with respect to claims against a non-signatory presents a question of law).

12

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

intertwined with the underlying contract obligations," and the arbitration clause in the underlying contract

will be enforced despite the lack of a signed agreement between plaintiff and defendant. *See McBro*

*Planning and Development*, 741 F.2d at 343-44. This principle applies here.

AMERICAN INTERNATIONAL is alleged to have been one of CCN's payor clients, and

ELLOWITZ is alleged to have been a member of CCN's provider network pursuant to the PPO Agreement.

Each of Plaintiff's claims presumes the existence of the PPO Agreement, and is founded on ELLOWITZ'

alleged expectation under that Agreement, i.e. his expectation that network access would be afforded only

to payors who provide the requisite "steerage".[4]  In other words, ELLOWITZ specifically references his

Provider Agreement, and his claims require a showing that the discounting of his fees by AMERICAN

INTERNATIONAL was improper because the PPO Agreement did not allow CCN to afford network

access to AMERICAN INTERNATIONAL.  Absent that showing, there was no wrongful conduct and

Plaintiff's claims cannot succeed.  Accordingly, ELLOWITZ' claims are said to "arise out of and relate

directly to" the PPO Agreement within the ambit of *MS Dealer*, and the claims are "intimately founded in

and intertwined with" the Provider Agreement within the meaning of *McBro Planning and Development*.

It would be grossly inequitable to allow Plaintiff to advance his claims – all of which rely on rights allegedly

---

[4]*See e.g.* Amended Complaint at paragraph 29, equating a "legitimate" PPO with "steerage", i.e. the persuasion of channeling of patients to the network providers.  See also paragraph 22, where Plaintiff alleges that AMERICAN INTERNATIONAL was not entitled to apply the standard CCN discount because it was not a "legitimate participant" under the CCN PPO Agreement.  This is begs the question of whether AMERICAN INTERNATIONAL was in fact a "proper" payor under the CCN PPO Agreement, and must be answered in Plaintiff's favor if he is to prevail on <u>any</u> count in the Amended Complaint with the possible exception of the statutory claim.

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

flowing from the Provider Agreement – while avoiding his agreement to arbitrate. *Cf. Int'l Paper Company v. Schwabedissen Maschinen & Anlagen*, 206 F. 3d 411, 417-418 (4th Cir. 2000) (it would be inequitable to allow plaintiff to pursue the benefit of a contract and at the same time assert defenses to enforcement of its arbitration provision).

> b.    Plaintiff's claims allege interdependent and concerted misconduct between
> CCN and AMERICAN INTERNATIONAL.

Equitable estoppel is also warranted when a signatory plaintiff makes allegations of substantially interdependent, concerted misconduct by both a nonsignatory party (AMERICAN INTERNATIONAL) and another signatory party (CCN). Otherwise, the arbitration agreement between the two signatories "would be rendered meaningless and the federal policy in favor or arbitration effectively thwarted." *MS Dealer*, 177 F.3d at 947 (internal citations omitted).

The Complaint is replete with allegations that CCN and AMERICAN INTERNATIONAL acted in concert and in violation of the CCN PPO Agreement. Plaintiff specifically accuses AMERICAN INTERNATIONAL and CCN of having formed an "association in fact" in an alleged scheme to "reduce payments made to CCN preferred providers on all Florida PIP medical expense claims submitted to AMERICAN INTERNATIONAL. Plaintiff also names AMERICAN INTERNATIONAL and CCN as RICO co-conspirators, alleging that they formed an "association-in-fact", engaging in a conspiracy to commit RICO predicate acts, and aiding and abetting the commission of those acts.[5] These allegations bring

---

[5] Amended Complaint, ¶¶115 *et seq.*

14

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

this case directly within the parameters of *MS Dealer*, and warrant an order staying the litigation and compelling arbitration.

      c.      Any claims that are not subject to arbitration must be stayed.

Finally, even if one or more of ELLOWITZ' claims fall outside the scope of the arbitration clause or are otherwise not arbitrable under the PPO Agreement,[6] the fact that one claim may not be arbitrable does not mean that the rest of the claims are thereby rendered non-arbitrable as well. In this circumstance, under black-letter principles, the arbitrable claims <u>must</u> be referred to arbitration. *See Baron v. Best Buy Co. Inc.*, 79 F. Supp. 2d 1350, 1356-57 (S.D. Fla. 1999) ("The Supreme Court has instructed that district courts must 'compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the results would be the possibly inefficient maintenance of separate proceedings in different forums'," *quoting Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 212, 217 (1985)). Therefore, any non-arbitrable claims should be stayed pending arbitration. *See Western International Media Corp. v. A.R. Johnson*, 754 F. Supp. 871 (S.D. Fla. 1991) (non-arbitrable claims stayed pending arbitration of remaining claims to , *inter alia*, avoid inconsistent results and unnecessary duplication and waste).

## C. CONCLUSION

In accordance with the foregoing, ELLOWITZ should be required to arbitrate the claims set forth in his suit against AMERICAN INTERNATIONAL pursuant to the PPO agreement. There is no doubt

---

     [6]Any claim not arbitrable under the PPO agreement would still be arbitrable pursuant to the provision in the AMERICAN INTERNATIONAL insurance policy. *See* Argument II, *infra*.

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

that the claims all relate to payments made pursuant to ELLOWITZ' PPO agreement with CCN, and that

such contract incorporates and references third party "payors" such as AMERICAN INTERNATIONAL.

Therefore, AMERICAN INTERNATIONAL's motion should be granted.

## II.  ARBITRATION IS REQUIRED UNDER
## AMERICAN INTERNATIONAL'S INSURANCE POLICY

As an entirely separate basis for compelling arbitration, AMERICAN INTERNATIONAL has

requested that ELLOWITZ submit to arbitration pursuant to the provision contained in its insurance

policies. ELLOWITZ' claim for PIP benefits under the Florida PIP statute and the insurance contract are

maintainable only via an assignment of benefits from the insured.[7] *See Nationwide Mutual Fire Insurance*

*Company v. Pinnacle Medical Inc.*, 753 So. 2d 55 (Fla. 2000)(medical provider who accepts assignment

of benefits stands in the shoes of the insured). Accordingly, ELLOWITZ must abide by the terms of the

insurance contract, including the arbitration requirement.

### A.  THE POLICY LANGUAGE

Prior to July 1, 2000, all policies issued by AMERICAN INTERNATIONAL contained a mandatory

arbitration provision for disputes involving benefits to be paid to a provider. *See* Exhibit B, attached hereto.

---

[7]ELLOWITZ did not attach a copy of any assignment to the Amended Complaint and has taken the position that he need not comply with initial Rule 26 disclosures because the Court has stayed discovery except that related to class issues. Because this is an entirely new Plaintiff, AMERICAN INTERNATIONAL has none of the relevant documents, including assignments, which were previously produced in the other consolidated cases. There are clearly grounds to compel production of such documents, however, AMERICAN INTERNATIONAL cannot file the appropriate motion for fear of waiving its right to arbitration.

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

Beginning July 1, 2000, for new policies, and August 30, 2000, for renewal policies, AMERICAN

INTERNATIONAL began offering a choice between voluntary and mandatory arbitration provisions. *See*

Affidavit Wendy Bowling. The Florida endorsement for AMERICAN INTERNATIONAL PIP policies

contains an arbitration provision with two alternative applications. The first section of the provision allows

for voluntary arbitration of a dispute involving benefits "if the parties agree." *See* Exhibit C, attached

hereto, "Personal Injury Protection Coverage-Florida endorsement," p. 4. However, the second, and

alternative, section of the arbitration provision is mandatory and states:

> Any dispute involving benefits under this part of the policy between the company and an
> "insured", or provider of medical services claiming benefits under this policy shall be
> decided by arbitration.
>
> . . .
>
> Arbitration is subject to the provisions of the Florida Arbitration Code Chapter 682 of
> the Florida statutes.
>
> This section 2. Only applies if your Declaration page indicates "Expanded Arbitration."

*See* Exhibit C, "Personal Injury Protection Coverage-Florida endorsement," p. 4. Thus, insureds who have

a policy with "Expanded Arbitration" and providers making claims thereunder must submit to arbitration.

In this case, it appears that one or more of the insureds' policies under which ELLOWITZ is

claiming benefits contains either the mandatory arbitration clause that existed before July 1, 2000, or the

Expanded Arbitration provision which was offered after that date. ELLOWITZ submits bills using the tax

identification number of his employer, Park Place Therapeutic Center, rather than under a number of his

own. *See* Affidavit of Wendy Bowling. This is evidenced by the explanation of benefits letters attached

17

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

as exhibits to ELLOWITZ' Amended Complaint, which show that payments and recommended deductions were directed to Park Place, not ELLOWITZ individually.[8]

A review of all the claims submitted under Park Place's tax identification number shows a number of claimants who are subject to abitration. *See* Affidavit of Wendy Bowling. AMERICAN INTERNATIONAL is in the process of pulling each of these files to determine which claims were submitted by ELLOWITZ personally, assuming he is permitted to do so. ELLOWITZ is bound to arbitrate those claims made under policies containing the arbitration provision.

## B. ARBITRATION MUST BE COMPELLED

This Court should direct ELLOWITZ to submit its claims to arbitration in accordance with the arbitration clause in the Policy and with the "Liberal federal policy favoring arbitration agreements." *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91 (2000); *accord Paladino v. Avnet Computer Techs, Inc.*, 134 F.3d 1054, 1057 (11th Cir. 1998)(noting the "general federal policy in favor of arbitration"). The Policy's arbitration clause covers the dispute in this case – a provider's claim to PIP benefits that otherwise would be payable to the insured. Hence, this Court should compel the arbitration of all of ELLOWITZ' claims and should dismiss the action.

---

[8]ELLOWITZ has not alleged any grounds by which he is permitted to use Park Place's tax identification number for submitting bills and, therefore, he lacks standing to bring this suit individually rather than on behalf of Park Place. However, AMERICAN INTERNATIONAL cannot raise this defense until after the arbitration issue is determined by this Court and the Eleventh Circuit Court of Appeals.

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

As already stated, in view of the FAA's strong "pro-arbitration policy", which was reaffirmed just last year by the Supreme Court in *Green Tree*, this Court should compel the arbitration of Dr. Ellowitz's claims. *Randolph v. Green Tree Fin. Corp.*, 244 F.3d 814, 819 (11th Cir. 2001); *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)(noting that the purpose of the Act is "to reverse the longstanding judicial hostility to arbitration . . . and to place arbitration agreements upon the same footing as other contracts"); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration").[9]

ElLOWITZ alleges, among other things, a breach of the PIP portion of the policy. That portion of those policies with arbitration clauses broadly requires arbitration for "any dispute involving benefits under this part of the policy." *See* Exhibits B, C. The dispute before the Court concerns ELLOWITZ' claims for direct payment of the benefits that AMERICAN INTERNATIONAL otherwise would pay to policyholders. The claims – which involve medical benefits under the Policy – thus fall squarely within the AMERICAN INTERNATIONAL arbitration clause.

The strong federal policy in favor of arbitration applies not only to ELLOWITZ' contract claims (Count II), but also to the statutory claims (RICO and Chapter 627) set forth in Counts III and V of the Complaint. *See Green Tree v. Randolph*, 531 U.S. at 89 ("[W]e have recognized that federal statutory

---

[9]     Florida law similarly favors the resolution of disputes through arbitration. *See* Rintin Corp., S.A. v. Domar, Ltd., 766 So. 2d 407, 409 (Fla. 3d DCA 2000) ("Further, courts are required to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms").

19

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

claims can be appropriately resolved through arbitration, and we have enforced agreements to arbitrate that involve such claims."); *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 242 (1987) (holding that RICO claims are subject to arbitration under FAA); *In re Managed Care Litig*, 132 F. Supp. 2d 989, 993 (S.D. Fla. 2000) (ordering arbitration of RICO claims).  Because these claims "touch matters" covered by the Policy and the arbitration clause, they too are arbitrable.  *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 n.13 (1985); *accord In re Managed Care*, 132 F. Supp. 2d at 993.

ELLOWITZ cannot avoid arbitration by pointing to his status as an alleged third-party beneficiary of the Policy.  ELLOWITZ seeks to obtain policy benefits that otherwise would be due to AMERICAN INTERNATIONAL's insureds.  He cannot seek to invoke an insured's rights while avoiding the policy obligations.  *See Interpool Ltd. v. Through Transp. Mut. Ins. Ass'n Ltd.*, 635 F. Supp. 1503, 1505 (S.D. Fla. 1985) ("The law is clear that a third party beneficiary is bound by the terms and conditions of the contract that it attempts to invoke.  'The beneficiary cannot accept the benefits and avoid the burdens or limitations of a contract.") (citation omitted); *See also MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (noting that third-party beneficiaries are bound by arbitration clause where they seek to assert rights under a contract containing such a clause); *Orion Ins. v. Magnetic Imaging Sys.*, 696 So. 2d 475, 478 (Fla. 3d DCA 1997) ("Because Magnetic is a third party beneficiary of the policy between Orion and its insured, Magnetic is bound by the arbitration provision in that policy."); *Terminix Int'l Co. v. Ponzio*, 693 So. 2d 104, 109 (Fla. 1st DCA 1997)("As third party beneficiaries, these additional plaintiffs

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

are bound by the arbitration provision"). Moreover, the arbitration clause at issue expressly states that it covers disputes between AMERICAN INTERNATIONAL and medical providers, such as ELLOWITZ, that seek direct payment of benefits under the policy.

### C. THE *PINNACLE* OPINION DOES NOT PRECLUDE ARBITRATION

Based on previous Reports and Recommendations filed by the Magistrate in other of the consolidated cases, it is anticipated that the argument will be advanced concerning the effect of the Florida Supreme Court's opinion in *Nationwide Mutual Fire Insurance Company v. Pinnacle Med., Inc.*, 753 So.2d 55 (Fla. 2000). The Magistrate has previously recommended denial of motions to compel arbitration on the theory that *Pinnacle* invalidated arbitration provisions in PIP policies that pre-existed the date of the *Pinnacle* opinion in February 2000. This reading of *Pinnacle* goes beyond the Florida Supreme Court's opinion and should not be found to preclude arbitration in this instance. The narrow issue before the court in *Pinnacle* was whether Florida Statutes §627.736(5) was unconstitutional in that it required PIP policies to contain arbitration provisions related to claims made by providers.

While the court determined that such a legislative mandate violated the Florida Constitution, nowhere does the opinion hold or even address the issue of whether the parties can voluntarily contract for arbitration. In fact, at least one Florida court has indicated subsequent to the *Pinnacle* opinion that contractual arbitration provisions would be upheld. *See Livingston v. State Farm Mut. Auto. Ins. Co.*, 774 So.2d 716 (Fla. 2d DCA 2000). In *Livingston*, the court noted, "*Pinnacle* did not address whether a health care provider may agree to arbitration when it accepts an assignment." *Id.* at 717. The court gave a

21

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

hypothetical example regarding the effect of an assignment and stated, "if State Farm were to dispute the

reasonableness of the bill after the chiropractor had accepted an assignment, the matter would either go to

court **or to arbitration**." *Id.* at 718 (emphasis added). Clearly, the *Livingston* court has indicated that

contractual arbitration provisions would be upheld, without regard to whether they pre-existed the *Pinnacle*

decision. *See also Benefit Association International, Inc. v. The Mount Sinai Comprehensive Cancer*

*Center,* 27 Fla.L.Weekly D973 (Fla. 3d DCA 2002).

### D. CONCLUSION

In accordance with the foregoing, ELLOWITZ should be compelled to submit his claims to

arbitration pursuant to the AMERICAN INTERNATIONAL policy provision. ELLOWITZ' claim is based

on an assignment of benefits from AMERICAN INTERNATIONAL's insureds and, therefore, he is bound

by the terms of the policy.

### III. MOTION TO STAY PROCEEDINGS AND MOTION FOR PROTECTIVE ORDER

The Federal Arbitration Act provides that, if a valid arbitration provision exists, "the court ... shall,

on application of one of the parties stay the trial of the action until such arbitration has been had." 9 U.S.C.

§3. The United States Supreme Court has stated this "leaves no place for the exercise of discretion by a

district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on

issues as to which an arbitration agreement has been signed." *Deen Witter,* 470 U.S. at 218. If

AMERICAN INTERNATIONAL is forced to participate in class discovery, ELLOWITZ will no doubt

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

claim that it has waived any right to arbitration. This inconsistency is the very reason the Supreme Court

has stated in no uncertain terms that the arbitration issue must be decided first.

Not only should the action be stayed as it relates to AMERICAN INTERNATIONAL, but all of

the consolidated cases should be stayed until resolution of the arbitration issues. If the Court permits some

litigants to proceed with class discovery while others await a decision from the Eleventh Circuit, any

depositions will have to be taken a second time if it is determined that arbitration will not be required. This

defeats the purpose of the Court's consolidation order which, presumably, was to streamline the discovery

process.

AMERICAN INTERNATIONAL also seeks a protective order to preclude its having to respond

to discovery already propounded by ELLOWITZ. The undersigned has contacted ELLOWITZ' attorney

who objects to the filing of this motion.

23

CASE NO. 00-6061-CIV-FERGUSON/SNOW
CASE NO. 01-8549-CIV-FERGUSON/SNOW

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 17th day

of June, 2002, to: Eric Lee, Esq., Lee & Amtzis, P.L. Suite 150, 350 N.W. 12th Ave., Deerfield Beach,

Florida 33442, and to counsel on the attached service list.

CONROY, SIMBERG, GANON,
KREVANS & ABEL, P.A.
Attorneys for AMERICAN INTERNATIONAL
3440 Hollywood Boulevard, Second Floor
Hollywood, Florida 33021
(954) 961-1400 Broward
(305) 940-4821 Dade

By: _Brian P Knight_
Dale L. Friedman, Esquire
Florida Bar No.: 854646
Brian P. Knight, Esquire
Florida Bar No.: 993662

BPK
02.0604
CB6841.WPD

24

## MASTER SERVICE LIST
### (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)
### (Updated 5/6/02)

**Co-Lead Counsel for Plaintiffs**

LEE & AMTZIS, P.L.
Eric Lee, Esq.
lee@lceamlaw.com
Suite 150
350 N.W. 12th Ave.
Deerfield Beach, FL 33442
(561) 981-9988
(561) 981-9980 Facsimile

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphillips@phillipsgarcia.com
Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 2510
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
personalinjurylawyer@earthlink.net
230 East Davis Boulevard, Suite 200
Tampa, FL 33606
(813) 251-8879
(813) 251-5786  Facsimile

RICHARD BOKOR, P.A.
Richard Bokor, Esq.
rabokor1@tampabay.rr.com
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-1000
(813) 254-6327 Facsimile

Casey Fundaro, Esq.
fundaro@aol.com
P.O. Box 7420
Fort Lauderdale, FL 33338-7420
(954) 462-2833
(954) 462-2835 Facsimile

**Counsel for:**
**Allstate, Fidelity and Casualty, Continental,**
**Deerbrook**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 Facsimile
**Counsel for Beech Street and ADP**

TEW, CARDENAS,et al.
John M. Quaranta, Esq.
(305)539-2495
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1116 Facsimile

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

**Counsel for CCN**

MCGUIRE WOODS, LLP
William W. Deem, Esq.
wdeem@mcguirewoods.com
3300 Bank of America Tower
50 North Laura Street
Jacksonville, FL  32202
(904) 798-3200
(904) 798-3207 Facsimile

**Counsel for Nationwide**

FOWLER, WHITE, et al.
Katherine C. Lake, Esq.
klake@fowlerwhite.com
Post Office Box 1438
Tampa, FL 33601
(813) 228-7411
(813) 229-8313 Facsimile

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esq.
haggerty@scdlaw.com
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316
(215) 299-4314
(215) 299-4301 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Rebecca Sack, Esq.
inslit@hklaw.com
Greg Baldwin, Esq.
gbaldwin@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500

(305) 789-7799 Facsimile

**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT et al.
Mark Shapiro, Esq.
mshapiro@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for:**
**Hartford, Metropolitan, Integon**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Metropolitan**

SONNENSCHEIN, NATH & ROSENTHAL
Jeffrey P. Lennard, Esq.
jpl@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000
(312) 876-7934

**Counsel for Superior**

BUTLER BURNETTE PAPPAS
Alan J. Nisberg, Esq.
anisberg@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for Prudential**

BUTLER BURNETTE PAPPAS
Kathy J. Maus, Esq.
kmaus@bbplaw.com
Lauren D. Levy, Esq.
llevy@bbplaw.com
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308
(850) 894-4111
(850) 894-4999 Facsimile

SHEA & GARDNER
John D. Aldock, Esq.
Jaldock@SheaGardner.com
Michael Isenman, Esq.
misenman@sheagardner.com
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
(202) 828-2000
(202) 828-2195 Facsimile

**Counsel for American International**

CONROY. SIMBERG, GANON, KREVANS & ABEL,
P.A.
Dale L. Friedman, Esq.
dfriedman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Boulevard
Second Floor
Hollywood, FL 33021
(954) 961-1400
(954) 967-8577 Facsimile

CCN MANAGED CARE, INC. PROFESSIONAL CARE PROVIDER AGREEMENT

This PROFESSIONAL CARE PROVIDER AGREEMENT ("Agreement") is made and entered into by and between CCN Managed Care, Inc. d.b.a. CCN, and _____Salvatore D. LaRusso Jr___, a _____ (hereinafter referred to as "Provider"):

### RECITALS

WHEREAS, CCN intends to execute contracts with Payor organizations which offer a preferred provider or exclusive provider health care coverage plan to Beneficiaries or Claimants; and

WHEREAS, Provider desires to make their services available to Beneficiaries or Claimants of Payors with whom CCN contracts; and

WHEREAS, CCN and Provider share the common goals of establishing a health care delivery system committed to the advancement of quality patient care, and developing innovative approaches to delivery of quality medical services in an efficient and cost-effective manner;

NOW THEREFORE, in consideration of the mutual covenants, terms and conditions herein contained, it is agreed by and between the parties hereto as follows:

### 1. DEFINITIONS

1.01   "**Beneficiary**" or "**Claimant**" is a person as defined in the applicable Insuring Agreement and who may be entitled to Health Care Services or Benefits.

1.02   "**CCN-Affiliated Health Plan**" is the health care plan offered, sponsored, administered or insured by Payor to provide coverage for Health Care Services or Benefits pursuant to the terms and conditions of this Agreement.

1.03   "**Claims Administrator**" is the Payor or the organization with the Payor has contracted to administer and process claims for the CCN-Affiliated Health Plan.

1.04   "**Health Care Services or Benefits**" shall be any and all covered medical services or benefits for such services rendered or provided to a Beneficiary or Claimant under an Insuring Agreement.

1.05   "**Insuring Agreement**" is the contract, certificate, policy, plan document, or any other legally enforceable instrument issued or sponsored by a Payor under which a Beneficiary or Claimant may be entitled to or receive Health Care Services or Benefits.

1.06   "**Payor**" is an employer, insurance carrier, claims administrator, health care service plan, trust, nonprofit facility service plan, any governmental unit or any other entity which has an obligation to provide Health Care Services or Benefits to a Beneficiary or Claimant.

1.07   "**Payor Agreement**" is an instrument between a Payor and CCN or its authorized representative which provides for CCN providers, including Provider pursuant to this Agreement, to render Health Care Services or Benefits at Reimbursement Amounts determined and established by CCN and such Payor.

1.08   "**Provider**" means the Provider who is duly licensed by the State of Florida to provide Health Care Services or Benefits.

**EXHIBIT**

**A**

**EXHIBIT A**

1.09    "Reimbursement Amounts" are the amounts payable to Provider for Health Care Services or Benefits rendered or provided to a Beneficiary or Claimant pursuant to Payor Agreements between CCN and the respective Payors. Such Reimbursement Amounts shall be established by CCN and Payors as specified in Exhibit A attached hereto and incorporated herein or as established by any state regulatory agency, whichever is less. Providers shall not individually or collectively with other providers determine or establish such Reimbursement Amounts.

1.10    "Utilization Review" means the function performed by organization(s) or entity(ies) selected by Payors to review and recommend to Payors whether Health Care Services or Benefits provided, or to be provided, are Medically Necessary.

## 2.  HEALTH CARE SERVICES OR BENEFITS

2.01    Provider hereby agrees to provide Health Care Services or Benefits to Beneficiaries or Claimants as set forth in Insuring Agreements, at the Reimbursement Amounts determined and established by CCN through Payor Agreements with Payors, which Payor Agreements are incorporated herein by reference. Such Reimbursement Amounts are set forth in Exhibit A attached hereto and incorporated herein.

2.02    Provider agrees to accept the Reimbursement Amounts in Exhibit A as payment in full for Health Care Services or Benefits provided, to Beneficiaries or Claimants. Provider shall look solely to the Payor for payment of any and all compensation due for Health Care Services or Benefits and shall not bill or otherwise collect or attempt to collect from Beneficiaries or Claimants any charges except and unless required or permitted to do so by the applicable Insuring Agreement. The foregoing restriction shall not apply to deductibles, co-payments or co-insurance which may be collected by Provider in accordance with the provisions of the applicable Insuring Agreement, nor to services or benefits rendered to Beneficiaries or Claimants which are not covered by the applicable Insuring Agreement. Provider expressly covenants and agrees that CCN shall not be responsible or liable for, nor does CCN guarantee any payments to Provider for, any services rendered by Provider to Beneficiary or Claimant.

2.03    Payor Agreements shall require Payors to make payments due from Payor to Provider within thirty (30) days of receipt by Payor of complete billings having sufficient information to reprice and/or adjudicate claim unless, within this thirty (30) day period, Provider is given written notice of Payor's inability to pay the claim because it is not complete, or there are issues related to coordination of benefits, subrogation, medical necessity or similar review. If a Payor fails to make timely payments, CCN shall review the applicable Payor Agreement and take appropriate action as specified in the CCN Administrative Manual for Participating Providers.

## 3.  TERM; TERMINATION

3.01    Following the effective date set forth herein, this Agreement shall be continued for consecutive annual terms thereafter, unless otherwise terminated.

3.02    This Agreement may be terminated by either party upon ninety (90) days written notice to the other party.

3.03    Provider agrees that if the Agreement is terminated, Provider shall exercise best efforts to notify all Beneficiaries or Claimants who are under Provider's care or seek services from Provider that Provider is no longer a CCN preferred provider. For those Beneficiaries or Claimants under Provider's care who so desire, Provider shall transfer the Beneficiaries or Claimants to other appropriate CCN Provider(s).

3.04    Following termination of this Agreement, CCN shall notify Beneficiaries or Claimants of such termination through the regular periodic updating of CCN Provider listings for Beneficiaries or Claimants.

PROFESSIONAL 2000 FL

3.05    Notwithstanding Section 3.02, CCN may terminate or suspend this Agreement, at CCN's option, immediately upon the occurrence of any of the following events:

A)    Provider fails to meet or fulfill CCN credentialing criteria;

B)    Provider has made a material misrepresentation to CCN;

C)    Provider's DEA certificate is revoked, restricted, or suspended;

D)    Provider commits any act or engages in any conduct for which Provider's license may be revoked or suspended by the licensing authorities of the state in which the Provider is located (whether or not such licensing authorities revoke or suspend such license);

E)    Whenever Provider is prohibited from participation in any federal or state healthcare entitlement program;

F)    Provider's performance in providing Health Care Services or Benefits is unsatisfactory for reasons including but not limited to Provider disability and Provider inability to achieve CCN quality assurance standards. CCN shall make such determinations reasonably and in good faith. In such instances, Provider shall have the right to appeal CCN's determination;

G)    Provider fails to maintain insurance coverage as required by CCN hereunder;

H)    Provider fraudulently submits a claim for services; or

I)    Provider ceases to maintain unrestricted active or courtesy admitting privileges at participating hospitals as may be required by CCN.

3.06    Provider shall notify CCN immediately upon the occurrence of any circumstances, including those set forth above, which would render this Agreement terminable by CCN.

3.07    Termination to this Agreement shall not affect any rights or obligations hereunder which shall have previously accrued, or shall thereafter arise with respect to any occurrence prior to termination, and such rights and obligations shall continue to be governed by the terms of this Agreement.

3.08    Either party to this Agreement has the right to terminate upon at least thirty (30) days prior written notice of such termination to the other party if the party to whom such notice is given materially breaches any provision of this Agreement. The party claiming the right to terminate shall set forth in the notice of termination the facts underlying its claims of breach and cite the relevant sections of this Agreement that are claimed to have been breached. Remedy of such breach to the satisfaction of the other party within thirty (30) days of the receipt of such notice shall revive this Agreement for the remaining portion of its then-current term, subject to any other rights of termination contained in this Agreement.

## 4. AUTHORIZATION TO CONTRACT

4.01    Provider authorizes CCN to act on its behalf to contract for the provision of Health Care Services or Benefits, at Reimbursement Amounts as set forth on Exhibit A.

4.02    Provider further authorizes CCN or other Claims Administrator, to coordinate and transmit billings to Payors for payment, on behalf of Provider.

## 6. COVENANTS OF PROVIDER

Provider covenants and agrees to the following:

5.01    To make available and render as appropriate Health Care Services or Benefits to Beneficiaries or Claimants which Provider is qualified by law to provide, which are medically necessary and consistent with the prevailing standards of quality of care generally accepted in their respective medical communities;

5.02    To comply with the requirements of all laws and regulations applicable to Provider's business and profession and ensure that all licenses, permits, authorizations and approvals required for that business and profession be maintained in effect for Provider as well as personnel employed or supervised by Provider, or acting on Provider's behalf;

5.03    To participate in and remain compliant with but not limited to CCN's and/or Payor's credentialing and recredentialing, medical management, utilization review quality assurance program, and which may be amended from time to time.  Provider agrees to provide any and all reasonable requested data and records in support of such programs;

5.04    To obtain and maintain throughout the term of this Agreement medical staff membership and active or courtesy privileges for the performance of Provider's duties hereunder at participating hospitals, if necessary for the rendition of Health Care Services or Benefits to Beneficiaries or Claimants;

5.05    To provide prompt availability and accessibility of Health Care Services or Benefits to Beneficiaries or Claimants in the same manner and quality as to all other patients;

5.06    To maximize the utilization of services that are alternatives to inpatient hospitalization and innovative delivery modes that promote more cost-efficient health care, which are consistent with Provider's professional judgment;

5.07    Except in an emergency and/or when medical necessity dictates, to admit Beneficiaries or Claimants, in each instance in which hospitalization is required, to a hospital contracting with CCN unless a Beneficiary or Claimant specifically requests otherwise after having been notified by Provider that the requested hospital is not a CCN hospital;

5.08    To obtain from each Beneficiary or Claimant a written assignment of benefits, an authorization to provide Health Care Services or Benefits to Beneficiary or Claimant and release of Beneficiary's or Claimant's medical records.  If a Beneficiary or Claimant refuses to provide such evidence of assignment, Provider may seek payment from the Beneficiary or Claimant directly with such payment limited to the Reimbursement Amounts defined in this Agreement;

5.09    To refer Beneficiaries or Claimants, in each instance in which referral is required, to other CCN Providers, unless Provider, in his/her professional judgment, determines that the Beneficiary's or Claimant's needs require otherwise and Beneficiary or Claimant so agrees after having been notified by Provider that the proposed provider is not a CCN Provider;

5.10    To permit CCN's representatives, including but not limited to utilization review committee members, and Payor representatives, upon reasonable advance written notice, to inspect specific aspects of the Health Care Services or Benefits provided to Beneficiaries or Claimants by Provider in response to concerns related to a Beneficiary or Claimant, or Payor;

5.11    To coordinate and transmit billings to Payors for payment, if required, in a formal commonly used in the community and approved by CCN;

4

5.12    To provide Health C.    Services or Benefits pursuant to all Payor Agreements executed between CCN and Payors;

5.13    To cooperate with Payors in expediting the return to work of ill or injured employed Beneficiaries or Claimants, consistent with Provider's professional judgment; and

5.14    To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant grievances.

## 6. COVENANTS OF CCN

CCN covenants and agrees to the following:

6.01    To accept sole responsibility for filing reports, obtaining approvals and complying with applicable laws and regulations of state, federal and other regulatory agencies having jurisdiction over CCN, provided however, that Provider agrees to cooperate by providing CCN with any information and assistance reasonably required in connection therewith;

6.02    To abide by a policy of non-interference with the professional relationship between any Beneficiary or Claimant and Provider;

6.03    To provide Provider periodically with an up-to-date list of Payors who have executed Payor Agreements with CCN specifying the respective insuring Agreements pertaining thereto; and

6.04    To establish and maintain a reasonable and fair procedure for resolving Beneficiary or Claimant or Provider grievances.

## 7. RECORDS

7.01    CCN and Provider shall maintain records and procedures, as shall reasonably be required to accurately account for all Health Care Services and Benefits provided pursuant to this Agreement. Such records shall be kept in accordance with generally accepted accounting principles and recognized standards of professional practice.

7.02    CCN and Provider shall have the mutual right, upon request, to inspect and copy, upon reasonable advance notice and during normal business hours or at such other times as may be agreed upon, relevant accounting and administrative books and records, as they pertain to this Agreement. Such information shall be provided to each party hereto pursuant to procedures designed to protect the confidentiality of patient medical records in accordance with applicable legal requirements and recognized standards of professional practice.

7.03    CCN and Provider shall each maintain records with respect to any matters necessary for the proper administration of this Agreement.

7.04    Upon termination of this Agreement, Provider agrees to cooperate with Beneficiaries or Claimants and subsequent Providers with respect to the orderly and prompt transfer of medical records of Beneficiaries or Claimants. This Agreement does not preclude Provider from assessing reasonable charges for the expense of transferring such records if appropriate.

7.05    CCN shall have access to provider records for four (4) years from the date on which Provider supplied or provided Health Care Services or Benefits documented in such records, regardless of when the Agreement has been terminated.

PROFESSIONAL 2000 FL

## 8. INSURANCE REQUIREMENTS

8.01    **Professional Liability Insurance.** Provider shall carry professional liability insurance or an equivalent program of self-insurance in minimum amounts as specified and amended from time to time in the CCN Administrative Manual for Participating Providers. Provider shall notify CCN of cancellation or material modification of the coverage under such professional liability insurance at least thirty (30) days prior to any cancellation or modification. Certificates of insurance evidencing Provider's professional liability insurance coverage shall be provided to CCN no later than thirty (30) days following execution of this Agreement.

8.02    **General Liability Insurance.** Provider shall also maintain a policy or program of comprehensive general liability insurance, covering Provider's acts or failure to act, with minimum coverage as specified and amended from time to time in the CCN Administrative Manual for Participating Providers.

8.03    **Extended Insurance.** In the event Provider terminates this Agreement for any reason whatsoever, or if Provider changes insurance carriers, Provider agrees to maintain malpractice insurance coverage in the amount required under Section 8.01 of this Agreement for all Health Care Services or Benefits provided to Beneficiaries or Claimants until the statutes of limitation expire for the filing of malpractice claims pertaining to those Health Care Services or Benefits. Such insurance coverage may take the form of an "occurrence" policy covering claims made for services rendered no matter when the claims are filed, ongoing "claims made" insurance covering all claims filed during the period when the insurance is in force, or "tail insurance" coverage if the Provider cancels his/her "claims made" coverage.

## 9. ADMINISTRATIVE MANUAL

9.01    Provider agrees to comply with the requirements and procedures set forth in the Administrative Manual for Participating Providers ("Administrative Manual") which CCN shall provide for use by Provider, and the provisions of the Administrative Manual (as it may be amended by CCN in its sole discretion from time to time) are incorporated herein by this reference. CCN will distribute the Administrative Manual or any amendments to the Administrative Manual to Provider at least thirty (30) days prior to implementation or amendment. Notwithstanding Section 10.01 of this Agreement, any such amendment shall be effective thirty (30) days after such amendment has been distributed to Provider. The Administrative Manual shall cover administration of this Agreement, Utilization Review/Quality Assurance Program, minimum professional and general liability insurance requirements for Provider, billing and accounting requirements for services rendered hereunder, and other matters as deemed necessary by CCN.

## 10. AMENDMENT

10.01    This Agreement or any part hereof, may be amended only by CCN at any time during the term of this Agreement with thirty (30) days prior written notice to the provider by CCN. Provider shall have thirty (30) days after Provider receives written notice of such notice to provide CCN with written notice rejecting the amendment. Failure of Provider to provide such written notice to CCN shall constitute Provider's acceptance of said amendment. Except as provided above, any other amendment or modification of this Agreement shall be in writing and executed by each party hereto.

## 11. ASSIGNMENT

11.01    No assignment or delegation of the rights, duties or obligations hereunder shall be made without the mutual written consent of the parties hereto. Notwithstanding the foregoing, CCN retains the right to assign this Agreement or delegate its performance hereunder in whole or in part, without Provider's consent, to any entity with which CCN or its parent company or any of its subsidiaries is affiliated.

## 12. DISPUTE RESOLUTION AND ARBITRATION

12.01    CCN and Provider agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

6

12.02   The sole and exclusive remedy for the resolution of any demands, disputes, claims or lawsuits shall be binding arbitration as the parties do not want the delay or expense of lawsuits. The parties shall mutually agree to the appointment of an impartial arbitrator within 30 days of the written request for the appointment of an arbitrator by any party. The arbitrator must be familiar with the health care industry. In the event that mutual agreement cannot be obtained, then the American Arbitration Association shall appoint an arbitrator who is familiar with the health care industry if one can be located; and, if one cannot be located, then another arbitrator shall be appointed. All arbitration proceedings shall be conducted in accord with the rules of the American Arbitration Association and the award shall be binding, final and conclusive on the parties. Any party may enforce the award rendered by the arbitrator in any court of competent jurisdiction.

12.03   In the event of any dispute as to the interpretation of any provision in this Agreement, there shall not be any inference made for or against either party by reason of such party proposing or modifying any provision.

### 13. INDEPENDENT CONTRACTOR

13.01   Provider, in furnishing Health Care Services or Benefits pursuant to this Agreement, does so as an independent contractor. Neither Provider nor CCN shall be construed to be the agent, employee, or representative of the other, except as specified in this Agreement.

13.02   Nothing contained herein shall be construed to prevent Provider from independently operating or participating in any other agreement or in providing health care services independent of this Agreement.

### 14. WAIVER

14.01   The waiver by either party of any breach of any provision of this Agreement or warranty or representation herein set forth shall not be construed as a waiver of any subsequent breach of the same or any other provision.

### 15. SEVERABILITY

15.01   If any term, provision, covenant, or condition of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remainder of the provisions herein shall remain in full force and effect and shall in no way be affected, impaired, or invalidated as a result of such decision.

### 16. GOVERNING LAW

16.01   This Agreement shall be construed and enforced in accordance with the laws of the State of Florida as amended from time to time subject to any applicable federal law.

### 17. INDEMNIFICATION

17.01   Each party to this Agreement agrees to indemnify and hold harmless the other party and its directors, officers, employees and agents against any and all liability and expense, including defense costs and legal fees as they are incurred in connection with claims or demands for damages of any nature whatsoever including, but not limited to, bodily injury, death, personal injury or property damage arising from or caused by the indemnifying party's acts or failure to act or the acts or failure to act of its directors, officers, employees or agents.

### 18. NOTICES

18.01   Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall either be personally delivered or sent by registered or certified mail with the United States Postal Service, return receipt requested, postage prepaid, addressed to such party at its respective last known address.

PROFESSIONAL 2000 FL

## 19. CONFIDENTIALITY

19.01    The parties hereto shall maintain the confidentiality of any and all medical, financial and administrative records which shall be in their possession and control, and such information shall only be released or disseminated pursuant to the valid written authorization of the other party, Beneficiary or Claimant or as and when permitted under applicable law.

19.02    CCN and Provider shall hold any and all proprietary and confidential information in the strictest confidence and shall not voluntarily or involuntarily, sell, transfer, publish, display or otherwise make available to others any portion of the other party's proprietary and confidential information. Provider acknowledges that this Agreement, Amendments, and Exhibits hereto are deemed proprietary and confidential. Provider agrees that the terms of 19.02 shall survive this Agreement for a period of two (2) years.

IN WITNESS THEREOF, the parties hereto have executed this Agreement by their duly authorized officers, and it shall be effective as of the 1st day of _March, 2001_

PROVIDER                                    CCN

FEDERAL TAX IDENTIFICATION #:

_65-0430505_

_____            _____
Signature                                   Signature

Dr. Salvatore D. LaRusso                    M. Cornelia Outten
Please print name                           Please print name

Director                                    Vice President, East Networks
Title                                       Title

2/8/01                                      3-1-01
Date                                        Date

8

PROFESSIONAL 2000 FL

AMENDMENT TO THE CCN MANAGED CARE, INC.

PROFESSIONAL CARE PROVIDER AGREEMENT/

PROFESSIONAL CARE PROVIDER AGREEMENT

(Provider Group)/

ANCILLARY PROVIDER AGREEMENT

Pursuant to Section 10 Amendment of the CCN Managed Care, Inc. Professional Care Provider Agreement/ Professional Care Provider Agreement (Provider Group)/Ancillary Provider Agreement, the Agreement is hereby amended as follows:

Amendment to Section 5.03:  Delete in its entirety and replace with the following:

"To provide Provider access to an up-to-date list of Payors who have executed Payor Agreements with CCN."

Amendment to Section 18:  Delete in its entirety and replace with the following:

"Any notice required under Section 3 Term; Termination and Section 8 Insurance Requirements of this Agreement shall be in writing and shall either be personally delivered or sent by registered or certified mail, return receipt requested, postage prepaid, addressed to such party at its respective last known address. All other notices required or permitted to be given pursuant to this Agreement shall be in writing and shall be either personally delivered or sent postage prepaid addressed to such party at its respective last known address."

The above referenced Agreement is hereby amended effective on date appearing on page 8 of the Agreement. All other terms and conditions of the Agreement and its Appendices shall remain in full force and effect.

## IBIT A: CCN REIMBURSEMENT AMOUNT.
### GREATER FLORIDA

I.   **Group Health, Auto Medical, and Property & Casualty Payors (other than Workers' Compensation):** Except as otherwise specified below, payment to Provider shall be based on the lesser of Provider's usual billed charge or the CCN Fee Schedule. The ground rules as stated in St. Anthony Publishing, Inc. Relative Values For Physicians (RVP) shall apply *

## SAMPLE CCN FEE SCHEDULE – GREATER FLORIDA

| CPT CODE | DESCRIPTION | | CPT CODE | DESCRIPTION | |
|---|---|---|---|---|---|
| **EVALUATION AND MANAGEMENT:** | | | 31575 | Diagnostic laryngoscopy | 145.15 |
| 99201 | Office visit, new, brief evaluation | 47.00 | 31622 | Bronchoscopy | 323.63 |
| 99202 | Office visit, new, limited initial history | 73.00 | 33200 | Insert permanent pacemaker | 1482.69 |
| 99203 | Office visit, new, intermed history | 104.00 | 33533 | CABG, arterial, single | 3249.23 |
| 99204 | Office visit, new, extended history | 150.00 | 33534 | CABG, arterial, two | 3624.36 |
| 99205 | Office visit, new, comprehensive history | 186.00 | 42821 | Tonsillectomy & adnoidectomy | 756.00 |
| 99211 | Office visit, estab, minimal service | 23.00 | 43239 | Upper GI endoscopy, biopsy | 327.90 |
| 99212 | Office visit, estab, brief exam | 40.00 | 44950 | Appendectomy | 627.54 |
| 99213 | Office visit, estab, intermediate exam | 55.00 | 45300 | Proctosigmoidoscopy          — | 67.79 |
| 99214 | Office visit, estab, extended exam | 85.00 | 45330 | Sigmoidoscopy, diagnostic | 116.60 |
| 99215 | Office visit, estab, comprehensive exam | 127.00 | 45380 | Colonoscopy and biopsy | 420.80 |
| 99221 | Initial hosp care, brief history & exam | 88.54 | 45385 | Colonoscopy | 619.86 |
| 99222 | Initial hosp care, intermediate hist&exam | 140.22 | 47600 | Cholecystectomy | 1025.40 |
| 99223 | Initial hosp care, comprehensive exam | 181.39 | 49505 | Repair inguinal hernia | 667.36 |
| 99231 | Subsqt hosp care, limited exam | 44.45 | 52000 | Cystoscopy | 182.43 |
| 99232 | Subsqt hosp care, intermediate exam | 66.32 | 52647 | Laser surgery of prostate | 1166.19 |
| 99233 | Subsqt hosp care, extended exam | 92.81 | 55700 | Biopsy of prostate | 183.09 |
| 99238 | Hospital discharge day | 79.09 | 55845 | Extensive prostate surgery | 2832.50 |
| 99241 | Office consult, new, limited exam | 65.00 | 56308 | Laparoscopy w/ hysterectomy | 2705.00 |
| 99242 | Office consult, new, intermediate exam | 107.00 | 56340 | Laparoscopy w/ cholecystectomy | 1060.80 |
| 99244 | Office consult, new, extended exam | 188.00 | 57454 | Colposcopy and biopsy | 224.00 |
| 99245 | Office consult, new, comprehensive exam | 246.00 | 58120 | Dilation and curettage (D&C) | 600.00 |
| 99251 | Initial hsp consult, new, brief exam | 60.89 | 58150 | Total hysterectomy | 1280.46 |
| 99252 | Initial hsp consult, new, limited exam | 94.00 | 59400 | Obstetrical care, routine, vag delivery | 1825.13 |
| 99253 | Initial hsp consult, new, intermed exam | 124.68 | 59409 | Vaginal delivery only | 1117.93 |
| 99255 | Initial hsp consult, new, comprehensive | 231.85 | 59410 | Vaginal delivery w/ PP care | 1192.96 |
| 99295 | Initial NICU care | 1200.00 | 59425 | Antepartum care only 4-6 visits | 394.34 |
| 99421 | Initial care, normal newborn | 114.37 | 59426 | Antepartum care only 7+ visits | 676.08 |
| | | | 59510 | Cesarean delivery | 2042.10 |
| 10060 | I & D abscess, simple/single | 74.39 | 61312 | Craniectomy or craniotomy | 2792.63 |
| 11100 | Biopsy of skin lesion | 68.33 | 63030 | Laminotomy | 1622.26 |
| 11101 | Biopsy, each added lesion | 36.15 | 66984 | Remove cataract, insert lens | 1440.00 |
| 11400 | Removal of skin lesion | 72.58 | 69436 | Tympanostomy | 254.09 |
| 11406 | Removal of skin lesion | 263.28 | 70450 | CAT scan of head or brain | 277.30 |
| 11440 | Removal of skin lesion | 93.11 | 71010 | Chest xray | 34.56 |
| 11602 | Removal of skin lesion | 203.35 | 71020 | Chest xray | 44.25 |
| 17000 | Destroy benign/reprnal lesion | 55.01 | 71250 | CAT scan of chest | 353.48 |
| 19100 | Biopsy of breast | 98.94 | 71260 | Contrast CAT scan of chest | 412.46 |
| 20610 | Drain/inject joint/bursa | 55.90 | 72148 | Magnetic image, lumbar spine | 668.81 |
| 28285 | Repair of hammertoe | 477.10 | 74000 | Xray exam of abdomen | 36.78 |
| 28296 | Correction of bunion | 943.04 | 76092 | Mammogram, screening | 60.06 |
| 29819 | Arthroscopy shoulder | 1025.44 | 76805 | Echo exam of pregnant uterus | 168.23 |
| 29881 | Arthroscopy knee | 1054.55 | 76857 | Echo exam of pelvis | 75.73 |
| 30520 | Septoplasty | 849.38 | | | |
| 31231 | Nasal endoscopy, diagnostic | 108.70 | | | |

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Civil Action No. 00-CIV-6061 FERGUSON/SNOW

| | | |
|---|---|---|
| DR. PAUL ZIDEL and All Others Similarly Situated, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| ALLSTATE INSURANCE COMPANY and COMMUNITY CARE NETWORK, INC. d/b/a CCN, | § § § | |
| Defendants. | § § § | |

## DECLARATION OF DAVE COWAN

I, Dave Cowan, hereby declare and state as follows:

1.      My name is Dave Cowan. I am over 18 years of age and am fully competent to make this declaration. I have personal knowledge of all facts stated herein and state that they are true and correct.

2.      I am Sr. Vice President, Eastern Region for CCN Managed Care, Inc. ("CCN") and have been so employed for 11 years. CCN's principal place of business is located in San Diego, California. CCN has 40 offices across the country and employs approximately 1500 people nationwide.

3.      CCN develops and markets health care service provider networks. CCN maintains and markets provider networks in 48 states and the District of Columbia. There are approximately 368,000 health care providers and facilities who are members of CCN's network. CCN forms its networks by recruiting health care service providers to join the networks. Members of CCN's networks agree to discount their usual and customary charges for health care services provided to

---

DECLARATION OF DAVE COWAN                                                    PAGE 1

**EXHIBIT B**

CCN' clients' insureds or beneficiaries. CCN markets the network to entities that provide health care benefits to large numbers of individuals, such as insurance companies, employers, third-party administrators, in the network's operating area. CCN provides its network members with a variety of services, including marketing and administrative support. CCN's network providers routinely conduct business with CCN's national headquarters in San Diego and CCN's regional offices.

4.    CCN's clients are typically large companies that operate in several states or -- as is the case with Allstate Insurance Company -- have nationwide operations. CCN's clients provide health care benefits to approximately 32 million individuals across the country. As with its network providers, CCN provides its clients with a variety of administrative, marketing and other services. CCN's clients transact business with both CCN's national headquarters and our regional offices.

5.    A true and correct copy of the Community Care Network, Inc. Provider Agreement between CCN and Paul Zidel, M.D. is attached as Exhibit B to CCN's Motion to Compel Arbitration and Stay Litigation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 13, 2000.

Case Paragraph B. of the Policy Period And Territory Provision is replaced by the follow

## POLICY PERIOD AND TERRITORY

**B.** The policy territory is:

1. Florida.

2. The United States of America, its territories or possessions or Canada.

This Provision (**B.2.**) applies only to:

**a.** The "named insured" or any "family member" while "occupying" "your covered auto"; or

**b.** The "named insured" while "occupying" a "motor vehicle":

(1) Owned by any "family member"; and

(2) For which security is maintained as required by the Florida Motor Vehicle No-Fault Law;

**C.** The **Our Right To Recover Payment** Provision is replaced by the following:

## OUR RIGHT TO RECOVER PAYMENT

**A.** If we make a payment under this coverage and the person to or for whom payment was made has a right to recover damages from another we shall, to the extent of our payment, be subrogated to that right. That person shall:

1. Execute and deliver instruments and papers and do whatever else is necessary to secure our rights; and

2. Do nothing after loss to prejudice these rights.

**B.** If we make a payment under this coverage and the person to or for whom payment was made sustained "bodily injury" while:

1. "Occupying"; or

2. A "pedestrian" struck by;

a commercial motor vehicle, as defined in the Florida Motor Vehicle No-Fault Law, we shall, to the extent of our payment, be entitled to reimbursement from the person who owns such motor vehicle or that person's insurer.

**D.** The following provisions are added:

## ARBITRATION

1. **Disputes with a provider of medical services.** If a provider of medical services or supplies has agreed to accept assignment of personal injury protection benefits, direction to pay, power of attorney or any instrument allowing direct payment to the provider:

**a.** Any claims dispute, involving medical expenses, between that provider and us shall be subject to binding arbitration in accordance with the Florida Arbitration Code.

D. The Costs and Expenses provision shall be entitled to attorneys fees and costs. The prevailing party is determined as follows:

(1) If the arbitration award is greater than the sum of the amount we offer at arbitration plus fifty percent of the difference between:

(a) The amount of the claim asserted by the provider at arbitration; and

(b) The amount we offer at arbitration;

then the provider is the prevailing party.

(2) If the arbitration award is less than the sum of the amount we offer at arbitration plus fifty percent of the difference between:

(a) The amount of the claim asserted by the provider at arbitration; and

(b) The amount we offer at arbitration;

then we are the prevailing party.

(3) If neither (1) nor (2) above applies, there is no prevailing party and each side is responsible for its own attorney's fees and costs.

The amount of the offer or claim at arbitration is the amount of the last offer or claim made at least thirty days prior to arbitration.

2. **Other disputes.** Any dispute involving benefits under this part of the policy between the company and a person claiming benefits under this policy shall be decided by arbitration.

Upon the written request for arbitration, each party will select one arbitrator. The two arbitrators will attempt to select a third arbitrator. If they cannot agree on a third arbitrator within 30 days, either party may request a judge of the court of record in the county of jurisdiction where the arbitration is pending to appoint the third arbitrator. A written decision agreed upon by any two or more arbitrators will be binding upon each party.

Each party will bear the expenses it incurs, including all legal fees and costs, and parties shall bear the expenses of the third arbitrator equally.

The arbitration will take place in the county in which the person claiming benefits under this policy resides. If they are located out of state, arbitration will take place in the county in which the insured resides. Arbitration is subject to the provisions of the Florida Arbitration Code Chapter 682 of the Florida statutes.

**Other disputes, 2.,** does not apply if your Declarations page indicates "Statutory Arbitration".



**EXHIBIT**

**B**

**AIG-554 (2/99)**

**Page 4 of 5**

b. The "named insured" while "occupying" a "motor vehicle":

(1) Owned by any "family member"; and

(2) For which security is maintained as required by the Florida Motor Vehicle No-Fault Law;

C. The **Our Right To Recover Payment** Provision is replaced by the following:

## OUR RIGHT TO RECOVER PAYMENT

A. If we make a payment under this coverage and the person to or for whom payment was made has a right to recover damages from another we shall, to the extent of our payment, be subrogated to that right. That person shall:

1. Execute and deliver instruments and papers and do whatever else is necessary to secure our rights; and

2. Do nothing after loss to prejudice these rights.

B. If we make a payment under this coverage and the person to or for whom payment was made sustained "bodily injury" while:

1. "Occupying"; or

2. A "pedestrian" struck by;

a commercial motor vehicle, as defined in the Florida Motor Vehicle No-Fault Law, we shall, to the extent of our payment, be entitled to reimbursement from the person who owns such motor vehicle or that person's insurer.

D. The following provision is added:

## ARBITRATION

1. Any dispute involving benefits under this part of the policy between the company and an "insured", or provider of medical services claiming benefits under this policy, may be decided by arbitration if the parties agree.

Upon the written request for arbitration, each party will select one arbitrator. The two arbitrators will attempt to select a third arbitrator. If they cannot agree on a third arbitrator within 30 days, either party may request a judge of the court of record in the county of jurisdiction where the arbitration is pending to appoint the third arbitrator. A written decision agreed upon by any two or more arbitrators will be binding upon each party.

Each party will bear the expenses it incurs, including all legal fees and costs, and parties shall bear the expenses of the third arbitrator equally.

The arbitration will take place in the county in which the person claiming benefits under this policy resides. If they are located out of state, arbitration will take place in the county in which the insured resides. Arbitration is subject to the provisions of the Florida Arbitration Code Chapter 682 of the Florida statutes.

2. Any dispute involving benefits under this part of the policy between the company and an "insured", or provider of medical services claiming benefits under this policy shall be decided by arbitration.

Upon the written request for arbitration, each party will select one arbitrator. The two arbitrators will attempt to select a third arbitrator. If they cannot agree on a third arbitrator within 30 days, either party may request a judge of the court of record in the county of jurisdiction where the arbitration is pending to appoint the third arbitrator. A written decision agreed upon by any two or more arbitrators will be binding upon each party.

Each party will bear the expenses it incurs, including all legal fees and costs, and parties shall bear the expenses of the third arbitrator equally.

The arbitration will take place in the county in which the person claiming benefits under this policy resides. If they are located out of state, arbitration will take place in the county in which the insured resides. Arbitration is subject to the provisions of the Florida Arbitration Code Chapter 682 of the Florida statutes.

This section 2. only applies if your Declaration page indicates "Expanded Arbitration."

## PAYMENT OF CLAIMS

If a person seeking Personal Injury Protection Coverage is charged with committing a felony, we shall withhold benefits until, at the trial level:

1. The prosecution makes a formal entry on the record that it will not prosecute the case against that person;

2. The charge is dismissed; or

3. That person is acquitted.

## MODIFICATION OF POLICY COVERAGES

1. Any coverage provided under Part B or Part C of this policy shall be excess over any personal injury protection benefits paid or payable.

2. Regardless of whether the limits for personal injury protection benefits have been exhausted, any coverage provided under Part B shall pay the amount of any claim for medical expenses payable under this coverage which exceeds the 80% limitation for medical expenses.



EXHIBIT

C

Includes copyrighted material of Insurance Services Office, Inc., with its permission.