UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO.  00-6061-CIV-FERGUSON/SNOW

DR. PAUL ZIDEL, on behalf of himself and
all others similarly situated,

      Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY and
COMMUNITY CARE NETWORK, INC.,
d/b/a CCN,

      Defendants.

_____/

ULTRA OPEN MRI CORPORATION,
on behalf of itself and all others similarly situated      00-6776

      Plaintiff,

v.

PROGRESSIVE AMERICAN INSURANCE COMPANY,

      Defendant.

_____/



### PLAINTIFF ULTRA OPEN MRI CORPORATION'S
### MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that Plaintiff ULTRA OPEN MRI CORPORATION, on behalf of itself and all others similarly situated ("UOMC"), by its undersigned counsel, shall move this Court for the entry of partial summary judgment against Defendant PROGRESSIVE AMERICAN INSURANCE COMPANY ("PROGRESSIVE"). For all the reasons set forth herein, UOMC respectfully submits that partial summary judgment should be granted in all respects.



LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO.  00-6061-CIV-FERGUSON/SNOW

## INTRODUCTION

UOMC filed a five count Complaint against PROGRESSIVE.  UOMC is entitled to partial summary judgment as to Counts 4 and 5 of the Class Action Complaint.  Count 4 of the Class Action Complaint asserts a cause of action for declaratory relief against PROGRESSIVE for its improper payment of personal injury protection ("PIP") medical expense benefits at preferred provider organization ("PPO") rates in violation of Section 627.736, Florida Statutes. Count 5 asserts a claim for damages due to PROGRESSIVE's violation of Section 627.736, Florida Statutes.  Since there are no factual issues relating to these Counts, UOMC submits that summary judgment is proper.

UOMC's Amended Motion for Class Certification was filed on December 7, 2001 [D.E. 409].  The Amended Motion for Class Certification is fully briefed and remains pending. UOMC respectfully requests that the Amended Motion for Class Certification be determined before this Court rules on this Motion for Partial Summary Judgment so that the determination will be class-wide.  In addition, in these consolidated proceedings, which were consolidated for discovery purposes only, the consolidated actions, other than Brickell v. Progressive Express, et al., Case No. 00-6649 and this matter, have been stayed pending ruling on various Motions to Compel Arbitration.  There is no stay in this action or in the Brickell action.

## BACKGROUND[1]

On October 18, 2000, UOMC began providing medical services to Raymond Garland. (UOMC Aff. at ¶ 3).[2]  On October 18, 2000, UOMC received an assignment of benefits from Mr. Garland.  (UOMC Aff. at ¶ 4; Ex. "2").  After UOMC provided services to Mr. Garland, UOMC submitted bills to PROGRESSIVE (UOMC Aff. at ¶ 5).  Upon receipt of the bills,

---

[1] Pursuant to Local Rule 7.5, the factual assertions in the background constitute UOMC's statement of material issues as to which there are no factual issues.

[2] A true and correct copy of UOMC's Affidavit is attached hereto as Exhibit "1."

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

2

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

PROGRESSIVE processed the bills and reduced the allowed amounts for payment based on a PPO reduction. (UOMC Aff. at ¶ 6; Ex. "3"). The explanation of benefit forms indicate that the reductions were made based on a contractual agreement with Beech Street Corporation ("Beech Street") (UOMC Aff. at ¶ 7; Ex. "3").

PROGRESSIVE has taken PPO reductions. PROGRESSIVE has not negotiated to enter into contracts directly with licensed healthcare providers in order to take PPO reductions. PROGRESSIVE does not give its insureds an option, at the time of the purchase of their policies, to elect to use preferred or non-preferred providers. PROGRESSIVE does not provide its insureds with a roster of healthcare providers at the time its policies of insurance are issued.

## ARGUMENT

This Court is no doubt well-familiar with the summary judgment standard. Summary judgment is "mandated" where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 372 (1986); accord Kee v. Nat'l Reserve Life Ins. Co., 918 F.2d 1538, 1543 (11th Cir. 1990). "Under Federal Rule of Civil Procedure 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Comyns v. U. S., 155 F. Supp. 2d 1344, 1347 (S.D. Fla. 2001). A judgment may be averted only if the non-moving party produces sufficient evidence in its favor for a jury to return a verdict for that party. "If the evidence advanced by the non-moving party "is merely colorable or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986). "Only disputes over facts that might affect

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO.  00-6061-CIV-FERGUSON/SNOW

the outcome of the suit under the governing law will . . . preclude summary judgment." Id.

Herein, UOMC is entitled to a summary judgment as a matter of law as to the claims brought

under Counts 4 and 5 of the Complaint.

**SECTION 627.736(10), FLORIDA STATUTES PROVIDES THE EXCLUSIVE METHOD FOR INSURANCE COMPANIES TO PAY PIP BENEFITS IN DEROGATION OF THE STATUTORILY REQUIRED AMOUNTS.**

Florida's no-fault insurance laws serve an important public need.  In Lasky v. State Farm

Ins. Co., 296 So. 2d 9 (Fla. 1974), the Florida Supreme Court upheld the constitutionality of the

Florida automobile no-fault laws.  The no-fault laws were enacted to provide prompt payment of

an insured victim's medical expenses in exchange for the insured victim's loss of certain

common law rights to seek judicial redress from a tortfeasor.  The no-fault act provides great

incentives for insurance carriers to pay promptly without unreasonably contesting medical bills.

Insurance carriers are required to pay claims within thirty days of presentation, are penalized if

they do not, and insurance carriers may be liable for attorneys' fees if they do not pay valid

claims within the thirty day period.  "Under Florida's Motor Vehicle No-Fault Law, motorists

provide their own PIP insurance for medical payments and lost wages up to a statutorily

mandated amount.  Section 627.736(5) requires that any charges for medical services provided to

a person covered by a PIP policy be reasonable and allows for an insurer to pay benefits directly

to those providing the services."  Nationwide Mut. Fire. Ins. Co. V. Pinnacle Medical, Inc., 753

So. 2d 55, 57 (Fla. 2000).

Pursuant to Section 627.736, Florida Statutes:

(1)    **Required benefits.**  Every insurance policy complying with the
security requirements of s. 627.733 shall provide personal injury protection to the
named insured, relatives residing in the same household, persons operating the
insured motor vehicle, passengers in such motor vehicle, and other persons struck
by such motor vehicle and suffering bodily injury while not an occupant of a self-
propelled vehicle, subject to the provisions of subsection (2) and paragraph (4)(d),

CONSOLIDATED CASE NO.  00-6061-CIV-FERGUSON/SNOW

to a limit of $10,000 of loss sustained by any such person as a result of bodily injury, sickness, disease, or death arising out of the ownership, maintenance, or use of a motor vehicle as follows:

        (a)   Medical benefits.  <u>Eighty percent of all reasonable expenses for necessary medical, surgical, x-ray, dental, and rehabilitative services, including prosthetic devices, and necessary ambulance, hospital, and nursing services</u>.  Such benefits shall also include necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person who relies upon spiritual means through a prayer alone for healing, in accordance with his religious beliefs.

. . .

**(4)    Benefits; when due.**

. . .

        (g)   It is a violation of the insurance code for an insurer to fail to timely provide benefits as required by this section with frequency as to constitute a general business practice.

. . .

(10)   An insurer may negotiate and enter into contracts with licensed healthcare providers for the benefits described in this section referred to in this section as "preferred providers" which shall include healthcare providers licensed under chapter 458, 459, 460, 461, and 463.  The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met.  <u>If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a nonpreferred provider policy, the medical benefits provided by the insurer shall be as required by this section</u>.  If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits.  If the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy.  The insurer shall provide each policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

(Emphasis added).

The language of the Florida No-Fault laws is clear.  "In addressing the interpretation of a

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

5

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

statute, this Court must look first to the plain language of the statute. 'While legislative intent controls construction of statutes in Florida, that intent is determined primarily from the language of the statute. The plain language of the statutory language is the first consideration.'" Nationwide Mut. Fire Ins. Co. v. Hild, 818 So. 2d 714, 716 (Fla. 2d DCA 2002) (citing Hawkins v. Ford Motor Co., 748 So. 2d 993, 997 (Fla. 1999); Overstreet v. State, 629 So. 2d 125, 126 (Fla. 1993); St. Petersburg Bank & Trust Co. v. Hamm, 414 So. 2d 1071, 1073 (Fla. 1982); Dep't of Revenue v. Cent. Dade Malpractice Trust Fund, 673 So. 2d 899, 900 (Fla. 1st DCA 1996)). Statutorily prescribed insurance coverage "is not to be 'widdled away' by exclusions and exceptions." Mosca, 693 So. 2d at 675.

In Colonial Penn Ins. Co., 537 So. 2d 623, the court rejected an insurance company's effort to avoid the express requirements of Section 627.736(4)(f). At issue in Colonial Penn was excess medical payment insurance. Despite the insurance carrier's efforts to make its medical payments insurance "excess" coverage and thus applicable only after health insurance coverage was exhausted, the court determined that the insurance carrier could not alter the plain language of the statute requiring medical payment insurance to apply before health insurance benefits. The insurance carrier's contractual language, presumably approved by the Department of Insurance, was overruled by the clear language of the statute. The insurance carrier's effort to alter the statutory requirements through a contractual agreement was rejected.

**A.     Section 627.736(10) is the Only Method Prescribed by the Legislature That Allows Payment of PIP Benefits at Rates Different Than Those Required by Section 627.736(1)(a).**

In 1991, the Florida legislature enacted Section 627.736(10). The original section was as follows:

> An insurer may negotiate and enter into contracts with licensed healthcare providers for the benefits described in this section, referred to in this section as

> "preferred providers," which shall include healthcare providers licensed under chapters 458, 459, 460, 461, and 463.  The insurer may provide an option to an insured to use a preferred provider <u>at the time that medical services are sought by the insured for the benefits described in this section</u>.  If the insured elects to use a provider who is not a preferred provider, the medical benefits provided by the insurer shall be as required by this section.  If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits.  The insurer may not require a policyholder or applicant to make any election in this regard at the time of purchase of the policy or at any time other than at the time that medical services are sought.  The insurer shall provide each policy holder with a current roster of preferred providers and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

(emphasis added).  Significantly, the original Statute provided that an insurer was <u>not</u> required to have its policy holder or applicant make any election regarding the use of a preferred provider at the time of the purchase of the policy.

Approximately one year after its original enactment in 1991, subsection 10 was amended.  Laws 1992, c. 92-318 § 84.  The amendment deleted the language previously noted that an insurer may provide an option to an insured to use a preferred provider at the time that medical services are sought and replaced it with the current language which gives the insured an option to use a preferred provider <u>at the time of purchase of the policy</u> for PIP benefits, if the requirements of the subsection are met.

A second significant difference between the original Statute and the 1992 amendment is the fact that the original Statute makes no reference to the purchase of a preferred provider policy versus a non-preferred provider policy.  In fact, the term "preferred provider policy" is not found at all in the original Statute.  The logical conclusion to be drawn from the omission of this term in the original Statute is that since an insured could not elect to use a preferred provider at any time prior to when the medical services were rendered, the purchase and sale of a preferred provider policy was not contemplated.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

The 1992 amendment, however, expressly contemplates the purchase and sale of a preferred provider policy since it states that "[i]f the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy." If an insured does not elect to use a preferred provider under Section 627.736(10) at the time of the purchase of the policy, as mandated by the statute, the insured is entitled to have his or her PIP benefits paid at the full indemnity rate of 80% of all reasonable expenses.

Pursuant to Section 627.736(10), insurance companies are permitted to negotiate and enter into contracts with licensed healthcare providers. The statutory provision provides that insurance companies can provide an option to insureds to use preferred providers at the time of the purchase of the policy if the requirements of the subsection are met. However, "if the insurer elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a nonpreferred provider policy, the medical benefits provided by the insurer shall be as required by this section." Fla. Stat. § 627.736(10) (emphasis added). Section 627.736(10) specifically defines "preferred providers" as providers that insurers enter into contracts with for the benefits described in Section 627.736. If an insurer does not enter into a contract with a licensed healthcare provider, a provider cannot be a preferred provider under Section 627.736(10).

The provisions of Section 627.736(10) are clear. If a healthcare provider that provides treatment is not a preferred provider as defined by Section 627.736(10), insurance carriers are required to pay benefits at reasonable and necessary rates under Section 627.736(1)(a). The only mention in the no-fault laws regarding payment of PIP benefits at rates different than the reasonable and necessary rates under Section 627.736(1)(a) is that found in Section 627.736(10).

The doctrine of *expressio unius est exclusio alterius* establishes that payment of PIP

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

benefits must be at reasonable and necessary rates if an insurance carrier does not comply with Section 627.736(10). "Under the doctrine of '*expressio unius est exclusio alterius*,' the mention of one thing implies the exclusion of another." Mosher v. Anderson, 817 So. 2d 812, 816 (Fla. 2002) (citing Young v. Progressive Southeastern Ins. Co., 753 So. 2d 80, 85 (Fla. 2000)). "Hence, where a statute enumerates the things on which it is to operate, or forbids certain things, it is ordinarily to be construed as excluding from its operation all those not expressly mentioned." Hillsborough County v. NCJ Inv. Co., 605 So. 2d 1287, 1288 (Fla. 2d DCA 1992) (citations omitted). Section 627.736(10) enumerates the procedure an insurance company must utilize if it intends to pay PIP benefits at amounts different than those required by Section 627.736(1)(a). Section 627.736(10) specifically provides that if a preferred provider, as defined by that Section, is not utilized by an insured, "the medical benefits provided by the insurer shall be as required by this section." Id. There is no other statute which governs or regulates the operation of a PPO in the context of personal injury protection benefits. Since Section 627.736(10) enumerates the things on which it is to operate, and forbids certain things, it must be construed as excluding from its operations all those not expressly mentioned. Hillsborough County, 605 So. 2d at 1288.

Section 627.736 does not contain any other provision that provides an insurance company with the ability to pay PIP benefits at rates other than the reasonable and necessary rates under Section 627.736(1)(a). Insurance carriers cannot change the statutory scheme. They are required to comply with the statute if they desire to make payments for PIP benefits at rates different than those required by Section 627.736(1)(a). Insurance carriers cannot alter the plain language of Section 627.736(10). Colonial Penn Ins. Co., 537 So. 2d 623.

PROGRESSIVE does not comply with the requirements of Section 627.736(10). "Under

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

Florida law, an agreement which violates a statute, or which cannot be performed without violating a statute, is illegal and void, and will not be enforced." In re Voltarel, 236 B.R. 464, 466 (Bankr. M.D.Fla. 1999) (citing Local No. 234 v. Hemley & Beckwith, Inc., 66 So. 2d 818 (Fla. 1953)). PROGRESSIVE does not provide an option to its insureds, at the time they purchase their policies, to select preferred provider no-fault benefits. PROGRESSIVE did not negotiate and enter into contracts with licensed healthcare providers. PROGRESSIVE did not provide each policyholder with a current roster of "preferred providers" in the county in which the insureds reside at the time of the purchase of the policy. PROGRESSIVE did not make such lists available for public inspection during regular business hours.

Since PROGRESSIVE does not comply with Section 627.736(10), every insured that utilizes the services of a healthcare provider utilizes the services of a provider who is not a preferred provider as defined by Section 627.736(10). Thus, PROGRESSIVE is required to pay medical benefits "as required by this section." Fla. Stat. § 627.736(10). The required benefits are those set forth in Section 627.736(1)(a) as 80% of all reasonable expenses for necessary medical, surgical, x-ray, dental, and rehabilitative services, including prosthetic devices, and necessary ambulance, hospital, and nursing services. The plain language of Section 627.736 precludes PROGRESSIVE's payment of the medical expenses at rates which are less than the reasonable and necessary rates under Section 627.736(1)(a).

**B.    Validating PROGRESSIVE's Silent PPO Scheme Does not Serve the Purpose of the Statute or Benefit its Insureds.**

There are more than 25 county court decisions finding against insurance carriers on this issue.[3] There are only 3-4 decisions UOMC's counsel is aware of that rule to the contrary. In

---

[3] 06/28/01 Arcadia Chiropractic v. Allstate 00-0165CC Desoto County, Florida; 06/27/01 Arcadia Chiropractic v. Allstate, 00-0168C Desoto County, Florida; 02/16/01 Arcadia Chiropractic v. Allstate, 00-0166CC Desoto County, Florida; 10/17/01 Arcadia Chiropractic v. Allstate, 00-0169CC Desoto County, Florida; 02/16/01 Arcadia

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

addition, the recent Eleventh Circuit decision in HCA Health Servs. of Georgia, Inc. v.

Employers Health Ins. Co., 240 F.3d 983 (11th Cir. 2001) directly addresses silent PPOs.  In

HCA Health Servs., the Court of Appeals described a series of "shared savings agreements," or

broker contracts, aimed at allowing a third-party payor or insurance company to pay discounted

fees to healthcare providers without providing anything in return for the provider.  The broker

contracts were between "middleman" MedView Services, Inc.,[4] Health Strategies, Inc. (a vendor

of health care provider discounts that allows insurance companies to access provider discounts

such as those in the MedView PPO network), and Employers Health, Inc., the insurance

company that ultimately accessed the MedView PPO discount through processing by Health

Strategies, Inc.  HCA Health Servs., 240 F.3d at 986-87.

In a strongly worded decision, the Court of Appeals denounced this arrangement because

---

Chiropractic v. Progressive Express 00-0167CC Desoto County, Florida; 12/20/00 Dr. Jeffrey Shebovsky v. Peachtree Casualty, CCO 99-9723 Orange County, Florida; 10/22/01 S.D. LaRusso, D.C., et al. v Nationwide Property and Casualty, MS-01-9820 Palm Beach County, Florida; 10/22/01 S.D. LaRusso, D.C., et al. v Nationwide Property and Casualty, MS 01 9821 Palm Beach County, Florida; 12/28/01 Dr. William Waters v. Nationwide Mutual insurance, 01 CC 1087 Bay County, Florida; 10/16/01 Ortho Associates, et al. v. Nationwide Property & Casualty, 01-008686 Broward County, Florida; 10/16/01 Ortho Associates, et al. v. Nationwide Property & Casualty, 01-8903 Broward County, Florida; 10/16/01 Ortho Associates, et al. v. Nationwide Property & Casualty, 01 8682 Broward County, Florida; 10/16/01 Ortho Associates, et al. v. Nationwide Property & Casualty, 01 10592 Broward County, Florida 10/24/01 Fishman and Stashak, et al. v. Progressive Bayside, 01 11729 Broward County, Florida; 11/26/01 Fishman and Stashak, et al. v. Progressive Bayside, 01 11646 Broward County, Florida 12/17/01 Fishman and Stashak, et al. v. Progressive Bayside, 01 11048 Broward County, Florida; Fishman and Stashak, et al. v. Progressive Bayside, 01 12275 Broward County, Florida; 10/23/01 Fishman and Stashak, et al. v. Progressive Bayside, 01 11619 Broward County, Florida; 12/20/01 Fishman and Stashak, et al. v. Progressive Bayside, 01 12268 Broward County, Florida; 02/09/02 Clifford D. Janssen v. Progressive Consumers, 01 6665 Broward County, Florida; 03/22/02 Barnes Family Chiropractic v. Metropolitan Property and Casualty, 2001 11775 Volusia County, Florida; 10/12/01 Frank Lanzisera, et al. v. Progressive Express 2001, SC 1636 Manatee County, Florida; 10/12/01 Lanzisera, et al. v. Progressive Express, 2001 SC 1594 Manatee County, Florida; Lanzisera, et al. v. Progressive Express, 2001 SC 1605 Manatee County, Florida; 05/131/92 Hugh Walters, D.C., P.A. v. Nationwide Mutual Fire, 01-1800 SPEJV Lee County, Florida; 06/28/02 Hugh A. Walters, D.C., P.A. v. Progressive Express Co., 01-1801 SPEJV Lee County, Florida; 07/19/02 Dukes Chiropractic Health Clinic, P.A. v. Nationwide Mutual Fire, 2000-17430-SC Hillsborough County, Florida; 09/04/02 Premier Rehab, Inc. v. Nationwide General Insurance Company, 2002-10283-CODL Volusia County, Florida; 09/04/02 Gregory J. Harbers, D.C. v. Progressive Express Ins. Co., 2001-11131-CODL Volusia County, Florida.  A true and correct copy of the recent Progressive decision is attached hereto as Exhibit "4".

[4] MedView is described by the Court of Appeals as "an entity that contracts with [medical care] providers . . . to form a preferred network which MedView then markets to third party payors, usually insurance companies." HCA Health Servs., 240 F.3d at 986.

LEE & AMTZIS, P.L.
Attorneys at Law

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

the healthcare provider never receives "steerage" as consideration in exchange for the provider's

PPO discount. The Court of Appeals recognized the term "steerage" as meaning "actively

encouraging plan participants to seek the services of the providers in the PPO by such means as

financial incentives . . . . Steerage also occurs through communication efforts such as providing

participants with a list of preferred providers, a hotline to inform and refer participants to

preferred providers, and issuing identification cards designed to inform providers that a patient is

a participant eligible for the PPO discount." HCA Health Servs., 240 F.3d at 1002, n. 43.

Without the necessary element of steerage, the Court highlighted the financial piracy taking

place at the expense of consumers and providers noting its concern that:

> while participants are deterred from exercising their contractual right to obtain
> out-of-network medical care, brokers such as HSI are profiting. EHI pays HSI a
> fee equal to twenty percent (20%) of the discount obtained on each provider bill .
> . . . In essence, participants pay more (in the form of premium payments) and
> providers receive less than the usual and customary fee for services. Meanwhile,
> EHI [the insurance company] collects premium payments which reflect its
> obligation to pay for out-of-network care while simultaneously refusing to pay the
> full fee for such care when its obligation arises. Then, EHI [the insurance
> company] pays HSI [the broker] a percentage of its savings and pockets the
> remainder.

Id. at 1005, n. 50.

Ultimately, the Court of Appeals reasoned that the Silent PPO scheme, if allowed to

perpetuate, will cause a "downward spiraling" of the level of health care services as a whole:

> Given that economic principles, not subjective motivations, underlie our analysis, we
> note that when a provider's fees are reduced yet overhead and other costs of doing
> business remain constant, something has to give. Of course we are not intimating that,
> regarding quality of outcomes, a provider will purposely provide less or worse medical
> care. We are saying that the economic realities of this scenario mean that something has
> to give, i.e., the level of service. The provider will be forced to take on more patients to
> offset the reduction in its fee; more patients may result in increased waiting time.
> Another way the provider can compensate for accepting lower fees is to cut the salaries
> of his staff or hire fewer staff. Lower salaries may mean a less educated or experienced
> staff, both of which would impact the level of service a patient receives. Likewise, fewer
> staff necessarily means there will be less personnel available to attend to the patient; this

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

too impacts the level of service a patient receives. . .

Id. at 1007, n 54.

The Eleventh Circuit went out of its way to explain why the claimed benefits to the insureds are nonexistent. PROGRESSIVE does not offer preferred provider plans or preferred provider programs to its insureds. PROGRESSIVE does not provide each policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy as required by Section 627.736(10). This requirement of the statute accomplishes the "steerage" of patients which is the fundamental underlying consideration why healthcare providers would agree to accept reduced fees. PROGRESSIVE has not only failed to comply with Section 627.736(10), but it also fails to comply with the requirements of the very contracts it seeks to utilize to pay PIP benefits at PPO rates. PROGRESSIVE collects premiums which reflect its obligations to pay 80% of reasonable expenses incurred, but then pays discounted amounts to providers. PROGRESSIVE pockets the difference and pays BEECH STREET a percentage of its savings. This is the exact same scheme criticized and invalidated in HCA Health Servs., 240 F.3d 983 ("The ultimate result . . . is that participants receive a level of service consonant with a discounted fee regardless of whether they receive their medical care from an in-network or out-of-network provider.")

### C.    PROGRESSIVE is Judicially Estopped From Claiming That it Could Take PPO Reductions.

PROGRESSIVE is judicially estopped from claiming that it could take PPO reductions because it took an entirely consistent position in a prior proceeding. This Circuit recognizes judicial estoppel as follows:

> Judicial estoppel is an equitable doctrine invoked and at a court's discretion. Under this doctrine, a party is precluded from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

proceeding. Judicial estoppel is an equitable concept intended to prevent the perversion of the judicial process." The purpose of the doctrine, "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."

Burns v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002) (citations omitted).

Judicial estoppel applies even where there is not complete mutuality of parties. See Blumberg v.

USAA Cas. Ins. Co., 790 So. 2d 1061 (Fla. 2001) ("The courthouse should not be viewed as an

all-you-can-sue buffet, in which litigants can pick and choose which verdicts they want and

which they do not.") PROGRESSIVE has taken the position in prior proceedings that it is not

entitled to take PPO reductions. Thus, it is judicially estopped from taking an inconsistent

position herein.

In Laloi v. Progressive American Insurance Company, Case No. NC-95-17152-RK, Palm

Beach County, Florida, PROGRESSIVE initially claimed that it was entitled to reduce PIP

benefits based on its PPO scheme despite the fact that the policy was not a preferred provider

policy. PROGRESSIVE eventually confessed error and paid full benefits. As a result,

PROGRESSIVE was required to pay its insured's attorneys' fees. PROGRESSIVE's insured

was seeking a contingency fee risk multiplier. To avoid paying the multiplier, PROGRESSIVE

hired an expert witness, an attorney, who testified that there should be no multiplier because

PROGRESSIVE could not reduce PIP benefits by paying only preferred provider amounts if the

insured did not have a preferred provider endorsement on his policy.[5]

Mr. Wilke reviewed the entire file and concluded that there should be no multiplier

because PROGRESSIVE erred by not paying full PIP benefits as opposed to PPO PIP benefits

when its insured did not have a PPO PIP policy. (Ex. "5" at pp. 75-77). Mr. Wilke specifically

testified:

---

[5] A true and correct copy of the testimony of John Wilke, Esq. is attached hereto as Exhibit "5."

. . . Apparently the carrier incorrectly paid the treating chiropractor a fee based upon what they perceived to be a private contract that the chiropractor had entered into, what's commonly referenced as a PPO situation where he had agreed to set amount of fees. That was incorrect because the PPO, if you will, contract was not present in this case. So from the moment they filed suit, even prior to when they filed suit, they had overdue payments which was part of one of the claims that they raised in the suit. They had a winner from the get-go. Even if you assume that a jury would buy into the chiropractic cut off, the insurance company from the outset had the insurmountable threshold to overcome in that improper payments were made and there was money due and owing to the chiropractor in question right from day one, right from the outset. And based upon my review of the file, that was evident to me as the primary reason why this case settled, when it was discovered pursuant to a deposition of the claims adjustor which was taken later on in the lawsuit.

. . .

Q:      So your opinion then as to the amount of the multiplier is what?

A:      It should be 1.0, because success at the outset not only was likely, it was assured under the fact scenario of the case.

(Ex. "5", pp. 76-77).

. . .

Q:      You're saying that if Progressive had known that their own policy did not have a PPO endorsement and their insured had not selected PPO, that they would have not tried to hold Dr. Rivner to his Med-View contract?

A:      I don't know what they would have or would have not done. But again, had they made that argument, it would have fallen on a motion for summary judgment or the first time it was raised before the court because, again, the plaintiff attorney had it within their fact finding to determine what was available with regard to the doctor aside from the cutoff issue.

(Ex. "5", p. 85).

. . .

Q:      So you're not saying that Progressive did not take the incorrect position that it could reduce payments regarding a Med-View contract notwithstanding whether or not they had a PPO contract?

A:      I don't know if they actually took a position. I am telling you payments were made under an incorrect assumption that there was a PPO present

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

here when there was not. And that fact was there in this case from day one.

(Ex. "5", p. 89-90).

. . .

Q:      Did Wendy Smith not say in her deposition words to the effect that regardless of whether there was a PPO contract or not, if the provider was a Med-View provider, the Med-View provider got paid according to the Med-View rate?

A:      She commented along those lines. But again that was an incorrect position to take.

(Ex. "5", p. 90).

PROGRESSIVE has taken the position, under oath, that regardless of whether a provider has a contract with a PPO, when there is no PPO policy issued in compliance with Section 627.736(10), Florida Statutes, PROGRESSIVE is not entitled to PPO reductions. Its expert's testimony could not be clearer. When defending against a contingency fee risk multiplier, PROGRESSIVE took the position that it could not take PPO reductions, that the issue was relatively clear, and that the insured's counsel should not receive a risk multiplier because: "They had a winner from the get-go." (Ex. "5", p. 77). Having taken this position, PROGRESSIVE is judicially estopped from taking a contrary position in this action. PROGRESSIVE is judicially estopped from claiming that it is entitled to take PPO reductions despite its failure to comply with Section 627.736(10), Florida Statutes.

## CONCLUSION

For all the reasons set forth herein, Plaintiff ULTRA OPEN MRI CORPORATION, on behalf of itself and all others similarly situated, respectfully requests that this Court enter an Order granting partial summary judgment on liability as to Counts 4 and 5 of UOMC's Complaint, reserving jurisdiction on the issue of damages and the remaining claims, together with such other and further relief as this Court may deem just and proper.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

mail on September 17, 2002 upon: all individuals on the attached Service List.

Respectfully submitted,

LEE & AMTZIS, P.L.
Co-Counsel for Class Plaintiffs
350 N.W. 12th Ave., Suite 150
Deerfield Beach, FL 33442
(561) 981-9988
(561) 981-9980 Fax

By: _____
ERIC LEE
Florida Bar No. 961299

### Co-Counsel for Class Plaintiffs

GOLD & COULSON
A Partnership of Professional and
Limited Liability Corporations
11 S. LaSalle Street
Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A.
Bank of America Tower
Suite 2510
One Financial Plaza
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO.  00-6061-CIV-FERGUSON/SNOW

Susan Lawson, Esq.
230 East Davis Boulevard
Suite 200
Tampa, FL  33606
(813) 251-8879
(813) 251-5786 Facsimile

Richard Bokor, Esq.
230 E. Davis Boulevard
Tampa, FL  33606
(813) 254-1000
(813) 254-6327 Facsimile

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

# MASTER SERVICE LIST
## (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)
(Updated 5/6/02)

**Co-Lead Counsel for Plaintiffs**

LEE & AMTZIS, P.L.
Eric Lee, Esq.
lee@leeamlaw.com
Suite 150
350 N.W. 12th Ave.
Deerfield Beach, FL 33442
(561) 981-9988
(561) 981-9980 Facsimile

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphillips@phillipsgarcia.com
Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 2510
Fort Lauderdale, FL 33394
(954) 462-6855
(954) 462-6899 Facsimile

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
personalinjurylawyer@earthlink.net
230 East Davis Boulevard, Suite 200
Tampa, FL 33606
(813) 251-8879
(813) 251-5786  Facsimile

RICHARD BOKOR, P.A.
Richard Bokor, Esq.
rabokor1@tampabay.rr.com
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-1000
(813) 254-6327 Facsimile

Casey Fundaro, Esq.
fundaro@aol.com
P.O. Box 7420
Fort Lauderdale, FL 33338-7420
(954) 462-2833
(954) 462-2835 Facsimile

**Counsel for:**
**Allstate, Fidelity and Casualty,**
**Continental, Deerbrook**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 Facsimile

**Counsel for Beech Street and ADP**

TEW, CARDENAS, et al.
John M. Quaranta, Esq.
(305)539-2495
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1116 Facsimile

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

**Counsel for CCN**

MCGUIRE WOODS, LLP
William W. Deem, Esq.
wdeem@mcguirewoods.com
3300 Bank of America Tower
50 North Laura Street
Jacksonville, FL  32202
(904) 798-3200
(904) 798-3207 Facsimile

**Counsel for Nationwide**

FOWLER, WHITE, et al.
Katherine C. Lake, Esq.
klake@fowlerwhite.com
Post Office Box 1438
Tampa, FL 33601
(813) 228-7411
(813) 229-8313 Facsimile

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esq.
haggerty@scdlaw.com
1601 Market Street
34th Floor
Philadelphia, PA 19103-2316
(215) 299-4314
(215) 299-4301 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Robert K. Levenson, Esq.
rlevenson@hklaw.com
Greg Baldwin, Esq.
gbaldwin@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 Facsimile

**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT et al.
Mark Shapiro, Esq.
mshapiro@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for:**
**Hartford, Metropolitan, Integon**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Metropolitan**

SONNENSCHEIN, NATH & ROSENTHAL
Jeffrey P. Lennard, Esq.
jpl@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000
(312) 876-7934

**Counsel for Superior**

BUTLER BURNETTE PAPPAS
Alan J. Nisberg, Esq.
anisberg@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for Prudential**

BUTLER BURNETTE PAPPAS
Kathy J. Maus, Esq.
kmaus@bbplaw.com
Lauren D. Levy, Esq.
llevy@bbplaw.com
3520 Thomasville Road, Suite 102
Tallahassee, FL 32308
(850) 894-4111
(850) 894-4999 Facsimile

SHEA & GARDNER
John D. Aldock, Esq.
Jaldock@SheaGardner.com
Michael Isenman, Esq.
misenman@sheagardner.com
1800 Massachusetts Ave., N.W.
Washington, D.C. 20036
(202) 828-2000
(202) 828-2195 Facsimile

**Counsel for American International**

CONROY, SIMBERG, GANON, KREVANS & ABEL, P.A.
Dale L. Friedman, Esq.
dfriedman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Boulevard
Second Floor
Hollywood, FL 33021
(954) 961-1400
(954) 967-8577 Facsimile

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO.  00-6061-CIV-FERGUSON/SNOW

DR. PAUL ZIDEL, on behalf of himself and
all others similarly situated,

      Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY and
COMMUNITY CARE NETWORK, INC.,
d/b/a CCN,

      Defendants.

_____/

ULTRA OPEN MRI CORPORATION,          00-6776
on behalf of itself and
all others similarly situated,

      Plaintiff,

vs.

PROGRESSIVE AMERICAN INSURANCE
COMPANY,

      Defendant.

_____/

### AFFIDAVIT OF PLAINTIFF ULTRA OPEN MRI CORPORATION

STATE OF FLORIDA
                     SS:
COUNTY OF HILLSBOROUGH

      John H. McCoskrie, being duly sworn, deposes and states:

      1.      I am an individual over the age of 18 and I make this Affidavit based upon

personal knowledge of the facts stated herein.

      2.      I am the Vice President of Plaintiff ULTRA OPEN MRI CORPORATION

("UOMC").

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-FERGUSON/SNOW

3.    On October 18, 2000, UOMC began providing medical services to Raymond Garland.

4.    On October 18, 2000, UOMC received an Assignment of Benefits from Mr. Garland. A true and correct copy of the Assignment of Benefits is attached to UOMC's Motion for Summary Judgment as Exhibit 2.

5.    After UOMC provided services to Mr. Garland, UOMC submitted bills to PROGRESSIVE AMERICAN.

6.    PROGRESSIVE AMERICAN processed the bills and reduced the allowed amount for payment based on a purported PPO reduction. A true and correct copy of the Explanation of Benefits Form is attached to UOMC's Motion for Summary Judgment as Exhibit 3.

7.    The Explanation of Benefit Form indicates that reductions were made based upon a purported agreement with Beech Street Corporation.

Under penalties of perjury, I declare that I have read the foregoing Affidavit and the facts stated therein are true and correct.

_____

ULTRA OPEN MRI CORPORATION

By:    JOHN H. MCCOSKRIE
Its:    VICE PRESIDENT

STATE OF FLORIDA
                                        SS:
COUNTY OF HILLSBOROUGH

The foregoing instrument was acknowledged before me this _11th_ day of _Sept_, 2002 by John H. McCoskrie, as Vice President of ULTRA OPEN MRI CORPORATION, who is personally known to me or who has produced _____ as identification and who did/did not take an oath.

LEE & AMTZIS, P.L.,
ATTORNEYS AT LAW

2

CONSOLIDATED CASE NO.  00-6061-CIV-FERGUSON/SNOW

Notary Public:

Sign _____

Print _____

State of Florida at Large (Seal)
My Commission Expires: 5|16|03

Paula J. Smith
Notary Public State of Florida
My Comm. Expires May 16, 2008
CC837277

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

*Garland — Progressive Amer.*

# Ultra Open MRI

### St. Petersburg • Palm Harbor • Tampa


radiagnostics.com

## PATIENT DATA

PATIENT *Raymond Garland*   TELEPHONE *327-7126*

ADDRESS *3637 3rd Ave N*

CITY *St Pete*   STATE _____   ZIP *33713*

EMPLOYER (INSURED'S) _____   TELEPHONE _____

TYPE OF COVERAGE: AUTO____ WORKER'S COMP ____ GROUP ____ MEDICARE ____ OTHER ____

INSURANCE CO. *Progressive*   TELEPHONE _____

DATE OF ACCIDENT *6-17-00*   CLAIM/ ID NO. _____

SOCIAL SECURITY NO. *046 14 9850*   DATE OF BIRTH *3-20-26*

SUPPLEMENTAL/SECONDARY INS. CO _____

CLAIM OR ID NO. _____   TELEPHONE _____

PRIMARY CARE PHYSICIAN _____   PRE-AUTHORIZATION NO. _____

ATTORNEY _____   TELEPHONE _____

### ACKNOWLEDGMENT & ASSIGNMENT OF BENEFITS

I hereby acknowledge that I am receiving health care services from  ULTRA OPEN MRI CORPORATION (ULTRA). I have been advised that ULTRA is willing to wait for payment for these services, provided that there continues to be a reasonable chance that payment will be made either by insurance proceeds or out of the settlement of a liability claim. If there is no liability claim and /or insurance coverage to pay for any service provided to me by ULTRA, I promise to pay my balance in full within 30 days of the date of service. In consideration of services and treatment rendered by ULTRA, I hereby authorize and direct payment of medical benefits to ULTRA and assign to ULTRA any cause of action I may have against any insurance company obligated to me by law, statute or contractual agreement, for payment for such services and treatment. I direct my insurer to escrow any personal injury protection and/or medical payments benefits it disputes for service or treatments rendered to me by ULTRA. I also understand that the services rendered by ULTRA can be obtained by other providers and I am under no obligation to utilize ULTRA for these services.

I also authorize the release of any pertinent information or medical records to ULTRA and any other medical provider, insurance company or attorney involved with my medical treatment or case.

X *Ray Garland*   *10-18-00*

PATIENT'S SIGNATURE   DATE
(PARENT/GUARDIAN)

---

6449 38th Avenue North, Suite B-3
St. Petersburg, FL 33710
Phone: (727) 381-1MRI
Fax:   (727) 381-7250

36454 U.S. Hwy. 19 North
Palm Harbor, FL 34684
Phone: (727) 771-2MRI
Fax:   (727) 781-1634

4914 North Armenia Avenue
Tampa, FL 33603
Phone: (813) 879-1MRI
Fax:   (813) 876-6471

Explanation of Reimbursement

**PROGRESSIVE**

Medical Claims Unit

3725 West Grace Street, Suite 200
Tampa, FL 33607

Telephone: 800 444-3909
Facsimile: 813 878-2818

progressive.com

─── Claim Information ───

| | |
|---|---|
| Claim Number: 004887768-03 | Carrier: PROGRESS. |
| Policyholder: GARLAND, RAYMOND | Branch: WFLORIDA. |
| Claimant: GARLAND, RAYMOND | Claim Rep: LCT0002 |
| Date of Loss: 06/18/2000 | Party: First |
| Updated: 11/13/2000 | Bill No: 26 |
| | Audited: 11/03/2000 |

─── Provider Information ───

TIMKEN, MARK
ULTR OPEN MRI CORPORATION
PO BOX 1186
TAMPA , FL 33601

| | |
|---|---|
| Place of Service ZIP: | 33710 |
| Jurisdiction State: | |
| Payee EIN: | 59-3605967 |
| Specialty: | 99 - UNSPECIFIED |
| Patient Account Number: | |

PATIENTS RESPONSIBLTY $ 118.18

─── Diagnosis ───

| # | ICD-9 | Description |
|---|---|---|
| 1 | 723.4 | BRACHIAL NEURITIS OR RADICULITIS NOS |

─── Item Detail ───

| Item | Date | POS | CPT-Mod | Description | Units | Charge | ALLOWED AMOUNT | Reason Code |
|---|---|---|---|---|---|---|---|---|
| 1 | 10/18/00 | 11 | 72141 | MRI, CERVICAL SPINE, W/ O CONTRAST | | 899.00 | 539.40 | EXBECH |
| | | | | Totals for Bill | | 899.00 | 539.40 | |

─── Reason Code Description ───

| Reason Code - Item | Description |
|---|---|
| EXBECH - | Charges exceed the Beech Street contractual allowance for this procedure. |

IN THE COUNTY COURT, IN AND
FOR VOLUSIA COUNTY, FLORIDA

CASE NO.: 2001-11131-CODL

GREGORY J. HARBERS, D.C.,
d/b/a DEBARY CHIROPRACTIC
CENTER, a/a/o Shirley Brucker,

     Plaintiff,

vs.

PROGRESSIVE EXPRESS INSURANCE
COMPANY,

     Defendant.

_____/

## O R D E R

THIS CAUSE having come before the Court for consideration on Plaintiff's

Motion for Partial Summary Judgment and the Court having reviewed the Motion and

being otherwise advised in the premises, it is hereby:

ORDERED AND ADJUDGED:

1.    The Plaintiff's Motion for Partial Summary Judgment as to the Court for

Declaratory Relief is hereby **granted**.

2.    In the instant case, it is undisputed that Progressive Express Insurance Company

reduced Plaintiff's bills for medical treatment pursuant to a contractual rate agreement

between the Plaintiff/health care provider and a third party (BeechStreet), but admits it

did not enter into a contract directly with the Plaintiff/health care provider, did not offer

both a PPO and Non-PPO policy at the time the insured purchased the policy and did not

offer the insured the election to have a PPO endorsement in her policy.

3.      Progressive contends it is entitled to utilize the contractual rate agreement for the purpose of determining reasonable and necessary charges pursuant to Florida Statute 627.736(1) without offering and the insured electing a PPO endorsement under Fla. Statute 627.736(10).

4.      This Court finds that the provisions of Section 627.736(10), Florida Statutes, require Progressive in this type of case to offer an insured an option to use a preferred provider at the time the insured purchases a policy for person injury protection, and the insured must elect the option.     The key language that persuades the Court that this requirement be met is found in 627.736(10) which states in part "If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section...". It is clear that by this language, the legislature intended that only when the insured elected the "Preferred Provider" option can the insurance company pay benefits in excess of the benefits required by 627.736(1)(a) i.e. 90% of covered medical expenses. It is only upon the insured's election that the insurer can benefit from its contract with the licensed health care provider. The requirement of the insurance company to offer the "Preferred Provider" option keeps the insured within the "loop" so to speak so the insured can understand the benefit and services he or she will receive and understand the charge that will be made. This in turn allows the insured to seek out the insurance company that provides the best benefits, promoting free enterprise and keeping intact the insured's right to choose a health care provider.

5.      The insured in this case assigned her personal injury protection benefits to the Plaintiff  The Plaintiff has standing.

6.    The Court's construction of Fla. Statute 327.736(10) does not allow a violation of the U.S. Constitution Article 1 Section 9cl.1 or Florida Constitution Article 1 Section 10. The Defendant is free to contract with any licensed health provider it wishes. Before the Defendant can require a licensed health provider, the Plaintiff in this case, to comply with a preferred provider agreement, the insured must be given the option to choose, and the insured must choose a provider. The Court's interpretation of Fla. Stat. 327.736(10) prevents the insurer or Defendant in this case, from circumventing the insured's benefits and protection Fla. Statute 627.736 provides and therefore avoiding great prejudice to the public.

7.    The Court's construction of Fla. Statute 627.736(10) leaves the insured with the choice of a policy paying 80% "of all reasonable expenses for medically necessary...services" or a policy paying a greater percentage (i.e. 90%) of a negotiated charge for services which may or may not be reasonable and necessary. The insured may rather choose a provider whose charge for services is reasonable and necessary as established by the provider's profession than a "preferred provider" who has contracted previously with the insurer as to what is reasonable and necessary.

8.    This Court reserves jurisdiction for the remaining issue in the Complaint and for the entry of an award of attorney fees and costs relative to the Declaratory Judgment action.

DONE AND ORDERED in Chambers at DeLand, Volusia County, Florida this ___ day of _____, 2002.

J. R. SMITH
COUNTY COURT JUDGE

```
 1              IN THE COUNTY COURT FOR THE
           FIFTEENTH JUDICIAL CIRCUIT IN AND FOR
 2                 PALM BEACH COUNTY, FLORIDA


 3     DELOUIS LALOI,                    )
                                         )
 4              Plaintiff,               )
                                         )
 5             -vs-                      )  Case No. MC-95-17152-RK
                                         )
 6     PROGRESSIVE AMERICAN INSURANCE    )
       COMPANY, a Florida corporation,   )
 7                                       )
                Defendant.               )
 8     _____)


 9
                                   West Palm Beach, Florida
10                                 March 14, 1997
                                   2:35 - 5:30 p.m.
11


12


13


14     APPEARANCES:

15              COOKSEY & COOKSEY, P.A.
                By: JAMES P. COOKSEY, ESQ.
16              and
                LAW OFFICES DIEGO ASENCIO, P.A.
17              By: DIEGO ASENCIO, ESQ.
                Attorneys for Plaintiff
18
                COONEY, HALICZER, MATTSON, BLACKBURN, PETTIS
19              & RICHARDS, P.A.
                Attorneys for Defendant
20              By: JOHN RICHARDS, ESQ.

21


22              The above-styled cause came on for hearing

23     before the Honorable DEBORAH PUCILLO, Presiding Judge, at

24     the Palm Beach County Courthouse, West Palm Beach, Palm

25     Beach County, Florida, on the 24th day of March, 1997.
```

A-142

1        MR. ASENCIO:  No, Your Honor.

2        THE COURT:  May this witness be excused?

3        MR. ASENCIO:  Yes, Your Honor.

4        THE COURT:  Thank you.  You're free to go.

5        (Witness excused).

6        THE COURT:  Bring in the next witness.

7        We'll take the defense expert out of turn?

8        MR. RICHARDS:  Yes.  With permission, we'll call

9    our defense expert out of turn.

10   THEREUPON,

11                    JOHN WILKE,

12   after having been first sworn by me to tell the whole truth

13   as hereinafter certified, testified as follows:

14                 DIRECT EXAMINATION

15   BY MR. RICHARDS:

16        Q    Good afternoon.

17        A    Good afternoon.

18        Q    Please tell the Court your name and professional

19   address.

20        A    John Wilke, W-I-L-K-E.  And my address is 1900

21   Glades Road, Boca Raton, Suite 400.

22        Q    What is your profession?

23        A    I'm an attorney, licensed to practice in the

24   State of Florida since 1987.

25        Q    With whom do you practice?

1      A      Green, Murphy, Wilke and Murphy.  We practice in

2  Broward, Dade and Palm Beach Counties.

3      Q      Do you hold any position with the firm?

4      A      I'm a partner with the firm and I run our north

5  office, formally off of Palm Beach Lakes Boulevard, and

6  moved down to Boca Raton as of about a month or so ago.

7      Q      Your educational background?

8      A      Villanova University, degree in Economics in

9  1994.  Nova University Law School, graduated in 1987, Chief

10  Advocate, Moot Court Society.  I've been practicing with my

11  current firm since 1986, first as a clerk, then I became an

12  associate in 1987.  In 1991 I opened up our satellite

13  office here in Palm Beach County.  I've been practicing up

14  here in Palm Beach County for the past seven years now or

15  thereabouts.  I specialize in auto defense work.  A great

16  deal of my file load is in what we commonly refer to as the

17  SIU or fraud unit for various carriers here in South

18  Florida including State Farm, Allstate, FIGA.  I've handled

19  all aspects of civil litigation between tort, third-party

20  claims, PIP lawsuit.  I've testified as an expert witness

21  in Broward, Dade and Palm Beach County, and been certified

22  as an expert in those fields on approximately 30 occasions

23  within the past five years.

24      Q      Do you try cases from time to time?

25      A      Too often.  I've tried probably -- in the last

PALM BEACH REPORTING SERVICE, INC.  (407) 471-2995

1    five years I average between ten and 12 jury trials a year.

2    That's been my average at least for the last five years.

3    I've litigated PIP lawsuits involving a variety of the

4    issues that are commonly raised in PIP suits from IME

5    cutoffs to coverage defenses for allegations of fraud and

6    so forth.  I've tried to a jury approximately a dozen PIP

7    cases and tried to a jury in total approximately 80 jury

8    trials in the past ten years.

9        Q      In the past, have you been asked to serve as an

10   expert witness on either side of a dispute over attorneys'

11   fees in a PIP matter?

12       A      On both sides.

13       Q      And when you do that, are you generally

14   compensated?

15       A      Yes.  I charge a hundred fifty dollars per hour

16   to go through the file and materials and to testify in

17   court.

18       Q      In this matter, were you so asked to serve in

19   that capacity?

20       A      Yes, I was.

21       Q      Did you have an opportunity to review anything

22   in anticipation of your testimony?

23       A      I did.  The file was sent down to me last month.

24   I had an opportunity to go through the entire file that was

25   furnished to me back on March 2nd, 1997.  I spent

1    approximately three and a half hours going through the

2    file.  I pulled the applicable case law to the issues that

3    were raised not only in the underlying file but as to the

4    fee hearing here as well.  I met with counsel on this case.

5    Had an opportunity to talk to counsel to make sure that all

6    of the issues were evident from the file and that there was

7    nothing novel or complex about the issues in this case.

8         Q     In particular, did you have an opportunity to

9    review fee invoices by Mr. Cooksey and Mr. Asencio?

10         A     Yes, I did, the time affidavits which were

11    submitted to counsel by Mr. Asencio and Mr. Cooksey back in

12    January, looks like January 22nd, 1997, as well as the

13    defense attorney's time billing statements in this case.

14         Q     And I guess those would be my time records?

15         A     Correct.

16         Q     And I believe you were asked to review this

17    matter by Ms. Nieto?

18         A     Correct.

19         Q     But you and I have had an opportunity to discuss

20    the issues relative to this matter?

21         A     Yes, we have.

22         Q     What areas did you formulate opinions in

23    relative to this matter?

24         A     I have an opinion with regard to what a

25    reasonable number of hours should have been by both counsel

1    in this case, what a reasonable hourly rate should be in

2    terms of the community standards for matters involving

3    these issues here in Palm Beach County and whether or not

4    the Court should use any type of fee multiplier other than

5    a 1.0 in enhancing the fee that the Court would set.

6         Q      And the determination relative to the number of

7    hours expended, did you formulate an opinion as to the

8    reasonable number of hours which should have been expended

9    in the litigation of a matter of this type?

10        A      Yes, I did, as well as going through the time

11   sheet line by line.

12        Q      Did you also compare the two time sheets or

13   invoices?

14        A      Well, the starting point that I used initially

15   was to check to see how many hours your law firm had put in

16   on the file just to give me a ballpark figure as to the

17   complexity and nature of the case, which I noted to be 49.6

18   hours.  Granted, that's not always the end all and be all,

19   but it's usually an accurate barometer to what we're

20   dealing with here.

21               I then went through Mr. Cooksey's and Mr.

22   Asencio's time sheet on a line by line manner.

23        Q      Have you ever testified at my request in any

24   matter?

25        A      No, I haven't.


PALM BEACH REPORTING SERVICE, INC.  (407) 471-2995

1      Q      Are you familiar with either Mr. Asencio or Mr.

2   Cooksey?

3      A      Very familiar.

4      Q      How are you so familiar?

5      A      I've litigated cases against both gentlemen.  I

6   currently have cases pending against Mr. Cooksey.  I have a

7   case with Mr. Asencio where we represent the same client.

8   I have had PIP cases against Mr. Asencio in the past.  I've

9   done probably in the past two years I would estimate ten to

10  15 hearings involved with these two gentlemen, had an

11  opportunity to listen to some of the testimony here, some

12  of their testimony and go through their files, and I'm

13  familiar with their work.

14     Q      You mentioned having an opportunity to review my

15  billing invoices.  In that, 49 point whatever it was, six

16  hours --

17     A      49.65.

18     Q      Does that reflect time through a period of time?

19     A      Yes, that's from November 28th, 1995, through

20  June 14th, 1996, which was the approximate point in time

21  when the case was settled.

22     Q      Could you please tell us what your opinion is

23  within a reasonable degree of legal probability to the

24  reasonable number of hours which should have been expended

25  in the handling of this matter and at the same time give us

1    the basis --

2        A    How I reached that figure?

3        Q    Right.

4        A    In regard to Mr. Asencio, he was asking for

5    53.75 hours through January 22, 1997 based on the affidav

6    furnished to me.  There were two areas that I made the

7    reductions on.  The first area is I subtracted 5.9 hours

8    under the Palma rationale because that was the time

9    allocated in Mr. Asencio's attempt to recover his fees for

10   fees.  That came to 5.9 hours.  I then went back through

11   the affidavit from the inception beginning on November

12   28th, 1995, apparently when he came on board here.  And fo

13   the time spent on receipt and review to co-counsel,

14   telephone calls to co-counsel as well as some trial prep i

15   there which I felt was excessive, I made the reductions of

16   7.65 hours.  The final figure that I came to for Mr.

17   Asencio for a reasonable number of hours that should have

18   been spent on this file was 40.2 hours.  And I did a

19   line-by-line assessment.  If it will assist the Court, I

20   can go through that.  There are approximately a dozen items

21   which I indicated were either excessive or duplicated.

22       Q    We'll just forge ahead, and you can leave me

23   those and we'll mark them -- we'll see --

24            THE COURT:  If you have a copy that's all marked

25       up --

2-149

1          THE WITNESS:  Yes, ma'am.  I went through each

2     item and I crossed out what I felt should not be

3     given, and I made the reduction off to the right-hand

4     side there.  You should be able to --

5          THE COURT:  Do you want me to look at that --

6          MR. RICHARDS:  Sure.

7          THE COURT: -- while the witness is here in case

8     I don't understand it?

9          Do you have a copy of this, Mr. Asencio?

10          MR. ASENCIO:  No, Your Honor, I have never seen

11     it.

12          THE COURT:  My only recollection from the last

13     time with this same witness is he has very legible

14     handwriting, which is a big help.

15          THE WITNESS:  Nothing has changed since.

16          THE COURT:  You want me to receive this as an

17     exhibit?

18          MR. RICHARDS:  Yeah.

19          THE COURT:  This would be --

20          MR. RICHARDS:  Unless there's an objection,

21     we'll make this Defendant's Number One.  Or we can

22     mark it for I.D. --

23          MR. ASENCIO:  No objection.

24          THE COURT:  Received in evidence without

25     objection.

A-150

1              MR. WILKE:  I may need that back with regard to

2        future questions, Your Honor.

3              THE COURT:  I see.

4              THE WITNESS:  With regard to Mr. Cooksey, I

5        employed the same process.  His time sheet begins

6        September 18th, 1995.  With regard to Mr. Cooksey,

7        there were two main areas that I made the reductions

8        in.  Mr. Cooksey was seeking through January 22nd,

9        1997, 44.55 hours.  I went through and made the

10       reductions of 4.45 hours, again, under the Palma

11       rationale of not being able to recover fees for fees.

12       I then went through and made an additional 12.55 hours

13       worth of reductions for work that was excessive on

14       this matter.  I did not make any reductions for the

15       time that Mr. Cooksey spent conferencing with

16       co-counsel.  It was made completely with regard to Mr.

17       Asencio as to counsel being brought on board.  Mr.

18       Cooksey apparently felt the need to bring Mr. Asencio

19       on board --

20             THE COURT:  Just so I understand that, we have

21       two lawyers now working together, they presumably --

22       although I haven't compared entry by entry yet, when

23       they meet or talk on the phone, they're both billing

24       for that time, because I'm assuming there's a

25       conversation.

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  Your position is that Mr. Cooksey

3    gets to bill for that but Mr. Asencio does not?

4          THE WITNESS:  On some of the items, ma'am, I did

5    not see a consistency between what Mr. Asencio was

6    billing for a conference and what Mr. Cooksey was

7    billing for a conference.

8          THE COURT:  Can you give me an example of that?

9    Let me let you have that exhibit back.  I have

10   unedited, if you will, copies.  Give me the date and

11   page and entry so I can follow along.

12         THE WITNESS:  All right.

13         THE COURT:  As you're looking for an example, am

14   I correct in understanding that it's not just across

15   the board, that every time they talked, Mr. Cooksey

16   gets to charge and Mr. Asencio doesn't, it's just that

17   you don't think the time reflected in each is the

18   same?

19         THE WITNESS:  Correct.  What I did, Your Honor,

20   I allowed them what I essentially consider to be file

21   review conference time for one lawyer's billing.  I

22   went through and compared the two time affidavits

23   again and there were -- let me see if I can cite the

24   Court to an example.

25         In June, for example, on June 13th, 1996,

1       they're both billing for multiple calls to each other.

2       Actually, Mr. Cooksey appears to be billing for one

3       call at .10.  Mr. Asencio, among other items, appears

4       to be billing for two calls on that date.

5              THE COURT:  So June 13th, Mr. Asencio is

6       charging calls to co-counsel, calls to defense

7       counsel, obviously a different person, calls from

8       defense counsel, again, different person, called --

9              THE WITNESS:  Called to co-counsel again.

10             THE COURT:  And then Mr. Cooksey, presumably

11      from the entry on Mr. Asencio, is only involved in the

12      co-counsel call of which there may have been two,

13      which is telephone conference with co-counsel, .1?

14             THE WITNESS:  Correct.

15             THE COURT:  What about those two joint entries

16      did you disallow and why?

17             THE WITNESS:  I disallowed with regard to Mr.

18      Asencio on June 13, 1996, call to co-counsel on the

19      two separate entries.  He's billing a total on June

20      13, 1996 of .6 hours.  I allowed .3 hours affording

21      him the calls to defense counsel --

22             THE COURT:  Did you assume all the calls were of

23      the same length?

24             THE WITNESS:  Well, Your Honor, unfortunately

25      Mr. Asencio did not further break down his affidavit

1    to indicate how much of the .60 was a call to Mr.

2    Cooksey as opposed to defense counsel in the case.

3    That's not necessarily a fault with the affidavit.

4    This is a fairly specific time sheet based upon others

5    that I have seen.  But again, it was a judgment call

6    on my behalf that that was a fair amount of time to

7    give him since he's billing on here two calls on that

8    one entry by way of example.

9         THE COURT:  You don't have any problem with him

10   talking to defense counsel?

11        THE WITNESS:  No, ma'am.

12        THE COURT:  Or talking to his co-counsel after

13   he's talked to co-counsel?  He's not allowed to do

14   that though.

15        THE WITNESS:  No, Your Honor.  I allowed one

16   conference call between the attorneys for each entry.

17   In other words, Mr. Cooksey billed call to co-counsel

18   I assume to obtain advice from Mr. Asencio since he

19   brought him on board for his expertise.  I afforded

20   Mr. Cooksey that conference call.  I did not award it

21   to Mr. Asencio for the reasons that I gave.

22        There's a 1994 Supreme Court case which came

23   down which addresses the issue where you have multiple

24   lawyers involved in the same case.  The rationale of

25   the Court was that although it may be plausible for a

```
1         party to retain as many lawyers as he sees fit, you

2         should not automatically assess that as a fee against

3         the other side if the nature of the case was not such

4         that required consultation by some other lawyers and

5         there might have been duplication of the efforts.

6              So you're absolutely correct to the extent that

7         I don't have a crystal ball.  I cannot say one call

8         was four minutes, the other call was eight minutes.

9         But under that case -- and for the record I'll cite --

10             THE COURT:  I'm familiar with the case.

11             What leads you to think based on the entry --

12        perhaps it was file review, I don't know -- that

13        there was duplication of effort in Mr. Asencio's 6/13

14        entry?

15             THE WITNESS:  They're both billing for it, Your

16        Honor.  That in and of itself indicates to me they're

17        duplicating their effort to the extent they're both

18        prosecuting the same issue in this case.

19             THE COURT:  That brings us back to if two people

20        are talking to one another, I don't understand how --

21        it's either all or nothing, either you can't talk to

22        each other at all, but it's like one person can

23        bill -- he gets to talk to the wall?

24             THE WITNESS:  It's reasonable to allow Mr.

25        Cooksey, the primary lawyer on this case, to bring in
```

1        an expert to confer with.  It's not reasonable under

2        the case law to allow both lawyers to bill

3        conferencing time for that.  That's my position.  Not

4        in light of the nature of this case and the issues

5        raised.

6             THE COURT:  So I should find then throughout

7        that every time there's a telephone conference between

8        Mr. Cooksey and Mr. Asencio, your position is that Mr.

9        Cooksey can bill for it but Mr. Asencio cannot?

10            THE WITNESS:  Correct, Mr. Cooksey was the

11       primary, the lead attorney in this case.

12            THE COURT:  Okay.  I understand.  Move on.

13   BY MR. RICHARDS:

14       Q    Just to pick that up, are there multiple

15   attorneys working in your firm?

16       A    Yes.

17       Q    Have there been occasions in the past where

18   you've worked in conjunction with another attorney on a

19   file?

20       A    Sure, not only inside of our firm but outside of

21   our firm as well.

22       Q    On those instances where you had such an

23   experience, do you charge for both ways of a phone

24   conference?

25       A    No, we do not.

          PALM BEACH REPORTING SERVICE, INC.  (407) 471-2995

1       Q       Do you double charge for review of a file?

2       A       No, we do not.

3       Q       Do you double charge for review of a particular

4    document such as a discovery order?

5       A       No.   Unless there's something extremely unusual

6    about the case, we do not bill the client for conferences,

7    whether it's in person conferencing, strategy conferences.

8       Q       It's your opinion based on your experience that

9    where somebody elects to bring in co-counsel, they are to

10   be governed similar to as if they were in the same firm?

11      A       Yes, pursuant to the case which I was

12   referencing earlier.

13      Q       Which case is that?

14      A       This is the case of Zuckerman vs. Hofrichter,

15   H-O-F-R-I-C-H-T-E-R.   And the cite on that, I have a

16   Florida Law Weekly cite, it's 21 Florida Law Weekly 1482,

17   and it was a June 26th, 1996 opinion.

18      Q       By the Florida Supreme Court?

19      A       By the Third District Court of Appeal.

20      Q       So then getting back to your analysis of Mr.

21   Cooksey's invoice, I think you told us the total hours

22   reflected in the affidavit on the invoice was 44.55; is

23   that correct?

24      A       Yeah.   Let me just make sure of that.

25              He was seeking 44.55 hours.

1      Q      And you reduced 4.45 hours for time --

2      A      Pursuant to the Palma issue, correct.  And then

3      12.55 hours not only for the phone conferencing, but there

4      were instances when they both went over the same pretrial

5      order, prepared the same witness list list and exhibit

6      list, reviewed the same documentation, which I made a

7      further reduction on.

8      Q      So then I guess in some instances you did give

9      the time to Mr. Asencio?

10     A      Yes.

11     Q      Okay.

12     A      The bulk of the trial preparation time, which

13     I'm assuming is why Mr. Asencio was brought on board, was

14     given to Mr. Asencio.  For example, on June 12th, 1996,

15     they both have what amounts to trial prep in both of their

16     affidavits, including preparation of the pretrial stip,

17     that they're both seeking time for, calls to expert

18     witnesses, calls to co-counsel and so forth.

19            With regard to Mr. Cooksey, he was seeking 3.4

20     hours, I made the reductions for preparation of the

21     pretrial stip, preparation for trial and telephone

22     conference calls with co-counsel down to 1.0 hours.  Again,

23     with regard to his affidavit, I've gone through and done a

24     line-by-line breakdown so that it should be relatively

25     clear for the court.

```
 1              THE COURT:  This will be Defense Exhibit Two.

 2      Any objection?

 3              MR. ASENCIO:  No objection.

 4              THE COURT:  Do you need to see it?

 5              MR. RICHARDS:  I can show it to him after I mark

 6      it.

 7              MR. ASENCIO:  That's fine.

 8      BY MR. RICHARDS:

 9          Q    So the total number of hours then which you feel

10      should have been reasonably expended in handling this

11      matter would have been the 40.2 hours of Mr. Asencio, 27.55

12      hours of Mr. Cooksey, for a total of 67.75 hours?

13          A    Correct.

14          Q    Did you formulate any opinion relative to the

15      reasonable hourly rate?

16          A    Yes, I did.

17          Q    Okay.  Why don't you tell us what your opinion

18      is and what that's based upon?

19          A    The opinion is based upon the nature of the

20      issues involved in this lawsuit, the background of both of

21      the lawyers involved in this case and the guidelines set

22      forth by the Supreme Court in the Quanstrom (phonetic)

23      matter, which I believe was -- I have the cite here.  It's

24      at 555 So. 2d. 828.  Specifically on page 830 of that

25      opinion there's a footnote that sets forth eight criteria
```

1    the trial court should look to in setting a reasonable

2    hourly rate for cases such as this.

3              It's my understanding that this was a

4    straightforward PIP lawsuit in which there were two issues

5    raised by the pleadings.  The first issue is whether or not

6    there were late or improper payments made.  Second, there

7    was an IME cutoff approximately six months after the date

8    of the accident by a chiropractor.  Those were the two

9    issues.  Those are the issues that you see in the majority

10   of these PIP lawsuits.  There was nothing novel or complex

11   about any of the issues raised here.

12         Q    Did you note in your review of the file any

13   issues relative to binding arbitration?

14         A    There was a motion to dismiss the complaint

15   filed by the defense counsel and subsequently a motion for

16   summary judgment entertained by defense counsel, both of

17   which were denied by the court.  And the matter went

18   forward through June of 1996 and I believe was heading for

19   a bench trial before it was settled on or about June 14th.

20         Q    Based upon your experience in handling matters

21   of this type, did the presence of a contention by the

22   defendant that the proper forum was binding arbitration

23   make this into a novel or complex or difficult legal

24   matter?

25         A    No.  That issue is contemplated in just about

1       all PIP suits, particularly in recent PIP suits where the

2       policy is indicating that that's an option that the parties

3       have.

4               Q       Are you familiar with Mr. Asencio's experience

5       and training?

6               A       Yes, I am.

7               Q       And his abilities?

8               A       Yes.

9               Q       And is this first-hand knowledge both from

10      litigation with Mr. Asencio and I guess from others?

11              A       Yes.

12              Q       Okay.  And based upon that experience and the

13      factors which you've set forth, what is your opinion as to

14      a reasonable fee?

15              A       For Mr. Asencio, in light of the nature and the

16      issues involved in this case as well as his background, it

17      would be $200 an hour.

18              Q       And with regard to Mr. Cooksey, again, are you

19      personally familiar with Mr. Cooksey's experience and

20      training?

21              A       Yes, I am.

22              Q       Are you familiar with his abilities to handle

23      litigation of this type?

24              A       Yes.

25              Q       And do you have an opinion as to what a

```
 1        reasonable hourly fee would be for Mr. Cooksey's services

 2        in this matter?

 3              A      Yes, I do.

 4              Q      What is that and what's it's based upon?

 5              A      One hundred twenty-five per hour in light of Mr.

 6        Cooksey's background, in light of the number of cases which

 7        he's taken to trial himself on this issue, in light of the

 8        fact that he apparently and properly saw fit to bring in

 9        co-counsel at a point in time where it was evident to him

10        it would be heading to trial.  He did not feel comfortable

11        handling the case by himself.  I took that into account as

12        well as the nature of the issues in this lawsuit.

13              Q      Did you formulate an opinion as to the

14        multiplier to which Mr. Asencio and Mr. Cooksey should be

15        entitled to receive in this matter?

16              A      Yes, I did.

17              Q      Are you familiar with the standards relative to

18        determination as to the appropriate multiplier?

19              A      Yes, I am.

20              Q      Can you go through for us what your opinion is

21        in that regard and the basis for it?

22              A      Sure.  Under the case law, specifically the Rowe

23        case and the Quanstrom decision, the first determination

24        that the Court needs to make is whether or not the nature

25        of this case was such that you should use a fee multiplier
```

1    to attract competent counsel in the relevant market.  These

2    types of lawsuits have become very popular with plaintiff

3    attorneys, particularly the lawyers involved in this case.

4    These two gentlemen hold themselves out as specializing in

5    this area.  Mr. Asencio has authored books and articles and

6    seminars in this area.  This is a lucrative area for

7    plaintiff attorneys to practice law in, particularly if

8    your office is set up to handle this with the forms, which

9    his office certainly is.

10          627.428 provides a vehicle by which lawyers can

11    recover if they're successful in the prosecution of a PIP

12    case.  The standard defining success for the plaintiff

13    attorney in a PIP suit is fairly easily met.  If, for

14    example, you're contesting a thousand dollars, whether it's

15    due to bill reductions or an IME cutoff, or whatever the

16    issue is, in order for you to prevail under 627.428, you

17    simply have to obtain a judgment against an insurance

18    company, whether it's in the amount of a thousand dollars

19    or a fraction of that.  As a result of those, cases have

20    been filed here in both Broward and Palm Beach County with

21    increasing frequency in the past five years.

22          So I don't think the first concern under the

23    Quanstrom rationale is met by this case.  In other words, I

24    don't think this plaintiff would have had any trouble

25    whatsoever finding competent counsel to handle this matter.

1              Assuming the Court has determined that the

2    market is such that it does require that you need some type

3    of fee multiplier, the next question the Court has to

4    address is the amount of the multiplier to be used,

5    anywhere from a low of 1.0 to a high of 2.5.  You then have

6    to look at the issues involved in this case.  And the

7    relevant points of inquiry are, at the time the lawsuit is

8    filed, what the lawyers knew or should have known as to the

9    issues involved in the case.

10              Initially, the first issue in this case was the

11   IME cutoff of chiropractic benefits relative to an IME that

12   was done I believe in September of '95, six months

13   post-accident.  However, the medical bills that were at

14   issue from the treating chiropractor in this case even

15   predated the IME cutoff and became an issue, and became the

16   issue that ended up disposing of the case.  And that is

17   apparently the carrier incorrectly paid the treating

18   chiropractor a fee based upon what they perceived to be a

19   private contract that the chiropractor had entered into,

20   what's commonly referenced as a PPO situation where he had

21   agreed to a set amount of fees.  That was incorrect because

22   the PPO, if you will, contract was not present in this

23   case.  So from the moment they filed suit, even prior to

24   when they filed suit, they had overdue payments which was

25   part of one of the claims that they raised in the suit.

1    They had a winner from the get-go.  Even if you assume that

2    a jury would buy into the chiropractic cutoff, the

3    insurance company from the outset had the insurmountable

4    threshold to overcome in that improper payments were made

5    and there was money due and owing to the chiropractor in

6    question right from day one, right from the outset.  And

7    based upon my review of the file, that was evident to me as

8    the primary reason why this case was settled, when it was

9    discovered pursuant to a deposition of the claims adjuster

10   which was taken later on in the lawsuit.

11        Q    So your opinion then as to the amount of the

12   multiplier is what?

13        A    It should be 1.0, because success at the outset

14   not only was likely, it was assured under the fact scenario

15   of the case.

16        Q    Do you have an opinion whether Mr. Asencio and

17   Mr. Cooksey should be able to recover attorneys fees

18   incurred subsequent to the resolution of the underlying

19   lawsuit?

20        A    I do have an opinion, and they should not be

21   able to recover those fees.

22             I would cite the court to the decision by the

23   Supreme Court of Florida of Danus Industries Corporation

24   vs. Grounds Improvement Technique, which was a November

25   1994 case found at 645 So. 2d. 420, which stands for the

1      proposition that once the insurance company offers to

2      settle the lawsuit, which was done in this case on or about

3      June 14th, 1996, that the fee clock should stop at that

4      point.  I took that case into account.  I took the Palma

5      decision into account.  I also had the opportunity to go

6      through the Kroll decision as has been referenced here in

7      light of some other recent County Court ruling as well.  I

8      think in light of the case law, the proper avenue for the

9      court to take at this point would be to stop assessing the

10     fees on or about June 14th, 1996.

11                  MR. RICHARDS:  Thank you.

12                  THE COURT:  Cross?

13                  MR. ASENCIO:  Yes, Your Honor.

14                         CROSS EXAMINATION

15     BY MR. ASENCIO:

16          Q     My understanding about your jury trial

17     experience is that you have tried some PIP cases?

18          A     Yes, I have.

19          Q     And when you tried those PIP cases, you tried

20     them for the defense?

21          A     Yes.

22          Q     And what was your success rate in trying your

23     jury trial PIP cases?

24          A     On these types of issues or just in general?

25          Q     No, generally speaking, all of the PIP jury

1    trials that you've done, what has your success rate been?

2        A    We have prevailed on the general issues in the

3    lawsuit probably five percent of the time.  We have paid

4    fees, sort of won the battle but lost the war, probably 90

5    percent of the time.  Although we succeeded on perhaps what

6    the underlying issues were, invariably there was always

7    some type of judgment entered probably in the 90 percentile

8    range.

9        Q    You don't make your living on PIP cases, do you?.

10       A    No, sir.

11       Q    You mostly have insurance companies as your

12   clients?

13       A    Yes.

14       Q    And I presume you represent some of the biggest

15   insurance companies, like State Farm, Allstate?

16       A    Yes.  FIGA.  Some others.

17       Q    When you represent insurance companies, I

18   presume there's a market rate that you accept because they

19   have you as an attorney on their various cases?

20       A    Yes and no.  That attitude is changing on the

21   defense side.

22       Q    Generally speaking, you do have a rate though

23   that you charge for your insurance clients like Allstate,

24   State Farm?

25       A    Sure.

79

```
1         Q      What is that?

2         A      It varies between the carrier and the nature of

3    the case.  In general, the parameters are between a low of

4    175 to a high of $200 per hour.

5         Q      That's what your firm would charge.  I mean

6    specifically you, John Wilke, what would you generally

7    charge?

8         A      That's what I'm giving you.  It really depends

9    on the nature of the case.  For example, labor SIU cases

10   are generally billed at a higher rate.  There are some

11   carriers that seek a flat fee type agreement with you.

12   They aren't in the majority.  But there's a multitude of

13   fee options, Mr. Asencio.  That's my range as best I can

14   give it to you.

15        Q      Right.  And you've also, as i understand it,

16   been lucky enough to get some plaintiff cases, too?

17        A      Yes, I have.

18        Q      And you found, have you not, plaintiff cases pay

19   better than defense work, doesn't it?

20        A      I don't know if I would agree with that.  The

21   bulk of my plaintiff cases are for friends and family, so

22   we all know what that's like.

23               But, no, I can't make that blanket statement.  I

24   can tell you that 95 percent of our firm's income is from

25   the defense side of the coin.
```

80

```
 1        Q     My main point, I believe you testified once

 2   before that you've actually done very, very well on some

 3   plaintiff cases?

 4        A     Sure.

 5        Q     And that's one of the bonuses of a plaintiff

 6   case, is if you get, say, a million dollar plaintiff case

 7   and you work, you know, 20, 30, 40 hours on it, you're

 8   going to collect your contingency fee and make out like a

 9   bandit?

10        A     No question about it.

11        Q     And you have been fortunate enough to

12   participate in some cases, I'm not saying the majority of

13   the cases, but some of that fashion?

14        A     Based on a fee agreement arranged between the

15   plaintiff and myself, sure, that's what the understanding

16   was.

17        Q     Now, my firm has some ongoing PIP cases with

18   your firm; is that right?

19        A     Yes.  I don't believe you and I have any cases

20   pending at the current time other than the one that I

21   referenced earlier.  But I believe you have some PIP cases

22   pending with some of the other attorneys in my office.

23        Q     You do agree that all the time spent by the

24   defense attorneys in this case was reasonable, right?

25        A     It appears to be in line with the work that was
```

1    done, approximately 49 hours, correct, which sometimes made

2    or may not be accurate.  For example, the defense attorney

3    may spend much more or less time than is needed.  But it's

4    one of the barometers I think we need to look to.

5         Q    You would agree that as a defense attorney, PIP

6    cases filed in County Court should be dismissed in favor of

7    arbitration?

8         A    No.

9         Q    You don't believe that?

10        A    No.  I mean, you can't -- no.  It depends on who

11   the carrier is.

12        Q    Okay.  When there has been an assignment given

13   and there's an arbitration agreement in the policy, do you

14   agree that PIP cases in County Court should be dismissed in

15   favor of arbitration?

16        A    It depends on the carrier.  If you're asking me

17   from a legal standpoint, again, you have to look at the

18   policy.  If you're asking me from a tactical standpoint as

19   a defense lawyer, no, I would personally prefer to have my

20   cases in County Court, because the rules of discovery can

21   be invoked and you avoid the problems of arbitration.

22   There's benefits in other areas to arbitration, but I can't

23   make that blanket statement across the board.

24        Q    You would agree that it is lawful for insurers

25   to reduce payment on bills based on PPO?

1          A       It depends on the manner in which they do it.

2     Sure.

3          Q       You would agree that having contracts like

4     Med-View contracts where a physician accepts X number of

5     payments that it would be an appropriate defense to raise

6     in the case?

7          A       Well, assuming the treating physician was bound

8     by that contract, and the insured, if it's a situation

9     where you're bringing suit by the insured, the insured was

10    bound by that contract, sure, I wouldn't argue with that.

11         Q       And it's your testimony that the plaintiff

12    lawyers in this case knew that there was a PPO contract or

13    did not know?

14         A       No.   What I'm saying is that Progressive

15    Insurance Company improperly paid Dr. Rivner's bills even

16    before the cutoff date.   There was a conference listed by

17    Mr. Cooksey, it's the first entry in his time sheet,

18    conferencing with the doctor and with his client.   That is

19    something that is evident particularly in today's day and

20    age where there can be a multitude of issues in PIP suits

21    from a cutoff to a medical bill reduction.   That could have

22    been the case here.

23              So it's a simple matter of calling the doctor

24    up, meeting with your client and confirming that everything

25    up to the cutoff has been paid properly, which is usually

1    where most PIP suits fall with regard to the fee issue

2    which I was discussing earlier.  And then once you

3    determine that you have a clean suit up to the cutoff, then

4    you know from the Plaintiff's standpoint that you're simply

5    litigating the cutoff issue.

6              In this case, had that conference taken place,

7    because I'm assuming it did, Mr. Cooksey billed for it,

8    that is something that either was discovered or should have

9    been discovered at the time when he first billed his time

10   on that file.

11        Q    I'm sorry.  What should have been discovered?

12   That the doctor had a Med-View contract?

13        A    No.  The fact that the doctor did not have a

14   contract that would bind the Plaintiff in this case, and

15   that the bills that were paid up to the point of the cutoff

16   were paid at an improper amount such that money was already

17   due and owing the Plaintiff and the treating doctor

18   involved.

19        Q    I see.  In other words, by speaking to the

20   client and the doctor, the Plaintiff's lawyers either knew

21   of should have known that there was no PPO endorsement on

22   the policy issued to the insured in this case?

23        A    When you sit down with the doctor and when you

24   contact the carrier and meet with your client, that's

25   something that -- that's either there or it isn't.

```
1        Q      When was it first discovered by the insurance,

2   or the defense company representing the insurer, that there

3   was no PPO on the policy?

4        A      That was discovered by the Defendant in this

5   case sometime shortly before the case was settled, but it

6   was present from the outset.  So the argument can be made,

7   do you fault the claims adjuster for not going through the

8   file?  That's not the issue before the Court, but that's

9   certainly something we should look into.  That doesn't

10  change the likelihood of success at the time the lawsuit

11  was filed because that factor was present from day one.

12       Q      So you're saying had Progressive known there was

13  no PPO endorsement, they would not have attempted to hold

14  Dr. Rivner to his Med-View contract where he had agreed to

15  accept X number of dollars if he happened to obtain a

16  Progressive patient?

17       A      I don't follow you.

18       Q      Well, you do know Dr. Rivner have a Med-View

19  contract?

20       A      With the insurance company.  That apparently was

21  not binding on the Plaintiff in this case -- or the patient

22  in this case.

23       Q      Well, we'll leave that as a secondary issue.

24  But you do know he did have a contract with Med-View?

25       A      There was discussion that he did have such an
```

1     agreement on other files, correct.

2          Q    You're saying that if Progressive had known that

3     their own policy did not have a PPO endorsement and their

4     insured had not selected PPO, that they would have not

5     tried to hold Dr. Rivner to his Med-View contract?

6          A    I don't know what they would have or would have

7     not done.  But again, had they made that argument, it would

8     have fallen on a motion for summary judgment or the first

9     time it was raised before the Court because, again, the

10    plaintiff attorney had it within their fact finding to

11    determine what was available with regard to the doctor

12    aside from the cutoff issue.

13         Q    So besides Progressive not having discovered

14    this issue and settled the case early on, also they're

15    defense lawyer, Mr. Richards, had not discovered this issue

16    and settled the case early on?

17         A    That I don't know.  The indication that I had

18    was sometime about the time the claims adjuster's

19    deposition was taken, which was shortly before it settled.

20         Q    So what you're saying is apparently nobody had

21    known whether or not there was a PPO endorsement on this

22    policy until the very date of the depo, which was like a

23    week before the trial?

24         A    I don't know.  I don't know what Mr. Cooksey

25    knew.  Obviously he filed a lawsuit for, among other

Δ- 174

1   things, improper or untimely payments.  The only improper

2   or late payments that I could see in this case were the

3   PPO -- or the assumed PPO payments.

4       Q    What exactly did you look at that made you think

5   that the first time they ever discovered there was no PPO

6   endorsement was close to the time of trial?  Was there a

7   letter or a memo or something or were you just told that?

8   How did you reach that conclusion?

9       A    I believe it was a deposition summary of claims

10  adjuster Wendy Smith which was confirmed -- initially,

11  pursuant to the cutoff, the amount in controversy $675.

12  The PPO issue then increased the amount in controversy to

13  approximately $1500.  That issue was first raised pursuant

14  to Ms. Smith's deposition in terms of when the Defendant

15  was on notice of it, and it was confirmed by you pursuant

16  to your correspondence of June 14th, 1996 when I believe it

17  was you who had furnished the figure of $1,082.80 to AIA

18  Chiro, and some of the other bills involved, but primarily

19  AIA Chiro.

20      Q    I understand it came up at the deposition.  I

21  was there, obviously.  And I understand I wrote a letter

22  about it.

23          On what do you base your statement that the

24  defense firm figured out that there wasn't a PPO

25  endorsement on the policy until that point -- I think what

1      you're saying is I pointed it out to him.  But I just want

2      to know how it is that they didn't figure it out earlier?

3          A      Pursuant to the deposition summary.

4          Q      There was something in the summary that said,

5      golly, gee, this is the first time we figured it out?

6          A      Something to that effect, that we have a serious

7      problem with the defensibility of this case, which again,

8      that problem was present from even before the cutoff date.

9          Q      Now, the Danus case, that's a Supreme Court case

10     that says a way that insurance companies can stop

11     attorneys' fees is offer to pay all the benefits they owe.

12         A      It's a somewhat lengthy decision, but the

13     holding of it as indicated in the headnote is, "The insured

14     cannot continue to incur attorneys' fees and costs or

15     accrue interest and have those awarded against the

16     insurance company or insurer after the insurance company

17     has offered the full amount for which it has liabilities on

18     the date it offers to make the payment."

19                And it cites back, Mr. Asencio, to that -- so

20     that we're operating under the same vehicle, 627.428.

21         Q      So on the date the suit was filed, the insurance

22     company offered to pay all the reductions and said, golly,

23     gee, sorry, we don't have a PPO endorsement, then they

24     would stop all attorneys' fees, unless, of course, the IME

25     cutoff was improper?

1          A      Well, we have two issues.  But yeah, whenever an

2     insurance company offers to settle a case, that's when the

3     fee clock stops on all of the issues.

4          Q      All right.

5          MR. RICHARDS:  May I see some of our exhibits,

6     Judge?  There's a couple -- thank you.

7     BY MR. RICHARDS:

8          Q      Now, you have seen Exhibit Number Four where Mr.

9     Laloi had signed an assignment specifically referencing the

10    PIP statute?

11         A      I'm assuming this was in the file.  I did not go

12    through the file page by page.  It was a rather lengthy

13    file.  But I'm assuming that that was in there.  I have no

14    reason to dispute that.

15         Q      And you did see this Med-View Services contract

16    that Dr. Rivner had entered into?

17         A      I saw this referenced.  I don't believe I

18    actually read the terms of the contract.  Again, I don't

19    know if this was in the actual claim file in this case or

20    not.

21         Q      And have you seen this letter, Exhibit Number

22    Six that was written to Dr. Narr who also had a Med-View

23    contract?

24         A      Yes.  Dr. Narr was one of the bills at issue in

25    this case under the improper calculation.  I think the

1    amount on him was $16.80, is what it was calculated out to

2    be, as well as Statewide Imaging I think.

3             Are you saying that Progressive did not take the

4    position that it could review and reduce bills pursuant to

5    a Med-View contract unless they also had a PPO endorsement?

6        A    The position that Progressive apparently

7    incorrectly took in this case, aside from the cutoff issue

8    which was a standard chiropractic cutoff, and there was

9    nothing incorrect or improper about that, that was just a

10   factual issue, was that there was a PPO in place with Dr.

11   Rivner.  They made calculations based on that assumption

12   that a PPO was in place.  They were incorrect calculations.

13   The calculations involved medical payments which predated

14   even the cutoff.

15            So the point that I'm making is that at the time

16   the lawsuit was filed, Progressive owed the Plaintiff and

17   the chiropractor money in this case regardless of the --

18   which I'm assuming is what prompted Mr. Cooksey's count in

19   the complaint as to improper payments.

20       Q    So you're not saying that Progressive did not

21   take the incorrect position that it could reduce payments

22   regarding a Med-View contract notwithstanding whether or

23   not they had a PPO contract?

24       A    I don't know if they actually took a position.

25   I'm telling you payments were made under an incorrect

```
 1      assumption that there was a PPO present here when there was

 2      not.  And that fact was there in this case from day one.

 3           Q      Okay.  Well, the adjuster was Wendy Smith,

 4      correct?

 5           A      She was the one who was deposed.  And I think

 6      she handled the majority of the file.  I don't know if she

 7      was the adjuster on it when the lawsuit was filed.  I'm not

 8      sure.

 9           Q      Did Wendy Smith not say in her deposition words

10      to the effect that regardless of whether there was a PPO

11      contract or not, if the provider was a Med-View provider,

12      the Med-View provider got paid according to the Med-View

13      rate?

14           A      She commented along those lines.  But again,

15      that was an incorrect position to take.

16           Q      I'm not asking whether it was incorrect or not.

17      I'm asking if that's what she basically stated.

18           A      I believe so, Mr. Asencio.  But I'm not positive

19      on that.  I won't dispute that with you.

20           Q      And generally that's what Progressive was doing

21      in that time period?

22           A      I can't make that statement.

23           Q      Now, have you seen the PPO endorsement in this

24      case?

25           A      I don't believe I have.  It might have been in
```

1    the file.

2          Q        Have you seen the policy like in the insurance

3    agent's file to see whether or not the fellow who actually

4    owned the car --

5          A        Your client's brother I believe?

6          Q        No, no.  My client's brother had no PIP

7    insurance.  There was another individual involved, Ms.

8    Desmantis (phonetic).

9          A        Uh-huh.

10         Q        Now, the Progressive insured, have you ever had

11    a chance to actually see whether that person signed on the

12    dotted line, I accept PPO or I don't accept PPO?

13         A        No.  But apparently they determined that he did

14    not, or for whatever reason Progressive determined that

15    they were not in compliance with the program to allow them

16    to calculate under the PPO.

17         Q        But you haven't actually seen the PPO selection

18    form?

19         A        It might have been in the claim file, Mr.

20    Asencio.  But again, I did not go through it page by page.

21    I determined what the issues were, read through some of the

22    discovery in this case, pleadings, correspondence, and went

23    through the claim file.  I can tell you what the mind set

24    of the carrier was at various points in time.  But for

25    exact specifics as to who signed what, I can not tell you.

PALM BEACH REPORTING SERVICE, INC.  (407) 471-2995

```
 1              MR. ASENCIO:  Thank you very much.

 2              THE WITNESS:  You're welcome.

 3              MR. RICHARDS:  No questions.

 4              (Witness excused).

 5              MR. ASENCIO:  Your Honor, I believe Mr. Richards

 6         and myself are in agreement as to costs.

 7              MR. RICHARDS:  Yeah, I thought we stipulated to

 8         that in the beginning.

 9              MR. ASENCIO:  We did.  The total costs for me

10         were $2,652.30.  Mr. Cooksey, $606.38.  Now that does

11         not include Ms. Murray, whose time --

12              MR. RICHARDS:  I'll stipulate to Ms. Murray,

13         Judge.  It's $2,625.

14              MR. ASENCIO:  Very well.

15              THE COURT:  I'm sorry?

16              MR. RICHARDS:  $2,625.

17    THEREUPON,

18                        DIEGO ASENCIO,

19    after having been first sworn by me to tell the whole truth

20    as hereinafter certified, testified as follows:

21                        DIRECT EXAMINATION

22    BY MR. COOKSEY:

23         Q    Please state your name.

24         A    Diego Asencio.

25         Q    And what is your occupation, Mr. Asencio?
```

PALM BEACH REPORTING SERVICE, INC.  (407) 471-2995