UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH
(Magistrate Snow)

DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

     Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

     Defendants.

_____/

ULTRA OPEN MRI CORP., on behalf of        01-6778
itself and all others similarly situated,

     Plaintiffs,

v.

PRUDENTIAL PROPERTY AND
CASUALTY INSURANCE COMPANY

     Defendant.

_____/



### PLAINTIFFS' MEMORANDUM IN SUPPORT OF
### THE PROPOSED SETTLEMENT WITH
### <u>PRUDENTIAL PROPERTY AND CASUALTY INSURANCE COMPANY</u>

### <u>PRELIMINARY STATEMENT</u>

Plaintiffs, Ultra Open MRI Corporation (hereinafter "UOMC") and Walter Afield, M.D.

("Dr. Afield") respectfully submit this memorandum pursuant to Rule 23(e) of the Federal Rules

of Civil Procedure in support of the proposed settlement of this action as against the named

1

Defendant, Prudential Property and Casualty Insurance Company (hereinafter "PRUPAC") for total class relief of over $562,000 (the "Settlement").[1]

## I.   HISTORICAL BACKGROUND OF THE LITIGATION[2]

### A.   The Consolidated Class Action Litigation

The consolidated class action litigation began five years ago on January 13, 2000, with the filing of Napoli v. Allstate Insurance Company, et al, later amended as Zidel v. Allstate Insurance Company, et al,. After filing the first case, Class Counsel filed fourteen additional cases, all of which were eventually consolidated into the current case. Each case alleged a similar pattern and practice by the various insurance defendants of reducing Florida automobile insurance personal injury protection ("PIP") medical expense claims based on the wrongful application of preferred provider organization ("PPO") discounts.[3]

The theories that predominated all the consolidated cases centered around allegations that the discounting practices of the defendant insurers: (1) violated Florida PIP insurance statutory law  (specifically Fla. Stat. § 627.736(10)); (2) constituted a violation of the federal Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. (the "RICO

_____

[1] The specific terms of the Settlement have been set forth in the Stipulation and Agreement of Settlement (the "Stipulation") filed with the Court and preliminarily approved on August 20, 2004. The settlement provides for a $450,000 class fund. PRUPAC has also agreed to pay up to $112,500 in attorneys' fees and reasonable litigation costs and expenses and the costs of settlement administration.

[2] The factual and procedural background of the case is described in more detail in the accompanying Declaration of Class Counsel in Support of the: (A) Proposed Settlement with PRUPAC; and (B) Class Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Lead Counsel's Declaration") attached as Exhibit 1. A brief summary is set forth herein for the Court's convenience.

[3] To Class Counsel's knowledge the Consolidated Cases are the first class action cases in the country to challenge the "silent PPO" discounting of automobile insurance medical expense claims, other than two similar actions brought in Massachusetts state court by Class Counsel, Phillips & Garcia, LLP.

Act"); (3) were in direct breach of the specific language of the relevant automobile insurance policies; and, (4) constituted unjust enrichment to the defendant insurers.

Since the plaintiffs and Class Counsel took on the Florida auto insurance industry to stop the industry-wide practice of discounting PIP claims through the wrongful application of PPO discounts, the defendant insurers, and their vendors supplying the discounts, aggressively "circled the wagons" in defense of these class actions.[4] As the Court's Docket Sheet from the consolidated cases demonstrates, a virtual legal war ensued with a first barrage of multiple motions to dismiss from various insurance defendants.

The current action against PRUPAC was filed on May 8, 2001. Later in May 2001, Class Counsel filed a motion for class certification. (See Docket Entry No. 5). PRUPAC subsequently filed its motion to dismiss or otherwise compel arbitration in August 2001 on the basis of an arbitration clause contained in the insurance contract. (Docket Entry No. 10). After consideration, in a Report dated December 14, 2001, Magistrate Snow recommended allowing PRUPAC's motion to compel arbitration finding that the arbitration clause was not statutorily-mandated and was therefore not struck down by Nationwide Mut. Fire Ins. Co. v. Pinnacle Medical, Inc., 753 So. 2d 55 (Fla. 2000).

Class Counsel objected to the Magistrate's recommendations. In January 2002, UOMC then filed its amended complaint adding Afield as a class representative. PRUPAC subsequently filed its second motion to compel arbitration with respect to Dr. Afield's claims. In June 2002, Magistrate Snow recommended that PRUPAC's second motion to compel be denied. Ultimately,

---

[4] The defendant insurers have all stopped the practice of applying PPO discounts to PIP medical expense claims.

in an October 28, 2002, Supplemental Order, this Court denied the motions to compel arbitration

in the consolidated cases, including PRUPAC's motions. With none of the cases subject to

arbitration, the defendants, including PRUPAC, then appealed Judge Ferguson's decisions on the

arbitration issue to the Eleventh Circuit, where the cases were consolidated on appeal.[5]

While the cases were in the District Court, Class Counsel aggressively sought discovery

from all the defendants and other non-party witnesses. Class Counsel propounded written

discovery and noticed various depositions of the defendants and other witnesses. Almost all of

these discovery efforts were met with motions for protective orders or motions to stay discovery.

In October, 2001, PRUPAC filed a motion to stay the action in light of its motion to compel

arbitration. (Docket Entry No. 17). Class Counsel opposed such motions and countered in some

cases by filing motions to compel discovery which were, in turn, opposed by the defendants. All

discovery and litigation in the District Court was eventually stayed when the cases were appealed

to the Eleventh Circuit.[6]

Despite the defendants' successful efforts at preventing Class Counsel from conducting

full discovery prior to the appeal, Class Counsel were able to obtain a wealth of invaluable

information by negotiating a settlement with the vendor defendants, ADP Integrated Medical

Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street").[7] Under this agreement,

---

[5] The Progressive defendants did not appeal, however the District Court stayed the Progressive cases when the other cases were appealed.

[6] As of October 28, 2002 when the cases were stayed, the consolidated docket had 882 entries.

[7] ADP, a national claims re-pricing company servicing property and casualty insurers, applied the Beech Street PPO discounts to the class members' medical bills on behalf of the certain defendant insurers via a software program designed to calculate the discount and produce an explanation of benefits form showing the PPO reductions.

ADP and Beech Street consented to a whole-scale production of documents, data and information relating to the defendant insurers' PPO reduction practices. ADP and Beech Street provided class counsel with thousands of pages of documents detailing the defendant insurers' PPO discounting programs. ADP and Beech Street also conducted a specific search of their respective databases that resulted in a CD ROM containing PPO discount information on a claim-by-claim basis for each insurer per year. The information on the CD ROM provided Class Counsel, in the majority of cases, with the complete class list (names, addresses and tax identification numbers) and the amount of each class member's damages on a claim-by-claim basis – information that would have taken Class Counsel years to obtain in the normal discovery process.

While on appeal, the parties in the majority of the cases agreed to participate in the Eleventh Circuit's mediation program before Joseph Unger. Armed with the ADP and Beech Street data and aided by Mr. Unger, Class Counsel were able to lay the groundwork for a settlement model that provided tremendous benefits to the class. The three settled cases currently before the Court were all mediated by Mr. Unger as part of the Eleventh Circuit's mediation program.

**B.      The PRUPAC Class Action**

UOMC and Dr. Afield are Florida healthcare provider that had entered into preferred provider agreements with Medview Services, Inc. ("Medview"), Community Care Network, Inc. ("CCN") and/or Beech Street, all PPOs. Under the terms of their agreements with these PPOs, UOMC and Dr. Afield agreed to discount their normal "full-priced" medical charges for medical services rendered to patients who were subscribers in any of the PPOs. UOMC and Dr. Afield

agreed to accept discounted fees for medical services in exchange for anticipated marketing of their services by Medview, CCN and Beech Street to its subscribers.

In the course of their respective practices, however, UOMC and Dr. Afield also treated patients covered by automobile insurance policies issued by PRUPAC. PRUPAC's standard Florida automobile insurance policy provided insureds with PIP coverage that paid for 80% of all reasonable and necessary medical expenses. After UOMC and Dr. Afield treated patients insured by PRUPAC, they submitted medical bills for payment by PRUPAC. To process these PIP claims, however, PRUPAC used the insurance claim processing services of ADP. In the course of processing these claims on behalf of PRUPAC, ADP improperly applied various PPO discounted rates to UOMC's and Dr. Afield's medical charges. UOMC and Dr. Afield allege that PRUPAC was not entitled to discount their medical fees based on any of the PPOs because PRUPAC had not become a subscriber of the Medview, CCN and/or Beech Street PPOs and had not complied with Fla. Stat. § 627.736(10).

The instant case is presently on appeal of the District Court's denial of PRUPAC's motions to compel arbitration. If the proposed Settlement is ultimately approved by this Court, PRUPAC will no longer actively participate in that appeal and its appeal will be dismissed.

## II.    DISCOVERY AND NEGOTIATIONS LEADING TO SETTLEMENT

As detailed in Class Counsel's Declaration, this litigation has been conducted intensively and aggressively over the past four years. The defendants in the consolidated cases, including PRUPAC, aggressively attempted to stop Class Counsel from conducting any discovery. Notwithstanding Class Counsel's extensive discovery requests, the defendants frustrated their efforts with motions to stay discovery, motions to compel arbitration and eventually with the

filing of the Eleventh Circuit appeals.

Despite all discovery being stayed, Class Counsel negotiated a settlement with ADP and Beech Street, (the companies that processed the PPO discounts for many of the defendant insurers), under which ADP and Beech Street produced all documents and data involving the PPO discounting programs they sold and facilitated for the relevant defendant insurers including PRUPAC. This document and data production provided Class Counsel with all the information about PRUPAC's PPO discounting practices and most importantly, contained the names, addresses, tax identification numbers and specific claim-by-claim damages for each member of the Class.[8]

Attempts at settlement negotiations with PRUPAC did not occur until after its motions to compel arbitration were denied at the District Court level and the case was appealed to the Eleventh Circuit. As part of the Eleventh Circuit's mediation program, counsel for the parties conducted extensive settlement discussions before mediator, Joseph Unger. The negotiations were difficult and protracted. At times, it appeared that no settlement acceptable to the Plaintiffs would, or could, be achieved. The negotiations involved an initial day-long session with Mr. Unger and then follow-up discussions between counsel for the parties over the course of approximately nine months.

Ultimately, through continued perseverance and hard work, the current $562,500 settlement was reached between the parties. Based on their extensive knowledge of the strengths

---

[8] At the eventual mediation of the case, the ADP data gave Class Counsel tremendous leverage because they knew with a reasonable degree of certainty the amount of PRUPAC's exposure and how a beneficial "settlement model" could be crafted since individual Class Member damages had been identified. The data Class Counsel obtained from ADP and Beech Street proved to be the information relied on by both parties when implementing the Settlement.

7

and vulnerabilities of the claims against PRUPAC and given the uncertainties of an appeal and/or ultimate trial of the action, Class Counsel believe that the Settlement represents an excellent result for the Class. UOMC, Dr. Afield and Class Counsel heartily recommend that the proposed Settlement be approved as fair, reasonable, adequate and in the best interests of the Class.

## III.    SUMMARY OF THE SETTLEMENT

### A.    Class Members Receive Their Damages With No Reduction for Costs of Settlement Administration or Counsel Fees

The Settlement provides for the distribution of a Settlement Fund of up to $450,000 to Class Members who timely file Proof of Claim forms with an independent Settlement Administrator paid for by PRUPAC.[9]  Each Class Member that timely filed a properly completed Proof of Claim form is entitled to reimbursement of sixty (60%) percent of the PPO discounts taken by PRUPAC, less any applicable deductibles and copayments during the relevant Class Period.[10]  Furthermore, all costs of settlement administration,[11] including the costs of notification to the Class Members, are being borne by PRUPAC separately and in addition to the Settlement Fund.

Under the terms of the Settlement, PRUPAC has agreed to pay any Class Counsel fees and reasonable costs and litigation expenses awarded by the Court up to twenty-five percent

---

[9]  The precise terms of the Settlement are set forth in the Stipulation of Settlement filed with this Court and are also discussed in detail in the Declaration of Class Counsel.

[10]  The proof of claim process was simple and straightforward.  To file a valid proof of claim, Class Members needed only to verify that they obtained "assignment of benefit" forms from PRUPAC's insureds and then provide basic information identifying their business and the person signing the form. *Class members did not have to provide any documentation, such as bills or explanation of benefit forms, to perfect a proof of claim.*

[11]  PRUPAC has retained Wachovia Information Consulting Group, a subsidiary of Wachovia Bank, of Jacksonville, Florida, to serve as the independent settlement administrator.

8

(25%) of the Settlement Fund, or $112,500.00. The payment of counsel fees and expenses will be paid *separate and outside of* the Settlement Fund. Thus, Class Member monetary benefits will not be reduced by attorneys' fees or expenses.

Finally, as a further long-term benefit to the Class and to all Florida health care providers, PRUPAC has agreed to stop the practice of applying PPO discounts on automobile insurance PIP claims, and in the future will abide by the requirements of Section 627.736(10) of the Florida Statutes.

**B.    <u>Notice Far Exceeded Due Process Standards</u>**

As to notice of the Settlement, potential Class Members were identified (name, address, and tax identification number) by the data obtained from PRUPAC's vendors, ADP and Beech Street. Based on this list, each Class Member was sent a Notice and claim form by direct mail describing the terms of the Settlement. In an attempt to reach as many Class Members as possible, the Settlement also provided that the Settlement Administrator take reasonable steps to locate any Class Members whose Notices were returned as "undeliverable." The Settlement Administrator "skip-traced" insufficient addresses and searched two online Florida state databases (the Florida Secretary of State website and the Florida Department of Health website)[12] in an effort to obtain valid addresses for all Class members.[13]

---

[12] The relevant internet addresses were: <u>www.sunbiz.org</u> and  <u>www.doh.state.fl.us</u>.

[13] On or before September 20, 2004, the Settlement Administrator initially mailed 968 notices to identified Class Members. After the initial mailing and the first re-mailing to Class Members with current forwarding addresses on file (a total of 17), a total of 136 Class Member addresses were deemed to be "bad addresses," or addresses for which no forwarding information was available. These addresses were then "skip-traced" and researched online with the result being that a total of 119 Notices were re-mailed to Class Members. Ultimately, only 4 Class Member addresses could not be confirmed through the efforts of the Settlement Administrator.

9

The individual Notices that were approved by the Court at the Hearing on Preliminary Approval, thoroughly described the terms of the proposed Settlement, apprised Class Members of their rights with respect to the Settlement, and informed them of the Court's schedule for consideration of the Settlement.

To further assist Class Members and furnish notice of the Settlement, PRUPAC also established an internet website entitled "PRUPAC Class Action Settlement." (See, http://prupac.net). The PRUPAC site was specifically designed to conveniently provide information about the Settlement and downloadable documents to Class Members and other persons interested in the Settlement. For example, one page of the site was devoted to "Frequently Asked Questions" about the Settlement, while another page supplied information on how to contact Class Counsel and the Settlement Administrator.

## IV.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED.

### A.    Due Notice Of The Settlement Has Been Appropriately Given.

The form of Notice utilized in this case was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). The Notice, which was preliminarily approved by this Court, provided detailed information concerning the rights of Class Members, including the manner in which objections could be lodged; the nature, history and progress of the Litigation; the proposed Settlement terms; the process for filing Proofs of Claim; the fees and expenses to be sought by Class counsel; the necessary information for any Class Member to examine the Court records

10

should he or she desire to; and the time and procedure for exclusion from the Settlement or to object to the Settlement or Class Counsel's fee application.

All potential Class Members were identified using a list of medical care providers whose claims had been reduced by ADP during the relevant class period. Notices were then prepared by an independent settlement administrator, Wachovia Information Consulting Group ("Wachovia"), which is being paid for by PRUPAC. Wachovia then mailed, postage pre-paid, to all Class Members identified on the Class Member list, a copy of the Notice approved by this Court. At the beginning of the settlement process on September 20, 2004, Wachovia initially mailed 968 total Notices.

Over the course of the claims period, Wachovia made efforts to ensure that as many of the 968 Notices were received by Class Members. During the claims peroid, Wachovia re-mailed any Notices returned with current forwarding addresses provided by the U.S. Postal Service. Also, as required under the terms of the Settlement, Wachovia made efforts to identify and locate any Class Members in the case of any Notices being returned as "undeliverable" without valid forwarding addresses on file through the use of a "skip tracing" service using available federal identification numbers for "missing" Class Members and conducting online database searches. Wachovia's efforts resulted in the re-mailing of 119 Notices to Class Members.

In addition to establishing an internet website devoted to the Settlement as discussed above, PRUPAC and the Administrator went to great lengths to ensure that Class Members whose claims forms were not properly completed had an opportunity to correct any deficiencies prior to the expiration of the claims process. Through those efforts, 20 Class Members whose

11

claims forms were deficient were able to correct the deficiencies prior to the close of the claims process.

Ultimately, the method of notice was the most reasonable method under the circumstances to apprise all potentially interested parties of the pending Settlement and amply satisfied the requirements of due process. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974).

**B.      The Standards For Judicial Approval Of Settlements Under Rule 23(e).**

There is an overriding public interest in favor of class action settlements which have the well-deserved reputation as being most complex.[14] Ass'n for Disabled Americans, Inc. v. Amoco Oil Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002) (citing Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977)); Warren v. City of Tampa, 693 F.Supp. 1051, 1054 (M.D. Fla. 1998), aff'd, 893 F.2d 347 (11th Cir. 1989). Accordingly, a class action settlement should be approved so long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984); Cotton v. Hinton, 559 F.2d at 1330; Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 537 (S.D. Fla. 1988).

When determining whether a settlement is fair, adequate and reasonable, a court should consider all relevant factors, including (1) an assessment of the likelihood of success at trial; (2) the range of possible recovery at such trial; (3) the consideration provided to class members

---

[14] The Eleventh Circuit has noted that "public policy strongly favors the pretrial settlement of class action lawsuits." In re U.S. Oil & Gas Litig., 967 F. 2d 489, 493 (11th Cir. 1992). In that action, the court noted that "complex litigation like the instant [class action] case can occupy the court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules . . . authorize District Courts to facilitate settlements..." Id.

under the Settlement, in comparison to the range of possible recovery discounted by the inherent

risks of litigation; (4) the complexity, expense and duration of the litigation in the absence of the

settlement; (5) the substance and amount of opposition to the settlement; and (6) the state of

proceedings at which the settlement was achieved.  Bennett v. Behring Corp., 737 F.2d at 986;

Cotton v. Hinton, 559 F.2d at 1330-31; see also Behrens v. Wometco Enter., Inc., 118 F.R.D.

534, 538-39 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990); ADA v. Aetna, Inc. (In re

Managed Care Litig.), 2004 U.S. Dist. LEXIS 14294, *3-4 (S.D. Fla. 2004).[15]

The application of the Bennett factors is left to the sound discretion of the trial judge and

appellate review of the Court's decision is based on an abuse of discretion standard.  In re U.S.

Oil & Gas Litig., 967 F.2d at 493; In re Broiler Chicken Antitrust Litig., 669 F.2d 228, 238 (5th

Cir. 1982).  Great weight is accorded a trial judge's views in evaluating a class action settlement.

City of Detroit v. Grinnell Corp., 453 F.2d 448, 454 (2d Cir. 1974) (quoting Ace Heating &

Plumbing Co. V. Crane Co., 453 F.2d 30, 34 (3d Cir. 1971)).  In making its determination, the

trial court is also entitled to rely on the judgment of experienced counsel for the parties.  In re

Smith, 926 F.2d 1027, 1028 (11th Cir. 1991); Cotton v. Hinton, 559 F.2d at 1330.

In evaluating these considerations, a court must not try the case on the merits.  Cotton v.

Hinton, 559 F.2d at 1330; Diaz v. Hillsborough County Hosp. Auth., 2000 U.S. Dist. LEXIS

14061, *6 (M.D. Fla. 2000).  Instead, the court should rely on the judgment of experienced

counsel and, absent fraud, "should be hesitant to substitute its own judgment for that of counsel."

Ass'n for Disabled Americans v. Amoco Oil, 211 F.R.D. at 467 (quoting Cotton v. Hinton, 559

_____

[15] Other factors relevant to a court's inquiry are the terms of the settlement, the procedure
afforded to notify Class members of the proposed settlement, and the judgment of counsel. Cotton v.
Hinton, 559 F.2d at 1330; Warren v. City of Tampa, 693 F.Supp. At 1055.

F.2d at 1330); see also In re Sunbeam Sec. Litig., 176 F.Supp.2d 1323, 1329 (S.D. Fla. 2001).

Rather than justifying each settlement term against a hypothetical or speculative measure of what

concessions might have been gained, a court should focus on the negotiation process to ensure

that the settlement was achieved through arms-length negotiations by counsel and was not the

product of collusion between the parties. See Behrens v. Wometco Enter., Inc., 118 F.R.D. at

538-39. Ultimately, in evaluating a settlement's fairness, the court should remember that

compromise is the essence of a settlement and that "inherent in compromise is a yielding of

absolutes and an abandoning of highest hopes." Cotton v. Hinton, 559 F.2d at 1330.

The application of these standards in the present case, warrants the approval of the

Settlement as fair, reasonable and adequate. Class Counsel and PRUPAC have had substantial

opportunity to weigh the strengths and weaknesses of the parties' respective positions in the

event this action were to proceed to appeal and/or trial, and to reach an informed compromise

based on their respective analyses.

### 1.    The Likelihood Of Success At Trial And Potential Recovery.

When considering the likelihood of success at trial and any potential recovery, a court can

limit its inquiry to determining "whether the possible rewards of continued litigation with its

risks and costs are outweighed by the benefits of the settlement." Ressler v. Jacobson, 822 F.

Supp. 1551, 1553 (M.D. Fla. 1992); see also Elkins v. Equitable Life Ins. Co., 1998 U.S. Dist.

LEXIS 1557, * 76 (M.D. Fla. 1998); Mashburn v. National Healthcare, Inc., 684 F. Supp. 660,

670 (M.D. Ala. 1988) (in the class action settlement context, courts do not decide the merits of

the case or resolve unsettled legal questions). This inquiry is premised on "balancing  the

probabilities, not assuring that the plaintiff class receives every benefit that might have been won

14

after a full trial." In re Chicken Antitrust Litig., 560 F. Supp. 957, 960 (N.D. Ga. 1980). The expense of achieving a more favorable result for the class at trial must be considered. Ressler v. Jacobson, 822 F. Supp. at 1555; see also, Young v. Katz, 447 F.2d 431, 433 (5th Cir. 1971).

While the Settlement represents an extremely favorable result under any measure, it must be considered in light of the significant risks faced by the Class with continued litigation. Class Counsel believe that they have a "strong case" to be made against PRUPAC. The potential for a substantial recovery at trial (assuming that the Plaintiffs could get past the hurdle of PRUPAC's appeal), however, was tempered by Class Counsel's analysis of certain major factors that favor the settlement of this action on the proposed terms. These factors include (1) the uncertain outcome of pending appeals to the Florida Supreme Court concerning the interpretation of Florida Statute section 627.736(10); (2) the uncertain outcome of a pending appeal to the 11th Circuit Court of Appeals concerning PRUPAC's motion to compel arbitration; and (3) the inherent difficulties in proving the elements of a RICO action against PRUPAC in a full trial on the merits.

> a.  **Two Florida District Courts of Appeal Have Conflicting Rulings Relating To The Application Of Section 627.736(10) In The Context Of Auto Insurance Companies Paying PIP Claims At PPO Discounted Rates Where No PPO Insurance Policy Has Been First Offered to Insureds.**

Class Counsel believes that one of the most important considerations concerning the likelihood of success at trial concerns PRUPAC's defenses under Florida's PIP statute, Section 627.736(10). There is currently a split between two Florida appellate districts, the Second and Fifth Districts, on whether an auto insurer may pay health care providers at reduced PPO contract rates without first offering a preferred provider PIP policy of insurance. In Nationwide Mut. Fire

Ins. Co. v. Central Florida Physiatrists, P.A., 851 So.2d 762 (Fla. 5th DCA 2003), the appellant,

Nationwide, an insurance company providing Florida auto insurance policies, paid Central

Florida Physiatrists ("CFP") at reduced rates based on CFP's participation in the Beech Street

PPO. Nationwide did not, however, contract directly with CFP as a "preferred provider" and

offer a preferred provider PIP insurance policy to its insureds as required under the specific

language of Section 627.736(10).[16] In affirming the trial court's grant of CFP's summary

judgment motion, the Fifth District Court of Appeals reasoned that the clear and precise language

of Section 627.736(10) demonstrates the Legislature's intent that the availability of PPO benefits

under a PIP auto insurance policy is subject to strict compliance with the terms of subsection

(10). According to the Fifth District, Nationwide was required to first comply with the

provisions of subsection (10) in order to take advantage of paying reduced PPO rates for payment

of PIP claims. Id., 851 So. 2d at 766. Nationwide's failure to do so, thus required it to pay the

statutorily mandated 80% of the reasonable and necessary medical expenses incurred by its

insured. Id.

     In stark contrast to the Fifth District's decision, the Second District held that subsection

(10) does not prohibit insurers that have not issued PPO auto policies from paying health care

providers at discounted PPO rates. See Nationwide Mut. Ins. Co. V. Dennis M. Jewell, D.C.,

---

[16] Section 627.736(10) provides that "An insurer may negotiate and enter into contracts with licensed health care providers for the [PIP] benefits described in this section, referred to in this section as "preferred providers,"... The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met...If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits." §627.736(1)(a)(10) Fla. Stat. (1999).

P.A., 862 So.2d 79 (Fla. 2d DCA 2003). The appellees[17] in Jewell were preferred health care

providers in the Beech Street and CCN PPOs and treated patients entitled to PIP benefits under

auto insurance policies issued by Nationwide.[18] Id. at 81. Instead of paying the providers at the

80% statutorily mandated PIP rate, Nationwide paid them at the lower PPO network rate though

admittedly not having direct contracts with the providers and not having first issued preferred

provider auto insurance policies under section 627.736 (10). Id. at 81-82. Both lower trial courts

in the actions ruled that Nationwide was not entitled to pay the providers at the discounted PPO

rates finding that Nationwide had violated the clear language of section 627.736(10). Id.

In reversing the trial courts' judgments in favor of the providers, the Second District held

that neither the clear language of section 627.736(10), nor the PIP insurance policies issued by

Nationwide prohibited the payment of PPO discounted rates. Id. at 83. Rejecting the providers'

statutory arguments, the Second District reasoned that section 627.736(10) is permissive in

nature and does not specifically limit insurers to direct contracts between PIP insurers and

providers. Id. at 84. Relying on the phrases contained in the statute - "may negotiate and enter

into contracts," and "may provide an option to an insured," - the Court determined that "such

permissive provisions should not be read to impose an implied prohibition." Id at 85.

Both cases have been appealed to the state Supreme Court and the question is currently

---

[17] There are three appellees in Jewell; Dennis M. Jewell, D.C., P.A., George G. Hudson, D.C., P.A and Jeff Davis, D.C., P.A. The appellees all brought separate actions in lower trial courts. Jewell and Hudson's individual cases were consolidated for consideration in the Sarasota County Court. The Davis action was heard in Hillsborough County Court. The actions were consolidated for hearing in the Court of Appeals for the Second District. Nationwide v. Jewell, 862 So.2d at 81.

[18] Jewell and Hudson brought their individual actions against Nationwide Mutual Insurance Company. Davis brought his action against Nationwide Mutual Fire Insurance Company. Both Appellants will be referred to collectively as "Nationwide."

pending. In light of this current conflict, the outcome of the present action remains uncertain should the Class proceed to litigate the action. It is entirely conceivable that the Florida Supreme Court could decide the section 627.736(10) issue in favor of the Second District decision prior to, or even during, the trial of the current case, which would effectively "hamstring" the Plaintiff's entire action. Given that the proposed Settlement now removes that uncertainty while offering to reimburse all Class Members 60% of the PPO discounts taken by PRUPAC, it is clear that potential litigation risks outweigh the rewards of the Settlement.[19]

### b. PRUPAC's Appeal Of Its Denial Of Its Motion To Compel Arbitration Casts A Shadow Of Uncertainty As To The Plaintiff's Likelihood Of Success

One of UOMC's and Dr. Afield's underlying causes of action against PRUPAC is based on their status as an assignee of the PIP insurance contract of one of its patients. In its motions to compel arbitration, PRUPAC asserts that UOMC's and Dr. Afield's claims should be arbitrated because the PRUPAC auto insurance policy issued to their respective patients contained an arbitration clause. According to PRUPAC, since the arbitration clause appears in the auto insurance contract, the clause binds the health care providers as assignees and third party beneficiaries of the policy's benefits.

---

[19] The Court may note that individual Class Member payments in the present action are less than individual Class Member payments in the related case of Ultra Open MRI Center, Inc. v. Integon Nat'l Ins. Co., et al., (the "GMAC" action) which final settlement is also before the Court for consideration. Importantly, the proposed PRUPAC settlement, presently being considered by the Court, was the first case in the entire line of consolidated cases to reach a settlement. The GMAC settlement was reached *after* the PRUPAC settlement, but *prior to* the Second District's unfavorable decision in Jewell. Notably, the settlement in the related Larusso v. Liberty Mutual Ins. Co. action (the "LMIC" settlement) was reached *after* the Jewell ruling *and* after the PRUPAC settlement. The fact that the PRUPAC case was the first case to be settled and was settled before the decisions in the Florida Districts weighed heavily in the analysis of Class Counsel of the proposed PRUPAC settlement and did ultimately affect the parameters of the settlements.

During the course of the litigation, in a Report dated November 13, 2001, Magistrate Snow recommended that PRUPAC's motion to compel arbitration be granted. Class Counsel filed an objection to that Report. In January 2002, UOMC then filed its amended complaint adding Dr. Afield as a class representative. PRUPAC subsequently filed its motion to compel arbitration with respect to Afield's claims. In a report dated June 12, 2002, Magistrate Snow recommended that PRUPAC's motion to compel be denied. In its Order of September 30, 2002, (which impacted all fifteen cases in the consolidated action), however, this Court adopted the Magistrate's recommendation to deny the Hartford Insurance defendant's motion to compel arbitration. Then, in its October 28, 2002, Supplemental Order, this Court clarified that the motions to compel arbitration in the consolidated cases, including PRUPAC's motions, were denied finding that: 1) a statutorily mandated obligation to arbitrate is unconstitutional; 2) a contractual provision entered into between an insured and an insurance company cannot require arbitration of claims that are assigned to health care providers where the insured is not required to arbitrate the same claim; or 3) the motion to compel arbitration is premature until such time as the Court decides whether the challenged contract is valid.

PRUPAC immediately appealed the Court's Orders to the Eleventh Circuit challenging the denial of its motions to compel arbitration. PRUPAC's appeal is currently pending and the outcome remains an uncertainty that Class Counsel has taken into consideration while crafting the present proposed Settlement.

## 2.    The Range Of Possible Recovery And The Consideration Under The Settlement In Relation To That Range

In <u>Behrens</u>, the Court combined the second and third factors of the <u>Bennett</u> test to

determine the appropriateness of the settlement. <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at 541. The factors considered are the range of possible recovery and the point within, or below, the range of possible recovery at which a settlement is fair, adequate and reasonable. Discounting multiple damages under RICO, the range of possible recovery under applicable law would be from zero to 100% of the discounted amount with interest and an award of attorney's fees and costs. Under the proposed Settlement, all claimants will receive 60% of the PPO discounts taken by PRUPAC. Additionally, PRUPAC will pay Class Counsel fees and reasonable litigation costs and expenses up to $112,500, as well as, costs of settlement administration *separate and outside of* the Claim Fund. The benefits provided by the Settlement are extremely close to the highest end of potential relief had the case been tried successfully by Class Counsel.

Moreover, based on the present state of the PIP statutory scheme in Florida, the terms of the Settlement actually provide Class Members with *significantly better* relief than they otherwise might expect should the settlement not be approved. Since the inception of this litigation in 2000, the Florida Legislature has amended the PIP statute by adding a complicated pre-suit demand procedure. Under the new statute, prior to filing a lawsuit a medical provider must send a demand letter to the insurer detailing: 1) the name of the insured upon which such benefits are being sought, including a copy of the assignment giving rights to the claimant if the claimant is not the insured; 2) the claim number or policy number upon which such claim was originally submitted to the insurer; 3) to the extent applicable, the name of any medical provider who rendered to an insured the treatment, services, accommodations, or supplies that form the basis of such claim; and 4) an itemized statement specifying each exact amount, the date of

20

treatment, service, or accommodation, and the type of benefit claimed to be due. Fla. Stat. §
627.736(11).

Class Members who have not yet filed suit for illegal PPO discounts would have to first
satisfy the pre-suit demand requirements of the new statute. The statute's evidentiary demand
requirements are far more onerous than the proof of claim process negotiated by Class Counsel.
Class Members need not provide any documentation or detailed claim information to participate
in the Settlement, whereas under the new statute they are required to conduct a file-by- file
review and provide documentary evidence just to meet the pre-suit demand requirements.

Finally, as a further long-term benefit to the Class and to all Florida health care providers,
PRUPAC has agreed to stop the practice of applying PPO discounts on automobile insurance PIP
claims, and in the future will abide by the requirements of Section 627.736(10) of the Florida
Statutes.

### 3.    The Complexity, Expense And Likely Duration Of The Litigation

Class Counsel believe that the claims asserted in this action have considerable merit.
However, its inherent complexities combined with the uncertainties those complexities engender,
are characteristic of RICO litigation and consolidated cases of this nature. The docket sheet tells
the story best as there are over 880 entries prior to the defendants filing their appeals and the
parties still have "a long way to go" in the litigation process. Those uncertainties militate
strongly in favor of approving the Settlement.

The likely duration and associated expenses of continued litigation likewise favor
approval of the Settlement. See Warren v. City of Tampa, 693 F.Supp. At 1059 ("The parties
estimate that trial of this case would take three weeks of Court time, and would cost hundreds of

thousands of dollars in attorneys' fees, expert witnesses fees and costs. These factors militate in favor of a decision to accept the proposed settlement."). In the present case, Class Counsel estimates that a trial of this action (assuming first that PRUPAC fails on its Eleventh Circuit appeal) could take approximately two weeks and could cost the Class hundreds of thousands of dollars in attorneys' fees, expert fees and litigation costs. Moreover, given that PRUPAC has already filed one appeal in this action, it is very likely that it would appeal class certification and any trial judgment in favor of the Plaintiffs. The Class would be further subject to the many years of delay and additional costs associated with those appeals.

Here there is a great deal at stake for the parties and, but for the proposed Settlement, the case would continue to be strongly litigated by them. As a result of the Settlement, the dispute between them will come to an end with the Class receiving a substantial recovery and there will also be substantial savings in Court resources by avoiding a lengthy trial of this case. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources. Behrens v. Wometco Enter., Inc., 118 F.R.D. at 538.

### 4.    The Substance And Amount Of Opposition To The Settlement

Even when a court becomes aware of one or more objecting parties, the court is not "required to open to question and debate every provision of the proposed compromise. The growing rule is that the trial courts may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." Cotton v. Hinton, 559 F.2d at 1331.

In the present case, the deadline for filing objections to the Settlement was November 22, 2004. Not a single objection has been filed by a Class Member. Additionally, out of a class consisting of over 900 Class Members, there have been only four (4) valid opt-outs filed.

22

Clearly, the reaction of the Class to the Settlement is favorable and positive. Courts have looked at the absence of meaningful objections to a proposed settlement as further support for the approval of the settlement. See Bennett v. Behring, Corp., 737 F.2d at 988.

> ### 5.    The Stage Of Proceedings At Which The Settlement Was Achieved

The purpose of considering the stage of the proceedings and the discovery taken is to ensure that the plaintiff has had access to sufficient information to evaluate the case and to determine the adequacy of the proposed settlement. Behrens v. Wometco Enter., Inc., 118 F.R.D. at 544. As discussed in greater detail in Class Counsel's Declaration, the Settlement was achieved after four years of intense litigation involving extensive motion practice and investigation.

The Plaintiffs and Class Counsel were very aware of the merits of their case based on their pre-suit investigation and the status of state case law on the issue of applying PPO discounts to automobile medical expense claims. Additionally, despite the District Court's stay of discovery, Class Counsel was able to obtain extensive discovery from ADP and Beech Street consisting of relevant documents, data and information about PRUPAC's practices, without involvement by PRUPAC. Absent this settlement with ADP and Beech Street, Class Counsel estimates that it would have taken years of post-appellate discovery to obtain the same information. Knowledge of the law, coupled with the discovery obtained from ADP and Beech Street, allowed Class Counsel to accurately assess its case for class-wide settlement negotiations.

> ### 6.    The Settlement Is The Result Of "Arms-Length" Negotiations Among Competent And Experienced Counsel.

In considering the fairness of a proposed settlement, the Court is entitled to rely heavily

on the opinion of competent counsel. <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at 544. This is especially apt where, as here, the extensive amount of independent investigation, legal research, briefing and discovery indicates that counsel are fully capable of evaluating the merits of the plaintiff's case and the probable course of future litigation. See <u>Cotton v. Hinton</u>, 559 F.2d at 1330.

In analyzing a proposed settlement and the opinion of counsel, it is also appropriate for the Court to examine the negotiating process that took place between the parties to confirm that there was no collusion in reaching the Settlement. <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at 538. In the present case, the Settlement was achieved only after years of hard-fought and contentious litigation that resulted in an appeal of the Consolidated Action to the Eleventh Circuit. Ultimately, the settlement negotiations were overseen by an independent mediator of the Eleventh Circuit -- clear evidence that the negotiations were conducted at "arms length." After a full day mediation session with Mr. Unger, the parties continued to negotiate details of the settlement for another several months. Through the efforts of Mr. Unger, Class Counsel and Defense Counsel were eventually able to fashion a Settlement that is not only fair and reasonable, but is a truly extraordinary and excellent result for the Class.

## CONCLUSION

For the foregoing reasons, Plaintiffs and Class Counsel submit that the proposed Settlement is fair, reasonable and adequate and should be approved in its entirety, and respectfully request that the Court approve the Settlement.

24

Respectfully submitted,
Co-Lead Counsel for the Plaintiffs:
**LEE & AMTZIS, P.L.**
5550 Glades Road, Suite 401
Boca Raton, FL 33431
Telephone: (561) 981-9988
Facsimile: (561) 981-9980


By:_____
        ERIC LEE, Florida Bar No. 961299


Co-Lead Counsel for the Plaintiffs:            Co-Lead Counsel for the Plaintiffs:
**KOPELMAN & BLANKMAN, P.A.**                  **GOLD & COULSON**
350 East Las Olas Blvd., Suite 980            11 S. LaSalle Street, Suite 2500
Fort Lauderdale, FL 33301                     Chicago, IL 60603
Telephone: (954) 462-6855                     Telephone: (312) 372-0777
Facsimile: (954) 462-6899                     Facsimile: (312) 372-0778


Co-Lead Counsel for the Plaintiffs:
**PHILLIPS & GARCIA, LLP**
13 Ventura Drive
N. Dartmouth, MA 02740
Telephone: (508) 998-0800
Facsimile: (508) 998-0919

25

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing was sent by U.S. Mail, postage pre-paid, to the counsel listed below on the Master Service List, this ⌒ L day of January, 2005.

Douglas Blankman, Co-Lead Counsel for
Plaintiffs

## MASTER SERVICE LIST
### (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)

**Co-Lead Counsel for Plaintiffs**

Eric Lee, Esq.
LEE & AMTZIS, P.L.
350 N.W. 12 Avenue
Deerfield Beach, FL 33442
561-981-9988
561-998-3021 (fax)
elee@leeamlaw.com

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphilips@gpandg.com
Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 1611
Fort Lauderdale, FL 33394
(954) 462-6855

**Counsel for Allstate, Fidelity & Casualty, Continental, Deerbrook**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
PO Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 Facsimile

26

**Counsel for Beech Street and ADP**

TEW, CARDENAS,et al.
John M. Quaranta, Esq
(305)536-2495
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1116 Facsimile

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

**Counsel for CCN**

KENNEY NACHWALTER
SEYMOUR ARNOLD CRITCHLOW
& SPECTOR, P.A.
Richard H. Critchlow, Esq
Robert D.W. Landon, III, Esq
rlandon@knsaca.com
201 South Biscayne Blvd., Ste 1100
Miami, FL 33131
(305) 373-1000
(305) 372-1861 Facsimile

**Counsel for Nationwide**

FOWLER, WHITE, et al.
Katherine C. Lake, Esq.
klake@fowlerwhite.com

PO Box 1438
Tampa, FL 33131
(813) 228-7411
(813) 229-8313 Facsimile

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esq.
haggerty@scdlaw.com
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316
(215) 299-4314
(215) 299-4301 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Robert K. Levenson, Esq.
rlevenson@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 Facsimile

**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT et al.
Nina K. Brown
nbrown@akerman.com
One Southeast Third Ave, 28th Flr
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Hartford, Metropolitan, Integon**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Prudential**

BUTLER BURNETTE PAPPAS
Kathy J. Maus, Esq
kmaus@bbplaw.com
Lauren D. Levy, Esq.
llevy@bbplaw.com
3600 Maclay Blvd. Suite 101
Tallahassee, FL 32312
(850) 894-4111
(850) 894-4999 Facsimile

SHEA & GARDNER
John D. Adlock, Esq.
jadlock@sheagardner.com
Michael Isenman, Esq.
misenman@sheagardner.com
1800 Massachusetts Ave, N.W.
Washington, D.C. 20036
(202) 828-2000
(202) 828-2195 Facsimile

**Counsel for Metropolitan**

SONNENSCHEIN, NATH & ROSENTHAL
Jeffrey P. Lennard, Esq.
jpl@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000

**Counsel for Superior**

BUTLER BURNETTE PAPPAS
Alan J. Nisberg, Esq.
anisber@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway, Ste 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for American International**

CONROY, SIMBERG, GANON, KREVANS
& ABEL, P.A.
Dale L. Friedman, Esq.
dfriefman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Blvd, 2d Floor
Hollywood, FL 33021
(954) 961-1400
(954) 967-8577 Facsimile

# Exhibit "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH
(Magistrate Snow)

DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

     Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

     Defendants.

_____/

ULTRA OPEN MRI CORP., on behalf of        01-6778
itself and all others similarly situated,

     Plaintiffs,

v.

PRUDENTIAL PROPERTY AND
CASUALTY INSURANCE COMPANY

     Defendant.

_____/

**DECLARATION OF CLASS COUNSEL IN SUPPORT
OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND AN AWARD OF ATTORNEY'S FEES AND COSTS**

1.     My name is Arthur S. Gold and I am a partner in the law firm of Gold & Coulson, P.A of

Chicago, IL.  I am one of the lead Class Counsel in the fifteen consolidated class action

cases (Zidel v. Allstate Insurance Company, et al, Consolidated C.A. No. 00-6061)

pending in this Court, one of which is the class action Ultra Open MRI Corp. v.

1

Prudential Property and Casualty Insurance Company, et al, C.A. No. 01-6779

(hereinafter "Prudential").  I am submitting this declaration in support of final approval of

the Prudential class action settlement and plaintiff's Memorandum in Support of Class

Counsel's Application for An Award of Attorney's Fees and Reimbursement of

Expenses.

2.      I have been plaintiff's counsel in the Prudential case and all the consolidated cases since

the first class action case was filed against Allstate Insurance Company approximately

five years ago on January 12, 2000.  Although the Prudential case is before the Court for

final approval of the class settlement, the historical background of the litigation in the

consolidated cases is necessary to understand the tremendous effort of Class Counsel in

prosecuting and managing the consolidated litigation which contributed substantially to

the settlement of the Prudential case.

**Pre-Suit Investigation**

3.      Prior to filing any of the consolidated cases, Class Counsel conducted an intensive and

thorough investigation of what they believed to be an industry-wide practice of Florida

automobile insurers reducing medical expense claims based on managed care preferred

provider organization ("PPO") discounts.  A practice Class Counsel has characterized

throughout this litigation as a "silent PPO."

4.      The investigation had three facets: 1) obtaining and reviewing any state and national

decisions on the PPO issue; 2) obtaining discovery documentation and deposition and

hearing testimony from Florida state cases, some of which Florida Class Counsel,

Kopelman & Blankman and Eric Lee, Esq. were directly involved; and 3) acquiring

2

documentation such as PPO contracts and explanation of benefit forms from as many sources as possible throughout the state of Florida.

5.      Also, prior to the filing of these consolidated cases, Class Counsel Eric Lee, Esq. and Larry Kopleman, Esq., had filed a state court class action seeking reimbursement for insureds whose medical providers balanced billed them after the insurer's application of PPO discounts to their medical expense claims. Information from the state court class action also served as part of the wealth of information reviewed by Class Counsel prior to filing the consolidated cases. Finally, documents and deposition transcripts from similar class actions in Massachusetts state court were accumulated and reviewed as the Massachusetts cases involved some of the same PPOs, PPO contracts and claim re-pricing companies working with the automobile insurers in Florida.

6.      Also as part of our investigation, Class Counsel met with their clients and their clients' billing personnel to gain information "on the ground" about how the PPOs, insurers and claims facilitators, such as ADP, were processing medical expense claims on a day-to-day basis.

7.      The majority of the documents obtained in Class Counsel's investigation, as well as documents gained after the litigation was filed, were organized into an electronic document depository which Class Counsel could access online from their offices for the purposes of prosecuting the litigation.

8.      Class Counsel's research at the time revealed that no similar federal or state class actions challenging a "silent PPO" discounting scheme on automobile medical expense claims had been filed anywhere in the country with the exception of two cases brought in

3

Massachusetts by Class Counsel team member Phillips & Garcia, LLP. The filing of the Florida federal court class actions based on the emerging "silent PPO" discounting practice in the automobile industry was both novel in theory and scope.

9. After this extensive pre-suit investigation of what amounted to the PPO discounting practices of the entire Florida automobile insurance industry, Class Counsel spent an enormous amount of time researching viable state and federal court causes of action before filing the first case. After completing their research and cognizant of the inherent difficulties of a federal court civil RICO case, Class Counsel spent a great deal of time on the drafting and re-drafting of the model class action complaint which was used as the backbone for all of the complaints filed in these consolidated cases. This time and effort proved valuable as the plaintiffs' RICO claims survived the defendants' motions to dismiss.

**The Allstate Filing and the Consolidated Litigation**

10. On January 12, 2000, Class Counsel filed the first class action case against Allstate. From the start, the case was aggressively defended with defendants Allstate and Medview Services, Inc. moving to dismiss.

11. After the Allstate filing, Class Counsel filed the following cases:

   a.    Brickell, et al v. Progressive Express Ins. Co., et al, C.A. No. 00-6649 (filed 5/12/00);

   b.    Browner v. Allstate Indemnity Company, et al, C.A. No. 00-7163 (filed 8/16/00);

   c.    LaRusso, et al v. Liberty Mutual Ins. Co., C.A. No. 00-7692 (filed 11/15/00);

   d.    Larusso, et al v. Nationwide Ins. Co., C.A. No. 01-8108 (filed 2/7/01);

   e.    Larusso, et al v. Florida Farm Bureau Casualty Ins. Co., C.A. No. 01-8110 (filed

4

2/7/01);

    f.    <u>Larusso ITT Hartford Life & Annuity Ins. Co.</u>, C.A. No. 01-8111 (filed 2/7/01);

    g.    <u>Ultra Open MRI Corp., et al v. Progressive American Ins. Co.</u>, C.A. No. 01-6776 (filed 5/8/01);

    h.    <u>Ultra Open MRI Corp., et al v. Deerbrook Ins. Co.</u>, C.A. No. .01-6777 (filed 5/8/01);

    i.    <u>Ultra Open MRI Corp., et al v. Prudential Property & Casualty Ins. Co.</u>, C.A. No. 01-6778 (filed 5/8/01);

    j.    <u>Ultra Open Mri Corporation, et al v. Fidelity & Casualty Co. of New York, et al</u>, C.A. No. 01-6779 (filed 5/8/01);

    k.    <u>Ultra Open MRI Corp. v. Integon National Ins. Co., et al</u>, C.A. No. 01-6780 (filed 5/8/01);

    l.    <u>The Chiropractic Centre, Inc., et al v. Superior Ins. Co.</u>, C.A. No. 01-6782 (filed 5/8/01);

    m.    <u>The Chiropractic Centre, Inc., et al v. Metropolitan Ins. Co.</u>, C.A. No. 01-6783 (filed 5/8/01);

    n.    <u>Mote Wellness & Rehab., Inc., et al v. American International Ins. Co., et al</u>, C.A. No. 01-8549 (filed 6/14/01).

10.    The cases were consolidated by Judge Ferguson. Each filed case was aggressively defended. As evidenced by the individual and consolidated case dockets, prior to the ultimate appeal of the cases, the defendants filed scores of different motions to dismiss and/or to compel arbitration.

11.    Class Counsel opposed all of the defendants' motions to dismiss and to compel arbitration and, with the exception of the dismissal of their Lanham Act counts, the

5

plaintiffs prevailed on each and every motion. In the two circumstances where Magistrate

Judge Snow partially ruled against the plaintiffs on the issue of arbitration presented in

the GMAC and Prudential cases, Class Counsel challenged the Magistrate Judge's

recommendation and was able to convince the District Court not to adopt the

recommendation. All motions to dismiss and compel were successfully defeated. It

almost goes without saying that it took Class Counsel a tremendous amount of time and

effort to defeat the defendants' initial attempts to dismiss these consolidated cases.

12.     While opposing the defendants' attempts to dismiss the cases, Class Counsel also went on

the offensive by propounding discovery to the defendants and subpoenaing non-party

witnesses. Class Counsel served separate requests for production, interrogatories and

admissions on all the defendants. Class Counsel also noticed over 40 depositions of

various defendants and sent document and deposition subpoenas to many non-party

witnesses.

13.     The vast majority of the Class Counsel's discovery requests were opposed by the

defendants. The defendants either objected to the discovery in its entirety or filed

motions for protective orders seeking to limit or stop Class Counsel from taking

discovery. Class Counsel opposed the defendants' motions and in some circumstances

filed motions to compel and for sanctions due to the defendants' failures to respond to

discovery. Despite these efforts, the defendants were for the most part successful in

preventing Class Counsel from conducting discovery as the District Court eventually

stayed the cases.

14.     After not being able to obtain discovery from the defendants through the normal

6

discovery process, Class Counsel entered into settlement discussions with defendants,

ADP Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street"), in

an effort to discover information about the defendants' polices and practices. In the

majority of the consolidated cases, Beech Street was the PPO whose discounts were

applied to automobile insurance medical expense claims by ADP. Adp's business was to

analyze and re-price claims for property and casualty insurers with its software programs.

15.    Class Counsel were able to negotiate a settlement with ADP and Beech Street whereby

they would produce any and all documents pertaining to the PPO discounting policies and

practices of the relevant defendant insurers. Accordingly, ADP and Beech Street

produced numerous boxes of documents to Class Counsel.

16.    As part of the settlement, Class Counsel also propounded specific data requests to ADP

whereby ADP produced data on CD ROM which listed class members by name, address,

tax identification number and also included specific claim by claim information per

insurer by year. Finally, pursuant to the settlement, ADP and Beech Street agreed to a

continuing obligation to provide additional documents and information as the litigation

proceeds.

17.    Based on Class Counsel's experience, it would have taken years to obtain the same

discovery in the formal litigation process. Moreover, the documents and information

obtained from ADP and Beech Street are confidential and therefore have not been

disclosed to the defendants with the limited exception of data shared in settlement

negotiations with the insurers.

18.    In addition to Class Counsel's efforts to obtain discovery from the vendor defendants,

7

plaintiffs also briefed and filed motions for class certification in all of the cases and were ready to argue same had the Court set them for hearing.

19.    As an example of the intense nature of the litigation, after the District Court issued its Omnibus Order on September 28, 2001, in the two month period from October 3, 2001 through December 7, 2001, the defendants filed 49 motions, notices, requests and submissions seeking all manner of stays, modifications, reaffirmations, clarifications, vacations, re-considerations and dismissals, all of which Class Counsel had to respond to in one form or another.

20.    As of October 30, 2002, the time at which the District Court appears to have issued its last order prior to appeal, the consolidated docket had been consumed with some 886 entries over a two and a half year period.

21.    After losing their motions to compel arbitration in the trial court, the majority of the defendants, with the exception of the Progressive defendants, appealed Judge Ferguson's decision to the Eleventh Circuit where the appeals are currently pending.

22.    All of the defendant insurers in these consolidated cases have stopped taking discounts on automobile medical expense claims.

**The Prudential Case**

23.    The Prudential class action was filed on May 8, 2001, over one year after the initial filing of the Allstate case. The case was transferred and reassigned to Judge Ferguson.

24.    After filing, the Class Counsel aggressively pursued the Prudential case. On May 25, 2001, the plaintiff filed a motion for class certification. Class Counsel also served requests for production, admissions and interrogatories on Prudential and noticed

8

depositions of Prudential personnel.

25.   Prudential aggressively defended the case from the beginning. On August 6, 2001, Prudential moved to compel arbitration, which Class Counsel opposed. On October 12, 2001, Prudential moved to stay the case and requested expedited consideration of its motion to compel arbitration and moved on November 2, 2001 for an emergency motion for a protective order to prevent Class Counsel from conducting discovery. Class Counsel opposed Prudential's attempts at staying the case and obtaining a protective order.

26.   After the Magistrate Judge recommended that the motion to compel arbitration be allowed in part, the plaintiff filed an objection to the recommendation. Judge Ferguson did not adopt the Magistrate Judge's recommendation and denied Prudential's motion to compel on July 29, 2002. Prudential eventually filed its appeal with the Eleventh Circuit.

27.   After the appeal was filed, Class Counsel and Prudential agreed to participate in the Eleventh Circuit's mediation program. The Prudential case was the first case of all the consolidated cases that was mediated and where the parties discussed settlements. Class Counsel, defense counsel and representatives from Prudential appeared in person for an all day mediation with Eleventh Circuit mediator, Joseph Unger, Esq.. With the help of Mr. Unger, the parties made considerable progress in the first mediation session.

28.   Thereafter, Class Counsel and defense counsel continued negotiations in person and over the telephone for over several months. There were times in the negotiation process where Class Counsel questioned whether the parties would be able to settle the case. Through hard work and perseverance, the parties were able to resolve their differences and enter

9

into a detailed settlement agreement. Settlement discussions were always conducted at arms-length, were very contentious at times and there was no collusion between counsel for the parties.

29.    During the pendency of these cases there have been two parallel state cases on the PPO discounting issue pending before the Fifth and Second Florida district courts of appeal. At the time the Prudential case was being negotiated, the Fifth District Court of Appeals had not yet issued its decision declaring that the insurer's PPO discounting practices violated the Florida statute. Class Counsel were concerned in negotiations that the Fifth DCA would rule against the plaintiff and prevent a settlement. Moreover, none of the other defendants in the 14 other cases were even broaching the subject of settlement with Class Counsel at the time the Prudential settlement talks started. Additionally, Prudential's liability as determined from the data obtained from ADP was relatively small due to their low market share in Florida.

30.    Finally, Class Counsel were very concerned about whether the Prudential case could be settled given the amount of individual state court PPO PIP cases pending in various Florida state courts. There was no settlement model to follow when the parties negotiated the Prudential settlement. The parties were in essence "breaking new ground" as they advanced their settlement talks.

31.    Despite these issues and concerns, Class Counsel was able to negotiate benefits for the Class where claims would be paid at 60% of the PPO discounted amount and were also able to negotiate the payment of attorney's fees and costs and the costs of settlement administration outside and separate from the Class Fund. Moreover, the settlement

provided for direct mail notice to Class Members with a minimal proof of claim process where Class Members would not be required to submit any documentation besides the basic information requested on the claim form.

32. As part of the Settlement, Prudential also agreed to comply with the Florida statutes concerning PPO discounts on medical expense claims and, since the filing of this case, has stopped the practice of taking PPO discounts in Florida. This is a substantial benefit to the class which will save them potentially hundreds of thousands of dollars on future medical expense claim payments.

33. Pursuant to the Settlement, Class Counsel communicated with defense counsel about the claims process and received and reviewed periodic reports from the independent Settlement Administrator and defense counsel regarding settlement administration.

34. Class Counsel have not yet received a fee for prosecuting the Prudential case or the consolidated class action cases. Class Counsel have spent 8,716 hours on the consolidated cases for a total lodestar of over $2,525,027. With respect to the Prudential case, Class Counsel have spent 184.35 hours prosecuting the case for a total lodestar of $67,264.26.

35. Based on Class Counsel's experience, negotiating a class action settlement where class members can receive approximately 60% of their actual damages without an evidentiary proof of claim process is a tremendous benefit to the class, especially given the risks associated with the age of the claims, the state and Eleventh Circuit appeals and the difficulties in certifying and trying a complex RICO case. At all times Class Counsel maintained and advocated for the interests of the Class, and as a result, negotiated a

11

settlement that far exceeds the standard class benefits in typical class action cases.

Sworn to under the pains and penalties of perjury this ___ day of January 2005.

Arthur S. Gold, Esq.
Gold & Coulson, P.A.
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 (fax)

12