UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH
(Magistrate Snow)

DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

     Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

     Defendants,

_____/

SALVATORE D. LARUSSO, D.C., d/b/a         CASE NO:  00-7692
FAMILY CHIROPRACTIC CENTER, on
behalf of himself and all others similarly
situated,

     Plaintiffs,

v.

LIBERTY MUTUAL INSURANCE
COMPANY and COMMUNITY CARE
NETWORK, INC., d/b/a CCN,

     Defendants.

_____/

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF THE
PROPOSED SETTLEMENT WITH LIBERTY MUTUAL INSURANCE CO.**

**PRELIMINARY STATEMENT**

Plaintiff, Salvatore D. Larusso, D.C. d/b/a Family Chiropractic Center (hereinafter

1



"Larusso") respectfully submits this memorandum pursuant to Rule 23(e) of the Federal Rules of

Civil Procedure in support of the proposed settlement of this action as against the named

Defendant, Liberty Mutual Insurance Company ("LMIC") for total class relief of over $1,217,500

(the "Settlement").[1]

## I.    HISTORICAL BACKGROUND OF THE LITIGATION[2]

### A.    The Consolidated Class Action Litigation.

The consolidated class action litigation began five years ago on January 13, 2000, with

the filing of Napoli v. Allstate Insurance Company, et al, later amended as Zidel v. Allstate

Insurance Company, et al,.  After filing the first case, Class Counsel filed fourteen additional

cases, all of which were eventually consolidated into the current Consolidate Case.[3]  Each

individual case, including the Larusso case, alleged a similar pattern and practice by the various

insurance defendants of reducing Florida automobile insurance personal injury protection ("PIP")

medical expense claims based on the wrongful application of preferred provider organization

("PPO") discounts.[4]

---

[1] The specific terms of the Settlement have been set forth in the Stipulation and Agreement of Settlement (the "Stipulation") filed with the Court and preliminarily approved on August 20, 2004.  The settlement provides for a $950,000 class fund.  LMIC has also agreed to pay the following monies separate from the class fund: 1) up to $237,500 (or 25% of the settlement fund) in attorneys' fees and reasonable litigation costs and expenses; and, 2) the costs of settlement administration up to $30,000.

[2] The factual and procedural background of the case is described in more detail in the accompanying Declaration of Class Counsel in Support of Final Approval of Class Action Settlement and an Award of Attorney's Fees and Costs ("Class Counsel's Declaration") attached as Exhibit A. A brief summary is set forth herein for the Court's convenience.

[3] The Class Action Complaint on behalf of Larusso was filed by Class Counsel on November 15, 2000 (See, Docket Entry #1).

[4] To Class Counsel's knowledge the Consolidated Cases are the first class action cases in the country to challenge the "silent PPO" discounting of automobile insurance medical expense claims, other

The theories that predominated all the consolidated cases centered around allegations that the discounting practices of the defendant insurers: (1) violated Florida PIP insurance statutory law (specifically Fla. Stat. § 627.736(10)); (2) constituted a violation of the federal Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. (the "RICO Act"); (3) were in direct breach of the specific language of the relevant automobile insurance policies; and, (4) constituted unjust enrichment to the defendant insurers.

Since the plaintiffs and Class Counsel took on the Florida auto insurance industry to stop the industry-wide practice of discounting PIP claims through the wrongful application of PPO discounts, the defendant insurers, and their vendors supplying the discounts, aggressively "circled the wagons" in defense of these class actions.[5] As the Court's Docket Sheet demonstrates, a virtual legal war ensued with a first barrage of multiple motions to dismiss. LMIC filed its motion to dismiss on January 19, 2001 (See Docket Entry #23). Later in that same month, co-Defendant, Community Care Network, Inc. ("CCN") filed its motion for a more definite statement (Docket Entry #28). In April 2001, LMIC also filed a motion to stay discovery by the plaintiff. (Docket Entry #65).

Ultimately, LMIC's motion to dismiss and CCN's defensive motions were denied by the Court. Undeterred, the majority of all of the insurance defendants except Progressive Insurance Company sought to compel arbitration alleging that the insurance policy contained a binding arbitration clause. In the present action, CCN filed its motion to compel arbitration, in which

---

than two similar actions brought in Massachusetts state court by Class Counsel, Phillips & Garcia, LLP.

[5] The defendant insurers have all stopped the practice of applying PPO discounts to PIP medical expense claims.

LMIC joined, arguing that the CCN preferred provider agreement contained an arbitration clause and that LMIC's automobile insurance policy requires claims to be arbitrated. (See Consolidated Docket Entry Nos: 698, 757 and 807). Class Counsel opposed the defendants' efforts to arbitrate the cases.[6] Magistrate Judge Snow recommended denying LMIC's motion to compel arbitration specifically referencing PIP claims made prior to the decision rendered by the Florida Supreme Court in Nationwide Mut. Fire Ins. Co. v. Pinnacle Medical, Inc., 753 So. 2d 55 (Fla. 2000).[7] Both Class Counsel and LMIC objected to the Magistrate's recommendations. On October 28, 2002, this Court in a Supplemental Order denied LMIC's motion to compel arbitration. (Consolidated Docket Entry #881). With none of the cases subject to arbitration, the defendants, including LMIC, then appealed Judge Ferguson's decisions on the arbitration issue to the Eleventh Circuit, where the cases were consolidated on appeal.[8]

While the cases were in the District Court, Class Counsel aggressively sought discovery from all the defendants and other non-party witnesses. Class Counsel propounded written discovery and noticed various depositions of the defendants and other witnesses. Almost all of these discovery efforts were met with motions for protective orders or motions to stay discovery. Class Counsel opposed such motions and countered in some cases by filing motions to compel

---

[6] Class Counsel dismissed CCN as a party defendant without briefing an opposition to CCN's motion *prior to* the recommendation by the Magistrate Judge. (Consolidated Docket Entry #794).

[7] Since the PIP claims asserted by Larusso involved claims made prior to the Pinnacle decision, the Magistrate declined deciding on the issue of potential Class Member claims for claims made after the Pinnacle decision. Class Counsel, however, did challenge the Magistrate's recommendations in other related actions as they applied to "post- Pinnacle" claims and were able to convince Judge Ferguson to not adopt Magistrate Judge Snow's recommendations in those instances.

[8] The Progressive defendants did not appeal. However, the District Court stayed the Progressive cases when the other cases were appealed.

4

discovery which were, in turn, opposed by the defendants. All discovery and litigation in the District Court was eventually stayed when the cases were appealed to the Eleventh Circuit.[9]

Despite the defendants' successful efforts at preventing the plaintiffs from conducting full discovery prior to the appeal, the plaintiffs were able to obtain a wealth of invaluable information by negotiating a settlement with the vendor defendants, ADP Integrated Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street").[10]  Under this agreement, ADP and Beech Street consented to a whole-scale production of documents, data and information relating to the defendant insurers' PPO reduction practices. ADP and Beech Street provided class counsel with thousands of pages of documents detailing the defendant insurers' PPO discounting programs. ADP and Beech Street also conducted a specific search of their respective databases that resulted in a CD ROM containing PPO discount information on a claim-by-claim basis for each insurer per year. The information on the CD ROM provided Class Counsel, in the majority of cases, with the complete class list (names, addresses and tax identification numbers) and the amount of each class member's damages on a claim-by-claim basis – information that would have taken Class Counsel years to obtain in the normal discovery process.

While on appeal, the parties in the majority of the cases agreed to participate in the Eleventh Circuit's mediation program before Joseph Unger. Armed with the ADP and Beech Street data and aided by Mr. Unger, Class Counsel were able to lay the groundwork for a

_____

[9] As of October 28, 2002 when the cases were stayed, the consolidated docket had 882 entries.

[10] ADP, a national claims re-pricing company servicing property and casualty insurers, applied the Beech Street PPO discounts to the class members' medical bills on behalf of the certain defendant insurers via a software program designed to calculate the discount and produce an explanation of benefits form showing the PPO reductions.

settlement model that provided tremendous benefits to the class. The three settled cases currently before the Court were all mediated by Mr. Unger as part of the Eleventh Circuit's mediation program.

### B.     The LMIC Class Action.

Dr. Larusso is a Florida healthcare provider who had entered into a contract with CCN, a PPO. Under the terms of his agreement, Larusso agreed to discount his normal "full-priced" medical charges for medical services rendered to patients who were subscribers of the PPO. Larusso agreed to accept discounted fees for medical services in exchange for anticipated marketing of his services to the PPO's subscribers.

In the course of his practice, however, Larusso also treated patients covered by automobile insurance policies issued by LMIC. LMIC's standard Florida automobile insurance policy provided insureds with PIP coverage that paid for 80% of all reasonable and necessary medical expenses. After Larusso treated patients insured by LMIC, Larusso submitted his bills for payment by LMIC. To process these PIP claims, however, LMIC used the insurance claim processing services of ADP. In the course of processing these claims on behalf of LMIC, ADP improperly applied Larusso's discounted rates to his medical charges. Larusso alleges that LMIC was not entitled to discount its medical fees based on his PPO contract because LMIC had not become a legitimate PPO subscriber and had not complied with Fla. Stat. § 627.736(10).

The instant case is presently on appeal of the District Court's denial of LMIC's motion to dismiss and to compel arbitration. If the proposed Settlement is ultimately approved by this Court, LMIC will no longer actively participate in that appeal and its appeal will be dismissed.

6

## II.   DISCOVERY AND NEGOTIATIONS LEADING TO SETTLEMENT

As detailed in Class Counsel's Declaration, this litigation has been conducted intensively and aggressively over the past four years. The defendants in the consolidated cases, including LMIC, aggressively attempted to stop Class Counsel from conducting any discovery. Notwithstanding Class Counsel's extensive discovery requests, the defendants frustrated their efforts with motions to stay discovery, motions to compel arbitration and eventually with the filing of the Eleventh Circuit appeal.

Despite all discovery being stayed, Class Counsel negotiated a settlement with ADP and Beech Street, (the companies that processed the PPO discounts for many of the defendant insurers), under which ADP and Beech Street produced all documents and data involving the PPO discounting programs they sold and facilitated for the relevant defendant insurers including LMIC. This document and data production provided Class Counsel with all the information about LMIC's PPO discounting practices and most importantly, contained the names, addresses, tax identification numbers and specific claim-by-claim damages for each member of the Class.[11]

Attempts at settlement negotiations with LMIC did not occur until after LMIC's motion to compel arbitration was denied at the District Court level and the case was appealed to the Eleventh Circuit. As part of the Eleventh Circuit's mediation program, counsel for the parties conducted extensive settlement discussions before mediator, Joseph Unger. The negotiations were difficult and protracted. At times, it appeared that no settlement acceptable to the Plaintiff

---

[11] At the eventual mediation of the case, the ADP data gave Class Counsel tremendous leverage because they knew with a reasonable degree of certainty the amount of LMIC's exposure and how a beneficial "settlement model" could be crafted since individual Class Member damages had been identified. The data Class Counsel obtained from ADP and Beech Street proved to be the information relied on by both parties when implementing the Settlement.

would, or could, be achieved.  The negotiations involved an initial day-long session with Mr.

Unger and then follow-up meetings and discussions between counsel for the parties over the

course of approximately nine months.

Ultimately, through continued perseverance and hard work, the current $1.2 million

settlement was reached between the parties.  Based on their extensive knowledge of the strengths

and vulnerabilities of the claims against LMIC and given the uncertainties of an appeal and/or

ultimate trial of the action, Class Counsel believe that the Settlement represents an excellent

result for the Class.  Larusso and Class Counsel heartily recommend that the proposed Settlement

be approved as fair, reasonable, adequate and in the best interests of the Class.

## III.    SUMMARY OF THE SETTLEMENT

### A.    Class Members Receive Their Damage Claims With No Reduction for Costs of Settlement Administration or Counsel Fees.

The Settlement provides for the distribution of a Settlement Fund of up to $950,000 to

Class Members who timely file Proof of Claim forms with an independent Settlement

Administrator paid for by LMIC.[12]  Each Class Member that timely filed a properly completed

Proof of Claim form is entitled to reimbursement of sixty (60%) percent of the difference

between eighty (80%) percent of the amount billed by that Class Member and the amount paid by

LMIC to that Class Member after the application of a PPO reduction during the relevant Class

Period.[13]  If the total claim amounts submitted by Class Members is less than or equal to the

---

[12]  The precise terms of the Settlement are set forth in the Stipulation of Settlement filed with this Court and are also discussed in detail in the Declaration of Class Counsel.

[13]  The proof of claim process was simple and straightforward.  To file a valid proof of claim, Class Members needed only to verify that they obtained "assignment of benefit" forms from LMIC's insureds and then provide basic information identifying their business and the person signing the form.

8

$950,000 Settlement Fund established by LMIC, then each properly submitted Class Member claim will be paid in full (*i.e.* at one hundred (100%) of the maximum claim amount). In the event that total claims submitted by Class Members is greater than the $950,000 Settlement Fund, then all properly filed claims will be paid on a *pro rata* basis to each Class Member. Furthermore, all costs of settlement administration up to $30,000,[14] including the costs of notification to the Class Members, are being borne by LMIC separately and in addition to the Settlement Fund.

The Settlement also provides for a claim dispute resolution process overseen by independent arbitrators should there be any disputes between a Class Member and LMIC as to the amount of a settlement payment or the completeness of any Proof of Claim form. Under the dispute resolution function of the Settlement, the Class Member, Class Counsel and LMIC are permitted to submit written presentations to the arbitrator. In the event that the arbitrator rules in favor of the Class Member, LMIC will be required to reimburse the Class Member for any arbitration fee and the Class Member claim will be perfected and paid by LMIC. To make the arbitration process more accessible to Class Members, Class Counsel negotiated a uniform arbitration fee not to exceed $50.00.

Finally, LMIC has agreed to pay, in addition to and outside the Settlement Fund, any Class Counsel fees and reasonable costs and litigation expenses awarded by the Court up to $237,500 (equaling twenty-five percent (25%) of the Settlement Fund).

---

*Class members did not have to provide any documentation, such as bills or explanation of benefit forms, to perfect a proof of claim.*

[14] LMIC has retained Wachovia Information Consulting Group, a subsidiary of Wachovia Bank, of Jacksonville, Florida, to serve as the independent settlement administrator.

B.    **Notice Far Exceeded Due Process Standards.**

As to notice of the Settlement, potential Class Members were identified (name, address, and tax identification number) by the data obtained from LMIC's vendors, ADP and Beech Street. Based on this list, each Class Member was sent a Notice and claim form by direct mail describing the terms of the Settlement. In an attempt to reach as many Class Members as possible, the Settlement also provided that the Settlement Administrator take reasonable steps to locate any Class Members whose Notices were returned as "undeliverable." The Settlement Administrator "skip-traced" insufficient addresses and searched two online Florida state databases (the Florida Secretary of State website and the Florida Department of Health website)[15] in an effort to obtain valid addresses for all Class Members. The individual Notices that were approved by the Court at the Hearing on Preliminary Approval, thoroughly described the terms of the proposed Settlement, apprised Class Members of their rights with respect to the Settlement, and informed them of the Court's schedule for consideration of the Settlement.

## IV.    **THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED**

A.    **Due Notice Of The Settlement Has Been Appropriately Given.**

The form of Notice utilized in this case was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). The Notice, which was preliminarily approved by this Court, provided detailed information concerning the rights of Class Members, including the manner in which

---

[15] The relevant internet addresses were: www.sunbiz.org and  www.doh.state.fl.us.

objections could be lodged; the nature, history and progress of the Litigation; the proposed

Settlement terms; the process for filing Proofs of Claim; the fees and expenses to be sought by

Class counsel; the necessary information for any Class Member to examine the Court records

should he or she desire to; and the time and procedure for exclusion from the Settlement or to

object to the Settlement or Class Counsel's fee application.

All potential Class Members were identified using a list of medical care providers whose

claims had been reduced by ADP during the relevant class period. Notices were then prepared by

an independent settlement administrator, Wachovia Information Consulting Group

("Wachovia"), which is being paid for by LMIC.[16] Wachovia then mailed, postage pre-paid, to

all Class Members identified on the Class Member list, a copy of the Notice approved by this

Court.

Over the course of the claims period, Wachovia made efforts to ensure that as many

Notices were received by Class Members as possible. For example, during the claims period,

when Wachovia received Notices returned with current forwarding addresses provided by the

U.S. Postal Service, it re-mailed the Notices to those new addresses. Further, as required under

the terms of the Settlement, Wachovia also made efforts to identify and locate any Class

Members in the case of any Notices being returned as "undeliverable" without valid forwarding

addresses on file through the use of a "skip tracing" service using available federal identification

numbers for "missing" Class Members and conducting online database searches. Thus, the

method of notice was the most reasonable method under the circumstances to apprise all

_____

[16] Under the terms of the Settlement Agreement, LMIC will pay up to $30,000 of administration costs. Any excess will be paid for from the Settlement Fund.

11

potentially interested parties of the pending Settlement and amply satisfied the requirements of

due process. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974).

**B.    The Standards For Judicial Approval Of Settlements Under Rule 23(e).**

There is an overriding public interest in favor of class action settlements which have the

well-deserved reputation as being most complex.[17] Ass'n for Disabled Americans, Inc. v. Amoco

Oil Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002) (citing Cotton v. Hinton, 559 F.2d 1326, 1331 (5th

Cir. 1977)); Warren v. City of Tampa, 693 F.Supp. 1051, 1054 (M.D. Fla. 1998), aff'd, 893 F.2d

347 (11th Cir. 1989). Accordingly, a class action settlement should be approved so long as it is

"fair, adequate and reasonable and is not the product of collusion between the parties." Bennett

v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984); Cotton v. Hinton, 559 F.2d at 1330;

Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 537 (S.D. Fla. 1988).

When determining whether a settlement is fair, adequate and reasonable, a court should

consider all relevant factors, including (1) an assessment of the likelihood of success at trial; (2)

the range of possible recovery at such trial; (3) the consideration provided to class members

under the Settlement, in comparison to the range of possible recovery discounted by the inherent

risks of litigation; (4) the complexity, expense and duration of the litigation in the absence of the

settlement; (5) the substance and amount of opposition to the settlement; and (6) the state of

proceedings at which the settlement was achieved. Bennett v. Behring Corp., 737 F.2d at 986;

_____

[17] The Eleventh Circuit has noted that "public policy strongly favors the pretrial settlement of class action lawsuits." In re U.S. Oil & Gas Litig., 967 F. 2d 489, 493 (11th Cir. 1992). In that action, the court noted that "complex litigation like the instant [class action] case can occupy the court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules . . . authorize District Courts to facilitate settlements..." Id.

12

Cotton v. Hinton, 559 F.2d at 1330-31; see also Behrens v. Wometco Enter., Inc., 118 F.R.D.

534, 538-39 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990); ADA v. Aetna, Inc. (In re

Managed Care Litig.), 2004 U.S. Dist. LEXIS 14294, *3-4 (S.D. Fla. 2004).[18]

The application of the Bennett factors is left to the sound discretion of the trial judge and

appellate review of the Court's decision is based on an abuse of discretion standard. In re U.S.

Oil & Gas Litig., 967 F.2d at 493; In re Broiler Chicken Antitrust Litig., 669 F.2d 228, 238 (5th

Cir. 1982). Great weight is accorded a trial judge's views in evaluating a class action settlement.

City of Detroit v. Grinnell Corp., 453 F.2d 448, 454 (2d Cir. 1974) (quoting Ace Heating &

Plumbing Co. V. Crane Co., 453 F.2d 30, 34 (3d Cir. 1971)). In making its determination, the

trial court is also entitled to rely on the judgment of experienced counsel for the parties. In re

Smith, 926 F.2d 1027, 1028 (11th Cir. 1991); Cotton v. Hinton, 559 F.2d at 1330.

In evaluating these considerations, a court must not try the case on the merits. Cotton v.

Hinton, 559 F.2d at 1330; Diaz v. Hillsborough County Hosp. Auth., 2000 U.S. Dist. LEXIS

14061, *6 (M.D. Fla. 2000). Instead, the court should rely on the judgment of experienced

counsel and, absent fraud, "should be hesitant to substitute its own judgment for that of counsel."

Ass'n for Disabled Americans v. Amoco Oil, 211 F.R.D. at 467 (quoting Cotton v. Hinton, 559

F.2d at 1330); see also In re Sunbeam Sec. Litig., 176 F.Supp.2d 1323, 1329 (S.D. Fla. 2001).

Rather than justifying each settlement term against a hypothetical or speculative measure of what

concessions might have been gained, a court should focus on the negotiation process to ensure

that the settlement was achieved through arms-length negotiations by counsel and was not the

---

[18] Other factors relevant to a court's inquiry are the terms of the settlement, the procedure afforded to notify Class members of the proposed settlement, and the judgment of counsel. Cotton v. Hinton, 559 F.2d at 1330; Warren v. City of Tampa, 693 F.Supp. At 1055.

product of collusion between the parties. See <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at

538-39. Ultimately, in evaluating a settlement's fairness, the court should remember that

compromise is the essence of a settlement and that "inherent in compromise is a yielding of

absolutes and an abandoning of highest hopes." <u>Cotton v. Hinton</u>, 559 F.2d at 1330.

The application of these standards in the present case, warrants the approval of the

Settlement as fair, reasonable and adequate. Class Counsel and LMIC have had substantial

opportunity to weigh the strengths and weaknesses of the parties' respective positions in the

event this action were to proceed to appeal and/or trial, and to reach an informed compromise

based on their respective analyses.

1.    **<u>The Likelihood Of Success At Trial And Potential Recovery</u>**.

When considering the likelihood of success at trial and any potential recovery, a court can

limit its inquiry to determining "whether the possible rewards of continued litigation with its

risks and costs are outweighed by the benefits of the settlement." <u>Ressler v. Jacobson</u>, 822 F.

Supp. 1551, 1553 (M.D. Fla. 1992); see also <u>Elkins v. Equitable Life Ins. Co.</u>, 1998 U.S. Dist.

LEXIS 1557, * 76 (M.D. Fla. 1998); <u>Mashburn v. National Healthcare, Inc.</u>, 684 F. Supp. 660,

670 (M.D. Ala. 1988) (in the class action settlement context, courts do not decide the merits of

the case or resolve unsettled legal questions). This inquiry is premised on "balancing the

probabilities, not assuring that the plaintiff class receives every benefit that might have been won

after a full trial." <u>In re Chicken Antitrust Litig.</u>, 560 F. Supp. 957, 960 (N.D. Ga. 1980). The

expense of achieving a more favorable result for the class at trial must be considered. <u>Ressler v.

Jacobson</u>, 822 F. Supp. at 1555; see also, <u>Young v. Katz</u>, 447 F.2d 431, 433 (5th Cir. 1971).

While the Settlement represents an extremely favorable result under any measure, it must

14

be considered in light of the significant risks faced by the Class with continued litigation. Class Counsel believe that they have a "strong case" to be made against LMIC. The potential for a substantial recovery at trial (assuming that Larusso could get past the hurdle of LMIC's appeal), however, was tempered by Class Counsel's analysis of certain major factors that favor the settlement of this action on the proposed terms. These factors include (1) the uncertain outcome of pending appeals to the Florida Supreme Court concerning the interpretation of Florida Statute section 627.736(10); (2) the uncertain outcome of a pending appeal to the 11th Circuit Court of Appeals concerning LMIC's motion to dismiss and to compel arbitration; and (3) the inherent difficulties in proving the elements of a RICO action against LMIC in a full trial on the merits.

**a.    Two Florida District Courts of Appeal Have Conflicting Rulings Relating To The Application Of Section 627.736(10) In The Context Of Auto Insurance Companies Paying PIP Claims At PPO Discounted Rates Where No PPO Insurance Policy Has Been First Offered to Insureds.**

Class Counsel believes that one of the most important considerations concerning the likelihood of success at trial concerns LMIC's defenses under Florida's PIP statute, Section 627.736(10). There is currently a split between two Florida appellate districts, the Second and Fifth Districts, on whether an auto insurer may pay health care providers at reduced PPO contract rates without first offering a preferred provider PIP policy of insurance.[19] In <u>Nationwide Mut. Fire Ins. Co. v. Central Florida Physiatrists, P.A.</u>, 851 So.2d 762 (Fla. 5th DCA 2003), the appellant, Nationwide, an insurance company providing Florida auto insurance policies, paid Central Florida Physiatrists ("CFP") at reduced rates based on CFP's participation in the Beech

---

[19] The Settlement was reached with GMAC after the Fifth District Court of Appeals decision but before the Second District Court of Appeals decision which created the split.

Street PPO. Nationwide did not, however, contract directly with CFP as a "preferred provider" and offer a preferred provider PIP insurance policy to its insureds as required under the specific language of Section 627.736(10).[20] In affirming the trial court's grant of CFP's summary judgment motion, the Fifth District Court of Appeals reasoned that the clear and precise language of Section 627.736(10) demonstrates the Legislature's intent that the availability of PPO benefits under a PIP auto insurance policy is subject to strict compliance with the terms of subsection (10). According to the Fifth District, Nationwide was required to first comply with the provisions of subsection (10) in order to take advantage of paying reduced PPO rates for payment of PIP claims. Id., 851 So. 2d at 766. Nationwide's failure to do so, thus required it to pay the statutorily mandated 80% of the reasonable and necessary medical expenses incurred by its insured. Id.

 In stark contrast to the Fifth District's decision, the Second District held that subsection (10) does not prohibit insurers that have not issued PPO auto policies from paying health care providers at discounted PPO rates. See Nationwide Mut. Ins. Co. V. Dennis M. Jewell, D.C., P.A., 862 So.2d 79 (Fla. 2d DCA 2003). The appellees[21] in Jewell were preferred health care

---

[20] Section 627.736(10) provides that "An insurer may negotiate and enter into contracts with licensed health care providers for the [PIP] benefits described in this section, referred to in this section as "preferred providers,"... The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met...If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits." §627.736(1)(a)(10) Fla. Stat. (1999).

[21] There are three appellees in Jewell; Dennis M. Jewell, D.C., P.A., George G. Hudson, D.C., P.A and Jeff Davis, D.C., P.A. The appellees all brought separate actions in lower trial courts. Jewell and Hudson's individual cases were consolidated for consideration in the Sarasota County Court. The Davis action was heard in Hillsborough County Court. The actions were consolidated for hearing in the Court of Appeals for the Second District. Nationwide v. Jewell, 862 So.2d at 81.

providers in the Beech Street and CCN PPOs and treated patients entitled to PIP benefits under auto insurance policies issued by Nationwide.[22] Id. at 81. Instead of paying the providers at the 80% statutorily mandated PIP rate, Nationwide paid them at the lower PPO network rate though admittedly not having direct contracts with the providers and not having first issued preferred provider auto insurance policies under section 627.736 (10). Id. at 81-82. Both lower trial courts in the actions ruled that Nationwide was not entitled to pay the providers at the discounted PPO rates finding that Nationwide had violated the clear language of section 627.736(10). Id.

In reversing the trial courts' judgments in favor of the providers, the Second District held that neither the clear language of section 627.736(10), nor the PIP insurance policies issued by Nationwide prohibited the payment of PPO discounted rates. Id. at 83. Rejecting the providers' statutory arguments, the Second District reasoned that section 627.736(10) is permissive in nature and does not specifically limit insurers to direct contracts between PIP insurers and providers. Id. at 84. Relying on the phrases contained in the statute - "may negotiate and enter into contracts," and "may provide an option to an insured," the Court determined that "such permissive provisions should not be read to impose an implied prohibition." Id at 85.

Both cases have been appealed to the state Supreme Court and the question is currently pending. In light of this current conflict, the outcome of the present action remains uncertain should the Class proceed to litigate the action. It is entirely conceivable that the Florida Supreme Court could decide the section 627.736(10) issue in favor of the Second District decision prior to, or even during, the trial of the current case, which would effectively "hamstring" Larusso's entire

---

[22] Jewell and Hudson brought their individual actions against Nationwide Mutual Insurance Company. Davis brought his action against Nationwide Mutual Fire Insurance Company. Both Appellants will be referred to collectively as "Nationwide."

action. Given that the proposed Settlement now removes that uncertainty while offering to reimburse the Class Members up to 60% of the difference between 80% of the amount billed by each Class Member and the amount paid by LMIC, it is clear that potential litigation risks outweigh the rewards of the Settlement.[23]

**b.    LMIC's Appeal Of The Denial Of Its Motion To Compel Arbitration Casts A Shadow Of Uncertainty As To The Plaintiff's Likelihood Of Success.**

One of Larusso's underlying causes of action against LMIC is based on its status as an assignee of the PIP insurance contract of one of its patients. In its motions to compel arbitration, LMIC asserted that Larusso's claims should be arbitrated because: 1) his provider agreement with the PPO contained an arbitration clause; and 2) the LMIC auto insurance policy issued by LMIC to Larusso's patient contained an arbitration clause.

With respect to LMIC's first argument, the Court adopted the Magistrate's decision finding the matter moot since CCN had been dismissed prior to its decision. With regard to the second argument, Class Counsel relied on Nationwide Mut. Fire Ins. Co. v. Pinnacle Medical, Inc., 753 So. 2d 55 (Fla. 2000) under which the Florida Supreme Court held that a mandatory arbitration requirement under Florida's PIP statute[24] was unconstitutional since it denied medical provider assignees access to the courts in violation of Article I, Section 21 of the Florida

---

[23] The Court may note that individual Class Member payments in the present action are less than individual Class Member payments in the related case of Ultra Open MRI Center, Inc. v. Integon Nat'l Ins. Co., et al., (the "GMAC" action) which final settlement is also before the Court for consideration. Importantly, the proposed settlement in the GMAC action was reached *prior to* the Second District's decision in Jewell, while the settlement in the LMIC action was reached *after* the Jewell ruling. The split in the Florida Districts was weighed heavily by Class Counsel in analyzing the proposed settlements and did ultimately affect the parameters of the settlements.

[24] Fla. Stat. §627.736(5).

Constitution.[25]

LMIC's appeal is currently pending and the outcome remains an uncertainty that Class

Counsel has taken into consideration while crafting the present proposed Settlement.

### 2.    The Range Of Possible Recovery And The Consideration Under The Settlement In Relation To That Range.

In <u>Behrens</u>, the Court combined the second and third factors of the <u>Bennett</u> test to

determine the appropriateness of the settlement. <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at

541. The factors considered are the range of possible recovery and the point within, or below,

the range of possible recovery at which a settlement is fair, adequate and reasonable.

Discounting multiple damages under RICO, the range of possible recovery under applicable law

would be from zero to 100% of the discounted amount with interest and an award of attorney's

fees and costs. Under the proposed Settlement, if the Claim Fund is not exhausted, all claimants

will receive 60% of the difference between 80% of the amount billed and the amount paid by

LMIC after applying the PPO reduction.   Additionally, LMIC will pay Class Counsel fees and

reasonable litigation costs and expenses, as well as, costs of settlement administration up to

$30,000.00 *separate* from the Claim Fund.  The benefits provided by the Settlement are

extremely close to the highest end of potential relief had the case been tried successfully by Class

Counsel.

Moreover, based on the present state of the PIP statutory scheme in Florida, the terms of

the Settlement actually provide Class Members with *significantly better* relief than they

---

[25] According to the Court, medical providers lost their access to the courts because their rights to appeal were severely limited under the Florida Arbitration Code while they did not receive a commensurate benefit from the statute. <u>Pinnacle</u>, 753 So. 2d at 58.

otherwise might expect should the settlement not be approved. Since the inception of this litigation in 2000, the Florida Legislature has amended the PIP statute by adding a complicated pre-suit demand procedure. Under the new statute, prior to filing a lawsuit a medical provider must send a demand letter to the insurer detailing: 1) the name of the insured upon which such benefits are being sought, including a copy of the assignment giving rights to the claimant if the claimant is not the insured; 2) the claim number or policy number upon which such claim was originally submitted to the insurer; 3) to the extent applicable, the name of any medical provider who rendered to an insured the treatment, services, accommodations, or supplies that form the basis of such claim; and 4) an itemized statement specifying each exact amount, the date of treatment, service, or accommodation, and the type of benefit claimed to be due. Fla. Stat. § 627.736(11).

Class Members who have not yet filed suit for illegal PPO discounts would have to first satisfy the pre-suit demand requirements of the new statute. The statute's evidentiary demand requirements are far more onerous than the proof of claim process negotiated by Class Counsel. Class Members need not provide any documentation or detailed claim information to participate in the Settlement, whereas under the new statute they are required to conduct a file-by- file review and provide documentary evidence just to meet the pre-suit demand requirements.

### 3.  **The Complexity, Expense And Likely Duration Of The Litigation.**

Class Counsel believe that the claims asserted in this action have considerable merit. However, its inherent complexities combined with the uncertainties those complexities engender, are characteristic of RICO litigation and consolidated cases of this nature. The docket sheet tells the story best as there are over 880 entries prior to the defendants filing their appeals and the

parties still have "a long way to go" in the litigation process. Those uncertainties militate strongly in favor of approving the Settlement.

The likely duration and associated expenses of continued litigation likewise favor approval of the Settlement. See Warren v. City of Tampa, 693 F.Supp. At 1059 ("The parties estimate that trial of this case would take three weeks of Court time, and would cost hundreds of thousands of dollars in attorneys' fees, expert witnesses fees and costs. These factors militate in favor of a decision to accept the proposed settlement."). In the present case, Class Counsel estimates that a trial of this action (assuming first that LMIC fails on its Eleventh Circuit appeal) could take approximately two weeks and could cost the Class hundreds of thousands of dollars in attorneys' fees, expert fees and litigation costs. Moreover, given that LMIC has already filed one appeal in this action, it is very likely that it would appeal class certification and any trial judgment in favor of the Plaintiff. The Class would be further subject to the many years of delay and additional costs associated with those appeals.

Here there is a great deal at stake for the parties and, but for the proposed Settlement, the case would continue to be strongly litigated by Larusso and LMIC. As a result of the Settlement, the dispute between them will come to an end with the Class receiving a substantial recovery and there will also be substantial savings in Court resources by avoiding a lengthy trial of this case. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources. Behrens v. Wometco Enter., Inc., 118 F.R.D. at 538.

### 4.    The Substance And Amount Of Opposition To The Settlement

Even when a court becomes aware of one or more objecting parties, the court is not "required to open to question and debate every provision of the proposed compromise. The

growing rule is that the trial courts may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." Cotton v. Hinton, 559 F.2d at 1331.

In the present case, the deadline for filing objections to the Settlement was November 22, 2004. Only a single objection has been filed by a Class Member the basis of which is a complaint by counsel for the Class Member that he (counsel) did not receive notice of the class action despite the fact that he had received a copy of the notice to stay his client's individual PIP action in the state court. Clearly, the reaction of the Class to the Settlement is favorable and positive. Courts have looked at the absence of meaningful objections to a proposed settlement as further support for the approval of the settlement. See Bennett v. Behring, Corp., 737 F.2d at 988.

### 5.    The Stage Of Proceedings At Which The Settlement Was Achieved

The purpose of considering the stage of the proceedings and the discovery taken is to ensure that the plaintiff has had access to sufficient information to evaluate the case and to determine the adequacy of the proposed settlement. Behrens v. Wometco Enter., Inc., 118 F.R.D. at 544. As discussed in greater detail in Class Counsel's Declaration, the Settlement was achieved after four years of intense litigation involving extensive motion practice and investigation.

The Plaintiff and Class Counsel were very aware of the merits of their case based on their pre-suit investigation and the status of state case law on the issue of applying PPO discounts to automobile medical expense claims. Additionally, despite the District Court's stay of discovery, Class Counsel was able to obtain extensive discovery from ADP and Beech Street consisting of relevant documents, data and information about LMIC's practices, without involvement by

22

LMIC.  Absent this settlement with ADP and Beech Street, Class Counsel estimates that it would have taken years of post-appellate discovery to obtain the same information.  Knowledge of the law, coupled with the discovery obtained from ADP and Beech Street, allowed Class Counsel to accurately assess its case for class-wide settlement negotiations.

**6.      The Settlement Is The Result Of "Arms-Length" Negotiations Among Competent And Experienced Counsel.**

In considering the fairness of a proposed settlement, the Court is entitled to rely heavily on the opinion of competent counsel.  Behrens v. Wometco Enter., Inc., 118 F.R.D. at 544.  This is especially apt where, as here, the extensive amount of independent investigation, legal research, briefing and discovery indicates that counsel are fully capable of evaluating the merits of the plaintiff's case and the probable course of future litigation.  See Cotton v. Hinton, 559 F.2d at 1330.

In analyzing a proposed settlement and the opinion of counsel, it is also appropriate for the Court to examine the negotiating process that took place between the parties to confirm that there was no collusion in reaching the Settlement.  Behrens v. Wometco Enter., Inc., 118 F.R.D. at 538.  In the present case, the Settlement was achieved only after years of hard-fought and contentious litigation that resulted in an appeal of the Consolidated Action to the Eleventh Circuit.  Ultimately, the settlement negotiations were overseen by an independent mediator of the Eleventh Circuit -- clear evidence that the negotiations were conducted at "arms length."  After a full day mediation session with Mr. Unger in February of 2004, the parties continued to negotiate details of the settlement for another nine months.  Through the efforts of Mr. Unger, Class Counsel and Defense Counsel were eventually able to fashion a Settlement that is not only fair

and reasonable, but is a truly extraordinary and excellent result for the Class.

## CONCLUSION

For the foregoing reasons, Plaintiff and Class Counsel submit that the proposed

Settlement is fair, reasonable and adequate and should be approved in its entirety, and

respectfully request that the Court approve the Settlement.

<div style="margin-left: 50%;">

Respectfully submitted,
Co-Lead Counsel for the Plaintiff:
**LEE & AMTZIS, P.L.**
5550 Glades Road, Suite 401
Boca Raton, FL 33431
Telephone: (561) 981-9988
Facsimile: (561) 981-9980


By: _____
        ERIC LEE, Florida Bar No. 961299

</div>

Co-Lead Counsel for the Plaintiff:                Co-Lead Counsel for the Plaintiff:
**KOPELMAN & BLANKMAN, P.A.**                     **GOLD & COULSON**
350 East Las Olas Blvd., Suite 980               11 S. LaSalle Street, Suite 2500
Fort Lauderdale, FL 33301                        Chicago, IL 60603
Telephone: (954) 462-6855                        Telephone: (312) 372-0777
Facsimile: (954) 462-6899                        Facsimile: (312) 372-0778


Co-Lead Counsel for the Plaintiff:
**PHILLIPS & GARCIA, LLP**
13 Ventura Drive
N. Dartmouth, MA 02740
Telephone: (508) 998-0800
Facsimile: (508) 998-0919

24

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing was sent by U.S. Mail, postage pre-paid, to the counsel listed below on the Master Service List, this 3rd day of January, 2005.

Douglas Blankman, Co-Lead Counsel for Plaintiffs

## MASTER SERVICE LIST
### (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)

**Co-Lead Counsel for Plaintiffs**

Eric Lee, Esq.
LEE & AMTZIS, P.L.
350 N.W. 12 Avenue
Deerfield Beach, FL 33442
561-981-9988
561-998-3021 (fax)
elee@leeamlaw.com

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphilips@gpandg.com
Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 1611
Fort Lauderdale, FL 33394
(954) 462-6855

**Counsel for Allstate, Fidelity & Casualty, Continental, Deerbrook**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
PO Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 Facsimile

**Counsel for Beech Street and ADP**

TEW, CARDENAS, et al.
John M. Quaranta, Esq
(305)536-2495
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1116 Facsimile

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

**Counsel for CCN**

KENNEY NACHWALTER
SEYMOUR ARNOLD CRITCHLOW
& SPECTOR, P.A.
Richard H. Critchlow, Esq
Robert D.W. Landon, III, Esq
rlando@knsaca.com
201 South Biscayne Blvd., Ste 1100
Miami, FL 33131
(305) 373-1000

(305) 372-1861 Facsimile

**Counsel for Nationwide**

FOWLER, WHITE, et al.
Katherine C. Lake, Esq.
klake@fowlerwhite.com
PO Box 1438
Tampa, FL 33131
(813) 228-7411
(813) 229-8313 Facsimile

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esq.
haggerty@scdlaw.com
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316
(215) 299-4314
(215) 299-4301 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Robert K. Levenson, Esq.
rlevenson@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 Facsimile

**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT et al.
Nina K. Brown
nbrown@akerman.com
One Southeast Third Ave, 28th Flr
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile


**Counsel for Hartford, Metropolitan, Integon**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Prudential**

BUTLER BURNETTE PAPPAS
Kathy J. Maus, Esq
kmaus@bbplaw.com
Lauren D. Levy, Esq.
llevy@bbplaw.com
3600 Maclay Blvd. Suite 101
Tallahassee, FL 32312
(850) 894-4111
(850) 894-4999 Facsimile

SHEA & GARDNER
John D. Adlock, Esq.
jadlock@sheagardner.com
Michael Isenman, Esq.
misenman@sheagardner.com
1800 Massachusetts Ave, N.W.
Washington, D.C. 20036

(202) 828-2000

**Counsel for Metropolitan**

SONNENSCHEIN, NATH & ROSENTHAL
Jeffrey P. Lennard, Esq.
jpl@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000
**Counsel for Superior**

BUTLER BURNETTE PAPPAS
Alan J. Nisberg, Esq.
anisber@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway, Ste 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for American International**

CONROY, SIMBERG, GANON, KREVANS
& ABEL, P.A.
Dale L. Friedman, Esq.
dfriefman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Blvd, 2d Floor
Hollywood, FL 33021
(954) 961-1400

27

(954) 967-8577 Facsimile

# EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH
(Magistrate Snow)

DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

      Plaintiffs,

vs.

ALLSTATE INSURANCE COMPANY
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

      Defendants,
_____/

SALVATORE D. LARUSSO, D.C., d/b/a          CASE NO: 00-7692
FAMILY CHIROPRACTIC CENTER, on
behalf of himself and all others similarly
situated,

      Plaintiffs,

v.

LIBERTY MUTUAL INSURANCE
COMPANY and COMMUNITY CARE
NETWORK, INC., d/b/a CCN,

      Defendants.
_____/

## DECLARATION OF CLASS COUNSEL IN SUPPORT
## OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT
## <u>AND AN AWARD OF ATTORNEY'S FEES AND COSTS</u>

1.     My name is Arthur S. Gold and I am a partner in the law firm of Gold & Coulson, P.A of

1

Chicago, IL.  I am one of the lead Class Counsel in the fifteen consolidated class action cases (Zidel v. Allstate Insurance Company, et al, Consolidated C.A. No. 00-6061) pending in this Court, one of which is the class action LaRusso. v. Liberty Mutual Insurance Company, et al, C.A. No. 00-7692 (hereinafter "Liberty Mutual").  I am submitting this declaration in support of final approval of the Liberty Mutual class action settlement and Plaintiff's Memorandum in Support of Class Counsel's Application for An Award of Attorney's Fees and Reimbursement of Expenses.

2.     I have been plaintiff's counsel in the Liberty Mutual case and all the consolidated cases since the first class action case was filed against Allstate Insurance Company approximately five years ago on January 12, 2000.  Although the Liberty Mutual case is before the Court for final approval of the class settlement, the historical background of the litigation in the consolidated cases is necessary to understand the tremendous effort of Class Counsel in prosecuting and managing the consolidated litigation which contributed substantially to the settlement of the Liberty Mutual case.

**Pre-Suit Investigation**

3.     Prior to filing any of the consolidated cases, Class Counsel conducted an intensive and thorough investigation of what they believed to be an industry-wide practice of Florida automobile insurers reducing medical expense claims based on managed care preferred provider organization ("PPO") discounts.  A practice Class Counsel has characterized throughout this litigation as a "silent PPO."

4.     The investigation had three facets: 1) obtaining and reviewing any state and national decisions on the PPO issue; 2) obtaining discovery documentation and deposition and

2

hearing testimony from Florida state cases, some of which Florida Class Counsel, Kopelman & Blankman and Eric Lee, Esq. were directly involved in; and 3) acquiring documentation such as PPO contracts and explanation of benefit forms from as many sources as possible throughout the state of Florida.

5.    Also, prior to the filing of these consolidated cases, Class Counsel Eric Lee, Esq. and Larry Kopleman, Esq., had filed a state court class action seeking reimbursement for insureds whose medical providers balanced billed them after the insurer's application of PPO discounts to their medical expense claims. Information from the state court class action also served as part of the wealth of information reviewed by Class Counsel prior to filing the consolidated cases. Finally, documents and deposition transcripts from similar class actions in Massachusetts state court were accumulated and reviewed as the Massachusetts cases involved some of the same PPOs, PPO contracts and claim re-pricing companies working with the automobile insurers in Florida.

6.    Also as part of our investigation, Class Counsel met with their clients and their clients' billing personnel to gain information "on the ground" about how the PPOs, insurers and claims facilitators, such as ADP, were processing medical expense claims on a day-to-day basis.

7.    The majority of the documents obtained in Class Counsel's investigation, as well as documents gained after the litigation was filed, were organized into an electronic document depository which Class Counsel could access online from their offices for the purposes of prosecuting the litigation.

8.    Class Counsel's research at the time revealed that no similar federal or state class actions

challenging a "silent PPO" discounting scheme on automobile medical expense claims had been filed anywhere in the country with the exception of two cases brought in Massachusetts by Class Counsel team member Phillips & Garcia, LLP. The filing of the Florida federal court class actions based on the emerging "silent PPO" discounting practice in the automobile industry was both novel in theory and scope.

9.    After this extensive pre-suit investigation of what amounted to the PPO discounting practices of the entire Florida automobile insurance industry, Class Counsel spent an enormous amount of time researching viable state and federal court causes of action before filing the first case. After completing their research and cognizant of the inherent difficulties of a federal court civil RICO case, Class Counsel spent a great deal of time on the drafting and re-drafting of the model class action complaint which was used as the backbone for all of the complaints filed in these consolidated cases. This time and effort proved valuable as the plaintiffs' RICO claims survived the defendants' motions to dismiss.

**The Allstate Filing and the Consolidated Litigation**

10.    On January 12, 2000, Class Counsel filed the first class action case against Allstate. From the start, the case was aggressively defended with defendants Allstate and Medview Services, Inc. moving to dismiss.

11.    After the Allstate filing, Class Counsel filed the following cases:

    a.    Brickell, et al v. Progressive Express Ins. Co., et al, C.A. No. 00-6649 (filed 5/12/00);

    b.    Browner v. Allstate Indemnity Company, et al, C.A. No. 00-7163 (filed 8/16/00);

    c.    LaRusso, et al v. Liberty Mutual Ins. Co., C.A. No. 00-7692 (filed 11/15/00);

<div align="center">4</div>

d.  _Larusso, et al v. Nationwide Ins. Co.,_ C.A. No. 01-8108 (filed 2/7/01);

e.  _Larusso, et al v. Florida Farm Bureau Casualty Ins. Co.,_ C.A. No. 01-8110 (filed 2/7/01);

f.  _Larusso ITT Hartford Life & Annuity Ins. Co.,_ C.A. No. 01-8111 (filed 2/7/01);

g.  _Ultra Open MRI Corp., et al v. Progressive American Ins. Co.,_ C.A. No. 01-6776 (filed 5/8/01);

h.  _Ultra Open MRI Corp., et al v. Deerbrook Ins. Co.,_ C.A. No. .01-6777 (filed 5/8/01);

i.  _Ultra Open MRI Corp., et al v. Prudential Property & Casualty Ins. Co.,_ C.A. No. 01-6778 (filed 5/8/01);

j.  _Ultra Open Mri Corporation, et al v. Fidelity & Casualty Co. of New York, et al,_ C.A. No. 01-6779 (filed 5/8/01);

k.  _Ultra Open MRI Corp. v. Integon National Ins. Co., et al,_ C.A. No. 01-6780 (filed 5/8/01);

l.  _The Chiropractic Centre, Inc., et al v. Superior Ins. Co.,_ C.A. No. 01-6782 (filed 5/8/01);

m.  _The Chiropractic Centre, Inc., et al v. Metropolitan Ins. Co.,_ C.A. No. 01-6783 (filed 5/8/01);

n.  _Mote Wellness & Rehab., Inc., et al v. American International Ins. Co., et al,_ C.A. No. 01-8549 (filed 6/14/01).

10.  The cases were consolidated by Judge Ferguson. Each filed case was aggressively defended. As evidenced by the individual and consolidated case dockets, prior to the ultimate appeal of the cases, the defendants filed scores of different motions to dismiss and/or to compel arbitration.

11.    Class Counsel opposed all of the defendants' motions to dismiss and to compel
arbitration and, with the exception of the dismissal of their Lanham Act counts, the
plaintiffs prevailed on each and every motion. In the two circumstances where Magistrate
Judge Snow partially ruled against the plaintiffs on the issue of arbitration presented in
the Liberty Mutual and Prudential cases, Class Counsel challenged the Magistrate Judge's
recommendation and was able to convince the District Court not to adopt the
recommendation. All motions to dismiss and compel were successfully defeated. It
almost goes without saying that it took Class Counsel a tremendous amount of time and
effort to defeat the defendants' initial attempts to dismiss these consolidated cases.

12.    While opposing the defendants' attempts to dismiss the cases, Class Counsel also went on
the offensive by propounding discovery to the defendants and subpoenaing non-party
witnesses. Class Counsel served separate requests for production, interrogatories and
admissions on all the defendants. Class Counsel also noticed over 40 depositions of
various defendants and sent document and deposition subpoenas to many non-party
witnesses.

13.    The vast majority of the Class Counsel's discovery requests were opposed by the
defendants. The defendants either objected to the discovery in its entirety or filed
motions for protective orders seeking to limit or stop the Class Counsel from taking
discovery. Class Counsel opposed the defendants' motions and in some circumstances
filed motions to compel and for sanctions due to the defendants' failures to respond to
discovery. Despite these efforts, the defendants were for the most part successful in
preventing Class Counsel from conducting discovery as the District Court eventually

6

stayed the cases.

14.    After not being able to obtain discovery from the defendants through the normal

discovery process, Class Counsel entered into settlement discussions with defendants,

ADP Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street"), in

an effort to discover information about the defendants' polices and practices. In the

majority of the consolidated cases, Beech Street was the PPO whose discounts were

applied to automobile insurance medical expense claims by ADP. ADP's business was to

analyze and re-price claims for property and casualty insurers with its software programs.

15.    Class Counsel were able to negotiate a settlement with ADP and Beech Street whereby

they would produce any and all documents pertaining to the PPO discounting policies and

practices of the relevant defendant insurers. Accordingly, ADP and Beech Street

produced numerous boxes of documents to Class Counsel.

16.    As part of the settlement, Class Counsel also propounded specific data requests to ADP

whereby ADP produced data on CD ROM which listed class members by name, address,

tax identification number and also included specific claim by claim information per

insurer by year. Finally, pursuant to the settlement, ADP and Beech Street agreed to a

continuing obligation to provide additional documents and information as the litigation

proceeds.

17.    Based on Class Counsel's experience, it would have taken years to obtain the same

discovery in the formal litigation process. Moreover, the documents and information

obtained from ADP and Beech Street are confidential and therefore have not been

disclosed to the defendants with the limited exception of data shared in settlement

7

negotiations with the insurers.

18.     In addition to Class Counsel's efforts to obtain discovery from the vendor defendants, plaintiffs also briefed and filed motions for class certification in all of the cases and were ready to argue same had the Court set them for hearing.

19.     As an example of the intense nature of the litigation, after the District Court issued its Omnibus Order on September 28, 2001, in the two month period from October 3, 2001 through December 7, 2001, the defendants filed 49 motions, notices, requests and submissions seeking all manner of stays, modifications, reaffirmations, clarifications, vacations, re-considerations and dismissals, all of which Class Counsel had to respond to in one form or another.

20.     As of October 30, 2002, the time at which the District Court appears to have issued its last order prior to appeal, the consolidated docket had been consumed with some 886 entries over a two and a half year period.

21.     After losing their motions to compel arbitration in the trial court, the majority of the defendants, with the exception of the Progressive defendants, appealed Judge Ferguson's decision to the Eleventh Circuit where the appeals are currently pending.

22.     All of the defendant insurers in these consolidated cases have stopped taking discounts on automobile medical expense claims.

**The Liberty Mutual Case**

23.     The Liberty Mutual class action was filed on November 15, 2000, as the fourth filed case of these consolidated cases. The case was transferred and reassigned to Judge Ferguson.

24.     After filing, Class Counsel aggressively pursued the Liberty Mutual case. At the

8

beginning of the case, the plaintiff filed a motion for class certification. Class Counsel also served requests for production, admissions and interrogatories on Liberty Mutual and noticed depositions of Liberty Mutual personnel.

25.   Liberty Mutual aggressively defended the case from the beginning. On January 16, 2001, Liberty Mutual moved to dismiss the case, which Class Counsel opposed. Thereafter, Class Counsel moved for consolidation which was opposed by the defendants.

26.   On April 24, 2001, Liberty Mutual moved for an order to stay discovery propounded by Class Counsel. The plaintiff opposed Liberty Mutual's attempts to stay discovery.

27.   On June 6, 2002, CCN moved to compel arbitration which motion was joined by Liberty Mutual. After joining in this motion, Liberty Mutual moved for a protective order to prevent the Class Counsel from taking discovery, a motion Class Counsel also opposed.

28.   The Magistrate Judge eventually denied Liberty Mutual's motion to dismiss and the Magistrate Judge's recommendation was adopted by Judge Ferguson over Liberty Mutual's objections. Liberty Mutual eventually filed its appeal with the Eleventh Circuit.

29.   After the appeal was filed, the plaintiff and Liberty Mutual agreed to participate in the Eleventh Circuit's mediation program. Class Counsel, defense counsel and representatives from Liberty Mutual appeared in person for an all day mediation session with Eleventh Circuit mediator, Joseph Unger, Esq.. With the help of Mr. Unger, the parties made considerable progress in the first mediation session.

30.   Thereafter, Class Counsel and defense counsel continued negotiations in person and over the telephone for several months. There were times in the negotiation process where Class Counsel questioned whether the parties would be able to settle the case. Through

9

hard work and perseverance, the parties were able to resolve their differences and enter into a detailed settlement agreement. Settlement discussions were always conducted at arms-length, were very contentious at times and there was no collusion between counsel for the parties.

31. During the pendency of these cases there have been two parallel state cases on the PPO discounting issue pending before the Fifth and Second Florida District Courts of Appeal. At the time the Liberty Mutual case was settled in principle, the Fifth District Court of Appeals had already issued its decision declaring that the insurer's PPO discounting practices violated the Florida statute. However, the Second District Court of Appeals had not yet rendered its decision.

32. Accordingly, Class Counsel were able to negotiate benefits for the Class where claims would be paid at 60% of the PPO discounted amount and were also able to negotiate the payment of attorney's fees and costs and the costs of settlement administration outside and separate from the Class Fund of $950,000. Moreover, the settlement provided for direct mail notice to Class Members with a minimal proof of claim process where Class Members would not be required to submit any documentation besides the basic information requested on the claim form.

33. Class Counsel have not yet received a fee for prosecuting the Liberty Mutual case or the consolidated class action cases. Class Counsel have spent 8,789.2 hours on the consolidated cases for a total lodestar of over $2,525,027. With respect to the Liberty Mutual case, Class Counsel have spent 292.60 hours prosecuting the case for a total lodestar of $76,672.00.

10

34.    Based on Class Counsel's experience, negotiating a class action settlement where class members can receive approximately 60% of their actual damages without an evidentiary proof of claim process is a tremendous benefit to the class, especially given the risks associated with the age of the claims, the state and Eleventh Circuit appeals and the difficulties in certifying and trying a complex RICO case.  At all times Class Counsel maintained and advocated for the interests of the Class, and as a result, negotiated a settlement that far exceeds the standard class benefits in typical class action cases. Sworn to under the pains and penalties of perjury this _3rd_ day of January 2005.

Arthur S. Gold, Esq.
Gold & Coulson
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 (fax)