UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH
(Magistrate Snow)

DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

Plaintiffs,
v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

Defendants.
_____/

ULTRA OPEN MRI CORP., on behalf of                    01-6780
itself and all others similarly situated,

Plaintiffs,
v.

INTEGON NATIONAL INSURANCE
COMPANY, INTEGON GENERAL
INSURANCE COMPANY, INTEGON
PREFERRED INSURANCE COMPANY,
INTEGON INDEMNITY CORPORATION,
NATIONAL GENERAL ASSURANCE
COMPANY, NATIONAL GENERAL
INSURANCE COMPANY, MIC GENERAL
INSURANCE CORPORATION and
INTEGON CASUALTY INSURANCE
COMPANY,

Defendants.
_____/

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF THE
## PROPOSED SETTLEMENT WITH INTEGON NATIONAL INS. CO., ET AL.

1



## PRELIMINARY STATEMENT

Plaintiff, Ultra Open MRI Corporation (hereinafter "UOMC") respectfully submits this memorandum pursuant to Rule 23(e) of the Federal Rules of Civil Procedure in support of the proposed settlement of this action as against the named Defendants which are direct or indirect subsidiaries of GMAC Insurance Holdings, Inc.[1] (collectively "GMAC Insurance") for total class relief of over $2,000,000 (the "Settlement").[2]

## I.    HISTORICAL BACKGROUND OF THE LITIGATION[3]

### A.    The Consolidated Class Action Litigation

The consolidated class action litigation began five years ago on January 13, 2000, with the filing of Napoli v. Allstate Insurance Company, et al, later amended as Zidel v. Allstate Insurance Company, et al,. After filing the first case, Class Counsel filed fourteen additional cases, all of which were eventually consolidated into the current case. Each case alleged a similar pattern and practice by the various insurance defendants of reducing Florida automobile insurance personal injury protection ("PIP") medical expense claims based on the wrongful

---

[1] The subsidiaries include Integon General Insurance Corporation, Integon National Insurance Company, Integon Preferred Insurance Company, Integon Indemnity Corporation, National General Assurance Company, National General Insurance Company, MIC General Insurance Corporation and Integon Casualty Insurance Company.

[2] The specific terms of the Settlement have been set forth in the Stipulation and Agreement of Settlement (the "Stipulation") filed with the Court and preliminarily approved on August 20, 2004. The settlement provides for a $1,500,000 class fund. GMAC has also agreed to pay the following monies separate from the class fund: 1) up to $500,000 in attorneys' fees; 2) reasonable litigation costs and expenses; and, 3) the costs of settlement administration.

[3] The factual and procedural background of the case is described in more detail in the Declaration of Class Counsel Counsel in Support of the: (A) Proposed Settlement with Integon; and (B) Class Counsel's Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Lead Counsel's Declaration") which is attached as Exhibit 1. A brief summary is set forth herein for the Court's convenience.

application of preferred provider organization ("PPO") discounts.[4]

The theories that predominated all the consolidated cases centered around allegations that the discounting practices of the defendant insurers: (1) violated Florida PIP insurance statutory law (specifically Fla. Stat. § 627.736(10)); (2) constituted a violation of the federal Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. (the "RICO Act"); (3) were in direct breach of the specific language of the relevant automobile insurance policies; and, (4) constituted unjust enrichment to the defendant insurers.

Since the plaintiffs and Class Counsel took on the Florida auto insurance industry to stop the industry-wide practice of discounting PIP claims through the wrongful application of PPO discounts, the defendant insurers, and their vendors supplying the discounts, aggressively "circled the wagons" in defense of these class actions.[5] As the Court's Docket Sheet demonstrates, a virtual legal war ensued with a first barrage of multiple motions to dismiss. The plaintiffs thwarted the initial flurry of defensive motions, most notably defeating the defendants' attempts to dismiss their RICO counts.[6]

The current action against GMAC Insurance was filed on May 8, 2001. Later in May 2001, Class Counsel filed a motion for class certification. (See Docket Entry No. 5). GMAC Insurance subsequently filed its motion to compel arbitration in October 2001 on the basis of an

---

[4] To Class Counsel's knowledge the Consolidated Cases are the first class action cases in the country to challenge the "silent PPO" discounting of automobile insurance medical expense claims, other than two similar actions brought in Massachusetts state court by Class Counsel, Phillips & Garcia, LLP.

[5] The defendant insurers have all stopped the practice of applying PPO discounts to PIP medical expense claims.

[6] The plaintiffs' victory was not total. In its main ruling on the motions to dismiss, the Court dismissed the plaintiffs' Lanham Act claims.

3

arbitration clause contained in the insurance contract. (Docket Entry No. 15). After

consideration, in a Report dated December 14, 2001, Magistrate Snow recommended denying

GMAC's motion to compel arbitration on the basis that the arbitration clause contained in the

GMAC Insurance auto policy was not an independent contract between the parties and must be

stricken as in violation of Florida's Constitution under <u>Nationwide Mut. Fire Ins. Co. v. Pinnacle</u>

<u>Medical, Inc.</u>,753 So.2d 55 (Fla. 2000). Later in December, GMAC Insurance then filed its

Objections to the Report and Recommendation. (See, Consolidated Docket Entry No. 509).

Ultimately, in an October 28, 2002, Supplemental Order, this Court denied the motions to

compel arbitration in the consolidated cases, including GMAC Insurance's motion. With none of

the cases subject to arbitration, the defendants, including GMAC Insurance, then appealed Judge

Ferguson's decisions on the arbitration issue to the Eleventh Circuit, where the cases were

consolidated on appeal.[7]

While the cases were in the District Court, Class Counsel aggressively sought discovery

from all the defendants and other non-party witnesses. Class Counsel propounded written

discovery and noticed various depositions of the defendants and other witnesses. Almost all of

these discovery efforts were met with motions for protective orders or motions to stay discovery.

Class Counsel opposed such motions and countered in some cases by filing motions to compel

discovery which were, in turn, opposed by the defendants. All discovery and litigation in the

District Court was eventually stayed as the cases were appealed to the Eleventh Circuit.[8]

_____

[7] The Progressive defendants did not appeal, however the District Court stayed the Progressive
cases when the other cases were appealed.

[8] As of October 28, 2002 when the cases were stayed, the consolidated docket had 882 entries.

4

Despite the defendants' successful efforts at preventing Class Counsel from conducting full discovery prior to the appeal, Class Counsel were able to obtain a wealth of invaluable information by negotiating a settlement with the vendor defendants, ADP Integrated Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street").[9] Under this agreement, ADP and Beech Street consented to a whole-scale production of documents, data and information relating to the defendant insurers' PPO reduction practices. ADP and Beech Street provided class counsel with thousands of pages of documents detailing the defendant insurers' PPO discounting programs. ADP and Beech Street also conducted a specific search of their respective databases that resulted in a CD ROM containing PPO discount information on a claim-by-claim basis for each insurer per year. The information on the CD ROM provided Class Counsel, in the majority of cases, with the complete class list (names, addresses and tax identification numbers) and the amount of each class member's damages on a claim-by-claim basis – information that would have taken Class Counsel years to obtain in the normal discovery process.

While on appeal, the parties in the majority of the cases agreed to participate in the Eleventh Circuit's mediation program before Joseph Unger. Armed with the ADP and Beech Street data and aided by Mr. Unger, Class Counsel were able to lay the groundwork for a settlement model that provided tremendous benefits to the class. The three settled cases currently before the Court were all mediated by Mr. Unger as part of the Eleventh Circuit's mediation

---

[9] ADP, a national claims re-pricing company servicing property and casualty insurers, applied the Beech Street PPO discounts to the class members' medical bills on behalf of certain defendant insurers via a software program designed to calculate the discount and produce an explanation of benefits form showing the PPO reductions.

program.

### B.    The GMAC InsuranceClass Action

UOMC is a Florida healthcare provider that had entered into a contract with Beech Street, a PPO. Under the terms of its agreement with Beech Street, UOMC agreed to discount its normal "full-priced" medical charges for medical services rendered to patients who were subscribers in Beech Street's PPO. UOMC agreed to accept discounted fees for medical services in exchange for anticipated marketing of its services by Beech Street to its subscribers.

In the course of its practice, however, UOMC also treated patients covered by automobile insurance policies issued by GMAC Insurance through its subsidiary Defendants. GMAC Insurance's standard Florida automobile insurance policy provided insureds with PIP coverage that paid for 80% of all reasonable and necessary medical expenses. After UOMC treated patients insured by GMAC Insurance, UOMC submitted its bills for payment to GMAC Insurance's subsidiary Defendants. To process these PIP claims, however, GMAC Insurance used the insurance claim processing services of ADP. In the course of processing these claims on behalf of GMAC Insurance, ADP improperly applied the Beech Street PPO discounted rate to UOMC's medical charges. UOMC alleges that GMAC Insurance was not entitled to discount its medical fees based on the Beech Street PPO because GMAC Insurance had not become a Beech Street PPO subscriber and had not complied with Fla. Stat. § 627.736(10).

The instant case is presently on appeal of the District Court's denial of GMAC Insurance's motion to compel arbitration. If the proposed Settlement is ultimately approved by this Court, GMAC Insurance will no longer actively participate in that appeal and its appeal will be dismissed.

6

## II.    DISCOVERY AND NEGOTIATIONS LEADING TO SETTLEMENT

As detailed in Class Counsel's Declaration, this litigation has been conducted intensively and aggressively over the past five years. The defendants in the consolidated cases, including GMAC Insurance, aggressively attempted to stop Class Counsel from conducting any discovery. Notwithstanding Class Counsel's extensive discovery requests, the defendants frustrated their efforts with motions to stay discovery, motions to compel arbitration and eventually with the filing of the Eleventh Circuit appeals.

Despite all discovery being stayed, Class Counsel negotiated a settlement with ADP and Beech Street, (the companies that processed the PPO discounts for many of the defendant insurers), under which ADP and Beech Street produced all documents and data involving the PPO discounting programs they sold and facilitated for the relevant defendant insurers including GMAC Insurance. This document and data production provided Class Counsel with all the information about GMAC Insurance's PPO discounting practices and most importantly, contained the names, addresses, tax identification numbers and specific claim-by-claim damages for each member of the Class.[10]

Attempts at settlement negotiations with GMAC Insurance did not occur until after GMAC's motions to dismiss and to compel arbitration were denied at the District Court level and the case was appealed to the Eleventh Circuit. As part of the Eleventh Circuit's mediation program, counsel for the parties conducted extensive settlement discussions before mediator,

---

[10] At the eventual mediation of the case, the ADP data gave Class Counsel tremendous leverage because they knew with a reasonable degree of certainty the amount of GMAC's exposure and how a beneficial "settlement model" could be crafted since individual Class Member damages had been identified. The data Class Counsel obtained from ADP and Beech Street proved to be the information relied on by both parties when implementing the Settlement.

Joseph Unger. The negotiations were difficult and protracted. At times, it appeared that no

settlement acceptable to the Plaintiff would, or could, be achieved. The negotiations involved an

initial day-long session with Mr. Unger and then follow-up meetings and discussions between

counsel for the parties over the course of approximately nine months.

Ultimately, through continued perseverance and hard work, the current $2 million

settlement was reached between the parties. Based on their extensive knowledge of the strengths

and vulnerabilities of the claims against GMAC Insurance and given the uncertainties of an

appeal and/or ultimate trial of the action, Class Counsel believe that the Settlement represents an

excellent result for the Class. UOMC and Class Counsel heartily recommend that the proposed

Settlement be approved as fair, reasonable, adequate and in the best interests of the Class.

## III.   SUMMARY OF THE SETTLEMENT

### A.   Class Members Receive 100% of Their Damages With No Reduction for Costs of Settlement Administration or Counsel Fees

The Settlement provides for the distribution of a Settlement Fund of up to $1,500,000 to

Class Members who timely file Proof of Claim forms with an independent Settlement

Administrator paid for by GMAC. Insurance.[11]  Each Class Member that timely filed a properly

completed Proof of Claim form is entitled to reimbursement of PPO reductions taken by GMAC

Insurance on bills submitted by that Class Member to GMAC Insurance during the relevant Class

Period.[12]  If the total claim amounts submitted by Class Members is less than or equal to the

---

[11]  The precise terms of the Settlement are set forth in the Stipulation of Settlement filed with this Court and are also discussed in detail in the Declaration of Class Counsel.

[12]  The proof of claim process was simple and straightforward. To file a valid proof of claim, Class Members needed only to verify that they obtained "assignment of benefit" forms from GMAC's insureds and then provide basic information identifying their business and the person signing the form.

8

$1,500,000.00 Settlement Fund established by GMAC Insurance, then each properly submitted Class Member claim will be paid in full (*i.e.* at one hundred (100%) of the maximum claim amount). In the event that total claims submitted by Class Members is greater than the $1,500,000 Settlement Fund, then all properly filed claims will be paid on a *pro rata* basis to each Class Member. Furthermore, all costs of settlement administration,[13] including the costs of notification to the Class Members, are being borne by GMAC Insurance separately and in addition to the Settlement Fund.

The Settlement also provides for a claim dispute resolution process overseen by independent arbitrators should there be any disputes between a Class Member and GMAC Insurance as to the amount of a settlement payment or the completeness of any Proof of Claim form. Under the dispute resolution function of the Settlement, the Class Member, Class Counsel and GMAC Insurance are permitted to submit written presentations to the arbitrator. In the event that the arbitrator rules in favor of the Class Member, GMAC Insurance will be required to reimburse the Class Member for any arbitration fee and the Class Member claim will be perfected and paid by GMAC Insurance.

Finally, GMAC Insurance has agreed to pay, in addition to and outside the Settlement Fund, any Class Counsel fees awarded by the Court up to thirty three and one-third percent (33 1/3%) of the Settlement Fund, as well as reasonable costs and litigation expenses.

---

*Class members did not have to provide any documentation, such as bills or explanation of benefit forms, to perfect a proof of claim.*

[13] GMAC Insurancehas retained Wachovia Information Consulting Group, a subsidiary of Wachovia Bank, of Jacksonville, Florida, to serve as the independent settlement administrator.

9

**B.    Notice Far Exceeded Due Process Standards**

As to notice of the Settlement, potential Class Members were identified (name, address, and tax identification number) by the data obtained from GMAC Insurance's vendors, ADP and Beech Street. Based on this list, each Class Member was sent a Notice and claim form by direct mail describing the terms of the Settlement. In an attempt to reach as many Class Members as possible, the Settlement also provided that the Settlement Administrator take reasonable steps to locate any Class Members whose Notices were returned as "undeliverable." The Settlement Administrator "skip-traced" insufficient addresses and searched two online Florida state databases (the Florida Secretary of State website and the Florida Department of Health website)[14] in an effort to obtain valid addresses for all Class members.[15] The individual Notices that were approved by the Court at the Hearing on Preliminary Approval, thoroughly described the terms of the proposed Settlement, apprised Class Members of their rights with respect to the Settlement, and informed them of the Court's schedule for consideration of the Settlement.

**IV.    THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED.**

**A.    Due Notice Of The Settlement Has Been Appropriately Given.**

The form of Notice utilized in this case was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an

---

[14]  The relevant internet addresses were: www.sunbiz.org and www.doh.state.fl.us.

[15]  The Settlement Administrator initially mailed 2,493 notices based on the ADP and Beech Street data. After the initial mailing and the first re-mailing to Class Members with current forwarding addresses on file (a total of 27), a total of 342 Class Member addresses were deemed to be "bad addresses," or addresses for which no forwarding information was available. These addresses were then "skip-traced" and researched online with the result being that a total of 316 Notices were re-mailed to Class Members.

opportunity to present their objections." <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339

U.S. 306, 314 (1950). The Notice, which was preliminarily approved by this Court, provided

detailed information concerning the rights of Class Members, including the manner in which

objections could be lodged; the nature, history and progress of the Litigation; the proposed

Settlement terms; the process for filing Proofs of Claim; the fees and expenses to be sought by

Class counsel; the necessary information for any Class Member to examine the Court records

should he or she desire to; and the time and procedure for exclusion from the Settlement or to

object to the Settlement or Class Counsel's fee application.

All potential Class Members were identified using a list of medical care providers whose

claims had been reduced by ADP during the relevant class period. Notices were then prepared by

an independent settlement administrator, Wachovia Information Consulting Group

("Wachovia"), which was entirely paid for by GMAC Insurance. Wachovia then mailed, postage

pre-paid, to all Class Members identified on the Class Member list, a copy of the Notice

approved by this Court. At the beginning of the settlement process on September 20, 2004,

Wachovia initially mailed 2,493 total Notices.

Over the course of the claims period, Wachovia made efforts to ensure that as many of

the 2,493 Notices were received by Class Members. For example, during the claims period,

Wachovia received 27 Notices returned with current forwarding addresses provided by the U.S.

Postal Service. Wachovia then re-mailed the Notices to those new addresses. Further, as

required under the terms of the Settlement, Wachovia also made efforts to identify and locate any

Class Members in the case of any Notices being returned as "undeliverable" without valid

forwarding addresses on file through the use of a "skip tracing" service using available federal

11

identification numbers for "missing" Class Members and conducting online database searches. Wachovia's efforts resulted in the re-mailing of 316 Notices to Class Members. Thus, the method of notice was the most reasonable method under the circumstances to apprise all potentially interested parties of the pending Settlement and amply satisfied the requirements of due process. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974).

**B.    The Standards For Judicial Approval Of Settlements Under Rule 23(e).**

There is an overriding public interest in favor of class action settlements which have the well-deserved reputation as being most complex.[16] Ass'n for Disabled Americans, Inc. v. Amoco Oil Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002) (citing Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977)); Warren v. City of Tampa, 693 F.Supp. 1051, 1054 (M.D. Fla. 1998), aff'd, 893 F.2d 347 (11th Cir. 1989). Accordingly, a class action settlement should be approved so long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984); Cotton v. Hinton, 559 F.2d at 1330; Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 537 (S.D. Fla. 1988).

When determining whether a settlement is fair, adequate and reasonable, a court should consider all relevant factors, including (1) an assessment of the likelihood of success at trial; (2) the range of possible recovery at such trial; (3) the consideration provided to class members under the Settlement, in comparison to the range of possible recovery discounted by the inherent

---

[16] The Eleventh Circuit has noted that "public policy strongly favors the pretrial settlement of class action lawsuits." In re U.S. Oil & Gas Litig., 967 F. 2d 489, 493 (11th Cir. 1992). In that action, the court noted that "complex litigation like the instant [class action] case can occupy the court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules . . . authorize District Courts to facilitate settlements..." Id.

risks of litigation; (4) the complexity, expense and duration of the litigation in the absence of the

settlement; (5) the substance and amount of opposition to the settlement; and (6) the state of

proceedings at which the settlement was achieved. Bennett v. Behring Corp., 737 F.2d at 986;

Cotton v. Hinton, 559 F.2d at 1330-31; see also Behrens v. Wometco Enter., Inc., 118 F.R.D.

534, 538-39 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990); ADA v. Aetna, Inc. (In re

Managed Care Litig.), 2004 U.S. Dist. LEXIS 14294, *3-4 (S.D. Fla. 2004).[17]

The application of the Bennett factors is left to the sound discretion of the trial judge and

appellate review of the Court's decision is based on an abuse of discretion standard. In re U.S.

Oil & Gas Litig., 967 F.2d at 493; In re Broiler Chicken Antitrust Litig., 669 F.2d 228, 238 (5th

Cir. 1982). Great weight is accorded a trial judge's views in evaluating a class action settlement.

City of Detroit v. Grinnell Corp., 453 F.2d 448, 454 (2d Cir. 1974) (quoting Ace Heating &

Plumbing Co. V. Crane Co., 453 F.2d 30, 34 (3d Cir. 1971)). In making its determination, the

trial court is also entitled to rely on the judgment of experienced counsel for the parties. In re

Smith, 926 F.2d 1027, 1028 (11th Cir. 1991); Cotton v. Hinton, 559 F.2d at 1330.

In evaluating these considerations, a court must not try the case on the merits. Cotton v.

Hinton, 559 F.2d at 1330; Diaz v. Hillsborough County Hosp. Auth., 2000 U.S. Dist. LEXIS

14061, *6 (M.D. Fla. 2000). Instead, the court should rely on the judgment of experienced

counsel and, absent fraud, "should be hesitant to substitute its own judgment for that of counsel."

Ass'n for Disabled Americans v. Amoco Oil, 211 F.R.D. at 467 (quoting Cotton v. Hinton, 559

F.2d at 1330); see also In re Sunbeam Sec. Litig., 176 F.Supp.2d 1323, 1329 (S.D. Fla. 2001).

---

[17] Other factors relevant to a court's inquiry are the terms of the settlement, the procedure
afforded to notify Class members of the proposed settlement, and the judgment of counsel. Cotton v.
Hinton, 559 F.2d at 1330; Warren v. City of Tampa, 693 F.Supp. At 1055.

Rather than justifying each settlement term against a hypothetical or speculative measure of what concessions might have been gained, a court should focus on the negotiation process to ensure that the settlement was achieved through arms-length negotiations by counsel and was not the product of collusion between the parties. See Behrens v. Wometco Enter., Inc., 118 F.R.D. at 538-39. Ultimately, in evaluating a settlement's fairness, the court should remember that compromise is the essence of a settlement and that "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." Cotton v. Hinton, 559 F.2d at 1330.

The application of these standards in the present case, warrants the approval of the Settlement as fair, reasonable and adequate. Class Counsel and GMAC Insurance have had substantial opportunity to weigh the strengths and weaknesses of the parties' respective positions in the event this action were to proceed to appeal and/or trial, and to reach an informed compromise based on their respective analyses.

### 1.    The Likelihood Of Success At Trial And Potential Recovery.

When considering the likelihood of success at trial and any potential recovery, a court can limit its inquiry to determining "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." Ressler v. Jacobson, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992); see also Elkins v. Equitable Life Ins. Co., 1998 U.S. Dist. LEXIS 1557, * 76 (M.D. Fla. 1998); Mashburn v. National Healthcare, Inc., 684 F. Supp. 660, 670 (M.D. Ala. 1988) (in the class action settlement context, courts do not decide the merits of the case or resolve unsettled legal questions). This inquiry is premised on "balancing the probabilities, not assuring that the plaintiff class receives every benefit that might have been won after a full trial." In re Chicken Antitrust Litig., 560 F. Supp. 957, 960 (N.D. Ga. 1980). The

expense of achieving a more favorable result for the class at trial must be considered. <u>Ressler v.</u> <u>Jacobson</u>, 822 F. Supp. at 1555; see also, <u>Young v. Katz</u>, 447 F.2d 431, 433 (5th Cir. 1971).

While the Settlement represents an extremely favorable result under any measure, it must be considered in light of the significant risks faced by the Class with continued litigation. Class Counsel believe that they have a "strong case" to be made against GMAC Insurance. The potential for a substantial recovery at trial (assuming that UOMC could get past the hurdle of GMAC Insurance's appeal), however, was tempered by Class Counsel's analysis of certain major factors that favor the settlement of this action on the proposed terms. These factors include (1) the uncertain outcome of pending appeals to the Florida Supreme Court concerning the interpretation of Florida Statute section 627.736(10); (2) the uncertain outcome of a pending appeal to the 11th Circuit Court of Appeals concerning GMAC Insurance's motion to compel arbitration or in the alternative to dismiss the action; and (3) the inherent difficulties in proving the elements of a RICO action against GMAC Insurance in a full trial on the merits.

     a.    **<u>Two Florida District Courts of Appeal Have Conflicting Rulings</u>** **<u>Relating To The Application Of Section 627.736(10) In The Context</u>** **<u>Of Auto Insurance Companies Paying PIP Claims At PPO Discounted</u>** **<u>Rates Where No PPO Insurance Policy Has Been First Offered to</u>** **<u>Insureds.</u>**

Class Counsel believes that one of the most important considerations concerning the likelihood of success at trial concerns UOMC's defenses under Florida's PIP statute, Section 627.736(10). There is currently a split between two Florida appellate districts, the Second and Fifth Districts, on whether an auto insurer may pay health care providers at reduced PPO contract

rates without first offering a preferred provider PIP policy of insurance.[18]  In <u>Nationwide Mut.</u>

<u>Fire Ins. Co. v. Central Florida Physiatrists, P.A.</u>, 851 So.2d 762 (Fla. 5th DCA 2003), the

appellant, Nationwide, an insurance company providing Florida auto insurance policies, paid

Central Florida Physiatrists ("CFP") at reduced rates based on CFP's participation in the Beech

Street PPO.  Nationwide did not, however, contract directly with CFP as a "preferred provider"

and offer a preferred provider PIP insurance policy to its insureds as required under the specific

language of Section 627.736(10).[19]  In affirming the trial court's grant of CFP's summary

judgment motion, the Fifth District Court of Appeals reasoned that the clear and precise language

of Section 627.736(10) demonstrates the Legislature's intent that the availability of PPO benefits

under a PIP auto insurance policy is subject to strict compliance with the terms of subsection

(10).  According to the Fifth District, Nationwide was required to first comply with the

provisions of subsection (10) in order to take advantage of paying reduced PPO rates for payment

of PIP claims.  <u>Id.</u>, 851 So. 2d at 766.  Nationwide's failure to do so, thus required it to pay the

statutorily mandated 80% of the reasonable and necessary medical expenses incurred by its

insured. <u>Id.</u>

    In stark contrast to the Fifth District's decision, the Second District held that subsection

---

[18]  The Settlement was reached with GMAC Insuranceafter the Fifth District Court of Appeals decision but before the Second District Court of Appeals decision which created the split.

[19]  Section 627.736(10) provides that "An insurer may negotiate and enter into contracts with licensed health care providers for the [PIP] benefits described in this section, referred to in this section as "preferred providers,"... The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met...If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits."  §627.736(1)(a)(10) Fla. Stat. (1999).

(10) does not prohibit insurers that have not issued PPO auto policies from paying health care providers at discounted PPO rates.  See <u>Nationwide Mut. Ins. Co. V. Dennis M. Jewell, D.C., P.A.</u>, 862 So.2d 79 (Fla. 2d DCA 2003).  The appellees[20] in <u>Jewell</u> were preferred health care providers in the Beech Street and CCN PPOs and treated patients entitled to PIP benefits under auto insurance policies issued by Nationwide.[21]  <u>Id.</u> at 81.  Instead of paying the providers at the 80% statutorily mandated PIP rate, Nationwide paid them at the lower PPO network rate though admittedly not having direct contracts with the providers and not having first issued preferred provider auto insurance policies under section 627.736 (10).  <u>Id.</u> at 81-82.  Both lower trial courts in the actions ruled that Nationwide was not entitled to pay the providers at the discounted PPO rates finding that Nationwide had violated the clear language of section 627.736(10).  <u>Id.</u>

In reversing the trial courts' judgments in favor of the providers, the Second District held that neither the clear language of section 627.736(10), nor the PIP insurance policies issued by Nationwide prohibited the payment of PPO discounted rates.  <u>Id.</u> at 83.  Rejecting the providers' statutory arguments, the Second District reasoned that section 627.736(10) is permissive in nature and does not specifically limit insurers to direct contracts between PIP insurers and providers.  <u>Id.</u> at 84.  Relying on the phrases contained in the statute - "may negotiate and enter into contracts," and "may provide an option to an insured,"- the Court determined that "such

---

[20] There are three appellees in <u>Jewell</u>: Dennis M. Jewell, D.C., P.A., George G. Hudson, D.C., P.A and Jeff Davis, D.C., P.A.  The appellees all brought separate actions in lower trial courts.  Jewell and Hudson's individual cases were consolidated for consideration in the Sarasota County Court.  The Davis action was heard in Hillsborough County Court.  The actions were consolidated for hearing in the Court of Appeals for the Second District.  <u>Nationwide v. Jewell</u>, 862 So.2d at 81.

[21] Jewell and Hudson brought their individual actions against Nationwide Mutual Insurance Company.  Davis brought his action against Nationwide Mutual Fire Insurance Company.  Both Appellants will be referred to collectively as "Nationwide."

permissive provisions should not be read to impose an implied prohibition." Id at 85.

Both cases have been appealed to the state Supreme Court and the question is currently

pending. In light of this current conflict, the outcome of the present action remains uncertain

should the Class proceed to litigate the action. It is entirely conceivable that the Florida Supreme

Court could decide the section 627.736(10) issue in favor of the Second District decision prior to,

or even during, the trial of the current case, which would effectively "hamstring" the Plaintiff's

entire action. Given that the proposed Settlement now removes that uncertainty while offering to

reimburse the Class Members up to 100% of their claimed losses, it is clear that potential

litigation risks outweigh the rewards of the Settlement.

>    **b.    GMAC's Appeal Of The Denial Of Its Motion Dismiss Or To Stay Litigation And Compel Arbitration Casts A Shadow Of Uncertainty As To The Plaintiff's Likelihood Of Success**

One of UOMC's underlying causes of action against GMAC Insurance is based on its

status as an assignee of the PIP insurance contract of one of its patients. In its Motion to Dismiss

or to Stay Litigation and Compel Arbitration, GMAC Insurance presented a copy of the

applicable insurance policy which includes an arbitration clause providing that, "All disputes

between [GMAC Insurance] and any medical services provider involving medical benefits under

this coverage shall be resolved through binding arbitration in accordance with Chapter 682 of the

Florida Statutes." In seeking to compel UOMC to arbitrate all of its claims against it, GMAC

Insurance asserted that as an assignee of the PIP insurance contract, the arbitration clause was

binding against UOMC.

In opposing GMAC Insurance's motion, Class Counsel relied on Nationwide Mut. Fire

Ins. Co. v. Pinnacle Medical, Inc., 753 So. 2d 55 (Fla. 2000) under which the Florida Supreme

18

Court held that a mandatory arbitration requirement under Florida's PIP statute[22] was

unconstitutional since it denied medical provider assignees access to the courts in violation of

Article I, Section 21 of the Florida Constitution.[23]

Ultimately, a Report and Recommendation denying GMAC Insurance's motion to

dismiss and to compel arbitration was issued by Magistrate Judge Snow and adopted by this

Court.[24] Immediately thereafter, GMAC Insurance appealed the decision to the Eleventh Circuit

Court of Appeals. The appeal is currently pending.

## 2.  The Range Of Possible Recovery And The Consideration Under The Settlement In Relation To That Range

In Behrens, the Court combined the second and third factors of the Bennett test to

determine the appropriateness of the settlement. Behrens v. Wometco Enter., Inc., 118 F.R.D. at

541. The factors considered are the range of possible recovery and the point within, or below,

the range of possible recovery at which a settlement is fair, adequate and reasonable.

Discounting multiple damages under RICO, the range of possible recovery under applicable law

would be from zero to 100% of the discounted amount with interest and an award of attorney's

fees and costs. Under the proposed Settlement, interest is the only monetary damage not

included in the Settlement. If the Claim Fund is not exhausted all claimants will receive a 100%

recovery. Additionally, GMAC Insurance will pay Class Counsel fees and reasonable litigation

---

[22] Fla. Stat. §627.736(5).

[23] According to the Court, medical providers lost their access to the courts because their rights to appeal were severely limited under the Florida Arbitration Code while they did not receive a commensurate benefit from the statute. Pinnacle, 753 So. 2d at 58.

[24] See Order Adopting Report and Recommendation and Administratively Closing Cases, (Sept. 30, 2002).

costs and expenses, as well as, costs of settlement administration *separate* from the Claim Fund.
The benefits provided by the Settlement are at the highest end of potential relief had the case
been tried successfully by Class Counsel.

Moreover, based on the present state of the PIP statutory scheme in Florida, the terms of
the Settlement actually provide Class Members with *significantly better* relief than they
otherwise might expect should the settlement not be approved. Since the inception of this
litigation in 2000, the Florida Legislature has amended the PIP statute by adding a complicated
pre-suit demand procedure. Under the new statute, prior to filing a lawsuit a medical provider
must send a demand letter to the insurer detailing: 1) the name of the insured upon which such
benefits are being sought, including a copy of the assignment giving rights to the claimant if the
claimant is not the insured; 2) the claim number or policy number upon which such claim was
originally submitted to the insurer; 3) to the extent applicable, the name of any medical provider
who rendered to an insured the treatment, services, accommodations, or supplies that form the
basis of such claim; and 4) an itemized statement specifying each exact amount, the date of
treatment, service, or accommodation, and the type of benefit claimed to be due. Fla. Stat. §
627.736(11).

Class Members who have not yet filed suit for illegal PPO discounts would have to first
satisfy the pre-suit demand requirements of the new statute. The statute's evidentiary demand
requirements are far more onerous than the proof of claim process negotiated by Class Counsel.
Class Members need not provide any documentation or detailed claim information to participate
in the Settlement, whereas under the new statute they are required to conduct a file-by- file
review and provide documentary evidence just to meet the pre-suit demand requirements.

20

3.    **The Complexity, Expense And Likely Duration Of The Litigation**

Class Counsel believe that the claims asserted in this action have considerable merit. However, its inherent complexities combined with the uncertainties those complexities engender, are characteristic of RICO litigation and consolidated cases of this nature. The docket sheet tells the story best as there are over 880 entries prior to the defendants filing their appeals and the parties still have "a long way to go" in the litigation process. Those uncertainties militate strongly in favor of approving the Settlement.

The likely duration and associated expenses of continued litigation likewise favor approval of the Settlement. See <u>Warren v. City of Tampa</u>, 693 F.Supp. At 1059 ("The parties estimate that trial of this case would take three weeks of Court time, and would cost hundreds of thousands of dollars in attorneys' fees, expert witnesses fees and costs. These factors militate in favor of a decision to accept the proposed settlement."). In the present case, Class Counsel estimates that a trial of this action (assuming first that GMAC Insurance fails on its Eleventh Circuit appeal) could take approximately two weeks and could cost the Class hundreds of thousands of dollars in attorneys' fees, expert fees and litigation costs. Moreover, given that GMAC Insurance has already filed one appeal in this action, it is very likely that it would appeal class certification and any trial judgment in favor of the Plaintiff. The Class would be further subject to the many years of delay and additional costs associated with those appeals.

Here there is a great deal at stake for the parties and, but for the proposed Settlement, the case would continue to be strongly litigated by UOMC and GMAC Insurance. As a result of the Settlement, the dispute between them will come to an end with the Class receiving a substantial recovery and there will also be substantial savings in Court resources by avoiding a lengthy trial

21

of this case. Settlements of complex cases contribute greatly to the efficient utilization of scarce

judicial resources. Behrens v. Wometco Enter., Inc., 118 F.R.D. at 538.

### 4.    The Substance And Amount Of Opposition To The Settlement

Even when a court becomes aware of one or more objecting parties, the court is not

"required to open to question and debate every provision of the proposed compromise. The

growing rule is that the trial courts may limit its proceeding to whatever is necessary to aid it in

reaching an informed, just and reasoned decision." Cotton v. Hinton, 559 F.2d at 1331.

In the present case, the deadline for filing objections to the Settlement was November 22,

2004. Not a single objection has been filed by any Class Member. Additionally, out of a class

consisting of over 2,400 Class Members, there have been only 10 valid opt-outs filed. Clearly,

the reaction of the Class to the Settlement is favorable and positive. Courts have looked at the

absence of meaningful objections to a proposed settlement as further support for the approval of

the settlement. See Bennett v. Behring, Corp., 737 F.2d at 988.

### 5.    The Stage Of Proceedings At Which The Settlement Was Achieved

The purpose of considering the stage of the proceedings and the discovery taken is to

ensure that the plaintiff has had access to sufficient information to evaluate the case and to

determine the adequacy of the proposed settlement. Behrens v. Wometco Enter., Inc., 118

F.R.D. at 544. As discussed in greater detail in Class Counsel's Declaration, the Settlement was

achieved after four years of intense litigation involving extensive motion practice and

investigation.

The Plaintiff and Class Counsel were very aware of the merits of their case based on their

pre-suit investigation and the status of state case law on the issue of applying PPO discounts to

automobile medical expense claims. Additionally, despite the District Court's stay of discovery, Class Counsel was able to obtain extensive discovery from ADP and Beech Street consisting of relevant documents, data and information about GMAC Insurance's practices, without involvement by GMAC Insurance. Absent this settlement with ADP and Beech Street, Class Counsel estimates that it would have taken years of post-appellate discovery to obtain the same information. Knowledge of the law, coupled with the discovery obtained from ADP and Beech Street, allowed Class Counsel to accurately assess its case for class-wide settlement negotiations.

6.    **The Settlement Is The Result Of "Arms-Length" Negotiations Among Competent And Experienced Counsel.**

In considering the fairness of a proposed settlement, the Court is entitled to rely heavily on the opinion of competent counsel. Behrens v. Wometco Enter., Inc., 118 F.R.D. at 544. This is especially apt where, as here, the extensive amount of independent investigation, legal research, briefing and discovery indicates that counsel are fully capable of evaluating the merits of the plaintiff's case and the probable course of future litigation. See Cotton v. Hinton, 559 F.2d at 1330.

In analyzing a proposed settlement and the opinion of counsel, it is also appropriate for the Court to examine the negotiating process that took place between the parties to confirm that there was no collusion in reaching the Settlement. Behrens v. Wometco Enter., Inc., 118 F.R.D. at 538. In the present case, the Settlement was achieved only after years of hard-fought and contentious litigation that resulted in an appeal of the Consolidated Action to the Eleventh Circuit. Ultimately, the settlement negotiations were overseen by an independent mediator of the Eleventh Circuit -- clear evidence that the negotiations were conducted at "arms length." After a

23

full day mediation session with Mr. Unger in July of 2003, the parties continued to negotiate details of the settlement for another nine months. Through the efforts of Mr. Unger, Class Counsel and Defense Counsel were eventually able to fashion a Settlement that is not only fair and reasonable, but is a truly extraordinary and excellent result for the Class.

## CONCLUSION

For the foregoing reasons, Plaintiff and Class Counsel submit that the proposed Settlement is fair, reasonable and adequate and should be approved in its entirety, and respectfully request that the Court approve the Settlement.

Respectfully submitted,
Co-Lead Counsel for the Plaintiff:
**LEE & AMTZIS, P.L.**
5550 Glades Road, Suite 401
Boca Raton, FL 33431
Telephone: (561) 981-9988
Facsimile: (561) 981-9980

By: _____
ERIC LEE, Florida Bar No. 961299

Co-Lead Counsel for the Plaintiff:
**KOPELMAN & BLANKMAN, P.A.**
350 East Las Olas Blvd., Suite 980
Fort Lauderdale, FL 33301
Telephone: (954) 462-6855
Facsimile: (954) 462-6899

Co-Lead Counsel for the Plaintiff:
**GOLD & COULSON**
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
Telephone: (312) 372-0777
Facsimile: (312) 372-0778

Co-Lead Counsel for the Plaintiff:
**PHILLIPS & GARCIA, LLP**
13 Ventura Drive
N. Dartmouth, MA 02740
Telephone: (508) 998-0800
Facsimile: (508) 998-0919

24

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that a true and correct copy of the foregoing was sent by U.S. Mail, postage pre-paid, to the counsel listed below on the Master Service List, this ___ day of January, 2005.

Douglas Blankman, Co-Lead Counsel for Plaintiffs

## MASTER SERVICE LIST
### (Consolidated Case No. 00-6061-Civ-FERGUSON/SNOW)

**Co-Lead Counsel for Plaintiffs**

Eric Lee, Esq.
LEE & AMTZIS, P.L.
350 N.W. 12 Avenue
Deerfield Beach, FL 33442
561-981-9988
561-998-3021 (fax)
elee@leeamlaw.com

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphilips@gpandg.com

Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
Bank of America Tower
One Financial Plaza
Suite 1611
Fort Lauderdale, FL 33394
(954) 462-6855

**Counsel for Allstate, Fidelity & Casualty, Continental, Deerbrook**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.

25

dshelton@rumberger.com
PO Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

ROSS & HARDIES
Peter J. Valeta, Esq.
peter.valeta@rosshardies.com
150 N. Michigan Avenue, Suite 2500
Chicago, IL 60601
(312) 750-3619
(312) 920-7241 Facsimile

**Counsel for Beech Street and ADP**

TEW, CARDENAS, et al.
John M. Quaranta, Esq
(305)536-2495
jmq@tewlaw.com
Miami Center, 26th Floor
201 S. Biscayne Boulevard
Miami, Florida 33131-4336
(305) 536-1116 Facsimile

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

**Counsel for CCN**

KENNEY NACHWALTER

SEYMOUR ARNOLD CRITCHLOW
& SPECTOR, P.A.
Richard H. Critchlow, Esq
Robert D.W. Landon, III, Esq
rlando@knsaca.com
201 South Biscayne Blvd., Ste 1100
Miami, FL 33131
(305) 373-1000
(305) 372-1861 Facsimile

**Counsel for Nationwide**

FOWLER, WHITE, et al.
Katherine C. Lake, Esq.
klake@fowlerwhite.com
PO Box 1438
Tampa, FL 33131
(813) 228-7411
(813) 229-8313 Facsimile

SWARTZ CAMPBELL DETWEILER
James C. Haggerty, Esq.
haggerty@scdlaw.com
1601 Market Street, 34th Floor
Philadelphia, PA 19103-2316
(215) 299-4314
(215) 299-4301 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Robert K. Levenson, Esq.
rlevenson@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 Facsimile


**Counsel for Liberty Mutual**

AKERMAN, SENTERFITT et al.
Nina K. Brown
nbrown@akerman.com
One Southeast Third Ave, 28th Flr
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Hartford, Metropolitan, Integon**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
28th Floor
One Southeast Third Avenue
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

(850) 894-4111
(850) 894-4999 Facsimile

SHEA & GARDNER
John D. Adlock, Esq.
jadlock@sheagardner.com
Michael Isenman, Esq.
misenman@sheagardner.com
1800 Massachusetts Ave, N.W.
Washington, D.C. 20036
(202) 828-2000
(202) 828-2195 Facsimile

**Counsel for Prudential**

BUTLER BURNETTE PAPPAS
Kathy J. Maus, Esq
kmaus@bbplaw.com
Lauren D. Levy, Esq.
llevy@bbplaw.com
3600 Maclay Blvd. Suite 101
Tallahassee, FL 32312

**Counsel for Metropolitan**

SONNENSCHEIN, NATH & ROSENTHAL
Jeffrey P. Lennard, Esq.
jpl@sonnenschein.com
8000 Sears Tower
Chicago, IL 60606
(312) 876-8000
**Counsel for Superior**

27

BUTLER BURNETTE PAPPAS
Alan J. Nisberg, Esq.
anisber@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway, Ste 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for American International**

CONROY, SIMBERG, GANON, KREVANS
& ABEL, P.A.
Dale L. Friedman, Esq.
dfriefman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Blvd, 2d Floor
Hollywood, FL 33021
(954) 961-1400
(954) 967-8577 Facsimile

# Exhibit "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH
(Magistrate Snow)

DR. PAUL ZIDEL, on behalf of
himself and all others similarly situated,

Plaintiffs,
v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

Defendants.
_____/

ULTRA OPEN MRI CORP., on behalf of                     01-6780
itself and all others similarly situated,

Plaintiffs,
v.

INTEGON NATIONAL INSURANCE
COMPANY, INTEGON GENERAL
INSURANCE COMPANY, INTEGON
PREFERRED INSURANCE COMPANY,
INTEGON INDEMNITY CORPORATION,
NATIONAL GENERAL ASSURANCE
COMPANY, NATIONAL GENERAL
INSURANCE COMPANY, MIC GENERAL
INSURANCE CORPORATION and
INTEGON CASUALTY INSURANCE
COMPANY,

Defendants.
_____/

**DECLARATION OF CLASS COUNSEL IN SUPPORT
OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AN
AWARD OF ATTORNEY'S FEES AND COSTS**

1.    My name is Arthur S. Gold and I am a partner in the law firm of Gold & Coulson, P.A of

Chicago, IL.  I am one of the lead Class Counsel in the fifteen consolidated class action

cases (Zidel v. Allstate Insurance Company, et al, Consolidated C.A. No. 00-6061)

pending in this Court, one of which is the class action Ultra Open MRI Corp. v. Integon

National Insurance Company, et al, C.A. No. 01-6780 (hereinafter "GMAC").  I am

submitting this declaration in support of final approval of the GMAC class action

settlement and plaintiff's Memorandum in Support of Class Counsel's Application for An

Award of Attorney's Fees and Reimbursement of Expenses.

2.    I have been plaintiff's counsel in the GMAC case and all the consolidated cases since the

first class action case was filed against Allstate Insurance Company approximately five

years ago on January 12, 2000.  Although the GMAC case is before the Court for final

approval of the class settlement, the historical background of the litigation in the

consolidated cases is necessary to understand the tremendous effort of Class Counsel in

prosecuting and managing the consolidated litigation which contributed substantially to

the settlement of the GMAC case.

**Pre-Suit Investigation**

3.    Prior to filing any of the consolidated cases, Class Counsel conducted an intensive and

thorough investigation of what they believed to be an industry-wide practice of Florida

automobile insurers reducing medical expense claims based on managed care preferred

provider organization ("PPO") discounts.  A practice Class Counsel has characterized

throughout this litigation as a "silent PPO."

4.    The investigation had three facets: 1) obtaining and reviewing any state and national

2

decisions on the PPO issue; 2) obtaining discovery documentation and deposition and hearing testimony from Florida state cases, some of which Florida Class Counsel, Kopelman & Blankman and Eric Lee, Esq. were directly involved; and 3) acquiring documentation such as PPO contracts and explanation of benefit forms from as many sources as possible throughout the state of Florida.

5.    Also, prior to the filing of these consolidated cases, Class Counsel Eric Lee, Esq. and Larry Kopleman, Esq., had filed a state court class action seeking reimbursement for insureds whose medical providers balanced billed them after the insurer's application of PPO discounts to their medical expense claims. Information from the state court class action also served as part of the wealth of information reviewed by Class Counsel prior to filing the consolidated cases. Finally, documents and deposition transcripts from similar class actions in Massachusetts state court were accumulated and reviewed as the Massachusetts cases involved some of the same PPOs, PPO contracts and claim re-pricing companies working with the automobile insurers in Florida.

6.    Also as part of our investigation, Class Counsel met with their clients and their clients' billing personnel to gain information "on the ground" about how the PPOs, insurers and claims facilitators, such as ADP, were processing medical expense claims on a day-to-day basis.

7.    The majority of the documents obtained in Class Counsel's investigation, as well as documents gained after the litigation was filed, were organized into an electronic document depository which Class Counsel could access online from their offices for the purposes of prosecuting the litigation.

3

8.  Class Counsel's research at the time revealed that no similar federal or state class actions challenging a "silent PPO" discounting scheme on automobile medical expense claims had been filed anywhere in the country with the exception of two cases brought in Massachusetts by Class Counsel team member Phillips & Garcia, LLP.  The filing of the Florida federal court class actions based on the emerging "silent PPO" discounting practice in the automobile industry was both novel in theory and scope.

9.  After this extensive pre-suit investigation of what amounted to the PPO discounting practices of the entire Florida automobile insurance industry, Class Counsel spent an enormous amount of time researching viable state and federal court causes of action before filing the first case.  After completing their research and cognizant of the inherent difficulties of a federal court civil RICO case, Class Counsel spent a great deal of time on the drafting and re-drafting of the model class action complaint which was used as the backbone for all of the complaints filed in these consolidated cases.  This time and effort proved valuable as the plaintiffs' RICO claims survived the defendants' motions to dismiss.

**The Allstate Filing and the Consolidated Litigation**

10. On January 12, 2000, Class Counsel filed the first class action case against Allstate. From the start, the case was aggressively defended with defendants Allstate and Medview Services, Inc. moving to dismiss.

11. After the Allstate filing, Class Counsel filed the following cases:

    a.  Brickell, et al v. Progressive Express Ins. Co., et al, C.A. No. 00-6649 (filed 5/12/00);

    b.  Browner v. Allstate Indemnity Company, et al, C.A. No. 00-7163 (filed 8/16/00);

4

c.  LaRusso, et al v. Liberty Mutual Ins. Co., C.A. No. 00-7692 (filed 11/15/00);

d.  Larusso, et al v. Nationwide Ins. Co., C.A. No. 01-8108 (filed 2/7/01);

e.  Larusso, et al v. Florida Farm Bureau Casualty Ins. Co., C.A. No. 01-8110 (filed 2/7/01);

f.  Larusso ITT Hartford Life & Annuity Ins. Co., C.A. No. 01-8111 (filed 2/7/01);

g.  Ultra Open MRI Corp., et al v. Progressive American Ins. Co., C.A. No. 01-6776 (filed 5/8/01);

h.  Ultra Open MRI Corp., et al v. Deerbrook Ins. Co., C.A. No. .01-6777 (filed 5/8/01);

i.  Ultra Open MRI Corp., et al v. Prudential Property & Casualty Ins. Co., C.A. No. 01-6778 (filed 5/8/01);

j.  Ultra Open Mri Corporation, et al v. Fidelity & Casualty Co. of New York, et al, C.A. No. 01-6779 (filed 5/8/01);

k.  Ultra Open MRI Corp. v. Integon National Ins. Co., et al, C.A. No. 01-6780 (filed 5/8/01);

l.  The Chiropractic Centre, Inc., et al v. Superior Ins. Co., C.A. No. 01-6782 (filed 5/8/01);

m.  The Chiropractic Centre, Inc., et al v. Metropolitan Ins. Co., C.A. No. 01-6783 (filed 5/8/01);

n.  Mote Wellness & Rehab., Inc., et al v. American International Ins. Co., et al, C.A. No. 01-8549 (filed 6/14/01).

10.  The cases were consolidated by Judge Ferguson. Each filed case was aggressively defended. As evidenced by the individual and consolidated case dockets, prior to the ultimate appeal of the cases, the defendants filed scores of different motions to dismiss

5

and/or to compel arbitration.

11.  Class Counsel opposed all of the defendants' motions to dismiss and to compel

arbitration and, with the exception of the dismissal of their Lanham Act counts, the

plaintiffs prevailed on each and every motion.  In the two circumstances where Magistrate

Judge Snow partially ruled against the plaintiffs on the issue of arbitration presented in

the GMAC and Prudential cases, Class Counsel challenged the Magistrate Judge's

recommendation and was able to convince the District Court not to adopt the

recommendation.  All motions to dismiss and compel were successfully defeated.  It

almost goes without saying that it took Class Counsel a tremendous amount of time and

effort to defeat the defendants' initial attempts to dismiss these consolidated cases.

12.  While opposing the defendants' attempts to dismiss the cases, Class Counsel also went on

the offensive by propounding discovery to the defendants and subpoenaing non-party

witnesses.  Class Counsel served separate requests for production, interrogatories and

admissions on all the defendants.  Class Counsel also noticed over 40 depositions of

various witnesses and sent document and deposition subpoenas to many non-party

witnesses.

13.  The vast majority of the Class Counsel's discovery requests were opposed by the

defendants.  The defendants either objected to the discovery in its entirety or filed

motions for protective orders seeking to limit or stop Class Counsel from taking

discovery.  Class Counsel opposed the defendants' motions and in some circumstances

filed motions to compel and for sanctions due to the defendants' failures to respond to

discovery.  Despite these efforts, the defendants were for the most part successful in

6

preventing Class Counsel from conducting discovery as the District Court eventually stayed the cases.

14. After not being able to obtain discovery from the defendants through the normal discovery process, Class Counsel entered into settlement discussions with defendants, ADP Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street"), in an effort to discover information about the defendants' polices and practices. In the majority of the consolidated cases, Beech Street was the PPO whose discounts were applied to automobile insurance medical expense claims by ADP. ADP's business was to analyze and re-price claims for property and casualty insurers with its software programs.

15. Class Counsel were able to negotiate a settlement with ADP and Beech Street whereby they would produce any and all documents pertaining to the PPO discounting policies and practices of the relevant defendant insurers. Accordingly, ADP and Beech Street produced numerous boxes of documents to Class Counsel.

16. As part of the settlement, Class Counsel also propounded specific data requests to ADP whereby ADP produced data on CD ROM which listed class members by name, address, tax identification number and also included specific claim by claim information per insurer by year. Finally, pursuant to the settlement, ADP and Beech Street agreed to a continuing obligation to provide additional documents and information as the litigation proceeds.

17. Based on Class Counsel's experience, it would have taken years to obtain the same discovery in the formal litigation process. Moreover, the documents and information obtained from ADP and Beech Street are confidential and therefore have not been

7

disclosed to the defendants with the limited exception of data shared in settlement negotiations with the insurers.

18.    In addition to Class Counsel's efforts to obtain discovery from the vendor defendants, plaintiffs also briefed and filed motions for class certification in all of the cases and were ready to argue same had the Court set them for hearing.

19.    As an example of the intense nature of the litigation, after the District Court issued its Omnibus Order on September 28, 2001, in the two month period from October 3, 2001 through December 7, 2001, the defendants filed 49 motions, notices, requests and submissions seeking all manner of stays, modifications, reaffirmations, clarifications, vacations, re-considerations and dismissals, all of which Class Counsel had to respond to in one form or another.

20.    As of October 30, 2002, the time at which the District Court appears to have issued its last order prior to appeal, the consolidated docket had been consumed with some 886 entries over a two and a half year period.

21.    After losing their motions to compel arbitration in the trial court, the majority of the defendants, with the exception of the Progressive defendants, appealed Judge Ferguson's decision to the Eleventh Circuit where the appeals are currently pending.

22.    All of the defendant insurers in these consolidated cases have stopped taking discounts on automobile medical expense claims.

**The GMAC Case**

23.    The GMAC class action was filed on May 8, 2001, over one year after the initial filing of the Allstate case.  The case was transferred and reassigned to Judge Ferguson.

8

24. After filing, Class Counsel aggressively pursued the GMAC case. On May 21, 2001, the plaintiff filed a motion for class certification. Class Counsel also served requests for production, admissions and interrogatories on GMAC and noticed depositions of GMAC personnel.

25. GMAC aggressively defended the case from the beginning. On October 22, 2001, GMAC moved to compel arbitration and to stay the case, which Class Counsel opposed. On November 13, 2001, GMAC moved for a protective order on Class Counsel's discovery. Class Counsel opposed GMAC's attempts at obtaining a protective order and filed a motion to compel GMAC to attend depositions that had been scheduled by the plaintiff. GMAC opposed the Class Counsel's motion and also filed an opposition to the plaintiff's amended motion for class certification.

26. After the Magistrate Judge recommended that the motion to compel arbitration be denied, GMAC filed its objections with Judge Ferguson. Judge Ferguson adopted the Magistrate Judge's recommendation and GMAC eventually filed its appeal with the Eleventh Circuit.

27. After the appeal was filed, Class Counsel and GMAC agreed to participate in the Eleventh Circuit's mediation program. On April 15, 2003, Class Counsel, defense counsel and representatives from GMAC appeared in person for an all day mediation with Eleventh Circuit mediator, Joseph Unger, Esq.. With the help of Mr. Unger, the parties made considerable progress in the first mediation session.

28. Thereafter, Class Counsel and defense counsel continued negotiations in person and over the telephone for over six months. There were times in the negotiation process where

9

Class Counsel questioned whether the parties would be able to settle the case. Through hard work and perseverance, the parties were able to resolve their differences and enter into a detailed settlement agreement. Settlement discussions were always conducted at arms-length, were very contentious at times and there was no collusion between counsel for the parties.

29.    During the pendency of these cases there have been two parallel state cases on the PPO discounting issue pending before the Fifth and Second Florida district courts of appeal. At the time the GMAC case was settled in principle, the Fifth District Court of Appeals had already issued its decision declaring that the insurer's PPO discounting practices violated the Florida statute. However, the Second District Court of Appeals had not yet rendered its decision.

30.    Accordingly, Class Counsel were able to negotiate benefits for the Class where claims would be paid at 100% of the PPO discounted amount and were also able to negotiate the payment of attorney's fees and costs and the costs of settlement administration outside and separate from the Class Fund of $1,500,000. Moreover, the settlement provided for direct mail notice to Class Members with a minimal proof of claim process where Class Members would not be required to submit any documentation besides the basic information requested on the claim form.

31.    Pursuant to the Settlement, Class Counsel communicated with defense counsel about the claims process and received and reviewed periodic reports from the independent Settlement Administrator and defense counsel regarding settlement administration.

32.    Class Counsel have not yet received a fee for prosecuting the GMAC case or the

10

consolidated class action cases. Class Counsel have spent approximately 8,789 hours on the consolidated cases for a total lodestar of over $2,525,027. With respect to the GMAC case, Class Counsel have spent approximately 384.77 hours prosecuting the case for a total lodestar of $150,718.78.

33.   Based on Class Counsel's experience, negotiating a class action settlement where class members can receive approximately 100% of their actual damages without an evidentiary proof of claim process is a tremendous benefit to the class, especially given the risks associated with the age of the claims, the state and Eleventh Circuit appeals and the difficulties in certifying and trying a complex RICO case. At all times Class Counsel maintained and advocated for the interests of the Class, and as a result, negotiated a settlement that far exceeds the standard class benefits in typical class action cases.

Sworn to under the pains and penalties of perjury this 31 day of January 2005.

                                        _____ for
                                        Arthur S. Gold, Esq.
                                        Gold & Coulson
                                        11 S. LaSalle Street, Suite 2500
                                        Chicago, IL 60603
                                        (312) 372-0777
                                        (312) 372-0778 (fax)

11