UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Fort Lauderdale Division

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

DR. PAUL ZIDEL, on behalf of itself and
all others similarly situated,

Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY
and COMMUNITY NETWORK , INC.,
d/b/a CCN,

Defendants.

_____/

**NIGHT BOX**
**FILED**

NOV 29 2005

CLARENCE MADDOX
CLERK, USDC/SDFL/FTL

DR. ANDREW ELLOWITZ, on behalf of himself
And others similarly situated,

CASE NO. 01-8549

Plaintiffs,

v.

AMERICAN INTERNATIONAL INSURANCE
COMPANY, AIU INSURANCE COMPANY,
AMERICAN HOME ASSURANCE COMPANY,
and AMERICAN INTERNATIONAL SOUTH
INSURANCE COMPANY,

Defendants.

_____/

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff DR. ANDREW ELLOWITZ ("ELLOWITZ") on behalf of himself and all others

similarly situated, by his undersigned counsel, sues Defendants ,AMERICAN

INTERNATIONAL INSURANCE COMPANY, AIU INSURANCE COMPANY, AMERICAN

HOME ASSURANCE COMPANY, and ,AMERICAN INTERNATIONAL SOUTH

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

INSURANCE COMPANY (collectively, "AIG"), and alleges as follows:

## THE PARTIES

1.    ELLOWITZ is a physician licensed in the state of Florida with his principal place of business in Broward County, Florida.

2.    AMERICAN INTERNATIONAL INSURANCE COMPANY is incorporated under the laws of the State of New York with its principal place of business located in Wilmington, Delaware.  AIU INSURANCE COMPANY is incorporated under the laws of the state of New York with its principal place of business located in New York, New York. AMERICAN HOME ASSURANCE COMPANY is incorporated under the laws of the state of New York with its principal place of business located in New York, New York.  AMERICAN INTERNATIONAL SOUTH INSURANCE COMPANY is incorporated under the laws of the State of Pennsylvania with its principal place of business located in New York, New York.  AIG provides automobile insurance throughout the State of Florida, is registered to do business in Florida, and transacts business in the Southern District of Florida.

3.    Non-Party Focus Healthcare Management, Inc. ("Focus") is a Tennessee corporation that established a preferred provider organization.

4.    Non-Party Chiro Alliance Corporation ("Chiro Alliance") is a Florida corporation that is an independent physician association.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States, specifically 18 U.S.C. § 1961 et seq. (the "RICO Act").

6.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 (b) and (c)

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

because a substantial part of the events or omissions giving rise to the claims occurred in this District. AIG is subject to personal jurisdiction in this District, AIG insures numerous individuals in this District, and numerous class members are present in this District.

## BACKGROUND

7.    AIG's standard Florida Automobile Insurance Policy (hereinafter the "Policy") provides personal injury protection benefits to its insureds. Certain policies also provide extended personal injury protection benefits and MPC coverage. All such coverage shall be referred to as ("PIP") coverage.

8.    With respect to payment of accident related medical expenses under PIP, AIG's policy of insurance states in pertinent part that AIG must pay eighty (80%) percent of all reasonable and necessary accident related medical expenses.

9.    AIG's Policy is a typical Florida indemnity insurance policy under which AIG is required to indemnify claimants for eighty percent (80%) of the full cost of their reasonable and necessary medical bills up to a defined limit.

10.    Under the Policy, an insured has the absolute right and freedom to choose his or her medical providers.

11.    Within Policy limits, medical providers have the unrestricted right to be reimbursed eighty percent (80%) of their reasonable and necessary accident related medical expenses.

12.    The State of Florida's PIP statute directly addresses a healthcare provider's right to be paid for reasonable charges. Section 627.736(5), Florida Statutes ("Section 627.736") states:

> Any physician, hospital, clinic, or other person or institution lawfully rendering
> treatment to an injured person for bodily injury covered by personal injury

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

protection insurance may charge only a reasonable amount for the products, services, and accommodations rendered ...

13.    Florida statutes permit an automobile insurance company to designate certain medical providers as preferred providers *if* the automobile insurer establishes a legitimate preferred provider organization ("PPO") network by satisfying the strict requirements of Section 627.736(10) which provides as follows:

> (10) An insurer may negotiate and enter into contracts with licensed healthcare providers for the benefits described in this section, referred to in this section as "preferred providers," which shall include healthcare providers licensed under chapters 458, 459, 460, 461, and 463. The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a non-preferred provider policy, the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policy-holder or applicant, it must also offer a non-preferred provider policy. The insurer shall provide each policy-holder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

14.    AIG has not offered its insureds preferred policies for PIP automobile insurance. As such, any medical provider who treated or treats an AIG insured under an AIG PIP auto insurance policy is not a "preferred provider." Therefore, in accordance with the above quoted statute, "the medical benefits provided by the insurer <u>shall</u> be as <u>required</u> by this section." (emphasis added). The medical benefits "required" are 80% of "all reasonable and necessary treatment, expenses..."

15.    Companies such as Focus are sometimes referred to as "brokers" or "managed care companies" in the healthcare industry. Focus contracts with healthcare providers, or

associations such as Chiro Alliance for the purpose of uniting healthcare providers with commercial payors to coordinate and arrange for the delivery of healthcare services to the payors' legitimate subscribers.  Focus may also administer healthcare claims submitted by healthcare providers to insurance companies.  These contracts are typically referred to as Preferred Provider Agreements ("PPAs").

16.    The contracts entered into with healthcare providers by Focus require the healthcare providers to accept fees for services to subscribers at discounted rates from payors.

17.    Healthcare providers, by definition, include, but are not limited to, physicians, chiropractors, hospitals, pharmacies, and other healthcare facilities.

18.    Payors benefit by paying healthcare providers at discounted rates.

19.    Healthcare providers benefit by becoming part of the network of healthcare providers that are supposed to be marketed by payors to their subscribers and insureds through the use of directories and marketing tools, thus increasing the healthcare providers' volume of business referrals. Such healthcare providers are recognized as "preferred providers."

20.    The insurance policies sold or provided by the payors to their subscribers are recognized as "preferred provider policies."

21.    The combination of all parties to this endeavor is recognized  as a Preferred Provider Organization.

22.    At all times material herein, ELLOWITZ entered into a contract with Chiro Alliance.  Chiro Alliance then entered into an agreement with Focus under which it agreed to provide Focus access to its members.    Thereafter, AIG began applying ELLOWITZ's Focus/Chiro Alliance contractual discount to ELLOWITZ's medical bills for its patients who were injured in automobile accidents and covered by a Florida AIG PIP Policy.  AIG processed

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

and discounted ELLOWITZ's bills based on the Focus/Chiro Alliance contractual discount.

23.     Section 627.736(10), provides a means for AIG to participate in such a PPO and offer a preferred provider policy for personal injury protection automobile insurance to its insureds after it enters into contracts with healthcare providers.

24.     AIG never became a legitimate participant in ELLOWITZ's purported PPO and never complied with the requirements of the Section 627.736(10).

25.     Nevertheless, AIG has taken discounts on healthcare providers' bills as if it were a legitimate participant in ELLOWITZ's purported PPO and had complied with Section 627.736 by offering a preferred provider policy of personal injury protection automobile insurance to its insureds, none of which was done by AIG.

26.     This unlawful practice (called a "Silent PPO") allows AIG to enjoy substantial savings and profits by paying out less in benefits which in turn causes ELLOWITZ and those similarly situated to suffer financial loss, without any consideration from AIG for these discounts.

27.     AIG, Focus and Chiro Alliance have collectively engaged in the previously described Silent PPO scheme to reduce benefits paid on PIP claims.

28.     The Silent PPO scheme has emerged primarily in the context of indemnity plans. Indemnity insurers, such as AIG, obtain access to PPO networks of preferred providers and their discounts.  AIG takes advantage of these discounts.

29.     AIG is not, however, entitled to take advantage of these legitimate PPO discounts under the terms and conditions of its Florida automobile insurance policies and  the Florida PIP statutes.

30.     AIG has not established the statutory prerequisites to be entitled to these PPO

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

discounts.

31.     This Silent PPO scheme contains none of the legitimate steerage mechanisms required by legitimate PPOs.  Legitimate steerage mechanisms include creating financial incentives for steering insureds to preferred providers such as lower premiums or lower co-payments, providing education and marketing information including directories and lists to insureds about preferred providers in the network, and printing and distributing preferred provider identification cards.

32.     By using the Silent PPO scheme, AIG enjoys substantial savings by paying PIP benefits without the attendant expense of establishing a legitimate PPO network.

33.     Legitimate managed care companies and insurers have knowledge of the illegality of such schemes.  The American Association of Preferred Providers has denounced such practices and the American Medical Association has issued an "Action Alert Kit" to its members educating them about Silent PPO schemes.

34.     AIG had knowledge of the illegal nature of this Silent PPO discounting scheme. Silent PPO discounting schemes have been the subject of widespread discussion in the insurance and managed care industries with many major medical associations denouncing the practice.

35.     Focus and Chiro Alliance had direct knowledge of the illegitimate nature of Silent PPOs.

36.     Under AIG's Silent PPO scheme, Focus and Chiro Alliance licensed, leased or otherwise provided their discount database to AIG.

37.     Armed with the Focus /Chiro Alliance preferred provider database of discounts, AIG systematically processed Florida medical expense claims through its automated PPO re-pricing product and applied discounts to bills where the medical provider's tax identification

LEE & AMTZIS, P.L.
Attorneys at Law

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

number on the bill matched a tax identification number in the Focus/Chiro Alliance database. At no time did ELLOWITZ have a contract with AIG authorizing discounts to be taken on its medical bills.

38.     AIG routinely and systematically used the Focus/Chiro Alliance preferred provider discounts to reduce millions of dollars of medical bills. The discounts were routinely and systematically applied despite the fact that a preferred provider policy was not offered by AIG and despite the fact that claimants were not referred steered or directed to preferred providers.

39.     As part of AIG's Silent PPO scheme, upon information and belief, Focus and Chiro Alliance were paid a percentage of AIG's PPO discount savings and/or a per transaction fee for processing claims for AIG.

40.     Without complying with the statutory prerequisites for the establishment of an automobile insurance PPO network, AIG has systematically discounted medical providers' PIP medical expenses by utilizing PPO discounts.

41.     AIG has illegitimately discounted hundreds of thousands of PIP medical expense claims in this manner without providing any steerage or other meaningful consideration for such discounts.

## FACTS AS TO PLAINTIFF

42.     ELLOWITZ was a party to an agreement with Chiro Alliance which purportedly established an independent physician association. Chiro Alliance then allowed Focus to access its providers' services through an agreement ("Licensing Agreement").

43.     Pursuant to the purported Licensing Agreement, Chiro Alliance agreed to allow its members to become a part of Focus' Network.

LEE & AMTZIS, P.L.
Attorneys at Law

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

44.     ELLOWITZ's agreement with Chiro Alliance could not allow automobile insurers or PPO discount brokers with automobile insurer clients the right to pay PPO rates to ELLOWITZ.

45.     AIG had not offered a PPO endorsement to its automobile insureds. Moreover, AIG never offered its Florida automobile insureds premium reductions as an economic incentive to use preferred providers.

46.     Despite these known facts, Chiro Alliance entered into an agreement with Focus which allowed AIG to pay claims at PPO rates.

47.     With Focus' consent, its database of preferred provider discounts was loaded into AIG's software and applied to bills submitted to AIG by Chiro Alliance members such as ELLOWITZ.

48.     ELLOWITZ never agreed to provide healthcare services to subscribers of AIG at a rate lower than ELLOWITZ would normally accept for the same healthcare services.

49.     AIG obtained access to Focus' and Chiro Alliance's database that contained the identities of all purported Chiro Alliance preferred providers, as well as the discounted fee rates that Focus/Chiro Alliance applied.

50.     At no time did AIG have a written contract with ELLOWITZ or other healthcare providers in Florida wherein healthcare providers agreed with AIG to accept PPO rates for their medical services to patients injured in automobile accidents who were insured for PIP coverage by AIG.

51.     By virtue of AIG's access to the discounted rates in the purported agreements between Focus/Chiro Alliance, ELLOWITZ, and the class, AIG began to systematically apply PPO discounts.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

52.    AIG  has mailed explanation of review forms ("EOBs") that indicated the application of a discount based upon the Focus/Chiro Alliance PPO.

53.    These EOBs state that AIG is entitled to such discounts.

54.    Under this scheme, AIG has been reaping huge savings while violating Florida law and providing no consideration whatsoever to healthcare providers, including ELLOWITZ, for the right to apply such discounts.

55.    Under AIG's Silent PPO scheme, it incorporated the purported Focus/Chiro Alliance  preferred provider discounts into its existing cost containment software product - a product specifically designed to "re-price" medical bills based on preferred provider rates for non-managed care lines of insurance such as property and casualty insurance.

56.    At all times material herein, in the course of its medical practice, ELLOWITZ provided medical care to patients who had been injured in automobile accidents and who were entitled to PIP benefits from AIG.

57.    At no time prior to their treatment with ELLOWITZ did this class of patients receive any marketing materials, including, but not limited to, publications identifying ELLOWITZ's name, address and available services, from AIG.

58.    At no time did AIG comply with the requirements of Section 627.736(10).

59.    At no time prior to their treatment with ELLOWITZ did AIG encourage patients to use ELLOWITZ's medical services.

60.    After providing medical treatment to patients, ELLOWITZ submitted medical bills for reasonable and necessary accident related medical expenses to AIG for payment.

61.    Upon receipt of the medical bills submitted by ELLOWITZ for payment under the PIP portion of the AIG Automobile Policy, AIG discounted ELLOWITZ's and other class

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

members' bills by using the Focus/Chiro Alliance PPO discounted rates claiming that AIG was entitled to said discounts.

62.    Upon information and belief, Focus and/or Chiro Alliance were paid a percentage of AIG's discount savings on each PIP medical expense claim.

63.    ELLOWITZ and other class members have received no consideration from AIG for the discounts taken.

64.    AIG could not provide such consideration because AIG failed to offer its insureds a PPO automobile insurance policy in compliance with the Florida PIP statute.

65.    AIG's illegal activity is demonstrated by Exhibit "1" attached hereto.  Exhibit "1" represents a sample of an EOB received by ELLOWITZ illustrating the illegal discount.

66.    ELLOWITZ billed AIG $30, $35, $35 and $40 for CPT Codes 97010, 97012, 97014 and 97124, respectively.  AIG then paid less than the amount billed by ELLOWITZ.  AIG reduced the billed amounts pursuant to the Focus/Chiro Alliance agreement.

67.    AIG was supposed to pay eighty (80%) percent of the billed amount.

68.    AIG paid only 80% of the reduced amount as its full obligation under the insured's automobile insurance policy.

69.    This example resulted in the misappropriation of $28 from ELLOWITZ.

70.    AIG routinely and systematically applied the Focus/Chiro Alliance    PPO discounted rates to PIP medical expense claims.

71.    At the time AIG implemented its PPO discounting scheme, it knew it was violating Florida law.

72.    After taking the illegal discounts on ELLOWITZ's and the class' bills, as described above, AIG routinely printed out EOBs showing the discounts.  It then forwarded the

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

EOBs and reduced payment checks to the healthcare providers in purported full satisfaction of the healthcare providers' medical charges.

73.    It was and is the custom and practice of AIG to discount thousands of automobile medical expense claims in this manner in violation of its policies with its insureds and in violation of Florida's PIP statutes.

74.    ELLOWITZ and those similarly situated have been economically damaged and have suffered monetary losses as a result of the conduct of AIG.

## CLASS ACTION ALLEGATIONS

75.    ELLOWITZ brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of a class of all other persons and entities similarly situated.   The class is defined to include:

> Health care providers, as defined by the Florida Motor Vehicle No-Fault Act: (a) That rendered medical services to person(s) insured under an American International PIP policy; (b) That received a valid assignment of benefits from the person(s) insured by American International as to such services; (c) That submitted bills for payment for such services to American International; (d) Whose bills were reduced by American International based on the application of a PPO reduction during the Class Period (January 1, 1996 through January 1, 2005); and (e) Who are identified as having had bills subject to a PPO reduction in American International's own records for the period December 1, 1997 through March 30, 2001.

76.    There are questions of law and fact that are common to all members of the class, which questions predominate over any question affecting only individual class members.

77.    The principal common issues include the following:

(a)    whether AIG violated Section 627.736, Florida Statutes, by paying personal injury protection medical expense claims at discounted Preferred Provider rates;

(b)    whether AIG's processing of the PPO discounts is permissible under state law or federal law;

(c)    whether ELLOWITZ and those similarly situated are entitled to compensatory, statutory, or punitive damages against AIG because of its illegal conduct; and

(d)    whether ELLOWITZ and the class are entitled to an injunction preventing the continued disclosure and/or use of their discounts by AIG and the application of these discounts to automobile personal injury protection medical expense claims.

78.    The class is comprised of all healthcare providers whose medical bills were discounted by AIG based upon a purported Preferred Provider Organization reduction.

79.    The amounts of the discounts are contained in AIG's computer systems and on the EOBs and checks mailed by AIG to ELLOWITZ and the members of the class.

80.    ELLOWITZ's claims are typical of the claims of all members of the class because the claims are based on the same legal and remedial theories.

81.    ELLOWITZ will fairly and adequately protect the interests of all class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein.

82.    ELLOWITZ is similarly situated with, and has suffered similar injuries as, the members of the class that he seeks to represent.

83.    ELLOWITZ has retained counsel experienced in class action cases and healthcare litigation.

84.    Neither ELLOWITZ, nor counsel, have any interest that may cause them to not vigorously pursue this action.

85.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, because:

(a)    the individual class members are not all aware that they have been

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

wronged and are thus unable to prosecute individual actions;

       (b)     concentration of the litigation concerning this matter in this Court is desirable;

       (c)     the claims of the representative Plaintiff are typical of the claims of the members of the class;

       (d)     a failure of justice will result from the absence of a class action; and

       (e)     the class and the difficulties likely to be encountered in the management of this class action are not great.

86.    The class is so numerous as to make it impracticable to join all members of the class as plaintiffs.

87.    AIG has discounted thousands of medical bills based on the Focus/Chiro Alliance discounted rates. Many healthcare providers may not even be aware of AIG's sophisticated scheme, and if they were, for many providers, the amount in controversy would be too small to justify the expense of pursuing individual litigation.

88.    In contrast, on a class-wide basis, AIG has saved millions of dollars by accessing and utilizing the discounted rates of healthcare providers.

**AS AND FOR A FIRST**
**CAUSE OF ACTION**
**(Unjust Enrichment)**

89.    ELLOWITZ repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

90.    ELLOWITZ and the class conferred benefits upon AIG by providing healthcare services to individuals insured by AIG.

91.    ELLOWITZ and the class billed AIG the reasonable value for these services.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

92.    AIG improperly paid these bills at reduced rates.

93.    AIG has provided no consideration to ELLOWITZ and the class for the retention of the discounts by AIG.

94.    AIG has reaped the benefit of substantial monetary savings on PIP claims by wrongfully and illegally applying the Focus/Chiro Alliance PPO discounted rates to Florida PIP medical expense claims.

95.    AIG had knowledge that it reaped said financial benefits to the detriment of ELLOWITZ and the members of the class by voluntarily accepting and retaining said benefits.

96.    Such savings constitute unjust enrichment for AIG and it would be inequitable under the circumstances for AIG to retain the benefits received from ELLOWITZ and the members of the class without paying the full value thereof to ELLOWITZ and the class members.

### AS AND FOR A SECOND
### CAUSE OF ACTION
### (Third-Party Beneficiary Breach of Contract)

97.    ELLOWITZ repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

98.    AIG and its insureds who purchased its Florida PIP automobile insurance policy entered into a contract of insurance.

99.    AIG's contract provided that in the event an insured was involved in an automobile accident, AIG would pay, on the insured's behalf, eighty (80%) percent of all reasonable and necessary medical expenses incurred.

100.    ELLOWITZ and the other members of the class provided medical services to AIG insureds who were injured in automobile accidents.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

101.    ELLOWITZ and the members of the class are intended third-party beneficiaries of AIG's automobile insurance agreements.

102.    ELLOWITZ and the members of the class were to be paid eighty (80%) percent of all reasonable and necessary medical expenses incurred and billed.

103.    AIG breached the agreement by improperly paying medical expenses at reduced rates.

104.    As a result, ELLOWITZ and the putative class members have suffered damages directly and proximately caused by AIG's breach of its insurance agreements with its insureds.

### AS AND FOR A THIRD
### CAUSE OF ACTION
### (RICO Act Violations)

105.    ELLOWITZ repeats and realleges each and every allegation contained in

106.    Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

107.    AIG, acting with Focus/Chiro Alliance formed an association-in-fact enterprise designed to reduce payments made to Focus/Chiro Alliance preferred providers on all Florida PIP medical expense claims submitted to AIG.  The "association- in- fact" is known as a "Silent PPO."

108.    AIG, with the knowing or grossly negligent cooperation of Focus and Chiro Alliance  participated, directly and indirectly, in the activities of this enterprise through a pattern of racketeering activity, as more fully set forth below.

109.    The activities of this enterprise affected commerce.

110.    The pattern of racketeering activity consisted of multiple acts of mail and wire fraud, punishable under 18 U.S.C. § 1341 and § 1343, respectively.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

16

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

111.    The pattern of racketeering activity has been continuous for at least two years, and, on information and belief, will continue into the future.

112.    In furtherance of the pattern of racketeering activity, AIG has engaged in a continuous scheme and artifice to defraud ELLOWITZ, and those similarly situated, of money as follows:

(a)    Chiro Alliance solicited ELLOWITZ by mail to join its independent physician association.  Chiro Alliance mailed its marketing and agreements to potential providers through use of the United States mails.  Chiro Alliance entered into an agreement with ELLOWITZ and class members which could not authorize the disclosure, sale, lease or license of preferred provider discounts to AIG;

(b)    Chiro Alliance entered into an agreement with Focus through use of the United States mails which allowed Focus to access the services of Chiro Alliance providers;

(c)    Focus and/or Chiro Alliance then entered into a broker agreement (hereinafter referred to as a "Broker Agreement") with AIG which allowed for the disclosure and lease and/or license of the Focus/Chiro Alliance  preferred provider database to AIG;

(d)    AIG applied the Focus/Chiro Alliance preferred provider discounts to medical expense claims submitted to AIG by Focus/Chiro Alliance preferred providers;

(e)    Focus, Chiro Alliance and AIG transferred claim information, medical bills, EOBs, compensation information and documentation and other documentation and information necessary to carry out this scheme via the United States mails and/or by wire;

(f)    After computer application of the discounts, AIG printed EOBs which indicated the PPO discount and the reduced amount owed after application of the discount;

(g)    By use of the United States mail, Focus, Chiro Alliance and/or AIG

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

thereafter transmitted or caused to be transmitted said EOBs and reduced claim checks to medical providers and persons insured by AIG.

(h)    Said EOBs falsely represented that AIG was entitled to apply a Focus/Chiro Alliance PPO discount to the claim;

(i)    Said EOBs falsely claimed the "Recommended Allowance" to be less than the amount actually owed and also falsely decreased a claimant's deductible, thereby exposing claimants to liability for the fraudulently discounted amount;

(j)    AIG, Focus and/or Chiro Alliance engaged in interstate telephone calls, computer communications, and/or wire communications and transactions to transmit information that was false and to exchange fees and compensation essential to the scheme.

113.    In the above described manner, AIG was able to gain access to managed care contract rates for application to Florida PIP medical expense claims without providing any consideration to ELLOWITZ or members of the purported class, and without ever entering into a managed care agreement with any medical providers.

114.    This scheme to sell and grant access to unauthorized proprietary discounts worth millions of dollars has directly caused monetary damages to ELLOWITZ and members of the class.

115.    AIG's, Focus' and/or Chiro Alliance's conduct gives rise to claims under 18 U.S.C. § 1964(a) of RICO and permits the recovery of treble damages against AIG for violations of 18 U.S.C. § 1962 (c), for a conspiracy to violate 18 U.S.C. § 1962(a) in violation of 18 U.S.C. § 1962(d) and for seeking to aid and abet and aiding and abetting violations of 18 U.S.C. § 1962(a) within the meaning of 18 U.S.C. § 2.

116.    ELLOWITZ and the class members are "persons" within the meaning of 18

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

18

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

U.S.C. § 1964(c).

117.    At all times relevant hereto, ELLOWITZ and class members were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

118.    With respect to the activities alleged herein, AIG, Focus and/or Chiro Alliance acted at all times with malice toward the class, intent to engage in the conduct complained of for their own benefit and with knowledge that such conduct constituted unlawful activity.  Such conduct was done with reckless disregard for the rights of the class as well as the laws, to which AIG, Focus and/or Chiro Alliance are subject, the same amounting to actionable wantonness.

119.    With respect to the activities alleged herein, AIG, Focus and/or Chiro Alliance aided and abetted each other, and others not named in this Complaint, in committing those activities, within the meaning of 18 U.S.C. § 2, by seeking to aid and abet and aiding and abetting a scheme to violate 18 U.S.C. §§ 1962(a) and (c).

120.    AIG operated the scheme or artifice to defraud and to obtain money by false pretenses and to deprive class members of the intangible right of honest payment.

121.    In furtherance of this scheme, AIG, Focus and/or Chiro Alliance interfered with, obstructed, delayed or affected commerce by attempting to obtain and/or actually obtaining property interests, to which AIG, Focus and Chiro Alliance are not entitled, through the exploitation of discount rates.

122.    With respect to the overt acts and activities alleged herein, AIG communicated and conspired with Focus and/or Chiro Alliance to violate 18 U.S.C. §§ 1962(a) and (c), all in violation of 18 U.S.C. § 1962(d).

123.    AIG communicated with Focus and/or Chiro Alliance so that it could participate directly in the fraudulent scheme or artifice alleged herein, to obtain money by false pretenses

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

and to deprive class members of the intangible right of honest payment.

124.    AIG communicated with Focus and/or Chiro Alliance so that it could participate directly in the interference with, obstructing of, delaying of, or effect upon commerce by actually obtaining property interests to which AIG was not entitled, through the exploitation of a proprietary discount rate.

125.    The numerous predicate acts of mail and wire fraud and interference with the operation of legitimate preferred provider discounts herein are part of a common fraudulent and extortionate scheme by AIG, Focus and/or Chiro Alliance to defraud ELLOWITZ and the purported class of money and property interests under false pretenses; to deprive ELLOWITZ and the purported class of receipt of reasonable and necessary compensation for medical services; to interfere with the patient-doctor fiduciary relationship; and to place AIG's, Focus' and/or Chiro Alliance's financial interests over the confidential records of ELLOWITZ and the class so that AIG, Focus and/or Chiro Alliance could make greater profits.

126.    ELLOWITZ, and the purported class, as victims of this unlawful pattern of illegal activity, have and continue to suffer losses.

**A.    RACKETEERING ACTIVITIES.**

127.    In carrying out the overt acts and fraudulent scheme described above, AIG, Focus and/or Chiro Alliance engaged in *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. §§ 1341 and 1346, 18 U.S.C. §§ 1343 and 1346, 18 U.S.C. § 1951(b)(2), 18 U.S.C. § 1952(a), 18 U.S.C. § 1954, and 18 U.S.C. § 961 et seq., as stated below.

128.    Section 1961(l) of RICO provides that "'racketeering activity' means. . . any act which is indictable under any of the following provisions of Title 18, United States Code ...

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

20

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Section 1341 (relating to mail fraud), Section 1343 (relating to wire fraud)."

129.    The United States Congress amended the mail and wire fraud statutes in 1988 by codifying a partial definition of the central term "scheme or artifice to defraud." The newly created definition of a "scheme or artifice" for purposes of specifically recognizing by statute certain unlawful acts also constituting mail and wire fraud violations under 18 U.S.C. §§ 1341 and 1343, respectively, now reads in its entirety as follows: "For purposes of this chapter, the term 'scheme or artifice' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

**1.   18 U.S.C. §§ 1341 and 1346, and 18 U.S.C. §§ 1343 and 1346**

130.    For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, AIG, Focus and Chiro Alliance, in violation of 18 U.S.C. § 1341 and § 1346, placed in United States Post Offices and/or in authorized repositories for mail, matter, matters and things to be sent or delivered by the United States Postal Service, and received matters and things therefrom and knowingly caused to be delivered by mail those matters and things according to the directions thereon or at the place at which they were directed to be delivered by the persons to whom they were addressed.

131.    For the purpose of executing and/or attempting to execute its scheme to defraud and to obtain money by means of false or fraudulent pretenses, as well as to execute and/or attempt to execute its scheme or artifice to deprive another of the intangible right of honest services, AIG, Focus and/or Chiro Alliance, in violation of 18 U.S.C. §§ 1343 and 1346, transmitted in interstate commerce by wire, telephone, or computer transmissions, information

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

regarding illegal discounts. In this manner, AIG, was knowingly violating purported obligations of Chiro Alliance to ELLOWITZ and others similarly situated to provide "honest services."

132.    AIG knowingly induced Focus and/or Chiro Alliance to deprive ELLOWITZ and others similarly situated of "honest services."

133.    In those matters and things sent or delivered by the United States Postal Service referred to above, AIG, Focus and/or Chiro Alliance falsely and fraudulently represented to ELLOWITZ and the class that AIG was entitled to a PPO discount from ELLOWITZ and the class under a system that legitimately provides education, marketing and economic incentives intended to "steer" more patients  and to provide other benefits to healthcare providers. AIG failed, however, to disclose to ELLOWITZ and the class that its EOBs were based upon illegal discounts designed to maximize profits on discounts illegally obtained  through ELLOWITZ's proprietary information.  AIG thus failed to disclose material facts regarding AIG's internal policies and practices specifically designed to reduce or limit the level of payment discussed in detail above.

134.    With respect to its unlawful activities described above, AIG also transmitted funds, contracts, and other forms of business communications and transactions in a continuous and uninterrupted flow across state lines and employed the United States mails and interstate wires in violations of 18 U.S.C. §§ 1341, 1343, and 1346.

135.    AIG intentionally and knowingly deceived ELLOWITZ and the purported class referred to above for the purpose of financial gain. AIG either knew, or recklessly disregarded, that the illegal discounts described above were material.

136.    ELLOWITZ and the class have been injured in their business or property by AIG's overt acts and racketeering activities in amounts to be determined at trial.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

## 2.  18 U.S.C. § 1951(b)(2)

137.  During the relevant times and in furtherance of and for the purpose of executing and/or attempting to execute the above discussed scheme and artifice to defraud or deprive, AIG, Focus and/or Chiro Alliance, on numerous occasions aided and abetted and conspired to and attempted to and did interfere with, obstruct, delay or affect "commerce" as that term is defined in 18 U.S.C. § 1951.

138.  AIG unlawfully attempted to and/or did induce Focus and/or Chiro Alliance to cause ELLOWITZ and numerous other healthcare providers to part with various property interests to which AIG was and is not entitled, including the intangible property right of healthcare providers to conduct their business free of fraud and their fiduciary obligation to provide their patients with privacy.

139.  AIG's conduct induced Focus and/or Chiro Alliance to provide it with the names of healthcare providers and their discounts and exploited a fear of economic loss and/or loss of business by ELLOWITZ and others similarly situated in violation of 18 U.S.C. § 1951(b)(2).

140.  In furtherance of the scheme or artifice to defraud to obtain money by false pretenses from ELLOWITZ and the class, AIG communicated with Focus and/or Chiro Alliance to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which AIG was not entitled through the exploitation of healthcare providers' fear of economic loss and/or loss of business by refusing to contest the aforesaid illegal discounts.

141.  AIG either knew, or recklessly disregarded, that the natural consequences of its acts would exploit and continue to exploit fear of economic loss or loss of business by ELLOWITZ and the class.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

142.    AIG's, Focus' and/or Chiro Alliance's overt acts and fraudulent and extortionate racketeering activities has and continues to defraud ELLOWITZ and the members of the class, of money, has and continues to unlawfully influence and interfere with the purported relationship of Focus and ELLOWITZ and the purported class, as well as interfering with the fiduciary relationship between ELLOWITZ, and members of the purported class and their patients.

143.    ELLOWITZ and the purported class have, therefor, been injured in their business or property by AIG's overt acts and racketeering activities in amounts to be determined at trial.

### 3. 18 U.S.C. § 1952(a).

144.    During the relevant times, and in furtherance of and for the purpose of executing the above-described scheme and artifice to defraud ELLOWITZ and the purported class, AIG, Focus and/or Chiro Alliance and their respective employees, agents and others, on numerous occasions did travel and caused others not named in this Complaint to travel in interstate commerce in order to attempt to and to commit mail fraud and wire fraud in violation of the Travel Act, 18 U.S.C. § 1952(a).

145.    AIG's, Focus' and/or Chiro Alliance's overt acts and fraudulent racketeering activity has and continues to defraud ELLOWITZ and the class of money.

### B.    PATTERN OF RACKETEERING ACTIVITY.

146.    AIG, Focus and/or Chiro Alliance have engaged in a "pattern of racketeering activity" as defined in 18 U.S.C. 1961(5) of RICO by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above, within the past ten years.   Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including ELLOWITZ and the class.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

147.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by AIG, Focus and/or Chiro Alliance, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefor, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

### C.    RICO VIOLATIONS OF 18 U.S.C. §§ 1962 (d).

148.    ELLOWITZ's claim for relief also arises under 18 U.S.C. § 1964 (c) of RICO and seeks to recover actual and treble damages for AIG's, Focus' and Chiro Alliance's violations of 18 U.S.C. §§ 1962(c) and for its violations of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a) and (c).

### 1.  Section 1962(c) claim.

149.    ELLOWITZ repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

150.    18 U.S.C. § 1962(c) of RICO provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

151.    18 U.S.C. § 1961(3) of RICO states that a "person" includes any individual or entity capable of holding a legal or beneficial interest in property.

152.    18 U.S.C. § 1961(4) of RICO defines enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

153.    For purposes of this 18 U.S.C. § 1962(c) claim, the persons consist of AIG, Focus and/or Chiro Alliance.  The enterprise is an association-in-fact consisting of AIG, Focus and/or

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Chiro Alliance by virtue of its control over physicians, medical specialists, medical laboratories, hospitals, healthcare clinics, pharmacies, home healthcare agencies, and other miscellaneous healthcare providers, all of which have the purpose of providing healthcare services to AIG's insureds making PIP claims under AIG's automobile insurance policies.

154.    This 18 U.S.C. § 1962(c) enterprise is distinct from AIG and includes many persons who are not employees of AIG and many entities that are not owned by AIG.    The Section 1962(c) enterprise is engaged in, and its activities substantially affect, interstate commerce.

155.    AIG is associated with Focus and Chiro Alliance in the 18 U.S.C. § 1962(c) enterprise as described above and conducts and participates in the affairs of that enterprise through the pattern of racketeering activity described herein. ELLOWITZ and the purported class members are directly and proximately injured both by this pattern of activity and by AIG's conduct and participation, for which they are entitled to actual and treble damages, attorneys' fees, and costs under 18 U.S.C. § 1964(c).

### 2.    Section 1962(d) Claim.

156.    ELLOWITZ repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

157.    This claim for relief also arises under 18 U.S.C. § 1964(c) of RICO and seeks to recover actual and treble damages for AIG's, Focus' and Chiro Alliance's violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a) and (c). Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

158.    18 U.S.C. § 1961(4) of RICO defines "enterprise" to include "any individual,

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

159.    18 U.S.C. § 1962 (a) of RICO provides that it "shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity... to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

160.    For purposes of the claim of a conspiracy in violation of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a), the persons under the latter subsection consist of AIG, Focus and Chiro Alliance and the enterprise consists of AIG and its investment division, which further profits from the ill-gotten gains.

161.    At all times relevant herein, Focus', Chiro Alliance's and AIG's investment division together constitute an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).

162.    The AIG investment division was and continues to be the investment beneficiary of additional monies realized from the above overt acts and fraudulent and extortionate scheme or activities to defraud ELLOWITZ and the purported class of money and to deprive them of their intangible right of honest services from Focus.

163.    AIG sells insurance. Assets generated from AIG's unlawful practices described herein are in the millions of dollars and the proceeds of such income amount to millions of dollars.

164.    AIG derived substantial income and proceeds through the above described pattern of racketeering activity, and conspired to use or invest, and did use or invest, directly or

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

indirectly, a significant part of such income or proceeds in the operation of the enterprise described above, in violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a).

165.    This use or investment injures ELLOWITZ and the purported class members because it permits that enterprise to continue, expand, and increase its revenue and to affect healthcare providers that are attacked by the enterprise. This use and investment directly and proximately injures purported class members in a manner that is distinct from the injury caused by the pattern of racketeering activity described herein.

166.    As demonstrated in detail above, AIG has engaged in numerous overt and predicate fraudulent and extortionate racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to fraudulently require ELLOWITZ and the purported class to accept discounted payments, yet failing to disclose numerous internal systemic fraudulent and extortionate policies and practices designed to defraud ELLOWITZ and the class of money, and to unlawfully interfere with their physician-patient relationship.

167.    AIG's pattern of fraudulent and extortionate racketeering acts include, but are not limited to, acts in furtherance of its efforts to not disclose conflicts of interest brought about by AIG's inducement to Focus and Chiro Alliance to allow AIG to defraud ELLOWITZ and the purported class.

168.    The nature of the above described acts of AIG constitutes material misrepresentations that give rise to an inference that AIG knew it was violating the objective of 18 U.S.C. § 1962(d) by violating 18 U.S.C. §§ 1962(a) and (c), through its ongoing fraudulent and extortionate acts that have been and are part of an overall pattern of racketeering activity.

169.    As a direct and proximate result of AIG's overt acts and predicate acts in

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

28

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. §§ 1962(a) and (c), ELLOWITZ and the class have been and are continuing to be injured in their business or property.

170.    Pursuant to 18 U.S.C. § 1964(c), ELLOWITZ is entitled, therefore, to bring this action on behalf of the purported class and to recover actual and treble damages, as well as the costs of bringing this suit and attorneys' fees.

171.    AIG has sought to and has engaged in the commission of and continues to commit overt acts and the aforesaid described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by AIG from such pattern of racketeering activity, to-wit:

        (a)      multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1343;

        (b)      multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

        (c)      multiple instances of wire fraud violations of 18 U.S.C. §§ 1343 and 1346;

        (d)      multiple instances of extortion violations of 18 U.S.C. § 1951(b)(2);

        (e)      multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud, wire fraud, and extortion, in violation of 18 U.S.C. § 1952(a); and

        (f)      multiple instances of violations of 18 U.S.C. § 1954.

172.    AIG's violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting AIG's illegal acts constituting a pattern of racketeering activity is fashioned and imposed by this Court.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

## AS AND FOR A FOURTH
## CAUSE OF ACTION
### (Declaratory Judgment)

173.    ELLOWITZ repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

174.    As previously alleged, AIG has improperly taken advantage of discounts to which it is not entitled for all the reasons that have been set forth in the previous paragraphs of this Complaint.

175.    AIG has taken these discounts in breach of the terms and conditions of their automobile insurance policies.  Said policies are indemnity policies that do not provide for preferred provider benefits or the application of preferred provider rates.

176.    By using the Focus/Chiro Alliance purported preferred provider rates to limit the payment of ELLOWITZ's and class members' PIP medical bills, AIG has imposed a limitation on benefits that is not contained in their automobile insurance policies.  ELLOWITZ and the class members are intended third-party beneficiaries of said insurance policies and are entitled to a declaration that AIG's payments of their PIP medical bills at preferred provider rates is a breach of the applicable insurance contracts.

## AS AND FOR A FIFTH
## CAUSE OF ACTION
### (Violation of Section 627.736, Florida Statutes)

177.    ELLOWITZ repeats and realleges each and every allegation contained in Paragraphs "1" through "88" above, with the same force and effect as if set forth fully herein.

178.    At all times material herein, ELLOWITZ and the members of the class that he seeks to represent presented or had presented on their behalf reasonable and necessary medical charges to AIG for treatment of patients entitled to PIP medical expense benefits pursuant to a

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Florida automobile insurance policy issued by AIG.

179.    Pursuant to Section 627.736, Florida Statutes:

**(1)    Required benefits.**  Every insurance policy complying with the security requirements of s. 627.733 shall provide personal injury protection to the named insured, relatives residing in the same household, persons operating the insured motor vehicle, passengers in such motor vehicle, and other persons struck by such motor vehicle and suffering bodily injury while not an occupant of a self-propelled vehicle, subject to the provisions of subsection (2) and paragraph (4)(d), to a limit of $10,000 of loss sustained by any such person as a result of bodily injury, sickness, disease, or death arising out of the ownership, maintenance, or use of a motor vehicle as follows:

(a)    Medical benefits.  Eighty percent of all reasonable expenses for necessary medical, surgical, X-ray, dental, and rehabilitative services, including prosthetic devices, and necessary ambulance, hospital, and nursing services.  Such benefits shall also include necessary remedial treatment and services recognized and permitted under the laws of the state for an injured person who relies upon spiritual means through a prayer alone for healing, in accordance with his religious beliefs.

. . .

**(4)    Benefits; when due.**

. . .

(g)    It is a violation of the insurance code for an insurer to fail to timely provide benefits as required by this section with such frequency as to constitute a general business practice.

180.    Effective October 1, 1991, as amended, effective October 1, 1992, Section 627.736(10), Florida Statutes provides:

An insurer may negotiate and enter into contracts with licensed healthcare providers for the benefits described in this section referred to in this section as "preferred providers" which shall include healthcare providers licensed under chapters 458, 459, 460, 461, and 463.  The insurer may provide an option to an insured to use a preferred provider at the time of purchase of the policy for personal injury protection benefits, if the requirements of this subsection are met. If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a nonpreferred provider policy,

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

the medical benefits provided by the insurer shall be as required by this section. If the insured elects to use a provider who is a preferred provider, the insurer may pay medical benefits in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits. If the insurer offers a preferred provider policy to a policyholder or applicant, it must also offer a nonpreferred provider policy. The insurer shall provide each policyholder with a current roster of preferred providers in the county in which the insured resides at the time of purchase of such policy, and shall make such list available for public inspection during regular business hours at the principal office of the insurer within the state.

181.    Pursuant to Section 627.736(10), Florida Statutes:  "If the insured elects to use a provider who is not a preferred provider, whether the insured purchased a preferred provider policy or a non-preferred provider policy, <u>the medical benefits provided by the insurer shall be as required by this section</u>."  (Emphasis added).

182.    Pursuant to Section 627.736(10), Florida Statutes:  "If the insured elects to use a provider who is a preferred provider, the insurance may pay medical benefits <u>in excess of the benefits required by this section and may waive or lower the amount of any deductible that applies to such medical benefits</u>."  (Emphasis added).

183.    In violation of the foregoing provisions of Section 627.736, AIG has implemented a policy and has conducted itself in a manner with such frequency as to constitute a general business practice whereby AIG has paid and continues to pay medical benefits at a rate less than the reasonable and necessary rate.

184.    AIG, as part of its general business practice, has been paying medical benefits at eighty (80%) percent of preferred provider rates.

185.    At all times material hereto, AIG did not offer preferred provider policies.

186.    Since AIG did not offer a preferred provider policies, AIG was required to pay eighty (80%) percent of all reasonable and necessary medical expenses.

187.    If AIG issued and sold preferred provider policies, AIG would then be entitled to

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

pay medical benefits in excess of the benefits required and may waive or lower the amounts of any deductible that applies to such medical benefits.

188.    By paying PIP benefits at a preferred provider rate, AIG has significantly reduced its payments and obligations under PIP policies throughout the State of Florida.

189.    AIG's actions are in direct violation of Section 627.736, Florida Statutes.

190.    AIG has wrongfully reduced ELLOWITZ's and the class members' PIP medical expense claims based on Focus/Chiro Alliance preferred provider discounts.

191.    AIG is not entitled to said Focus/Chiro Alliance preferred provider discounts. AIG has failed to offer insureds a PPO endorsement and also failed to otherwise comply with the requirements of Section 627.736(10), Florida Statutes.

192.    Despite this failure, AIG has reduced and continues to reduce PIP automobile insurance medical expense claims of ELLOWITZ and the purported class members by accessing and applying Focus preferred provider discounts.

193.    Accordingly, an outstanding balance remains on all automobile insurance PIP medical expense claims that AIG has reduced based on Focus/Chiro Alliance purported preferred provider discounts.

194.    Pursuant to Section 627.736(4)(b): "Personal injury protection insurance benefits paid pursuant to this section shall be overdue if not paid within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of same."

195.    Pursuant to Section 627.736(c): "All overdue payments shall bear interest at the rate of 10 percent per year."

196.    AIG has failed to pay the full amount of the reasonable and necessary medical expense billed by ELLOWITZ and the class members within 30 days after AIG was furnished

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

197.    AIG has failed to pay interest on the remaining balances owed to ELLOWITZ and the class members.

198.    By reducing ELLOWITZ's and the purported class members' legitimate medical expenses by the application of Focus/Chiro Alliance purported preferred provider discount rates, AIG has violated Section 627.736, Florida Statutes.

199.    As a result of AIG's failure to comply with Section 627.736, Florida Statutes, ELLOWITZ and the members of the purported class have suffered damages.

WHEREFORE, DR. ANDREW ELLOWITZ and the class demand the following relief:

(a)    As to the First Cause of Action, compensatory damages;

(b)    As to the Second Cause of Action, compensatory damages;

(c)    As to the Third Cause of Action, compensatory damages, punitive damages, and injunctive relief;

(d)    As to the Fourth Cause of Action, a declaration that AIG's insurance practices are improper;

(e)    As to the Fifth Cause of Action, compensatory damages;

(f)    Interest, Attorneys' fees and costs where applicable;

(g)    A trial by jury on all issues so triable; and

(h)    Such other and further relief as the Court may deem just and proper.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 28th day of November, 2005 the foregoing was served on:  See attached Service List.

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Respectfully submitted,

LEE & AMTZIS, P.L.
Lead Counsel for Plaintiff
DR. ANDREW ELLOWITZ
5550 Glades Road, Suite 401
Boca Raton, FL  33431
(561) 981-9988
(561) 981-9987 Facsimile


By: _____
    ERIC LEE
    Florida Bar No. 961299

**Co-Counsel Counsel for Plaintiff**

GOLD & COULSON
A Partnership of Professional and
Limited Liability Corporation
11 S. LaSalle Street
Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA, LLP
13 Ventura Drive
North Dartmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A.
350 E. Las Olas Blvd., Ste. 980
Ft. Lauderdale, FL  33301
(954) 462-6855
(954) 462-6899 Facsimile

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

**MASTER SERVICE LIST**
**(Consolidated Case No. 00-6061-Civ-ZLOCH/SNOW)**
(Updated 11/23/05)

**Co-Lead Counsel for Plaintiffs**

LEE & AMTZIS, P.L.
Eric Lee, Esq.
lee@leeamlaw.com
5550 Glades Road, Suite 401
Boca Raton, FL 33431
(561) 981-9988
(561) 981-9980 Facsimile

GOLD & COULSON
Arthur S. Gold, Esq.
asg@gcjustice.com
11 S. LaSalle Street, Suite 2500
Chicago, IL 60603
(312) 372-0777
(312) 372-0778 Facsimile

PHILLIPS & GARCIA
Andrew Garcia, Esq.
agarcia@phillipsgarcia.com
Carlin Phillips, Esq.
cphillips@phillipsgarcia.com
Attorneys at Law
13 Ventura Drive
North Darthmouth, MA 02747
(508) 998-0800
(508) 998-0919 Facsimile

KOPELMAN & BLANKMAN, P.A
Larry Kopelman, Esq.
Douglas Blankman, Esq.
dblan2155@aol.com
350 E. Las Olas Blvd., Ste. 980
Ft. Lauderdale, FL 33301
(954) 462-6855
(954) 462-6899 Facsimile

**Co-Counsel for Plaintiffs**

Susan L. Lawson, Esq.
personalinjurylawyer@earthlink.net
230 East Davis Boulevard, Suite 200
Tampa, FL 33606
(813) 251-8879
(813) 251-5786  Facsimile

RICHARD BOKOR, P.A.
Richard Bokor, Esq.
richard@bokorlaw.com
230 East Davis Boulevard
Tampa, FL 33606
(813) 251-1000
(813) 254-6327 Facsimile

**Counsel for:**
**Allstate, Fidelity and Casualty, Deerbrook**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
Signature Plaza, Suite 300
201 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

MECKLER BULGER & TILSON
Peter J. Valeta, Esq.
peter.valeta@mbtlaw.com
123 N. Wacker Dr., Ste. 1800
Chicago, IL 60606
(312) 474-7895
(312) 474-7898 Facsimile

**Counsel for Progressive**

ANANIA, BANDKLAYDER, et al.
Francis Anania, Esq.
fanania@anania-law.com
Donald A. Blackwell, Esq.
dblackwell@Anania-law.com
NationsBank Tower, Suite 4300
100 Southeast Second Street
Miami, Florida 33131
(305) 373-4900
(305) 373-6914 Facsimile

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW

36

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

**Counsel for CCN**

The Kenny Nachwalter Law Firm
Richard Critchlow, Esq.
rcritchlow@knsacs.com
Robert Landon, Esq.
rlandon@knsacs.com
201 S. Biscayne Blvd., Ste. 1100
Miami, FL 33131-4327
(305) 373-1000
(305) 372-1861 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Greg Baldwin, Esq.
gbaldwin@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 Facsimile

**Counsel for:**
**Hartford**

AKERMAN, SENTERFITT et al.
Marcy Levine Aldrich, Esq.
maldrich@akerman.com
SunTrust International Center
One Southeast Third Ave., 28th Flr.
Miami, FL 33131
(305) 374-5600
(305) 374-5095 Facsimile

**Counsel for Superior**

BUTLER BURNETTE PAPPAS
Alan J. Nisberg, Esq.
anisberg@bbplaw.com
Bayport Plaza
6200 Courtney Campbell Causeway
Suite 1100
Tampa, FL 33607
(813) 281-1900
(813) 281-0900 Facsimile

**Counsel for American International**

CONROY, SIMBERG, GANON, KREVANS &
ABEL, P.A.
Dale L. Friedman, Esq.
dfriedman@csglaw.com
Brian P. Knight, Esq.
bknight@csglaw.com
3440 Hollywood Blvd., 2nd Flr.
Hollywood, FL 33021
(954) 961-1400
(954) 967-8577 Facsimile

LEE & AMTZIS, P.L.
ATTORNEYS AT LAW