## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

DR. PAUL ZIDEL, on behalf of himself and
all others similarly situated,

      Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

      Defendants.
_____/
MARC J. BROWNER, D.C., individually and on behalf of
all others similarly situated,

    Plaintiffs,

v.                                      00-7163

ALLSTATE INDEMNITY COMPANY, et al.

    Defendants.
_____/
ULTRA OPEN MRI CORPORATION, and on behalf of
Itself and all others similarly situated,

    Plaintiff,

v.                                      00-6777

DEERBROOK INSURANCE COMPANY,

    Defendant.
_____/

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF CLASS ACTION SETTLEMENT WITH
## ALLSTATE INSURANCE COMPANY DEFENDANTS

Plaintiffs Dr. Paul Zidel, Marc Browner, D.C., and Ultra Open MRI Corporation

("UOMC") (collectively "Plaintiffs"or "Class Representatives"), suing on behalf of themselves and the class defined below, respectfully submit this memorandum pursuant to Rule 23(e) of the Federal Rules of Civil Procedure in support of the proposed settlement of this action against the following Defendants: Allstate Insurance Company, Allstate Indemnity Company, Deerbrook Insurance Company, The Fidelity and Casualty Company of New York, National-Ben Franklin Insurance Company of Illinois, The Buckeye Union Insurance Company, The Glens Falls Insurance Company, Kansas City Fire & Marine Insurance Company, Fireman's Insurance Company of Newark, New Jersey, Pacific Insurance Company, Niagara Fire Insurance Company, Boston Old Colony Insurance Company, Commercial Insurance Company of Newark, New Jersey, Continental Reinsurance Corporation, Continental Casualty Company of Reading, Pennsylvania, Transcontinental Insurance Company, Transportation Insurance Company, American Casualty Company of Reading, Pennsylvania, National Fire Insurance Company of Hartford, Valley Forge Insurance Company, Encompass Floridian Insurance Company, Encompass Floridian Indemnity Company and the Continental Insurance Company, which are direct or indirect subsidiaries of Allstate Insurance Company[1] (collectively "Allstate") for total class relief of over $8,900,000 (the "Settlement").

## <u>SUMMARY OF SETTLEMENT</u>

The specific terms of the Settlement have been set forth in the Settlement Agreement and Stipulation (the "Stipulation") filed with the Court and preliminarily approved on June 19, 2006. The Settlement provides for an $8,900,000 class fund.  Allstate has also agreed to pay the following monies <u>separate</u> from the class fund: 1) up to $2,966,667 in attorney's fees; 2)

---

[1]  These companies all issued and underwrote automobile insurance policies in Florida during the relevant class period which is January 1, 1998 through May 4, 2006.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

reasonable litigation costs and expenses, not to exceed $15,000; and 3) the costs of settlement administration, including the costs of notification to the Class Members.  In accordance with the Stipulation, a total of 8,068 Notices and Proof of Claim forms were mailed.  Out of all of these Notices, only 77 valid Opt-Outs were filed.  This represents less than 1% of the class members who were sent notice.  Additionally, and most importantly, there has not been a single objection filed to the class action settlement, the requested attorney's fees, or the requested reimbursement of expenses.  The lack of a single objection speaks volumes to the fairness and reasonableness of the Settlement.  Finally, pursuant to the Stipulation, Allstate had the right to nullify the settlement if certain benchmarks were reached.  Allstate has not nullified the settlement by the nullification deadline (as extended) and Allstate can no longer nullify the settlement.

## I.    HISTORICAL BACKGROUND OF THE LITIGATION

### A.    The Consolidated Class Action Litigation.

The consolidated class action litigation began over seven years ago on January 12, 2000, with the filing of Napoli v. Allstate Insurance Company, et al, later amended as Zidel v. Allstate Insurance Company, et al,.  After filing the first case, Class Counsel filed fourteen additional cases, all of which were eventually consolidated into the current case.  Each case alleged a similar pattern and practice by the various insurance defendants of reducing Florida automobile insurance personal injury protection ("PIP") medical expense claims based on the wrongful application of preferred provider organization ("PPO") discounts, issues of first impression in this Circuit.[2]

---

[2]  To Class Counsels' knowledge, the Consolidated Cases were the first class actions cases in the country to challenge the "Silent PPO" discounting of auto insurance claims, other than two similar action brought in Massachusetts state courts by Class Counsel, Phillips & Garcia.  See Mitzan v. Medview Servs. et al., 10 Mass.L. Rep. 242 (1999) and Southeast Physical Therapy Servs., Inc. v. Health Care Value Mngmt., 11 Mass.L.Rep. 571 (2000).

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

The practice about which the Plaintiffs complained has become known as a "Silent PPO." In a typical PPO relationship, a group of medical providers agree to provide medical services to a group of subscribers of an insurance company at a lesser cost than the medical providers would have normally charged.   In exchange, the insurance carrier would attempt to "steer" its subscribers to the PPO's preferred providers through methods such as financial incentives, I.D. cards and provider lists.   See First Health Group Corp. v. United Payors & United Providers, Inc., 95 F. Supp. 2d 845, 849-850 (N.D. Ill. 2000) (referring to Office of Insp. Gen., Office of Personnel Mngmt., Rep. No. 99-00-97-054, "Report on the Use of Silent PPOs in Fed. Employers Health Ben. Programs," 20-23 (1998)).   The Eleventh Circuit has recognized the term "steerage" as meaning the process of "actively encouraging plan participants to seek the services of the providers in the PPO by such means as financial incentives.   Steerage also occurs through communication efforts such as providing participants with a list of preferred providers, a hotline to inform and refer participants to preferred providers, and issuing identification cards designed to inform providers that a patient is a participant eligible for the PPO discount." HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 983, 1002 (11th Cir. 2001).

The term "Silent PPO" typically describes a payment scheme to obtain discounts for payors who are not entitled to them.   First Health Group Corp., 95 F. Supp. 2d at 849-50.   In a Silent PPO arrangement, another PPO will sell its medical providers' names and discounted fee information, often without the providers' knowledge or permission, to a secondary market of vendors who then access the information on behalf of their payor clients, recalculating the provider's fees based on the discounted fee information.   Id.

The theories that predominated the consolidated cases before this Court, centered around the Plaintiffs' allegations that the discounting practices of the defendant insurers in processing

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

and paying PIP auto insurance claims constituted a Silent PPO.  In all the cases, the Plaintiffs

urged that the defendants' conduct (1) violated Florida PIP insurance statutory law  (specifically

Fla. Stat. § 627.736(10)); (2) constituted a violation of the federal Racketeer Influenced and

Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. (the "RICO Act"); (3) were in direct

breach of the specific language of the relevant automobile insurance policies; and, (4) constituted

unjust enrichment to the defendant insurers.

Since the Plaintiffs and Class Counsel challenged the Florida auto insurance industry to

stop the industry-wide practice of discounting PIP claims through the wrongful application of

PPO discounts, the defendant insurers, and their vendors supplying the discounts, aggressively

"circled the wagons" in defense of these cases.  As the Court's Docket Sheet demonstrates, a

virtual legal war ensued beginning with multiple motions to dismiss.  Class Counsel zealously

opposed the initial flurry of defensive motions, most notably defeating the defendants' attempts

to dismiss their RICO counts.[3]

The current actions against Allstate were filed as follows: (1) On January 12, 2000,

David Napoli, D.C. filed suit against Allstate Insurance Co. and Community Care Network

("CCN") and subsequently, the current class representative, Dr. Zidel[4], filed his Motion to

Certify the case as a class action (See Zidel Case No. 00-CV-6061, Consolidated DE # 1, 168);

(2) On August 16, 2000, Dr. Browner filed suit against Allstate Indemnity Co. and subsequently

filed his Motion to Certify Class Action (See Browner Case No. 00-CV-7163, DE# 1,7); (3)  On

May 28, 2001, UOMC filed suit against Deerbrook Insurance along with its Motion to Certify

---

[3]   The Plaintiffs' victory was not total.  In its main ruling on the motions to dismiss, this Court dismissed the Plaintiffs' Lanham Act claims.

[4]  On or about October 30, 2000, this Court entered an Order substituting Dr. Zidel as the Plaintiff.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Class Action (See UOMC Case No. 01-CV-6777, DE# 1,4); and, (4) On May 28, 2001, UOMC filed suit against Fidelity & Casualty Company of New York and the Continental Insurance Company along with its Motion to Certify Class Action (See UOMC Case No. 01-CV-6779, DE# 1,4).

Allstate subsequently filed its motions to compel arbitration in these pending cases on the basis of an arbitration clause contained in its insurance contracts (Consolidated DE# 332). Class Counsel opposed the motion. After consideration, in a Report dated September 27, 2002, Magistrate Snow recommended denying the parties' motions to compel arbitration on the basis that the arbitration clause contained in the related auto policies was not an independent contract between the parties and must be stricken as in violation of Florida's Constitution under Nationwide Mut. Fire Ins. Co. v. Pinnacle Medical, Inc., 753 So. 2d 55 (Fla. 2000) (Consolidated DE# 852). Allstate subsequently filed its Objection to the Report and Recommendations along with other PPO Defendants (Consolidated DE# 862, 867-872). Ultimately, in an October 28, 2002, Supplemental Order, this Court denied the motions to compel arbitration in the consolidated cases (Consolidated DE# 881). Allstate along with other related PPO Defendants then appealed Judge Ferguson's decision on the arbitration issue to the Eleventh Circuit, where the cases were consolidated on appeal.

While the cases were pending in the District Court, Class Counsel aggressively sought discovery from all the Defendants and other non-party witnesses. Class Counsel propounded written discovery and noticed various depositions of the defendants and other witnesses. Almost all of these discovery efforts were met with motions for protective orders or motions to stay discovery. Class Counsel opposed such motions and countered in some cases by filing motions to compel discovery which were, in turn, opposed by the defendants. All discovery and

litigation in the District Court was eventually stayed as the cases were appealed to the Eleventh Circuit.[6]

Despite the Defendants' successful efforts at preventing Class Counsel from conducting full discovery prior to the appeal, Class Counsel were able to obtain a wealth of invaluable information by negotiating a settlement with the vendor defendants, ADP Integrated Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street").[7]  Under this agreement, ADP and Beech Street consented to a whole-scale production of documents, data and information relating to the Defendant insurers' PPO reduction practices.  ADP and Beech Street provided class  counsel with thousands of pages of documents detailing the defendant insurers' PPO discounting programs.  ADP and Beech Street also conducted a specific search of their respective databases that resulted in a CD ROM containing PPO discount information on a claim-by-claim basis for each insurer per year.  The information on the CD ROM provided Class Counsel, in the majority of cases, with the complete class list (names, addresses and tax identification numbers) and the amount of each class member's damages on a claim-by-claim basis - information that would have taken Class Counsel years to obtain in the normal discovery process.

**B.**    **The Allstate Class Action Case.**

**1.**    **Dr. Zidel v. Allstate Ins. Co., et al.**

Plaintiff, Dr. Zidel is a licensed Florida physician. In 1999, Dr. Zidel entered into a "Preferred Provider Agreement" (a "PPA") with Community Care Network ("CCN") whereby

---

[6]  As of October 28, 2002, when the cases were stayed, the Consolidated Docket had 882 entries.

[7]  ADP, a national claims re-pricing company servicing property and casualty insurers, applied the Beech Street PPO discounts to class members' medical bills on behalf of certain Defendant insurers using a software program designed to calculate the discount and produce an explanation of benefits form showing the PPO reductions.

he became a participating preferred medical provider.  Companies such as CCN are sometimes referred to as "brokers" or "managed care companies" in the health care industry.  CCN contracts with healthcare providers for the purpose of uniting healthcare providers with commercial payors to coordinate and arrange for the delivery of healthcare services to legitimate subscribers or members.  Pursuant to the PPA, Dr. Zidel agreed to become a CCN Preferred Provider.  Dr. Zidel's Agreement did not allow CCN Street to allow automobile insurers or PPO discount brokers with automobile insurer clients access to Dr. Zidel's preferred provider rates.  Dr. Zidel agreed to discount his normal medical fees in return for increased patient volume.  For patients who were not part of the CCN PPO network, Zidel charged his normal fee without any discount.

At the time Dr. Zidel had executed the PPA, Allstate had already stopped offering a PPO Endorsement to their insureds and had ceased notifying insureds of the identity of preferred providers in their alleged PPO network.  Allstate was also no longer offering insureds premium reductions as an economic incentive to use the preferred providers in their alleged PPO network.  Despite these facts, CCN subsequently allowed Allstate access to all of CCN's preferred provider's confidential and proprietary discount rates.  Allstate then improperly applied those discounts to all bills submitted to Allstate by CCN providers such as Dr. Zidel.

## 2.    Dr. Browner v. Allstate Ins. Co., et al.

Plaintiff, Dr. Browner is a licensed Florida chiropractor that had also entered into a PPA with Beech Street, another health care broker.   Under the terms of the PPA contract, Dr. Browner agreed to become a member of Beech Street's network with employer/employee based group or individual health plan related payors.  Dr. Browner's PPA did not permit Beech Street

to allow automobile insurers or PPO discount brokers with automobile insurer clients to access Dr. Browner's discount PPA rates.

Allstate had not offered a PPO endorsement to its automobile insureds, and never offered its Florida automobile insureds premium reductions as an economic incentive to use preferred providers in the Beech Street network. Additionally, Dr. Browner's PPA with Beech Street did not authorize the application of discounts by automobile insurers or discount brokers who could not increase Dr. Browner's patient volume through any legitimate steerage.

Despite these facts, Beech Street subsequently allowed ADP access to all of Beech Street's preferred providers' confidential and proprietary discount rates. ADP is a company in the business of developing software-driven cost containment products used in the claims review process by property and casualty insurers to reduce payments made on insurance medical expense claims. ADP then loaded Beech Street's database of preferred provider discounts into ADP's software, and then applied those discounts of all bills submitted to Allstate by Beech Street providers such as Browner.

### 3.     UOMC v. Allstate Subsidiaries, Deerbrook Ins., Fidelity and Cas. Co. of New York, and the Continental Ins. Co.

Plaintiff, UOMC is a Florida healthcare provider that had also entered into a PPA with Beech Street. Under the terms of the PPA with Beech Street, UOMC agreed to become a member of Beech Street's network with employer/employee based group or individual health plan related payors. UOMC's PPA did not permit Beech Street to allow automobile insurers or PPO discount brokers with automobile insurer clients to access UOMC's discounted PPA rates. Deerbrook Insurance, Fidelity and Casualty Company of New York, and The Continental Insurance Company, all subsidiaries of Allstate, had not offered a PPO endorsement to their automobile insureds, and never offered its Florida automobile insureds premium reductions as an

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

economic incentive to use preferred providers. Additionally, UOMC's PPA with Beech Street did not authorize the application of discounts by automobile insurers or discount brokers who could not increase UOMC's patient volume.

Despite these facts, Beech Street subsequently allowed non-party ADP access to all of Beech Street's preferred providers' confidential and proprietary discount rates. Beech Street also permitted Allstate access to the same proprietary information. ADP then loaded Beech Street's database of preferred provider discounts into ADP's software, and then applied those discounts of all bills submitted to Allstate by Beech Street providers such as UOMC..

## II.    NEGOTIATIONS LEADING TO THE SETTLEMENT

Attempts at settlement negotiations with Allstate did not occur until well after the complaint was initially filed and the litigation had progressed. Allstate would not even entertain settlement overtures until well after its motion to dismiss was denied. Eventually, counsel for all parties met in Chicago, Illinois to hear settlement proposals from Class Counsel and to discuss the possibilities of a settlement. Although counsel for all the parties worked in good faith, settlement discussions stalled. Allstate then appealed the denial of its Motions to Compel Arbitration to the Eleventh Circuit.

While Allstate's appeal was pending in the Eleventh Circuit, Class Counsel conducted extensive settlement negotiations with some of the related insurance Defendants and Allstate both privately and in accordance with the Eleventh Circuit's mediation program before Joseph Unger, a mediator with the United States Court of Appeals for the Eleventh Circuit. As settlements were reached (and ultimately approved by this Court) with the related insurance Defendants, Class Counsel continued to offer to Allstate the opportunity to discuss parameters of a settlement. Unfortunately, very little progress was made.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Ultimately, after protracted discussions on both sides, and through continued perseverance and hard work, the current $8,900,000 settlement was finally reached between Allstate and the Plaintiffs in the Spring of 2006. Based on their extensive knowledge of the strengths and vulnerabilities of the claims against Allstate and given the uncertainties of an appeal and/or ultimate trial of the action, Class Counsel believe that the Settlement represents an excellent result for the Class. Plaintiffs and Class Counsel heartily recommend that the proposed Settlement be approved as fair, reasonable, adequate and in the best interests of the Class.

III.    **SETTLEMENT TERMS.**

A.    **Summary of the Settlement - Class Members Will Receive Approximately 65% Of Their Damages With No Reduction For Attorney's Fees Or Costs Of Settlement Administration.**

The Settlement provides for the distribution of a Settlement Fund of up to $8,900,000 to Class Members who timely file Proof of Claim forms with Allstate, the appointed Settlement Administrator.[8] Each Class Member that timely files a properly completed Proof of Claim form is entitled to reimbursement of that Class Member's Maximum Claim Amount calculated as follows: (1) The total PPO reductions will be identified from only the ADP, Beech Street, or CCN databases based upon the TIN listed in the Class Member's Proof of claim; (2) Each Class Member's PPO Reduction Amount as identified will then be multiplied by 80%; (3) The total amount of PPO reductions for each class member will be reduced by any amount for a prior PPO reduction which was the subject of a prior settlement or court order resolving such claim, and by any amount of a PPO reduction that may have been other wise previously repaid or credited by Allstate to such Class member; (4) the Net PPO Reduction Amount will then be multiplied by

---

[8] The precise terms of the Settlement are set forth in the Stipulation of Settlement filed with and preliminarily approved by this Court and are also discussed in detail in the Declaration of Class Counsel.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

sixty-five percent (65%), which then becomes the PPO Settlement Amount.[9]   Additionally, all costs of the settlement administration, including the costs of notifying the Class Members, were borne by Allstate.

The Settlement also provides for a claim dispute resolution process overseen by an independent arbitrator should there be any disputes between a Class Member and Allstate as to the amount of a settlement payment or the completeness of any Proof of Claim form.  Under the dispute resolution function of the Settlement, the Class Member and Allstate shall designate in advance an independent arbitrator to oversee the dispute process.  Allstate, Class Counsel, and the Class Member shall be permitted to submit written presentations regarding their respective positions regarding the disputed claim.  In the event that the independent arbitrator rules in favor of the Class Member, Allstate will be required to reimburse the Class Member for any arbitration fee and the Class Member's claim will be paid by Allstate as calculated under this Agreement.

Finally, Allstate has agreed to pay, in addition to and outside the Settlement Fund, any Class Counsel fees awarded by the Court up to thirty three and one third percent (33.3%) of the Settlement Fund totaling $2,966,667, as well as reasonable costs and litigation expenses not to exceed $15,000.

## B.    Due Notice Of The Settlement Was Appropriately Given.

The form of Notice utilized in this case was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."   Mullane v. Central Hanover Bank & Trust Co., 339

---

[9]  The proof of claim process was simple and straightforward.  To file a valid Proof of Claim, Class Members only needed to verify that they provided medical services to Allstate insureds during the class period of January 1, 1998 through May 4, 2006, and that they obtained "Assignments of Benefits" from their Allstate patients during that class period.  Class Members *did not* have to provide any documentation, such as bills or explanation of benefits forms to perfect their Proof of Claim.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

U.S. 306, 314 (1950). The Notice, which was preliminarily approved by this Court, provided detailed information concerning the rights of Class Members, including the manner in which objections could be lodged; the nature, history and progress of the Litigation; the proposed Settlement terms; the process for filing Proofs of Claim; the fees and expenses to be sought by Class counsel; the necessary information for any Class Member to examine the Court records should he or she desire to; and the time and procedure for exclusion from the Settlement or to object to the Settlement or Class Counsel's fee application. Thus, the notice adequately described the proceedings and substantive claims being settled, and it contained more than sufficient information reasonably necessary for class members to remain a class member and be bound by final judgment or to opt out. See Twigg v. Sears, Roebuck & Co., 153 F.3d 1222, 1227 (11th Cir. 1998) (citing In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1103-05 (5th Cir. 1977).

All potential Class Members were identified using the most current records and electronic data provided by Allstate. Notices were then prepared by Allstate as settlement administrator, and were entirely paid for by Allstate. Allstate then mailed first class, postage pre-paid, to all Class Members identified on the Class Member list, a copy of the Notice and the Proof of Claim approved by this Court. Notice through the use of first class mail has consistently been considered sufficient to satisfy the due notice requirements of Rule 23(e). See e.g., Zimmer Paper Prods., Inc. v. Berger & Montague, P.C., 758 F.2d 86, 90-91 (2d Cir. 1985) (citations omitted).

At the beginning of the settlement process Allstate initially mailed 8,068 Notices. Over the course of the claims period, Allstate made efforts to ensure that as many of the Notices were received by Class Members. For example, prior to mailing out Notices, Allstate first attempted

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

to during the claims period, Allstate re-mailed any Notices returned with current forwarding addresses provided by the U.S. Postal Service. As required under the terms of the Settlement, Allstate also made efforts to identify and locate any Class Members by using the National Change of Address database. Thus, the method of notice was the most reasonable method under the circumstances to apprise all potentially interested parties of the pending Settlement and amply satisfied the requirements of due process. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974).

## IV.    THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS UNDER RULE 23(e) HAVE BEEN SATISIFIED

There is an overriding public interest in favor of class action settlements which have the well-deserved reputation as being most complex.[11] Ass'n for Disabled Americans, Inc. v. Amoco Oil Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002) (citing Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977)); Warren v. City of Tampa, 693 F.Supp. 1051, 1054 (M.D. Fla. 1998), aff'd, 893 F.2d 347 (11th Cir. 1989). Accordingly, a class action settlement should be approved so long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984); Cotton v. Hinton, 559 F.2d at 1330; Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 537 (S.D. Fla. 1988).

When determining whether a settlement is fair, adequate and reasonable, a court should consider all relevant factors, including (1) an assessment of the likelihood of success at trial; (2) the range of possible recovery at such trial; (3) the consideration provided to class members under the Settlement, in comparison to the range of possible recovery discounted by the inherent

---

[11] The Eleventh Circuit has noted that "public policy strongly favors the pretrial settlement of class action lawsuits." In re U.S. Oil & Gas Litig., 967 F. 2d 489, 493 (11th Cir. 1992). In that action, the court noted that "complex litigation like the instant [class action] case can occupy the court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules . . . authorize District Courts to facilitate settlements..." Id.

risks of litigation; (4) the complexity, expense and duration of the litigation in the absence of the settlement; (5) the substance and amount of opposition to the settlement; and (6) the state of proceedings at which the settlement was achieved.[12] <u>Bennett</u>, 737 F.2d at 986; <u>Cotton</u>, 559 F.2d at 1330-31; <u>see also</u> <u>Behrens</u>, 118 F.R.D. at 538-39; <u>ADA v. Aetna, Inc. (In re Managed Care Litig.)</u>, 2004 U.S. Dist. LEXIS 14294, *3-4 (S.D. Fla. 2004).

The application of the <u>Bennett</u> factors is left to the sound discretion of the trial judge and appellate review of the Court's decision is based on an abuse of discretion standard. <u>In re U.S. Oil & Gas Litig.</u>, 967 F.2d at 493; <u>In re Broiler Chicken Antitrust Litig.</u>, 669 F.2d 228, 238 (5th Cir. 1982). Great weight is accorded a trial judge's views in evaluating a class action settlement. <u>City of Detroit v. Grinnell Corp.</u>, 453 F.2d 448, 454 (2d Cir. 1974) (quoting <u>Ace Heating & Plumbing Co. V. Crane Co.</u>, 453 F.2d 30, 34 (3d Cir. 1971)). In making its determination, the trial court is also entitled to rely on the judgment of experienced counsel for the parties. <u>In re Smith</u>, 926 F.2d 1027, 1028 (11th Cir. 1991); <u>Cotton</u>, 559 F.2d at 1330.

In evaluating these considerations, a court must not try the case on the merits. <u>Cotton</u>, 559 F.2d at 1330; <u>Diaz v. Hillsborough County Hosp. Auth.</u>, 2000 U.S. Dist. LEXIS 14061, *6 (M.D. Fla. 2000). Instead, the court should rely on the judgment of experienced counsel and, absent fraud, "should be hesitant to substitute its own judgment for that of counsel." <u>Ass'n for Disabled Americans v. Amoco Oil</u>, 211 F.R.D. at 467 (quoting <u>Cotton v. Hinton</u>, 559 F.2d at 1330); see also <u>In re Sunbeam Sec. Litig.</u>, 176 F.Supp.2d 1323, 1329 (S.D. Fla. 2001). Rather than justifying each settlement term against a hypothetical or speculative measure of what concessions might have been gained, a court should focus on the negotiation process to ensure

---

[12] Other factors relevant to a court's inquiry are the terms of the settlement, the procedure afforded to notify Class member of the proposed settlement, and the judgment of counsel. <u>Cotton</u>, 559 F.2d at 1330; <u>Warren</u>, 693 F.Supp. at 1055.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

that the settlement was achieved through arms-length negotiations by counsel and was not the product of collusion between the parties. See Behrens, 118 F.R.D. at 538-39. Ultimately, in evaluating a settlement's fairness, the court should remember that compromise is the essence of a settlement and that "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." Cotton, 559 F.2d at 1330.

The application of these standards in the present case, warrants the approval of the Settlement as fair, reasonable and adequate. Class Counsel and Allstate have had substantial opportunity to weigh the strengths and weaknesses of the parties' respective positions in the event this action were to proceed to appeal and/or trial, and to reach an informed compromise based on their respective analyses.

###### A.    The Likelihood of Success at Trial and Potential Recovery

When considering the likelihood of success at trial and any potential recovery, a court can limit its inquiry to determining "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." Ressler v. Jacobson, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992); see also Elkins v. Equitable Life Ins. Co., 1998 U.S. Dist. LEXIS 1557, * 76 (M.D. Fla. 1998); Mashburn v. National Healthcare, Inc., 684 F. Supp. 660, 670 (M.D. Ala. 1988) (in the class action settlement context, courts do not decide the merits of the case or resolve unsettled legal questions). This inquiry is premised on "balancing the probabilities, not assuring that the plaintiff class receives every benefit that might have been won after a full trial." In re Chicken Antitrust Litig., 560 F. Supp. 957, 960 (N.D. Ga. 1980). The expense of achieving a more favorable result for the class at trial must be considered. Ressler, 822 F. Supp. at 1555; see also, Young v. Katz, 447 F.2d 431, 433 (5th Cir. 1971).

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

While the Settlement represents an extremely favorable result under any measure, it must be considered in light of the significant risks faced by the Class with continued litigation. Class Counsel believe that they have a "strong case" to be made against Allstate. The potential for a substantial recovery at trial, however, was tempered by Class Counsel's analysis of certain major factors that favor the settlement of this action on the proposed terms. These factors include (1) the uncertain outcome of pending appeals to the Florida Supreme Court concerning the interpretation of Florida Statute section 627.736(10); (2) the uncertain outcome of pending appeals to the 11th Circuit Court of Appeals concerning related parties' motions to compel arbitration or in the alternative to dismiss similar actions; and (3) the inherent difficulties in proving the elements of a RICO action against Allstate in a full trial on the merits.

**1.    The Florida State District Courts Have Conflicting Rulings on the PPO Issue in the State's Statutory Auto Insurance Scheme**

One of the most important considerations concerning the likelihood of success at trial concerns Plaintiffs' claims under Florida's PIP statute, Section 627.736(10). There is currently a split between the Florida appellate districts on whether an auto insurer may pay health care providers at reduced PPO contract rates without first offering a preferred provider PIP policy of insurance. In <u>Nationwide Mut. Fire Ins. Co. v. Central Florida Physiatrists, P.A.</u>, 851 So. 2d 762 (Fla. 5th DCA 2003), the Fifth District Court of Appeal reasoned that the clear and precise language of Section 627.736(10) demonstrates the Legislature's intent that the availability of PPO benefits under a PIP auto insurance policy is subject to strict compliance with the terms of subsection (10). According to the Fifth District, Nationwide Mutual Fire Insurance was required to first comply with the provisions of subsection (10) in order to take advantage of paying reduced PPO rates for payment of PIP claims. <u>Id.</u> at 766. Nationwide Mutual Fire Insurance's

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

failure to do so thus required it to pay the statutorily mandated 80% of the reasonable and necessary medical expenses incurred by its insured. Id.

In stark contrast to the Fifth District's decision, the Second District held that subsection (10) does not prohibit insurers that have not issued PPO auto policies from paying health care providers at discounted PPO rates. See Nationwide Mut. Ins. Co. V. Dennis M. Jewell, D.C., P.A., 862 So. 2d 79 (Fla. 2d DCA 2003). In Allstate Ins. Co. v. Holy Cross Hosp., Inc., 895 So. 2d 1241 (Fla. 4th DCA 2005), the Fourth District Court of Appeals agreed with the decision by the Second District Court of Appeal. All three cases have been appealed to the Florida Supreme Court and the issue is currently pending. In light of this current conflict, the outcome of the present action remains uncertain should the Class proceed to litigate the action. Given that the proposed Settlement now removes that uncertainty while offering to reimburse the Class Members Approximately 65% of their claimed losses under the Maximum Claim Amount as calculated in the Settlement Agreement, it is clear that potential litigation risks outweigh the rewards of the Settlement.

    **2.    The Range of Possible Recoveries and the Consideration Offered Under the Settlement in Relation to that Range.**

In Behrens, the Court combined the second and third factors of the Bennett test to determine the appropriateness of the settlement. Behrens, 118 F.R.D. at 541. The factors considered are the range of possible recovery and the point within, or below, the range of possible recovery at which a settlement is fair, adequate and reasonable. Discounting multiple damages under RICO, the range of possible recovery under applicable law would be from zero to 60% of the discounted amount with interest and an award of attorney's fees and costs. Under the proposed Settlement, interest is the only monetary damage not included in the Settlement. All claimants will receive up to a 65% recovery of their allowed claims as calculated under the

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Settlement Agreement. Additionally, Allstate will pay Class Counsel fees and reasonable litigation costs and expenses, as well as costs of settlement administration *separate* from the Claim Fund. The benefits provided by the Settlement are at the highest end of potential relief had the case been tried successfully by Class Counsel.

Moreover, based on the present state of the PIP statutory scheme in Florida, the terms of the Settlement actually provides Class Members with *significantly better* relief than they otherwise might expect should the settlement not be approved. Since the inception of this litigation in 2000, the Florida Legislature has amended the PIP statute by adding a complicated pre-suit demand procedure. Under the new statute, prior to filing a lawsuit a medical provider must send a demand letter to the insurer detailing: 1) the name of the insured upon which such benefits are being sought, including a copy of the assignment giving rights to the claimant if the claimant is not the insured; 2) the claim number or policy number upon which such claim was originally submitted to the insurer; 3) to the extent applicable, the name of any medical provider who rendered to an insured the treatment, services, accommodations, or supplies that form the basis of such claim; and 4) an itemized statement specifying each exact amount, the date of treatment, service, or accommodation, and the type of benefit claimed to be due. Fla. Stat. § 627.736(11).

Class Members who have not yet filed suit for illegal PPO discounts would have to first satisfy the pre-suit demand requirements of the new statute. The statute's evidentiary demand requirements are far more onerous than the proof of claim process negotiated by Class Counsel. Class Members need not provide any documentation or detailed claim information to participate in the Settlement, whereas under the new statute they are required to conduct a file-by-file review and provide documentary evidence just to meet the pre-suit demand requirements.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

3.     <u>**The Complexity, Expense and Likely Duration of the Litigation.**</u>

Class Counsel believe that the claims asserted in these actions have considerable merit. However, its inherent complexities combined with the uncertainties those complexities engender, are characteristic of RICO litigation and consolidated cases of this nature.  The docket sheet tells the story best as there are over 880 entries prior to the related defendants filing their appeals (currently there are over 1,179 docket entries), and the parties still have "a long way to go" in the litigation process.  Those uncertainties militate strongly in favor of approving the Settlement. The likely duration and associated expenses of continued litigation likewise favor approval of the Settlement.  See <u>Warren</u>, 693 F.Supp. At 1059 ("The parties estimate that trial of this case would take three weeks of Court time, and would cost hundreds of thousands of dollars in attorneys' fees, expert witnesses fees and costs.  These factors militate in favor of a decision to accept the proposed settlement.").  In the present case, Class Counsel estimates that a trial of this action could take approximately two weeks and could cost the Class hundreds of thousands of dollars in attorneys' fees, expert fees and litigation costs.  Moreover, given that related Defendants have already filed appeals in this action, it is very likely that Allstate would appeal class certification and any trial judgment in favor of the Plaintiff.  The Class would be further subject to the many years of delay and additional costs associated with those appeals.  Here there is a great deal at stake for the parties and, but for the proposed Settlement, the case would continue to be strongly litigated by Plaintiffs and Allstate.  As a result of the Settlement, the dispute between them will come to an end with the Class receiving a substantial recovery and there will also be substantial savings in Court resources by avoiding a lengthy trial of this case. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources.  <u>Behrens</u>, 118 F.R.D. at 538.

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

4. **The Substance and Amount of Opposition to the Settlement.**

Even when a court becomes aware of one or more objecting parties, the court is not "required to open to question and debate every provision of the proposed compromise. The growing rule is that the trial courts may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." Cotton, 559 F.2d at 1331.

Allstate, as settlement administrator, sent out over 8,000 Notices in this action. Not a single objection was filed by any Class Member. Additionally, there have been only 77 valid Opt-outs filed. Less than 1% of the Class Members opted out of the Settlement. Clearly, the reaction of the Class to the Settlement is favorable and positive. Courts have looked at the absence of meaningful objections to a proposed settlement as further support for the approval of a settlement. See Bennett, 737 F.2d at 988.

5. **The Stage of the Proceedings at Which the Settlement was Achieved.**

The purpose of considering the stage of the proceedings and the discovery taken is to ensure that the plaintiff has had access to sufficient information to evaluate the case and to determine the adequacy of the proposed settlement. Behrens, 118 F.R.D. at 544. The Settlement was achieved after nearly seven years of intense litigation involving extensive motion practice and investigation.

The Plaintiffs and Class Counsel were very aware of the merits of their case based on their pre-suit investigation and the status of state case law on the issue of applying PPO discounts to automobile medical expense claims. Additionally, despite the District Court's stay of discovery, Class Counsel was able to obtain extensive discovery from ADP and Beech Street consisting of relevant documents, data and information about the industry's PPO discounting practices. Absent this settlement with ADP and Beech Street, Class Counsel estimates that it

21

would have taken years of post-appellate discovery to obtain the same information. Knowledge of the law, coupled with the discovery obtained formally and informally from ADP and Beech Street, allowed Class Counsel to accurately assess its case for class-wide settlement negotiations.

**6.    The Settlement is the Result of Arms-length Negotiations Among Competent Counsel.**

In considering the fairness of a proposed settlement, the Court is entitled to rely heavily on the opinion of competent counsel. <u>Behrens</u>, 118 F.R.D. at 544. This is especially apt where, as here, the extensive amount of independent investigation, legal research, briefing and discovery indicates that counsel are fully capable of evaluating the merits of the Plaintiffs' cases and the probable course of future litigation. <u>See</u> <u>Cotton</u>, 559 F.2d at 1330. In analyzing a proposed settlement and the opinion of counsel, it is also appropriate for the Court to examine the negotiating process that took place between the parties to confirm that there was no collusion in reaching the Settlement. <u>Behrens</u>, 118 F.R.D. at 538.

In the present case, the Settlement was achieved only after years of hard-fought and contentious litigation. In accordance with the Eleventh Circuit's mediation program, the parties negotiated before Joseph Unger, a mediator with the United States Court of Appeals for the Eleventh Circuit. Additionally, the Settlement negotiations were conducted by counsel for the parties over the course of almost five years - clear evidence that the negotiations were conducted at "arms length." From the complex and thorough terms of the Settlement Agreement it is clear that the process by which this Settlement was accomplished was fairly and zealously advocated by counsel for all parties. Through their consistent and hard-pressed efforts, Class Counsel and Defense Counsel were eventually able to fashion a Settlement that is not only fair and reasonable, but is a truly extraordinary and an excellent result for the Class.

**<u>CONCLUSION</u>**

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

For the foregoing reasons, Plaintiffs submit that the proposed Settlement is fair, reasonable and adequate and should be approved in its entirety, and respectfully request that the Court approve the Settlement.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Dated: January 12, 2007                     Respectfully submitted,
      Boca Raton, FL  33431

                                                                 _____
                                                                 Eric Lee (961299)
                                                                 lee@leeamlaw.com
                                                                 Lee & Amtzis, P.L.
                                                                 5550 Glades Road, Ste. 401
                                                                 Boca Raton, FL  33431
                                                                 Telephone:  (561) 981-9988
                                                                 Facsimile:  (561) 981-9980
                                                **Attorneys for Plaintiffs Keith Brickell and Ultra Open MRI Corp.**

## Co-Counsel for Plaintiffs

Art Gold, Esq.
asg@gcjustice.com
Gold & Coulson
11 S. LaSalle Street
Suite 2500

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Chicago, IL 60603
Telephone: (312) 372-0777
Facsimile: (312) 372-0778

Carlin Phillips, Esq.
cphillips@phillipsgarcia.com
Phillips & Garcia, LLP
13 Ventura Drive
North Dartmouth, MA 02747
Telephone: (508) 998-0800
Facsimile: (508) 998-0919

Larry Kopelman, Esq.
lmk@kopelman.com
Kopelman & Blankman, P.A.
350 E. Las Olas Blvd., Ste. 980
Ft. Lauderdale, FL 33301
Telephone: (954) 462-6855
Facsimile: (954) 462-6899

Richard Bokor, Esq.
richard@bokorlaw.com
230 E. Davis Boulevard
Tampa, FL 33606
Telephone: (813) 251-1000
Facsimile: (813) 254-6327

Susan Lawson, Esq.
personalinjurylawyer@earthlink.net
230 East Davis Blvd., Ste. 200
Tampa, FL 33606
Telephone: (813) 251-8879
Facsimile: (813) 251-5786

# SERVICE LIST

**Counsel for**
**Allstate Defendants**

RUMBERGER, KIRK & CALDWELL
David B. Shelton, Esq.
dshelton@rumberger.com
Post Office Box 1873
Orlando, Florida 32802-1873
(407) 872-7300
(407) 841-2133 Facsimile

MECKLER BULGER & TILSON
Peter J. Valeta, Esq.
peter.valeta@mbtlaw.com
123 N. Wacker Dr., Ste. 1800
Chicago, IL 60606
(312) 474-7895
(312) 474-7898 Facsimile

**Counsel for Florida Farm Bureau**

HOLLAND & KNIGHT, LLP
Greg Baldwin, Esq.
gbaldwin@hklaw.com
701 Brickell Avenue, Suite 3000
Miami, FL 33131
(305) 374-8500
(305) 789-7799 Facsimile