## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

DR. PAUL ZIDEL, on behalf of himself and
all others similarly situated,

       Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

       Defendants.
_____/

MARC J. BROWNER, D.C., individually and on behalf of
all others similarly situated,

    Plaintiffs,

v.                                                       00-7163

ALLSTATE INDEMNITY COMPANY, et al.

    Defendants.
_____/

ULTRA OPEN MRI CORPORATION, and on behalf of
Itself and all others similarly situated,

    Plaintiff,

v.                                                     00-6777

DEERBROOK INSURANCE COMPANY,

    Defendant.
_____/

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

ULTRA OPEN MRI CORPORATION, on behalf
of itself and all others similarly situated,

    Plaintiff,

v.                                                                       01-6779

FIDELITY AND CASUALTY COMPANY OF
NEW YORK and THE CONTINENTAL
INSURANCE COMPANY,

    Defendants.
_____/

## DECLARATION OF CLASS COUNSEL IN SUPPORT
## OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT
## AND AN AWARD OF ATTORNEYS' FEES AND COSTS

1.    My name is Eric Lee and I am the managing member of the law firm of Lee & Amtzis, P.L of Boca Raton, Florida. I am one of the lead Class Counsel in the fifteen consolidated class action cases (Zidel v. Allstate Insurance Company, et al, Consolidated C.A. No. 00-6061) pending in this Court, four of which are the following class actions: (1) Dr. Paul Zidel v. Allstate Insurance and Community Care Network, Inc., d/b/a CCN, Case No. 00-6061 ("Zidel"); (2) Dr. Marc Browner v. Allstate Indemnity Co., Case No. 00-7163 ("Browner"); (3) Ultra Open MRI Corp. v. Deerbrook Insurance Co., case No. 01-6777 ("UOMC"); and (4) Ultra Open MRI Corp. v. Fidelity and Casualty Company of New York and The Continental Insurance Company, Case No. 01-6779. I am submitting this Declaration in support of final approval of the Allstate class action Settlement Agreement and the Memorandum of Law in Support of Class Counsel's Application for An Award of Attorney's Fees and Reimbursement of Expenses.

2.    I have been Plaintiffs' counsel in the Allstate case and all the consolidated cases. Although the Allstate case is before the Court for final approval of the Class Settlement, the historical background of the litigation in the consolidated cases is necessary to understand the

tremendous effort of Class Counsel in prosecuting and managing the consolidated litigation which contributed substantially to the final settlement of the Allstate case. I served in the capacity of Class Counsel with the law firms of Kopelman & Blankman, P.A. of Ft. Lauderdale, Florida, Gold & Coulson of Chicago, Illinois, and Phillips & Garcia, P.C. of Dartmouth, Massachusetts.

**Pre-Suit Investigation**

3. Prior to filing any of the consolidated cases, Class Counsel conducted an intensive and thorough investigation of what they believed to be an industry-wide practice of Florida automobile insurers reducing medical expense claims based on managed care preferred provider organization ("PPO") discounts. A practice Class Counsel has characterized throughout this litigation as a "Silent PPO." The term "Silent PPO" typically describes a payment scheme to obtain discounts for payors who are not entitled to them. First Health Group Corp. v. United Payors & United Providers, Inc., 95 F. Supp. 2d 845, 849-850 (N.D. Ill. 2000) (referring to Office of Insp. Gen., Office of Personnel Mngmt., Rep. No. 99-00-97-054, "Report on the Use of Silent PPOs in Fed. Employers Health Ben. Programs," 20-23 (1998)).

4. To understand a Silent PPO, it is important to understand the workings of a traditional PPO. In a typical PPO relationship, a group of medical providers agree to provide medical services to a group of subscribers of an insurance company at a lesser cost than the medical providers would have normally charged. In exchange, the insurance carrier would attempt to "steer" its subscribers to the PPO's preferred providers through methods such as financial incentives, I.D. cards and provider lists. First Health Group Corp., 95 F. Supp. 2d at 849-850. The Eleventh Circuit has recognized the term "steerage" as meaning the process of "actively encouraging plan participants to seek the services of the providers in the PPO by such means as financial incentives. . . .Steerage also occurs through communication efforts such as providing participants with a list of preferred

3

providers, a hotline to inform and refer participants to preferred providers, and issuing identification cards designed to inform providers that a patient is a participant eligible for the PPO discount." HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 983, 1002 (11th Cir. 2001).

 5. In contrast, in a Silent PPO arrangement, another PPO will sell its medical providers' names and discounted fee information, often without the providers' knowledge or permission, to a secondary market of vendors who then access the information on behalf of their payor clients, recalculating the provider's fees based on the discounted fee information. First Health Group Corp., 95 F. Supp. 2d at 849-850. In the context of the present case, the Plaintiffs all alleged that Allstate was wrongfully applying negotiated PPO discounted medical billing rates to PIP automobile insurance claims without the requisite "steerage" in violation of their preferred provider agreements ("PPAs") and in violation of Florida statutory law.

 6. The investigation had three facets: 1) obtaining and reviewing any state and national decisions on the PPO issue; 2) obtaining discovery documentation and deposition and hearing testimony from Florida state cases, some of which Florida Class Counsel, Kopelman & Blankman and myself were directly involved in; and 3) acquiring documentation such as PPO contracts and explanation of benefit forms from as many sources as possible throughout the state of Florida. Also, prior to the filing of these consolidated cases, Class Counsel, Larry Kopleman, and myself had filed a state court class action seeking reimbursement for insureds whose medical providers balanced billed" them after an insurer's application of PPO discounts to their medical expense claims. The term "balance billing" has been generally recognized as the practice of a health care provider charging or collecting from a medical insurance plan participant or Medicare beneficiary an amount in excess of the negotiated health care contract rate or the Medicare reimbursement rate for medical services covered by the health insurance plan or by Medicare. See e.g., Downhour v. Somani, 85

F.3d 261, 264 (6th Cir. 1996); see also, Garelick v. Sullivan, 987 F.2d 913, 915 (2d Cir. 1993). Information from the state court class action also served as part of the wealth of information reviewed by Class Counsel prior to filing the consolidated cases. Finally, documents and deposition transcripts from similar class actions in Massachusetts state court were accumulated and reviewed as the Massachusetts cases involved some of the same PPOs, PPO contracts and claim re-pricing companies working with the automobile insurers in Florida. See Mitzan v. Medview Servs. et al., 10 Mass.L. Rep. 242 (1999); Southeast Physical Therapy Servs., Inc. v. Health Care Value Mngmt., 11 Mass.L.Rep. 571 (2000).

7. Also as part of our investigation, Class Counsel met with our clients and our clients' billing personnel to gain information "on the ground" about how the PPOs, insurers and claims facilitators, such as ADP, were processing medical expense claims on a day-to-day basis.

8. The majority of the documents obtained in Class Counsel's investigation, as well as documents gained after the litigation was filed, were organized into an electronic document depository which Class Counsel could access online from their offices for the purposes of prosecuting the litigation.

9. Class Counsel's research at the time revealed that no similar federal or state class actions challenging a "Silent PPO" discounting scheme on automobile medical expense claims had been filed anywhere in the country with the exception of two cases brought in Massachusetts by Class Counsel team member Phillips & Garcia. The filing of the Florida federal court class actions based on the emerging "Silent PPO" discounting practice in the automobile industry was both novel in theory and scope.

10. After this extensive pre-suit investigation of what amounted to the PPO discounting practices of the entire Florida automobile insurance industry, Class Counsel spent an enormous

amount of time researching viable state and federal court causes of action before filing the first case. After completing their research, and cognizant of the inherent difficulties of a federal court civil RICO case, Class Counsel also spent a large amount of time on the drafting and re-drafting of the model class action complaint which was used as the backbone for all of the complaints filed in these consolidated cases. Class Counsel's time and effort proved valuable since the Plaintiffs' RICO claims survived the Defendants' motions to dismiss.

**The Allstate Filing and the Consolidated Litigation**

11.  On January 12, 2000, Class Counsel filed the first class action case against Allstate Insurance Company. From the start, the case was aggressively defended with Defendants Allstate and Medview Services, Inc. first moving to dismiss.

12.  After the Allstate filing, Class Counsel then filed the following cases:

1. Brickell, et al v. Progressive Express Ins. Co., et al, Case No. 00-6649 (filed 5/12/00);
2. Browner v. Allstate Indemnity Company, et al, Case No. 00-7163 (filed 8/16/00);
3. LaRusso, et al v. Liberty Mutual Ins. Co., Case No. 00-7692 (filed 11/15/00);
4. Larusso, et al v. Nationwide Ins. Co., Case No. 01-8108 (filed 2/7/01);
5. Larusso, et al v. Florida Farm Bureau Casualty Ins. Co., Case No. 01-8110 (filed 2/7/01);
6. Larusso ITT Hartford Life & Annuity Ins. Co., Case No. 01-8111 (filed 2/7/01);
7. Ultra Open MRI Corp., et al v. Progressive American Ins. Co., Case No. 01-6776 (filed 5/8/01);
8. Ultra Open MRI Corp., et al v. Deerbrook Ins. Co., C.A. No. .01-6777 (filed 5/8/01);
9. Ultra Open MRI Corp., et al v. Prudential Property & Casualty Ins. Co., C.A. No. 01-6778 (filed 5/8/01);
10. Ultra Open Mri Corporation, et al v. Fidelity & Casualty Co. of New York, et al, C.A. No. 01-6779 (filed 5/8/01);
11. Ultra Open MRI Corp. v. Integon National Ins. Co., et al, C.A. No. 01-6780 (filed 5/8/01);
12. The Chiropractic Centre, Inc., et al v. Superior Ins. Co., C.A. No. 01-6782 (filed 5/8/01);
13. The Chiropractic Centre, Inc., et al v. Metropolitan Ins. Co., C.A. No. 01-6783 (filed 5/8/01);

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

      14.    <u>Mote Wellness & Rehab., Inc., et al v. American International Ins. Co., et al</u>, C.A. No. 01-8549 (filed 6/14/01).

    13.    The cases were consolidated by Judge Ferguson. Each filed case was aggressively defended. As evidenced by the individual and consolidated case dockets, prior to the ultimate appeal of the cases, the Defendants filed scores of different motions to dismiss and/or to compel arbitration. Class Counsel opposed all of the Defendants' motions to dismiss and to compel arbitration and, with the exception of the dismissal of their Lanham Act counts, the Plaintiffs prevailed on each and every motion. In the two circumstances where Magistrate Judge Snow partially ruled against the Plaintiffs on the issue of arbitration, Class Counsel challenged the Magistrate Judge's recommendation and the District Court did not adopt the recommendation. All motions to dismiss and to compel arbitration were successfully defeated. Because of the Defendants' zealous defense of the cases, it took Class Counsel a tremendous amount of time and effort to defeat the Defendants' initial attempts to dismiss these consolidated cases.

    14.    While opposing the Defendants' attempts to dismiss the cases, Class Counsel also went on the offensive by propounding discovery to the Defendants and subpoenaing non-party witnesses. Class Counsel served separate requests for production, interrogatories and admissions on all the defendants. Class Counsel also scheduled over 40 depositions of various witnesses and sent document and deposition subpoenas to many non-party witnesses.

    15.    The vast majority of Class Counsels' discovery requests were opposed by the Defendants. The Defendants either objected to the discovery in its entirety or filed motions for protective orders seeking to limit or stop Class Counsel from taking discovery. Class Counsel opposed the Defendants' motions and in some circumstances filed motions to compel and for sanctions due to the defendants failures to respond to discovery. Despite these efforts, the defendants were for the most part successful in preventing Class Counsel from conducting discovery

7

as the District Court eventually stayed the cases.

16.  After not being able to obtain discovery from the Defendants through the normal discovery process, Class Counsel entered into settlement discussions with Defendants ADP Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street"), in an effort to discover information about the Defendants' polices and practices. In the majority of the consolidated cases, Beech Street was the PPO whose discounts were applied to automobile insurance medical expense claims by ADP. ADP's business was to analyze and re-price claims for property and casualty insurers with its software programs.

17.  Class Counsel were able to negotiate a settlement with ADP and Beech Street under which they would produce any and all documents pertaining to the PPO discounting policies and practices of the relevant Defendant insurers. Accordingly, ADP and Beech Street produced numerous boxes of documents to Class Counsel.

18.  As part of the settlement, Class Counsel also propounded specific data requests to ADP whereby ADP produced data on CD ROM which listed class members by name, address, tax identification number and also included specific claim by claim information per insurer by year. Finally, pursuant to the settlement, ADP and Beech Street agreed to a continuing obligation to provide additional documents and information as the litigation proceeds.

19.  Based on Class Counsels' experience, it would have taken years to obtain the same discovery in the formal litigation process. Moreover, the documents and information obtained from ADP and Beech Street are confidential and therefore have not been disclosed to the defendants with the limited exception of data shared in settlement negotiations with the insurers.

20.  In addition to Class Counsels' efforts to obtain discovery from the vendor Defendants, Class Counsel also briefed and filed motions for class certification in all of the cases

and were ready to argue the same had the Court set them for hearing.

21.     As an example of the intense nature of the litigation, after the District Court issued its Omnibus Order on September 28, 2001, in the two month period from October 3, 2001 through December 7, 2001, the defendants filed 49 motions, notices, requests and submissions seeking all manner of stays, modifications, reaffirmations, clarifications, vacations, re-considerations and dismissals, all of which Class Counsel had to respond to in one form or another.

22.     As of October 30, 2002, the time at which the District Court appears to have issued its last Order prior to appeal, the consolidated docket had been consumed with some 886 entries over a two and a half year period.

23.     After losing their motions to compel arbitration in the trial court, the majority of the Defendants, with the exception of the Progressive defendants, appealed Judge Ferguson's decision to the Eleventh Circuit where the appeals are currently pending.

24.     All of the Defendant insurers in these consolidated cases have stopped taking discounts on automobile medical expense claims.

**The Allstate Case**s

25.     The Allstate class actions were filed on January 12, 2000 ("Zidel"), August 16, 2000 ("Browner"), and May 28, 2001, (both "UOMC" cases). The cases were transferred and reassigned to Judge Ferguson.

26.     After filing, Class Counsel aggressively pursued the Allstate cases. Class Counsel filed a motion for class certification shortly after the class action filings. Class Counsel also served requests for production, admissions and interrogatories on Allstate and noticed depositions of Allstate personnel.

27.     Allstate aggressively defended the cases from the beginning. Allstate moved to

amend the answers and add affirmative defenses, and to stay the cases, which Class Counsel opposed. Allstate moved for a protective order on Class Counsel's discovery. Class Counsel opposed Allstate's attempts at obtaining a protective order and filed a motion to compel Allstate to attend depositions that had been scheduled by Class Counsel. Allstate opposed Class Counsel's motion and also filed an opposition to the Plaintiffs' amended motion for class certification.

28. After the Magistrate Judge recommended that the motions to compel arbitration be denied in part and granted in part as filed by the related PPO Defendants, objections were then filed with Judge Ferguson. Judge Ferguson subsequently adopted the Magistrate Judge's Recommendation and sustained the Plaintiffs' objections. Allstate and the related PPO Defendants thereafter filed their appeals with the Eleventh Circuit.

29. After the appeal was filed, Class Counsel and Allstate agreed to begin settlement negotiations before Joseph Unger, a Mediator with the United States Court of Appeals for the Eleventh Circuit.

30. Separately, Class Counsel and defense counsel in Allstate continued settlement negotiations in person, with two "face-to-face" meetings in Chicago, Illinois and over the telephone for more than three years. There were times in the negotiation process where Class Counsel questioned whether the parties would be able to settle the case. There were serious issues regarding Allstate's supplying complete data related to this case. Through hard work and perseverance, though, the parties were able to resolve their differences and enter into a detailed settlement agreement. Settlement discussions were always conducted at arms-length, were fairly and zealously advocated and there was no collusion between counsel for the parties.

31. During the pendency of these cases there have been three appellate state court cases on the PPO discounting issue pending before the Fifth, Second and Fourth Florida District Courts of

Appeal. These three decisions have played a role in analyzing the relative strengths and weaknesses of the Plaintiffs' position and in determining the advisability of the proposed Settlement. At the time Allstate's case was settled in principle, the Fifth District Court of Appeals had already issued its decision declaring that the insurers' PPO discounting practices violated the Florida statute. In Nationwide Mut. Fire Ins. Co. v. Central Florida Physiatrists, P.A., 851 So. 2d 762 (Fla. 5th DCA 2003), the Fifth District Court of Appeal reasoned that the clear and precise language of Section 627.736(10) demonstrates the Legislature's intent that the availability of PPO benefits under a PIP auto insurance policy is subject to strict compliance with the terms of subsection (10). According to the Fifth District, Nationwide Mutual Fire Insurance was required to first comply with the provisions of subsection (10) in order to take advantage of paying reduced PPO rates for payment of PIP claims. Id. at 766. Nationwide Mutual Fire Insurance's failure to do so thus required it to pay the statutorily mandated 80% of the reasonable and necessary medical expenses incurred by its insured. Id. However, the Second District Court of Appeals ruled that their discounting practice did not violate the Florida Statute. See Nationwide Mut. Ins. Co. V. Dennis M. Jewell, D.C., P.A., 862 So. 2d 79 (Fla. 2d DCA 2003). Thereafter, the Fourth District Court of Appeal followed the decision by the Second District Court of Appeal. See Allstate Ins. Co. v. Holy Cross Hop., Inc., 895 So. 2d 1241 (Fla. 4th DCA 2005),

32. Accordingly, Class Counsel were able to negotiate benefits for the Class where claims would be paid at approximately 65% of the PPO discounted amount in accordance with that Class Member's Maximum Claim Amount as calculated under the Settlement Agreement, and were also able to negotiate the payment of attorney's fees and costs and the costs of settlement administration outside and separate from the Class Fund of $8,900,000. Moreover, the Settlement provided for direct mail notice to Class Members with a minimal proof of claim process where Class

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

Members would not be required to submit any documentation besides the basic information requested on the claim form.

33. Pursuant to the Settlement, Class Counsel communicated with defense counsel about the claims process and receives and reviews periodic reports from Allstate, who is acting as the Settlement Administrator, and defense counsel regarding the ongoing settlement administration.

34. Class Counsel have not yet received a fee for prosecuting the Allstate case. Class Counsel have spent over approximately 12,200 hours on the consolidated cases for a total lodestar of over $3,453,500.00. With respect to the Allstate case, Class Counsel have spent approximately 2,872.60 hours prosecuting the case for a total lodestar of $924,503.50. Based on a requested award of legal fees of $2,966,667.00, the multiplier under a lodestar approach to calculating attorneys' fees is 3.1.

35. Based on Class Counsels' experience, negotiating a class action settlement where Class Members will receive approximately 65% of their actual allowed claims in accordance with the Maximum Claim Amount calculation without an evidentiary proof of claim process is a tremendous benefit to the Class, especially given the risks associated with the age of the claims, the state and Eleventh Circuit appeals and the difficulties in certifying and trying a complex RICO case. At all times, Class Counsel maintained and advocated for the interests of the Class, and as a result, negotiated a settlement that far exceeds the standard class benefits in typical class action cases.

**UNDER PENALTIES OF PERJURY, I DECLARE THAT I HAVE READ THE FOREGOING DECLARATION AND THE FACTS STATED THEREIN ARE TRUE AND CORRECT.**

_____
ERIC LEE