UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

DR. PAUL ZIDEL, on behalf of himself and
all others similarly situated,

        Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

        Defendants.
_____/

SALVATORE D. LARUSSO, D.C.
      Plaintiff,

v.                                  CASE NO:    01-8110

FLORIDA FARM BUREAU
      Defendant.
_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
CLASS ACTION SETTLEMENT WITH FLORIDA FARM BUREAU**

Plaintiff Dr. Salvatore Larusso ("Dr. Larusso"), suing on behalf of himself and the

Settlement Class defined below, respectfully submits this Memorandum pursuant to Rule 23(e)

of the Federal Rules of Civil Procedure in support of the final approval of a settlement of this

class action against the Florida Farm Bureau Insurance entities (collectively referred to as

"FFB") that underwrote automobile insurance in the State of Florida during the Class Period as

defined under the terms of the Settlement.[1]  The FFB insurance entities consist of Florida Farm

Bureau Casualty Insurance Company and Florida Farm Bureau General Insurance Company.

_____

[1] The Class Period means the time period between January 1, 1998 to August 1, 2007.

The total Class relief of the Settlement is over $1.5 million (the "Settlement").

**SUMMARY OF SETTLEMENT**

The specific terms of the Settlement have been set forth in the Settlement Agreement and Stipulation (the "Stipulation") filed with the Court and preliminarily approved on May 16, 2007. The Settlement provides for a $1,200,000 Settlement Fund for the payment of properly filed Class Member claims. FFB has also agreed to pay the following monies <u>separate</u> from the Settlement Fund: 1) $300,000 in attorney's fees; 2) reasonable litigation costs and expenses, not to exceed $15,000; and 3) the costs of settlement administration, including the costs of notification to the Class Members. In accordance with the Stipulation, a total of 1,826 Notices and Proof of Claim forms were mailed. Out of all of these Notices, only 35 valid Opt-Outs were filed. This represents less than .02% of the Class Members who were sent notice. Additionally, and most importantly, <u>there has not been a single objection filed</u> challenging the Settlement, the requested attorneys' fees, or the requested reimbursement of expenses. The lack of a single objection speaks volumes to the fairness and reasonableness of the Settlement. This Court has entered Final Approval Orders in the other consolidated cases. This matter is the final case to be settled and ends the consolidated litigation.

**I.    HISTORICAL BACKGROUND OF THE LITIGATION**

**A.    The Consolidated Class Action Litigation.**

The consolidated class action litigation began over seven years ago on January 12, 2000, with the filing of <u>Napoli v. Allstate Insurance Company, et al</u>, later amended as <u>Zidel v. Allstate Insurance Company, et al</u>,. After filing the first case, Class Counsel filed fourteen additional cases, all of which were eventually consolidated into the current case. Each case alleged a similar pattern and practice by the various insurance defendants of reducing Florida automobile

insurance personal injury protection ("PIP") medical expense claims based on the wrongful application of preferred provider organization ("PPO") discounts, issues of first impression in this Circuit.[2]

The practice about which the Plaintiffs complained has become known as a "Silent PPO." In a typical PPO relationship, a group of medical providers agree to provide medical services to a group of subscribers of an insurance company at a lesser cost than the medical providers would have normally charged.   In exchange, the insurance carrier would attempt to "steer" its subscribers to the PPO's preferred providers through methods such as financial incentives, I.D. cards and provider lists.  See First Health Group Corp. v. United Payors & United Providers, Inc., 95 F.Supp.2d 845, 849-850 (N.D. Ill. 2000) (referring to Office of Insp. Gen., Office of Personnel Mngmt., Rep. No. 99-00-97-054, "Report on the Use of Silent PPOs in Fed. Employers Health Ben. Programs," 20-23 (1998)).  The Eleventh Circuit has recognized the term "steerage" as meaning the process of "actively encouraging plan participants to seek the services of the providers in the PPO by such means as financial incentives. . . .Steerage also occurs through communication efforts such as providing participants with a list of preferred providers, a hotline to inform and refer participants to preferred providers, and issuing identification cards designed to inform providers that a patient is a participant eligible for the PPO discount." HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 983, 1002 (11th Cir. 2001).

The term "Silent PPO" typically describes a payment scheme to obtain discounts for payors who are not entitled to them.  First Health Group Corp., 95 F.Supp.2d at 849-50.  In a

---

[2] To Class Counsel's knowledge, the Consolidated Cases were the first class action cases in the country to challenge the "Silent PPO" discounting of auto insurance claims, other than two similar action brought in Massachusetts state courts by Class Counsel, Phillips & Garcia.  See Mitzan v. Medview Servs. et al., 10 Mass.L. Rep. 242 (1999) and Southeast Physical Therapy Servs., Inc. v. Health Care Value Mngmt., 11 Mass.L.Rep. 571 (2000).

Silent PPO arrangement, another PPO will sell its medical providers' names and discounted fee information, often without the providers' knowledge or permission, to a secondary market of vendors who then access the information on behalf of their payor clients, recalculating the provider's fees based on the discounted fee information. Id.

The theories that predominated the consolidated cases before this Court, centered around the Plaintiffs' allegations that the discounting practices of the various defendant insurers in processing and paying PIP auto insurance claims constituted a Silent PPO. In all the cases, the Plaintiffs urged that the Defendants' conduct (1) violated Florida PIP insurance statutory law (specifically Fla. Stat. § 627.736(10)); (2) constituted a violation of the federal Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq. (the "RICO Act"); (3) were in direct breach of the specific language of the relevant automobile insurance policies; and, (4) constituted unjust enrichment to the defendant insurers.

Since the Plaintiffs and Class Counsel challenged the Florida auto insurance industry to stop the industry-wide practice of discounting PIP claims through the wrongful application of PPO discounts, the Defendant Insurers, and their vendors supplying the discounts, aggressively "circled the wagons" in defense of these cases. As the Court's Docket Sheet demonstrates, a virtual legal war ensued beginning with multiple motions to dismiss. Class Counsel zealously opposed the initial flurry of defensive motions, most notably defeating the defendants' attempts to dismiss their RICO counts.[3]

Dr. Larusso filed the action against FFB on February 7, 2001. FFB subsequently filed a Motion to Dismiss in April 2001 (See D.E. #18). In its Motion, FFB attacked Dr. Larusso's

---

[3] The Plaintiffs' victory was not total. In its main ruling on the motions to dismiss, this Court dismissed the Plaintiffs' Lanham Act claims.

RICO claims, and also urged that the state based causes of action be dismissed on various grounds. When FFB's Motion was filed, there were numerous other defensive motions attacking the claims that were pending in the related PPO cases.

In November 2001, Magistrate Judge Snow issued an Order denying the Motion to Dismiss[4]. Ultimately, Magistrate Snow issued a detailed Report affecting all pending defensive motions that recommended denying them on the basis that any arbitration clauses contained in the related auto policies was not an independent contract between the parties and must be stricken as in violation of Florida's Constitution under Nationwide Mut. Fire Ins. Co. v. Pinnacle Medical, Inc., 753 So. 2d 55 (Fla. 2000) (Consolidated DE# 852). Subsequently, in September 2002, this Court approved and adopted Magistrate Snow's Report[5]. FFB, along with other related PPO Defendants, then appealed Judge Ferguson's decision to the Eleventh Circuit, where the cases were consolidated on appeal.[6]

While the cases were pending in the District Court, Class Counsel aggressively sought discovery from all the Defendants and other non-party witnesses. Class Counsel propounded written discovery and noticed various depositions of the defendants and other witnesses. Almost all of these discovery efforts were met with motions for protective orders or motions to stay discovery. Class Counsel opposed such motions and countered in some cases by filing motions to compel discovery which were, in turn, opposed by the defendants. All discovery and

---

[4] In the Order, Magistrate Judge Snow noted that FFB's Motion to Dismiss had been orally denied by the Court at a May 14, 2001 hearing.

[5] In an October 28, 2002, Supplemental Order, the Court denied all motions to dismiss or to compel arbitration in the Consolidated Cases which includ ed the FFB case (Consolidated DE# 881).

[6] The Progressive Defendants did not join in the appeal. The District Court, however, stayed the Progressive actions when the other related cases were appealed.

litigation in the District Court was eventually stayed as the cases were appealed to the Eleventh Circuit.[7]

Despite the Defendants' successful efforts at preventing Class Counsel from conducting full discovery prior to the appeal, Class Counsel were able to obtain a wealth of invaluable information by negotiating a settlement with the vendor defendants, ADP Integrated Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street").[8]  Under this agreement, ADP and Beech Street consented to a whole-scale production of documents, data and information relating to the Defendant insurers' PPO reduction practices.  ADP and Beech Street provided class  counsel with thousands of pages of documents detailing the defendant insurers' PPO discounting programs.  ADP and Beech Street also conducted a specific search of their respective databases that resulted in a CD ROM containing PPO discount information on a claim-by-claim basis for each insurer per year.  The information on the CD ROM provided Class Counsel, in the majority of cases, with the complete class list (names, addresses and tax identification numbers) and the amount of each class member's damages on a claim-by-claim basis - information that would have taken Class Counsel years to obtain in the normal discovery process.

B.    **The FFB Class Action Case.**

Dr. Larusso, a licensed Florida chiropractor, entered into a "Preferred Provider Agreement" (a "PPA") with MedView Services, Inc. under which he became a participating preferred medical provider.  MedView Services later merged with Community Care Network

---

[7]  As of October 28, 2002, when the cases were stayed, the Consolidated Docket had 882 entries. The Consolidated Docket now has over 1,100 enteries.

[8]  ADP, a national claims re-pricing company servicing property and casualty insurers, applied the Beech Street PPO discounts to class members' medical bills on behalf of certain Defendant insurers using a software program designed to calculate the discount and produce an explanation of benefits form showing the PPO reductions.

("CCN"). Companies such as CCN are sometimes referred to as "brokers" or "managed care companies" in the health care industry. CCN contracts with healthcare providers for the purpose of uniting healthcare providers with commercial payors to coordinate and arrange for the delivery of healthcare services to legitimate subscribers or members.

Under the terms of his PPA, Dr. Larusso agreed to become a preferred provider and to accept reduced payments in exchange for his medical services to legitimate members. Dr. Larusso alleges that the terms of his PPA did not allow CCN, as successor in interest to MedView, to permit automobile insurers or PPO discount brokers with automobile insurer clients access to his preferred provider rates. Dr. Larusso agreed to discount his normal medical fees in return for increased patient volume. For patients who were not part of the CCN PPO network, Dr. Larusso charged his normal fee without any discount.

At the time he had executed the PPA, Dr. Larusso's alleges that FFB did not offer a preferred provider endorsement under its Florida automobile insurance policies. He also alleges that FFB did not notify its insureds of the identities of any CCN preferred providers including Dr. Larusso, and, FFB did not offer insureds premium reductions as an economic incentive to use the preferred providers in CCN's network. Despite these facts, CCN subsequently allowed FFB access to all of CCN's preferred provider's confidential and proprietary discount rates, including Dr. Larusso's. FFB then improperly applied those discounts to all automobile insurance bills submitted to it.

## II.    NEGOTIATIONS LEADING TO THE SETTLEMENT

During the pendency of this lengthy litigation, Plaintiffs' counsel made various attempts at settlement negotiations with FFB to no avail. In fact, while the cases against the other auto insurance Defendants were settled and ultimately approved by this Court, FFB maintained its

position of not negotiating a settlement.  Ultimately, as the last class action settlement against the

Allstate Insurance defendant was crafted and presented to the Court for approval, FFB began to

entertain settlement negotiations.  Over the course of months, Class Counsel conducted extensive

settlement negotiations with counsel for FFB.

Ultimately, after protracted discussions on both sides, and through continued

perseverance and hard work, the current $1,500,000 settlement was finally reached between FFB

and the Plaintiff in the Spring of 2007.  Based on their extensive knowledge of the strengths and

vulnerabilities of the claims against FFB and given the uncertainties of an appeal and/or ultimate

trial of the action, Class Counsel believe that the Settlement represents an excellent result for the

Class.  Plaintiff and Class Counsel heartily recommend that the proposed Settlement be approved

as fair, reasonable, adequate and in the best interests of the Class.

> **A.    Summary of the Settlement - Class Members Will Receive Approximately 80% Of Their Damages With No Reduction For Attorney's Fees Or Costs Of Settlement Administration.**

The Settlement provides for the distribution of a Settlement Fund of up to $1,200,000 to

Class Members who timely file Proof of Claim forms with FFB which acted as Settlement

Administrator.[9]  Each Class Member that timely filed a properly completed Proof of Claim[10] is

entitled to reimbursement of the PPO reductions taken by FFB on medical bills submitted by a

Class Member during the relevant Class period.  This reimbursement, which is defined as the

Maximum Claim Amount, is arrived at by taking the difference between eighty (80%) of the

---

[9]  The precise terms of the Settlement are set forth in the Stipulation of Settlement filed with and preliminarily approved by this Court and are also discussed in detail in the Declaration of Class Counsel.

[10]  The proof of claim process was simple and straightforward.  To file a valid Proof of Claim, Class Members only needed to verify that they provided medical services to FFB insureds during the class period and that they obtained "Assignments of Benefits" from their FFB patients during that class period.  Class Members *did not* have to provide any documentation, such as bills or explanation of benefits forms to perfect their Proof of Claim.

amount billed by the Class Member and the amount paid by FFB after application of the PPO reduction. If the total claim amounts submitted by Class Members was less than or equal to the $1,200,000 Settlement Fund, then each properly submitted Class Member claim would be paid in full, i.e. at one hundred (100%) percent of the calculated PPO Settlement Amount.[11]

The Settlement provides for a claim dispute resolution process overseen by an independent arbitrator should there be any disputes between a Class Member and FFB as to the amount of a settlement payment or the completeness of any Proof of Claim form. Under the dispute resolution function of the Settlement, Class Counsel and FFB shall designate, in advance, an independent arbitrator to oversee the dispute process and to establish a uniform arbitration fee schedule. FFB, Class Counsel, and the Class Member shall be permitted to submit written presentations regarding their respective positions regarding the disputed claim. The arbitrator will then determine whether a valid Proof of Claim was submitted and will determine the amount of any appropriate Settlement payment. In the event that the independent arbitrator rules in favor of the Class Member, FFB will be required to reimburse the Class Member for any arbitration fee and the Class Member's claim will be paid by FFB as calculated under this Agreement.

Finally, FFB has agreed to pay, in addition to and outside the Settlement Fund, any Class Counsel fees awarded by the Court up to twenty-five percent (25%) of the Settlement Fund totaling $300,000, as well as reasonable costs and litigation expenses not to exceed $15,000. Additionally, all costs of the settlement administration, including the costs of notifying the Class Members, were borne by FFB.

---

[11] The Settlement Agreement also provides that should the aggregate total of all PPO Settlement Amounts calculated under this settlement agreement for all Class Members exceed the Settlement Fund Amount, then each Class Member=s Maximum Claim Amount will be equal to the PPO Settlement Amount for that Class Member multiplied by a fraction whose numerator is the Settlement Fund Amount and whose denominator is the aggregate total of all PPO Settlement Amounts.

B.      **Due Notice Of The Settlement Was Appropriately Given**.

The form of Notice utilized in this case was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  The Notice, which was preliminarily approved by this Court, provided detailed information concerning the rights of Class Members, including the manner in which objections could be lodged; the nature, history and progress of the Litigation; the proposed Settlement terms; the process for filing Proofs of Claim; the fees and expenses to be sought by Class counsel; the necessary information for any Class Member to examine the Court records should he or she desire to; and the time and procedure for exclusion from the Settlement or to object to the Settlement or Class Counsel's fee application.  Thus, the notice adequately described the proceedings and substantive claims being settled, and it contained more than sufficient information reasonably necessary for class members to remain a class member and be bound by final judgment or to opt out.  See Twigg v. Sears, Roebuck & Co., 153 F.3d 1222, 1227 (11th Cir. 1998) (citing In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1103-05 (5th Cir. 1977).

All potential Class Members were identified using the most current records and electronic data provided by FFB.  Notices were then prepared by FFB acting as settlement administrator, and were entirely paid for by FFB.  FFB then mailed first class, postage pre-paid, to all Class Members identified on the Class Member list, a copy of the Notice and the Proof of Claim approved by this Court.  Notice through the use of first class mail has consistently been considered sufficient to satisfy the due notice requirements of Rule 23(e).  See e.g., Zimmer

Paper Prods., Inc. v. Berger & Montague, P.C., 758 F.2d 86, 90-91 (2d Cir. 1985) (citations omitted).

At the beginning of the settlement process FFB initially mailed 1,826 Notices. Over the course of the claims period, FFB made efforts to ensure that as many of the Notices were received by Class Members. For example, after receiving any Notices as "undeliverable," FFB undertook an investigation to determine whether any of the returned items were duplicates. As required under the terms of the Settlement, FFB then made efforts to identify and locate any Class Member addresses for Notices returned undeliverable by using State of Florida "on-line" health care related data bases. Thus, the method of notice was the most reasonable method under the circumstances to apprise all potentially interested parties of the pending Settlement and amply satisfied the requirements of due process. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173 (1974).

## IV. THE STANDARDS FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS UNDER RULE 23(e) HAVE BEEN SATISFIED.

There is an overriding public interest in favor of class action settlements which have the well-deserved reputation as being most complex.[12] Ass'n for Disabled Americans, Inc. v. Amoco Oil Co., 211 F.R.D. 457, 466 (S.D. Fla. 2002) (citing Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977)); Warren v. City of Tampa, 693 F.Supp. 1051, 1054 (M.D. Fla. 1998), aff'd, 893 F.2d 347 (11th Cir. 1989). Accordingly, a class action settlement should be approved so long as it is "fair, adequate and reasonable and is not the product of collusion between the

---

[12] The Eleventh Circuit has noted that "public policy strongly favors the pretrial settlement of class action lawsuits." In re U.S. Oil & Gas Litig., 967 F. 2d 489, 493 (11th Cir. 1992). In that action, the court noted that "complex litigation like the instant [class action] case can occupy the court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive. Accordingly, the Federal Rules . . . authorize District Courts to facilitate settlements..." Id.

parties." <u>Bennett v. Behring Corp.</u>, 737 F.2d 982, 986 (11th Cir. 1984); <u>Cotton v. Hinton</u>, 559 F.2d at 1330; <u>Behrens v. Wometco Enters., Inc.</u>, 118 F.R.D. 534, 537 (S.D. Fla. 1988).

When determining whether a settlement is fair, adequate and reasonable, a court should consider all relevant factors, including (1) an assessment of the likelihood of success at trial; (2) the range of possible recovery at such trial; (3) the consideration provided to class members under the Settlement, in comparison to the range of possible recovery discounted by the inherent risks of litigation; (4) the complexity, expense and duration of the litigation in the absence of the settlement; (5) the substance and amount of opposition to the settlement; and (6) the state of proceedings at which the settlement was achieved.[13] <u>Bennett v. Behring Corp.</u>, 737 F.2d at 986; <u>Cotton v. Hinton</u>, 559 F.2d at 1330-31; see also <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. 534, 538-39 (S.D. Fla. 1988), <u>aff'd</u>, 899 F.2d 21 (11th Cir. 1990); <u>ADA v. Aetna, Inc. (In re Managed Care Litig.)</u>, 2004 U.S. Dist. LEXIS 14294, *3-4 (S.D. Fla. 2004).

The application of the <u>Bennett</u> factors is left to the sound discretion of the trial judge and appellate review of the Court's decision is based on an abuse of discretion standard. <u>In re U.S. Oil & Gas Litig.</u>, 967 F.2d at 493; <u>In re Broiler Chicken Antitrust Litig.</u>, 669 F.2d 228, 238 (5th Cir. 1982). Great weight is accorded a trial judge's views in evaluating a class action settlement. <u>City of Detroit v. Grinnell Corp.</u>, 453 F.2d 448, 454 (2d Cir. 1974) (quoting <u>Ace Heating & Plumbing Co. V. Crane Co.</u>, 453 F.2d 30, 34 (3d Cir. 1971)). In making its determination, the trial court is also entitled to rely on the judgment of experienced counsel for the parties. <u>In re Smith</u>, 926 F.2d 1027, 1028 (11th Cir. 1991); <u>Cotton v. Hinton</u>, 559 F.2d at 1330.

---

[13] Other factors relevant to a court's inquiry are the terms of the settlement, the procedure afforded to notify Class member of the proposed settlement, and the judgment of counsel. <u>Cotton v. Hinton</u>, 559 F.2d at 1330; <u>Warren v. City of Tampa</u>, 693 F.Supp. at 1055.

In evaluating these considerations, a court must not try the case on the merits. Cotton v. Hinton, 559 F.2d at 1330; Diaz v. Hillsborough County Hosp. Auth., 2000 U.S. Dist. LEXIS 14061, *6 (M.D. Fla. 2000). Instead, the court should rely on the judgment of experienced counsel and, absent fraud, "should be hesitant to substitute its own judgment for that of counsel." Ass'n for Disabled Americans v. Amoco Oil, 211 F.R.D. at 467 (quoting Cotton v. Hinton, 559 F.2d at 1330); see also In re Sunbeam Sec. Litig., 176 F.Supp.2d 1323, 1329 (S.D. Fla. 2001). Rather than justifying each settlement term against a hypothetical or speculative measure of what concessions might have been gained, a court should focus on the negotiation process to ensure that the settlement was achieved through arms-length negotiations by counsel and was not the product of collusion between the parties. See Behrens v. Wometco Enter., Inc., 118 F.R.D. at 538-39. Ultimately, in evaluating a settlement's fairness, the court should remember that compromise is the essence of a settlement and that "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." Cotton v. Hinton, 559 F.2d at 1330.

The application of these standards in the present case warrants the approval of the Settlement as fair, reasonable and adequate. Class Counsel and FFB have had substantial opportunity to weigh the strengths and weaknesses of the parties' respective positions in the event this action were to proceed to appeal and/or trial, and to reach an informed compromise based on their respective analyses.

### A.     The Likelihood of Success at Trial and Potential Recovery.

When considering the likelihood of success at trial and any potential recovery, a court can limit its inquiry to determining "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." Ressler v. Jacobson, 822 F. Supp. 1551, 1553 (M.D. Fla. 1992); see also Elkins v. Equitable Life Ins. Co., 1998 U.S. Dist.

LEXIS 1557, * 76 (M.D. Fla. 1998); Mashburn v. National Healthcare, Inc., 684 F. Supp. 660, 670 (M.D. Ala. 1988) (in the class action settlement context, courts do not decide the merits of the case or resolve unsettled legal questions). This inquiry is premised on "balancing the probabilities, not assuring that the plaintiff class receives every benefit that might have been won after a full trial." In re Chicken Antitrust Litig., 560 F. Supp. 957, 960 (N.D. Ga. 1980). The expense of achieving a more favorable result for the class at trial must be considered. Ressler v. Jacobson, 822 F. Supp. at 1555; see also, Young v. Katz, 447 F.2d 431, 433 (5th Cir. 1971).

While the Settlement represents an extremely favorable result under any measure, it must be considered in light of the significant risks faced by the Class with continued litigation. Class Counsel believe that they have a "strong case" to be made against FFB.   The potential for a substantial recovery at trial, however, was tempered by Class Counsel's analysis of certain major factors that favor the settlement of this action on the proposed terms.  These factors include (1) the uncertain outcome of pending appeals to the Florida Supreme Court concerning the interpretation of Florida Statute section 627.736(10); (2) the uncertain outcome of pending appeals to the 11th Circuit Court of Appeals concerning related parties' motions to compel arbitration or in the alternative to dismiss similar actions; and (3) the inherent difficulties in proving the elements of a RICO action against Allstate in a full trial on the merits.

**1.      Florida State District Courts Had Conflicting Rulings on the PPO Issue in the State's Statutory Auto Insurance Scheme Which the Florida Supreme Court Ultimately Decided in Favor of the Insurers.**

One of the most important considerations concerning the likelihood of success at trial concerns Plaintiff's claims under Florida's PIP statute, Section 627.736(10). Both before and during the litigation, there was a split between two Florida appellate districts, the Second and Fifth Districts, on whether an auto insurer may pay health care providers at reduced PPO

contract rates without first offering a preferred provider PIP policy of insurance.  In <u>Nationwide Mut. Fire Ins. Co. v. Central Florida Physiatrists, P.A.</u>, 851 So.2d 762 (Fla. 5th DCA 2003), the Fifth District Court of Appeals reasoned that the clear and precise language of Section 627.736(10) demonstrates the Legislature's intent that the availability of PPO benefits under a PIP auto insurance policy is subject to strict compliance with the terms of subsection (10). According to the Fifth District, Nationwide Mutual Fire Insurance was required to first comply with the provisions of subsection (10) in order to take advantage of paying reduced PPO rates for payment of PIP claims.  <u>Id.</u>  at 766.  Nationwide Mutual Fire Insurance's failure to do so thus required it to pay the statutorily mandated 80% of the reasonable and necessary medical expenses incurred by its insured. <u>Id.</u>

In stark contrast to the Fifth District's decision, the Second District held that subsection (10) does not prohibit insurers that have not issued PPO auto policies from paying health care providers at discounted PPO rates.  See <u>Nationwide Mut. Ins. Co. V. Dennis M. Jewell, D.C., P.A.</u>, 862 So.2d 79 (Fla. 2d DCA 2003).  Likewise, in <u>Allstate Ins. Co. v. Holy Cross Hosp., Inc.</u>, 895 So. 2d 1241 (Fla. 4th DCA 2005), the Fourth District Court of Appeals agreed with the decision by the Second District Court of Appeal.

All three cases were appealed to the Florida Supreme Court.  As recently as July 2007, the Florida Supreme Court decided that auto insurers that utilized preferred provider contractual rates, but that had not issued PPO auto insurance endorsements could do so without complying with the requirements of the Florida PIP statute.  See <u>Allstate Ins. Co. v. Holy Cross Hosp., Inc.</u>, 32 Fla.L.Weekly S. 453 (July 12, 2007).  The high court reasoned that the effect of such contractual arrangements was to predetermine what constituted a "reasonable" medical expense for a covered service. <u>Id.</u>

While the Florida Supreme Court's decision is not final as of the submission of this Memo of Law pending the expiration of time to file motions for rehearing, in light of this current development this Settlement represents a major victory for the Class. Given that the proposed Settlement avoids the harsh outcome of the Supreme Court's ruling while offering to reimburse the Class Members approximately 80% of their claimed losses under the Maximum Claim Amount as calculated in the Settlement Agreement, it is clear that potential litigation risks outweigh the rewards of the Settlement.

> **2.    The Range of Possible Recoveries and the Consideration Offered Under the Settlement in Relation to that Range.**

In <u>Behrens</u>, the Court combined the second and third factors of the <u>Bennett</u> test to determine the appropriateness of the settlement. <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at 541. The factors considered are the range of possible recovery and the point within, or below, the range of possible recovery at which a settlement is fair, adequate and reasonable. Discounting multiple damages under RICO, the range of possible recovery under applicable law would be from zero to 60% of the discounted amount with interest and an award of attorney's fees and costs. Under the proposed Settlement, interest is the only monetary damage not included in the Settlement. If the Claim Fund is not exhausted, then all claimants will receive up to a 100% recovery of their allowed claims as calculated under the Settlement Agreement. Additionally, FFB will pay Class Counsel fees and reasonable litigation costs and expenses, as well as costs of settlement administration *separate* from the Claim Fund. The benefits provided by the Settlement are at the highest end of potential relief had the case been tried successfully by Class Counsel.

Moreover, based on the present state of the PIP statutory scheme in Florida, the terms of the Settlement actually provides Class Members with *significantly better* relief than they

otherwise might expect should the settlement not be approved. Since the inception of this litigation in 2000, the Florida Legislature has amended the PIP statute by adding a complicated pre-suit demand procedure. Under the new statute, prior to filing a lawsuit a medical provider must send a demand letter to the insurer detailing: 1) the name of the insured upon which such benefits are being sought, including a copy of the assignment giving rights to the claimant if the claimant is not the insured; 2) the claim number or policy number upon which such claim was originally submitted to the insurer; 3) to the extent applicable, the name of any medical provider who rendered to an insured the treatment, services, accommodations, or supplies that form the basis of such claim; and 4) an itemized statement specifying each exact amount, the date of treatment, service, or accommodation, and the type of benefit claimed to be due. Fla. Stat. § 627.736(11).

Class Members who have not yet filed suit for illegal PPO discounts would have to first satisfy the pre-suit demand requirements of the new statute. The statute's evidentiary demand requirements are far more onerous than the proof of claim process negotiated by Class Counsel. Class Members need not provide any documentation or detailed claim information to participate in the Settlement, whereas under the new statute they are required to conduct a file-by-file review and provide documentary evidence just to meet the pre-suit demand requirements.

### 3. The Complexity, Expense and Likely Duration of the Litigation.

Class Counsel believe that the claims asserted in these actions have considerable merit. However, its inherent complexities combined with the uncertainties those complexities engender, are characteristic of RICO litigation and consolidated cases of this nature. The docket sheet tells the story best as there are over 1,200 entries and the parties would still have "a long way to go" in the litigation process. Those uncertainties militate strongly in favor of approving the

Settlement.

The likely duration and associated expenses of continued litigation likewise favor approval of the Settlement. See <u>Warren v. City of Tampa</u>, 693 F.Supp. At 1059 ("The parties estimate that trial of this case would take three weeks of Court time, and would cost hundreds of thousands of dollars in attorneys' fees, expert witnesses fees and costs. These factors militate in favor of a decision to accept the proposed settlement."). In the present case, Class Counsel estimates that a trial of this action could take approximately two weeks and could cost the Class hundreds of thousands of dollars in attorneys' fees, expert fees and litigation costs.

Moreover, given that FFB has already filed an appeal in this action, it is very likely that it would appeal class certification and any trial judgment in favor of the Plaintiff. The Class would be further subject to the many years of delay and additional costs associated with those appeals. Here there is a great deal at stake for the parties and, but for the proposed Settlement, the case would continue to be strongly litigated by the Plaintiff and FFB. As a result of the Settlement, the dispute between them will come to an end with the Class receiving a substantial recovery and there will also be substantial savings in Court resources by avoiding a lengthy trial of this case. Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources. <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at 538.

### 4. <u>The Substance and Amount of Opposition to the Settlement.</u>

Even when a court becomes aware of one or more objecting parties, the court is not "required to open to question and debate every provision of the proposed compromise. The growing rule is that the trial courts may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision." <u>Cotton v. Hinton</u>, 559 F.2d at 1331. FFB, as settlement administrator, sent out over 1,800 Notices in this action. Not a single objection was

filed by any Class Member. Additionally, there have been only 35 valid Opt-outs filed, or less than 2% of the Class Members who opted out of the Settlement. Clearly, the reaction of the Class to the Settlement is favorable and positive. Courts have looked at the absence of meaningful objections to a proposed settlement as further support for the approval of a settlement. See <u>Bennett v. Behring, Corp.</u>, 737 F.2d at 988.

    **5.**  <u>**The Stage of the Proceedings at Which the Settlement was Achieved**</u>.

    The purpose of considering the stage of the proceedings and the discovery taken is to ensure that the plaintiff has had access to sufficient information to evaluate the case and to determine the adequacy of the proposed settlement. <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at 544. As discussed in greater detail in Class Counsel's Declaration, the Settlement was achieved after nearly seven years of intense litigation involving extensive motion practice and investigation.

    The Plaintiff and Class Counsel were very aware of the merits of their case based on their pre-suit investigation and the status of state case law on the issue of applying PPO discounts to automobile medical expense claims. Additionally, despite the District Court's stay of discovery, Class Counsel was able to obtain extensive discovery from ADP and Beech Street consisting of relevant documents, data and information about the industry's PPO discounting practices. Absent this settlement with ADP and Beech Street, Class Counsel estimates that it would have taken years of post-appellate discovery to obtain the same information. Knowledge of the law, coupled with the discovery obtained formally and informally from ADP and Beech Street, allowed Class Counsel to accurately assess its case for class-wide settlement negotiations.

6.    **The Settlement is the Result of Arms-length Negotiations Among Competent Counsel.**

In considering the fairness of a proposed settlement, the Court is entitled to rely heavily on the opinion of competent counsel.  <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at 544.  This is especially apt where, as here, the extensive amount of independent investigation, legal research, briefing and discovery indicates that counsel are fully capable of evaluating the merits of a plaintiff's case and the probable course of future litigation.  See <u>Cotton v. Hinton</u>, 559 F.2d at 1330.  In analyzing a proposed settlement and the opinion of counsel, it is also appropriate for the Court to examine the negotiating process that took place between the parties to confirm that there was no collusion in reaching the Settlement.  <u>Behrens v. Wometco Enter., Inc.</u>, 118 F.R.D. at 538.

In the present case, the Settlement was achieved only after years of hard-fought and contentious litigation.  Additionally, for a number of years while the litigation and appeal was pending and the other related PPO cases were being settled and approved, FFB did not even entertain settlement talks proposed by Class Counsel.  Ultimately, it was not until the last settlement was reached with the related Allstate Insurance defendant, that serious settlement negotiations with FFB were begun.  Then, Settlement negotiations were conducted by counsel for the parties over the course of months and were, without a doubt, conducted at "arms length."  From the complex and thorough terms of the Settlement Agreement it is clear that the process by which this Settlement was accomplished was fairly and zealously advocated by counsel for all parties.  Through their consistent and hard-pressed efforts, Class Counsel and Defense Counsel were eventually able to fashion a Settlement that is not only fair and reasonable, but is a truly extraordinary and an excellent result for the Class.

**CONCLUSION**

20

For the foregoing reasons, Plaintiff submits that the proposed Settlement is fair, reasonable and adequate and should be approved in its entirety, and respectfully request that the Court approve the Settlement.

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Dated:  September 7, 2007          Respectfully submitted,
        Boca Raton, FL

_____
ERIC LEE (Fl. Bar No. 961299)
lee@leeamlaw.com
Lee & Amtzis, P.L.
5550 Glades Road, Suite 401
Boca Raton, FL 33431
Telephone: 561-981-9988
Facsimile: 561-981-9980
**Counsel for Plaintiff**