UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CONSOLIDATED CASE NO. 00-6061-CIV-ZLOCH/SNOW

DR. PAUL ZIDEL, on behalf of himself and
all others similarly situated,

        Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY,
and COMMUNITY CARE NETWORK,
INC., d/b/a CCN,

        Defendants.
_____/

SALVATORE D. LARUSSO, D.C.
        Plaintiff,

v.                                     CASE NO:    01-8110

FLORIDA FARM BUREAU
        Defendant.
_____/

**DECLARATION OF CLASS COUNSEL IN SUPPORT OF
FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND
AN AWARD OF ATTORNEYS' FEES AND COSTS**

      1.      My name is Eric Lee and I am a partner in the law firm of Lee & Amtzis, P.L of Boca

Raton, Florida.  I am one of the lead Class Counsel in the fifteen consolidated class action cases

(Zidel v. Allstate Insurance Company, et al, Consolidated C.A. No. 00-6061) that had been pending

in this Court.  The last of these actions is the above-captioned, Larusso v. Florida Farm Bureau (the

"FFB" action).  I am submitting this Declaration in support of final approval of the FFB class action

Settlement Agreement and the Memorandum of Law in Support of Class Counsel's Application for

An Award of Attorney's Fees and Reimbursement of Expenses.

      2.      I have been Plaintiffs' counsel in the  FFB case and all the consolidated cases that

were previously settled and approved by this Court.  Although the FFB case is before the Court for

final approval of the Class Settlement, the historical background of the litigation in the consolidated cases is necessary to understand the tremendous effort of Class Counsel in prosecuting and managing the consolidated litigation which contributed substantially to the final settlement of the FFB case.  I served in the capacity of Class Counsel with the law firms of  Kopelman & Blankman, P.A. of Ft. Lauderdale, Florida, Gold & Coulson of Chicago, Illinois, and Phillips & Garcia, P.C. of Dartmouth, Massachusetts.

**Pre-Suit Investigation**

3.      Prior to filing any of the consolidated cases, Class Counsel conducted an intensive and thorough investigation of what they believed to be an industry-wide practice of Florida automobile insurers reducing medical expense claims based on managed care preferred provider organization ("PPO") discounts.  A practice Class Counsel has characterized throughout this litigation as a "Silent PPO."

To understand what a "Silent PPO" is, it is essential to first understand the concept of preferred provider organizations ("PPOs") in general.  In a typical PPO relationship, a group of medical providers agree to provide medical services to a group of subscribers of an insurance company at a lesser cost than the medical providers would have normally charged.  In exchange, the insurance carrier would attempt to "steer" its subscribers to the PPO's preferred providers through methods such as financial incentives, I.D. cards and provider lists.  See First Health Group Corp. v. United Payors & United Providers, Inc., 95 F.Supp.2d 845, 849-850 (N.D. Ill. 2000) (referring to Office of Insp. Gen., Office of Personnel Mngmt., Rep. No. 99-00-97-054, "Report on the Use of Silent PPOs in Fed. Employers Health Ben. Programs," 20-23 (1998)).  The Eleventh Circuit has recognized the term "steerage" as meaning the process of "actively encouraging plan participants to seek the services of the providers in the PPO by such means as financial incentives. . . .Steerage also occurs through communication efforts such as providing participants with a list of preferred

providers, a hotline to inform and refer participants to preferred providers, and issuing identification cards designed to inform providers that a patient is a participant eligible for the PPO discount." HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 983, 1002 (11th Cir. 2001). The term "Silent PPO" typically describes a payment scheme to obtain discounts for payors who are not entitled to them.   First Health Group Corp., 95 F.Supp.2d at 849-50.   In a Silent PPO arrangement, another PPO will sell its medical providers' names and discounted fee information, often without the providers' knowledge or permission, to a secondary market of vendors who then access the information on behalf of their payor clients, recalculating the provider's fees based on the discounted fee information.  Id.  In the context of the present case, the Plaintiffs all alleged that Allstate was wrongfully applying negotiated PPO discounted medical billing rates to PIP automobile insurance claims without the requisite "steerage" in violation of their preferred provider agreements ("PPAs") and in violation of Florida statutory law.

4.     The investigation had three facets: 1) obtaining and reviewing any state and national decisions on the PPO issue; 2) obtaining discovery documentation and deposition and hearing testimony from Florida state cases, some of which Florida Class Counsel, Kopelman & Blankman and myself were directly involved in; and 3) acquiring documentation such as PPO contracts and explanation of benefit forms from as many sources as possible throughout the state of Florida.  Also, prior to the filing of these consolidated cases, Class Counsel, Larry Kopleman, and myself had filed a state court class action seeking reimbursement for insureds whose medical providers Abalanced billed" them after an insurer's application of PPO discounts to their medical expense claims.  The term "balance billing" has been generally recognized as the practice of a health care provider charging or collecting from a medical insurance plan participant or Medicare beneficiary an amount in excess of the negotiated  health care contract rate or the Medicare reimbursement rate for medical services covered by the health insurance plan or by Medicare.  See e.g., Downhour v. Somani, 85

F.3d 261, 264 (6th Cir. 1996); see also, Garelick v. Sullivan, 987 F.2d 913, 915 (2d Cir. 1993). Information from the state court class action also served as part of the wealth of information reviewed by Class Counsel prior to filing the consolidated cases.  Finally, documents and deposition transcripts from similar class actions in Massachusetts state court were accumulated and reviewed as the Massachusetts cases involved some of the same PPOs, PPO contracts and claim re-pricing companies working with the automobile insurers in Florida. See Mitzan v. Medview Servs. et al., 10 Mass.L. Rep. 242 (1999) and Southeast Physical Therapy Servs., Inc. v. Health Care Value Mngmt., 11 Mass.L.Rep. 571 (2000).

5.      Also as part of our investigation, Class Counsel met with our clients and our clients' billing personnel to gain information "on the ground" about how the PPOs, insurers and claims facilitators, such as ADP, were processing medical expense claims on a day-to-day basis.

6.      The majority of the documents obtained in Class Counsel's investigation, as well as documents gained after the litigation was filed, were organized into an electronic document depository which Class Counsel could access online from their offices for the purposes of prosecuting the litigation.

7.      Class Counsel's research at the time revealed that no similar federal or state class actions challenging a "Silent PPO" discounting scheme on automobile medical expense claims had been filed anywhere in the country with the exception of two cases brought in Massachusetts by Class Counsel team member Phillips & Garcia.  The filing of the Florida federal court class actions based on the emerging "Silent PPO" discounting practice in the automobile industry was both novel in theory and scope.

8.      After this extensive pre-suit investigation of what amounted to the PPO discounting practices of the entire Florida automobile insurance industry, Class Counsel spent an enormous amount of time researching viable state and federal court causes of action before filing the first case.

After completing their research, and cognizant of the inherent difficulties of a federal court civil RICO case, Class Counsel also spent a large amount of time on the drafting and re-drafting of the model class action complaint which was used as the backbone for all of the complaints filed in these consolidated cases. Class Counsel's time and effort proved valuable since the Plaintiffs' RICO claims survived the Defendants' motions to dismiss.

**The FFB Filing and the Consolidated Litigation**

9.      On January 12, 2000, Class Counsel filed the first class action case against Allstate Insurance Company. From the start, the case was aggressively defended with Defendants Allstate and Medview Services, Inc. first moving to dismiss.

10.     After the Allstate filing, Class Counsel then filed the following cases:

1.   Brickell, et al v. Progressive Express Ins. Co., et al, C.A. No. 00-6649 (filed 5/12/00);
2.   Browner v. Allstate Indemnity Company, et al, C.A. No. 00-7163 (filed 8/16/00);
3.   LaRusso, et al v. Liberty Mutual Ins. Co., C.A. No. 00-7692 (filed 11/15/00);
4.   Larusso, et al v. Nationwide Ins. Co., C.A. No. 01-8108 (filed 2/7/01);
5.   Larusso, et al v. Florida Farm Bureau Casualty Ins. Co., C.A. No. 01-8110 (filed 2/7/01);
6.   Larusso ITT Hartford Life & Annuity Ins. Co., C.A. No. 01-8111 (filed 2/7/01);
7.   Ultra Open MRI Corp., et al v. Progressive American Ins. Co., C.A. No. 01-6776 (filed 5/8/01);
8.   Ultra Open MRI Corp., et al v. Deerbrook Ins. Co., C.A. No. .01-6777 (filed 5/8/01);
9.   Ultra Open MRI Corp., et al v. Prudential Property & Casualty Ins. Co., C.A. No. 01-6778 (filed 5/8/01);
10.  Ultra Open Mri Corporation, et al v. Fidelity & Casualty Co. of New York, et al, C.A. No. 01-6779 (filed 5/8/01);
11.  Ultra Open MRI Corp. v. Integon National Ins. Co., et al, C.A. No. 01-6780 (filed 5/8/01);
12.  The Chiropractic Centre, Inc., et al v. Superior Ins. Co., C.A. No. 01-6782 (filed 5/8/01);
13.  The Chiropractic Centre, Inc., et al v. Metropolitan Ins. Co., C.A. No. 01-6783 (filed 5/8/01);
14.  Mote Wellness & Rehab., Inc., et al v. American International Ins. Co., et al, C.A. No. 01-8549 (filed 6/14/01).

11.     The cases were consolidated by Judge Ferguson. Each filed case was aggressively defended. As evidenced by the individual and consolidated case dockets, prior to the ultimate appeal

of the cases, the Defendants filed scores of different motions to dismiss and/or to compel arbitration. Class Counsel opposed all of the Defendants' motions to dismiss and to compel arbitration and, with the exception of the dismissal of their Lanham Act counts, the Plaintiffs prevailed on each and every motion. In the two circumstances where Magistrate Judge Snow partially ruled against the Plaintiffs on the issue of arbitration, Class Counsel challenged the Magistrate Judge's recommendation and the District Court did not adopt the recommendation. All motions to dismiss and to compel arbitration were successfully defeated. Because of the Defendants' zealous defense of the cases, it took Class Counsel a tremendous amount of time and effort to defeat the Defendants' initial attempts to dismiss these consolidated cases.

12.     While opposing the Defendants' attempts to dismiss the cases, Class Counsel also went on the offensive by propounding discovery to the Defendants and subpoenaing non-party witnesses. Class Counsel served separate requests for production, interrogatories and admissions on all the defendants. Class Counsel also scheduled over 40 depositions of various witnesses and sent document and deposition subpoenas to many non-party witnesses.

13.     The vast majority of Class Counsels' discovery requests were opposed by the Defendants. The Defendants either objected to the discovery in its entirety or filed motions for protective orders seeking to limit or stop Class Counsel from taking discovery. Class Counsel opposed the Defendants' motions and in some circumstances filed motions to compel and for sanctions due to the defendants' failures to respond to discovery. Despite these efforts, the defendants were for the most part successful in preventing Class Counsel from conducting discovery as the District Court eventually stayed the cases.

14.     After not being able to obtain discovery from the Defendants through the normal discovery process, Class Counsel entered into settlement discussions with Defendants, ADP Medical Solutions, Inc ("ADP") and Beech Street Corporation ("Beech Street"), in an effort to discover

information about the Defendants' polices and practices.  In the majority of the consolidated cases, Beech Street was the PPO whose discounts were applied to automobile insurance medical expense claims by ADP.  ADP's business was to analyze and re-price claims for property and casualty insurers with its software programs.

15.     Class Counsel were able to negotiate a settlement with ADP and Beech Street under which they would produce any and all documents pertaining to the PPO discounting policies and practices of the relevant Defendant insurers.  Accordingly, ADP and Beech Street produced numerous boxes of documents to Class Counsel.

16.     As part of the settlement, Class Counsel also propounded specific data requests to ADP whereby ADP produced data on CD ROM which listed class members by name, address, tax identification number and also included specific claim by claim information per insurer by year. Finally, pursuant to the settlement, ADP and Beech Street agreed to a continuing obligation to provide additional documents and information as the litigation proceeds.

17.     Based on Class Counsels' experience, it would have taken years to obtain the same discovery in the formal litigation process.  Moreover, the documents and information obtained from ADP and Beech Street are confidential and therefore have not been disclosed to the defendants with the limited exception of data shared in settlement negotiations with the insurers.

18.     In addition to Class Counsels' efforts to obtain discovery from the vendor Defendants, Class Counsel also briefed and filed motions for class certification in all of the cases and were ready to argue the same had the Court set them for hearing.

19.     As an example of the intense nature of the litigation, after the District Court issued its Omnibus Order on September 28, 2001, in the two month period from October 3, 2001 through December 7, 2001, the defendants filed 49 motions, notices, requests and submissions seeking all manner of stays, modifications, reaffirmations, clarifications, vacations, re-considerations and

dismissals, all of which Class Counsel had to respond to in one form or another.

20.    As of October 30, 2002, the time at which the District Court appears to have issued its last Order prior to appeal, the consolidated docket had been consumed with some 886 entries over a two and a half year period.

21.    After losing their motions to compel arbitration and to dismiss in the trial court, the majority of the Defendants, with the exception of the Progressive defendants, appealed Judge Ferguson's decision to the Eleventh Circuit where the appeals are currently pending.

22.    All of the Defendant insurers in these consolidated cases have stopped taking discounts on automobile medical expense claims.

**The FFB Case**

23.    The FFB action was filed on February 7, 2001.  In his Class Action Complaint, Dr. Larusso alleged that he had entered into a "Preferred Provider Agreement" with MedView Services, Inc. under which he became a participating preferred medical provider.  MedView Services later merged with Community Care Network ("CCN").  Companies such as CCN are sometimes referred to as "brokers" or "managed care companies" in the health care industry.  CCN contracts with healthcare providers for the purpose of uniting healthcare providers with commercial payors to coordinate and arrange for the delivery of healthcare services to legitimate subscribers or members.

24.    Under the terms of his PPA, Dr. Larusso agreed to become a preferred provider and to accept reduced payments in exchange for his medical services to legitimate members.  Dr. Larusso alleged that the terms of his PPA did not allow CCN, as successor in interest to MedView, to permit automobile insurers or PPO discount brokers with automobile insurer clients access to his preferred provider rates.  Dr. Larusso agreed to discount his normal medical fees in return for increased patient volume, but for patients who were not part of the CCN PPO network, Dr. Larusso charged his normal fee without any discount.

25.     At the time he had executed the PPA, Dr. Larusso alleged that FFB did not offer a preferred provider endorsement under its Florida automobile insurance policies. He also alleged that FFB did not notify its insureds of the identities of any CCN preferred providers including Dr. Larusso, and, FFB did not offer insureds premium reductions as an economic incentive to use the preferred providers in CCN's network. Despite these facts, CCN subsequently allowed FFB access to all of CCN's preferred provider's confidential and proprietary discount rates, including Dr. Larusso's. FFB then improperly applied those discounts to all automobile insurance bills submitted to it.

26.     FFB subsequently filed a Motion to Dismiss in April 2001 (See D.E. #18). In its Motion, FFB attacked Dr. Larusso's RICO claims, and also urged that the state based causes of action be dismissed on various grounds. When FFB's Motion was filed, there were numerous other defensive motions attacking the claims that were pending in the related PPO cases.

27.     In November 2001, Magistrate Judge Snow issued an Order denying the Motion to Dismiss[4]. Ultimately, Magistrate Snow issued a detailed Report affecting all pending defensive motions that recommended denying them on the basis that any arbitration clauses contained in the related auto policies was not an independent contract between the parties and must be stricken as in violation of Florida's Constitution under Nationwide Mut. Fire Ins. Co. v. Pinnacle Medical, Inc., 753 So. 2d 55 (Fla. 2000) (Consolidated DE# 852). Subsequently, in September 2002, this Court approved and adopted Magistrate Snow's Report[5]. FFB, along with other related PPO Defendants, then appealed Judge Ferguson's decision to the Eleventh Circuit, where the cases were consolidated on appeal.

28.     After the appeal was filed and during the pendency of this lengthy litigation, Class

---

[4] In the Order, Magistrate Judge Snow noted that FFB's Motion to Dismiss had been orally denied by the Court at a May 14, 2001 hearing.

[5] In an October 28, 2002, Supplemental Order, the Court denied all motions to dismiss or to compel arbitration in the

Counsel began making attempts at settlement negotiations with all of the Defendant insurers. As this Court knows, these negotiations, although lengthy and difficult, resulted in a succession of class action settlements that were ultimately approved by this Court. During this time, Class Counsel also made various attempts at settlement negotiations with FFB to no avail. In fact, while the cases against the other auto insurance co-defendants were settled and approved by this Court, FFB maintained its position of not negotiating a settlement. Ultimately, as the last class action settlement against the Allstate Insurance Defendant was crafted and presented to the Court for approval, FFB began to entertain settlement negotiations. Over the course of months, Class Counsel conducted extensive settlement negotiations with counsel for FFB.

29.    Ultimately, after protracted discussions on both sides, and through continued perseverance and hard work, the current $1,500,000 settlement was finally reached between FFB and the Plaintiff in the Spring of 2007. Based on their extensive knowledge of the strengths and vulnerabilities of the claims against FFB and given the uncertainties of an appeal and/or ultimate trial of the action, Class Counsel believe that the Settlement represents an excellent result for the Class. Plaintiff and Class Counsel heartily recommend that the proposed Settlement be approved as fair, reasonable, adequate and in the best interests of the Class.

30.    During the pendency of these cases there were three appellate state court cases on the PPO discounting issue pending before the Second, Fourth and Fifth Florida District Courts of Appeal. These three decisions played a key role in analyzing the relative strengths and weaknesses of the Plaintiff's position and in determining the advisability of the proposed Settlement. In the Fifth District case, Nationwide Mut. Fire Ins. Co. v. Central Florida Physiatrists, P.A., 851 So.2d 762 (Fla. 5th DCA 2003), the Court of Appeals reasoned that the clear and precise language of Section

---

Consolidated Cases which included the FFB case (Consolidated DE# 881).

627.736(10) demonstrates the Legislature's intent that the availability of PPO benefits under a PIP auto insurance policy is subject to strict compliance with the terms of subsection (10). According to the Fifth District, Nationwide was required to first comply with the provisions of subsection (10) in order to take advantage of paying reduced PPO rates for payment of PIP claims. Id. at 766. Nationwide's failure to do so thus required it to pay the statutorily mandated 80% of the reasonable and necessary medical expenses incurred by its insured. Id.

In stark contrast, however, the Second and Fifth District Courts of Appeal ruled that the discounting practices of auto insurers did not violate the Florida Statute. See Nationwide Mut. Ins. Co. V. Dennis M. Jewell, D.C., P.A., 862 So.2d 79 (Fla. 2d DCA 2003) and Allstate Ins. Co. v. Holy Cross Hop., Inc., 895 So. 2d 1241 (Fla. 4th DCA 2005).

All three cases were appealed to the Florida Supreme Court. After the FFB case was settled and the settlement was preliminarily approved by this Court, the Florida Supreme Court in a July 2007 decision held that auto insurers that utilized preferred provider contractual rates, but that had not issued PPO auto insurance endorsements could do so without complying with the requirements of the Florida PIP statute. See Allstate Ins. Co. v. Holy Cross Hosp., Inc., 32 Fla.L.Weekly S. 453 (July 12, 2007). The Court reasoned that the effect of such contractual arrangements was to predetermine what constituted a "reasonable" medical expense for a covered service. Id.

Although the Florida Supreme Court's decision is not final as of the submission of this Declaration pending the expiration of time to file motions for rehearing, in light of this current development the FFB Settlement represents a major victory for the Class. Given that the proposed Settlement avoids the harsh outcome of the Supreme Court's ruling while offering to reimburse the Class Members approximately 80% of their claimed losses under the Maximum Claim Amount as calculated in the Settlement Agreement, it is clear that potential litigation risks outweigh the rewards of the Settlement.

31.    Accordingly, Class Counsel were able to negotiate benefits for the Class where claims would be paid at approximately 80% of the PPO discounted amount in accordance with that Class Member's Maximum Claim Amount as calculated under the Settlement Agreement, and were also able to negotiate the payment of attorney's fees and costs and the costs of settlement administration outside and separate from the Class Fund of $1,200,000. Moreover, the Settlement provided for direct mail notice to Class Members with a minimal proof of claim process where Class Members would not be required to submit any documentation besides the basic information requested on the claim form.

32.    Class Counsel have not yet received a fee for prosecuting the FFB case. Class Counsel have spent over approximately 12,200 hours on the consolidated cases for a total lodestar of over $3.4 million. With respect to the FFB case, Class Counsel have spent approximately 1,446.1 hours prosecuting the case for a total lodestar of $428,470.13. Based on a requested award of legal fees of $300,000, there would be a "negative multiplier" using a lodestar approach to calculating attorneys' fees.

33.    Based on Class Counsels' experience, negotiating a class action settlement where Class Members will receive approximately 80% of their actual allowed claims in accordance with the Maximum Claim Amount calculation without an evidentiary proof of claim process is a tremendous benefit to the Class, especially given the risks associated with the age of the claims, the recent decision by the Florida Supreme Court and the difficulties in certifying and trying a complex RICO case. At all times, Class Counsel maintained and advocated for the interests of the Class, and as a result, negotiated a settlement that far exceeds the standard class benefits in typical class action cases.

ERIC LEE